SCHINDEL, FARMAN & LIPSIUS LLP
14 Penn Plaza Suite 500
(225 West 34th Street)
New York, New York 10122
Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Gregory V. Serio, Superintendent of Insurance of    :
the State of New York, as Rehabilitator of    :
FRONTIER INSURANCE COMPANY, and as    :
Assignee of PLATINUM INDEMNITY, LTD,    :    **Case No.: 04 CV 3361**
    :    Hon. Richard M. Berman
          Plaintiff,    :

    v.    :    **ANSWER**

DWIGHT HALVORSON INSURANCE    :
SERVICES, INC d/b/a F.S.I.M. INSURANCE    :
SERVICES and FOOD SERVICES    :
INSURANCE MANAGERS, INC.,    :

          Defendant.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Defendants Dwight Halvorson Insurance Services, Inc. ("DHIS") and Food Service

Insurance Managers, Inc. (FSIM"), as and for their answer to the claims asserted herein by

Gregory V. Serio, Superintendent of Insurance of the State of New York, as Rehabilitator of

of Frontier Insurance Company ("Frontier") and by Frontier as assignee of Platinum Indemnity

Company, LTD, ("Platinum"), allege as follows:

<u>**NATURE OF THE ACTION**</u>

    1.    Deny, except state this matter concerns a workers compensation insurance

program related to the food services industry in California and in which the parties herein participated as insurers, reinsurers, agents and/or representatives.

2.    Admit that DHIS admits that it entered into a Limited Agency Agreement ("Agency Agreement") with Frontier effective January 1, 1998, and refers the Court to that Agency Agreement for its terms and conditions, and otherwise deny the allegations in paragraph "2". A copy of the Agency Agreement is annexed hereto as **Exhibit A.**

3.    Deny the allegations contained in paragraph "3" of the complaint.

4.    Deny the allegations contained in paragraph "4" of the complaint.

5.    Deny the allegations contained in paragraph "5" of the complaint.

6.    Deny the allegations contained in paragraph "6" of the complaint to the extent they claim defendants owe monies to plaintiffs and otherwise deny knowledge or information sufficient to form a belief as to the assertions of the "court authorized assignment" alleged.

## JURISDICTION AND VENUE

7.    Defendants deny the allegations contained in paragraph "7" of the complaint except admit that the matter in controversy is between citizens of different states.

8.    Deny the allegations contained in paragraph "8" of the complaint.

## THE PARTIES

9.    Admit, upon information and belief, the allegations in paragraph "9" of the complaint.

10.    Deny knowledge or information sufficient to form a belief as to truth of the

allegations contained in paragraph "10" of the complaint.

11.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "11" of the complaint.

12.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "12" of the complaint.

13.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "13" of the complaint.

14.    Deny knowledge or information sufficient to form a belief as to the allegations contained in paragraph "14" of the complaint.

15.    Admit the allegations contained in paragraph "15".

16.    Deny the allegations contained in paragraph "16" of the complaint.

17.    Admit the allegations contained in paragraph "17" of the complaint.

18.    Deny the allegations contained in paragraph "18" of the complaint.

19.    Deny.  As of October 2003, DHIS and FSIM maintain their place of business at 3260 Penryn Road, Loomis California.

## RESPONSE TO FACTUAL BACKGROUND

20.    Deny the allegations contained in paragraph "20" of the complaint.

21.    Deny, except state that DHIS procures policies of insurance for growers, shippers, packers, distributors and processors of food products.

22.    Deny the allegations contained in paragraph "22" of the complaint, but state that Dwight J. Halvorson, and others, formed FSIM in 1996 and that FSIM is involved in

Page 3 of  20

administering workers compensation related matters for agribusiness and food-related industries.

23.    Deny the allegations contained in paragraph "23" of the complaint, but state that FSIM is involved in administering workers compensation related matters for agribusiness and food-related industries.

24.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "24" of the complaint.

25.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "25" of the complaint.

26.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "26" of the complaint.

27.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "27" of the complaint.

28.    Deny the allegations contained in paragraph "28" of the complaint to the extent they refer to any actions of defendants and otherwise deny knowledge or information sufficient to form a belief as to the truth of the further allegations contained in paragraph "28" of the complaint.

29.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "29" of the complaint.

30.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "30" of the complaint.

31    Deny knowledge or information sufficient to form a belief as to the truth of the

allegations contained in paragraph "31" of the complaint.

32.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "32" of the complaint.

33.    Deny the allegations contained in paragraph "33" of the complaint, except refer the Court to the contracts, agreements and policies between the parties herein and otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "33" of the complaint.

34.    Admit the allegations contained in paragraph "34" of the complaint, upon information and belief.

35.    Deny the allegations contained in paragraph "35" of the complaint.

36.    Deny the allegations contained in paragraph "36" of the complaint.

37.    Deny the allegations contained in paragraph "37" of the complaint.

38.    Admit the allegations contained in paragraph "38" of the complaint.

39.    Defendants admit that Frontier and DHIS entered into a Limited Agency Agreement effective January 1, 1998 and refer to that Agency Agreement for its terms and conditions, and otherwise deny the allegations contained in paragraph "39" of the complaint to the extent those allegations are not consistent with the terms of that Agency Agreement.

40.    Defendants admit that Frontier and DHIS entered into a Limited Agency Agreement effective January 1, 1998 and refer to that Agency Agreement for its terms and conditions, and otherwise deny the allegations contained in paragraph "40" of the complaint to the extent those allegations are not consistent with the terms of that Agency Agreement.

41.    Defendants admit that Frontier and DHIS entered into a Limited Agency

Agreement effective January 1, 1998 and refer to that Agency Agreement for its terms and conditions, and otherwise deny the allegations contained in paragraph "41" of the complaint to the extent those allegations are not consistent with the terms of that Agency Agreement.

42.    Defendants admit that Frontier and DHIS entered into a Limited Agency Agreement effective January 1, 1998 and refer to that Agency Agreement for its terms and conditions, and otherwise deny the allegations contained in paragraph "42" of the complaint to the extent those allegations are not consistent with the terms of that Agency Agreement.

43.    Defendants admit that Frontier and DHIS entered into a Limited Agency Agreement effective January 1, 1998 and refer to that Agency Agreement for its terms and conditions, and otherwise deny the allegations contained in paragraph "43" of the complaint to the extent those allegations are not consistent with the terms of that Agency Agreement.

44.    Defendants admit that Frontier and DHIS entered into a Limited Agency Agreement effective January 1, 1998 and refer to that Agency Agreement for its terms and conditions, and otherwise deny the allegations contained in paragraph "44" of the complaint to the extent those allegations are not consistent with the terms of that Agency Agreement.

45.    Defendants admit that Frontier and DHIS entered into a Limited Agency Agreement effective January 1, 1998 and refer to that Agency Agreement for its terms and conditions, and otherwise deny the allegations contained in paragraph "45" of the complaint to the extent those allegations are not consistent with the terms of that Agency Agreement.

46.    Defendants admit that Frontier and DHIS entered into a Limited Agency Agreement effective January 1, 1998 and refer to that Agency Agreement for its terms and conditions, and otherwise deny the allegations contained in paragraph "46" of the complaint to

Page 6 of  20

the extent those allegations are not consistent with the terms of that Agency Agreement.

47.    Defendants admit that Frontier and DHIS entered into a Limited Agency Agreement effective January 1, 1998 and refer to that Agency Agreement for its terms and conditions, and otherwise deny the allegations contained in paragraph "47" of the complaint to the extent those allegations are not consistent with the terms of that Agency Agreement.

48.    Defendants admit that the Limited Agency Agreement was amended effective January 1, 1999, and refer to the Agency Agreement and its amendments for their terms and conditions, and otherwise deny the allegations contained in paragraph "48" of the complaint to the extent those allegations are not consistent with the terms of that Agency Agreement.

49.    Defendants admit that Frontier and DHIS entered into a Limited Agency Agreement effective January 1, 1998 and refer to that Agency Agreement for its terms and conditions, and otherwise deny the allegations contained in paragraph "49" of the complaint to the extent those allegations are not consistent with the terms of that Agency Agreement.

50.    Admit that FSIM and Platinum entered into a Subscription and Shareholders Agreement ("Shareholders Agreement") on or about January 16, 1998. A true copy of that "Shareholders Agreement" is annexed hereto as **Exhibit B**.

51.    Admit that FSIM and Platinum entered into a Subscription and Shareholders Agreement on or about January 16, 1998, and refer to that Shareholders Agreement for its terms and conditions, and otherwise deny the allegations contained in paragraph "51" of the complaint to the extent those allegations are not consistent with the terms of that Shareholders Agreement.

52.    Admit that FSIM and Platinum entered into a Subscription and Shareholders Agreement on or about January 16, 1998, and refer to that Shareholders Agreement for its terms

and conditions, and otherwise deny the allegations contained in paragraph "52" of the complaint to the extent those allegations are not consistent with the terms of that Shareholders Agreement.

53.    Admit that FSIM and Platinum entered into a Subscription and Shareholders Agreement on or about January 16, 1998, and refer to that Shareholders Agreement for its terms and conditions, and otherwise deny the allegations contained in paragraph "53" of the complaint to the extent those allegations are not consistent with the terms of that Shareholders Agreement.

54.    Admit that on or about November 8, 2000, FSIM executed a document titled "Promissory Note" and refer to that document for its specific terms, and otherwise deny the allegations contained in paragraph "54" of the complaint and deny that FSIM has any obligations under the document titled "Promissory Note."  A copy of that document is annexed hereto as **Exhibit C**.

55.    Deny the allegations contained in paragraph "55" of the complaint but state that FSIM believed the document titled "Promissory Note" was to secure its obligations under the Shareholders Agreement.

56.    Admit that on or about November 8, 2000, FSIM executed a document titled "Promissory Note" and refer to that document for its specific terms, and otherwise deny the allegations contained in paragraph "56" of the complaint and deny that FSIM has any obligations under the document titled "Promissory Note."

57.    Admit that on or about November 8, 2000, FSIM executed a document titled "Promissory Note" and refer to that document for its specific terms, and otherwise deny the allegations contained in paragraph "57" of the complaint and deny that FSIM has any obligations under the document titled "Promissory Note".

