SCHINDEL, FARMAN & LIPSIUS LLP
14 Penn Plaza Suite 500
(225 West 34th Street)
New York, New York 10122
Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Gregory V. Serio, Superintendent of Insurance of the State of New York, as Rehabilitator of FRONTIER INSURANCE COMPANY, and as Assignee of PLATINUM INDEMNITY, LTD, <br><br>                                      Plaintiff, <br><br> vs. <br><br> DWIGHT HALVORSON INSURANCE SERVICES, INC d/b/a F.S.I.M. INSURANCE SERVICES and FOOD SERVICES INSURANCE MANAGERS, INC., <br><br>                                      Defendants | **Case No.:  04 CV 3361** <br><br> **Hon. Richard M. Berman** <br><br> **AFFIRMATION IN SUPPORT OF MOTION** _____ |


**AFFIRMATION IN SUPPORT OF DEFENDANTS' MOTION TO
DISMISS OR TO COMPEL ARBITRATION
AND STAY OF THE INSTANT ACTION**


        MARC I. KUNKIN, an attorney duly admitted to practice before the United States

District Court for the Southern District of New York, affirms under penalty of perjury as

follows:

        1.        I am an associate member of the firm of SCHINDEL, FARMAN & LIPSIUS,

LLP, counsel to Defendants Dwight Halvorson Insurance Services, Inc. ("DHIS") and Food

Service Insurance Managers, Inc. (FSIM") in connection with this action.  I submit this affirmation in support of Defendants' motion for to dismiss the complaint for lack of jurisdiction, improper venue and/or to dismiss or stay the proceedings based on the mediation clause in the applicable contract.

2.       This is an action to recover money damages based on the claimed breach of the terms agreements between Frontier Insurance Company ("Frontier") and DHIS and the breach of a "Promissory Note" executed by FSIM in favor of Platinum Indemnity Limited ("Platinum").  Plaintiff, brings this action as Rehabilitator of Frontier and, on behalf of Frontier as assignee of Platinum.

3.       The issues before this Court in the instant motion concern whether the court has jurisdiction over the defendants, whether venue is proper and whether the case should be dismissed and/or mediation compelled based on the mediation clause in the Limited Agency Agreement.

4.       In support of its motion, Defendants rely upon the pleadings and upon the Memorandum of Law.  Plaintiff's complaint is attached as **Exhibit A** to this affirmation.

5.       Defendants' answer is attached hereto as **Exhibit B**.

6.       The January 1,1998 "Limited Agency Agreement" between Frontier and DHIS is annexed as Exhibit A to Defendants' answer.

7.       The January 16, 1998 "Subscription and Shareholders Agreement" between FSIM and Platinum is annexed as Exhibit B to Defendants' answer.

8.       The November 8, 2000 "Promissory Note" executed by FSIM is annexed as Exhibit C to Defendants' answer.

9.       The July 2, 2001 letter from DHIS demanding mediation pursuant to the terms of

the Limited Agency Agreement is annexed as <u>Exhibit D</u> to Defendants' answer.

10.    Frontier had its principal place of business in Rock Hill, Sullivan Count, New York (paragraph 9 of complaint).

11.    DHIS and FSIM are California corporations with their principal place of business in California (paragraphs 15, 17, and 19 of complaint).

12.    Under the terms of the Limited Agency Agreement, DHIS was limited to business in California and Arizona ("Addendum No. 1 to Limited Agency Agreement).

_____

Marc I Kunkin (MK4182)

UNITED ST**Judge Berman**RICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

Gregory V. Serio, Superintendent of Insurance
of the State of New York, as Rehabilitator of
FRONTIER INSURANCE COMPANY, and as
Assignee of PLATINUM INDEMNITY, LTD.,

                     Plaintiff,

           -against-

DWIGHT HALVORSON INSURANCE
SERVICES, INC d/b/a/ F.S.I.M. INSURANCE
SERVICES and FOOD SERVICE INSURANCE
MANAGERS, INC.,

                     Defendants.

