UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                 :

Gregory V. Serio, Superintendent of Insurance    :
of the State of New York, as Rehabilitator of     :     04 CV 3361 (RMB)
FRONTIER INSURANCE COMPANY, and as     :
Assignee of PLATINUM INDEMNITY, LTD.,    :

                                 :

                   Plaintiff,    :

                                 :

        -against-                :

                                 :

DWIGHT HALVORSON INSURANCE        :
SERVICES, INC d/b/a/ F.S.I.M. INSURANCE   :
SERVICES and FOOD SERVICE INSURANCE  :
MANAGERS, INC.,                   :

                               :

                 Defendants.  :

                               :
------------------------------------------------------------x

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT AND TO COMPEL MEDIATION

ENTWISTLE & CAPPUCCI LLP
299 Park Avenue, 14th Floor
New York, New York 10171
(212) 894-7200

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ iii

PRELIMINARY STATEMENT.................................................................................................1

STATEMENT OF FACTS .........................................................................................................3

    A.    The Parties ...................................................................................................3

        1.    FIC ..............................................................................................3

        2.    The Defendants ...........................................................................3

    B.    The FSIM Program ....................................................................................3

    C.    The Agency Agreement ..............................................................................4

    D.    FIC's Termination of the FSIM Program...................................................4

ARGUMENT

POINT I.

THE COURT'S EXERCISE OF PERSONAL
JURISDICTION OVER THESE DEFENDANTS IS
ENTIRELY APPROPRIATE UNDER THE CIRCUMSTANCES..........................5

    A.    The Defendants Have Waived Any
        Objections to Personal Jurisdiction.......................................................5

    B.    DHIS Has Consented to
        the Jurisdiction of this Court..................................................................7

    C.    The Defendants' "Transaction of Business" in New
        York Provides the Basis for Personal Jurisdiction.................................8

        1.    New York's Long-Arm Statute...................................................8

        2.    The "Transacting Business" Requirement .................................9

        3.    The "Arising Out of" Requirement...........................................12

        4.    The Defendants' Fall Within Reach
                of New York's Long-Arm Statute.............................................12

POINT II.

NEW YORK IS A PROPER
VENUE FOR THIS DISPUTE ........................................................................................16

A.    The Forum Selection Clause Expressly Provides
      For Disputes to Be Venued in New York ...........................................................16

B.    This District Is a Proper Venue Because a Substantial
      Part of the Underlying Events Occurred in New York .......................................16

POINT III.

THE MEDIATION CLAUSE IS PERMISSIVE
RATHER THAN MANDATORY AND PROVIDES
NO BASIS FOR A STAY OF THIS ACTION…………………………………….....20

CONCLUSION………………………………………………………………………….24

## TABLE OF AUTHORITIES

### Cases

Abert Trading, Inc. v. Kipling Belgium N.V./S.A.,
   2001 U.S. Dist. LEXIS 3109 (S.D.N.Y. Feb. 26, 2002) .............................................8, 9, 10, 11

Arrowsmith v. United Press International,
   320 F.2d 219, 223 (2d Cir. 1963) ......................................................................................9

Astor Holdings, Inc. v Roski,
   2002 U.S. Dist. LEXIS 758 (S.D.N.Y. Jan. 17, 2002) ......................................... 17-18

Bates v. C&S Adjusters, Inc.,
   980 F.2d 865 (2d Cir. 1992) .......................................................................................17

Constitution Reinsurance Co. v. Stonewall Ins. Co.,
   872 F. Supp. 1247 (S.D.N.Y. 1995) .............................................................................18

CutCo Industries, Inc. v. Naughton,
   806 F.2d 361 (2d Cir. 1986) ...............................................................................9, 10, 11

Department of Transportation v. City of Atlanta,
   380 S.E.2d 265 (Ga. 1989) .........................................................................................22

Drabik v. Murphy,
   246 F.2d 408 (2d Cir. 1957) .........................................................................................6

ESI, Inc. v. Coastal Power Production Co.,
   995 F. Supp. 419 (S.D.N.Y. 1998) ..........................................................................17, 18

Greenblatt v. Gluck,
   265 F. Supp. 2d 346 (S.D.N.Y. 2003) .........................................................................17

ICC Primex Plastics Corp. v. LA/ES Laminati Estrusi Termo-Plastici S.P.A.,
   775 F. Supp. 650 (S.D.N.Y. 1995) .............................................................................11

In re Blutrich Herman & Miller,
   227 B.R. 53 (Bankr., S.D.N.Y. 1998) ...........................................................................6

Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,
   456 U.S. 694 (1982) .....................................................................................................7

International Shoe Co. v. State of Washington,
   326 U.S. 310 (1945) ...................................................................................................15

Madison Models, Inc. v. Casta,
   2003 U.S. Dist. LEXIS 14844 (S.D.N.Y. Aug. 21, 2003) .....................................10, 11

Marie Midland Bank, N.A. v. Miller,
   664 F.2d 899, 904 (2d Cir. 1981).................................................................9

McGowan v. Smith,
   52 N.Y.2d 268, 419 N.E.2d 321, 437 N.Y.S.2d 643 (1981)...................................12

McKee Electric Co. v. Rauland-Borg Corp.,
   20 N.Y.2d 377, 229 N.E.2d 604, 283 N.Y.S.2d 34 (1967)....................................10

Mende v. Milestone Technology, Inc.,
   269 F. Supp. 2d 246 (S.D.N.Y. 2003).......................................................9, 10

Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lecopulos,
   553 F.2d 842 (2d. Cir. 1977)....................................................................7

Metropolitan Life Insurance Co. v. Robertson-Ceco Corp.,
   84 F.3d 560 (2d Cir. 1996)......................................................................9

National Equipment Rental, Ltd. v. Szukent,
   375 U.S. 311 (1964)..............................................................................7

Okasa v. Hyppolite,
   1992 U.S. Dist. LEXIS 1863 (S.D.N.Y. Feb. 19, 1992)....................................18

Paribas Corp. v. Shelton Ranch Corp.,
   742 F. Supp. 86 (S.D.N.Y. 1990)..............................................................7

Premier Lending Services, Inc. v. J.L.J. Assocs.,
   924 F. Supp. 13 (S.D.N.Y. 1996).............................................................11

Robert Diaz Assocs. Enterprises, Inc. v. Elete, Inc.,
   2004 U.S. Dist. LEXIS 8620 (S.D.N.Y. May 14, 2004)...................................18

Robinson v. Overseas Military Sales Corp.,
   21 F.3d 502, 507 (2d Cir. 1994)..............................................................10

Rohrer v. FSI Futures, Inc.,
   981 F. Supp. 270, 275 (S.D.N.Y. 1997).......................................................5

Ross v. UKI Ltd.,
   2004 U.S. Dist. LEXIS 2970 (S.D.N.Y. Mar. 2, 2004)...................................12

Sacondy Technologies, Inc. v. Avant, Inc.,
   862 F. Supp. 1152 (S.D.N.Y. 1994)..........................................................18

SAS Group, Inc. v. Worldwide Inventions, Inc.,
   245 F. Supp. 2d 543 (S.D.N.Y. 2003)..............................................10, 11, 12, 15

iv

Spier v. Erber,
  759 F. Supp. 1024 (S.D.N.Y. 1991).................................................................7

TBV Holdings Ltd. v. Schey,
  2002 U.S. Dist. LEXIS 13682 (S.D.N.Y. July 26, 2002) .......................................19

U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.,
  241 F.3d 135 (2d Cir. 2001)..........................................................................18

Ultracashmere House Ltd. v. Madison's of Columbus, Inc.,
  534 F. Supp. 542 (S.D.N.Y. 1982)....................................................................7

Xedit Corp. v. Harvel Industries Corp.,
  456 F. Supp. 725 (S.D.N.Y. 1978).................................................................12

Zets v. Scott,
  498 F. Supp. 884 (W.D.N.Y. 1980) .................................................................6

## Rules

28 U.S.C. § 1391(a) ...........................................................................17, 18, 19

Fed. R. Civ. P. 12(h)(1)...........................................................................5

N.Y. CPLR § 302..........................................................................9, 11, 12, 15

## Secondary Authorities

10 American Revue of International Arbitration, at 265, 268 (1999)...........................22

J. Grenig, Alternative Dispute Resolution, § 7.2 at 117 (West 1997) ...........................22

17 J. Moore, Moore's Federal Practice, § 110.04[2] at 110-42.1 (3d ed. 2004)..........................17

5A Wright & Miller, Federal Practice & Procedure, § 1391 at 752 (2d ed. 1990) .....................5

## PRELIMINARY STATEMENT

Plaintiff Gregory V. Serio, Superintendent of Insurance of the State of New York, as Rehabilitator of Frontier Insurance Company ("FIC") and assignee of Platinum Indemnity, Ltd. ("Platinum"), respectfully submits this memorandum of law in opposition to the defendants' motion to dismiss the Complaint, compel mediation and stay the above-captioned action.

Defendants Dwight Halvorson Insurance Services, Inc. ("DHIS") and Food Service Insurance Managers, Inc. ("FSIM") (collectively, the "Defendants") raise their jurisdictional challenge in just six lines of legal argument -- without elaboration, without a single supporting affidavit and apparently without much conviction. As discussed below in Point I, this perfunctory approach to the personal jurisdiction issue reflects what the Defendants must know are grave defects in their position. First, the Defendants have waived this jurisdictional objection by failing to raise it in their Answer. Second, the Defendants' position is undermined by a valid contractual provision in which the parties consented to the jurisdiction of this Court. Third, the Defendants' position simply cannot be squared with the indisputable fact that they took affirmative steps directed at New York to initiate a business relationship with FIC, entered into an agency agreement with FIC and then, throughout their two-year business relationship with that New York insurance company, engaged in constant interaction with FIC representatives in New York with respect to the very subject matter of this litigation. These contacts are more than sufficient to justify the Court's exercise of personal jurisdiction pursuant to New York's long-arm statute.

The Defendants' venue argument fares no better. As discussed below in Point II, the contract at the heart of this dispute expressly provides that "the parties agree that the courts of

New York shall have exclusive jurisdiction to resolve" any disputes. Moreover, the Defendants'

argument reflects a fundamental misunderstanding of the concept of venue. The controlling

venue statute does not require that New York have the most substantial contacts with the dispute

of any potential venue; instead, the statute requires only that a substantial part of the underlying

events occurred here. The courts consistently have held that, in a contract action, even if the

underlying contract was performed and breached elsewhere, venue in New York nonetheless is

proper where the parties' communications relating to the contract flowed to and from New York.

In short, the venue requirements are not nearly as restrictive as the Defendants suggest. These

liberal requirements compel the conclusion that, given the Defendants' conduct directed at New

York, this district is an appropriate venue for this dispute.

              Finally, as discussed below in Point III, there is no merit to the Defendants'

attempt to compel mediation and stay this action. On its face, the mediation provision at issue is

permissive rather than mandatory. It provides that "either party may request, in writing,

mediation" of any dispute. (emphasis supplied). The Defendants ignore this plain and

unambiguous language and essentially ask the Court to rewrite a contractual provision they

apparently no longer find advantageous. They do not have that option. Had the parties intended

to make mediation mandatory, these sophisticated business entities easily could have done so.

The fact that they elected not to do so reflects the reality that mediation, at its core, is a

consensual process. At this juncture, FIC has no interest in mediation; instead, it prefers to

pursue discovery and litigate this case in order to recover the substantial damages it has sustained

in connection with the insurance program in question. The Defendants' effort to avert discovery,

stay this action and compel mediation is without merit.

2

## STATEMENT OF FACTS

### A.     The Parties

#### 1.     FIC

At all times relevant to this dispute, FIC was an insurance company organized and existing under the laws of New York.  Based in Rock Hill, New York, FIC served as the fronting carrier for the insurance program giving rise to this dispute.  See Complaint, ¶ 9.

#### 2.     The Defendants

DHIS at all relevant times was a corporate entity organized and existing under the laws of California and maintained its principal place of business in Roseville, California.  Id., ¶¶ 15, 19.  It was an insurance agency specializing in providing insurance and risk management services to the food services industry.  Id., ¶ 16.  At all relevant times, FSIM was a corporate entity organized and existing under California law.  Based in Roseville, California, FSIM was engaged in the business of securing workers' compensation insurance coverage for insureds in the agribusiness and food-related industries.  Id., ¶¶ 17-19.

### B.     The FSIM Program

Dwight J. Halvorson, DHIS's president, formed FSIM in or about 1997.  Id., ¶ 22.  Halvorson had been operating DHIS since 1987.  DHIS grew to become a regional leader in that segment of the insurance industry servicing growers, shippers, packers, distributors and processors in Northern California.  Id., ¶¶ 20-21.  Halvorson established FSIM as part of a comprehensive workers' compensation insurance program developed for and marketed to this industry.  Id., ¶ 22.

Halvorson's concept was to secure coverage for his clients through an offshore captive insurance facility.  Because neither FSIM nor DHIS were insurers, Halvorson needed to

affiliate with an established carrier willing to "front" the insurance policies covering those clients. The offshore captive would, in turn, reinsure the fronting carrier. Id., ¶¶ 23-32.

      **C.**    **The Agency Agreement**

        In late 1997, Halvorson approached FIC to gauge its interest in serving as the fronting carrier for the FSIM insurance program ("FSIM Program"). Id., ¶ 35. After a period of negotiations, FIC and DHIS ultimately entered into a Limited Agency Agreement ("Agency Agreement") dated effective January 1, 1998. Id., ¶ 38. (A copy of the Agency Agreement is attached as Exhibit C to the accompanying Declaration of Laurie J. Weiss ("Weiss Decl.")). Therein, FIC appointed DHIS as its agent and authorized DHIS to quote, bind and decline coverage in connection with the FSIM Program. Id., ¶ 39. At the same time, FSIM formed its offshore captive reinsurance facility through a series of agreements with Platinum. Id., ¶¶ 33-34, 50-53.

      **D.**    **FIC's Termination of the FSIM Program**

        FIC terminated the Agency Agreement effective January 1, 2000. Id., ¶ 61. FIC did so due to, among other things, DHIS's non-compliance with the program's underwriting guidelines and other provisions of the Agency Agreement. Id., ¶ 62.

        Subsequent to the termination of the Agency Agreement, FIC conducted an extensive audit of the FSIM Program. Id., ¶ 63. These audits disclosed that DHIS had improperly withheld from FIC millions of dollars in premium collected from the insureds covered under the FSIM Program. Pursuant to the terms of the Agency Agreement, once DHIS deducted its allowable expenses and fees from the premiums collected from the insureds, the balance should have been -- but in large part was

not -- forwarded to FIC. Id., ¶ 64.

## ARGUMENT[1]

## POINT I.

## THE COURT'S EXERCISE OF PERSONAL JURISDICTION OVER THESE DEFENDANTS IS ENTIRELY APPROPRIATE UNDER THE CIRCUMSTANCES

### A.    The Defendants Have Waived Any Objections to Personal Jurisdiction

The Defendants' jurisdictional challenge is easily disposed of on straightforward procedural grounds.  It is well settled that by failing to raise their jurisdictional objection in the Answer, the Defendants have waived their right to do so now.  Rule 12(h), in relevant part, provides as follows:

> A defense of lack of jurisdiction over the person . . . is waived . . . if it is neither made by motion under this rule nor included in a responsive pleading or amendment thereby permitted by Rule 15(a) to be made as a matter of course.

Fed. R. Civ. P. 12(h)(1).  There is no ambiguity or flexibility in this requirement.  To the contrary:

> "The message conveyed by . . . Rule 12(h)(1) is quite clear. It advises a litigant to exercise great care in challenging personal jurisdiction, venue, or service of process.  If he wishes to raise any of these defenses he must do so at the time he makes his first significant defensive move -- whether it be by way of a Rule 12 motion or a responsive pleading."

Rohrer v. FSI Futures, Inc., 981 F. Supp. 270, 275 (S.D.N.Y. 1997) (quoting 5A Wright & Miller, Federal Practice & Procedure, § 1391 at 752 (2d ed. 1990)).

---

[1]    For the Court's convenience, copies of all LEXIS decisions cited herein are attached hereto in alphabetical order.

The Defendants plainly have run afoul of Rule 12(h)(1). On or about June 25, 2004, the Defendants filed their Answer. Therein, they assert no less than seventeen affirmative defenses. Nowhere in the Answer, however, do the Defendants raise any challenge to the Court's exercise of personal jurisdiction over them.[2]

The courts consistently have precluded defendants from asserting jurisdictional defenses when they have failed to raise them at the earliest opportunity. See e.g., Drabik v. Murphy, 246 F.2d 408, 409 (2d Cir. 1957) (objection to personal jurisdiction rejected where defendant failed to raise the defense in the answer); Zets v. Scott, 498 F. Supp. 884, 885 (W.D.N.Y. 1980) ("[u]nder the plain and unambiguous language" of Rule 12(h), jurisdictional defense "is waived if a preanswer motion is made without including such a defense or if an answer is filed without it and such answer is not amended within twenty days to include such defense"); In re Blutrich Herman & Miller, 227 B.R. 53, 60 (Bankr., S.D.N.Y. 1998) ("[i]t is black letter law that a failure to raise the defense of lack of personal jurisdiction . . . in a pre-answer motion or in an initial responsive pleading waives" that objection). This case should be no exception. FIC respectfully submits that the Defendants' waiver compels the denial with prejudice of that prong of the motion seeking the dismissal of the Complaint for lack of personal jurisdiction.

---

[2]    In the First Affirmative Defense, the Defendants object to the Court's exercise of subject matter jurisdiction. Subject matter jurisdiction and personal jurisdiction are, however, wholly distinct concepts and FIC respectfully submits that the First Affirmative Defense is insufficient to preserve an objection to the Court's exercise of personal jurisdiction.

**B.     DHIS Has Consented to
the Jurisdiction of this Court**

A second, equally fundamental defect undermines the Defendants' jurisdictional

argument.  In Section 15.2 of the Agency Agreement, the parties expressly agreed "that the courts

of New York shall have exclusive jurisdiction" to resolve any disputes between them.  See Weiss

Decl., Ex. C at § 15.2.  Although they quote Article 15 of the Agency Agreement in their brief,

the Defendants conveniently overlook the effect that key contractual provision has on their

jurisdictional argument.

Contracting parties are free to contractually consent to a court's exercise of

personal jurisdiction over them.  See Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites

de Guinee, 456 U.S. 694, 703-04 (1982) ("'parties to a contract may agree in advance to submit

to the jurisdiction of a given court'") (quoting National Equip. Rental, Ltd. v. Szukent, 375 U.S.

311, 316 (1964)).  The Second Circuit has held that a forum selection clause specifying New

York as the parties' preferred venue is tantamount to a consent to personal jurisdiction in New

York.  See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lecopulos, 553 F.2d 842, 844 (2d. Cir.

1977).

Where, as here, a party contractually consents to jurisdiction, the courts have not

hesitated to enforce such provisions.  See e.g., Spier v. Erber, 759 F. Supp. 1024, 1027 (S.D.N.Y.

1991) (enforcing a jurisdictional consent provision, court states that it "is well-established 'that

parties to a contract may agree in advance to submit to the jurisdiction of a given court'")

(citation omitted); Paribas Corp. v. Shelton Ranch Corp., 742 F. Supp. 86, 90 (S.D.N.Y. 1990)

(enforcing jurisdictional consent provision); Ultracashmere House Ltd. v. Madison's of

Columbus, Inc., 534 F. Supp. 542, 545 (S.D.N.Y. 1982) (same).  In light of the plain language of

the Agency Agreement's jurisdictional consent provision, DHIS cannot in good faith now

challenge the Court's ability to exercise personal jurisdiction in this case.

**C.    The Defendants' "Transaction of Business" in New
        York Provides the Basis for Personal Jurisdiction**

Even if the Court were to conclude that the Defendants have neither waived their

jurisdictional objection nor consented to jurisdiction, well-settled law compels the conclusion

that they nonetheless are subject to the jurisdiction of this Court under New York's long-arm

statute.  This is not a case in which a defendant has been sandbagged by being sued in a

jurisdiction with which it had no or perhaps only fleeting contacts.  To the contrary, having

affirmatively reached out beyond California to solicit FIC's participation in the FSIM Program;

having contracted with a New York company; having served as the agent of a New York-based

insurer over a two-year period; having been in constant communication with FIC representatives

in New York in connection with the day-to-day operations of the FSIM Program; having traveled

to New York to meet with FIC representatives with respect to the FSIM Program; and having

reaped the substantial benefits flowing from their two-year business relationship with that New

York company, the Defendants can hardly be heard to complain of being compelled to defend

themselves in a New York court against claims arising out of those very same contacts with New

York.  The Defendants have cited and can cite no authority supporting a contrary conclusion.

**1.    New York's Long-Arm Statute**

Personal jurisdiction in a diversity action such as this is determined by the laws of

the state in which the district court sits.  Abert Trading, Inc. v. Kipling Belgium N.V./S.A., 2002

U.S. Dist. LEXIS 3109, at *3-4 (S.D.N.Y. Feb. 26, 2002).  In determining "'the amenability of a

foreign corporation to suit'" in a diversity action, "'federal law enter[s] the picture only for the

8

purpose of deciding whether a state's assertion of jurisdiction contravenes a constitutional guarantee.'" Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996) (quoting Arrowsmith v. United Press Int'l, 320 F.2d 219, 223 (2d Cir. 1963).

New York law provides two general bases for the exercise of personal jurisdiction over a non-domicillary: (1) "general jurisdiction" pursuant to CPLR 301, and (2) "specific jurisdiction" pursuant to CPLR 302. Here, ample grounds exist for the exercise of "specific" jurisdiction over the Defendants pursuant to CPLR 302(a)(1). CPLR 302(a)(1) provides for the exercise of personal jurisdiction over a non-domiciliary that "'transacts any business within the state . . .' when the cause of action is related to the transaction . . . ." Abert Trading, 2002 U.S. Dist. LEXIS 3109, at *5 (quoting CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986)).[3]

### 2.     The "Transacting Business" Requirement

The transacting business element of CPLR 302(a)(1) "does not require regular and systematic activities but rather the purposeful availment of the privilege of conducting activities within New York, thus invoking the benefits and protections of its laws." Abert Trading, 2002 U.S. Dist. LEXIS 3109, at *5. CPLR 301(a)(1) "requires only a minimal quantity of activity, provided that it is of the right nature and quality." Id. In this regard, the "showing necessary for

---

[3]   If the Court elects to dispose of the Defendants' jurisdictional challenge without conducting an evidentiary hearing, FIC "'need make only a prima facie showing of jurisdiction through its own affidavits and supporting material'" to defeat the motion. Mende v. Milestone Tech., Inc., 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003) (quoting Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2d Cir. 1981). In opposing the motion, FIC is entitled to the benefit of every doubt and the Court "will `construe jurisdictional allegations liberally and take as true uncontroverted factual allegations.'" Id. (quoting Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994).

a finding that a defendant `transacted business´ under Section 302(a)(1) is considerably less than the showing required for a finding that a defendant was `doing business´ under Section 301." Mende v. Milestone Tech., Inc., 269 F. Supp. 2d 246, 255 (S.D.N.Y. 2003). Even if the non-domiciliary never steps foot in New York, a "single transaction might be sufficient to fulfill this requirement so long as the relevant cause of action arises out of that transaction." Id. at 255; see also Madison Models, Inc. v. Casta, 2003 U.S. Dist. LEXIS 14844, at *12 (S.D.N.Y. Aug. 21, 2003).

There "is no fixed standard by which to measure the minimal contacts required to sustain jurisdiction under the provisions of CPLR 302(a)(1)." McKee Elec. Co. v. Rauland-Borg Corp., 20 N.Y.2d 377, 381-82, 229 N.E.2d 604, 607, 283 N.Y.S.2d 34, 37 (1967). The defendant simply must be shown to have "purposefully availed itself of the privileges of conducting activities within the forum State, thus invoking the benefits and protection of its laws." Id. at 382, 229 N.E.2d at 607, 283 N.Y.S.2d at 37-38; see also CutCo Indus., 806 F.2d at 365. In determining whether a defendant's contacts with New York are of the requisite nature and quality, "the Court examines the totality of the circumstances." Abert Trading, 2002 U.S. Dist. LEXIS 3109, at *5. This standard is designed to safeguard against an exercise of personal jurisdiction based on a non-domiciliary's "`random,'" "`fortuitous'" or "`attenuated´ contacts" with the forum state and ensure that, based on its more substantial ties to that state, the non-domiciliary is provided with "`fair warning´ of a possibility of being subject to courts of the forum state." SAS Group, Inc. v. Worldwide Inventions, Inc., 245 F. Supp. 2d 543, 548 (S.D.N.Y. 2003).

The test for "transacting business" in a contract action remains "imprecise."
Premier Lending Servs., Inc. v. J.L.J. Assocs., 924 F. Supp. 13, 15-16 (S.D.N.Y. 1996).
Nevertheless, certain general principles have evolved and inform the Court's analysis of whether
an exercise of jurisdiction under CPLR 302(a)(1) is appropriate here. See SAS, 245 F. Supp. 2d
at 548. First, "'any contract negotiations which indicate a purposeful invocation of the laws of
New York State are transactions of business for purposes of New York's long arm statute[.]'" Id.
(quoting Premier Lending, 924 F. Supp. at 15-16). In this regard, "[i]t does not matter whether
the negotiations are preliminary, whether the contract is executed in New York, or whether
performance is contemplated for New York." Id. at 549. In addition, "'contract negotiations in
New York will satisfy [CPLR 302(a)(1)] if the discussions substantially advanced or were
essential to the formation of the contract or advanced the business relationship to a more solid
level.'" Id. (quoting ICC Primex Plastics Corp. v. LA/ES Laminati Estrusi Termo-Plastici
S.P.A., 775 F. Supp. 650, 655 (S.D.N.Y. 1995).

         The day-to-day communications between contracting parties is also relevant to the
jurisdictional analysis. As this Court has observed, "[v]oluminous interaction in the form of
phone calls, e-mails and faxes" from the non-domiciliary to New York is a factor under CPLR
302(a)(1). See Abert Trading, 2002 U.S. Dist. LEXIS 3109, at *6. The parties' selection of New
York law in a choice of law provision is also a relevant factor. See CutCo Indus., 806 F.2d at
367. Whether the contracting parties stipulate that New York is a proper venue for any dispute
between them is an additional consideration to be factored into the jurisdictional analysis.
Madison Models, 2003 U.S. Dist LEXIS 14844, at *13-14. In addition, whether the underlying
contract requires the non-domiciliary to forward notices or payments to New York is a relevant

<div align="center">11</div>

factor. Id. Similarly, the courts consider whether the contract requires the supervision of the

non-domiciliary by a person located within New York. Id.

### 3.   The "Arising Out of" Requirement

A claim "arises out of" a transaction under CPLR 302(a)(1) where there is "'some

articulable nexus between the business transacted and the cause of action sued upon.'" Ross v.

UKI Ltd., 2004 U.S. Dist. LEXIS 2970, at *11 (S.D.N.Y. Mar. 2, 2004) (quoting McGowan v.

Smith, 52 N.Y.2d 268, 272, 419 N.E.2d 321, 323, 437 N.Y.S.2d 643, 645 (1981). The

defendant's contacts with New York "must be substantially proximate to the allegedly unlawful

act before the cause of action can be said to arise out of those activities." Xedit Corp. v. Harvel

Indus. Corp., 456 F. Supp. 725, 729 (S.D.N.Y. 1978).

### 4.   The Defendants' Fall Within Reach
### of New York's Long-Arm Statute

The Defendants have marshaled and can marshal no evidence demonstrating that

their contacts with New York in relation to the subject matter of this litigation were in any way

"random," "fortuitous" or "attenuated." See SAS Group, 245 F. Supp. 2d at 548. Indeed, the

record reflects that, in connection with the FSIM Program, the Defendants purposefully availed

themselves of the privileges of conducting business in New York and contracting with a New

York entity. For example:

- In late 1997, DHIS reached out from California to
  FIC representatives in New York to solicit FIC's
  participation as the "fronting" carrier for the FSIM
  Program. See Complaint, ¶ 35; Weiss Decl., ¶¶ 6-7,
  Ex. A.

- When FIC expressed an interest in the FSIM
  program, DHIS engaged in a series of negotiations
  with FIC representatives based in New York. These
  negotiations involved a substantial volume of

communications by telephone and otherwise between the Defendants in California and FIC representatives in New York.  <u>See</u> Complaint, ¶ 36; Weiss Decl., ¶ 8.

- During the course of these negotiations, the Defendants forwarded to FIC in New York information critical to FIC's decision to participate in the FIC Program, including an overview of the nature of the program, a completed application, information regarding their errors and omissions insurance coverage, licenses, resumes of key personnel and a financial statement.  <u>See</u> Weiss Decl., ¶ 9, Ex. B.

- These negotiations ultimately led to the parties' execution of the Agency Agreement pursuant to which DHIS agreed to serve as the agent of a New York-based insurance company.  <u>See</u> Complaint, ¶¶ 38-39; Weiss Decl., ¶ 10, Ex. C.

- The Agency Agreement was drafted by FIC and its counsel in New York.  Certain of its terms were the subject of detailed communications between the Defendants in California and FIC representatives in New York.  FIC executed the Agency Agreement in New York.  DHIS executed the contract in California and forwarded it to FIC in New York.  <u>See</u> Weiss Decl., ¶ 11.

- During the course of their two-year business relationship with a New York corporation, the Defendants' representatives traveled to New York to meet with FIC representatives in connection with the FSIM Program.  <u>See</u> Weiss Decl., ¶ 15, Ex. D.

- During the course of the parties' two-year business relationship, the Defendants placed countless telephone calls to FIC managers in New York with respect to the FSIM Program.  <u>Id.</u>, ¶ 16.

- During 1998 and 1999, there was a substantial flow of correspondence from the Defendants to FIC in New York with respect to the FSIM Program.  <u>Id.</u>, ¶ 17, Exs. E, F.

13

- In the Agency Agreement, DHIS agreed that New York law would control in resolving any dispute arising between the parties. See Complaint, ¶ 49; Weiss Decl., Ex. C at § 15.2.

- In the Agency Agreement, DHIS agreed that the courts of New York would have exclusive jurisdiction over any dispute arising between the parties. Id.

- Pursuant to the Agency Agreement, FIC's activities as FIC's agent were to be supervised by FIC representatives based in New York. See Weiss Decl., ¶ 12.

- Pursuant to the Agency Agreement, DHIS obligated itself to forward and did forward to FIC in New York the monthly Account Current reports which are at the heart of this dispute. See Complaint, ¶¶ 42-43; Weiss Decl., ¶ 20, Ex. C at § 6.1.

- Pursuant to the Agency Agreement, DHIS obligated itself to forward and did forward to FIC in New York monies reflecting the balance due on the Accounts Current reports in the form of both checks for deposit into FIC's New York bank account and wire transfers to FIC's New York bank. See Complaint, ¶ 44; Weiss Decl., ¶ 18, Ex. G, Ex. H and Ex. C at § 6.2.

- FSIM claims to have forwarded to FIC in New York certain additional capital contributions reflecting a percentage of the gross written premiums under the program. See Answer, ¶ 129.

- DHIS was obligated under the Agency Agreement to forward to FIC in New York notices of claims it received with respect to insurance policies issued through the FSIM program. See Weiss Decl., Ex. C at § 3.11.

- DHIS obligated itself under the Agency Agreement to forward to FIC in New York DHIS's audited financials. Id., § 5.11.

- DHIS obligated itself under the Agency Agreement to forward to FIC in New York regular reports regarding all premium trust account transactions. Id., § 8.5.

- One of the banks through which payments were made under promissory note at issue in this litigation was Chase Manhattan Bank, N.A. in New York. See Complaint, Ex. A at Schedule 1.

Notwithstanding their tepid assertions to the contrary, these substantial New York contacts demonstrate that the Defendants "'deliberately reached out beyond [their] home state for the purpose of establishing a business relationship" with a New York entity and "as a result, purposefully availed [themselves] of the forum and should have reasonably foreseen being haled into court here.'" SAS Group, 245 F. Supp. 2d at 547. Each of the New York contacts highlighted above "'substantially advanced or were essential to the formation of the contract or advanced the business relationship to a more solid level.'" Id. at 549. The Defendants cannot credibly deny that FIC's claims arise out of these contacts.

In short, CPLR 301(a)(2) provides a rock-solid basis for jurisdiction over the Defendants. Given the overall set of circumstances surrounding the FSIM Program and its demise, the Court may exercise that jurisdiction without offending "traditional notions of fair play and substantial justice" because, given their purposeful activity directed at New York, the Defendants reasonably should have foreseen being sued in New York based on their contacts with New York. See International Shoe Co. v. State of Washington, 326 U.S. 310, 316 (1945). Accordingly, FIC respectfully requests that the Court deny with prejudice that prong of the Defendants' motion seeking dismissal of the Complaint for lack of personal jurisdiction.

15

## POINT II.

## NEW YORK IS A PROPER
## VENUE FOR THIS DISPUTE

### A.    The Forum Selection Clause Expressly Provides
### For Disputes to Be Venued in New York

In disposing of the Defendants' contention at page 4 of their brief that "there is no

basis for venue in this district," the Court need look no further than the Agency Agreement.  As

noted above, Section 15.2 of the Agency Agreement, in relevant part, provides:

> [T]he parties agree that the courts of New York shall have
> exclusive jurisdiction to resolve [any disputes].

Weiss Decl., Ex. C at § 15.2.  This provision is fatal to DHIS's venue argument.

### B.    This District Is a Proper Venue Because a Substantial
### Part of the Underlying Events Occurred in New York

The Defendants' venue argument suffers from an additional defect in that it

reflects a fundamental misunderstanding of the concept of venue.  In just five lines of argument

at page 4 of their brief, the Defendants contend that venue is improper because the Defendants

are California, not New York, corporations.  Of course, if the Defendants' status as California

corporations in and of itself was sufficient to preclude venue in New York, no New York-based

party to a contract with a California-based entity could maintain a breach of contract claim in

New York against the California-based party.  This simplistic position, for which the Defendants

cite no authority, is without merit.

The only other argument the Defendants raise is that New York is an improper

venue because "the activities contemplated and performed under" the Agency Agreement "were

limited to California and in [sic] Arizona."  Once again, the Defendants cite no support for this

position, which does not withstand scrutiny.  According to the Defendants' theory of venue, no

16

New York-based party to a contract could sue a breaching party in New York for failing to fulfill its obligations that were to have been performed outside of New York. This position has no basis in law or logic, as is reflected by the Defendants' failure to cite a single case in support of it.

Contrary to the Defendants' apparent belief, venue is neither a black-and-white nor an all-or-nothing proposition. Any meaningful analysis of venue in a diversity action must focus on the flexible requirements of 28 U.S.C. § 1391(a). Section 1391(a)(2) provides that venue properly lies in a "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred[.]" 28 U.S.C. § 1391(a)(2). As one leading authority on federal procedure has observed, the courts "generally are appropriately interpreting" this venue statute "broadly as intended by Congress." See 17 J. Moore, Moore's Federal Practice, § 110.04[2] at 110-42.1 (3d ed. 2004).

Section 1391(a) does not require a litigant to commence an action in "the best venue." Bates v. C&S Adjusters, Inc., 980 F.2d 865, 867 (2d Cir. 1992). It "does not require venue in the district with the most substantial contracts to the dispute. Rather, it is sufficient that a substantial part of the event occurred in the challenged venue, even if a greater part of the events occurred elsewhere." Astor Holdings, Inc. v Roski, 2002 U.S. Dist. LEXIS 758, at *22 (S.D.N.Y. Jan. 17, 2002) (emphasis supplied); see also Greenblatt v. Gluck, 265 F. Supp. 2d 346, 352 (S.D.N.Y. 2003). In fact, venue may properly lie in more than one district. ESI, Inc. v. Coastal Power Prod. Co., 995 F. Supp. 419, 424 (S.D.N.Y. 1998). This liberal standard:

> [A]cknowledges the more porous borders of the electronic age where events can be influenced anywhere in the world by fax, phone and keystroke, and recognizes that a person acting predominantly in one state can easily cause his or her acts to have effects outside the borders of that state.

17

Astor Holdings, 2002 U.S. Dist. LEXIS 758, at *22.

What the Defendants overlook is that, in a contract action, venue may be proper in a district where the contract was substantially negotiated, drafted and executed even if the contract was not performed there and the alleged breach occurred elsewhere. ESI, 995 F. Supp. at 425; see also Okasa v. Hyppolite, 1992 U.S. Dist. LEXIS 1863, at *2-3 (S.D.N.Y. Feb. 19, 1992) (venue proper because extensive negotiations and preparations for formation of contract occurred in forum state). Indeed, the venue requirements of Section 1391(a)(2) "'may be satisfied by a communication transmitted to or from the district in which the cause of action was filed given a sufficient relationship between the communication and the cause of action.'" Constitution Reins. Co. v. Stonewall Ins. Co., 872 F. Supp. 1247, 1249 (S.D.N.Y. 1995) (citation omitted).

In Sacondy Technologies, Inc. v. Avant, Inc., 862 F. Supp. 1152 (S.D.N.Y. 1994), for example, the Southern District of New York was found to be a proper venue where "at least some of defendants' dealings" with the plaintiff in connection with the underlying contract "took place over the phone and by correspondence and facsimile between [defendant] in Massachusetts and [plaintiff] in New York, respectively." Id. at 1157. In addition, the Sacondy Technologies court emphasized that the underlying contract "was transmitted from and to [plaintiff's] offices within this district." Id.; see also U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., 241 F.3d 135, 153 (2d Cir. 2001) (venue in New York deemed proper based on fact that defendant "directed communications to New York"); Robert Diaz Assocs. Enters., Inc. v. Elete, Inc., 2004 U.S. Dist. LEXIS 8620, at *24 (S.D.N.Y. May 14, 2004) (New York found to be an appropriate venue given, among other things, the fact that defendant signed the contract in Colorado and

18

faxed it to plaintiff in Manhattan and sent e-mails to Manhattan); TBV Holdings Ltd. v. Schey,

2002 U.S. Dist. LEXIS 13682, at *4 (S.D.N.Y. July 26, 2002) (finding a substantial part of the

events giving rise to the contract claims occurred in New York where, among other things,

contract was negotiated over the telephone between plaintiff in New York and defendant in

Florida; the contract was prepared in New York and ultimately returned from Florida to New

York after execution; and plaintiff performed its contractual obligations in New York).

        The Defendants' substantial and long-running contacts with New York with

respect to the subject matter of this jurisdiction, as detailed above in Point I. C., demonstrate that

this district is a proper venue for this dispute. The parties' business dealings included, among

other things, face-to-face meetings in Sullivan County. The parties' business relationship was

initiated by the Defendants' decision to reach out to FIC managers in Sullivan County to solicit

their participation in the FSIM Program. The underlying contract was negotiated via

communications the Defendants had with FIC managers in Sullivan County. The parties'

contractual relationship was formalized when the Defendants forwarded the executed Agency

Agreement to FIC in Sullivan County. Throughout the course of the parties' two-year

relationship, the Defendants on countless occasions conducted their business with FIC through

telephone calls, faxes and correspondence directed to FIC managers in Sullivan Country.

Throughout this time, the payments due to FIC under the Agency Agreement -- payments that go

to the very heart of this dispute -- were forwarded by the Defendants to FIC managers for deposit

in FIC's account at a New York bank.

        These contacts establish that, for purposes of 28 U.S.C. 1391(a)(2), a substantial

part of the Defendants' acts or omissions giving rise to this action occurred within this district.

Accordingly, FIC respectfully submits that the Defendants motion to dismiss the Complaint for improper venue should be denied with prejudice.

### POINT III.

### THE MEDIATION CLAUSE IS PERMISSIVE RATHER THAN MANDATORY AND PROVIDES NO BASIS FOR A STAY OF THIS ACTION

The Defendants' contention that FIC should be compelled to mediate this dispute is premised upon a gross misreading of the plain language of the contractual provision at issue. Only by once again ignoring the unambiguous language of the Agency Agreement could the Defendants assert at pages 2 and 3 of their brief that the parties have agreed that any dispute between them "was to be submitted to mediation" or that the Agency Agreement "provides that disputes are to be submitted to mediation." The Agency Agreement provides for no such thing. Section 15.1 of the Agency Agreement, in relevant part, provides:

> If irreconcilable differences arise as to the business done under this Agreement, either party may request, in writing, mediation of such differences.

Weiss Decl., Ex. C at § 15.1 (emphasis supplied).

Clearly, this mediation provision is permissive rather than mandatory in nature. It reflects the plain intention of the parties to provide for a process though which they may resort to mediation if, under the circumstances, they both deem mediation to be a beneficial alternative to litigation. Accordingly, either party is left the option of raising the possibility of mediation by requesting that the other party agree to mediate. Only if the other party grants the request, however, would the dispute then proceed to mediation under the American Arbitration Association's Commercial Mediation Rules.

Section 15.1 does not provide, as the Defendants suggest, that either party to the

Agency Agreement unilaterally can <u>demand</u> or <u>compel</u> mediation. It does not provide that if one

of the parties favors mediation, the other <u>shall</u> or <u>must</u> consent to mediation. The parties to the

Agency Agreement knew how to use mandatory language when they intended to impose firm

obligations. Similarly, they knew how to use permissive language when it was their intention to

do so. Indeed, the word "shall" appears no less than 125 times in the Agency Agreement. The

word "may" appears just 15 times. The terms plainly were intended to reflect differing

intentions. They were not intended to be used interchangeably.

Against this backdrop, the phrase "may request" in the Agency Agreement's

mediation provision cannot reasonably be construed to mean "may compel" or "may demand."

Yet this is precisely how the Defendants would have the Court interpret the mediation clause. A

"request" is just that -- a request. Under the plain language of Section 15.1, as the recipient of

any request to mediate, FIC at all times remains free to grant, deny or simply ignore any such

request. The Defendants' argument to the contrary is a transparent attempt to rewrite a

contractual provision they apparently no longer view as being to their advantage.

The reality is that if the Defendants genuinely believed that Section 15.1

empowered them to compel mediation, they would have done so when they first raised the issue

of mediation more than three years ago. <u>See</u> Answer, Ex. D. Significantly, at that time the

Defendants did not purport to demand mediation. To the contrary, in keeping with the

permissive nature of Section 15.1, the Defendants wrote to FIC "<u>requesting</u> mediation," noting

that "mediation is <u>requested</u>" in response to certain issues FIC had raised in earlier

correspondence. <u>Id.</u> (emphasis supplied). The fact that the Defendants took no legal steps three

years ago to compel mediation strongly supports the conclusion that they have no basis for doing so now.

The plain and unambiguously permissive language of Section 15.1 is entirely consistent with the nature of the mediation process itself. It reflects the reality that, in most instances, "compelled mediation" is an oxymoron. First and foremost, mediation is a "voluntary process." Department of Transp. v. City of Atlanta, 380 S.E.2d 265, 268 (Ga. 1989). Given the nature of the mediation process, "[i]t is incongruous to say one may order another to mediate a dispute so that it violates the first premise of mediation, that it is a voluntary process." Id.; see also 10 Am. Rev. Int'l Arb., 265, 268 (1999) (the "most critical difference" between mediation and arbitration is that mediation is a "consensual procedure, facilitated by a neutral third party without any decisional power"). Of course, contracting parties are free to alter this fundamental tenet and compel the mediation of any dispute. The fact remains, however, that FIC and the Defendants did not elect to do so here.

One of the basic dynamics of mediation is that "for mediation to be effective, it is necessary that the parties have a good faith interest in settling their dispute." J. Grenig, Alternative Dispute Resolution, § 7.2 at 117 (West 1997). To require FIC to mediate when, at this time, it has no interest in doing so is inconsistent with this principle. Absent FIC's commitment to what by definition is a consensual process, any compelled mediation of this dispute is virtually doomed to failure. Although FIC's position with respect to mediation may change at a later juncture -- perhaps after some preliminary discovery has been taken, for example, or if the factual and legal issues are substantially narrowed -- at present it prefers to litigate, as is its prerogative. For their part, the Defendants no doubt would prefer to avoid any

22

inquiry into their conduct in operating the FSIM Program and attempt, instead, to secure a pre-discovery resolution to this matter. From FIC's perspective, however, an aggressive pursuit of discovery into the Defendants' acts and omissions is crucial to recouping the substantial damages it has incurred in connection with the FSIM Program. Under these circumstances, FIC respectfully submits that the Defendants' application to compel mediation and stay this action should be denied with prejudice.

## **CONCLUSION**

For the reasons set forth above, plaintiff Gregory V. Serio, Superintendent of

Insurance of the State of New York, as Rehabilitator of Frontier Insurance Company and

assignee of Platinum Indemnity, Ltd., respectfully requests that the Court deny in its entirety the

Defendants' motion to dismiss the Complaint, compel mediation and stay the action.

Dated:  New York, New York
        September 27, 2004

ENTWISTLE & CAPPUCCI LLP
299 Park Avenue, 14th Floor
New York, New York 10171
(212) 894-7200

By: _____
        WILLIAM S. GYVES (WG 2770)
        ADAM F. JACHIMOWSKI (AJ 1664)
        MICHAEL A. McDONOUGH (MM 5712)

Attorneys for Plaintiff Gregory V. Serio,
Superintendent of Insurance of the State of New York, as
Rehabilitator of Frontier Insurance Company and as
Assignee of Platinum Indemnity, Ltd.

LEXIS Decisions

ABERT TRADING, INC., Plaintiff, -against- KIPLING BELGIUM N.V./S.A., Defendant.

00 Civ. 0478 (RMB)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2002 U.S. Dist. LEXIS 3109

February 26, 2002, Decided
February 26, 2002, Filed

**DISPOSITION:** [*1] Defendant's motion for summary judgment to dismiss this case for lack of personal jurisdiction denied; Defendant's motion for summary judgment to dismiss this case based on the doctrine of forum non conveniens granted; and Defendant's motion for summary judgment to dismiss the complaint denied as moot.

## CASE SUMMARY

**PROCEDURAL POSTURE:** The corporation brought suit against the foreign company for breach of contract. The foreign company moved for summary judgment dismissing the case for lack of personal jurisdiction and based on the doctrine of forum non conveniens. The foreign company also moved for summary judgment dismissing the complaint on the merits of the asserted claims.

**OVERVIEW:** The corporation and the foreign company entered into an agreement under which the foreign company sold, delivered, and shipped merchandise to the corporation in New York. The corporation brought suit for breach of contract and the foreign corporation filed motions for summary judgment. The court found that the corporation made a showing of jurisdiction based upon the totality of the circumstances. Those circumstances included the facts that at least some of the negotiations that surrounded the agreement entered into between the corporation and the foreign company occurred in New York, a meeting took place in the foreign company's New York showroom, and the foreign company engaged in promotional activities in New York. Thus, the court concluded that the exercise of personal jurisdiction would not offend traditional notions of fair play and substantial justice. The court found that the private interest factors weighed so heavily in favor of the foreign forum that they overcame any presumption for the corporation's choice of forum. The public interest factors weighed substantially in favor of a Belgian forum.

**OUTCOME:** The foreign company's motion for summary judgment to dismiss the case for lack of personal jurisdiction was denied. The foreign company's motion for summary judgment to dismiss the case based on the doctrine of forum non conveniens was granted, and the foreign company's motion for summary judgment to dismiss the complaint was denied as moot.

**CORE TERMS:** conveniens, summary judgment, alternative forum, doctrine of forum, choice of forum, weigh, lack of personal jurisdiction, personal jurisdiction, public interest, foreign law, negotiation, causes of action, cause of action, foreign forum, moving party, invoices, reside, evidentiary hearing, compulsory process, judicial economy, substantive law, general subject, choice of law, forum state, prima facie, duty free, jury duty, block, unsatisfactory, inappropriate

## LexisNexis(TM) Headnotes

*Civil Procedure > Summary Judgment > Summary Judgment Standard*

[HN1]The standard for granting summary judgment is well established. Summary judgment may not be granted unless the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*

[HN2]On a motion for summary judgment, the moving party bears the initial burden of informing the district court of the basis for its motion and identifying the matter that it believes demonstrates the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party which must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The substantive law governing the case will identify those facts which are material and only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. In determining whether summary judgment is appropriate, a court must resolve all ambiguities and

draw all reasonable inferences against the moving party.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

*Civil Procedure > State & Federal Interrelationships > Application of State Law*

[HN3]Personal jurisdiction in a diversity action is determined by the laws of the forum state in which the district court sits. Fed. R. Civ. P. 12(d) grants the court broad discretion to hear and decide a motion to dismiss for lack of personal jurisdiction before trial or to defer the matter until trial. The court may decide the motion solely upon pleadings and affidavits or by an evidentiary proceeding. Where the court chooses not to conduct an evidentiary hearing before trial, a plaintiff need only make a prima facie showing of personal jurisdiction over the defendant.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

[HN4]N.Y. C.P.L.R. 302(a)(1), part of New York's long-arm statute, allows personal jurisdiction over any non-domiciliary who in person or through an agent transacts any business within the state or contracts anywhere to supply goods or services in the state when the cause of action is related to the transaction or the contract. The transacting business test does not require regular and systematic activities but rather the purposeful availment of the privilege of conducting activities within New York, thus invoking the benefits and protections of its laws. N.Y. C.P.L.R. 302(a)(1), requires only a minimal quantity of activity, provided that it is of the right nature and quality. In determining whether a defendant's contacts are of the appropriate nature, the court examines the totality of the circumstances. Jurisdiction can be grounded on a combination of seemingly separate events, any one of which, standing alone, would be insufficient to confer jurisdiction.

*Civil Procedure > Venue > Change of Venue in Federal Courts*

*Civil Procedure > Venue > Forum Non Conveniens*

[HN5]Congress' enactment of 28 U.S.C.S. § 1404(a), which authorizes transfers between federal courts, relegated common law forum non conveniens to cases where the alternative forum to which a transfer is proposed is a foreign one. Dismissal under the doctrine of forum non conveniens involves a balancing test in which the court first considers the availability of an alternative forum, and second balances the private interest factors affecting the convenience of the

litigants and the public interest factors affecting the convenience of the forum. A defendant's burden is heavy, as there is ordinarily a strong presumption in favor of the plaintiff's choice of forum. The forum non conveniens determination is committed to the sound discretion of the trial court.

*Civil Procedure > Venue > Forum Non Conveniens*

[HN6]At the outset of any forum non conveniens inquiry, the court must determine whether there exists an alternative forum. That requirement is ordinarily satisfied when the defendant is amenable to process in the competing forum. An agreement by the defendant to submit to the jurisdiction of the foreign forum can generally satisfy that requirement.

*Civil Procedure > Venue > Forum Non Conveniens*

[HN7]The U.S. Court of Appeals for the Second Circuit has affirmed dismissal on the grounds of forum non conveniens where the defendant has already commenced suit in the alternative foreign forum.

*Civil Procedure > Venue > Forum Non Conveniens*

[HN8]In the context of forum non conveniens, the United States Court of Appeals for the Second Circuit makes clear that on rare occasion the remedy available in the alternative forum may be so unsatisfactory that the forum is inadequate. Concluding that the foreign forum is inappropriate is a rare exception and not the rule.

*Civil Procedure > Venue > Forum Non Conveniens*

[HN9]The United States Supreme Court has held that the possibility of a change in substantive law should ordinarily not be given conclusive or even substantial weight in the forum non conveniens inquiry.

*Civil Procedure > Venue > Forum Non Conveniens*

[HN10]In the context of a motion to dismiss based on the doctrine of forum non conveniens, courts in the Second Circuit have found that an alternative jurisdiction is not rendered inappropriate simply because not all of the contemplated causes of action are available there, so long as the general subject matter of the litigation can be heard there.

*Civil Procedure > Venue > Forum Non Conveniens*

[HN11]In the context of a forum non conveniens inquiry, the United States Supreme Court stated that the following private interest factors should be considered: (1) ease of access to sources of proof; (2) the cost of obtaining attendance of willing witnesses; (3) the availability of compulsory process for unwilling witnesses; (4) the enforceability of a judgment if one is obtained; and (5) evidence of a plaintiff's attempt to harass a defendant by its choice of forum. In addition

to those factors, the court must take into consideration the presumption in favor of the plaintiff's choice of forum. Dismissal is warranted where those factors weigh heavily in favor of the alternative forum.

*International Law > Dispute Resolution > Conflicts of Laws*

*Civil Procedure > Entry of Judgments > Enforcement & Execution > Foreign Judgments*

[HN12]See Belgian Judicial Code § 570.

*Civil Procedure > Venue > Forum Non Conveniens*

[HN13]A plaintiff may not, by choice of an inconvenient forum, vex, harass, or oppress the defendant by inflicting upon him expense or trouble not necessary to his own right to pursue his remedy.

*Civil Procedure > Venue > Forum Non Conveniens*

[HN14]In the context of a forum non conveniens inquiry, a plaintiff's home choice of forum should be given full weight.

*Civil Procedure > Venue > Forum Non Conveniens*

[HN15]In the context of a forum non conveniens inquiry, the United States Supreme Court identified four public interest factors to weigh: (1) the interest in having localized controversies decided at home; (2) the burden of jury duty on citizens not interested in the controversy; (3) congestion of the courts' dockets; and (4) the need to apply foreign law. Courts in the Southern District of New York have also considered the efficiency of combining related suits in a single forum.

*Civil Procedure > Venue > Forum Non Conveniens*

[HN16]In the context of a forum non conveniens inquiry, the fact that a plaintiff is a corporation in the forum state does not, by itself, vest the forum and its jurors with an interest in the litigation. To impose jury duty on the residents of a district is unfair where there is no local interest in the controversy.

*Civil Procedure > Venue > Forum Non Conveniens*

[HN17]In the context of a forum non conveniens inquiry, it is well-recognized that the Southern District of New York is a congested district, and there is a legitimate interest in ensuring that disputes with little connection to the district be litigated elsewhere.

*Civil Procedure > Venue > Forum Non Conveniens*

*Civil Procedure > State & Federal Interrelationships > Choice of Law*

[HN18]In the context of a forum non conveniens inquiry, with respect to whether foreign law will apply, the likelihood that foreign law will apply weighs

against retention of the action. A federal district court applies the choice-of-law rules of the forum state. Under New York law, in contract cases, courts follow a center of gravity or grouping of contacts approach. Among others, the factors considered are the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties. While the prospect of applying foreign law is not dispositive in favor of dismissal, it is relevant.

**COUNSEL:** For ABERT TRADING, INC., plaintiff: Harlan M. Lazarus, Lazarus & Lazarus, P.C., New York, NY.

**JUDGES:** RICHARD M. BERMAN, U.S.D.J.

**OPINIONBY:** RICHARD M. BERMAN

**OPINION: DECISION & ORDER**

### I. Introduction

This ruling addresses and resolves the following three motions in Abert Trading, Inc. v. Kipling Belguim N.V./S.A., all of which were filed pursuant to Federal Rule of Civil Procedure 56 and were completely briefed on or about May 30, 2001: (i) Defendant Kipling Belguim's ("Defendant" or "Kipling") motion for summary judgment dismissing this case for lack of personal jurisdiction; (ii) Defendant's motion for summary judgment dismissing the complaint based on the doctrine of forum non conveniens; and (iii) Defendant's motion for summary judgment dismissing the complaint (on the merits of the asserted claims). The facts relevant to this decision are set forth in the section below **[*2]** entitled "III. Analysis." **For the following reasons, Defendant's motion for summary judgment based upon the doctrine of forum non conveniens is granted, and the instant case is dismissed in favor of a related commercial litigation pending in the Sixth Division of the Commercial Court of Antwerp, Belgium.**

### II. Standard of Review

[HN1]The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).

[HN2]The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrates the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The burden then shifts to the nonmoving party which "must set forth specific [*3] facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986) (quoting Fed. R. Civ. P. 56(e)); accord Brass v. American Film Technologies, Inc., 987 F.2d 142 (2d Cir. 1993). The substantive law governing the case will identify those facts which are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 8 L. Ed. 2d 176, 82 S. Ct. 993 (1962)); see also Gallo, 22 F.3d at 1223.

## III. Analysis

### A. Personal Jurisdiction

[HN3]Personal jurisdiction in a diversity action is determined by the laws of the forum state in which the district court sits; [*4] therefore the law of new York is applicable to this case. See United States v. First Nat'l City Bank, 379 U.S. 378, 381-82, 13 L. Ed. 2d 365, 85 S. Ct. 528 (1965). Fed. R. Civ. P. 12(d) grants the court broad discretion to hear and decide a motion to dismiss for lack of personal jurisdiction before trial or to defer the matter until trial. See CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 364 (2d Cir. 1986). n1 The court may decide the motion solely upon pleadings and affidavits or by an evidentiary proceeding. Id. Where the court chooses not to conduct an evidentiary hearing before trial, plaintiff need only make a prima facie showing of personal jurisdiction over the defendant. See Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2d Cir. 1981). Here, no evidentiary hearing has been held. See Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 57 (2d Cir. 1985).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n1 The Court notes that upon Defendant's motion to dismiss for lack of personal jurisdiction, U.S. Magistrate Judge Peck, on August 8, 2000, denied the motion

without prejudice "on the ground that plaintiff has sufficiently made a prima facia case of personal jurisdiction . . . ." Abert Trading, Inc. v. Kipling Belgium N.V./S.A., 00 Civ. 478 (RMB) (AJP), Tr. at 15 (S.D.N.Y. Aug. 8, 2000) (conference).

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*5]

Plaintiff contends that the Court has jurisdiction pursuant to Section 302(a)(1) of the New York Civil Practice Law ("CPLR"). [HN4]CPLR § 302(a)(1), part of New York's long-arm statute, allows personal jurisdiction over any non-domiciliary who in person or through an agent "transacts any business within the state or contracts anywhere to supply goods or services in the state" when the cause of action is related to the transaction or the contract. See CutCo Indus., 806 F.2d at 365. The "transacting business" test does not require regular and systematic activities but rather the purposeful availment of the privilege of conducting activities within New York, thus invoking the benefits and protections of its laws. Id. Section 302(a)(1) requires only a minimal quantity of activity, provided that it is of the right nature and quality. See United States Theatre Corp v. Gunwyn/Lansburgh Ltd. P'ship, 825 F. Supp. 594, 595 (S.D.N.Y. 1993) (Conboy, J.). In determining whether defendants's contacts are of the appropriate nature, the Court examines the totality of the circumstances. See Sterling Nat'l Bank v. Fidelity Mortgage Investors, 510 F.2d 870, 873 (2d Cir. 1975); [*6] see also M. Fabrikant & Sons, Inc. v. Adrianne Kahn, Inc., 144 A.D.2d 264, 265, 533 N.Y.S.2d 866 (1st Dept. 1988) ("jurisdiction can be grounded on a combination of seemingly separate events, any one of which, standing alone, would be insufficient to confer jurisdiction."). The Court concludes that Plaintiff has made a prima facie showing of jurisdiction based upon the totality of the following circumstances:

. At least some of the negotiations surrounding the agreement entered into between Plaintiff Abert Trading and Kipling N.V., Defendant Kipling Belgium N.V.'s predecessor company, in or about November 1998, entitled "Letter of Intent, Guidelines and Notes for Final Distribution Agreement" (the "Agreement") occurred in New York;

. A meeting took place on September 8, 1999 in Abert's New York Showroom between, among others, Raphael Avigdor, president of Abert, and Ian Sidall, chairman of the board of Kipling Belgium;

. Defendants engaged in promotional activities in New York including, publishing and distributing sales brochures and maintaining a Web-site, each listing Abert's New York phone and fax numbers as "Kipling" numbers;

. Voluminous interactions **[*7]** in the form of phone calls, e-mails and faxes between Defendants and Abert's office in New York; and

. Pursuant to the Agreement, Kipling sold, delivered, and shipped to Abert in New York approximately $ 5,000.00 in sample merchandise.

Considering, among others, the above circumstances, the Court concludes at this stage that the exercise of personal jurisdiction by this Court would not offend "traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945).

**B. Forum Non Conveniens**

[HN5]"Congress' . . . enactment of 28 U.S.C. § 1404(a) . . . , which authorizes transfers between federal courts, relegated common law forum non conveniens to cases where the alternative forum to which a transfer is proposed is a foreign one." DiRienzo v. Philip Servs. Corp., 232 F.3d 49 at 56. Dismissal under the doctrine of forum non conveniens involves a balancing test in which the court first considers the availability of an alternative forum, and second balances the "private interest" factors affecting the convenience of the litigants and the "public interest" factors affecting the **[*8]** convenience of the forum. See Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508-09, 91 L. Ed. 1055, 67 S. Ct. 839 (1947). Defendant's burden is heavy, as there is ordinarily a strong presumption in favor of the plaintiff's choice of forum. Murray v. British Broadcasting Corp., 81 F.3d 287 (2d Cir. 1996). "The forum non conveniens determination is committed to the sound discretion of the trial court." Piper Aircraft Co. v. Reyno, 454 U.S. 235, 257, 70 L. Ed. 2d 419, 102 S. Ct. 252 (1981).

**1. Availability of an Alternative Forum**

[HN6]"At the outset of any forum non conveniens inquiry, the court must determine whether there exists an alternative forum." Piper Aircraft, 454 U.S. at 254 n.22. This requirement is ordinarily satisfied when the defendant is "amenable to process" in the competing forum. Gulf Oil, 330 U.S. at 506-07; see also DiRienzo v. Philip Svcs. Corp., 232 F.3d 49, 56 (2d Cir. 2000) ("An agreement by the defendant to submit to the jurisdiction of the foreign forum can generally satisfy this requirement.").

Here, Kipling has already submitted to the jurisdiction of the Belgian **[*9]** courts, i.e. the Sixth Division of the Commercial Court of Antwerp, by filing suit there against Abert to resolve disputes arising under the same Agreement at issue in this case. n2 [HN7]The U.S. Court of Appeals for the Second Circuit has affirmed dismissal on the grounds of forum non conveniens where, as here, the defendant has already commenced suit in the alternative (foreign) forum. See Alcoa Steamship Co. v. M/V Nordic Regent, 654 F.2d 147, 150 (2d Cir. 1980) (Trinidad). Plaintiff, however, citing Dirienzo v. Philip Svcs. Corp., 232 F.3d 49 (2d Cir. 2000), contends that this first requirement cannot be satisfied because the alternative forum (Belguim) "offers a clearly unsatisfactory or inadequate remedy." Pl. Opp. at 10. Plaintiff asserts that the notion of contract repudiation [another term for a form of breach of contract], i.e. the cause of action asserted here, is not known under Belgian law. Even assuming Plaintiff's contention to be correct, the Court finds Plaintiff's argument to be unpersuasive for the following reasons:(i) [HN8]the Court of Appeals for the Second Circuit, in DiRienzo, makes clear that "**on rare occasion** **[*10]** . . the remedy available in the alternative forum may be so unsatisfactory that the forum is inadequate." 232 F.3d at 56 (emphasis added). Thus, as Defendant contends, concluding that the foreign forum is inappropriate is a "rare" exception and not the rule; and

(ii) [HN9]the U.S. Supreme Court has held that "the possibility of a change in substantive law should ordinarily **not** be given conclusive or even substantial weight in the forum non conveniens inquiry," Piper Aircraft, 454 U.S. at 247; and

(iii) [HN10]other courts in this Circuit have found that "an alternative jurisdiction is **not** rendered inappropriate simply because not all of the contemplated causes of action are available there, so long as the general subject matter of the litigation can be heard there." Alnwick v. European Micro Holdings, Inc., 137 F. Supp. 2d 112, 119 (E.D.N.Y. 2001) (Spatt, J.) (emphasis added); see also PT United Can Co. v. Crown Cork & Seal Co., 138 F.3d 65, 73, 74-75 (2d Cir. 1998) (Indonesia held to be an adequate forum despite unavailability of RICO causes of action; the adequacy of an alternate forum "does not depend on the **[*11]** existence of the identical cause of action"). Here, the general subject matter of this straightforward commercial/contract litigation can be, **and is being**, heard in Belgium. See also Calavo Growers of California v. Generali Belgium, 632 F.2d 963, 968 (2d Cir. 1998) (dismissing contract suit in favor of continued litigation in Belgium forum).

- - - - - - - - - - - - - Footnotes - - - - - - - - -

n2 Documents which appear to be the summons and other initial papers filed with the Commercial Court in Antwerp are included in the submissions before this Court at Exhibit D of the Decl. of Andrew Walker.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

## 2. "Private Interest" Factors

[HN11]The U.S. Supreme Court stated that the following private interest factors should be considered: (1) ease of access to sources of proof, (2) the cost of obtaining attendance of (willing) witnesses, (3) the availability of compulsory process for unwilling witnesses, (4) the enforceability of a judgment if one is obtained, and (5) evidence of plaintiff's attempt to harass defendant by its choice of forum. n3 [*12] Gulf Oil, 330 U.S. at 508-09. In addition to these factors, the Court must take into consideration the presumption in favor of plaintiff's choice of forum. Id. Dismissal is warranted where these factors weigh heavily in favor of the alternative forum.

- - - - - - - - - - - - - Footnotes - - - - - - - - -

n3 Courts in this district have also considered additional factors, including "obtaining translations, calculating exchange rates, and the likelihood of needing interpreters." Bybee v. Oper Der Standt Bonn, 899 F. Supp. 1217, 1223 (S.D.N.Y. 1995) (Stein, J.)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Abert's president, Mr. Avigdor, has acknowledged that the (bulk of) documentary and real evidence is primarily located in Belgium. n4 Moreover, many of the "events" leading up to the alleged repudiation occurred in and around Belgium.

- - - - - - - - - - - - - Footnotes - - - - - - - - -

n4 Plaintiffs contention that "all of the documents in issue are now available in New York" is unpersuasive. See Alnwick, 137 F. Supp. 2d at 121 (finding that ease of access to sources of proof still weighed in favor of dismissal even where "some 850,000 pages of discovery have been produced by Plaintiffs, third-parties and Defendants" in New York).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*13]

Second, the three Kipling employees that were deposed by Plaintiff all reside in or near Belgium. Moreover, two of these witnesses do not speak English as his or her primary language and will require a Flemish translator here in New York City. Plaintiff also subpoenaed Mr. Ian Siddall, Chairman of Kipling Belgium, who resides in London. At this juncture, the Court concludes that the (only) essential witness that resides in New York is Mr. Avigdor, the president of Abert who negotiated the letter. n5 And, the record here demonstrates that Mr. Avigdor has, in the past, traveled extensively between Belguim and New York and is already a party in the Belgium litigation.

- - - - - - - - - - - - - Footnotes - - - - - - - - -

n5 Mr. Avigdor declared during his deposition that "I am Abert Trading," and that "I control the decisions of Abert Trading." Avigdor Dep. at 35.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Third, two non-party witnesses, Paul Van De Velde and Tony Gram, the two men who founded Kipling N.V. and negotiated the Letter of Intent, both live in Belgium, and thus are subject to the compulsory process [*14] of the Belgium Court.

Fourth, both Plaintiff and Defendant acknowledge that because Belgium does not have a treaty with the United States with regard to enforcement of foreign judgments, the basic provisions of the Belgian Judicial Code apply to any U.S. Judgment that might be reached in this case. Def. Mem. at 15; Aff. of Harlan Lazarus, Ex. 14. Pursuant to the [HN12]Belgian Judicial Code:The Belgian Court will have to examine the merits of the foreign judgment. . . . This examination of the merits of the judgment is compulsory and requires an examination of the trial (not only the procedure, but the dispute as well). . . . The Belgian Court will have to review the reasoning, the application and the interpretation of the law of the foreign court.Belgian Judicial Code § 570 (emphasis in original). Judicial efficiency and avoidance of duplicative litigation argue in favor of Belgium. Moreover, Kipling expressly agrees to be bound by

any judgment from the Belgian Court. Decl. of Andrew Walker P 18.

Fifth, [HN13]"the plaintiff may not, by choice of an inconvenient forum, 'vex', 'harass', or 'oppress' the defendant by inflicting upon him expense or trouble not necessary to [*15] his own right to pursue his remedy." Gulf Oil, 330 U.S. at 508. Without ruling on this factor, the court notes that in one document produced by Plaintiff in discovery entitled "The Nasty Side of RAF [Raphael Avigdor], Mr. Avigdor states:1. Block the importation of Kipling with my contracts stopping goods at the border with my customs contacts.

2. Sue any potential sub distributors who import product as they breach my exclusive rights to the territory as per my contract. Begin by suing any duty free clients who have already brought goods in.

**3. Sue Kipling from America**

4. Sue Kipling from each and every country in Latin America as covered by my contract

5. Sue the duty free accounts as this is a clear breach of our contract.Aff. of Peter A. Bellacosa, Ex. 34 (emphasis added). Mr. Avigdor also writes: "**I want to be clear that we can make your business life difficult.** . . . We can sue you from more than one country. I have already consulted lawyers in various of the territories (sic) to investigate our rights to block any imports from any parties which breech (sic) our exclusive rights. We can go as far as to threaten lawsuits from 17 different [*16] countries where you will have to depose in 17 foreign jurisdictions." Id. at Ex. 35 (emphasis added).

Thus, notwithstanding Abert's contention that [HN14]a Plaintiff's home choice of forum should be "given full weight," DiRienzo v. Philip Svcs. Corp., 232 F.3d at 62, 63 (2d Cir. 2000), the Court concludes that the private interest factors weigh so heavily in favor of the foreign forum that they overcome any presumption for Plaintiff's choice of forum. See Bybee v. Oper Der Standt Bonn, 899 F. Supp. 1217, 1224 (S.D.N.Y. 1995) (Stein, J.) (dismissing case to Germany even though "certain of the negotiations leading to the contract occurred in New York and [the plaintiff] is a New York resident."); see also Shields v. Mi Ryung Constr. Co., 508 F. Supp. 891, 895 n.4 (S.D.N.Y. 1981) (Cannella, J.) (requiring "plaintiff to accept the risks along with the possible benefits of pursuing business opportunities in a foreign country" where plaintiff "voluntarily involved himself" in business abroad).

**3. "Public Interest" Factors**

In Gulf Oil, [HN15]the U.S. Supreme Court identified four "public interest" factors to weigh: (1) the interest

in [*17] having localized controversies decided at home; (2) the burden of jury duty on citizens not interested in the controversy; (3) congestion of the courts' dockets; and (4) the need to apply foreign law. See Gulf Oil, 330 U.S. at 509. Moreover, Courts in this district have also considered the efficiency of combining related suits in a single forum. See Red Rock Holdings, Ltd. v. Union Bank Trust Co., Ltd., 1998 U.S. Dist. LEXIS 12383, 97 Civ. 5008 (JGK), 1998 WL 474094, at *9 (S.D.N.Y. Aug. 11, 1998).

The Agreement was made for the distribution and sale of Belgian goods which were packed for shipment in Belguim. Pursuant to the Agreement, the goods were to be shipped directly from Belgium to Central and South America. The invoices that were regularly used by the parties, on their face, reflect a Belgian origin, providing for, among other things, the currency to be in Belgian francs, **the laws of Belgium to govern any of the agreements and contracts,** and that **any such disputes should be settled in the courts of Antwerp, Belgium.** See Decl. of Andrew Walker, Ex. C (sample invoices) (**"The Belgian Law rules our agreements and contracts. In cases of dispute, only the Courts of Antwerp [*18]  are competent to note the dispute."**) (emphasis added). Moreover, the Agreement was allegedly breached by actions taken (predominantly) in Belgium.

[HN16]The fact that Abert is a New York corporation does not, by itself, vest this forum (and its jurors) with an interest in the litigation. See Bybee, 899 F. Supp. at 1223 (Stein, J.); see also Shields, 508 F. Supp. at 894 (Cannella, J.) ("To impose jury duty on the residents of this district would thus be unfair" where there is no local interest in the controversy); Krimizis v. Panoceanic Navigation Corp., 1985 U.S. Dist. LEXIS 13925, 83 Civ. 5667 (JFK), 1985 WL 3834, at *6 (S.D.N.Y. Nov. 14, 1985) ("the burden which would be placed on American jurors asked to sit on a case having no relation to their community" militates toward dismissal).

[HN17]It is well-recognized that the Southern District of New York is a congested district, see PT United Can Co., Ltd. v. Crown Cork & Seal Co., 1997 U.S. Dist. LEXIS 692, 96 Civ. 3669 (JGK), 1997 WL 31194, at *9 (S.D.N.Y. Jan. 28, 1997) (noting Gulf Oil's reference to the Southern District of New York as a burdened court), and there is a legitimate interest in ensuring that disputes with [*19]  little connection to the district be litigated elsewhere. See Karlitz v. Regent Int'l Hotels, Ltd., 1997 U.S. Dist. LEXIS 2111, 95 Civ. 10136 (LAP), 1997 WL 88291, at *3 (S.D.N.Y. Feb. 28, 1997).

[HN18]With respect to whether foreign law will apply, "while the Court need not definitively resolve the

choice of law issue at this point, the likelihood that foreign law will apply weighs against retention of the action." Ioannides v. Marika Maritime Corp., 928 F. Supp. 374, 379 (S.D.N.Y. 1996) (Kaplan, J.). This Court applies the choice-of-law rules of the forum state -- New York. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941). Under New York law, in contract cases, the subject of the instant dispute, courts follow a "center of gravity" or "grouping of contacts" approach. Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1539 (2d Cir.) cert. denied, 522 U.S. 864, 139 L. Ed. 2d 112, 118 S. Ct. 169 (1997). Among others, the factors considered are: the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place [*20] of business of the contracting parties. Id. Here, both the final negotiations and the signing of the Agreement occurred in Belgium at Kipling's offices. n6 There is a real likelihood that Belguim law would apply to these causes of action. While the prospect of applying foreign law is not dispositive in favor of dismissal, see Manu Int'l, S.A. v. Avon Prods., Inc., 641 F.2d 62, 67-68 (2d Cir.1981), it is relevant, see Bybee, 899 F. Supp. at 1223.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - -

n6 The Court also notes that Defendant alleges that a New York choice of law provision was specifically removed from the signed Agreement. See Decl. of Andrew Walker P 14. And, as discussed, the invoices clearly stated that the laws of Belgium apply to disputes about the agreements and contracts.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

A suit is currently pending (since August 2000), in Belgium covering essentially the same dispute between the parties. See Def. Stmt. Mat. Facts P 44. The interests of judicial economy would best be served by resolving issues in this [*21] case with the Belgian case. Red Rock Holdings, 1998 U.S. Dist. LEXIS 12383, 1998 WL 474094, at *9-10 (Koeltl, J.) (dismissing case where plaintiff filed its lawsuit in the Southern District of New York and defendant thereafter filed in Israel, because "Israel is plainly the most convenient forum and the forum where all the parties are already joined" and thus "consolidating the litigation would serve the interests of judicial economy . . . .").

Accordingly, the public interest factors weigh substantially in favor of a Belgian forum. The Court, therefore, exercises its discretion in favor of granting the motion on the basis of the doctrine of forum non conveniens. See Bybee, 899 F. Supp. at 1224.

## IV. Conclusion

For the aforementioned reasons, the Court makes the following conclusions: (i) Defendant's motion for summary judgment to dismiss this case for lack of personal jurisdiction is denied; (ii) Defendant's motion for summary judgment to dismiss this case based on the doctrine of forum non conveniens is granted; and (iii) Defendant's motion for summary judgment to dismiss the complaint is denied as moot.

The Clerk of Court is respectfully requested to close this [*22] case.

Dated: New York, New York

February 26, 2002

**RICHARD M. BERMAN, U.S.D.J.**

2002 U.S. Dist. LEXIS 758

ASTOR HOLDINGS, INC. f/k/a PROFILE RECORDS, INC. and ROBOT WARS LLC as Successor to ROBOT WARS, Plaintiffs, -v- EDWARD "TREY" ROSKI, III, and BATTLEBOTS, INC., Defendants.

01 Civ. 1905 (GEL)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2002 U.S. Dist. LEXIS 758

January 15, 2002, Decided
January 17, 2002, Filed

**DISPOSITION:** [*1] Defendants' motions to dismiss for lack of venue or to transfer venue denied. Defendants' motion to dismiss for failure to state a claim granted as to Count III and denied as to Counts I, II, and IV. Defendants' motion to strike Plaintiffs' request for compensatory damages denied, and motion to strike Plaintiffs' request for attorneys' fees granted.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiffs, capital provider and robotic combat business, sued defendants, robotic combat competitor and individual, for tortious interference, aiding and abetting a breach of fiduciary duty, and unjust enrichment. Defendants moved to dismiss for lack of venue or to transfer venue. Defendants moved to strike plaintiffs' requests for compensatory damages and attorneys' fees. Defendants also moved to dismiss for failure to state a claim.

**OVERVIEW:** The capital contributor and a co-owner entered into a venture agreement for the formation of the robotic combat business. The co-owner allegedly violated the agreement's non-compete clause by planning a competitive robotic combat event. After several phases of litigation, the co-owner filed for bankruptcy. The parties executed a bankruptcy settlement, but plaintiffs alleged that defendants attempted to undermine the settlement. Plaintiffs contended that defendants' competitive success was unjustly earned through defendants' surreptitious acts that caused the decline in plaintiffs' market position and goodwill. The court determined that venue was proper because a substantial part of defendants' actions giving rise to plaintiffs' claims were directed at New York events that comprised a substantial basis of plaintiffs' causes of action. Also, the factors relevant to venue were evenly balanced, so plaintiffs' choice of forum become the important consideration. Plaintiffs sufficiently alleged their tortious interference and aiding and abetting claims, but plaintiffs alleged no independent theory to justify the unjust enrichment claim.

**OUTCOME:** Defendants' motion to dismiss or transfer venue was denied. Defendants' motion to dismiss for failure to state a claim was granted as to the unjust enrichment claim, but the motion was denied as to the remaining claims. Defendants' motion to strike was granted as to attorney's fees and denied as to compensatory damages.

**CORE TERMS:** venue, venture, tortious interference, settlement, mediation, compensatory damages, giving rise, license, motion to dismiss, business relations, involvement, contractual, enrichment, interfered, substantial part, robot, robotic, motion to strike, omissions, tortious, adversary proceeding, settlement agreement, negotiation, competitor, trademark, breach of contract, cause of action, convenience, statute of limitations, fiduciary duty

## LexisNexis(TM) Headnotes

*Civil Procedure > Venue > Change of Venue in Federal Courts*

[HN1]For the purposes of deciding a defendant's motion to dismiss for improper venue or, in the alternative, to transfer the case to another judicial district, the court must accept all of the uncontroverted allegations in the plaintiff's complaint as true and construe all reasonable inferences in the plaintiff's favor.

*Civil Procedure > Venue > General Venue*

[HN2]See 28 U.S.C.S. § 1391(a)(2).

*Civil Procedure > Venue > General Venue*

[HN3]The plaintiff bears the burden of establishing that venue is proper once an objection to venue has been raised and must demonstrate that venue is proper for each claim asserted in their complaint. To determine whether the plaintiff has satisfied its burden of proving venue under 28 U.S.C.S. § 1391(b), courts evaluate the defendant's actions as well as the nature of the dispute.

2002 U.S. Dist. LEXIS 758

*Civil Procedure > Venue > Change of Venue in Federal Courts*

[HN4]The venue statute does not require venue in the district with the most substantial contacts to the dispute. Rather, it is sufficient that a substantial part of the events occurred in the challenged venue, even if a greater part of the events occurred elsewhere.

*Civil Procedure > Venue > Change of Venue in Federal Courts*

[HN5]Venue will usually exist where an act outside the district causes physical injury or other tortious effect i nside t he d istrict. I f, for e xample, a d efendant by actions in California interfered with a business opportunity that existed in New York, the harm which the tort contemplates would occur here. But if the economic loss that resulted was inflicted on a corporation in Georgia, for example, that alone would not be sufficient for venue in Georgia, else plaintiffs could always sue in their home forum.

*Civil Procedure > Venue > Change of Venue in Federal Courts*

[HN6]While the locus of the harm suffered is a factor to c onsider, t he c ase l aw d oes n ot s upport t he t heory that venue is proper on an economic-effects inquiry alone.

*Civil Procedure > Venue > Change of Venue in Federal Courts*

[HN7]See 28 U.S.C.S. § 1404(a).

*Civil Procedure > Venue > Change of Venue in Federal Courts*

[HN8]The determination whether to transfer on grounds of convenience is left to the broad discretion of the district court. The burden of showing the propriety of the transfer lies with the moving party, who must make a clear-cut showing that a transfer is in the best interests of the litigation.

*Civil Procedure > Venue > Change of Venue in Federal Courts*

[HN9]While there is no precise method to determine whether to transfer a case pursuant to 28 U.S.C.S. § 1404(a), courts are guided by a variety of factors, which include: (1) the convenience of witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of the operative facts; (5) the availability of process to compel attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) trial efficiency and the interests of

justice based on the totality of the circumstances. While courts are to consider the above factors, there is no rigid formula for balancing these factors and no single one of them is determinative. In addition, the court must defer to the plaintiff's choice of forum unless the balance of convenience and justice weigh heavily in favor of defendant's proposed forum.

*Civil Procedure > Venue > Change of Venue in Federal Courts*

[HN10]In the context of deciding proper venue, when weighing the convenience of the witnesses, courts must consider the materiality, nature and quality of each witness, not nearly the number of witnesses in each district.

*Civil Procedure > Venue > Change of Venue in Federal Courts*

[HN11]In deciding proper venue, the location of records is not a compelling consideration when records are easily portable.

*Civil Procedure > Venue > Change of Venue in Federal Courts*

[HN12]The "governing law" factor is to be accorded little weight on a motion to transfer venue because federal courts are deemed capable of applying the substantive law of other states.

*Civil Procedure > Venue > Change of Venue in Federal Courts*

[HN13]In deciding proper venue, the trial efficiency and interests of justice factor relates primarily to issues of judicial economy.

*Civil Procedure > Venue > Change of Venue in Federal Courts*

[HN14]A plaintiff's choice of forum is entitled to great deference when the plaintiff has sued in the plaintiff's home forum. Further, venue should not be transferred under 28 U.S.C.S. § 1404(a) where the result is merely to shift the inconvenience to plaintiff.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

[HN15]On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff. The court must limit itself to facts stated in the complaint, including documents attached to or incorporated by the complaint. The court should grant the motion only if, after viewing plaintiff's allegations in this favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which

would entitle him to relief. The court's role on a Rule 12(b)(6) motion is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof. While the pleading standard is liberal, bald assertions and conclusions of law are insufficient.

*Torts > Procedure > Statutes of Limitations*

[HN16]New York has a three-year statute of limitations for tort claims. N.Y. C.P.L.R. 214(4).

*Torts > Procedure > Statutes of Limitations*

[HN17]For New York tort claims, the federal court considers New York's doctrine of equitable estoppel, which is similar, but not identical, to the federal doctrine of equitable tolling. Equitable estoppel prevents a defendant from pleading the statute of limitations if the plaintiff refrained from filing a timely action because of the defendant's affirmative acts of misrepresentation or concealment. Plaintiffs must also demonstrate that they exercised due diligence in bringing the cause of action and reasonable care in ascertaining facts which might have led to discovery of their claim.

*Torts > Business & Employment Torts > Interference With a Contract*

[HN18]To state a claim for tortious interference with contract under New York law, a plaintiff must allege (1) the existence of a valid contract between itself and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional procuring of a breach; and (4) damages. There is also a causation burden on the plaintiff, who must assert that defendant's actions were the "but for" cause of the alleged breach of contract -- in other words, that there would not have been a breach but for the defendant's activities. Lastly, the pleadings must have some factual specificity to state a claim for tortious interference; conclusory assertions are not sufficient.

*Governments > Legislation > Statutes of Limitations > Equitable Estoppel*

[HN19]Principles of equitable estoppel require that a statute of limitations does not run against a plaintiff who is unaware of his cause of action.

*Business & Corporate Entities > Agency > Causes of Action & Remedies > Breach of Fiduciary Responsibility*

[HN20]To state a claim for aiding and abetting a breach of fiduciary duty under New York law, a plaintiff must allege (1) a breach by a fiduciary of obligations to another, and (2) that the defendant knowingly induced or participated in the breach.

*Contracts Law > Types of Contracts > Implied-in-Law Contracts*

[HN21]Unjust enrichment is best understood as a general principle, straddling the division between contract and tort, that underlies various legal doctrines and remedies, rather than as a single well-defined cause of action. In essence, it is an action for restitution or on quasi contract, and the existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter. Unjust enrichment is not an appropriate remedy for fruitless negotiation, frustration or disappointed expectations.

*Contracts Law > Types of Contracts > Implied-in-Law Contracts*

[HN22]To state a claim for unjust enrichment in New York, a plaintiff must allege that (1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendants to make restitution.

*Torts > Business & Employment Torts > Interference With Prospective Advantage*

[HN23]The tort of interference with potential contractual relations consists of an intentional and improper interference with another's prospective contract. To sustain its claim for tortious interference with prospective economic advantage, a plaintiff must satisfy an extremely high pleading standard with allegations that include elements more demanding than those for interference with the performance of an existing contract. To state a prima facie case under New York law, the plaintiff must establish (1) business relations with a third party; (2) the defendant's interference with those business relations; (3) that the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the business relationship.

*Torts > Business & Employment Torts > Interference With Prospective Advantage*

[HN24]In the very nature of the tort of interference with potential contractual relations, an existing contract is not required to state a claim for tortious interference with prospective business relations. However, there is a threshold requirement that a plaintiff must specify some particular, existing business relationship through which plaintiff would have done business but for the allegedly tortious behavior.

*Torts > Business & Employment Torts > Interference With Prospective Advantage*

[HN25]Even if the requirement of existing business relations i s met, i n o rder t o s tate a c laim f or t ortious interference with prospective business relations, plaintiffs must allege either (1) that defendants' sole purpose was to harm the plaintiffs, or (2) that defendants employed wrongful means in their interference.

*Torts > Business & Employment Torts > Interference With Prospective Advantage*

[HN26]A defendant's status as a competitor may excuse him from the consequences of interference with prospective contractual relationships, where the interference is intended at least in part to advance the competing interest of the interferer, no unlawful restraint of trade is effected, and the means employed are not wrongful. Hence, one who intentionally causes a third party not to enter into a prospective contract with his competitor does not interfere improperly with the other's relation if his purpose is at least in part to advance the interest of competing with the other.

*Torts > Business & Employment Torts > Interference With Prospective Advantage*

[HN27]Where the plaintiffs and defendants are economic competitors, the actions alleged for the claim of tortious interference with prospective business relations can only be tortious if defendants used dishonest, unfair, or improper means (collectively called "wrongful means"), to interfere with plaintiffs' potential contractual relations. Wrongful means include physical violence, fraud, misrepresentation, civil suits, criminal prosecutions and some degree of economic pressure, but more than simple persuasion is required.

*Civil Procedure > Preclusion & Effect of Judgments > Res Judicata*

[HN28]When deciding whether the doctrine of res judicata bars a subsequent action, the court must consider whether (1) the prior decision was a final judgment on the merits, (2) the litigants were the same parties, (3) the prior court was of competent jurisdiction, and (4) the causes of action were the same.

*Torts > Multiple Defendants*

[HN29]While multiple parties may be liable to plaintiffs for the same injury, satisfaction of only one judgment for that injury may be collected.

*Civil Procedure > Costs & Attorney Fees > Attorney Fees*

[HN30]Under New York law, attorneys' fees are not recoverable by prevailing parties absent express statutory or contractual authority or court rule.

**COUNSEL:** Fran M. Jacobs, Duane Morris & Heckscher, Kurt Hunciker, of counsel, New York, New York, f or Astor H oldings, I nc. a nd R obot W ars LLC., Plaintiffs.

Daniel S. Schecter, Latham & Watkins, James S. Blank, Belinda S. Lee, Heather L. Mayer and Tehmina Jaffer, of counsel, Los Angeles, California, for Edward "Trey" Roski, III and BattleBots, Inc., Defendants.

**JUDGES:** Gerard E. Lynch, United States District Judge.

**OPINIONBY:** Gerard E. Lynch

**OPINION:** OPINION AND ORDER

GERARD E. LYNCH, District Judge:

In this latest incarnation of a protracted litigation battle that has continued on both coasts of the United States over the past several years, Plaintiffs Astor Holdings, Inc. ("Astor"), formerly known as Profile Records, Inc. ("Profile"), and Robot Wars LLC ("Robot Wars") (collectively, "Plaintiffs") have brought suit in this district against Edward **[*2]** "Trey" Roski III, and BattleBots, Inc. ("BattleBots") (collectively, "Defendants"). Plaintiffs allege in their complaint that Defendants tortiously interfered with efforts to resolve prior litigation related to the instant action and wrongfully prevented them from entering into various commercial agreements related to their burgeoning business of robotic combat events.

On May 1, 2001, Defendants moved to dismiss this action for improper venue, pursuant to 28 U.S.C. § 1406 and Fed. R. Civ. P. 12(b)(3), or, alternatively, for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6). Following oral argument on June 21, 2001, Defendants also moved to transfer the action to the United States District Court for the Northern District of California, pursuant to 28 U.S.C. § 1404. Finally, Defendants move to strike portions of the complaint pursuant to Fed. R. Civ. P. 12(f). For the reasons that follow, Defendants' motion to dismiss or transfer venue will be denied, the motion to dismiss for failure to state a claim will be granted as to Count III and denied as to Counts I, II and IV, and the motion to strike will be granted as to attorney's **[*3]** fees and denied as to compensatory damages.

**BACKGROUND**

The parties' dispute involves the industry of robotic combat events, spectacles in which robots fight to the death with various tools of battle like post-modern gladiators. Given the long and convoluted history between the parties, it is necessary to recite at some

length -- both for contextual and venue purposes -- facts concerning the formation of the Robot Wars venture, the parties' prior litigations in this district and the Northern District of California, and the events that led to Plaintiffs' commencing the current action. The facts below are drawn primarily from the Plaintiffs' complaint, which must be taken as true at this stage of the litigation.

## The Formation of Robot Wars

In 1994, Profile Records, Inc. ("Profile"), a New York corporation with its principal place of business in this state (Compl. P 1), entered into a joint venture ("the Venture") named "Robot Wars" with Marc Thorpe, a California resident. Profile and Thorpe, which held equal shares of the Venture (Id. P 2), contemplated that Robot Wars would promote itself by staging live combat events that, among other things, could be used as a [*4] vehicle for licensing the Robot Wars trademark. (Id. P 10.) Profile advanced approximately $ 400,000 in start-up capital; Thorpe, who had originated the idea and "took center stage at the live events," contributed no financing. (Id. PP 14, 16.)

Concomitant to the formation of the Venture, Thorpe and Profile executed a Venture Agreement on July 22, 1994. The agreement specified, among other things, that Thorpe was precluded from "negotiating, seeking to enter into, or entering into any other agreement with respect to matters within the scope of the Venture or becoming involved in any capacity in any other project relating to robots or robotic combat." (Id. P 12.) The Venture Agreement specifies that it is to be governed by New York law, and contains a forum-selection clause specifying that any litigation arising out of its interpretation must be commenced in this state. (Plotnicki Aff. Ex. B at 7.) The parties contemplated that they would later execute more formal corporate documents, such as a shareholders' agreement, in connection with the Venture Agreement. Profile prepared the documents, but Thorpe, for reasons unclear, "declined to sign them." (Id. P 14.)

From [*5] 1994 to 1996, Robot Wars expanded its competitions to the point where "it created a recognizable name and market for robotic entertainment." As the company grew, Thorpe became its public face among robot manufacturers, who regarded him as the "father of robotic competition," while Profile provided Robot Wars with financing and managed its daily operations. (Id. P 16.) Despite its increasing success -- and the apparent interest of prospective licensees -- the company did not turn a profit during that time period. (Id. P 15.)

## Thorpe's Purported Breach of the Venture Agreement and Related Litigation

In July 1997, Profile learned that Thorpe had hatched surreptitious plans to conduct an event called "Robot Wars '97," which was supposedly to be funded by Robert Leppo, a California resident who is currently a co-owner of Defendant BattleBots, a California corporation with its principal place of business in California. (Id. P 17.) This putative event violated the terms of the non-compete clause of the Venture Agreement, which prohibited Thorpe from conducting robot competitions independent of his joint venture with Profile. Leppo, aware of Thorpe's contractual restrictions, [*6] retained counsel to assist Thorpe with the legal implications of his breach of the Venture Agreement. (Id. PP 17-18.)

Subsequently, Profile informed Thorpe that his decision to hold Robot Wars '97 violated the Venture Agreement. Thorpe and Leppo ignored Profile's cease-and-desist efforts, and subsequently sent an e-mail to "all Robot Wars supporters," ostensibly in an effort to promote the rival competition. (Id. P 19.)

In response to Thorpe and Leppo's actions, Profile commenced an action against Thorpe in this district on July 25, 1997, which was assigned to Judge Deborah A. Batts. The complaint alleged, among other things, that Thorpe had breached the Venture Agreement and infringed the Robot Wars trademark. Shortly thereafter, at Judge Batts' urging, the parties reached a settlement, memorialized on the record in open court, which specified, in part, that the Venture Agreement was to be "converted into a limited liability company operating agreement," and the new entity would then repay Profile the various cash advances it had made since the inception of the Robot Wars venture. (Id. PP 21-22.) The agreement also permitted Thorpe to conduct Robot Wars '97.

### [*7] The Settlement Unravels

Following Robot Wars '97, Thorpe contacted Profile in an effort to split the new limited liability company into two separate divisions -- a United States unit, which would be controlled by Thorpe, and an international unit, which would be held by Profile. Unbeknownst to Profile, Thorpe had purportedly entered into side-discussions with Leppo and Defendant Edward "Trey" Roski III, a resident of California. (Id. P 3.) At a time uncertain, Thorpe and Roski then created what Plaintiffs term an "Entity-in-Formation," which was to compete directly with Robot Wars. (Id. P 32.)

Profile considered Thorpe's actions to be in derogation of the parties' August 6, 1997, settlement agreement, and it sought permission from Judge Batts to move for

an order requiring Thorpe to perform the agreement. By order dated October 3, 1997, Judge Batts directed Profile and Thorpe to engage in mediation in an effort to secure the parties' compliance with the terms of the settlement agreement. (Id. P 26.)

During the subsequent mediation, which was conducted in New York City, the parties reached a tentative agreement, pursuant to which Thorpe agreed to sell his half-share **[*8]** in the limited liability company to Profile, which in turn licensed Thorpe to conduct various robotic competitions with the Robot Wars trademark. However, after Profile's attorneys memorialized the settlement terms and presented them to Thorpe, he refused to execute the documentation and requested that he receive an interim license to conduct "Robot Wars '98" while he was still reviewing the settlement terms that had been presented to him. Profile declined, and Thorpe then moved on March 6, 1998, b efore J udge B atts f or a n i njunction t o c ompel Profile to grant the license. Judge Batts denied the motion on February 25, 1998, and directed the parties to appear at a subsequent conference in yet another effort to resolve their disputes. (Id. PP 27-30.)

On March 5, 1998, the day before Thorpe and Profile were scheduled to conduct yet another mediation session in New York City, Thorpe informed his adversary that an attorney from Latham & Watkins would be attending. Unbeknownst to Profile, Roski (and, apparently, the Entity-in-Formation) had retained the attorney to monitor the subsequent mediation and, ostensibly, advise him as to how Thorpe could best attempt to dissolve his relationship **[*9]** with Profile. (Id. P 34.)

Immediately following the session, Roski conferred with the attorney. F ollowing those discussions, Roski advised Thorpe that he should not settle with Profile under the terms that Thorpe had previously assented to in October 1997. Thorpe, convinced by Roski's reasoning and knowing that Roski would support him financially in any subsequent litigation with Profile, then i nformed P rofile that h e would not s ettle. ( Id. P 35.)

Subsequently, R oski's attorneys i nformed Thorpe that if he were interested in developing the Entity-in-Formation, he would have to terminate the business arrangement with Profile. Thorpe acceded to the attorneys' advice. (Id. PP 36-37.) Then, following various telephonic conversations with Roski, Thorpe sent an e-mail on March 20, 1998, to all robot makers and fans on the Venture's mailing list, which referenced his dispute with Profile and noted that Thorpe "had worked too hard and too long and at far too much personal sacrifice to be bullied into submission by a wealthy businessman and his clever

attorneys." (Id. PP 37-38.) At least one of the recipients of the e-mail resided in this district. (June 21, 2001 Tr. at 23.) **[*10]**

Around that time, Roski and his attorneys allegedly devised a scheme to free Thorpe from the constraints that the Venture Agreement imposed on him by either buying out his half-share in the Venture or convincing Thorpe to file for bankruptcy. Profile contends that as a result of these discussions between Thorpe and Roski, Thorpe was precluded from engaging in any further Venture-related business, which made it impossible for the Venture to conduct operations in the early portion of 1998. (Id. PP 39-40.)

Thorpe's Bankruptcy Filing

As of May 13, 1998, Thorpe had less than $ 100,000 of debt, which he was capable of paying off as it became due. On that day, Thorpe borrowed $ 150,000 from Roski, solely to make Thorpe eligible to file a federal bankruptcy petition. Thorpe then used the loan proceeds, which he secured with his half-interest in the Venture, to retain bankruptcy counsel, who had been selected for him by Roski. (Id. PP 41-42.) On May 27, 1998, Thorpe filed a Chapter 11 petition in the United States Bankruptcy Court for the Northern District of California. Thorpe, acting on the advice of his bankruptcy counsel, then notified Profile that he would be rejecting **[*11]** the Venture Agreement. Subsequently, he also refused to participate in the Venture's business operations, thereby immobilizing Robot Wars.

Additionally, Plaintiffs claim that Thorpe took affirmative steps to hurt Robot Wars' potential business. For example, on July 13, 1998, Thorpe's bankruptcy counsel, through a cease-and-desist letter notified Mentorn Films Group ("Mentorn"), a Robot Wars licensee, that Thorpe owned Robot Wars' trademark rights. Profile contends that as a consequence of Thorpe's actions toward Mentorn -- and, apparently, other potential licensees -- Robot Wars lost an unspecified amount of prospective business. (Id. PP 43-47.) Thorpe also allegedly failed to inform Profile in June 1998 that David Letterman was interested in running a "segment on Robot Wars" during his late-night talk show on CBS, which is produced in this district. (Id. P 48.) Moreover, Thorpe failed to prevent two of his acquaintances from using the Robot Wars trademark without authorization, thus diluting the mark's value. (Id. PP 49-50.)

Profile subsequently moved in the Bankruptcy Court to dismiss Thorpe's petition on the theory that he had filed it in bad faith. It also sought **[*12]** to lift the automatic bankruptcy stay on other litigation so that it

could seek a ruling from Judge Batts concerning whether Thorpe was bound by the terms of the August 6, 1997, settlement. On July 30, 1998, the Bankruptcy Court granted Profile relief from the terms of automatic stay, but delayed the order's effect for ninety days to allow Thorpe to develop a reorganization plan. (Id. P 52.) The motion to dismiss the bankruptcy petition for bad faith was deferred pending submission of Thorpe reorganization plan. (Id. P 52.)

The Bankruptcy Settlement Negotiations

Shortly after the stay was lifted, Thorpe's bankruptcy counsel circulated a draft reorganization plan for his client to one of Roski's attorneys at Latham & Watkins. The plan apparently contemplated that Roski would acquire Thorpe's interest in the Venture and hire Thorpe as an officer to work for the new entity. To facilitate Roski's prospective purchase, Thorpe's draft specified that Roski would be entitled to match any offer made to Thorpe by a third-party, and would have an opportunity to purchase the Robot Wars trademark -- although the mark was allegedly owned by the Venture. Profile renewed its objection **[*13]** to the plan on the grounds that Thorpe's Chapter 11 filing had been made in bad faith. (Compl. PP 53-56.) This motion was ultimately never heard by the Bankruptcy Court, as the parties continued to negotiate terms for the dissolution of the Venture, terms that apparently conflicted with those embodied in Thorpe's draft reorganization plan. (Id.) For instance, Thorpe insisted that Profile purchase his half-share and grant him a license to conduct Robot Wars competitions in the United States while the plan contemplated that Roski would acquire this interest. (Id. P 56.)

Following an unsuccessful settlement conference before the Bankruptcy Court on December 3, 1998, Roski retained Frederick Fierst to advise Thorpe in connection with licensing issues related to the negotiations. Profile objected to Fierst's disclosing information about the negotiations to Roski, but Fierst nevertheless remained in regular communication with him. Thorpe himself also continued to consult directly with Roski and Leppo. (Id. PP 57-58.)

Profile informed Fierst, as Thorpe's attorney, that it would be willing to release any claims it had against Thorpe, provided that he "help to promote and rehabilitate **[*14]** the Venture and Profile's reputation." (Id. P 59.) Following further negotiations, Fierst presented Profile with a proposed agreement under which Thorpe would receive $ 250,000 for his half-share of the Venture, a license to stage a Robot Wars competition in San Francisco, and various other inducements and benefits. Profile signed the

agreement, but Thorpe -- as had become customary -- declined to do so. (Id. PP 60-63.)

On January 24, 1999, Thorpe, following further consultations with Roski and his attorneys, submitted yet another settlement term sheet to Profile. The sheet provided that in exchange for a mutual release of any claims that Thorpe and Profile may have had against one another, Thorpe would receive, among other things, $ 250,000 for his half-share of the Venture and a royalty from Robot Wars contingent on its future receipts. (Id. PP 65-69.) Thorpe would also "disclose potential competitors to Profile," and enter into a five-year non-compete agreement with Robot Wars. (Id. P 69.) On or about February 2, 1999, both parties executed the agreement and submitted it to the Bankruptcy Court for final approval ("the Bankruptcy Settlement"). (Id. PP 68, 71.) **[*15]** The Bankruptcy Court approved the settlement on March 5, 1999. (Id. P 75.)

Roski's Purported Efforts to Undermine the Bankruptcy Settlement

Shortly after the parties reached the settlement, Roski obtained a copy of the settlement agreement from either Thorpe or his counsel. He then disseminated the information to a robot maker, who posted an item on an unspecified website entitled "Which of You Would Be a Prostitute," opining that Thorpe was "prostituting" himself to Profile by agreeing to the settlement. (Id. P 72.) Following the settlement, Roski and BattleBots, although aware of the settlement terms, encouraged Thorpe not to publicly support Robot Wars as the settlement required, and Thorpe effectively did not extend his support. (Id. P 78-79.)

A Competitor Emerges

On March 10, 1999, Roski and Leppo unveiled BattleBots, a similar robotic combat event to take place one week before the planned Robot Wars '99. (Id. P 80.) Plaintiffs contend that during the month of February, when BattleBots filed its Articles of Incorporation, Thorpe had approximately three dozen conversations with Roski. (Id. P 81.) They further allege that Thorpe was secretly **[*16]** on Leppo's payroll, with Roski promising to indemnify Leppo for any claims asserted against him in connection with BattleBots (id. PP 82-84), and that Thorpe made damaging public statements on the internet about Profile and Steven Plotnicki, Profile's principal, in violation of the Bankruptcy Settlement (id. P 85). Finally, on March 15, 1999, Profile notified Thorpe that he had breached the Bankruptcy Settlement and invoked the mediation procedure provided for by the

Settlement. (Id. P 87.) During this period, Plaintiffs allege that Roski and BattleBots were pursuing opportunities that Thorpe had told them had been offered to Robot Wars, including holding a meeting with TalentWorks, a television company that had previously "approached Robot Wars." (Id. P 90.)

Defendants assertedly benefitted from Thorpe's refusal to promote Robot Wars. Plaintiffs charge that 38 "key competitors" from past Robot Wars events signed up for BattleBots instead of Robot Wars in 1999 and, likewise, that BattleBots was able to avoid the start-up costs of a robotic combat business. (Id. PP 99-100.) Robot Wars '99, without enough warriors to hold a profitable event, was canceled, while the [*17] first BattleBots event attracted approximately 70 teams of robot makers and has since climbed to profitable new heights, within three months attracting "enough quality robot makers to create a television series." (Id. P 100-101.) Plaintiffs contend that BattleBots' success was unjustly earned through the Defendants' calculated and surreptitious acts that caused the decline in Robot Wars' market position and goodwill. (Id. PP 123-126.)

### Further Litigation in this Court

Approximately a month later, Robot Wars filed another complaint in this district, Robot Wars v. Roski. III. Roski, Jr., and BattleBots, 51 F. Supp. 2d 491, 1999 U.S. Dist. LEXIS 9032, No. 99 Civ. 2953 (S.D.N.Y. filed 1999), alleging unfair competition, tortious interference with business and contractual relations, tortious interference with economic advantage, and trade dress infringement against Roski and BattleBots for largely the same activity that forms the material part of the instant complaint. (Defs.' Ex. D at 41-46.) On June 30, 1999, Judge Jed S. Rakoff approved Plaintiffs' voluntarily dismissal of the claim without prejudice. (Defs.' Ex. F.)

### Further Bankruptcy Litigation

Back in the Northern District of California, [*18] the Bankruptcy Court ruled on August 8, 2000, that Thorpe had breached the Bankruptcy Settlement and ordered Thorpe to fulfill the provisions of the settlement agreement that required him to promote Robot Wars. (Defs.' Ex. H at 3-4.) Claims of a Roski-Thorpe conspiracy were presented to the Bankruptcy Court by Profile in the determination of Thorpe's liability. Roski's and BattleBots' liability, however, were not considered in this action. Profile appealed the Bankruptcy Court's order to the District Court, which affirmed in part and remanded solely as to the calculation of damages. (Pls.' Ex. A at 19.)

Thorpe subsequently brought an adversary proceeding against Profile in the Bankruptcy Court, claiming that Profile had violated the Bankruptcy Court's discharge injunction by not discontinuing another suit Profile had filed against Thorpe in this district, Robot Wars v. Marc Thorpe, No. 01 Civ. 3195 (S.D.N.Y. filed Apr. 16, 2001), that has been consolidated with the instant action. (Defs.' Ex. K.) The Bankruptcy Court entered a preliminary injunction on May 24, 2001, enjoining Profile from prosecuting that action against Thorpe pending trial in the adversary proceeding. (Defs. [*19] ' Ex. N at 1-2.) To the Court's knowledge, that trial is still pending.

### The Instant Litigation

On March 5, 2001, Plaintiffs filed the complaint in this action. Plaintiffs present four separate claims, charging that:(1) Defendants tortiously interfered with Profile's contracts with Thorpe;

(2) Defendants aided and abetted Thorpe's breach of a fiduciary duty he owed to Plaintiffs;

(3) Defendants were unjustly enriched when they acquired a portion of the Robot Wars business for themselves; and

(4) Defendants tortiously interfered with Robot Wars' prospective business relations. n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 The first and fourth claims were previously before Judge Rakoff in this district, but were voluntarily dismissed without prejudice. (Defs.' Ex. F.)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

## DISCUSSION

### I. Venue Issues

[HN1]For the purposes of deciding Defendants' motion to dismiss for improper venue or, in the alternative, to transfer the case to another judicial district, the Court must accept all of the uncontroverted allegations [*20] in Plaintiffs' complaint as true and construe all reasonable inferences in plaintiffs' favor. Dolson v. New York State Thruway Auth., 2001 U.S. Dist. LEXIS 4283, 2001 WL 363032 at *1 (S.D.N.Y. 2001) (citation omitted).

A. Improper Venue: Rule 12(b)(3) and § 1406(a)

Defendants maintain that pursuant to 28 U.S.C. § 1406(a), Plaintiffs' claims should be dismissed because (1) all Defendants do not reside in the state of New York (28 U.S.C. § 1391(a)(1)); (2) no "substantial part of the events of omissions giving rise to the claim" occurred in New York (§ 1391(a)(2)); and (3) this action can be (and should have been) brought in the Northern District of California (§ 1391(a)(3)). (Defs.' Br. at 9.) Plaintiffs maintain that their claims have a substantial connection to New York, and hence, that venue is proper in this district under § 1391(a)(2). n2

- - - - - - - - - - - - - Footnotes - - - - - - - - - -

n2 28 U.S.C. § 1391(a)(2), provides in relevant part:[HN2]

A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in . . . (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred . . . .

- - - - - - - - - - - - End Footnotes- - - - - - - - - -

[*21]

The crux of the venue issue, therefore, is whether Plaintiffs can demonstrate that a substantial part of the events or omissions giving rise to the claim occurred in New York. Defendants argue that the events or omissions giving rise to the claim "all occurred in California, not New York." (Defs.' Br. 8-9.)

Although there may have been initial confusion as to the proper interpretation of the 1990 amended version of the venue statute, courts are now settled in their method of application. [HN3]The Plaintiff bears the burden of establishing that venue is proper once an objection to venue has been raised, D'Anton Jos, S.L. v. Doll Factory, Inc., 937 F. Supp. 320, 321 (S.D.N.Y. 1996), and must demonstrate that venue is proper for each claim asserted in their complaint. See Saferstein v. Paul Mardinly, Durham, James, Flandreau & Rodger, P.C., 927 F. Supp. 731, 736 (S.D.N.Y. 1996); Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3808. To determine whether Plaintiffs have satisfied their burden of proving venue under § 1391(b), courts evaluate Defendants' actions as well as the nature of the dispute. See Friedman v. Revenue Mgmt. of New York, Inc., 38 F.3d 668, 672 (2d Cir. 1994) [*22] (affirming transfer of venue to district where a substantial part of Defendant's alleged actions occurred); I.M.D. USA, Inc. v. Shalit, 92 F. Supp. 2d 315, 318 (S.D.N.Y. 2000) ("The fact that the events and omissions most closely

related to the alleged breach . . . unmistakably occurred in South Carolina is material, as the focus under Section 1391(a)(2) is on the activities of the defendant, not the plaintiff.")

[HN4]The venue statute, furthermore, does not require venue in the district with the most substantial contacts to the dispute. Rather, it is sufficient that a substantial part of the events occurred in the challenged venue, even if a greater part of the events occurred elsewhere. See David D. Siegel, Commentary on 1990 Revision of Subdivisions (a), (b), and (e) at 4, 28 U.S.C.A. § 1391 (Supp. 1993); Bates v. C&S Adjusters, Inc., 980 F.2d 865 (2d Cir. 1992). The current venue standard, thus, acknowledges the more porous borders of the electronic age, where events can be influenced anywhere in the world by fax, phone and keystroke, and recognizes that a person acting predominantly in one state can easily cause his or her [*23] acts to have effects outside the borders of that state. Therefore, to show that venue lies in the Southern District of New York, Astor Holdings and Robot Wars bear the burden of establishing only that a substantial part of Roski's and BattleBots' actions or omissions giving rise to this lawsuit occurred in this district for each of the counts raised.

Plaintiffs contend that the Court can find venue solely because "plaintiffs were injured in New York." (Pl's. Br. at 5.) While it is true that the place where harm of a tort occurs is "relevant for venue purposes," New York Mercantile Exch. v. Central Tours, Inc., 1997 U.S. Dist. LEXIS 9242, at *13 (S.D.N.Y. June 30, 1997), Plaintiffs' argument overstates the breadth of the law of venue. In this case, when Plaintiffs speak of the harm caused by the tort, they mean solely the place where the economic effect of the tort was felt, in other words, the Plaintiffs' place of business. If this were enough to confer venue, then the plaintiff's residence would always be a proper venue in tort cases, or at least in cases of business torts. But this is conspicuously not what Congress has provided in § 1391(a). [HN5]Venue will usually [*24] exist where an act outside the district causes physical injury or other tortious effect inside the district. If, for example, a defendant by actions in California interfered with a business opportunity that existed in New York, the harm which the tort contemplates would occur here. But if the economic loss that resulted was inflicted on a corporation in Georgia, for example, that alone would not be sufficient for venue in Georgia, else plaintiffs could always sue in their home forum.

The only case cited that directly supports Plaintiffs' argument that a court may find venue proper under 28 U.S.C. § 1391(a)(2) based solely on the situs of the economic harm is Reynolds Corp. v. National Operator

Services, Inc., 73 F. Supp. 2 d 299 (W.D.N.Y. 1999). n3 The other cases cited by Plaintiffs to support an effects-only inquiry are inapposite. Unlike the claims here, the cases cited: (1) concern motions to transfer from a district where venue had already been found proper n4; (2) contain analyses for personal jurisdiction purposes of defendants' forum-related contacts, an inquiry that is distinct from a determination as to whether venue lies; n5 (3) involve [*25] fact patterns in which the quantum of defendants' activities in the district in question was relatively greater than that alleged in the present action; n6 or (4) do not even discuss venue or are cited out of context. n7 There is an obvious potential for unbounded venue if the courts were to find venue regardless of where the acts occurred, based solely on the existence of economic harm felt in the district where the plaintiff resides or is headquartered. Therefore, [HN6]while the locus of the harm suffered is a factor to consider, the case law does not support the theory that venue is proper on an economic-effects inquiry alone, and this Court respectfully declines to follow such limited non-binding authority as appears to take that view.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n3 The Reynolds court cited to Rothstein v. Carriere, 41 F. Supp. 2d 381, 387 (E.D.N.Y. 1999), to support this effects-only test for venue. However, in Rothstein, Judge Gershon noted that "the place where the harm occurred . . . [is] . . . relevant for venue inquiry," but not determinative and, further, that "all of the events regarding plaintiff' transpired in the forum district. Id.

[*26]

n4 CAT Internet Servs. v Magazines.com, Inc., 2001 U.S. Dist. LEXIS 8, at *22 (E.D. Pa. Jan. 4, 2001).

n5 Levisohn, Lerner, Berger & Langsam v. Medical Taping Sys., 10 F. Supp. 2d 334, 343 (S.D.N.Y. 1998); National Westminster Bank PLC v. Retirement Care Assocs., Inc., 1999 U.S. Dist. LEXIS 5807, at *8 (S.D.N.Y. Apr. 22, 1999).

n6 Neufeld v. Neufeld, 910 F. Supp. 977, 986 (S.D.N.Y. 1996); New York Mercantile Exch. v. Central Tours Int'l, Inc., 1997 U.S. Dist. LEXIS 9242, at *13 (S.D.N.Y. June 30, 1997).

n7 Lewis v. Rosenfeld, 138 F. Supp. 2d 466, 2001 U.S. Dist. LEXIS 2313, at *14 (S.D.N.Y. 2001); Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A., 2001 U.S. Dist. LEXIS 5880, at *11 (S.D.N.Y. May 8, 2001); J.C. Whitney & Co. v. Renaissance Software Corp., 2000 U.S. Dist. LEXIS 6180, at *64 (N.D. Ill. Apr. 19, 2000). Kirkpatrick v. Rays Group, 71 F. Supp. 2d 204, 212 (W.D.N.Y. 1999); Bates v. C&S Adjusters, Inc., 980 F.2d 865, 868 (2d Cir. 1992).

- - - - - - - - - - - - End Footnotes - - - - - - - - - - - - - -

[*27]

But while Plaintiffs are wrong that the situs of economic injury is, without more, a place where "a substantial part of the events or omissions giving rise to the claim occurred," they are nevertheless correct that on the facts of this case, this district is an appropriate venue under the statute.

1. Tortious interference with contract

Under § 1391(a)(2), Plaintiffs may litigate the tortious interference of contract claim in this district, because the complaint demonstrates that a substantial part of the events giving rise to this claim occurred here.

Because the claim requires a preexisting contract, the Court first looks to the contracts at issue. There are two contracts to consider: the Venture Agreement and the Bankruptcy Settlement. Plaintiffs claim that Defendants caused Thorpe to breach the Venture Agreement in various ways. (Compl. P 111(a), (b), (c).) It is undisputed that the Venture Agreement was a New York contract to be performed in New York and governed by New York law, as provided by a forum selection clause in the Agreement. (Plotnicki Aff. at 7.) Plaintiffs also allege that Defendants induced Thorpe to breach the Bankruptcy Settlement between himself and the [*28] Plaintiffs. (Id. P 111(e).) Although the bankruptcy itself took place in the Northern District of California, the Bankruptcy Settlement Agreement specifically states that the contract "may be enforced in the courts of California and New York," and called for Thorpe to provide information to Profile, which is located in New York, as well as to "promote the [Robot Wars] property." (Defs.' Ex. F at 3, 5-6.) While many of the actions giving rise to this claim occurred in California (Defs.' Br. at 11-12), the complaint alleges that these actions were directed at interfering with contracts that had substantial connections to New York.

Thus, substantial events giving rise to the alleged tortious interference of contract occurred in this district and venue is proper here.

## 2. Aiding and abetting breach of fiduciary duty

Venue in this district is also proper under § 1391(a)(2) for the second claim, aiding and abetting a breach of fiduciary duty. Plaintiffs allege that "knowing that Thorpe owed fiduciary obligations to plaintiffs, defendants deliberately induced Thorpe to breach such obligations and gave substantial assistance and encouragement to him in breaching such obligations. **[*29]** " (Compl. P 118.) Specifically, Plaintiffs assert that Roski, "through his attorney, covertly participated in the March 6, 1998, mediation session between Thorpe and Profile" in New York to prevent the New York lawsuit from settling. (Id. PP 34-36). They further contend that on March 29, 1999, Roski's father was in New York on behalf of BattleBots, where he attended a meeting with TalentWorks, "a television company which had approached Robot Wars" via Thorpe, who then relayed this information to Roski and BattleBots instead of Profile. (Id. P 90.) Although Roski himself may have been physically located in California when arranging for the above events, his actions were unmistakably directed towards concrete New York events that comprise a substantial basis of Plaintiffs' cause of action. Wachtel v. Storm, 796 F. Supp. 114, 116 (S.D.N.Y. 1992) (citing Ostrowe v. Lee, 256 N.Y. 36, 175 N.E. 505 (1931)). Moreover, the fiduciary duty that Thorpe allegedly owed to Profile and Robot Wars is established by the Venture Agreement, which, as discussed above, is without question a New York contract that created a duty to a New York-based venture (Plotnicki **[*30]** Aff. Ex. B at 2), and thus the actions alleged above are directed to a duty established, governed and enforced by New York law. Accordingly, venue in the Southern District of New York is proper for this claim under § 1391(a)(2).

## 3. Unjust enrichment

Determining the application of § 1391(a)(2) to the third claim is a more difficult exercise, partly because of the somewhat derivative nature of the claim and partly because of the vague language in Plaintiff's complaint which references, without specifying which are relevant, the prior 121 paragraphs of their complaint. (Compl. PP 122-127.) The main basis for the claim is that "Defendants engaged in conduct, and encouraged Thorpe to engage in conduct designed to paralyze the Robot Wars business so that defendants could acquire a valuable part of the Robot Wars business for themselves." ( Id. P 123.) n8 By reference, however, defendants' "conduct" includes all of the acts alleged for the above actions, including interfering

with the New York Venture Agreement, the New York lawsuit and the New York settlement negotiations. Thus, while the enrichment of the Defendants would occur in California, the means that were **[*31]** to accomplish that enrichment involved the undermining of Plaintiffs' venture in New York, which suffices to meet the substantiality test and establish venue for this claim under § 1391(a)(2).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - - -

n8 Notwithstanding several references in their brief to a "deal with Comedy Central," by which Plaintiffs contend Defendants were unjustly enriched, this specific instance does not appear in the complaint itself. (Pls.' Br. at 10, 12.)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - - -

## 4. Tortious interference with prospective business relations

Venue is also proper in the Southern District of New York for the fourth and final claim. Plaintiffs here allege that Defendants "engaged in fraudulent, dishonest, and unfair competition in order to interfere with the economic opportunities of the Robot Wars business." (Compl. P 129.) Specifically, Plaintiffs contend that Defendants diverted a corporate opportunity for Robot Wars to appear on the David Letterman Show, a New York-based program ( Id. PP 48, 129), as well as other prospective business relationships **[*32]** with "a variety of third parties, including TalentWorks" ( Id. P 129), also a New York company, albeit one located in the Eastern District of New York. (Defs.' Reply at 5.) Plaintiffs further maintain that Defendants assisted Thorpe in disrupting the settlement proceedings in New York, thus interfering with the potential settlement. (Id. PP 34-36.) Specifically, it is alleged that Thorpe was in New York to settle a New York lawsuit when Defendants convinced Thorpe not to settle through a variety of tactics, including sending an attorney to the New York mediation proceedings to prevent the settlement. (Id.) n9 Therefore two of the three business relationships allegedly interfered with were based in this district and one was based in the neighboring Eastern District of New York. Thus, substantial events giving rise to this claim transpired in this district, making venue in this Court proper.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - - -

n9 Defendants' assertion that this activity was covered by a "mediation privilege" is unavailing, as such a privilege can protect only actual parties to the mediation, which Defendants were not. (Defs.' Br. at 13-14.) Defendants provide no legal support for the proposition that third parties covertly taking part in a mediation are protected by the mediation privilege. This is not surprising, as one of the purposes for the mediation privilege is to encourage settlement, precisely the opposite of what involving interested third-parties in a mediation session would contemplate. See generally Fields-D'Arpino v. Restaurant Assocs., Inc., 39 F. Supp. 2d 412, 417 (S.D.N.Y. 1999); Alan Kirtley, *The Mediation Privilege's Transition From Theory to Implementation*, J. Disp. Resol. 1, 9 (1995).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**[*33]**

B. Change of Venue: § 1404(a)

In letter briefs to the Court filed after oral argument, the parties have addressed whether a transfer of venue was appropriate pursuant to 28 U.S.C. § 1404(a). That statute provides that [HN7]"for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). There is no dispute that the action in question could have been brought in the Northern District of California. Accordingly, [HN8]the determination whether to transfer on grounds of convenience is left to "the broad discretion of the district court." Palace Exploration Co. v. Petroleum Dev. Co., 41 F. Supp. 2d 427, 437 (S.D.N.Y. 1998) (citation omitted) (quoting In re Cuyahoga Equipment Corp., 980 F.2d 110, 117 (2d Cir. 1992)); Filmline (Cross-Country) Prod., Inc. v. United Artists Corp., 865 F.2d 513, 520 (2d Cir. 1989). The burden of showing the propriety of the transfer lies with the moving party, who must make a "clear-cut showing that a transfer is in the [*34] best interests of the litigation." Dwyer v. Gen. Motors Corp., 853 F. Supp. 690, 692 (S.D.N.Y. 1994) (citations omitted) (quotations omitted).

[HN9]While there is no precise method to determine whether to transfer a case pursuant to § 1404(a), courts are guided by a variety of factors, which include: (1) the convenience of witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of the operative facts; (5) the availability of process to compel attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) trial efficiency and the interests of justice based on the totality of the circumstances. Reliance Insurance Co. v. Six Star, Inc., 155 F. Supp. 2d 49, 56-57 (S.D.N.Y. 2001) (citing 800- Flowers, Inc. v. Intercontinental Florist, Inc., 860 F. Supp. 128, 133 (S.D.N.Y. 1994); Ivy-Mar Co., Inc. v. Weber-Stephen Products Co., 1993 U.S. Dist. LEXIS 17965, 1993 WL 535166, at *4 (S.D.N.Y. Dec. 22, 1993). n10 While courts are to consider the [*35] above factors, there is "no rigid formula for balancing these factors and no single one of them is determinative." Citigroup, Inc. v. City Holding Company and City Nat'l Bank, 97 F. Supp. 2d 549, 561 (S.D.N.Y. 2000) (citations omitted). In addition, the Court must defer to the plaintiff's choice of forum unless the balance of convenience and justice weigh heavily in favor of defendant's proposed forum. Id.; Toy Biz, Inc. v. Centuri Corp, 990 F. Supp. 328, 330 (S.D.N.Y. 1998); Jannus Group, Inc. v. Independent Container, Inc., 1998 U.S. Dist. LEXIS 13106 *9 (S.D.N.Y. Aug. 24, 1998).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n10 While Defendants seek to add to this list of factors another "key consideration" of "the pendency of related actions in the transferee district," citing APA Excelsior III L.P. v. Premiere Techs., Inc., 49 F. Supp. 2d 664, 667-68 (S.D.N.Y. 1999), this consideration would appear to be not a separate factor, but simply an aspect of the trial efficiency/interests of justice factor. Moreover, APA Excelsior is distinguishable from the instant case as in that case there were twenty-two previously-filed and then-consolidated actions in the Northern District of Georgia that "hinged on the same core of operative facts," versus one case filed in the Southern District of New York pursuant to a forum selection clause in a merger agreement. Id. at 670. Here, there is hardly such an overwhelming preponderance of cases in one district, but rather, related cases have been filed both in New York and in California during the history of the Robot Wars litigation.

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*36]

Plaintiffs claim there are nine potential non-party witnesses who are either New York residents or subject to subpoena in New York, but do not specify their identities. (Pls.' Letter Br. at 6.) Although Defendants do not address this factor in their letter brief, Mark Thorpe, the most significant third-party witness, is a long-time resident of Northern California (Defs.' Br. at 1), as is Robert Leppo, another significant witness (Leppo Aff. at 2). [HN10]"When weighing the convenience of the witnesses, courts must consider the materiality, nature and quality of each witness, not nearly the number of witnesses in each district." TM Claims Service A/S/O Fuji Photo Film v. KLM Royal Dutch Airlines, 143 F. Supp. 2d 402, 406 (S.D.N.Y. 2001) (citation omitted). Thus, as important third party witnesses live in California while other witnesses most likely reside on both coasts, this factor does little to favor one venue over the other. n11

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n11 Assessing this factor is necessarily somewhat difficult at this stage of the case, as discovery has not commenced and neither party has formally identified the witnesses who will be called to testify at trial.

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*37]

Neither side presents or argues the location of documents, perhaps because it is evident that relevant documents will be found in both New York and California, and thus, this factor does little to help either side. In any event, [HN11]the location of records is not a compelling consideration when records are easily portable. Coker v. Bank of America, 984 F. Supp. 757, 766 (S.D.N.Y. 1997) ("In today's era of photocopying, fax machines and Federal Express," the location of documents factor is neutral).

As the parties to the suit are located both in California and in New York, the convenience of the parties factor does not weigh in either party's favor. Although Roski is a California resident and BattleBots is a California Corporation, BattleBots does business in New York, as shown by its interactions with Comedy Central, which is located in this district. (Roski Supp. Aff. at 2.) Similarly, although Astor Holding and Robot Wars are New York companies, Robot Wars held events in California. (Plotnicki Aff. at 3.) Indeed, Defendants

conceded on the record in open court that this factor is a wash. (6/21/01 Tr. at 37.)

The main factor in Defendants' favor is that the primary [*38] locus of operative facts occurred in California (Def's. Br. at 11-15), something plaintiffs do not contest (Pls.' Br. at 10-12). As Roski and Thorpe both live in California, many of the alleged unlawful activities were committed there. However, even if many of the events giving rise to Plaintiffs' claim occurred in California, significant acts that occurred in New York or were directed at New York, as discussed in the § 1406 analysis above. Thus, this factor does not weigh heavily in favor of California.

Neither side has argued that process to compel unwilling witnesses is an issue in this case. Further, there is nothing on the record before the Court to suggest that trial in New York would impede the attendance of any contemplated witness. Similarly, the relative means of the parties has not been persuasively presented to the Court, although Plaintiffs assert, without specific evidentiary support, that they are of limited means while Defendants have "unlimited resources." (Pls.' Letter Br. at 7.) As this conclusory statement is unsupported and as Defendants have not addressed this point, this factor does not favor either side. See, e.g. TM Claims Service, 143 F. Supp. 2d 402, 405 n. 4 [*39] (citation omitted).

In addition, familiarity with the governing law, whether it be that of California or New York, does little to favor either party, as this factor is generally given little weight in federal courts. See Prudential Sec. Inc. v. Norcom Dev., Inc., 1998 U.S. Dist. LEXIS 10569, at *17 (S.D.N.Y. July 15, 1998) ("this Court has routinely held that [HN12]the 'governing law' factor is to be accorded little weight on a motion to transfer venue because federal courts are deemed capable of applying the substantive law of other states"). To the extent this factor could be held to have any weight, defendants have not persuasively argued that California law rather than New York law should apply to Plaintiffs' claims, nor that the two states' laws differ in any significant relevant respect.

Defendants choose to focus largely on the trial efficiency and interests of justice factor, in arguing that these claims should be consolidated with the bankruptcy proceedings in the Northern District of California. (Defs.' Letter Br. at 2.) [HN13]This factor "relates primarily to issues of judicial economy." Dostana Enterprises LLC v. Federal Express Corp., 2000 U.S. Dist. LEXIS 11726, [*40] *19 (S.D.N.Y. Aug. 9, 2000). Thorpe's bankruptcy proceedings in California, however, are largely complete. Profile appealed the Bankruptcy Court's ruling to the Northen District of California, which affirmed the decision in

part and remanded to the Bankruptcy Court on the sole issue of damages. (Pls.' Letter Br. Ex. A at 19.) The other proceeding in Thorpe's bankruptcy case that involves Robot Wars is a narrow adversary proceeding brought by Thorpe against Profile for violating the discharge injunction by failing to discontinue a lawsuit against Thorpe after his reorganization plan was confirmed. (Pascoe Aff. at 2.) Additionally, and more to the point, the bankruptcy proceedings before the California court, including the Bankruptcy Settlement, did not specifically consider Roski's and Battlebots' alleged breaches of the Venture Agreement, but rather considered Marc and Denise Thorpe's breaches. Hence, the claims against Roski and BattleBots have not been litigated in the California action. Finally, it is not at all clear that Plaintiffs' claims against Roski and BattleBots, who are not bankrupt, could be consolidated with bankruptcy court proceedings involving Thorpe. Given these circumstances, **[*41]** the pendency of the California bankruptcy appeal provides no efficiency ground for transfer of an essentially distinct, if somewhat overlapping, litigation. See Wright, Miller & Cooper, Federal Practice & Procedure: Jurisdiction 2d § 3584 at 454-55 (the related case factor need not be given weight "if there is no realistic possibility of consolidating the present case with the related cases"). Further, as this Court is already familiar with the claims alleged, judicial economy is served by keeping venue in this district.

Since the other factors relevant to venue are fairly evenly balanced, Plaintiffs' choice of forum becomes the important consideration that tips the scales in Plaintiffs' favor to keep venue in New York for each of the claims raised. It is axiomatic that [HN14]a plaintiff's choice of forum is entitled to great deference when the plaintiff has sued in the plaintiff's home forum. Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29, 101 L. Ed. 2d 22, 108 S. Ct. 2239 (1988) (quoting Van Dusen v. Barrack, 376 U.S. 612, 622, 11 L. Ed. 2d 945, 84 S. Ct. 805 (1964)); Royal & Sunalliance v. British Airways, 167 F. Supp. 2d 573, 2001 U.S. Dist. LEXIS 4508 **[*42]** at *2 (S.D.N.Y. 2001). See also Koster v. (Am.) Lumbermens Mut. Cas. Co., 330 U.S. 518, 524, 91 L. Ed. 1067, 67 S. Ct. 828 (1947); Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255-56 & n.23, 70 L. Ed. 2d 419, 102 S. Ct. 252 (1981); Iragorri v. United Techs. Corp., 274 F.3d 65, 2001 U.S. App. LEXIS 26033 *7 (2d Cir. 2001) (forum non conveniens context) (citations omitted); Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3848. Further, venue should not be transferred under § 1404(a) "where the result is merely to shift the inconvenience to plaintiff." Shube's Manufacturing Corp. v. Blake's Bros. Int'l, Inc., 1990 U.S. Dist.

LEXIS 1779, at *12 (S.D.N.Y. Feb. 21, 1990). Here, two New York companies have chosen to litigate in New York claims related to this dispute.

In short, Defendants have not met their burden under § 1404(a). The balance of factors does not weigh heavily in Defendants' favor, but instead, is largely in equipoise. Given the deference courts are required to give to a plaintiff's choice of forum, this Court declines to transfer this case to the Northern District **[*43]** of California under § 1404(a).

## II. Motion to Dismiss Under Rule 12(b)(6)

[HN15]On a motion to dismiss under Rule 12(b)(6), the court "must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." Harris v. City of New York, 186 F.3d 243, 247 (2d Cir. 1999). The court must limit itself to facts stated in the complaint, including documents attached to or incorporated by the complaint. See Dangler v. New York City Off Track Betting Corp., 193 F.3d 130, 138 (2d Cir. 1999). The court should grant the motion only if, "after viewing plaintiff's allegations in this favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. The court's role on a Rule 12(b)(6) motion is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir. 1998) (internal quotation marks and citation omitted). While the pleading standard is liberal, "bald assertions and conclusions of **[*44]** law are insufficient." Id. at 440 (citing Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir. 1996)).

### A. Tortious Interference with Contract

Defendants move to dismiss the tortious interference of contract claim on three grounds: the claim is barred by the statute of limitations, the claim has previously been satisfied, and the claim fails as a matter of law.

### 1. Statute of limitations

[HN16]New York has a three-year statute of limitations for tort claims. N.Y. C.P.L.R. § 214(4); Van Dussen-Storto Motor Inn, Inc. v. Rochester Tel. Corp., 63 A.D.2d 244, 407 N.Y.S.2d 287, 292 (4th Dep't 1978). Defendants maintain that Plaintiffs' claims for tortious interference of contract accrued -- at the latest -- on July 25, 1997, the filing date of the action that Astor commenced against Thorpe alleging, among other things, breach of contract. Plaintiffs claim, however, that Roski's involvement in the ongoing dispute was not known until May 13, 1998, when Roski's loan to Thorpe to fund Thorpe's

bankruptcy proceedings was publicly disclosed in the bankruptcy court filings. Plaintiffs maintain that principles of equitable estoppel prevent the statute of [*45] limitations from running against plaintiffs who were unaware of their cause of action. (Pls.' Br. at 15.)

While Defendants list numerous allegations in the complaint itself to show that Roski's involvement was known to Plaintiffs prior to the bankruptcy filings, the allegations in the complaint represent information known to the Plaintiffs at the time of filing the complaint and do not necessarily demonstrate what was previously known by Plaintiffs. Further, although the complaint shows that Plaintiffs were suspicious of Leppo's involvement in July 1997, Thorpe falsely denied Leppo's involvement, supporting Plaintiffs' claim that they lacked actual knowledge of Roski's and Leppo's involvement at the relevant time.

[HN17]For New York tort claims, the Court considers New York's doctrine of equitable estoppel, which is similar, but not identical, to the federal doctrine of equitable tolling. Johnson v. Nyack Hosp., 86 F.3d 8, 11 (2d Cir. 1996); Cary Oil Co., Inc. v. MG Refining and Mktg., Inc., 90 F. Supp. 2d 401, 419 (S.D.N.Y. 2000). Equitable estoppel prevents a defendant from pleading the statute of limitations if plaintiff refrained from filing a timely [*46] action because of defendants' affirmative acts of misrepresentation or concealment. Plaintiffs must also demonstrate that they exercised due diligence in bringing the cause of action and reasonable care in ascertaining facts which might have led to discovery of their claim. Id. at 420; see also Menke v. Glass, 898 F. Supp. 227, 232-233 (S.D.N.Y. 1995) ("the critical question is whether the circumstances of the case put plaintiffs on notice . . . and if, through the exercise of reasonable diligence, they would have discovered the wrongdoing"). The complaint here alleges both that Thorpe affirmatively misrepresented Roski's involvement and that Plaintiffs were reasonably diligent in attempting to determine Defendants' role in the alleged actions by asking Thorpe and his attorney of Leppo's connection to the alleged violations. (Compl. P 21.) Perhaps these allegations will not in the end be established. At this stage of the proceeding, however, the facts alleged must be taken as true. Accordingly, the statute of limitations defense presents issues of fact that must be resolved at trial, or at least at summary judgment after development of a full factual [*47] record. It cannot be found on the face of the complaint that the tortious interference with contract claim is time-barred as a matter of law.

2. Claim preclusion

Defendants also argue that "in the Thorpe-Astor Adversary Proceeding, Astor was compensated for any

alleged damages it suffered as a result of Thorpe's breach of contract" (Defs.' Br. at 17.) The tortious interference with contract claim, however, is a separate tort for which there is a separate cause of action brought against different persons than those sued in the bankruptcy court. While a breach of contract claim against Thorpe would be precluded, having already been litigated in the former proceeding, the claim at issue here involves Roski's and BattleBots' involvement in that breach, which has not yet been litigated, and for which a claim is not extinguished. While Plaintiffs would not be entitled to duplicative compensatory damages for any injuries for which they have already been compensated by Thorpe, Plaintiffs are entitled to demonstrate that Defendants here are joint tortfeasors with Thorpe, as well as to seek additional remedies, including punitive damages, against the Defendants.

3. Failure to state [*48] a claim

[HN18]To state a claim for tortious interference with contract under New York law, a plaintiff must allege (1) the existence of a valid contract between itself and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional procuring of a breach; and (4) damages. There is also a causation burden on the plaintiff, who must assert that defendant's actions were the "but for" cause of the alleged breach of contract -- in other words, that there would not have been a breach but for the defendant's activities. Lastly, the pleadings must have some factual specificity to state a claim for tortious interference; conclusory assertions are not sufficient. Alevizopoulos & Assocs. v. Comcast Int'l Holdings, 100 F. Supp. 2d 178, 186 (S.D.N.Y. 2000).

Plaintiffs identify two contracts with which Defendants interfered: the July 22, 1994, Venture Agreement between Profile Records, Inc. and Marc Thorpe that created Robot Wars, Inc., and the February 2, 1999, Bankruptcy Settlement Agreement among Profile Holdings, Inc., Robot Wars LLC, Steven Plotnicki and Marc Thorpe. (Compl. PP 111-113; Pls.' Ex. B; Defs.' Ex. F.) Plaintiffs claim that, notwithstanding [*49] their knowledge of these agreements, Defendants deliberately interfered with the contracts (id. PP 112, 115) by inducing Thorpe to breach both of them (id. PP 112-113), resulting in an estimated $ 5 million in damages to Plaintiffs (id. P 114).

While the claims meet the required factual specificity as to the elements of the cause of action, the required causation is not as clearly alleged. However, Plaintiffs have alleged certain facts, particularly that Defendants formed an "Entity-in-Formation," and planned to hold Robot Wars '97 with Thorpe before the breach of the Venture Agreement, which suggest that Plaintiffs

could show that without the assurance of a future business partner, Thorpe would not have breached the contract with Plaintiffs. n12 (Id. P 111.)

- - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n12 The terms of the Venture Agreement state that the joint venture "shall terminate at the election of either party, exercised by giving written notice to the other party . . . upon a material breach by either party, other than the party giving notice of termination." (Plotnicki Aff. Ex. B at 5.) Although Profile previously brought an action against Thorpe in this district on July 25, 1997, for violating the Venture Agreement, it does not appear that Profile sought to terminate the Venture because of the breach. Rather, the Venture was converted following settlement negotiations into a limited liability company operating agreement, with Thorpe and Profile each having a 50% interest in Robot Wars LLC. As the agreement was restructured in this manner, it is possible for there to be more than one period of relevant interference with contract.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*50]

Likewise, Plaintiffs have pled specific facts that, if proven, could show that but for Roski's involvement, Thorpe would not have breached the Bankruptcy Settlement, including that Roski (a) hired attorney Fierst to advise Thorpe on the Bankruptcy Settlement (P 57); (b) sat alongside Thorpe at the Bankruptcy Court's approval of the Settlement (P 74); (c) "encouraged" Thorpe's various e-mail messages that allegedly failed to promote Robot Wars as required by the Settlement Agreement (PP 74-79); and (d) secretly arranged for Thorpe to be placed on his business partner's payroll at around the time of the settlement, and indemnified his partner for the relationship (PP 82-83). Thus, the facts alleged in the complaint, if they are substantiated, would permit a reasonable jury to conclude that but for Roski's actions, Thorpe would not have breached the Bankruptcy Settlement.

Thus, Plaintiffs have adequately alleged facts constituting a claim of tortious interference with contract. Accordingly, Defendants' motion to dismiss that claim is denied.

B. Aiding and Abetting Breach of a Fiduciary Duty

Defendants claim that the statute of limitations for a claim of breach of a fiduciary duty [*51] is three years, thus barring Plaintiffs from bringing this claim. Plaintiffs maintain that the appropriate time period is six years where the relief sought is equitable in nature or the breach grounded in fraud, or alternatively, that Roski's breach fell within the three-year statute of limitations period.

Even assuming arguendo that the applicable limitations period is three years, there is no statute of limitations bar here. [HN19]Principles of equitable estoppel require that "a statute of limitations does not run against a plaintiff who is unaware of his cause of action." Dillman v. Combustion Engineering, Inc., 784 F.2d 57 (2d Cir. 1986) (citations omitted). In this case, the fact of which Plaintiffs needed to be aware is not the claimed breach of duty by Thorpe, but the alleged involvement by Defendants in inducing that breach. As stated above, Plaintiffs allege that they did not know, and could not have known, of the existence of contractual interference by Roski until Roski's May 13, 1998, loan to fund Thorpe's bankruptcy petition was publically disclosed. For the purposes of this motion, the Court must accept these allegations as true. Thus, since the instant action [*52] was filed on March 5, 2001, the claim falls within the three-year statute.

Defendants also argue that Plaintiffs have failed to state a claim for which relief can be granted. [HN20]To state a claim for aiding and abetting a breach of fiduciary duty under New York law, Plaintiffs must allege (1) a breach by a fiduciary of obligations to another, and (2) that the defendant knowingly induced or participated in the breach. Wight v. Bankamerica Corp., 219 F.3d 79, 91 (2d Cir. 2000). Plaintiffs assert in the complaint that Defendants, knowing of the Venture Agreement between Thorpe and Profile and the later non-compete agreement in the Bankruptcy Settlement, encouraged Thorpe to attack Profile publicly (Compl. PP 19, 38); advised him to deadlock the Robot Wars business (id. PP 36,40,45); sent their attorney to a private mediation with Profile (id. P 35); caused Thorpe to create a cloud on Robot Wars' ownership of the Robot Wars trademark (id. P 47); arranged for Thorpe to file for bankruptcy to obtain control of the Robot Wars business (id. P 43); and placed Thorpe on his payroll (id. PP 82-83). Taking these allegations as true, this claim is adequately pled. [*53]

Accordingly, Defendants' motion to dismiss the claim of aiding and abetting breach of a fiduciary duty is denied.

C. Unjust Enrichment

Plaintiffs allege that Defendants engaged in conduct to obstruct the Robot Wars business, causing the erosion and goodwill of Robot Wars' market position, in order to acquire part of the Robot Wars business for themselves. (Compl. PP 123-125.) Defendants maintain that the claim of unjust enrichment, similar to quantum meruit, requires that "plaintiffs conferred a benefit on defendants," which Plaintiffs fail to demonstrate in their complaint. (Defs.' Br. at 23.)

[HN21]Unjust enrichment is best understood as a general principle, straddling the division between contract and tort, that underlies various legal doctrines and remedies, rather than as a single well-defined cause of action. 22A NY Jur. Contracts § 512. In essence, it is an action for restitution or on quasi contract, and "[the] existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." Feigen v. Advance Capital Management Corp., 150 A.D.2d 281, 541 N.Y.S.2d 797, 799 [*54] (1st Dep't. 1989) (citing Clark-Fitzpatrick, Inc. v Long Is. R.R. Co., 70 N.Y.2d 382, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190 (N.Y. 1987)). Unjust enrichment is not an appropriate remedy for fruitless negotiation, frustration or disappointed expectations. Cunningham v. Merchant-Sterling Corp., 155 Misc. 2d 226, 587 N.Y.S.2d 492, 494 (1991); Songbird Jet Ltd., Inc. v. Amax, Inc., 581 F. Supp. 912, 926 (S.D.N.Y. 1984); 22A NY Jur. Contracts § 512.

[HN22]To state a claim for unjust enrichment in New York, a plaintiff must allege that (1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendants to make restitution. Louros v. Cyr, 175 F. Supp. 2d 497, 2001 U.S. Dist. LEXIS 4663 *35 (S.D.N.Y. 2001) (citing Huntington Dental & Medical Co., Inc. v. Minnesota Mining and Mfg. Co., 1998 U.S. Dist. LEXIS 1526, *17 (S.D.N.Y. Feb. 11, 1998).

Although the conferral of a benefit upon Defendants is not clearly stated in the complaint, the crux of Plaintiffs' allegation appears to be that Roski and BattleBots were enriched in two basic [*55] ways. First, Plaintiffs contend Roski and BattleBots harmed RobotWars' business by "paralyzing the Robot Wars business . . . and causing the erosion of its goodwill and market position," so that Defendants could "acquire a valuable part of the Robot Wars business." (Compl. P 123.) This was allegedly done by "either divesting Profile of its interest in the Robot Wars business or by forcing the Venture to grant Roski and BattleBots a license." (Id.) Second, Plaintiffs contend that BattleBots procured "key competitors" from prior

Robot Wars events for BattleBots. (Compl. PP 99-100, 125.) Thus, Defendants' enrichment has been alleged. Whether the claimed enrichment is alleged to have been at Plaintiffs' expense is more dubious, as that claim appears to be based largely on the generalized notion of the erosion of Robot Wars "goodwill and market position." Though these allegations are less than specific, and do not suggest that Plaintiffs conferred a benefit on Defendants, it cannot be said at this point that Plaintiffs could not demonstrate facts to show that Defendants' enrichment came at their expense.

With such a vague claim, the equity standard is of critical importance. In this [*56] case, virtually all of the facts that could conceivably suggest that "equity and good conscience require Defendants to make restitution" are facts that are alleged to constitute specific torts charged elsewhere in the complaint. For example, in the tortious interference with contract claim, Plaintiffs allege Defendants caused Thorpe to file for bankruptcy in an effort to divest Profile of its interest in the Robot Wars business (Compl. P 111), and in the aiding a breach of fiduciary duty claim, Plaintiffs maintain Defendants' alleged role in Thorpe's breaching of the Venture Agreement resulted in unjust enrichment (Compl. PP 119-120). Whether any benefit obtained by Defendants at Plaintiffs' expense by those alleged actions was "unjust" is better assessed according to the well-established rules defining the applicable torts, rather than by free-floating notions of "equity and good conscience."

The sole specific allegation that is not found elsewhere in the complaint is the question of the grant of a license from Robot Wars to Defendants. It is unclear precisely which licensePlaintiffs refer to in this claim. Although the complaint mentions several licenses-in-negotiation, there appears [*57] to only have been one license that was ultimately granted to Thorpe: the license permitting Thorpe to conduct Robot Wars '97, that resulted from the settlement of August 6, 1997. (Compl. P 22.) Plaintiffs rely on Rostropovich v. Koch, 1995 U.S. Dist. LEXIS 2785 (S.D.N.Y. March 7, 1995) for the proposition that "even though defendants paid for the right . . . defendants did not pay [plaintiff] Rostropovich and a jury might find that the defendants benefitted monetarily at plaintiff's expense." (Pls.' Br. at 22.) Rostropovich is not analogous to the instant situation, however, as it is nowhere alleged that Plaintiffs did not receive consideration for the license. In fact, Thorpe gave valuable consideration for that license, in the form of the settlement agreement. If Thorpe did not completely fulfill the promises exchanged for the license, because he failed to comply with the terms of the settlement agreement after staging Robot Wars '97, Plaintiffs

deserve compensation to the extent they can show that Defendants achieved this result by tortious behavior, as alleged in the first two claims. If, however, they cannot establish the elements of the alleged torts, they [*58] have alleged no independent theory on which their success could be labeled unjust, such that equity should fill the gap and provide restitution where no tortious behavior can be shown. Accordingly, Defendants' motion to dismiss the unjust enrichment claim is granted.

D. Tortious Interference with Prospective Contractual Relations

[HN23]The tort of interference with potential contractual relations consists of an intentional and improper interference with another's prospective contract. "To sustain its claim for tortious interference with prospective economic advantage, Plaintiffs must satisfy "an extremely high pleading standard" with allegations that include elements "more demanding than those for interference with [the] performance of an existing contract." Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt Corp., 2000 U.S. Dist. LEXIS 2604 *101 (S.D.N.Y. March 8, 2000) (citing Fine v. Doernberg & Co., Inc., 203 A.D.2d 419, 610 N.Y.S.2d 566, 567 (2d Dep't 1994).

To state a prima facie case under New York law, Plaintiffs must establish (1) business relations with a third party; (2) the defendant's interference with those business relations; [*59] (3) that the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the business relationship. See Nadel v. Play-By-Play Toys & Novelties, Inc., 208 F.3d 368, 382 (2d Cir, 2000) (citing Purgess v. Sharrock, 33 F.3d 134, 141 (2d Cir.1994)); Restatement (Second) of Torts § 766B.

Plaintiffs claim that Defendants interfered with two distinct business opportunities of Robot Wars, specifically, potential contracts with David Letterman and TalentWorks (Compl. P 129), causing damages they estimate at $ 5 million (Compl. P 130). Defendants allege, however, that they did no more than engage in competitive activity, which is not actionable under a theory of intentional interference with prospective economic advantage, Six West Retail, 2000 U.S. Dist. LEXIS 2604 at *101.

1. Existing business relations

[HN24]In the very nature of this tort, an existing contract is not required to state a claim for tortious interference with prospective business relations. Hannex Corp. v. GMI, Inc., 140 F.3d 194, 205 (2d Cir. 1998); Volvo N. Am. Corp. v. Men's Intern. Prof'l Tennis Council, 857 F.2d 55, 74 (2d Cir. 1988). [*60] However, there is a threshold requirement that a plaintiff "must specify some particular, existing business relationship through which plaintiff would have done business but for the allegedly tortious behavior." Six West Retail, 2000 U.S. Dist. LEXIS 2604 at *101 (citing Minnesota Mining and Mfg. Co. v. Graham-Field, Inc., 1997 U.S. Dist. LEXIS 4457, 1997 WL 166497 at *7 (S.D.N.Y. Apr. 9, 1997) (internal citations omitted); see also Envirosource, Inc. v. Horsehead Resource Dev. Co., 1996 U.S. Dist. LEXIS 9099, 1996 WL 363091 at *14 (S.D.N.Y. 1996).

It is questionable whether Plaintiffs can establish such a business relationship with the David Letterman Show. In fact, the complaint supports the view there was no existing relationship of which Plaintiffs were aware, but rather the mere possibility of a limited future relationship between Robot Wars and the David Letterman Show which was only known to Thorpe. (Compl. P 48.) Further, while Thorpe knew of this potential relationship, the relationship in question appears to be a one-off appearance on the Letterman show that will be hard to argue, even with more evidence, meets the requirement of an "existing business relationship." Plaintiffs [*61] rely on Hannex for the proposition that it need not plead that it would have entered into a contract to state a claim for interference with prospective business relations. However, in Hannex, although plaintiff Hannex did not have a contract to prove the existence of a business relationship with S&S Japan, Hannex had an ongoing distributorship relationship that was shown to be "continuing" or "customary." This type of relationship is different from that alleged here, which appears to be nothing more than a preliminary contact that had not yet ripened even to negotiations. Whether the Letterman allegations meet the standard for this tort is thus a close question.

The alleged relationship with TalentWorks, however, was a longer term, potentially "continuing" relationship. Although the nature of the potential TalentWorks relationship is not specified in the complaint, a supporting affidavit shows that TalentWorks sought in September of 1997 to "open discussions" with Robot Wars about developing "a mutual agreement for pay-per-view television rights as well as other television related exposures." (Stucker Aff. Ex. A.) However, Defendants also provide a declaration of TalentWorks' [*62] CEO, Leonard Stucker, who states under oath that he formally withdrew his proposal to Thorpe and Robot Wars a year before he heard of and made contact with Roski and BattleBots. (Stucker Aff. PP 6, 8.) If Stucker is to be believed, Plaintiffs will be unable to establish that any action of Defendants disrupted Plaintiffs' relationship with TalentWorks. At this stage of the

litigation, however, Plaintiffs' allegations must be taken as true, and Plaintiffs have alleged that the failure of this relationship resulted from Defendants' interference. (Compl. P 129.) Plaintiffs are entitled to test Stucker's assertions through discovery.

Given that the TalentWorks allegations can meet this requirement, it is unnecessary to decide whether the Letterman allegations are independently sufficient to meet the test. Since the claim will not be dismissed in any event, it is preferable to allow discovery on the Letterman episode as well, and defer until development of a fuller record the question whether the Letterman claim will remain part of the case.

2. Wrongful purpose/wrongful means

[HN25]Even if the requirement of existing business relations is met, in order to state a claim for tortious interference [*63] with prospective business relations, Plaintiffs must allege either (1) that Defendants' sole purpose was to harm the Plaintiffs, or (2) that Defendants employed wrongful means in their interference.

The first test cannot be met as Plaintiffs and Defendants are economic competitors and, thus, disruption of Plaintiffs' business cannot be shown to be the sole purpose of Defendants' alleged interference. It is well settled that [HN26]a defendant's "status as a competitor . . . may excuse him from the consequences of interference with prospective contractual relationships, where the interference is intended at least in part to advance the competing interest of the interferer, no unlawful restraint of trade is effected, and the means employed are not wrongful." Six West Retail, 2000 U.S. Dist. LEXIS 2604 *106 (citing Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 50 N.Y.2d 183, 191, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980)); Rest. 2d Torts § 768 (1)(d). Hence, one who intentionally causes a third party not to enter into a prospective contract with his competitor does not interfere improperly with the other's relation if his purpose is at least in part to [*64] advance the interest of competing with the other. Here, Defendants are direct competitors of Plaintiffs, involved in precisely the same highly specialized business. In such a situation, it cannot be plausibly maintained that competitive impulses were not, in part, behind Defendants' actions.

Thus, [HN27]the actions alleged for this claim can only be tortious if Defendants used "dishonest, unfair, or improper means" (collectively called "wrongful means"), to interfere with Plaintiffs' potential contractual relations. Wrongful means include "physical violence, fraud, misrepresentation, civil suits, criminal prosecutions and some degree of

economic pressure, but more than simple persuasion is required." Snyder v. Sony Music Entertainment, Inc. 252 A.D.2d 294, 300, 684 N.Y.S.2d 235 (1st Dept. 1999) (citation omitted). Plaintiffs allege that "Defendants engaged in fraudulent, dishonest and unfair conduct in order to interfere" with Plaintiffs' prospective contractual relations. (Compl. P 129.) Fraud is only alleged, if at all, to the extent that Thorpe was violating his fiduciary duty to Plaintiffs. In Hannex, considering conduct similar to that here, the Second Circuit [*65] held that "if a jury were to find the Defendants tortiously interfered with Salvo's fiduciary duties to [plaintiff] Hannex, they could also find that such interference constituted wrongful means sufficient to support a tortious interference with contractual and prospective business relations claim." Hannex, 140 F.3d at 206. Thus, although fraud may only be alleged as to Thorpe, a jury could find that Roski's alleged tortious interference with Thorpe's breach of fiduciary duty to Profile and Robot Wars constitutes wrongful means to support this claim. Accordingly, Defendants' motion to dismiss this claim is denied.

IV. Motion to Strike

Defendants claim Plaintiffs are not entitled to compensatory damages for the alleged interference with contract as they have already received such damages in the prior Thorpe-Astor Adversary Proceeding (Defs.' Br. at 23; Marc and Denise Thorpe v. Profile Holdings, Inc., Bankr. N.D. Cal. (Aug. 14, 2000)) and that Plaintiffs have no basis on which to request attorneys' fees. They therefore move to strike both demands. Plaintiffs offer no law or precedent to support their requests for either compensatory damages or attorneys' [*66] fees.

A. Compensatory Damages

It is telling that Defendants' motion to strike compensatory damages is not based on a claim of res judicata, although the substance of Defendants' argument is similar to an assertion that the claim for damages should be precluded as the issue was already litigated. Res judicata could not bar compensatory damages here because the Defendants in this action, Roski and BattleBots, are separate and distinct from those in the prior proceeding. [HN28]When deciding whether the doctrine of res judicata bars a subsequent action, the court must consider whether (1) the prior decision was a final judgment on the merits, (2) the litigants were the same parties, (3) the prior court was of competent jurisdiction, and (4) the causes of action were the same. Corbett v. MacDonald Moving Servs., 124 F.3d 82, 88 (2d Cir. 1997).

This case involves plaintiffs, one of whom was a party as the prior proceeding, seeking to bring claims against two new defendants. The prior Adversary Proceeding was between Profile and the Thorpes, not Roski or BattleBots. Profile was not required to bring its claims against Roski in the bankruptcy proceedings because Profile has [*67] separate and distinct causes of action against each defendant. Northern Assur. Co. of Am. v. Square D Co., 201 F.3d 84, 89 (2d Cir. 2000) (where plaintiff chooses to sue one joint tortfeasor, but not the other, the unadjudicated claim survives the first judgment and can be brought against other potentially liable parties); Restatement (Second) of Judgments § 49 cmt. a (1982) (claim against others liable for the same harm is considered separate for preclusion purposes). Thus, although Plaintiffs' claim for compensatory damages for breach of contract may have been finally adjudicated as against the Thorpes, Plaintiffs are entitled to litigate their claims against Roski and BattleBots.

However, [HN29]while multiple parties may be liable to Plaintiffs for the same injury, satisfaction of only one judgment for that injury may be collected. Northern Assur. Co. of Am., 201 F.3d at 89; Gentile v. County of Suffolk, 926 F.2d 142, 153 (2d Cir. 1991) (when plaintiff seeks compensation for same damages under different legal theories of wrongdoing, plaintiff generally should receive compensation for an item of damages only once); Conway v. Icahn & Co., Inc., 16 F.3d 504, 511 (2d Cir. 1994) [*68] ("where plaintiff[s'] theories of recovery are based on a single set of facts, and the economic loss sustained was predicated on those unitary facts," only a single recovery should be allowed); see also Broome v. Biondi, 17 F. Supp. 2d 211, 227 (S.D.N.Y. 1997). Thus, while both Thorpe and the Defendant here can both be found liable for Plaintiffs' breach of contract injury, only one recovery may be collected for compensatory damages for the breach of the Venture Agreement with Thorpe.

In the Thorpe-Astor Adversary Proceeding, Thorpe's breach of the Venture Agreement was litigated to a judgment, and the Plaintiffs' award ($ 225,666.67) was offset against Profile's larger debt to Thorpe ($ 250,000), resulting in a judgment that Profile pay Thorpe $ 24,333.33. The decision, however, was appealed by Profile to the District Court, which remanded the calculation of damages to the Bankruptcy Court, directing that contract rather than tort theory be applied in the calculation. (Pls.' Ex. A at 19.) So far as the record before this Court reveals, the damage award from that action has not been satisfied, nor even finally determined, and, thus, the motion to strike compensatory [*69] damages is premature at this stage. If, however, a final damages award is

entered against Thorpe and the judgment is paid, Plaintiffs will not be entitled to a double recovery, and Defendants' motion can be renewed. Alternatively, if Plaintiffs cannot, for whatever reason, execute their judgment against Thorpe, there is no reason why they would not be entitled to obtain and execute a judgment against Roski and/or BattleBots as joint tortfeasors for the alleged claim. Northern Assur. Co. of Am., 201 F.3d at 88. Accordingly, the motion to strike the demand for compensatory damages for tortious interference with contract is denied, without prejudice to renewal at a later stage in the litigation if a prior judgment for this claim is obtained and satisfied.

B. Attorneys' Fees

Plaintiffs make a perfunctory request for attorneys' fees at the end of their complaint. [HN30]Under New York law, attorneys' fees are not recoverable by prevailing parties absent express statutory or contractual authority or court rule. See Severino v. Classic Collision, Inc., 280 A.D.2d 463, 719 N.Y.S.2d 902, 903 (2d Dep't 2001); Klein v. Sharp, 41 A.D.2d 926, 343 N.Y.S.2d 1014, 1015 [*70] (1st Dep't 1973). Plaintiffs' claims do not derive from a statute or contract authorizing recovery of attorneys' fees, but rather are articulated as common law tort claims for which attorneys' fees are ordinarily not available. In light of the litigious history of the Robot Wars dispute, this would be the last case in which any court would consider expanding the law of attorneys' fees eligibility in such a way as to provide further incentives to either party to prolong the dispute. Accordingly, Defendants' motion to strike Plaintiffs' demand for attorneys' fees is granted.

## CONCLUSION

Defendants' motions to dismiss for lack of venue or to transfer venue are denied. Defendants' motion to dismiss for failure to state a claim is granted as to Count III and denied as to Counts I, II, and IV. Defendants' motion to strike Plaintiffs' request for compensatory damages is denied, and the motion to strike Plaintiffs' request for attorneys' fees is granted.

SO ORDERED:

New York, New York
January 15, 2002

Gerard E. Lynch

United States District Judge

ROBERT DIAZ ASSOCIATES ENTERPRISES, INC., Plaintiff, - against - ELETE, INC.; ELETE SPORTS COUTURE; ELETECOUTURE.COM; C. LAMONT SMITH; BRIAN HUEBSCH; TIM ALEXANDER; and CASTLE STUDIOS, Defendants.

03 Civ. 7758 (DFE)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2004 U.S. Dist. LEXIS 8620

May 13, 2004, Decided
May 14, 2004, Filed

**DISPOSITION:** [*1] Motion to dismiss denied in its entirety.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff technology firm alleged that defendants, corporation, its owner, and its general counsel, wrongfully changed the password for the firm's account with an Internet Service Provider (ISP), hacked into the ISP's computer server, and copied the ISP's work product and trade secrets. The case was before a magistrate judge. The corporation, its owner, and its general counsel moved to dismiss for lack of personal jurisdiction and improper venue.

**OVERVIEW:** The corporation retained the firm to design and implement a website. Since the firm was located in New York and the corporation was located in Colorado, all of their contract negotiations occurred by telephone, by e-mail, and by facsimile. When the website was not completed by the completion date, the corporation terminated the contract. The firm alleged that without its consent, the corporation's general counsel contacted the firm's ISP and had the master password on the firm's account changed so that he could access all of the data stored by the firm on the servers. The court found that as to the first four causes of action, which alleged that the corporation, its owner, and its general counsel committed tortious acts outside New York that caused injury to the firm's property within New York, the court had personal jurisdiction over the corporation, its owner, and its general counsel on the basis of the N.Y. C.P.L.R. § 302(a)(3)(ii) because they derived substantial revenue from interstate commerce, and they should have expected that their actions would harm the firm in New York because that was where the firm's computer was physically located.

**OUTCOME:** The motion to dismiss for lack of personal jurisdiction and improper venue was denied in its entirety.

**CORE TERMS:** internet, website, com, personal jurisdiction, venue, password, eletecouture, telephone, e-mail, e-commerce, server, web, cause of action, phone, movants, site, work product, discovery, tortious, auction, waiting, fax, breach of contract, motion picture, transacted, copied, principal place of business, confer jurisdiction, general counsel, giving rise

## LexisNexis(TM) Headnotes

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*

[HN1]A plaintiff opposing a Fed. R. Civ. P. 12(b)(2) motion to dismiss for lack of personal jurisdiction bears the burden of establishing that the court has jurisdiction over the defendants. Prior to discovery, such a motion may be defeated if the plaintiff's complaint and affidavits contain sufficient allegations to establish a prima facie showing of jurisdiction. Moreover, the plaintiff's factual allegations are presumed to be true.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*

[HN2]In the context of a motion to dismiss for lack of personal jurisdiction, in diversity or federal question cases the court must look first to the long-arm statute of the forum state.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

[HN3]See N.Y. C.P.L.R. § 302(a).

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

[HN4]When an unauthorized person "hacks" into a computer t o a ccess, c opy o r s teal files, t hen p ersonal jurisdiction may be established where the victim's computer is physically located.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

[HN5]The acts that can subject a defendant to long-arm jurisdiction under N.Y. C.P.L.R. 302(a) may be performed by the defendant herself or through an agent. Whether a representative of the defendant qualifies as an agent for jurisdictional purposes does not turn on legalistic distinctions between being an agent or independent contractor. Furthermore, no showing of a formal relationship between the defendant and the agent is required. It is sufficient that the representative acted for the benefit of and with the knowledge and consent of the defendant and that he or she exercised some control over the agent in the matter.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

[HN6]Under N.Y. C.P.L.R. § 302(a)(1), a plaintiff must show acts which give rise to the particular cause of action in question.

*Civil Procedure > Venue > General Venue*

[HN7]When the defendant is a corporation, the courts look to 28 U.S.C.S. § 1391(c) for purposes of venue. 28 U.S.C.S. § 1391(a) and (b) each state, inter alia, that venue is proper in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred. Venue is a federal issue, and the federal c ourts a re n ot b ound by s tate s tatutes o r c ase law in determining w hether an event or omission has occurred" in the forum district.

**COUNSEL:** For Elete Sport Couture, Defendant: Hugh W. Campbell, LEAD ATTORNEY, Rodman and Campbell, P.C., Bronx, NY.

For Robert Diaz Associates Enterprises, Inc., Plaintiff: Jay R. McDaniel, LEAD ATTORNEY, Porzio, Bromberg & Newman, P.C., New York, NY.

**JUDGES:** DOUGLAS F. EATON, United States Magistrate Judge.

**OPINIONBY:** DOUGLAS F. EATON

**OPINION:** OPINION AND ORDER

DOUGLAS F. EATON, United States Magistrate Judge.

Plaintiff Robert Diaz Associates Enterprises, Inc. alleges that, in August 2003, the defendants wrongfully (a) changed the password for plaintiff's account at a company named Interland, Inc., and (b) hacked into Interland's computer servers and copied plaintiff's work product and trade secrets. Plaintiff seeks compensatory damages, punitive damages, attorneys fees, and a permanent injunction. It sues under the civil provisions o f t he E lectronic Communications P rivacy Act of 1986 (18 U.S.C. § 2707) and the Computer Fraud and Abuse Act of 1986 (18 U.S.C. § 1030). Also, under New York state law, plaintiff sues for conversion, misappropriation of trade secrets, and breach of contract. [*2]

On December 30, 2003, the parties consented to have this case assigned to me for all purposes pursuant to 28 U.S.C. § 636(c).

On January 8, 2004, the first five defendants (Elete, Inc., Elete Sports Couture, Eletecouture.com, C. Lamont Smith, and Brian Huebsch) moved to dismiss for lack of personal jurisdiction and improper venue. These five defendants are collectively referred to as the "Elete defendants."

On February 3, 2004, plaintiff served opposition papers. On February 20, the Elete defendants served a reply affirmation which annexed an affidavit.

I find personal jurisdiction over the Elete defendants, on the basis of the New York Civil Practice Law and Rules ("CPLR") § 302(a)(3)(ii), as to the first four Causes of Action, which allege tortious acts. I decline to dismiss the Fifth Cause of Action prior to discovery. I find that venue is proper in our District.

BACKGROUND

A. Plaintiff and the defendants as initially listed

Plaintiff Robert Diaz Associates Enterprises, Inc. ("RDA") is a New York corporation with its principal place of business in Manhattan. It is an information technology consulting firm that developed certain proprietary [*3] applications for the administration of web sites and for the operation of e-commerce enterprises (also called "proprietary back-end coding"). RDA operates an Internet consulting division, RDAOnline, based in New York City. RDAOnline provides customers with Internet web page design and applications. (Compl. P 3.)

Elete, Inc. ("Elete") is a Delaware Corporation with its corporate offices located in Denver, Colorado.

(12/18/03 Smith Aff. PP 4, 7.) Elete says that Elete Sports Couture and Eletecouture.com are trademarks of Elete. Elete says that it has not operated a business under either of these names, but that it does operate an Internet e-commerce site at eletecouture.com. (12/18/03 Smith Aff. P 5.) Elete sells sports apparel. (See eletecouture.com.)

C. Lamont Smith ("Smith") is the principal owner of Elete, Inc. (12/18/03 Smith Aff. 1.)P 1.) He signed the contract between RDA and Elete. (Exh. 2 to 2/3/04 Pl. Memo.)

Brian Huebsch ("Huebsch") says he is general counsel of Elete, Inc., Elete Sports Couture, and Eletecouture.com. (12/18/03 Huebsch Aff. P 1.)

Castle Studios ("Castle") is an unincorporated business entity that maintains its principal place of business in West Hollywood, [*4] California. It provides Internet services and consulting. (Compl. P 8.) Castle has not appeared in this action; it is unclear whether Castle has been served with the summons and complaint.

Tim Alexander ("Alexander") owns and operates Castle. Alexander acted as the agent of Huebsch and Elete during the time period in question. (Compl. P 8.) He was served with the summons and complaint in October 2003, but he has not yet made an appearance in our Court. If plaintiff wishes to move for a default judgment against Castle or Alexander, it must make the motion to Judge Berman and explain that Castle and Alexander have not consented under 28 U.S.C. § 636(c).

Interland, Inc. ("Interland") is a Minnesota corporation with its principal place of business in Atlanta, Georgia. It is RDA's Internet Service Provider. RDA stores electronic information on the servers maintained by Interland. (Compl. P 9.) Interland was dismissed from this lawsuit based on a binding arbitration provision contained in its contract with RDA. (Docket Item # 6.)

B. The contract between RDA and Elete

On March 24, 2003, Elete retained RDA to design and implement an Internet e-commerce website [*5] under the Internet address eletecouture.com. Elete planned to sell sports apparel on the website. (Compl. P 10.) RDA and Elete entered into a written contract on March 24, 2003. Since RDA is located in New York and Elete is located in Colorado, all of their contract negotiations, as well as the execution of the contract, occurred by telephone, by e-mail, and by facsimile. (12/18/03 Huebsch Aff. PP 8-11; 12/18/03 Smith Aff. PP 7-10.)

RDA argues that the contract was formed in New York, and that it was performed by RDA personnel in New York City. (Compl. P 11.) Elete, on the other hand, argues that the contract was not negotiated or entered into in the State of New York, and that:all of the activities in New York relating to [the] aforementioned contract were performed by the plaintiff. At no time did [the Elete defendants] intend to confer jurisdiction on the New York courts for any disputes arising out of this contract.(12/18/03 Huebsch Aff. PP 12-13; 12/18/03 Smith Aff. PP 11-12.) The contract contains no choice-of-law provision. The terms of the contract provided that: (1) RDA would design and develop numerous Internet web pages and e-commerce applications [*6] for the planned website; (2) RDA would retain ownership of the programming codes, but the text and graphical content would ultimately become Elete's property; and (3) Elete could cancel the contract at any time, provided that it paid RDA for the stages of the project on which RDA had begun work. (Compl. PP 10-11.)

The Elete defendants allege that RDA and Elete agreed to a completion date of May 31, 2003. "However, by the end of July, the website was not completed and as a result, Elete terminated the contract." (Def. Memo. p. 2.) But the contract's "Project Timeline" says, "delays by Elete in submission of PREREQUISITES will affect Delivery Dates Timeline on a day-to-day basis." (Pl. Memo. Exh. 2.) Moreover, e-mails exchanged between the parties show that, throughout the months of June and July, 2003, RDA was (1) waiting for Elete to send a video clip and photographs; (2) waiting for Elete to send more information for the news section; (3) waiting for Elete to decide how it wanted to run the video; (4) asked by Elete to make changes to the website, such as making the Customer Support, Contact Us, and Login and Registration areas "more like the Store Locator Section"; (5) asked by [*7] Elete to think of ways that RDA could incorporate two future lines that Elete wanted to add to the website; and (6) waiting for Elete to send updated and complete descriptions of all of Elete's products. (Pl. Memo. Exh. 3.)

C. The August 1, 2003 incident

RDA alleges that it substantially performed its obligations under the contract by August 1, 2003, and that it was owed $ 24,889. (Compl. PP 12, 32.) However, on August 1, Huebsch sent RDA an e-mail that said: (1) the agreement was terminated for cause; (2) Elete's partial payments should be returned; and (3) RDA should immediately provide him with the passwords to the Interland servers that held RDA's work product. (Compl. P 12.)

The complaint further alleges as follows. Hours later and without RDA's knowledge or consent, Huebsch contacted Interland and convinced one of Interland's

technicians to change the master password on RDA's account, so that Huebsch could access all of the data stored by RDA on Interland's servers. (Compl. 13; see the 8:30 p.m. entries on Exh. 3 annexed to 2/3/04 Pl. Memo.) Huebsch then gave the password to Alexander, who had been hired by the Elete defendants to replace RDA. Alexander used the password [*8] to access RDA's computer files. Once inside the system, he copied all of the work RDA had completed for Elete, including the designs for the e-commerce web pages and RDA's proprietary back-end coding that RDA had developed for the eletecouture.com site. (Compl. PP 13-14.)

On either Saturday August 2 or Monday August 4, 2003, RDA discovered that its computer files had been accessed and copied. Moreover, RDA was unable to access its own files because it did not know the new password. (Compl. P 15; Pl. Memo. p. 3.) On August 8, 2003, the Elete website went online, using the RDA work product that had been stolen from RDA's files. (Compl. P 16.) For purposes of the present motion, the Elete defendants do not deny that the events occurred as described in the Complaint.

On March 25 and April 8, 2004, my law clerk accessed Elete's website. It said "Site Design By: Castle Studio web design," and "site built by: Castle Studio web design." A click on the Castle icon brought her to a screen that said: "Castle Studio/ Creative Pictures, Inc., Studio of Creative Director/ Photographer Tim Alexander." Plaintiff alleges that, by copying RDA's files, the defendants were able to access RDA's back-end [*9] coding, which is a "valuable trade secret of RDA," and were able to use RDA's work as their own. (Compl. PP 3, 14, 16, 27-29.)

DISCUSSION

[HN1]A plaintiff opposing a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction bears the burden of establishing that our Court has jurisdiction over the defendants. CNN, L.P. v. GoSMS.com, Inc., 2000 U.S. Dist. LEXIS 16156, 2000 WL 1678039, at *1 (S.D.N.Y. Nov. 6, 2000) (McKenna, J.), citing Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1996). Prior to discovery, such a motion may be defeated if the plaintiff's complaint and affidavits contain sufficient allegations to establish a prima facie showing of jurisdiction. Id. Moreover, the plaintiff's factual allegations are presumed to be true. Cable News Network, 2000 U.S. Dist. LEXIS 16156, 2000 WL 1678039, at *1, citing, PDK Labs, Inc. v. Friedlander, 103 F.3d 1105, 1108 (2d Cir. 1997).

[HN2]"In diversity or federal question cases the court must look first to the long-arm statute of the forum state, in this instance, New York." Bensusan Restaurant Corp. v. King, 126 F.3d 25, 27 (2d Cir. 1997).

CPLR § 302 says, [*10] in part:[HN3](a) ... As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:1. transacts any business within the state or contracts anywhere to supply goods or services in the state; [or]

***

3. commits a tortious act without the state causing injury to person or property within the state, ... if he

(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce.
RDA argues that our Court has personal jurisdiction over the Elete defendants on three bases -- CPLR §§ 302(a)(1), and 302(a)(3)(i), and 302(a)(3)(ii). Four of the five Causes of Action are tort claims. Hence, I will first discuss § 302(a)(3).

CPLR § 302(a)(3). The first four Causes of Action clearly allege that the Elete defendants committed [*11] tortious acts outside New York causing injury to plaintiff's property within New York. Thus, New York has personal jurisdiction over the Elete defendants as to those four Causes of Action if plaintiff can satisfy either subsection 3(i) or 3(ii). It is conceivable that, with discovery, plaintiff might satisfy 3(i); I need not consider this because, on the current record, plaintiff has satisfied 3(ii).

The first question is whether the Elete defendants derive substantial revenue from interstate commerce. I find that the answer is yes, despite the fact that neither side submitted any evidence of the Elete defendants' total revenue from interstate or international commerce. It appears to be undisputed that (a) the Elete defendants received $ 15,000 in revenue from Macy's New York store for a shipment of goods delivered to New York on or about December 1, 2003, and (b) as of February 3, 2004, that New York store was the only store in the nation that sold Elete's clothes, and (c) the Elete defendants also sell Elete's clothes from Colorado by means of the Internet. In Cable News Network, L.P. v. GoSMS.com, Inc., 2000 U.S. Dist. LEXIS 16156, 2000 WL 1678039, at *5

(S.D.N.Y. Nov. 6, 2000), Judge McKenna [*12] wrote:In this case, however, at oral argument, defendants admitted that GoSMS.com has earned $ 60,000 in revenue from its operations in Europe and Israel ... Although the amount is not large, the Court recognizes that it is common for internet companies to be viewed as extremely successful despite the fact that they operate at a great loss. The important fact in this analysis is that GoSMS.com's operations are international and in no way limited to California.Similarly, in the case at bar, I find that Elete's operations are in no way limited to Colorado, and that the Elete defendants derive substantial revenue from interstate commerce.

I turn now to the second requirement, whether the Elete defendants should have expected that their actions would harm plaintiff in New York state. My own research shows that [HN4]when an unauthorized person "hacks" into a computer to access, copy or steal files, then personal jurisdiction may be established where the victim's computer is physically located. *U.S. v. Ivanov*, 175 F. Supp.2d 367, 371-73 (D. Conn. 2001). Although *Ivanov* was a criminal case, it was brought under 18 U.S.C. § 1030, [*13] the same statute invoked here in the Second Cause of Action. Ivanov was physically located in Russia when he committed the crimes. Judge Thompson wrote:

At the point Ivanov gained root access to OIB's computers, he had complete control over that data, and consequently, had possession of it. That data was in OIB's computers. Since Ivanov possessed that data while it was in OIB's computers in Vernon, Connecticut, the court concludes that he obtained it, for purposes of § 1030(a)(4), in Vernon, Connecticut. The fact that Ivanov is charged with obtaining OIB's valuable data by means of a complex process initiated and controlled from a remote location, and that he subsequently moved that data to a computer located in Russia, does not alter the fact that at the point when Ivanov first possessed that data, it was on OIB's computers in Vernon, Connecticut.
*Id.* at 371-72. In our case, it could be argued that Huebsch and Alexander stole plaintiff's property from Interland's server in Georgia. But their alleged conduct was clearly aimed at a victim located in New York. The defendants fraudulently induced Interland to give them the key to open RDA's New York computers; [*14] once inside RDA's computers, the defendants were able to take what they wanted and move it over the Internet to their own computers. Moreover, the reason they knew the contents would be valuable to them was that they had contracted with plaintiff and caused plaintiff to design those contents.

It is clear that Huebsch's tortious acts are properly imputed to the four other Elete defendants. The contract was signed by defendant Smith, the CEO of Elete, Inc. Huebsch's 12/18/03 affidavit says he is general counsel of Elete, Inc., Elete Sports Couture and Eletecouture.com.

In the Practice Commentaries to the McKinney's edition of CPLR § 302, Professor Vincent C. Alexander writes:

**C302:4. Commission of Acts "Through an Agent."**

[HN5]The acts that can subject a defendant to long-arm jurisdiction under CPLR 302(a) may be performed by the defendant herself or "through an agent." Whether a representative of the defendant qualifies as an agent for jurisdictional purposes does not turn on legalistic distinctions between being an agent or independent contractor. Furthermore, no showing of a formal relationship between the defendant and the agent is required. It is sufficient that the representative [*15] acted "for the benefit of and with the knowledge and consent of [the] defendant[] and that [he or she] exercised some control over [the agent] in the matter." *Kreutter v. McFadden Oil Corp.*, 1988, 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195, 199, 522 N.E.2d 40, 44 (nondomiciliary held to have transacted business in New York (CPLR 302(a)(1)) through corporation over which, in his position as officer and owner of affiliated company, he exercised "some control").

On the current state of the record, I find that Smith and the three non-individual movants exercised some control over Huebsch and Alexander, and knew that Huebsch and Alexander were committing the alleged tortious acts for the benefit of Smith and the three non-individual movants.

Finally, it would not offend traditional notions of fair play and substantial justice for our Court to exercise jurisdiction over all five movants on the first four Causes of Action. See Judge Koeltl's thorough discussion of the due process case law in *Landau v. New Horizon*, 2003 U.S. Dist. LEXIS 15999, 2003 WL 22097989, at *8-10 (S.D.N.Y. Sept. 8, 2003).

I now turn to the one non-tort claim, the Fifth Cause of Action for breach of contract. [*16]

CPLR § 302(a)(1). RDA argues:

In the manner in which Elete contracted with RDA and supervised RDA's activities in minute detail, it transacted business in New York sufficient to confer jurisdiction under CPLR 302(a)(1). Moreover, as an e-commerce business that solicits business in New York and sells its goods through an "exclusive" outlet at Macy's, it is likely that Elete is subject to general

jurisdiction in this state and may be sued for any purpo [] se. (Pl. Memo. p. 7.) To sue Elete for any purpose, on any cause of action, plaintiff would have to show something that it has concededly not yet shown: that Elete was regularly doing business in New York within the meaning of CPLR § 301. [HN6]Under § 302(a)(1), plaintiff must show acts which give rise to the particular cause of action in question. The Fifth Cause of Action alleges breach of contract and seeks $ 24,889 allegedly due for services rendered to Elete. This cause of action does not arise from Elete's sales of goods through Macy's. Nor does it arise from any subsequent use of the e-commerce site by Elete to sell goods to New Yorkers. Relevant to the Fifth Cause of Action, RDA merely asserts that (1) the Elete [*17] defendants were aware that the contract would be performed (on RDA's part) in New York, and (2) the Elete defendants, from Colorado, constantly supervised RDA's work in New York through telephone communications, facsimiles, and e-mails. (Pl. Memo. pp. 2, 7-11 and Exh. 5.)

The Elete defendants argue that they cannot be deemed to have engaged in the New York activities that were actively performed by plaintiff. _Worldwide Futgol Assocs., Inc. v. Event Entertainment, Inc., 983 F. Supp. 173, 177 (E.D.N.Y. 1997)_ (Dearie, J.); _J.E.T. Advertising Associates, Inc. v. Lawn King Inc., 84 A.D.2d 744, 745, 443 N.Y.S.2d 745, 747 (2d Dept. 1981)._ I agree with the Elete defendants on this point, although I have found a contrary dictum in _Geller Media Management, Inc. v. Beaudreault, 910 F. Supp. 135, 137-38 (S.D.N.Y. 1996)_ (Leisure, J.).

It seems to be undisputed that the Elete defendants' contacts with plaintiff were entirely by telephone, e-mail and fax from outside New York.

Plaintiff cites _Parke-Bernet Galleries, Inc. v. Franklyn, 26 N.Y.2d 13, 256 N.E.2d 506, 308 N.Y.S.2d 337 (1970)._ The New York Court of Appeals held that [*18] the California defendant was subject to personal jurisdiction in New York when he placed bids at the New York plaintiff's auction by mail, and by telephone, and through an agent attending the auction. The _Parke-Bernet_ case is distinguishable from the case at bar. First, defendant's agent was actually attending the auction in New York. Second, the Elete defendants' telephone calls, faxes and e-mails were made solely to ensure compliance with the contract terms, and to provide plaintiff with the information it needed to produce the website. By contrast, in the _Parke-Bernet_ case the California defendant's actions affected not only Parke-Bernet, but the other participants in the New York auction who were bidding against him.

My own research shows the following. In _Roper Starch Worldwide, Inc. v. Reymer & Associates, Inc._, 2 F. Supp.2d 470 (S.D.N.Y. 1998), Judge Parker (then a District Judge) held:In order to base jurisdiction on § 302(a)(1), phone calls and mailings must serve to "project" a defendant into New York in such a manner that the defendant "purposefully avails himself" of the protections and benefits of New York Law ... Phone calls that seek [*19] to insure fulfillment of contract terms do not "project" a defendant into a state sufficiently to confer jurisdiction ... Here, plaintiff has offered no evidence to rebut defendant's contention that the "several" telephone calls defendant made were solely to ensure compliance with the contract terms, stating through [plaintiff's employee] that the conference calls were "to discuss changes to the work after the preliminary tabulations were completed." Defendant's phone calls into New York do not suffice to confer personal jurisdiction under § 302(a)(1).2 F. Supp.2d at 474 (internal citations omitted).

But in _Serendip LLC v. Franchise Pictures LLC_, 2000 U.S. Dist. LEXIS 12946, 2000 WL 1277370 (S.D.N.Y. Sept. 7, 2000) (Baer, J.), the non-resident defendants hired the New York plaintiff to compose a musical score for their motion picture. The defendants (1) solicited the plaintiff's services by telephone, (2) initiated numerous telephone calls with her to "discuss the music for the film and [to give] her directions on how to proceed," and (3) periodically sent her video tapes of the film to work with. 2000 U.S. Dist. LEXIS 12946, 2000 WL 1277370, at 5. Judge Baer held:In [_Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp., 98 F.3d 25, 29 (2d Cir. 1996)_], [*20] the Second Circuit concluded that "the [defendants'] contacts with New York have been ... anything but temporary, random, or tenuous. Rather, they have been continual, repetitive, and essential to the [defendants'] businesses." _Id._ Here too, the plaintiff has alleged that Battlefield contracted for the services of the composer in order to supply an essential element of their motion picture: the soundtrack. And that motion picture was produced with the intention that it be distributed in New York and elsewhere.

***

... I find that Serendip has made a prima facie showing of personal jurisdiction over the Battlefield entities and Don Carmody. The facts alleged by plaintiff indicate that Battlefield has "purposefully avail[ed] [itself] of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws," and has therefore "transacted business" in New York within the meaning of § 302(a)(1).

*Serendip,* 2000 U.S. Dist. LEXIS 12946, 2000 WL 1277370 at *5.

However, one year later, Judge Baer reached a different conclusion. *See Ljungkvist v. Rainey Kelly Campbell Roalfe/Young & Rubicam, Ltd., 2001 U.S. Dist. LEXIS 16894, 2001 WL 1254839* (S.  **[*21]** D.N.Y. Oct. 19, 2001) . In *Ljungkvist,* the non-resident defendant hired the New York plaintiff to create artwork for a London advertising campaign. Judge Baer held that there was no personal jurisdiction, even though (1) the parties exchanged several faxes regarding the artwork, including faxes containing the defendant's written comments on the sketches, and (2) the parties spoke on the phone at least once every day for a 10-day period. Judge Baer ruled that those "correspondences did not project the defendants into local commerce." 2001 U.S. Dist. LEXIS 16894, 2001 WL 1254839, at *3.

Plaintiff also cites *Pilates, Inc. v. Pilates Institute, Inc., 891 F. Supp. 175, 179 (S.D.N.Y. 1995); Citigroup Inc. v. City Holding Co.,* 97 F. Supp.2d 549, 564 (S.D.N.Y. 2000); and *Hsin Ten Enterprises USA, Inc. v. Clark,* 138 F. Supp.2d 449, 456 (S.D.N.Y. 2000). But those cases involved trademark and patent infringement, which is not alleged here. (Where a defendant (a) deliberately targets New York residents to receive its products and (b) passes off its products as those of the plaintiff, courts will apply CPLR § 302(a)(1) or § 302(a)(2) against the infringer **[*22]** even if he projected himself into New York only by phone and/or mail. *Pilates,* 891 F. Supp. at 179, 182.)

More on point are *Armouth International, Inc. v. Haband Co., Inc.,* 277 A.D.2d 189, 715 N.Y.S.2d 438 (2d Dept. 2000), and *Ainbinder v. Potter,* 282 F. Supp.2d 180, 189-90 (S.D.N.Y. 2003) (Koeltl, J.).

It is possible that discovery may elicit facts showing jurisdiction over the Fifth Cause of Action. Since the lawsuit will proceed on the first four Causes of Action, I decline to dismiss the Fifth Cause of Action at this early stage.

Venue

[HN7]Since Elete, Inc. is a corporation, we look to 28 U.S.C. § 1391(c) for purposes of venue. I find that Elete, Inc.'s contacts within the Southern District of New York "would be sufficient to subject it to personal jurisdiction if that district were a separate State." Therefore, § 1391(c) deems the corporation to reside in our judicial district. However, § 1391(c) does not apply to the four non-corporate movants. The first two Causes of Action are based on federal-question jurisdiction; the others are based on diversity of citizenship. We must look to both subsections **[*23]**

(a) and (b) of § 1391 to determine venue as to the four non-corporate movants.

Subsections (a) and (b) each state, *inter alia,* that venue is proper in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred,

...

Venue is a federal issue, and the federal courts are not bound by New York statutes or case law in determining whether an event or omission has "occurred" in the forum district. The Second Circuit has ruled on the same language quoted above:

As held by the district court, the charter party giving rise to Titan's claim and the purported "ad hoc" arbitration agreement giving rise to Zhen Hua's defense were negotiated between China and Pelham, New York via Connecticut. That many of Zhen Hua's communications reached Titan's offices in New York through the Connecticut brokers does not alter the fact that Zhen Hua directed communications to New York. Accordingly, venue in the Southern District of New York was proper ... *Sacody Techs., Inc. v. Avant, Inc.,* 862 F. Supp. 1152, 1157 (S.D.N.Y. 1994) ("The standard set forth in § 1391(a)(2) [which employs the 'substantial part language, **[*24]** ] may be satisfied by a communication transmitted to or from the district in which the cause of action was filed, given a sufficient relationship between the communication and the cause of action.").

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.,* 241 F.3d 135, 153-54 (2d Cir. 2001) (brackets in the original).

*Sacody* was also cited with approval in *TBV Holdings Ltd. v. Schey,* 2002 U.S. Dist. LEXIS 13682, 2002 WL 1733649 (S.D.N.Y. July 26, 2002) (Jones, J.), and *Ainbinder v. Potter,* 282 F. Supp.2d 180, 190 n. 9 (S.D.N.Y. 2003) (Koeltl, J.).

In the case at bar, three events gave rise to the claims in each of the five Causes of Action:

Event 1: Defendant Smith, as CEO of Elete, Inc., signed a contract in Colorado and faxed it to plaintiff in Manhattan, thus causing the plaintiff to expend efforts in Manhattan to design a website for the Elete defendants.

Event 2: After many e-mails to Manhattan, defendant Huebsch, as General Counsel for the Elete defendants, sent an e-mail to plaintiff in Manhattan demanding that plaintiff provide him with the passwords to the Interland servers that held plaintiff's work product.

Event 3: A few hours **[*25]** later, Huebsch contacted Interland in Georgia, fraudulently changed plaintiff's

2004 U.S. Dist. LEXIS 8620

password, and then gave it to Alexander in order to open plaintiff's computers in Manhattan.

Events 1 and 2 have a close relationship with Event 3. Event 1 caused the creation, in Manhattan, of the property which was later stolen, from Manhattan.

Accordingly, I find that venue in our District is proper as to all five of the moving defendants.

CONCLUSION

I deny the motion (Docket Item # 10) in its entirety. I direct the attorneys to place a conference call to my Chambers (212-805-6175) to schedule an Initial Case Management Conference.

DOUGLAS F. EATON

United States Magistrate Judge

Dated: May 13, 2004

2003 U.S. Dist. LEXIS 14844

MADISON MODELS, INC., Plaintiff, -v- LAETITIA CASTA, FINTAGE TALENT B.V., FINTAGE HOUSE, and DOMINIQUE CASTA, Defendants.

No. 01 Civ. 9323 (LTS)(THK)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2003 U.S. Dist. LEXIS 14844

August 20, 2003, Decided
August 21, 2003, Filed

**DISPOSITION:** Motion to dismiss granted as to some defendants.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff modeling agency brought the instant asserting breach of contract and conversion of funds, against defendant agencies and a model and her father. Defendants moved to dismiss.

**OVERVIEW:** In consideration of the model agency's services to the agency's alleged predecessor and in accordance with an agreement reached by the parties the modeling agency was entitled to receive 33 1/3 percent of all fees earned by the model, out of the gross fees received by the model, her father and/or entities working on their behalf. The modeling agency alleged that defendants wrongfully terminated the agency agreement. The court held that the modeling agency's allegations were insufficient to make out a prima facie case for personal jurisdiction over the model and/or the agency pursuant to the state long arm statute. The modeling agency did not proffer allegations or evidence of a contract by any of the moving defendants to supply goods or services in New York, nor did the activities cited constitute the transaction of business. Mere promotion via a website was insufficient to constitute transacting business within the meaning of the long-arm statute. The agency's website was not even alleged to be "interactive" in the relevant sense: there is no allegation or proffer that the agency did business over its website by allowing customers to purchase items or services on-line.

**OUTCOME:** The defendants' motion to dismiss was granted.

**CORE TERMS:** personal jurisdiction, motion to dismiss, website, entity, prima facie case, conversion, lack of personal jurisdiction, services rendered, exercise of jurisdiction, general jurisdiction, discovery, invoice, exercise of personal jurisdiction, exercise personal jurisdiction, sufficient to support, breach of contract, causes of action, doing business, jurisdictional, solicitation, proffered, unrelated, proffer, cause of action, agency agreement, tortious act, predecessor, failure to state a claim, insufficient to support, consent to jurisdiction

## LexisNexis(TM) Headnotes

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

[HN1]A federal court sitting in diversity jurisdiction may e xercise p ersonal j urisdiction t o t he s ame e xtent as courts of general jurisdiction in the state in which it sits. Federal courts sitting in New York thus engage in a two-step analysis, examining first whether New York law would support the exercise of personal jurisdiction and, if so, turning to the question of whether New York's extension of jurisdiction would, under the circumstances, be permissible under the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*

[HN2]A plaintiff opposing a motion to dismiss under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction has the burden of establishing that the court has jurisdiction over the defendant. Where no discovery has been had and no evidentiary hearing held, a plaintiff can satisfy its burden by making allegations sufficient to establish a prima facie case for the exercise of jurisdiction. All such allegations are taken as true for purposes of determination of the motion and all inferences are drawn in favor of the plaintiff.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

[HN3]N.Y.C.P.L.R. art. 301 permits New York courts to exercise general jurisdiction over a corporation that is "doing business" in the state. The "doing business"

standard is a stringent one because a corporation which is amenable to a court's general jurisdiction may be sued in New York on causes of action wholly unrelated to the acts done in New York. The rule is that a corporation is "doing business" and is therefore "present" in New York if it does business in New York not occasionally or casually, but with a fair measure of permanence and continuity. The United States Court of Appeals for the Second Circuit has explained the "doing business" standard by stating that it requires a showing of continuous, permanent, and substantial activity in New York.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

[HN4]New York courts have held that, while the mere solicitation of business in New York does not constitute "doing business" for jurisdictional purposes in New York by a corporation, activities of substance in addition to solicitation do.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

[HN5]See N.Y.C.P.L.R. art. 302(a).

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

[HN6]Jurisdiction under the long arm provisions is "qualitative rather than quantitative," and a single transaction is sufficient to support personal jurisdiction as long as the defendant's activities were purposeful and there is a substantial nexus between the activities and the claim.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

[HN7]For jurisdictional analysis, courts look at "the totality of circumstances" in determining whether a party has "transacted business" under N.Y.C.P.L.R. art. 302(a)(1), including the following: (1) whether a defendant has an ongoing contractual relationship with a New York corporation; (2) whether the contract is negotiated or executed in New York; (3) whether the contract contains a New York choice-of-law, forum-selection or consent to jurisdiction clause; and (4) whether the contract requires notices or payments to be sent to New York or requires supervision by the corporation in New York.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

[HN8]A finding of personal jurisdiction is not warranted based on maintenance of the website.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

[HN9]N.Y.C.P.L.R. art. 302(a)(2), (a)(3) premise the exercise of jurisdiction, respectively, on the commission of a tort within New York state or outside New York state where the act causes injury within the state, where certain commercial criteria are met.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

[HN10]In order to satisfy N.Y.C.P.L.R. art. 302(a)(3), a plaintiff has to aver facts constituting a tort under the law o f t he p ertinent j urisdiction. I n o rder t o m aintain an action for conversion - the only tort alleged -, a plaintiff must allege legal ownership or immediate superior right of possession to property and defendant's unauthorized interference with plaintiffs ownership or possession of such property.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

[HN11]Jurisdictional discovery is inappropriate where a plaintiff has failed entirely even to allege facts from which a court properly can infer the existence of jurisdiction.

**COUNSEL:**   **[*1]**   For Plaintiff: HANTMAN & ASSOCIATES, By: Robert J. Hantman, Esq., New York, New York.

For Defendant Dominique Casta: SALANS, By: Kenneth W. Taber, Esq., Jane E. Manning, Esq., New York, New York.

For Defendants: Fintage Talent B.V. and Fintage House: McELROY, DEUTSCH & MULVANEY, LLP, By: Daniel F. Markham, Esq., New York, New York.

**JUDGES:** LAURA TAYLOR SWAIN, United States District Judge.

**OPINIONBY:** LAURA TAYLOR SWAIN

**OPINION:** MEMORANDUM OPINION AND ORDER

Madison Models, Inc. ("Plaintiff" or "Madison") brings this action, asserting causes of action for breach of contract and conversion of funds, against Fintage Talent B.V. ("FT"), Fintage House ("FH" and, with FT, "Fintage") and Dominique Casta ("DC")

(collectively "Moving Defendants"), as well as against Laetitia Casta ("LC"). This matter comes before the Court on the Moving Defendants' motions to dismiss the complaint pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure for lack of personal jurisdiction. DC has also moved for dismissal of the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief may be granted.

Plaintiff asserts that the Court has [*2] jurisdiction of this matter pursuant to 28 U.S.C. section 1332.

The Court has considered thoroughly all submissions related to these motions. For the following reasons, the motion to dismiss for lack of personal jurisdiction is granted as to the Moving Defendants. Given the Court's disposition of the Rule 12(b)(2) aspect of the instant motion practice, the Court will not address DC's motion to dismiss the complaint pursuant to Rule 12(b)(6).

FACTS

The following facts are alleged in the Complaint. Plaintiff is a corporation organized on or about October 3, 1997 under the laws of the State of New York with its principal office located in New York, New York. (Compl. P 5.) Plaintiff is affiliated with Madison Models Paris and is in the business of providing managerial and professional services for models. (Id. P 6.) n1 FT and FH (which Plaintiff refers to collectively as "Fintage" throughout its complaint and papers in connection with this motion) are "a" (sic) Netherlands limited liability company (with a principal place of business in the Netherlands and offices in "Hungary, Australia, Japan, Spain and... Tennessee") that "prepared invoices for and on [*3] behalf of defendant LC for services rendered by her for Victoria's Secret." (Id. PP 15-16.) Fintage is a subsidiary of Meespierson Company; "both" (sic) "do business within the Southern District of New York." (Id. P 18.) Defendant Dominique Casta is father to and purported legal agent of Defendant Laetitia Casta and resides in France. n2 (Id. P 19.)



------------- Footnotes ---------
------

n1 The November 22, 2002 affidavit of Veronique Tuil, submitted by Plaintiff in opposition to DC's motion to dismiss the complaint, identifies Madison Models SA as a French corporation that is the parent company of Plaintiff Madison. (Id. at P 1.)

n2 Laetitia Casta has not moved to dismiss the complaint.

----------- End Footnotes- -------
------

In consideration of Plaintiff Madison's services to FH's alleged predecessor LC and/or Fintage, and in accordance with an agreement reached on or about June 11, 1998, Madison was entitled to receive 33 1/3% of all fees earned by LC for Victoria's Secret modeling assignments and/or campaigns in the United States, out of the gross fees received [*4] by LC, DC and/or entities working on their behalf. (Id. P 20.) It was expressly agreed that Fintage would invoice Victoria's Secret directly, and then, out of the gross amount received, Fintage would be responsible for making wire transfers to "Madison New York" (presumably, the Plaintiff entity) for the agreed-upon commissions upon receipt of an invoice from Plaintiff (Id. P 21.)

Plaintiff alleges that, on or about March 1, 2001, Defendants wrongfully terminated the agency agreement between Fintage and Madison SA (Paris) as of June 1, 2001, without cause and in breach of previously existing promises, commitments and obligations. In spite of repeated requests by Madison, no additional monies have been paid. (Id. PP 23, 24.) The termination of the agency agreement was in breach of, inter alia, the obligation of all defendants to "pay outstanding commission payments to plaintiff Madison in New York, for services rendered by LC in the United States." (Id. P 23.) The Complaint does not, however, allege that plaintiff Madison was a party to this agency agreement.

The Complaint asserts eight causes of action. In the First, which alleges breach of a contract to pay commissions [*5] for services rendered by Madison "for 1999," Plaintiff alleges that the 33 1/3% commission was provided for in a written agreement between plaintiff and a Fintage predecessor, and that LC was "working as an employee of first Belstar [(the predecessor)] and then Fintage." (Id. PP 27-29) The Second Cause of Action alleges breach of a contract to pay commissions for services rendered by plaintiff "for 2000," and incorporates by reference the preceding allegations. (Id. PP 31-33). The Third alleges, on the same basis, breach of contract to pay commissions for services "for 2001," and the Fourth the same as to 2002. (Id. PP 34-39.) The Fifth alleges that "defendants" wrongfully terminated "their [sic] contracts with Madison S.A. and Madison." (Id. PP 40-42.) In the Sixth, Plaintiff alleges that it rendered services "for Defendants" and that "Defendants" have been unjustly enriched by reason of nonpayment of commissions to Plaintiff. (Id. PP 44-48.) In the Seventh, Plaintiff alleges that "Defendants" are liable for conversion by reason of failure "to pay and

distribute monies to Plaintiff as outlined herein" (Id. PP 49-51), and in the Eighth Plaintiff asserts [*6] a need for provisional remedies. (Id. PP 52-55.)

DISCUSSION

Motion to Dismiss Pursuant to Rule 12(b)(2)

[HN1]A federal court sitting in diversity jurisdiction may exercise personal jurisdiction to the same extent as courts of general jurisdiction in the state in which it sits. See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 124 (2d Cir. 2002); Fed. R. Civ. P. 4(k)(l)(A). Federal courts sitting in New York thus engage in a two-step analysis, examining first whether New York law would support the exercise of personal jurisdiction and, if so, turning to the question of whether New York's extension of jurisdiction would, under the circumstances, be permissible under the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States. Bank Brussels Lambert, 305 F.3d at 124.

[HN2]A plaintiff opposing a motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction has the burden of establishing that the court has jurisdiction over the defendant. Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 784 (2d Cir. 1999). Where, as here, no discovery has been [*7] had and no evidentiary hearing held, the plaintiff can satisfy its burden by making allegations sufficient to establish a prima facie case for the exercise of jurisdiction. All such allegations are taken as true for purposes of determination of the motion and all inferences are drawn in favor of the plaintiff. See In re Sumitomo Copper Litigation, 120 F. Supp. 2d 328, 335 (S.D.N.Y. 2000); Cornell v. Assicurazioni Generali S.p.A., 2000 U.S. Dist. LEXIS 2922, No. 97 Civ. 2262 (MBM), No. 98 Civ. 9186 (MBM), 2000 WL 284222 at *1 (S.D.N.Y. March 16, 2000).

As a threshold matter, Plaintiff argues that the Court should deem all of the Defendants alter egos of each other for purposes of determining whether the complaint should be dismissed as to any of them for lack of personal jurisdiction. See Pl.'s Mem. in Opp'n to Mot. to Dismiss at 18-20. Plaintiff has not cited, and the Court is not aware of any, authority for application of an alter ego or veil-piercing analysis for this purpose outside of the corporate context. Nor has Plaintiff even alleged any facts tending to show that Defendants acted as a single entity in connection with the matters complained of. The Court [*8] will, accordingly, analyze Plaintiff's jurisdictional contentions as to each Moving Defendant separately.

CPLR Section 301

Plaintiff asserts that the Court is authorized to exercise personal jurisdiction over defendants DC and Fintage by [HN3]New York CPLR section 301, which permits New York courts to exercise general jurisdiction over a corporation that is "doing business" in the state. See N.Y.C.P.L.R. § 301 (McKinney 2001); Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG, 160 F. Supp. 2d 722, 731 (S.D.N.Y. 2001). "The 'doing business' standard is a stringent one because a corporation which is amenable to the Court's general jurisdiction 'may be sued in New York on causes of action wholly unrelated to the acts done in New York.' . . . The rule is that 'a corporation is 'doing business' and is therefore 'present' in New York . . . if it does business in New York 'not occasionally or casually, but with a fair measure of permanence and continuity.'" Jacobs, 160 F. Supp. 2d at 731. The Second Circuit has explained the "doing business" standard by stating that it "requires a showing of 'continuous, permanent, and substantial activity [*9] in New York.'" Id. (quoting Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 95 (2d Cir. 2000)).

[HN4]New York courts have, however, held that, while the mere solicitation of business in New York does not constitute "doing business" in New York by a corporation, "activities of substance in addition to solicitation" do. Laufer v. Ostrow, 55 N.Y.2d 305, 310, 449 N.Y.S.2d 456, 434 N.E.2d 692 (N.Y. 1982). In support of its claim of CPLR 301 jurisdiction over Fintage, n3 Plaintiff asserts that LC's New York alleged activities (including entry into the Victoria's Secret contract in New York, obtaining a visa through plaintiff Madison, earning income through work for Victoria's Secret (a New York-based company) on which the subject commissions were to be paid, rendering modeling services in New York, working with New York photographers, being party to the VS contract, which contains New York choice of law and consent to jurisdiction provisions, and appearing in magazines published in New York) are attributable to Fintage based on Plaintiff's general allegation that LC was an employee of Fintage. (See Decl. of Robert Hantman ("Hantman Decl.") at PP 7-8.) [*10] Most, if not all, of the activities cited by Plaintiff relate to LC's entry into and performance of the contract with Victoria's Secret. A copy of the contract is appended to the Hantman Declaration as Exhibit B ("VS Contract"). This December 24, 1998 contract names as parties only LC and Victoria's Secret entities, and includes representations that LC has the exclusive right to enter into the agreement and is the only party entitled to receive remuneration thereunder. (VS Contract at opening paragraph and §§ 5.4, 6.3; see also id. at §§ 5.3, 6.8.) In light of the specific provisions of the contract proffered by Plaintiff, general allegations that

LC performed the activities as an employee of Fintage are insufficient to support a reasonable inference that the activities were so undertaken. Accordingly, the Court does not impute LC's activities to Fintage for purposes of evaluating whether Plaintiff has proffered allegations sufficient to make a prima facie case for the exercise of personal jurisdiction over either of the Fintage entities.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - -

n3 In making its jurisdictional arguments, Plaintiff does not distinguish between FH and FT, arguing that further discovery would be necessary to make differentiations as to the roles played by each. For purposes of this motion, the Court construes Plaintiffs factual allegations regarding "Fintage" to have been made a s a gainst e ach o f FH a nd FT separately.

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*11]

Plaintiff also asserts that FH's admission that its representatives "travel to New York approximately twice a year regarding new or potential business for its subsidiaries," documentation indicating that FH was involved in a 1999 release of funds to a Brooklyn, New York, bank account maintained by an entity, Seagal-Nasso, which is unrelated to the transactions that are the subject of the instant complaint, evidence that FH sent marketing materials to Seagal-Nasso, n4 and a website allegedly indicating that Fintage has an office "in the United States," are sufficient to support a finding of general personal jurisdiction over one or both Fintage entities pursuant to section 301 of the CPLR. See, e.g., Hantman Dec. at PP 10-18. These alleged contacts are plainly insufficient to meet Plaintiffs burden of showing continuous, permanent and substantial activity in New York, nor do they show activities of substance in New York in addition to solicitation. Plaintiff has thus failed to sustain its burden as to Fintage with respect to CPLR section 301 jurisdiction.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - -

n4 The Court notes that, while Plaintiffs papers argue that the Seagal-Nasso correspondence is plainly indicative of marketing and related activities in New York, fax cover sheets included in Plaintiffs exhibits indicate that the communications were faxed within Los Angeles and between Los Angeles and the Netherlands. See Exhibit C to Hantman Decl.

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*12]

Plaintiff has failed entirely to proffer factual allegations supporting the exercise of general personal jurisdiction over defendant DC pursuant to section 301 of the CPLR. It has therefore failed to make a prima facie showing of general section 301 jurisdiction over DC.

Long-Arm Jurisdiction CPLR § 302(a)

Plaintiff also asserts that the Court is authorized to exercise personal jurisdiction over Moving Defendants by the following provisions of [HN5]New York CPLR section 302(a), which, in relevant part, permit New York courts to exercise jurisdiction, as to "a cause of action arising from any of the acts enumerated in this section," over any "non-domiciliary, or his executor or administrator, who in person or through an agent":1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or

2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or

3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if h e(i) regularly [*13] does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce...N.Y.C.P.L.R. § 302 (McKinney 2001). [HN6]Jurisdiction under the long arm provisions is "qualitative rather than quantitative," and a single transaction is sufficient to support personal jurisdiction as long as the defendant's activities were purposeful and there is a substantial nexus between the activities and the claim. See Agency Rent A Car System v. Grand Rent A Car Corp., 98 F.3d 25, 31 (2d Cir. 1996); Jerge v. Potter, 2000 U.S. Dist. LEXIS 11648, No. 99 Civ. 031 2E(F), 2000 WL 1160459 (W.D.N.Y. Aug. 11, 2000).

[HN7]Courts look at "the totality of circumstances" in determining whether a party has "transacted business" under section 302(a)(1), including the following:(1)

whether the defendant has an ongoing contractual relationship with a New York corporation; (2) whether the contract was negotiated or executed in New York; (3) [*14] whether the contract contains a New York choice-of-law, forum-selection or consent to jurisdiction clause; and (4) whether the contract requires notices or payments to be sent to New York or requires supervision by the corporation in New York. ESI, Inc. v. The Coastal Corp., 61 F. Supp. 2d 35, 57 (S.D.N.Y. 1997).

Plaintiff asserts that Fintage transacted business in New York State when it advertised its services on its website, sent representatives to New York twice a year, sent invoices on LC's behalf to Victoria's Secret, wired money into Plaintiffs account and conducted the above-described dealings with Seagal-Nasso. Plaintiff further alleges that Fintage directly or indirectly wired money to Madison's New York bank in connection with LC's Victoria's Secret work. Plaintiff asserts that the exercise of jurisdiction over DC pursuant to section 302(a)(1) is appropriate because DC professes to have led the negotiations with Victoria's Secret. Plaintiff admits, however, that the Victoria's Secret negotiations took place in Paris. (Tuil Dec. at P 6.)

Plaintiffs allegations are insufficient to make out a prima facie case for personal jurisdiction over DC [*15] and/or Fintage pursuant to CPLR section 301(a)(1). Plaintiff has not proffered allegations or evidence of a contract by any of the Moving Defendants to supply goods or services in New York, nor do the activities cited constitute the transaction of business relevant to the claim Plaintiff asserts here. Plaintiff acknowledges that the Seagal-Nasso dealings are entirely unrelated to the Casta service and commission issues. Mere promotion via a website is insufficient to constitute transacting business within the meaning of the statute. Fintage's website is not even alleged to be "interactive" in the relevant sense: there is no allegation or proffer that Fintage does business over its website by allowing customers to purchase items or services on-line. [HN8]A finding of personal jurisdiction thus is not warranted based on maintenance of the website. See Hsin Ten Enter. v. Clark Enter., 138 F. Supp. 2d 449, 456 (S.D.N.Y. 2000) (websites that permit viewers to purchase devices online and are "highly interactive" generally support a finding of personal jurisdiction over the defendant). Nor is there any allegation that Fintage's representatives' twice-yearly visits to New York [*16] have anything to do with Casta or Madison. Furthermore, none of the Moving Defendants is a party to the VS Contract which was, in any event, negotiated outside New York. Plaintiffs proffer is thus insufficient to support a prima facie case for the exercise of jurisdiction under CPLR section 302(a)(1).

[HN9]CPLR sections 302(a)(2) and 302(a)(3) premise the exercise of jurisdiction, respectively, on the commission of a tort within New York state or outside New York state where the act causes injury within the state, where certain commercial criteria are met. Section 302(a)(2) is irrelevant because none of the Moving Defendants is alleged to have committed a tortious act within New York. Section 302(a)(3) is also inapplicable here. [HN10]In order to satisfy section 302(a)(3), Plaintiff has to aver facts constituting "a tort under the law of the pertinent jurisdiction." Bank Brussels Lambert, 171 F.3d at 792. In order to maintain an action for conversion -- the only tort alleged --, a plaintiff must allege legal ownership or immediate superior right of possession to property and defendant's unauthorized interference with plaintiffs ownership or possession of such property. [*17] Weizmann Institute of Science v. Neschis, 229 F. Supp. 2d 234, 253 (S.D.N.Y. 2002) (citation omitted). Plaintiffs "conversion" cause of action does not lay out the elements of a prima facie case for conversion as to Moving Defendants and alleges no affirmative act by the Moving Defendants that would constitute conversion. Plaintiff alleges facts consistent with a breach of contract claim, namely that Defendants refused to pay amounts owed to Plaintiff that Defendants were allegedly obligated to pay under a contract. Plaintiffs papers in opposition to the motion to dismiss do nothing further to elucidate any tort element of the claim. Plaintiff has thus failed to come forward with allegations sufficient to support a prima facie case for exercise of tort-based special jurisdiction.

Because the Court finds no basis for the exercise of personal jurisdiction over the Moving Defendants pursuant to New York law, it is unnecessary for the Court to undertake a minimum contacts analysis. Accordingly, the Moving Defendants' motion to dismiss the complaint for lack of personal jurisdiction is granted.

Additional Discovery

Plaintiff also seeks to be afforded permission [*18] to conduct discovery prior to the Court's ruling on the motion to dismiss for lack of personal jurisdiction. [HN11]Jurisdictional discovery is inappropriate where, as in the instant case, a plaintiff has failed entirely even to allege facts from which a court properly could infer the existence of jurisdiction. Daval Steel Products v. M.V. Juraj Dalmatinac, 718 F. Supp. 159, 162 (S.D.N.Y. 1989). The application for further discovery is, therefore, denied.

Motion to Dismiss Pursuant to Fed. R. Civ. P 12(bk6)

2003 U.S. Dist. LEXIS 14844

DC has moved pursuant to Rule 12(b)(6) to dismiss the complaint for failure to state a claim on which relief can be granted. In light of the Court's disposition of his motion pursuant to Rule 12(b)(2), the Court does not reach his motion under Rule 12(b)(6).

CONCLUSION

For the foregoing reasons, the motion to dismiss the Complaint for lack of personal jurisdiction is granted as to defendants Dominique Casta, Fintage Talent B.V. and Fintage House. The parties shall contact Magistrate Judge Katz's chambers promptly to schedule further proceedings.

SO ORDERED.


Dated: [*19] New York, New York

August 20, 2003

LAURA TAYLOR SWAIN

United States District Judge

1992 U.S. Dist. LEXIS 1863

FRANCIS A. OKASA, Plaintiff, -against- ALVY HYPPOLITE, JR. and ANTHONY THIBAULT, Defendants.

91 Civ. 4093 (JFK)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

1992 U.S. Dist. LEXIS 1863

February 19, 1992, Decided
February 19, 1992, Filed

## CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant alleged partners filed a motion to dismiss plaintiff buyer's action on the basis of improper venue in the buyer's breach of contract action. The buyer filed a cross-motions for sanctions pursuant to Fed. R. Civ. P. 11.

**OVERVIEW:** The buyer alleged that he and the partners entered into an agreement to form a corporation to purchase and operate a gas station in Moonachie, New Jersey. The buyer was a citizen of the Republic of Nigeria. The partners were citizens of New York and New Jersey. The buyer brought a breach of contract action against the partners because they allegedly failed to pay the money that was owed for the gas station purchase. The court's subject matter jurisdiction was based upon the diversity of the parties. The court was located in the southern district of New York. The partners filed a motion to dismiss the buyer's complaint due to improper venue. Under Fed. R. Civ. P. 12(h)(1)(B), the partners waived the defense of improper venue by failing to present it as one of the affirmative defenses cited in their answer. Furthermore, venue was proper under 28 U.S.C.S. 1391(a)(2) because extensive negotiations and preparations for the formation of the corporation took place in New York. Sanctions under Fed. R. Civ. P. 11 were not warranted even though the partners' motion was without merit.

**OUTCOME:** The court denied the partners' motion to the buyer's action. The court denied the buyer's cross-motion for sanctions.

**CORE TERMS:** venue, gas station, conveniens, motion to dismiss, waived

### LexisNexis(TM) Headnotes

*Civil Procedure > Venue > Individual Defendants*

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses*

[HN1]A defendant waives the defense of improper venue by failing to present it as an affirmative defenses in an answer. Fed. R. Civ. P. 12(h)(1)(B).

**COUNSEL:** [*1] APPEARANCES: For Plaintiff: Deyan Ranko Brashich, Esq., New York, New York.

For Defendants: James E. Young, Jr., Esq., Hackensack, New Jersey.

**JUDGES:** KEENAN

**OPINIONBY:** JOHN F. KEENAN

**OPINION:** OPINION and ORDER

JOHN F. KEENAN, United States District Judge:

Before the Court is defendants' motion to dismiss plaintiffs' complaint. Plaintiff cross-moves for sanctions pursuant to Fed. R. Civ. P. 11, arguing that the motion is frivolous and not supported by law. The Court heard oral argument on these motions on February 6, 1992. Decision was reserved. For the reasons set forth below, defendants' motion is denied. Plaintiff's motion for sanctions is also denied.

Background

Plaintiff alleges that he and the defendants entered into an agreement to form a corporation which would, in turn, purchase and operate a gas station in Moonachie, New Jersey. Because plaintiff is a citizen of the Republic of Nigeria and the defendants citizens of New York and New Jersey, this Court's subject matter jurisdiction is premised on diversity.

Plaintiff contends that he and defendants orally agreed that he was to pay $ 357,000 of the total purchase price of $ 595,000 for the gas station. In return, he would own sixty percent of [*2] the shares of the business. Plaintiff alleges that defendants were to assume and pay off a purchase money mortgage in the amount of $ 295,000 and were to operate the gas station in return for a forty percent share in the business. Plaintiff alleges that defendants have not fulfilled their obligations under the agreement in that they have failed to make mortgage payments, forcing the plaintiff to assume those payments. Plaintiff's complaint seeks a declaratory judgment that defendants have breached

the oral agreement between the parties, and that consequently plaintiff is the sole shareholder of Afco Services, Inc., the corporation formed for the purchase of the gas station.

Discussion

Defendants advance two arguments in support of their motion to dismiss.

Defendants argue first that the complaint should be dismissed due to improper venue. Plaintiff argues, and the Court agrees, that [HN1]defendants waived the defense of improper venue by failing to present it as one of their affirmative defenses in their answer. Fed. R. Civ. P. 12(h)(1)(B).

Even if not waived, there is no merit to defendants' venue objections. Venue is proper in this district pursuant to 28 U.S.C. 1391(a)(2), because [*3] extensive negotiations and preparations for the formation of the corporation took place in New York.

Defendants' second argument is that this action should be dismissed based on the doctrine of forum non conveniens. Defendants argue that the action should proceed in the District of New Jersey.

There is absolutely no basis for a forum non conveniens dismissal of this action. One of the defendants resides in this district. The District of New Jersey is within the same metropolitan area as this district. In short, defendants have failed to demonstrate that any of the factors set forth by the Supreme Court in Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 955 (1947), and Piper Aircraft Co. v. Reyno, 454 U.S. 235, 102 S.Ct. 252, 70 L. Ed.2d 419 (1981) indicates that a forum non conveniens dismissal would be appropriate in this case.

Plaintiff's motion for Rule 11 sanctions is denied. While the Court has concluded that defendants' motion was without merit, Rule 11 sanctions are not warranted in this instance.

Conclusion

For the reasons set forth above, defendants' motion [*4] is denied. Plaintiff's cross-motion for sanctions is also denied. Counsel are directed to appear for a conference in this action on March 30, 1992 at 11:00 A.M. in Courtroom 228.


SO ORDERED.

Dated: New York, New York
February 19, 1992

JOHN F. KEENAN
United States District Judge

JOEL ROSS, ROSS PROPERTIES, INC. and CITADEL REALTY GROUP, LLC, Plaintiff, -against- UKI LTD., TONEX HOLDINGS, LTD., JACOB SCHIMMEL, MARC SCHIMMEL and HAROLD SCHIMMEL, Defendants.

02 Civ. 9297 (WHP)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2004 U.S. Dist. LEXIS 2970

March 1, 2004, Decided

March 2, 2004, Filed

**PRIOR HISTORY:** Ross v. UKI Ltd., 2004 U.S. Dist. LEXIS 483 (S.D.N.Y., Jan. 15, 2004)

**DISPOSITION:** Defendants' motion to dismiss granted in part and denied in part.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiffs, a real estate broker and two brokerage agencies, sued defendants, an asset management company, two of its officers, a holding company, and a consultant, for breach of contract and quantum meruit. The holding company, one of the officers, and the consultant moved to dismiss for lack of personal jurisdiction.

**OVERVIEW:** The broker, who was based in New York, alleged that he entered into a series of transactions with the asset management company that required payment of commissions to the broker. The officers and the consultant were citizens of the United Kingdom. Although the broker personally dealt only with the officers, plaintiffs alleged that the consultant, the officers' father, was the head of the family's real estate empire. The court found that personal jurisdiction did not exist under N.Y. C.P.L.R. 302(a)(1) (2004) over the consultant. The consultant undertook no affirmative acts in New York with respect to the transactions at issue. Plaintiffs offered nothing to rebut defendants' claim that the consultancy by the consultant pre-dated the transactions. Even if the consultant was, as alleged, chairman of the asset management company, plaintiffs had made no effort to pierce the corporate veil. However, plaintiffs had made a prima facie showing of personal jurisdiction with respect to the moving officer and the holding company. The officer allegedly knew of and consented to the transactions, and plaintiffs sufficiently alleged the holding company's involvement in the transactions.

**OUTCOME:** The consultant's motion to dismiss was granted. The motions to dismiss by the officer and the holding company were denied.

**CORE TERMS:** personal jurisdiction, oral agreement, real estate, prima facie, comport, declaration, exercise jurisdiction, notions of fair play, motion to dismiss, long-arm, acquisition, financing, favorable, entity, lack of personal jurisdiction, substantial relationship, cause of action, claim asserted, doing business, jurisdictional, purposefully, transacted, consented, exercise of personal jurisdiction, joint venture, personally, takeover, empire, owed, privilege of conducting activities

## LexisNexis(TM) Headnotes

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*

[HN1]On a motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), the plaintiff bears the burden of showing that the court has jurisdiction over the moving defendant(s). To satisfy that burden where the parties have conducted jurisdictional discovery but no evidentiary hearing has been held, a plaintiff need only make a prima facie showing of personal jurisdiction. Such a prima facie showing is satisfied by an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*

[HN2]In reviewing a Fed. R. Civ. P. 12(b)(2) motion, a court must construe all pleadings and affidavits in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party. However, a plaintiff may not rely merely on conclusory statements or allegations to establish jurisdiction.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

*Civil Procedure > State & Federal Interrelationships > Application of State Law*

[HN3]In a federal diversity case, the resolution of issues concerning personal jurisdiction are governed by the law of the state in which the district court sits.

*Civil Procedure > State & Federal Interrelationships > Application of State Law*

[HN4]The amenability of a foreign corporation to suit in a federal court in a diversity action is determined in accordance with the law of the state where the court sits, with "federal law" entering the picture only for the purpose of deciding whether a state's assertion of jurisdiction contravenes a constitutional guarantee.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

[HN5]N.Y. C.P.L.R. 302(a)(1) (2004) permits a court to exercise jurisdiction over a person or entity that in person or through an agent transacts business within the state or contracts anywhere to supply goods and services in the state. Specifically, jurisdiction under N.Y. C.P.L.R. 302(a)(1) is proper where: (1) the defendant has transacted business in New York; and (2) the cause of action arises out of the subject matter of the transacted business.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

[HN6]A non-domiciliary transacts business under N.Y. C.P.L.R. 302(a)(1) (2004) where he purposefully avails himself of the privilege of conducting activities within New York, thus invoking the benefits and protections of its laws. A court must look to the totality of the circumstances in deciding whether the defendant has engaged in such purposeful activity. Second, the court must find some articulable nexus between the business transacted and the cause of action sued upon. A substantial relationship is required between the transaction and the claim asserted. In a breach of contract case, the pivotal inquiry is whether the defendant has performed purposeful acts in New York in relation to the contract.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

[HN7]In addition to affirmative acts, jurisdiction is also appropriate under N.Y. C.P.L.R. 302(a)(1) (2004) pursuant to the so-called "agency theory." To be considered an agent for jurisdictional purposes, the putative agent must have acted in the state for the benefit of, and with the knowledge and consent of the non-resident principal. An agent must act at the request and for the business purposes of the principal. In addition, the United States Court of Appeals for the Second Circuit has interpreted N.Y. C.P.L.R. 302(a)(1) to require a showing that the principal exercised some control over the activities of the alleged agent. A showing must be made that the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal. Thus, if plaintiffs can demonstrate that personal jurisdiction vests over an agent of a defendant, and that the agent acted on behalf of the defendant in the transaction at issue, personal jurisdiction will be imputed to the defendant.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*

[HN8]In addition to determining whether a state's long-arm statute extends the state's jurisdiction over a non-domiciliary defendant, a court must also determine whether exercise of this jurisdiction comports with federal due process. To do so, a court must undertake a two-step analysis: (1) a "minimum contacts" inquiry; and (2) a "reasonableness" inquiry.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*

[HN9]Under the "minimum contacts" inquiry for exercise of personal jurisdiction, a court must determine whether the defendant has certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. To establish minimum contacts with a state, a plaintiff must show that the moving defendant "purposefully availed" himself of the privilege of doing business in the state and should reasonably anticipate being haled into court there. It is required that there be some act by which the defendant purposely avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*

[HN10]Under the second step of the due process analysis for personal jurisdiction, a court must determine whether the assertion of personal jurisdiction comports with traditional notions of fair play and substantial justice--that is, whether it is reasonable under the circumstances of the particular case. In evaluating reasonableness, courts must consider the following five factors: (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

[HN11]It is well-settled that where a corporation is doing business in New York, an officer of the corporation does not subject himself individually to jurisdiction unless he is doing business in New York individually.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*

[HN12]Conclusory allegations are insufficient to support a prima facie showing of personal jurisdiction under the New York long-arm statute, and do not comport with constitutional due process requirements.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

[HN13]Where there is joint control of a business enterprise--similar to that existing in a partnership or joint venture--enough control has been shown to establish prima facie this particular element of agency to satisfy long-arm jurisdiction.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*

[HN14]Upon a motion to dismiss, a court must construe all pleadings and affidavits in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party.

*Business & Corporate Entities > Agency > Agency Established > Elements of Agency*

[HN15]Under traditional agency law, joint participation in a partnership or joint venture establishes "control" sufficient to make each partner or joint venturer an agent of the others.

**COUNSEL:** [*1]  For Joel Ross, Ross Properties, Inc, Citadel Realty Group, L.L.C., Plaintiffs: Gerald Padian, Tashjian & Padian, New York, NY.

For UKI, Ltd., Tonex Holdings, Ltd., Jacob Schimmel, Marc Schimmel, Harold Schimmel, Defendants: Marshall R. King, Gibson, Dunn & Crutcher, L.L.P., New York, NY.

**JUDGES:** WILLIAM H. PAULEY III, U.S.D.J.

**OPINIONBY:** WILLIAM H. PAULEY III

**OPINION:** MEMORANDUM AND ORDER

WILLIAM H. PAULEY III, District Judge:

In this breach of contract and quantum meruit action, plaintiffs Joel Ross ("Ross"), Ross Properties, Inc. ("Ross Properties"), and Citadel Realty Group, LLC ("Citadel") allege that defendants UKI Ltd. ("UKI"), Tonex Holdings, Ltd. ("Tonex"), Jacob Schimmel, Abraham Moses Schimmel ("Marc Schimmel"), and Harry C. Schimmel breached a series of oral brokerage agreements with plaintiffs. Currently before this Court are motions to dismiss this action for lack of personal jurisdiction, pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, by defendants Harry Schimmel, Marc Schimmel, and Tonex. For the reasons set forth below, Harry Schimmel's motion is granted, and Marc Schimmel's and Tonex's motions are denied.  [*2]

BACKGROUND

I. The Parties

Ross is a licensed real estate broker in New York, and a principal in two New York-based real estate brokerage agencies, Ross Properties and Citadel. (Affidavit of Joel Ross in Opposition to Motion to Dismiss, dated May 22, 2003 ("Ross Aff.") P 2; Complaint ("Compl.") PP 1-3.) UKI is a United Kingdom limited liability company, based in London, that serves as an advisor and asset manager for real estate investors. (Declaration of Abraham Moses Schimmel, dated January 15, 2003 ("M. Schimmel Decl.") P 10.) Tonex is a holding company, organized

under the laws of Gibraltar, that owns various subsidiaries that invest in real estate and other assets. (Declaration o f M aurice M oses B enady, d ated M arch 27, 2003 ("Benady Decl.") P 3.) Tonex is beneficially owned by a trust whose beneficiaries are members of the Schimmel family. (Ross Decl. PP 27-28, Exs. 9, 11, 20, 26, 42-44.) Jacob Schimmel and Marc Schimmel, U.K. citizens who reside in London, England, are officers, directors, and shareholders of UKI. (M. Schimmel Decl. PP 2, 10; Declaration of Jacob Schimmel, dated June 20, 2003 ("J. Schimmel Decl.") P 1; Compl. P 6.) Harry Schimmel, Jacob and Marc **[*3]** Schimmel's father, is a U.K. citizen who has at times served as a consultant to UKI. (Declaration o f Harry C . S chimmel, d ated M arch 2 1, 2003 ("H. Schimmel Decl.") PP 2, 11.)

In October 1998, Ross was introduced to Jacob and Marc Schimmel, and agreed to assist the Schimmels in accessing sources of capital in the United States for various real estate acquisitions. (Ross Decl. P 6.) Ross claims that although he personally dealt with Jacob and Marc Schimmel, they were "young, inexperienced and unsophisticated with regard to real estate financing," and that Harry Schimmel was in fact the "head . . . of the entire Schimmel real estate empire." (Ross Decl. PP 7-8.)


II. The Westbrook Transactions

In October 1998, Ross introduced Marc and Jacob Schimmel to the principals of Westbook Partners, LLC ("Westbrook"), an opportunity fund based in New York that targeted real-estate investments. (Ross Decl. P 9.) Over the course of the next few months, Ross, on behalf of Jacob and Marc Schimmel, negotiated a joint venture with Westbrook (the "Westbrook Joint Venture") in which the Schimmels would provide 10% of the equity and Westbrook would provide 90%, with the Schimmels managing the acquired **[*4]** properties. (Ross Decl. PP 10, 11.)

On November 4, 1998, UKI, by Marc Schimmel, entered into an agreement with Ross Properties (the "Joint Venture Agreement") under which Ross Properties was to be paid a commission based on the equity contributed by Westbrook for acquisitions of property by the Westbrook Joint Venture. (Ross Decl. P 12, Ex. 3.) Ross was paid approximately $ 1.5 million under the Joint Venture Agreement. (Ross Decl. P 14, Ex. 5.)

While the Complaint and opposing declaration are far from clear on this point, Ross also appears to allege that he entered into a simultaneous oral agreement with the Schimmels at the time of the Joint Venture Agreement (the "Westbrook Oral Agreement"). Under the Westbrook Oral Agreement, Ross was to receive a

brokerage commission of 1% of the gross proceeds of any transaction, other than those covered under the Joint Venture Agreement, involving the Schimmels (or any related entity) and Westbrook. (Compl. P 14.)

A. The British Land Agreement

In March 1999, Tonex, through a wholly-owned subsidiary Allerbeck Limited, purchased a portfolio of properties from The British Land Company, PLC (the "Bond Portfolio"). (Ross Decl. P 30, Exs. **[*5]** 13, 25.) Tonex financed the acquisition of the Bond Portfolio through a secured loan facility with a German bank, DG Bank AG (the "British Land Agreement"). (Ross Decl. Ex. 13; Compl. P 18.) Ross alleges, however, that Tonex first procured a viable offer from Westbrook to fund the acquisition of the Bond Portfolio (the "Westbrook Offer"), and then leveraged the W estbrook Offer t o o btain a more favorable d eal from DG Bank AG. (Ross Decl. P 31; Compl. P 18.) Ross claims that, under the terms of the Westbrook Oral Agreement, he is entitled to a 1% brokerage commission on the British Land Agreement. Ross alleges t hat Ja cob S chimmel acknowledged t his d ebt, but that Marc Schimmel refused to pay it, stating that "we will do a lot more business with you [Ross] in the future and will make it up to you that way." (Ross Decl. PP 31-32.)

B. Project Alliance

In March 2001, Jacob Schimmel told Ross that the Schimmel family desired to sell many of their properties. (Ross Decl. P 42.) Ross suggested to Jacob Schimmel that the family sell certain of their properties to Westbrook, and reminded him that if they did so, Ross would be owed a 1% commission under the Westbrook O ral A greement. ( Ross **[*6]** D ecl. P 4 2.) Jacob Schimmel agreed. (Ross Decl. PP 42-43, 47.) Later that year, Westbrook, along with another fund, purchased a $ 573,000,000 portfolio of properties beneficially owned by Marc Schimmel, Jacob Schimmel, and Tonex ("Project Alliance"). (Ross Decl. PP 44-45, Exs. 11, 30-32; Compl. P 15.) Ross claims that, under the terms of the Westbrook Oral Agreement, he is owed a 1% commission as a result of Project Alliance.

III. The GMAC Transactions

In Spring 2000, Jacob Schimmel informed Ross that "the Schimmel family" was contemplating a possible takeover of Great Portland Estates Plc. ("Great Portland"), a publicly-traded real estate investment company in the U.K. (Ross Decl. P 36.) In order to meet the Schimmel's need for a substantial amount of financing to complete the Great Portland takeover, Ross set up a s eries o f meetings for Ja cob a nd M arc

Schimmel with officers of GMAC Commercial Mortgage ("GMAC") in New York. (Ross Decl. P 37.)

On or about April 13, 2000, Ross and Jacob Schimmel entered into another oral agreement (the "GMAC Oral Agreement") pursuant to which Ross would be paid a fee of 1% of any senior financing and 2% of any mezzanine financing obtained **[*7]** from GMAC by the Schimmels and their related entities. (Ross Decl. P 38; Compl. P 22.) Although both Marc and Jacob Schimmel attended meetings with GMAC in New York through Summer 2000, the Great Portland transaction was never completed. (Ross Decl. PP 39-41, Ex. 29.) Ross, however, continued to cultivate the GMAC relationship on behalf of the Schimmels with an eye toward future deals. (Ross Decl. P 41.)

In October 2002, Tonex acquired certain properties in the U.K. ("Project Aston Martin"). (Ross Decl. PP 54-55, Exs. 39-40.) GMAC financed Project Aston Martin, providing Tonex with a $ 210,000,000 loan facility. (Ross Decl. P 54, Exs. 39-43; Compl. P 23.) Ross claims that GMAC made additional loans to the Schimmels and related entities in excess of $ 785,000,000. (Ross Decl. P 54; Compl. P 24-27.) Ross claims that under the terms of the GMAC Oral Agreement, he is owed a commission on these loans.

DISCUSSION

I. Rule 12(b)(2) Standards

[HN1]On a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), the plaintiff bears the burden of showing that the court has jurisdiction over the moving defendant(s). Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1996). **[*8]** To satisfy that burden where, as here, the parties have conducted jurisdictional discovery but no evidentiary hearing has been held, a plaintiff need only make a prima facie showing of personal jurisdiction. Metro. Life Ins., 84 F.3d at 567. Such a prima facie showing is satisfied by "an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over the defendant." Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990).

[HN2]In reviewing a Rule 12(b)(2) motion, a court must construe all pleadings and affidavits "in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party." A.I. Trade Fin., Inc. v. Petra Bank, 989 F.2d 76, 79-80 (2d Cir. 1993); accord Metro. Life Ins., 84 F.3d at 567; Landoil Res. Corp. v. Alexander & Alexander Servs., Inc., 918 F.2d 1039, 1043 (2d Cir. 1990). However, a plaintiff may not rely merely on conclusory statements or allegations to establish jurisdiction. Ball, 902 F.2d at 197.

II. **[*9]** Exercise of Personal Jurisdiction

[HN3]In a federal diversity case such as this, the resolution of issues concerning personal jurisdiction are governed by the law of the state in which the district court sits. DiStefano v. Carozzi N. Am., Inc., 286 F.3d 81, 84 (2d Cir. 2001); CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986). Accordingly, New York law controls personal jurisdiction in this action. The issue currently before this Court is whether the moving defendants are subject to personal jurisdiction under New York law on the theory that they transacted business within the meaning of Section 302(a)(1) of the New York Civil Practice Law and Rules ("CPLR"), a provision of New York's long-arm statute, and, if so, whether doing so comports with constitutional due process guarantees. See Int'l Shoe Co. v. State of Washington, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945); accord Metro. Life Ins., 84 F.3d at 567 [HN4]("The amenability of a foreign corporation to suit in a federal court in a diversity action is determined in accordance with the law of the state where the court sits, with 'federal law' entering **[*10]** the picture only for the purpose of deciding whether a state's assertion of jurisdiction contravenes a constitutional guarantee.") (quoting Arrowsmith v. United Press Int'l, 320 F.2d 219, 223 (2d Cir. 1963) (en banc)).

A. Jurisdiction Under CPLR 302(a)(1)

CPLR 302(a)(1) [HN5]permits a court to exercise jurisdiction over a person or entity that "in person or through an agent . . . transacts business within the state or contracts anywhere to supply goods and services in the state." n1 N.Y. CPLR § 302(a)(1) (McKinney's 2004). Specifically, jurisdiction under CPLR 302(a)(1) is proper where: (1) the defendant has transacted business in New York; and (2) the cause of action arises out of the subject matter of the transacted business. CutCo Indus., 806 F.2d at 365.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 Plaintiffs concede, as they must, that the moving defendants lack the systemic contacts required to be held to be "doing business in the New York" under CPLR § 301.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

First, [HN6]a non-domiciliary [*11] transacts business under CPLR 302(a)(1) where he "purposefully avails [himself] of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws." CutCo Indus., 806 F.2d at 365 (quoting McKee Elec. Co. v. Rauland-Borg Corp., 20 N.Y.2d 377, 382, 229 N.E.2d 604, 283 N.Y.S.2d 34 (1967)). A court must look to the totality of the circumstances in deciding whether the defendant has engaged in such purposeful activity. CutCo Indus., 806 F.2d at 365. Second, the court must find "some articulable nexus between the business transacted and the cause of action sued upon." McGowan v. Smith, 52 N.Y.2d 268, 272, 419 N.E.2d 321, 437 N.Y.S.2d 643 (N.Y. 1981); accord Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 467, 522 N.E.2d 40, 527 N.Y.S.2d 195 (N.Y. 1988) (requiring a "substantial relationship between the transaction and the claim asserted"); see also PDK Labs, Inc. v. Friedlander, 103 F.3d 1105, 1109 (2d Cir. 1997); Agency Rent a Car Sys., Inc. v. Grand Rent a Car Corp., 98 F.3d 25, 29-31 (2d Cir. 1996); CutCo Indus., 806 F.2d at 365. In a breach of contract case, the pivotal inquiry is "whether the [*12] defendant has performed purposeful acts in New York in relation to the contract." A.C.K. Sports, Inc. v. Doug Wilson Enters., 661 F. Supp. 386, 390 (S.D.N.Y. 1989).

[HN7]In addition to affirmative acts, jurisdiction is also appropriate under CPLR 302(a)(1) pursuant to the so-called "agency theory." To be considered an agent for jurisdictional purposes, the putative agent must have acted in the state "for the benefit of, and with the knowledge and consent of" the non-resident principal. Grove Press, Inc. v. Angleton, 649 F.2d 121, 122 (2d Cir. 1981); accord Galgay v. Bulletin Co., Inc., 504 F.2d 1062, 1065 (2d Cir. 1974) (an agent must act "at the request and for the business purposes of" the principal). In addition, the Second Circuit has interpreted CPLR 302(a)(1) to require a showing that the principal exercised some control over the activities of the alleged agent. CutCo Indus., 806 F.2d at 366; accord Grove Press, 649 F.2d at 122 ("[A] showing must be made that the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal. [*13] "). Thus, if plaintiffs can demonstrate that personal jurisdiction vests over an agent of one of the moving defendants, and that the agent acted on behalf of the moving defendant in the transaction at issue, personal jurisdiction will be imputed to the moving defendant.

B. Due Process

[HN8]In addition to determining whether the New York long-arm statute extends the state's jurisdiction over a nondomiciliary defendant, a court must also determine whether exercise of this jurisdiction comports with federal due process. Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 127 (2d Cir. 2002). To do so, a court must undertake a two-step analysis: (1) a "minimum contacts" inquiry; and (2) a "reasonableness" inquiry. Bank Brussels Lambert, 305 F.3d at 127; Metro. Life Ins., 84 F.3d at 567.

[HN9]Under the "minimum contacts" inquiry, a court must determine whether the defendant "has 'certain minimum contacts [with the forum] . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., 241 F.3d 135, 152 (2d Cir. 2001) [*14] (quoting Calder v. Jones, 465 U.S. 783, 788, 79 L. Ed. 2d 804, 104 S. Ct. 1482 (1984)) (alteration in original and internal citations omitted). To establish minimum contacts with New York, a plaintiff must show that the moving defendant "purposefully availed" himself of the privilege of doing business in New York and "should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980); accord Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985) (requiring that "there be some act by which the defendant purposely avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws").

[HN10]Under the second step of the due process analysis, a court must determine "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice' -- that is, whether it is reasonable under the circumstances of the particular case." Metro. Life Ins., 84 F.3d at 568 (quoting Int'l Shoe, 326 U.S. at 316). In evaluating reasonableness, [*15] courts must consider the following five factors: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." Metro. Life Ins., 84 F.3d at 568; accord Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 113-14, 94 L. Ed. 2d 92, 107 S. Ct. 1026 (1987); Burger King, 471 U.S. at 476-77; Bank Brussels Lambert, 305 F.3d at 129.

III. Defendant Harry Schimmel

Even after construing all pleadings and affidavits in the light most favorable to plaintiffs, and resolving all doubts in their favor, plaintiffs are unable to make a prima facie showing of personal jurisdiction over defendant Harry Schimmel. Harry Schimmel is a citizen and resident of the U.K., and it is undisputed that he undertook no affirmative acts in New York with respect to the transactions at issue. Further, the [*16] indirect actions alleged by plaintiffs are insufficient to establish jurisdiction under either the CPLR or federal due process.

For example, while plaintiffs assert generally that Harry Schimmel was a consultant to UKI and therefore personally benefitted from the transactions at issue, they present no evidence to rebut defendants' specific averment that Harry Schimmel's consultancy was limited to properties managed by UKI that pre-dated the earliest of the Ross transactions. (H. Schimmel Decl. P 11; Reply Declaration of Harry C. Schimmel, dated June 19, 2003 ("H. Schimmel Reply Decl.") P 5.) See, e.g., Kreutter, 71 N.Y.2d at 467 (must be a "substantial relationship between the transaction and the claim asserted"); McGowan, 52 N.Y.2d at 272 (must find "some articulable nexus between the business transacted and the cause of action sued upon").

Further, plaintiffs claim that this Court may exercise jurisdiction over Harry Schimmel pursuant to an agency theory on the grounds that he was a beneficial owner of at least some of the properties sold to Westbrook pursuant to Project Alliance. However, this Court may not exercise jurisdiction over Harry [*17] Schimmel under the agency theory absent any proof that he knew about, authorized, and exercised some control over the actions of Jacob Schimmel, Marc Schimmel, UKI, or Ross with respect to the Westcliff Oral Agreement. (H. Schimmel Decl. P 11; H. Schimmel Reply Decl. PP 11, 13, 15.) See, e.g., Grove Press, 649 F.2d at 122 (in order to exercise jurisdiction over an agent, a court must find that the agent "acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal"); Cornell v. Assicurazioni Generali S.p.A., 2000 U.S. Dist. LEXIS 2922, Nos. 97 Civ. 2262, 98 Civ. 9186 (MBM), 2000 WL 284222, at *6 (S.D.N.Y. March 16, 2000) (in finding no jurisdiction under agency theory, stating "plaintiffs cannot rely upon such wholly non-specific allegations as the sole basis for connecting [defendant] to the alleged conspiracy").

Finally, plaintiffs' allegation that Harry Schimmel was the Chairman of UKI, and therefore is subject to the jurisdiction of this Court based on UKI's contacts, is unavailing. Even if Harry Schimmel were Chairman of UKI (Ross Decl. Ex. 2), plaintiffs make no effort to pierce UKI's [*18] corporate veil, nor could they on the record before this Court. Harry Schimmel's position with UKI does not by itself subject him to the jurisdiction of this Court. See, e.g., Black v. USA Travel Auth., 2001 U.S. Dist. LEXIS 9297, No. 99 Civ. 11278 (WHP), 2001 WL 761070, at *4 (S.D.N.Y. July 6, 2001) [HN11]("It is well-settled that 'where a corporation is doing business in New York, an officer of the corporation does not subject himself, individually to . . . jurisdiction unless he is doing business in [New York] individually.'") (quoting United Mizrahi Bank Ltd. v. Sullivan, 2000 U.S. Dist. LEXIS 16157, No. 97 Civ. 9282 (LMM), 2000 WL 1678040, at *3 (S.D.N.Y. Nov. 6, 2000)).

The gravamen of plaintiffs jurisdictional allegations concerning Harry Schimmel are that he is the "patriarch of the Schimmel family" and "de facto head of the Schimmel family empire." (Pl. Opp. at 1, 18; see also Ross Decl. PP 7-8 (Harry Schimmel is the "head . . . of the entire Schimmel real estate empire.").) Such [HN12]conclusory allegations are insufficient to support a prima facie showing of personal jurisdiction under the New York long-arm statute, and do not comport with constitutional due process requirements. See [*19] Ball, 902 F.2d at 197. Accordingly, Harry Schimmel's Rule 12(b)(2) motion is granted, and all claims against defendant Harry C. Schimmel are dismissed. n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n2 The parties' various letters to this Court while the current motions were sub judice have no impact on this Court's determination. (Letters to the Court from Gerald Padian, Esq., dated August 19, September 18, and October 21, 2003; Letters to the Court from Marshall R. King, Esq., dated August 20, September 16, September 18, and October 27, 2003.) Plaintiffs' allegations that defendants were somehow trying to game this Court by asserting attorney-client privilege for Harry Schimmel based on a common interest while simultaneously arguing absence of personal jurisdiction are attractive, but ultimately fail to withstand scrutiny. Defendants' arguments concerning the "common interest" privilege for Harry Schimmel were based on transactions wholly separate from the Ross transactions that are the subject of this motion. See Ross v. UKI Ltd., 2004 U.S. Dist. LEXIS 483, No. 02 Civ. 9297



(WHP)(JCF), 2004 WL 67221, *3-8 (S.D.N.Y. Jan. 15, 2004).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*20]

IV. Defendants Marc Schimmel and Tonex

In contrast to their allegations concerning Harry Schimmel, plaintiffs have made out a sufficient prima facie case for this Court's exercise of personal jurisdiction over both Marc Schimmel and Tonex under an agency theory. Plaintiffs have alleged that Marc Schimmel knew of and consented to actions by Jacob Schimmel, UKI, and Ross in New York, and that he exercised at least "some control" over those actions. See Grove Press, 649 F.2d at 122. For example, Marc Schimmel played an active role in the negotiation of the Joint Venture Agreement in both his personal and corporate capacities (Ross Decl. P 10-11), while directly and personally benefitting from Project Alliance (Ross Decl. PP 44-45, Exs. 11, 30-32). See CutCo Indus., 806 F.2d at 366 [HN13]("Where there is joint control of a business enterprise - similar to that existing in a partnership or joint venture - enough control has been shown to establish prima facie this particular element of agency to satisfy long-arm jurisdiction.").

In addition, Marc Schimmel was intimately involved in the negotiation of the failed Great Portland takeover, which [*21] led directly to the GMAC Oral Agreement and Project Aston Martin. (Ross Decl. PP 39-41, Ex. 29.) See, e.g., Kreutter, 71 N.Y.2d at 467 (must be a "substantial relationship between the transaction and the claim asserted"). Therefore, at this stage of the proceedings, Marc Schimmel may be presumed to have consented to, and exercised some control over, the execution of the Westbrook Oral Agreement and GMAC Oral Agreement in New York, thus subjecting him to jurisdiction under CPLR 302(a)(1). See A.I. Trade Fin., 989 F.2d at 79-80 [HN14](court must construe all pleadings and affidavits "in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party.") (emphasis added); see also CutCo Indus., 806 F.2d at 366 [HN15]("Under traditional agency law, joint participation in a partnership or joint venture establishes 'control' sufficient to make each partner or joint venturer an agent of the others.").

Further, exercising personal jurisdiction over Marc Schimmel comports with the requirements of the due process clause. Through his actions and the actions

[*22] of his agents, Marc Schimmel purposefully availed himself of the privilege of doing business with plaintiffs in New York, and could reasonably anticipate having to defend his actions in a New York court. World-Wide Volkswagen, 444 U.S. at 297. As a result, Marc Schimmel has sufficient "minimum contacts" with New York such that the exercise of this Court's jurisdiction over him "does not offend traditional notions of fair play and substantial justice." Calder, 465 U.S. at 788. Further, after considering the factors established by the Supreme Court in Metro. Life Ins., 84 F.3d at 568, this Court's exercise of jurisdiction over Marc Schimmel is reasonable under the circumstances of this case. Accordingly, Marc Schimmel's motion to dismiss for lack of personal jurisdiction is denied.

As with Marc Schimmel, plaintiffs have made a sufficient prima facie showing that Jacob Schimmel, UKI, and Ross acted as agents of Tonex with respect to at least some of the transactions at issue. Tonex was the eventual Schimmel-controlled counter-party in the British Land Agreement (Ross Decl. P 31, Ex. 13) and Project Aston Martin (Ross Decl. P 54-55, Exs. [*23] 39-40), and was a direct beneficiary of Project Alliance (Ross Decl. PP 44-45, Exs. 11, 30-32). Further, plaintiffs have credibly alleged control over Tonex by members of the Schimmel family including Marc and Jacob Schimmel (Ross Decl. PP 27-28, Exs. 42-44), and UKI's role as Tonex's managing agent with respect to the above-mentioned transactions (Ross Decl. P 54, Exs. 42-44). See A.I. Trade Fin., 989 F.2d at 79-80. Accordingly, plaintiffs have sufficiently demonstrated that Tonex knew of and consented to actions by Jacob Schimmel, UKI, and Ross in New York, and that it exercised at least "some control" over those actions, and thus personal jurisdiction under CPLR 302(a)(1) is appropriate. See Grove Press, 649 F.2d at 122.

In addition, this Court finds that, like Marc Schimmel, Tonex had sufficient minimum contacts with New York, and that the exercise of personal jurisdiction over Tonex comports with the "traditional notions of fair play and substantial justice" embodied in the due process clause of the Fourteenth Amendment. Int'l Shoe, 326 U.S. at 316. Therefore, Tonex's motion to dismiss based on lack of personal jurisdiction [*24] is denied.

CONCLUSION

For the foregoing reasons: (1) defendant Harry C. Schimmel's Rule 12(b)(2) motion to dismiss based on lack of personal jurisdiction is granted, and plaintiffs' claims against him are dismissed; (2) defendant Abraham Moses ("Marc") Schimmel's Rule 12(b)(2) motion is denied; and (3) defendant Tonex Holdings Ltd.'s Rule 12(b)(2) motion is denied.

Dated: March 1, 2004

New York, New York

SO ORDERED:

/s/ William H. Pauley III

U.S.D.J.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                             :
Gregory V. Serio, Superintendent of Insurance               :
of the State of New York, as Rehabilitator of               :       04 CV 3361 (RMB)
FRONTIER INSURANCE COMPANY, and as                          :
Assignee of PLATINUM INDEMNITY, LTD.,                       :
                                                             :
                                        Plaintiff,          :       **DECLARATION OF**
                                                             :       **LAURIE J. WEISS**
                     -against-                               :
                                                             :
DWIGHT HALVORSON INSURANCE                                   :
SERVICES, INC d/b/a/ F.S.I.M. INSURANCE                      :
SERVICES and FOOD SERVICE INSURANCE                         :
MANAGERS, INC.,                                              :
                                                             :
                                        Defendants.         :
                                                             :
-------------------------------------------------------------x

        LAURIE J. WEISS, pursuant to 28 U.S.C. § 1746, being of full age, hereby

declares as follows:

        1.    I am an employee of Frontier Insurance Company in Rehabilitation

("FIC"), the plaintiff in the above-captioned action. I respectfully submit this Declaration in

opposition to the defendants' motion to dismiss FIC's Complaint.

        2.    As a Program Manager at FIC, I am fully familiar with the insurance

program giving rise to FIC's claims. As a result, I have personal knowledge of the facts set forth

herein, based either on my involvement with the program at issue or my review of FIC's files

with respect to that program.

        3.    This litigation arises out of a workers' compensation insurance program

referred to as the Food Service Insurance Managers, Inc. ("FSIM") program, or the FSIM

Program for short.

4.    FSIM, a defendant in this matter, was formed in or about 1997. Dwight J. Halvorson, the president of defendant Dwight Halvorson Insurance Services, Inc., established FSIM as part of a comprehensive workers' compensation program for the agribusiness and food-related industries.

5.    During the time period relevant to this litigation, neither FSIM nor DHIS was an insurance company. As a result, they needed to affiliate with an established insurance carrier in order to secure coverage for participants in Halvorson's program.

6.    It is in this context that the defendants first approached FIC in late 1997. At that time, representatives of the defendants reached out to senior FIC managers in New York to determine if FIC was interested in serving as the "fronting" carrier for the FSIM program.

7.    In pitching the FSIM Program, on or about November 24, 1997, FSIM forwarded to FIC in New York certain materials outlining the nature of the program. These materials included a binder entitled "Program Explanation & Proposal of Underwriting Authority Parameters." I have attached hereto as Exhibit A true and correct copies of these materials.

8.    Based on these promotional materials, FIC decided to pursue negotiations with the defendants. These negotiations involved substantial communications by telephone and otherwise between the defendants' representatives in California and FIC managers in New York.

9.    During the course of these negotiations, FIC required the defendants to submit additional information in order to better evaluate the proposed program. For example, on or about December 3, 1997, DHIS forwarded to FIC in New York a completed Agency Appointment Questionnaire, information regarding its errors and omissions insurance policy, licenses, resumes of key personnel and a financial statement. I have attached hereto as Exhibit B a true and correct copy of DHIS's letter enclosing these materials.

10.     Ultimately, on or about January 14, 1998, FIC and DHIS entered into a Limited Agency Agreement ("Agency Agreement") with respect to the FSIM Program. The Agency Agreement was deemed effective January 1, 1998. I have attached hereto as Exhibit C a true and correct copy of the Agency Agreement.

11.     The Agency Agreement was drafted by FIC and its counsel in New York. Negotiations regarding specific terms of the contract took place primarily by telephone between FIC representatives based in New York and the defendants' representatives in California. FIC executed the agreement in New York. It is my understanding that DHIS executed the agreement in California and then forwarded the executed document to FIC in New York.

12.     Pursuant to the Agency Agreement, FIC appointed DHIS as its agent authorized to quote, bind and decline coverage in connection with the FSIM Program. Although DHIS was granted considerable latitude with respect to these responsibilities, pursuant to the Agency Agreement, it was to remain FIC's agent and operate under the overall supervision of FIC managers based in New York.

13.     FIC terminated its relationship with the defendants effective January 1, 2000.

14.     During the two-year period the FSIM Program was in existence, the defendants continued to have substantial and continuous contacts with FIC representatives in New York regarding the FSIM Program's day-to-day operations and other issues relating to the program.

15.     Among other things, throughout the course of this business relationship, Halvorson and a number of other representatives of the defendants traveled to New York to meet with FIC representatives at our offices in Sullivan County with respect to the FSIM Program. I

3

have attached hereto as Exhibit D true and correct copies of agendas and related documents concerning the face-to-face meetings these representatives of the defendants had with FIC representatives in New York.

16.    In addition, during this two-year period, representatives of the defendants placed countless telephone calls to FIC managers in New York with respect to the FSIM Program.

17.    There also was a voluminous flow of correspondence from the defendants to FIC representatives in New York regarding the FSIM Program. I have attached hereto as Exhibits E and F true and correct copies of some of this correspondence forwarded to FIC during 1998 and 1999, respectively.

18.    Throughout the course of the parties' two-year business relationship, and pursuant to their obligations under the Agency Agreement, the defendants also routinely forwarded to FIC in New York payments in the form of checks to be deposited into FIC's New York bank account. I have attached hereto as Exhibit G true and correct copies of some of these checks forwarded to FIC in connection with the FSIM Program.

19.    On occasion, the defendants also wired funds to FIC's account in New York in connection with the FSIM Program. I have attached hereto as Exhibit H true and correct copies of certain FSIM bank records relating to these wire transfers.

20.    Pursuant to their obligations under the Agency Agreement, the defendants also forwarded monthly Account Current reports to FIC managers in New York. These reports were of critical importance to the FSIM Program and are at the heart of FIC's claims in this case.

4

I declare under penalty of perjury that the foregoing is true and correct.  Executed

on September 24, 2004.

_Laurie J. Weiss_

LAURIE J. WEISS

# F.S.I.M.
# FOOD SERVICES INSURANCE MANAGERS, INC.
### 3300 Douglas Blvd., Suite #295
### Roseville, CA 95661
### (916) 769-0493



RECEIVED
NOV 25 1997

November 24, 1997

Mr. Kevin Jefferies
**FRONTIER INSURANCE**
195 Lake Louise Marie Road
Rock Hill, New York 12775-8000

Dear Mr. Jefferies,

Thank you for your interest in doing business with **F.S.I.M.** As promised during your conversation with Dwight Halvorson, this morning, I have attached a ***"Program Explanation & Proposal of Underwriting Authority Parameters"*** binder for your review and reference.

Please note that this is the same binder that we gave to Cal Comp in our quest for underwriting authority (which should be granted shortly), and to other prospective "fronts". Should you have any questions regarding the information within the binder, or desire further information, please do not hesitate to call me at 916-773-0206.

I have also attached to this cover a spreadsheet (*"F.S.I.M. "Controlled" Business, Historical Experience)* and a copy of our third party claims servicing agreement.

Once again, thank you for your interest in working with us.

Sincerely,



George Hagosian
Vice President Marketing/Underwriting

cc : Dwight Halvorson

LOOK FOR
HALVERSON INS. ASSOC.
SUBMISSION → AN OVERNIGHT
TO KEVIN
GIVE TO JANET

FIC/FSIM 000001

# F.S.I.M.

## FOOD SERVICE INSURANCE MANAGERS, INC.

## PROGRAM EXPLANATION

## &

## PROPOSAL
## OF
## UNDERWRITING AUTHORITY
## PARAMETERS

FIC/FSIM 000002

# PROPOSAL OF PROGRAM PARAMETERS

## TABLE OF CONTENTS

### SECTION                              CONTENT

**Section 1.  Introduction**

        **Dwight Halvorson Insurance Services**
        **Food Service Insurance Managers, Inc.**
        **FSIM Needs**

**Section 2.  Risk Quality Analysis**

**Section 3.  Underwriting of the Program**

        **Coverage**
        **Premium Requirements**
        **Submission/Underwriting File Content/Quality**
        **Risk Desirability**
        **Underwriting Criteria**
        **Underwriting Authority**
        **Audit(s) of Underwriting Authority**

**Section 4.  Loss Control**

**Section 5.  Program Target Classifications**

**Section 6.  FSIM Book of Business Report**

**Section 7.  New Business Opportunities Jan. 1998**

**Section 8.  FSIM Resumes**

FIC/FSIM 000003

# What F.S.I.M. Needs

1). Captive with FSIM as sole cell

2). Ability to establish separate cells for individual or group of accounts, where their experience would not be combined with original captive group of accounts.

3). Some Level of Underwriting, Pricing, and Binding Authority (see Section 3. for suggested parameters)

4). Loss Control and Claim Management Services Unbundled.

5). Premium Audit to be provided by Carrier    —   NO

6). FSIM would be willing to issue policies.    Yes

7). Management Fees equal or near to those on MGA/Agency Own Captive sheet (attached)

8). Program structured without need for LOC    —   N o

9). Competitive Rates, Net of Commission    Yes

10). Agency Bill, Remitted Net of Management Fees

11). Program will involve unrelated risks, heterogeneous in nature, written throughout the year.

12). All risks to maintain their normal anniversary date.

# MGA/AGENCY OWN CAPTIVE

**REINSURANCE PARAMETERS :**
      a. specific excess             $250K per claim for loss & alae
      b. aggregate stop             68% of standard prem. (gross)   *is this acceptable*

**EXPENSES :**

| | |
|---|---|
| a. fronting fee | 5.0% |
| b. premium tax allowance | 3.3% |
| c. federal excise tax | 0.0% |
| d. specific excess reinsurance | 4.0% |
| e. aggregate stop loss reinsurance | 4.0% |
| f. loss control fees to FSIM | 1.0% |
| g. claims management fees to FSIM | 6.0% |
| h. program management fees to FSIM | 12.0% |

*(handwritten annotations: "?", "−1.0%", "80%", "18% m@4", "will have to negotiate", "25,000 + 1% of invested assets !")*

<u>\*Any "gap" to be secured by pledge of interest income, rather than LOC</u>

**\*\*All factors are NEGOTIABLE**

**\*\*\*Additional 2% CAPTIVE MANAGEMENT FEE BEING CHARGED**

i

# RISK QUALITY ANALYSIS (RQA)

On every risk underwritten by FSIM, the RISK QUALITY ANALYSIS procedure will be conducted. It is a weighted grading of ten (10) subjective and objective risk elements, providing measurement standards by which risk quality can be determined.

The RQA process works to identify the degree to which an operation is committed to reducing and controlling its loss exposures. It distinguishes those risks that have a higher potential for profit. The RQA provides documentation to support underwriting decisions regarding scheduled credits and declinations. The RQA will also provide an insight into an accounts most pronounced service needs.

FSIM's focus is on accounts where the overall RISK QUALITY ANALYSIS or RQA Grade is *"EXCEPTIONAL"* or *"PREFERRED"*. But, FSIM will also pursue accounts where the overall RQA Grade is *"AVERAGE"*, when and where we can work with the customer to improve the grading.

FSIM's goal for an *"AVERAGE"* account is to improve profit potential by immediately integrating injury prevention and cost containment programs into its operations. Such action is likely to improve overall account quality analysis to *"PREFERRED"* or *"EXCEPTIONAL"*.

While individual characteristics of an account may be *"DEFICIENT"* or *"UNFAVORABLE"* in RQA Grading, FSIM will identify specific factors that have the greatest impact on profitability. During the pre-quote stage FSIM Underwriting and Loss Control will determine if these identified factors can be improved through effective delivery of services.

Ultimately the RQA process will provide a comprehensive, and effective tool for underwriting in the acceptance and pricing process.

Copies of the FSIM RISK QUALITY ANALYSIS FORM , and THE RISK QUALITY ANALYSIS GRADING FORM, are provided following this page.

Insured :

# F.S.I.M. RISK QUALITY ANALYSIS

| Risk Elements | Weight | Grade/Points | | | | | Total Points Weight x Grade Point |
|---|---|---|---|---|---|---|---|
| | | E | P | A | D | U | |
| **1. MANAGEMENT** | | | | | | | |
| Safety Program | 5 | 5 | 4 | 3 | 2 | 1 | |
| Accountability/Involvement | 10 | 5 | 4 | 3 | 2 | 1 | |
| **2. MANAGEMENT EXPERIENCE** | | | | | | | |
| Years in Business | 1 | 5 | 4 | 3 | 2 | 1 | |
| Loss Handling/Prevention | 4 | 5 | 4 | 3 | 2 | 1 | |
| **3. EMPLOYMENT PRACTICES** | 5 | 5 | 4 | 3 | 2 | 1 | |
| **4. TRAINING PRACTICES** | 5 | 5 | 4 | 3 | 2 | 1 | |
| **5. TURNOVER RATIO** | 10 | 5 | 4 | 3 | 2 | 1 | |
| **6. WAGE LEVEL** | 10 | 5 | 4 | 3 | 2 | 1 | |
| **7. BENEFITS** | 10 | 5 | 4 | 3 | 2 | 1 | |
| **8. FIT IN CLASS** | 10 | 5 | 4 | 3 | 2 | 1 | |
| **9. EXPOSURE** | | | | | | | |
| Workplace Conditions | 5 | 5 | 4 | 3 | 2 | 1 | |
| Equipment | 5 | 5 | 4 | 3 | 2 | 1 | |
| Material Handling | 5 | 5 | 4 | 3 | 2 | 1 | |
| Repetitive Motion | 5 | 5 | 4 | 3 | 2 | 1 | |
| Industrial Hygiene | 5 | 5 | 4 | 3 | 2 | 1 | |
| **10. CLAIM MANAGEMENT** | | | | | | | |
| Claim Reporting | 2 | 5 | 4 | 3 | 2 | 1 | |
| Perferred Med. Provider | 1 | 5 | 4 | 3 | 2 | 1 | |
| Modified Duty/RTW | 2 | 5 | 4 | 3 | 2 | 1 | |
| **TOTALS** | 100 | | | | | | |

## RISK QUALITY GRADING SCALE          Risk Quality Grade = _____

Exceptional (E)    = 456 to 500
Preferred (P)      = 356 to 455
Average (A)        = 256 to 355
Deficient (D)      = 156 to 255
Unfavorable (U)   = 100 to 155

Comments :

FIC/FSIM 000007

# F.S.I.M. RISK QUALITY ANALYSIS

Insured : _____

Date Prepared : _____

Prepared by : _____

## Risk Quality Grading

Exceptional  (E)
Preferred  (P)
Average  (A)
Deficient  (D)
Unfavorable  (U)

FIC/FSIM 000008

## *F.S.I.M. RISK QUALITY ANALYSIS*

| RISK ELEMENTS | GRADE | GRADE DEFINITION |
|---|---|---|

*I. MANAGEMENT*

| | | |
|---|---|---|
| Safety Program | E | Strong, established Safety Program. Management anticipates hazards & builds controls into plans. Commitment to quality, employee involvement in safety matters, positive attitudes exhibited at operation. |
| | P | Established Safety Program. Formal Safety Program has active management support. |
| | A | Informal Safety Program. Aware of major exposures. Rely upon and respond to loss control for solutions and/or recommendations to improve safety program. |
| | D | Existing Safety Program not effective/not understood. Some exposures not addressed by controls and/or management. |
| | U | Lack of awareness toward basic safety controls. Employees not aware or not required to operate under safe conditions |

COMMENTS :

_____
_____
_____
_____
_____

......................................................

| | | |
|---|---|---|
| Accountability/Involvement | E | Senior management and all other levels of management are held accountable for safety results. Safety results monitored or highly publicized throughout the operation. |
| | P | Managers and supervisors held responsible for safety results. |
| | A | Supervisors may be responsible for safety but not held accountable for results. |
| | D | Managers/Supervisors performance is tied to production with little or any safety results included. |
| | U | No accountability or safety policy in place. |

COMMENTS :

_____
_____
_____
_____

## 2. MANAGEMENT EXPERIENCE

| Years in Business | | |
|---|---|---|
| | E | More than 10 years |
| | P | 6 to 10 years |
| | A | 3 to 6 years |
| | D | 1 to 3 years |
| | U | Less than 1 year |

COMMENTS :

| Loss Handling/Prevention | | |
|---|---|---|
| | E | Loss trends indicate that Senior Management has enforced and exercised influential control over loss prevention. Safety Program is effective. Safety Incentive Program exists. |
| | P | Loss trends indicate active risk management. All current incident loss occurrences are reviewed. Management very active in loss review. |
| | A | Loss trends indicate that corrective actions not entirely effective. Losses addressed. Reactive to loss. |
| | D | Loss trends indicate ineffective or sporadic ability to influence loss activity. Casual awareness of past loss experience, low interest in controlling future activity. |
| | U | Loss trends indicate frequency or severity that could have been prevented. Little if any interest in affecting future activity. Poor knowledge of past loss activity. |

COMMENTS :

FIC/FSIM 000010

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| *3. EMPLOYMENT PRACTICES* | E | Candidate screening includes verification of application information and demonstration of most critical skills. |
| | P | Reference checks to verify employment, history & experience. Knowledge, skills and experience judged. Union hiring permits choice of individual based on skill or prior knowledge. |
| | A | Minimum job skill requirements identified and used for hire. Union hiring requirements preclude selection by skill level. |
| | D | Candidate screening through application and general interview. No background, experience or reference checks. |
| | U | No formal screening process. "Walk-ins". |

COMMENTS :

_____
_____
_____
_____
_____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| *4. TRAINING PRACTICES* | E | Covers ALL pertinent operational & safety topics. Regular, periodic training provided. All training documented. |
| | P | New Employees & Employees moving to new position receive General Policy training. Continued training based upon Manager/Supervisor's identified skill deficiency and/or claim. Training documented. |
| | A | Formal, documented new hire orientation, position specific training provided. Training provided to maintain skills and address new and/or changing exposures. Ongoing training not conducted on regular basis, may not be documented, and/or employee attendance may be optional. |
| | D | Some new hire orientation. No formal training or guidance to ensure correct performance of job tasks. |
| | U | Little or no orientation for new hire. No Formal training or guidance to ensure correct performance of job tasks. |

COMMENTS :

_____
_____
_____
_____

FIC/FSIM 000011

.........................................................

| 5. TURNOVER RATIO | E | 25% less than typical, for annual employees. Seasonal employees return with no more that 20% change. |
|---|---|---|
| | P | 10 to 25% less than typical for industry and region, for annual employees. Seasonal employees return with no more than 35% change. |
| | A | Typical for industry and region |
| | D | 10 to 25% higher than typical for industry for annual employees. Few Seasonal employees return. |
| | U | 25% higher than typical for industry for annual employees. Few Seasonal employees return. |

COMMENTS :

_____
_____
_____
_____
_____

.........................................................

| 6. WAGE LEVEL | E | 30% or more above average class wage |
|---|---|---|
| | P | 15 to 30% above average class wage |
| | A | Average Class wage |
| | D | 15 to 30% below average class wage |
| | U | .30% or more below average class wage |

COMMENTS :

_____
_____
_____
_____
_____

.........................................................

| 7. BENEFITS | E | Medical benefits, sick leave, short term/long term disability programs, vacation, available for all employees at time of hire or following probation period not to exceed 90 days. |
|---|---|---|
| | P | Medical benefits, sick leave, disability programs available to all employees following hire by time on the job not to exceed 6mos. |

| (Benefits, Con't) | A | Medical benefits, sick leave, disability programs availability limited based on defined eligibility requirements (i.e. time on the job exceeding 6 mos., or job position) |
| | D | Benefit Package Available following time on the job requirement which exceeds 6mos, or for only Annual employees (seasonal employees excluded). |
| | U | No benefit package available. |

COMMENTS :

_____

_____

_____

_____

_____

_____

..........................................................

| *8. FIT IN CLASS* | E | Does not have hazardous exposures that are contemplated in class. |
| | P | Has fewer operations than defined in class |
| | A | Has most operations defined in class |
| | D | Has all exposures defined in class |
| | U | Has all exposures contemplated in class as well as additional hazardous exposures NOT contemplated in class. Or may have a heavier weight of hazardous exposure than contemplated in class. |

COMMENTS :

_____

_____

_____

_____

_____

_____

..........................................................

| *9. EXPOSURE* | | |
| Workplace Conditions | E | Excellent housekeeping. No fall exposure |
| | P | Continual clean-up, designated storage areas; well arranged process flow. |
| | A | Limited debris, scheduled clean-up, aisles clear. All walking surfaces well maintained. Fall exposures controlled. |

FIC/FSIM 000013

| (Workplace, Con't) | D | No regular clean-up, no designated storage areas; slippery or uneven surfaces. |
| | U | No attention paid to housekeeping or layout; uncontrolled fall exposure |

COMMENTS :

_____
_____
_____
_____
_____
_____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| Equipment | E | State of the Art, with redundant guarding. All lockout procedures followed. Scheduled maintenance procedures followed and documented. |
| | P | Some State of the Art equipment with redundant guarding. Scheduled maintenance procedures followed and documented. |
| | A | Points of operation and drive mechanisms guarded on high hazard equipment. Scheduled maintenance procedures followed and documented. |
| | D | Points of operation and drive mechanisms partially guarded on high hazard equipment Partial lockout procedures followed. Unscheduled maintenance only. |
| | U | Unprotected points of operation or drive mechanisms on high hazard equipment. No lockout procedures. No preventative inspection or maintenance program. |

COMMENTS :

_____
_____
_____
_____
_____
_____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| Material Handling | E | None, or minimal material handling activities requiring no lifting over 15 lbs. |
| | P | Heavy degree of automation for material handling, appropriate equipment available and used. |
| | A | Some material handling automated. Appropriate equipment available and use usually enforced. |

FIC/FSIM 000014

(Material Handling, Con't)

| | | |
|---|---|---|
| | D | Moderate exposures. Aids not readily available or used. |
| | U | Tasks require excessive lifting. NO lifting aids. |

COMMENTS :

_____
_____
_____
_____
_____
_____

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

| Repetitive Motion | E | No repetitive motion activities. |
|---|---|---|
| | P | Intermittent performance of well designed task. |
| | A | Intermittent performance of poorly designed tasks or continual performance of well designed tasks. |
| | D | Continual performance of poorly designed tasks, small portion of workforce exposed. |
| | U | Continual performance of poorly designed tasks, large portion of workforce exposed. |

COMMENTS :

_____
_____
_____
_____
_____

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

| Industrial Hygiene | E | Very minor exposure to hazardous substances, noise, temperature extremes, etc... |
|---|---|---|
| | P | Occasional exposure to limited number of employees. Excellent controls. |
| | A | Exposure to hazardous substances, noise, temperature extremes. Basic controls in place. |
| | D | Uncontrolled exposure to hazardous substances, noise, temperature extremes, etc... Less than 25% of workforce exposed. |
| | U | Uncontrolled exposure to hazardous substances, noise, |

(I.H., Con't)                              temperature extremes, etc... More than 25% of the workforce
                                          exposed.

    COMMENTS :

_____
_____
_____
_____
_____

---

## 10. CLAIM MANAGEMENT

| | | |
|---|---|---|
| Claim Reporting | E | Notice of claim faxed in, 800 # used. Single employee or department handles on priority basis. 0 to 3 day reporting. |
| (Claim Reporting, Con't) | P | Single employee or department handles on priority basis. Reported within 7 days. |
| | A | Single department assigned responsibility. Procedures in place. Reported within 13 days. |
| | D | Department or individuals' other responsibilities take priority over claim reporting. Reported within 20 days. |
| | U | No set procedures. Claim reporting done on a batch basis. Reported over 20 days. |

    COMMENTS :

_____
_____
_____
_____
_____

---

| | | |
|---|---|---|
| Preferred Medical Provider | E | Provider evaluated prior to selection. Excellent relationship. Full utilization of services, performance monitored. |
| | P | Various components partially in place, evidence of effective relationship. |
| | A | Partial use of preferred provider. No tracking or follow-up. |
| | D | Posted but no direction or control. |
| | U | No direction, Not Posted. |

FIC/FSIM 000016

(Preferred Med. Provider, Con't)
   COMMENTS:

_____
_____
_____
_____
_____

• • • • • • • • • • • • • • • • • • • • • • • • • • •

| Modified Duty/Return to Work | E | Formal & effective written program. Job analyses completed in advance for most positions. |
|---|---|---|
| | P | Job analyses completed in advance for some specific sectors of employee population. Effective program in place. |
| | A | Modified duty when convenient. Job analyses completed when requested. |
| | D | Refusal to create modified duty tasks. |
| | U | No belief in concept or desire to pursue. |

COMMENTS :

_____
_____
_____
_____
_____

• • • • • • • • • • • • • • • • • • • • • • • • • • •

OVERVIEW/ ADDITIONAL COMMENTS :

Insured : _____

# F.S.I.M. RISK EXPERIENCE ANALYSIS

| Valuation Date | Carrier Name | Policy Year | # of Clms. | # Open | $Total Incurred | $Total Paid |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| Totals | | | | | | |
| Averages | | | | | | |
| | | | | | | |

## Large Losses (over $25,000)

| Date of Loss | $ Loss | Description of Loss |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

## Underwriting Loss Analysis Narrative :

Loss Type Expected in class? Shock Loss? Preventable/Controllable? Corrective Action. Service Impact.

FIC/FSIM 000018

# COVERAGE

* Standard Workers' Compensation Form. Annual Policy.

* All policies will be quoted/issued on guaranteed cost (non-par) basis.

* USL&H or FELA on Incidental basis only.

* Employer Liability Limits $1,000,000/$1,000,000/$1,000,000

* Broad Form All States Endorsement, when and where applicable at
    no additional charge.

* All policies will be 12 month term.

# PREMIUM REQUIREMENTS

$50,000 Minimum Premium

$150,000 + Preferred premium for most classes.

$250,000 Minimum Premium for "Ag Haulers"

Majority of FSIM book will be comprised of risks with premium of $150,000+.

Risks with premium under $150,000 will be considered on an "exception", or "accommodation" basis.

FIC/FSIM 000020

# SUBMISSION/UNDERWRITING FILE CONTENT & QUALITY

All producers representing FSIM are required to furnish FSIM Underwriting with the following minimum information,

    1). Complete Accord Application

    2). Detailed description of operations

    3). Minimum of 3 years, currently valued loss runs

    4). Experience Modification Worksheet(s)

    5). Four (4) year payroll history

The FSIM underwriter is required to maintain a quote file, which will include and organize the above information. The quote file will also include the following,

    1). All RISK QUALITY ANALYSIS forms (see Section 2.)

    2). Risk Experience Analysis form.

    3). Large Claim Detailed Summary or Large Claim Status Reports

    4). Loss Control Survey Report

    5). All pricing worksheets and correspondence.

For quotes that are not accepted, the quote file will be saved, and documented as to outcome and rational.

For quotes that are accepted, Policy Files will be assembled and maintained by the FSIM underwriter. All content from the quote file will be transferred. In addition the Policy File will contain the following,

    1). The Policy
    2). Binders
    3). Endorsements
    4). Audits
    5). Correspondence (includes notes from underwriter to file)
    6). Loss Control Reports
    7). Loss Runs

# RISK DESIRABILITY

Desirability will be assessed through a weighted grading of a number of subjective and objective measurement standards, the FSIM RISK QUALITY ANALYSIS (Section 2). Our underwriting goal is to reduce uncertainty and maintain or improve results through informed, detailed and documented decisions.

Utilizing RISK QUALITY ANALYSIS, FSIM will focus on accounts with controllable exposures based upon frequency, <u>not</u> severity. Targeting those insureds who have clearly expressed a desire to <u>work with</u> an insurance carrier.

FSIM's basic underwriting constant is that ***<u>Predictable and controllable loss exposures give us the greatest profit potential and provide us with an opportunity to leverage our service expertise.</u>*** Most all exposures found in FSIM's targeted classifications are identifiable and controllable.

Many of the accounts involved in the Food Industry will have season fluctuations in employment needs. Recognizing the work force norms, in this industry, FSIM will work <u>only</u> with operations that are currently, or will immediately commit to,

     1). Utilize aggressive "up front" employee pre-screening practices

     2). Provide training of all workers and rigid enforcement of safe operational practices.

     3). Actively participate with their insurance partner in post-loss investigation and worker management tasks focused on returning injured employees to the job in a temporary or permanent modified duty basis.

# UNDERWRITING CRITERIA

1). Program Target Classifications <u>Only</u>

2). Adherence to Premium Requirements

3). Complete Submission

4). Physical Loss Control Survey on <u>all</u> accounts of $100,000 plus

5). Completed Loss Control Survey Report on all accounts of $100,000 plus

6). If loss frequency and severity minimal, loss ratios under 50% for past 3 years and loss trends are favorable, underwriter has ability to quote "subject to favorable loss control survey". "Subject to" issues must have loss control survey within 30 days following policy inception.

7). Quote only risks with PREDICTABLE and CONTROLLABLE loss exposures, based upon *frequency* not *severity.*

8). Complete RISK QUALITY ANALYSIS (see Section 2) on <u>every</u> risk. Update RQA at every renewal.

9). Quote those risks with RQA grading of *"EXCEPTIONAL", "PREFERRED",* or *"AVERAGE"* <u>only.</u>

10). <u>All</u> accounts of $150,000 plus will have Underwriter physically survey risk.

11). New Ventures acceptable if,
        a). "Split Off" from current company, or
        b). Management has had experience in same business @ another company for 10 years or more.

12). "Ag Haulers" $250,000 Minimum Premium, NO Sub-haulers, Loss Ratios under 50% for past 3 years, just to be considered for Underwriting analysis.

13). All accounts in excess of $150,000 to be reviewed and signed off by FSIM Underwriting V.P.

# UNDERWRITING AUTHORITY

**FSIM** needs to have the ability to quote and bind coverage, consistent with the established Underwriting criteria (preceding page), and within the perimeters suggested below,

## *1). BY HAZARD GROUP (copy of CA Hazard Group following this section),*

| Hazard Group | RQA GRADE | AUTHORITY LEVEL |
|---|---|---|
| A, B, C | "Exceptional", "Preferred" or "Average" | Full Underwriting Authority Pricing & Binding Authority |
| A, B, C | "Deficient" or "Unfavorable" | DECLINE |
| D & Above | "Exceptional", "Preferred" or "Average" | No U/W Authority FSIM Underwrites, forward to Fronting Carrier Underwriter for approval. No Binding Authority |
| D & Above | "Deficient" or "Unfavorable" | DECLINE |

## *2). BY PREMIUM SIZE*

| Premium Range | RQA Grade | Authority Level |
|---|---|---|
| $50,000 - 75,000 | Exceptional Preferred | Full Underwriting Authority Pricing and Binding Authority 30% Max. Sched. Credit |
| $50,000 - 75,000 | Average | Limited U/W Authority Pricing & Binding Authority 15% Max Sched. Credit Refer to Fronting Carrier U/W for additional credit. |

| Premium Range | RQA GRADE | AUTHORITY LEVEL |
|---|---|---|
| $50,000 – 75,000 | Deficient<br>Unfavorable | DECLINE |
| $75,001 – 99,999 | Exceptional<br>Preferred | Full U/W Authority<br>Pricing & Binding Authority<br>50% Max Sched. Credit |
| $75,001 – 99,999 | Average | Limited U/W Authority<br>Pricing and Binding Authority<br>40% Max Sched. Credit<br>Refer to Fronting Carrier U/W<br>for additional credits. |
| $75,001 – 99,999 | Deficient<br>Unfavorable | DECLINE |
| $100,000 – 500,000 | Exceptional<br>Preferred | Full Underwriting Authority<br>Pricing & Binding Authority<br>65% Max Sched. Credit |
| $100,000 – 500,000 | Average | Limited U/W Authority<br>Pricing & Binding Authority<br>55% Max Sched. Credit<br>Refer to Fronting Carrier U/W<br>for additional credits |
| $100,000 – 500,000 | Deficient<br>Preferred | DECLINE |
| Over $500,000 | Exceptional<br>Preferred | Limited U/W Authority<br>No Binding Authority<br>FSIM Underwrite & Price<br>55% Max Credit<br>Submit to Fronting Carrier U/W<br>for approval. |

FIC/FSIM 000025

| Premium Range | ROA GRADE | AUTHORITY LEVEL |
|---|---|---|
| Over $500,000 | Average | Limited U/W Authority<br>No Binding Authority<br>FSIM Underwrite & Price<br>45% Max Credit<br>Submit to Fronting carrier U/W<br>for additional credits and/or<br>approval. |
| Over $500,000 | Deficient<br>Unfavorable | DECLINE |

Consistent with, and confined to authority levels, notice of all bound accounts will be sent to fronting carrier underwriter. Policy Issuance Notification Form will be developed to help this process.

Notification of all non-renewal action will be sent to fronting carrier underwriter.

There is no authority assumed in regards to Transportation exposure. Land Travel Questionnaire and/or Aircraft Questionnaire will be provided to fronting carrier underwriter for reinsurance quote.

CALIFORNIA RETROSPECTIVE RATING PLAN
TABLE OF CLASSIFICATIONS BY CALIFORNIA HAZARD GROUP
Effective January 1, 1997

APPENDIX B
Table 1
Page 1 of 2

| Code No. | Hazard Group | Code No. | Hazard Group | Code No. | Hazard Group | Code No. | Hazard Group | Code No. | Hazard Group | Code No. | Hazard Group |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0005 | C | 2106 | D | 2852 | C | 3501 | B | 4150 | B | 4670 | C |
| 0016 | C | 2107 | B | 2881 | C | 3507 | B | 4239 | B | 4683 | G |
| 0034 | C | 2108 | E | 2883 | C | 3560 | B | 4240 | C | 4691 | B |
| 0035 | E | 2109 | C | 2915 | F | 3566 | B | 4243 | C | 4692 | B |
| 0036 | C | 2111 | C | 2923 | B | 3567 | B | 4244 | E | 4717 | C |
| 0038 | D | 2113 | D | 2960 | D | 3568 | B | 4250 | D | 4720 | C |
| 0040 | B | 2116 | H | 3004 | B | 3569 | B | 4251 | C | 4740 | D |
| 0041 | C | 2117 | G | 3018 | C | 3570 | B | 4279 | C | 4743 | D |
| 0042 | C | 2121 | B | 3022 | E | 3572 | B | 4283 | C | 4757 | B |
| 0044 | B | 2142 | B | 3028 | B | 3573 | B | 4286 | C | 4771 | F |
| 0045 | C | 2150 | C | 3030 | D | 3574 | A | 4295 | C | 4823 | B |
| 0050 | C | 2163 | C | 3039 | D | 3577 | B | 4297 | B | 4829 | C |
| 0079 | I | 2211 | F | 3040 | D | 3578 | B | 4299 | B | 4831 | C |
| 0103 | C | 2222 | C | 3060 | B | 3579 | B | 4304 | C | 4922 | B |
| 0104 | D | 2362 | G | 3066 | B | 3612 | B | 4312 | E | 4983 | A |
| 0106 | F | 2402 | D | 3070 | A | 3620 | C | 4350 | C | 5020 | C |
| 0171 | C | 2413 | G | 3076 | C | 3632 | B | 4351 | A | 5022 | F |
| 0172 | H | 2501 | C | 3081 | F | 3634 | B | 4354 | A | 5027 | F |
| 0251 | F | 2503 | C | 3082 | C | 3643 | B | 4360 | B | 5028 | F |
| 0400 | C | 2532 | C | 3085 | G | 3647 | G | 4361 | B | 5040 | E |
| 0401 | C | 2570 | C | 3099 | A | 3651 | B | 4362 | E | 5057 | D |
| 1122 | E | 2571 | C | 3110 | D | 3681 | B | 4410 | C | 5059 | E |
| 1123 | E | 2576 | C | 3111 | C | 3719 | H | 4414 | D | 5102 | D |
| 1124 | E | 2578 | B | 3131 | A | 3724 | C | 4420 | C | 5107 | D |
| 1320 | C | 2584 | D | 3146 | C | 3726 | B | 4431 | B | 5108 | D |
| 1322 | I | 2585 | D | 3152 | A | 3805 | B | 4432 | B | 5123 | A |
| 1350 | E | 2586 | G | 3165 | C | 3807 | D | 4470 | D | 5140 | C |
| 1438 | C | 2589 | D | 3169 | D | 3808 | A | 4478 | C | 5146 | C |
| 1452 | D | 2623 | C | 3175 | B | 3815 | B | 4492 | B | 5160 | B |
| 1463 | C | 2660 | H | 3178 | E | 3821 | E | 4494 | C | 5183 | C |
| 1624 | B | 2683 | G | 3179 | B | 3823 | B | 4495 | C | 5184 | F |
| 1699 | F | 2688 | D | 3180 | C | 3830 | E | 4496 | C | 5185 | C |
| 1701 | E | 2702 | H | 3220 | B | 3831 | B | 4497 | C | 5186 | C |
| 1710 | C | 2710 | C | 3224 | B | 3840 | B | 4498 | C | 5187 | C |
| 1741 | D | 2727 | H | 3241 | C | 4000 | E | 4499 | C | 5188 | C |
| 1803 | E | 2731 | C | 3255 | B | 4034 | C | 4511 | B | 5190 | B |
| 1925 | D | 2757 | D | 3257 | C | 4036 | C | 4512 | B | 5191 | B |
| 2002 | C | 2759 | D | 3300 | B | 4038 | C | 4557 | B | 5192 | B |
| 2003 | D | 2790 | B | 3339 | G | 4041 | F | 4558 | B | 5195 | B |
| 2014 | D | 2797 | B | 3365 | B | 4049 | E | 4567 | H | 5200 | D |
| 2050 | B | 2806 | C | 3372 | D | 4111 | A | 4568 | D | 5201 | D |
| 2063 | C | 2812 | C | 3373 | B | 4112 | A | 4611 | C | 5205 | C |
| 2081 | D | 2819 | D | 3383 | C | 4114 | G | 4623 | C | 5207 | C |
| 2095 | C | 2840 | C | 3400 | C | 4130 | B | 4635 | E | 5212 | C |
| 2102 | B | 2842 | E | 3401 | B | 4133 | C | 4665 | B | 5213 | F |

FIC/FSIM 000027

CALIFORNIA RETROSPECTIVE RATING PLAN
TABLE OF CLASSIFICATIONS BY CALIFORNIA HAZARD GROUP
Effective January 1, 1997

| Code No. | Hazard Group | Code No. | Hazard Group | Code No. | Hazard Group | Code No. | Hazard Group | Code No. | Hazard Group | Code No. | Hazard Group |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5214 | E | 6220 | F | 7520 | D | 8103 | D | 8743 | C | 9050 | D |
| 5222 | H | 6223 | C | 7538 | E | 8105 | B | 8745 | D | 9053 | C |
| 5225 | F | 6235 | E | 7539 | D | 8106 | B | 8748 | E | 9060 | B |
| 5348 | C | 6255 | H | 7580 | D | 8107 | A | 8755 | I | 9061 | C |
| 5403 | E | 6237 | D | 7600 | G | 8110 | D | 8800 | C | 9066 | C |
| 5432 | F | 6251 | H | 7601 | I | 8111 | C | 8801 | C | 9067 | C |
| 5436 | E | 6252 | H | 7605 | B | 8113 | D | 8803 | C | 9069 | C |
| 5443 | C | 6254 | F | 7606 | B | 8116 | D | 8804 | G | 9070 | G |
| 5445 | F | 6258 | C | 7607 | C | 8117 | B | 8806 | A | 9078 | C |
| 5446 | F | 6306 | F | 7610 | C | 8204 | C | 8807 | B | 9079 | A |
| 5447 | F | 6307 | F | 7706 | E | 8209 | G | 8808 | C | 9085 | E |
| 5462 | B | 6308 | F | 7707 | F | 8215 | E | 8810 | C | 9092 | C |
| 5467 | B | 6315 | E | 7720 | H | 8227 | C | 8813 | B | 9096 | G |
| 5470 | B | 6316 | E | 7721 | E | 8232 | C | 8817 | C | 9097 | G |
| 5473 | D | 6319 | E | 7722 | D | 8264 | B | 8818 | C | 9101 | G |
| 5474 | H | 6325 | F | 7855 | H | 8265 | H | 8820 | G | 9151 | C |
| 5479 | E | 6361 | F | 8001 | H | 8267 | E | 8822 | G | 9154 | A |
| 5480 | H | 6364 | C | 8004 | C | 8278 | B | 8823 | D | 9155 | A |
| 5482 | H | 6400 | C | 8006 | B | 8236 | C | 8827 | H | 9156 | C |
| 5484 | H | 6504 | C | 8008 | B | 8290 | E | 8829 | G | 9130 | B |
| 5485 | H | 6834 | B | 8013 | E | 8291 | D | 8850 | C | 9181 | G |
| 5506 | E | 7133 | E | 8015 | C | 8292 | E | 8831 | A | 9182 | B |
| 5507 | F | 7198 | A | 8017 | B | 8293 | F | 8834 | E | 9184 | D |
| 5538 | B | 7207 | D | 8018 | C | 8304 | C | 8853 | A | 9185 | D |
| 5542 | D | 7219 | H | 8019 | B | 8524 | D | 8859 | B | 9220 | C |
| 5551 | I | 7232 | D | 8021 | G | 8350 | E | 8840 | B | 9402 | F |
| 5552 | I | 7248 | D | 8028 | C | 8387 | B | 8846 | B | 9403 | D |
| 5553 | I | 7272 | F | 8031 | B | 8388 | B | 8847 | E | 9410 | H |
| 5606 | C | 7332 | F | 8032 | C | 8389 | B | 8850 | C | 9420 | H |
| 5650 | E | 7360 | F | 8039 | B | 8390 | B | 8851 | G | 9422 | D |
| 5631 | F | 7365 | F | 8041 | G | 8391 | B | 8852 | B | 9424 | C |
| 5632 | F | 7382 | H | 8042 | C | 8392 | E | 8859 | C | 9426 | F |
| 5633 | H | 7392 | C | 8046 | B | 8393 | C | 8868 | I | 9501 | E |
| 5645 | F | 7403 | B | 8057 | C | 8397 | B | 8875 | I | 9507 | C |
| 5650 | C | 7405 | A | 8059 | C | 8400 | C | 8901 | I | 9516 | D |
| 5697 | H | 7409 | D | 8060 | C | 8500 | E | 9007 | G | 9519 | D |
| 5703 | E | 7410 | D | 8061 | G | 8601 | B | 9008 | G | 9521 | E |
| 5951 | A | 7413 | D | 8062 | C | 8604 | D | 9009 | E | 9522 | D |
| 6003 | F | 7419 | D | 8065 | B | 8631 | F | 9010 | E | 9529 | F |
| 6011 | D | 7421 | B | 8064 | C | 8710 | C | 9011 | E | 9545 | C |
| 6204 | E | 7424 | B | 8065 | C | 8719 | D | 9015 | E | 9549 | D |
| 6206 | F | 7426 | D | 8066 | B | 8720 | E | 9016 | B | 9552 | F |
| 6213 | E | 7428 | A | 8070 | B | 8729 | E | 9031 | C | 9586 | D |
| 6216 | F | 7429 | G | 8071 | B | 8740 | E | 9033 | E | 9610 | C |
| 6217 | F | 7500 | C | 8079 | C | 8741 | E | 9043 | D | 9620 | D |
| 6218 | F | 7515 | D | 8102 | B | 8742 | C | 9043 | B | | |

— 13 —

FIC/FSIM 000028

# AUDIT(S) OF UNDERWRITING AUTHORITY

Fronting carrier will have full access to all FSIM Underwriting Quote and Policy files.

For the first twelve (12) months, quarterly audits of all existing "inforce" accounts, risks quoted, new business issued, and renewals would be conducted at FSIM office. FSIM would also be willing to send a predetermined number of files to fronting carrier's location. At audits conducted at FSIM office, Underwriting, Loss Control, and Claim Management personnel would be available, as necessary.

If all quarterly audits suggest full compliance to agreed upon terms, business quality and performance is consistent with profit expectations, FSIM would like to move Underwriting Authority Audit frequency to once every six (6) months.

On a monthly basis, FSIM will provide the fronting carrier with,

> 1). Inforce Policy Listing
> 2). Quote Log (notes Issued, Lost, Declined)
> 3). Large Loss Analysis
> 4). Significant Service Accomplishments

# LOSS CONTROL SERVICES

**FSIM** will provide all loss control services to accounts written in the captive. The department will be staffed with people who have demonstrated long term experience in the food industry and have had extensive experience in loss prevention. In addition the majority of **FSIM** loss control representatives will have bi-lingual capabilities (both verbal and written).

Loss Control representatives will work closely with Underwriting and Claims and shall be trained in **FSIM RISK QUALITY ANALYSIS** procedures. Loss control representatives will report to **FSIM'S** Vice President of Loss Control.

On all accounts of $100,000 or above, Physical Loss Control Survey will be conducted. The Loss Control representative will complete a Loss Control Survey Report (copy following this narrative) on each risk of $100,000 or more. It will be reviewed by the **FSIM** underwriter, and will be assimilated into the **RQA.**

Representatives will focus on accident trends and design action for long term solutions. Results (and service needs) will determine service intensity and time allocation by account. Following every visit, a "follow-up" letter will be sent summarizing the visit, accomplishments, hazard identification (if any), trends, strategy effectiveness, and or recommendations. Copy of this letter will be forwarded to **FSIM** underwriting and kept in the **FSIM** underwriting file.

Representatives will be responsible for developing Objectives and Service Strategies which will be incorporated (along with Claim Management Objectives and Strategies) into the **FSIM SERVICE AGREEMENT** (copy following this narrative).

The Loss Control Representative, Underwriting VP, Claim Management VP, Claim Adjuster, and producer will receive copies of the agreement and shall all monitor the **FSIM SERVICE AGREEMENT** on a monthly basis, and update it as necessary.

During the risk selection process, Loss Control will focus upon **FSIM's** risk desirability standards, those accounts with controllable exposures based upon frequency <u>not</u> severity, and targeting those insureds who have clearly expressed a desire to <u>work with</u> an insurance carrier.

Loss Control will fully support **FSIM's** basic underwriting constant that ***Predictable and controllable loss exposures give us the greatest profit potential and provide us with an opportunity to leverage our service expertise.***

On renewal accounts, a pre-renewal survey will be conducted 90 to 45 days prior to effective date. The Loss Control Representative will work closely with the **FSIM** underwriter to prepare a renewal **RQA**.

Loss Control Representative will also;
* Participate in/at Claim Reviews
* Participate in/at New & Renewal Proposal Presentations
* Conduct or Participate in Educational Seminars or Workshops for **FSIM** insureds.
* Be provided with Loss Runs on a monthly basis and be expected to review this with the Insured.
* Participate in/at Safety Committee Meetings and/or "Tailgate Safety Meetings".
* Conduct specific safety training.
* "train the trainers"; educating the Supervisors/Foremen in managing a safe work environment.

In regards to the *TARGET EMPLOYER PROGRAM* (accounts having ExMods of 125+). **FSIM** and "fronting carrier" should make a joint effort to comply with the program. **FSIM** Loss Control will create, establish, administer, and monitor a Formal Action Plan, in compliance with the State requirements. This information will be coordinated back through "fronting carrier" who, will in turn, respond to th State.

# F.S.I.M. LOSS CONTROL SURVEY REPORT

ACCOUNT:_____

CONTACT:_____DATE OF CONTACT_____

PREPARED BY:_____

## PART I. RISK OVERVIEW

### 1. Loss Trend Analysis

### 2. Safety Program

### 3. Strength(s)

### 4. Weakness(es)

FIC/FSIM 000032

# F.S.I.M. LOSS CONTROL SURVEY REPORT

### Account:_____

## PART II. RISK DETAIL

### 1. Exposure

**Workplace Conditions:** (Housekeeping, Clean-up, Slip/Fall Exposure?)

**Equipment:** (State of the Art?, Maintenance Procedures)

**Material Handling:** (Degree of Automation, Lifting #lbs, Aids?)

**Repetitive Motion:** (Tasks well designed?, Warm-ups?, Rest?, Rotation?)

**Industrial Hygiene:** (Hazardous Substances?, Noise?, Temperature Extremes?)

FIC/FSIM 000033

# F.S.I.M. LOSS CONTROL SURVEY REPORT

Account:_____

## *PART III. CONCLUSION*

### 1. Loss Control Service Plan: Condition/Suggestion(s)

# THE F.S.I.M. SERVICE AGREEMENT

## for

## (NAMED INSURED)

Workers' Compensation Insurance Policy Period April 1, 1997 to April 1, 1998

At *F.S.I.M.* we understand that workers' compensation COST REDUCTION is a "Team Effort". This Service Agreement is our Team's "Game Plan" for the policy period identified above.

It is written confirmation of *F.S.I.M.*'s Service Commitments. It will list objectives, outline service strategies, establish responsibility and provide target "due dates".

*F.S.I.M.* Service personnel will be held accountable for adherence to these commitments.

This Service Agreement is not a finished product. Periodically, it will be revised to reflect completion dates and effectiveness of service. It will adapt or react to changes in your situation. New Objectives or New Strategies/Commitments may need to be developed and included during the policy year. Any modification to this original agreement will be based upon mutual consent and consultation. A copy of all revisions will be sent to you.

### THE F.S.I.M. SERVICE PLEDGE

All *F.S.I.M.* Service and Management personnel will monitor this Service Agreement, and any subsequent revisions, on a monthly basis to ensure compliance with all service commitments.

Dwight Halvorson
President, *F.S.I.M.*

Dan Henke
Vice President Claims

George Hagosian
Vice President Marketing/Underwriting

# THE F.S.I.M. SERVICE AGREEMENT

## for

### INSURED: _____

POLICY PERIOD : _____

AGREEMENT ESTABLISHED : _____ AGREEMENT REVISED : _____

AGENT : _____

LOSS CONTROL : _____

CLAIM MANAGEMENT CONTACT : _____

## OBJECTIVE:

| STRATEGY | RESPONSIBILITY | DUE DATE | COMPLETED | EFFECTIVENESS |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |

FIC/FSIM 000036

**OBJECTIVE:**

| STRATEGY | RESPONSIBILITY | DUE DATE | COMPLETED | EFFECTIVENESS |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |

**OBJECTIVE:**

| STRATEGY | RESPONSIBILITY | DUE DATE | COMPLETED | EFFECTIVENESS |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |

FIC/FSIM 000037

F.S.I.M.   Qualifying Classes - CALIFORNIA

4/9/97

| Class Description | Class Code |
|---|---|
| Aircraft Operations, Transport. of Personnel | 7421 |
| Bakeries & Cracker Mfg | 2003 |
| Beer or Ale Dealers | 7392 |
| Bottling - Beverages - No spirituous liquors | 2163 |
| Breweries or Malt Houses - Including Bottling/Canning | 2121 |
| Bush Berry Crops | 0079(2) |
| Canneries - Fish | 2113 |
| Canneries, NOC - Including Fruit preserving | 2111 |
| Clerical Office Employees, NOC | 8810 |
| Confections & Food Sundries, Mfg. or Processing, NOC | 6504 |
| Cotton Farms | 0044 |
| Cotton Gin Operation | 0401 |
| Cotton Merchants | 0400(1) |
| Cottonseed Oil Mfg. & Refining | 4683(2) |
| Creameries & Dairy Products Mfg. | 2063 |
| Dairy Farms | 0036 |
| Distilling, NOC | 2142(2) |
| Feed Mfg. - Preparing & Compounding Feeds for Livestock & Poultry | 2014(2) |
| Feed Yards | 0038(2) |
| Field Crops | 0171 |
| Fruit - Citrus Fruit packing & handling; Including Storage | 2108 |
| Fruit - Dried Fruit packing & handling | 2109 |
| Fruit - Fresh Fruit packing & handling; Including Storage | 2107 |
| Fruit Juice or Concentrate Mfg. | 2116 |
| Fruit or Vegetable Evaporation or Dehydrating | 2102 |
| Grain Elevators or Grain Storage Warehouses | 8304 |
| Grain or Rice Milling | 2014(1) |
| Hay, Grain or Feed Dealers | 8215(1) |
| Macaroni Mfg. | 2002 |
| Meat Products Mfg. - NOC, Including Canning | 2095 |
| Olive Handling - Sorting, curing, packing, canning including Olive Oil Mfg. | 2106(1) |
| Orchards - Citrus & Deciduous Fruits | 0016 |
| Orchards - Nut Crops | 0045 |

F.S.I.M.    Qualifying Classes - CALIFORNIA

PAGE TWO

4/7/97

| Class Description | Class Code |
|---|---|
| Pickle Mfg. | 2106(2) |
| Potato Crops | 0041 |
| Poultry Raising, Egg Production &  Hatcheries | 0034(1) |
| Restaurants or Taverns - All Employees | 9079(1) |
| Salespersons - Outside | 8742(1) |
| Salt Production - by solar evaporation exclusively | 4000(3) |
| Seed Merchants - Including operation of seed sorting machinery | 8102 |
| Sheep Raising & Hog Farms | 0034(2) |
| Stock Farms | 0038(1) |
| Stockyards - with/without butchering | 2081(2) |
| Stores - Delicatessen - retail | 8006(3) |
| Stores - Feed, tack & farm supplies - retail | 8117 |
| Stores - Fruit or Vegetables - retail | 8006(2) |
| Stores - Groceries or provisions - convenience - retail | 8061 |
| Stores - Groceries or provisions - retail | 8006(1) |
| Stores - Meat, fish or poultry - retail | 8031 |
| Stores - Meat, fish or poultry - wholesale | 8021 |
| Stores - Retail, NOC | 8017(1) |
| Stores - Wine, beer or spirits - retail | 8060 |
| Stores - Wine or spirits - wholesale, including blending, rectifying, distilling or bottling | 8041 |
| Strawberry Crops | 0079(1) |
| Sugar Mfg. or Refining - beet or cane | 2030 |
| Truck Farms | 0172 |

F.S.I.M.     Qualifying Classes - CALIFORNIA

PAGE THREE

4/7/97

| Class Description | Class Code |
|---|---|
| Vegetable or Fruit Processors - Frozen | 2117 |
| Vegetables - Fresh vegetable and tomato packing and handling - including storage | 8209 |
| Vending Concessionaires - Dispensing food, drinks, candy, etc., at ball parks, race tracks, theaters & exhibitions | 9079(2) |
| Vineyards | 0040 |
| Vitamin or Food Supplement Mfg. - compounding, blending or packaging only | 4831 |
| Vinegar Mfg. | 2142(3) |
| Warehouses - Cold Storage | 8291 |
| Warehouses - Cotton, including cotton compressing "cotton gin operation" | 0400(2) |
| Warehouses - Grain or bean - including cleaning & handling | 8215(2) |
| Wineries - All operations | 2142(1) |

FIC/FSIM 000040



# BOOK OF BUSINESS REPORT
## OCTOBER 1997

*REPORT KEY*

F.S.I.M. TOTAL : refers to all FSIM business.

Section 1. BOOK OF BUSINESS REPORT : Account, Producer, Policy #, EAP, Earned Premium
Section 2. MONTHLY RESULTS REPORT : Claim Cost/Severity, Loss Ratio.

Loss Ratio = $Claims divided by Earned Premium
Losses Valued as of September 30, 1997
Earned Premium as of September 30, 1997

FIC/FSIM 000041

# F.S.I.M. Total MONTHLY RESULTS REPORT

| Account | Effec. | E.A.P. | Earned | Clm $ Indemnity | Clm $ Med | Clm $ Rehab | Clm $ Expense | Clm $ Total | L/R |
|---|---|---|---|---|---|---|---|---|---|
| C&M Packing | 1-Jan | $ 43,900 | $ 24,811 | $ - | $ - | $ - | $ - | $ - | 0% |
| Desert Packing | 1-Jul | $ 117,167 | $ 31,753 | $ - | $ - | $ - | $ - | $ - | 0% |
| Emerald Packing | 1-Jul | $ 114,335 | $ 52,307 | $ 1,089 | $ 8,900 | $ 500 | $ - | $ 10,489 | 20% |
| Escamilla | 1-Jul | $ 1,250,000 | $ 236,438 | $ 6,696 | $ 17,993 | $ 500 | $ 1,500 | $ 26,689 | 11% |
| Fresh West | 28-Dec | $ 123,923 | $ 98,523 | $ 4,813 | $ 16,849 | $ 500 | $ 1,000 | $ 23,162 | 24% |
| Growers Co. | 1-Jul | $ 385,574 | $ 116,511 | $ 2,600 | $ 5,050 | $ - | $ - | $ 7,650 | 7% |
| GVE | 1-May | $ 128,589 | $ 79,359 | $ - | $ - | $ - | $ - | $ - | 0% |
| La Tapatia | 31-Mar | $ 178,529 | $ 109,940 | $ 3,414 | $ 8,652 | $ - | $ - | $ 12,066 | 11% |
| Sam McKinsey | 1-Jan | $ 48,802 | $ 43,919 | $ 264 | $ 1,269 | $ - | $ - | $ 1,533 | 4% |
| Mission Ranches | 1-Jan | $ 190,295 | $ 234,000 | $ 6,698 | $ 20,438 | $ 1,000 | $ 5,500 | $ 33,636 | 14% |
| Natural Selection | 1-Jul | $ 132,754 | $ 89,199 | $ 6,470 | $ 26,277 | $ 100 | $ 1,000 | $ 33,847 | 38% |
| Seasun | 28-Jan | $ 1,250,000 | $ 651,237 | $ 83,042 | $ 76,612 | $ 3,500 | $ 3,606 | $ 166,760 | 26% |
| Sunsweet Dryers | 1-Jul | $ 144,005 | $ 107,427 | $ 26,269 | $ 52,831 | $ 1,000 | $ 1,750 | $ 81,850 | 76% |
| Nature Quality | 1-Jan | $ 111,308 | $ 50,906 | $ 11,990 | $ 18,743 | $ 500 | $ 2,000 | $ 33,233 | 65% |
| Cal West Farming | 18-Sep | $ 650,500 | $ 88,260 | $ - | $ - | $ - | $ - | $ - | 0% |
| Gudpak | 30-Sep | $ 115,150 | $ 11,515 | $ - | $ - | $ - | $ - | $ - | 0% |
| F & F Contracting | 1-May | $ 286,529 | $ 143,268 | $ 3,268 | $ 15,396 | | $ 500 | $ 19,164 | 13% |
| Sayler American | 1-May | $ 445,414 | $ 222,708 | $ 9,724 | $ 14,323 | | $ 1,000 | $ 25,047 | 11% |
| SK Foods | 1-May | $ 121,403 | $ 60,702 | $ - | $ 12,205 | $ - | $ - | $ 12,205 | 20% |
| Ramco | 1-Apr | $ 193,431 | $ 112,833 | $ - | $ 214 | $ - | $ - | $ 214 | 0.2% |
| Rigel | 1-Nov | $ 259,154 | $ 25,915 | $ - | $ - | $ - | $ - | $ - | 0% |
| TOTALS | | $ 6,290,762 | $ 2,591,531 | $ 166,337 | $ 295,752 | $ 7,600 | $ 17,856 | $ 487,545 | 18.8% |
| 21 Accts | | | | | | | | | |

October 1997

# F.S.I.M. Total MONTHLY RESULTS REPORT

*October 1997*

| Account | Effec. | E.A.P. | Earned | Clm # Open | Clm # Closed | Clm # Legal | Clm # Total |
|---|---|---|---|---|---|---|---|
| C&M Packing | 1-Jan | $ 43,900 | $ 24,811 | 0 | 0 | 0 | 0 |
| Desert Packing | 1-Jul | $ 117,167 | $ 31,753 | 0 | 0 | 0 | 0 |
| Emerald Packing | 1-Jul | $ 114,335 | $ 52,307 | 4 | 0 | 0 | 4 |
| Escamilla | 1-Jul | $ 1,250,000 | $ 236,438 | 10 | 0 | 2 | 10 |
| Fresh West | 28-Dec | $ 123,923 | $ 98,523 | 5 | 1 | 1 | 6 |
| Growers Co. | 1-Jul | $ 385,574 | $ 116,511 | 3 | 0 | 0 | 3 |
| GVE | 1-May | $ 128,589 | $ 79,359 | 0 | 0 | 0 | 0 |
| La Tapatia | 31-Mar | $ 178,529 | $ 109,940 | 13 | 4 | 0 | 17 |
| Sam McKinsey | 1-Jan | $ 48,802 | $ 43,919 | 2 | 0 | 0 | 2 |
| Mission Ranches | 1-Jan | $ 190,295 | $ 234,000 | 11 | 3 | 2 | 14 |
| Natural Selection | 1-Jul | $ 132,754 | $ 89,199 | 12 | 1 | 0 | 13 |
| Seasun | 28-Jan | $ 1,250,000 | $ 651,237 | 18 | 9 | 1 | 27 |
| Sunsweet Dryers | 1-Jul | $ 144,005 | $ 107,427 | 14 | 0 | 0 | 14 |
| Nature Quality | 1-Jan | $ 111,308 | $ 50,906 | 8 | 1 | 0 | 9 |
| Cal West Farming | 18-Sep | $ 650,500 | $ 88,260 | 0 | 0 | 0 | 0 |
| Gudpak | 30-Sep | $ 115,150 | $ 11,515 | 0 | 0 | 0 | 0 |
| F & F Contracting | 1-May | $ 286,529 | $ 143,268 | 1 | 15 | 0 | 16 |
| Sayler American | 1-May | $ 445,414 | $ 222,708 | 1 | 12 | 0 | 13 |
| SK Foods | 1-May | $ 121,403 | $ 60,702 | 0 | 8 | 0 | 8 |
| Ramco | 1-Apr | $ 193,431 | $ 112,833 | 0 | 1 | 0 | 1 |
| Rigel | 1-Nov | $ 259,154 | $ 25,915 | 0 | 0 | 0 | 0 |
| | | | | | | | |
| *TOTALS* | | $ 6,290,762 | $ 2,591,531 | *102* | *55* | *6* | *157* |
| *21 Accts* | | | | | | | |

| ACCOUNT | Est. 98 EAP | 1998 Xmod | 1997 Xmod | 1997 LOSSES | 1997 PREM | 1996 LOSSES | 1996 PREM | 1995 LOSSES | 1995 PREM | 1994 LOSSES | 1994 PREM |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Farm | $ 150,000 | | 1.12 | | | $ 24,655 | $ 131,994 | $ 35,892 | $ 166,745 | $134,419 | $ 254,553 |
| Distributor | $ 250,000 | | 1.66 | | | $ 21,747 | $ 241,698 | $ 155,033 | $ 198,012 | $188,262 | $ 203,568 |
| Fast Food Chain | $ 200,000 | | 0.76 | $ 41,852 | $ 195,678 | $ 46,566 | $ 194,980 | $ 64,994 | $ 169,410 | | |
| Distributor | $ 250,000 | | 1.23 | $ 24,500 | $ 240,587 | $ 77,996 | $ 235,055 | $ 148,172 | | $185,073 | |
| Packing | $ 350,000 | | 1.57 | $ 76,103 | $ 378,502 | $100,153 | $ 432,397 | $ 121,490 | $ 409,946 | | |
| Meat Packing | $ 150,000 | | 0.94 | | | | | | | | |
| Packing | $ 195,000 | | | | | | | | | | |
| Distributor | $ 160,000 | | | | | | | | | | |
| Processing | $ 100,000 | | 0.64 | | | | | | | | |
| Packing | $ 200,000 | | 0.72 | | | | | | | | |
| Farm | $ 175,000 | | | | | | | | | | |
| Distributor | $ 160,000 | | 1.08 | | | | | | | | |
| Packing | $ 250,000 | | 1.3 | | | | | | | | |
| Harvesting | $ 175,000 | | 0.96 | | | | | | | | |
| Packing | $ 180,000 | | 1.08 | | | | | | | | |
| Labor Contractor | $ 600,000 | | 1.98 | | | | | | | $ 92,932 | |
| Processing | $ 140,000 | | 0.88 | | | | | $ 8,764 | | | |
| Processing | $ 1,400,000 | | 0.93 | | | | | | | | |
| Packing | $ 240,000 | | 1 | | | | | | | | |
| Processing | $ 500,000 | | 0.67 | | | | | | | | |
| Packing | $ 205,000 | | 0.71 | | | | | | | | |
| Packing | $ 155,000 | | 0.66 | | | | | | | | |
| Farm | $ 250,000 | | 1.03 | $ 12,318 | | $ 81,949 | | $ 155,820 | | $ 23,334 | |
| Packing | $ 150,000 | | 0.86 | $ 42,486 | | $ 77,348 | | $ 119,608 | | | |
| Packing | $ 600,000 | | | | | | | | | | |
| Labor Contractor | $ 170,240 | 0.92 | 1.18 | $ 77,465 | $ 235,536 | $ 63,774 | $ 168,067 | $ 257,629 | $ 309,523 | $178,211 | $ 367,619 |
| Winery | $ 45,263 | 0.92 | 1.18 | $ 18,270 | $ 38,000 | $ 20,629 | $ 28,460 | $ 955 | $ 33,902 | $ 12,475 | $ 52,769 |
| Harvesting | $ 295,000 | | | $182,656 | $ 299,284 | $405,206 | $ 369,888 | $ 119,575 | $ 326,900 | $264,045 | $ 511,500 |
| *TOTALS* | $ 7,695,503 | | | $ 475,650 | $ 1,387,587 | $895,368 | $ 1,670,545 | $ 1,152,040 | $ 1,447,693 | $944,332 | $1,135,456 |
| Loss Ratio | | | | | | | | | | | |
| 29 Accounts | | | | | | | | | | | |

*Coastal Valley & Mesa Vineyard are written seperate, but have common ownership, share mod & are 12/1 effective.

FIC/FSIM 000044

DWIGHT HALVORSON

INSURANCE INDUSTRY EXPERIENCE

Began insurance career in 1973 selling life and disability products for American Fidelity Assurance Company. Promoted to Sales Manager for pension and group programs and transferred to Sacramento, California in 1975.

Became a producer for Employee Benefits Insurance Company (EBI), a specialty workers' compensation insurer in 1979. Was primarily responsible for selling EBI's workers' compensation products to large commercial accounts. Was consistently one of the company's most successful producers. Gained extensive knowledge about the unique need of accounts within the food industry, including growers, packers, shippers, wholesalers and retailers because EBI insured many businesses within this industry.

Joined Wise Insurance Agents/Brokers in 1981 and from 1981 through 1987 was the largest producer of property-casualty and workers compensation premium for that organization.

Assisted in forming and managing a Bermuda based captive to reinsure workers' compensation risks of agri-businesses in mid-1982. Gained extensive knowledge about structuring reinsurance treaties, insurance company management and administering effective loss control and claims services.

Left Wise Insurance to form Dwight Halvorson Insurance Services in early 1987, specializing in handling the insurance risks of accounts within the food industry. Dwight Halvorson Insurance Services is a full service insurance brokerage offering property and casualty, workers' compensation and employee benefits expertise to its clients.

Its primary focus is on serving the food industry, consequently, most of its clients are comprised of businesses with the "food chain" such as: growers, shippers, packers, wholesale distributors, restaurants and retail grocers. The organization, with Halvorson as its President, has achieved great success, growing to become one of the larger commercial insurance brokerages in the Sacramento Valley.

Created and marketed a special workers' compensation program for convenience stores and is the endorsed workers' compensation insurance broker for the California Grocers Association.

Helped form a specialty brokerage to insure the liability risks of residential real estate brokers and is the Chief Financial Officer of this rapidly growing organization.

Recognizing the conflict of interest inherent in the traditional method of providing workers' compensation products and services, created Food Services Insurance Managers (FSIM) in late December, 1996 to provide an innovative, yet pragmatic alternative to this substantial under-served market. As the Chief Executive Officer of Food Services Insurance Managers, has achieved accelerated growth and fostered enthusiastic support from all who have been exposed to this innovative new program.

EDUCATION

B.A. Degree - St. Thomas College - St. Paul, MI

# GEORGE HAGOSIAN

## INSURANCE INDUSTRY EXPERIENCE:

Began insurance career as a sales representative for Liberty Mutual Insurance Company in 1977. Gained extensive knowledge about workers' compensation as a result of intensive training provided by the company. Was primarily responsible to sell workers' compensation products to large companies. Was regularly one of the division's highest producing salespersons. Left Liberty in March 1981.

Joined Maryland Casualty from March 1981 to April 1985 to become a marketing representative, negotiating agreements with agents and brokers.

Left to join Argonaut Insurance Company April 1985 as the manager of agency relations. Was a member of Home Office Project Team which developed Argonaut's "Account Management Strategy". Remained with Argonaut until August 1987, after gaining a reputation within the company as a high performer.

Joined Citation Insurance Company in August 1987 as its Marketing Manager. Was responsible for developing sales aids, business plans, sales presentations and staffing. Left the company in January 1992 due to its downsizing resulting from business reverses.

Joined Industrial Indemnity Company's Sacramento Division as its Managing Director of Client Services. In that capacity was responsible for creating and managing Sales/Service, Underwriting, Loss Control, Claims Service Representatives and Clerical Support personnel. Managed business development, service commitments and monitored compliance with underwriting guidelines. Improved closing ratio to 93% and increased average account size from under $30,000 to over $285,000, before leaving in March, 1994.

Joined Fireman's Fund Insurance Company in March, 1994 as Business Development Manager in their Rancho Cordova division office. Was responsible for production, profits, development of marketing/sales materials, territorial market segmentation strategies and underwriting compliance.

Assisted staff in transitioning to "open rating" environment. Collaborated with Regional Vice President on developing successful underwriting and marketing strategies. During tenure at Fireman's Fund, exceeded both new business production and account retention goals, while substantially improving the quality of the business being insured. During last year with the company, accounts earned a pure loss ratio under 30%.

Left Fireman's Fund to join Food Services Insurance Managers as its Vice President - Underwriting in February 1997.

## EDUCATION:

B.A. - University of San Francisco (Cum Laude - Dean's List)
Foundation Courses, MBA Program - University of San Francisco
Contract Law, Torts, Criminal Law Personal Property Law - Lincoln Law University
Successfully Completed:

   Claim Management Workshop - Industrial Indemnity Company
   Product Knowledge Training Course - Liberty Mutual
   Professional Selling Skills - Liberty Mutual

FIC/FSIM 000046

ED W. WILSON

INSURANCE INDUSTRY EXPERIENCE

Was Commercial Accounts Underwriting Manager for State Farm Insurance, Westlake Village, California from 1973-1979. Was responsible for growth and profits for commercial lines of insurance—with particular emphasis on farm and ranch program.

Joined Maryland Casualty Insurance Company in 1979 and for two years acted as Commercial Casualty Underwriting Manager for their Los Angeles office. Responsibilities included managing the activities of commercial lines underwriters for all lines of insurance, including workers' compensation, for both California and Arizona. Met company's growth and profit objectives.

Left to join Mission American Insurance Company as an Assistant Branch Manager in their Ventura, California office. Was promoted to Assistant Branch Manager of Mission's Los Angeles branch. Was responsible for achieving production and profit objectives for the branch which was producing approximately $100 million of annual premium.

1983, was promoted to Vice President and Branch Manager of San Jose branch. While in that position, opened its Fresno office and increased production to over $60 million from these two offices. Was responsible for all operations of these two branches.

Due to success in San Jose, was made the Regional Vice President for the Pacific Northwest in 1984, with responsibilities for three branch offices—Portland, Oregon, Boise, Idaho and Seattle, Washington. Met company's production and profitability objectives during his two year stint.

Joined Superior National Insurance Company in 1986 as Vice President. Was responsible for developing Northern California territory. Was successful in transforming $6 million of unprofitable premium into a $60 million book of profitable accounts over a seven year period. While an employee of Superior National, was promoted to Senior Vice President in 1986, Executive Vice President in 1990 and made director of all company field operations in 1993.

Joined RTW Insurance Company in 1995—currently acts as General Manager, Director of Midwest Operations, responsible for opening offices in various states targeted for entry by the company. Position requires establishing and staffing offices and managing operations, until systems and procedures are firmly in place and operating.

EDUCATION

B.A. Degree - Bethany College, Lindsberg, KS
Has successfully completed 7 parts of CPCU
Has attained CLU designation

J. DANIEL HENKE

INSURANCE INDUSTRY EXPERIENCE

Began insurance adjusting career with Liberty Mutual Insurance Company in 1971, specializing in handling claims for large accounts, including TWA, United Parcel Service and American President Lines. Participated in Liberty's on-the-job training programs and successfully completed extensive claim adjusting courses.

Joined Employee Benefits Insurance Company, a workers' compensation specialty insurer, in 1976. Charged with responsibility of opening its Sacramento branch's claims department. Was the Claim Manager for that office—overseeing the activities of over 60 claim adjusters and supportive personnel.

Promoted to Vice President of Sacramento Division of EBI Services, Inc., a wholly owned subsidiary which specialized in administering self-funded workers' compensation programs.

Joined Homeland Insurance Corporation and establish their Sacramento regional claims office in January 1985. Was responsible for hiring, training and managing the 15 person staff for that office.

Left Homeland Insurance to found Risk Management Service, Inc. in early 1987 and is the President of that organization. RMSI specializes in handling the claim management functions for special insurance programs on behalf of insurance carriers and managing general agents and self funded programs for municipalities and other large corporations, on a contract basis. In that capacity, RMSI performs all of the functions usual to a claim department, including but not limited to: claim investigation and settlement, filing Unit Statistical reports, special statistical reports and training Insureds.

EDUCATION

B.A. Degree - California State University, Riverside Campus, Riverside, CA
Hold Workers' Compensation Claims Law Associate designation
Successfully passed Self Administrators Examination
Past President - Claims Executive's Council



## $\mathcal{D}$wight $\mathcal{H}$alvorson
### INSURANCE SERVICES

December 3, 1997



Janet L. Backer
Frontier Insurance Company
195 Lake Louise Marie Road
Rock Hill, NY  12775

RE: AGENCY APPOINTMENT DOCUMENTS

Dear Janet:

Per your request, I am returning to you the completed Agency Appointment
Questionnaire which was signed by Dwight Halvorson.  Also included are the
copies of the dec page of our E & O policy, Bond dec page, licenses for
California and Arizona (other states available if needed), resumes of key
personnel, and financial statement.

Should you need any additional information, please give myself or George
Hagosian a call.

Thank you for your consideration.

Sincerely,

John Stassi
Marketing Manager

# FRONTIER INSURANCE COMPANY

# LIMITED AGENCY AGREEMENT

This Limited Agency Agreement **("Agreement")** is entered into by and between **FRONTIER INSURANCE COMPANY**, an insurance company domiciled in New York **("Company")**(and/or their subsidiary companies as required), and **Dwight Halvorson Insurance Services,** a California Corporation **("Agent")**.

## COMPANY AND AGENT HEREBY AGREE AS FOLLOWS:

## ARTICLE 1 - APPOINTMENT

1.1    **Company** hereby appoints **Agent** to act on behalf of **Company** with the authority and subject to the terms and conditions hereinafter set forth, and **Agent** hereby accepts such appointment.

1.2    **Company's** appointment of **Agent** hereby shall not restrict in any manner **Company's** right to appoint other producers and agents.

## ARTICLE 2 - DEFINITIONS

2.1    **"Sub-producer"** shall mean any insurance broker, insurance agent or other person or entity properly licensed to produce insurance and through which Policies may be produced to **Agent**.

2.2    **"Effective Date"** shall mean 12:01 a.m., January 1, 1998.

2.3    **"Policy"** shall mean any Policy, contract, coverage slip, endorsement, binder, certificate, proposal for insurance or other document which binds **Company** to insurance or coverage issued or renewed by **Company** on or after the Effective Date through **Agent** and shall also include any rewrite, renewal or extension (whether before or after termination of this Agreement) through **Agent** required by law.

## ARTICLE 3 - AUTHORITY OF AGENT

3.1    **Agent** is hereby authorized and assumes the duty to act on behalf of **Company** as a casualty broker-Agent. All actions and inactions of **Agent** under this authorization

12/29/97                                    1

FIC/FSIM 000071

shall be subject to the ultimate authority of **Company**, and **Company** from time to time shall be entitled to place reasonable restrictions on **Agent's** authority; provided such restrictions are in writing.

3.2    **Agent** is hereby authorized, subject to the terms of Article 11, requiring prior written permission and applicable law, to advertise and solicit with respect to **Company** and the business to be produced through the **Agent** hereunder.

3.3    **Agent** is hereby authorized, subject to underwriting guidelines established and rates set by **Company** from time to time and applicable law to accept applications, to quote, bind and decline coverages and to conduct audits ("Underwrite") on behalf of **Company** for all classes or lines of insurance set forth in Addendum No. 1, Schedule of Business prepared by **Company** and attached hereto ("Schedule of Business"); provided **Agent** shall use applications and quote, bind and decline forms approved by **Company** or where unregulated business, the generally accepted market forms, and provided additionally that except where specifically agreed in writing **Agent** shall have no authority to bind reinsurance or retrocessions on behalf of **Company**. The Schedule of Business shall provide the authority of **Agent** with regard to, but not limited to, underwriting guidelines, the types of risks which may be written, maximum limits of liability, territorial limitations, maximum Policy periods and projected annual premium volume. The Schedule of Business may be amended from time to time as deemed appropriate by **Company,** provided such amendments are in writing.

3.4    **Agent** is hereby authorized, as a trustee for **Company,** and subject to applicable law, to print, maintain, execute and issue Policies and to assemble, countersign and issue Policies.

3.5    **Agent** is hereby authorized, subject to applicable law, Policy provisions and **Company's** ultimate authority, to cancel and renew Policies underwritten or delivered by **Agent** hereunder.

3.6    **Agent** shall be responsible to the Insured while this Agreement continues in effect for the renewal or non-renewal of any Policy underwritten or delivered by **Agent** hereunder and shall in a timely manner and pursuant to applicable statutes and regulations communicate any renewal quote or notice of non-renewal to the insured to preclude the extension of coverage beyond the expiration date of the Policy.

3.7    **Agent** is hereby authorized, as a trustee for **Company,** and subject to the applicable provisions of this Agreement, to receive and receipt for premiums and fees, to pay return premiums, to pay adjustments and to retain and pay commissions out of such collected premiums, subject to the provisions of this Agreement and applicable statutes and regulations.

12/29/97                                                     2



3.8    With the exception of Food Services Insurance Managers, Inc., **Agent** shall not authorize any sub-producer or other person or entity to quote, bind, or decline coverages or otherwise underwrite on behalf of **Company** without the prior written consent of the **Company.**

3.9    The original sources of some or all business under this Agreement shall be sub-producers. **Agent** is hereby authorized to enter into agreements with such sub-producers with respect to the business hereunder; provided **Agent** shall have no authority to obligate Company in any manner to such sub-producers and all agreements with such sub-producers shall provide that the sub-producers shall have no claims or causes of action against **Company** except for reckless conduct or willful misconduct of **Company.** Additionally, **Agent** shall be responsible for verifying the proper licensing of such sub-producers, and if any liabilities are incurred by **Company** as the result of **Agent's** accepting business from unlicensed or improperly licensed sub-producers, **Agent** shall indemnify and hold **Company** harmless from, and reimburse **Company** for, any and all such liabilities, including but not limited to fines, court costs and expenses, legal fees and travel expenses.

3.10    **Agent** may accept as a trustee for **Company** premium financed by premium finance companies, upon terms and conditions approved in writing by Company.

3.11    **Agent** shall not process, adjust, settle or pay any claims under Policies underwritten or delivered by **Agent** pursuant to this Agreement, nor shall **Agent** commit **Company** to pay any claim. Should **Agent** become aware, or have delivered to it any notice of claim or claims, **Agent** immediately shall forward such notice of claim or claims to **Company** or its designee in a manner designated by **Company.**

## ARTICLE 4 - COMPENSATION

4.1    Except as otherwise specified on the Schedule of Business, **Company** shall allow **Agent** a gross commission of twelve (12%) of all gross written premium collected, for Policies underwritten or delivered by **Agent** hereunder. This commission arrangement shall be reviewed from time to time and shall be subject to adjustment at the discretion of the Company on a prospective basis and upon at least sixty (60) days prior written notice to the **Agent.**

4.2    The **Agent** is responsible for all commissions due to sub-producers and others with respect to Policies written or delivered hereunder. The **Company** shall not be responsible to pay sub-producers.

4.3    **Agent** shall charge and collect for all Policy and other fees required with respect

12/29/97                                              3

FIC/FSIM 000073

to business produced hereunder to the extent such charges are permitted by law.

## ARTICLE 5 - ACCOUNTING, RECORDS AND EDP

5.1    **Agent** shall provide and maintain in forms reasonably acceptable to **Company** complete and accurate books, records, dailies and correspondence necessary to determine the amount of liability of **Company** and the amount of premium and expense derived from business written hereunder.

5.2    The omission of any item from any statement, or report applicable to the business hereunder shall not affect the responsibility of either party to account for and pay all amounts due the other party hereunder, nor shall it prejudice the rights of either party to collect all such amounts due from the other party.

5.3    **Agent** shall prepare separate, itemized, invoices and/or monthly statements for each sub-producer for the business produced by the sub-producer hereunder, and furnish the sub-producers IRS Forms 1099 each year if and when required.

5.4    All of **Agent's** records applicable to the business hereunder shall be kept in such manner and form as are generally recognized as acceptable in the insurance industry or as reasonably may be required by **Company**.  Such records shall be maintained for five (5) years or for any longer retention period required by law or **Company.**

5.5    All records in **Agent's** possession or control and applicable to the business hereunder shall be made available for inspection, copying and/or audit at reasonable times by **Company** or its **Agents**, or any governmental authority with the right to inspect.

5.6    All records in **Agent's** possession or control and applicable to the business hereunder shall be made available, upon prior written request and at the **Company's** cost, for inspection at any office of **Company**, should such inspection be requested by insurance department or other governmental authorities.

5.7    **Agent** shall immediately forward upon request to Company or Company's Agent's exact, as written, copies of all applications, Policies and reports underwritten or delivered by **Agent** or used by **Agent** hereunder, including all other evidence of insurance written, modified or terminated.

5.8    **Agent** shall be solely responsible for and shall keep accurate records of all Policy supplies assigned to **Agent** and shall account to **Company**, upon **Company's** request, for all outstanding and unused Policy supplies.  If canceled or terminated Policy supplies are unavailable, **Agent** shall forward or cause to be forwarded to

12/29/97                                              4

FIC/FSIM 000074

**Company** properly executed lost Policy receipts therefor. Upon termination of this Agreement, **Agent** shall promptly dispose of all Policy supplies and other property of the **Company** as directed by the **Company.**

5.9    **Company** shall be entitled to conduct examinations of Agent's operations at any reasonable time. Such examinations shall be conducted in reasonable manners and may cover such matters as required or permitted by law and as are relevant to the business done hereunder.

5.10   **Agent** shall furnish **Company,** with any additional information and reports as reasonably requested by **Company** and necessary to complete **Company's** quarterly and annual statements filed with regulatory authorities or otherwise satisfy regulatory requirements.

5.11   **Agent** shall annually furnish **Company,** within ninety (90) days following the end of the **Agent's** fiscal year, current (audited, if available) financial statements of **Agent.** These financial statements shall include, but not be limited to, profit and loss, balance sheet and cash flow statements.

## ARTICLE 6 - ACCOUNT CURRENT

6.1    The **Agent** shall, not later than fifteen (15) days after the end of each month, prepare and forward to the **Company** a detailed and itemized statement of account of all premiums written and premium adjustments made (whether additional or return) within the month for which the statement (herein referred to as the "Account Current") is rendered. However, the **Company** shall have the privilege, exercisable at its option, of preparing the Account Current.

6.2.   The **Agent** shall pay the balance, if any, due the **Company** as shown on each Account Current within forty-five (45) days following the end of the month for which the Account Current was rendered. Upon rendition by the **Company** of invoices or statements adjusting or correcting any Account Current, the **Agent** shall pay to the **Company** forthwith the balance, if any, shown to be due thereon. **Agent** shall be responsible to pay written premium to the **Company,** whether or not premium has been paid by any insured or sub-producer, it being understood that **Agent** assumes the credit risk should it bind insurance without receiving premium.

6.3    The Account Current between the parties prepared and forwarded by the **Company** in accordance with the above, or invoices, statements or adjustments on any Account Current transmitted to the **Agent** by the **Company** shall be binding and conclusive on the **Agent** unless the **Agent,** within ten (10) days from receipt of such Account Current, invoice, statement or adjustment shall send to the **Company** a

FIC/FSIM 000075

written itemization of objections thereto.

6.4    The provisions of this Article, which are binding upon the parties subsequent to the termination of this Agreement, shall survive such termination until all obligations are finally discharged.

## ARTICLE 7 - EXPENSES

7.1    **Agent** shall be responsible for and promptly pay all expenses attributable to producing and servicing business under this Agreement, except as specified in Section 7.2. This responsibility shall not be altered whether the expenses are billed to **Agent** or **Company.** These expenses shall include, but not be limited to:

(a)    Salaries, related taxes and benefits of all employees of **Agent;**

(b)    Transportation, lodging and meals of employees of **Agent;**

(c)    Postage and other delivery charges;

(d)    Advertising unless specifically agreed otherwise by **Company** in writing;

(e)    EDP hardware, software and programming;

(f)    Countersignature fees or commissions;

(g)    License and appointment fees for **Agent's**, brokers, sub-producers and others;

(h)    Income and state and local sales taxes, if any, directly applicable to **Agent's** business;

(i)    Taxes on surplus lines premium, and Policy fees if necessary in respect of Policies underwritten or delivered by **Agent** hereunder;

(j)    Costs of office space, facilities, equipment and occupancy used by **Agent;**

(k)    Legal and auditing expenses incurred by **Agent** in the normal conduct of its business; and

(l)    Such other expenses as are customarily borne by insurance producers.

12/29/97                                   6

FIC/FSIM 000076

(m)   Any and all charges made by NCCI or applicable state governing body against premium volume written under this program. It being understood that **Company** is an NCCI member company and that NCCI or state governing body charges are applicable on both a fee for service basis and a percentage charge applicable against total premium volume written under this program;

(n)   Printing of preposals, booklets, certificates, solicitation brochures, premium notices, records and reports, and all documents and other materials required to fulfill the obligation of Manager under this agreement;

7.2   **Company** shall be responsible for and promptly pay all expenses incurred by **Company** under this Agreement. This responsibility shall not be altered whether the expenses are billed to **Company** or **Agent.** These expenses shall include but not be limited to:

(a)   Salaries, related taxes and benefits of all employees of **Company;**

(b)   Transportation, lodging and meals of employees of **Company;**

(c)   Board and bureau fees;

(d)   Income and state and local sales taxes, if any, directly applicable to **Company's** business;

(e)   State or guaranty fund assessments;

(f)   Losses and loss adjustment expenses incurred by or at the direction of **Company;**

(g)   Reinsurance costs;

(h)   Legal and auditing expenses incurred by, on behalf of or at the direction of the **Company**; and

(i)   Such other expenses as are customarily borne by insurance companies.

## ARTICLE 8 - HANDLING OF FUNDS

8.1   **Agent** shall accept and maintain at all times all premium collected and other funds relating to the business underwritten by **Agent** under this Agreement in the capacity of a fiduciary and trustee for **Company**. The privilege of retaining commissions shall not be construed as changing the fiduciary capacity.

8.2   **Agent** shall establish and maintain a premium trust account designated **Food**

12/29/97                                    7

FIC/FSIM 000077

**Services Insurance Managers, Inc., Premium Trust Account - Frontier** in a bank mutually agreed by **Agent** and **Company** and shall deposit into such premium trust account all premiums collected by **Agent** hereunder. **Agent** shall have the right to transfer funds held in such premium trust account to successor banks with the prior written consent of **Company**. All such banks shall be members of the Federal Reserve System whose deposits are insured by the Federal Deposit Insurance Corporation. **Agent** shall be entitled to retain any interest earned on funds deposited in such premium trust accounts until premium is to be remitted to **Company** pursuant to Article 6 hereof.

8.3   **Agent** shall maintain sole signature authority on such premium trust account and may use any and all premium and other funds collected by **Agent** under this Agreement only for the following purposes:

   (a)   Payments of amounts due **Company** pursuant to this Agreement;

   (b)   Return of unearned premiums arising due to cancellation or endorsement of Policies underwritten or delivered by **Agent;**

   (c)   Payment of **Agent's**, sub-producers' and others' compensations as described in Article 4;

   (d)   Return of money deposited in error; and

   (e)   Withdrawal of interest due **Agent** hereunder.

8.4   **Agent** shall not commingle any funds in such premium trust account with funds in **Agent's** corporate accounts or other funds held by **Agent** in any other capacity.

8.5   **Agent** shall render accounts to **Company** detailing all premium trust account transactions, and remit to **Company** all funds due under this Agreement pursuant to said account by the end of the month following the month during which the **Agent** collected such funds for the account of the **Company.**

8.6   In the absence of negligence or fraud by either party hereto, neither party shall be liable for any loss which occurs by reason of the default or failure of the bank in which an account is carried.

8.7   **Agent** shall promptly account for and refund commissions on Policy cancellations, reductions in premiums or any other return premiums at the same rate at which such commissions were originally retained.

8.8   Neither **Company** nor **Agent** shall offset any balances due under this Agreement

12/29/97                                          8

with any amounts due under any other agreement between **Company** and/or its affiliates and **Agent** and/or its affiliates.

## ARTICLE 9 - OWNERSHIP OF BOOKS AND RECORDS

9.1     Subject to Article 5 hereof, upon termination of this Agreement, **Agent's** records and the exclusive use and control of expirations of business produced by sub-producers retained by **Agent** and contracts with such sub-producers shall remain the sole property of **Agent** and be left in **Agent's** undisputed possession, provided **Agent** is not then in default of any payment obligated to **Company** hereunder.  If **Agent** is then in default of any such payment obligated and has not cured such default within fifteen (15) days of **Company's** notice to **Agent** thereof, ownership of the records, use and control of expirations and contracts with sub-producers shall become and remain vested in **Company**.  **Company** may then dispose of such expirations as it deems proper.

9.2     **Agent** hereby assigns to **Company** as security for the payment obligations of **Agent** under this Agreement all sums due or to become due to **Agent** from any insureds whose Policies were underwritten or delivered by **Agent** hereunder. **Company** shall have full authority to demand and collect such sums if **Agent** is then in default of any payment obligation to **Company** hereunder and has not cured such default within fifteen (15) days of **Company's** notice to **Agent** thereof.

9.3     **Agent** pledges and grants to **Company** to further secure the payment obligations of **Agent** hereunder all of **Agent's** records of expirations of Policies, including, but not limited to, the ownership and use of such expirations.  **Company** shall have the rights of the holder of a security interest granted by law, including, but not limited to, the rights of foreclosure to effectuate such security interest, and **Agent** hereby agrees peaceably to surrender possession of such records to the **Company** upon demand.

9.4     **Agent** agrees that this Agreement or a copy hereof may be filed as a financing statement, if **Company** so elects.  **Agent** further agrees to sign a UCC-1 Form to secure **Company's** security interest in the expirations and renewals upon request by **Company**; provided that upon termination of this Agreement and **Agent** not being in default of any payment obligation to **Company** hereunder, **Company** immediately shall cancel or terminate such filing.

## ARTICLE 10 - INDEPENDENT CONTRACTOR RELATIONSHIP

10.1     Nothing contained in this Agreement shall be construed to create the relationship of employer and employee between **Company** and **Agent**, or between **Company**

12/29/97                                        9

and any employees, representatives or sub-producers of **Agent**. **Agent** shall carry out its responsibilities hereunder subject to its own discretion and not subject to time or manner directions of **Company**.

## ARTICLE 11 - ADVERTISING

11.1   Before **Agent** uses **Company** name in any form of advertising, a copy of the proposed advertisement shall be forwarded to **Company**. No such advertisement shall be used without the prior written permission of **Company**. All agreements with sub-producers shall require that before they use **Company's** name in any advertising, a copy of the proposed advertisements shall be forwarded to **Company,** and that no such advertisements shall be used without the prior permission of **Company**.

11.2   If an advertisement containing **Company's** name is used by **Agent** or sub-producers retained by **Agent**, **Agent** shall maintain a copy of the advertisement and full details concerning where, when and how it was used, and comply with all legal requirements regarding content, review and approval of advertising and maintenance of records. **Agent**, however, shall not be required to maintain records of the names and addresses of recipients of any direct mailing or advertising but shall only record the geographical area in which such mailing or advertising was used except to the extent retention of such information is required by law.

## ARTICLE 12 - LICENSING

12.1   **Agent** warrants that it has and shall maintain current licenses and authorities as required by law for the conduct of its business pursuant to this Agreement.

12.2   **Agent** shall be responsible for verifying that all sub-producers to **Agent** shall maintain appropriate licenses and authorities as required by law for conduct of their businesses.

12.3   **Agent** shall maintain in force written agreements, in form reasonably satisfactory to **Company**, with sub-producers to **Agent** hereunder.

## ARTICLE 13 - AGENT'S SALE OR TRANSFER

13.1   In the event any interest in **Agent** is to be sold or transferred or is to merge to be consolidated with another firm not under common control, controlling or controlled by **Agent** or **Company**, **Agent** shall give thirty (30) days advance written notice to **Company**, to allow **Company**, at its election:

12/29/97                                  10

(a)    To consent to assignment of this Agreement to the successor;

(b)    To enter into a new Agreement with the successor; or

(c)    To terminate this Agreement.

13.2   **Company** shall notify **Agent** of its decision within fifteen (15) days of the receipt of the notice.

13.3   **Agent** shall notify **Company** in writing within fifteen (15) days if there is a change in:

(a)    Ownership of ten-percent (10%) or more of the outstanding voting stock of **Agent**; or

(b)    The President of **Agent,**

## ARTICLE 14 - INDEMNITY AGREEMENT

14.1   **Agent** shall indemnify and hold **Company** (including its officers and employees) harmless from any and all claims, causes of action, damages, judgments, fines, penalties and expenses (including, but not limited to, attorney's fees, litigation expenses and costs of court) which may be made against the **Company** by anyone, including any governmental agency or regulatory authority, and which arise, either directly or indirectly, principally out of any negligent or grossly negligent actions or inactions or willful misconduct or violation of any statute or regulation by **Agent**, including, but not limited to, any negligent or grossly negligent actions or inactions or willful misconduct or violation of any statute or regulation by any sub-producer to **Agent** or any of **Agent's** or such sub-producers' employees or representatives arising under this Agreement.

14.2   **Company** shall indemnify and hold **Agent** (including its officers and employees) harmless from any and all claims, causes of actions, damages, judgments, fines, penalties and expenses (including, but not limited to, attorney's fees, litigation expenses and costs of court) which may be made against the **Agent** and which arise either directly or indirectly, principally out of any negligent or grossly negligent actions or inactions or willful misconduct or violation of any statute or regulation by **Company**, including, but not limited to, any negligent or grossly negligent actions or inactions or willful misconduct or violation of any statute or regulation by **Company's** employees or representatives arising under this **Agreement.**

14.3   If any person seeks indemnity hereunder the person to be indemnified ("Indemnified Person") shall give the indemnifying party ("Indemnifying Party")

FIC/FSIM 000081

prompt written notice of the claim, cause of action, damage, judgment, fine, penalty and expense against which indemnification is sought, including copies of all documents and information reasonably relating thereto. The Indemnifying Party promptly shall commence defending the Indemnified Person through competent attorneys reasonably satisfactory to the Indemnified Person. The Indemnified Person shall cooperate with the Indemnified Party in such defense, but the ultimate decision whether to defend or settle shall be made by the Indemnified Person.

14.4 If either party shall institute any lawsuit to enforce the obligations assumed by the other party under this Agreement, the prevailing party shall be entitled to recover from the other party all costs, expenses, judgments and attorney's fees incurred by the prevailing party in connection with the lawsuit.

14.5 **Agent** warrants that it has and shall maintain Errors & Omissions insurance with an insurer reasonably acceptable to **Company** and providing coverage of the greater of (i) the minimum required by law or (ii) $1,000,000.

## ARTICLE 15 - MEDIATION AND VENUE

15.1 If irreconcilable differences arise as to business done under this Agreement, either party may request, in writing, mediation of such difference. Such mediation shall be conducted pursuant to Commercial Mediation Rules of the American Arbitration Association. Such mediation shall be conducted in **New York** and concluded within thirty (30) days after notice of mediation. The costs of the parties incurred in the mediation shall be allocated by the mediator pursuant to the equities of the parties with respect to the matter mediated. Any such mediation shall be non-binding and without prejudice.

15.2 If any dispute cannot be resolved by mediation, the parties agree that the courts of **New York** shall have exclusive jurisdiction to resolve any such dispute and that the internal law of the state of **Company's** domicile will apply to the interpretation and enforcement of the dispute.

## ARTICLE 16 - TERMINATION

16.1 This Agreement shall be terminable by (i) either party upon fifteen (15) days prior written notice to the other party for "cause" (defined, as hereinafter used, as the other party's permanent legal or physical inability to perform its obligations hereunder, the other party's conviction of a felony, or the other party's "Material Breach" of this Agreement and failure to cure such Material Breach within the applicable cure period); (ii) the **Company** in the event the **Company** determines that the **Agent** has exceeded the authority granted the **Agent** by the **Company**

12/29/97                                                    12

FIC/FSIM 000082

under Article 3 - Authority of Agent or (iii) upon ninety (90) days prior written notice to the other party as of the end of any calendar quarter. A "Material Breach" shall consist of (a) failure by a party to pay any amount due hereunder when due, which is not paid within fifteen (15) days following the other party's written demand for such payment, or (b) the failure to obtain or maintain, or the termination or suspension of, a license, permit or other authority necessary for a party to conduct its business as contemplated hereunder which is not cured within thirty (30) days.

16.2    Upon termination, **Agent** promptly shall deliver or cause to be delivered to **Company**, at **Company's** expense, all property of **Company** in **Agent's** control or possession, including but not limited to, EDP equipment owned by **Company**, Policies, manuals, forms, unused drafts and all materials used in servicing of Policies, including computerized and data processing records and the physical equipment required for the processing of those records and data. If **Agent** fails to deliver such property within fifteen (15) days after the termination of this Agreement, **Agent** shall bear all reasonable expenses which **Company** may expend or cause to be expended in obtaining such items. If Policy supplies cannot be accounted for by **Agent** or have been destroyed, lost or mislaid, **Agent** agrees to protect, defend and hold **Company** harmless from all persons and claims whatsoever arising with respect to such Policy supplies.

16.3    **Company** may, for "cause," in its sole discretion, suspend any and all of **Agent's** authority pursuant to this Agreement. Such suspension shall be effective upon written notification to **Agent** setting forth the nature of the "cause" in reasonable detail.

16.4    In the event of termination of this Agreement by **Company** for "cause" any indebtedness of **Agent** to **Company** and all premiums in the possession of **Agent**, or for the collection of which **Agent** is responsible, shall become immediately due to **Company.**

16.5    The failure of either party to declare promptly a default or breach of any of the terms and conditions of this Agreement shall not be construed as a waiver of any of such terms and conditions, nor stop either party from thereafter demanding full and complete compliance herewith.

16.6    In the event of termination of the Reinsurance Agreement between Platinum Indemnity Limited and **Company**, **Company** reserves the right to terminate this Agreement effective immediately upon written notice to the **Agent**.

16.7    Notwithstanding the termination of this Agreement, the provisions of this Agreement shall continue to apply to all unfinished business to the end that all obligations and liabilities incurred by each party as a result of this Agreement shall be fully

FIC/FSIM 000083

performed and discharged according to its terms.

## ARTICLE 17 - MISCELLANEOUS

17.1    This Agreement supersedes all previous agreements, if any, whether written or oral, between **Company** and **Agent** relating specifically to the subject matter hereof.

17.2    Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and plural and any term stated in either the masculine, or feminine or the neuter gender, shall include the masculine, the feminine and the neuter gender.  All captions and section headings are intended to be for purposes of reference only and do not affect the substance of the section to which they refer.

17.3    Each party hereto agrees to perform any further acts and execute and deliver any further documents which may be reasonably necessary to carry out the provisions of this Agreement.

17.4    In the event that any of the provisions, or portions thereof, of this Agreement are held to be illegal, invalid or unenforceable by any court of competent jurisdiction, the validity and enforceability of the remaining provisions, or portions thereof, shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom.

17.5    Any and all notices required or permitted to be given under this Agreement shall be in writing and shall be deemed given when deposited in the United States Postal Service, Certified Mail, Return Receipt Requested or faxed with confirmation by telephone to a Vice President or senior officer of the recipient, to the parties' addresses as provided below or such other addresses provided by the parties by like means:

### COMPANY:

**Frontier Insurance Company
195 Lake Louise Marie Road
Rock Hill, New York 12775**

**Attn:  Kevin F. Jeffery
           Senior Vice President**

12/29/97                                  14

**AGENT:**

**Dwight Halvorson Insurance Services**
**3300 Douglas Blvd.**
**Suite # 295**
**Roseville, CA 95661-3807**

**Attn: Dwight Halvorson**
**President**

17.6 This Agreement may be executed in multiple counterparts, each of which and together shall constitute an original document.

**COMPANY:**                          **AGENT:**

FRONTIER INSURANCE COMPANY      DWIGHT HALVORSON INSURANCE
                                 SERVICES

By: _R.W. Pulee_                 By: _Dwight J. Halvorson_

Date: _January 14, 1998_         Date: _12/7/98_

12/29/97                    15

Addendum No. 1

"Schedule of Business"

(A)     Lines of Coverage:

        (1)     Workers Compensation

(B)     Territory:

        California, Arizona

(C)     Maximum Policy Period(s):

        Twelve (12) months plus odd time not to exceed eighteen (18) months.

(D)     Class of Business:

        Agricultural operations with governing class codes of 0172-Truck Farms, 0171- Crops, 0040-Vineyards and 8209-Fresh fruit/vegetable packing and handling including storage.

(E)     Maximum Limits of Binding Authority:

        Dwight Halvorson Insurance Services is authorized to bind agricultural operations for the following limits:

        (1)     Coverage A: Statutory

        (2)     Coverage B: $1,000,000.

(F)     Projected Annual Premium Volume:

        $10,500,000. the first calendar year.

FIC/FSIM 000086

## ADDENDUM #2

### FRONTIER INSURANCE COMPANY
### FOOD SERVICES INSURANCE MANAGERS, INC. PROGRAM

It is hereby agreed that this Addendum modifies the Limited Agency Agreement executed between Frontier Insurance Company and Dwight Halvorson Insurance Services. This Addendum supersedes the original Addendum #2 executed by Dwight J. Halvorson.

### I.  UNDERWRITING GUIDELINES

Insureds may be added to this program on an automatic basis provided the following criteria are met:

1.    The prospective insured's net premium is $50,000. or greater;

2.    Experience modification factors shall be obtained prior to quoting any new or renewal risk. Experience modification factors shall be obtained from the Workers Compensation Insurance Rating Bureau of CA, NCCI, or governing state as applicable.  Experience modification must be 1.25 or lower based on three (3) years or more of loss experience;

3.    No prospect without prior Workers' Compensation coverage will be considered for admission to the program.  The prospective insured must have been in business a minimum of three (3) years and provided a full three (3) years plus current year of currently valued (within 120 days prior to expiration date) loss experience including large losses in excess of $25,000.  Such loss runs shall be obtained prior to quoting any new or renewal risk;

4.    The prospective insured's classification codes do not deviate from those listed in the Class/Rate Schedule in Section III. of this Addendum.;

5.    No single claim, any one occurrence, has exceeded $125,000. Prior carrier loss runs confirming this shall be obtained prior to quoting any new or renewal risk;

6.    The prospective insured's most recent three (3) year cumulative loss ratio does not exceed 50%.   Prior carrier loss runs confirming this shall be obtained prior to quoting any new or renewal risk;

7.    NCCI underwriting criteria must be complied with, including scheduled credits and rate deviations.

5/19/98 - food4.wpd

8.    Rating shall be performed using Frontier's currently filed rates, premium discount and schedule debits/credits.

9.    A maximum thirty percent (30%) schedule credit may be applied to risks in the State of CA with standard premium ranging from $50,000 to $149,999.

A maximum forty -five percent (45%) schedule credit may be applied to risks in the State of CA with standard premium ranging from $150,000. to $599,999.

A maximum forty percent (40%) schedule credit may be applied to risks in the State of CA with standard premium of $650,000. or more.

10.    A maximum twenty -five percent (25%) schedule credit may be applied to risks in the State of AZ.

Any risk not falling within the above guidelines must be submitted to Frontier for special consideration and no such risk may be bound without prior written approval by an underwriter employed by Frontier. Frontier shall have no obligation to accept any risk submitted for special consideration by Agent. In addition, the following risks must be submitted to Frontier, prior to binding:

1.    All risks providing bus transportation to their employees; and

2.    All risks having aircraft exposures.

The following operations are prohibited:

1.    Aircraft and airline operations;

2.    Navigation and operation of all vessels;

3.    Construction and/or maintenance of cofferdams;

4.    Operation of drydocks;

5.    Subaqueous work;

6.    Subway construction;

7.    Tunneling operations;

5/19/98 - food4.wpd

8.    Wrecking or demolition of bridges, structures or vessels;

9.    All coal mining operations;

10.   All underground mining operations;

11.   Onshore and offshore gas and oil drilling operations;

12.   Manufacture, production or refining of natural or artificial fuel, gas, butane, propane or liquefied petroleum gases or gasoline;

13.   Manufacture of fireworks, fuses, nitroglycerine, celluloid and pyroxylin;

14.   Manufacture of any explosive substance intended for use as an explosive; and

15.   Loading, handling, transportation or storage of explosives.

## II.  SUBMISSION REQUIREMENTS

The following are to be submitted to Frontier for each insured included in this program:

1.    Fully completed Application;

2.    Three (3) years plus current year premium and payroll history;

3.    Currently valued (within 120 days) loss experience for past three (3) years plus current year;

4.    Large losses excess of $25,000. for past three (3) years plus current year; and

5.    Most recent experience modification.

5/19/98 - food4.wpd

FIC/FSIM 000089

## III.    CLASS/RATE SCHEDULE

Approved Classification Codes: California        Effective: January 1998

| Code | Description | Rates |
|------|-------------|-------|
| | | Rate X 1.134 (LCM) |
| 7421 | Aircraft Operations, Transport. of Personnel | 2.48 |
| 2003 | Bakeries & Cracker Mfg. | 6.26 |
| 7392 | Beer or Ale Dealers | 10.61 |
| 2163 | Bottling-Beverages-No spirituous liquors | 5.72 |
| 2121 | Breweries / Malt Houses-Incl Bottling/Canning | 4.85 |
| 0079 | Bush Berry Crops | 6.26 |
| 2113 | Canneries-Fish | 8.28 |
| 2111 | Canneries, NOC-Incl Fruit Preserving | 8.23 |
| 8810 | Clerical Office Employees, NOC | 0.71 |
| 6504 | Confections&Food Sundries, Mfg.or ProcNOC | 6.96 |
| 0044 | Cotton Farms | 7.41 |
| 0401 | Cotton Gin Operation | 10.39 |
| 0400 | Cotton Merchants | 9.67 |
| 4683 | Cottonseed Oil Mfg. & Refining | 3.44 |
| 2063 | Creameries& Dairy Products  Mfg. | 5.86 |
| 0036 | Dairy Farms | 8.30 |
| 2142 | Distilling, NOC | 6.13 |
| 2014 | Feed Mfg.Prep & Compounding Feeds for Livestock & Poultry | 8.75 |
| 0038 | Feed Yards | 16.35 |
| 0171 | Field Crops | 12.21 |

5/19/98 - food4.wpd

FIC/FSIM 000090

| Code | Description | Rates |
|------|-------------|-------|
| 2108 | Fruit-Citrus Fruit packing & handling; Including Storage | 8.12 |
| 2109 | Fruit-Dried Fruit packing & handling | 7.19 |
| 2107 | Fruit- Fresh Fruit packing & handling; Including Storage | 7.22 |
| 2116 | Fruit Juice or Concentrate Mfg. | 7.26 |
| 2102 | Fruit or Vegetable Evaporation or Dehydrating | 5.00 |
| 8304 | Grain Elevators or Grain Storage Warehouses | 10.39 |
| 2014 | Grain or Rice Milling | 8.75 |
| 8215 | Hay, Grain or Feed Dealers | 10.26 |
| 2002 | Macaroni Mfg. | 7.77 |
| 2095 | Meat Products Mfg.-NOC Including Canning | 6.19 |
| 2106 | Olive Handling- Sorting,curing,packing,canning including Olive Oil Mfg. | 7.99 |
| 0016 | Orchards- Citrus & Deciduous Fruits | 9.89 |
| 0045 | Orchards-Nut Crops | 7.71 |
| 2106 | Pickle Mfg. | 7.99 |
| 0041 | Potato Crops | 4.52 |
| 0034 | Poultry Raising, Egg Production &Hatcheries | 9.57 |
| 9079 | Restaurants or Taverns-All Employees | 4.79 |
| 8742 | Salespersons-Outside | 0.83 |
| 4000 | Salt Production-by Solar Evaporation exclusively | 5.96 |
| 8102 | Seed Merchants-including operation of seed sorting machinery | 4.20 |
| 0034 | Sheep Raising & Hog Farms | 9.57 |

5/19/98 - food4.wpd

FIC/FSIM 000091

| Code | Description | Rates |
|------|-------------|-------|
| 0038 | Stock Yards | 16.35 |
| 2081 | Stockyards-with/without butchering | 14.38 |
| 8006 | Stores-Delicatessen-retail | 4.94 |
| 8117 | Stores-Feed,tack & farm supplies-retail | 7.86 |
| 8006 | Stores-Fruit or Vegetables-retail | 4.94 |
| 8061 | Stores-Groceries or provisions-convenience-retail | 9.20 |
| 8006 | Stores-Groceries or provisions-retail | 4.94 |
| 8031 | Stores-Meat, fish or poultry-retail | 7.27 |
| 8021 | Stores-Meat, fish or poultry-retail | 11.96 |
| 8017 | Stores-Retail, NOC | 4.14 |
| 8060 | Stores-Wine, Beer or Spirits-Retail | 6.91 |
| 8041 | Stores-Wine or spirits-wholesale, including blending, rectifiying, distilling or bottling | 9.56 |
| 0079 | Strawberry Crops | 6.26 |
| 2030 | Sugar Mfg. or Refining- beet or cane | 7.60 |
| 0172 | Truck Farms | 7.58 |
| 2117 | Vegetable or Fruit Processors-Frozen | 10.60 |
| 8209 | Vegetables-Fresh vegetable and tomato packing and handling-including storage | 9.25 |
| 9079 | Vending Concessionaires-Dispensing food,drinks,candy,etc.at ball parks,race tracks,theaters & exhibitions | 4.79 |
| 0040 | Vineyards | 5.64 |
| 4831 | Vitamin or Food Supplement Mfg.-compounding,blending or packaging only | 4.58 |
| 2142 | Vinegar Mfg. | 6.13 |

5/19/98 - food4.wpd

FIC/FSIM 000092

| Code | Description | Rates |
|------|-------------|-------|
| 8291 | Warehouses-Cold Storage | 7.31 |
| 0400 | Warehouses-Cotton, including cotton compressing "cotton gin operation" | 9.67 |
| 8215 | Warehouses-Grain or bean-including cleaning & handling | 10.26 |
| 2142 | Wineries-All operations | 6.13 |

5/19/98 - food4.wpd

FIC/FSIM 000093

Approved Classification Codes: Arizona          Effective: October 1997

| Code | Description | Rates |
|------|-------------|-------|
| 7421 | Aircraft Operations, Transport of Personnel | 2.60 |
| 2003 | Bakeries & Cracker Mfg. | 6.31 |
| 2121 | Breweries/Malt Houses-Incl Bottling/Canning | 2.94 |
| 2111 | Canneries, NOC-Incl Fruit Preserving | 7.85 |
| 8810 | Clerical Office Employees, NOC | .41 |
| 6504 | Confections&Food Sundries,Mfg.orProc NOC | 4.03 |
| 0401 | Cotton Gin Operation | 14.14 |
| 0400 | Cotton Merchants | 11.73 |
| 4683 | Cottonseed Oil Mfg. & Refining | 4.34 |
| 0036 | Dairy Farms | 7.53 |
| 2014 | Feed Mfg.Prep&Compounding Feeds for Livestock & Poultry | 8.81 |
| 8304 | Grain Elevators or Grain Storage Warehouses | 18.10 |
| 2014 | Grain or Rice Milling | 8.81 |
| 8215 | Hay,Grain or Feed Dealers | 10.00 |
| 2002 | Macaroni Mfg. | 8.29 |
| 2095 | Meat Products Mfg.-NOC Including Canning | 14.04 |
| 0016 | Orchards-Citrus & Deciduous Fruits | 5.36 |
| 0034 | Poultry Raising, Egg Production & Hatcheries | 5.39 |
| 9082 | Restaurants or Taverns-All Employees | 2.81 |
| 8742 | Salespersons-Outside | .53 |
| 4000 | Salt Products-by Solar Evaporation exclusively | 6.59 |
| 8102 | Seed Merchants-including operation of seed sorting machine | 4.98 |

5/19/98 - food4.wpd

FIC/FSIM 000094

| Code | Description | Rates |
|------|-------------|-------|
| 0034 | Sheep Raising & Hog Farms | 5.39 |
| 2081 | Stockyards-with/without butchering | 4.57 |
| 8006 | Stores-Delicatessen-retail | 4.14 |
| 8006 | Stores-Fruit or Vegetables-retail | 4.14 |
| 8006 | Stores-Groceries or provisions-retail | 4.14 |
| 8031 | Stores-Meat, Fish or poultry-retail | 3.18 |
| 8021 | Stores-Meat, fish or poultry-retail | 5.43 |
| 8017 | Stores-Retail, NOC | 1.99 |
| 2021 | Sugar Mfg. or Refining-beet or cane | 2.40 |
| 8209 | Vegetables-Fresh vegetable and tomato packing and handling-including storage | 3.67 |
| 9082 | Vending Concessionaires-Dispensing food, drinks, candy, etc. at ball parks, race tracks, theaters & exhibitions | 2.81 |
| 8291 | Warehouses-Cold Storage | 6.48 |
| 8215 | Warehouse-Grain or bean-including cleaning & handling | 10.00 |

5/19/98 - food4.wpd

FIC/FSIM 000095

This Addendum shall not go into force until duly executed on behalf of Agent and Company.

IN WITNESS WHEREOF, the parties have set their hands:

at Rock Hill, NY

this 12th day of January, 1998

FRONTIER INSURANCE COMPANY

By: _Kevin F. Jeffery_

Kevin F. Jeffery
Senior Vice President

at Roseville, California

this 8th day of December, 1998

DWIGHT HALVORSON INSURANCE SERVICES

By: _Dwight J Halvorson_

Name: _DWIGHT J. HALVORSON_

Title: _President_

Addendum No. 3

It is hereby agreed that effective 01/01/98 item (B) of Addendum No. 1 "Schedule of Business" to the Limited Agency Agreement executed between Frontier Insurance Company and Dwight Halvorson Insurance Services is replaced by the following:

(B)    Territory:

      Arizona, California, Colorado, Texas

All other terms and conditions remain as originally agreed to by Frontier Insurance Company and Dwight Halvorson Insurance Services.

IN WITNESS WHEREOF, the parties have set their hands:

at Rock Hill, NY this _24th_ day of _Dec_, 199_8_

FRONTIER INSURANCE COMPANY

By: _____
     Kevin F. Jeffery
     Senior Vice President

at Roseville, CA this _31_ day of _Dec._, 199_8_

DWIGHT HALVORSON INSURANCE SERVICES

By: _____

Name:    Dwight J. Halvorson

Title:    _Presideat_

**ADDENDUM NO. 3 TO**

**LIMITED AGENCY AGREEMENT BETWEEN**

**FRONTIER INSURANCE COMPANY ("COMPANY")**

**AND**

**DWIGHT HALVORSON INSURANCE SERVICES, INC. ("AGENT")**

In consideration of the Limited Agency Agreement, Company shall loan Agent $200,000 pursuant to a Promissory Note in the form annexed hereto as Exhibit A (the "Loan").

Company shall forgive repayment of the Loan subject to the following conditions:

1.    The Limited Agency Agreement remains in full force and effect at all times while any part of the Loan remains unrepaid;

2.    Upon the first anniversary of the Loan, the Company shall forgive repayment of one-third of the original principal, plus a proportional share of interest, so long as Agent's premium volume under the Limited Agency Agreement is equal to or greater than $5.0 million during that year;

3.    Upon the second anniversary of the Loan, the Company shall forgive repayment of a second one-third of the original principal, plus a proportional share of interest, so long as Agent's premium volume under the Limited Agency Agreement is equal to or greater than $8.0 million during that year; and

- 1 -

FIC/FSIM 000098

4.    Upon the third anniversary of the Loan, the Company shall forgive repayment of all remaining principal and interest, so long as Agent's premium volume under the Limited Agency Agreement is equal to or greater than $12.0 million during that year.

5.    All other terms and conditions of the Limited Agency Agreement remain unchanged and are hereby ratified and reaffirmed.

DATED:   May 29, 1998

FRONTIER INSURANCE COMPANY

By: _____

DWIGHT HALVORSON INSURANCE
SERVICES, INC.

By: _____

(doc.limtagr5)

— 2 —

FIC/FSIM 000099

## PROMISSORY NOTE

$200,000.00

Roseville, California
May 29, 1998

DWIGHT HALVORSON INSURANCE SERVICES, INC, a California corporation, and DWIGHT J. HALVORSON, an individual, for value received, hereby promise, jointly and severally, to pay on demand to the order of Frontier Insurance Company, a New York corporation ("Frontier") at its offices at 195 Lake Louise Marie Road, Rock Hill, New York 12775-8000, or such other address as Frontier may designate, the principal amount of Two Hundred Thousand Dollars ($200,000.00), together with interest thereon at an annual rate of 7.0%.

We hereby waive presentment for payment, protest, notice of protest and notice of nonpayment of this Promissory Note. It is further agreed that any delay on the part of the payee in exercising any of its rights hereunder shall not operate as a waiver of said rights.

In the event this Promissory Note is collected by an attorney, either with or without suit, we hereby agree to pay a reasonable attorney's fee and all expenses of collection.

- 1 -

## EXHIBIT A

This Note has been issued pursuant to Addendum No.3 dated
May 29, 1998 to a Limited Agency Agreement between Frontier
and DWIGHT HALVORSON INSURANCE SERVICES, INC.


DWIGHT HALVORSON INSURANCE SERVICES, INC.


By: _____

    Dwight J. Halvorson, President


_____

DWIGHT J. HALVORSON
INDIVIDUALLY AND PERSONALLY


(doc.promis5.1)

- 2 -

FIC/FSIM 000101



# MEMO

To:        Mark Mishler
From:      Kevin Jeffery
Subject:   Food Services Insurance Managers
           Promissory Note and Addendum No. 3 to Limited Agency Agreement
Date:      June 4, 1998


Mark,

Per our previous discussions with Peter Foley and myself, attached find the original Promissory Note and a copy of Addendum No. 3 to the Limited Agency Agreement for the Food Services Insurance Managers program in California.

Let me know if there is anything else you need to cut a check.


KJF:jr
cc:     Harry Rhulen - without attachments
        Peter Foley - with attachments

FIC/FSIM 000102

Addendum No. 4

It is hereby agreed that effective 01/01/99, item 4.1 of Article 4 - Compensation of the Limited Agency Agreement executed between Frontier Insurance Company and Dwight Halvorson Insurance Services is replaced by the following:

4.1    Except as otherwise specified on the Schedule of Business, Company shall allow Agent a gross commission of 15.65% of all gross written premium collected for Policies underwritten or delivered by Agent hereunder.    This commission arrangement shall be reviewed from time to time and shall be subject to adjustment at the discretion of the Company on a prospective basis and upon at least sixty (60) days prior written notice to the Agent.

All other terms and conditions remain as originally agreed to by Frontier Insurance Company and Dwight Halvorson Insurance Services.

IN WITNESS WHEREOF, the parties have set their hands:

at Rock Hill, NY this _24th_ day of _Dec_ , 199_8_

FRONTIER INSURANCE COMPANY

By: _____

Kevin F. Jeffery
Senior Vice President

at Roseville, CA this _31_ day of _DEC._ , 199_8_

DWIGHT HALVORSON INSURANCE SERVICES

By: _____

Name:    Dwight J. Halvorson

Title:    _PRESIDENT_

Addendum No. 5

It is hereby agreed that effective 01/01/99 Addendum #2 to the Limited Agency Agreement executed between Frontier Insurance Company and Dwight Halvorson Insurance Services is amended as follows:

Item 1. of I. Underwriting Guidelines is replaced by the following:

    1.    The prospective insured's net premium is $2,000 or greater;

Item 2. of I. Underwriting Guidelines is replaced by the following:

    2.    Experience modification factors shall be obtained prior to quoting any new or renewal risk. Experience modification factors shall be obtained from the NCCI or state governed insurance rating bureau as applicable. Experience modification factors must be 1.50 or lower based on three (3) years or more of loss experience. Recent trending (current plus prior year) for both frequency and severity must be positive (downward trend) for any risk having in excess of a 1.25 experience modification factor.

Item 3. of I. Underwriting Guidelines is replaced by the following:

    3.    Agent has secured three (3) years plus current year of currently valued (within 120 days) hard copy loss runs, including large losses in excess of $25,000. Such loss runs shall be obtained prior to quoting any new or renewal risk. Risks having less than three (3) years of experience shall be eligible for inclusion in the program provided they have had prior experience in either an ownership or management capacity, in the same type of operation, for a period of five (5) years or more.

Item 4. of I. Underwriting Guidelines is hereby deleted.

Item 9. of I. Underwriting Guidelines is replaced by the following:

    9.    <u>California</u>

        A maximum thirty percent (30%) schedule credit may be applied to risks with standard premium ranging from $2,000 to $49,999.

        A maximum fifty percent (50%) schedule credit may be applied to risks with standard premium ranging from $50,000 to $999,999,

A maximum forty-five percent (45%) schedule credit may be applied to risks with standard premium of $1,000,000 or more.

Arizona

A maximum twenty-five percent (25%) schedule credit may be applied to any risk bound in the State of AZ.

Colorado

A maximum twenty-five percent (25%) schedule credit may be applied to any risk bound in the State of CO.

Texas

A maximum twenty-five percent (25%) schedule credit may be applied to risks in the State of TX.

A yearly average of plus or minus forty percent (40%) of Company's filed rates must be maintained on the overall book of business.

All other terms and conditions remain as originally agreed to by Frontier Insurance Company and Dwight Halvorson Insurance Services.

IN WITNESS WHEREOF, the parties have set their hands:

at Rock Hill, NY this _24th_ day of _Dec_, 199_8_

FRONTIER INSURANCE COMPANY

By: _____

Kevin F. Jeffery
Senior Vice President

at Roseville, CA this _31_ day of _Dec._, 199_8_

DWIGHT HALVORSON INSURANCE SERVICES

By: _____

Name:    Dwight J. Halvorson

Title:    _President_

Addendum No. 6


It is hereby agreed that item (B) of Addendum No. 1 "Schedule of Business" to the Limited Agency Agreement executed between Frontier Insurance Company and Dwight Halvorson Insurance Services is extended to the States of Maryland and New Jersey with respect to coverage bound for Amy's Kitchen.  This extension of coverage is applicable to the aforementioned risk only.  All other terms and conditions remain as originally agreed to by Frontier Insurance Company and Dwight Halvorson Insurance Services.

IN WITNESS WHEREOF, the parties have set their hands:

at Rock Hill, NY this _24th_ day of _Dec_ , 199_8_

FRONTIER INSURANCE COMPANY

By: _____
Kevin F. Jeffery
Senior Vice President

at Roseville, CA this _31_ day of _Dec._ , 199_8_

DWIGHT HALVORSON INSURANCE SERVICES

By: _____

Name:     Dwight J. Halvorson

Title:     _President_

# VISIT OF DWIGHT HALVORSONS & DAN HENKE

## Thursday, May 21, 1998

| | |
|---|---|
| 8:30AM - 10:00AM | Dick & Janet |
| 10:00AM | Brief "hello" with Harry, if available<br>Presently scheduled to be out of town |
| 10:00AM - 11:00AM | Jerry Hartwick/Reinsurance - **confirmed** |
| 11:00AM - 11:30AM | Nancy Bowden/State Filings - **confirmed** |
| 12Noon - 1:00PM | Lunch Janet/Kevin |
| 1:00PM - 1:00PM | Lori Brahs/Claims - **confirmed** |
| 2:00PM - 2:30PM | ?Joe Daches/Rocco Capuano/Dan Howard/Finance? |
| 2:30PM | Peter Foley, if available<br>Presently scheduled to be out of town |
| 2:30PM - | Kevin/Janet |

*- Not sure of Kevin's plans at this point.*

*- Did you tell Joe Daches et al what they will want?*

**PAGE INTENTIONALLY LEFT BLANK**

## UNDERWRITING AGENDA

## 6/4/98 MEETING WITH DWIGHT HALVORSON AND DAN HENKE

Accounts Bound Outside of Parameters of Underwriting Guidelines

- North State Grocery

No referral made despite experience modification factor of 1.91.

- Holiday Quality Foods, Inc.

No referral made despite experience modification factor of 1.99.

- La Tapatia Tortilleria

Premium was cut by $20,607 without submitting for re-approval.

- Country Gold Farm Services, Inc.

Does not meet minimum experience requirements. Bound despite written declination.

Administration

- Dec page, class of operations page and schedule of forms and endorsements to be forwarded to my attention for each risk bound into program within 10 days of policy issuance.

- F.S.I.M. to be responsible for forwarding policies directly to the NCCI.

**PAGE INTENTIONALLY LEFT BLANK**

## VISIT OF DWIGHT HALVORSON & DAN HENKE

### Thursday, June 4, 1998

Wednesday, June 3:

Approx. 6:30PM          Kevin and Dick - dinner at The Old Homestead

Thursday, June 4:

8:30AM - 10:00AM        Dick and Janet

10:00AM                 Brief "hello" with Harry - **confirmed will be in Rock Hill but no specific time set**

10:15AM - 11:00AM       Jerry Hartwick - Reinsurance - **confirmed**

12 NOON - 1:00PM        Lunch - Kevin, Dick and Janet

1:00PM - 2:00PM         Dave Jackson - Pioneer Claims - **confirmed**

Mark Mishler

**PAGE INTENTIONALLY LEFT BLANK**

# facsimile
## TRANSMITTAL

to:       George Hagosian
fax #:    (916) 773-0402
re:       STATE EXPANSION
date:     June 24, 1998
pages:    1, including this cover sheet.

George,

This is in response to your fax of June 22nd regarding expansion of the current F.S.I.M. program to the states of CO and TX.

Kevin Jeffery, Dick Marshall and I discussed this issue at length with Dwight Halvorson and Dan Henke during their recent visit to Rock Hill. Per our discussions, while we are not adverse to expanding the program based on a sound business plan and reasonable expectation of premium volume in a given state, we are not looking to expand the current program as an accommodation for incidental exposures.

As you are well aware, tax rates, resident claims adjusting requirements, mandatory loss control requirements, state banking requirements and other important issues must be considered when contemplating program expansion. As a result, any proposed expansion must be carefully considered in terms of long-term goals and overall business plan. Should we (jointly) determine that expansion is warranted based on anticipated premium volume, we will require significant lead time to research these and other related issues to ensure that any state expansion is beneficial to the overall program in full compliance with various state regulations.

Should you wish to include risks having incidental exposures outside the states of CA and AZ in the program we suggest that the incidental exposures be funneled through the assigned risk pool.

As always, please call me with any questions.

Best Regards,

Janet

cc:

Dwight Halvorson
Kevin Jeffery
Dick Marshall

From the desk of...

Janet L. Backer
Program Manager
Alternative Risk Division
195 Lake Louise Marie Road
Rock Hill, NY 12775-8000

(800) 836-2100 ext. 5831
Fax (914) 796-1005

**PAGE INTENTIONALLY LEFT BLANK**

From:     Juliet Reggero
To:         FIGI2..FIGI2.NMULVEY
Date:     7/28/99 3:54pm
Subject:    Request for Limos - Dwight Halvorson - Thurs & Fri, 7/29 & 30 -Reply -Reply
-Reply -Reply

To confirm the arrangements for the 4 gentlemen: Dwight Halvorson, Jason Gamache, George
Hagosian and Ed Wilson:

__Thursday, July 29:__

4:31PM Meet Dwight, Jason and George at Terminal A, Newark Airport.
They have been advised Peter will be in baggage claim holding a "Frontier" sign and that they
should go there regardless of whether they checked bags.
Limo will then go to TWA Terminal, Newark, and meet Ed Wilson off TWA 136 ETA 4:33PM
(I am working on obtaining a copy of his itinerary). He has been asked to go to arrivals exit
and to watch for the limo. If they don't connect the first time around, one of them will go
into the terminal to look for him.

The limo will then bring them all back to The Hampton Inn, Middletown.

__Friday, July 30__

(Janet Backer will give them a ride up here on Friday morning.)

We would like two options:

1. Could the limo be on standby for a 12 noon departure from Rock Hill? Perhaps the driver
could give you a call about 11:00AM?
Providing business is concluded, they will all leave for Newark.
George would like to take a 3:00PM United flight if possible.
Ed Wilson is scheduled to be on a TWA flight departing Newark at 5:30PM.
Jason and Dwight should be taken to the Marriott Newark (their flight leaves at 7:15AM on
Saturday).

2. Should business not be concluded for a 12 noon departure, we would like the limo to be
available at 1:30PM to take them all to Newark, which will leave plenty of time to get down
for Ed's 5:30PM flight and George's reserved flight at 6:45PM.

I apologize for the request for flexibility and hope you are able to work with us on this one.

> > > Nita Mulvey 07/28/99 11:28am > > >
Peter will do the trip, and he will have the suburban. Do you think that Ed could wait on the
outside of the building (right outside - (TWA arrivals) so the driver doesn't have to park the
car with the guys in it? Do the other folks know Ed to recognize him? You could also just tell
him to look for the green suburban with NY license plates.

Thanks
Nita

> > > Juliet Reggero 07/28/99 08:53am > > >
Are you able to give me name of driver and limo for p/u tomorrow?

I just heard that Ed Wilson is also traveling in and will arrive at Newark off TWA flight 136

ETA 4:33PM tomorrow.

Could the driver pick up the passengers from the United flight and then go to TWA terminal?

I will obtain return information from everyone today!

>>> Nita Mulvey 07/27/99 11:35am >>>
I think that sounds like a good idea - otherwise they would have to leave hear around 4:30am.
Let me know.

Thanks,
Nita


Juliet Reggero 07/26/99 03:06pm >>>
In follow-up to my e-mail of 7/22, there will be a 3rd member of the party, George Hagosian, who will ride up from Newark on Thursday.

As far as the return trip is concerned, George leaves at 6:45PM on Friday out of Newark and the other two at 7:15AM on Saturday.  I have recommended they all travel to Newark on Friday afternoon.  I'm awaiting confirmation of their plan and will keep you advised.

CC:        RMARSHALL, JBACKER

# F.S.I.M.
# FOOD SERVICES INSURANCE MANAGERS, INC.

3300 Douglas Blvd., Suite #295
Roseville, CA 95661
(916) 773-0206



January 29, 1998

Ms. Janet Backer
**Frontier Insurance Company**
195 Lake Louise Marie Road
Rock Hill, NY 12775

Sorry for the delay, but as we discussed by phone, I've been involved with putting
together an analysis/quotation/proposal on a $1.6 million risk which presents on February
3, 1998.

I have enclosed complete information on all risks bound effective 1/1/98 (one was
1/3/98) with **Frontier**. I have also attached a *"F.S.I.M./FRONTIER ISSUANCE LOG"*,
which lists the nine (9) accounts, noting their effective date, E.A.P., Policy Number,
Ex.Mod., Credit/(Debit), and Governing Class. This log will serve as an easy reference
for you, and will be updated as we produce more accounts into the program.

As you will notice, a couple of the accounts are beyond the boundaries set forth in your
December 31, 1997 letter on Underwriting/Pricing/Binding Authority. We had talked
about this, and since time constraints didn't allow full adherence to the guidelines, you
said an exception would be allowed. We appreciate this, and promise that all future
accounts will follow the guidelines to the letter.

Please also notice that three (3) of the nine (9) accounts are under the $50,000 threshold.
That is because they are related to larger accounts written. Specifically,

- Dunlap Management $38,060 is related to Coachella Valley Citrus
- Growers Transport $54,615 is related to Coachella Valley Citrus
- Bar 20 Dairy is related to Producer's Dairy

It was necessary to write the "smaller" accounts with the aforementioned "larger"
accounts as it was the desire of the decision maker at the insured to keep all accounts
with one carrier.

When we determine how to apply the CA State Assessment Charges, and receive the
additional policy materials, we will produce the policies and forward a copy of each to
your attention.

I have also attached a copy of a *"Account Current Bordereaux"* that we will be using,
for your review and approval.

Thank you for all your assistance, and patience. We all enjoy working with you and feel that we are off to an excellent start.

Sincerely,

George Hagosian
Vice President Underwriting/Marketing

# F.S.I.M./FRONTIER ISSUANCE LOG

| Account Name | Effec. Date | New Renewal | E.A.P. | Policy # | Ex.Mod. | Credit (Debit) | Gov. Class |
|---|---|---|---|---|---|---|---|
| Coachella Valley Citrus | 1/1/98 | N | $ 495,970 044 | WC 38851 | 1.82 | 20% | 0016 |
| Dunlap Management | 1/1/98 | N | $ 38,000 250 | WC 38852 | 1.59 | 45% | 0016 |
| Growers Transport | 1/1/98 | N | $ 54,616 07 | WC 38853 | 1.72 | 45% | 7219 |
| Producer's Dairy | 1/1/98 | N | $ 213,565 767 | WC 38854 | 1.16 | 43.50% | 2063 |
| Bar 20 Dairy | 1/1/98 | N | $ 45,397 36 | WC 38855 | 1.16 | 45% | 0036 |
| Sierra Citrus Assoc. | 1/1/98 | N | $ 113,862 95 | WC 38856 | 1.13 | 38% | 2108 |
| V & L Farms | 1/3/98 | N | $ 79,890 034 | WC 38857 | 0.76 | 42% | 0079 |
| George Perry & Sons | 1/1/98 | N | $ 79,578 04 | WC 38858 | 1.24 | 40% | 0172 |
| Nature Quality | 1/1/98 | N | $ 71,464 447 | WC 38859 | 1.47 | 40% | 6504 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| TOTALS | | | $ 1,191,444 | | | | |

PAGE INTENTIONALLY LEFT BLANK

*Kevin – Please review and advise. Janet*

# F.S.I.M.
# FOOD SERVICES INSURANCE MANAGERS, INC.
### Fax # (916) 773-0402

## ===FAX===

RECEIVED FEB 17 1998

**NAME:** JANET BACKER

**COMPANY:** FRONTIER INS. CO.

**FAX #:** (914) 796-1005

**FROM:** George Hagosian

**# of Pages** 4 [including this cover page]

**Date:** Feb. 17, 1998

**Comments:** please see attached. Thanks,

George

*OK let's try it as the suggest see how it unfolds. JB 2-17-98*

**If you do not receive all of the pages indicated above, please give us a call at (916) 773-0206.**

# F.S.I.M.
# FOOD SERVICES INSURANCE MANAGERS, INC.
3300 Douglas Blvd., Suite #295
Roseville, CA 95661
(916) 773-0206

February 17, 1998

Ms. Janet L. Backer
**FRONTIER INSURANCE COMPANY**
195 Lake Louise Marie Road
Rock Hill, New Your 12775-8000

Dear Janet,

Thank you for your review and comments regarding the initial risks bound into the FSIM program for January 1998. As we all attempted to put this thing together, in record time, we knew that there would be "rough edges" needing refinement at a latter date. We appreciate Kevin Jeffery and you, giving us the latitude to bind coverage, "outside" the prescribed parameters of the program.

As we had disclosed to you, during the formative stages of the program, we were quoting Frontier, without any "set" parameters (they were not received until 12/31/97), so as not wanting to miss January opportunities.

It was, has been, and will continue to be our desire to make this partnership both productive in volume, and profitable from an underwriting perspective. As I mentioned in my January 29, 1998 letter to you, all future risks will follow the guidelines (detailed in addendum #2) "to the letter".

As regards the *"F.S.I.M./FRONTIER ISSUANCE LOG"*, the EAP will be reflected as bound premium from the Pricing Worksheet rather than "net rate" calculated premium. This was an error on my part, copied the wrong information. I have attached a "revised" log for your reference. The bordereau will report this amount.

In regards to Addendum #3, we have some issues. During the formation of our partnership, we were "up front" with the fact that there exists a formidable competitive climate in California. We had told you that we averaged approximately 35% deviation on our Cal Comp book, (note their filed rates are lower than your filed rates). The general "average" amount of credits being afforded by carriers desiring to compete for business is between 45 and 48%.

On the January business we quoted and bound with you, FSIM used an average of 34% credits, that being Modified Premium plus Scheduled Credits (before Premium discount). If we add the Premium Discount, all total deviation from Modified Premium averaged 41%. Either way both are below the carrier average in the state.

We feel that if we follow the guidelines outlined in Addendum #2, additional latitude should be afforded to our efforts in the area of pricing, than outlined in Addendum #3. Limiting us to 20% maximum credits will result in our submitting the vast majority of our accounts to you. This basically eliminates the Underwriting/Pricing Authority we need to make the program flow efficiently.

To make our program effective we need that ability to underwrite and price competitively. This is a point we have emphasized throughout our negotiations with Frontier. Addendum #3 comes as a surprise and disappointment to us.

Please reconsider the scope of Addendum #3. We would like to recommend the following parameters (all with the full compliance to guidelines set forth in Addendum #2),

1.  On risks with premium of *$50,000 to $149,999* Max. *30%* Credit/Debit without prior approval by Frontier underwriting.

2.  On risks with premium of *$150,000 to $599,999* Max of *45%* Credit/Debit without prior approval by Frontier underwriting.

3.  On risks with premium of *$650,000* plus Max of *40%* Credit/Debit without prior approval by Frontier underwriting.

*incorporated into 2/9/98 draft of Addendum #2*

Please call me following your review and consideration to this letter. We are beginning to work on several accounts with March and April anniversary dates. One being a March 1st, that we meet with for a needs assessment on February 20th, and will have to present within three to four days following that meeting. In many instances like this one, we will not have a lot of time to do our underwriting analysis, price, then forward for approval.

Our relationship, to date, has been fantastic. We appreciate all that Frontier has done, in creating this program. We want it to grow. Please help us by accommodating us on this request.

As always, thank you for your consideration and willingness to work with us.

Sincerely,

George Hagosian
Vice President Underwriting

# F.S.I.N./FRONTIER ISSUANCE LOG

| Account Name | Effec. Date | New Renewal | E.A.P. | | Policy # | Ex.Mod. | Credit (Debit) | Gov. Class |
|---|---|---|---|---|---|---|---|---|
| Coachella Valley Citrus | 1/1/98 | N | $ | 495,044 | WC 38851 | 1.82 | 20% | 0016 |
| Dunlap Management | 1/1/98 | N | $ | 38,250 | WC 38852 | 1.59 | 45% | 0016 |
| Growers Transport | 1/1/98 | N | $ | 54,607 | WC 38853 | 1.72 | 45% | 7219 |
| Producer's Dairy | 1/1/98 | N | $ | 213,707 | WC 38854 | 1.16 | 43.50% | 2063 |
| Bar 20 Dairy | 1/1/98 | N | $ | 45,336 | WC 38855 | 1.16 | 45% | 0036 |
| Sierra Citrus Assoc. | 1/1/98 | N | $ | 113,895 | WC 38856 | 1.13 | 38% | 2108 |
| V & L Farms | 1/3/98 | N | $ | 79,634 | WC 38857 | 0.76 | 42% | 0079 |
| George Perry & Sons | 1/1/98 | N | $ | 79,519 | WC 38858 | 1.24 | 40% | 0172 |
| Nature Quality | 1/1/98 | N | $ | 71,447 | WC 38859 | 1.47 | 40% | 6504 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| TOTALS | | | $ | 1,191,439 | | | | |

**PAGE INTENTIONALLY LEFT BLANK**

# F.S.I.M.

# FOOD SERVICES INSURANCE MANAGERS, INC.

## Fax # (916) 773-0402

## ===FAX===

**NAME:** Ms. Janet Backer

**COMPANY:** Frontier Ins. Co.

**FAX #:** (914) 796-1005

**FROM:** George Haroosian

**# of Pages** 2 [including this cover page]

**Date:** April 13, 1998

**Comments:** Janet, Thanks for all your Work on Cal West, we appreciate it. I wanted to quickly respond to your cover Memo. I am in the process of putting together our 1st quarter results & will forward a copy to you. I did attach prior results — losses valued as of 2/2/98 + EP valued as of 1/1/98 — for your review. Thought that I sent these, but must have forgotten. Thanks

George

*\*\*If you do not receive all of the pages indicated above, please give us a call at (916) 773-0206.*

# F.S.I.M. MONTHLY RESULTS REPORT '98 Calendar Frontier Total

| Account | Effec. | E.A.P. | Earned | Clm $ Indemnity | Clm $ Med | Clm $ Rehab | Clm $ Expense | Clm $ Total | L/R |
|---|---|---|---|---|---|---|---|---|---|
| Coachella Valley | 1/1/98 | $ 495,044 | $ 97,367 | $ 1,074 | $ 3,750 | $ - | $ 500 | $ 5,324 | 5% |
| Dunlap Mgmt. | 1/1/98 | $ 38,250 | $ 3,806 | $ - | $ - | $ - | $ - | $ - | 0% |
| Growers Transport | 1/1/98 | $ 54,607 | $ 5,462 | $ - | $ - | $ - | $ - | $ - | 0% |
| Producer's Dairy | 1/1/98 | $ 213,707 | $ 39,556 | $ - | $ - | $ - | $ - | $ - | 0% |
| Bar 20 Dairy | 1/1/98 | $ 45,336 | $ 4,539 | $ - | $ - | $ - | $ - | $ - | 0% |
| Sierra Citrus Assoc. | 1/1/98 | $ 113,895 | $ 25,568 | $ 146 | $ 1,000 | $ - | $ - | $ 1,146 | 4% |
| V & L Farms | 1/3/98 | $ 79,634 | $ 8,625 | $ - | $ - | $ - | $ - | $ - | 0% |
| George Perry | 1/1/98 | $ 79,519 | $ 13,254 | $ - | $ - | $ - | $ - | $ - | 0% |
| Nature Quality | 1/1/98 | $ 71,447 | $ 9,389 | $ - | $ - | $ - | $ - | $ - | 0% |
| | | | | | | | | | |
| **TOTALS** | | $ 1,191,439 | $ 207,566 | $ 1,220 | $ 4,750 | $ - | $ 500 | $ 6,470 | 3.1% |
| **9 Accounts** | | | | | | | | | |

*January 1998*

PAGE INTENTIONALLY LEFT BLANK

APR. -24' 98 (FRI) 11:38    D. H. S.                    TF 916 773 0402              P. 002



## $\mathcal{D}$wight $\mathcal{H}$alvorson
### INSURANCE SERVICES

TO:     PETER FOLEY
FROM: TONY MILLER
DATE: APRIL 24, 1998

RE:     ACQUISITION FUNDING,

PETER,

PLEASE WIRE THE TRANSFER TO THE BANK OF AMERICA, ROSEVILLE MAIN OFFICE

# 120  2221 DOUGLAS BLVD. ROSEVILLE, CA 95661

ACCOUNT # 01206- 03957

ABA   11-35/1210

THANKS,

TONY MILLER

---

**Ed Sorensen**
Vice President and Manager          Roseville Main Office 0120

**Bank of America NT&SA**
2221 Douglas Boulevard
Roseville, CA 95661
916/781-4518  (BAnet 631)

**Bank of America**



PAGE INTENTIONALLY LEFT BLANK

# *F.S.I.M.*
# *FOOD SERVICES INSURANCE MANAGERS, INC.*

## ==*MEMORANDUM*==



**TO** : Janet Backer
**FROM** : George Hagosian
**DATE** : May 8, 1998
**SUBJECT** : *Issuance Log & Credit Allocation Log/Explanation*

As promised in a previous memo, I have attached an updated *F.S.I.M./FRONTIER ISSUANCE LOG*. This one reflects not only the new accounts to the program, but also the "changed" premiums, credits, etc.., caused by the re-ratings incorporating the 1997 rates. (All 5/1/98 policies shown have been rated utilizing the 1998 rates).

We are in the process of typing up all policies, and will forward your copies ASAP.

I have also attached a *F.S.I.M./FRONTIER CREDIT ALLOCATION* summary form, for your review and reference. Please note that this spreadsheet (like the Issuance Log) has those policies with effective dates prior to 5/1/98, reflecting premiums derived from your 1997 rates. Prior to the re-ratings the average (and for that matter, individual) credits were considerably lower. As you remember, additional credits had to be applied to "match" the premiums quoted and sold and bound using the 1998 rates.

When we take the total premiums written (15 policies, excluding Bar 50 Dairy due to pending action regarding additional credits) the average credits before application of premium discount is *39%!* In the extremely competitive California marketplace, that is extraordinary. The average credit with premium discount is 45% - also extraordinary.

The seven (7) new accounts bound into the program since 1/1/98 have averaged *40%* before premium discount. With application of premium discount the average credit is 46%. The 1/1/98 accounts (ex Bar 20) reflect an average credit of *37%* before premium discount, 43% with the application of premium discount. The combined effect is reflected in the paragraph above.

We are very pleased with the management of credits, and the growth of the book, to date. We sincerely hope that you concur.

Thanks,
George

## F.S.I.M./FRONTIER ISSUANCE LOG

| Account Name | Effec. Date | New Renewal | E.A.P. | Policy # | Ex.Mod. | Credit (Debit) | Gov. Class |
|---|---|---|---|---|---|---|---|
| Coachella Valley Citrus | 1/1/98 | N | $ 490,577 | WC 38851 | 1.82 | 25% | 0016 |
| Dunlap Management | 1/1/98 | N | $ 38,238 | WC 38852 | 1.59 | 49% | 0016 |
| Growers Transport | 1/1/98 | N | $ 53,918 | WC 38853 | 1.72 | 49% | 7219 |
| Producer's Dairy | 1/1/98 | N | $ 210,008 | WC 38854 | 1.16 | 40% | 2063 |
| Bar 20 Dairy | 1/1/98 | N | $ 45,336 | WC 38855 | 1.13 | 45% | 0036 |
| Sierra Citrus Assoc. | 1/1/98 | N | $ 113,085 | WC 38856 | 1.13 | 41% | 2108 |
| V & L Farms | 1/3/98 | N | $ 78,712 | WC 38857 | 0.76 | 50% | 0079 |
| George Perry & Sons | 1/1/98 | N | $ 78,478 | WC 38858 | 1.24 | 46% | 0172 |
| Nature Quality | 1/1/98 | N | $ 71,388 | WC 38859 | 1.47 | 41% | 6504 |
| La Tapatia Tortilleria | 3/31/98 | N | $ 109,738 | WC 38860 | 1.64 | 46% | 2003 |
| Holiday Quality Foods | 4/1/98 | N | $ 366,814 | WC 38861 | 1.99 | 39% | 8006 |
| North State Grocery | 4/1/98 | N | $ 670,562 | WC 38862 | 1.91 | 40% | 8006 |
| Holiday Ranches | 4/1/98 | N | $ 26,170 | WC 38863 | 1.99 | 44% | 38 |
| Organic Food Products | 5/1/98 | N | $ 61,161 | WC 38864 | 0.81 | 29% | 6504 |
| SK Foods | 5/1/98 | N | $ 131,741 | WC 38865 | 1 | 47% | 2111 |
| Cal West Farming | 5/1/98 | N | $ 499,148 | WC 38866 | 1.57 | 36% | 172 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| TOTALS | | | $ 3,045,074 | | | | |
| | | | | | | | |
| | | | | | | | |

## F.S.I.M./FRONTIER
## CREDIT ALLOCATION

| Account Name | Prem. with Mod | Prem. with Credit | Deviation % | Prem. Crd. +Pm.Disct. | Deviation % |
|---|---|---|---|---|---|
| Holiday Quality Foods | $ 677,179 | $ 413,079 | 39% | $ 366,814 | 46% |
| Holiday Ranches | $ 50,685 | $ 28,384 | 44% | $ 26,170 | 48% |
| North State Grocery | $ 1,265,688 | $ 759,413 | 40% | $ 670,562 | 47% |
| Cal West Farming | $ 880,268 | $ 563,372 | 36% | $ 499,148 | 43% |
| Organic Food Prod. | $ 94,455 | $ 67,063 | 29% | $ 61,161 | 35% |
| SK Foods | $ 275,880 | $ 146,216 | 47% | $ 131,741 | 52% |
| La Tapatia | $ 224,552 | $ 121,258 | 46% | $ 109,738 | 51% |
| V & L Farms | $ 172,993 | $ 86,497 | 50% | $ 78,712 | 54% |
| Sierra Citrus Assoc. | $ 212,023 | $ 125,094 | 41% | $ 113,085 | 47% |
| Geo. Perry & Sons | $ 159,528 | $ 86,145 | 46% | $ 78,478 | 51% |
| Nature Quality | $ 132,817 | $ 78,362 | 41% | $ 71,388 | 46% |
| Growers Transport | $ 115,797 | $ 59,056 | 49% | $ 53,918 | 53% |
| Coachella Valley Citrus | $ 738,265 | $ 553,699 | 25% | $ 490,577 | 34% |
| Dunlap Management | $ 81,853 | $ 41,745 | 49% | $ 38,238 | 53% |
| Producers Dairy | $ 391,952 | $ 235,171 | 40% | $ 210,008 | 46% |
| | | | | | |
| TOTALS | $ 5,473,935 | $ 3,364,554 | 39% | $ 2,999,738 | 45% |

NOTE: Excluded Bar 20 Dairy from listing above, due to fact that "final/adjusted" prem/credits have not yet been determined.

PAGE INTENTIONALLY LEFT BLANK

TEL:916 773 0402   P. 001



*Copy Peta Foley*
*5/11.*

May 11, 1998

Kevin Jeffery
Frontier Insurance Group, Inc.

Dear Kevin,

Thank you for reconsidering the loan to F.S.I.M. for $200,000 to purchase the book of
business from AON effective 4/1/98 . We have already placed well over $3,000,000 with
Frontier since 1/1/98 and expect that figure to be significantly higher by July 1, 1998.
The purchase price for the AON book is $450,000. F.S.I.M. would like to borrow the
$200,000 to make the down payment and first installment. F.S.I.M. would like to repay
the loan to Frontier over 3 years beginning 1/1/99, and will comply with the following
conditions.

1. Dwight Halvorson will sign a personal guarantee for the $200,000.
2. F.S.I.M. will place a minimum of $4,000,000 of premium volume with
   Frontier in the first year, will maintain an aggregate limit of $10,000,000
   by the end of year 2 and will achieve an aggregate limit for year 3 of
   $15,000,000.

If you need additional information please call me. Again thank you for your support. We
look forward to Frontier being a long-term partner in F.S.I.M.'s growth.

Sincerely,

Dwight J. Halvorson
President

**PAGE INTENTIONALLY LEFT BLANK**

**RECEIVED**

**JUN 25 1998**

# F.S.I.M.

## FOOD SERVICES INSURANCE MANAGERS, INC.

### Fax # (916) 773-0402

## ===FAX===

**NAME:** Janet Backer

**COMPANY:** Frontier Ins. Co.

**FAX #:** 914 - 796 - 1005

**FROM:** Dwight Halvorson

**# of Pages** 2 [including this cover page]

**Date:** 6/25/98

**Comments:** Please find the attached correspondence. Thank you

*\*\*If you do not receive all of the pages indicated above, please give us a call at (916) 773-0206.*

June 21, 1998

Frontier Insurance Co.
Attn: Janet Backer
Program Manager
195 Lake Louise Marie Road
Rock Hill, NY 12775-8000

Dear Janet,

In response to your letter of June 24, 1998, regarding expansion of FSIM's program to Texas and Colorado, I would like to clarify our intentions. FSIM would like to expand its program to Colorado and Texas because of the large volume of business that can be written in those states through our program.

We are confident that our volume in both of these states will easily exceed $1,000,000 within the first year with the accounts we now control. Where there is incidental exposure in other states, we are glad to use the State Fund or the Assigned Risk pool. Many of our agriculture accounts have growing and harvesting operations in Colorado. We also have acquired an account, Summit Logistics that has a California premium of $1,500,000. They have plants of similar size both in Texas and Colorado. I would like to expedite this process if at all possible since we are in the process of rolling our Cal Comp book of business to Frontier. Let me know what I need to do to satisfy your requirements for being able to write in these two states.

We are already in compliance with the regulations in these states from a claims and loss control standpoint. There is some rollover business and new business that must be placed by July 1, 1998 in Colorado. We're hoping that we can accommodate these accounts since their California premiums are around $1,000,000. Jamba Juice has very aggressive plans for growth in Arizona, Colorado and Texas.

Janet, I hope this helps us to move forward. After our conversation this morning I understand exactly where you're coming from. I believe we will produce significant volume in all four states in a very short time period.

Sincerely,

Dwight J. Halvorson
President

PAGE INTENTIONALLY LEFT BLANK

JUL. -14'98(TUE) 07:46    D.H.I.S.

TEL 916 773 0402    001

URGENT!!

# F.S.I.M.
# FOOD SERVICES INSURANCE MANAGERS, INC.
### Fax # (916) 773-0402

Please HAND Deliver asap. Thankyou!

## ===FAX===

**NAME:** Kevin Jeffery

**COMPANY:** Frontier Insurance Co.

**FAX #:** 1-914-796-1005

**FROM:** Dwight Halverson

**# of Pages** 2 [including this cover page]

**Date:** 7/14/98

**Comments:**

Please review the letter attached and call me to discuss as soon as possible.

Thankyou! Dwight

**If you do not receive all of the pages indicated above, please give us a call at (916) 773-0206.



## $\mathcal{D}$wight $\mathcal{H}$alvorson

### INSURANCE SERVICES

July 13, 1998

Frontier Insurance Co.
Attn: Kevin Jeffery
195 Lake Louise Marie Road
Rockhill, NY  12775

Dear Kevin:

Recently F.S.I.M. reached an agreement with Ventura County Agriculture
Association whereby they endorsed F.S.I.M. as their exclusive Workers'
Compensation company.  The Association is providing a loss control
consultant for their accounts for which they are requiring F.S.I.M. to
reimburse them for a twelve month period begining 7/1/98.  The Association
would also like $100,000. for the expense of promoting F.S.I.M. and
Frontier to their members for one year.

The Association has moved $2,300,000. of business from PAULA to F.S.I.M.
effective 7/1/98 and will place another $3,000,000. with us between now
and 1/1/99.

F.S.I.M. is able to pick up the cost of their loss control person, but our
cash flow will not enable us to provide the $100,000.  We would like
Frontier to help us with this expense.  Please let me know if you have any
questions.

Sincerely,

Dwight J. Halvorson

DJH/jb

PAGE INTENTIONALLY LEFT BLANK


RECEIVED
JUL 28 1999

# F.S.I.M.
## Food Services Insurance Managers, Inc.
### Fax # (916) 797-4950

RUSH

### ===FAX===

**NAME:** Janet Backer

**COMPANY:** Frontier Ins.

**FAX #:** (914) 796-1005

**FROM:** George Hagosian

**# of Pages** 4 (including this cover page)

**DATE:** July 28, 1998

**COMMENTS:** per Sue Cole's Request please see attached Thanks,

**\*\*If you do not receive all of the pages indicated above, please give us a call at (916)** 797-4925

## F.S.I.M. 1998 ISSUANCE LOG

| Account Name | Effec. Date | New Renewal | E.A.P. | Policy # | Gov. Class |
|---|---|---|---|---|---|
| Coachella Valley Citrus | 1/1/98 | N | $ 490,577 | W205000106 | 0016 |
| Dunlap Management | 1/1/98 | N | $ 38,238 | W205000107 | 0016 |
| Growers Transport | 1/1/98 | N | $ 53,918 | W205000108 | 7219 |
| Producer's Dairy | 1/1/98 | N | $ 210,008 | W205000109 | 2063 |
| Bar 20 Dairy | 1/1/98 | N | $ 45,336 | W205000125 | 0036 |
| Sierra Citrus Assoc. | 1/1/98 | N | $ 113,085 | W205000110 | 2108 |
| V & L Farms | 1/3/98 | N | $ 78,712 | W205000111 | 0079 |
| George Peary & Sons | 1/1/98 | N | $ 78,478 | W205000112 | 0172 |
| Nature Quality | 1/1/98 | N | $ 71,388 | W205000113 | 6504 |
| La Tapatia Tortilleria | 3/31/98 | N | $ 109,738 | W205000114 | 2003 |
| Holiday Quality Foods | 4/1/98 | N | $ 366,814 | W205000115 | 8006 |
| North State Grocery | 4/1/98 | N | $ 670,562 | W205000116 | 8006 |
| Holiday Ranches | 4/1/98 | N | $ 26,170 | W205000117 | 0038 |
| Organic Food Products | 5/1/98 | N | $ 61,161 | W205000118 | 6504 |
| SK Foods | 5/1/98 | N | $ 131,741 | W205000119 | 2111 |
| Cal West Farming | 5/1/98 | N | $ 499,148 | W205000120 | 0172 |
| Desert Packing | 7/1/98 | N | $ 187,733 | W205000121 | 0172 |
| The Growers Company | 7/1/98 | N | $ 395,619 | W205000122 | 0172 |
| Sunsweet Dryers | 7/1/98 | N | $ 134,129 | W205000123 | 2102 |
| Natural Selection Foods | 7/1/98 | N | $ 314,379 | W205000124 | 0172 |
| Swiss Louis Restaurant | 7/1/98 | N | $ 26,817 | W205000126 | 9079 |
| Spengers | 7/1/98 | N | $ 112,543 | W205000127 | 9079 |
| Country Gold Farm | 7/1/98 | N | $ 148,085 | W205000128 | 0016 |
| Martinez Farms | 7/1/98 | N | $ 44,583 | W205000129 | 0079 |
| Bien Nacido Vineyards | 7/1/98 | N | $ 64,926 | W205000130 | 0040 |
| M. Nishimori Farms | 7/1/98 | N | $ 88,346 | W205000131 | 0172 |
| B.J. Harvesting | 7/1/98 | N | $ 89,792 | W205000132 | 0016 |

## F.S.I.M. 1998 ISSUANCE LOG

| Account Name | Effec. Date | New Renewal | E.A.P. | Policy # | Gov. Class |
|---|---|---|---|---|---|
| Luna Fertilizer | 7/1/98 | N | $ 18,665 | W205000133 | 0050 |
| Fukutomi Farms | 7/1/98 | N | $ 51,141 | W205000134 | 0079 |
| D & V Harvesting | 7/1/98 | N | $ 108,380 | W205000135 | 0016 |
| Casper Berry Farms | 7/1/98 | N | $ 56,186 | W205000136 | 0079 |
| Hasegawa Farms | 7/1/98 | N | $ 32,319 | W205000137 | 0079 |
| Philip McGrath Farms | 7/1/98 | N | $ 8,182 | W205000138 | 0079 |
| Conroy Berry Farms | 7/1/98 | N | $ 45,454 | W205000139 | 0079 |
| Valley Dorado Ag | 7/1/98 | N | $ 194,624 | W205000140 | 0040 |
| Pacifico Berry Farms | 7/1/98 | N | $ 172,856 | W205000141 | 0079 |
| Hiji Brothers, Inc. | 7/1/98 | N | $ 277,578 | W205000142 | 0172 |
| Santa Clara Farms | 7/1/98 | N | $ 67,687 | W205000143 | 0016 |
| Channel Island Berry | 7/1/98 | N | $ 67,932 | W205000144 | 0079 |
| Fulfillment Systems | 7/1/98 | N | $ 107,912 | W205000145 | 9079 |
| Yamamoto Farms | 7/1/98 | N | $ 7,317 | W205000146 | 0005 |
| Bob Jones Ranch | 7/1/98 | N | $ 1,914 | W205000147 | 8810 |
| Rancho Guadalasca | 7/1/98 | N | $ 63,582 | W205000148 | 0016 |
| Goldberg & Solovy | 8/1/98 | N | $ 119,940 | W205000155 | 8018 |
| Poplar Farms | 8/1/98 | N | $ 109,685 | W205000157 | 79 |
| Eclipse Berry Farms | 8/1/98 | N | $ 172,000 | W205000156 | 79 |
| Rio Mesa Farms | 8/1/98 | N | $ 119,738 | W205000158 | 79 |
| Odwalla | 9/1/98 | N | $ 566,360 | W205000149 | 2163 |
| Coronet Foods, Inc | 9/1/98 | N | $ 84,253 | W205000151 | 6504 |
| KGM Harvesting | 9/1/98 | N | $ 64,105 | W205000152 | 0172 |
| Gudpak | 9/30/98 | N | $ 166,400 | W205000159 | 0172 |
| Cal West Farming | 9/18/98 | R | $ 695,492 | W205000160 | 0172 |
| Athans Baking | 10/1/98 | N | $ 47,574 | W205000154 | 2003 |
| MJS | 10/1/98 | N | $ 190,409 | W205000153 | 0172 |

# F.S.I.N. 1998 ISSUANCE LOG

| Account Name | Effec. Date | New/Renewal | E.A.P. | Policy # | Gov. Class |
|---|---|---|---|---|---|
| Progresso Harvesting | 11/1/98 | N | $ 39,613 | W205000161 | 0079 |
| Rancho Buena Vista | 11/1/98 | N | $ 39,613 | W205000163 | 0079 |
| Olivers Market | 11/1/98 | N | $ 59,907 | W205000164 | 8006 |
| Tierra Linda Corp. | 11/1/98 | N | $ 132,488 | W205000165 | 0172 |
| Safari Harvesting | 11/1/98 | N | $ 39,613 | W205000162 | 0079 |
| Mill Valley Market | 9/1/98 | N | $ 25,077 | W205000150 | 8017 |
| LA Poultry | 11/30/98 | N | $ 101,689 | W205000166 | 8021 |
| Amy's Kitchen | 12/1/98 | N | $ 191,584 | W205000167 | 6504 |
| | | | | | |
| TOTALS | | | $ 8,899,295 | | |

Do not house w/o VIC.

Do not house w/o VIC.

PAGE INTENTIONALLY LEFT BLANK



JUL 28 1999

# F.S.I.M.
## Food Services Insurance Managers, Inc.
### Fax # (916) 797-4950

### ===FAX===

RUSH

**NAME:** Janet Backer

**COMPANY:** Frontier Ins.

**FAX #:** (914) 796-1005

**FROM:** George Hagosian

**# of Pages** 4 (including this cover page)

**DATE:** July 28, 1998

**COMMENTS:** per Sue Cole's Request
please see attach'd
Thanks,
George

---

**\*\*If you do not receive all of the pages indicated above, please
give us a call at (916) 797-4925.**

## F.S.I.M. 1998 ISSUANCE LOG

| Account Name | Effec. Date | New Renewal | E.A.P. | Policy # | Gov. Class |
|---|---|---|---|---|---|
| Coachella Valley Citrus | 1/1/98 | N | $ 490,577 | W205000106 | 0016 |
| Dunlap Management | 1/1/98 | N | $ 38,238 | W205000107 | 0016 |
| Growers Transport | 1/1/98 | N | $ 53,918 | W205000108 | 7219 |
| Producer's Dairy | 1/1/98 | N | $ 210,008 | W205000109 | 2063 |
| Bar 20 Dairy | 1/1/98 | N | $ 45,336 | W205000125 | 0036 |
| Sierra Citrus Assoc. | 1/1/98 | N | $ 113,085 | W205000110 | 2108 |
| V & L Farms | 1/3/98 | N | $ 78,712 | W205000111 | 0079 |
| George Perry & Sons | 1/1/98 | N | $ 78,478 | W205000112 | 0172 |
| Nature Quality | 1/1/98 | N | $ 71,388 | W205000113 | 6504 |
| La Tapatia Tortilleria | 3/31/98 | N | $ 109,738 | W205000114 | 2003 |
| Holiday Quality Foods | 4/1/98 | N | $ 366,814 | W205000115 | 8006 |
| North State Grocery | 4/1/98 | N | $ 670,562 | W205000116 | 8005 |
| Holiday Ranches | 4/1/98 | N | $ 26,170 | W205000117 | 0038 |
| Organic Food Products | 5/1/98 | N | $ 61,161 | W205000118 | 6504 |
| SK Foods | 5/1/98 | N | $ 131,741 | W205000119 | 2111 |
| Cal West Farming | 5/1/98 | N | $ 499,148 | W205000120 | 0172 |
| Desert Packing | 7/1/98 | N | $ 187,733 | W205000121 | 0172 |
| The Growers Company | 7/1/98 | N | $ 395,619 | W205000122 | 0172 |
| Sunsweet Dryers | 7/1/98 | N | $ 134,129 | W205000123 | 2102 |
| Natural Selection Foods | 7/1/98 | N | $ 314,379 | W205000124 | 0172 |
| Swiss Louis Restaurant | 7/1/98 | N | $ 26,817 | W205000126 | 9079 |
| Spengers | 7/1/98 | N | $ 112,543 | W205000127 | 9079 |
| Country Gold Farm | 7/1/98 | N | $ 148,085 | W205000128 | 0016 |
| Martinez Farms | 7/1/98 | N | $ 44,583 | W205000129 | 0079 |
| Bien Nacido Vineyards | 7/1/98 | N | $ 64,926 | W205000130 | 0040 |
| M. Nishimori Farms | 7/1/98 | N | $ 88,346 | W205000131 | 0172 |
| B.J. Harvesting | 7/1/98 | N | $ 89,792 | W205000132 | 0016 |

# F.S.I.M. 1998 ISSUANCE LOG

| Account Name | Effec. Date | New Renewal | E.A.P. | Policy # | Gov. Class |
|---|---|---|---|---|---|
| Luna Fertilizer | 7/1/98 | N | $ 18,665 | W205000133 | 0050 |
| Fukutomi Farms | 7/1/98 | N | $ 51,141 | W205000134 | 0079 |
| D & V Harvesting | 7/1/98 | N | $ 108,380 | W205000135 | 0016 |
| Casper Berry Farms | 7/1/98 | N | $ 56,186 | W205000136 | 0079 |
| Hasegawa Farms | 7/1/98 | N | $ 32,319 | W205000137 | 0079 |
| Philip McGrath Farms | 7/1/98 | N | $ 8,182 | W205000138 | 0079 |
| Conroy Berry Farms | 7/1/98 | N | $ 45,454 | W205000139 | 0079 |
| Valley Dorado Ag | 7/1/98 | N | $ 194,624 | W205000140 | 0040 |
| Pacifico Berry Farms | 7/1/98 | N | $ 172,856 | W205000141 | 0079 |
| Hiji Brothers, Inc. | 7/1/98 | N | $ 277,578 | W205000142 | 0172 |
| Santa Clara Farms | 7/1/98 | N | $ 67,687 | W205000143 | 0016 |
| Channel Island Berry | 7/1/98 | N | $ 67,932 | W205000144 | 0079 |
| Fulfillment Systems | 7/1/98 | N | $ 107,912 | W205000145 | 9079 |
| Yamamoto Farms | 7/1/98 | N | $ 7,317 | W205000146 | 0005 |
| Bob Jones Ranch | 7/1/98 | N | $ 1,914 | W205000147 | 8810 |
| Rancho Guadalasca | 7/1/98 | N | $ 63,582 | W205000148 | 0016 |
| Goldberg & Solovy | 8/1/98 | N | $ 119,940 | W205000155 | 8018 |
| Poplar Farms | 8/1/98 | N | $ 109,685 | W205000157 | 79 |
| Eclipse Berry Farms | 8/1/98 | N | $ 172,000 | W205000156 | 79 |
| Rio Mesa Farms | 8/1/98 | N | $ 119,738 | W205000158 | 79 |
| Odwalla | 9/1/98 | N | $ 566,360 | W205000149 | 2163 |
| Coronet Foods, Inc | 9/1/98 | N | $ 84,253 | W205000151 | 6504 |
| KGM Harvesting | 9/1/98 | N | $ 64,105 | W205000152 | 0172 |
| Gudpak | 9/30/98 | N | $ 166,400 | W205000159 | 0172 |
| Cal West Farming | 9/18/98 | R | $ 695,492 | W205000160 | 0172 |
| Athens Baking | 10/1/98 | N | $ 47,574 | W205000154 | 2003 |
| MJS | 10/1/98 | N | $ 190,409 | W205000153 | 0172 |

# F.S.I.M. 1998 ISSUANCE LOG

| Account Name | Effec. Date | New Renewal | E.A.P. | Policy # | Gov. Class |
|---|---|---|---|---|---|
| Progresso Harvesting | 11/1/98 | N | $ 39,613 | W205000161 | 0079 |
| Rancho Buena Vista | 11/1/98 | N | $ 39,613 | W205000163 | 0079 |
| Olivers Market | 11/1/98 | N | $ 59,907 | W205000164 | 8006 |
| Tierra Linda Corp. | 11/1/98 | N | $ 132,488 | W205000165 | 0172 |
| Safari Harvesting | 11/1/98 | N | $ 39,613 | W205000162 | 0079 |
| Mill Valley Market | 9/1/98 | N | $ 25,077 | W205000150 | 8017 |
| LA Poultry | 11/30/98 | N | $ 101,689 | W205000166 | 8021 |
| Amy's Kitchen | 12/1/98 | N | $ 191,584 | W205000167 | 6504 |
| | | | | | |
| TOTALS | | | $ 8,899,295 | | |

PAGE INTENTIONALLY LEFT BLANK

# *F.S.I.M.*
# *FOOD SERVICES INSURANCE MANAGERS, INC.*

## ==*MEMORANDUM*==

**TO :** Janet Backer
**FROM :** George Hagosian
**DATE :** August 13, 1998
**SUBJECT :** *July 1998 New Business – FSIM Program*

Sorry for the delay in getting this to you, but as busy as 7/1 was, (and somewhat complicated by my taking some vacation time off), post 7/1 has been its equal. In fact we wrote some late July & early August business which will be forwarded to you under separate cover. We also have substantial business in for September!

I have several displays attached to this cover letter, to illustrate the overall book and to help substantiate various business decisions made in the "heat of battle" and caused by circumstances beyond our control. Most of your file copies will have a short memo attached to explain the risk and quotation/underwriting rational.

The first exhibit attached is the *"July '98 Quote/Issue"* listing. This shows the amount of volume we were able to entertain. (Note: It does not list those accounts discussed and declined verbally). You will notice that under the "notes" column various producers and "sub-producers" are mentioned, I will expand upon that point latter in this memo. You will also notice that three (3) accounts that were in the old Cal Comp captive arrangement were moved/renewed into the Frontier program. This was done in compliance with your desires and our commitment following our initial audit, and program negotiations.  *Did Dwight have conversation w/ Kevin?*

Prior to the July push, Dwight Halvorson Insurance Agency hired a new producer Chuck Hughes. Chuck introduced Dwight to a San Francisco Agent, Don Tarantino who specializes in the food industry in the Bay Area. He had written or had access to some of the best known accounts in the industry. Don has worked out an arrangement with Dwight to broker business through DHIS.

Dwight also made similar agreements (appointing them as sub-brokers) with Dodge, Warren & Peters – a large regional brokerage firm that has substantial volume in the Food Industry in Southern California- and VCAA (Ventura County Ag Association). VCAA is a Southern California Association that has hired two brokers, a loss control professional and lawyer to handle/negotiate their insurance. Members of the association deal solely in the Agricultural Industry and represented a huge block of both July and January business that they desired to move to FSIM.

With Tarantino and Dodge,Warren & Peters we were able to deal with individual accounts as they were submitted. But….with VCAA we had to deal with a block of business. In order to keep the endorsement of the association we had to find a way to write all existing members. PAULA had been the endorsed carrier, but lost that

*Do they all meet underwriting criteria ?!*

designation to FSIM. To complicate matters, one of the producers at VCAA left another agency and many of his records were purged or kept by that brokerage firm which then competed against him (and us) to obtain the business. It took substantial effort to collect the information, and some cases (very limited) we had to proceed with less information than we normally get.

Another unique feature of the VCAA book, is that there is a lot of accounts which fell below our $50,000 minimum. Some were associated with larger accounts which were being quoted or come up in Jan. Others were just part of the group. Our solution was to split the VCAA business into two distinct groups. One being for the "small" accounts the other being for "Big" accounts. In each group our minimum collective premium threshold was $500,000.

To facilitate a true "breakdown" in VCAA business we ask that you set up two separate cells. The first could be called VCAA "Small" Group, and will be comprised (initially, we plan to add additional accounts to the group) of the accounts listed in exhibit #2. The second cell would be called VCAA "BIG" Group, and will be comprised, initially, by the accounts listed in exhibit #3. We anticipate that each "cell" will be in excess of $2 Million by Feb. 1999.

Exhibit #4 shows the combined totals for VCAA's "Small" and "BIG" groups.

As indicated in Exhibit #1, July was an outstanding production month. We were able to add $2,847,977 to the total FSIM/Frontier program. This despite a very tough marketplace. Along with the traditional competition, Superior National (fresh from their announcement of their purchase of Cal Comp.) has been extremely competitive. Allistar, Paula, and Liberty Mutual rounded out the stiff competition.

With the July success, our total EAP with Frontier equals $5,893,094, as of July 1, 1998! Exhibit #5, "FSIM/FRONTIER ISSUANCE LOG", lists all accounts in the program as of July 1, 1998 with EAP, Policy #, Ex.Mod., Credit, and Gov. Class.

As you go through the accounts you will notice that there were several violations of our granted authority. They stem from the competitive environment, the necessity to make business decisions, the late publication of experience modifications, and necessity to make accommodations to capture a large block of business. Throughout the underwriting process, I kept a focus on the "overall" balance of the book. Most of the Exhibits attached to this cover show both individual Credit allocation and cumulative totals. *Kevin to address*

In regards to the Experience Modification situation, please note that many accounts were quoted and presented using 1997 Experience Modifications. When the 1998 Xmod was published we didn't have time to notify you, and in several instances had the order before the new mod was published. We are attempting to correct this situation, and have gone "on line" with the "net" to expedite the process of obtaining Xmods. Still, major quarters in California, have historically seen slow promulgation by the WCIRB. *How do we address?*

Please note that those accounts with Mods over 1.25, have shown positive trends in both Frequency and Severity reduction. In most instances we sense that the Mods will be on the way down, once positive years are fully incorporated into the Mod calculation.

In regards to credits, although on several occasions I exceeded the authority (45% max), it was done to capture an exceptional account, or in regards to the groups, attempting to keep the "block" together. It was also done with the focus upon selling some with a lower credit and keeping the overall average reasonable.

As I have stated in previous memos and letters, the competitive environment in California has seen most carriers using anywhere from 46 to 48% average credits (this before Premium Discount). Our efforts in July – as illustrated in Exhibit #6 – show a total average discount of 39.7%! Exhibit #7 shows that FSIM's average credit allocation for all business currently in the Frontier program (as of 7/1/98) is 39.06! Other exhibits show average credit allocations that fall below the industry average;

> Exhibit #2 VCAA "Small" Group = 32.7% Average Credit Allocation
> Exhibit #3 VCAA "Big" Group = 36.8% Average Credit Allocation
> Exhibit #4 VCAA Total Business = 34.5% Average Credit Allocation

Clearly, were we can sell less credit (or even a debit) we will. But the ferocity of the market place had dictated that to be successful on desirable, outstanding accounts, we need to exceed 45% credits from time to time. In July, we were not given much notice by the buyer and had to adjust original quotes to "come closer", not necessarily beat the competition price wise.

*not w/o approval*

I hope the information provided above and file information provided makes sense. If you have any questions please do not hesitate to call. I'll be updating you shortly on some of the accounts written following 7/1/98. And I hope to hear from you regarding the two separate cells (VCAA Small & BIG).

Again, please excuse the delay in getting all this to you. Thank you for your help, understanding and faith in our program.

Exhibit X

# FSIM
# July '98 Quote/Issue

| Account Name | E.A.P. | Status | Issued @ | Notes |
|---|---|---|---|---|
| Alioto Fish Company | $ 58,994 | Lost | $ - | Sub-Producer Tarantino |
| Apple Packing | $ 62,445 | Lost | $ - | Wise |
| B.J. Harvesting | $ 89,792 | Issued | $ 89,792 | VCAA |
| BHG Ventures | $ 23,775 | Lost | $ - | Sub-Producer Tarantino |
| Bien Nacido Vineyards | $ 64,926 | Issued | $ 64,926 | VCAA |
| Bob Jones Ranch | $ 1,914 | Issued | $ 1,914 | VCAA |
| Boskovich Farms | $ 520,142 | Lost | $ - | VCAA |
| Casper Berry Farms | $ 56,186 | Issued | $ 56,186 | VCAA |
| Central Coast Packing | $ 183,725 | Lost | $ - | Wise |
| Channel Island Berry | $ 67,932 | Issued | $ 67,932 | VCAA |
| Chualar Labor | $ 270,495 | Lost | $ - | |
| Clinton's Restaurant | $ 64,102 | Lost | $ - | Dodge Warren Peters |
| Conroy Berry Farms | $ 45,454 | Issued | $ 45,454 | VCAA |
| Country Gold Farm | $ 148,085 | Issued | $ 148,085 | VCAA |
| D & V Harvesting | $ 67,719 | Issued | $ 67,719 | VCAA |
| Desert Packing | $ 187,733 | Issued | $ 187,733 | from Cal Comp Program |
| E & L Avila | $ 108,000 | Lost | $ - | Wise |
| Emerald Produce | $ 126,200 | Lost | $ - | from Cal Comp Program |
| Ferrari-Carano Winery | $ 110,854 | Lost | $ - | Jackson |
| Fino Ristorante | $ 14,749 | Lost | $ - | Sub-Producer Tarantino |
| Fukutomi Farms | $ 51,141 | Issued | $ 51,141 | VCAA |
| Fulfillment Systems | $ 107,912 | Issued | $ 107,912 | Sub-Producer Tarantino |
| Garcia Farming | $ 86,404 | Lost | $ - | |
| Hall Ag. Ent. | $ 373,051 | Lost | $ - | Wise |
| Hasegawa Farms | $ 32,319 | Issued | $ 32,319 | VCAA |
| Hiji Brothers | $ 277,548 | Issued | $ 277,548 | VCAA |
| J.A. Contracting | $ 147,700 | Lost | $ - | |
| Jamba Juice | $ 299,974 | Lost | $ - | Dodge Warren Peters |
| La Pizza Loca | $ 103,730 | Lost | $ - | Dodge Warren Peters |
| Lardas Systems | $ 41,000 | Lost | $ - | Dodge Warren Peters |
| Luna Fertilizer | $ 18,665 | Issued | $ 18,665 | VCAA |
| M. Nishimori Farms | $ 88,346 | Issued | $ 88,346 | VCAA |
| Martinez Farms | $ 44,583 | Issued | $ 44,583 | VCAA |
| Mollie Stone's Market | $ 166,898 | Lost | $ - | Sub-Producer Tarantino |
| Moss Beach Distillery | $ 53,440 | Lost | $ - | Sub-Producer Tarantino |
| Mt. Peoples Warehouse | $ 474,078 | Lost | $ - | |

# FSIM
## July '98 Quote/Issue

| Account | E.A.P. | Status | Issued @ | Notes |
|---|---|---|---|---|
| Natural Selection | $ 314,379 | Issued | $ 314,379 | from Cal Comp Program |
| Original Joe's | $ 18,434 | Lost | $ - | Sub-Producer Tarantino |
| P & P Agri Labor | $ 6,201 | Lost | $ - | part of Chualar |
| Pacific Fruit Processors | $ 33,724 | Lost | $ - | Dodge Warren Peters |
| Pacifico Berry Farms | $ 172,856 | Issued | $ 172,856 | VCAA |
| Philip McGrath Farms | $ 8,182 | Issued | $ 8,182 | VCAA |
| Quality Farm Labor | $ 165,598 | Lost | $ - | Wise |
| Rancho Guadalasca | $ 63,569 | Issued | $ 63,569 | VCAA |
| Ruiz Mexican Foods | $ 54,675 | Lost | $ | Dodge Warren Peters |
| Santa Clara Farms | $ 67,687 | Issued | $ 67,687 | VCAA |
| Spengers | $ 112,543 | Issued | $ 112,543 | Sub-Producer Tarantino |
| Sunsweet Dryers | $ 134,129 | Issued | $ 134,129 | from Cal Comp Program |
| Swiss Louis Restaurant | $ 26,817 | Issued | $ 26,817 | Sub-Producer Tarantino |
| The Growers Company | $ 395,619 | Issued | $ 395,619 | from Cal Comp Program |
| The Villa Restaurant | $ 14,769 | Lost | $ - | Sub-Producer Tarantino |
| Union Foods, Inc. | $ 96,897 | Lost | $ - | Dodge Warren Peters |
| Valle Dorado Ag. | $ 194,624 | Issued | $ 194,624 | VCAA |
| WSF Beverage | $ 21,636 | Lost | $ - | Sub-Producer Tarantino |
| Yamamoto Farms | $ 7,317 | Issued | $ 7,317 | VCAA |
| | | | | |
| | | | | |
| | | | | |
| | $ 6,549,667 | | $ 2,847,977 | |
| | | | | |
| *UNIT QUOTE TO ISSUE "HIT RATIO" = 46%* | | | | |
| *PREMIUM QUOTE TO ISSUE "HIT RATIO = 43%* | | | | |

Exhibit #2

## FSIM/FRONTIER
## CREDIT ALLOCATION 7/1/98 Business

| Account Name | Effec. Date | Gov. Class | Prem. after Xmod | Prem. after Credits | % Credits |
|---|---|---|---|---|---|
| Country Gold Farm | 7/1/98 | 0016 | $ 297,126 | $ 164,905 | 44% |
| Martinez Farms | 7/1/98 | 0079 | $ 64,967 | $ 48,725 | 25% |
| Bien Nacido Vineyards | 7/1/98 | 0040 | $ 83,754 | $ 71,191 | 15% |
| M. Nishimori Farms | 7/1/98 | 0172 | $ 134,838 | $ 97,083 | 28% |
| B.J. Harvesting | 7/1/98 | 0016 | $ 176,200 | $ 98,200 | 44% |
| Luna Fertilizer | 7/1/98 | 0050 | $ 29,547 | $ 20,092 | 32% |
| Fukutomi Farms | 7/1/98 | 0079 | $ 65,899 | $ 56,014 | 15% |
| Santa Clara Farms | 7/1/98 | 0016 | $ 148,599 | $ 74,300 | 50% |
| D & V Harvesting | 7/1/98 | 0016 | $ 148,670 | $ 74,335 | 50% |
| Casper Berry Farms | 7/1/98 | 0079 | $ 78,897 | $ 61,540 | 22% |
| Hasegawa Farms | 7/1/98 | 0079 | $ 59,607 | $ 35,168 | 41% |
| Philip McGrath Farms | 7/1/98 | 0079 | $ 10,017 | $ 8,514 | 15% |
| Conroy Berry Farms | 7/1/98 | 0079 | $ 65,360 | $ 49,677 | 24% |
| Channel Island Berry | 7/1/98 | 0079 | $ 82,854 | $ 74,569 | 10% |
| Yamamato Farms | 7/1/98 | 0005 | $ 8,391 | $ 7,552 | 10% |
| Bob Jones Ranch | 7/1/98 | 8810 | $ 1,914 | $ 1,914 | 0% |
| Rancho Guadalasca | 7/1/98 | 0016 | $ 49,798 | $ 69,717 | -40% |
| | | | | | |
| TOTALS | | | $ 1,506,438 | $ 1,013,496 | 32.7% |

## "VCAA "Small" Group"

Exhibit #3

## FSIM/FRONTIER
## CREDIT ALLOCATION 7/1/98 Business

| Account Name | Effec. Date | Gov. Class | Prem. after Xmod | Prem. after Credits | % Credits |
|---|---|---|---|---|---|
| Valle Dorado Ag. | 7/1/98 | 0040 | $ 410,754 | $ 217,700 | 47% |
| Pacifico Berry Farms | 7/1/98 | 0079 | $ 311,162 | $ 192,920 | 38% |
| Hiji Brothers, Inc. | 7/1/98 | 0172 | $ 421,416 | $ 311,848 | 26% |
| | | | | | |
| TOTALS | | | $ 1,143,332 | $ 722,468 | 36.8% |

VCAA "BIG" Group

Exhibit #47

## FSIM/FRONTIER
## CREDIT ALLOCATION 7/1/98 Business

| Account Name | Effec. Date | Gov. Class | Prem. after Xmod | Prem. after Credits | % Credits |
|---|---|---|---|---|---|
| Country Gold Farm | 7/1/98 | 0016 | $ 297,126 | $ 164,905 | 44% |
| Martinez Farms | 7/1/98 | 0079 | $ 64,967 | $ 48,725 | 25% |
| Bien Nacido Vineyards | 7/1/98 | 0040 | $ 83,754 | $ 71,191 | 15% |
| M. Nishimori Farms | 7/1/98 | 0172 | $ 134,838 | $ 97,083 | 28% |
| B.J. Harvesting | 7/1/98 | 0016 | $ 176,200 | $ 98,200 | 44% |
| Luna Fertilizer | 7/1/98 | 0050 | $ 29,547 | $ 20,092 | 32% |
| Fukutomi Farms | 7/1/98 | 0079 | $ 65,899 | $ 56,014 | 15% |
| Santa Clara Farms | 7/1/98 | 0016 | $ 148,599 | $ 74,300 | 50% |
| D & V Harvesting | 7/1/98 | 0016 | $ 148,670 | $ 74,335 | 50% |
| Casper Berry Farms | 7/1/98 | 0079 | $ 78,897 | $ 61,540 | 22% |
| Hasegawa Farms | 7/1/98 | 0079 | $ 59,607 | $ 35,168 | 41% |
| Philip McGrath Farms | 7/1/98 | 0079 | $ 10,017 | $ 8,514 | 15% |
| Conroy Berry Farms | 7/1/98 | 0079 | $ 65,360 | $ 49,677 | 24% |
| Channel Island Berry | 7/1/98 | 0079 | $ 82,854 | $ 74,569 | 10% |
| Valle Dorado Ag. | 7/1/98 | 0040 | $ 410,754 | $ 217,700 | 47% |
| Pacifico Berry Farms | 7/1/98 | 0079 | $ 311,162 | $ 192,920 | 38% |
| Hiji Brothers, Inc. | 7/1/98 | 0172 | $ 421,416 | $ 311,848 | 26% |
| Yamamato Farms | 7/1/98 | 0005 | $ 8,391 | $ 7,552 | 10% |
| Bob Jones Ranch | 7/1/98 | 8810 | $ 1,914 | $ 1,914 | 0% |
| Rancho Guadalasca | 7/1/98 | 0016 | $ 49,798 | $ 69,717 | -40% |
| TOTALS | | | $ 2,649,770 | $ 1,735,964 | 34.5% |

## VCAA Total Business

Exhibit 8 5

# F.S.I.M./FRONTIER ISSUANCE LOG

| Account Name | Effec. Date | New Renewal | E.A.P. | Policy # | Ex.Mod. | Credit (Debit) | Gov. Class |
|---|---|---|---|---|---|---|---|
| ~~Coachella Valley Gins~~ | 1/1/98 | N | $ 490,577 | WC 38851 | 1.82 | 25% | 0016 |
| ~~Dental Management~~ | 1/1/98 | N | $ 38,238 | WC 38852 | 1.59 | 49% | 0016 |
| ~~Growers Transport~~ | 1/1/98 | N | $ 53,918 | WC 38853 | 1.72 | 49% | 7219 |
| ~~Produce Dairy~~ | 1/1/98 | N | $ 210,008 | WC 38854 | 1.16 | 40% | 2063 |
| Bar 20 Dairy | 1/1/98 | N | $ 45,336 | WC 38855 | 1.16 | 45% | 0036 |
| ~~Sierra Citrus Assoc~~ | 1/1/98 | N | $ 113,085 | WC 38856 | 1.13 | 41% | 2108 |
| ~~WC 3541 Farm~~ | 1/3/98 | N | $ 78,712 | —WC 38857 | 0.76 | 50% | 0079 |
| ~~George Dairy & Cattle~~ | 1/1/98 | N | $ 78,478 | WC 38858 | 1.24 | 46% | 0172 |
| ~~Mirive Quality~~ | 1/1/98 | N | $ 71,388 | WC 38859 | 1.47 | 41% | 6504 |
| La Tapatia Tortilleria | 3/31/98 | N | $ 109,738 | WC 38860 | 1.64 | 46% | 2003 |
| Holiday Quality Foods | 4/1/98 | N | $ 366,814 | WC 38861 | 1.99 | 39% | 8006 |
| North State Grocery | 4/1/98 | N | $ 670,562 | WC 38862 | 1.91 | 40% | 8006 |
| Holiday Ranches | 4/1/98 | N | $ 26,170 | WC 38863 | 1.99 | 44% | 0038 |
| Organic Food Products | 5/1/98 | N | $ 61,161 | WC 38864 | 0.81 | 29% | 6504 |
| SK Foods | 5/1/98 | N | $ 131,741 | WC 38865 | 1 | 47% | 2111 |
| Cal West Farming | 5/1/98 | N | $ 499,148 | WC 38866 | 1.57 | 36% | 0172 |
| Desert Packing | 7/1/98 | N | $ 187,733 | WC 38872 | 1.53 | 45% | 0172 |
| The Growers Company | 7/1/98 | N | $ 395,619 | WC 38871 | 0.73 | 50% | 0172 |
| Sunsweet Dryers | 7/1/98 | N | $ 134,129 | WC 38892 | 1.77 | 44% | 2102 |
| Natural Selection Foods | 7/1/98 | N | $ 314,379 | WC 38885 | 1.19 | 45% | 0172 |
| Swiss Louis Restaurant | 7/1/98 | N | $ 26,817 | WC 38891 | 0.89 | 46% | 9079 |
| Spengers | 7/1/98 | N | $ 112,543 | WC 38870 | 1.78 | 45% | 9079 |
| Country Gold Farm | 7/1/98 | N | $ 148,085 | WC 38873 | 1 | 44% | 0016 |
| Martinez Farms | 7/1/98 | N | $ 44,583 | WC 38884 | 1.21 | 25% | 0079 |
| Bien Nacido Vineyards | 7/1/98 | N | $ 64,926 | WC 38889 | 0.99 | 15% | 0040 |
| M. Nishimori Farms | 7/1/98 | N | $ 88,346 | WC 38883 | 0.91 | 28% | 0172 |
| B.J. Harvesting | 7/1/98 | N | $ 89,792 | WC 38880 | 0.89 | 44% | 0016 |

# F.S.I.M./FRONTIER ISSUANCE LOG

| Account Name | Effec. Date | New Renewal | E.A.P. | Policy # | Ex.Mod. | Credit (Debit) | Gov. Class |
|---|---|---|---|---|---|---|---|
| Luna Fertilizer | 7/1/98 | N | $ 18,665 | WC 38888 | 1 | 32% | 0050 |
| Fukutomi Farms | 7/1/98 | N | $ 51,141 | WC 38886 | 0.85 | 15% | 0079 |
| D & V Harvesting | 7/1/98 | N | $ 67,719 | WC 38881 | 1 | 50% | 0016 |
| Casper Berry Farms | 7/1/98 | N | $ 56,186 | WC 38882 | 1.02 | 22% | 0079 |
| Hasegawa Farms | 7/1/98 | N | $ 32,319 | WC 38874 | 1 | 41% | 0079 |
| Philip McGrath Farms | 7/1/98 | N | $ 8,182 | WC 38875 | 1 | 15% | 0079 |
| Conroy Berry Farms | 7/1/98 | N | $ 45,454 | WC 38877 | 0.73 | 24% | 0079 |
| Valley Dorado Ag | 7/1/98 | N | $ 194,624 | WC 38893 | -0.87 | 47% | 0040 |
| Pacifico Berry Farms | 7/1/98 | N | $ 172,856 | WC 38879 | 1.71 | 38% | 0079 |
| Hiji Brothers, Inc. | 7/1/98 | N | $ 277,578 | WC 38890 | 0.89 | 26% | 0172 |
| Santa Clara Farms | 7/1/98 | N | $ 67,687 | WC 38887 | 1 | 50% | 0016 |
| Channel Island Berry | 7/1/98 | N | $ 67,932 | WC 38878 | 0.99 | 10% | 0079 |
| Fulfillment Systems | 7/1/98 | N | $ 107,912 | WC 38869 | 0.95 | 50% | 9079 |
| Yamamoto Farms | 7/1/98 | N | $ 7,317 | WC 38898 | 1.09 | 10% | 0005 |
| Bob Jones Ranch | 7/1/98 | N | $ 1,914 | WC 38897 | 1 | 0% | 8810 |
| Rancho Guadalasca | 7/1/98 | N | $ 63,582 | WC 38895 | 0.9 | -40% | 0016 |
| | | | | | | | |
| TOTALS | | | $ 5,893,094 | | | 39.06% | |

Exhibit # 6

# FSIM/FRONTIER
## CREDIT ALLOCATION 7/1/98 Business

| Account Name | Effec. Date | Gov. Class | Prem. after Xmod | Prem. after Credits | % Credits |
|---|---|---|---|---|---|
| Desert Packing | 7/1/98 | 0172 | $ 381,377 | $ 209,757 | 45% |
| Growers Company | 7/1/98 | 0172 | $ 355,332 | $ 177,666 | 50% |
| Sunsweet Dryers | 7/1/98 | 2102 | $ 266,128 | $ 149,032 | 44% |
| Natural Selection (CA) | 7/1/98 | 0172 | $ 532,546 | $ 292,900 | 45% |
| Swiss Louis Rest. | 7/1/98 | 9079 | $ 53,921 | $ 29,117 | 46% |
| Spengers | 7/1/98 | 9079 | $ 226,355 | $ 124,495 | 45% |
| Fulfillment Systems | 7/1/98 | 9079 | $ 238,480 | $ 119,240 | 50% |
| Country Gold Farm | 7/1/98 | 0016 | $ 297,126 | $ 164,905 | 44% |
| Martinez Farms | 7/1/98 | 0079 | $ 64,967 | $ 48,725 | 25% |
| Bien Nacido Vineyards | 7/1/98 | 0040 | $ 83,754 | $ 71,191 | 15% |
| M. Nishimori Farms | 7/1/98 | 0172 | $ 134,838 | $ 97,083 | 28% |
| B.J. Harvesting | 7/1/98 | 0016 | $ 176,200 | $ 98,200 | 44% |
| Luna Fertilizer | 7/1/98 | 0050 | $ 29,547 | $ 20,092 | 32% |
| Fukutomi Farms | 7/1/98 | 0079 | $ 65,899 | $ 56,014 | 15% |
| Santa Clara Farms | 7/1/98 | 0016 | $ 148,599 | $ 74,300 | 50% |
| D & V Harvesting | 7/1/98 | 0016 | $ 148,670 | $ 74,335 | 50% |
| Casper Berry Farms | 7/1/98 | 0079 | $ 78,897 | $ 61,540 | 22% |
| Hasegawa Farms | 7/1/98 | 0079 | $ 59,607 | $ 35,168 | 41% |
| Philip McGrath Farms | 7/1/98 | 0079 | $ 10,017 | $ 8,514 | 15% |
| Conroy Berry Farms | 7/1/98 | 0079 | $ 65,360 | $ 49,677 | 24% |
| Channel Island Berry | 7/1/98 | 0079 | $ 82,854 | $ 74,569 | 10% |
| Valle Dorado Ag. | 7/1/98 | 0040 | $ 410,754 | $ 217,700 | 47% |
| Pacifico Berry Farms | 7/1/98 | 0079 | $ 311,162 | $ 192,920 | 38% |
| Hiji Brothers, Inc. | 7/1/98 | 0172 | $ 421,416 | $ 311,848 | 26% |
| Yamamoto Farms | 7/1/98 | 0005 | $ 8,391 | $ 7,552 | 10% |

**FSIM/FRONTIER**
**CREDIT ALLOCATION 7/1/98 Business**

| Account Name | Effec. Date | Gov. Class | Prem. after Xmod | Prem. after Credits | % Credits |
|---|---|---|---|---|---|
| Bob Jones Ranch | 7/1/98 | 8810 | $ 1,914 | $ 1,914 | 0% |
| Rancho Guadalasca | 7/1/98 | 0016 | $ 49,798 | $ 69,717 | -40% |
| | | | | | |
| TOTALS | | | $ 4,703,909 | $ 2,838,171 | 39.7% |

**FSIM/FRONTIER**
**CREDIT ALLOCATION Total Business**

| Account Name | Effec. Date | Gov. Class | Prem. after Xmod | Prem. after Credits | % Credits |
|---|---|---|---|---|---|
| Holiday Quality Food | 5/1/98 | 8006 | $ 677,179 | $ 413,079 | 39% |
| Holiday Ranches | 5/1/98 | 0038 | $ 50,685 | $ 28,384 | 44% |
| North State Grocery | 5/1/98 | 8006 | $ 1,265,688 | $ 759,413 | 40% |
| Cal West Farming | 5/1/98 | 0172 | $ 880,268 | $ 563,372 | 36% |
| Organic Food Prod. | 5/1/98 | 6504 | $ 94,455 | $ 67,063 | 29% |
| SK Foods | 5/1/98 | 2111 | $ 275,880 | $ 146,216 | 47% |
| La Tapatia | 3/31/98 | 2003 | $ 224,552 | $ 121,258 | 46% |
| V & L Farms | 1/3/98 | 0079 | $ 172,993 | $ 86,497 | 50% |
| Sierra Citrus Assoc. | 1/1/98 | 2108 | $ 212,023 | $ 125,094 | 41% |
| Geo. Perry & Sons | 1/1/98 | 0172 | $ 159,528 | $ 86,145 | 46% |
| Nature Quality | 1/1/98 | 6504 | $ 132,817 | $ 78,362 | 41% |
| Growers Transport | 1/1/98 | 7219 | $ 115,797 | $ 59,056 | 49% |
| Coachella Valley Citru | 1/1/98 | 0016 | $ 738,265 | $ 553,699 | 25% |
| Dunlap Management | 1/1/98 | 0016 | $ 81,853 | $ 41,745 | 49% |
| Producers Dairy | 1/1/98 | 2063 | $ 391,952 | $ 235,171 | 40% |
| Desert Packing | 7/1/98 | 0172 | $ 381,377 | $ 209,757 | 45% |
| Growers Company | 7/1/98 | 0172 | $ 355,332 | $ 177,666 | 50% |
| Sunsweet Dryers | 7/1/98 | 2102 | $ 266,128 | $ 149,032 | 44% |
| Natural Selection (CA) | 7/1/98 | 0172 | $ 532,546 | $ 292,900 | 45% |
| Swiss Louis Rest. | 7/1/98 | 9079 | $ 53,921 | $ 29,117 | 46% |
| Spengers | 7/1/98 | 9079 | $ 226,355 | $ 124,495 | 45% |
| Fulfillment Systems | 7/1/98 | 9079 | $ 238,480 | $ 119,240 | 50% |
| Country Gold Farm | 7/1/98 | 0016 | $ 297,126 | $ 164,905 | 44% |
| Martinez Farms | 7/1/98 | 0079 | $ 64,967 | $ 48,725 | 25% |
| Bien Nacido Vineyards | 7/1/98 | 0040 | $ 83,754 | $ 71,191 | 15% |
| M. Nishimori Farms | 7/1/98 | 0172 | $ 134,838 | $ 97,083 | 28% |
| B.J. Harvesting | 7/1/98 | 0016 | $ 176,200 | $ 98,200 | 44% |

**FSIM/FRONTIER**
**CREDIT ALLOCATION  Total Business**

| Account Name | Effec. Date | Gov. Class | Prem. after Xmod | Prem. after Credits | % Credits |
|---|---|---|---|---|---|
| Luna Fertilizer | 7/1/98 | 0050 | $ 29,547 | $ 20,092 | 32% |
| Fukutomi Farms | 7/1/98 | 0079 | $ 65,899 | $ 56,014 | 15% |
| Santa Clara Farms | 7/1/98 | 0016 | $ 148,599 | $ 74,300 | 50% |
| D & V Harvesting | 7/1/98 | 0016 | $ 148,670 | $ 74,335 | 50% |
| Casper Berry Farms | 7/1/98 | 0079 | $ 78,897 | $ 61,540 | 22% |
| Hasegawa Farms | 7/1/98 | 0079 | $ 59,607 | $ 35,168 | 41% |
| Philip McGrath Farms | 7/1/98 | 0079 | $ 10,017 | $ 8,514 | 15% |
| Conroy Berry Farms | 7/1/98 | 0079 | $ 65,360 | $ 49,677 | 24% |
| Channel Island Berry | 7/1/98 | 0079 | $ 82,854 | $ 74,569 | 10% |
| Valle Dorado Ag. | 7/1/98 | 0040 | $ 410,754 | $ 217,700 | 47% |
| Pacifico Berry Farms | 7/1/98 | 0079 | $ 311,162 | $ 192,920 | 38% |
| Hiji Brothers, Inc. | 7/1/98 | 0172 | $ 421,416 | $ 311,848 | 26% |
| Yamamoto Farms | 7/1/98 | 0005 | $ 8,391 | $ 7,552 | 10% |
| Bob Jones Ranch | 7/1/98 | 8810 | $ 1,914 | $ 1,914 | 0% |
| Rancho Guadalasco | 7/1/98 | 0016 | $ 49,798 | $ 69,717 | -40% |
| TOTALS | | | $ 10,177,844 | $ 6,202,725 | 39.06% |

**PAGE INTENTIONALLY LEFT BLANK**

# *F.S.I.M.*
# FOOD SERVICES INSURANCE MANAGERS, INC.

## ==MEMORANDUM==

**TO :** Janet Backer
**FROM :** George Hagosian
**DATE :** October 15, 1998
**SUBJECT :** *Land Transportation Reinsurance for FSIM Program*

Sorry for the delay in getting this to you, but ,as always, prior and post "10/1" has been hectic.

In any case, as a follow-up/written confirmation of our September discussions regarding *"Land Transportation Reinsurance"* we have chosen option two of the four options provided in Sue Cole's memo of September 16, 1998. This option was structured as follows,

- *Limits/Coverage*      *$7,500,000 x/s $500,000*
- *Contact Period*       *TBA*
- *ReIns. Placement*     *100%*
- *ReIns. Rate(s)*       *Per Vehicle/Per Seat*

    *Non Seated  : $ 43.94*   Typo - should be $35.15
    *5 - 15 Seats : $ 5.15*
    *16-25 Seats : $ 58.57*
    *25+ Seats   : $117.16*

- *Max Any 1 Life*       *$1,000,000*

In addition this is written confirmation of my verbal suggestion for underwriting criteria via MVRs for the program,          Good recommendation

- **No Major (Reckless Driving, DUI) Violation in last 36 months**
- **No Suspensions or Revocation of License in last 36 months**
- **No Driver shall have 3 moving violations or 2 at fault accidents in last 36 months.**
- **No Driver shall have 2 moving violations or 1 fault accident in the last 24 months.**

Thank you for all your assistance in creating this.

Cc: Dwight Halvorson

PAGE INTENTIONALLY LEFT BLANK

*[handwritten: For new and renewal business → possible solution.]*

# F.S.I.M./FRONTIER PROGRAM
## "Wish List"
## Requested/Suggested Program Alterations For Renewal of Contract

1. ***Maintain current competitiveness on base rates***. If California Pure Premium rates increase, file for reduction in loss cost multiplier. Conversely, should California Pure Premium rates decrease, file for increase in loss cost multiplier. In either case the net result should be to maintain consistency in "gross rates" 1998 vs. 1999. *[handwritten: No]*

*[handwritten left margin: to write cream of the business.]*

2. ***File for increase in schedule credit/debit to 60%***. This would be more consistent with filings by our competitors. It would also allow us to close "the gap" between us and the Direct Writers (Farmers, Liberty Mutual, the State Fund) who have become extremely competitive on profitable accounts. *[handwritten: Perhaps will consid...]*

3. ***Expand credit application authority as follows***,

    A maximum of ~~45%~~ *[handwritten: 30% 35% 25%]* schedule credit may be applied to risks in the State of California with standard **premium ranging from $2,000 to $49,999**.

    A maximum of ~~55%~~ *[handwritten: 45%]* schedule credit may be applied to risks in the State of California with standard **premium ranging from $50,000 to $999,999**. *[handwritten: No]*

    A maximum of 50% schedule credit may be applied to risks in the State of California with standard **premium of $1,000,000 or more**. *[handwritten: ✓]*

    Additional credits my be request through referral of account to Frontier Underwriter.

    *[handwritten: ✱ Yearly averages to exceed 40%? ← Need to add wording.]*

4. ***Lower minimum premium to $2,000***. This is necessitated to support some of the Groups we have an opportunity to assemble. This is also necessitated in situations where larger accounts have relationships (interest) in smaller accounts and must be written in conjunction with the larger in order to secure order. *[handwritten: OK]*

*[handwritten left margin: 35% 40% ✗]*

5. ***Allow the inclusion of risks with less than three years of operation into the program provided they have had prior experience in either an ownership or management capacity, in the same type of operation, for a period of five (5) years or more***. Distinction here being, new business vs. new venture. *[handwritten: OK]*

6. ***Expand underwriting authority to include risks with Experience Modifications in excess of 1.26 provided that their recent trending (current plus prior year) for both frequency and severity is positive (downward trend)***. In addition, FSIM RQA should reflect Senior Management commitment, safety enhancement, significant operational modifications and/or elimination of hazards.

*[handwritten: no experience not → losses etc]*
*[handwritten: George relies on losses as indicator, not exp mod]*
*[handwritten: OK 1.50]*

FIC/FSIM 000596

*yes*

7. *In instances where Experience Modification is in excess of 1.26 and recent trending is "flat" or negative (upward trend), and FSIM has reason or rational to entertain quotation, risk will be submitted to Frontier for special consideration.* No such risk will be bound without prior written approval by Frontier.

8. *Grant four (4) additional points to Management Fee.* Allowance ~~without increase to LOC requirement.~~

*L7. Advised that this may not be possible. Point of discussion for Dick/Kevin.*

FIC/FSIM 000597

**Volume Status and Projection for Year End 1999**

Current Frontier Volume: approximately **$8,000,000.**

Production goal 1/1/99: **$5,000,000.** of new business
· Production goal for 7/1/99: **$7,000,000.**
Production goal for 7/2/99:12/31/99: **$5,000,000.**
Production goal for 1/1/00: **$10,000,000.**

**Total projected growth through 1/1/00- $35,000,000.**

FIC/FSIM 000598

**PAGE INTENTIONALLY LEFT BLANK**

# F.S.I.M.
## FOOD SERVICES INSURANCE MANAGERS, INC.

## ==MEMORANDUM==

NOV 16 1998

_ Fed Ex

**TO :** Janet Backer
**FROM :** George Hagosian
**DATE :** November 13, 1998
**SUBJECT :** *Program Renewal Data*

Per your October 8, 1998 memo, the information you requested is attached. In addition I have also included an updated *FSIM/Frontier Issuance Log*. A copy of the Issuance Log was also sent to Allison Wingerter (I'll continue to send you and her an updated version on a monthly basis).

This cover and "spread sheets" are being faxed. A "hard copy" of memo and spread sheets, along with copies of payroll history on each account will be overnighted to your attention (you should receive them Monday).

The projected/estimated payroll broken down by WC Classification codes, is just that ESTIMATED. As indicated by the Issuance Log our current EAP in the program is in excess of $8 million. We intend (and have projected and planed for) growth in 1999 to total $25,000,000 EAP.

What I have done to estimate the '99 payrolls is to project a high renewal persistency and figure modest payroll growth for those renewals. Then in classes where we anticipate the greatest opportunity for growth, I have increased the percentage of payroll increase. For instance Classification 0040 Vineyards projects a 28% increase, Classification 8209 Fresh Vegetable Packing projects a 20% increase over 1998 payroll in the class. Other classes such as 6504 Confections, Food Mfg reflect modest (2%) increase, most likely added to policies as incidental operations.

Several classes, not included in prior years were added and have had payroll projections listed in anticipation that these types of accounts are added to the book's mix. (Note, From Breweries 2121 down).

As regards large loss data, information on that has been provided in our submissions to you. Should you need additional copies I can get it for your, but, I'll have to go through our files and make copies. Didn't want to hold this up any longer.

Once again, sorry for the delay in getting this to you, but I wanted it to be accurate and precise. If you have any questions, please do not hesitate to call.

Cc : Dwight Halvorson

# F.S.I.M./FRONTIER ISSUANCE LOG

| Account Name | Effec. Date | New Renewal | E.A.P. | Policy # | Ex. Mod. | Credit (Debit) | Gov. Class |
|---|---|---|---|---|---|---|---|
| Coachella Valley Citrus | 1/1/98 | N | $ 490,577 | W205000106 | 1.82 | 25% | 0016 |
| Dunlap Management | 1/1/98 | N | $ 38,238 | W205000107 | 1.59 | 49% | 0016 |
| Growers Transport | 1/1/98 | N | $ 53,918 | W205000108 | 1.72 | 49% | 7219 |
| Producer's Dairy | 1/1/98 | N | $ 210,008 | W205000109 | 1.16 | 40% | 2063 |
| Bar 20 Dairy | 1/1/98 | N | $ 45,336 | W205000125 | 1.16 | 45% | 0036 |
| Sierra Citrus Assoc. | 1/1/98 | N | $ 113,085 | W205000110 | 1.13 | 41% | 2108 |
| V & L Farms | 1/3/98 | N | $ 78,712 | W205000111 | 0.76 | 50% | 0079 |
| George Perry & Sons | 1/1/98 | N | $ 78,478 | W205000112 | 1.24 | 46% | 0172 |
| Nature Quality | 1/1/98 | N | $ 71,388 | W205000113 | 1.47 | 41% | 6504 |
| La Tapatia Tortilleria | 3/31/98 | N | $ 109,738 | W205000114 | 1.64 | 46% | 2003 |
| Holiday Quality Foods | 4/1/98 | N | $ 366,814 | W205000115 | 1.99 | 39% | 8006 |
| North State Grocery | 4/1/98 | N | $ 670,562 | W205000116 | 1.91 | 40% | 8006 |
| Holiday Ranches | 4/1/98 | N | $ 26,170 | W205000117 | 1.99 | 44% | 0038 |
| Organic Food Products | 5/1/98 | N | $ 61,161 | W205000118 | 0.81 | 29% | 6504 |
| SK Foods | 5/1/98 | N | $ 131,741 | W205000119 | 1 | 47% | 2111 |
| Cal West Farming | 5/1/98 | N | $ 499,148 | W205000120 | 1.57 | 36% | 0172 |
| Desert Packing | 7/1/98 | N | $ 187,733 | W205000121 | 1.53 | 45% | 0172 |
| The Growers Company | 7/1/98 | N | $ 395,619 | W205000122 | 0.73 | 50% | 0172 |
| Sunsweet Dryers | 7/1/98 | N | $ 134,129 | W205000123 | 1.77 | 44% | 2102 |
| Natural Selection Foods | 7/1/98 | N | $ 314,379 | W205000124 | 1.19 | 45% | 0172 |
| Swiss Louis Restaurant | 7/1/98 | N | $ 26,817 | W205000126 | 0.89 | 46% | 9079 |
| Spengers | 7/1/98 | N | $ 112,543 | W205000127 | 1.78 | 45% | 9079 |
| Country Gold Farm | 7/1/98 | N | $ 148,085 | W205000128 | 1 | 44% | 0016 |
| Martinez Farms | 7/1/98 | N | $ 44,583 | W205000129 | 1.21 | 25% | 0079 |
| Bien Nacido Vineyards | 7/1/98 | N | $ 64,926 | W205000130 | 0.99 | 15% | 0040 |
| M. Nishimori Farms | 7/1/98 | N | $ 88,346 | W205000131 | 0.91 | 28% | 0172 |
| B.J. Harvesting | 7/1/98 | N | $ 89,792 | W205000132 | 0.89 | 44% | 0016 |

# F.S.I.M./FRONTIER ISSUANCE LOG

| Account Name | Effec. Date | New Renewal | E.A.P. | Policy # | Ex.Mod. | Credit (Debit) | Gov. Class |
|---|---|---|---|---|---|---|---|
| Luna Fertilizer | 7/1/98 | N | $ 18,665 | W205000133 | 1 | 32% | 0050 |
| Fukutomi Farms | 7/1/98 | N | $ 51,141 | W205000134 | 0.85 | 15% | 0079 |
| D & V Harvesting | 7/1/98 | N | $ 108,380 | W205000135 | 1.61 | 50% | 0016 |
| Casper Berry Farms | 7/1/98 | N | $ 56,186 | W205000136 | 1.02 | 22% | 0079 |
| Hasegawa Farms | 7/1/98 | N | $ 32,319 | W205000137 | 1 | 41% | 0079 |
| Philip McGrath Farms | 7/1/98 | N | $ 8,182 | W205000138 | 1 | 15% | 0079 |
| Conroy Berry Farms | 7/1/98 | N | $ 45,454 | W205000139 | 0.73 | 24% | 0079 |
| Valley Dorado Ag | 7/1/98 | N | $ 194,624 | W205000140 | 0.87 | 47% | 0040 |
| Pacifico Berry Farms | 7/1/98 | N | $ 172,856 | W205000141 | 1.71 | 38% | 0079 |
| Hiji Brothers, Inc. | 7/1/98 | N | $ 277,578 | W205000142 | 0.89 | 26% | 0172 |
| Santa Clara Farms | 7/1/98 | N | $ 67,687 | W205000143 | 1 | 50% | 0016 |
| Channel Island Berry | 7/1/98 | N | $ 67,932 | W205000144 | 0.99 | 10% | 0079 |
| Fulfillment Systems | 7/1/98 | N | $ 107,912 | W205000145 | 0.95 | 50% | 9079 |
| Yamamoto Farms | 7/1/98 | N | $ 7,317 | W205000146 | 1.09 | 10% | 0005 |
| Bob Jones Ranch | 7/1/98 | N | $ 1,914 | W205000147 | 1 | 0% | 8810 |
| Rancho Guadalasca | 7/1/98 | N | $ 63,582 | W205000148 | 0.9 | -40% | 0016 |
| Goldberg & Solovy | 8/1/98 | N | $ 119,940 | W205000155 | 0.87 | 47% | 8018 |
| Poplar Farms | 8/1/98 | N | $ 109,685 | W205000157 | 1.17 | 45% | 79 |
| Eclipse Berry Farms | 8/1/98 | N | $ 172,000 | W205000156 | 1.63 | 48% | 79 |
| Rio Mesa Farms | 8/1/98 | N | $ 119,738 | W205000158 | 1.28 | 45% | 79 |
| Odwalla | 9/1/98 | N | $ 566,360 | W205000149 | 1.84 | 15% | 2163 |
| Coronet Foods, Inc | 9/1/98 | N | $ 84,253 | W205000151 | 1.52 | 47% | 6504 |
| KGM Harvesting | 9/1/98 | N | $ 64,105 | W205000152 | 1.52 | 47% | 0172 |
| Gudpak | 9/30/98 | N | $ 166,400 | W205000159 | 0.94 | 40% | 0172 |
| Cal West Farming | 9/18/98 | R | $ 695,492 | W205000160 | 1.87 | 43% | 0172 |
| Athens Baking | 10/1/98 | N | $ 47,574 | W205000154 | 0.93 | 50% | 2003 |

# F.S.I.M./FRONTIER ISSUANCE LOG

| Account Name | Effec. Date | New Renewal | E.A.P. | Policy # | Ex. Mod. | Credit Debit | Gov. Class |
|---|---|---|---|---|---|---|---|
| MJS | 10/1/98 | N | $ 190,409 | W205000153 | 1 | 30% | 0172 |
| Progresso Harvesting | 11/1/98 | N | $ 39,613 | W205000161 | 1 | 34% | 0079 |
| Rancho Buena Vista | 11/1/98 | N | $ 39,613 | W205000163 | 1 | 34% | 0079 |
| Olivers Market | 11/1/98 | N | $ 59,907 | W205000164 | 1.09 | 45% | 8006 |
| Tierra Linda Corp. | 11/1/98 | N | $ 132,488 | W205000165 | 1.01 | 38% | 0172 |
| Safari Harvesting | 11/1/98 | N | $ 39,613 | W205000162 | 1 | 34% | 0079 |
| Mill Valley Market | 9/1/98 | N | $ 25,077 | W205000150 | 0.7 | 37% | 8017 |
| | | | | | | | |
| | | | | | | | |
| TOTALS | | | $ 8,606,022 | | | 39.06% | |
| | | | | | | | |

# F.S.I.M./FRONTIER Classification/Payroll 1999 Projected/Estimated

California

| Classification | Code | Payroll Est. 1999 | Jan '98 Loss Cost (.134 mult) | Cost |
|---|---|---|---|---|
| Truck Farms | 0172 | $ 40,413,723 | 7.58 | 3,063,360 |
| Strawberry Crops | 0079 | $ 28,079,787 | 6.26 | 1,757,795 |
| Salesmen | 8742 | $ 6,486,252 | .83 | 53,836 |
| Orchards-Citrus | 0016 | $ 10,338,514 | 9.89 | 1,022,479 |
| Fruit Packing | 2108 | $ 3,023,540 | 8.13 | 245,811 |
| Confections,Food Mfg. | 6504 | $ 6,553,193 | 6.96 | 456,710 |
| Vineyards | 0040 | $ 3,113,889 | 5.64 | 175,623 |
| Stores Retail NOC | 8017 | $ 1,222,100 | 4.14 | 50,595 |
| Bakeries | 2003 | $ 6,170,136 | 6.26 | 386,251 |
| Restaurants | 9079 | $ 7,861,325 | 4.79 | 366,977 |
| Stores-Deli-Retail | 8006 | $ 15,078,862 | 4.94 | 744,896 |
| Stores-Meat,Fish | 8031 | $ 2,895,571 | 7.27 | 210,508 |
| Nurseries | 0005 | $ 608,163 | 5.66 | 34,422 |
| Feed Yards | 0038 | $ 274,080 | 9.35 | 25,626 |
| Fresh Veg. Packing | 8209 | $ 5,100,000 | 9.35 | 477,750 |
| Clerical | 8810 | $ 16,557,474 | .71 | 1,175,558 |
| Strawberry Crops | 0072 | $ - | ? | 1 |
| Farm Machinery | 0050 | $ 326,316 | 0.38 | 32,008 |
| Fruit,Veg Dehydrating | 2102 | $ 4,000,000 | 5.00 | 200,000 |
| Stores-Meat,Fish | 8021 | $ 829,787 | 11.96 | 99,243 |
| Bottling-Beverages | 2163 | $ 5,019,391 | 5.12 | 287,109 |
| Fruit,Juice Concentrate | 2116 | $ 1,882,473 | 7.26 | 136,908 |
| Meat Products Mfg. | 2095 | $ 1,201,105 | 6.9 | 74,348 |
| Canneries-Fruit | 2111 | $ 3,102,500 | 8.22 | 255,336 |
| Analytical Labs | 4511 | $ - | 1.61 | 1 |

# F.S.I.M./FRONTIER Classification/Payroll 1999 Projected/Estimated

| Classification | Code | Payroll Est. 1992 | | |
|---|---|---|---|---|
| Stores-Wine,Beer | 8060 | $ 85,430 | 6.91 | 5903 |
| Stores-Groceries | 8061 | $ 218,000 | 9.20 | 20,056 |
| Trucking NOC | 7219 | $ 531,915 | 11.95 | 63,564 |
| Stores-Wholesale | 8018 | $ 3,333,333 | 6.18 | 206,000 |
| Creameries,Dairy Prod. | 2063 | $ 6,647,059 | 5.86 | 389,518 |
| Breweries | 2121 | $ 1,500,000 | 4.85 | 72,750 |
| Canneries-Fish | 2113 | $ 600,000 | 8.28 | 49,680 |
| Cotton Gin Operations | 0401 | $ 1,000,000 | 10.39 | 103,900 |
| Orchards-Nut Crops | 0045 | $ 3,000,000 | 7.71 | 231,300 |
| Veg.& Fruit Processors | 2117 | $ 3,000,000 | 10.60 | 318,000 |
| Warehouses,Cold Storage | 8291 | $ 2,500,000 | 7.31 | 182,750 |
| Wineries | 2142 | $ 2,500,000 | 6.13 | 153,250 |
| | | | | |
| Total | | $ | | 12,081,060 |

```
       5 9 0 3 . +
     2 0 0 5 6 . +
     6 3 5 6 4 . +
   2 0 6 0 0 0 . +
   3 8 9 5 1 8 . +
     7 2 7 5 0 . +
     4 9 6 8 0 . +
   1 0 3 9 0 0 . -
   2 3 1 3 0 0 . +
   3 1 8 0 0 0 . +
   1 8 2 7 5 0 . +
   1 5 3 2 5 0 . +
 1 2 0 8 1 0 6 6 . *
```

# F.S.I.M./FRONTIER LOSS HISTORY

| Account Name | Effec. Date | 1998 | 1997 | 1996 | 1995 | 1994 |
|---|---|---|---|---|---|---|
| Coachella Valley Citrus | 1/1/98 | $ 370,699 | $ 137,781 | $ 455,316 | $ 717,869 | |
| Dunlap Management | 1/1/98 | $ 141 | $ 5,280 | $ 7,837 | $ 74,591 | |
| Growers Transport | 1/1/98 | $ 2,935 | $ - | $ 2,410 | $ 240,076 | |
| Producer's Dairy | 1/1/98 | $ 152,633 | $ 24,500 | $ 182,496 | $ 315,200 | |
| Sierra Citrus Assoc. | 1/1/98 | $ 130,027 | $ 12,318 | $ 81,949 | $ 155,820 | $ 23,334 |
| V & L Farms | 1/3/98 | $ 3,850 | $ 32,339 | $ 66,564 | $ 3,140 | |
| George Perry & Sons | 1/1/98 | $ 26,206 | $ 24,374 | $ 119,442 | $ 29,903 | $ 53,164 |
| Nature Quality | 1/1/98 | $ 4,666 | $ 33,233 | $ 73,162 | $ 11,663 | |
| La Tapatia Tortilleria | 3/31/98 | $ 10,390 | $ 49,506 | $ 101,991 | $ 108,545 | $ 127,682 |
| Holiday Quality Foods | 4/1/98 | $ 20,385 | $ 67,222 | $ 84,665 | $ 124,067 | $ 335,419 |
| North State Grocery | 4/1/98 | $ 101,539 | $ 47,101 | $ 72,967 | $ 128,622 | $ 766,880 |
| Holiday Ranches | 4/1/98 | $ - | $ 2,881 | $ 996 | $ 907 | |
| Organic Food Products | 5/1/98 | $ 12,963 | $ 1,372 | $ 1,593 | $ 2,052 | |
| SK Foods | 5/1/98 | $ 12,652 | $ 152,463 | $ 78,330 | $ 31,919 | $ 57,939 |
| Desert Packing | 7/1/98 | $ - | $ 147,688 | $ 77,159 | $ 234,583 | $ 287,315 |
| The Growers Company | 7/1/98 | $ 23,092 | $ 97,597 | $ 76,026 | $ 51,835 | |
| Sunsweet Dryers | 7/1/98 | $ - | $ 101,017 | $ 22,082 | $ 30,912 | |
| Natural Selection Foods | 7/1/98 | $ 34,959 | $ 109,227 | $ 201,157 | $ 1,046 | |
| Swiss Louis Restaurant | 7/1/98 | $ - | $ 722 | $ 49,225 | $ 16,564 | |
| Spengers | 7/1/98 | $ 29,555 | $ 19,035 | $ 26,948 | $ 56,545 | |
| Country Gold Farm | 7/1/98 | $ 18,241 | | | | |
| Martinez Farms | 7/1/98 | $ - | $ - | $ 6,223 | $ 2,883 | |
| Bien Nacido Vineyards | 7/1/98 | $ - | $ 3,819 | $ 3,598 | $ 59,347 | |
| M. Nishimori Farms | 7/1/98 | $ 10,500 | $ 37,136 | $ 40,026 | $ 67,209 | |
| B.J. Harvesting | 7/1/98 | $ - | $ - | $ 10,776 | $ 54,871 | |
| | | | | | | |
| | | | | | | |

# F.S.I.M./FRONTIER LOSS HISTORY

| Account Name | Effec. Date | Policy Yr. 98 | Policy Yr. 97 | Policy Yr. 96 | Policy Yr. 95 | Policy Yr. 94 |
|---|---|---|---|---|---|---|
| Luna Fertilizer | 7/1/98 | $ - | $ - | $ 17,039 | | |
| Fukutomi Farms | 7/1/98 | $ - | | $ 30,809 | $ 53,205 | |
| D & V Harvesting | 7/1/98 | $ 6,574 | $ 683 | $ 17,541 | | |
| Casper Berry Farms | 7/1/98 | $ - | $ 17,187 | $ 37,104 | $ 2,492 | |
| Hasegawa Farms | 7/1/98 | $ - | $ 9,535 | $ 4,983 | $ 59,946 | |
| Philip McGrath Farms | 7/1/98 | $ - | $ 292 | $ - | $ 448 | |
| Conroy Berry Farms | 7/1/98 | $ - | $ - | $ 1,515 | $ 34,680 | |
| Pacifico Berry Farms | 7/1/98 | $ 3,135 | $ 4,458 | $ 46,857 | $ 74,611 | |
| Hiji Brothers, Inc. | 7/1/98 | $ 16,385 | $ 79,314 | $ 52,186 | $ 48,481 | |
| Santa Clara Farms | 7/1/98 | $ - | $ 999 | | | |
| Channel Island Berry | 7/1/98 | $ - | $ 68,722 | $ 6,712 | $ 19,360 | $ 55,667 |
| Fulfillment Systems | 7/1/98 | $ 26,540 | $ 16,364 | $ 24,887 | $ 103,285 | |
| Yamamoto Farms | 7/1/98 | $ - | $ - | $ - | $ - | |
| Bob Jones Ranch | 7/1/98 | $ - | $ - | $ - | $ 9,110 | |
| Rancho Guadalasca | 7/1/98 | $ - | $ 137,022 | $ 8,303 | $ 9,932 | $ 43,427 |
| Goldberg & Solovy | 8/1/98 | $ 5,844 | $ 107,201 | $ 32,393 | $ 316,605 | $ 31,709 |
| Poplar Farms | 8/1/98 | $ - | $ 21,348 | $ 57,836 | | |
| Eclipse Berry Farms | 8/1/98 | $ - | $ 2,043 | $ 271,595 | $ 1,032 | $ 134,593 |
| Rio Mesa Farms | 8/1/98 | $ - | $ 157,315 | $ 84,771 | | |
| Odwalla | 9/1/98 | $ - | $ 186,848 | $ 716,126 | $ 932,397 | |
| Coronet Foods, Inc | 9/1/98 | $ - | $ 20,930 | $ 9,138 | $ 412,735 | |
| KGM Harvesting | 9/1/98 | $ - | $ 41,973 | $ 785 | $ 99,983 | |
| Gudpak | 9/30/98 | $ - | $ 9,689 | $ 71,209 | $ 71,855 | $ 101,467 |
| Cal West Farming | 9/18/98 | $ 67,772 | $ 148,598 | $ 376,823 | $ 510,889 | $ 250,383 |
| Athens Baking | 10/1/98 | $ - | $ 54,338 | $ 43,091 | $ 26,138 | |

# F.S.I.M./FRONTIER LOSS HISTORY

| Account Name | Effec. Date | Policy Yr. 98 | Policy Yr. 97 | Policy Yr. 96 | Policy Yr. 95 | Policy Yr. 94 |
|---|---|---|---|---|---|---|
| MJS | 10/1/98 | $ - | $ 41,937 | $ | $ | $ |
| Progresso Harvesting | 11/1/98 | $ - | $ - | | | |
| Rancho Buena Vista | 11/198 | $ - | $ 6,136 | | | |
| Olivers Market | 11/1/98 | $ - | $ 33,691 | $ 17,315 | $ 45,667 | $ 85,563 |
| Tierra Linda Corp. | 11/1/98 | $ - | $ 18,294 | $ 28,692 | $ 157,661 | |
| Safari Harvesting | 11/1/98 | $ - | $ 39,409 | | | |
| Mill Valley Market | 9/1/98 | $ - | $ 1,155 | $ 2,978 | $ 892 | $ 5,573 |
| | | | | | | |
| TOTALS | | $ 1,081,683 | $ 2,332,092 | $ 3,803,626 | $ 5,511,573 | $ 2,360,115 |

# F.S.I.M./FRONTIER Classification/Payroll History

| Classification | Code | Payroll 1998 | Payroll 1997 | Payroll 1996 | Payroll 1995 | Payroll 1994 |
|---|---|---|---|---|---|---|
| Truck Farms | 0172 | $ 37,988,900 | $ 30,827,900 | $ 30,711,778 | $ 24,744,429 | $ 23,072,888 |
| Strawberry Crops | 0079 | $ 26,395,000 | $ 20,756,283 | $ 16,199,928 | $ 14,617,450 | $ 11,302,223 |
| Salesmen | 8742 | $ 6,226,802 | $ 5,973,547 | $ 5,250,042 | $ 1,295,983 | $ 3,974,056 |
| Orchards-Citrus | 0016 | $ 9,097,892 | $ 5,261,783 | $ 4,814,566 | $ 2,903,493 | $ 2,923,057 |
| Fruit Packing | 2108 | $ 2,721,186 | $ 2,643,457 | $ 2,622,750 | $ 2,436,719 | $ 2,331,834 |
| Confections,Food Mfg. | 6504 | $ 6,402,529 | $ 6,759,595 | $ 5,558,776 | $ 3,806,852 | $ 3,051,209 |
| Vineyards | 0040 | $ 2,242,000 | $ 2,029,987 | $ 1,941,708 | $ 1,966,075 | $ 2,137,437 |
| Stores Retail NOC | 8017 | $ 1,197,655 | $ 1,103,730 | $ 1,080,671 | $ 821,835 | $ 910,884 |
| Bakeries | 2003 | $ 5,614,824 | $ 5,231,799 | $ 5,226,263 | $ 4,620,081 | $ 4,283,788 |
| Restaurants | 9079 | $ 6,971,806 | $ 6,911,749 | $ 6,524,392 | $ 5,945,838 | $ 5,620,117 |
| Stores-Deli-Retail | 8006 | $ 14,626,496 | $ 13,791,369 | $ 13,373,402 | $ 12,572,280 | $ 11,132,856 |
| Stores-Meat,Fish | 8031 | $ 2,837,660 | $ 2,772,928 | $ 2,661,797 | $ 2,578,265 | $ 2,204,584 |
| Nurseries | 0005 | $ 596,000 | $ 594,385 | $ 575,303 | $ 470,752 | $ 423,902 |
| Feed Yards | 0038 | $ 260,376 | $ 258,705 | $ 256,719 | $ 246,784 | $ 96,827 |
| Fresh Veg. Packing | 8209 | $ 4,080,000 | $ 2,174,702 | $ 1,887,925 | $ 1,210,878 | $ 756,817 |
| Clerical | 8810 | $ 15,895,175 | $ 14,967,517 | $ 13,373,894 | $ 12,623,955 | $ 9,707,671 |
| Strawberry Crops | 0072 | $ - | $ - | $ - | $ 126,057 | $ 121,393 |
| Farm Machinery | 0050 | $ 310,000 | $ 309,765 | $ 295,987 | $ 295,679 | $ 285,887 |
| Fruit,Veg Dehydrating | 2102 | $ 3,000,000 | $ 3,200,000 | $ 3,017,600 | $ 2,933,409 | $ 2,842,767 |
| Stores-Meat,Fish | 8021 | $ 780,000 | $ 775,062 | $ 765,008 | $ 762,007 | $ 599,166 |
| Bottling-Beverages | 2163 | $ 4,417,064 | $ 4,272,656 | $ 4,181,452 | $ 4,175,723 | $ 3,168,879 |
| Fruit,Juice Concentrate | 2116 | $ 1,505,978 | $ 1,333,232 | $ 1,291,235 | $ 1,291,106 | $ 979,175 |
| Meat Products Mfg. | 2095 | $ 960,884 | $ 948,393 | $ 913,302 | $ 851,289 | $ 765,309 |
| Canneries-Fruit | 2111 | $ 2,482,000 | $ 2,000,000 | $ 2,000,000 | $ 2,300,000 | $ 2,250,000 |
| Analytical Labs | 4511 | $ - | $ 110,000 | $ 110,000 | $ 100,000 | $ 100,000 |

## F.S.I.M./FRONTIER Classification/Payroll History

| Classification | Code | Payroll Policy Yr. 98 | Payroll Policy Yr. 97 | Payroll Policy Yr. 96 | Payroll Policy Yr. 95 | Payroll Policy Yr. 94 |
|---|---|---|---|---|---|---|
| Stores-Wine,Beer | 8060 | $ 64,073 | $ 84,073 | $ 64,067 | $ 54,963 | $ 52,961 |
| Stores-Groceries | 8061 | $ 163,500 | $ 159,999 | $ 158,065 | $ 156,075 | $ 1,170,506 |
| Trucking NOC | 7219 | $ 500,000 | $ 483,395 | $ 460,776 | $ 402,980 | $ 318,215 |
| Stores-Wholesale | 8018 | $ 2,500,000 | $ 2,429,899 | $ 2,400,659 | $ 2,321,369 | $ 1,653,024 |
| Creameries,Dairy Prod. | 2063 | $ 5,650,000 | $ 5,632,492 | $ 5,620,006 | $ 5,615,721 | $ 5,103,675 |
| | | | | | | |
| Total | | $ | | | | $ 103,340,907 |

Per Janet  total the Payroll from individual accounts + use those figures. 111898 (JH)

PAGE INTENTIONALLY LEFT BLANK

PAGE INTENTIONALLY LEFT BLANK

·NOV. -30' 99 (TUE) 15:24     D. H. I. S.                 TEL:916 773 0402            P. 006



**FOOD SERVICE INSURANCE MANAGERS**

December 4, 1998

Mr. Kevin Jefferey
Frontier Insurance Group
195 Lake Louise Marie Road
Rock Hill, New York 12775-8000

Dear Kevin:

Thanks for getting back to me on the TPA questions. Dan has agreed to go ahead and hire the staff he'll need to handle the Frontier business. He says you will pay the Summit nurse direct, which is fine since I think Ed intends to have her on site there full time. By the way, congratulations on writing that one. It is a major prestige account.

I also want to document our agreement for the one year notice if Ed decides to build his own in-house claims operation. I know that is his plan, and we can't afford to staff up and then have the business moved on us. One year is fair.

Dan also is emphatic that 6% is 2% below the going market rate, so we need to re-negotiate that later on. We'll be fair with you there also; we just don't want to get hit with any unanticipated expense. Ed is really getting the case management piece in shape, which is very exciting for us.

We'll leave it in your hands to coordinate with the claims people there in Rock Hill, but let me know if we need to do anything further.

Sincerely,

Dwight J. Halvorson

cc: Ed Wilson

P.S.: By the way if I do not hear from you, we will assume this agreement is acceptable.

3300 Douglas Boulevard, Suite 295  •  Roseville, California 95661-3807  •  (916) 773-0208 • Fax (916) 773-0402

NOV.-30' 99 (TUE) 15:24     D. H. I. S.          TEL:916 773 0402          P. 007

**SENDER:**
- Complete items 1 and/or 2 for additional services.
- Complete items 3, 4a, and 4b.
- Print your name and address on the reverse of this form so that we can return this card to you.
- Attach this form to the front of the mailpiece, or on the back if space does not permit.
- Write "Return Receipt Requested" on the mailpiece below the article number.
- The Return Receipt will show to whom the article was delivered and the date delivered.

I also wish to receive the following services (for an extra fee):

1. ☐ Addressee's Address
2. ☐ Restricted Delivery

Consult postmaster for fee.

| 3. Article Addressed to: | 4a. Article Number |
|---|---|
| Mr. Gerald J. Steines | 2 435 607 406 |
| Vice President | **4b. Service Type** |
| Frontier Insurance Co. | ☐ Registered  ☒ Certified |
| 195 Lake Louise Marie Rd | ☐ Express Mail  ☐ Insured |
| Rock Hill, NY 12775-8000 | ☐ Return Receipt for Merchandise  ☐ COD |
| | **7. Date of Delivery** 11/19/99 |
| 5. Received By: (Print Name) | 8. Addressee's Address (Only if requested and fee is paid) |
| 6. Signature: (Addressee or Agent)  X _____ | |

PS Form 3811, December 1994          102595-98-B-0229     **Domestic Return Receipt**

*Is your RETURN ADDRESS completed on the reverse side?*

*Thank you for using Return Receipt Service.*

**PAGE INTENTIONALLY LEFT BLANK**



FOOD SERVICE INSURANCE MANAGERS

December 4, 1998

Mr. Kevin Jefferey
Frontier Insurance Group
195 Lake Louise Marie Road
Rock Hill, New York  12775-8000

Dear Kevin:

Thanks for getting back to me on the TPA questions.  Dan has agreed to go ahead and
hire the staff he'll need to handle the Frontier business.  He says you will pay the Summit
nurse direct, which is fine since I think Ed intends to have her on site there full time.  By
the way, congratulations on writing that one.  It is a major prestige account.

I also want to document our agreement for the one year notice ~~if Ed decides to build his
own in-house claims operation.~~  I know that is his plan, and we can't afford to staff up
and then have the business moved on us.  One year is fair.

Dan also is emphatic that 6% is 2% below the going market rate, so we need to re-
negotiate that later on.  We'll be fair with you there also; we just don't want to get hit
with any unanticipated expense.  Ed is really getting the case management piece in shape,
which is very exciting for us.

We'll leave it in your hands to coordinate with the claims people there in Rock Hill, but
let me know if we need to do anything further.

Sincerely,

Dwight J. Halvorson

cc: Ed Wilson

P.S.:  By the way if I do not hear from you, we will assume this agreement is acceptable.



## Dwight Halvorson

### INSURANCE SERVICES

# FAX COVER SHEET

**TO:**     **Mr. Kevin Jeffries**

**FAX#:**   **914-796-1005**

**FROM:**      **Dwight Halvorson**

**DATE:**      **02/23/99**

# of Pages   **2**
(incl. Cover
Sheet):

# CONFIDENTIAL

Please contact Melissa Miller at 916-773-0206 if entire fax was not received.

3300 Douglas Blvd., Suite 295, Roseville, CA 95661-3807
(916) 773-0206 * FAX (916) 773-0402

SH INCOME PROJECTIONS 1999

| | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL PREMIUM & FEES | 15,711,916 | | 16,699,916 | 18,699,916 | | | 21,667,916 | | | 24,645,916 | | |
| TOTAL INCOME | 245,791 | 210,791 | 210,791 | 273,751 | 273,751 | 273,751 | 336,416 | 336,416 | 336,416 | 399,078 | 399,079 | 399,079 |
| **LES EXPENSE** | | | | | | | | | | | | |
| 500 PRODUCER EXPENSE | 109,391 | 109,391 | 84,391 | 121,091 | 121,091 | 121,091 | 140,666 | 140,666 | 140,666 | 160,290 | 160,290 | 160,290 |
| 504 AUTO EXPENSE-EMPLOYEES | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 6,000 | 9,000 | 9,000 | 9,000 | 10,000 | 10,000 | 10,000 |
| 506 MEALS EXPENSE-DH | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| 507 MEALS EXPENSE-EMPLOYEES | 1,500 | 1,500 | 1,500 | 2,000 | 2,000 | 2,000 | 2,500 | 2,500 | 2,500 | 3,000 | 3,000 | 3,000 |
| 508 TRAVEL EXPENSE-DH | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| 509 TRAVEL EXPENSE-EMPLOYEES | 3,500 | 3,500 | 3,500 | 4,000 | 4,000 | 4,000 | 4,500 | 4,500 | 4,500 | 5,000 | 5,000 | 5,000 |
| 510 ENTERTAINMENT-DH | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| 511 ENTERTAINMENT-EMPLOYEES | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| 512 CLAIMS MANAGEMENT EXPENSE 5% OF PREMIUM | 50,000 | 50,000 | 50,000 | 61,041 | 61,041 | 61,041 | 72,082 | 72,082 | 72,082 | 83,123 | 83,123 | 83,123 |
| 540 MARKETING EXPENSES | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| 546 LOSS INCENTIVE EXPENSE | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| 550 AEON PURCHASE | 0 | 0 | 0 | 85,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL SELLING EXPENSE | 183,141 | 183,141 | 158,141 | 291,882 | 206,882 | 206,882 | 239,498 | 239,498 | 239,498 | 272,163 | 272,163 | 272,163 |
| **OD SERVICE INSURANCE MANAGERS INC** | | | | | | | | | | | | |
| **SH INCOME PROJECTIONS** | | | | | | | | | | | | |
| 600 SALARIES AND WAGES | 72,500 | 72,500 | 72,500 | 56,000 | 56,000 | 56,000 | 59,000 | 59,000 | 59,000 | 59,000 | 59,000 | 59,000 |
| 600 TEAM EMPLOYEE 1-JULY & 1-OCTOBER | | | | | | | 3,750 | 3,750 | 3,750 | 7,500 | 7,500 | 7,500 |
| 600 LOSS CONTROL 1-JULY & 1-OCTOBER | | | | | | | 3,750 | 3,750 | 3,750 | 7,500 | 7,500 | 7,500 |
| 604 OUTSIDE SERVICES | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| 605 ACCOUNTING & LEGAL | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 |
| 606 COMPUTER SERVICES | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| 608 BANK CHARGES | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 |
| 611 MOTOR VEHICLE REPORTS | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 |
| 612 DUES, FEES & SUBSCRIPTIONS | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| 613 SEMINARS & EDUCATION | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| 614 GENERAL INSURANCE | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| 615 HEALTH INSURANCE | 5,250 | 5,250 | 5,250 | 4,500 | 4,500 | 4,500 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 |
| 616 WORKERS COMP INSURANCE | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 |
| 617 UTILITIES | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| 619 INTEREST | 1,100 | 1,100 | 1,100 | 1,100 | 1,100 | 1,100 | 1,100 | 1,100 | 1,100 | 1,100 | 1,100 | 1,100 |
| 620 OFFICE EQUIP RENTAL | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| 621 LICENSES | 100 | 100 | 100 | 100 | 100 | 100 | 400 | 400 | 400 | 500 | 500 | 500 |
| 625 OFFICE SUPPLIES | 2,500 | 2,500 | 2,500 | 2,750 | 2,750 | 2,750 | 3,000 | 3,000 | 3,200 | 3,500 | 3,500 | 3,500 |
| 626 POSTAGE | 750 | 750 | 750 | 750 | 750 | 750 | 1,200 | 1,200 | 1,200 | 1,300 | 1,300 | 1,300 |
| 630 RENT | 3,662 | 3,662 | 3,662 | 3,662 | 3,662 | 3,662 | 3,662 | 3,662 | 3,662 | 3,662 | 3,662 | 3,662 |
| 631 REPAIRS & MAINTENANCE | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| 636 PAYROL TAXES EMPLOYER | 7,250 | 7,250 | 7,250 | 5,600 | 5,600 | 5,600 | 7,000 | 7,000 | 7,000 | 7,400 | 7,400 | 7,400 |
| 650 TELEPHONE | 5,000 | 5,000 | 5,000 | 5,500 | 5,500 | 5,500 | 6,000 | 6,000 | 6,000 | 8,500 | 8,500 | 8,500 |
| TOTAL ADMIN EXPENSE | 113,962 | 113,962 | 113,962 | 95,812 | 95,812 | 95,812 | 110,212 | 110,212 | 110,212 | 119,312 | 119,312 | 119,312 |
| TOTAL EXPENSES | 297,103 | 297,103 | 272,103 | 387,694 | 302,694 | 302,694 | 349,710 | 349,710 | 349,710 | 391,475 | 391,475 | 391,475 |
| ESTIMATED NET PROFIT (LOSS) | (51,312) | (86,312) | (61,312) | (113,843) | (28,943) | (28,943) | (13,294) | (13,294) | (13,294) | 7,604 | 7,604 | 7,604 |

# PAGE INTENTIONALLY LEFT BLANK



03/01/99
**Via Fax and Regular Mail, Fax #914-796-1005**

Mr. Kevin Jeffrey
Frontier Insurance Company
195 Lake Louise Marie Road
Rock Hill, NY 12775-8000

Dear Kevin:

I would like to summarize some of the topics we discussed at our meeting of February 25, 1999. There are several different issues on the table and Food Service Insurance Managers, Inc. (F.S.I.M.) has given you many projections for the future for your consideration. I will attempt to break each segment out for you and hopefully provide you with a simplified picture of the "who we are" and the "where we are going."

First of all, F.S.I.M. was started by Dwight Halvorson in July of 1996 with two concepts in mind:

1.    Commissions were too low for a broker to provide loss control and claims management. These services were also not being provided by the carriers since "open rating" reduced their revenues significantly.

2.    Our book of accounts was extremely profitable because of the services we were providing. We were willing to spend the money for these services if we could share in the underwriting profit.

The "rent a captive" program seemed to fit with what we wanted to accomplish because it could provide us with management fees to support our services, while allowing us to capture underwriting profit. As a result of our success in the "food industry" prior to F.S.I.M., we were confident our loss control and claims management services would provide us with a unique product as well as a profitable program. We were correct. F.S.I.M. has produced about $17,000,000.00 in premium volume since January 1, 1997 and has achieved loss ratios far superior to our competition.

We are now at a crossroads because of our success. There are many opportunities for us to expand and grow. Our future expansion will be both in volume and type of operations. At F.S.I.M., Inc., all employees have one challenge and one goal: to take care of the worker before, during, and after an injury. If we are successful in achieving this goal, our clients win, F.S.I.M. wins, Frontier wins, and F.S.I.M. employees gain satisfaction from successfully helping other human beings. The financial rewards take care of themselves. In the next few paragraphs, I would like to briefly discuss these opportunities.

Mr. Kevin Jeffrey, Frontier Insurance Company
03/01/99
Page 2

## F.S.I.M.

1. Currently, F.S.I.M. needs to add four more Loss Control Consultants at a cost of $250,000.00 annually. This will increase our marketing capacity and provide us with a better loss ratio. (These consultants will split their time with T.E.A.M.)

2. F.S.I.M. needs $500,000.00 immediately to cash-flow our current situation since we have been operating at a deficit since day one. Our management fee income will cash-flow our operations in the very near future which will result in F.S.I.M. realizing a profit each month.

3. F.S.I.M. needs to purchase Risk Management Services, Inc. (R.M.S.I. - our Third-Party Administrator) from Dan Henke. Our Third-Party Administrator will be a significant profit center and having claims "in-house" will improve our efficiency and our loss ratio by approximately 6 or 7 points.

4. The Escamilla deal needs to be funded. They are the largest Farm Labor Contractor in California, with a great deal of influence besides their $2,000,000.00 annual premium. Just as you are concerned about giving F.S.I.M. a capital infusion and then losing the program, I am concerned about committing to Frontier and then not getting the Escamilla deal done.

5. T.E.A.M. is a subsidiary of F.S.I.M. which specializes in H/R and Labor Relations. T.E.A.M. receives their revenue on a "fee-for-service" basis. You have received a list of their services at our meeting. By providing these services to the client, we will increase our volume and produce a better loss ratio.

Hopefully, this will give you a brief overview of the F.S.I.M. plan. I will have a detailed marketing plan for you within the next couple of days. If you have any questions regarding this letter or any other issue, please call me.

Sincerely,

**FOOD SERVICE INSURANCE MANAGERS**

Dwight J. Halvorson, CEO

DJH:mmm

**PAGE INTENTIONALLY LEFT BLANK**

# F.S.I.M.
# FOOD SERVICES INSURANCE MANAGERS, INC.

## ==MEMORANDUM==



**TO :** Laura J. Notarbartolo
**FROM :** George Hagosian
**DATE :** June 9, 1999
**SUBJECT :** *FSIM Policy Revisions*

In response to your April 9, 1999 memo (copy attached), I have completed the revisions requested. Following conversations with Janet Backer, I was advised to mail the finished product(s) to your attention.

For each of the fourteen (14) policies revised, I have sent two copies. Janet wanted Frontier to check these revisions for accuracy, and said you would send the "proofed" copy to the WCIRB.

I am in receipt of your June 3, 1999 memo, and have begun work on these requested revisions. I beg your indulgence on these as we are in the push for July new and renewal business. July (as you probably already know) is our largest month. I will put forth every effort to expedite these revisions.

As was the case with the first set of revisions, I truly appreciate your patience and assistance. Should you have any questions please do not hesitate to call.

cc: Janet Backer.

*[signature: George]*

per new / conv wl Janet

- He's going to charge for IL on all quotes on a going forward basis.

- All prior quotes. ~~no need to~~ it was agreed iac that we would not endorse the change in EL limits at this. Should the state come back to us, we will advise.

- we understand the time pressures you're under, however, it is critical that we receive the corrected policies no later than (2 weeks) to avoid an unapplied cash issues.
  further

PAGE INTENTIONALLY LEFT BLANK

*Francis Blamey*
*(916) - 727-0740 Phone #*
*916 - 727 - 0741 Fax #*
*(Contact person)*

**F.S.I.M.**
8391 Auburn Blvd. Suite 2
Citrus Heights, CA 95610
(916) 727-07540. Fax (916) 727-0751

# Memo

*Claims over "50,000 only*
*(from Dave Jackson)*

| | |
|---|---|
| **To:** | Dave Jackson, Frontier Insurance |
| **From:** | Nancy McAlpin |
| **CC:** | George Hagosian, Ed Wilson, Frances Blamey |
| **Date:** | 07/08/99 |
| **Re:** | Large Loss Reports |

*Thanks again*

---

Attached is a report showing claims with reserves over $50,000.

All have been previously reported except:

| | |
|---|---|
| **Joel Ruvalcaba;** | DOI 8/11/98 |
| **Jaimie Espinal;** | DOI 7/06/98 |
| **Roy Gomez;** | DOI 1/21/99 |

Joel Ruvalcaba was resolved by a Stipulated Award for $24,000 in Feb '99, future med is open & he has commenced vocational rehabilitation. Jaimie Espinal was settled by Compromise & Release for $17,500 in May '99. He is currently involved in vocational rehabilitation which should be completed in the next 60 days. Please let me know if you will need Large Loss reports on these two claims.

A report is in the process of being completed on Roy Gomez. Also, I note that quite a few supplemental reports are due in July and I will forward them to you upon receipt.

Please let me know if you need additional information.

● Page 1

**PAGE INTENTIONALLY LEFT BLANK**

8391 Auburn Blvd. Ste 2
Citrus Heights, CA 95610
Phone: 916-727-0740 ext 111
Fax: 916-727-0742



**F.S.I.M.**



RECEIVED

JUL 23 1999

# FAX

| | | | |
|---|---|---|---|
| **To:** | Janet Backer | **From:** | Frances Blamey |
| | | **Date:** | 7/22/1999 |
| | Fax #: 914-796-1005 | **# pages :** 29 | including cover |
| **Re:** | Updated loss data | **CC:** | |

☐ **Urgent**   ☐ **For Review**   ☐ **Please Comment**   ☐ **Please Reply**   ☐ **Please Recycle**

•Comments:

Attached is a copy of the data you requested.
It is sorted as follows:

All claims on policies incepting in 1998 (by treaty year)
All claims with injuries in 1998
All claims on policies incepting in 1999
All claims with injuries in 1999

The above data is for Frontier FSIM only.

Call me if you have any questions or need additional information.

Frances Blamey

*[handwritten notes]* could be copies of ones clipped for Janet
— 3 copies all —Allison Betty + Trish

Run Date: 07/22/1999
Run Time: 15.58.33

Frontier FSIM policies incepting in 1998.
valued as of 6/30/1999

# Food Service Insurance Mgr's/Frontier
## Management Summary
06/01/1999 through 06/30/1998

| Insured | # of claims | Open | Closed | Paid < SIR | reserves to date | Incurred < SIR | Paid > SIR | Incurred > SIR | Total Incurred |
|---|---|---|---|---|---|---|---|---|---|
| **Insured : AMYS KITCHEN, INC. 12/1/98-11/30/99** | | | | | | | | | |
| AMYS KITCHEN, INC 12/1/98-11/30/99 | 48 | 26 | 22 | 82,992.66 | 121,788.73 | 204,781.36 | 0.00 | 0.00 | 204,781.36 |
| **Insured Totals** | 48 | 26 | 22 | 82,992.66 | 121,788.70 | 204,781.36 | 0.00 | 0.00 | 204,781.36 |
| **Insured : ATHENS BAKING CO., LLC - 98/99** | | | | | | | | | |
| ATHENS BAKING CO., LLC - 98/99 | 8 | 4 | 4 | 1,502.57 | 32.64 | 1,535.21 | 0.00 | 0.00 | 1,535.21 |
| **Insured Totals** | 8 | 4 | 4 | 1,502.57 | 32.64 | 1,535.21 | 0.00 | 0.00 | 1,535.21 |
| **Insured : BAR 20 DAIRY FARMS 1/1/98-12/31/98** | | | | | | | | | |
| BAR 20 DAIRY FARMS 1/1/98-12/31/98 | 3 | 2 | 1 | 23,010.09 | 2,990.42 | 26,000.51 | 0.00 | 0.00 | 26,000.51 |
| BAR 20 DAIRY FARMS 1/1/98-12/31/98 | 3 | 1 | 2 | 15,504.02 | 7,548.74 | 23,052.76 | 0.00 | 0.00 | 23,052.76 |
| **Insured Totals** | 6 | 3 | 3 | 38,514.11 | 10,539.16 | 49,053.27 | 0.00 | 0.00 | 49,053.27 |
| **Insured : BIEN NACIDO VINEYARDS - 98** | | | | | | | | | |
| BIEN NACIDO VINEYARDS - 98 | 8 | 7 | 1 | 58,453.50 | 48,552.70 | 107,006.20 | 0.00 | 0.00 | 107,006.20 |
| **Insured Totals** | 8 | 7 | 1 | 58,453.50 | 48,552.70 | 107,006.20 | 0.00 | 0.00 | 107,006.20 |
| **Insured : BJ HARVESTING, INC-1998** | | | | | | | | | |
| BJ HARVESTING, INC-1998 | 1 | 0 | 1 | 14,705.42 | 0.00 | 14,705.42 | 0.00 | 0.00 | 14,705.42 |
| **Insured Totals** | 1 | 0 | 1 | 14,705.42 | 0.00 | 14,705.42 | 0.00 | 0.00 | 14,705.42 |
| **Insured : CAL WEST FARMING 5/1/98-9/17/98** | | | | | | | | | |
| CAL WEST FARMING 5/1/98-9/17/98 | 17 | 6 | 11 | 101,729.74 | 189,290.06 | 291,019.80 | 0.00 | 0.00 | 291,019.80 |
| CAL WEST FARMING 5/1/98-9/17/98 | 8 | 4 | 4 | 60,100.17 | 13,148.58 | 73,248.75 | 0.00 | 0.00 | 73,248.75 |
| **Insured Totals** | 25 | 10 | 15 | 161,829.91 | 202,438.64 | 364,268.55 | 0.00 | 0.00 | 364,268.55 |
| **Insured : CAL WEST FARMING, INC. 9/18/98-9/17/99** | | | | | | | | | |
| CAL WEST FARMING, INC. 9/18/98-9/17/99 | 27 | 14 | 13 | 107,213.52 | 126,979.00 | 234,192.52 | 0.00 | 0.00 | 234,192.52 |
| **Insured Totals** | 27 | 14 | 13 | 107,213.62 | 126,979.00 | 234,192.52 | 0.00 | 0.00 | 234,192.52 |
| **Insured : CASPER BERRY FARMS, INC. - 98** | | | | | | | | | |
| CASPER BERRY FARMS, INC. - 98 | 6 | 6 | 0 | 4,404.03 | 18,416.65 | 22,820.68 | 0.00 | 0.00 | 22,820.68 |
| **Insured Totals** | 6 | 6 | 0 | 4,404.03 | 18,416.65 | 22,820.68 | 0.00 | 0.00 | 22,820.68 |

P.02

Run Date: 07/22/1999
Run Time: 15:58:33

# Food Service Insurance Mgr's/Frontier

## Management Summary

06/01/1999 through 06/30/1998

Frontier FSM policies incepting in 1998.
valued as of 6/30/1999

| Insured | # of claims | Open | Closed | Paid < SIR Reserves to date | Incurred < SIR | Paid > SIR | Incurred > SIR | Total Incurred | Recovery |
|---|---|---|---|---|---|---|---|---|---|
| **Insured : CHANNEL ISLANDS BERRY FARMS, INC. - 98** | | | | | | | | | 0.00 |
| CHANNEL ISLANDS BERRY FARMS, INC. - 98 | 7 | 4 | 3 | 5,626.19 | 34,887.91 | 40,514.10 | 0.00 | 0.00 | 40,514.10 | 0.00 |
| **Insured Totals** | 7 | 4 | 3 | 5,626.19 | 34,887.91 | 40,514.10 | 0.00 | 0.00 | 40,514.10 | 0.00 |
| **Insured : CONROY FARMS, INC. - 98** | | | | | | | | | 0.00 |
| CONROY FARMS, INC. - 98 | 5 | 5 | 0 | 6,287.80 | 9,348.00 | 15,635.80 | 0.00 | 0.00 | 15,635.80 | 0.00 |
| **Insured Totals** | 5 | 5 | 0 | 6,287.80 | 9,348.00 | 15,635.80 | 0.00 | 0.00 | 15,635.80 | 0.00 |
| **Insured : COUNTRY GOLD 5/20/98-7/1/98** | | | | | | | | | 0.00 |
| COUNTRY GOLD 5/20/98-7/1/98 | 2 | 0 | 2 | 16,866.46 | 0.00 | 16,866.46 | 0.00 | 0.00 | 16,866.46 | 0.00 |
| **Insured Totals** | 2 | 0 | 2 | 16,866.46 | 0.00 | 16,866.46 | 0.00 | 0.00 | 16,866.46 | 0.00 |
| **Insured : COUNTRY GOLD 7/1/98-7/1/99** | | | | | | | | | 0.00 |
| COUNTRY GOLD 7/1/98-7/1/99 | 8 | 7 | 1 | 34,000.18 | 45,273.59 | 79,273.77 | 0.00 | 0.00 | 79,273.77 | 0.00 |
| **Insured Totals** | 8 | 7 | 1 | 34,000.18 | 45,273.59 | 79,273.77 | 0.00 | 0.00 | 79,273.77 | 0.00 |
| **Insured : D&V HARVESTING** | | | | | | | | | 0.00 |
| D&V HARVESTING | 1 | 1 | 0 | 194.50 | 0.00 | 194.50 | 0.00 | 0.00 | 194.50 | 0.00 |
| D&V HARVESTING | 2 | 0 | 2 | 8,326.77 | 0.00 | 8,326.77 | 0.00 | 0.00 | 8,326.77 | 0.00 |
| **Insured Totals** | 3 | 1 | 2 | 8,521.27 | 0.00 | 8,521.27 | 0.00 | 0.00 | 8,521.27 | 0.00 |
| **Insured : DESERT PACKING 7/1/98-6/30/99** | | | | | | | | | 0.00 |
| DESERT PACKING 7/1/98-6/30/99 | 11 | 7 | 4 | 31,129.64 | 48,311.61 | 79,441.25 | 0.00 | 0.00 | 79,441.25 | 0.00 |
| **Insured Totals** | 11 | 7 | 4 | 31,129.64 | 48,311.61 | 79,441.25 | 0.00 | 0.00 | 79,441.25 | 0.00 |
| **Insured : DUNLAP MANAGEMENT** | | | | | | | | | 0.00 |
| DUNLAP MANAGEMENT | 2 | 1 | 1 | 588.60 | 0.00 | 588.60 | 0.00 | 0.00 | 588.60 | 0.00 |
| DUNLAP MANAGEMENT | 1 | 0 | 1 | 8,502.24 | 0.00 | 8,502.24 | 0.00 | 0.00 | 8,502.24 | 0.00 |
| **Insured Totals** | 3 | 1 | 2 | 9,090.84 | 0.00 | 9,090.84 | 0.00 | 0.00 | 9,090.84 | 0.00 |
| **Insured : EARTHBOUND FARMS 7/1/98-7/1/99** | | | | | | | | | 0.00 |
| EARTHBOUND FARMS 7/1/98-7/1/99 | 7 | 3 | 4 | 18,760.29 | 0.00 | 18,760.29 | 0.00 | 0.00 | 18,760.29 | 0.00 |
| **Insured Totals** | 7 | 3 | 4 | 18,760.29 | 0.00 | 18,760.29 | 0.00 | 0.00 | 18,760.29 | 0.00 |

Run Date: 07/22/1999
Run Time: 15:58:33

Frontier FSIM policies incepting in 1998,
valued as of 6/30/1999

# Food Service Insurance Mgr's/Frontier
## Management Summary
### 06/01/1999 through 06/30/1999

| Insured | # of claims | Open | Closed | Paid < SIR | Reserves to date | Incurred < SIR | Paid > SIR | Incurred > SIR | Total Incurred | Recovery |
|---|---|---|---|---|---|---|---|---|---|---|
| **Insured : FRANK SPENGERS CO. INC - T.I.B.** | | | | | | | | | | |
| FRANK SPENGERS CO., INC - T.I.B. | 9 | 5 | 4 | 47,334.37 | 23,279.77 | 70,614.14 | 0.00 | 0.00 | 70,614.14 | 0.00 |
| **Insured Totals** | 9 | 5 | 4 | 47,334.37 | 23,279.77 | 70,614.14 | 0.00 | 0.00 | 70,614.14 | 0.00 |
| **Insured : FUKUTOMI FARMS, INC - 98** | | | | | | | | | | |
| FUKUTOMI FARMS, INC - 98 | 7 | 4 | 3 | 15,557.73 | 3,251.24 | 18,808.97 | 0.00 | 0.00 | 18,808.97 | 0.00 |
| **Insured Totals** | 7 | 4 | 3 | 15,557.73 | 3,251.24 | 18,808.97 | 0.00 | 0.00 | 18,808.97 | 0.00 |
| **Insured : FULFILLMENT SYSTEMS, INC - 98** | | | | | | | | | | |
| FULFILLMENT SYSTEMS, INC - 98 | 39 | 15 | 24 | 63,896.50 | 36,288.70 | 100,185.20 | 0.00 | 0.00 | 100,185.20 | 0.00 |
| **Insured Totals** | 39 | 15 | 24 | 63,896.50 | 36,288.70 | 100,185.20 | 0.00 | 0.00 | 100,185.20 | 0.00 |
| **Insured : GOLDBERG & SOLOVY FOODS, INC. - 98** | | | | | | | | | | |
| GOLDBERG & SOLOVY FOODS, INC. - 98 | 23 | 7 | 16 | 86,146.46 | 38,295.46 | 124,441.92 | 0.00 | 0.00 | 124,441.92 | 0.00 |
| **Insured Totals** | 23 | 7 | 16 | 86,146.46 | 38,295.46 | 124,441.92 | 0.00 | 0.00 | 124,441.92 | 0.00 |
| **Insured : GROWERS AZ 7/1/98-6/30/99** | | | | | | | | | | |
| GROWERS AZ 7/1/98-6/30/99 | 21 | 5 | 16 | 52,678.16 | 34,666.03 | 87,344.19 | 0.00 | 0.00 | (87,344.19) | 0.00 |
| **Insured Totals** | 21 | 5 | 16 | 52,678.16 | 34,666.03 | 87,344.19 | 0.00 | 0.00 | (87,344.19) | 0.00 |
| **Insured : GROWERS TRANSPORT 1/1/98-12/31/98** | | | | | | | | | | |
| GROWERS TRANSPORT 1/1/98-12/31/98 | 1 | 0 | 1 | 2,935.96 | 0.00 | 2,935.96 | 0.00 | 0.00 | 2,935.96 | 0.00 |
| GROWERS TRANSPORT 1/1/98-12/31/98 | 2 | 0 | 2 | 2,480.22 | 0.00 | 2,480.22 | 0.00 | 0.00 | 2,480.22 | 0.00 |
| **Insured Totals** | 3 | 0 | 3 | 5,416.18 | 0.00 | 5,416.18 | 0.00 | 0.00 | 5,416.18 | 0.00 |
| **Insured : GROWERS VEGETABLE 5/1/98-4/30/99** | | | | | | | | | | |
| GROWERS VEGETABLE 5/1/98-4/30/99 | 1 | 1 | 0 | 8,901.91 | 786.57 | 9,688.48 | 0.00 | 0.00 | 9,688.48 | 0.00 |
| GROWERS VEGETABLE 5/1/98-4/30/99 | 4 | 4 | 0 | 18,737.95 | 34,520.93 | 53,258.88 | 0.00 | 0.00 | 53,258.88 | 0.00 |
| **Insured Totals** | 5 | 5 | 0 | 27,639.86 | 35,307.50 | 62,947.36 | 0.00 | 0.00 | 62,947.36 | 0.00 |
| **Insured : GUDPAK INC 9/30/98-9/29/99** | | | | | | | | | | |
| GUDPAK, INC 9/30/98-9/29/99 | 15 | 8 | 7 | 19,238.37 | 21,519.07 | 40,757.44 | 0.00 | 0.00 | 40,757.44 | 0.00 |
| **Insured Totals** | 16 | 8 | 7 | 19,238.37 | 21,519.07 | 40,757.44 | 0.00 | 0.00 | 40,757.44 | 0.00 |

Food Service Insurance Mgr's/Frontier - Confidential

Run By:

P.04

JUL-22-99 18:34

Run Date: 07/22/1999
Run Time: 15:58:33

Frontier FSIM policies incepting in 1998.
valued as of 6/30/1999

# Food Service Insurance Mgr's/Frontier
## Management Summary
08/01/1999 through 06/30/1999

| Insured | # of claims | Open | Closed | Paid < SIR Reserves to date | Incurred < SIR | Paid > SIR | Incurred > SIR | Total Incurred | Recovery |
|---|---|---|---|---|---|---|---|---|---|
| **Insured : HASEGAWA FARMS, INC. - 98** | | | | | | | | | |
| HASEGAWA FARMS, INC. - 98 | 4 | 4 | 0 | 12,456.89 | 43,001.57 | 55,458.46 | 0.00 | 0.00 | 55,458.46 | 0.00 |
| **Insured Totals** | 4 | 4 | 0 | 12,456.89 | 43,001.57 | 55,458.46 | 0.00 | 0.00 | 55,458.46 | 0.00 |
| **Insured : HIJI BROTHERS, INC. - 98** | | | | | | | | | |
| HIJI BROTHERS, INC. - 98 | 31 | 13 | 18 | 113,563.68 | 49,417.37 | 162,981.05 | 0.00 | 0.00 | 162,981.05 | 0.00 |
| **Insured Totals** | 31 | 13 | 18 | 113,563.68 | 49,417.37 | 162,981.05 | 0.00 | 0.00 | 162,981.05 | 0.00 |
| **Insured : HOLIDAY QUALITY FOODS - 98** | | | | | | | | | |
| HOLIDAY QUALITY FOODS - 98 | 9 | 4 | 5 | 53,990.82 | 44,087.01 | 98,077.83 | 0.00 | 0.00 | 98,077.83 | 0.00 |
| HOLIDAY QUALITY FOODS - 98 | 21 | 10 | 11 | 14,036.51 | 21,238.26 | 35,274.77 | 0.00 | 0.00 | 35,274.77 | 0.00 |
| **Insured Totals** | 30 | 14 | 16 | 68,027.33 | 65,325.27 | 133,352.60 | 0.00 | 0.00 | 133,352.60 | 0.00 |
| **Insured : HOLIDAY RANCHES, INC. - 98** | | | | | | | | | |
| HOLIDAY RANCHES, INC. - 98 | 1 | 1 | 0 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Insured Totals** | 1 | 1 | 0 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Insured : KGM HARVESTING - 98** | | | | | | | | | |
| KGM HARVESTING - 98 | 2 | 2 | 0 | 10,150.00 | 6,860.22 | 17,010.22 | 0.00 | 0.00 | 17,010.22 | 0.00 |
| **Insured Totals** | 2 | 2 | 0 | 10,150.00 | 6,860.22 | 17,010.22 | 0.00 | 0.00 | 17,010.22 | 0.00 |
| **Insured : La Tapatia 98** | | | | | | | | | |
| La Tapatia 98 | 9 | 1 | 8 | 11,286.86 | 4,073.86 | 15,360.72 | 0.00 | 0.00 | 15,360.72 | 0.00 |
| La Tapatia 98 | 24 | 7 | 17 | 46,646.56 | 17,248.17 | 63,894.73 | 0.00 | 0.00 | 63,894.73 | 0.00 |
| **Insured Totals** | 33 | 8 | 25 | 57,933.42 | 21,322.03 | 79,255.45 | 0.00 | 0.00 | 79,255.45 | 0.00 |
| **Insured : MARTINEZ FARMS - 98** | | | | | | | | | |
| MARTINEZ FARMS - 98 | 2 | 2 | 0 | 1,938.86 | 2,247.82 | 4,186.68 | 0.00 | 0.00 | 4,186.68 | 0.00 |
| **Insured Totals** | 2 | 2 | 0 | 1,938.86 | 2,247.82 | 4,186.68 | 0.00 | 0.00 | 4,186.68 | 0.00 |
| **Insured : MILL VALLEY MARKET, INC. - 98** | | | | | | | | | |
| MILL VALLEY MARKET, INC. - 98 | 3 | 1 | 2 | 1,333.14 | 0.00 | 1,333.14 | 0.00 | 0.00 | 1,333.14 | 0.00 |
| **Insured Totals** | 3 | 1 | 2 | 1,333.14 | 0.00 | 1,333.14 | 0.00 | 0.00 | 1,333.14 | 0.00 |

Run By:

Case 1:04-cv-03361-RJS-HBP   Document 13-8   Filed 09/27/2004   Page 16 of 49

Run Date: 07/22/1999
Run Time: 15:58:33

Frontier FSIM policies incepting in 1998,
valued as of 6/30/1999

# Food Service Insurance Mgr's/Frontier
## Management Summary
08/01/1999 through 06/30/1999

| Insured | # of claims | Open | Closed | Paid < SIR | Reserves to date | Incurred < SIR | Paid > SIR | Incurred > SIR | Total Incurred | Recovery |
|---|---|---|---|---|---|---|---|---|---|---|
| **Insured : MJS, INC - 98/99** | | | | | | | | | | |
| MJS, INC - 98/99 | 21 | 12 | 9 | 26,856.40 | 15,890.28 | 42,746.68 | 0.00 | 0.00 | 42,746.68 | 0.00 |
| **Insured Totals** | 21 | 12 | 9 | 26,856.40 | 15,890.28 | 42,746.68 | 0.00 | 0.00 | 42,746.68 | 0.00 |
| **Insured : Natural Selection 1998** | | | | | | | | | | |
| Natural Selection 1998 | 31 | 11 | 20 | 72,497.90 | 71,503.33 | 144,001.23 | 0.00 | 0.00 | 144,001.23 | 0.00 |
| **Insured Totals** | 31 | 11 | 20 | 72,497.90 | 71,503.33 | 144,001.23 | 0.00 | 0.00 | 144,001.23 | 0.00 |
| **Insured : NATURAL SELECTION AZ-98** | | | | | | | | | | |
| NATURAL SELECTION AZ-98 | 16 | 1 | 15 | 4,562.22 | 4,210.42 | 8,772.64 | 0.00 | 0.00 | 8,772.64 | 0.00 |
| **Insured Totals** | 16 | 1 | 15 | 4,562.22 | 4,210.42 | 8,772.64 | 0.00 | 0.00 | 8,772.64 | 0.00 |
| **Insured : NORTH STATE GROCERY - 98** | | | | | | | | | | |
| NORTH STATE GROCERY - 98 | 13 | 3 | 10 | 50,344.45 | 29,144.65 | 79,489.10 | 0.00 | 0.00 | 79,489.10 | 0.00 |
| NORTH STATE GROCERY - 98 | 53 | 14 | 39 | 54,036.61 | 34,155.57 | 88,192.18 | 0.00 | 0.00 | 88,192.18 | 0.00 |
| **Insured Totals** | 66 | 17 | 49 | 104,381.06 | 63,300.22 | 167,681.28 | 0.00 | 0.00 | 167,681.28 | 0.00 |
| **Insured : ODWALLA - 98** | | | | | | | | | | |
| ODWALLA - 98 | 56 | 16 | 40 | 72,211.58 | 57,646.26 | 129,857.84 | 0.00 | 0.00 | 129,857.84 | 0.00 |
| **Insured Totals** | 56 | 16 | 40 | 72,211.58 | 57,646.26 | 129,857.84 | 0.00 | 0.00 | 129,857.84 | 0.00 |
| **Insured : OLIVERS MARKET** | | | | | | | | | | |
| OLIVERS MARKET | 19 | 9 | 10 | 15,488.61 | 21,340.81 | 36,829.42 | 0.00 | 0.00 | 36,829.42 | 0.00 |
| **Insured Totals** | 19 | 9 | 10 | 15,488.61 | 21,340.81 | 36,829.42 | 0.00 | 0.00 | 36,829.42 | 0.00 |
| **Insured : ORGANIC FOOD PRODUCTS** | | | | | | | | | | |
| ORGANIC FOOD PRODUCTS | 3 | 1 | 2 | 27,312.11 | 111,987.32 | 139,299.43 | 0.00 | 0.00 | 139,299.43 | 0.00 |
| ORGANIC FOOD PRODUCTS | 8 | 6 | 2 | 36,086.99 | 42,240.66 | 78,327.65 | 0.00 | 0.00 | 78,327.65 | 0.00 |
| **Insured Totals** | 11 | 7 | 4 | 63,399.10 | 154,227.98 | 217,627.08 | 0.00 | 0.00 | 217,627.08 | 0.00 |
| **Insured : PACIFICO BERRY FARMS - 98** | | | | | | | | | | |
| PACIFICO BERRY FARMS - 98 | 15 | 12 | 3 | 17,617.61 | 67,796.51 | 85,414.12 | 0.00 | 0.00 | 85,414.12 | 0.00 |
| **Insured Totals** | 15 | 12 | 3 | 17,617.61 | 67,796.51 | 85,414.12 | 0.00 | 0.00 | 85,414.12 | 0.00 |

Run By:

Run Date: 07/22/1999
Run Time: 15:58:33

Frontier FSIM policies incepting in 1998,
valued as of 6/30/1999

Run By:

# Food Service Insurance Mgr's/Frontier
## Management Summary
### 06/01/1999 through 06/30/1999

| Insured | # of claims | Open | Closed | Paid < SIR | Reserves to date | Incurred < SIR | Paid > SIR | Incurred > SIR | Total Incurred | Recovery |
|---|---|---|---|---|---|---|---|---|---|---|
| **Insured: POPLAR FARMS, INC. - 98** | | | | | | | | | | |
| POPLAR FARMS, INC. - 98 | 10 | 5 | 5 | 3,737.48 | 30,490.35 | 34,227.83 | 0.00 | 0.00 | 34,227.83 | 0.00 |
| **Insured Totals** | 10 | 5 | 5 | 3,737.48 | 30,490.35 | 34,227.83 | 0.00 | 0.00 | 34,227.83 | 0.00 |
| **Insured: Producers Dairy Products, Inc. - 98** | | | | | | | | | | |
| Producers Dairy Products, Inc. - 98 | 32 | 9 | 23 | 221,220.66 | 128,701.85 | 349,922.51 | 0.00 | 0.00 | 349,922.51 | 0.00 |
| Producers Dairy Products, Inc. - 98 | 20 | 2 | 18 | 27,792.92 | 9,177.56 | 36,970.48 | 0.00 | 0.00 | 36,970.48 | 0.00 |
| **Insured Totals** | 52 | 11 | 41 | 249,013.58 | 137,879.41 | 386,892.99 | 0.00 | 0.00 | 386,892.99 | 0.00 |
| **Insured: PROGRESSO HARVESTING & FARMING, LLC** | | | | | | | | | | |
| PROGRESSO HARVESTING & FARMING, LLC | 1 | 1 | 0 | 849.56 | 0.00 | 849.56 | 0.00 | 0.00 | 849.56 | 0.00 |
| **Insured Totals** | 1 | 1 | 0 | 849.56 | 0.00 | 849.56 | 0.00 | 0.00 | 849.56 | 0.00 |
| **Insured: RIO MESA FARMS - 98** | | | | | | | | | | |
| RIO MESA FARMS - 98 | 6 | 3 | 3 | 965.94 | 11,676.18 | 12,642.12 | 0.00 | 0.00 | 12,642.12 | 0.00 |
| **Insured Totals** | 6 | 3 | 3 | 965.94 | 11,676.18 | 12,642.12 | 0.00 | 0.00 | 12,642.12 | 0.00 |
| **Insured: S.K. FOODS, LP** | | | | | | | | | | |
| S.K. FOODS, LP | 22 | 4 | 18 | 10,834.07 | 36,112.25 | 46,946.32 | 0.00 | 0.00 | 46,946.32 | 0.00 |
| **Insured Totals** | 22 | 4 | 18 | 10,834.07 | 36,112.25 | 46,946.32 | 0.00 | 0.00 | 46,946.32 | 0.00 |
| **Insured: SAFARI HARVESTING & FARMING, LLC** | | | | | | | | | | |
| SAFARI HARVESTING & FARMING, LLC | 1 | 1 | 0 | 0.00 | 2,500.00 | 2,500.00 | 0.00 | 0.00 | 2,500.00 | 0.00 |
| **Insured Totals** | 1 | 1 | 0 | 0.00 | 2,500.00 | 2,500.00 | 0.00 | 0.00 | 2,500.00 | 0.00 |
| **Insured: SANTA CLARA FARMS - 98** | | | | | | | | | | |
| SANTA CLARA FARMS - 98 | 7 | 3 | 4 | 11,891.95 | 173,055.45 | 184,947.40 | 0.00 | 0.00 | 184,947.40 | 0.00 |
| **Insured Totals** | 7 | 3 | 4 | 11,891.95 | 173,055.45 | 184,947.40 | 0.00 | 0.00 | 184,947.40 | 0.00 |
| **Insured: Sierra Citrus Association** | | | | | | | | | | |
| Sierra Citrus Association | 22 | 4 | 18 | 89,304.98 | 24,150.73 | 113,455.71 | 0.00 | 0.00 | 113,455.71 | 0.00 |
| Sierra Citrus Association | 10 | 2 | 8 | 92,082.18 | 70,240.32 | 162,322.50 | 0.00 | 0.00 | 162,322.50 | 0.00 |
| **Insured Totals** | 32 | 6 | 26 | 181,387.16 | 94,391.05 | 275,778.21 | 0.00 | 0.00 | 275,778.21 | 0.00 |

P.07

JUL-22-99 18:35

Run Date: 07/22/1999
Run Time: 15:58:33

Frontier FSIM policies incepting in 1998, valued as of 6/30/1999

# Food Service Insurance Mgr's/Frontier
## Management Summary
### 06/01/1999 through 06/30/1999

Run By:

| Insured | # of claims 7/1/98 - 7/1/99 | Open | Closed | Paid < SIR | Reserves to date | Incurred < SIR | Paid > SIR | Incurred > SIR | Total Incurred | Recovery |
|---|---|---|---|---|---|---|---|---|---|---|
| **Insured :  SUNSWEET DRYERS 7/1/98 - 7/1/99** | | | | | | | | | | |
| SUNSWEET DRYERS 7/1/98 - 7/1/99 | 8 | 5 | 3 | 29,239.31 | 37,129.58 | 66,368.89 | 0.00 | 0.00 | 66,368.89 | 0.00 |
| **Insured Totals** | 8 | 5 | 3 | 29,239.31 | 37,129.58 | 66,368.89 | 0.00 | 0.00 | 66,368.89 | 0.00 |
| **Insured :  SWISS LOUIS RESTAURANT - 98** | | | | | | | | | | |
| SWISS LOUIS RESTAURANT - 98 | 3 | 3 | 0 | 15,444.10 | 35,689.26 | 51,133.35 | 0.00 | 0.00 | 51,133.35 | 0.00 |
| **Insured Totals** | 3 | 3 | 0 | 15,444.10 | 35,689.25 | 51,133.35 | 0.00 | 0.00 | 51,133.35 | 0.00 |
| **Insured :  The Growers Company** | | | | | | | | | | |
| The Growers Company | 19 | 9 | 10 | 18,598.14 | 33,430.73 | 52,028.87 | 0.00 | 0.00 | 52,028.87 | 0.00 |
| **Insured Totals** | 19 | 9 | 10 | 18,598.14 | 33,430.73 | 52,028.87 | 0.00 | 0.00 | 52,028.87 | 0.00 |
| **Insured :  TRICAL INC. 4/30/99-4/30/00** | | | | | | | | | | |
| TRICAL INC. 4/30/99-4/30/00 | 1 | 1 | 0 | 890.47 | 0.00 | 890.47 | 0.00 | 0.00 | 890.47 | 0.00 |
| **Insured Totals** | 1 | 1 | 0 | 890.47 | 0.00 | 890.47 | 0.00 | 0.00 | 890.47 | 0.00 |
| **Insured :  V L FARMS - 98** | | | | | | | | | | |
| V L FARMS - 98 | 2 | 1 | 1 | 1,946.84 | 0.00 | 1,946.84 | 0.00 | 0.00 | 1,946.84 | 0.00 |
| V L FARMS - 98 | 1 | 0 | 1 | 6,160.96 | 77.87 | 6,238.83 | 0.00 | 0.00 | 6,238.83 | 0.00 |
| **Insured Totals** | 3 | 1 | 2 | 8,107.80 | 77.87 | 8,185.67 | 0.00 | 0.00 | 8,185.67 | 0.00 |
| **Insured :  VALLE DORADO AGRI. SERV.- 98** | | | | | | | | | | |
| VALLE DORADO AGRI. SERV.- 98 | 5 | 3 | 2 | 68,546.77 | 34,267.10 | 102,813.87 | 0.00 | 0.00 | 102,813.87 | 0.00 |
| **Insured Totals** | 5 | 3 | 2 | 68,546.77 | 34,267.10 | 102,813.87 | 0.00 | 0.00 | 102,813.87 | 0.00 |
| **Grand Totals** | 808 | 333 | 475 | 2,159,730.15 | 2,129,965.68 | 4,289,695.83 | 0.00 | 0.00 | 4,289,695.83 | 0.00 |

Run Date: 07/22/1999
Run Time: 16:02:02

# Food Service Insurance Mgr's/Frontier
## Management Summary
06/01/1999 through 06/30/1999

Frontier FSIM  Dates of Injury in 1998
As of 6/30/1999

| Insured | # of claims | Open | Closed | Paid < SIR Reserves to date | Incurred < SIR | Paid > SIR | Incurred > SR | Total Incurred |
|---|---|---|---|---|---|---|---|---|
| **Insured :  AMYS KITCHEN, INC. 12/1/98-11/30/99** | | | | | | | | |
| AMYS KITCHEN, INC. 12/1/98-11/30/99 | 5 | 3 | 2 | 16,971.40  16,347.18 | 35,318.58 | 0.00 | 0.00 | 35,318.58 |
| **Insured Totals** | 5 | 3 | 2 | 18,971.40  16,347.18 | 35,318.58 | 0.00 | 0.00 | 35,318.58 |
| **Insured :  BAR 20 DAIRY FARMS 1/1/98-12/31/98** | | | | | | | | |
| BAR 20 DAIRY FARMS 1/1/98-12/31/98 | 3 | 2 | 1 | 23,010.09  2,990.42 | 26,000.51 | 0.00 | 0.00 | 26,000.51 |
| BAR 20 DAIRY FARMS 1/1/98-12/31/98 | 3 | 1 | 2 | 15,504.02  7,548.74 | 23,052.76 | 0.00 | 0.00 | 23,052.76 |
| **Insured Totals** | 6 | 3 | 3 | 38,514.11  10,539.16 | 49,053.27 | 0.00 | 0.00 | 49,053.27 |
| **Insured :  BIEN NACIDO VINEYARDS - 98** | | | | | | | | |
| BIEN NACIDO VINEYARDS - 98 | 3 | 2 | 1 | 42,982.07  29,172.64 | 72,154.71 | 0.00 | 0.00 | 72,154.71 |
| **Insured Totals** | 3 | 2 | 1 | 42,982.07  29,172.64 | 72,154.71 | 0.00 | 0.00 | 72,154.71 |
| **Insured :  CAL WEST FARMING 5/1/98-9/17/98** | | | | | | | | |
| CAL WEST FARMING 5/1/98-9/17/98 | 17 | 6 | 11 | 101,729.74  189,290.06 | 291,019.80 | 0.00 | 0.00 | 291,019.80 |
| CAL WEST FARMING 5/1/98-9/17/98 | 8 | 4 | 4 | 60,100.17  13,148.58 | 73,248.75 | 0.00 | 0.00 | 73,248.75 |
| **Insured Totals** | 25 | 10 | 15 | 161,829.91  202,438.64 | 364,268.55 | 0.00 | 0.00 | 364,268.55 |
| **Insured :  CAL WEST FARMING, INC. 9/18/98-9/17/99** | | | | | | | | |
| CAL WEST FARMING, INC. 9/18/98-9/17/99 | 24 | 11 | 13 | 102,007.02  103,878.65 | 205,885.67 | 0.00 | 0.00 | 205,885.67 |
| **Insured Totals** | 24 | 11 | 13 | 102,007.02  103,878.65 | 205,885.67 | 0.00 | 0.00 | 205,885.67 |
| **Insured :  COACHELLA VALLEY CITRUS 1/1/98-12/31/98** | | | | | | | | |
| COACHELLA VALLEY CITRUS 1/1/98-12/31/98 | 14 | 7 | 7 | 363,743.73  155,334.95 | 519,078.68 | 0.00 | 204,012.34 | 723,091.02 |
| COACHELLA VALLEY CITRUS 1/1/98-12/31/98 | 11 | 5 | 6 | 85,510.40  52,410.06 | 137,920.46 | 0.00 | 0.00 | 137,920.46 |
| **Insured Totals** | 25 | 12 | 13 | 449,254.13  207,745.01 | 656,999.14 | 0.00 | 204,012.34 | 861,011.48 |
| **Insured :  CORONET AZ 9/1/98-9/1/99** | | | | | | | | |
| CORONET AZ 9/1/98-9/1/99 | 1 | 1 | 0 | 0.00  100.00 | 100.00 | 0.00 | 0.00 | 100.00 |
| **Insured Totals** | 1 | 1 | 0 | 0.00  100.00 | 100.00 | 0.00 | 0.00 | 100.00 |
| **Insured :  CORONET FOODS, INC  9/1/98-9/1/99** | | | | | | | | |
| CORONET FOODS, INC  9/1/98-9/1/99 | 2 | 2 | 0 | 19,606.35  5,658.86 | 25,265.21 | 0.00 | 0.00 | 25,265.21 |
| **Insured Totals** | 2 | 2 | 0 | 19,606.35  5,658.86 | 25,265.21 | 0.00 | 0.00 | 25,265.21 |

Food Service Insurance Mgr's/Frontier - Confidential

Run By:

Run Date: 07/22/1999
Run Time: 16:02:02
Frontier FSIM   Dates of Injury in 1998
As of 6/30/1999

# Food Service Insurance Mgr's/Frontier
## Management Summary
06/01/1999 through 06/30/1999

| Insured | # of claims | Open | Closed | Paid < SIR | Reserves to date | Incurred ≤ SIR | Paid > SIR | Incurred > SIR | Total Incurred |
|---|---|---|---|---|---|---|---|---|---|
| **Insured : COUNTRY GOLD 5/20/98-7/1/98** | | | | | | | | | |
| COUNTRY GOLD 5/20/98-7/1/98 | 2 | 0 | 2 | 16,866.46 | 0.00 | 16,866.46 | 0.00 | 0.00 | 16,866.46 |
| **Insured Totals** | 2 | 0 | 2 | 16,866.46 | 0.00 | 16,866.46 | 0.00 | 0.00 | 16,866.46 |
| **Insured : COUNTRY GOLD 7/1/98-7/1/99** | | | | | | | | | |
| COUNTRY GOLD 7/1/98-7/1/99 | 2 | 1 | 1 | 25,220.61 | 2,144.00 | 27,364.61 | 0.00 | 0.00 | 27,364.61 |
| **Insured Totals** | 2 | 1 | 1 | 25,220.61 | 2,144.00 | 27,364.61 | 0.00 | 0.00 | 27,364.61 |
| **Insured : D&V HARVESTING** | | | | | | | | | |
| D&V HARVESTING | 1 | 1 | 0 | 194.50 | 0.00 | 194.50 | 0.00 | 0.00 | 194.50 |
| D&V HARVESTING | 2 | 0 | 2 | 8,326.77 | 0.00 | 8,326.77 | 0.00 | 0.00 | 8,326.77 |
| **Insured Totals** | 3 | 1 | 2 | 8,521.27 | 0.00 | 8,521.27 | 0.00 | 0.00 | 8,521.27 |
| **Insured : DESERT PACKING 7/1/98-6/30/99** | | | | | | | | | |
| DESERT PACKING 7/1/98-6/30/99 | 3 | 2 | 1 | 23,517.57 | 25,155.01 | 48,672.58 | 0.00 | 0.00 | 48,672.58 |
| **Insured Totals** | 3 | 2 | 1 | 23,517.57 | 25,155.01 | 48,672.58 | 0.00 | 0.00 | 48,672.58 |
| **Insured : DUNLAP MANAGEMENT** | | | | | | | | | |
| DUNLAP MANAGEMENT | 2 | 1 | 1 | 588.60 | 0.00 | 588.60 | 0.00 | 0.00 | 588.60 |
| DUNLAP MANAGEMENT | 1 | 0 | 1 | 8,502.24 | 0.00 | 8,502.24 | 0.00 | 0.00 | 8,502.24 |
| **Insured Totals** | 3 | 1 | 2 | 9,090.84 | 0.00 | 9,090.84 | 0.00 | 0.00 | 9,090.84 |
| **Insured : EARTHBOUND FARMS 7/1/98-7/1/99** | | | | | | | | | |
| EARTHBOUND FARMS 7/1/98-7/1/99 | 4 | 0 | 4 | 18,760.29 | 0.00 | 18,760.29 | 0.00 | 0.00 | 18,760.29 |
| **Insured Totals** | 4 | 0 | 4 | 18,760.29 | 0.00 | 18,760.29 | 0.00 | 0.00 | 18,760.29 |
| **Insured : FRANK SPENGERS CO., INC - T.I.B.** | | | | | | | | | |
| FRANK SPENGERS CO., INC - T.I.B. | 7 | 4 | 3 | 43,727.00 | 23,279.77 | 67,006.77 | 0.00 | 0.00 | 67,006.77 |
| **Insured Totals** | 7 | 4 | 3 | 43,727.00 | 23,279.77 | 67,006.77 | 0.00 | 0.00 | 67,006.77 |
| **Insured : FUKUTOMI FARMS, INC - 98** | | | | | | | | | |
| FUKUTOMI FARMS, INC - 98 | 1 | 1 | 0 | 4,573.18 | 3,251.24 | 7,824.42 | 0.00 | 0.00 | 7,824.42 |
| **Insured Totals** | 1 | 1 | 0 | 4,573.18 | 3,251.24 | 7,824.42 | 0.00 | 0.00 | 7,824.42 |

Run By:

P.10    JUL-22-99 18:35

Run Date: 07/22/1999
Run Time: 16:02:02

Frontier FSIM   Dates of Injury in 1998
As of 6/30/1999

# Food Service Insurance Mgr's/Frontier
## Management Summary
06/01/1999 through 06/30/1999

| Insured | # of claims | Open | Closed | Paid < SIR | Reserves to date | Incurred < SIR | Paid > SIR | Incurred > SIR | Total Incurred | Recoven |
|---|---|---|---|---|---|---|---|---|---|---|
| **Insured : FULFILLMENT SYSTEMS, INC - 98** | | | | | | | | | | |
| FULFILLMENT SYSTEMS, INC - 98 | 17 | 5 | 12 | 57,832.08 | 29,487.76 | 87,319.84 | 0.00 | 0.00 | 87,319.84 | 0.0 |
| **Insured Totals** | 17 | 5 | 12 | 57,832.08 | 29,487.76 | 87,319.84 | 0.00 | 0.00 | 87,319.84 | 0.0 |
| **Insured : GEORGE PERRY & SONS 1/1/98-12/31/98** | | | | | | | | | | |
| GEORGE PERRY & SONS 1/1/98-12/31/98 | 3 | 0 | 3 | 22,494.62 | 30.50 | 22,525.12 | 0.00 | 0.00 | 22,525.12 | 0.00 |
| **Insured Totals** | 3 | 0 | 3 | 22,494.62 | 30.50 | 22,525.12 | 0.00 | 0.00 | 22,525.12 | 0.00 |
| **Insured : GOLDBERG & SOLOVY FOODS, INC. - 98** | | | | | | | | | | |
| GOLDBERG & SOLOVY FOODS, INC. - 98 | 10 | 1 | 9 | 62,020.71 | 28,157.35 | 90,178.06 | 0.00 | 0.00 | 90,178.06 | 0.0 |
| **Insured Totals** | 10 | 1 | 9 | 62,020.71 | 28,157.35 | 90,178.06 | 0.00 | 0.00 | 90,178.06 | 0.0 |
| **Insured : GROWERS AZ 7/1/98-6/30/99** | | | | | | | | | | |
| GROWERS AZ 7/1/98-6/30/99 | 12 | 2 | 10 | 45,812.13 | 21,185.51 | 66,997.64 | 0.00 | 0.00 | 66,997.64 | 0.0 |
| **Insured Totals** | 12 | 2 | 10 | 45,812.13 | 21,185.51 | 66,997.64 | 0.00 | 0.00 | 66,997.64 | 0.0 |
| **Insured : GROWERS TRANSPORT 1/1/98-12/31/98** | | | | | | | | | | |
| GROWERS TRANSPORT 1/1/98-12/31/98 | 1 | 0 | 1 | 2,935.96 | 0.00 | 2,935.96 | 0.00 | 0.00 | 2,935.96 | 0.0 |
| GROWERS TRANSPORT 1/1/98-12/31/98 | 2 | 0 | 2 | 2,480.22 | 0.00 | 2,480.22 | 0.00 | 0.00 | 2,480.22 | 0.0 |
| **Insured Totals** | 3 | 0 | 3 | 5,416.18 | 0.00 | 5,416.18 | 0.00 | 0.00 | 5,416.18 | 0.0 |
| **Insured : GROWERS VEGETABLE 5/1/98-4/30/99** | | | | | | | | | | |
| GROWERS VEGETABLE 5/1/98-4/30/99 | 1 | 1 | 0 | 8,901.91 | 786.57 | 9,688.48 | 0.00 | 0.00 | 9,688.48 | 0.0 |
| GROWERS VEGETABLE 5/1/98-4/30/99 | 1 | 1 | 0 | 15,038.43 | 9,931.83 | 24,970.26 | 0.00 | 0.00 | 24,970.26 | 0.0 |
| **Insured Totals** | 2 | 2 | 0 | 23,940.34 | 10,718.40 | 34,658.74 | 0.00 | 0.00 | 34,658.74 | 0.0 |
| **Insured : GUDPAK, INC 9/30/98-9/29/99** | | | | | | | | | | |
| GUDPAK, INC 9/30/98-9/29/99 | 8 | 2 | 6 | 18,605.35 | 15,179.07 | 33,784.42 | 0.00 | 0.00 | 33,784.42 | 0.0 |
| **Insured Totals** | 8 | 2 | 6 | 18,605.35 | 15,179.07 | 33,784.42 | 0.00 | 0.00 | 33,784.42 | 0.0 |
| **Insured : HASEGAWA FARMS, INC. - 98** | | | | | | | | | | |
| HASEGAWA FARMS, INC. - 98 | 1 | 1 | 0 | 11,214.15 | 15,255.67 | 26,469.82 | 0.00 | 0.00 | 26,469.82 | 0.0 |
| **Insured Totals** | 1 | 1 | 0 | 11,214.15 | 15,255.67 | 26,469.82 | 0.00 | 0.00 | 26,469.82 | 0.0 |

Case 1:04-cv-03361-RJS-HBP   Document 13-8   Filed 09/27/2004   Page 22 of 49

Run Date: 07/22/1999
Run Time: 16:02:02

Frontier FSIM  Dates of Injury in 1998
As of 6/30/1999

# Food Service Insurance Mgr's/Frontier

**Management Summary**
08/01/1999 through 08/30/1999

| Insured | # of claims | Open | Closed | Paid < SIR | Reserves to date | Incurred < SIR | Paid > SIR | Incurred > SIR | Total Incurred | Recover |
|---|---|---|---|---|---|---|---|---|---|---|
| **Insured : HIJI BROTHERS, INC. - 98** | | | | | | | | | | |
| HIJI BROTHERS, INC. - 98 | 16 | 2 | 14 | 80,883.32 | 8,346.41 | 89,229.73 | 0.00 | 0.00 | 89,229.73 | 0.0 |
| **Insured Totals** | 16 | 2 | 14 | 80,883.32 | 8,346.41 | 89,229.73 | 0.00 | 0.00 | 89,229.73 | 0.0 |
| **Insured : HOLIDAY QUALITY FOODS - 98** | | | | | | | | | | |
| HOLIDAY QUALITY FOODS - 98 | 9 | 4 | 5 | 53,990.82 | 44,087.01 | 98,077.83 | 0.00 | 0.00 | 98,077.83 | 0.00 |
| HOLIDAY QUALITY FOODS - 98 | 13 | 3 | 10 | 6,735.55 | 9,069.64 | 15,805.19 | 0.00 | 0.00 | 15,805.19 | 0.00 |
| **Insured Totals** | 22 | 7 | 16 | 60,726.37 | 53,156.65 | 113,883.02 | 0.00 | 0.00 | 113,883.02 | 0.00 |
| **Insured : KGM HARVESTING - 98** | | | | | | | | | | |
| KGM HARVESTING - 98 | 1 | 1 | 0 | 9,948.61 | 6,860.22 | 16,808.83 | 0.00 | 0.00 | 16,808.83 | 0.00 |
| **Insured Totals** | 1 | 1 | 0 | 9,948.61 | 6,860.22 | 16,808.83 | 0.00 | 0.00 | 16,808.83 | 0.00 |
| **Insured : La Tapatia 98** | | | | | | | | | | |
| La Tapatia 98 | 9 | 1 | 8 | 11,286.86 | 4,073.86 | 15,360.72 | 0.00 | 0.00 | 15,360.72 | 0.00 |
| La Tapatia 98 | 15 | 4 | 11 | 30,038.96 | 6,428.31 | 36,467.27 | 0.00 | 0.00 | 36,467.27 | 0.00 |
| **Insured Totals** | 24 | 5 | 19 | 41,325.82 | 10,502.17 | 51,827.99 | 0.00 | 0.00 | 51,827.99 | 0.00 |
| **Insured : M. NISHIMORI FARMS - 98** | | | | | | | | | | |
| M. NISHIMORI FARMS - 98 | 4 | 2 | 2 | 50,741.59 | 38,164.45 | 88,906.04 | 0.00 | 0.00 | 88,906.04 | 0.00 |
| **Insured Totals** | 4 | 2 | 2 | 50,741.59 | 38,164.45 | 88,906.04 | 0.00 | 0.00 | 88,906.04 | 0.00 |
| **Insured : MILL VALLEY MARKET, INC. - 98** | | | | | | | | | | |
| MILL VALLEY MARKET, INC. - 98 | 2 | 0 | 2 | 1,333.14 | 0.00 | 1,333.14 | 0.00 | 0.00 | 1,333.14 | 0.00 |
| **Insured Totals** | 2 | 0 | 2 | 1,333.14 | 0.00 | 1,333.14 | 0.00 | 0.00 | 1,333.14 | 0.00 |
| **Insured : MJS, INC - 98/99** | | | | | | | | | | |
| MJS, INC - 98/99 | 4 | 1 | 3 | 6,574.38 | 864.35 | 7,438.73 | 0.00 | 0.00 | 7,438.73 | 0.00 |
| **Insured Totals** | 4 | 1 | 3 | 6,574.38 | 864.35 | 7,438.73 | 0.00 | 0.00 | 7,438.73 | 0.00 |
| **Insured : Natural Selection 1998** | | | | | | | | | | |
| Natural Selection 1998 | 19 | 3 | 16 | 68,586.52 | 34,628.20 | 103,214.72 | 0.00 | 0.00 | 103,214.72 | 0.00 |
| **Insured Totals** | 19 | 3 | 16 | 68,586.52 | 34,628.20 | 103,214.72 | 0.00 | 0.00 | 103,214.72 | 0.00 |

Run By:

P. 12

JUL-22-99  18:36

Run Date: 07/22/1999
Run Time: 16:02:02

Frontier FSIM   Dates of Injury in 1998
As of 6/30/1999

# Food Service Insurance Mgr's/Frontier

## Management Summary
0601/1999 through 06/30/1999

Page 5 of

Run By

| Insured | # of claims | Open | Closed | Paid < SIR reserves to date | Incurred < SIR | Paid > SIR | Incurred > SIR | Total Incurred |
|---|---|---|---|---|---|---|---|---|
| **Insured : NATURAL SELECTION AZ-98** | | | | | | | | |
| NATURAL SELECTION AZ-98 | 2 | 0 | 2 | 907.80 | 907.80 | 0.00 | 0.00 | 907.80 |
| **Insured Totals** | 2 | 0 | 2 | 907.80 | 907.80 | 0.00 | 0.00 | 907.80 |
| **Insured : NATURE QUALITY - 98** | | | | | | | | |
| NATURE QUALITY - 98 | 6 | 0 | 6 | 7,896.79 | 7,896.79 | 0.00 | 0.00 | 7,896.79 |
| **Insured Totals** | 6 | 0 | 6 | 7,896.79 | 7,896.79 | 0.00 | 0.00 | 7,896.79 |
| **Insured : NORTH STATE GROCERY - 98** | | | | | | | | |
| NORTH STATE GROCERY - 98 | 13 | 3 | 10 | 50,344.45 | 29,144.65 | 79,489.10 | 0.00 | 79,489.10 |
| NORTH STATE GROCERY - 98 | 36 | 8 | 28 | 43,680.05 | 22,006.83 | 65,686.88 | 0.00 | 65,686.88 |
| **Insured Totals** | 49 | 11 | 38 | 94,024.50 | 51,151.48 | 145,175.98 | 0.00 | 145,175.98 |
| **Insured : ODWALLA - 98** | | | | | | | | |
| ODWALLA - 98 | 19 | 2 | 17 | 25,198.17 | 14,619.92 | 39,818.09 | 0.00 | 39,818.09 |
| **Insured Totals** | 19 | 2 | 17 | 25,198.17 | 14,619.92 | 39,818.09 | 0.00 | 39,818.09 |
| **Insured : OLIVERS MARKET** | | | | | | | | |
| OLIVERS MARKET | 4 | 2 | 2 | 7,677.52 | 14,055.68 | 21,733.20 | 0.00 | 21,733.20 |
| **Insured Totals** | 4 | 2 | 2 | 7,677.52 | 14,055.68 | 21,733.20 | 0.00 | 21,733.20 |
| **Insured : ORGANIC FOOD PRODUCTS** | | | | | | | | |
| ORGANIC FOOD PRODUCTS | 3 | 1 | 2 | 27,312.11 | 111,987.32 | 139,299.43 | 0.00 | 139,299.43 |
| ORGANIC FOOD PRODUCTS | 4 | 2 | 2 | 34,497.04 | 21,887.16 | 56,384.20 | 0.00 | 56,384.20 |
| **Insured Totals** | 7 | 3 | 4 | 61,809.15 | 133,874.48 | 195,683.63 | 0.00 | 195,683.63 |
| **Insured : PACIFICO BERRY FARMS - 98** | | | | | | | | |
| PACIFICO BERRY FARMS - 98 | 2 | 1 | 1 | 5,088.56 | 2,348.14 | 7,436.70 | 0.00 | 7,436.70 |
| **Insured Totals** | 2 | 1 | 1 | 5,088.56 | 2,348.14 | 7,436.70 | 0.00 | 7,436.70 |
| **Insured : PHILIP MCGRATH FARMS - 98** | | | | | | | | |
| PHILIP MCGRATH FARMS - 98 | 1 | 0 | 1 | 807.58 | 0.00 | 807.58 | 0.00 | 807.58 |
| **Insured Totals** | 1 | 0 | 1 | 807.58 | 0.00 | 807.58 | 0.00 | 807.58 |
| **Insured : Producers Dairy Products, Inc. - 98** | | | | | | | | |
| Producers Dairy Products, Inc. - 98 | 32 | 9 | 23 | 221,220.66 | 128,701.85 | 349,922.51 | 0.00 | 349,922.51 |

Run Date: 07/22/1999
Run Time: 16:02:02

Frontier FSIM   Dates of Injury in 1998
As of 6/30/1999

# Food Service Insurance Mgr's/Frontier
## Management Summary
06/01/1999 through 06/30/1999

Run By:

| Insured | # of claims | Open | Closed | Paid < SIR | Reserves to date | Incurred < SIR | Paid > SIR | Incurred > SIR | Total Incurred |
|---|---|---|---|---|---|---|---|---|---|
| **Insured : Producers Dairy Products, Inc. - 98** | | | | | | | | | |
| Producers Dairy Products, Inc. - 98 | 20 | 2 | 18 | 27,792.92 | 9,177.56 | 36,970.48 | 0.00 | 0.00 | 36,970.48 |
| **Insured Totals** | 52 | 11 | 41 | 249,013.58 | 137,879.41 | 386,892.99 | 0.00 | 0.00 | 386,892.99 |
| **Insured : S.K. FOODS, LP** | | | | | | | | | |
| S.K. FOODS, LP | 9 | 2 | 7 | 10,064.81 | 36,112.25 | 46,177.06 | 0.00 | 0.00 | 46,177.06 |
| **Insured Totals** | 9 | 2 | 7 | 10,064.81 | 36,112.25 | 46,177.06 | 0.00 | 0.00 | 46,177.06 |
| **Insured : SANTA CLARA FARMS - 98** | | | | | | | | | |
| SANTA CLARA FARMS - 98 | 4 | 1 | 3 | 4,535.77 | 17,200.80 | 21,736.57 | 0.00 | 0.00 | 21,736.57 |
| **Insured Totals** | 4 | 1 | 3 | 4,535.77 | 17,200.80 | 21,736.57 | 0.00 | 0.00 | 21,736.57 |
| **Insured : Sierra Citrus Association** | | | | | | | | | |
| Sierra Citrus Association | 22 | 4 | 18 | 89,304.98 | 24,150.73 | 113,455.71 | 0.00 | 0.00 | 113,455.71 |
| Sierra Citrus Association | 10 | 2 | 8 | 92,082.18 | 70,240.32 | 162,322.50 | 0.00 | 0.00 | 162,322.50 |
| **Insured Totals** | 32 | 6 | 26 | 181,387.16 | 94,391.05 | 275,778.21 | 0.00 | 0.00 | 275,778.21 |
| **Insured : SUNSWEET DRYERS 7/1/98 - 7/1/99** | | | | | | | | | |
| SUNSWEET DRYERS 7/1/98 - 7/1/99 | 4 | 1 | 3 | 17,878.38 | 10,939.51 | 28,817.89 | 0.00 | 0.00 | 28,817.89 |
| **Insured Totals** | 4 | 1 | 3 | 17,878.38 | 10,939.51 | 28,817.89 | 0.00 | 0.00 | 28,817.89 |
| **Insured : SWISS LOUIS RESTAURANT - 98** | | | | | | | | | |
| SWISS LOUIS RESTAURANT - 98 | 2 | 2 | 0 | 15,309.12 | 35,689.25 | 50,998.37 | 0.00 | 0.00 | 50,998.37 |
| **Insured Totals** | 2 | 2 | 0 | 15,309.12 | 35,689.25 | 50,998.37 | 0.00 | 0.00 | 50,998.37 |
| **Insured : The Growers Company** | | | | | | | | | |
| The Growers Company | 9 | 1 | 8 | 16,134.20 | 2,834.44 | 18,968.64 | 0.00 | 0.00 | 18,968.64 |
| **Insured Totals** | 9 | 1 | 8 | 16,134.20 | 2,834.44 | 18,968.64 | 0.00 | 0.00 | 18,968.64 |
| **Insured : TIERRA LINDA CORP.** | | | | | | | | | |
| TIERRA LINDA CORP. | 4 | 2 | 2 | 25,079.83 | 34,776.06 | 59,855.89 | 0.00 | 0.00 | 59,855.89 |
| **Insured Totals** | 4 | 2 | 2 | 25,079.83 | 34,776.06 | 59,855.89 | 0.00 | 0.00 | 59,855.89 |
| **Insured : TOP FLAVOR FARMS-AZ 1999** | | | | | | | | | |
| TOP FLAVOR FARMS-AZ 1999 | 2 | 0 | 2 | 309.97 | 0.00 | 309.97 | 0.00 | 0.00 | 309.97 |
| **Insured Totals** | 2 | 0 | 2 | 309.97 | 0.00 | 309.97 | 0.00 | 0.00 | 309.97 |

Run Date: 07/22/1999
Run Time: 16:02:02

Frontier FSIM  Dates of Injury in 1998
As of 6/30/1999

# Food Service Insurance Mgr's/Frontier
## — Management Summary
06/01/1999 through 06/30/1999

| Insured | # of claims | Open | Closed | Paid < SIR | Reserves to date | Incurred < SIR | Paid > SIR | Incurred > SIR | Total Incurred | Recovery |
|---|---|---|---|---|---|---|---|---|---|---|
| **Insured : V L FARMS - 98** | | | | | | | | | | |
| V L FARMS - 98 | 2 | 1 | 1 | 1,946.84 | 0.00 | 1,946.84 | 0.00 | 0.00 | 1,946.84 | 0.00 |
| V L FARMS - 98 | 1 | 1 | 0 | 6,160.96 | 77.87 | 6,238.83 | 0.00 | 0.00 | 6,238.83 | 0.00 |
| **Insured Totals** | 3 | 1 | 2 | 8,107.80 | 77.87 | 8,185.67 | 0.00 | 0.00 | 8,185.67 | 0.00 |
| **Insured : VALLE DORADO AGRI. SERV.- 98** | | | | | | | | | | |
| VALLE DORADO AGRI. SERV - 98 | 3 | 1 | 2 | 67,344.47 | 29,222.79 | 96,567.26 | 0.00 | 0.00 | 96,567.26 | 0.00 |
| **Insured Totals** | 3 | 1 | 2 | 67,344.47 | 29,222.79 | 96,567.26 | 0.00 | 0.00 | 96,567.26 | 0.00 |
| **Grand Totals** | 478 | 135 | 343 | 2,349,462.68 | 1,517,430.00 | 3,866,892.68 | 0.00 | 204,012.34 | 4,070,905.02 | 0.00 |

**PAGE INTENTIONALLY LEFT BLANK**

# F.S.I.M.

## Food Services Insurance Managers, Inc.

### Fax # (916) 797-4950

===FAX===

*RUSH*

**NAME :** Ms. Sue Cole

**COMPANY :** Frontier

**FAX # :** (914) 796-1005

**FROM :** George Haggosian

RECEIVED
JUL 2 2 1999

**# of Pages** 5 (including this cover page)

**DATE :** 7-22-99

**COMMENTS :** please see attached information you requested. Thanks

George

**\*\*If you do not receive all of the pages indicated above, please
give us a call at (916)** 797-4925 .

# F.S.I.M. ISSUANCE LOG "In Force"

| Account Name | Effec. Date | New Renewal | E.A.P. | Policy # | Gov. Class |
|---|---|---|---|---|---|
| Goldberg & Solovy | 8/1/98 | N | $119,940 | W205000155 | 8018 |
| Poplar Farms | 8/1/98 | N | $109,685 | W205000157 | 79 |
| Eclipse Berry Farms | 8/1/98 | N | $172,000 | W205000156 | 79 |
| Rio Mesa Farms | 8/1/98 | N | $119,738 | W205000158 | 79 |
| Odwalla | 9/1/98 | N | $566,360 | W205000149 | 2163 |
| Coronet Foods, Inc | 9/1/98 | N | $84,253 | W205000151 | 6504 |
| KGM Harvesting | 9/1/98 | N | $64,105 | W205000152 | 0172 |
| Gudpak | 9/30/98 | N | $166,400 | W205000159 | 0172 |
| Cal West Farming | 9/18/98 | R | $695,492 | W205000160 | 0172 |
| Athens Baking | 10/1/98 | N | $47,574 | W205000154 | 2003 |
| MJS | 10/1/98 | N | $190,409 | W205000153 | 0172 |
| Progresso Harvesting | 11/1/98 | N | $39,613 | W205000161 | 0079 |
| Rancho Buena Vista | 11/1/98 | N | $39,613 | W205000163 | 0079 |
| Olivers Market | 11/1/98 | N | $59,907 | W205000164 | 8006 |
| Tierra Linda Corp. | 11/1/98 | N | $132,488 | W205000165 | 0172 |
| Safari Harvesting | 11/1/98 | N | $39,613 | W205000162 | 0079 |
| Mill Valley Market | 9/1/98 | N | $25,077 | W205000150 | 8017 |
| LA Poultry | 11/30/98 | N | $101,689 | W205000166 | 8021 |
| Amy's Kitchen | 12/1/98 | N | $191,584 | W205000167 | 6504 |
| J & A Lukrich | 1/1/99 | N | $14,622 | W205000168 | 0016 |
| Crum & Crum | 1/1/99 | N | $85,191 | W205000169 | 7219 |
| Sharer Harvest | 1/1/99 | N | $60,775 | W205000170 | 0172 |
| Adobe Packing | 1/1/99 | N | $216,608 | W205000171 | 0172 |
| Guerra's Farming | 1/1/99 | N | $92,504 | W205000172 | 0172 |
| Dreisbach Ent. | 1/1/99 | N | $107,789 | W205000174 | 9015 |
| Watsonville Coast Pro. | 1/1/99 | N | $52,533 | W205000175 | 8018 |
| Anacapa Berry Farms | 1/1/99 | N | $242,730 | W205000186 | 0079 |

(handwritten annotations in margin: "doesn't match", "with does match", and percentages: 38%, 38%, 28%, 180%, "I don't know 1-10%", 24%, 24%)

# F.S.I.N. ISSUANCE LOG "In Force"

| Account Name | Effec. Date | New/Renewal | E.A.P. | Policy # | Gov. Class | |
|---|---|---|---|---|---|---|
| Ruby Farms | 1/1/99 | N | $ 132,322 | W205000187 | 0079 | 0% |
| Manzanita Berry | 1/1/99 | N | $ 132,983 | W205000188 | 0079 | 0% |
| Rio Farms | 1/1/99 | N | $ 417,375 | W205000189 | 0172 | # doesn't match 12% |
| DB Specialty Farms | 1/1/99 | N | $ 124,319 | W205000190 | 0079 | 5% |
| Bagshaw Co. | 1/1/99 | N | $ 10,152 | W205000191 | 8292 | |
| Carlyle Farming | 1/1/99 | N | $ 2,371 | W205000192 | 0016 | 408% |
| Howeling Nurseries | 1/1/99 | N | $ 16,822 | W205000173 | 0172 | 11% |
| West Coast Harvesting | 1/1/99 | N | $ 229,732 | W205000193 | 0172 | # doesn't match 14% |
| Naturipe Harvesting | 1/1/99 | N | $ 60,875 | W205000194 | 2111 | 13% |
| Sierra Citrus Assoc. | 1/1/99 | R | $ 104,083 | W205000176 | 2108 | 8% |
| Coachella Valley Citrus | 1/1/99 | R | $ 346,315 | W205000177 | 0016 | 14% |
| Growers Transport | 1/1/99 | R | $ 47,962 | W205000178 | 7219 | 10% |
| Dunlap Management | 1/1/99 | R | $ 36,358 | W205000179 | 0016 | # doesn't match 45% |
| Geo. Perry & Sons | 1/1/99 | R | $ 64,182 | W205000180 | 0172 | |
| Fresh West Harvesting | 1/1/99 | R | $ 134,276 | W205000181 | 0172 | eff. date doesn't match |
| V&L Farms | 1/1/99 | R | $ 64,468 | W205000182 | 0079 | 25% |
| Nature Quality | 1/1/99 | R | $ 60,875 | W205000183 | 6504 | 45% |
| Bar 20 Dairy | 1/1/99 | R | $ 42,911 | W205000184 | 0036 | 20% |
| Producers Dairy | 1/1/99 | R | $ 193,292 | W205000185 | 2063 | |
| Coronet Foods (AZ) | 1/1/99 | N | $ 18,916 | W205000200 | 6504 | 38% |
| KGM (AZ) | 1/1/99 | N | $ 11,996 | W205000199 | 0017 | |
| Hueneme Berry | 1/1/99 | N | $ 12,542 | W205000195 | 0079 | |
| CaliMex | 1/28/99 | N | $ 37,977 | W205000198 | 0172 | |
| Hills Harvesting | 2/1/99 | N | $ 22,683 | W205000197 | 0172 | |
| VegPacker, Inc (AZ) | 3/1/99 | N | $ 52,121 | W205000201 | 0017 | |
| Tony's Fine Foods | 4/1/99 | N | $ 191,546 | W205000203 | 8018 | # doesn't match 11% |
| Sunland Garden | 4/1/99 | N | $ 39,655 | W205000202 | 8232 | 0% |

# F.S.I.N. ISSUANCE LOG "In Force"

| Account Name | Effec. Date | New Renewal | E.A.P. | Policy # | Gov. Class | |
|---|---|---|---|---|---|---|
| Frisco Baking Co. | 4/1/99 | N | $ 86,374 | W205000204 | 2003 | 0% |
| Goglanian Bakeries | 4/1/99 | N | $ 160,983 | W205000205 | 2003 | 1% |
| Eaglet Pride Co | 4/25/99 | N | $ 48,205 | W205000206 | 0172 | |
| Escamillia | 4/5/99 | R | $ 933,282 | W205000207 | 0172 | 19% |
| Organic Food Products | 5/1/99 | R | $ 25,607 | W205000208 | 6504 | 89% |
| GVE | 5/1/99 | R | $ 122,715 | W205000209 | 0172 | |
| SK Foods | 5/1/99 | R | $ 131,602 | W205000210 | 2111 | 1% |
| Tri-Cal | 4/30/99 | N | $ 205,303 | W205000211 | 0050 | 0% |
| Los Burritos | 5/1/99 | N | $ 28,587 | W205000212 | 9079 | |
| I C & Sons Farm Labor | 5/1/99 | N | $ 39,275 | W205000213 | 0172 | 3% |
| Veo Farms | 5/17/99 | N | $ 2,108 | W205000214 | 0172 | |
| Central Cold Storage | 6/1/99 | N | $ 147,319 | W205000216 | | |
| Sunsweet Dryers | 7/1/99 | R | $ 119,493 | W205000219 | | |
| E&L Avila | 7/1/99 | N | $ 152,072 | W205000223 | | |
| Natural Selection Foods | 7/1/99 | R | $ 278,801 | W205000217 | | |
| Escamillia | 7/1/99 | R | $ 882,040 | W205000218 | | |
| The Growers Company | 7/1/99 | R | $ 438,392 | W205000220 | | |
| Fulfillment Systems | 7/1/99 | R | $ 95,558 | W205000225 | | |
| Desert Packing | 7/1/99 | R | $ 259,033 | W205000221 | | |
| Boskovitch | 7/1/99 | N | $ 551,212 | W205000224 | | |
| F & T Labor | 7/1/99 | N | $ 83,160 | W205000226 | | |
| 4 Seasons | 7/1/99 | N | $ 142,035 | W205000227 | | |
| Luma Fertilizer | 7/1/99 | R | $ 20,428 | W205000228 | | |
| Bob Jones Ranch | 7/1/99 | R | $ 1,829 | W205000229 | | |
| Conroy Berry Farms | 7/1/99 | R | $ 64,550 | W205000230 | | |
| Hasagawa | 7/1/99 | R | $ 31,197 | W205000231 | | |
| BJ Harvesting | 7/1/99 | R | $ 82,970 | W205000232 | | |

# F.S.I.M. ISSUANCE LOG "In Force"

| Account Name | Effec. Date | New/Renewal | E.A.P. | Policy # | Gov. Class |
|---|---|---|---|---|---|
| Santa Lucia | 7/1/99 | N | $ 69,679 | W205000233 | |
| Golden West Ind. | 6/30/99 | N | $ 38,987 | W205000234 | |
| Swiss Louis Rest. | 7/1/99 | R | $ 33,683 | W205000235 | |
| Rancho Foods | 7/1/99 | N | $ 71,210 | W205000236 | |
| Bien Nacido | 7/1/99 | R | $ 94,200 | W205000237 | |
| United Packing | 7/1/99 | N | $ 88,490 | W205000238 | |
| Vasquez Bros. | 7/1/99 | N | $ 69,168 | W205000222 | |
| Nishimori | 7/1/99 | R | $ 142,618 | W205000239 | |
| Hiji | 7/1/99 | R | $ 285,268 | W205000240 | |
| Rancho Guadalasoa | 7/1/99 | R | $ 57,650 | W205000241 | |
| Philip McGrath Farms | 7/1/99 | R | $ 8,508 | W205000242 | |
| Casper Berry Farms | 7/1/99 | R | $ 55,900 | W205000243 | |
| Martinez Farms | 7/1/99 | R | $ 68,430 | W205000244 | |
| Fukutomi Farms | 7/1/99 | R | $ 42,018 | W205000245 | |
| Santa Clara Farms | 7/1/99 | R | $ 88,797 | W205000246 | |
| | | 1999 | 9,830,597 | | |
| TOTALS | | | $ 12,796,137 | | |

PAGE INTENTIONALLY LEFT BLANK

# F.S.I.M.

# Food Services Insurance Managers, Inc.

## Fax # (916) 797-4950

### ===FAX===

$RUSH$

**NAME :** Sue Cole

**COMPANY :** Frontier Ins. Company

**FAX # :** (914) 796 - 1005

**RECEIVED AUG 1 3 1999**

**FROM :** George Hagosian

**# of Pages** 4 (including this cover page)

**DATE :** Aug 12, 1999

**COMMENTS :** Attached is "Declined" Log. PLEASE NOTE that this is just for "complete"/Actual submissions. It does not reflect declines given over the phone while discussing a potential submission. Nor does it reflect a decline given immediately following an Underwriting "Needs Assessment" (sometimes done prior to actual or complete submission) or a pre-submission/quote loss control survey. Call if you have any questions.

Thanks,
George

**\*\*If you do not receive all of the pages indicated above, please give us a call at (916) 797-4925**

## FSM Declined Business

| Account Name | Effect Date | Declination Date | Rational for Declination |
|---|---|---|---|
| Warwick | Jun-99 | 5/11/99 | Premium Vs. Exposure |
| WSF Beverage | Jun-99 | | Premium Vs. Exposure |
| Tagawa West | Jun-99 | 5/11/99 | Poor Loss Data-Old Valuation |
| Bernardo/Tocchetto | Jun-99 | | Premium Vs. Exposure |
| Plantel Nurseries | Jul-99 | 6/8/99 | Adverse loss history |
| 3 Ring Restaurant | Jul-99 | | Premium Vs. Exposure |
| The Waterfront | Jul-99 | | Premium Vs. Exposure |
| Firewood Café | Jul-99 | | Premium Vs. Exposure |
| Mels Drive In | Jul-99 | | Premium Vs. Exposure |
| Alioto Fish Co. | Jul-99 | | Adverse loss history |
| The Fly Trap | Jul-99 | | Premium Vs. Exposure |
| Olema Inn B&B | Jul-99 | | Class/Exposure |
| Andrews Hotel | Jul-99 | | Class/Exposure |
| City of Paris | Jul-99 | | Premium Vs. Exposure |
| Bruno's Market | Jul-99 | | Premium Vs. Exposure |
| Herrera Packing Co. | Jul-99 | | Adverse loss history |
| Kuhn Hay | Jul-99 | 6/14/99 | Tied to Kuhn Farms |
| Kuhn Farms | Jul-99 | 6/14/99 | Losses & Broker doesn't know acct. |
| KP Dairy | Jul-99 | 6/14/99 | Tied to Kuhn Farms |
| The Inn at the Tides | Jul-99 | | Class/Exposure |
| The Graduate Rest. | Jul-99 | | Premium Vs. Exposure |
| Carcbanila | Jul-99 | | Adverse loss history |
| Santa Lucia Harvesting | Jul-99 | | Possible Gap in Coverage |
| Coach Farms | Jun-99 | | Lack of complete loss data |
| Arizona Son Harvesting | Jul-99 | 6/22/99 | Adverse loss history |
| Rick Young Ranches | Jul-99 | | Premium Vs. Exposure |
| Critello Olive Oil | Aug-99 | | Size |
| Shelter Cove Lodge | Sep-99 | 7/20/99 | Class/Exposure |

**FSM Declined Business**

| Account Name | Effect. Date | Declination Date | Rational for Declination |
|---|---|---|---|
| Antonio Areland | Sep-99 | | Premium Vs. Exposure |
| National Cold Storage | Sep-99 | | Adverse loss history |
| La Pizza Loca | Jul-99 | | Loss History & Construction expos. |
| Clinton's Rest. | Jul-99 | | Adverse loss history |
| Arnord's Rest. | Jul-99 | | Poor '96 Yr, Low EAP |
| Valley Harvesting Ca. | Mar-99 | | Adverse loss history |
| Cal West | 5/1/99 | 2/1/99 | Non-Renewal Losses |
| Spenders | 7/1/99 | 5/1/99 | Non-Renewal Losses |
| Tandori Nites | May-99 | 5/7/99 | Prem. Vs. Exposure |
| The Villa Rest. | 6/1/99 | 5/14/99 | Prem. Vs. Exposure/'97 Yr losses |
| Bobby Rubinos | Jul-99 | Jun-99 | Premium Vs. Exposure |
| EZ Labor | Jul-99 | 6/10/99 | Lack of complete loss data |
| Adrienne's Gourmet Food | Jan-99 | 12/22/98 | Adverse loss history |
| Airdrome Orchards | Apr-98 | 3/24/98 | No Mgmt. Commitment to Safety |
| Alpine Meats | Jan-98 | 12/19/97 | Losses & Financial Concerns |
| Freedom Foods | Jan-98 | 11/7/97 | Size |
| Chase National KIWI | Jan-98 | 11/6/97 | Adverse loss history |
| La Felce | Apr-98 | 3/18/99 | Size |
| Hallmark Meat Packing | Feb-99 | 1/27/99 | Late Submission, Lack of time |
| Polli Allabrace | May-99 | 4/15/99 | Premium Vs. Exposure |
| Café Rocco | May-99 | 4/15/99 | Premium Vs. Exposure |
| Pinnetti LLC | May-99 | 4/15/99 | Premium Vs. Exposure |
| Moss Beach Distillery | Jun-99 | 4/6/99 | Adverse loss history |
| Central Coast Sod | May-99 | 4/15/99 | Premium Vs. Exposure |
| Gueras' Lettuce Harvesting | Apr-99 | 3/11/99 | Adverse loss history |
| Rulli Italian Pastry | Mar-99 | 2/18/99 | Premium Vs. Exposure |
| Samos LLC | Oct-98 | | Financial Concerns |
| All Seasons Flowers | Mar-99 | | Losses, Lack of time |

**FSIN Declined Business**

| Account Name | Effect Date | Declination Date | Rational for Declination |
|---|---|---|---|
| Luis Esparza Services | Jan-99 | | Late Submission, Lack of time |
| Herrera Packing Co. | Jul-97 | | Losses/Exposure |
| Redding Lumbar transport | Apr-97 | 3/14/97 | Class/Exposure |
| BJI Company | Apr-97 | 24-Mar | Losses, Severity driven, Exposure |
| Naumes | n/a | 4/15/97 | Self Insured Poor Safety, Labor camp |
| OG Packing | Jan-98 | 12/23/97 | High frequency, Price buyer only |
| Tri G Farms | Jan-98 | 12/23/97 | related to OG Packing |
| Gotelli & Sons | Jan-98 | 12/23/97 | related to OG Packing |
| Marshall Orchards | Jan-98 | 12/22/97 | Needed premium higer than market |
| Jim Aartman | Jan-98 | 1/7/98 | Late Submission, Lack of time |
| Reiter Afilated | Dec-97 | 12/16/97 | Losses, No safety director |
| Salicoy Berry | Jan-99 | 12/21/98 | Adverse loss history |
| Pure Pak | Jan-99 | 12/15/98 | Lack of complete loss data |
| Malone's | Jan-99 | 12/22/98 | Size |
| Cal Shellfish Co. | Jan-99 | 12/22/98 | USL&H, Losses, 1.91 Xmod |
| Raza | Mar-99 | 3/9/99 | Size |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

PAGE INTENTIONALLY LEFT BLANK

# F.S.I.M.
## Food Services Insurance Managers, Inc.
### Fax # (916) 797-4950

=== FAX ===

RUSH

**NAME:** Sue Cole

**COMPANY:** Frontier Ins. Company

**FAX #:** (914) 796-1005

**FROM:** George Hagosian

RECEIVED
AUG 13 1999

**# of Pages** 5 (including this cover page)

**DATE:** Aug 12, 1999

**COMMENTS:** Attached is "In Force" Issuance Log you requested.
Should you have any questions do not hesitate to call.

Thanks,
George

**If you do not receive all of the pages indicated above, please give us a call at (916) 797-4925 .**

# F.S.I.M. "In Force" LOG

| Account Name | Effec. Date | New Renewal | E.A.P. | Policy # | Gov. Class |
|---|---|---|---|---|---|
| Odwalla | 9/1/98 | N | $ 566,360 | W205000149 | 2163 |
| Coronet Foods, Inc | 9/1/98 | N | $ 84,253 | W205000151 | 6504 |
| KGM Harvesting | 9/1/98 | N | $ 64,105 | W205000152 | 0172 |
| Gudpak | 9/30/98 | N | $ 166,400 | W205000159 | 0172 |
| Cal West Farming | 9/18/98 | R | $ 695,492 | W205000160 | 0172 |
| Athens Baking | 10/1/98 | N | $ 47,574 | W205000154 | 2003 |
| MJS | 10/1/98 | N | $ 190,409 | W205000153 | 0172 |
| Progresso Harvesting | 11/1/98 | N | $ 39,613 | W205000161 | 0079 |
| Rancho Buena Vista | 11/1/98 | N | $ 39,613 | W205000163 | 0079 |
| Olivers Market | 11/1/98 | N | $ 59,907 | W205000164 | 8006 |
| Tierra Linda Corp. | 11/1/98 | N | $ 132,488 | W205000165 | 0172 |
| Safari Harvesting | 11/1/98 | N | $ 39,613 | W205000162 | 0079 |
| Mill Valley Market | 9/1/98 | N | $ 25,077 | W205000150 | 8017 |
| LA Poultry | 11/30/98 | N | $ 101,689 | W205000166 | 8021 |
| Amy's Kitchen | 12/1/98 | N | $ 191,384 | W205000167 | 6504 |
| J & A Lukrich | 1/1/99 | N | $ 14,622 | W205000168 | 0016 |
| Crum & Crum | 1/1/99 | N | $ 85,191 | W205000169 | 7219 |
| Sharer Harvest | 1/1/99 | N | $ 60,775 | W205000170 | 0172 |
| Adobe Packing | 1/1/99 | N | $ 216,608 | W205000171 | 0172 |
| Guerra's Farming | 1/1/99 | N | $ 92,504 | W205000172 | 0172 |
| Dreisbach Ent. | 1/1/99 | N | $ 107,789 | W205000174 | 9015 |
| Watsonville Coast Pro. | 1/1/99 | N | $ 52,533 | W205000175 | 8018 |
| Anacapa Berry Farms | 1/1/99 | N | $ 242,730 | W205000186 | 0079 |
| Ruby Farms | 1/1/99 | N | $ 132,322 | W205000187 | 0079 |
| Manzanita Berry | 1/1/99 | N | $ 132,983 | W205000188 | 0079 |
| Río Farms | 1/1/99 | N | $ 417,375 | W205000189 | 0172 |
| DB Specialty Farms | 1/1/99 | N | $ 124,319 | W205000190 | 0079 |

# F.S.I.M. "In Force" LOG

| Account Name | Effec. Date | New/Renewal | E.A.P. | Policy # | Gov. Class |
|---|---|---|---|---|---|
| Bagshaw Co. | 1/1/99 | N | $ 10,152 | W205000191 | 8292 |
| Carlyle Farming | 1/1/99 | N | $ 2,371 | W205000192 | 0016 |
| Howeling Nurseries | 1/1/99 | N | $ 16,822 | W205000173 | 0172 |
| West Coast Harvesting | 1/1/99 | N | $ 229,732 | W205000193 | 0172 |
| Naturipe Harvesting | 1/1/99 | N | $ 60,875 | W205000194 | 2111 |
| Sierra Citrus Assoc. | 1/1/99 | R | $ 104,083 | W205000176 | 2108 |
| Coachella Valley Citrus | 1/1/99 | R | $ 346,315 | W205000177 | 0016 |
| Growers Transport | 1/1/99 | R | $ 47,962 | W205000178 | 7219 |
| Dunlap Management | 1/1/99 | R | $ 36,358 | W205000179 | 0016 |
| Geo. Perry & Sons | 1/1/99 | R | $ 64,182 | W205000180 | 0172 |
| Fresh West Harvesting | 1/1/99 | R | $ 134,276 | W205000181 | 0172 |
| V&L Farms | 1/1/99 | R | $ 64,468 | W205000182 | 0079 |
| Nature Quality | 1/1/99 | R | $ 60,875 | W205000183 | 6504 |
| Bar 20 Dairy | 1/1/99 | R | $ 42,911 | W205000184 | 0036 |
| Producers Dairy | 1/1/99 | R | $ 193,292 | W205000185 | 2063 |
| Coronet Foods (AZ) | 1/1/99 | N | $ 18,916 | W205002200 | 6504 |
| KGM (AZ) | 1/1/99 | N | $ 11,996 | W205000199 | 0017 |
| Hueneme Berry | 1/1/99 | N | $ 12,542 | W205000195 | 0079 |
| CalMex | 1/28/99 | N | $ 37,977 | W205000198 | 0172 |
| Hills Harvesting | 2/1/99 | N | $ 22,683 | W205000197 | 0172 |
| VegPacker, Inc (AZ) | 3/1/99 | N | $ 52,121 | W205000201 | 0017 |
| Tony's Fine Foods | 4/1/99 | N | $ 191,546 | W205000203 | 8018 |
| Sunland Garden | 4/1/99 | N | $ 39,655 | W205000202 | 8232 |
| Frisco Baking Co. | 4/1/99 | N | $ 86,374 | W205000204 | 2003 |
| Goghanian Bakeries | 4/1/99 | N | $ 160,983 | W205000205 | 2003 |
| Eaglet Pride Co | 4/25/99 | N | $ 48,205 | W205000206 | 0172 |
| Escamilla | 4/5/99 | R | $ 933,282 | W205000207 | 0172 |

# F.S.M. "In Force" LOG

| Account Name | Effec. Date | New Renewal | E.A.P. | Policy # | Gov. Class |
|---|---|---|---|---|---|
| Organic Food Products | 5/1/99 | R | $ 25,607 | W205000208 | 6504 |
| GVE | 5/1/99 | R | $ 122,715 | W205000209 | 0172 |
| SK Foods | 5/1/99 | R | $ 131,602 | W205000210 | 2111 |
| Tri-Cal | 4/30/99 | N | $ 205,303 | W205000211 | 0050 |
| Los Burritos | 5/1/99 | N | $ 28,587 | W205000212 | 9079 |
| 1 C & Sons Farm Labor | 5/1/99 | N | $ 39,275 | W205000213 | 0172 |
| Vec Farms | 5/17/99 | N | $ 2,108 | W205000214 | 0172 |
| Central Cold Storage | 6/1/99 | N | $ 147,319 | W205000216 | 2177 |
| Sunsweet Dryers | 7/1/99 | R | $ 119,493 | W205000219 | 2102 |
| E&L Avila | 7/1/99 | N | $ 152,072 | W205000223 | 0172 |
| Natural Selection Foods | 7/1/99 | R | $ 278,801 | W205000217 | 0172 |
| Escamilla | 7/1/99 | R | $ 882,040 | W205000218 | 0172 |
| The Growers Company | 7/1/99 | R | $ 438,392 | W205000220 | 0172 |
| Fulfillment Systems | 7/1/99 | R | $ 95,558 | W205000225 | 9079 |
| Desert Packing | 7/1/99 | R | $ 259,033 | W205000221 | 0172 |
| Boskovitch | 7/1/99 | N | $ 551,212 | W205000224 | 0172 |
| F & T Labor | 7/1/99 | N | $ 83,160 | W205000226 | 0172 |
| 4 Seasons | 7/1/99 | N | $ 142,035 | W205000227 | 0017 |
| Luna Fertilizer | 7/1/99 | R | $ 20,428 | W205000228 | 0050 |
| Bob Jones Ranch | 7/1/99 | R | $ 1,829 | W205000229 | 8006 |
| Conroy Berry Farms | 7/1/99 | R | $ 64,550 | W205000230 | 0079 |
| Hasagawa | 7/1/99 | R | $ 31,197 | W205000231 | 0079 |
| BJ Harvesting | 7/1/99 | R | $ 82,970 | W205000232 | 0016 |
| Santa Lucia | 7/1/99 | N | $ 69,679 | W205000233 | 0172 |
| Golden West Ind | 6/30/99 | N | $ 38,987 | W205000234 | 0034 |
| Swiss Louis Rest. | 7/1/99 | R | $ 33,683 | W205000235 | 9079 |
| Rancho Foods | 7/1/99 | N | $ 71,210 | W205000236 | 8021 |

# F.S.L.N. "In Force" Log

| Account Name | Effec. Date | New Renewal | E.A.P. | Policy # | Gov. Class |
|---|---|---|---|---|---|
| Bien Nacido | 7/1/99 | R | $ 94,200 | W205000237 | 0040 |
| United Packing | 7/1/99 | N | $ 88,490 | W205000238 | 0172 |
| Vasquez Bros. | 7/1/99 | N | $ 69,168 | W205000222 | 0172 |
| Nishimori | 7/1/99 | R | $ 142,618 | W205000239 | 0005 |
| Fiji | 7/1/99 | R | $ 285,268 | W205000240 | 0172 |
| Rancho Guadalasca | 7/1/99 | R | $ 57,650 | W205000241 | 0016 |
| Philip McGrath Farms | 7/1/99 | R | $ 8,508 | W205000242 | 0016 |
| Casper Berry Farms | 7/1/99 | R | $ 55,900 | W205000243 | 0079 |
| Martinez Farms | 7/1/99 | R | $ 68,430 | W205000244 | 0079 |
| Fukutomi Farms | 7/1/99 | R | $ 42,018 | W205000245 | 0079 |
| Santa Clara Farms | 7/1/99 | R | $ 88,797 | W205000246 | 0016 |
| DV Harvesting | 7/1/99 | R | $ 99,421 | W205000247 | 0016 |
| Channel Island Berry | 7/1/99 | R | $ 62,597 | W205000248 | 0079 |
| Pacifico Berry | 7/1/99 | R | $ 152,236 | W205000249 | 0079 |
| Country Gold Farms | 7/1/99 | R | $ 187,665 | W205000250 | 0016 |
| Goldberg & Solovy | 8/1/99 | R | $ 168,106 | W205000251 | 8018 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| TOTALS | | | $ 12,944,799 | | |

**PAGE INTENTIONALLY LEFT BLANK**



**FOOD SERVICES INSURANCE MANAGERS**



*SENT VIA FAX AND CERTIFIED MAIL*

November 16, 1999

Mr. Gerald J. Steimers, AIC
Vice President, Frontier Insurance Company
195 Lake Louise Marie Road
Rock Hill, NY 12775-8000

RE: **Termination of Claims Service Agreement**

Dear Mr. Steimers:

Receipt of your correspondence of November 10, 1999 notifying termination of the Claims Service Agreement between Risk Management Services, Inc. and Frontier Insurance Company is hereby acknowledged.

The attempt by Frontier Insurance (hereinafter "Frontier") to terminate its service agreement with Risk Management Services, Inc. (hereinafter "FSIM") raises serious and significant concerns on our part. These concerns included our mutual clients' ongoing interests in reducing claims costs, the future handling of existing and potential claims against our clients and the adverse publicity resulting from the termination.

As you are aware, after the Claims Service Agreement was entered into in January of 1998, a significant effort was put forth to develop a program to market the Frontier product coupled with the unique services provided by FSIM. (As you know, FSIM purchased Risk Management Services, Inc. in January of 1999, assuming the obligations and benefits of Risk Management Services, Inc. under the subject agreement.)

The marketing program developed by Dwight Halvorson Insurance Services was successful in selling a significant amount of Frontier policies. In addition to Dwight Halvorson Insurance Services, other independent brokers also utilized the Frontier/FSIM marketing program to generate sales of Frontier's product. To date, approximately 12 million dollars in premium has been generated to Frontier by direct sales. Another 14 million dollars in premium has been generated under the Captive program underwritten by Frontier.

Without question, the vast majority of clients purchasing policies under the program relied on representations of the service provided by the FSIM. FSIM has developed a

unique approach to workers compensation claims management which has provided clients with excellent loss control and superior claims service program for both the captive program and Frontier primary business. FSIM's approach to risk management and claims management is unique in the industry. This factor was, without question, essential in generating in the aforementioned sales.

It is important to note that we incurred substantial costs in gearing up to handle the business generated by Frontier primary. During this process, I had numerous discussions with Kevin Jefferey, Senior Vice President, and Ed Wilson, Vice President in charge of the Frontier primary operations. These gentlemen agreed that in light of the costs of adding staff and equipment and other related issues that we would be given a one-year notice provision for termination of the agreement. This agreement is memorialized in a letter to Kevin Jefferey (see attached). Mr. Wilson was copied on that letter, acknowledged its receipt and confirmed in a subsequent letter Kevin's and his acceptance of these terms. As point of fact, Frontier would not have been able to write primary business at all in this state had we not, on very short notice, changed our operation substantially to accommodate handling claims generated by accounts written outside the FSIM program.

Subsequent to FSIM's assumption of the Frontier business, four audits were conducted. The first three audits all resulted in excellent reviews on behalf of FSIM. The last audit was conducted in August of this year and we are yet to receive the results from Frontier. Throughout the term of this relationship, FSIM has worked closely with Frontier personnel in the review of claims handling procedures and the setting of appropriate reserves.

Your intentions as outlined in your letter are, therefore, not acceptable to us. We do, however, wish to resolve this amicably and would welcome a conference call to discuss this matter and reach a mutually satisfactory resolution. Please contact us at your earliest convenience. If we have not heard back from you within 10 days, we will assume you have rethought your position based on the facts of this letter and wish us to proceed on a business as usual basis.

In closing, we would also respectfully point out that we have been as cooperative and understanding as possible with other decisions Frontier has made relative to Workers Compensation in California, specifically its withdrawal from the market. Frontier's actions in this regard have caused us and our policyholders substantial difficulty, not the least of which has been a tremendous blow to our credibility as we were Frontier's strongest supporter. We had been assured by Mr. Jefferey, as the Executive in charge of the California Workers Compensation operations, that Frontier was committed to a 3 to 5 year plan in this state. Further, Mr. Jefferey was in negotiations to purchase 51% of FSIM over a period of six months up to the point of his departure from the company. So all that has occurred in this regard has been confusing at best. While we understand that the change in management has resulted in certain philosophical changes, we're sure you can appreciate that the abruptness of the actions related to these changes have had

numerous and irreversible consequences already.   All of these problems would be severally exacerbated by now reneging on the product we sold our mutual customers.

I'm sure you want to avoid these further complications that almost certainly would result from these actions as much as we do.   We look forward to hearing from you so we can resolve this matter to our mutual satisfaction.

Very truly yours,

Dwight J. Halvorson
Dwight Halvorson Insurance Services
Food Service Insurance Managers

DJH/sah
Attachment

cc:  Mark Sioma
     Harry Rhulen

**PAGE INTENTIONALLY LEFT BLANK**



FOOD SERVICE INSURANCE MANAGERS

**NAME :** MR. GERALD STEIMERS

**COMPANY :** FRONTIER INSURANCE GROUP

**FAX # :** 914-791-7991

**FROM :** DWIGHT HALVORSON

**# of Pages** 7 [including this cover page]

**Date :** 11/30/99

**Comments :**

_____

*\*\*If you do not receive all of the pages indicated above, please give us a call at
(916) 773-0206.*

3300 Douglas Boulevard, Suite 295 • Rossville, California 95661-3807 • (916) 773-0206 • Fax (916) 773-0402

NOV. -30' 99(TUE) 15:22    D. H. I. S.                    TEL:916 773 0402        P. 002



**FOOD SERVICES INSURANCE MANAGERS**

## SENT VIA FAX AND CERTIFIED MAIL

November 30, 1999

Mr. Gerald J. Steimers, AIC
Vice President
Frontier Insurance Company
195 Lake Louise Marie Road
Rock Hill, NY  12275-8000

RE:  Termination of Claims Service Agreement

Dear Mr. Steimers:

This is a follow-up to my letter dated November 16, 1999 which was faxed to you as well as sent certified mail and received in your office on November 19, 1999 (see attachments). To date, I have not received your response.

Since we have not heard back from you within 10 days of the above referenced letter, we assume you have rethought your position and wish us to proceed on a business as usual basis.  In the absence of hearing from you by the close of business this week, we assume you wish to enforce the language of this letter.

Again, we look forward to hearing from you so we can resolve this matter to our mutual satisfaction. Thank you for your cooperation in this matter.

Sincerely,

Dwight J. Halvorson
Chief Executive Officer
Dwight Halvorson Insurance Services
Food Service Insurance Managers

DJH/sah
Attachments

cc:    Mark Sioma
       Harry Rhulen

---

3300 Douglas Blvd., Suite 295 • Roseville, CA 95661 • TEL: 916.773.0206 • FAX: 916.773.0402 • www.fsimholdings.com • LIC# 0895245

FOOD SERVICE INSURANCE MANAGERS, INC.
3300 DOUGLAS BLVD., SUITE 295
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office    #0120
2221 Douglas Blv., Roseville, CA 95661

11-35/1210

NO. 0000129
129

PAY
TWO HUNDRED SEVENTY-FOUR THOUSAND SIX HUNDRED THIRTY-NINE DOLLARS and 36 CENTS
TO THE ORDER OF

DATE        AMOUNT
09/15/98    $274,639.36*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

⑈000129⑈ ⑈121000358⑈ 01208⑈04267⑈       ⑈274639⑈36⑈

---

FOOD SERVICE INSURANCE MANAGERS, INC.
3300 DOUGLAS BLVD., SUITE 2
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO. 0000142
142

PAY
THREE HUNDRED FIFTY-FOUR THOUSAND EIGHT HUNDRED THIRTY-TWO DOLLARS and 17 CENTS
TO THE ORDER OF

DATE        AMOUNT
10/12/98    $354,832.17*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

⑈000142⑈ ⑈121000358⑈ 01208⑈04267⑈       ⑈00354832 17⑈

---

FOOD SERVICE INSURANCE MANAGERS, INC.
3300 DOUGLAS BLVD., SUITE
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO. 0000156
156

PAY
ONE HUNDRED EIGHTY-SIX THOUSAND FIVE HUNDRED SEVENTY-EIGHT DOLLARS and 22 CENTS
TO THE ORDER OF

DATE        AMOUNT
11/11/98    $186,578.22*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

⑈000156⑈ ⑈121000358⑈ 01208⑈04267⑈       ⑈00186578 22⑈

---

FOOD SERVICE INSURANCE MANAGERS, INC.
3300 DOUGLAS BLVD., SUITE 2
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO. 0000172
171

PAY
TWO HUNDRED TWENTY-SIX THOUSAND NINE HUNDRED FORTY-FOUR DOLLARS and 32 CENTS
TO THE ORDER OF

DATE        AMOUNT
12/15/98    $226,944.32*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

FIC/FSIM 000786

⑈000172⑈ ⑈121000358⑈ 01208⑈04267⑈

**FOOD SERVICE INSURANCE MANAGERS, INC.**
3300 DOUGLAS BLVD., SUITE _
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office      20
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.     **0000182**
182

PAY

ONE HUNDRED SEVENTY-FOUR THOUSAND TWO HUNDRED SEVENTY DOLLARS and 81 CENTS
ORDER OF

DATE     01/14/99

AMOUNT     $174,270.81*
TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

⑈000182⑈ ⑈121000358⑈ 01208⑈0426 7⑈     ⑈00174270⑈
27886

---

**FOOD SERVICE INSURANCE MANAGERS, INC.**
3300 DOUGLAS BLVD., SUITE _
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.     **0000188**
188

PAY

TWO HUNDRED SIXTY-THREE THOUSAND TWO HUNDRED SIXTY-FOUR DOLLARS and 51 CENTS
ORDER OF

DATE     02/18/99

AMOUNT     $263,264.51*
TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

⑈000188⑈ ⑈121000358⑈ 01208⑈0426 7⑈     ⑈00263264 51⑈
2785

---

**FOOD SERVICE INSURANCE MANAGERS, INC.**
3300 DOUGLAS BLVD., SUITE _
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.     **0000193**
193

PAY
TO THE
ORDER OF

THREE HUNDRED EIGHTY-FIVE THOUSAND ONE HUNDRED THREE DOLLARS and 43 CENTS

DATE     03/15/99

AMOUNT     $385,103.43*
TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

⑈000193⑈ ⑈121000358⑈ 01208⑈0426 7⑈     ⑈00385103 43⑈
2 RS

---

**FOOD SERVICE INSURANCE MANAGERS, INC.**
3300 DOUGLAS BLVD., SUITE _
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office      0
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.     **0000196**
196

PAY
TO THE
ORDER OF

THREE HUNDRED SEVENTY-FIVE THOUSAND SIX HUNDRED NINETY-FOUR DOLLARS and 29 CENTS

DATE     04/16/99

AMOUNT     $375,694.29*
TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

FIC/FSIM 000787

⑈000196⑈ ⑈121000358⑈ 01208⑈0426 7⑈     ⑈00375694 29⑈

**FOOD SERVICE INSURANCE MANAGERS, INC.**
3300 DOUGLAS BLVD., SUITE
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office
2221 Douglas Blvd., Roseville, CA 95661
11-35/1210

NO. 000020
202

*Replaced W/ Wire Transfer*

PAY
TO THE ORDER OF: TWO HUNDRED NINETY-SIX THOUSAND TWO HUNDRED FIFTY-SIX DOLLARS and 30 CENTS

DATE    05/14/99

AMOUNT    $296,256.30*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY 12775

⑈000 20 2⑈  ⑆121000358⑈  01208⑈04267⑈    ⑈00 296 256 30

---

**FOOD SERVICE INSURANCE MANAGERS, INC.**
3300 DOUGLAS BLVD., SUITE
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office       30
2221 Douglas Blvd., Roseville, CA 95661
11-35/1210

NO. 000020
204

PAY
TO THE ORDER OF: TWO HUNDRED NINETY THOUSAND THREE HUNDRED TWENTY-FOUR DOLLARS and 66 CENTS

DATE    06/09/99

AMOUNT    $290,324.66*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY 12775

⑈000 204⑈  ⑆121000358⑈  01208⑈0426⑈    ⑈00 290 324 66⑈

---

**FOOD SERVICE INSURANCE MANAGERS, INC.**
3300 DOUGLAS BLVD., SUITE
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office       30
2221 Douglas Blvd., Roseville, CA 95661
11-35/1210

NO. 000023
234

PAY
TO THE ORDER OF: FOUR HUNDRED SEVENTEEN THOUSAND EIGHT HUNDRED THIRTY DOLLARS and 60 CENTS

DATE    11/15/99

AMOUNT    $417,830.60*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY 12775

⑈000 234⑈  ⑆121000358⑈  01208⑈04267⑈    ⑈004 178 3060⑈

---

**FOOD SERVICE INSURANCE MANAGERS, INC.**
3300 DOUGLAS BLVD., SUITE
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office       30
2221 Douglas Blvd., Roseville, CA 95661
11-35/1210

NO. 0000249
249

PAY
TO THE ORDER OF: EIGHT HUNDRED SEVENTY-EIGHT THOUSAND SEVEN HUNDRED TWENTY-SEVEN DOLLARS and 43 CENTS

DATE    12/14/99

AMOUNT    $878,727.43*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY 12775

FIC/FSIM 000788

⑈000 249⑈  ⑆121000358⑈  01208⑈04267⑈    ⑈000 787 2743⑈

8 ORIGINAL DOCUMENT IS PRINTED ON CHEMICAL REACTIVE PAPER & HAS A MICROPRINTED BORDER 8

**FOOD SERVICE INSURANCE MANAGERS, INC.**
3300 DOUGLAS BLVD., SUITE 295
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office #0120
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO. 0000280
280

PAY

TO THE ORDER OF THREE HUNDRED SEVENTEEN THOUSAND NINE HUNDRED SIXTY-FIVE DOLLARS and 62 CENTS

DATE     AMOUNT

03/13/00     $317,965.62*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

Julie Brixton

8 THE REVERSE SIDE OF THIS DOCUMENT INCLUDES AN ARTIFICIAL WATERMARK • HOLD AT AN ANGLE TO VIEW 8

⑈000280⑈ ⑆121000358⑆ 01208⑈0426 7⑈

---

8 ORIGINAL DOCUMENT IS PRINTED ON CHEMICAL REACTIVE PAPER & HAS A MICROPRINTED BORDER 8

**FOOD SERVICE INSURANCE MANAGERS, INC.**
3300 DOUGLAS BLVD., SUITE 295
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office #0120
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO. 0000281
281

PAY

TO THE ORDER OF EIGHTY-EIGHT THOUSAND TWO HUNDRED SEVENTY-FIVE DOLLARS and 20 CENTS

DATE     AMOUNT

03/13/00     $88,275.20*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

Julie Brixton

8 THE REVERSE SIDE OF THIS DOCUMENT INCLUDES AN ARTIFICIAL WATERMARK • HOLD AT AN ANGLE TO VIEW 8

⑈000281⑈ ⑆121000358⑆ 01208⑈0426 7⑈

FIC/FSIM 000789

**FOOD SERVICE INSURANCE MANAGERS, INC.**
3300 DOUGLAS BLVD., SUITE
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office        20
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.    **0000262**
262

PAY

TO THE **FIVE HUNDRED SEVENTEEN THOUSAND ONE HUNDRED NINETY DOLLARS and 73 CENTS**
ORDER OF

DATE    AMOUNT

01/17/00    $517,190.73*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

*John A. Hassett*

⑈000262⑈ ⑆121000358⑆ 01208⑈04267⑈        ⑈0051719073⑈

---

**FOOD SERVICE INSURANCE MANAGERS, INC.**
3300 DOUGLAS BLVD., SUITE
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office        )
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.    **0000270**
270

PAY

TO THE **FIVE HUNDRED TWENTY-THREE THOUSAND SEVEN HUNDRED SIX DOLLARS and 39 CENTS**
ORDER OF

DATE    AMOUNT

02/15/00    $523,706.39*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

⑈000270⑈ ⑆121000358⑆ 01208⑈04267⑈        ⑈0052370639⑈

---

**FOOD SERVICE INSURANCE MANAGERS, INC.**
3300 DOUGLAS BLVD., SUITE
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office        20
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.    **0000292**
292

PAY

TO THE **ONE HUNDRED TWENTY-THREE THOUSAND EIGHT HUNDRED NINETY-SEVEN DOLLARS and 73 CENTS**
ORDER OF

DATE    AMOUNT

04/12/00    $123,897.73*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

*Julie Bryerton*

⑈000292⑈ ⑆121000358⑆ 01208⑈04267⑈        ⑈0012389773⑈

---

**FOOD SERVICE INSURANCE MANAGERS, INC.**
3300 DOUGLAS BLVD., SUITE
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office        20
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.    **0000293**
293

PAY

TO THE **TWO HUNDRED FIFTY-FOUR THOUSAND TWO HUNDRED NINETY-SEVEN DOLLARS and 65 CENTS**
ORDER OF

DATE    AMOUNT

04/12/00    $254,297.65*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

FIC/FSIM 000790

*Julie Bryerton*

⑈000293⑈ ⑆121000358⑆ 01208⑈04267⑈        ⑈0025429765⑈

21054

**FOOD SERVICE INSURANCE MANAGERS, INC.**
3300 DOUGLAS BLVD., SUITE
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office         0
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.    0000295
295

PAY
TO THE ORDER OF    TWO THOUSAND SEVEN HUNDRED FIFTY-NINE DOLLARS and 00 CENTS

DATE    04/12/00

AMOUNT    $2,759.00*
TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

*Julie Brigdon*

⑈"000295"  ⑆121000358⑆  0 ⑈208⑈0426 7"         ⑈0000275900⑈

---

**FOOD SERVICE INSURANCE MANAGERS, INC.**
3300 DOUGLAS BLVD., SUITE 250
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office         0
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.    0000305
305

PAY
TO THE ORDER OF    TWENTY-ONE THOUSAND SEVEN HUNDRED TWENTY-EIGHT DOLLARS and 99 CENTS

DATE    05/15/00

AMOUNT    $21,728.99*
TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

*Julie Brigdon*

⑈"000305"  ⑆121000358⑆  0 ⑈208⑈0426 7"         ⑈000217 2899⑈

---

**FOOD SERVICE INSURANCE MANAGERS, INC.**
3300 DOUGLAS BLVD., SUITE 250
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office         0
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.    0000307
307

PAY
TO THE ORDER OF    SIXTY-SIX THOUSAND SIX HUNDRED EIGHTY-FOUR DOLLARS and 18 CENTS

DATE    05/15/00

AMOUNT    $66,684.18*
TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

*Julie Brigdon*

⑈"000307"  ⑆121000358⑆  0 ⑈208⑈0426 7"         ⑈0006668418⑈

---

**FOOD SERVICE INSURANCE MANAGERS, INC.**
3300 DOUGLAS BLVD., SUITE 250
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office         0
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.    0000308
308

PAY
TO THE ORDER OF    TWO HUNDRED FIFTY-FIVE THOUSAND NINE HUNDRED SIXTY-SEVEN DOLLARS and 71 CENTS

DATE    05/15/00

AMOUNT    $255,967.71*
TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

FIC/FSIM 000791

*Julie Brigdon*

⑈"000308"  ⑆121000358⑆  0 ⑈208⑈0426 7"         ⑈0025596771⑈

FOOD SERVICE INSURANCE MANAGERS, INC.
3300 DOUGLAS BLVD., SUITE
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office          10
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.    0000322
               322

PAY
TO THE
ORDER OF    ONE HUNDRED EIGHTY-SIX THOUSAND FIVE HUNDRED SIXTY-FIVE DOLLARS and 02 CENTS

DATE    AMOUNT

06/27/00    $186,565.02*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

⑈000322⑈ ⑆121000358⑆ 01208⑈04267⑈          ⑈0018656502⑈

---

FOOD SERVICE INSURANCE MANAGERS, INC.
3300 DOUGLAS BLVD., SUITE
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office          10
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.    0000323
               323

PAY
TO THE
ORDER OF    FIFTY-THREE THOUSAND NINE HUNDRED SIXTY-EIGHT DOLLARS and 77 CENTS

DATE    AMOUNT

06/27/00    $53,968.77*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

⑈000323⑈ ⑆121000358⑆ 01208⑈04267⑈          ⑈0005396877⑈

---

FOOD SERVICE INSURANCE MANAGERS, INC.
3300 DOUGLAS BLVD., SUITE
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office          10
2221 Douglas Blvd.,          ville, CA 95661

11-35/1210

NO.    0000329
               329

PAY
TO THE
ORDER OF    ONE HUNDRED ONE THOUSAND FOUR HUNDRED FORTY-SIX DOLLARS and 74 CENTS

DATE    AMOUNT

07/14/00    $101,446.74*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

⑈000329⑈ ⑆121000358⑆ 01208⑈04267⑈          ⑈0010144674⑈

---

FOOD SERVICE INSURANCE MANAGERS, INC.
3300 DOUGLAS BLVD., SUITE
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office          10
2221 Douglas Blvd.,          ville, CA 95661

11-35/1210

NO.    0000331
               331

PAY
TO THE
ORDER OF    TWO HUNDRED FIFTY THOUSAND ONE HUNDRED FORTY DOLLARS and 34 CENTS

DATE    AMOUNT

07/14/00    $250,140.34*

TRUST CHECKING ACCOUNT

FIC/FSIM 000792

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

⑈000331⑈ ⑆121000358⑆ 01208⑈04267⑈          ⑈0025014034⑈

**FOOD SERVICE INSURANCE MANAGERS, INC.**
3300 DOUGLAS BLVD., SUITE 295
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office #0120
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.     0000348
348

PAY
TO THE
ORDER OF    EIGHT THOUSAND TWO HUNDRED SEVENTY-NINE DOLLARS and 72 CENTS

DATE                          AMOUNT

08/01/00          $8,279.72*
TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

⑆000348⑆ ⑈121000358⑈ 01208⑈0426 7⑈

FIC/FSIM 000793

**FOOD SERVICE INSURANCE MANAGERS, INC.**
3300 DOUGLAS BLVD., SUITE 295
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office #0120
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.    **0000345**
345

PAY
TO THE
ORDER OF  ONE THOUSAND TWO HUNDRED EIGHTY-EIGHT DOLLARS and 15 CENTS    DATE    AMOUNT

08/01/00    $1,288.15*
TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

⑈000345⑈ ⑆121000358⑆ 01208⑊04267⑈    ⑈0000128815⑈

---

**FOOD SERVICE INSURANCE MANAGERS, INC.**
3300 DOUGLAS BLVD., SUITE 295
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office #0120
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.    **0000346**
346

PAY
TO THE
ORDER OF  ONE THOUSAND FIVE HUNDRED SIXTY-THREE DOLLARS and 14 CENTS    DATE    AMOUNT

08/01/00    $1,563.14*
TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

⑈000346⑈ ⑆121000358⑆ 01208⑊04267⑈    ⑈0000156314⑈

---

**FOOD SERVICE INSURANCE MANAGERS, INC.**
3300 DOUGLAS BLVD., SUITE 295
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office #0120
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.    **0000347**
347

PAY
TO THE
ORDER OF  ONE THOUSAND FIVE HUNDRED SIXTY-FIVE DOLLARS and 49 CENTS    DATE    AMOUNT

08/01/00    $1,565.49*
TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

⑈000347⑈ ⑆121000358⑆ 01208⑊04267⑈    ⑈0000156549⑈

---

**FOOD SERVICE INSURANCE MANAGERS, INC.**
3300 DOUGLAS BLVD., SUITE 295
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office #0120
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.    **0000349**
349

PAY
TO THE
ORDER OF  TWO THOUSAND TWO HUNDRED ELEVEN DOLLARS and 49 CENTS    DATE    AMOUNT

08/01/00    $2,211.49*
TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

FIC/FSIM 000794

⑈000349⑈ ⑆121000358⑆ 01208⑊04267⑈    ⑈0000221149⑈

**FOOD SERVICE INSURANCE MANAGERS, INC.**
3300 DOUGLAS BLVD., SUITE 295
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office #0120
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.    **0000350**
350

PAY
TO THE ORDER OF   TWO THOUSAND EIGHT HUNDRED FIFTY-FOUR DOLLARS and 83 CENTS

DATE    AMOUNT

08/01/00    $2,854.83*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY 12775

"000350" ⑆121000358⑆ 01208▪0426 7"    ⑈0000 2854 83⑉

---

**FOOD SERVICE INSURANCE MANAGERS, INC.**
3300 DOUGLAS BLVD., SUITE 295
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office #0120
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.    **0000351**
351

PAY
TO THE ORDER OF   FIVE THOUSAND TWO HUNDRED NINETY-TWO DOLLARS and 32 CENTS

DATE    AMOUNT

08/01/00    $5,292.32*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY 12775

"000351" ⑆121000358⑆ 01208▪0426 7"    ⑈0000 5292 32⑉

---

**FOOD SERVICE INSURANCE MANAGERS, INC.**
3300 DOUGLAS BLVD., SUITE 295
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office #0120
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.    **0000352**
352

PAY
TO THE ORDER OF   NINE HUNDRED TWENTY-SEVEN DOLLARS and 26 CENTS

DATE    AMOUNT

08/01/00    $927.26*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY 12775

"000352" ⑆121000358⑆ 01208▪0426 7"    ⑈0000 0927 26⑉

---

**FOOD SERVICE INSURANCE MANAGERS, INC.**
3300 DOUGLAS BLVD., SUITE 295
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office #0120
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.    **0000353**
353

PAY
TO THE ORDER OF   NINETEEN THOUSAND TWO HUNDRED FOURTEEN DOLLARS and 85 CENTS

DATE    AMOUNT

08/01/00    $19,214.85*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY 12775

FIC/FSIM 000795

"000353" ⑆121000358⑆ 01208▪0426 7"    ⑈0000 19214 85⑉

**FOOD SERVICE INSURANCE MANAGERS, INC.**
3300 DOUGLAS BLVD., SUITE 295
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office #0120
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.    **0000354**
354

PAY
TO THE
ORDER OF     TEN THOUSAND NINE HUNDRED THIRTY DOLLARS and 36 CENTS

DATE     08/01/00

AMOUNT     $10,930.36*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

⑈000354⑈ ⑆121000358⑆ 01208⑈04267⑈              ⑈000 1093036⑈

---

**FOOD SERVICE INSURANCE MANAGERS, INC.**
3300 DOUGLAS BLVD., SUITE 295
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office #0120
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.    **0000355**
355

PAY
TO THE
ORDER OF     TWENTY-FIVE THOUSAND TWENTY DOLLARS and 54 CENTS

DATE     08/01/00

AMOUNT     $25,020.54*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

⑈000355⑈ ⑆121000358⑆ 01208⑈04267⑈              ⑈000 2502054⑈

---

**FOOD SERVICE INSURANCE MANAGERS, INC.**
3300 DOUGLAS BLVD., SUITE 295
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office #0120
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.    **0000356**
356

PAY
TO THE
ORDER OF     SIX THOUSAND SEVEN HUNDRED FIFTY-ONE DOLLARS and 83 CENTS

DATE     08/01/00

AMOUNT     $6,751.83*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

⑈000356⑈ ⑆121000358⑆ 01208⑈04267⑈              ⑈000067 5183⑈

---

**FOOD SERVICE INSURANCE MANAGERS, INC.**
3300 DOUGLAS BLVD., SUITE 295
ROSEVILLE, CA 95661
(916) 773-0206

BANK OF AMERICA
Roseville Main Office #0120
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

TIERRA LINDA   W20S000264

NO.    **0000362**
362

PAY
TO THE
ORDER OF     TWENTY-FOUR THOUSAND NINE HUNDRED SEVEN DOLLARS and 48 CENTS

DATE     08/23/00

AMOUNT     $24,907.48*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

FIC/FSIM 000796

⑈000362⑈ ⑆121000358⑆ 01208⑈04267⑈              ⑈000 2490748⑈



DWIGHT HALVORSON INSURANCE SERVICES
3300 DOUGLAS BOULEVARD, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AME
Roseville Main     e #0120
2221 Douglas Blvd., Roseville, CA 95661
11-35/1210                        NO.

0003341

3341

PAY
TEN THOUSAND DOLLARS and 00 CENTS
TO THE
ORDER OF

RISK MANAGEMENT SERVICES
PO BOX 276307
SACRAMENTO, CA  95827-6307

DATE                    AMOUNT

01/19/98            $10,000.00*

TRUST CHECKING ACCOUNT

Dwight D Halvorson

THE REVERSE SIDE OF THIS DOCUMENT INCLUDES AN ARTIFICIAL WATERMARK • HOLD AT AN ANGLE TO VIEW

⑆003341⑆ ⑈121000358⑈ 01209⑈04054⑆                    ⑈0001000000⑆

---



DWIGHT HALVORSON INSURANCE SERVICES
3300 DOUGLAS BOULEVARD, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMEF
Roseville Main C..   #0120
2221 Douglas Blvd., Roseville, CA 95661
11-35/1210                        NO.

0003508

3508

PAY
ONE HUNDRED EIGHTY-THREE THOUSAND SEVEN HUNDRED FIFTY-THREE DOLLARS and 98 CENTS
TO THE
ORDER OF

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

DATE                    AMOUNT

04/05/98            $183,753.98*

TRUST CHECKING ACCOUNT

Julie A. Bryerton

THE REVERSE SIDE OF THIS DOCUMENT INCLUDES AN ARTIFICIAL WATERMARK • HOLD AT AN ANGLE TO VIEW

⑆003508⑆ ⑈121000358⑈ 01209⑈04054⑆                    ⑈00183753983⑆

---



DWIGHT HALVORSON INSURANCE SERVICES
3300 DOUGLAS BOULE..  ID, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMEF
Roseville Main     #0120
2221 Douglas Blvd., Roseville, CA 95661
11-35/1210                        NO.

0003514

3514

PAY
TO THE
ORDER OF
SIXTY-NINE THOUSAND FIVE HUNDRED TWENTY-FOUR DOLLARS and 53 CENTS

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

AMOUNT

04/10/98            $69,524.53*

TRUST CHECKING ACCOUNT

Julie A. Bryerton

THE REVERSE SIDE OF THIS DOCUMENT INCLUDES AN ARTIFICIAL WATERMARK • HOLD AT AN ANGLE TO VIEW

⑆003514⑆ ⑈121000358⑈ 01209⑈04054⑆                    ⑈0006952453⑆

---



DWIGHT HALVORSON INSURANCE SERVICES
3300 DOUGLAS BOULE    ID, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMEF
Roseville Main     #0120
2221 Douglas Blvd., Roseville, CA 95661
11-35/1210                        NO.

0003584

3584

PAY
TO THE
ORDER OF
FORTY THOUSAND SEVEN HUNDRED SIXTY-TWO DOLLARS and 73 CENTS

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

DATE                    AMOUNT

05/16/98            $40,762.73*            FIC/FSIM 000797

TRUST CHECKING ACCOUNT

Julie A. Bryerton



DWIGHT HALVORSON INSURANCE SERVICES
3300 DOUGLAS BOULE_ _D, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMER_
Roseville Main _ _ #0120
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210    NO.

0003626

3626

PAY
TO THE
ORDER OF
EIGHTY-TWO THOUSAND THREE _____ TWENTY-FOUR DOLLARS and 91 CENTS

DATE    AMOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE
ROCK HILL, NY  12775

/11/98    $82,324.91*

*These have not been copied yet*

TRUST CHECKING ACCOUNT

Julie A. Bryerton

⑈003626⑈ ⑆121000358⑆ 19⑈04054⑈    ⑈000827↵9↵⑈
2785 6

---



DWIGHT HALVORSON INS_ _ANCE SERVICES
3300 DOUGLAS BOULE_ _J, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMER_
Roseville Main C_ _ #0120
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210    NO.

0003673

PAY
TO THE
ORDER OF
ONE HUNDRED SEVENTY-SIX THOUSAND TWO HUNDRED THIRTY-FOUR DOLLARS and 26 CENTS

DATE    AMOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

07/15/98    $176,234.26*

TRUST CHECKING ACCOUNT

Julie A. Bryerton

⑈003673⑈ ⑆121000358⑆ 01209⑈04054⑈    ⑈00127824769⑈
2785 6

---



DWIGHT HALVORSON INS_ _ANCE SERVICES
3300 DOUGLAS BOULE_ _D, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMER_
Roseville Main _ _ #0120
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210    NO.

0003704

3704

PAY
TO THE
ORDER OF
TWO HUNDRED TWENTY-THREE THOUSAND ONE HUNDRED SIXTY-TWO DOLLARS and 48 CENTS

DATE    AMOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

08/14/98    $223,162.48*

TRUST CHECKING ACCOUNT


Attn: JANET BACKER

Julie A. Bryerton

⑈003704⑈ ⑆121000358⑆ 01209⑈04054⑈    ⑈00727856⑈
2785 6

---



DWIGHT HALVORSON INS_ _ANCE SERVICES
3300 DOUGLAS BOULE_ _D, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMER_
Roseville Main _ _ #0120
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210    NO.

0003759

3759

PAY
TO THE
ORDER OF
TWO HUNDRED TWENTY-ONE THOUSAND FOUR HUNDRED THREE DOLLARS and 22 CENTS

DATE    AMOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

09/15/98    $221,403.22*

TRUST CHECKING ACCOUNT

Dwight J Halvorson

FIC/FSIM 000798



**DWIGHT HALVORSON INSURANCE SERVICES**
3300 DOUGLAS BOULE    D, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMER
Roseville Main    #0120
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

0003784

NO.

3784

PAY
TWO HUNDRED SIXTY-TWO THOUSAND SIX HUNDRED EIGHTY-ONE DOLLARS and 68 CENTS
ORDER OF

DATE

AMOUNT

10/12/98          \$262,681.68*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

Julie A. Bryerton

⑈003784⑈ ⑆121000358⑆ 01209⑈04054⑈

---



**DWIGHT HALVORSON INSURANCE SERVICES**
3300 DOUGLAS BOULEVARD    SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMERICA
Roseville Main Office    0
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

0003837

NO.

3837

PAY
TWO HUNDRED TWENTY-SEVEN THOUSAND NINE HUNDRED NINE DOLLARS and 19 CENTS
ORDER OF

DATE

AMOUNT

11/11/98          \$227,909.19*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

Julie A. Bryerton

⑈003837⑈ ⑆121000358⑆ 01209⑈04054⑈

---



**DWIGHT HALVORSON INSURANCE SERVICES**
3300 DOUGLAS BOULEVARD, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMERICA
Roseville Main Office #0120
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

0003890

NO.

3890

PAY
FOUR HUNDRED FORTY THOUSAND EIGHT HUNDRED TWENTY-EIGHT DOLLARS and 68 CENTS
ORDER OF

DATE

AMOUNT

12/15/98          \$440,828.68*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

Dwight J. Halvorson

⑈003890⑈ ⑆121000358⑆ 01209⑈04054⑈

---



**DWIGHT HALVORSON INSURANCE SERVICES**
3300 DOUGLAS BOULEVARD    SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMERICA
Roseville Main Office    20
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

0003907

NO.

3907

PAY
THREE HUNDRED THOUSAND FOUR HUNDRED THIRTY-FIVE DOLLARS and 40 CENTS
ORDER OF

DATE

AMOUNT

01/14/99          \$300,435.40*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

Julie A. Bryerton

**FIC/FSIM 000799**



**DWIGHT HALVORSON INSURANCE SERVICES**
3300 DOUGLAS BOULEVARD, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

**BANK OF AMERICA**
Roseville Main Office   20
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.

0003956

3956

PAY
TWO HUNDRED SIXTY-FOUR THOUSAND FOUR HUNDRED TEN DOLLARS and 48 CENTS
TO THE
ORDER OF

DATE     02/18/99

AMOUNT     $264,410.48*

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

TRUST CHECKING ACCOUNT

*Julie A. Bryerton*

⑈003956⑈ ⑆121000358⑆ 01209⑈04054⑈            ⑈0026441048⑈
2785

---



**DWIGHT HALVORSON INSURANCE SERVICES**
3300 DOUGLAS BOULEVARD, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

**BANK OF AMERICA**
Roseville Main Office   0
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.

0003986

3986

PAY
TO THE ONE HUNDRED NINETY-TWO THOUSAND SIX HUNDRED ONE DOLLARS and 24 CENTS
ORDER OF

DATE     03/15/99

AMOUNT     $192,601.24*

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

TRUST CHECKING ACCOUNT

*Julie A Bryerton*

⑈003986⑈ ⑆121000358⑆ 01209⑈04054⑈            ⑈0019260124⑈
2785

---



**DWIGHT HALVORSON INSURANCE SERVICES**
3300 DOUGLAS BOULEVARD, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

**BANK OF AMERICA**
Roseville Main Office #0
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.

0003988

3988

PAY
TO THE TWO HUNDRED SIXTY-EIGHT THOUSAND THREE HUNDRED FIFTY-SIX DOLLARS and 41 CENTS
ORDER OF

DATE     03/15/99

AMOUNT     $268,356.41*

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

TRUST CHECKING ACCOUNT

*Julie A. Bryerton*

⑈003988⑈ ⑆121000358⑆ 01209⑈04054⑈            ⑈0026835641⑈
2785

---



**DWIGHT HALVORSON INSURANCE SERVICES**
3300 DOUGLAS BOULEVARD, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

**BANK OF AMERICA**
Roseville Main Office   0
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.

0003989

3989

PAY
TO THE THIRTY-TWO THOUSAND THREE HUNDRED THIRTY-TWO DOLLARS and 60 CENTS
ORDER OF

DATE     03/15/99

AMOUNT     $32,332.60*          FIC/FSIM 000800

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

TRUST CHECKING ACCOUNT

*Julie A. Bryerton*



**DWIGHT HALVORSON INSURANCE SERVICES**
3300 DOUGLAS BOULEVARD, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

**BANK OF AMERICA**
Roseville Main Office #0120
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

0003991

NO.        3991

PAY
TO THE ONE THOUSAND FIVE HUNDRED NINETY-NINE DOLLARS and 52 CENTS
ORDER OF

DATE            AMOUNT

03/15/99        $1,599.52*

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

TRUST CHECKING ACCOUNT

*Julie A. Brighton*

⑈⑈003991⑈⑈ ⑈121000358⑈ 01209⑈04054⑈

FIC/FSIM 000801



DWIGHT HALVORSON INSURANCE SERVICES
3300 DOUGLAS BOULEVARD, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMERICA
Roseville Main Office     20
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.                    0003990

3990

PAY
TO THE
ORDER OF    THREE THOUSAND SIX HUNDRED FORTY-NINE DOLLARS and 70 CENTS

DATE    03/15/99

AMOUNT    $3,649.70*

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

TRUST CHECKING ACCOUNT

Julie A. Bryson

"0003990"  ⑈121000358⑈ 01209"040054"        "000036497°85



DWIGHT HALVORSON INSURANCE SERVICES
3300 DOUGLAS BOULEVARD, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMERICA
Roseville Main Office #u120
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.                    0004027

4027

*Replaced with 4/29/ WIRE*

PAY
TO THE
ORDER OF    TWO HUNDRED SIX THOUSAND FORTY-ONE DOLLARS and 04 CENTS

DATE    04/16/99

AMOUNT    $206,041.04*

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

TRUST CHECKING ACCOUNT

Dwight J Halvorson

"004027"  ⑈121000358⑈ 01209"040054"        "00206041°4"



DWIGHT HALVORSON INSURANCE SERVICES
3300 DOUGLAS BOULEVARD, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMERICA
Roseville Main Office     20
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.                    0004028

4028

PAY
TO THE
ORDER OF    NINE THOUSAND SEVEN HUNDRED THIRTY-THREE DOLLARS and 84 CENTS

DATE    04/16/99

AMOUNT    $9,733.84*

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

TRUST CHECKING ACCOUNT

Dwight J Halvorson

"0004028"  ⑈121000358⑈ 01209"040054"        "000097338°4"



DWIGHT HALVORSON INSURANCE SERVICES
3300 DOUGLAS BOULEVARD, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMERICA
Roseville Main Office     20
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.                    0004029

4029

PAY
TO THE
ORDER OF    TWO HUNDRED TEN THOUSAND FOUR HUNDRED FIFTY-TWO DOLLARS and 99 CENTS

DATE    04/15/99

AMOUNT    $210,452.99*

FIC/FSIM 000802

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

TRUST CHECKING ACCOUNT

Dwight J Halvorson



**DWIGHT HALVORSON INSURAN** **CE SERVICES**
3300 DOUGLAS BOULEVARD   SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

**BANK OF AMERICA**
Roseville Main Office    0
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

**0004030**

NO.      4030

PAY
NINE HUNDRED EIGHT DOLLARS and 10 CENTS
TO THE
ORDER OF

DATE      04/16/99

AMOUNT      $908.10*

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

TRUST CHECKING ACCOUNT

*Dwight J Halvorson*

⑈004030⑈ ⑆121000358⑈ 01209⑈04054⑈                *000000908 10*

---



**DWIGHT HALVORSON INSURAN** **CE SERVICES**
3300 DOUGLAS BOULEVARD   SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

**BANK OF AMERICA**
Roseville Main Office    0
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

**0004053**

NO.      4053

PAY
TO THE
ORDER OF
ONE HUNDRED NINETY-FOUR THOUSAND THREE HUNDRED EIGHTY-SIX DOLLARS and 61 CENTS

DATE      05/14/99

AMOUNT      $194,386.61*

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

TRUST CHECKING ACCOUNT

*Julie A. Bryerton*

⑈004053⑈ ⑆121000358⑈ 01209⑈04054⑈                *00194386 61*

---



**DWIGHT HALVORSON INSURAN** **CE SERVICES**
3300 DOUGLAS BOULEVARD   SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

**BANK OF AMERICA**
Roseville Main Office    0
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

**0004054**

NO.      4054

PAY
TO THE
ORDER OF
THREE HUNDRED TWENTY-SEVEN THOUSAND SEVEN HUNDRED EIGHTY DOLLARS and 66 CENTS

DATE      05/14/99

AMOUNT      $327,780.66*

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

TRUST CHECKING ACCOUNT

*Julie A. Bryerton*

⑈004054⑈ ⑆121000358⑈ 01209⑈04054⑈                *00327780 66*

---



**DWIGHT HALVORSON INSURAN** **CE SERVICES**
3300 DOUGLAS BOULEVARD   SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

**BANK OF AMERICA**
Roseville Main Office    0
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

**0004055**

NO.      4055

PAY
TO THE
ORDER OF
TWO THOUSAND FIVE HUNDRED SEVEN DOLLARS and 58 CENTS

DATE      05/14/99

AMOUNT      $2,507.58*

FIC/FSIM 000803

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

TRUST CHECKING ACCOUNT

*Julie A. Bryerton*



DWIGHT HALVORSON INSURANCE SERVICES
3300 DOUGLAS BOULEVARD, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMERICA
Roseville Main Office,    20
2221 Douglas Blvd., Roseville, CA 95661
11-35/1210                    NO.

0004067

4067

PAY
TO THE
ORDER OF  ONE HUNDRED NINETY-EIGHT THOUSAND THREE HUNDRED THIRTEEN DOLLARS and 36 CENTS

DATE                        AMOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

06/09/99          $198,313.36*
                  TRUST CHECKING ACCOUNT

⑆0004067⑈ ⑆121000358⑆ 01209⑈04054⑈          ⑆00198313 36⑈

---



DWIGHT HALVORSON INSURANCE SERVICES
3300 DOUGLAS BOULEVARD, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMERICA
Roseville Main Office,    20
2221 Douglas Blvd., Roseville, CA 95661
11-35/1210                    NO.

0004068

4068

PAY
TO THE
ORDER OF  THREE HUNDRED EIGHT THOUSAND SIX HUNDRED FORTY-TWO DOLLARS and 23 CENTS

DATE                        AMOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

06/09/99          $308,642.23*
                  TRUST CHECKING ACCOUNT

⑆0004068⑈ ⑆121000358⑈ 01209⑈04054⑈          ⑆0030864 223⑈

---

copied to
5B
attached
#
0006177

DWIGHT HALVORSON INSURANCE SERVICES
3300 DOUGLAS BOULEVARD, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMERICA
Roseville Main Office,    0
2221 Douglas Blvd., Roseville, CA 95661
11-35/1210                    NO.

0004146

4146

PAY
TO THE
ORDER OF  THOUSAND THREE HUNDRED FORTY-SIX DOLLARS and 95 CENTS

DATE                        AMOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

09/14/99          $6,346.95*
                  TRUST CHECKING ACCOUNT

⑆0004146⑈ ⑆121000358⑈ 01209⑈04054⑈          ⑆00006346 95⑈

---

DWIGHT HALVORSON INSURANCE SERVICES
3300 DOUGLAS BOULEVARD, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMERICA
Roseville Main Office,    20
2221 Douglas Blvd., Roseville, CA 95661
11-35/1210                    NO.

0004220

4220

PAY
TO THE
ORDER OF  SEVEN HUNDRED TWENTY-EIGHT THOUSAND NINETY-FIVE DOLLARS and 96 CENTS

DATE                        AMOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

11/15/99          $728,095.96*
                  TRUST CHECKING ACCOUNT

FIC/FSIM 000804

VOID AFTER 90 DAYS

2785 G

10/20/99

11-35/1210   2017265614

**Bank of America**

Issuer: BankAmerica Corporation or
Bank of America NT&SA, San Francisco, California
IF THE AMOUNT OF THIS CHECK EXCEEDS $10,000 IT IS DRAWN ON AND
ISSUED BY BANK OF AMERICA NT&SA AND IT IS A CASHIER'S CHECK

MATCH THE AMOUNT IN WORDS WITH THE AMOUNT IN NUMBERS

Pay To The
Order Of    ***FRONTIER INSURANCE COMPANY***

PURCHASER:
GWEN HALVORSEN

**Official Check**
Payable at Bank of America NT&SA,
ISSUED IN U.S. DOLLARS

AUTHORIZED SIGNATURE

TWO SIGNATURES REQUIRED FOR AMOUNTS OVER $500,000.

⑈2017265614⑈ ⑉121000358⑈ 13977⑈84016⑈

2785

Date of Check: 10/20/99

FIC/FSIM 000806



**DWIGHT HALVORSON INSURANCE SERVICES**
3300 DOUGLAS BOULEVARD, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

**BANK OF AMERICA**
Roseville Main Office #0120
2221 Douglas Blvd., Roseville, CA. 95661

11-35/1210                    NO.

0004239

4239

PAY
ONE HUNDRED SIXTY-FIVE THOUSAND FORTY-FIVE DOLLARS and 56 CENTS
TO THE ORDER OF

DATE          AMOUNT
12/14/99     $165,045.56*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY   12775

⑈004239⑈ ⑆121000358⑆ 01209⑈04054⑈          ⑈0016504556⑈

---



**DWIGHT HALVORSON INSURANCE SERVICES**
3300 DOUGLAS BOULEVARD, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

**BANK OF AMERICA**
Roseville Main Office #0120
2221 Douglas Blvd., Roseville, CA. 95661

11-35/1210                    NO.

0004275

4275

PAY
THREE HUNDRED NINETY-NINE THOUSAND THREE HUNDRED TWELVE DOLLARS and 09 CENTS
TO THE ORDER OF

DATE          AMOUNT
01/17/00     $399,312.09*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY   12775

⑈004275⑈ ⑆121000358⑆ 01209⑈04054⑈          ⑈0039931209⑈

---



**DWIGHT HALVORSON INSURANCE SERVICES**
3300 DOUGLAS BOULEVARD, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

**BANK OF AMERICA**
Roseville Main Office #0120
2221 Douglas Blvd., Roseville, CA. 95661

11-35/1210                    NO.

0004286

4286

PAY
THREE HUNDRED SIXTY THOUSAND SEVEN HUNDRED FORTY-NINE DOLLARS and 23 CENTS
TO THE ORDER OF

DATE          AMOUNT
02/15/00     $360,749.23*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY   12775

⑈004286⑈ ⑆121000358⑆ 01209⑈04054⑈          ⑈0036074923⑈

---



**DWIGHT HALVORSON INSURANCE SERVICES**
3300 DOUGLAS BOULEVARD, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

**BANK OF AMERICA**
Roseville Main Office #0120
2221 Douglas Blvd., Roseville, CA. 95661

11-35/1210                    NO.

0004326

4326

PAY
TWO HUNDRED SIXTY-FIVE THOUSAND TWO HUNDRED THIRTY-EIGHT DOLLARS and 72 CENTS
TO THE ORDER OF

DATE          AMOUNT
04/12/00     $265,238.72*

TRUST CHECKING ACCOUNT

FIC/FSIM 000807

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY   12775

® ORIGINAL DOCUMENT IS PRINTED ON CHEMICAL REACTIVE PAPER & HAS A MICROPRINTED BORDER ®



**DWIGHT HALVORSON INSURANCE SERVICES**
3300 DOUGLAS BOULEVARD, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

**BANK OF AMERICA**
Roseville Main Office #0120
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.

0004298

4298

PAY
TO TWO HUNDRED SEVENTY THOUSAND SEVENTY-SEVEN DOLLARS and 36 CENTS

ORDER OF

DATE

AMOUNT

03/13/00          $270,077.36*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

_Julie Bryston_

® THE REVERSE SIDE OF THIS DOCUMENT INCLUDES AN ARTIFICIAL WATERMARK - HOLD AT AN ANGLE TO VIEW ®

⑈004298⑈ ⑆121000358⑆ 01209⑈04054⑈

---

® ORIGINAL DOCUMENT IS PRINTED ON CHEMICAL REACTIVE PAPER & HAS A MICROPRINTED BORDER ®

**DWIGHT HALVORSON INSURANCE SERVICES**
3300 DOUGLAS BOULEVARD, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

**BANK OF AMERICA**
Roseville Main Office #0120
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210

NO.

0004299

4299

PAY
TO FIFTY THOUSAND THREE HUNDRED THIRTY-ONE DOLLARS and 73 CENTS

ORDER OF

DATE

AMOUNT

03/13/00          $50,331.73*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

_Julie Bryston_

® THE REVERSE SIDE OF THIS DOCUMENT INCLUDES AN ARTIFICIAL WATERMARK - HOLD AT AN ANGLE TO VIEW ®

⑈004299⑈ ⑆121000358⑆ 01209⑈04054⑈



DWIGHT HALVORSON INSURANCE SERVICES
3300 DOUGLAS BOULEVA.   SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMERICA
Roseville Main Office    .20
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210                    NO.

0004327

4327

PAY

DATE                                    AMOUNT

TO THE FORTY-TWO THOUSAND ONE HUNDRED FIFTY-THREE DOLLARS and 27 CENTS
ORDER OF

04/12/00          $42,153.27*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

Julie Bryerton

⑈004327⑈ ⑈121000358⑈ 01209⑈04054⑈          ⑈0004215327⑈

---



DWIGHT HALVORSON INSURANCE SERVICES
3300 DOUGLAS BOULEVA.   SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMERICA
Roseville Main Office    .20
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210                    NO.

0004357

4357

PAY

DATE                                    AMOUNT

TO THE SEVENTY THOUSAND SIX HUNDRED NINETY-FOUR DOLLARS and 26 CENTS
ORDER OF

05/15/00          $70,694.26*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

Julie Bryerton

⑈004357⑈ ⑈121000358⑈ 01209⑈04054⑈          ⑈000706942⑈26⑈

---



DWIGHT HALVORSON INSURANCE SERVICES
3300 DOUGLAS BOULEVA.   SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMERICA
Roseville Main Office    .20
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210                    NO.

0004358

4358

PAY

DATE                                    AMOUNT

TO THE THIRTEEN THOUSAND TWELVE DOLLARS and 77 CENTS
ORDER OF

05/15/00          $13,012.77*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

Julie Bryerton

⑈004358⑈ ⑈121000358⑈ 01209⑈04054⑈          ⑈000130127⑈7⑈

---



DWIGHT HALVORSON INSURANCE SERVICES
3300 DOUGLAS BOULEVA.   SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMERICA
Roseville Main Office    .20
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210                    NO.

0004361

4361

PAY

DATE                                    AMOUNT

TO THE TWO HUNDRED THIRTY-THREE THOUSAND FOUR HUNDRED SEVENTY-EIGHT DOLLARS and 01 CENTS
ORDER OF

05/15/00          $233,478.01*

TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

FIC/FSIM 000809

Julie Bryerton



DWIGHT HALVORSON INSURANCE SERVICES
3300 DOUGLAS BOULEVARD SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMERICA
Roseville Main Office
2221 Douglas Blvd., Roseville, CA 95661
11-35/1210                    NO.

0004402

4402

PAY
TO THE    TWENTY-THREE THOUSAND TWO HUNDRED FOURTEEN DOLLARS and 74 CENTS
ORDER OF                                                    DATE              AMOUNT

06/27/00          $73,214.74*

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

TRUST CHECKING ACCOUNT

⑈004402⑈ ⑆121000358⑈ 01209⑈04054⑈    ⑈000732147⑈

---

DWIGHT HALVORSON INSURANCE SERVICES
3300 DOUGLAS BOULEVARD SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMERICA
Roseville Main Office
2221 Douglas Blvd., Roseville, CA 95661
11-35/1210                    NO.

0004403

4403

PAY
TO THE    NINETY-TWO THOUSAND NINE HUNDRED SIXTY-FOUR DOLLARS and 87 CENTS
ORDER OF                                                    DATE              AMOUNT

06/27/00          $92,964.87*

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

TRUST CHECKING ACCOUNT

⑈004403⑈ ⑆121000358⑈ 01209⑈04054⑈    ⑈000929648⑈

---



DWIGHT HALVORSON INSURANCE SERVICES
3300 DOUGLAS BOULEVARD SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMERICA
Roseville Main Office
2221 Douglas Blvd., Roseville, CA 95661
11-35/1210                    NO.

0004423

4423

PAY
TO THE    TWENTY-EIGHT THOUSAND NINE HUNDRED THIRTY-TWO DOLLARS and 57 CENTS
ORDER OF                                                    DATE              AMOUNT

07/14/00          $38,932.57*

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

TRUST CHECKING ACCOUNT

⑈004423⑈ ⑆121000358⑈ 01209⑈04054⑈    ⑈000389325⑈

---



DWIGHT HALVORSON INSURANCE SERVICES
3300 DOUGLAS BOULEVARD SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMERICA
Roseville Main Office
2221 Douglas Blvd., Roseville, CA 95661
11-35/1210                    NO.

0004424

4424

PAY
TO THE    TWENTY-TWO THOUSAND SEVEN HUNDRED TWENTY-ONE DOLLARS and 47 CENTS
ORDER OF                                                    DATE              AMOUNT

07/14/00          $32,721.47*

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

TRUST CHECKING ACCOUNT

FIC/FSIM 000810



**DWIGHT HALVORSON INSURANCE SERVICES**
3300 DOUGLAS BOULEVARD, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMERICA
Roseville Main Office . . .20
2221 Douglas Blvd., Roseville, CA 95661
11-35/1210                    NO.

**0004460**

4460

PAY
TO THE
ORDER OF   TWELVE THOUSAND FIVE HUNDRED SIXTEEN DOLLARS and 16 CENTS

DATE                          AMOUNT

08/01/00          $12,516.16*
TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

*Julie Bryeston*

⑈004460⑈ ⑉121000358⑉ 01209⑈04054⑈          ⑈0001251616⑈

---



**DWIGHT HALVORSON INSURANCE SERVICES**
3300 DOUGLAS BOULEVARD, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMERICA
Roseville Main Office . . .20
2221 Douglas Blvd., Roseville, CA 95661
11-35/1210                    NO.

**0004461**

4461

PAY
TO THE
ORDER OF   SEVENTEEN THOUSAND SIX HUNDRED THIRTY-NINE DOLLARS and 62 CENTS

DATE                          AMOUNT

08/01/00          $17,639.62*
TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

*Julie Bryeston*

⑈004461⑈ ⑉121000358⑉ 01209⑈04054⑈          ⑈0001763962⑈

---



**DWIGHT HALVORSON INSURANCE SERVICES**
3300 DOUGLAS BOULEVARD, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMERICA
Roseville Main Office . . .20
2221 Douglas Blvd., Roseville, CA 95661
11-35/1210                    NO.

**0004462**

4462

PAY
TO THE
ORDER OF   TWENTY-THREE THOUSAND FIVE HUNDRED NINETY-THREE DOLLARS and 76 CENTS

DATE                          AMOUNT

08/01/00          $23,593.76*
TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

*Julie Bryeston*

⑈004462⑈ ⑉121000358⑉ 01209⑈04054⑈          ⑈0002359376⑈

---



**DWIGHT HALVORSON INSURANCE SERVICES**
3300 DOUGLAS BOULEVARD, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMERICA
Roseville Main Office . . .20
2221 Douglas Blvd., Roseville, CA 95661
11-35/1210                    NO.

**0004466**

4466

PAY
TO THE
ORDER OF   FIVE HUNDRED ONE DOLLARS and 82 CENTS

DATE                          AMOUNT

08/01/00          $501.82*
TRUST CHECKING ACCOUNT

FIC/FSIM 000811

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

(916) 773-0206    11-35/1210    NO.

4467

PAY
TO THE
ORDER OF **THOUSAND SIXTY-FIVE DOLLARS and 96 CENTS**

DATE    AMOUNT

08/01/00    $2,065.96*
TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

⑆004467⑆ ⑈121000358⑈ 01209⑆04054⑆    ⑆0000206596⑆

---

DWIGHT HALVORSON INSUR___ CE SERVICES
3300 DOUGLAS BOULEVA__, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMERICA
Roseville Main Office    20
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210    NO.

0004468

4468

PAY
TO THE
ORDER OF **THOUSAND TWO HUNDRED NINETY-SIX DOLLARS and 09 CENTS**

DATE    AMOUNT

08/01/00    $4,296.09*
TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

⑆004468⑆ ⑈121000358⑈ 01209⑆04054⑆    ⑆0000429609⑆

---

DWIGHT HALVORSON INSUR___ CE SERVICES
3300 DOUGLAS BOULEVARD, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMERICA
Roseville Main Office    20
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210    NO.

0004469

4469

PAY
TO THE
ORDER OF **__RTY-THREE THOUSAND FIFTY-SEVEN DOLLARS and 28 CENTS**

DATE    AMOUNT

08/01/00    $33,057.28*
TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

⑆004469⑆ ⑈121000358⑈ 01209⑆04054⑆    ⑆0003305728⑆



---

DWIGHT HALVORSON INSUR___ CE SERVICES
3300 DOUGLAS BOULEVA__, SUITE 295
ROSEVILLE, CALIFORNIA 95661-3807
(916) 773-0206

BANK OF AMERICA
Roseville Main Office    20
2221 Douglas Blvd., Roseville, CA 95661

11-35/1210    NO.

0004470

4470

PAY
TO THE
ORDER OF **THOUSAND EIGHT HUNDRED FORTY-THREE DOLLARS and 95 CENTS**

DATE    AMOUNT

08/01/00    $1,843.95*
TRUST CHECKING ACCOUNT

FRONTIER INSURANCE CO.
195 LAKE LOUISE MARIE ROAD
ROCK HILL, NY  12775

⑆004470⑆ ⑈121000358⑈ 01209⑆04054⑆    ⑆0000184395⑆



FIC/FSIM 000813

MAR 14 2001 10:16 FR BANK OF AMERICA #27  530 742 8018 TO 1916??38432    P.07/35

# ank of America

OD SERVICE INSURANCE MANAGERS,INC
UST ACCOUNT

Statement Period: July 1 through July 30, 1999
Account Number: 01208-04267

=======================================================================
count Activity

| ate osted | Description | Reference Number | Amount |
|---|---|---|---|
| | Withdrawals, Transfers and Account Fees | | |
| 7/12 | Check Deposit Adjustment | | 010,138.16 |
| 7/20 | Buscontrsf Dwight Halvorson    Co ID: 1202150000 | | 60,000.00 |
| | 01208-04267/121000356    IDW 2S Ref:121106251209407 | | |
| 7/23 | Money Transfer-Calif    Trn: 990723-032420 Sender Ref: 30759 | | 710,291.88 |
| | Src: Br 0426 Benf: Frontier Insurance Co Orig: Food Service | | |
| | Incurance Managers Inc | | |
| | Total Withdrawals, Transfers and Account Fees | | $780,430.04 |
| | Service Charge | | |
| 7/30 | 7 Teller Deposit(s) Exceeded The Activity Allowance Of 10 | | 014.00 |

7/23 WIRE

=======================================================================
lly Balance

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 07/02 | $ 354,990.90 | 07/20 | 682,392.04 | 07/27 | 58,175.55 |
| 07/06 | 516,793.72 | 07/21 | 742,392.04 | 07/29 | 141,427.90 |
| 07/07 | 520,850.74 | 07/22 | 717,274.71 | 07/30 | 137,643.50 |
| 07/12 | 633,285.19 | 07/23 | 14,001.83 | | |
| 07/16 | 545,130.16 | 07/26 | 43,156.66 | | |

=======================================================================
TS - FDIC Insured Account Disclosure Information

  following information, effective August 9, 1999, replaces the second paragraph of the Overdraft Line Service
  section under the Overdraft Protection section in our publication, FACTS About Business Deposit Account Programs:
  n your checking account balance falls below zero, we automatically transfer funds from your business line of
  dit to your checking account in multiples of $100. We do so as long as you aren't in default on your business line
  credit agreement. The transfer normally may not exceed the amount of available credit on your business line of
  dit. We make the transfer under the terms and conditions of your business line of credit agreement.

California

FIC/FSIM 000814

Bank of America, N.A. · Member FDIC       ♻ Recycled Paper

**Bank of America**

GHT HALVORSON **INSURANCE SERVICES**
RUST ACCOUNT

Statement Period: July 1 through July 30, 1999
Account Number: 01209-04054

## ☐ Checks Paid Continued    * Gap in check sequence

| Date Paid | Number | Amount | | Date Paid | Number | Amount |
|-----------|--------|--------|--|-----------|--------|--------|
| 07/30 | 4075 | 457.00 | | 07/21 | 4093 | 4,730.25 |
| 07/16 | 4076 | 1,103.00 | | 07/21 | 4094 | 89,866.62 |
| 07/16 | 4077 | 1,045.00 | | 07/30 | 4095 | 52,274.79 |
| 07/30 | 4078 | 1,473.00 | | 07/30 | 4096 | 9,833.20 |
| 07/16 | 4079 | 1,437.00 | | 07/23 | 4097 | 1,043.00 |
| 07/19 | * 4082 | 518.50 | | 07/28 | 4098 | 18,881.00 |
| 07/16 | * 4086 | 1,107.00 | | 07/28 | 4099 | 795.00 |
| 07/16 | 4087 | 582.00 | | 07/29 | * 4105 | 2,299.22 |
| 07/23 | 4088 | 1,176.44 | | 07/29 | 4106 | 24,145.90 |
| 07/29 | * 4090 | 37,960.15 | | 07/30 | * 4108 | 149,083.95 |
| 07/22 | 4091 | 24,076.15 | | Total of 26 Checks Paid | | $734,892.67 |
| 07/27 | 4092 | 2,275.50 | | | | |

## ☐ Account Activity

| Date Posted | Description | Reference Number | Amount |
|-------------|-------------|------------------|--------|
| | **Other Deposits and Credits** | | |
| 07/20 | Buscontrsf Dwight Halvorson   Co ID: 1282150000 01209-04054/121000358  ID# Ref:12110825 209408 | | $60,000.00 |
| | **Withdrawals, Transfers and Account Fees** | | |
| 07/19 | Deposited Item Returned Fee | | $4.00 |
| 07/19 | Deposited Item Returned | | 9,142.90 |
| 07/19 | Money Transfer-Calif   Trn: 990719-033347 Sender Ref: 675946 Src: Br 0426 Benf: New Frontier Insurance Co Orig: Dwight Halvorson Insurance Svcs Inc | 7/19 WIRE | 814,943.38 |
| 07/26 | Deposited Item Returned Fee | | 4.00 |
| 07/26 | Deposited Item Returned | | 4,352.00 |
| 07/28 | Deposited Item Returned Fee | | 4.00 |
| 07/28 | Deposited Item Returned | | 1,043.68 |
| 07/28 | Buscontrsf Dwight Halvorson   Co ID: 1282150000 01209-04054/121000358  ID# 29 Ref:12110825 059639 | | 36,899.78 |
| 07/28 | Buscontrsf Dwight Halvorson   Co ID: 1282150000 01209-04054/121000358  ID# 27 Ref:12110825 359637 | | 75,000.00 |
| | *Total Withdrawals, Transfers and Account Fees* | | $941,393.74 |
| | **Service Charge** | | |
| 07/30 | 9 Teller Deposit(s) Exceeded The Activity Allowance Of 10 | | $18.00 |

## ☐ Daily Balance

| Date | Amount | Date | Amount | Date | Amount |
|------|--------|------|--------|------|--------|
| 07/02 | $ 444,596.74 | 07/19 | 377,172.69 | 07/27 | 346,902.12 |
| 07/06 | 593,593.73 | 07/20 | 458,318.45 | 07/28 | 284,189.61 |
| 07/07 | 629,248.03 | 07/21 | 303,721.58 | 07/29 | 300,275.92 |
| 07/12 | 717,416.73 | 07/22 | 291,895.03 | 07/30 | 144,178.80 |
| 07/14 | 644,889.73 | 07/23 | 310,141.20 | | |
| 07/16 | 1,201,781.47 | 07/26 | 325,060.38 | | |

FIC/FSIM 000815

**Bank of America**

DWIGHT HALVORSON INSURANCE SERVICES
TRUST ACCOUNT

Statement Period: September 1 through September 30, 1999
Account Number: 01209-04054

## ☐ Deposits    Continued

| Number | Date Posted | Amount | | Number | Date Posted | Amount |
|---|---|---|---|---|---|---|
| Total of 20 deposits | | $1,297,056.78 | | | | |

## ☐ Checks Paid    * Gap in check sequence

| Date Paid | Number | Amount | | Date Paid | Number | Amount |
|---|---|---|---|---|---|---|
| 09/30 | | $ 25,000.00 | | 09/21 | 4146 | 6,346.95 |
| 09/07 | * 4126 | 12,236.53 | | 09/27 | 4147 | 38,388.85 |
| 09/02 | * 4129 | 719.75 | | 09/17 | * 4149 | 2,405.00 |
| 09/07 | * 4132 | 1,644.56 | | 09/17 | 4150 | 922.00 |
| 09/01 | 4133 | 11,981.45 | | 09/17 | * 4153 | 35,750.72 |
| 09/02 | 4134 | 1,575.00 | | 09/16 | 4154 | 2,270.50 |
| 09/22 | * 4136 | 1,186.60 | | 09/20 | 4155 | 325.00 |
| 09/13 | 4137 | 5,625.00 | | 09/22 | 4156 | 2,950.00 |
| 09/22 | * 4139 | 1,352.07 | | 09/29 | 4157 | 1,683.00 |
| 09/15 | * 4141 | 2,954.23 | | 09/24 | 4158 | 18,853.20 |
| 09/15 | * 4142 | 3,363.85 | | 09/24 | 4159 | 142,238.57 |
| 09/15 | 4143 | 427.44 | | Total of 24 Checks Paid | | $320,920.11 |
| 09/15 | * 4145 | 719.84 | | | | |

## ☐ Account Activity

| Date Posted | Description | Reference Number | Amount |
|---|---|---|---|
| | **Withdrawals, Transfers and Account Fees** | | |
| 09/02 | Deposited Item Returned Fee | | $4.00 |
| 09/02 | Deposited Item Returned | | 5,000.00 |
| 09/02 | Buscontrsf Dwight Halvorson   Co ID: 1282150000 01209-04054/121000358  ID# 27 Ref:121108255863130 | | 20,000.00 |
| 09/10 | Buscontrsf Dwight Halvorson   Co ID: 1282150000 01209-04054/121000358  ID# 27 Ref:121108254000473 | | 50,000.00 |
| 09/16 | Buscontrsf Dwight Halvorson   Co ID: 1282150000 01209-04054/121000358  ID# 27 Ref:121108258162228 | | 20,000.00 |
| 09/17 | Money Transfer-Calif   Trn: 990917-033825 Sender Ref: 945765 Src: Br 0426 Benf: Frontier Insurance Co Orig: Dwight Halvorson Insurance Services | 9/17 WIRE | 832,188.41 |
| 09/20 | Deposited Item Returned Fee | | 4.00 |
| 09/20 | Deposited Item Returned | | 3,937.37 |
| 09/21 | Buscontrsf Dwight Halvorson   Co ID: 1282150000 01209-04054/121000358  ID# 29 Ref:121108256677037 | | 30,000.00 |
| 09/27 | Buscontrsf Dwight Halvorson   Co ID: 1282150000 01209-04054/121000358  ID# 27 Ref:121108254069058 | | 4,000.00 |
| 09/27 | Buscontrsf Dwight Halvorson   Co ID: 1282150000 01209-04054/121000358  ID# 29 Ref:121108254069062 | | 20,000.00 |
| 09/27 | Buscontrsf Dwight Halvorson   Co ID: 1282150000 01209-04054/121000358  ID# 27 Ref:121108254069060 | | 44,000.00 |
| | *Total Withdrawals, Transfers and Account Fees* | | $1,029,133.78 |
| | **Service Charge** | | |
| 09/30 | 10 Teller Deposit(s) Exceeded The Activity Allowance Of 10 | | $20.00 |

FIC/FSIM 000816

MAR 14 2001 10:17 FR BANK OF AMERICA #27  530 742 8018 TO 1915 730402       P.11/35

 **ank of America**

O SERVICE INSURANCE MANAGERS,INC                    Statement Period: September 1 through September 30, 1999
ST ACCOUNT                                          Account Number: 01208-04267

================================================================================
cks Paid  Continued    * Gap in check sequence

| Date Paid | Number | Amount | Date Paid | Number | Amount |
|---|---|---|---|---|---|
| 09/27 | * 216 | 637.50 | 09/28 | 218 | 34,007.95 |
| 09/20 | 217 | 2,674.60 | Total of 6 Checks Paid | | 6103,261.45 |

================================================================================
ount Activity

| to sted | Description | Reference Number | Amount |
|---|---|---|---|
| | Withdrawals, Transfers and Account Fees | | |
| /02 | Buscontref Dwight Halvorson  Co ID: 1282150000 | | |
| | 01208-04267/121000358  ID# 24 Ref:121108255863132 | | 640,000.00 |
| /10 | Buscontref Dwight Halvorson  Co ID: 1282150000 | | |
| | 01208-04267/121000358  ID# 24 Ref:121108254000475 | | 2,727.52 |
| /10 | Buscontref Dwight Halvorson  Co ID: 1282150000 | | |
| | 01208-04267/121000358  ID# 24 Ref:121108254000477 | | 50,000.00 |
| /17 | Money Transfer-Calif  Trn: 990917-034854 Sender Ref: 945775 | | |
| | Src: Br 0426 Benf: Frontier Insurance Co Orig: Food Services | 9/17 WIRE | 648,022.51 |
| | Insurance Mangers Inc | | |
| /24 | Money Transfer-Calif  Trn: 990924-023751 Sender Ref: | | |
| | 00990924000953nn  Src: Bank Funds Trn Benf: Frontier Insurance Co | | 7,576.00 |
| | Orig: /0120804267 | | |
| /24 | Money Transfer-Calif  Trn: 990924-031208 Sender Ref: | | |
| | 00990924001031nn  Src: Bank Funds Trn Benf: Frontier Insurance Comp | | |
| | Orig: /0120804267 | | 75,000.00 |
| | Total Withdrawals, Transfers and Account Fees | | $823,326.03 |
| | Service Charge | | |
| /30 | 5 Teller Deposit(s) Exceeded The Activity Allowance Of 10 | | 610.00 |

================================================================================
ly Balance

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 09/02 | $ 338,619.14 | 09/14 | 617,574.48 | 09/24 | 60,279.93 |
| 09/03 | 298,619.14 | 09/15 | 624,173.36 | 09/27 | 106,085.66 |
| 09/08 | 398,147.88 | 09/16 | 643,554.76 | 09/28 | 104,538.41 |
| 09/09 | 399,674.20 | 09/17 | 66,653.76 | 09/29 | 155,947.24 |
| 09/10 | 346,946.68 | 09/20 | 87,718.42 | 09/30 | 130,937.24 |
| 09/13 | 494,238.66 | 09/21 | 142,855.93 | | |

California                                          Page 2 of 2

FIC/FSIM 000817

Bank of America, N.A.- Member FDIC          Recycled Paper

MAR 14 2001 10:17 FR B/ OF AMERICA #27 530 742 8018 TO 191. 30402     P.09/35


ank of America

OD SERVICE INSURANCE MANAGERS,INC
UST ACCOUNT

Statement Period: July 31 through August 31, 1999
Account Number: 01208-04267

count Activity

| ate octed | Description | Reference Number | Amount |
|---|---|---|---|
| | Withdrawals, Transfers and Account Fees | | |
| 8/05 | Buscontrsf Dwight Halvorson   Co ID: 1282150000 | | $20,000.00 |
| | 01208-04267/121000358  ID# 24 Ref:121108254369625 | | |
| 8/06 | Buscontrsf Dwight Halvorson   Co ID: 1282150000 | | 10,000.00 |
| | 01208-04267/121000358  ID# 24 Ref:121108258143600 | | |
| 8/11 | Buscontrsf Dwight Halvorson   Co ID: 1282150000 | | 30,794.93 |
| | 01208-04267/121000358  ID# 24 Ref:121108254612492 | | |
| 8/11 | Buscontrsf Dwight Halvorson   Co ID: 1282150000 | | 40,000.00 |
| | 01208-04267/121000358  ID# 22 Ref:121108254612490 | | |
| 8/16 | Buscontrsf Dwight Halvorson   Co ID: 1282150000 | | 27,522.07 |
| | 01208-04267/121000358  ID# 24 Ref:121108254680009 | | |
| 8/17 | Money Transfer-Calif     Trn: 990817-031262 Sender Ref: 945542 | | |
| | Src: Br 0426 Benf: Frontier Insurance Co-Concentration Orig: Food | | |
| | Service Incurance Manager | | 150,000.00 |
| 8/17 | Money Transfer-Calif     Trn: 990817-031420 Sender Ref: 945546 | | |
| | Src: Br 0426 Benf: Frontier Insurance Co-Concentration Orig: Food | | |
| | Service Insurance Manager | 8/17 WIRE  ⟨690,277.92⟩ | |
| 8/24 | Buscontrsf Dwight Halvorson   Co ID: 1282150000 | | 20,000.00 |
| | 01208-04267/121000358  ID# 24 Ref:121108257646590 | | |
| 8/30 | Check Printing Charge (includes Delivery Charges And All Applicable | | |
| | Taxes) | | 15.10 |
| 8/31 | Buscontrsf Dwight Halvorson   Co ID: 1282150000 | | 20,000.00 |
| | 01208-04267/121000358  ID# 24 Ref:121108252822957 | | |
| | Total Withdrawals, Transfers and Account Fees | | 81,016,610.02 |
| | Service Charge | | |
| 8/31 | 12 Teller Deposit(s) Exceeded The Activity Allowance Of 10 | | $24.00 |

lly Balance

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 08/02 | G 141,176.06 | 08/13 | 718,783.06 | 08/25 | 552,311.47 |
| 08/03 | 151,345.64 | 08/16 | 906,502.84 | 08/26 | 359,404.75 |
| 08/05 | 131,345.64 | 08/17 | 221,356.56 | 08/27 | 381,653.26 |
| 08/06 | 439,328.02 | 08/18 | 247,278.29 | 08/30 | 404,097.69 |
| 08/09 | 501,755.98 | 08/20 | 286,876.23 | 08/31 | 378,619.14 |
| 08/11 | 481,643.53 | 08/23 | 342,703.62 | | |
| 08/12 | 668,593.79 | 08/24 | 346,055.59 | | |

TS - FDIC Insured Account Disclosure Information

h day we process withdrawals from your account in a specific order. For example, we process ATM withdrawals,
omatic payments and check card purchases before the checks you have written. As of October 1, we will process
hdrawals from highest to lowest dollar amount within each category. If there are insufficient funds to cover all
the items processed on any given day, this procedure may enable us to pay your larger items, such as your rent or
tgage payment. In some cases, it may result in additional overdraft fees for smaller items. We offer overdraft
tection plans that may help you avoid overdrafts.

FIC/FSIM 000818

California

Page 2 of 2

Bank of America, N.A.• Member FDIC       ♻ Recycled Paper

## CERTIFICATE OF SERVICE

I, Jessica Sosby, hereby certify that I am not a party to the action, I am over the age of eighteen years, I am employed by the law firm of Entwistle & Cappucci LLP, attorneys for plaintiff Gregory V. Serio, Superintendent of Insurance of the State of New York, as Rehabilitator of Frontier Insurance Company, and as Assignee of Platinum Indemnity, Ltd., and that on September 27, 2004, I served the foregoing documents in the within action by causing a true and correct copy of (1) Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint and to Compel Mediation and (2) Declaration of Laurie J. Weiss to be sent via first class mail to counsel listed below:

> Lorienton N.A. Palmer, Esq.
> Schindel, Farman & Lipsius LLP
> 14 Penn Plaza, Suite 500
> New York, New York 10122

JESSICA SOSBY