58.     Admit that on or about November 8, 2000, FSIM executed a document titled "Promissory Note" and refer to that document for its specific terms, and otherwise deny the allegations contained in paragraph "58" of the complaint and deny that FSIM has any obligations under the document titled "Promissory Note".

59.     Admit that on or about November 8, 2000, FSIM executed a document titled "Promissory Note" and refer to that document for its specific terms, and otherwise deny the allegations contained in paragraph "59" of the complaint and deny that FSIM has any obligations under the document titled "Promissory Note".

60.     Admit that on or about November 10, 1999 Frontier notified DHIS that it would terminate the Agency Agreement.

61.     Admit that Frontier terminated the Agency Agreement effective January 1, 2000.

62.     Deny the allegation that DHIS did not comply with the "underwriting guidelines and other provisions of the" Agency Agreement and otherwise deny knowledge or information sufficient to form a belief as to the further allegations contained in paragraph "62" of the complaint.

63.     Admit that Frontier conducted extensive audits of FSIM's records related to the Agency Agreement and otherwise deny the allegations in paragraph "63" of the complaint.

64.     Deny the allegations contained in paragraph "64" of the complaint.

65.     FSIM admits that Frontier and/or its representatives demanded various sums of money from FSIM, however FSIM denies it owes any monies to Frontier and denies it owes any payments under the terms of the Agency Agreement and otherwise denies the further allegations in paragraph "65" of the complaint.

Page 9 of  20



66.    FSIM admits that it made seven payments of $21,000.00 each to Platinum but otherwise denies the further allegations contained in paragraph "66" of the complaint and specifically denies that it owes any monies to Platinum.

67.    Deny the allegations contained in paragraph "67" of the complaint.

68.    Deny the allegations contained in paragraph "68" of the complaint.

69.    Deny the allegations contained in paragraph "69" of the complaint.

70.    Deny the allegations contained in paragraph "70" of the complaint.

71.    Deny knowledge or information sufficient to form a belief as to the allegations contained in paragraph "71" of the complaint.

72.    Deny knowledge or information sufficient to form a belief as to the allegations contained in paragraph "72" of the complaint.

73.    Deny knowledge or information sufficient to form a belief as to the allegations contained in paragraph "73" of the complaint.

74.    Deny knowledge or information sufficient to form a belief as to the allegations contained in paragraph "74" of the complaint.

75.    Deny knowledge or information sufficient to form a belief as to the allegations contained in paragraph "75" of the complaint.

76.    Deny knowledge or information sufficient to form a belief as to the allegations contained in paragraph "76" of the complaint.

77.    Deny knowledge or information sufficient to form a belief as to the allegations contained in paragraph "77" of the complaint.

78.    Deny knowledge or information sufficient to form a belief as to the allegations

Page 10 of 20

conditions, and otherwise deny the allegations contained in paragraph "86" of the complaint to the extent those allegations are not consistent with the terms of that Agency Agreement and refer questions of law to the court.

87.   Deny the allegations contained in paragraph "87" of the complaint.

88.   Deny the allegations contained in paragraph "88" of the complaint.

## RESPONDING TO COUNT III
### (Breach of Fiduciary Duty -DHIS)

89.   As and for their response to the allegations contained in paragraph "89" of the complaint, defendants repeat their responses above to the allegations set out in paragraphs "1" through "88" of the complaint.

90.   Defendants admit that Frontier and DHIS entered into a Limited Agency Agreement effective January 1, 1998 and refer to that Agency Agreement for its terms and conditions, and otherwise deny the allegations contained in paragraph "90" of the complaint to the extent those allegations are not consistent with the terms of that Agency Agreement and refer questions of law to the court.

91.   Deny the allegations contained in paragraph "91" of the complaint.

92.   Deny the allegations contained in paragraph "92" of the complaint.

## RESPONDING TO COUNT IV
### (Breach of Fiduciary Duty -FSIM)

93.   As and for their response to the allegations contained in paragraph "93" of the complaint, defendants repeat their responses above to the allegations set out in paragraphs "1"

Page 12 of 20

through "92" of the complaint.

94.    Deny the allegations contained in paragraph "94" of the complaint.

95.    Deny the allegations contained in paragraph "95" of the complaint.

96.    Deny the allegations contained in paragraph "96" of the complaint.

97.    Deny that Platinum has any rights against FSIM and otherwise deny knowledge or information to form a belief as to the allegations contained in paragraph "97" of the complaint.

98.    Deny the allegations contained in paragraph "98" of the complaint.

### RESPONDING TO COUNT V
### (Breach of Contract -FSIM)

99.    As and for their response to the allegations contained in paragraph "99" of the complaint, defendants repeat their responses above to the allegations set out in paragraphs "1" through "98" of the complaint.

100.    Admit that FSIM and Platinum entered into a Subscription and Shareholders Agreement on or about January 16, 1998, and refer to that Shareholders Agreement for its terms and conditions, and refer questions of law to the Court.

101.    Deny the allegations contained in paragraph "101" of the complaint.

102.    Deny the allegations contained in paragraph "102" of the complaint.

103.    Deny the allegations contained in paragraph "103" of the complaint.

104.    Deny that Platinum has any rights against FSIM and otherwise deny knowledge or information to form a belief as to the allegations contained in paragraph "104" of the

complaint.

105.    Deny the allegations contained in paragraph "105" of the complaint.

## AFFIRMATIVE DEFENSES TO PLAINTIFF'S CLAIMS

**General Allegations**:

106.    The Agency Agreement between Frontier and DHIS (Exhibit A at page 12) provides that disagreements under the Agency Agreement shall be first submitted to mediation.

107.    The Subscription Agreement between Platinum and FSIM (Exhibit B at page 5) provides that it shall be governed by the courts and laws of Bermuda.

108.    The document titled "Promissory Note" (Exhibit C at paragraph G), provides that it is governed by Bermuda law and that suit may be brought in a Bermuda court.

109.    DHIS demanded mediation, pursuant to the Agency Agreement, by letter dated July 2, 2001. A copy of that letter is annexed hereto as **Exhibit D**.

110.    Frontier has failed and/or refused to respond to DHIS's demand for mediation.

111.    The Subscription Agreement (Exhibit B at page 5) provides that any dispute concerning the Subscription Agreement shall be submitted to arbitration.

112.    The Subscription Agreement further provides that the arbitration shall take place in Bermuda.

113.    Under the terms of the Subscription Agreement, FSIM is entitled to receive the "investment income earned on the capital provided to" Platinum.

114.    Under the terms of the Subscription Agreement, FSIM is entitled to a an

Page 14 of 20

forward to Platinum, the "additional capital contribution equal to 4% of the gross written premiums under the program" that was forwarded by FSIM to Frontier.

124.    Platinum further represented that because Frontier it did not receive the "additional capital contribution equal to 4% of the gross written premiums under the program," Platinum was undercapitalized in the amount of $469,515.00, that Platinum was at risk of insolvency and that the regulatory authorities in Bermuda would look to FSIM for the additional capital.

125.    Platinum presented the document titled "Promissory Note" to FSIM for its signature.

126.    FSIM believed it was obligated to pay the $469,515.00 to Platinum.

127.    FSIM executed the document based on the representations of Platinum.

128.    FSIM made seven payments of $21,000 each to Platinum under the "Promissory Note."

129.    FSIM also continued to forward to Frontier,  the "additional capital contribution equal to 4% of the gross written premiums under the program".

130.    In 2001, After making the seven payments of $21,000 each to Platinum, FSIM realized it did not owe the $469,515.00 as represented by Platinum. FSIM notified Platinum that it would make no further payments towards the $469,515.00 claimed and made no further payments.

131.    Platinum accepted FSIM's explanation and made no request to FSIM for any payment under the "Promissory Note."

132.    Prior to Frontier's cancellation of the program, FSIM provided certain loss

Page 16 of  20

control services to Frontier.

133.    The value of those loss control services exceeded $60,000.

134.    Frontier has failed and/or refused to pay for those loss control services.

135.    Prior to the cancellation of the program, at Frontier's request, FSIM provided additional services to Frontier which included preparing OSHA filing with the California regulatory authorities on behalf of Frontier.

136.    Frontier has failed and/or refused to pay for those additional services.

137.    The value of those additional services is to be determined at trial.


**FIRST AFFIRMATIVE DEFENSE**

138.    The Court lacks jurisdiction over the matters asserted in the complaint. The Agency Agreements at issue provides for mediation of disputes. The Shareholders Agreement at issue provides for arbitration of disputes in Bermuda pursuant to Bermuda laws. The "Promissory Note" at issue also provides for the application of Bermuda and for lawsuits in Bermuda courts.

**SECOND AFFIRMATIVE DEFENSE**

139.    This is an improper venue for this matter.  The matters alleged as the basis of the complaint did not take place in the district in which this action is brought or in the State of New York. Additionally, the Shareholders Agreement and the "Promissory Note" provide for the application of Bermuda law.

**THIRD AFFIRMATIVE DEFENSE**

140.    Frontier breached the terms of the Agency Agreement by refusing to honor the

Page 17 of  20

demand for mediation.

### FOURTH AFFIRMATIVE DEFENSE

141.    FSIM was induced to execute the document titled "Promissory Note" based on the misrepresentation of Platinum and/or Frontier.  Accordingly, that "Promissory Note" is not enforceable.

### FIFTH AFFIRMATIVE DEFENSE

142.    The claimed "Promissory Note" is unenforceable as no consideration was provided to FSIM  for that "Promissory Note".

### SIXTH AFFIRMATIVE DEFENSE

143.    Frontier is barred from any attempt to recover on the "Promissory Note" as Frontier is not a holder in due course of that "Promissory Note."

### SEVENTH AFFIRMATIVE DEFENSE

144.    Frontier is barred from any attempt to recover on the "Promissory Note" as the amounts claimed under that  "Promissory Note" were previously paid by FSIM to Frontier.