------------------------------------------------------x



Civil Action No.

**04 CV 3361**

ECF CASE

COMPLAINT

RECEIVED
MAY 03 2004
U.S.D.C. S.D. N.Y.
CASHIERS

        Plaintiff Gregory V. Serio, Superintendent of Insurance of the State of New York,

as Rehabilitator of Frontier Insurance Company ("FIC") and as the Assignee of Platinum

Indemnity, Ltd., by and through the undersigned attorneys, as and for his Complaint against

defendants Dwight Halvorson Insurance Services, Inc. d/b/a F.S.I.M. Insurance Services

("DHIS") and Food Service Insurance Managers, Inc. ("FSIM"), hereby alleges as follows:

### NATURE OF THE ACTION

       1.     This action arises out of a workers' compensation insurance program that the

defendants developed for and marketed to the food services industry.

       2.     FIC provided insurance coverage under this program and, in return, was entitled to

receive from DHIS certain payments pursuant to the terms of the controlling agency agreement.

       3.     FIC fully performed its obligations to DHIS by, among other things, not only

issuing the insurance policies in question but also paying out millions of dollars on workers'

compensation claims made on those policies.

4.    DHIS, however, has breached its contractual and fiduciary obligations to FIC by collecting premiums from insureds but failing to forward the payments due and owing to FIC.

5.    Subsequent to the termination of its relationship with the insurance program at issue, FIC confirmed that DHIS improperly has withheld millions of dollars in payments due to it under the program.  FIC brings this action to recover these payments from DHIS.

6.    In addition, pursuant to a binding and court-authorized assignment of certain claims belonging to the offshore reinsurer involved in the insurance program giving rise to this litigation, FIC brings this action to recover several million dollars due from FSIM to the reinsurer under certain agreements between those parties.

### JURISDICTION AND VENUE

7.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy is in excess of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

8.    This district is a proper venue pursuant to 28 U.S.C. § 1391(a)(1)(2) because a substantial part of the events and/or omissions giving rise to this action occurred within this district.

### THE PARTIES

#### Frontier Insurance Company

9.    FIC at all relevant times was and is an insurance company organized and existing under the laws of the State of New York and maintaining its principal place of business in Rock Hill, New York.

10.    On or about August 24, 2001, the Superintendent of Insurance of the State of New

York ("Superintendent") initiated proceedings in the Supreme Court of the State of New York, New York County, seeking an order placing FIC into rehabilitation pursuant to Article 74 of the New York Insurance Law.

11.     On or about August 27, 2001, the Court appointed the Superintendent as temporary receiver of FIC.

12.     The Court entered an Order of Rehabilitation with respect to FIC on or about October 15, 2001.  Therein, the Court appointed the Superintendent as Rehabilitator of FIC, declared FIC insolvent and found that "[i]t is in the best interest of Frontier's policyholders, creditors and the general public that the Superintendent be directed to take possession of Frontier's property and to rehabilitate its business and affairs[.]"

13.     The Order of Rehabilitation expressly authorizes the Superintendent to:

> [T]ake possession of [FIC's] property, conduct its business
> . . . take such steps toward the removal of the causes and
> conditions which made [the rehabilitation] proceeding
> necessary as he shall deem wise and expedient; and deal
> with the property and business of [FIC] in its name or in the
> name of the Superintendent as Rehabilitator.

14.     As Rehabilitator, the Superintendent also is authorized and empowered to commence litigation and pursue the recovery of damages on FIC's behalf, as well as for the benefit and protection of its policyholders, insureds and creditors.  It is in this capacity that the Superintendent brings this action.

### The Defendants

15.     DHIS at all relevant times was and is a corporate entity organized and existing under the laws of the State of California.

16.     At all times relevant to this litigation, DHIS was an insurance agency specializing in providing insurance and risk management services to clients in the food services industry.

3

17. FSIM at all relevant times was and is a corporate entity organized and existing under the laws of the State of California.