### EIGHTH AFFIRMATIVE DEFENSE

145.    Frontier is barred from any recovery herein by the doctrine of  "un clean hands".

### NINTH AFFIRMATIVE DEFENSE

146.    The assignment of the "Promissory Note" by Platinum to Frontier effected a satisfaction of its terms.

### TENTH AFFIRMATIVE DEFENSE

147.    Platinum waived any rights it may have had under the "Promissory Note".

Page 18 of  20

**ELEVENTH AFFIRMATIVE DEFENSE**

148.    Recovery under the "Promissory Note" is barred by the doctrine of laches.


**TWELFTH AFFIRMATIVE DEFENSE**

149.    Plaintiff's claims herein, if any, shall be reduced by the amounts owed to defendants by Frontier and by the amount of the payments made by FSIM to Platinum under the terms of the "Promissory Note."


**THIRTEENTH AFFIRMATIVE DEFENSE**

150.    Plaintiff's claims herein, if any, shall be reduced by the amounts owed to defendants by Frontier and by the amount of the payments made by FSIM to Frontier on behalf of Platinum.

**FOURTEENTH AFFIRMATIVE DEFENSE**

151.    Frontier and/or Platinum failed and or refused to mitigate their claimed damages.

**FIFTEENTH AFFIRMATIVE DEFENSE**

152.    Platinum failed and/or refused to provide FSIM with the "investment income earned on the capital provided to Platinum" and any recovery herein from FSIM should be offset by those amounts owed by Platinum to FSIM.

**SIXTEENTH AFFIRMATIVE DEFENSE**

153.    Frontier improperly withheld funds it collected on behalf of Platinum, and as a result FSIM paid the sum of $147,000 to Platinum. Frontier was unjustly enriched by that $147,000 and any recovery herein should be reduced by that amount.

Page 19 of  20

**SEVENTEENTH AFFIRMATIVE DEFENSE**

154.    The claims herein and barred, in whole or in part, by the applicable statute of limitations.

WHEREFORE, Defenfddants Dwight Halvorson Insurance Services, Inc. ("DHIS") and Food Service Insurance Managers, Inc. (FSIM") demand judgment dismissing the complaint herein, along with such other further relief as this Court may deem just and proper.

Dated:    June 25, 2004
          New York, New York

SCHINDEL, FARMAN & LIPSIUS LLP
Attorneys for Defendants Dwight Halvorson
Insurance Services, Inc., and Food Service
Insurance Managers, Inc.

By: _____
    Laurence J. Rabinovich  (LR 8616)
    Lorienton N.A. Palmer (LP 3934)
    14 Penn Plaza -Suite 500
    (225 West 34th Street)
    New York, New York 10122
    (212) 563-1710
    File No. 3090/0001

TO:    ENTWISTLE & CAPPUCCI, LLP
       299 Park Avenue - 14th Floor
       New York, NY 10171
       (212) 894-7200
       Attn:  William S. Gyves, Esq.

Page 20 of  20

Exhibit A

# FRONTIER INSURANCE COMPANY

## LIMITED AGENCY AGREEMENT

This Limited Agency Agreement ("Agreement") is entered into by and between FRONTIER INSURANCE COMPANY, an insurance company domiciled in New York ("Company")(and/or their subsidiary companies as required), and Dwight Halvorson Insurance Services, a California Corporation ("Agent").

## COMPANY AND AGENT HEREBY AGREE AS FOLLOWS:

### ARTICLE 1 - APPOINTMENT

1.1   Company hereby appoints Agent to act on behalf of Company with the authority and subject to the terms and conditions hereinafter set forth, and Agent hereby accepts such appointment.

1.2   Company's appointment of Agent hereby shall not restrict in any manner Company's right to appoint other producers and agents.

### ARTICLE 2 - DEFINITIONS

2.1   "Sub-producer" shall mean any insurance broker, insurance agent or other person or entity properly licensed to produce insurance and through which Policies may be produced to Agent.

2.2   "Effective Date" shall mean 12:01 a.m., January 1, 1998.

2.3   "Policy" shall mean any Policy, contract, coverage slip, endorsement, binder, certificate, proposal for insurance or other document which binds Company to insurance or coverage issued or renewed by Company on or after the Effective Date through Agent and shall also include any rewrite, renewal or extension (whether before or after termination of this Agreement) through Agent required by law.

### ARTICLE 3 - AUTHORITY OF AGENT

3.1   Agent is hereby authorized and assumes the duty to act on behalf of Company as a casualty broker-Agent. All actions and inactions of Agent under this authorization

12/29/97                                  1

shall be subject to the ultimate authority of Company, and Company from time to time shall be entitled to place reasonable restrictions on Agent's authority; provided such restrictions are in writing.

3.2    Agent is hereby authorized, subject to the terms of Article 11, requiring prior written permission and applicable law, to advertise and solicit with respect to Company and the business to be produced through the Agent hereunder.

3.3    Agent is hereby authorized, subject to underwriting guidelines established and rates set by Company from time to time and applicable law to accept applications, to quote, bind and decline coverages and to conduct audits ("Underwrite") on behalf of Company for all classes or lines of insurance set forth in Addendum No. 1, Schedule of Business prepared by Company and attached hereto ("Schedule of Business"); provided Agent shall use applications and quote, bind and decline forms approved by Company or where unregulated business, the generally accepted market forms, and provided additionally that except where specifically agreed in writing Agent shall have no authority to bind reinsurance or retrocessions on behalf of Company. The Schedule of Business shall provide the authority of Agent with regard to, but not limited to, underwriting guidelines, the types of risks which may be written, maximum limits of liability, territorial limitations, maximum Policy periods and projected annual premium volume. The Schedule of Business may be amended from time to time as deemed appropriate by Company, provided such amendments are in writing.

3.4    Agent is hereby authorized, as a trustee for Company, and subject to applicable law, to print, maintain, execute and issue Policies and to assemble, countersign and issue Policies.

3.5    Agent is hereby authorized, subject to applicable law, Policy provisions and Company's ultimate authority, to cancel and renew Policies underwritten or delivered by Agent hereunder.

3.6    Agent shall be responsible to the Insured while this Agreement continues in effect for the renewal or non-renewal of any Policy underwritten or delivered by Agent hereunder and shall in a timely manner and pursuant to applicable statutes and regulations communicate any renewal quote or notice of non-renewal to the insured to preclude the extension of coverage beyond the expiration date of the Policy.

3.7    Agent is hereby authorized, as a trustee for Company, and subject to the applicable provisions of this Agreement, to receive and receipt for premiums and fees, to pay return premiums, to pay adjustments and to retain and pay commissions out of such collected premiums, subject to the provisions of this Agreement and applicable statutes and regulations.

12/29/97                                    2

3.8     With the exception of Food Services Insurance Managers, Inc., **Agent** shall not authorize any sub-producer or other person or entity to quote, bind, or decline coverages or otherwise underwrite on behalf of **Company** without the prior written consent of the **Company**.

3.9     The original sources of some or all business under this Agreement shall be sub-producers. **Agent** is hereby authorized to enter into agreements with such sub-producers with respect to the business hereunder; provided **Agent** shall have no authority to obligate **Company** in any manner to such sub-producers and all agreements with such sub-producers shall provide that the sub-producers shall have no claims or causes of action against **Company** except for reckless conduct or willful misconduct of **Company**. Additionally, **Agent** shall be responsible for verifying the proper licensing of such sub-producers, and if any liabilities are incurred by **Company** as the result of **Agent's** accepting business from unlicensed or improperly licensed sub-producers, **Agent** shall indemnify and hold **Company** harmless from, and reimburse **Company** for, any and all such liabilities, including but not limited to fines, court costs and expenses, legal fees and travel expenses.

3.10    **Agent** may accept as a trustee for **Company** premium financed by premium finance companies, upon terms and conditions approved in writing by **Company**.

3.11    **Agent** shall not process, adjust, settle or pay any claims under Policies underwritten or delivered by **Agent** pursuant to this Agreement, nor shall **Agent** commit **Company** to pay any claim. Should **Agent** become aware, or have delivered to it any notice of claim or claims, **Agent** immediately shall forward such notice of claim or claims to **Company** or its designee in a manner designated by **Company**.

## ARTICLE 4 - COMPENSATION

4.1     Except as otherwise specified on the Schedule of Business, **Company** shall allow **Agent** a gross commission of twelve (12%) of all gross written premium collected for Policies underwritten or delivered by **Agent** hereunder. This commission arrangement shall be reviewed from time to time and shall be subject to adjustment at the discretion of the Company on a prospective basis and upon at least sixty (60) days prior written notice to the **Agent**.

4.2     The **Agent** is responsible for all commissions due to sub-producers and others with respect to Policies written or delivered hereunder. The **Company** shall not be responsible to pay sub-producers.

4.3     **Agent** shall charge and collect for all Policy and other fees required with respect

12/29/97                                    3

to business produced hereunder to the extent such charges are permitted by law.

## ARTICLE 5 - ACCOUNTING, RECORDS AND EDP

5.1    Agent shall provide and maintain in forms reasonably acceptable to Company complete and accurate books, records, dailies and correspondence necessary to determine the amount of liability of Company and the amount of premium and expense derived from business written hereunder.

5.2    The omission of any item from any statement, or report applicable to the business hereunder shall not affect the responsibility of either party to account for and pay all amounts due the other party hereunder, nor shall it prejudice the rights of either party to collect all such amounts due from the other party.

5.3    Agent shall prepare separate, itemized, invoices and/or monthly statements for each sub-producer for the business produced by the sub-producer hereunder, and furnish the sub-producers IRS Forms 1099 each year if and when required.

5.4    All of Agent's records applicable to the business hereunder shall be kept in such manner and form as are generally recognized as acceptable in the insurance industry or as reasonably may be required by Company. Such records shall be maintained for five (5) years or for any longer retention period required by law or Company.

5.5    All records in Agent's possession or control and applicable to the business hereunder shall be made available for inspection, copying and/or audit at reasonable times by Company or its Agents, or any governmental authority with the right to inspect.

5.6    All records in Agent's possession or control and applicable to the business hereunder shall be made available, upon prior written request and at the Company's cost, for inspection at any office of Company, should such inspection be requested by insurance department or other governmental authorities.