18. At all relevant times, FSIM was engaged in the business of securing workers' compensation insurance coverage for insureds in the agribusiness and food-related industries.

19. Both DHIS and FSIM maintain their principal places of business at 3300 Douglas Boulevard, Roseville, California.

## FACTUAL BACKGROUND

### The FSIM Program

20. DHIS was formed in or about 1987 as an insurance agency specializing in providing risk management services to businesses in the food services industry in and around California's Sacramento Valley.

21. DHIS grew to become a regional leader in that segment of the insurance industry, servicing growers, shippers, packers, distributors and processors of food products in Northern California.

22. In or about 1997, DHIS's president, Dwight J. Halvorson, formed FSIM as part of a comprehensive workers' compensation insurance program specifically designed for and marketed to the agribusiness and food-related industries (the "FSIM Program").

23. At all relevant times, FSIM was a risk-bearing managing general agency providing workers' compensation coverage to its clients through an offshore rent-a-captive insurance facility.

24. A captive insurance company is an insurance company owned and controlled by the insureds themselves. Its primary purpose is to insure the risks of those owners.

25. Captive insurance programs provide an alternative source of coverage to insureds

4

for whom the conventional approach of purchasing policies from an established insurance carrier may be unavailable or prohibitively expensive.

26.    For a variety of regulatory and financial reasons, captive insurers typically are domiciled in offshore jurisdictions such as Bermuda, the Cayman Islands, Barbados and the British Virgin Islands.

27.    These offshore captives typically are not licensed to actually issue insurance policies within the United States.  As a result, they typically act solely as reinsurers and partner with a fronting insurer that is licensed to issue policies in the United States to the insureds.  The fronting carrier issues those policies and then transfers a significant portion of the risk back to the offshore captive pursuant to a reinsurance agreement.

28.    One variation of the captive insurance program approach -- and the alternative the defendants in this action utilized -- is to structure the program around a rent-a-captive.

29.    The rent-a-captive is designed to accommodate insureds who either are unable or unwilling to assume the higher costs of establishing their own captive, a process which can require substantial upfront costs and capital investment.

30.    A rent-a-captive facility involves a captive formed by one or more sponsors who then "rent" the captive's capital, surplus, services and expertise to various insureds or groups of insureds.

31.    The insured or insureds who use the rent-a-captive typically purchase non-voting preferred shares in the captive, pay a fee and post some form of collateral to shield the captive reinsurer from any underwriting losses that may arise.

32.    In the typical rent-a-captive facility, separate rent-a-captive accounts are established within the overall captive infrastructure for each distinct set of insureds.  Premiums

collected on policies issued under a particular program are credited to the appropriate rent-a-captive account and loss payments made in connection with those losses are debited from the appropriate account.

33.    Platinum Indemnity, Ltd. ("Platinum Indemnity") served as the rent-a-captive around which the defendants structured the FSIM Program.

34.    At all relevant times, Platinum Indemnity was a corporate entity organized and existing under the laws of the Islands of Bermuda and maintained its principal place of business at Windsor Place, 18 Queen Street, Hamilton, Bermuda.

### FIC Is Enlisted as the FSIM Program's "Fronting" Insurer

35.    In or about 1997, Halvorson, DHIS's president, approached FIC to determine if FIC would be interested in serving as the fronting carrier for the FSIM program.

36.    During its negotiations with DHIS, FIC emphasized that it would consider Halvorson's proposed program only if it received assurance that, whether through reinsurance or otherwise, FIC as the fronting insurer would be exposed to virtually no risk on the underlying policies.

37.    Halvorson acknowledged this demand and assured FIC that the FSIM Program would be structured in such a way that FIC would face minimal exposure on the underlying policies.

38.    FIC and DHIS ultimately entered into a Limited Agency Agreement (the "Agency Agreement") dated effective January 1, 1998.

39.    Under the Agency Agreement, FIC appointed DHIS as its agent and authorized it to quote, bind and decline workers' compensation insurance coverage for agricultural operations,

6

including farms and vineyards, as well as produce packing and handling operations.