5.7    Agent shall immediately forward upon request to Company or Company's Agent's exact, as written, copies of all applications, Policies and reports underwritten or delivered by Agent or used by Agent hereunder, including all other evidence of insurance written, modified or terminated.

5.8    Agent shall be solely responsible for and shall keep accurate records of all Policy supplies assigned to Agent and shall account to Company, upon Company's request, for all outstanding and unused Policy supplies. If canceled or terminated Policy supplies are unavailable, Agent shall forward or cause to be forwarded to

12/29/97                                    4

Company properly executed lost Policy receipts therefor. Upon termination of this Agreement, Agent shall promptly dispose of all Policy supplies and other property of the Company as directed by the Company.

5.9     Company shall be entitled to conduct examinations of Agent's operations at any reasonable time. Such examinations shall be conducted in reasonable manners and may cover such matters as required or permitted by law and as are relevant to the business done hereunder.

5.10    Agent shall furnish Company, with any additional information and reports as reasonably requested by Company and necessary to complete Company's quarterly and annual statements filed with regulatory authorities or otherwise satisfy regulatory requirements.

5.11    Agent shall annually furnish Company, within ninety (90) days following the end of the Agent's fiscal year, current (audited, if available) financial statements of Agent. These financial statements shall include, but not be limited to, profit and loss, balance sheet and cash flow statements.

## ARTICLE 6 - ACCOUNT CURRENT

6.1     The Agent shall, not later than fifteen (15) days after the end of each month, prepare and forward to the Company a detailed and itemized statement of account of all premiums written and premium adjustments made (whether additional or return) within the month for which the statement (herein referred to as the "Account Current") is rendered. However, the Company shall have the privilege, exercisable at its option, of preparing the Account Current.

6.2     The Agent shall pay the balance, if any, due the Company as shown on each Account Current within forty-five (45) days following the end of the month for which the Account Current was rendered. Upon rendition by the Company of invoices or statements adjusting or correcting any Account Current, the Agent shall pay to the Company forthwith the balance, if any, shown to be due thereon. Agent shall be responsible to pay written premium to the Company, whether or not premium has been paid by any insured or sub-producer, it being understood that Agent assumes the credit risk should it bind insurance without receiving premium.

6.3     The Account Current between the parties prepared and forwarded by the Company in accordance with the above, or invoices, statements or adjustments on any Account Current transmitted to the Agent by the Company shall be binding and conclusive on the Agent unless the Agent, within ten (10) days from receipt of such Account Current, invoice, statement or adjustment shall send to the Company a

12/29/97                                          5

written itemization of objections thereto.

6.4    The provisions of this Article, which are binding upon the parties subsequent to the termination of this Agreement, shall survive such termination until all obligations are finally discharged.

## ARTICLE 7 - EXPENSES

7.1    Agent shall be responsible for and promptly pay all expenses attributable to producing and servicing business under this Agreement, except as specified in Section 7.2. This responsibility shall not be altered whether the expenses are billed to Agent or Company. These expenses shall include, but not be limited to:

    (a)    Salaries, related taxes and benefits of all employees of Agent;

    (b)    Transportation, lodging and meals of employees of Agent;

    (c)    Postage and other delivery charges;

    (d)    Advertising unless specifically agreed otherwise by Company in writing;

    (e)    EDP hardware, software and programming;

    (f)    Countersignature fees or commissions;

    (g)    License and appointment fees for Agent's, brokers, sub-producers and others;

    (h)    Income and state and local sales taxes, if any, directly applicable to Agent's business;

    (i)    Taxes on surplus lines premium, and Policy fees if necessary in respect of Policies underwritten or delivered by Agent hereunder;

    (j)    Costs of office space, facilities, equipment and occupancy used by Agent;

    (k)    Legal and auditing expenses incurred by Agent in the normal conduct of its business; and

    (l)    Such other expenses as are customarily borne by insurance producers.

12/29/97                                    6

(m)    Any and all charges made by NCCI or applicable state governing body against premium volume written under this program. It being understood that **Company** is an NCCI member company and that NCCI or state governing body charges are applicable on both a fee for service basis and a percentage charge applicable against total premium volume written under this program;

(n)    Printing of proposals, booklets, certificates, solicitation brochures, premium notices, records and reports, and all documents and other materials required to fulfill the obligation of Manager under this agreement.

7.2    **Company** shall be responsible for and promptly pay all expenses incurred by **Company** under this Agreement. This responsibility shall not be altered whether the expenses are billed to **Company** or **Agent**. These expenses shall include but not be limited to:

(a)    Salaries, related taxes and benefits of all employees of **Company**;

(b)    Transportation, lodging and meals of employees of **Company**;

(c)    Board and bureau fees;

(d)    Income and state and local sales taxes, if any, directly applicable to **Company's** business;

(e)    State or guaranty fund assessments;

(f)    Losses and loss adjustment expenses incurred by or at the direction of **Company**;

(g)    Reinsurance costs;

(h)    Legal and auditing expenses incurred by, on behalf of or at the direction of the **Company**; and

(i)    Such other expenses as are customarily borne by insurance companies.

## ARTICLE 8 - HANDLING OF FUNDS

8.1    **Agent** shall accept and maintain at all times all premium collected and other funds relating to the business underwritten by **Agent** under this Agreement in the capacity of a fiduciary and trustee for **Company**. The privilege of retaining commissions shall not be construed as changing the fiduciary capacity.

8.2    **Agent** shall establish and maintain a premium trust account designated **Food**

12/29/97                7



Services Insurance Managers, Inc., Premium Trust Account - Frontier in a bank mutually agreed by Agent and Company and shall deposit into such premium trust account all premiums collected by Agent hereunder. Agent shall have the right to transfer funds held in such premium trust account to successor banks with the prior written consent of Company. All such banks shall be members of the Federal Reserve System whose deposits are insured by the Federal Deposit Insurance Corporation. Agent shall be entitled to retain any interest earned on funds deposited in such premium trust accounts until premium is to be remitted to Company pursuant to Article 6 hereof.

8.3    Agent shall maintain sole signature authority on such premium trust account and may use any and all premium and other funds collected by Agent under this Agreement only for the following purposes:

  (a)    Payments of amounts due Company pursuant to this Agreement;

  (b)    Return of unearned premiums arising due to cancellation or endorsement of Policies underwritten or delivered by Agent;

  (c)    Payment of Agent's, sub-producers' and others' compensations as described in Article 4;

  (d)    Return of money deposited in error; and

  (e)    Withdrawal of interest due Agent hereunder.

8.4    Agent shall not commingle any funds in such premium trust account with funds in Agent's corporate accounts or other funds held by Agent in any other capacity.

8.5    Agent shall render accounts to Company detailing all premium trust account transactions, and remit to Company all funds due under this Agreement pursuant to said account by the end of the month following the month during which the Agent collected such funds for the account of the Company.

8.6    In the absence of negligence or fraud by either party hereto, neither party shall be liable for any loss which occurs by reason of the default or failure of the bank in which an account is carried.

8.7    Agent shall promptly account for and refund commissions on Policy cancellations, reductions in premiums or any other return premiums at the same rate at which such commissions were originally retained.

8.8    Neither Company nor Agent shall offset any balances due under this Agreement

12/29/97                                    8

and any employees, representatives or sub-producers of Agent. Agent shall carry out its responsibilities hereunder subject to its own discretion and not subject to time or manner directions of Company.

## ARTICLE 11 - ADVERTISING

11.1   Before Agent uses Company name in any form of advertising, a copy of the proposed advertisement shall be forwarded to Company. No such advertisement shall be used without the prior written permission of Company. All agreements with sub-producers shall require that before they use Company's name in any advertising, a copy of the proposed advertisements shall be forwarded to Company, and that no such advertisements shall be used without the prior permission of Company.

11.2   If an advertisement containing Company's name is used by Agent or sub-producers retained by Agent, Agent shall maintain a copy of the advertisement and full details concerning where, when and how it was used, and comply with all legal requirements regarding content, review and approval of advertising and maintenance of records. Agent, however, shall not be required to maintain records of the names and addresses of recipients of any direct mailing or advertising but shall only record the geographical area in which such mailing or advertising was used except to the extent retention of such information is required by law.

## ARTICLE 12 - LICENSING

12.1   Agent warrants that it has and shall maintain current licenses and authorities as required by law for the conduct of its business pursuant to this Agreement.

12.2   Agent shall be responsible for verifying that all sub-producers to Agent shall maintain appropriate licenses and authorities as required by law for conduct of their businesses.

12.3   Agent shall maintain in force written agreements, in form reasonably satisfactory to Company, with sub-producers to Agent hereunder.

## ARTICLE 13 - AGENT'S SALE OR TRANSFER

13.1   In the event any interest in Agent is to be sold or transferred or is to merge to be consolidated with another firm not under common control, controlling or controlled by Agent or Company, Agent shall give thirty (30) days advance written notice to Company, to allow Company, at its election:

12/29/97                          10



    (a)    To consent to assignment of this Agreement to the successor;

    (b)    To enter into a new Agreement with the successor; or

    (c)    To terminate this Agreement.

13.2   **Company** shall notify **Agent** of its decision within fifteen (15) days of the receipt of the notice.

13.3   **Agent** shall notify **Company** in writing within fifteen (15) days if there is a change in:

    (a)    Ownership of ten-percent (10%) or more of the outstanding voting stock of **Agent**; or

    (b)    The President of **Agent**,

## ARTICLE 14 - INDEMNITY AGREEMENT

14.1   **Agent** shall indemnify and hold **Company** (including its officers and employees) harmless from any and all claims, causes of action, damages, judgments, fines, penalties and expenses (including, but not limited to, attorney's fees, litigation expenses and costs of court) which may be made against the **Company** by anyone, including any governmental agency or regulatory authority, and which arise, either directly or indirectly, principally out of any negligent or grossly negligent actions or inactions or willful misconduct or violation of any statute or regulation by **Agent**, including, but not limited to, any negligent or grossly negligent actions or inactions or willful misconduct or violation of any statute or regulation by any sub-producer to **Agent** or any of **Agent's** or such sub-producers' employees or representatives arising under this Agreement.