40.    The Agency Agreement provided that DHIS, "as a trustee for" FIC, was authorized to receive premiums and fees, pay return premiums, pay adjustments and retain and pay commissions out of the premiums collected through the FSIM program.

41.    The Agency Agreement further provided for DHIS to accept and maintain all premiums and other funds it collected under the FSIM program "in the capacity of a fiduciary and trustee" for FIC.

42.    Pursuant to the Agency Agreement, within fifteen days of the end of each month, DHIS was required to provide FIC with an "Account Current." This monthly Account Current was an itemized statement of all premiums written, as well as any premium adjustments, made within the month in question.

43.    Pursuant to the Agency Agreement, each Account Current forwarded to FIC was to reflect DHIS's customer numbers for each insured; FIC policy numbers for each policy; gross premiums to be paid; the percentage of commission to be retained -- and most significantly for purposes of this dispute -- the net premium payment to be remitted to FIC.

44.    Under the Agency Agreement, within forty-five days following the end of each month, DHIS was obligated to pay to FIC the balance due as reflected on the Account Current relating to that month.

45.    Pursuant to the Agency Agreement, DHIS was obligated to make these payments to FIC regardless of whether the premiums in question actually were paid by the insured or subproducer. Therein, the parties expressly agreed that DHIS "assumes the credit risk should it bind insurance without receiving premium."

46.    Pursuant to the terms of the Agency Agreement, upon termination, all premiums

in DHIS's possession as of that time, as well as those DHIS was obligated to collect, became immediately due and owing to FIC.

47.    As compensation for its services, FIC agreed to allow DHIS a gross commission of 12 percent of all gross premium collected on policies underwritten or delivered by DHIS through the program.

48.    Subsequently, the Agency Agreement was amended effective January 1, 1999 to allow DHIS a 15.65 percent commission.

49.    In the Agency Agreement, FIC and DHIS specifically agreed that "the courts of New York shall have exclusive jurisdiction to resolve" any dispute arising between the parties. Further, FIC and DHIS agreed that any such dispute would be resolved under New York law.

### The Subscription and Shareholders Agreement

50.    On or about January 16, 1998, FSIM and Platinum Indemnity entered into a Subscription and Shareholders Agreement.

51.    Therein, as part of its rent-a-captive arrangement with Platinum Indemnity, FSIM agreed to purchase a non-voting redeemable preferred share in the captive for $125,000.00.

52.    Among the rights and obligations reflected in the Subscription and Shareholder's Agreement is FSIM's obligation to pay to Platinum Indemnity all amounts necessary to remedy any "Negative Balance" in its account.

53.    In essence, a Negative Balance would arise under the terms of the Subscription and Shareholders Agreement if the losses Platinum Indemnity was compelled to reinsure under the FSIM Program outstripped the level of premium dollars flowing from DHIS to FIC and, ultimately, into FSIM's rent-a-captive account at Platinum Indemnity.

8

### The Promissory Note

54.     On or about November 8, 2000, FSIM executed and delivered to Platinum Indemnity a promissory note ("Note") obligating itself to pay to Platinum Indemnity the amount of $469,515.00, plus interest.  A copy of the Note is attached hereto as Exhibit A.

55.     The Note was executed as a means of securing FSIM's performance of its financial obligations to Platinum Indemnity under the Subscription and Shareholders Agreement.

56.     Pursuant to the terms of the Note, FSIM was obligated to pay the $469,515.00 in . monthly installments of $21,000.00, commencing in or about August 15, 2000.

57.     The Note provides that the "balance of principal and any outstanding interest as well as any other sum remaining unpaid on this Note shall be paid in full no later than August 15, 2002."

58.     The Note further provides that FSIM would be in default thereunder if, among other things, FSIM "fails to pay any principle or interest on this Note when it becomes due and payable, or Debtor fails to pay any other cost, fee, expense or other amount owing to [Platinum Indemnity] under the Note[.]"