14.2   **Company** shall indemnify and hold **Agent** (including its officers and employees) harmless from any and all claims, causes of actions, damages, judgments, fines, penalties and expenses (including, but not limited to, attorney's fees, litigation expenses and costs of court) which may be made against the **Agent** and which arise either directly or indirectly, principally out of any negligent or grossly negligent actions or inactions or willful misconduct or violation of any statute or regulation by **Company**, including, but not limited to, any negligent or grossly negligent actions or inactions or willful misconduct or violation of any statute or regulation by **Company's** employees or representatives arising under this Agreement.

14.3   If any person seeks indemnity hereunder the person to be indemnified ("Indemnified Person") shall give the indemnifying party ("Indemnifying Party")

12/29/97                     11

prompt written notice of the claim, cause of action, damage, judgment, fine, penalty and expense against which indemnification is sought, including copies of all documents and information reasonably relating thereto. The Indemnifying Party promptly shall commence defending the Indemnified Person through competent attorneys reasonably satisfactory to the Indemnified Person. The Indemnified Person shall cooperate with the Indemnified Party in such defense, but the ultimate decision whether to defend or settle shall be made by the Indemnified Person.

14.4    If either party shall institute any lawsuit to enforce the obligations assumed by the other party under this Agreement, the prevailing party shall be entitled to recover from the other party all costs, expenses, judgments and attorney's fees incurred by the prevailing party in connection with the lawsuit.

14.5    **Agent** warrants that it has and shall maintain Errors & Omissions insurance with an insurer reasonably acceptable to **Company** and providing coverage of the greater of (i) the minimum required by law or (ii) $1,000,000.

## ARTICLE 15 - MEDIATION AND VENUE

15.1    If irreconcilable differences arise as to business done under this Agreement, either party may request, in writing, mediation of such difference. Such mediation shall be conducted pursuant to Commercial Mediation Rules of the American Arbitration Association. Such mediation shall be conducted in **New York** and concluded within thirty (30) days after notice of mediation. The costs of the parties incurred in the mediation shall be allocated by the mediator pursuant to the equities of the parties with respect to the matter mediated. Any such mediation shall be non-binding and without prejudice.

15.2    If any dispute cannot be resolved by mediation, the parties agree that the courts of **New York** shall have exclusive jurisdiction to resolve any such dispute and that the internal law of the state of **Company's** domicile will apply to the interpretation and enforcement of the dispute.

## ARTICLE 16 - TERMINATION

16.1    This Agreement shall be terminable by (i) either party upon fifteen (15) days prior written notice to the other party for "cause" (defined, as hereinafter used, as the other party's permanent legal or physical inability to perform its obligations hereunder, the other party's conviction of a felony, or the other party's "Material Breach" of this Agreement and failure to cure such Material Breach within the applicable cure period); (ii) the **Company** in the event the Company determines that the **Agent** has exceeded the authority granted the Agent by the **Company**

under Article 3 - Authority of Agent or (iii) upon ninety (90) days prior written notice to the other party as of the end of any calendar quarter. A "Material Breach" shall consist of (a) failure by a party to pay any amount due hereunder when due, which is not paid within fifteen (15) days following the other party's written demand for such payment, or (b) the failure to obtain or maintain, or the termination or suspension of, a license, permit or other authority necessary for a party to conduct its business as contemplated hereunder which is not cured within thirty (30) days.

16.2   Upon termination, **Agent** promptly shall deliver or cause to be delivered to **Company**, at **Company's** expense, all property of **Company** in **Agent's** control or possession, including but not limited to, EDP equipment owned by **Company**, Policies, manuals, forms, unused drafts and all materials used in servicing of Policies, including computerized and data processing records and the physical equipment required for the processing of those records and data. If **Agent** fails to deliver such property within fifteen (15) days after the termination of this Agreement, **Agent** shall bear all reasonable expenses which **Company** may expend or cause to be expended in obtaining such items. If Policy supplies cannot be accounted for by **Agent** or have been destroyed, lost or mislaid, **Agent** agrees to protect, defend and hold **Company** harmless from all persons and claims whatsoever arising with respect to such Policy supplies.

16.3   **Company** may, for "cause," in its sole discretion, suspend any and all of **Agent's** authority pursuant to this Agreement.  Such suspension shall be effective upon written notification to **Agent** setting forth the nature of the  "cause" in reasonable detail.

16.4   In the event of termination of this Agreement by **Company** for "cause", any indebtedness of **Agent** to **Company** and all premiums in the possession of **Agent**, or for the collection of which **Agent** is responsible, shall become immediately due to **Company**.

16.5   The failure of either party to declare promptly a default or breach of any of the terms and conditions of this Agreement shall not be construed as a waiver of any of such terms and conditions, nor stop either party from thereafter demanding full and complete compliance herewith.

16.6   In the event of termination of the Reinsurance Agreement between Platinum Indemnity Limited and **Company**, **Company** reserves the right to terminate this Agreement effective immediately upon written notice to the Agent.

16.7   Notwithstanding the termination of this Agreement, the provisions of this Agreement shall continue to apply to all unfinished business to the end that all obligations and liabilities incurred by each party as a result of this Agreement shall be fully

12/29/97                                      13



performed and discharged according to its terms.

## ARTICLE 17 - MISCELLANEOUS

17.1   This Agreement supersedes all previous agreements, if any, whether written or oral, between **Company** and **Agent** relating specifically to the subject matter hereof.

17.2   Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and plural and any term stated in either the masculine, or feminine or the neuter gender, shall include the masculine, the feminine and the neuter gender.  All captions and section headings are intended to be for purposes of reference only and do not affect the substance of the section to which they refer.

17.3   Each party hereto agrees to perform any further acts and execute and deliver any further documents which may be reasonably necessary to carry out the provisions of this Agreement.

17.4   In the event that any of the provisions, or portions thereof, of this Agreement are held to be illegal, invalid or unenforceable by any court of competent jurisdiction, the validity and enforceability of the remaining provisions, or portions thereof, shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom.

17.5   Any and all notices required or permitted to be given under this Agreement shall be in writing and shall be deemed given when deposited in the United States Postal Service, Certified Mail, Return Receipt Requested or faxed with confirmation by telephone to a Vice President or senior officer of the recipient, to the parties' addresses as provided below or such other addresses provided by the parties by like means:


**COMPANY:**

Frontier Insurance Company
195 Lake Louise Marie Road
Rock Hill, New York 12775

Attn:  Kevin F. Jeffery
        Senior Vice President


12/29/97                                14

AGENT:

Dwight Halvorson Insurance Services
3300 Douglas Blvd.
Suite # 295
Roseville, CA 95661-3807

Attn:  Dwight Halvorson
President

17.6  This Agreement may be executed in multiple counterparts, each of which and
together shall constitute an original document.

COMPANY:                           AGENT:

FRONTIER INSURANCE COMPANY         DWIGHT HALVORSON INSURANCE
                                   SERVICES

By: _____        By: _____

Date: January 14, 1998             Date: 12/7/98

12/29/97                    15

Addendum No. 1

"Schedule of Business"

(A)    Lines of Coverage:

      (1)    Workers Compensation

(B)    Territory:

    California, Arizona

(C)    Maximum Policy Period(s):

    Twelve (12) months plus odd time not to exceed eighteen (18) months.

(D)    Class of Business:

    Agricultural operations with governing class codes of 0172-Truck Farms, 0171- Crops, 0040-Vineyards and 8209-Fresh fruit/vegetable packing and handling including storage.

(E)    Maximum Limits of Binding Authority:

    Dwight Halvorson Insurance Services is authorized to bind agricultural operations for the following limits:

      (1)    Coverage A: Statutory

      (2)    Coverage B: $1,000,000.

(F)    Projected Annual Premium Volume:

    $10,500,000. the first calendar year.

ADDENDUM #2

FRONTIER INSURANCE COMPANY
FOOD SERVICES INSURANCE MANAGERS, INC. PROGRAM

It is hereby agreed that this Addendum modifies the Limited Agency Agreement executed between Frontier Insurance Company and Dwight Halvorson Insurance Services.

I.  UNDERWRITING GUIDELINES

Insureds may be added to this program on an automatic basis provided the following criteria are met:

1.  The prospective insured's net premium is $50,000. or greater;

2.  Experience modification factors shall be obtained from the Workers Compensation Insurance Rating Bureau of CA, NCCI, or governing state as applicable.  Experience modification must be 1.25 or lower based on three (3) years or more of loss experience.

3.  No prospect without prior Workers' Compensation coverage will be considered for admission to the program.  The prospective insured must have been in business a minimum of three (3) years and provided a full three (3) years plus current year of currently valued (within 120 days prior to expiration date) loss experience including large losses in excess of $25,000.;

4.  The prospective insured's classification codes do not deviate from those listed in the Class/Rate Schedule in Section III. of this Addendum.;

5.  No single claim, any one occurrence, has exceeded $125,000;

6.  The prospective insured's most recent three (3) year cumulative loss ratio does not exceed 50%;

7.  NCCI underwriting criteria must be complied with, including scheduled credits and rate deviations.

Any risk not falling within the above guidelines must be submitted to Frontier for special consideration and no such risk may be bound without prior written approval by an underwriter employed by Frontier.  Frontier shall have no obligation to accept any risk submitted for special consideration by Agent. In addition, the following risks must be submitted to Frontier, prior to binding:

1.   All risks providing bus transportation to their employees; and

2.   All risks having aircraft exposures.

The following operations are prohibited:

1.   Aircraft and airline operations;

2.   Navigation and operation of all vessels;

3.   Construction and/or maintenance of cofferdams;

4.   Operation of drydocks;

5.   Subaqueous work;

6.   Subway construction;

7.   Tunneling operations;

8.   Wrecking or demolition of bridges, structures or vessels;

9.   All coal mining operations;

10.   All underground mining operations;

11.   Onshore and offshore gas and oil drilling operations;

12.   Manufacture, production or refining of natural or artificial fuel, gas, butane, propane or liquefied petroleum gases or gasoline;

13.   Manufacture of fireworks, fuses, nitroglycerine, celluloid and pyroxylin;

14.   Manufacture of any explosive substance intended for use as an explosive; and

15.   Loading, handling, transportation or storage of explosives.

## II. SUBMISSION REQUIREMENTS

The following are to be submitted to Frontier for each insured included in this program:

1.  Fully completed Application;

2.  Three (3) years plus current year premium and payroll history;

3.  Currently valued (within 120 days) loss experience for past three (3) years plus current year;

4.  Large losses excess of $25,000. for past three (3) years plus current year; and

5.  Most recent experience modification.

### III.   CLASS/RATE SCHEDULE

Approved Classification Codes:

| Code | Description | Rates |
|------|-------------|-------|
| | | |
| 7421 | Aircraft Operations, Transport. of Personnel | 2.62 |
| 2003 | Bakeries & Cracker Mfg. | 6.61 |
| 7392 | Beer or Ale Dealers | 11.21 |
| 2163 | Bottling-Beverages-No spirituous liquors | 6.04 |
| 2121 | Breweries / Malt Houses-Incl Bottling/Canning | 5.13 |
| 0079 | Bush Berry Crops | 6.61 |
| 2113 | Canneries-Fish | 8.75 |
| 2111 | Canneries, NOC-Incl Fruit Preserving | 8.70 |
| 8810 | Clerical Office Employees, NOC | 0.75 |
| 6504 | Confections&Food Sundries,Mfg.or ProcNOC | 7.36 |
| 0044 | Cotton Farms | 7.82 |
| 0401 | Cotton Gin Operation | 10.97 |
| 0400 | Cotton Merchants | 10.22 |
| 4683 | Cottonseed Oil Mfg. & Refining | 3.63 |
| 2063 | Creameries& Dairy Products Mfg. | 6.19 |
| 0036 | Dairy Farms | 8.77 |
| 2142 | Distilling, NOC | 6.48 |



| 2014 | Feed Mfg.Prep & Compounding Feeds for Livestock & Poultry | 9.25 |
|---|---|---|
| 0038 | Feed Yards | 17.28 |
| 0171 | Field Crops | 12.90 |
| 2108 | Fruit-Citrus Fruit packing & handling; Including Storage | 8.58 |
| 2109 | Fruit-Dried Fruit packing & handling | 7.60 |
| 2107 | Fruit- Fresh Fruit packing & handling; Including Storage | 7.63 |
| 2116 | Fruit Juice or Concentrate Mfg. | 7.67 |
| 2102 | Fruit or Vegetable Evaporation or Dehydrating | 5.28 |
| 8304 | Grain Elevators or Grain Storage Warehouses | 10.97 |
| 2014 | Grain or Rice Milling | 9.25 |
| 8215 | Hay, Grain or Feed Dealers | 10.84 |
| 2002 | Macaroni Mfg. | 8.21 |
| 2095 | Meat Products Mfg.-NOC Including Canning | 6.54 |
| 2106 | Olive Handling- Sorting,curing,packing,canning including Olive Oil Mfg. | 8.45 |
| 0016 | Orchards- Citrus & Deciduous Fruits | 10.45 |
| 0045 | Orchards-Nut Crops | 8.15 |
| 2106 | Pickle Mfg. | 8.45 |
| 0041 | Potato Crops | 4.78 |
| 0034 | Poultry Raising, Egg Production &Hatcheries | 10.11 |

| Code | Description | Rates |
|------|-------------|-------|
| 9079 | Restaurants or Taverns-All Employees | 5.06 |
| 8742 | Salespersons-Outside | 0.87 |
| 4000 | Salt Production-by Solar Evaporation exclusively | 6.30 |
| 8102 | Seed Merchants-including operation of seed sorting machinery | 4.43 |
| 0034 | Sheep Raising & Hog Farms | 10.11 |
| 0038 | Stock Yards | 17.28 |
| 2081 | Stockyards-with/without butchering | 15.19 |
| 8006 | Stores-Delicatessen-retail | 5.22 |
| 8117 | Stores-Feed,tack & farm supplies-retail | 8.30 |
| 8006 | Stores-Fruit or Vegetables-retail | 5.22 |
| 8061 | Stores-Groceries or provisions-convenience-retail | 9.72 |
| 8006 | Stores-Groceries or provisions-retail | 5.22 |
| 8031 | Stores-Meat, fish or poultry-retail | 7.68 |
| 8021 | Stores-Meat, fish or poultry-retail | 12.64 |
| 8017 | Stores-Retail, NOC | 4.37 |
| 8060 | Stores-Wine, Beer or Spirits Retail | 7.30 |
| 8041 | Stores-Wine or spirits-wholesale, including blending, rectifiying, distilling or bottling | 10.10 |
| 0079 | Strawberry Crops | 6.61 |
| 2030 | Sugar Mfg. or Refining- beet or cane | 8.03 |
| 0172 | Truck Farms | 8.00 |
| 2117 | Vegetable or Fruit Processors-Frozen | 11.20 |

| 8209 | Vegetables-Fresh vegetable and tomato packing and handling-including storage | 9.78 |
|---|---|---|
| 9079 | Vending Concessionaires-Dispensing food,drinks,candy,etc.at ball parks,race tracks,theaters & exhibitions | 5.06 |
| 0040 | Vineyards | 5.95 |
| 4831 | Vitamin or Food Supplement Mfg.-compounding,blending or packaging only | 4.84 |
| 2142 | Vinegar Mfg. | 6.48 |
| 8291 | Warehouses-Cold Storage | 7.73 |
| 0400 | Warehouses-Cotton, Including cotton compressing "cotton gin operation" | 10.22 |
| 8215 | Warehouses-Grain or bean-including cleaning & handling | 10.84 |
| 2142 | Wineries-All operations | 6.48 |

Exhibit B

# Subscription and Shareholders Agreement

This Agreement is made as of January 16, 1998

**Between**

(1)     Platinum Indemnity Limited a company organized and existing under the laws of the Islands of Bermuda (hereinafter "Platinum") and

(2)     Food Service Insurance Managers Inc., a corporation organized and existing under the laws of California (hereinafter the "Shareholder").

**Witnesseth**

**Whereas**, Shareholder wishes to purchase the "Preferred Share" for the "Purchase Price", and

**Whereas**, Platinum wishes to repurchase the "Preferred Share" on the "Repurchase Date" at the "Repurchase Price", and

**Whereas**, Platinum wishes to enter into certain reinsurance contracts with the Ceding Companies pursuant to which Platinum will reinsure certain of the liabilities of the Ceding Companies under one or more contracts of insurance produced by the Shareholder.

**Now, therefore**, in consideration of the premises and mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1)     **Definitions.**  The following terms are defined as follows:

   a)     "Business Day" shall mean any day other than a Saturday or Sunday or a day on which banks located in Bermuda are authorized or required by law or executive order to close.

   b)     "Ceding Companies" shall mean the reinsured or reinsureds which are parties to the Treaties.

   c)     "Dividend Date" shall mean the dates shown on Schedule 2 on which a dividend to the extent permitted by law shall be declared to the owner of record of the Preferred Share.

   d)     "Net Premium" shall mean the aggregate net premium received by Platinum under the Treaties after all deductions made by, or credited or paid to, the Ceding Companies including, but not limited to, ceding commissions, boards, bureaus, taxes, fees, licenses, residual risk facility charges, guarantee fund assessments and other charges as provided in the Treaties.

   e)     "Preferred Share" shall mean the preferred share to be issued by Platinum pursuant to the provisions of this Agreement as more particularly described in Schedule 1 hereto.

   f)     "Purchase Price" shall mean One-hundred and twenty-five thousand United States Dollars(US$125,000.00).

   g)     "Purchase Price Administrative Fee" shall mean (i) during the term of the Treaties (or any renewal thereof), 1% of the average "Purchase Price Investment Funds" held by Platinum during each 12 month period beginning on the date the Purchase Price for the Preferred Share is paid and on each anniversary thereof, and (ii) after the termination or expiration of the Treaties, 1% of the average Purchase Price Investment Funds held by Platinum during each 12 month period.

1

h) "Purchase Price Investment Funds" shall mean the total of the Purchase Price proceeds, plus any additional contribution to the capital of Platinum, and all accumulated investment income earned thereon (which is not the subject of prior dividend payment).

i) "Repurchase Date" shall mean five (5) business days after the Ceding Companies acknowledge in writing to Platinum that Platinum has no further liability under the Treaties. Platinum shall be deemed to have no further liability when all losses on policies ceded to Platinum pursuant to the Treaties have been fully run-off or the aggregate limit of the liability of Platinum under the Treaties has been exhausted or, all liability under the Treaties has been commuted.

j) "Repurchase Price" shall mean an amount equal to the Purchase Price, plus any additional contribution to the capital of Platinum by the Shareholder, plus any Undistributed Profits Attributable to the Preferred Share.

k) "Treaties" shall mean the reinsurance agreement or agreements identified in Schedule 2 between Platinum, as assuming reinsurer, and the Ceding Companies, the subject of which are policies of insurance issued pursuant to business produced by the Shareholder.

l) "Treaties Administrative Fee" shall mean, (i) during the term of the Treaties (or any renewal thereof) 1% of the average "Treaties Investment Funds" during each 12 month period beginning on the date the Purchase Price for the Preferred Share is paid and on each anniversary thereof, and (ii) after the termination or expiration of the Treaties, 1% of the average treaties investment Fund during each 12 month period.

m) "Treaties Investment Funds" shall mean (i) the Net Premium, plus (ii) all amounts actually recovered and received by Platinum under the Treaties by way of salvage or subrogation (net of expenses allocable to Platinum), less (iii) all losses and expenses paid and all premium returned by Platinum to the Ceding Companies pursuant to the Treaties, less (iv) Underwriting Profit previously paid out in dividends.

n) "Underwriting Profit or Loss" shall mean ("except as otherwise provided in this Agreement")
   i) the "Net Premium", plus
   ii) the amounts actually recovered and received by Platinum under the Treaties contracts by way of salvage or subrogation (net of expenses allocable to Platinum); less
   iii) all losses and loss expenses paid, or incurred by Platinum under the Treaties (including reserves set aside for incurred but not reported losses and expenses, as determined by Platinum, but in no event in an amount less than the amount estimated by the Ceding Companies); less
   iv) the Treaties Administrative Fee; and less
   v) the cost of aggregate stop loss reinsurance; less
   vi) the actual cost incurred by Platinum in establishing and maintaining letter(s) of credit in favor of the Ceding Companies pursuant to the Treaties; plus
   vii) investment income earned on the capital provided by the Shareholder as required from time to time, and directly related to the underwriting of the Treaties.

o) The "Undistributed Profit Attributable to the Preferred Share" on any date is the aggregate sum of the following:

   i) The amount of investment income, if any, earned by Platinum on the Purchase Price Investments Funds, since the last Dividend Date (if any);

   ii) The amount of investment income, if any, earned by Platinum on the Treaties Investment Funds since the last Dividend Date (if any); less (ii)the Treaties Administrative Fee allocable to the period since the last Dividend Date (if any); plus or minus

   iii) The Underwriting Profit or Loss since the last Dividend Date (if any); plus or minus

2

iv) any Underwriting Profit or Loss prior to the last Dividend Date (if any) not previously distributed by way of dividend.