59.     The Note expressly authorized Platinum Indemnity to assign its rights thereunder to any third party with or without FSIM's consent.

### DHIS's Failure to Make Payments Due
### To FIC Under the Agency Agreement

60.     On or about November 10, 1999, FIC placed DHIS on notice of its intention to terminate the Agency Agreement.

61.     The Agency Agreement, in fact, was terminated effective January 1, 2000.

62.     The Agency Agreement was terminated due, in part, to DHIS non-compliance with the FSIM Program's underwriting guidelines and other provisions of said agreement.

63.    Subsequent to its termination of the Agency Agreement, FIC conducted extensive audits of the FSIM Program.

64.    These audits revealed that DHIS improperly withheld millions of dollars in premium collected from insureds covered under the FSIM Program that, once DHIS had deducted its allowable expenses and fees, should have been forwarded to FIC.

65.    Despite FIC's repeated demands for these funds, DHIS has refused to remit to FIC the payments due and owing under the terms of the Agency Agreement.

### FSIM's Failure to Make Payments Due to Platinum Indemnity

66.    In addition to DHIS's failure to perform its obligations to FIC under the Agency Agreement, FSIM also has defaulted under the Note. After making just seven monthly payments of $21,000.00 each, in or about 2001 FSIM ceased making the payments, leaving a remaining indebtedness under the Note of approximately $322,515.00, plus interest.

67.    Platinum Indemnity made repeated written demands to FSIM for the payments due and owing under the Note.

68.    Despite these demands, FSIM refused and failed to make the payments due and owing to Platinum Indemnity under the Note.

69.    FSIM also has failed to make the payments to Platinum Indemnity required under the Subscription and Shareholders Agreement to remedy the Negative Balance in its account with the captive.

70.    Several million dollars in outstanding payments relating to the Negative Balance are now outstanding. This figure has risen as FIC has continued to pay out on claims made on the underlying policies and the flow of premium into the FSIM account has ceased.

10

### Platinum Indemnity's Assignment
### to FIC of Its Claims Against FSIM

71.    FIC and Platinum Indemnity's respective rights and obligations with respect to the

FSIM program were memorialized in a Reinsurance Agreement dated effective January 1, 1998.

72.    Pursuant to the Reinsurance Agreement, Platinum Indemnity obligated itself to

reinsure certain of FIC's risks on the policies it issued in connection with the FSIM Program.

73.    In the wake of FIC's termination of its involvement with the FSIM Program, a

dispute arose between FIC and Platinum Indemnity regarding their respective rights and

obligations under the Reinsurance Agreement.

74.    On or about December 2, 2002, FIC and Platinum Indemnity executed a

Commutation Agreement pursuant to which they resolved their differences amicably.

75.    The Commutation Agreement provided for Platinum Indemnity to pay FIC

$2,918,851.65 to resolve the dispute.  This settlement amount was to consist of $15,000.00 in

cash and an assignment of claims relating to FSIM's outstanding obligations to Platinum

Indemnity relating to the FSIM Program.

76.    In the Commutation Agreement, FIC and Platinum Indemnity exchanged mutual

releases.

77.    On or about December 2, 2002, Platinum Indemnity executed an Assignment to

FIC of its claims against FSIM.  Specifically, this Assignment assigned to FIC all of Platinum

Indemnity's right, title and interest in the Subscription and Shareholders Agreement as well as

the Note.

78.    In an Order dated May 2, 2003, the Supreme Court of the State of New York for

New York County, formally approved the Commutation Agreement between FIC and Platinum

Indemnity, as required by the New York Insurance Law.

79.    In a Verified Petition seeking the Court approval of the Commutation Agreement, the Superintendent explained that the "primary reasons" for settling with Platinum Indemnity was that the commutation "will enable the Rehabilitator to pursue the balances due from FSIM including all claims paid as of the date of valuation [as well as] balances due on future claims as they are settled."