2) **The Purchase Price.** The Shareholder agrees to purchase and Platinum agrees to issue the Preferred Share at the Purchase Price. Platinum shall issue and deliver the Preferred Share to the Shareholder within five (5) business days after the Shareholder pays Platinum the Purchase Price. The Purchase Price shall be paid within thirty (30) days of the execution of this Agreement. The Purchase Price may be provided in the form of a letter of credit.

3) **Dividends.** To the extent permitted by law, Platinum agrees to cause a dividend to be declared to the owner of record of the Preferred Share on each Dividend Date in an amount equal to the positive Undistributed Profit Attributable to the Preferred Share (if any).

4) **Negative Balance/ Indemnification**

   a) In the event the Undistributed profit Attributable to the Preferred Share, minus the cumulative amounts of dividends paid to the Shareholder is, at any time, negative (the"Negative Balance", the Shareholder agrees, within 30 days after receipt of written demand by Platinum. to pay Platinum the Negative Balance minus all previous payments made to Platinum since the last Dividend date (if any) under this paragraph; provided, however, that, for purposes of this provision only, Underwriting Profit or Loss shall not take into account unpaid losses and expenses other than such losses and expenses which Platinum believes are likely to be paid within the following ninety (90) days.

   b) The Shareholder will indemnify and hold Platinum harmless from all dangers, costs, losses, fees, liabilities, judgements, penalties and expenses (including without limitation, reasonable attorneys' fees and expenses of legal counsel) that Platinum may suffer, sustain, incur or become subject to, whether directly or indirectly, arising out of, based upon, resulting from or in connection with the failure of the Shareholder to comply with Paragraph 4.(a) hereof.

5) **Maintenance of Records.** Platinum shall maintain such records as are necessary to verify the amount of investment income earned on the Purchase Price Investment Funds and on the Treaties Investment Funds and shall produce copies of such records to the Shareholder within a reasonable time after the Shareholder's written request therefor.

6) **Repurchase Procedure.** On the Repurchase Date, Platinum shall repurchase the Preferred Share for the Repurchase Price, from the Shareholder. The Shareholder shall deliver the certificate representing the Preferred Share together with proper instrument of assignment and transfer thereof duly executed in blank.

7) **Representations and Warranties.** The Shareholder represents and warrants that:

   a) It is purchasing the Preferred Share for the Shareholder's own account for investment purposes and not with a view to resale or distribution.

   b) The Shareholder has adequate means for providing for the Shareholder's current needs and possible personal contingencies and has no need for liquidity of the Shareholder's investment and has no reason to anticipate any change in personal circumstances, financial or otherwise, which may cause or require the sale or distribution of the Preferred Share.

   c) The Shareholder understands that the Preferred Share has not been and will not be registered under the United States Securities Act of 1933, as amended, and that the Preferred Share may not be sold, transferred, pledged, hypothecated, assigned or otherwise disposed of.

3

8) **Preferred Share Not Transferable.** The Shareholder covenants and agrees not to, or attempt to, sell, transfer, pledge, hypothecate, assign or otherwise dispose of the Preferred Share.

9) It is acknowledged and agreed that the certificate representing the Preferred Share shall bear the following legend:

"The share evidenced by this certificate has not been registered under the Securities Act of 1933, as amended. This share has been acquired for investment purposes only and may not be sold, transferred, pledged, hypothecated, assigned or otherwise disposed of."

10) **Waiver or Modification.** Neither this Agreement nor any of the terms hereof may be changed, waived or discharged orally, but only by an instrument in writing signed by the party against which enforcement of such change, waiver or discharge is sought.

11) **Entire Agreement.** This Agreement constitutes the sole and entire agreement of the parties hereto relating to the subject matter hereof and supersedes all prior agreements and understanding related to the subject matter hereof.

12) **Agreement Governs.** The parties agree that in the event the terms of this Agreement conflict with the bye-laws of Platinum, the parties shall cause the bye-laws to be amended to conform with this Agreement; provided, however, in the event such bye-laws are not amended, this Agreement shall govern.

13) **Notices.** All notices, request, demands or other communications required or permitted to be given hereunder shall be in writing and shall be delivered by facsimile, by hand, or by first class mail, addressed to the address for service of the parties as follows:

If to Platinum:
Platinum Indemnity Limited,
Windsor Place, 3rd Floor, 18 Queen Street, Hamilton, Bermuda,
Fax No. 441-292-1196,
Attn: Andrew McComb

If to the Shareholder:
Food Service Insurance Managers Inc.,
3300 Douglas Boulevard, Suite 295
Roseville, CA 95661-3807
Attn: J. Daniel Henke, Secretary

Unless shown to have been received earlier, any such notice so delivered shall be deemed to have been given:

a) if delivered by hand when delivered if delivered during normal business hours of the recipient or if delivered outside such hours at the opening of business on the next business day of the recipient;

b) if delivered by facsimile three hours after the time of transmission if transmitted during normal business hours of the recipient or if delivered outside such hours at the opening of business on the next business day of the recipient;

c) if mailed by first class mail or by registered mail three days after the date of mailing unless the notice was mailed during postal strike or other postal disruption in which case the notice shall be deemed to have been received within three days after the resumption of normal mail service.

4

Any party by notice in writing given to the other party in the manner specified above may change the name and address to which notices, request, demands or other communication to which shall be given pursuant to this Agreement.

14) **Governing Law and Jurisdiction.** This Agreement shall be constructed and enforced in accordance with, and governed by, the laws of Bermuda. Subject to Paragraph 14. The courts of Bermuda shall be vested with the non-exclusive jurisdiction to resolve any dispute arising out of or related to this Agreement and the Shareholder will submit to the jurisdiction of any court of competent jurisdiction in Bermuda and will comply with all requirements necessary to give such court jurisdiction.

15) **Arbitration.** If any dispute shall arise between the parties to this Agreement with reference to the interpretation of this Agreement or their rights with respect to any transaction involved, whether such disputes arises before or after termination of this Agreement, such dispute, upon the written request of either party, shall be submitted to three arbitrators, one to be chosen by each party and the third by the two so chosen. If either party refuses or neglects to appoint an arbitrator within thirty days after the receipt of written notice from the other party requesting it to do so, the requesting party may appoint a second arbitrator. If the two arbitrators fail to agree on the selection of a third arbitrator within thirty days of their appointment, either of the parties may apply upon notice to the other to the President of Bermuda Bar Association to name a third arbitrator. All arbitrators shall be active or retired executive officers of insurance or reinsurance companies not under the control of either party to this Agreement and having no personal or financial interest in the outcome of the arbitration. Each party shall submit its case to the arbitrator within thirty days of the appointment of the third arbitrator. The decision in writing of any two arbitrators , when filed with the parties hereto, shall be final and binding on both parties. Unless otherwise specified in the decision of the arbitrators, the expense of the arbitrators and of the arbitration shall be equally divided between the two parties. The said arbitration shall take place in Bermuda unless some other place is mutually agreed upon by the parties to this Agreement. Except as to matters otherwise provided herein, the provisions of the Bermuda International Conciliation and Arbitration Act, 1993 (or any successor statute) shall apply; and the procedural rules set forth in Section III and IV of UNCITRAL shall be followed.

16) **Currency.** All amounts referred to herein are expressed in United States Dollars and all payments shall be made in such dollars.

5

**In witness whereof,** the parties hereto have duly executed this Agreement as of the date first above written.

**Platinum Indemnity Limited**

In Hamilton, Bermuda this 16 day of January, 1998

By: _____

Name: Andrew McComb

Title: Chief Financial Officer

Witness _____

**Food Service Insurance Managers Inc.,**

In Hamilton, Bermuda this 16 day of January, 1998:

By: _____

Name: J. Daniel Henke

Title: Secretary

Witness _____

6

Schedule 1

### Description of the Preferred Share

**Share classification**

Class G non-voting Redeemable Preferred Share

**Number of shares authorised in class**

One (1) - (This is a separate class and no other shares will be issued in this class. There are/will be other classes of shares in Platinum, including without limitations, other preferred shares forming separate classes.)

**Par value**

US$1.00 (One dollar).

**Issue price per share**

US$125,000.00

**Rights in general meetings/ members or shareholders' resolutions**

No right to participate in or to sign any written resolution of the members or shareholders of Platinum and no right (a) to receive notice of, (b) to attend at or, (c) vote at any general meeting of the members or shareholders of Platinum EXCEPT where Bermuda law provides for such rights for all members or shareholders for certain actions e.g.. discontinuance (relocation) of Platinum.

**Dividend and distribution rights**

Only as provided for in the Shareholder Agreement attached. Such rights are accumulated when payment of a dividend at any particular Dividend Date is not permitted under Bermuda law and paid at the next Dividend Date if permitted without any interest.

**Redemption terms**

The Class G Non-voting Redeemable Preferred Shares carry no right of redemption by the Members. Platinum has the right to repurchase the Class ? Non-voting Redeemable Preferred Shares as provided for in the Shareholder Agreement attached.