## COUNT I

### (Breach of Contract - DHIS)

80.    FIC repeats and realleges each and every allegation set forth in paragraphs 1 through 79 above as if fully set forth herein.

81.    The Agency Agreement constitutes a valid and binding contract between FIC and DHIS.

82.    FIC performed all of its contractual obligations to DHIS as set forth in the Agency Agreement.

83.    Through its acts and/or omissions, including its failure to remit net premiums and other payments due to FIC, DHIS has materially breached its obligations under the Agency Agreement.

84.    As a result of DHIS's material breach of the Agency Agreement, FIC has sustained and continues to sustain substantial monetary damages.

12

## COUNT II

### (Breach of Duty of Good Faith - DHIS)

85.    FIC repeats and realleges each and every allegation set forth in paragraphs 1 through 84 above as if fully set forth herein.

86.    Implied in the Agency Agreement between FIC and DHIS was a covenant of good faith and fair dealing pursuant to which DHIS obligated itself to refrain from engaging in conduct that would destroy or injure FIC's right to obtain the benefit of that contractual arrangement.

87.    Through its acts and/or omissions, including its improper retention of net premiums and other payments due to FIC, DHIS has materially breached this implied covenant of good faith and fair dealing.

88.    By engaging in this improper conduct in violation of the covenant of good faith and fair dealing, DHIS has deprived FIC of the anticipated benefit of the Agency Agreement.

## COUNT III

### (Breach of Fiduciary Duty - DHIS)

89.    FIC repeats and realleges each and every allegation set forth in paragraphs 1 through 88 above as if fully set forth herein.

90.    Both by contract and as a matter of law, DHIS served in a fiduciary capacity to FIC in connection with the FSIM Program.

91.    Through its acts and/or omissions, including its failure to remit net premiums and other payments due to FIC, DHIS has breached its fiduciary duties to FIC.

92.    As a result of DHIS's breach of its fiduciary duties, FIC has sustained and will continue to sustain substantial monetary injury.

13

## COUNT IV

### (Default on Promissory Note - FSIM)

93.    FIC repeats and realleges each and every allegation set forth in paragraphs 1 through 92 above as if fully set forth herein.

94.    The Note constitutes a valid and binding obligation on the part of FSIM to pay monies to Platinum Indemnity.

95.    Through its acts and/or omissions, including its failure to make the payments required under the Note, FSIM is in default.

96.    As a result of FSIM's default, Platinum Indemnity sustained substantial monetary injury.

97.    Platinum Indemnity has assigned to FIC its rights against FSIM with respect to Note.

98.    By operation of the Assignment of Platinum Indemnity's rights to FIC, the balance of principal and interest on the Note previously due to Platinum Indemnity under the Note is now properly due and owing to FIC.

## COUNT V

### (Breach of Contract - FSIM)

99.    FIC repeats and realleges each and every allegation set forth in paragraphs 1 through 98 above as if fully set forth herein.

100.    The Subscription and Shareholders Agreement constitutes a valid and binding contract between FSIM and Platinum Indemnity.

101.    Platinum Indemnity performed all of its obligations to FSIM as set forth in the Subscription and Shareholders Agreement.

14

102.    Through its acts and/or omissions, including its failure to make those payments necessary to remedy the Negative Balance in its account with Platinum Indemnity, FSIM has materially breached its obligations under the Subscription and Shareholders Agreement.

103.    As a result of FSIM's material breach of the Subscription and Shareholders Agreement, Platinum Indemnity sustained substantial monetary damages.

104.    Platinum Indemnity has assigned to FIC its rights against FSIM with respect to the Subscription and Stockholders Agreement.

105.    By operation of the assignment of Platinum Indemnity's rights to FIC. FIC is entitled to recover all damages flowing from FSIM's breaching conduct.