**Other Preferred share series classes**

The holder of the Class G Non-voting Redeemable Preferred Shares acknowledges and agrees that Platinum may issue from time to time other shares carrying rights and restrictions similar to the Class [ ] Non-voting Redeemable Preferred Shares but where the dividend and distribution rights are contingent on the underwriting results of other Treaties which are distinct from the Treaties detailed in Schedule 2 to this agreement, and such shareholders have signed a shareholder agreement with similar terms to that to which this is attached (mutatis mutandis).

7

Schedule 2

## Treaties

The following reinsurance agreements:

| Ceding Company | Company Reference | Period |
|---|---|---|
| Frontier Insurance Company | PLA/FIC/007 | 1/1/1998 – 12/31/1998 |

## Dividend date

Platinum will compute an initial dividend 24 months from the effective date of this agreement, and annuallly thereafter, in accordance with the provisions of clause 3 of this agreement. Such dividend, if declared, to be paid 30 days thereafter.

## Additional capital contribution

In addition to the Purchase Price of $125,000.00, additional capital contributions equal to 4% of gross written premiums under the program will be remitted on a monthly basis for policies written in the previous 30 days. These additional contributions will be included in the Purchase Price Investment Funds as specified in the text of the agreement.

8

Exhibit C

# PROMISSORY NOTE

**PRINCIPAL: $469,515.00**

*November 8, 2000*

FOR VALUE RECEIVED on the above referenced date, Food Service Insurance Managers, Inc., a California corporation ("Debtor"), promises to pay to the order of Platinum Indemnity Limited, a Bermuda Company ("Creditor"), at Windsor Place, 3rd Floor, 18 Queen Street, Hamilton, Bermuda the principal sum of Four Hundred and Sixty Nine Thousand, Five Hundred and Fifteen Dollars and 00/100 Cents ($469,515.00) with interest as set forth herein, payable as follows:

A.    Principal shall be paid on this Promissory Note (this "Note") as follows: Twenty One Thousand Dollars and No Cents ($21,000.00) on the fifteenth day of each month commencing with August 15, 2000. Such payment to be made by bank wire transfer to the bank and account detailed in Schedule 1 attached hereto, and any other bank and account as may be advised by the Creditor from time to time.

B.    Subject to paragraph D below, interest at a variable rate, namely the Federal Funds Rate (the target interest rate for banks borrowing reserves among themselves as announced and in effect from time to time by the Federal Open Markets Committee of the U.S. Federal Reserve Board) plus two percentage points, shall accrue on principal outstanding from time to time. Subject to paragraph D below, interest payments shall be due on the fifteenth day of every month until Maturity.

C.    Should interest not be paid by Debtor as stated, it shall thereafter bear like interest as the principal. Unpaid interest shall be compounded at a rate not to exceed simple interest on the unpaid principal at the maximum rate permitted by law.

D.    Notwithstanding anything to the contrary herein, interest shall not begin to accrue on any amounts due hereunder until such time as the "Separate Account" maintained for Debtor by Creditor ceases to have a positive balance. The "Separate Account" is an account maintained by Creditor on its books which represents an ownership interest of Debtor in certain segregated assets of Creditor pursuant to the Subscription and Shareholder Agreement ("Agreement") dated January 16, 1998 between the Creditor and the Debtor and executed by both parties in Hamilton, Bermuda. For purposes of this Note, Creditor shall determine from time to time whether the Separate Account has a positive balance in accordance with the terms of the Agreement, and such determination shall be conclusive and binding on Debtor, absent manifest error. If Debtor nonetheless disputes Creditor's determination, Debtor shall pay the interest and principal amounts due hereunder as if such determination were undisputed and such dispute did not exist and Debtor's sole recourse against Creditor for such manifest error shall be an action separate from this Note.

E.    This Promissory Note may be prepaid at any time without penalty. The

CH99 3516723-1.040965.0010

balance of principal and any outstanding interest as well as any other sum remaining unpaid on this Note shall be paid in full no later than August 15, 2002.

      F.    If any of the following events shall occur and be continuing for any reason whatsoever (and whether such occurrence shall be voluntary or involuntary or come about or be effected by operation of law or otherwise), an "Event of Default" shall be deemed to have occurred:

      (1)    If Debtor fails to pay any principal or interest on this Note when it becomes due and payable, or Debtor fails to pay any other cost, fee, expense or other amount owing to Creditor under this Note; or

      (2)    Debtor becomes insolvent or generally fails to pay, or admits in writing its inability or refusal to pay, debts as they become due; or Debtor applies for, consents to, or acquiesces in the appointment of a trustee, receiver or other custodian for Debtor or any property thereof, or makes a general assignment for the benefit of creditors; or, in the absence of such application, consent or acquiescence, a trustee, receiver or other custodian is appointed for Debtor or for a substantial part of the property of Debtor and is not discharged within 30 days; or any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any bankruptcy or insolvency law, or any dissolution or liquidation, is commenced in respect of Debtor, and if such case or proceeding is not commenced by Debtor, it is consented to or acquiesced in by Debtor, or remains for 30 days undismissed; or Debtor takes any action to authorize, or in furtherance of, any of the foregoing.

      G.    THIS PROMISSORY NOTE SHALL BE GOVERNED BY BERMUDA LAW WITHOUT REGARD OR CONFLICT OF LAWS PRINCIPLES. SUIT HEREUNDER MAY BE BROUGHT IN A BERMUDA COURT. DEBTOR HEREBY IRREVOCABLY AND KNOWINGLY WAIVES ANY OBJECTION TO SUIT IN SUCH COURT DUE TO INCONVENIENCE OR UNSUITABILITY OF FORUM, VENUE OR OTHERWISE, AND HEREBY WAIVES ANY RIGHT DEBTOR MAY HAVE TO A JURY TRIAL. The foregoing shall not prejudice Creditor's right to bring suit in any jurisdiction it deems desirable or to enforce any judgments obtained in any jurisdiction. The remedies provided herein are not exclusive and Creditor shall have the option to utilize any one or more remedies available at law or in equity to enforce the provisions of this Note.

      H.    Principal and interest shall be payable in lawful money of the United States.

      I.    Debtor waives presentment, demand, notice of demand, protest, notice of protest, notice of dishonor and notice of non-payment and agrees to pay such costs, expenses and reasonable attorneys' fees as may be adjudged by a court in connection with any litigation relating to this Note. No delay or omission of Creditor in exercising any right or remedy hereunder shall impair any such right or operate as a waiver thereof. No single or partial exercise by Creditor of any remedy shall preclude any further exercise thereof.

J.     Creditor may assign this Note without Debtor's consent; Debtor may not assign this Note without Creditor's prior written consent.

K.     If any provision or any word, term, clause or part of any provision of this Note shall be invalid for any reason, the same shall be ineffective, but the remainder of this Note and of the provisions shall not be affected and shall remain in full force and effect.

IN WITNESS WHEREOF, Debtor has caused this Note to be executed by its officers thereunto duly authorized, all as of the day and year first above written.

FOOD SERVICE INSURANCE
MANAGERS, INC.

By: _____
        President

ATTEST:

By: _____
        Secretary

CH99 3516723-1.040965.0010

PROMISSORY NOTE DATED NOVEMBER 8, 2000

SCHEDULE 1

BANK ACCOUNT DETAILS AND ROUTING INSTRUCTIONS

**PLEASE REQUEST THAT CHASE MANHATTAN BANK N.A. WIRE FUNDS TO THE INSTRUCTIONS BELOW <u>UNDER A SWIFT 100 ORDER</u>. This will cause the Bank of Butterfield & Son Ltd. in Bermuda to be notified in advance of funds to be received into Platinum Indemnity Limited-FSIM Buttress MMF A/C # 006922.**

| | |
|---|---|
| BANK: | Chase Manhattan Bank, N.A.<br>Building F, Floor 8<br>4 Chase Metrotech Centre<br>New York, N.Y. 11245, USA |
| ABA #: | 021-000-021 |
| SWIFT: | CHAS US 33 |
| For Credit to: | |
| BENEFICIARY BANK: | The Bank of N.T. Butterfield & Son Ltd.<br>Hamilton, Bermuda |
| ACCOUNT NUMBER: | 001-106-7808 |
| | For Further Credit to: Butterfield Money Market Fund Ltd. |
| BENEFICIARY ACCOUNT NUMBER: | 006922 |
| BENEFICIARY ACCOUNT NAME: | Platinum Indemnity Limited-FSIM |

CHI99 3516723-1.040965.0010

Exhibit D



### Dwight Halvorson
INSURANCE SERVICES

July 2, 2001

Christopher DuBois
The Law Offices of CHRISTOPHER DuBOIS
Attorney at Law
195 Lake Louise Marie Road
Rock Hill, NY 12775-8000

RE:    Agency Balance with Frontier Insurance Company

Dear Chris:

This correspondence shall serve as a formal notice that Dwight Halvorson Insurance Services is requesting mediation pursuant to Article 15.1 of the Frontier Insurance Limited Agency Agreement.

Specifically, this mediation is requested in response to the matters set forth in your correspondence of June 25, 2001.

Please contact the undersigned as soon as possible so that we may proceed forward with the necessary arrangements.

Very truly yours,

ROBERT J. FRANCESCHI
General Counsel

RJF:baa

cc:    Dwight Halvorson

3300 Douglas Blvd., Suite 295, Roseville, CA  95661-3807
(916) 773-0206  •  FAX (916) 773-0402

AFFIDAVIT OF SERVICE

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK   )

     I, Pauline Hylton, being duly sworn, states as follows:  I am over 18 years of age, not a

party to the within action, and reside at 14 Penn Plaza, Suite 500, New York, New York 10122.

On June 25, 2004, I served the within Answer upon the person(s) or parties designated below by

mailing a true and complete copy of same in a postage pre-paid envelope, and depositing same in

a post office or official depository of the United States Postal Service within New York State, at

the last known address of the addressee(s) as set forth herein.

TO:    ENTWISTLE & CAPPUCCI, LLP
       299 Park Avenue - 14th Floor
       New York, NY 10171
       (212) 894-7200
       Attn:  William S. Gyves, Esq.

_____
Pauline Hylton

Sworn to before me this
25th day of June, 2004

_____
Notary Public

KATE E. MORAN
Notary Public, State of New York
No. 02MO6060703
Qualified in New York County
Commission Expires Feb. 10, 2007