WHEREFORE, plaintiff Gregory V. Serio, Superintendent of Insurance of the State of New York, as Rehabilitator of Frontier Insurance Company and Assignee of Platinum Indemnity, Ltd., hereby demands judgment as follows:

A.    awarding FIC an amount to be determined at trial; and,

B.    granting FIC such other and further relief as the Court deems just and proper under the circumstances.

Dated:  New York, New York
        May 3, 2004

ENTWISTLE & CAPPUCCI LLP
299 Park Avenue, 14th Floor
New York, New York 10171
(212) 894-7200

By: _____
    William S. Gyves (WG 2770)
    Gerard N. Saggese III (GS 5346)

Attorneys for Plaintiff

15

# EXHIBIT A

# PROMISSORY NOTE

**PRINCIPAL: $469,515.00**

November 8, 2000

FOR VALUE RECEIVED on the above referenced date, Food Service Insurance Managers, Inc., a California corporation ("Debtor"), promises to pay to the order of Platinum Indemnity Limited, a Bermuda Company ("Creditor"), at Windsor Place, 3rd Floor, 18 Queen Street, Hamilton, Bermuda the principal sum of Four Hundred and Sixty Nine Thousand, Five Hundred and Fifteen Dollars and 00/100 Cents ($469,515.00) with interest as set forth herein, payable as follows:

     **A.**    Principal shall be paid on this Promissory Note (this "Note") as follows: Twenty One Thousand Dollars and No Cents ($21,000.00) on the fifteenth day of each month commencing with August 15, 2000. Such payment to be made by bank wire transfer to the bank and account detailed in Schedule 1 attached hereto, and any other bank and account as may be advised by the Creditor from time to time.

     **B.**    Subject to paragraph D below, interest at a variable rate, namely the Federal Funds Rate (the target interest rate for banks borrowing reserves among themselves as announced and in effect from time to time by the Federal Open Markets Committee of the U.S. Federal Reserve Board) plus two percentage points, shall accrue on principal outstanding from time to time. Subject to paragraph D below, interest payments shall be due on the fifteenth day of every month until Maturity.

     **C.**    Should interest not be paid by Debtor as stated, it shall thereafter bear like interest as the principal. Unpaid interest shall be compounded at a rate not to exceed simple interest on the unpaid principal at the maximum rate permitted by law.

     **D.**    Notwithstanding anything to the contrary herein, interest shall not begin to accrue on any amounts due hereunder until such time as the "Separate Account" maintained for Debtor by Creditor ceases to have a positive balance. The "Separate Account" is an account maintained by Creditor on its books which represents an ownership interest of Debtor in certain segregated assets of Creditor pursuant to the Subscription and Shareholder Agreement ("Agreement") dated January 16, 1998 between the Creditor and the Debtor and executed by both parties in Hamilton, Bermuda. For purposes of this Note, Creditor shall determine from time to time whether the Separate Account has a positive balance in accordance with the terms of the Agreement, and such determination shall be conclusive and binding on Debtor, absent manifest error. If Debtor nonetheless disputes Creditor's determination, Debtor shall pay the interest and principal amounts due hereunder as if such determination were undisputed and such dispute did not exist and Debtor's sole recourse against Creditor for such manifest error shall be an action separate from this Note.

     **E.**    This Promissory Note may be prepaid at any time without penalty. The

CH99 3516723-L040965 0010

balance of principal and any outstanding interest as well as any other sum remaining unpaid on this Note shall be paid in full no later than August 15, 2002.

F.    If any of the following events shall occur and be continuing for any reason whatsoever (and whether such occurrence shall be voluntary or involuntary or come about or be effected by operation of law or otherwise), an "Event of Default" shall be deemed to have occurred:

(1)    If Debtor fails to pay any principal or interest on this Note when it becomes due and payable, or Debtor fails to pay any other cost, fee, expense or other amount owing to Creditor under this Note; or

(2)    Debtor becomes insolvent or generally fails to pay, or admits in writing its inability or refusal to pay, debts as they become due; or Debtor applies for, consents to, or acquiesces in the appointment of a trustee, receiver or other custodian for Debtor or any property thereof, or makes a general assignment for the benefit of creditors; or, in the absence of such application, consent or acquiescence, a trustee, receiver or other custodian is appointed for Debtor or for a substantial part of the property of Debtor and is not discharged within 30 days; or any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any bankruptcy or insolvency law, or any dissolution or liquidation, is commenced in respect of Debtor, and if such case or proceeding is not commenced by Debtor, it is consented to or acquiesced in by Debtor, or remains for 30 days undismissed; or Debtor takes any action to authorize, or in furtherance of, any of the foregoing.

G.    THIS PROMISSORY NOTE SHALL BE GOVERNED BY BERMUDA LAW WITHOUT REGARD OR CONFLICT OF LAWS PRINCIPLES. SUIT HEREUNDER MAY BE BROUGHT IN A BERMUDA COURT. DEBTOR HEREBY IRREVOCABLY AND KNOWINGLY WAIVES ANY OBJECTION TO SUIT IN SUCH COURT DUE TO INCONVENIENCE OR UNSUITABILITY OF FORUM, VENUE OR OTHERWISE, AND HEREBY WAIVES ANY RIGHT DEBTOR MAY HAVE TO A JURY TRIAL. The foregoing shall not prejudice Creditor's right to bring suit in any jurisdiction it deems desirable or to enforce any judgments obtained in any jurisdiction. The remedies provided herein are not exclusive and Creditor shall have the option to utilize any one or more remedies available at law or in equity to enforce the provisions of this Note.

H.    Principal and interest shall be payable in lawful money of the United States.

I.    Debtor waives presentment, demand, notice of demand, protest, notice-of protest, notice of dishonor and notice of non-payment and agrees to pay such costs, expenses and reasonable attorneys' fees as may be adjudged by a court in connection with any litigation relating to this Note. No delay or omission of Creditor in exercising any right or remedy hereunder shall impair any such right or operate as a waiver thereof. No single or partial exercise by Creditor of any remedy shall preclude any further exercise thereof.

J.       Creditor may assign this Note without Debtor's consent; Debtor may not assign this Note without Creditor's prior written consent.

K.       If any provision or any word, term, clause or part of any provision of this Note shall be invalid for any reason, the same shall be ineffective, but the remainder of this Note and of the provisions shall not be affected and shall remain in full force and effect.

IN WITNESS WHEREOF, Debtor has caused this Note to be executed by its officers thereunto duly authorized, all as of the day and year first above written.

FOOD SERVICE INSURANCE
MANAGERS, INC.

By: _____
    President

ATTEST:

By: _____
    Secretary

CH199 3516723-1.040965.0010

PROMISSORY NOTE DATED NOVEMBER 8, 2000

SCHEDULE 1

BANK ACCOUNT DETAILS AND ROUTING INSTRUCTIONS

**PLEASE REQUEST THAT CHASE MANHATTAN BANK N.A. WIRE FUNDS TO THE INSTRUCTIONS BELOW <u>UNDER A SWIFT 100 ORDER.</u> This will cause the Bank of Butterfield & Son Ltd. in Bermuda to be notified in advance of funds to be received into Platinum Indemnity Limited-FSIM Buttress MMF A/C # 006922.**

BANK:                                 Chase Manhattan Bank, N.A.
                                      Building F, Floor 8
                                      4 Chase Metrotech Centre
                                      New York, N.Y. 11245, USA

ABA #:                                021-000-021

SWIFT:                                CHAS US 33

For Credit to:

BENEFICIARY BANK:                     **The Bank of N.T. Butterfield & Son Ltd.
                                      Hamilton, Bermuda**

ACCOUNT NUMBER:                       **001-106-7808**

                                      **For Further Credit to: Butterfield Money
                                      Market Fund Ltd.**

BENEFICIARY ACCOUNT NUMBER:           **006922**

BENEFICIARY ACCOUNT NAME:             **Platinum Indemnity Limited-FSIM**

CHI99 3516723-1.040965.0010