UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
                                                :

Gregory V. Serio, Superintendent of Insurance     :
of the State of New York, as Rehabilitator of      :       04 CV 3361 (KMK)
FRONTIER INSURANCE COMPANY, and as     :
Assignee of PLATINUM INDEMNITY, LTD.,     :
                                                :

                                 Plaintiff,    :
                                                :

           -against-                    :
                                                :

DWIGHT HALVORSON INSURANCE         :
SERVICES, INC d/b/a/ F.S.I.M. INSURANCE   :
SERVICES and FOOD SERVICE INSURANCE  :
MANAGERS, INC.,                      :
                                              :

                             Defendants.   :
                                              :
-----------------------------------------------------------------x

---

## SUPPLEMENTAL MEMORANDUM OF LAW IN
## FURTHER OPPOSITION TO DEFENDANTS' MOTION
## TO DISMISS AND TO COMPEL MEDIATION

---

ENTWISTLE & CAPPUCCI LLP
299 Park Avenue, 14th Floor
New York, New York 10171
(212) 894-7200

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ iii

PRELIMINARY STATEMENT ...................................................................................... 1

ARGUMENT ................................................................................................................... 3

POINT I.

THE RECORD PROVIDES AMPLE
GROUNDS FOR THE COURT'S EXERCISE
OF JURISDICTION OVER BOTH DEFENDANTS……………………………………..3

    A.    A Hearing on the Jurisdictional Issue Would Be
           Inappropriate Given the Defendants' Waiver of This Defense.................. 3

    B.    A Hearing Is Unnecessary Because FIC Has Made
           the Requisite Prima Facie Showing of Jurisdiction………………………5

    C.    FIC Should Be Afforded An Opportunity to Pursue Limited
           Discovery If the Court Is Inclined to Hold a Hearing ................................ 7

POINT II.

THIS COURT IS A PROPER VENUE FOR THE
CLAIMS ASSERTED AGAINST BOTH DEFENDANTS ............................................. 8

    A.    The Venue Clause Applies Only to DHIS ................................................... 8

    B.    Independent of the Agency Agreement, Venue Is
           Proper With Respect to the Claims Against DHIS ..................................... 8

    C.    Venue Is Proper With Respect to
           the Assigned Claims Against FSIM ............................................................ 8

           1.    The "Substantial Part" Test ............................................................. 9

           2.    The Promissory Note Claim ........................................................... 10

           3.    The Claim for Breach of
                the Subscription Agreement ........................................................... 11

                a.    Funding the FSIM Account………………………………12

                b.    Remedying the Negative Balance………………………..12

D.    The Defendants Cannot Credibly Argue
That This Is an Inconvenient Venue .......................................................... 13

E.    FIC Should Be Afforded an Opportunity to Pursue
Limited Discovery If the Court Is Inclined to Hold a Hearing.................. 15

CONCLUSION ........................................................................................................................... 15

## TABLE OF AUTHORITIES

### Cases

Ball v. Metallurgie Hoboken-Overpelt, S.A.,
  902 F.2d 194 (2d Cir. 1990) ........................................................................................ 5

Cottman Transmission Systems, Inc. v. Martino,
  36 F.3d 291 (3d Cir. 1994) .......................................................................................... 9

Greenblatt v. Gluck,
  265 F. Supp.2d 346 (S.D.N.Y. 2003) ........................................................................... 9

Gregory v. Pocono Grow Fertilizer Corp.,
  35 F. Supp.2d 295 (W.D.N.Y. 1999) ........................................................................... 9

GTFM Inc. v. International Basic Source, Inc.,
  2002 U.S. Dist. LEXIS 345 (S.D.N.Y. Jan. 4, 2002) ................................................... 7

Interlease Aviation Investors II (Aloha) LLC v. Vanguard Airlines, Inc.,
  262 F. Supp.2d 898 (N.D. Ill. 2003) ............................................................................ 9

Jordache Enterprises, Inc. v. Nakash,
  1994 U.S. Dist. LEXIS 2551 (S.D.N.Y. Mar. 3, 1994) ............................................... 9

Leroy v. Great Western United Corp.,
  443 U.S. 173 (1979) ................................................................................................... 13

Metropolitan Life Insurance Co. v. Robertson-Ceio Corp.,
  84 F.3d 560 (2d Cir. 1996) .......................................................................................... 6

PDK Labs, Inc. v Friedlander,
  103 F.3d 1105 (2d Cir. 1997) ...................................................................................... 5

Robinson v. Overseas Military Sales Corp.,
  21 F.3d 502 (2d Cir. 1994) ...................................................................................... 5, 6

Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc.,
  869 F. Supp. 152 (S.D.N.Y. 1994) ............................................................................. 13

Products, plc. v. J. Tiras Classic Handbags, Inc.,
  1997 U.S. Dist. LEXIS 3545 (S.D.N.Y. Mar. 26, 1997) ............................................ 10

Transaero, Inc. v. La Fuerza Aerea Boliviana,
  162 F.3d 724 (2d Cir. 1998) ........................................................................................ 3

Tyco International Ltd. v. Walsh,
    2003 U.S. Dist. LEXIS 2670 (S.D.N.Y. Feb. 28, 2003) ............................................................. 3

Wachtel v. Storm,
    796 F. Supp. 114 (S.D.N.Y. 1992).................................................................................................. 9

Wafios Machinery Corp. v. Nucoil Industries Co.,
    2004 U.S. Dist. LEXIS 13674 (S.D.N.Y. July 13, 2004) ......................................................... 15

**Statutes**

28 U.S.C. 1391(a)(2)………………………………………………………………………....8

**Secondary Authorities**

28 U.S.C.A. § 1391, Practice Commentary (D. Siegel, "Commentary on
1988 and 1990 Revisions of Section 1391") (West 1993)………………………………11, 12, 13

2 J. Moore, Moore's Federal Practice, § 12.31[3] (3d ed. 2004)………………………………....3

17 J. Moore, Moore's Federal Practice, § 110.01[1] (3d ed. 2003)………………………....13

17 J. Moore, Moore's Federal Practice, § 110.04[2] (3d ed. 2003)……………..……………...9

## PRELIMINARY STATEMENT

Plaintiff Gregory V. Serio, Superintendent of Insurance of the State of New York, as Rehabilitator of Frontier Insurance Company ("FIC") and assignee of Platinum Indemnity, Ltd. ("Platinum"), respectfully submits this supplemental memorandum of law in further opposition to the motion to dismiss the Complaint, compel mediation and stay the above-captioned action.

In its Orders filed November 18, 2004 and December 3, 2004, the Court directed the parties to submit supplemental briefing and, if warranted, additional evidence on the issues raised on the motion. At a hearing on December 3, 2004, the Court expressed particular interest in the issues of personal jurisdiction and venue with respect to FIC's assigned claims against defendant Food Service Insurance Managers, Inc. ("FSIM"). The Court also queried whether an evidentiary hearing on these issues was warranted.

As discussed below in Point I, an evidentiary hearing on the jurisdictional challenge would be neither appropriate nor necessary. Such a hearing is unwarranted because defendants FSIM and Dwight Halvorson Insurance Services, Inc. ("DHIS") (collectively, "Defendants") -- parties who at the outset of this litigation planned to assert counterclaims against FIC and thus obviously had no objection to submitting to the Court's jurisdiction -- have waived the personal jurisdiction defense by intentionally failing to assert it in their Answer. Moreover, an evidentiary hearing is unnecessary because FIC has carried its burden at this pre-discovery phase of making a prima facie showing of the adequacy of the Defendants' jurisdictional contacts with New York. To the extent the Court concludes otherwise, however, FIC respectfully submits that prior to any evidentiary hearing it should be afforded an

opportunity to pursue expedited discovery on the jurisdictional issue. This jurisdictional

discovery would be particularly appropriate given the Defendants' continued and unjustified

refusal to date to respond to FIC's interrogatories and document demands.

The venue issue raised on this motion is addressed below in Point II. In its Order

of December 3, the Court identified the "most important[]" open issue on this motion as being

whether the venue provision in FIC's agreement with DHIS applies also to FSIM. This

contractual provision binds only DHIS which, in any event, had sufficient contacts with New

York to render venue proper independent of that contractual provision.

As for FSIM, venue is proper because a substantial part of the acts or omissions

giving rise to the assigned claims against that defendant occurred in New York. On multiple

levels, New York was the hub of the insurance program giving rise not only to FIC's claims

against DHIS but also the assigned claims against FSIM. Specifically, the payments due on the

promissory note executed for Platinum's benefit were supposed to have been -- but were not --

made by wire transfer through a New York bank. Similarly, the monies necessary to adequately

fund FSIM's account with Platinum, along with the payments necessary to remedy the so-called

Negative Balance in that account, were supposed to have been -- but were not -- funneled

through New York. This breaching conduct in New York goes to the very core of the assigned

claims against FSIM. As a result, the Court is a wholly appropriate venue for this dispute.

However, should the Court conclude otherwise or deem an evidentiary hearing to be necessary,

FIC respectfully submits that it should be afforded an opportunity to pursue limited discovery on

the venue issue.

## ARGUMENT[1]

### POINT I.

### THE RECORD PROVIDES AMPLE
### GROUNDS FOR THE COURT'S EXERCISE
### OF JURISDICTION OVER BOTH DEFENDANTS

**A.    A Hearing on the Jurisdictional Issue Would Be
Inappropriate Given the Defendants' Waiver of This Defense**

FIC respectfully submits that an evidentiary hearing on the Defendants'

jurisdictional challenge would be inappropriate in light of the undisputed and indisputable fact

that DHIS and FSIM have waived this defense. As discussed at pages 5-6 of FIC's opposition

brief, the Defendants failed to preserve a personal jurisdiction defense in their Answer. Nowhere

in their reply do the Defendants even attempt to dispute this assertion, nor could they do so

credibly. As a result of this omission, the Defendants plainly have waived their right to assert a

jurisdictional defense now. See Transaero, Inc. v. La Fuerza Aerea Boliviana, 162 F.3d 724, 730

(2d Cir. 1998) (if a litigant wishes to raise a challenge to personal jurisdiction, Rule 12(h)(1)

requires that he "'do so at the time he makes his first significant defensive move'") (quoting 5A

C. Wright and A. Miller, Federal Practice & Procedure, § 1391 (1990)), cert. denied, 526 U.S.

1146 (1999); see also Tyco Int'l. Ltd. v. Walsh, 2003 U.S. Dist. LEXIS 2670, at *5 (S.D.N.Y.

Feb. 28, 2003) (personal jurisdiction "is a waivable defense"); 2 J. Moore, Moore's Federal

Practice, § 12.31[3] at 12-44 to 12-45 (3d ed. 2004) ("defendant must object to the court's

exercise of personal jurisdiction in the first Rule 12 motion or in the responsive pleading or be

deemed to have waived the issue").

---

[1]    For the Court's convenience, copies of all LEXIS decisions cited herein are attached hereto in
alphabetical order.

3

There is nothing hypertechnical or inequitable in determining that the Defendants have waived the personal jurisdiction defense here.  From the outset of this litigation, the Defendants intended to pursue counterclaims against FIC and thus in good faith could not have asserted a personal jurisdiction defense at the time they filed the Answer.  The record is clear that at the time they filed their Answer, the Defendants fully intended to submit to the Court's jurisdiction in order to pursue those claims.

The Answer in which the Defendants raised no challenge to personal jurisdiction was filed on June 25, 2004.  In the Answer, the Defendants attributed to FIC a series of allegedly wrongful acts and/or omissions.  See Answer, ¶¶ 106-137.  Despite these affirmative allegations of wrongdoing, however, no counterclaims were included in the Answer.  Upon initially reviewing the Answer, FIC's counsel contacted defense counsel to determine if the Defendants intended to assert counterclaims against FIC.  See Declaration of William S. Gyves ("Gyves Decl.") at ¶¶ 6-7.  In response, defense counsel advised that the Defendants were still reviewing their options in this regard.  Id., ¶ 7.

At a July 8, 2004 initial conference before the Honorable Richard M. Berman, defense counsel advised the Court of the Defendants' intention to move for leave to amend the Answer to assert counterclaims against FIC.  Id., ¶ 8.  At the conference, FIC's counsel noted for the Court and defense counsel a line of authority firmly supporting the proposition that FIC, as an insurance company in rehabilitation, was immune from affirmative claims by operation of the New York Insurance Law.  Id., ¶ 9.  In an attempt to avoid unnecessary motion practice, FIC's counsel offered to provide these authorities to defense counsel for his consideration.  Id., ¶ 10. The Court instructed FIC's counsel to do so.  Id.  On July 21, 2004, FIC's counsel forwarded to

4

defense counsel a detailed analysis of the relevant authorities. Id., ¶ 11, Ex. A. On or about

August 4, 2004, defense counsel advised that, given the protection afforded to FIC under New

York law, the Defendants had reversed course and elected not to assert affirmative claims against

FIC. Id., ¶ 12.

      In light of the above, there can be no question that the Defendants initially elected

not to preserve a personal jurisdiction defense in the Answer and that they did so intentionally

given their plan to pursue affirmative claims against FIC. Their tardy attempt to now resurrect

this defense should be rejected.

    **B.**    **A Hearing Is Unnecessary Because FIC Has Made**
        **the Requisite Prima Facie Showing of Jurisdiction**

      Assuming without conceding that the Defendants have not waived the personal

jurisdictional defense, it is respectfully submitted that an evidentiary hearing on this issue is

unnecessary because FIC already has carried its burden in defeating that purported defense. At

this pre-discovery juncture in the litigation, FIC is required only to make a prima facie showing

that the Court may properly exercise jurisdiction over the Defendants. See PDK Labs, Inc. v

Friedlander, 103 F.3d 1105, 1108 (2d Cir. 1997) (in the context of a pre-discovery motion to

dismiss for lack of personal jurisdiction, plaintiff need only make a prima facie showing of

personal jurisdiction); Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir.

1994) (where "district court relies solely on the pleadings and supporting affidavits, the plaintiff

need only make a prima facie showing of jurisdiction"); Ball v. Metallurgie Hoboken-Overpelt,

S.A., 902 F.2d 194, 197 (2d Cir.) (prior to discovery, "plaintiff challenged by a jurisdiction

testing motion may defeat the motion by pleading in good faith legally sufficient allegations of

jurisdiction") (internal citation omitted), cert. denied, 498 U.S. 854 (1990). Further, FIC's

factual assertions in response to the Defendants' jurisdictional challenge are to be accepted as true and any factual disputes are to be resolved in FIC's favor. See Metropolitan Life Ins. Co. v. Robertson-Ceio Corp., 84 F.3d 560, 566 (2d Cir.) (court credits plaintiff's averment of jurisdictional facts as being true), cert. denied, 519 U.S. 1006 (1996); Robinson, 21 F.3d at 507 (in determining whether plaintiff has made a prima facie showing of jurisdiction, "[w]e will . . . construe jurisdictional allegations liberally and take as true uncontroverted factual allegations). Given the procedural posture of this case and particularly in light of the Defendants' continued refusal to comply with their discovery obligations, see Gyves Decl., ¶¶ 23-32, Exs. B, C, FIC respectfully submits that the record developed to date more than adequately demonstrates a prima facie basis for personal jurisdiction.

At pages 12-15 of its opposition brief, FIC outlined the raft of contacts DHIS and FSIM had with New York relating directly to the subject matter of this litigation. The documents attached as Exhibits A-H to the previously submitted Declaration of Laurie J. Weiss ("Weiss Decl.") confirm that DHIS and FSIM purposefully reached out to and transacted business in New York for the sole purpose of putting into place the insurance program that has given rise to all of the claims asserted in this litigation. These New York contacts involved all aspects of the FSIM Program, including the critically important element of reinsurance to be provided through Platinum, the offshore captive that has assigned its claims to FIC. See, e.g., Weiss Decl., Ex. A at Bates No. FIC/FSIM 000004 (document forwarded by FSIM to FIC entitled "What FSIM Needs" identifies "Captive with FSIM as sole cell" and "Ability to establish separate cells" for certain accounts), Bates No. FIC/FSIM 000005 (document forwarded by FSIM to FIC entitled "MGA/Agency Own Captive"); Ex. D at pp. 1, 5 (agendas for meeting between FIC

6

representatives and FSIM's CEO include a session relating to the program's reinsurance

component); Exhibit F at p. 4 (letter from FSIM's CEO to FIC regarding, among other things, the

"'rent-a-captive' program"); Ex. G at Bates No. FIC/FSIM 000786-796 (some thirty-nine checks

from FSIM to FIC for a total of nearly $7 million relating to the FSIM Program); Ex. H at Bates

No. FIC/FSIM 000814-818 (four wire transfers from FSIM to FIC for a total of nearly $2 million

relating to the FSIM Program).

        Were it not for these transactions within New York, the FSIM program --

including the relationship between FSIM and Platinum at the heart of FIC's assigned claims

here -- never would have materialized. The nature and volume of these New York contacts

compel the conclusion that DHIS and FSIM availed themselves of the benefits of transacting

business in New York. Those contacts plainly were related to the FSIM Program and tied

directly to the causes of action asserted against these Defendants. Under these circumstances,

neither of the Defendants can complain of being unfairly haled into New York to defend against

claims touching on all aspects of the FSIM Program, including the reinsurance component of that

program.

     **C.**     **FIC Should Be Afforded An Opportunity to Pursue Limited
Discovery If the Court Is Inclined to Hold a Hearing**

        To the extent the Court concludes either that FIC has not made a prima facie

jurisdictional showing or that an evidentiary hearing is otherwise necessary, FIC respectfully

submits that in advance of any such hearing it should be permitted to pursue discovery limited to

the jurisdiction issue. See GTFM Inc. v. International Basic Source, Inc., 2002 U.S. Dist. LEXIS

345, at *3 (S.D.N.Y. Jan. 4, 2002) ("court may allow discovery to aid in determining whether it

has in personam . . . jurisdiction"); Gyves Decl., ¶¶ 15-36.

## POINT II.

## THIS COURT IS A PROPER VENUE FOR THE
## CLAIMS ASSERTED AGAINST BOTH DEFENDANTS

### A.    The Venue Clause Applies Only to DHIS

The venue provision set forth at Section 15.2 of the Agency Agreement applies only to DHIS. The Agency Agreement constitutes a contract between FIC and DHIS. It is binding only upon those two parties. As discussed at pages 7-8 of FIC's opposition brief, the venue provision is fatal to DHIS's contention that this Court is not a proper venue. With respect to FSIM, as discussed below in Point II. C, factors other than this contractual provision compel the conclusion that FIC's assigned claims against that entity are properly venued here.

### B.    Independent of the Agency Agreement, Venue Is
### Proper With Respect to the Claims Against DHIS

Even if the Court were to conclude that the mediation clause is insufficient to dispose of DHIS's venue challenge, DHIS's contacts with New York establish that "a substantial part" of the events or omissions giving rise to Count I (breach of contract), Count II (breach of the duty of good faith) and Count III (breach of fiduciary duty) occurred in New York and thus venue is proper pursuant to 28 U.S.C. § 1391(a)(2). See Opposition Brief at 16-20.

### C.    Venue Is Proper With Respect to
### the Assigned Claims Against FSIM

Venue is proper with respect to FIC's assigned claims against FSIM because, consistent with the controlling venue statute, "a substantial part" of the events or omissions giving rise to Count IV (default on the Note) and Count IV (breach of the Subscription Agreement) occurred in New York. See 28 U.S.C. § 1391(a)(2).

8

1.    **The "Substantial Part" Test**

What constitutes a "substantial part" of the acts and omissions giving rise to a

particular claim is an inherently subjective, fact-sensitive inquiry.  In attempting to determine the

proper parameters of the term "substantial," the courts have instructed that at one end of the

spectrum, "[e]vents or omissions that might only have some tangential connection with the

dispute in litigation are not enough."  Cottman Transmission Sys., Inc. v. Martino, 36 F.3d 291,

294 (3d Cir. 1994).  For a venue to be proper, it must have a "real relationship" to the parties'

dispute.  Id.; see also Greenblatt v. Gluck, 265 F. Supp.2d 346, 352 (S.D.N.Y. 2003)

("peripheral[]" contacts "do not rise to the level of significance required by § 1391(a)(2)").

At the other end of the spectrum, the courts have noted, "a majority of the events

giving rise to the claim need not occur in the venue. . . . "  Interlease Aviation Investors II

(Aloha) LLC v. Vanguard Airlines, Inc., 262 F. Supp.2d 898, 913 (N.D. Ill. 2003).  Indeed, a

forum "'should not be disqualified'" as a proper venue "'even if it is shown that the activities in

[an alternative venue] were more substantial, or even the most substantial.'"  Gregory v. Pocono

Grow Fertilizer Corp., 35 F. Supp.2d 295, 299 (W.D.N.Y. 1999) (citation omitted).  Where

events "crucial" to a claim occurred in a judicial district, that district is a proper venue.  Wachtel

v. Storm, 796 F. Supp. 114, 116 (S.D.N.Y. 1992).  For venue to be proper, there must be some

"nexus" between the defendants' activities in the forum and the cause of action asserted against

them.  Jordache Enters., Inc. v. Nakash, 1994 U.S. Dist. LEXIS 2551, at *12 (S.D.N.Y. Mar. 3,

1994).

This "substantial part" test for venue is intended to be construed broadly and the

courts have done so.  See 17 J. Moore, Moore's Federal Practice, § 110.04[2] at 110-42.1 (3d ed.

2003). For example, in <u>Time Products, plc. v. J. Tiras Classic Handbags, Inc.</u>, 1997 U.S. Dist.
LEXIS 3545 (S.D.N.Y. Mar. 26, 1997), Judge Sweet addressed the "substantial part" element of
28 U.S.C. § 1391(b)(2), whose language tracks that of 28 U.S.C. § 1391(a)(2) which is at issue
here. Judge Sweet determined that the Southern District of New York was a proper venue for a
trade dress claim despite the fact that only <u>2.52</u> <u>percent</u> of defendants' allegedly wrongful sales
occurred in New York as opposed to Texas, in which <u>57.56</u> <u>percent</u> of those sales occurred. <u>Id.</u>
at *10. Judge Sweet concluded that notwithstanding this lopsided distribution of sales between
the two potential venues, the New York sales were "sufficiently substantial to make venue proper
in this district." <u>Id.</u> at *11. Viewed against this flexible framework, FIC respectfully submits
that the Court is a proper venue for the resolution of both of its two assigned claims against
FSIM.

### 2.    The Promissory Note Claim

In Count IV, FIC as Platinum's assignee claims that FSIM defaulted on the Note.
FIC alleges that, "[t]hrough its acts and/or omissions, <u>including</u> <u>its</u> <u>failure</u> <u>to</u> <u>make</u> <u>the</u> <u>payments</u>
<u>required</u> <u>under</u> <u>the</u> <u>Note</u>, FSIM is in default." Complaint, ¶ 95 (emphasis supplied). The Note, a
copy of which is attached to the Complaint, contains explicit provisions regarding how FSIM
was to make the required payments in question. Platinum and FSIM agreed that those payments
were to be made by wire transfer. <u>See</u> Note, ¶ A. Schedule 1 to the Note is entitled "Bank
Account Details and Routing Instructions." Therein, Platinum instructs FSIM to wire the
payments through Chase Manhattan Bank in "<u>New York</u>, <u>New York</u>." <u>Id.</u>, Schedule 1 (emphasis
supplied).

10

The gravaman of FIC's claim is that these payments on the Note -- i.e., the wire transfers through the New York-based bank -- were not made and thus FSIM is in default. This omission goes to the very heart of the default claim and thus renders this Court a proper venue. As one leading commentator on federal practice has observed:

> [I]n instances in which an act or acts were required by the engagement of the parties, and were required to take place in a given district, a failure to perform them in that district can qualify that district as a proper venue.

28 U.S.C.A. § 1391, Practice Commentary at 10 (D. Siegel, "Commentary on 1988 and 1990 Revisions of Section 1391") (West 1993) [hereinafter Siegel Commentary].

But for FSIM's failure to make the payments through the New York bank as specified in the Note, there would have been no default on the Note and thus no cause of action for breach of that Note. Under the circumstances, FSIM's omissions in New York plainly are more than tangential or peripheral to the dispute over the Note. Those omissions are, in fact, crucial to the underlying claim. Because these New York omissions have a genuine nexus to the elements of the default claim, this Court is a proper venue.

### 3. The Claim for Breach of the Subscription Agreement

In Count V, FIC claims that FSIM materially breached its Subscription Agreement with Platinum. FIC alleges that, through FSIM's acts and/or omissions, a Negative Balance arose in FSIM's account with the offshore captive through which FIC was to have been provided with reinsurance relating to the FSIM Program. See Complaint, ¶¶ 52-53, 69. FSIM also is alleged to have failed to make the payments required to remedy that Negative Balance. Id., ¶¶ 69-70, 102-103.

11

### a.    Funding the FSIM Account

Venue is proper as to this claim because, as discussed in detail in the accompanying Declaration of Ronald Labenski ("Labenski Decl.") at paragraphs 24-29, the payments necessary to adequately fund FSIM's account with Platinum so as to avoid a Negative Balance should have been made in the first instance in New York. FSIM's account with the offshore captive was to be funded through premium dollars forwarded by FSIM to FIC in New York. See Labenski Decl., ¶¶ 25-27. Once it deducted its fees, FIC then was to forward the net premium from New York to Platinum in Bermuda, where those funds were to be credited to FSIM's account through which FIC was to be reinsured. Id., ¶¶ 28-29. FSIM did, in fact, forward premium payments to FIC in New York. Id., ¶ 27; Weiss Decl., Ex. G at Bates No. FIC/FSIM 000786-796 (some thirty-nine checks from FSIM to FIC in New York totaling nearly $7 million with respect to the FSIM Program) and Ex. H at Bates No. FIC/FSIM 000814-818 (four wire transfers from FSIM to FIC in New York totaling nearly $2 million with respect to the FSIM program). Those payments, however, were inadequate to fund the FSIM account and thus triggered the Negative Balance at the center of the breach of contract claim. FSIM's failure to ensure that adequate payments were made through FIC in New York is at the core of this claim and thus constitutes a "substantial part" of the omissions giving rise to this breach of contract cause of action. See Siegel Commentary, supra.

### b.    Remedying the Negative Balance

Similarly, any payments necessary to remedy a Negative Balance in the FSIM account were to be funneled by FSIM through New York. As discussed in the Labenski Declaration at paragraphs 30-33, Platinum expected FSIM to remedy this Negative Balance through payments wired in a manner consistent with the terms of the Note. See discussion,

supra, at Part II. C.2. FSIM's failure to make those payments through the New York bank identified in Platinum's wiring instructions is a pivotal element of the assigned breach of contract claim and a "substantial part" of the omissions giving rise to that cause of action. See Siegel Commentary, supra.

### D.    The Defendants Cannot Credibly Argue That This Is an Inconvenient Venue

In the end, the venue rules are concerned principally with pragmatic questions of convenience rather than issues of due process or the application of rigid rules. See Leroy v. Great W. United Corp., 443 U.S. 173, 183-84 (1979) ("the purpose of statutorily specified venue is to protect the defendant against the risk that a plaintiff will select an unfair or inconvenient place of trial") (emphasis omitted); Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc., 869 F. Supp. 152, 154 (S.D.N.Y. 1994) ("venue statutes protect defendants from litigating in an unfair or inconvenient location"); 17 J. Moore, Moore's Federal Practice, § 110.01[1] at 110-12 (3d ed. 2003) (venue statutes "generally are concerned with convenience. They seek to channel lawsuits to an appropriately convenient court, given the matters raised and the parties involved in the action."). Here, the Defendants cannot be heard to complain that this Court is either an inconvenient or unfair forum in which to resolve the claims FIC has asserted against them. Indeed, any such contention would be grossly disingenuous given the fact that the Defendants were poised to assert counterclaims in this forum and would, in fact, have done so but for the protection afforded to FIC under the New York Insurance Law. See discussion, supra, at Point I.A; Gyves Decl., ¶¶ 4-12.

The nexus between this venue and all of the claims asserted in this litigation is clear. All of the entities involved in this dispute -- FIC, FSIM, DHIS and Platinum -- joined

13

forces in 2000 for one reason and one reason only:  to cobble together the various elements of a

complex workers' compensation insurance program that could not have become a reality without

the involvement of a New York-based insurer willing to issue the insurance policies through

which that coverage was provided.  The underlying insurance policies were issued out of New

York, premium payments were supposed to be forwarded to New York, and the payments needed

to fund the critically important reinsurance component of the program were supposed to be made

in or through New York.

It was entirely foreseeable that a dispute between FSIM and the FSIM Program's

captive reinsurer would be venued in any number of jurisdictions having ties to that program,

whether it be New York, Bermuda or Arizona.  Indeed, the Subscription Agreement between

FSIM and Platinum reflects the fact that, given the geographical scope of the FSIM Program,

litigation in a number of venues was a distinct possibility.  See Subscription Agreement attached

as Exhibit B to the Labenski Declaration at § 14 ("courts of Bermuda shall be vested with non-

exclusive jurisdiction to resolve any dispute arising out of or related to this Agreement")

(emphasis supplied).

Proceeding with this litigation in New York will cause no undue inconvenience to

the Defendants.  The Superintendent selected this venue in good faith.  Respectfully, the decision

of a high ranking governmental official fulfilling his fiduciary obligations as rehabilitator of a

failing insurance company is entitled to considerable deference.  This is particularly so where, as

here, the other parties to the litigation have articulated no genuine inconvenience or hardship they

will experience by being made to litigate here.

14

**E.    FIC Should Be Afforded an Opportunity to Pursue
Limited Discovery If the Court Is Inclined to Hold a Hearing**

To the extent the Court determines that FIC has failed to establish the propriety of

venue or that a hearing on that issue is otherwise warranted, FIC respectfully submits that it

should be afforded a reasonable opportunity to pursue discovery limited to that issue for the same

reasons discussed above in Point I.C.  See Wafios Mach. Corp. v. Nucoil Indus. Co., 2004 U.S.

Dist. LEXIS 13674, at *14 (S.D.N.Y. July 13, 2004) ("discovery should be permitted where the

facts necessary to establish . . . [the] propriety of venue lie exclusively within the defendant's

knowledge"); Gyves Decl., ¶¶ 15-36.

## CONCLUSION

For the reasons set forth above, as well as in the previously submitted opposition

brief, plaintiff Gregory V. Serio, Superintendent of Insurance of the State of New York, as

Rehabilitator of Frontier Insurance Company and assignee of Platinum Indemnity, Ltd.,

respectfully requests that the Court deny in its entirety the Defendants' motion to dismiss the

Complaint, compel mediation and stay the action.

Dated:  New York, New York
        December 17, 2004

ENTWISTLE & CAPPUCCI LLP
299 Park Avenue, 14th Floor
New York, New York 10171
(212) 894-7200

By: _____
    WILLIAM S. GYVES (WG 2770)
    ADAM F. JACHIMOWSKI (AJ 1664)
    MICHAEL A. McDONOUGH (MM 5712)

Attorneys for Plaintiff

**LEXIS Decisions**

LEXSEE 2002 US DIST LEXIS 345

**GTFM INC., Plaintiff, - against - INTERNATIONAL BASIC SOURCE, INC. a/k/a IBS and BRANDON KIM, Defendants.**

**01 Civ. 6203 (RWS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2002 U.S. Dist. LEXIS 345*

**January 4, 2002, Decided
January 11, 2002, Filed**

**DISPOSITION:** [*1] Basic's motions denied at this time. Leave granted to refile any and all the motions to dismiss and for sanctions at a later date.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant corporation and individual moved to dismiss plaintiff's complaint alleging, inter alia, trademark counterfeiting and trademark infringement to enforce plaintiff's rights to a trademark used by the corporation in its sale of goods. The corporation moved for sanctions, and plaintiff cross-moved to compel the corporation to comply with a discovery order permitting discovery for the limited purpose of determining jurisdiction and venue.

**OVERVIEW:** Plaintiff alleged facts pertaining to jurisdiction and venue on information and belief. The corporation argued that plaintiff did not meet its burden of proving the existence of personal jurisdiction and venue. Plaintiff ultimately needed to prove facts sufficient to support personal jurisdiction and venue, but alleging such facts was sufficient to permit limited discovery. Therefore, plaintiff's motion to permit discovery was granted.

**OUTCOME:** Plaintiff's motion to compel discovery was granted. The corporation's motions were denied. Leave was granted to refile any and all the motions to dismiss and for sanctions at a later date.

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Action*
[HN1] A trial court has jurisdiction to determine its own jurisdiction. A court may allow discovery to aid in determining whether it has in personam or subject matter jurisdiction.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN2] A plaintiff must prove issues of in personam jurisdiction and venue by a preponderance of the evidence. However, alleging such facts is sufficient to permit limited discovery.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
*Civil Procedure > Disclosure & Discovery*
[HN3] Pre-motion discovery should be permitted where the facts necessary to establish personal jurisdiction and propriety of venue lie exclusively within the defendant's knowledge.

**COUNSEL:** For GTFM, INC., plaintiff: Louis S. Ederer, Martin Jon Feinberg, Neil B. Friedman, Gursky & Ederer, L.L.P., New York, NY.

**JUDGES:** ROBERT W. SWEET, U.S.D.J.

**OPINIONBY:** ROBERT W. SWEET

**OPINION:**

MEMORANDUM OPINION

2002 U.S. Dist. LEXIS 345, *

**Sweet, D.J.,**

Defendant International Basic Source, Inc. ("Basic") has moved to dismiss plaintiff GTFM, Inc.'s ("GTFM") complaint (1) for lack of personal jurisdiction pursuant to *Rule 12(b)(2), Fed. R. Civ. P.*; (2) for improper venue pursuant to *Rule 12(b)(3) Fed. R. Civ. P.*; and (3) for failure to state a claim upon which relief can be granted pursuant to *Rule 12(b)(6) Fed. R. Civ. P.* Basic has also moved for sanctions pursuant to *Rule 11, Fed. R. Civ. P.*, (1) for filing a lawsuit which names Brandon Kim ("Kim") personally without evidentiary support for jurisdiction; (2) alleges jurisdiction and venue upon information and belief without evidentiary support; and (3) for improperly using a lawsuit to intimidate competitors and inhibit competition. GTFM has cross-moved by letter application to compel Basic to comply with this Court's discovery [*2] order of November 14, 2001 permitting discovery for the limited purpose of determining jurisdiction and venue. Because this court has jurisdiction to allow discovery for the purpose of determining in personam jurisdiction and venue, GTFM's motion to compel such discovery is granted. For the related reasons, Basic's motions are denied at this time. Leave is granted to refile the motions to dismiss and for sanctions at a later date.

**Parties and Prior Proceedings**

This case began with a Complaint, dated July 9, 2001, alleging, inter alia, trademark counterfeiting, trademark infringement, false designation of origin, federal trademark dilution, common law trademark infringement, and other claims to enforce GTFM's rights to the "05" Trademark used by Basic in its sale of goods. GTFM has alleged on information and belief, that Basic is doing and/or transacting business in the State of New York and this judicial district.

On November 14, 2001, this Court ordered a one-month adjournment of the underlying motion to dismiss for the purpose of allowing discovery to proceed on the issue of jurisdiction and venue. Basic has apparently refused to comply with certain of the [*3] discovery requests made by GTFM including a deposition of Kim. The instant motions were marked submitted and oral argument was heard on December 12, 2001.

**Jurisdictional Discovery is Proper**

[HN1] A trial court has jurisdiction to determine its own jurisdiction. *United States v. United Mine Workers, 330 U.S. 258, 292 n. 57, 91 L. Ed. 884, 67 S. Ct. 677 (1947).* A court may allow discovery to aid in determining whether it has in personam or subject matter jurisdiction. *Lekkas v. Liberian M/V Caledonia, 443 F.2d 10 (4th Cir. 1971); Fraley v. Chesapeake & Ohio*

*Ry., 397 F.2d 1 (3d Cir. 1968); Surpitski v. Hughes-Keenan Corp., 362 F.2d 254 (1st Cir. 1966); Urquhart v. American-La France Foamite Corp., 79 U.S. App. D.C. 219, 144 F.2d 542, 544,* cert. denied, *323 U.S. 783, 89 L. Ed. 625, 65 S. Ct. 273 (1944); Alfadda v. Fenn, 1994 U.S. Dist. LEXIS 18267, 1994 WL 714254 (S.D.N.Y. Dec. 22, 1994); Leasco Data Processing Equip. Corp. v. Maxwell, 319 F. Supp. 1256, 1263 (S.D.N.Y. 1970);* see also *Landoil Resources Corp. v. Alexander & Alexander Serv. Inc., 918 F.2d 1039, 1041 (2d Cir.1990)* [*4] (district court denied motion to dismiss under *Fed.R.Civ.P. 12(b)(2)* & (3) and permitted discovery on issue of personal jurisdiction then heard motion).

Here, GTFM has alleged facts pertaining to jurisdiction and venue on information and belief. Basic argues that GTFM has not met its burden of proving the existence of personal jurisdiction and venue. It is true that [HN2] a plaintiff must prove issues of in personam jurisdiction and venue by a preponderance of the evidence. See *Credit Lyonnais Secs. (USA), Inc. v. Alcantara, 183 F.3d 151, 154 (2d Cir. 1999)* (jurisdiction); *Pocahontas Supreme Coal Co. v. National Mines Corp., 90 F.R.D. 67, 69 (S.D.N.Y. 1981)* (venue). At this stage, however, those standards are beside the point. GTFM must ultimately prove facts sufficient to support personal jurisdiction and venue, but alleging such facts is sufficient to permit limited discovery.

[HN3] Pre-motion discovery should be permitted where the facts necessary to establish personal jurisdiction and propriety of venue lie exclusively within the defendant's knowledge. See *Wells Fargo & Co. v. Wells Fargo Express Co., 556 F.2d 406, 430 n.4 (2d Cir. 1977);* [*5] *Gelfand v. Tanner Motor, Ltd., 339 F.2d 317, 323 (2d Cir. 1964).* Here, there is an issue of whether Basic is doing and/or transacting business in the State of New York and this judicial district. Discovery will lead to a more accurate judgement than one made solely on the basis of affidavits in response to the motion. See *Peterson v. Spartan Industries, Inc., 33 N.Y.2d 463, 354 N.Y.S.2d 905, 310 N.E.2d 513 (1974).*

For these reasons, GTFM's motion to permit discovery is granted. Limited and expedited discovery proceedings will include service of document requests and one deposition of defendant Kim to be completed no later than thirty (30) days from the entry of this order.

**Basic's Motions are Denied With Leave to Refile**

Because Basic's motion to dismiss on jurisdiction and venue grounds and for failure to state a claim under Rule 12(b)(6) cannot be resolved until after jurisdictional discovery has been conducted, it is denied at this time. Similarly, Basic's motion for sanctions under Rule 11 is

2002 U.S. Dist. LEXIS 345, *

premature since the issue will be moot if jurisdiction can be established.

Leave is granted to refile any and all of the motions pending [*6] closure of the limited discovery ordered above.

It is so ordered.

**New York, NY**
**January 4, 2002**

**ROBERT W. SWEET**

**U.S.D.J.**

LEXSEE 1994 U.S. DIST. LEXIS 2551

**JORDACHE ENTERPRISES, INC., AVI NAKASH, JOE NAKASH, and RALPH NAKASH, Plaintiffs, v. BROBECK, PHLEGER & HARRISON, et al., Defendants.**

**92 CIV. 9002 (KMW)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1994 U.S. Dist. LEXIS 2551*

**March 3, 1994, Decided**
**March 7, 1994, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff clients brought an action for malpractice and breach of contract arising out of legal representation provided by defendant attorneys in connection with a stock purchase agreement. The attorneys moved to transfer the action to the Central District of California pursuant to *28 U.S.C.S. § 1406*(a). The clients cross-moved to transfer to the Central District of California pursuant to *28 U.S.C.S. § 1404*(a).

**OVERVIEW:** The clients filed their action alleging legal malpractice and breach of contract in connection with the attorneys' representation of them in a stock purchase agreement and in a state action. Under *28 U.S.C.S. § 1391*(a)(2), the events upon which venue was based had to make up a substantial part of the events giving rise to the claim. The court found that the clients failed to show that a substantial part of the alleged acts of malpractice took place in the Southern District of New York where the action was filed. It was undisputed that the specific acts alleged took place in the Central District of California. The court also found that the clients failed to show that a substantial part of the events or omissions giving rise to their breach of contract claim took place in New York. Meetings and communications in New York designed to inform the clients about the attorneys' performance of contractual obligations in California did not ground venue. *28 U.S.C.S. § 1404*(a) was premised on proper venue where the action was originally filed; therefore, the clients' motion to transfer pursuant to § 1404(a) had to be denied. The court granted the attorneys' motion under *28 U.S.C.S. § 1406*(a).

**OUTCOME:** The court granted the attorneys' motion to transfer the action to the Central District of California, a district in which the action could have been brought, without deciding the attorneys' motion to dismiss for lack of personal jurisdiction.

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
*Civil Procedure > Venue > General Venue*
[HN1] Although the question of personal jurisdiction is typically decided before that of venue, a court may reverse the normal order where there is a sound prudential justification for doing so.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
*Civil Procedure > Venue > General Venue*
[HN2] Deciding the venue issue before the question of personal jurisdiction is sound where personal jurisdiction is the more complicated question, and resolution of the venue issue resolves the case before the court.

*Civil Procedure > Venue > Change of Venue in Federal Courts*
[HN3] In addition to authorizing dismissal, *28 U.S.C.S. § 1406*(a) gives a court that lacks venue the discretion to transfer to a jurisdiction where venue is proper in lieu of dismissing the case.

1994 U.S. Dist. LEXIS 2551, *

*Civil Procedure > Venue > Change of Venue in Federal Courts*
[HN4] When a case is transferred pursuant to *28 U.S.C.S. § 1406*(a), the transferee court applies the law it would have applied had the action been properly commenced there.

*Civil Procedure > Venue > Change of Venue in Federal Courts*
[HN5] See *28 U.S.C.S. § 1406*(a).

*Civil Procedure > Venue > Change of Venue in Federal Courts*
*Civil Procedure > Trials > Judicial Discretion*
[HN6] The decision whether to grant a transfer under *28 U.S.C.S. § 1406*(a) to a jurisdiction where venue is proper is in the broad discretion of the district court.

*Civil Procedure > Venue > Change of Venue in Federal Courts*
[HN7] *28 U.S.C.S. § 1404*(a) authorizes a court in which venue is properly laid to transfer to another forum in which the action might have been brought for the convenience of the parties and witnesses or in the interests of justice. When an action is transferred pursuant to § 1404(a), the law the transferor court would have applied governs the case.

*Civil Procedure > Venue > Change of Venue in Federal Courts*
[HN8] See *28 U.S.C.S. § 1404*(a).

*Civil Procedure > Jurisdiction > Diversity Jurisdiction > Citizenship*
*Civil Procedure > Venue > General Venue*
[HN9] Venue in diversity cases is governed by *28 U.S.C.S. § 1391*(a).

*Civil Procedure > Jurisdiction > Diversity Jurisdiction > Citizenship*
*Civil Procedure > Venue > General Venue*
[HN10] See *28 U.S.C.S. § 1391*(a).

*Civil Procedure > Venue*
[HN11] Venue statutes serve the purpose of protecting a defendant from the inconvenience of having to defend an action in a trial court that is either remote from the defendant's residence or from the place where the acts underlying the controversy occurred.

*Civil Procedure > Venue > General Venue*
*Evidence > Procedural Considerations > Burdens of Proof*
[HN12] Where venue is challenged by a defendant, the plaintiff bears the burden of proving that venue is proper in the forum state. In a case with multiple claims, the plaintiff has the burden of establishing that venue is proper as to each claim.

*Civil Procedure > Venue > General Venue*
[HN13] Under amended *28 U.S.C.S. § 1391*(a)(2), venue may be proper in more than one district. However, the events or omissions on which venue is based must still make up a substantial part of the events or omissions giving rise to the claim, and pre-1990 decisions construing the meaning of "substantial part" are still good law.

*Civil Procedure > Venue > General Venue*
[HN14] Under *28 U.S.C.S. § 1391*(a)(2), the proper inquiry is whether a substantial portion of the acts or omissions giving rise to the claim took place in this district.

*Civil Procedure > Venue > General Venue*
*Contracts Law > Breach > Causes of Action*
[HN15] In determining what events give rise to breach of contract claims, courts interpreting *28 U.S.C.S. § 1391*(a)(2) generally look to where the contract is negotiated or executed, where services under the contract are to be performed, or where the alleged breach occurred.

*Civil Procedure > Venue > General Venue*
*Contracts Law > Breach > Causes of Action*
[HN16] Meetings and communications designed to inform plaintiffs about defendants' performance of contractual obligations, which do not ground venue, must be distinguished from the performance itself, which does ground venue.

*Civil Procedure > Venue > Change of Venue in Federal Courts*
[HN17] *28 U.S.C.S. § 1404*(a) operates on the premise that the plaintiff has properly exercised his venue privilege.

*Civil Procedure > Venue > Change of Venue in Federal Courts*
[HN18] Courts generally transfer rather than dismiss when it is clear where proper venue would be laid.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
*Civil Procedure > Venue > Change of Venue in Federal Courts*
[HN19] A court has the power to transfer pursuant to *28 U.S.C.S. § 1406* (a) or even if it lacks personal jurisdiction over the defendant.

1994 U.S. Dist. LEXIS 2551, *

**JUDGES:** [*1] Wood

**OPINIONBY:** KIMBA M. WOOD

**OPINION:**

MEMORANDUM OPINION AND ORDER

WOOD, D.J.

Plaintiffs bring an action for malpractice and breach of contract arising out of legal representation provided by defendants in connection with a stock purchase agreement. Defendants move, in the alternative: (1) to dismiss plaintiffs' claim for lack of personal jurisdiction pursuant to *Fed. R. Civ. P. 12(b)(2)*; (2) to dismiss for improper venue pursuant to *Fed. R. Civ. P. 12(b)(3)* and § 1406(a); (3) to transfer the action to the Central District of California pursuant to *28 U.S.C. § 1406*(a); or (4) to dismiss the action pursuant to the "exceptional circumstances" doctrine. Plaintiffs cross-move to transfer to the Central District of California pursuant to *28 U.S.C. § 1404*(a). For the reasons stated below, the court orders that this case be transferred to the Central District of California pursuant to *28 U.S.C. § 1406*(a). The court does not reach the remaining grounds for defendants' motion. Plaintiffs' motion to transfer pursuant to *28 U.S.C. § 1404*(a) is denied.

**Background** [*2]

Plaintiff Jordache Enterprises, Inc. ("Jordache") is a corporation incorporated under the laws of the State of New York, with its principal place of business in New York. Individual plaintiffs Avi Nakash, Joe Nakash, and Ralph Nakash ("the Nakashes"), are residents of the State of New York and are each officers, directors and shareholders of Jordache. Defendant Brobeck, Phleger & Harrison ("Brobeck") is a California partnership licensed to practice law in California. The individual members of the partnership, also named as defendants but too numerous to list here, are residents of the State of California. The court has diversity jurisdiction over this action pursuant to *28 U.S.C. § 1332*.

In 1983, Brobeck represented Jordache and the Nakashes in connection with their purchase of 51% of the stock of Guess? Inc. ("Guess"), a California Corporation, from the Marciano brothers ("the Marcianos"), owners of Guess and residents of California. The parties executed a stock purchase agreement ("the stock purchase agreement") in Los Angeles, California on July 25, 1983. Subsequently, the Marcianos brought suit against the Nakashes in federal court in the Central [*3] District of California, seeking to rescind the stock purchase agreement on grounds of fraud and lack of consideration. Brobeck represented the Nakashes in that case ("the federal action"), which

settled and was dismissed with prejudice on January 19, 1984. In November, 1984, the Marcianos again filed suit against the Nakashes, this time in state court in Los Angeles on grounds of fraud, unfair competition, misappropriation of trade secrets, and trademark infringement. Brobeck represented the Nakashes in this second lawsuit ("the state action") until April of 1987, when the Nakashes terminated Brobeck and substituted other counsel.

On December 14, 1992, plaintiffs filed this lawsuit, alleging legal malpractice and breach of contract in connection with defendants' representation of them in the stock purchase agreement and the state action. n1 Defendants then brought the instant motion. Plaintiffs responded with a motion to transfer pursuant to § 1404(a). n2

---

n1 Plaintiffs filed a previous complaint against defendants on February 12, 1991, in the Superior Court for the County of Los Angeles. The complaint asserted causes of action for rescission, breach of contract, negligent misrepresentation and malpractice arising from defendants' representation of plaintiffs in connection with the stock purchase agreement and both the federal and state court actions. An attempt to resolve this lawsuit through mediation failed, and the action is currently being litigated. [*4]

---

n2 Defendant Barbara Caulfield filed separately to join in defendants' motion.

---

**Venue**

[HN1] Although the question of personal jurisdiction is typically decided before that of venue, a court may reverse the normal order "where there is a sound prudential justification for doing so." *Leroy v. Great Western United Corp., 443 U.S. 173, 180, 61 L. Ed. 2d 464, 99 S. Ct. 2710 (1979)*. Here, the question of personal jurisdiction is an extremely complex one, involving a partnership and approximately one hundred individual partners, and resting at least in part on an "alter ego" claim which could require discovery. Plaintiffs and defendants agree that the action should be litigated, if at all, in the Central District of California, which unquestionably has personal jurisdiction over all defendants. Determination of the venue issue would resolve the case before this court and render the question of personal jurisdiction moot. See *Leech v. First Commodity Corp., 553 F. Supp. 688, 689 (W.D. Pa.*

1994 U.S. Dist. LEXIS 2551, *

*1982*) ( [HN2] deciding venue issue [*5] before question of personal jurisdiction where personal jurisdiction was the more complicated question, and resolution of venue issue resolved the case before the court). Accordingly, I turn first to the issue of venue.

Although the parties agree that the proper venue for this action is the Central District of California, their objections to venue rest on different grounds. Defendants argue that venue is improper here, warranting dismissal pursuant to *Fed. R. Civ. P. 12(b)(3)* or *28 U.S.C. § 1406*(a). [HN3] In addition to authorizing dismissal, § 1406(a) gives a court that lacks venue the discretion to transfer to a jurisdiction where venue is proper in lieu of dismissing the case. n3 Defendants request this relief in the alternative. [HN4] When a case is transferred pursuant to § 1406(a), the transferee court applies the law it would have applied had the action been properly commenced there. *Martin v. Stokes, 623 F.2d 469, 473 (6th Cir. 1980).*

n3 Section 1406(a) provides:

[HN5] The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought.

[HN6] The decision whether to grant a transfer is in the broad discretion of the district court. *Levitt v. Maryland Deposit Ins. Fund Corp., 643 F. Supp. 1485, 1492 (E.D.N.Y. 1986).*

[*6]

Plaintiffs, in contrast, argue that venue is proper in the Southern District of New York, but that the Central District of California is a more convenient forum. They request transfer under *28 U.S.C. § 1404*(a), [HN7] which authorizes a court in which venue is properly laid to transfer to another forum in which the action "might have been brought," "for the convenience of the parties and witnesses" or "in the interests of justice." n4 When an action is transferred pursuant to § 1404(a), the law the transferor court would have applied governs the case. *Van Dusen v. Barrack, 376 U.S. 612, 639, 11 L. Ed. 2d 945, 84 S. Ct. 805 (1964).* Indeed, it is at least partly for this reason that plaintiffs filed suit in the Southern District of New York and then moved to transfer pursuant to § 1404(a): plaintiffs contend that a § 1404(a) transfer would entitle them to invoke New

York's longer statute of limitations for legal malpractice actions. Pl.'s Opp. Mem. at 28.

n4 Section § 1404(a) provides:

[HN8] For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

[*7]

A. Standard for determining venue in diversity cases

[HN9] Venue in diversity cases is governed by *28 U.S.C. § 1391*(a) (1992). Section § 1391(a) provides:

[HN10] A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which the defendants are subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

[HN11] Venue statutes serve the purpose of "protecting a defendant from the inconvenience of having to defend an action in a trial court that is either remote from the defendant's residence or from the place where the acts underlying the controversy occurred." *VE Holding Corp. v. Johnson Gas Appliance Co., 917 F.2d 1574, 1576 (Fed. Cir. 1990).* [HN12] Where [*8] venue is challenged by a defendant, plaintiff bears the burden of proving that venue is proper in the forum state. *Pocahontas Supreme Coal Co. v. National Mines Corp., 90 F.R.D. 67, 69 (S.D.N.Y. 1981).* In a case with multiple claims, plaintiff has the burden of establishing that venue is proper as to each claim. *VDI Technologies v. Price, 781 F. Supp. 85, 92 (D.N.H. 1991).* Here, plaintiffs assert that venue is proper under § 1391(a)(2), on the ground that "a substantial part of the events or omissions giving rise to the claim" occurred in the Southern District of New York. n5 Pl.'s Opp. Mem. at 24.

1994 U.S. Dist. LEXIS 2551, *

n5 Section 1391(a)(1) does not confer venue because both the partnership and the individual defendants reside in the State of California, not in New York. Similarly, even if the court has personal jurisdiction over all the defendants, a question I do not reach, venue is unavailable under § 1391(a)(3) because the action might "otherwise [have been] brought" in federal court in California.

[*9]

Plaintiffs correctly note that § 1391(a)(2) was amended in 1990 pursuant to the Judicial Improvements Act of 1990, Pub. L. No. 101-650, Tit. III, § 311(a), 104 Stat. 1623. Prior to the amendment, § 1391(a)(2) conferred venue in only one district, the district "where the claim arose." Where events giving rise to the claim took place in more than one district, courts interpreting the earlier version of § 1391(a)(2) held that at least a "substantial part" of a claim must arise in a district for venue to be proper there, and adopted a "weight of the contacts" test to determine if this threshold was met. *Alcoholics Anonymous World Servs., Inc. v. Friedman, 1992 WL 150633 at *2 (S.D.N.Y.); Honda Assocs., Inc. v. Nozawa Trading, Inc., 374 F. Supp. 886, 889 (S.D.N.Y. 1974)* [HN13] Under amended § 1391(a)(2), venue may be proper in more than one district. However, the events or omissions on which venue is based must still make up a "substantial part of the events or omissions giving rise to the claim" (emphasis added), and pre-1990 decisions construing the meaning of "substantial part" are still good law. *Bates v. C & S Adjusters, Inc., 980 F.2d 865, 867 (2d Cir. 1992)* [*10] (holding 1990 amendment to be "at most a marginal expansion of the venue provision," and stating that pre-1990 decisions interpreting § 1391(a)(2) "remain important sources of guidance"); see also *Alcoholics Anonymous, 1992 WL 150633 at *3.*

Here, plaintiffs assert two claims, a malpractice claim and a breach of contract claim. The same factual allegations appear to underlie both claims. Plaintiffs allege that (1) defendants drafted the stock purchase agreement without including an integration clause; (2) defendants' defense of the state action did not include the argument that the action was barred by a release signed by the Marcianos as part of the settlement agreement in the federal action; (3) defendants conducted their defense of plaintiffs in the state action without attempting to get the state action dismissed, stayed, or sent to arbitration; (4) defendants did not mail notices of the state action to plaintiffs' insurers; and (5) defendants conducted the defense of the state action incompetently. Complaint at P 10.

B. Plaintiffs' malpractice claim

With respect to the malpractice claim, the question is whether plaintiffs have shown that a "substantial part" of these alleged [*11] acts of malpractice took place in the Southern District of New York. The court concludes that plaintiffs have not made this showing. Defendants contend, and plaintiffs do not contest, that all of the specific acts alleged took place in the Central District of California. The stock purchase agreement was drafted and negotiated in California, to be governed by California law. The Marciano's release was negotiated in California. The defense of plaintiffs in the state action took place in California before the Superior Court of Los Angeles. It is in California that defendants would have asserted the release as a defense, or attempted to get the action stayed, dismissed, or sent to arbitration. Def.'s Mem. at 21-4. See *Berube v. Brister, 140 F.R.D. 258, 259-60 (D.R.I. 1992)* (venue in malpractice claim improper in Rhode Island where underlying cause of action serving as basis for plaintiffs' claim of malpractice was commenced and tried in Massachusetts); *Schur v. Porter, 712 F. Supp. 1140, 1147 (S.D.N.Y. 1989)* (venue proper in New York in breach of fiduciary duty claim where claim was based on filing of a lawsuit in New York). [*12]

In response, plaintiffs list twenty-five trips made by Brobeck lawyers to New York "in connection with their work for Jordache." Pl.'s Opp. Mem. at 7. Some of these appear to be related to the defense of plaintiffs in the state action. n6 However, plaintiffs fail to establish a nexus between defendants' activities in New York and their malpractice claim. [HN14] Under § 1391(a)(2), the proper inquiry is whether a substantial portion of the acts or omissions giving rise to the claim took place in the Southern District of New York. *Alcoholics Anonymous, 1992 WL 150633 at *4* (venue improper where plaintiffs fail to establish "a substantial connection between the harm complained of and the activity in this district"); *Pfeiffer v. Insty Prints, et al., 1993 WL 443403 at *3 (N.D. Ill.)* (venue improper where contacts alleged by plaintiff did not substantially involve the act of false reporting underlying plaintiff's RICO claim); *id., 1993 WL 443403 at * 3* (venue improper in breach of contract case where conduct alleged by plaintiff in proposed forum was not conduct underlying breach) of which plaintiff provided evidence was not conduct underlying the breach); *Tifa Ltd. v. Republic of Ghana, 692 F. Supp. 393, 406 (D.N.J. 1988)* [*13] (venue improper under Foreign Sovereign Immunities Act "substantial portion" test where most events that occurred in New Jersey did not give rise to the claim). The court concludes that the conduct of defendants in the Southern District of New York does not represent a significant portion of the events giving rise to plaintiffs' malpractice claim. n7

n6 Some of the visits listed by plaintiffs seem connected to defendants' defense of the state action, but involve depositions or meetings that are not asserted to give rise to the malpractice claim. The purpose of other visits is equivocal, particularly in light of plaintiffs' claim that by the time the state action commenced, Brobeck represented Jordache in all legal matters in California, "including general matters, taxes and litigation." Pl.'s Opp. Mem. at 5. At least one of the listed visits was made to provide information regarding the state action to plaintiffs' criminal counsel in connection with what plaintiffs state was "an ancillary matter of a grand jury investigation" pending against plaintiffs in New York." Spiegelman Decl. at P 9. Plaintiffs allege no activity in New York at all in connection with the negotiation and drafting of the stock purchase agreement. [*14]

n7 Plaintiffs cite Schur, a legal malpractice action interpreting pre-1990 § 1391(a)(2). But Schur not only fails to support plaintiffs' claim that venue is proper here; it leads to opposite conclusion. In Schur, a Washington, D.C. defendant represented New York plaintiffs in connection with the negotiation and drafting of two partnership agreements. The court found venue proper in New York in spite of the fact that defendant provided plaintiffs with legal advice from Washington and drafted the agreements there. *712 F. Supp. at 1147.* The facts in Schur, however, differ significantly from those in the instant case. The partnership agreements at issue in Schur were governed by New York law, were executed in New York, and created New York partnerships for the purpose of owning and operating property located in New York. The court applied a "weight of the contacts" test and held that the claim arose in New York. *Id. at 1142-43, 1147.* Here, in contrast, a stock purchase agreement was negotiated in California to acquire an interest in a California firm. Lawsuits arising out of the transaction were filed in California and defended there. If the court were to follow Schur, it would be required to find that venue is proper in California, but improper in the Southern District of New York.

[*15]

C. Plaintiffs' breach of contract claim

Plaintiffs also fail to show that a "substantial part" of the events or omissions giving rise to their breach of contract claim took place in the Southern District of New York. [HN15] In determining what events give rise to breach of contract claims, courts interpreting § 1391(a)(2) generally look to where the contract is negotiated or executed, where services under the contract are to be performed, or where the alleged breach occurred. See *Okasa v. Hyppolite, et al., 1992 WL 35931* (S.D.N.Y.) (venue proper because extensive negotiations and preparations for formation of contract occurred in Southern District of New York); *Pfeiffer, 1993 WL 443403* at *3 (acts intended to inform plaintiffs about contractual activities, in contrast to acts constituting performance of the contract, do not ground venue); id. (venue improper in breach of contract case because activities purporting to ground venue were not the conduct underlying the breach).

Here, plaintiffs attempt to ground venue as to their breach of contract claim on the statement that the contract for the representation of plaintiffs in the state action "was (at least 'substantially') [*16] negotiated and executed in this district." Pl.'s Opp. Mem. at 27 (citing Spiegelman Decl. at P 9). But this conclusory statement is not supported by sufficient factual allegations, and is undermined by conflicting allegations contained in the Declarations submitted by plaintiffs. n8 Plaintiffs make no allegations at all concerning a contract to represent them in connection with the stock purchase agreement.

n8 In support of the claim that the contract for representation of plaintiffs in the state action was negotiated and executed in New York, plaintiffs state that merely that two Brobeck attorneys came to New York for a meeting on strategy; that these attorneys were "given instructions to proceed to represent" plaintiffs, and that one attorney, Mr. Sutcliffe, "'sold' Jordache on another attorney, Mr. Woods, by telling [plaintiffs] that Woods was one of the firm's top litigators." These statements are insufficient to ground the claim that the contract to represent plaintiffs in the state action was "substantially" negotiated in New York. Moreover, plaintiffs claim that the contract was negotiated in New York is undermined by their claim that, by the time the state action was filed, it was already understood that Brobeck would perform all plaintiffs' legal work in California, and that the attorney in charge of all of plaintiffs' litigation was Mr. Woods.

Case 1:04-cv-03361-RJS-HBP    Document 21    Filed 12/17/2004    Page 31 of 49

Page 7
1994 U.S. Dist. LEXIS 2551, *

There is no question that some of the services to be performed under the contract to represent plaintiffs in the state action, such as the defense of depositions, were performed in the Southern District of New York. However, the vast bulk of those services, and all of the services to be performed in connection with the stock purchase agreement, were performed in California. [HN16] Meetings and communications designed to inform plaintiffs about defendants' performance of contractual obligations must be distinguished from the performance itself. *Pfeiffer, 1993 WL 443403* at *3 (distinguishing between acts that constitute performance of a contract, which do ground venue, and acts intended to inform plaintiffs about contractual activities, which do not). The court is not persuaded that a "substantial portion" of the services to be performed under defendants' contracts with plaintiffs was performed in the Southern District of New York.

Finally, as the analysis of plaintiffs' malpractice claim, supra, suggests, plaintiffs allege no conduct amounting to a breach of either contract that took place in the Southern District of New York. Although plaintiffs allege some activity on the part [*18] of defendants in New York, they do not claim that defendants' New York activity constituted conduct underlying their breach of contract. *Pfeiffer, 1993 WL 443403* at *3 (venue improper in breach of contract case because activities purporting to ground venue were not the conduct underlying the breach). The court concludes that plaintiffs have failed to show that a "substantial portion" of the events or omissions giving rise to its breach of contract claim took place in the Southern District of New York, and therefore that venue is improper as to this claim.

### Conclusion

Because venue is improper in this case, plaintiffs' motion to transfer pursuant to *28 U.S.C. § 1404*(a) must be denied. n9 *Van Dusen, 376 U.S. at 634* ( [HN17] section 1404(a) "operates on the premise[] that the plaintiff has properly exercised his venue privilege"); *Liaw Su Teng v. Skaarup Shipping Corp., 743 F.2d 1140, 1147 (5th Cir. 1984)* (describing sections 1404(a) and 1406(a) as mutually exclusive). It remains to be determined whether this action should be dismissed pursuant to Fed. R. Civ. [*19] P. 12(b)(3) and *28 U.S.C. § 1406*(a), or whether the court should exercise its discretion to transfer pursuant to *28 U.S.C. § 1406*(a) "in the interests of justice." I conclude that transfer is preferable to dismissal because it avoids the potential wastefulness of requiring plaintiffs to refile the action, and defendants will suffer no prejudice from the transfer. n10 See *Metropa Co. v. Choi, 458 F. Supp. 1052, 1056 (S.D.N.Y. 1978)* ( [HN18] courts generally transfer rather than dismiss when it is clear where proper venue would

be laid). I therefore order that this action be transferred to the Central District of California, a district in which it "could have been brought." I do so without deciding defendants' motion to dismiss for lack of personal jurisdiction. See *Hernandez v. Graebel Van Lines, 761 F. Supp. 983 (E.D.N.Y. 1991)* (citing *Goldlawr, Inc. v. Heiman, 369 U.S. 463, 8 L. Ed. 2d 39, 82 S. Ct. 913 (1962))* ( [HN19] court has power to transfer pursuant to *28 U.S.C. § 1406* [*20] (a) or even if it lacks personal jurisdiction over defendant). I decline to reach defendants' motion to dismiss pursuant to the "exceptional circumstances doctrine" because I believe it is preferable for the transferee court, before whom the action will ultimately be determined, to do so.

n9 I reject plaintiffs' argument that, even if venue is improper, the court has discretion to order a transfer § 1404(a). Pl.'s Reply Mem. at 4. Decisions cited by plaintiffs in support of this claim both involve instances in which venue was proper, but the court lacked personal jurisdiction. *Corke v. Sameiet M. S. Song of Norway, 572 F.2d 77 (2d Cir. 1978);* Volkswagen de Mexico v. Germanischer Lloyd, 768 F. Supp. (S.D.N.Y. 1991). In still other cases, courts have transferred to obtain personal jurisdiction over a defendant, but have declined to reach the issue of venue, and thus fail to specify whether the transfer is granted pursuant to § 1404(a) or § 1406(a). *Volk Corp. v. Art-Pak Clip Art Service, 432 F. Supp. 1179 (S.D.N.Y. 1977).* To permit plaintiffs to bring an action in an impermissible forum with the intention of invoking § 1404(a) to obtain favorable law defeats the policy against forum shopping enunciated in Van Dusen and other cases construing the impact of transfer on choice of law. *Martin, 623 F.2d at 472* (allowing plaintiff to benefit from bringing action in impermissible forum would encourage plaintiffs to file actions wherever state law is most advantageous, regardless of whether the forum is proper). [*21]

n10 To the extent that plaintiffs' conduct constitutes forum shopping, defendants will not be prejudiced by transfer because the transferee court will apply the law it would have applied had the action originally been filed there.

SO ORDERED.

1994 U.S. Dist. LEXIS 2551, *

DATED: New York, New York          Kimba M. Wood
March 3, 1994
                                   United States District Judge

LEXSEE 1997 U.S. DIST. LEXIS 3545

**TIME PRODUCTS, plc, Plaintiff, - against - J. TIRAS CLASSIC HANDBAGS, INC., CLASSIC HANDBAGS & IMPORTS, JEROME TIRAS and JEANNIE TIRAS, a/k/a ETHEL TIRAS, Defendants.**

**93 Civ. 7856 (RWS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1997 U.S. Dist. LEXIS 3545*

**March 26, 1997, Decided**
**March 26, 1997, FILED**

**DISPOSITION:** [*1] Defendants' motions denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants, a corporation, a partnership, and their officers and shareholders, filed motions dismiss the amended complaint of plaintiff company for lack of jurisdiction, improper venue, insufficiency of process and service of process, and for a stay of discovery. Plaintiff alleged, among other causes of action, trademark infringement.

**OVERVIEW:** Plaintiff contended that it owned all rights in handbags featuring the shapes of various animals designed by a particular individual, that these designs were inherently distinctive. Plaintiff also alleged that defendants offered for sale and sold "knock-offs" of the animal handbags by catalogue and other means throughout the United States, including the State of New York. The court denied defendants' motions to dismiss plaintiff's complaint. The court held that the conclusions of law set forth by a prior opinion disposing of an earlier motion to dismiss the complaint were the law of the case and disposed of the present motion to dismiss those claims that were the subject of the first motion to dismiss. Further, the earlier opinion held that a federal district court in New York had jurisdiction over individual defendants who, as officers, directors and shareholders, benefitted from and exercised control over a corporation that acted within the state. Further, although a greater proportion of sales of the infringing items occurred elsewhere, the sales in New York were sufficiently substantial to make venue proper in the district.

**OUTCOME:** The court denied defendants' motions.

**LexisNexis(R) Headnotes**

*Civil Procedure > Preclusion & Effect of Judgments > Law of the Case Doctrine*
[HN1] Under the law of the case doctrine, a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation. The law of the case doctrine is discretionary, and does not preclude a court from reconsidering prior rulings. However, absent compelling reasons to depart from a prior ruling, a court should adhere to its earlier decisions. Generally, the "compelling circumstances" justifying departure from a prior decision are limited to intervening changes in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.

*Civil Procedure > Preclusion & Effect of Judgments > Law of the Case Doctrine*
[HN2] The law of the case doctrine is applicable to rulings on jurisdiction and venue.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*

1997 U.S. Dist. LEXIS 3545, *

[HN3] In a federal question case, a federal court looks to the law of the state in which it sits for authority to exercise personal jurisdiction over a defendant.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN4] See N.Y. C.P.L.R. § 302(a).

*Civil Procedure > Venue > General Venue*
[HN5] See 28 U.S.C.S. § 1391(b)(2).

*Civil Procedure > Venue > General Venue*
[HN6] 28 U.S.C.S. § 1391(b)(2) permits venue in more than one district.

*Civil Procedure > Venue > General Venue*
*Copyright Law > Infringement > Jurisdiction & Venue*
[HN7] Venue for a copyright claim is proper pursuant to 28 U.S.C.S. § 1400(a) in any district court that could exercise personal jurisdiction over the defendant.

**COUNSEL:** APPEARANCES:

For Plaintiff: PARKER CHAPIN FLATTAU & KLIMPL, LLP, New York, NY, By: SHARON H. STERN, ESQ., Of Counsel.

For Defendants: ARNOLD, WHITE & DURKEE, Houston, TX, By: TIMOTHY N. TROP, ESQ., MICHAEL S. DOWLER, ESQ., Of Counsel.

**JUDGES:** ROBERT W. SWEET, U.S.D.J.

**OPINIONBY:** ROBERT W. SWEET

**OPINION:**

OPINION

**Sweet, D.J.**

Defendants J. Tiras Classic Handbags, Inc. ("Classic"), Classic Handbags & Imports ("Classic Imports"), and Jerome and Jeanne Tiras (the "Tiras's") have moved to dismiss the amended complaint of Time Products, plc ("Time") for lack of jurisdiction pursuant to *Fed. R. Civ. P. 12(b)(2)*, improper venue pursuant to *Fed. R. Civ. P. 12(b)(3)*, insufficiency of process and service of process pursuant to *Fed. R. Civ. P. 12(b)(4) & (5)*, n1 and for a stay of discovery pursuant to *Fed. R. Civ. P. 26(c)*. For the reasons set forth below, the motions will be denied.

    n1 Defendants move to dismiss for insufficiency of process and service of process

"in order to preserve the issue for appeal purposes." They advance no argument in support of this motion. Accordingly, the motion to dismiss for insufficiency of process and service will be denied.

[*2]

**Parties**

Time is a corporation duly organized and existing under the laws of the United Kingdom, with its principal place of business in London, England. The Judith Leiber Division of Time manufactures, markets, distributes and sells handbags designed by Judith Leiber.

Classic is a corporation organized and existing under the laws of the State of Texas, with a principal place of business in Houston, Texas. Classic formerly conducted business as Classic Imports, a Texas partnership. Both entities sold or sell handbags.

The Tiras's are residents of Texas and are officers and shareholders of Classic and partners of Classic Imports.

**Prior Proceedings**

This action was commenced on November 15, 1993 by the filing of a complaint alleging, among other causes of action, trademark infringement arising out of the sale of handbags by the Defendants alleged to be "knock-offs" of Time's Judith Leiber products. A motion to dismiss the complaint on the grounds urged here was denied by the Honorable Charles S. Haight in a comprehensive opinion dated July 13, 1994. See *Time Products, plc v. J. Tiras Classic Handbags, Inc., No. 93 Civ. 7856, 1994 WL 363930* (S.D.N.Y. July [*3] 13, 1994) ("Time I").

Time then sought to amend its complaint to add causes of action for trade dress infringement under *15 U.S.C. § 1114*, unfair competition under *15 U.S.C. § 1125* and under the New York common law for trade dress infringement of an animal handbag design, and copyright infringement of an additional design (the "Tulips" design). Judge Haight, by opinion dated June 16, 1995, granted the motion in part, permitting the addition of the federal and common law unfair competition claims (hereinafter the "trade dress claims") and the new copyright claim (hereinafter the "copyright claim"), but rejecting the trade dress claim under *15 U.S.C. § 1114*. See *Time Products, plc v. J. Tiras Classic Handbags, Inc., No. 93 Civ. 7856, 1995 WL 363831* (S.D.N.Y. June 19, 1995) ("Time II"). The additional claims in the amended complaint were carefully considered by Judge Haight in his decision. Defendants opposed the amendment on the grounds that the additional causes of action failed to state a claim.

They did not contend at the time that the new claims were jurisdictionally defective or that venue was improper.

On July 21, 1995 the Defendants made the instant motion to [*4] dismiss the amended complaint and briefing on this motion was completed on September 8, 1995. On January 10, 1996, the Defendants moved for a protective order to stay discovery until the motion to dismiss was determined. On January 27, 1997, the action was reassigned from Judge Haight pursuant to Rule 16 of the Rules for the Division of Business Among District Judges in the Southern District of New York.

**Facts**

The facts of this case have been set forth in the prior opinions of Judge Haight, based appropriately upon the allegations of the complaint and the amended complaint. Familiarity with those opinions is assumed and this Court adopts the Court's factual statements here. The factual allegations relating to the claims added in the amended complaint are briefly summarized below.

Time alleges that it owns all rights in handbags featuring the shapes of various animals designed by Judith Leiber (the "animal handbags"), that these designs are inherently distinctive, in that Time has obtained copyrights for them, and that the animal handbags have acquired secondary meaning, in that consumers and the public associate the bags with Time's trade name "Judith Leiber." Time [*5] also alleges that the Defendants offered for sale and sold "knock-offs" of the Leiber animal handbags by catalogue and other means throughout the United States, including the State of New York. Defendants have produced evidence that 2.52% of their sales of the allegedly infringing animal-shaped handbags occurred in New York and 57.56% of such sales took place in Texas. The marketing and sale of the alleged knock-offs of the animal handbags form the basis of Time's federal and New York common law unfair competition claims.

Time also alleges that Defendants have marketed and sold rhinestone bags bearing a flower design that is imitative and virtually indistinguishable from rhinestone handbags sold by Time bearing a copyrighted "Tulips" design created by Judith Leiber. Time alleges that Defendants' "knock off" handbags were marketed and sold throughout the United States, including this district.

**Discussion**

**I. Prior Opinions In This Action Require Denial of Motion to Dismiss Prior Claims**

[HN1] Under the law of the case doctrine, "a decision on an issue of law made at one stage of a case

becomes binding precedent to be followed in subsequent stages of the same [*6] litigation." *Scottish Air Int'l, Inc. v. British Caledonian Group, plc, 152 F.R.D. 18, 24 (S.D.N.Y. 1993)*, citing *DiLaura v. Power Auth. of N.Y., 982 F.2d 73, 76 (2d Cir. 1992)*. The law of the case doctrine is discretionary, and does not preclude a court from reconsidering prior rulings. Id. However, absent compelling reasons to depart from a prior ruling, a court should adhere to its earlier decisions. See *U.S. v. Stanley, 54 F.3d 103, 108 (2d Cir. 1995)*. Generally, the "compelling circumstances" justifying departure from a prior decision are limited to intervening changes in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice. See *DiLaura, 982 F.2d at 76.* [HN2] The law of the case doctrine is applicable to rulings on jurisdiction and venue, such as those challenged here. See *Marquis Who's Who, Inc. v. North American Advertising Assoc., Inc., 426 F. Supp. 139, 142 (D.D.C. 1976)*, aff'd, *187 U.S. App. D.C. 426, 574 F.2d 637 (1978)*.

The conclusions of law set forth in Judge Haight's prior opinion disposing of the earlier motion to dismiss the complaint are the law of the case and dispose of the present motion to dismiss [*7] those claims that were the subject of the first motion to dismiss. Defendants have pointed to no intervening changes in law or new evidence warranting departure from the earlier opinion. In fact, their arguments and authorities are the same as those put forth in the prior motion and rejected by the Court. Judge Haight's opinion is not clearly erroneous and trial of this matter in this district is not manifestly unjust.

As for these claims, the law of the case doctrine applies, and this Court will adhere to the prior ruling that this Court has jurisdiction over the Defendants and that venue is proper in this district.

**II. The Motion to Dismiss as to the New Trade Dress and Copyright Claims Will Be Denied**

**A. This Court Has Jurisdiction over the Non-Corporate Defendants**

The non-corporate defendants contend that New York's long arm statute does not confer personal jurisdiction over them.

[HN3] In a federal question case, a federal court looks to the law of the state in which it sits for authority to exercise personal jurisdiction over a defendant. New York's long arm statute, *N.Y. CPLR § 302* provides, in part:

> [HN4] (a) [A] court may exercise
> personal jurisdiction [*8] over any non-

1997 U.S. Dist. LEXIS 3545, *

domiciliary ... who in person or through an agent ...

>> (2) commits a tortious act within the state ... or

>> (3) commits a tortious act without the state causing injury to person or property within the state ... if he

>>> (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

>>> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate ... commerce.

*N.Y. CPLR § 302(a).*

Judge Haight previously held that *N.Y. CPLR § 302(a)* conferred personal jurisdiction over the non-corporate defendants, because as officers, shareholders and directors of the corporate defendants, they would derive substantial benefits from the alleged transactions conducted by the corporate defendant in New York. *Time I, 1994 WL 363930* at *6-7. In reaching this decision, Judge Haight analyzed relevant Second Circuit case law, including *Retail Software Services, Inc. v. Lashlee, 854 F.2d 18 (2d Cir. 1988)*. In Retail Software, the Second Circuit held that a [*9] federal district court in New York had jurisdiction pursuant to Section 302(a) over individual defendants who, as officers, directors and shareholders, benefitted from and exercised control over a corporation that acted within the state. *Id. at 22.* Judge Haight also considered *Kinetic Instruments, Inc. v. Lares, 802 F. Supp. 976 (S.D.N.Y. 1992),* the case upon which Defendants primarily rely here, and concluded that Time had made a prima facie showing of jurisdiction over the non-corporate defendants, who directed and benefitted from Classic's activities in New York.

Defendants have done no more than revive previously rejected arguments in support of their motion

to dismiss the new trade dress and copyright claims on jurisdictional grounds. As set forth above, Judge Haight's ruling on these arguments is the law of the case. Accordingly, their motion to dismiss the new claims for lack of personal jurisdiction over the non-corporate defendants is denied.

**B. Venue Is Proper**

**1. Trade Dress Claims**

With respect to the new trade dress claims (as well as the copyright claim), Time contends that venue is proper in the Southern District of New York pursuant [*10] to *28 U.S.C. § 1391*(b)(2). Section 1391(b)(2) provides in relevant part that a [HN5] "civil action . . . may . . . be brought in a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of the property that is the subject of the action is situated . . . ."

The Defendants' primary argument against venue with respect to the trade dress claims is that because only 2.52% of their nation-wide sales of animal-shaped handbags occurred in New York, whereas 57.56% of such sales occurred in Texas, a "substantial part" of the events did not occur in New York.

The Defendants cite to *Leroy v. Great Western United Corp., 443 U.S. 173, 61 L. Ed. 2d 464, 99 S. Ct. 2710 (1979),* and a number of lower court cases applying the pre-1990 version of the federal venue provisions. Under those cases, venue was generally appropriate only in the single district "in which the claim arose." However, courts have construed the amended statute to [HN6] permit venue in more than one district. See *Pilates, Inc. v. Pilates Institute, Inc., 891 F. Supp. 175, 182 (S.D.N.Y. 1995).* For example, venue in trademark infringement claims, which are analogous [*11] to the trade dress claims here, may be proper in each jurisdiction where the infringement is properly alleged to have occurred. See *Cottman Transmission Systems, Inc. v. Martino, 36 F.3d 291, 294-95 (3d Cir. 1994).*

Here, although a greater proportion of sales of the infringing items occurred elsewhere, the sales in New York are sufficiently substantial to make venue proper in this district. See *Halsoprodukter Labs Karnerud AB v. Gero Vita Int'l, No. 93 C 2129, 1993 WL 384525,* at *4 (N.D. Ill. Sept. 28, 1993)* (venue proper in district where less than 3% of sales of infringing product occurred, as opposed to 27% in another district).

**2. Copyright Claim**

The parties agree that [HN7] venue for the copyright claim is proper pursuant to *28 U.S.C. § 1400*(a) in any district court that could exercise personal jurisdiction over the defendant. The Defendants do not

dispute personal jurisdiction over Classic. As set forth above, this court also has personal jurisdiction over the non-corporate defendants. Accordingly, venue is proper with respect to the new copyright claim.

**II. Discovery Will Proceed**

The motion to dismiss the amended complaint having been denied, [*12] the motion to stay discovery is moot. The parties will confer on an appropriate schedule to complete discovery within 90 days of the date of this opinion. The pretrial order will be filed within two weeks thereafter. If further extensions are required for good cause, an informal application may be made by letter motion.

**Conclusion**

For the reasons set forth above, Defendants' motions are hereby denied.

It is so ordered.

**New York, N. Y.**
**March 26, 1997**

**ROBERT W. SWEET**

**U.S.D.J.**

LEXSEE 2003 U.S. DIST. LEXIS 2670

**TYCO INTERNATIONAL LIMITED, Plaintiff, -v- FRANK E. WALSH, JR., Defendant.**

**02 CIV. 4633 (DLC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2003 U.S. Dist. LEXIS 2670*

**February 27, 2003, Decided
February 28, 2003, Filed**

**DISPOSITION:** Defendant's motion to dismiss based on improper venue and lack of personal jurisdiction and motion for transfer denied. Plaintiff's cross-motion for leave to amend its complaint denied as moot.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff company sued defendant, a member of its board of directors, for restitution, breach of fiduciary duty, conversion, unjust enrichment, constructive trust, and inducing breach of fiduciary duty. The board member moved to dismiss the action on the grounds of a lack of personal jurisdiction and improper venue, or, in the alternative, for a transfer. The company cross-moved for leave to amend its complaint to establish jurisdiction.

**OVERVIEW:** The complaint arose out of the company payment of $ 20 million to the board member and his refusal to return $ 10 million of the money. Arguing for dismissal of the complaint or for a transfer, the board member asserted that the court lacked personal jurisdiction. The company argued that the motion to dismiss was procedurally improper because it was filed after the answer. In response, the board member argued for the court to construe his untimely *Fed. R. Civ. P. 12(b)* motion as a one under *Fed. R. Civ. P. 12(c)*, but such a conversion could occur only if the untimely motion asserted a non-waivable defense. A defense of lack of personal jurisdiction or improper venue was waivable. The board member also relied on a case in which the court exercised its discretion to convert an untimely *Fed. R. Civ. P. 12(b)* motion to a request for a

*Fed. R. Civ. P. 12(d)* hearing. But the board member had not requested that his motion be converted to a Rule 12(d) motion. Finally, with respect to his motion to transfer, the board member made no supporting arguments and thus did not show that he would be seriously inconvenienced or that it would be unfair for him to litigate the case in New York.

**OUTCOME:** The board member's motions to dismiss based on improper venue and lack of personal jurisdiction and his motion for transfer were denied. The company's cross-motion for leave to amend its complaint was denied as moot.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*
[HN1] There are generally three means by which a party may challenge venue or personal jurisdiction: (1) a timely motion under *Fed. R. Civ. P. 12(b)*; (2) a motion under *Fed. R. Civ. P. 56*; or (3) a request for an adjudication of disputed jurisdictional facts, either at a hearing pursuant to *Fed. R. Civ. P. 12(d)* or in the course of a trial on the merits.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*
[HN2] The Federal Rules of Civil Procedure require that a motion based upon any of the defenses under *Fed. R. Civ. P. 12(b)*, including motions under *Fed. R. Civ. P. 12(b)(2)* for lack of personal jurisdiction and under *Fed. R. Civ. P. 12(b)(3)* for improper venue, shall be made

before pleading if a further pleading is permitted. *Fed. R. Civ. P. Rule 12(b)*. A motion based on *Fed. R. Civ. P. 12(b)(2)* or *Fed. R. Civ. P. 12(b)(3)* is therefore untimely when it is served after the answer. *Fed. R. Civ. P. 12(b)*.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*
[HN3] Untimely *Fed. R. Civ. P. 12(b)* motions may only be converted to *Fed. R. Civ. P. 12(c)* motions if they assert non-waivable defenses.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Waiver & Preservation*
*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*
[HN4] A defense of lack of jurisdiction over the person or improper venue is a waivable defense. *Fed. R. Civ. P. 12(h)*.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN5] Federal trial courts have broad discretion to grant discovery to resolve issues of personal jurisdiction.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN6] New York courts are encouraged to permit discovery to resolve the issue of personal jurisdiction over a nondomiciliary defendant under New York law.

*Civil Procedure > Venue > Change of Venue in Federal Courts*
[HN7] *28 U.S.C.S. § 1404*(a) allows for a transfer of venue for the convenience of parties and witnesses, in the interest of justice. *28 U.S.C.S. § 1404*(a). Such motions are in the court's discretion to grant or deny and are determined upon notions of convenience and fairness on a case-by-case basis. A plaintiff's choice of forum is entitled to great weight and should not be disturbed except when the balance of public and private interest factors clearly weighs in favor of trial in an alternative forum.

**COUNSEL:** [*1]  For Plaintiff: Paul R. Verkuil, Nicholas A. Gravante, Jr., Harlan A. Levy, Ann M. Galvani, Andrew W. Hayes, Marilyn Kunstler, Boies, Schiller & Flexner, LLP, New York, NY.

For Defendant: Laurence Greenwald, Michele Pahmer, Stroock & Stroock & Lavan LLP, New York, NY.

**JUDGES:** Denise Cote, United States District Judge

**OPINIONBY:** Denise Cote

**OPINION:**

OPINION AND ORDER

DENISE COTE, District Judge :

Defendant Frank E. Walsh, Jr. ("Walsh") has moved to dismiss this action on the grounds of a lack of personal jurisdiction and improper venue, or, in the alternative, for a transfer of this case to the District of New Jersey. The plaintiff Tyco International Limited ("Tyco") asserts personal jurisdiction in this diversity action pursuant to New York's long arm statute. The plaintiff, in the alternative, has requested leave to take jurisdictional discovery and has filed a cross-motion for leave to amend its complaint to establish jurisdiction. For the following reasons, the defendant's motions are denied.

Background

The complaint arises out of Tyco's payment of $ 20 million to Walsh on or about July 31, 2001, in connection with Tyco's acquisition [*2] of CIT Group, Inc. ("CIT") on or about June 1, 2001. Walsh was allegedly paid this amount for introducing Tyco's Chairman and CEO, L. Dennis Kozlowski, to CIT's Chairman and CEO and otherwise promoting the acquisition. Walsh was a member of the Board of Directors of Tyco at the time, having been a board member since 1997, and having been a board member of its predecessor since 1992. The complaint alleges that Walsh knew that the payment of the $ 20 million, half of which went to a New Jersey charity designated by Walsh, had to be disclosed to and approved by the Board, but that he and Kozlowski agreed that the Board would not be informed. Outside directors learned of the payment in January 2002. At the Board meeting on January 16, 2002, in Florida, the Board asked Walsh to return $ 10 million and he refused. The complaint contains causes of action for restitution, breach of fiduciary duty, conversion, unjust enrichment, constructive trust, and inducing breach of fiduciary duty.

The answer was filed on August 16, 2002, and plead as affirmative defenses a lack of personal jurisdiction and improper venue. On August 27, Walsh filed the instant motion to dismiss.

In support of his motion [*3]  to dismiss Walsh asserts that he is a resident of New Jersey and has no residence in New York. His business office is in New Jersey and his involvement with the CIT acquisition took place outside of New York. The last Tyco meeting that he attended in New York was on October 13, 1999. The CIT transaction was approved by Tyco at a Board meeting in Bermuda, its place of incorporation since 1997.

2003 U.S. Dist. LEXIS 2670, *

To support the assertion of personal jurisdiction and venue in this district, Tyco points to Walsh's regular attendance at Tyco board meetings in New York through 1997, and attendance at a board committee meeting in New York in 1999. It asserts that Walsh negotiated payment of the $ 20 million fee in telephone calls with Kozlowski and Tyco's Chief Financial Officer while the latter two men were in New York. The invoice that Walsh prepared for payment of the fee was addressed to Tyco's Treasurer in New York, although sent by Walsh to Florida for transmittal to New York. While in New York, the Treasurer approved the payment. Tyco also relies on the fact that the CIT acquisition was negotiated and closed in New York.

Discussion

A. Timeliness

Tyco argues that the defendant's motion to [*4] dismiss is procedurally improper since the motion was filed eleven days after the defendant had answered. [HN1] There are generally three means by which a party may challenge venue or personal jurisdiction: 1) a timely motion under Rule 12(b), *Fed. R. Civ. P.*, 2) a motion under *Rule 56, Fed. R. Civ. P.*, or 3) a request for an adjudication of disputed jurisdictional facts, either at a hearing pursuant to *Rule 12(d), Fed. R. Civ. P.*, or in the course of a trial on the merits. See *Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990)*(personal jurisdiction).

[HN2] The Federal Rules of Civil Procedure require that a motion based upon any of the defenses under Rule 12(b), including motions under Rule 12(b)(2) for lack of personal jurisdiction and under Rule 12(b)(3) for improper venue, "shall be made before pleading if a further pleading is permitted." *Rule 12(b), Fed. R. Civ. P.* A motion based on Rule 12(b)(2) or Rule 12(b)(3) is therefore untimely when it is served after the answer. *Rule 12(b), Fed. R. Civ. P.*; see *Beacon Enterprises, Inc. v Menzies, 715 F.2d 757, 768 (2d Cir. 1983)*(personal jurisdiction).

The defendant's argument that untimely [*5] motions under Rule 12(b) can be construed as motions under Rule 12(c) is misplaced. [HN3] Untimely Rule 12(b) motions may only be converted to Rule 12(c) motions if they assert non-waivable defenses. *Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123, 126 (2d Cir. 2001).* [HN4] A defense of lack of jurisdiction over the person or improper venue is a waivable defense. See *Rule 12(h), Fed. R. Civ. P.*

The defendant's reliance on the decision in Saldanha is unpersuasive. See *Saldanha v. Baidroy, 1992 U.S. Dist. LEXIS 8391, No. 91-6413 (PKL), 1992 WL 147669* (S.D.N.Y. June 15, 1992). In Saldanha, the defendants,

realizing that they could not move under Rule 12(b)(2) since they had already filed their answer, moved pursuant to Rule 12(c) for judgment on the pleadings for lack of personal jurisdiction. Id. at *2. The district court, in an exercise of discretion, essentially converted the motion to a request for a hearing pursuant to Rule 12(d). Id.

The defendant has not requested that his motion be converted to a Rule 12(d) motion. Even if he had, that request would be premature given the plaintiff's request for discovery. [HN5] Federal trial courts have broad discretion [*6] to grant discovery to resolve issues of personal jurisdiction. *Koehler v. Bank of Bermuda, 101 F.3d 863, 867 (2d Cir. 1996); Lehigh Valley Indus., Inc. v. Birenbaum, 527 F.2d 87, 93 (2d Cir. 1975).* [HN6] New York courts are encouraged to permit discovery to resolve the issue of personal jurisdiction over a nondomiciliary defendant under New York law. *Peterson v. Spartan Indus., Inc., 33 N.Y.2d 463, 467, 354 N.Y.S.2d 905, 310 N.E.2d 513 (1974).* To guide the parties should they seek to pursue these issues during the discovery period, a brief discussion of the governing standard for personal jurisdiction and venue follows.

B. Personal Jurisdiction

Tyco relies on two provisions in New York's long arm statute to obtain personal jurisdiction over Walsh. Tyco asserts general jurisdiction over Walsh under *N.Y. C.P.L.R. § 301* (2001) ("Section 301") based on his attendance at Tyco board meetings in New York. It also asserts specific jurisdiction under *N.Y. C.P.L.R. § 302(a)(1)* (2001) ("Section 302(a)(1)") based on Walsh's actions directed at New York in connection with the fee.

In a diversity case, the issue of personal jurisdiction must [*7] be determined according to the law of the forum state. See *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp., 98 F.3d 25, 29 (2d Cir. 1996).* "If the exercise of jurisdiction is appropriate under [the state's statutes], the court then must decide whether such exercise comports with the requisites of due process." *Bensusan Rest. Corp. v. King, 126 F.3d 25, 27 (2d Cir. 1997).*

1. General Jurisdiction

New York law is not settled on whether a natural person may be subject to general jurisdiction under Section 301 based upon "doing business". *First Capital Asset Mgmt. v. Brickellbush, Inc., 218 F. Supp. 2d 369, 392 n.115 (S.D.N.Y. 2002);* see also *Laufer v. Ostrow, 55 N.Y.2d 305, 313, 449 N.Y.S.2d 456, 434 N.E.2d 692 (1982).* Even assuming that general jurisdiction does apply to natural persons, the plaintiff must still establish that the defendant conducted business in New York as an

2003 U.S. Dist. LEXIS 2670, *

individual and not simply as a corporate officer. *Laufer, 55 N.Y.2d at 313.*

2. Transacting Business in New York

Section 302(a)(1) allows the exercise of personal jurisdiction over an out-of-state defendant [*8] if the defendant "transacts any business within the state" and the cause of action "arises from" that business activity. n1 *CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986).* In order to meet the transacting business element under Section 302(a)(1), a plaintiff must show that the defendant "purposefully availed himself of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 787 (2d Cir. 1999)* (citation omitted). A defendant "need not be physically present" in the state in order for there to be jurisdiction over him. *Id. at 788* (citation omitted). To find jurisdiction, however, "there must be some transaction attributable to the one sought to be held which occurs in New York." *Id. at 787* (citation omitted) (emphasis in original). A single purposeful act in New York can be sufficient to support jurisdiction. See *Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc., 15 N.Y.2d 443, 456, 261 N.Y.S.2d 8, 209 N.E.2d 68 (1965).* On the other hand, [*9] "no single event or contact connecting defendant to the forum state need be demonstrated; rather, the totality of all defendant's contacts with the forum state must indicate that the exercise of jurisdiction would be proper." *CutCo, 806 F.2d at 365;* see *George Reiner & Co. v. Schwartz, 41 N.Y.2d 648, 650, 394 N.Y.S.2d 844, 363 N.E.2d 551 (1977).* The requisite "minimum contacts" must provide a fair warning to the defendant of the possibility of being subject to the jurisdiction of New York courts. See *Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 527 N.Y.S.2d 195, 198, 522 N.E.2d 40 (1988)* (citing *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985)).*

n1 Section 302(a) states:

As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent:

1. transacts any business within the state or contracts anywhere to supply goods or services in the state.

CPLR § 302(a).

[*10]

Tyco asserts that Walsh engaged in a pattern of activity which demonstrates that he transacted business within New York. Tyco's contention is based primarily upon the fact that the defendant negotiated and consummated his fee agreement in telephone calls with Tyco personnel working in New York and that he directed his invoice for payment to New York.

Generally, telephone contacts between a nondomiciliary defendant and a New York party are insufficient by themselves to confer jurisdiction under Section 302(a)(1). *Fiedler v. First City Nat'l Bank, 807 F.2d 315, 317-18 (2d Cir. 1986).* A nondomiciliary defendant will be subject to jurisdiction under Section 302(a)(1), however, if the defendant uses these telephone communications to deliberately "project" himself into business transactions occurring within the State. See *Parke-Bernet Galleries, Inc. v. Franklyn, 26 N.Y.2d 13, 18, 308 N.Y.S.2d 337, 256 N.E.2d 506 (1970)*(defendant projected himself into art auction in State by participating in bidding by telephone). In order for these telephone contacts to sustain jurisdiction, the defendant must do more than place an order or engage in business negotiations [*11] regarding a contract whose center of gravity is outside of the state. *Fiedler, 807 F.2d at 317-18.* Rather, he must use the "telephonic link" as a means of projecting himself into the "local commerce" of the state. *807 F.2d at 317.*

C. Venue

The defendant asserts that this District is not the proper venue for this case since most of the alleged events at issue occurred in New Jersey. The plaintiff bears the burden of establishing proper venue once venue has been challenged by the defendant. *Fisher v. Hopkins, 2003 U.S. Dist. LEXIS 307, No. 02-7077(CSH), 2003 WL 102845, at *2 (S.D.N.Y. Jan. 9, 2003); TBV Holdings Ltd. v. Schey, 2002 U.S. Dist. LEXIS 13682, No. 02-1122 (BSJ), 2002 WL 1733649, at *1 (S.D.N.Y. July 26, 2002).*

In order for venue to be proper, "a substantial part of the events or omissions giving rise to the claim" must have occurred in the judicial district where venue is sought. *28 U.S.C. § 1391(a)(2); Hopkins, 2003 U.S. Dist. LEXIS 307, 2003 WL 102845, at *2.* The "substantial part" standard can be "be satisfied by a communication transmitted to or from the district in which the cause of action was filed, given a sufficient relationship between [*12] the communication and the cause of action." *TBV Holdings, 2002 U.S. Dist. LEXIS 13682, 2002 WL 1733649, at *1* (citation omitted).

D. Transfer

[HN7] Section 1404(a) of Title 28, United States Code, allows for a transfer of venue "for the convenience of parties and witnesses, in the interest of justice." *28 U.S.C. § 1404(a) (2002)*. Such motions are in the court's discretion to grant or deny and are "'determined upon notions of convenience and fairness on a case-by-case basis.'" *Hall v. South Orange, 89 F. Supp. 2d 488, 493 (S.D.N.Y. 2000)* (quoting *In re Cuyahoga Equip. Corp., 980 F.2d 110, 117 (2d Cir. 1992))*. Plaintiff's choice of forum is entitled to great weight and should not be disturbed except when the balance of public and private interest factors clearly weighs in favor of trial in an alternative forum. *Piper Aircraft v. Reyno, 454 U.S. 235, 255-57, 70 L. Ed. 2d 419, 102 S. Ct. 252 (1981)*.

Defendant has not shown that he would be seriously inconvenienced or that it would be unfair for him to litigate this case in New York. Indeed, the defendant has not presented any argument to support his motion for transfer. Based [*13] on this and the facts in the record, the defendant's motion for transfer is denied.

Conclusion

The defendant's motions to dismiss based on improper venue and lack of personal jurisdiction and his motion for transfer are denied. The plaintiff's cross-motion for leave to amend its complaint is denied as moot.

Dated: New York, New York

February 27, 2003$

Denise Cote United States District Judge

LEXSEE 2004 US DIST LEXIS 13674

**WAFIOS MACHINERY CORPORATION; and WAFIOS AG, Plaintiffs, - against - NUCOIL INDUSTRIES CO., LTD.; NUCOIL INDUSTRIES, INC.; and OTHER UN-NAMED PARTIES, Defendants.**

**03 Civ. 9865 (RWS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2004 U.S. Dist. LEXIS 13674*

**July 21, 2004, Decided**
**July 23, 2004; Filed**

**DISPOSITION:** Defendant Nucoil USA's motion to dismiss denied with leave to renew following limited jurisdictional discovery. Defendant Nucoil Taiwan's motion to dismiss complaint against it granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In a patent infringement action, one defendant, a domestic corporation, moved to dismiss the complaint pursuant to *Fed. R. Civ. P. 12(b)(2)* and (3) for lack of personal jurisdiction and improper venue. The other defendant, a foreign corporation, separately moved to dismiss the claims against it pursuant to Rule 12(b)(2), (3), and (5), asserting, in addition to lack of personal jurisdiction and improper venue, improper service of process.

**OVERVIEW:** One defendant asserted counterclaims in its responsive pleading, and plaintiffs alleged that the counterclaims were permissive and, as a consequence, defendant waived its defenses. The court disagreed. The filing of a counterclaim, whether permissive or compulsory, did not operate as a waiver of an objection either to personal jurisdiction or to venue. Plaintiffs argued that jurisdiction was proper under *N.Y. C.P.L.R. § 302(a)(2)(ii)* (2001) because through its offer of an infringing product for sale, in violation of *35 U.S.C.S. § 271*(a), to New York consumers through the internet, defendants committed a tortious act outside of New York that they should have expected to have consequences within the state. The court found that the information on the website was insufficient to create an offer to sell

according to traditional contract law principles. Because long-arm jurisdiction could not be shown on the basis of the website, a federal due process analysis was unnecessary. However, plaintiffs demonstrated that they were entitled to limited jurisdictional discovery as to one defendant, but not as to the other.

**OUTCOME:** The court granted one defendant's motion to dismiss because plaintiff failed to meet its burden of showing that personal jurisdiction could be exercised over defendant or that jurisdictional discovery could establish facts necessary to establish jurisdiction. The court denied the other defendant's motion to dismiss because it could not be resolved until after jurisdictional discovery was conducted.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Waiver & Preservation*
*Civil Procedure > Joinder of Claims & Parties > Joinder of Claims & Remedies*
[HN1] Although the United States Court of Appeals for the Second Circuit has not ruled on the question of whether the assertion of a counterclaim, whether permissive or compulsory, waives the defense of personal jurisdiction, and has observed that federal law on this issue appears to be in disarray, a finding of waiver would exalt form over substance in a way that the adoption of the Federal Rules of Civil Procedure rendered obsolete.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Waiver & Preservation*
*Civil Procedure > Joinder of Claims & Parties > Joinder of Claims & Remedies*
[HN2] The rationale for finding that a permissive counterclaim waives the defenses of lack of personal jurisdiction is that the defendant has affirmatively sought the aid of the court. However, when both jurisdictional defenses and counterclaims are included in a single responsive pleading, it is appropriate to treat the counterclaim as conditional: its assertion being hypothecated upon an adverse ruling on a defendant's jurisdictional defenses.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Waiver & Preservation*
*Civil Procedure > Joinder of Claims & Parties > Joinder of Claims & Remedies*
[HN3] *Fed. R. Civ. P. 12(b)* provides a defendant with the option of raising jurisdictional defenses by motion or by answer. To take the position that a defendant, by raising his jurisdictional defenses in the same pleading in which he asserted a counterclaim, waived his jurisdictional defenses, a court would in effect be engrafting a judicial exception to Rule 12(b) and requiring a defendant to raise his jurisdictional defenses by motion when he intends to file a counterclaim in his responsive pleading. This requirement would be contrary to the option provided to the defendant in Rule 12(b). Furthermore, the policy behind Rule 12(b) militates against finding a waiver where a defendant files a counterclaim in the same pleading in which he asserts jurisdictional defenses. The purpose behind Rule 12(b) is to avoid the delay occasioned by successive motions and pleadings and to reverse the prior practice of asserting jurisdictional defenses by special appearance.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Waiver & Preservation*
*Civil Procedure > Joinder of Claims & Parties > Joinder of Claims & Remedies*
[HN4] Filing of a counterclaim, whether permissive or compulsory, does not operate as a waiver of an objection either to personal jurisdiction or to venue, whether the objection is raised by motion or answer, provided that the objection is not otherwise waived in the course of the litigation.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*
[HN5] Plaintiffs bear the burden of establishing that the court has jurisdiction over a defendant when served with a *Fed. R. Civ. P. 12(b)(2)* motion to dismiss. When an evidentiary hearing has not been held, the plaintiffs need only make a prima facie showing of jurisdiction through the complaint's allegations and affidavits in order to defeat a motion to dismiss.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*
[HN6] On a motion to dismiss for lack of personal jurisdiction, the facts must be construed in the light most favorable to the plaintiff. In assessing whether personal jurisdiction is authorized, the court must look first to the long-arm statute of the forum state. If the exercise of jurisdiction is appropriate under that statute, the court must decide whether such exercise comports with the requisites of due process. In patent infringement cases, when analyzing personal jurisdiction for the purposes of compliance with federal due process, Federal Circuit law, rather than regional circuit law, applies.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN7] New York's long-arm statute allows for personal jurisdiction over a non-domiciliary when that person or his or her agent: (2) commits a tortious act within the state; or (3) commits a tortious act without the state causing injury to person or property within the state, if he or she (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce. *N.Y. C.P.L.R. § 302(a)(2)-(3)* (2001).

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN8] *N.Y. C.P.L.R. § 302(a)(2)* (2001) reaches only tortious acts performed by a defendant who was physically present in New York when he performed the wrongful act.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Personal Jurisdiction*
[HN9] The existence of a website outside New York, even one that offers a product for sale, cannot alone confer jurisdiction over the defendant under *N.Y. C.P.L.R. § 302(a)(2)*.

*Contracts Law > Contract Interpretation > Interpretation Generally*
*Patent Law > Infringement > Acts of Infringement*

[HN10] The question whether an invention is the subject of a commercial offer for sale is a matter of Federal Circuit law, to be analyzed under the law of contracts as generally understood.

*Contracts Law > Formation > Offer*
*Contracts Law > Formation > Acceptance*
[HN11] An offer creates the power of acceptance in the offeree.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*
*Civil Procedure > Disclosure & Discovery*
[HN12] Pre-motion discovery should be permitted where the facts necessary to establish personal jurisdiction and propriety of venue lie exclusively within the defendant's knowledge.

**COUNSEL:** [*1] REED SMITH LLP, for Plaintiffs, New York, NY, By: GERALD H. KIEL, ESQ., PAUL P. ROONEY, ESQ. Of Counsel.

LU & ASSOCIATES, for Defendants, Havertown, PA, By: KAO H. LU, ESQ., Of Counsel.

DONNA C. CHIN, ESQ., for Defendant NUCOIL Industries, Inc., Short Hills, NJ.

**JUDGES:** ROBERT W. SWEET, U.S.D.J.

**OPINIONBY:** ROBERT W. SWEET

**OPINION: Sweet, D.J.**

Defendant Nucoil Industries, Inc. ("Nucoil USA") has moved to dismiss the complaint filed against it by plaintiffs Wafios Machinery Corporation and Wafios AG (collectively, "Wafios") pursuant to *Fed. R. Civ. P. 12(b)(2) and (3)*. Defendant Nucoil Industries Co. Ltd. ("Nucoil Taiwan") has moved separately to dismiss the claims against it pursuant to *Rule 12(b)(2), (3) and (5)*. For the reasons stated below, both motions are denied with leave to renew following limited jurisdictional discovery.

**Prior Proceedings**

Wafios filed the complaint in this action on December 11, 2003, alleging patent infringement by both Nucoil USA and Nucoil Taiwan. An answer was filed by Nucoil USA on March 31, 2004, and an amended answer including counterclaims was filed on April 5, 2004. Nucoil USA's motion was [*2] filed on April 1, 2004. Following the exchange of briefs, oral argument was heard on the motion on April 21, 2004, at which time the motion was deemed fully submitted.

Nucoil Taiwan's motion was filed on April 22, 2004. Following the exchange of briefs, oral argument was heard on the motion on May 19, 2004, at which time the motion was deemed fully submitted.

**Discussion**

Both Nucoil USA and Nucoil Taiwan argue that personal jurisdiction is lacking and that venue is improper, and the complaint should accordingly be dismissed. Nucoil Taiwan also argues that service of process on it in Taiwan was improper.

**Nucoil USA Has Not Waived Its Jurisdictional Defenses**

Wafios argues that Nucoil USA's counterclaims for defamation, tortious interference with prospective economic advantage and violation of the Connecticut Unfair Trade Practices Act, *Conn. Gen. Stat. § 42-110b* ("CUTPA") are permissive, and therefore that Nucoil USA has waived the defenses of lack of personal jurisdiction and improper venue. n1

n1 Because Nucoil Taiwan has not yet answered the complaint, the following discussion pertains only to Nucoil USA.

[*3]

Although Nucoil USA has not contested the issue, the premise of Wafios's argument is incorrect. [HN1] Although the Second Circuit has not ruled on the question of whether the assertion of a counterclaim, whether permissive or compulsory, waives the defense of personal jurisdiction, and has observed that "federal law on this issue appears to be in disarray," *Cargill, Inc. v. Sabine Trading & Shipping Co., 756 F.2d 224, 229 (2d Cir. 1985)*; see also *PDK Labs, Inc. v. Friedlander, 103 F.3d 1105, 1111 n.4 (2d Cir. 1997)*; *Matter of Arbitration between InterCarbon Bermuda, Ltd. and Caltex Trading and Transport Corp., 146 F.R.D. 64, 69-70 (S.D.N.Y. 1993)* (collecting caselaw demonstrating opposing views on the issue), a finding of waiver would "exalt form over substance in a way that the adoption of the Federal Rules of Civil Procedure rendered obsolete." *Local Union No. 38, Sheet Metal Workers' Int'l Ass'n, AFL-CIO v. A & M Heating, Air Conditioning, Ventilation & Sheet Metal, Inc., 314 F. Supp. 2d 332, 352 (S.D.N.Y. 2004)*.

[HN2] The rationale for finding that a permissive counterclaim waives the defenses of lack of personal jurisdiction [*4] is that the defendant has affirmatively sought the aid of the court. See *Beaunit Mills, Inc. v. Industrias Reunidas F. Matarazzo, 23 F.R.D. 654, 656-*

2004 U.S. Dist. LEXIS 13674, *

57 (S.D.N.Y. 1959). However, when both jurisdictional defenses and counterclaims are included in a single responsive pleading, it is appropriate to treat the counterclaim "as conditional: its assertion being hypothecated upon an adverse ruling on Defendant's jurisdictional defenses." *Queen Noor, Inc. v. McGinn, 578 F. Supp. 218, 220 (S.D. Tex. 1984)* (citing *Lomanco, Inc. v. Missouri Pacific Railroad Company, 566 F. Supp. 846 (E.D. Ark. 1983)* and *In Re Arthur Treacher's Franchisee Litigation, 92 F.R.D. 398 (E.D. Pa. 1981)).* Such an approach best serves both the language of *Rule 12(b)* and the policy behind it, as articulated by the Third Circuit over thirty years ago:

> *Rule 12(b)* [HN3] provides a defendant with the option of raising jurisdictional defenses by motion or by answer.
>
> If we were to take the position that a defendant, by raising his jurisdictional defenses in the same pleading in which he asserted a counterclaim, waived his jurisdictional defenses, we [*5] would in effect be engrafting a judicial exception to *Rule 12(b)*. We would be requiring a defendant to raise his jurisdictional defenses by motion when he intends to file a counterclaim in his responsive pleading. This requirement would be contrary to the option provided to the defendant in *Rule 12(b)*.
>
> Furthermore, the policy behind *Rule 12(b)* militates against our finding a waiver where a defendant files a counterclaim in the same pleading in which he asserts jurisdictional defenses. The purpose behind *Rule 12(b)* is to avoid the delay occasioned by successive motions and pleadings and to reverse the prior practice of asserting jurisdictional defenses by 'special appearance.'

*Neifeld v. Steinberg, 438 F.2d 423, 428-29 (3d Cir. 1971)* (citing 5 C. Wright and A. Miller, Federal Practice and Procedure: Civil § 1362, at 647-48 (1969)). Since the Neifeld decision, at least three other Circuits have also held that the [HN4] filing of a counterclaim, whether permissive or compulsory, does not operate as a waiver of an objection either to personal jurisdiction or to venue, "whether the objection is raised by motion or answer, provided that the objection is not [*6] otherwise waived in the course of the litigation." *Bayou Steel Corp. v. M/V Amstelvoorn, 809 F.2d 1147, 1149 (5th Cir.*

1987); see also *Chase v. Pan-Pacific Broadcasting, Inc., 242 U.S. App. D.C. 283, 750 F.2d 131, 132 (D.C. Cir. 1984)* (Ginsburg, J.); *Gates Learjet Corp. v. Jensen, 743 F.2d 1325, 1330 n. 1 (9th Cir. 1984)*; and generally Wright & Miller, supra, § 1397 (1990) (stating view that the "trend in more recent cases is to hold that no *Rule 12(b)* defense is waived by the assertion of a counterclaim, whether permissive or compulsory"). Accordingly, Nucoil USA has not waived its right to assert its jurisdictional defenses, and it is not necessary to decide whether its counterclaims are permissive or compulsory.

**Personal Jurisdiction Over Nucoil USA**

Nucoil USA argues that Wafios' complaint should be dismissed for lack of personal jurisdiction pursuant to *Rule 12(b)(2)*, arguing that Wafios has not shown that Nucoil USA has sufficient contacts to the forum to subject it to jurisdiction. Wafios conversely argues that specific jurisdiction may be exercised over Nucoil USA because of its internet website through [*7] which potential customers may request sales literature.

[HN5] Plaintiffs bear the burden of establishing that the court has jurisdiction over a defendant when served with *Rule 12(b)(2)* motion to dismiss. *DiStefano v. Carozzi North American Inc., 286 F.3d 81, 84 (2d Cir. 2001)*; *Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994)*. Because an evidentiary hearing has not been held, the plaintiffs need only make a prima facie showing of jurisdiction through the complaint's allegations and affidavits in order to defeat the motion to dismiss. *CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986)*; *Network Enterprises, Inc. v. APBA Offshore Prods. Inc., 2002 U.S. Dist. LEXIS 17256, 01 Civ. 11765, 2002 WL 31050846, at *8 (S.D.N.Y. Sept. 12, 2002)*.

[HN6] The facts must be construed in the light most favorable to plaintiffs. *Cooper, Robertson & Partners L.L.P. v. Vail, 143 F. Supp. 2d 367, 370 (S.D.N.Y. 2001)* (citing *Hoffritz for Cutlery Inc. v. Amajac, Ltd., 763 F.2d 55, 57 (2d Cir. 1985)).* In assessing whether personal jurisdiction is authorized, the court must look first to the long-arm [*8] statute of the forum state. *Bensusan Rest. Corp. v. King, 126 F.3d 25, 27 (2d Cir. 1997)*. If the exercise of jurisdiction is appropriate under that statute, the court must decide whether such exercise comports with the requisites of due process. *Id.* In patent infringement cases, "when analyzing personal jurisdiction for the purposes of compliance with federal due process, Federal Circuit law, rather than regional circuit law, applies." *3D Systems, Inc. v. Aarotech Laboratories, Inc., 160 F.3d 1373, 1377 (Fed. Cir. 1998).*

2004 U.S. Dist. LEXIS 13674, *

[HN7] New York's long-arm statute allows for personal jurisdiction over a non-domiciliary when that person or his or her agent:

> (2) commits a tortious act within the state ...; or (3) commits a tortious act without the state causing injury to person or property within the state ..., if he [or she] (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international [*9] commerce...

*N.Y. C.P.L.R. § 302(a)(2)-(3)* (McKinney 2001). The tortious act alleged by Wafios is the violation of *35 U.S.C. § 271(a)*, which provides that "whoever without authority . . . offers to sell . . . any patented invention, within the United States . . . during the term of the patent therefor, infringes the patent."

Wafios argues that by publishing on its internet website a detailed catalogue of its machines, including the allegedly infringing machines, Nucoil USA has thereby offered to sell its products in New York. The website also includes an option to fill out forms which a potential customer may access from New York, and which can be used to request written materials and videotapes promoting Nucoil USA's machines. The website also includes a "button" on which a potential customer can click to have information sent to New York.

Wafios is apparently not alleging that personal jurisdiction may be exercised over Nucoil USA based on § § 302(a)(2) or (a)(3)(i). Section 302(a)(2) [HN8] "reaches only tortious acts performed by a defendant who was physically present in New York when he performed the wrongful act." *Bensusan, 126 F.3d at 28;* [*10] *Telebyte, Inc. v. Kendaco, Inc., 105 F. Supp. 2d 131, 134 (E.D.N.Y. 2000)* (" [HN9] The existence of a website outside New York, even one that offers a product for sale, cannot alone confer jurisdiction over the defendant under *CPLR § 302(a)(2))*."). Wafios has only alleged that Nucoil USA has sold or offered to sell its products to customers in New York. Wafios has not alleged that Nucoil USA regularly does or solicits business in New York. Nucoil USA has stated that since 2001, before the date the allegedly infringing patent issued, Nucoil USA has made only eight sales of "component-related products, and no machines, to just

one customer in Freeport, New York." Affidavit of Yin Wang, P 15.

Wafios instead argues that jurisdiction is proper under § 302(a)(2)(ii) because through its offer of an infringing product for sale to New York consumers through the internet, Nucoil USA has committed a tortious act outside of New York that it should have expected to have consequences within the state. n2 The tortious act alleged by Wafios to have occurred outside the state causing injury to it within New York is the "offer to sell" the allegedly infringing products in violation of § [*11] 271(a). In support of its argument, Wafios cites *Int'l Truck & Engine Corp. v. Dawson Int'l., 216. F. Supp. 2d 754 (N.D. Ind. 2002)*, for the proposition that an offer to sell can be found from conduct which "generates interest in a potential infringing product to the commercial detriment of the rightful patentee." *216. F. Supp. 2d at 761* (quoting *3D Systems, Inc. v. Aarotech Labs., Inc., 160 F.3d 1373, 1379 (Fed. Cir. 1998))*. By this standard, the publication of Nucoil USA's website would constitute an offer to sell wherever internet users could access it.

> n2 Nucoil USA has not contested that it derives substantial revenue from interstate commerce.

However, *3D Systems*, on which *Int'l Truck Engine* relies, "is not the Federal Circuit's final word on the subject" of offers to sell. *Moldflow Corp. v. Simcon, Inc., 296 F. Supp. 2d 34, 42 (D. Mass. 2003)*. In a later case, *Rotec Indus., Inc. v. Mitsubishi Corp., 215 F.3d 1246 (Fed. Cir. 2000)*, the Federal [*12] Circuit held that the meaning of the phrase "offer to sell," as it is used in § 271(a), "is to be interpreted according to its ordinary meaning in contract law, as revealed by traditional sources of authority." *215 F.3d at 1255*.

Although Rotec purports to affirm *3D Systems*, see *215 F.2d at 1254*, at least two district courts have recognized a conflict between the two opinions. See *Moldflow, 296 F. Supp. 2d at 42-43; Elan Corp. v. Andrx Pharms., Inc., 272 F. Supp. 2d 1325, 1339 n.2 (S.D. Fla. 2002)*, rev'd on other grounds, *366 F.3d 1336 (Fed. Cir. 2004)*. A subsequent Federal Circuit decision reiterated "that [HN10] the question whether an invention is the subject of a commercial offer for sale is a matter of Federal Circuit law, to be analyzed under the law of contracts as generally understood." *Group One, Ltd. v. Hallmark Cards, Inc., 254 F.3d 1041, 1047 (Fed. Cir. 2001)*.

Following the Federal Circuit's direction, the Moldflow court reviewed traditional sources of authority

on contract law and sensibly concluded [HN11] that "an offer creates the power of acceptance in the [*13] offeree." *296 F. Supp. 2d at 34* (citing Restatement (Second) of Contracts § 24 (1981); Arthur Corbin, Corbin on Contracts, § 1.11 (1964)).

The product information contained on Nucoil USA's website is insufficient to create an offer to sell according to traditional contract law principles. No pricing information is given and no order forms are available even to print out and mail. Accordingly, Wafios has not shown that Nucoil USA has committed a "tortious act without the state" for purposes of *§ 302(a)(3)* solely on the basis of Nucoil USA's website. Because long-arm jurisdiction cannot be shown on the basis of the website, a federal due process analysis is unnecessary. Nor is it necessary to consider Nucoil USA's motion to dismiss pursuant to *Rule 12(b)(3)*.

**Personal Jurisdiction over Nucoil Taiwan**

Wafios's arguments in support of personal jurisdiction over Nucoil Taiwan are also based on its website. The arguments are essentially identical, as Nucoil Taiwan's website is only alleged to give rise to jurisdiction insofar as it contains a link to the same Nucoil USA website that Wafios argued created jurisdiction [*14] over Nucoil USA. Because Nucoil USA's website does not constitute an offer to sell pursuant to *§ 271(a)*, nor does Nucoil Taiwan's. Accordingly, Wafios has not yet carried its burden of establishing that personal jurisdiction may be exercised over Nucoil Taiwan.

**Limited Jurisdictional Discovery is Granted**

Wafios has requested jurisdictional discovery in the event that specific personal jurisdiction is not found over either Nucoil USA or Nucoil Taiwan on the basis of their websites alone. [HN12] "Pre-motion discovery should be permitted where the facts necessary to establish personal jurisdiction and propriety of venue lie exclusively within the defendant's knowledge." *Winston & Strawn v. Dong Won Securities Co., Ltd., 2002 U.S. Dist. LEXIS 20952, 02 Civ. 0183, 2002 WL 31444625, at *5 (S.D.N.Y. Nov. 1, 2002)* (citing *Wells Fargo & Co. v. Wells Fargo Express Co., 556 F.2d 406, 430 n.4 (2d Cir. 1977))*.

Nucoil USA has submitted an affidavit which provides several facts alleged by Wafios to be within Nucoil USA's exclusive knowledge. In particular, Nucoil USA states that it has sold no machines in New York, does not advertise in media which originates or which targets New [*15] York or which have a national circulation, and does not "target" the New York market. Wang Affidavit, PP 9-11, 15. However, there are further questions which are not answered by the affidavit, and which may be necessary to establish either personal jurisdiction or venue.

Nucoil USA has acknowledged receiving four requests for product information from New York (although at least one of those requests appears to be from counsel for Wafios), but has not stated what materials were sent in response to those requests. Nor has Nucoil USA indicated whether other sales materials had been sent to its single existing customer in New York.

Accordingly, Nucoil USA's motion to dismiss is denied and Wafios' request for discovery is granted limited to the question whether Nucoil USA has "offered to sell" its allegedly infringing machines in New York, as that phrase is interpreted in this Opinion. Limited and expedited discovery proceedings will include service of document requests and one deposition of a witness to be designated by defendant to answer questions regarding jurisdictional issues. This discovery is to be completed no later than thirty (30) days from the entry of this order.

The affidavits [*16] submitted by counsel for Nucoil Taiwan and from a Nucoil Taiwan sales representative are more categorical than those of Nucoil USA, and call for a different result. According to the affidavits, Nucoil Taiwan has no offices or employees in New York, and has sold no products and derives no revenue from any activity in New York, and does not market products or attend trade shows in New York. In addition, Nucoil Taiwan has received no requests for information from the United States. Finally, Nucoil Taiwan has no common ownership with Nucoil USA, and derives no revenue from any sales or business by Nucoil USA.

Because Wafios has not shown that it is entitled to any jurisdictional discovery with respect to Nucoil Taiwan that is not contained in the affidavits submitted with Nucoil Taiwan's briefs, the motion to dismiss Nucoil Taiwan is granted. It is therefore not necessary to consider Nucoil Taiwan's motion to dismiss for improper service of process pursuant to *Rule 12(b)(5)*.

**Conclusion**

Because Nucoil USA's motion to dismiss for lack of personal jurisdiction and for improper venue cannot be resolved until after jurisdictional discovery has been conducted, it is denied at [*17] this time. Leave is granted to refile any and all of the motions pending closure of the limited discovery ordered above.

Wafios has not carried its burden of showing that personal jurisdiction may be exercised over Nucoil Taiwan. Because Wafios has also not shown that

2004 U.S. Dist. LEXIS 13674, *

jurisdictional discovery could establish facts necessary to establish jurisdiction, Nucoil Taiwan's motion to dismiss the complaint against it is granted.

It is so ordered.

**New York, NY**

**July 21, 2004**

**ROBERT W. SWEET**

**U.S.D.J.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
                                 :

Gregory V. Serio, Superintendent of Insurance    :
of the State of New York, as Rehabilitator of     :    04 CV 3361 (KMK)
FRONTIER INSURANCE COMPANY, and as    :
Assignee of PLATINUM INDEMNITY, LTD.,    :
                                 :

                     Plaintiff,   :    **DECLARATION OF**
                                 :    **WILLIAM S. GYVES, ESQ.**

     -against-                  :

DWIGHT HALVORSON INSURANCE       :
SERVICES, INC d/b/a/ F.S.I.M. INSURANCE  :
SERVICES and FOOD SERVICE INSURANCE  :
MANAGERS, INC.,                   :
                                 :

                  Defendants.  :
                                 :
-------------------------------------------------------------------x

       WILLIAM S. GYVES, pursuant to 28 U.S.C. § 1746, being of full age, hereby

declares as follows:

       1.     I am an attorney-at-law duly admitted to practice before this Court and a

member of Entwistle & Cappucci LLP, attorneys for plaintiff Gregory V. Serio, Superintendent

of Insurance of the State of New York, as Rehabilitator of Frontier Insurance Company ("FIC")

and assignee of Platinum Indemnity, Ltd. ("Platinum") in the above-captioned action.  I have

direct responsibility for representing FIC in this action and, as a result, I am fully familiar with

the facts and circumstances set forth herein.

       2.     I respectfully submit this Declaration in opposition to the motion of

defendants Dwight Halvorson Insurance Services, Inc. ("DHIS")  and Food Service Insurance

Managers, Inc. ("FSIM") (collectively, "Defendants") to dismiss the Complaint on jurisdictional

and venue grounds and to compel mediation.

**Defendants' Intentional Waiver
of the Jurisdictional Defense**

3.     In its accompanying supplemental brief, FIC argues that the Defendants'

personal jurisdiction challenge should be rejected because they have waived that defense

pursuant to Rule 12(h)(1). The factual basis for this contention is straightforward.

4.     At the outset of this litigation, the Defendants made no secret of their

intention to pursue counterclaims against FIC. In light of this intention, the Defendants in good

faith could not have asserted -- and, in fact, did not assert -- a personal jurisdiction defense at the

time they filed the Answer. The record is clear that the Defendants fully intended to submit to

the Court's jurisdiction in order to pursue those claims.

5.     The Answer in which the Defendants raised no challenge to personal

jurisdiction was filed on or about June 25, 2004. In their Answer, the Defendants attributed to

FIC a series of allegedly wrongful acts and/or omissions. See Answer, ¶¶ 106-137.

6.     Despite these allegations of wrongdoing directed at FIC, no counterclaims

were asserted in the Answer. Upon initially reviewing the Answer, I was puzzled because the

Defendants' detailed recitation of allegations of wrongdoing without any accompanying claim

for affirmative relief against FIC was, based on my experience, quite peculiar.

7.     I promptly contacted defense counsel for clarification. It was unclear to

me whether the Defendants' omission of counterclaims was an error or if they intended to assert

counterclaims against FIC at some later stage in the litigation. In response to my queries,

defense counsel advised that the Defendants were still reviewing their options in this regard.

8.     Ultimately, at a July 8, 2004 initial conference before the Honorable

Richard M. Berman, defense counsel advised the Court of the Defendants' intention to move for

leave to amend the Answer to assert counterclaims against FIC.

9.    At this conference, I noted for the Court and defense counsel a line of authority firmly supporting the proposition that FIC, as an insurance company in rehabilitation, was immune from affirmative claims by operation of the New York Insurance Law.

10.    In an attempt to avoid unnecessary motion practice, I offered to forward these authorities for defense counsel's review.  The Court instructed me to do so and directed counsel to attempt to resolve the issue amicably.

11.    On July 21, 2004, I forwarded to defense counsel a detailed analysis of the relevant authorities.  A copy of my July 21 letter to defense counsel is attached hereto as Exhibit A.

12.    On or about August 4, 2004, defense counsel advised that, given the protection afforded to FIC under New York law, the Defendants had elected not to assert affirmative claims against FIC.

13.    On or about August 25, 2004 -- two months after the Answer was filed -- the Defendants filed this motion in which they for the first time raised the jurisdictional defense omitted from its initial pleading.

14.    In light of the above, I respectfully submit that there can be no question that the Defendants knowingly elected not to preserve a personal jurisdiction defense in the Answer and that they did so intentionally given their plan to pursue affirmative claims against FIC.  By doing so, I submit that they waived the defense pursuant to Rule 12(h)(1).

**Expedited Discovery on the**
**Venue and Jurisdictional Issues**

15.    In its supplemental brief, FIC maintains that in the event the Court finds that FIC has failed to overcome the Defendants' jurisdiction and venue challenges or otherwise

concludes that an evidentiary hearing on either issue is warranted, FIC should be permitted to pursue expedited discovery on either or both of those issues.

16.    This discovery is necessary because, for a number of reasons, FIC has found itself at a distinct disadvantage in supplementing the record with additional evidence on the jurisdiction and venue issues.

17.    One disadvantage flows from FIC's status as an insurance company in rehabilitation.

18.    On or about August 24, 2001, the Superintendent of Insurance of the State of New York ("Superintendent") initiated proceedings in the Supreme Court of the State of New York, New York County, seeking an order placing FIC into rehabilitation pursuant to Article 74 of the New York Insurance Law.

19.    On or about August 27, 2001, the Court appointed the Superintendent as temporary receiver of FIC.

20.    The Court entered an Order of Rehabilitation with respect to FIC on or about October 15, 2001.

21.    By the time FIC was placed into rehabilitation, the great majority of its officers, directors and employees already had left the company's employ. They no longer are affiliated with FIC. In short, many of the persons who had direct involvement in FIC's business operations prior to the decision to place the company into rehabilitation are no longer within FIC's control. This has complicated FIC's ability to marshal the type of jurisdictional facts that, in most instances, the Court might reasonably expect to be readily available to a plaintiff opposing a jurisdictional motion.

4

22.     FIC's difficulties also arise out of the fact that it is pursuing claims Platinum has assigned to it. The reality is that, although it is Platinum's assignee, to date FIC has had only limited access to Platinum personnel and documents relating to the insurance program at the heart of this litigation. Thus, FIC's knowledge of the transactions between Platinum and FSIM is more limited than might otherwise be the case.

23.     Another significant impediment FIC has experienced in developing a more detailed record on the jurisdiction and venue issues arises out of the fact that the Defendants thus far have improperly refused to respond to FIC's discovery demands.

24.     On October 5, 2004, we served interrogatories upon the Defendants.

25.     On October 8, 2004, we served document demands upon the Defendants.

26.     The Defendants' responses to these discovery demands were due in early November 2004. To date, we have received no such responses. Those responses are now grossly overdue.

27.     On repeated occasions since early November, my colleagues and I have contacted defense counsel in an attempt to obtain this discovery. During these discussions, defense counsel repeatedly assured us that we would receive the discovery responses in short order. Despite these assurances, the responses have not materialized.

28.     Most recently on November 30, 2004, we again pressed defense counsel for the outstanding discovery. He assured us that we would receive responses and responsive documents by no later than December 2, 2004.

29.     The December 2 deadline passed and the Defendants still had not complied with their discovery obligations.

30.    On December 8, 2004, we wrote to defense counsel in a final attempt to resolve this discovery impasse. A copy of our December 8 letter is attached hereto as Exhibit B. To date, we have received no response to our letter.

31.    On December 10, 2004, we wrote to Your Honor seeking the Court's assistance in resolving this dispute. A copy of our December 10 letter is attached hereto as Exhibit C.

32.    We forwarded a copy of our December 10 letter to defense counsel. To date, we have received no response from defense counsel with respect to that letter.

33.    Based on the above, I respectfully submit that it is plain to see that the Defendants have stonewalled our efforts to conduct discovery into their conduct relative to the FSIM Program.

34.    Leaving aside for now the issue of whether the Defendants' refusal to comply with their discovery obligations is worthy of sanctions, this stonewalling has prevented us from further developing the record with respect to the jurisdiction and venue issues.

35.    For the reasons set forth in its supplemental brief, FIC maintains that the record as it stands is sufficient to defeat the jurisdictional and venue challenge. However, if the Court concludes otherwise, FIC requests an opportunity to pursue discrete discovery narrowly tailored to address the jurisdiction and venue issue.

36.    Specifically, prior to any such hearing, FIC proposes to pursue:

    (a)    deposition testimony of former FIC employees, officers and/or directors who had direct involvement in the FSIM Program and thus are believed to have personal knowledge of facts relevant to the Defendants' conduct inasmuch as it relates to the jurisdiction and venue issues;

    (b)    documentary evidence from Platinum and deposition testimony of its personnel who had direct

6

involvement in the FSIM Program and thus are believed to have personal knowledge of facts relevant to FSIM's conduct inasmuch as it relates to the jurisdiction and venue issues; and,

(c)    documentary evidence from the Defendants and deposition testimony of their personnel who had direct involvement in the FSIM Program and thus are believed to possess personal knowledge of facts relevant to the Defendants' acts and/or omissions inasmuch as they relate to the jurisdiction and venue issues.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 17, 2004.

_____
WILLIAM S. GYVES

**EXHIBIT A**

# ENTWISTLE & CAPPUCCI LLP

ATTORNEYS AT LAW
299 PARK AVENUE
NEW YORK, NEW YORK 10171-1499
TELEPHONE: (212) 894-7200
TELECOPIER: (212) 894-7272
www.entwistle-law.com

AUSTIN, TX
CHICAGO, IL
FLORHAM PARK, NJ

NEW YORK, NY
TALLAHASSEE, FL
WASHINGTON, DC

July 21, 2004

**VIA HAND DELIVERY**
Lorienton N.A. Palmer, Esq.
Schindel, Farman & Lipsius LLP
14 Penn Plaza, Suite 500
New York, New York 10122

> **Re:    Frontier Insurance Co. v. Dwight Halvorson Ins. Services, Inc.**
> **04 Civ. 3361 (RMB)**

Dear Mr. Palmer:

At the recent initial conference in the above-referenced matter, you advised the

Court of your intention to amend the Answer to assert certain counterclaims against our client,

Gregory V. Serio, Superintendent of Insurance of the State of New York ("Superintendent"), as

Rehabilitator of Frontier Insurance Company ("FIC") and Assignee of Platinum Indemnity, Ltd.

("Platinum"). In the interest of avoiding the expense of unnecessary motion practice, we have

set forth below the authority for our position that defendants Dwight Halvorson Insurance

Services, Inc. d/b/a/ F.S.I.M. Insurance Services and Food Service Insurance Managers, Inc.

("FSIM") (collectively, "Defendants") are precluded as a matter of law from doing so.

### The Superintendent as Rehabilitator

On or about October 15, 2001, FIC was placed into rehabilitation pursuant to

Article 74 of the New York Insurance Law. A copy of the Order of Rehabilitation

("Rehabilitation Order") is attached hereto as Exhibit A. Among other things, the Rehabilitation

Order includes a litigation stay that:

Lorienton N.A. Palmer, Esq.
July 21, 2004
Page 2

- . enjoins and restrains all persons from commencing or prosecuting any actions, lawsuits or proceedings against FIC or the Superintendent as Rehabilitator; and,

- enjoins and restrains all persons from obtaining preferences, judgments, attachments or other liens or making any levy against FIC's assets or any part thereof.

See Rehabilitation Order at p. 3.

The stay incorporated as part of the Rehabilitation Order is a standard provision in this context and reflects the overall objective of the rehabilitation process as provided for in Article 74. In short, the pursuit of affirmative litigation against the Superintendent in his capacity as a rehabilitator is viewed as being disruptive to the overall rehabilitation process and its objective of stabilizing failing insurers. For this reason, such claims are disfavored as a general rule and, in this case, precluded as a matter of law.

The statutory scheme set forth in Article 74 is designed to allow the Superintendent to take possession of the property of a failing insurer, attempt to restore as much of the insolvent carrier's estate as possible and avoid placing the insurer into liquidation. As the First Department has noted, the "pervasive intent" of this statutory scheme "is to preserve the assets of the insolvent insurer for the benefit of policyholders and creditors." See Curiale v. AIG Multi-Line Syndicate, Inc., 204 A.D.2d 237, 238, 613 N.Y.S.2d 360, 361 (1st Dep't 1994) (emphasis supplied); see also In re Stewart, 23 N.Y.2d 407, 420, 244 N.E.2d 690, 697, 297 N.Y.S.2d 115, 126 (1968) (rehabilitator is put in place as "a temporary receiver to preserve and protect the company's assets") (Fuld, J., dissenting); In re Schaick, 264 N.Y. 69, 80, 190 N.E. 153, 156 (1934) (as rehabilitator, the Superintendent becomes a "statutory receiver" and "the

Lorienton N.A. Palmer, Esq.
July 21, 2004
Page 3

property of the corporation is brought into the protective arm of the law"); In re Allcity Ins. Co.,

66 A.D.2d 531, 535, 413 N.Y.S.2d 929, 932 (1st Dep't 1979) (distinguishing characteristic of the

rehabilitation mechanism is that it is "'directed toward preservation, whenever possible, of the

business of an insurance company threatened with insolvency'"); In re Lawyers Westchester

Mortgage & Title Co., 176 Misc. 435, 437, 26 N.Y.S.2d 575, 578 (Sup. Ct. Westchester Co.) (in

his capacity as a rehabilitator, the Superintendent's duty is to "conserve the property of the

corporation, and to administer it"), aff'd, 262 A.D. 878, 29 N.Y.S.2d 721 (2nd Dep't 1941),

rev'd on other grounds, 288 N.Y. 40, 41 N.E.2d 449, cert. denied, 317 U.S. 701 (1942).

When viewed against this backdrop, the Rehabilitation Order plainly precludes

the assertion of any affirmative claims against our client in this litigation. There is ample

authority for this position. See e.g., Maleski v. Landberg, 1995 U.S. Dist. LEXIS 154, at *4

(S.D.N.Y. Jan. 12, 1995) ("under New York law, a counterclaim seeking affirmative relief may

not be asserted in an action brought by New York's insurance commissioner as liquidator of an

insolvent insurance company"); Pink v. Title Guar. & Trust Co., 274 N.Y. 167, 172, 8 N.E.2d

321, 323 (1937) (in an action commenced by the Superintendent in his capacity as a rehabilitator,

court notes the order of rehabilitation and concludes that "obviously, defendant could not

proceed to collect its claims by a direct action against or by way of any counterclaim in any

action brought by the Superintendent"); Corcoran v. National Union Fire Ins. Co., 143 A.D.2d

309, 311, 532 N.Y.S.2d 376, 378 (1st Dep't 1998) ("liquidation order bars any actions against

the Superintendent as liquidator, which precludes the assertion of counterclaims herein");

Curiale, 204 A.D.2d at 238, 613 N.Y.S.2d at 361 (defendants' counterclaim "encompassed by

Lorienton N.A. Palmer, Esq.
July 21, 2004
Page 4

the injunction contained in the Liquidation Order"); Harnett v. National Motorcycle Plan, Inc.,

59 A.D.2d 870, 870, 399 N.Y.S.2d 242, 244 (1st Dep't 1977) (liquidation order enjoined all

persons from bringing any action against liquidated insurer or its liquidator and "[t]hat injunction

against the commencement of any action has been held to include the interposition of any

counterclaim"); Schenck v. Coordinated Coverage Corp., 50 A.D.2d 50, 51, 376 N.Y.S.2d 131,

133 (1st Dep't 1975) (finding that counterclaim "was barred by virtue of the stay contained in the

order of liquidation," court observes that "the injunction contained in the order of liquidation

must be interpreted as a matter of law to include counterclaims, despite the fact that the order

does not specifically refer to counterclaims").

   The rationale supporting such a bar to the assertion of affirmative claims against

the Superintendent here is as straightforward as it is compelling. Requiring the Superintendent

to expend the limited assets of FIC's estate in order to defend against such affirmative claims

would undermine the overriding goal of both Article 74 in general and the Rehabilitation Order

in particular -- i.e., to facilitate the Superintendent's efforts to preserve and marshal the estate's

assets so as to stabilize FIC's financial condition and afford the company a reasonable

opportunity to emerge from rehabilitation as a viable operation. All concerned parties -- FIC, its

creditors and others -- have a vested interest in seeing that his goal is achieved. The expense and

business disruption flowing from the need for the Superintendent to defend himself here plainly

would undermine the rehabilitation efforts. The greater public good achieved through the stay

necessarily trumps any private causes of action your clients may have with respect to the subject

matter of this litigation. This is not to say, however, that the stay strips your clients of all

Lorienton N.A. Palmer, Esq.
July 21, 2004
Page 5

remedies. The Defendants may have standing, for example, to pursue an adjudication of their

purported claims as part of the ongoing rehabilitation proceeding pending in the New York State

Supreme Court for Sullivan County.

### The Superintendent as Assignee

This same analysis compels the conclusion that your clients are precluded from

asserting any counterclaim against the Superintendent as Assignee of Platinum's claims. Any

counterclaim asserted against the Superintendent as Platinum's assignee would be legally

indistinguishable from a counterclaim asserted against the Superintendent as Rehabilitator of

FIC; the former would fail for the same reasons as the latter.

The assignment was executed as part and parcel of the Superintendent's ongoing

effort to rehabilitate FIC pursuant to Article 74. The assignment was an integral element of a

Reinsurance Commutation and Release Agreement ("Commutation Agreement") between

Platinum and the Superintendent in his capacity as FIC's rehabilitator. A copy of the

Commutation Agreement is attached hereto as Exhibit B. Therein, the parties acknowledged

that, pursuant to the Rehabilitation Order, the Superintendent "was ordered to take possession of

the property and conduct the business of" FIC. Id., p. 1. Among the property the Superintendent

has assumed control over in the rehabilitation proceeding is the assignment, which conveyed "all

right, title and interest in [FSIM's obligations to Platinum], including without limitation" the

promissory note FSIM executed for Platinum's benefit. Id., Art. I, ¶ 1. The assignment itself, a

copy of which is attached hereto as Exhibit C, notes that Platinum was assigning certain of its

rights to the Superintendent "as Rehabilitator . . . of Frontier Insurance Company[.]" Id., p. 1.

Lorienton N.A. Palmer, Esq.
July 21, 2004
Page 6

   In the Verified Petition seeking court approval of the Commutation Agreement, a

copy of which is attached hereto as Exhibit D, the Superintendent noted that pursuant to the

Rehabilitation Order he "was authorized and directed to take possession of the property and

rehabilitate [FIC] and was vested with title to all property, contracts, and rights of action of" FIC.

Id., ¶ 3.  Therein, the Superintendent identified the "primary reasons" justifying the

Commutation Agreement as follows:

> • it would enable him to pursue the balances due from FSIM
> including all claims paid as of the date of valuation;
>
> • it would enable him to pursue balances due on future claims as
> they are settled;
>
> • it would bring $15,000.00 into the FIC estate, which could
> immediately begin earning interest; and,
>
> • it would negate potentially expensive and protracted
> accounting and collection efforts to resolve the issue of the
> respective rights, duties and obligations of the parties thereto.

Id., ¶ 11.  Further, the Superintendent described the arrangement memorialized in the assignment

as being "fair and reasonable under the circumstances and in the best interest of all the creditors

and others interested in the affairs of the estate of" FIC.  Id., ¶ 13.  In an Order filed May 2,

2003, a copy of which is attached hereto as Exhibit E, the Honorable Edward H. Lehner

approved the Commutation Agreement, noting that the interests of FIC, its creditors and others

"will best be served by acceptance" of the Commutation Agreement.  Id., p. 1.

   Given the nature of the assignment and the related Commutation Agreement, any

counterclaim against the Superintendent as Platinum's assignee would run afoul of the stay

included as part of the Rehabilitation Order.  The Superintendent entered into the Commutation

Lorienton N.A. Palmer, Esq.
July 21, 2004
Page 7

Agreement in his capacity as FIC's Rehabilitator. He did so in furtherance of his responsibilities

for attempting to rehabilitate FIC by marshaling and preserving its assets. Similarly, the

Supreme Court approved the Commutation Agreement in recognition of the fact that it advanced

the objectives of rehabilitation and was in FIC's best interests. Compelling the Superintendent to

devote FIC's limited resources to defending against counterclaims relating in any way to the

assignment and/or Commutation Agreement would be directly contrary to the legislative

objective reflected in Article 74. The same rationale supporting the holdings in the decisions

cited above would preclude such counterclaims under the circumstances presented here. A

counterclaim asserted against the Superintendent as Assignee of Platinum would constitute as

great an interference with the ongoing rehabilitation effort as would a counterclaim asserted

against the Superintendent as Rehabilitator.

*    *    *    *

We submit the above analysis for your consideration in a good faith effort to

resolve amicably and efficiently the issue of whether an amendment of the Answer to include

counterclaims would be futile. Once you have had an opportunity to consider this matter, kindly

contact me at your convenience so that we might confer on this issue.

Very truly yours,

William S. Gyves

WSG/jr

Encls.

At IAS Part 19 of the Supreme Court
of the State of New York, County of
New York, at the Courthouse, 60
Centre Street, New York, New York
on the 10th day of October, 2001.

P R E S E N T :

HON. EDWARD H. LEHNER

JUSTICE

------------------------------------------------x

In the Matter of                                  Index No.: 405090/Ci

The Application of                                **ORDER OF
                                                  REHABILITATION**

GREGORY V. SERIO, as Superintendent of Insurance
of the State of New York, for an order to take
possession of the property of and rehabilitate

FRONTIER INSURANCE COMPANY

------------------------------------------------x

Petitioner, Gregory V. Serio, Superintendent of Insurance of the State of New

York (the "Superintendent"), having moved this Court for an order to take possession of

the property of and rehabilitate Frontier Insurance Company ("Frontier");

NOW, upon reading and filing the order to show cause signed August 27,

2001, the petition of Gregory V. Serio, Superintendent of Insurance, by Kevin Rampe,

First Deputy Superintendent, duly verified August 24, 2001 and the emergency affidavit

of Kevin Rampe sworn to on August 27, 2001; (the exhibits annexed thereto); the cross

motion by Frontier Insurance Group dated September 7, 2001, the annexed proposed

petition, the affidavit of Suzanne Loughlin sworn to on September 7, 2001, the exhibits

annexed thereto; the affirmation in opposition by Mary Nicholls dated September 7,

2001; the affirmation in opposition by Adam J. Glatt dated September 7, 2001; the

affidavit of Kevin Rampe sworn to on October 3, 2001, and the exhibits annexed thereto;

OCT-15-2001  13:26   FROM LIQUIDATION BUREAU           TO  18457961906          P.04
212 791 4237

and the reply affidavit of Joseph Termini sworn to on October 3, 2001 and it appearing to

my satisfaction that:

1. Frontier was incorporated in New York as a stock property/casualty insurer on November 2, 1962 and commenced business on August 17, 1966;

2. Frontier's principal place of business is located at 195 Lake Louise Marie Road, Rock Hill, New York in Sullivan County. Frontier's tax ID number is 13-2559805;

3. Frontier is subject to the New York Insurance Law and particularly to article 74 thereof;

4. Frontier is insolvent;

5. Frontier has failed to cure its impairment of capital or minimum surplus to policyholders;

6. Frontier has consented to the entry of the order of rehabilitation; and

7. It is in the best interest of Frontiers's policyholders, creditors and the general public that the Superintendent be directed to take possession of Frontier's property and to rehabilitate its business and affairs;

And, the Petitioner, having appeared by the Hon. Eliot Spitzer, Attorney

General of the State of New York, and due deliberation having been had;

NOW, on motion of Hon. Eliot Spitzer, Attorney General of the State of New

York, it is ORDERED as follows:

1. The petition is granted and the cross-motion is withdrawn;

2. Gregory V. Serio, Superintendent, and his successors in office as Superintendent, is appointed Rehabilitator of Frontier and is authorized and directed to immediately take possession of its property, conduct its business, including but not limited to settling claims within his sole discretion, take such steps toward the removal of the causes and conditions which made this proceeding necessary as he shall deem wise and expedient, and deal with the property and business of Frontier in its name or in the name of the Superintendent as Rehabilitator; ··

2

3.  Notice to all persons having claims against Frontier to file or present their claims to the Superintendent as Rehabilitator is deferred until further order of this court;

4.  Frontier, its officers, directors, depositories, trustees, agents, servants, employees, and all other persons, having any property or records belonging or relating to Frontier, including, but not limited to insurance policy, loss claim and legal files are directed, upon request of the Superintendent as Rehabilitator to assign, transfer, set over and deliver to him all such property or records;

5.  Any persons, firms, corporations, or associations having any books, papers or records relating to the business of Frontier shall preserve them and submit them to the Superintendent as Rehabilitator for examination and copying at all reasonable times;

6.  All persons including, but not limited to the officers, directors, shareholders, trustees, agents, servants, employees, attorneys, and managers of Frontier, are enjoined and restrained from the transaction of Frontier's business, the waste or disposition of its property, interfering with the Superintendent as Rehabilitator in the possession, control and management of Frontier's property or in the discharge of his duties;

7.  All persons are enjoined and restrained from commencing or prosecuting any actions, lawsuits, or proceedings against Frontier, or the Superintendent as Rehabilitator;

8.  All persons are enjoined and restrained from obtaining preferences, judgments, attachments or other liens or making any levy against Frontier's assets or any part thereof.

9.  All parties to actions, lawsuits, and special or other proceedings in which Frontier is obligated to defend a party pursuant to an insurance policy, bond, contract or otherwise are enjoined and restrained from proceeding with any discovery, court conferences including but not limited to pre-trial conference, trial, application for judgment or proceedings on settlements or judgments for a period of one hundred and eighty days from the date of entry of this order.

10. Those persons who may have first-party or New York Comprehensive Automobile Insurance Reparations Act (No-Fault) policyholder loss claims against Frontier coming within the purview of Article 76 of the Insurance Law are enjoined from presenting and filing such claims in this proceeding for 90 days from the date of entry of this order.

3

11. In addition to the powers enumerated above and those delegated to the Rehabilitator in the New York Insurance Law, the Rehabilitator, by Order to Show Cause on notice to interested parties, including without limitation Frontier's sole shareholder, and subject to court approval, may sell or otherwise dispose of all or any part of the real and personal property of Frontier, sell any line of insurance, and take such other actions as set forth in Section 7428 of the New York Insurance Law.

12. That the Superintendent of Insurance, as Rehabilitator, may at any time make further application at the foot of this Order to this Court for such further and different relief as he sees fit.

13. All further papers in this proceeding shall bear the caption:

In the Matter of

The Rehabilitation of

FRONTIER INSURANCE COMPANY

E N T E R

_____
J.S.C.

RehOrder 1



4

OCT-15-2001  13:27  FROM  LIQUIDATION BUREAU        TO  18457961906        P.07
212 791 4237

Sir:

Please take notice that the within is a true copy of duly filed and entered in the office of the clerk of County, on the day of , 2001

Yours, etc.,

ELIOT SPITZER

Attorney General,

Office and Post Office Address
120 Broadway, New York, N.Y. 10271

To:                                     , Esq.

Attorney for

Sir:

Please take notice that the within

will be presented for settlement and signature herein to the Hon.
one of the Judges of the within named Court, at

In the Borough of
City of New York, on the              day of
Date, N.Y.,       , 2001.

Yours, etc.

ELIOT SPITZER

Attorney General,

Office and Post Office Address
120 Broadway, New York, N.Y. 10271

To:                                     Esq.

Attorney for

---

SUPREME COURT : NEW YORK COUNTY

In the Matter of

the Application of

GREGORY V. SERIO, as Superintendent of Insurance of the State of New York, for an order to take possession of the property of and rehabilitate

FRONTIER INSURANCE COMPANY

ORDER OF REHABILITATION

ELIOT SPITZER

Attorney General

Attorney for the Superintendent of Insurance
Office and Post Office Address
120 Broadway, New York, N.Y. 10271

Tel.

Personal Service of a copy of within...
is admitted this.................day of
................................2001

## COMMUTATION AGREEMENT

REINSURANCE COMMUTATION AND RELEASE AGREEMENT (the "Commutation") effective as of the latest date of execution set forth below, by and between GREGORY V. SERIO, Superintendent of Insurance of the State of New York as Rehabilitator (the "Rehabilitator") of Frontier Insurance Company ("Frontier") and Platinum Indemnity Limited, a company organized and existing under the laws of the Islands of Bermuda ("Platinum") (collectively the "Parties").

WHEREAS, effective January 1, 1998, Frontier entered into a certain reinsurance agreement with Platinum, attached hereto as Exhibit 1 (the "Agreement"), whereby Platinum was committed to reinsure certain risks of Frontier in respect of Frontier's liability on certain direct policies classified as food manufacturing and related industries and produced by Dwight Halvorson Insurance Services of Roseville, California.

WHEREAS, on October 15, 2001, Frontier was placed into rehabilitation by Order of the Supreme Court of the State of New York (the "Order of Rehabilitation"), attached hereto as Exhibit 2. Pursuant to the Order of Rehabilitation and Article 74 of the New York Insurance Law, the Rehabilitator was ordered to take possession of the property and conduct the business of Frontier;

WHEREAS, certain disputes have arisen between the Parties regarding the rights, duties and obligations pursuant to the Agreement;

WHEREAS, pursuant to a Subscription and Shareholders Agreement made as of January 16, 1998 and annexed hereto as Exhibit 3, Food Services Insurance Managers, Inc., a corporation organized and existing under the laws of California ("FSIM"), has undertaken to pay certain amounts to Platinum as additional capital contributions and as indemnification for negative balances in the account for Undistributed Profit Attributable to the Preferred Share (the "FSIM Obligations");

WHEREAS, in partial performance of the FSIM Obligations, FSIM issued a promissory note to Platinum on or about November 8, 2000 pursuant to which FSIM undertook to pay $469,515.00 together with interest thereon (the "FSIM Promissory Note"), copy of which is annexed as Exhibit 4; and

WHEREAS, FSIM defaulted on the FSIM Promissory after making only seven monthly payments of $21,000.00, leaving a remaining indebtedness in excess of $322,515.00; and

WHEREAS, Platinum has issued written demands to FSIM for payment of amounts due and outstanding in respect of the FSIM Obligations, including the FSIM Promissory Note, and FSIM has substantially failed to pay such amounts; and

WHEREAS, recognizing the value of settling such disputes expeditiously, Platinum has offered to pay and the Rehabilitator has agreed to accept the sum of **$2,918,851.65**, comprised of $15,000.00 cash and an assignment of the FSIM Obligations, including without limitation the FSIM Promissory Note, in accordance with the terms set forth herein in full and final satisfaction of Platinum's and the Rehabilitator's past, present, and future liabilities and/or obligations to each other, relating to or arising out of the Agreement(s).

NOW THEREFORE, the Rehabilitator and Platinum agree as follows:

## ARTICLE A - PAYMENTS

1. Within fifteen (15) days of service upon Platinum of an Order approving the terms of this Commutation, Platinum shall pay to the Rehabilitator by wire transfer the sum of **$15,000.00** and shall deliver a duly executed Assignment in the form annexed hereto as Exhibit 5 assigning to the Rehabilitator all right, title and interest in the FSIM Obligations, including without limitation the FSIM Promissory Note (the "Settlement Consideration").

2

2. The Rehabilitator shall accept the Settlement Consideration in full and final settlement of any and all amounts claimed to be due by Platinum to the Rehabilitator relating to or arising out of the Agreement.

## ARTICLE B - RELEASES

1. Simultaneous with transfer of the Settlement Consideration to the Rehabilitator, the Rehabilitator, its predecessors, successors, and assigns and its or their respective past, present and future employees, agents, attorneys, and legal representatives hereby release, acquit, and forever discharge Platinum, its predecessors, successors, heirs and assigns, and its or their respective past, present, and future officers, directors, shareholders, employees, agents, receivers, trustees, attorneys, and legal representatives from any and all claims, demands, causes of action, liabilities, obligations, costs, disbursements, fees, attorneys' fees, expenses, damages, and injuries of every kind, nature, and description based on, relating to, or arising out of the Agreement whether or not now known, suspected, reported, or claimed, whether fixed or contingent, and whether currently existing or arising in the future, provided, however, that nothing in this Commutation shall be construed so as to negate or diminish the liability of FSIM in respect of the FSIM Obligations, including without limitation the ongoing obligation to fund negative balances calculated as of future dates.

2. Simultaneous with transfer of the Settlement Consideration to the Rehabilitator, Platinum, its predecessors, successors, heirs and assigns, and its or their respective past, present, and future officers, directors, shareholders, employees, agents, receivers, trustees, attorneys, and legal representatives hereby release, acquit, and forever discharge Frontier and the Rehabilitator, their predecessors, successors, and assigns and their respective past, present, and future employees, agents, attorneys, and legal representatives from any and all claims, demands, causes of action, liabilities, obligations, costs,

3

disbursements, fees, attorneys' fees, expenses, damages, and injuries of every kind, nature, and description based on, relating to, or arising out of the Agreement whether or not now known, suspected, reported, or claimed, whether fixed or contingent and whether currently existing or arising in the future.

    3. Platinum shall file no claim whatsoever in any rehabilitation or other receivership proceeding concerning Frontier based on, arising out of, or relating to the Agreement.

## ARTICLE C - APPROVALS

    1. The Rehabilitator will apply to the Justice of the Supreme Court of the State of New York supervising the Frontier Rehabilitation for an Order approving the terms of this Commutation ("Court Approval").

    2. Platinum shall cooperate fully with the Rehabilitator and will use its best efforts to aid the Rehabilitator in obtaining Court Approval.

## ARTICLE D - REPRESENTATIONS AND WARRANTIES

    1. Platinum hereby represents and warrants to the Rehabilitator that:

        (a) Platinum is a company duly organized, validly existing, and in good standing under the laws of the Islands of Bermuda;

        (b) Platinum, and the individual executing this Commutation and the Assignment on its behalf, each has the full legal right, power, and authority (corporate and otherwise) to execute, deliver, and perform this Commutation and Assignment;

        (c) All corporate action by Platinum necessary for the execution, delivery, and performance of this Commutation and Assignment by Platinum has been duly taken;

(d) This Commutation and the Assignment when executed and delivered will constitute a valid and legally binding obligation of Platinum;

(e) No action, consent, or approval of any person, entity, court, or other governmental authority is required by Platinum for the lawful execution or delivery of this Commutation and the Assignment or the lawful performance and consummation of the transactions contemplated hereby;

(f) The execution and delivery of this Commutation and Assignment and the performance and consummation of the transactions contemplated herein will not violate any provision of any law or conflict with the Certificate of Incorporation or By-laws of Platinum or any order, writ, injunction, or decree of any court or other governmental authority;

(g) Platinum has not done, nor will it do, any act or provide any reward whatsoever, or give anything of value to any person(s), entity, or the Rehabilitator as an inducement to enter into this Commutation and Assignment and that the Commutation and Assignment are entered into in good faith and without any collusion or fraud; and

(h) Platinum has not assigned, sold or transferred any interest in the Agreement.

### ARTICLE E - NONDISCLOSURE

1. The Rehabilitator and Platinum expressly agree that the terms and conditions of this Commutation shall not be disclosed by either Party without the prior written consent of the other except to the companies to whom business covered by the Agreement(s) was retroceded or where required by law. The Parties expressly agree that such written consent shall not be unreasonably withheld.

5

2. In the event disclosure is to be made pursuant to this Article Section 1, the disclosing Party shall give prior written notice to the other Party specifying the information to be disclosed, the manner of disclosure, and to whom disclosure is to be made.

3. No disclosure shall be made to any third party unless said third party states in writing to the Parties hereto prior to disclosure that said third party agrees to and is bound by this Article.

## ARTICLE F - DELIVERY OF NOTICE

1. All notices required hereunder shall be in writing and shall be given by personal delivery, or registered or certified mail, return receipt requested, postage prepaid to the addresses set forth in Section 2 of this Article, and shall be deemed given upon receipt. In addition, notice may be given by facsimile transmission and shall be deemed given upon the receipt of the transmission and the mailing of a hard copy of the transmission.

2. Notices to the Parties shall be addressed as follows:

**Notice to the Rehabilitator:**

Superintendent of Insurance of
the State of New York as Rehabilitator of
Frontier Insurance Company
123 William Street
New York, NY 10038-3889

ATTN: John Tafuro
          Director of Reinsurance

Notice to Platinum:

Platinum Indemnity Limited
P.O. Box HM 2267
Windsor Place, 3d Floor
18 Queen Street
Hamilton HM JX
Bermuda

ATTN: Andrew McComb
          President

6

## ARTICLE G - GENERAL

1. This Commutation constitutes the entire understanding by and between the Parties hereto, superseding all negotiations, prior discussions, representations, promises, and understandings, oral or written, expressed or implied, made prior to or contemporaneous with its execution.

2. This Commutation may only be modified or amended by a written agreement, entered into subsequent to the date of the Commutation and duly executed by the Parties hereto. Such modification or amendment may require approval of the Justice of the Supreme Court of the State of New York supervising the Frontier rehabilitation.

3. This Commutation and any of the rights and/or obligations herein may not be assigned in whole or in part by any of the Parties hereto without prior written approval of the Parties hereto.

4. This Commutation shall be binding upon and inure to the benefit of the Parties hereto and their respective successors, assigns, heirs, executors, and administrators.

5. Waiver by any of the Parties of any term, provision, or condition of this Commutation shall not be construed to be a waiver of any other term, provision, or condition hereof, nor shall such waiver be deemed a waiver of any subsequent breach of the same term, provision, or condition.

6. The failure of any Party to enforce any of the provisions herein shall not be construed to be a waiver of the right of such Party to enforce any such provisions.

7. Each of the Parties hereto shall use its best efforts to cooperate with the other Party hereto in performing all acts necessary for carrying out this Commutation.

8. The Parties to this Commutation are entering into it in good faith, at arm's length, and in the regular course of business and are in agreement that this Commutation is

7

valid and enforceable. However, in the event that any court of competent jurisdiction or governmental agency renders an order, ruling, or other determination declaring this Commutation or any material provision hereof null and void, it is mutually agreed by the Rehabilitator and Platinum that each shall be restored to the position it was in just prior to entering into this Commutation.

9. If any provision of this Commutation, other than a provision covered in Section 8 of this Article is held by a court of competent jurisdiction to be invalid, the remaining provisions shall remain in full force and effect.

10. This Commutation shall be interpreted, construed, and enforced in accordance with the laws of the State of New York, without regard to its rules concerning conflict of laws.

11. In the event any differences or disputes arise between the Rehabilitator and Platinum with reference to this Commutation or the terms hereof, the same shall be referred to and determined solely in the Frontier rehabilitation pending in the Supreme Court of the State of New York.

12. Platinum hereby subjects itself to the personal jurisdiction of the Supreme Court of the State of New York and appoints the Superintendent of Insurance of the State of New York as its agent for acceptance of service of all process except service of the Order as specified in Article A.

13. The headings in this Commutation are descriptive only and shall not affect the interpretation or construction of this Commutation.

8

IN WITNESS WHEREOF the Parties hereto have executed this

Commutation as of the date(s) set forth below.


**GREGORY V. SERIO**
**Superintendent of Insurance of the**
**State of New York as Rehabilitator of**
**Frontier Insurance Company**


BY: _____
    RICHARD S. KARPIN
    Assistant Special Deputy
    Superintendent of Insurance

                                        _Florence Cornett_
                                        Witness


DATE: _December 27, 2002_


**PLATINUM INDEMNITY LIMITED**

BY: _____
    ANDREW McCOMB
    President

                                        _____
                                        Witness


DATE: DECEMBER 2, 2002

9

## ASSIGNMENT

For Ten Dollars ($10.00) and other good and sufficient

consideration, receipt of which is hereby acknowledged, Platinum Indemnity

Limited, a company organized and existing under the laws of the Islands of

Bermuda ("Assignor"), assigns all right, title, and interest in:

> (i) the attached Subscription and Shareholders
> Agreement (the "Agreement") executed as of
> January 16, 1998 between Platinum and Food
> Services Insurance Managers, Inc., a corporation
> organized and existing under the laws of California
> ("FSIM"); and

> (ii) the attached promissory note executed November 8,
> 2000 whereby FSIM promised to pay $469,515.00
> plus interest to Platinum

to GREGORY V. SERIO, Superintendent of Insurance of the State of New York

as Rehabilitator (the "Assignee") of Frontier Insurance Company ("Frontier") of

123 William Street, New York, New York.

Platinum further agrees to execute all documents which may be

necessary to effectuate the assignment of rights under the Agreement, and to

cooperate in any proceedings in which the Assignee may elect to pursue

enforcement of such rights, and to maintain all documents relevant to such rights

and, upon request, to timely provide copies of any such documents.

**PLATINUM INDEMNITY LIMITED**

BY: _____
ANDREW McCOMB
President

_____
Witness

DATE: ___DECEMBER 2, 2002___

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of

the Rehabilitation of

FRONTIER INSURANCE COMPANY

Index No. 405090/01

**VERIFIED PETITION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TO THE SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

       The Verified Petition of GREGORY V. SERIO, Superintendent of Insurance of the State of New York, as Rehabilitator of FRONTIER INSURANCE COMPANY ("FRONTIER"), by RICHARD S. KARPIN, Assistant Special Deputy Superintendent of Insurance and Agent in this proceeding, for approval of an agreement to compromise a claim pursuant to Section 7428 of the New York Insurance Law, respectfully shows and alleges:

       FIRST:  Your petitioner is the Superintendent of Insurance of the State of New York, as Rehabilitator of FRONTIER (the "Rehabilitator").

       SECOND:  FRONTIER was incorporated under the laws of the State of New York as a stock property/casualty insurer on November 2, 1962 and commenced business on August 17, 1966.

       THIRD:  On October 15, 2001, FRONTIER was placed into rehabilitation by order of this Court (the "Order of Rehabilitation") pursuant to which the Rehabilitator was authorized and directed to take possession of the property and rehabilitate FRONTIER and was vested with title to all property, contracts, and rights of action of FRONTIER.

FOURTH:  Subsequently, pursuant to the terms and provisions of the Order of Rehabilitation and Article 74 of the Insurance Law, RICHARD S. KARPIN was duly appointed Assistant Special Deputy Superintendent of Insurance and Agent in this proceeding.

FIFTH:  Prior to the rehabilitation of FRONTIER, PLATINUM INDEMNITY LIMITED ("PLATINUM") entered into a reinsurance agreement (the "Agreement") whereby PLATINUM was committed to reinsure certain risks of FRONTIER in respect of FRONTIER's liability on certain direct policies classified as food manufacturing and related industries and produced by Dwight Halvorson Insurance Services of Roseville, California.

SIXTH:  Pursuant to a Subscription and Shareholders Agreement annexed hereto as EXHIBIT 3, made as of January 16, 1998 and the Promissory Note  annexed hereto as EXHIBIT 4, Food Services Insurance Managers, Inc., a corporation organized and existing under the laws of California ("FSIM"), has undertaken to pay certain amounts to PLATINUM as additional capital contributions and as indemnification for negative balances in the account for Undistributed Profit Attributable to the Preferred Share (the "FSIM Obligations");

SEVENTH:  In an effort to settle and commute all liabilities and obligations between the parties, PLATINUM has offered to pay and the Rehabilitator has agreed to accept the sum of Fifteen Thousand Dollars and No Cents ($15,000.00) (the "Settlement Amount") and the duly executed Assignment in the form annexed as EXHIBIT 5 assigning to the Rehabilitator all right, title and interest in the FISM Obligations, including without limitation the FSIM Promissory Note (the "Settlement Consideration") as full and final satisfaction of all past, present, and future liabilities of PLATINUM based on, relating to, or arising out of the Agreement.

EIGHTH:  On December 2, 2002 and December 27, 2002 the parties executed the Reinsurance Commutation and Release Agreement (the "Commutation") in the form annexed hereto as Exhibit A.

NINTH:  Pursuant to the terms of the Commutation, PLATINUM will transfer the Settlement Amount to the Rehabilitator within fifteen (15) days of service upon PLATINUM of an Order approving the terms of this Commutation.

TENTH:  Members of the Rehabilitator's staff carefully reviewed all of the circumstances surrounding this matter and recommended that this offer be accepted and the matter be disposed of.

ELEVENTH:  The primary reasons the Rehabilitator agreed to this Commutation and is respectfully asking the Court to accept this Commutation are:

1.    The Commutation will enable the Rehabilitator to pursue the balances due from FSIM including all claims paid as of the date of valuation;

2.    The Commutation will enable the Rehabilitator to pursue balances due on future claims as they are settled.

3.    The Commutation will presently bring Fifteen Thousand Dollars and No Cents ($15,000.00) into the FRONTIER estate which could immediately begin earning interest;

4.    The Commutation would negate potentially expensive and protracted accounting and collection efforts to resolve the issue of the respective rights, duties and obligations of the parties pursuant to the Agreement.

TWELFTH:  As the Rehabilitator is compromising a claim which exceeds Twenty Five Hundred Dollars ($2,500), Petitioner asks the Court to approve this Commutation pursuant to Section 7428 of the Insurance Law.

THIRTEENTH:  Petitioner respectfully submits that the aforementioned settlement offer of Fifteen Thousand Dollars and No Cents ($15,000.00) plus the Assignment is fair and reasonable under the circumstances and is in the best interest of all the creditors and others interested in the affairs of the estate of FRONTIER.

FOURTEENTH: No previous application has been made for the relief requested herein to this or any other Court or Judge.

WHEREFORE, your petitioner prays for an Order of this Court authorizing and permitting the Rehabilitator to enter into the Commutation in the form annexed hereto and the transactions contemplated thereby, upon the terms and conditions set forth, and authorizing and permitting the Rehabilitator and his Assistant Special Deputy of Insurance to take such steps and to therein execute such Agreement and papers as may be necessary to effect, carry out and consummate said Commutation and said transactions.

Dated:    New York, New York
          March 5    , 2003

GREGORY V. SERIO
Superintendent of Insurance of the State
of New York as Rehabilitator of
FRONTIER INSURANCE COMPANY

By: _____
RICHARD S. KARPIN
Assistant Special Deputy Superintendent of
Insurance and Agent

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK)


RICHARD S. KARPIN, being duly sworn, deposes and says:

That he has read the foregoing Verified Petition and knows the contents thereof, and that the same is true to his own knowledge except as to the matters therein stated to be alleged upon information and belief, and as to those matters he believes it to be true; that the reason this petition is verified by this deponent rather than by the Superintendent of Insurance is that deponent is the duly appointed Assistant Special Deputy Superintendent of Insurance and Agent to take possession of the property of and rehabilitate the business of FRONTIER INSURANCE COMPANY, and as such is acquainted with the facts alleged therein.

Deponent further says that the sources of his information and the grounds of his belief as to the matters stated in said Verified Petition to be alleged upon information and belief are records, books and papers of said company in the possession of the Rehabilitator and communications made to deponent by employees and attorneys of the Rehabilitator.

RICHARD S. KARPIN

Sworn to before me this
5TH day of MARCH , 2003

Notary Public

STEVE S. MAHADEO
Notary Public, State of New York
No. 24-4897743
Qualified in Kings County
Commission Expires 6/18/2006

At IAS Part 19 of the Supreme Court of the State of
New York, County of New York, at the Courthouse
thereof, 60 Centre Street, in the Borough of
Manhattan, City and State of New York, on the
day of                    , 2003.

APR 3 0 2003

P R E S E N T :

HON. EDWARD H. LEHNER

JUSTICE.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of                                    INDEX No. 405090/01

the Rehabilitation of                               Order No.:        7

FRONTIER INSURANCE COMPANY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

FILED
MAY 02 2003
NEW YORK
COUNTY CLERK'S OFFICE

        Upon reading and filing the annexed Verified Petition of GREGORY V. SERIO,
Superintendent of Insurance of the State of New York, as REHABILITATOR of FRONTIER
INSURANCE COMPANY ("FRONTIER") by RICHARD S. KARPIN, Assistant Special
Deputy Superintendent of Insurance and Agent in this proceeding, for compromise of a claim
against PLATINUM INDEMNITY LIMITED pursuant to Section 7428 of the New York
Insurance Law, duly verified the 5th day of *MARCH*, 2003, the Affirmation of Christina J.
Lee dated *MARCH* 5 , 2003, and upon all the papers and proceedings heretofore had
herein;

        AND, it appearing from the Verified Petition of GREGORY V. SERIO, that the
interests of FRONTIER INSURANCE COMPANY, in Rehabilitation, its creditors, and all
others interested in the affairs of FRONTIER INSURANCE COMPANY, will best be served by
acceptance of the compromise and settlement referred to in said Verified Petition, and the relief
prayed for in the Verified Petition should be granted;

        NOW, on motion of STEVEN R. HARRIS, Esq., Attorney for the petitioner, it is

ORDERED, that the prayer of said petitioner be and the same hereby is granted; and it is further

ORDERED, that the Rehabilitator of FRONTIER INSURANCE COMPANY, and/or his duly authorized Assistant Special Deputy Superintendent of Insurance, be and they hereby are authorized and permitted to compromise and settle the Rehabilitator's claim against PLATINUM INDEMNITY LIMITED as more fully set forth in the annexed Verified Petition for the sum of Fifteen Thousand Dollars and No Cents ($15,000.00) and the delivery of a duly executed Assignment.

ORDERED, that the Rehabilitator of FRONTIER INSURANCE COMPANY, and/or his successors in office, and/or his duly authorized Assistant Special Deputy Superintendent of Insurance, be and they hereby are authorized and permitted to execute releases and any other instruments necessary to consummate the aforesaid settlement and to carry out and do so cause to be carried out and do all things that may be necessary or desirable to consummate the same.

ENTER

J. S. C.

FILED
MAY 02 2005
NEW YORK
COUNTY CLERK'S OFFICE

**EXHIBIT B**

# ENTWISTLE & CAPPUCCI LLP

ATTORNEYS AT LAW
299 PARK AVENUE
NEW YORK, NEW YORK 10171-1499
TELEPHONE: (212) 894-7200
TELECOPIER: (212) 894-7272
www.entwistle-law.com

AUSTIN, TX
CHICAGO, IL
FLORHAM PARK, NJ

NEW YORK, NY
TALLAHASSEE, FL
WASHINGTON, DC

December 8, 2004

**VIA FACSIMILE**
Lorienton N.A. Palmer, Esq.
Schindel, Farman & Lipsius LLP
14 Penn Plaza, Suite 500
New York, New York 10122

> Re:    **Frontier Insurance Co. v. Dwight Halvorson Insurance Services, et al.,
> 04 Civ. 3361 (KMK)**

Dear Mr. Palmer:

Your clients' discovery responses and related document productions are now long overdue. Despite your repeated assurances that we would receive discovery responses and documents, your clients continue to be in non-compliance with their obligations under the discovery rules. Most recently, on November 30, 2004, you advised me that we would receive your clients' responses and documents by no later than December 2, 2004. Nearly a week has passed since that deadline and we have still not received such responses or any indication from your office as to when we could expect your clients' responses.

Neither Judge Berman nor Judge Karas has stayed discovery in this matter during the pendency of your clients' motion. As you know, we are on a tight discovery schedule. This constitutes our final attempt to resolve this matter amicably. Kindly provide us with your clients' responses and documents by the close of business tomorrow or we will raise this issue with the Court immediately.

Very truly yours,

Adam F. Jachimowski

AFJ/js

**EXHIBIT C**

# ENTWISTLE & CAPPUCCI LLP

ATTORNEYS AT LAW
299 PARK AVENUE
NEW YORK, NEW YORK 10171-1499
TELEPHONE: (212) 894-7200
TELECOPIER: (212) 894-7272

AUSTIN, TX
CHICAGO, IL
FLORHAM PARK, NJ

www.entwistle-law.com

NEW YORK, NY
TALLAHASSEE, FL
WASHINGTON, DC

December 10, 2004

**VIA HAND DELIVERY**
Honorable Kenneth M. Karas, U.S.D.J.
Daniel Patrick Moynihan
  United States Courthouse
500 Pearl Street, Room 920
New York, New York 10007-1312

> Re:     **Frontier Insurance Co. v. Dwight Halvorson Insurance Services, et al.,**
>         **04 Civ. 3361 (KMK)**

Dear Judge Karas:

        We represent plaintiff Gregory V. Serio, Superintendent of Insurance of the State of New York, as Rehabilitator of Frontier Insurance Company and as Assignee of Platinum Indemnity, Ltd., in the above-referenced matter. We write to respectfully request the Court's assistance in resolving a discovery dispute that has arisen in this litigation. In short, the defendants' discovery responses are now long overdue and defense counsel has provided no meaningful assurances that those responses will be forthcoming.

        In early October 2004, we served on defense counsel our document demands and interrogatories. The defendants' responses to those discovery requests were due in early November 2004. To date, we have yet to receive any responses from the defendants. On repeated occasions throughout the past month, we have contacted defense counsel in an attempt to resolve this issue amicably. Defense counsel repeatedly assured us that we would receive discovery responses and documents in short order. Most recently, on November 30, 2004, defense counsel advised that we would receive the responses and documents by no later than December 2, 2004. Over a week has passed since that deadline and we have still not received either responses or documents, nor have we received any indication from defense counsel as to when we might expect the outstanding discovery responses. On December 8, 2004, we wrote to defense counsel advising that if this matter was not resolved by the close of business on December 9, 2004, we would raise the issue with the Court. As of this morning, we have received no response to our letter.

Hon. Kenneth M. Karas, U.S.D.J.
December 10, 2004
Page 2


        Significantly, the Court has <u>not</u> stayed discovery during the pendency of the defendants' dismissal motion.  Discovery is scheduled to close on February 9, 2005.  Under the circumstances, we respectively request a conference with the Court in an effort to get discovery on track in the most expeditious manner possible.

        Thank you for your consideration.

        Respectfully submitted,

        William S. Gyves

WSG/jr

cc:     Lorienton N.A. Palmer, Esq. (via facsimile)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
                                       :

Gregory V. Serio, Superintendent of Insurance  :
of the State of New York, as Rehabilitator of    :
FRONTIER INSURANCE COMPANY, and as  :      04 CV 3361 (KMK)
Assignee of PLATINUM INDEMNITY, LTD.,  :
                                         :

                        Plaintiff,  :     **DECLARATION OF**
                                   :     **RONALD LABENSKI**
      -against-                   :
                                         :

DWIGHT HALVORSON INSURANCE       :
SERVICES, INC d/b/a/ F.S.I.M. INSURANCE  :
SERVICES and FOOD SERVICE INSURANCE  :
MANAGERS, INC.,                      :
                                         :

                    Defendants.  :
                                         :
----------------------------------------------------------------x

        RONALD LABENSKI, pursuant to 28 U.S.C. § 1746, being of full age, hereby

declares as follows:

        1.    I am the Chief Reinsurance Officer of Frontier Insurance Company in

Rehabilitation ("FIC"), the plaintiff in the above-captioned matter. I respectfully submit this

Declaration in opposition to the defendants' motion to dismiss the Complaint.

        2.    This litigation arises out of a workers' compensation insurance program

called the Food Service Insurance Managers, Inc. program. Internally at FIC, this program is

referred to as the FSIM Program.

**The FSIM Program**

        3.    There were four corporate entities involved in the FSIM Program.

        4.    FIC itself issued the policies to the insureds participating in the FSIM

Program.

5.      Defendant Dwight Halvorson Insurance Services, Inc. ("DHIS"), an insurance agency catering to the food services industry, introduced FIC to the program and served as FIC's agent with respect to that program.

6.      Food Service Insurance Managers, Inc. ("FSIM") was the risk-bearing managing general agency formed by DHIS's president, Dwight J. Halvorson, as part of this comprehensive workers' compensation insurance program he developed and marketed to the agribusiness and food-related industries.

7.      Platinum Indemnity, Ltd. ("Platinum") served as the Bermuda-based rent-a-captive insurance company around which Halvorson structured the FSIM Program.

**Mechanics of a "Captive" Program**

8.      I have worked in the reinsurance industry for twenty-four years. During this period, I have on numerous occasions been directly involved in insurance programs (such as the one at issue in this case) in which reinsurance was provided through offshore captives.

9.      A captive insurance company is an insurance company owned and controlled by the insureds themselves. Its primary purpose is to insure the risks of those owners.

10.     Captive insurance programs provide an alternative source of coverage to insureds for whom the conventional approach of purchasing policies from an established insurance carrier may be unavailable or prohibitively expensive.

11.     For a variety of regulatory and financial reasons, captive insurers typically are domiciled in offshore jurisdictions, including Bermuda, Platinum's base of operations.

12.     One variation of the captive insurance program approach -- and the approach the Defendants in this action utilized -- is to structure the program around what is referred to as a "rent-a-captive."

2

13.     A rent-a-captive is designed to accommodate insureds who either are unable or unwilling to assume the higher costs of establishing their own captive, a process which can require substantial upfront costs and capital investment.

14.     A rent-a-captive facility involves a captive formed by one or more sponsors who then "rent" the captive's capital, surplus, services and expertise to various insureds or groups of insureds.

15.     The insured or insureds who use the rent-a-captive typically purchase non-voting preferred shares in the captive, pay a fee and post some form of collateral to shield the captive reinsurer from any underwriting losses that may arise.

16.     In the typical rent-a-captive facility, separate rent-a-captive accounts are established within the overall captive infrastructure for each distinct set of insureds. Premiums collected on policies issued under a particular program are credited to the appropriate rent-a-captive account and loss payments made in connection with those losses are debited from the appropriate account.

17.     These offshore captives typically are not licensed to actually issue insurance policies within the United States. As a result, they typically act solely as reinsurers and partner with a "fronting" insurer that is licensed to issue policies in the United States to the insureds participating in the program.

18.     FIC was the fronting carrier in the FSIM Program.

19.     The fronting carrier issues the policies and then transfers a significant portion of the risk back to the offshore captive pursuant to a reinsurance agreement.

3

### The Controlling Agreements

20.    The rights and obligations of the key players in the FSIM Program are set

forth in three documents: the Limited Agency Agreement ("Agency Agreement") between FIC

and DHIS, the Subscription and Shareholders Agreement ("Subscription Agreement") between

FSIM and Platinum, and the Reinsurance Agreement between Platinum and FIC ("Reinsurance

Agreement").

21.    I am advised that the Agency Agreement is attached as Exhibit A to the

Answer. For the Court's convenience, I also have attached a copy of that contract hereto as

Exhibit A.

22.    I am advised that the Subscription Agreement is attached as Exhibit B to

the Answer. For the Court's convenience, I also have attached a copy of this contract hereto as

Exhibit B.

23.    I have attached a copy of the Reinsurance Agreement hereto as Exhibit C.

### Funding the FSIM Account at Platinum

24.    When viewed collectively, these three contracts outline the mechanism by

which FSIM was supposed to fund its account with Platinum. I have reviewed the Complaint in

this action. As I understand it, the degree to which FSIM did or did not fund its account is at the

center of the two claims Platinum has assigned to FIC and which are being asserted against

FSIM here.

25.    The first step in this process of funding FSIM's account with Platinum

was for DHIS to collect from the program's participating insureds the monies necessary to pay

the premiums due on the FIC policies. This obligation is reflected in Section 6.2 of the Agency

Agreement.

26.    Next, the premiums collected by DHIS, less DHIS's fees, were to be forwarded to FIC in New York. This obligation is set forth at Sections 6.1 and 6.2 of the Agency Agreement.

27.    FSIM itself forwarded these payments for deposit in FIC's account with a New York bank. It did so by checks and wire transfers, as evidenced by the documents attached as Exhibits G and H to the Declaration previously submitted by my colleague, Laurie J. Weiss.

28.    Once these funds were received by FIC in New York, FIC was to deduct its fees and then forward the resulting net premium to Platinum in Bermuda. This obligation is set forth at page 3 of the Reinsurance Agreement.

29.    Platinum, in turn, was to credit the net premiums received from FIC to the FSIM account within the captive facility. This obligation is reflected in Section 1(d) of the Subscription Agreement.

### Remedying the "Negative Balance"

30.    As is reflected in Section 4(a) of the Subscription Agreement, FSIM was obligated to pay to Platinum all amounts necessary to remedy any "Negative Balance" in its account within the captive.

31.    Pursuant to a somewhat complicated formula involving Sections 1(n), 1(o) and 4(a) of the Subscription Agreement, a Negative Balance would arise if the losses Platinum was compelled to reinsure under the FSIM Program outstripped the flow of premium dollars FSIM paid to FIC in New York and which then were forwarded to Bermuda to fund FSIM's account. In essence, this circumstance would occur if the monies credited to FSIM's account were not sufficient to cover the funds debited from that same account to cover losses.

32.    The Subscription Agreement does not specify the manner in which FSIM was to make any payments necessary to remedy a Negative Balance. However, it is my understanding -- based on my experience in the reinsurance industry, my prior numerous dealings with Platinum and its principals and certain discussions I have had with one of those principals with respect to the FSIM Program -- that FSIM was expected to make these payments in a manner consistent with the mechanism set up for payments on the promissory note FSIM executed and delivered to Platinum ("Note") on or about November 8, 2000.  I am advised that a copy of the Note is attached to the Complaint.

33.    In short, it is my understanding that FSIM's payments to remedy any Negative Balance were expected to be wired to Platinum through Chase Manhattan Bank in New York, as specified in the Note.  I understand that wire transfers through this New York bank was Platinum's preferred means of payment in dealing with its business partners, such as FSIM.

6

I declare under penalty of perjury that the foregoing is true and correct.  Executed on December 16, 2004.

RONALD LABENSKI

**EXHIBIT A**

# FRONTIER INSURANCE COMPANY

# LIMITED AGENCY AGREEMENT

This Limited Agency Agreement **("Agreement")** is entered into by and between **FRONTIER INSURANCE COMPANY**, an insurance company domiciled in New York **("Company")**(and/or their subsidiary companies as required), and **Dwight Halvorson Insurance Services**, a California Corporation ("**Agent**").

## COMPANY AND AGENT HEREBY AGREE AS FOLLOWS:

## ARTICLE 1 - APPOINTMENT

1.1    **Company** hereby appoints **Agent** to act on behalf of **Company** with the authority and subject to the terms and conditions hereinafter set forth, and **Agent** hereby accepts such appointment.

1.2    **Company's** appointment of **Agent** hereby shall not restrict in any manner **Company's** right to appoint other producers and agents.

## ARTICLE 2 - DEFINITIONS

2.1    **"Sub-producer"**shall mean any insurance broker, insurance agent or other person or entity properly licensed to produce insurance and through which Policies may be produced to **Agent**.

2.2    **"Effective Date"** shall mean 12:01 a.m., January 1, 1998.

2.3    **"Policy"** shall mean any Policy, contract, coverage slip, endorsement, binder, certificate, proposal for insurance or other document which binds **Company** to insurance or coverage issued or renewed by **Company** on or after the Effective Date through **Agent** and shall also include any rewrite, renewal or extension (whether before or after termination of this Agreement) through **Agent** required by law.

## ARTICLE 3 - AUTHORITY OF AGENT

3.1    **Agent** is hereby authorized and assumes the duty to act on behalf of **Company** as a casualty broker-Agent. All actions and inactions of **Agent** under this authorization

12/29/97                                    1

FIC/FSIM 000071

shall be subject to the ultimate authority of **Company**, and **Company** from time to time shall be entitled to place reasonable restrictions on **Agent's** authority; provided such restrictions are in writing.

3.2    **Agent** is hereby authorized, subject to the terms of Article 11, requiring prior written permission and applicable law, to advertise and solicit with respect to **Company** and the business to be produced through the **Agent** hereunder.

3.3    **Agent** is hereby authorized, subject to underwriting guidelines established and rates set by **Company** from time to time and applicable law to accept applications, to quote, bind and decline coverages and to conduct audits ("Underwrite") on behalf of **Company** for all classes or lines of insurance set forth in Addendum No. 1, Schedule of Business prepared by **Company** and attached hereto ("Schedule of Business"); provided **Agent** shall use applications and quote, bind and decline forms approved by **Company** or where unregulated business, the generally accepted market forms, and provided additionally that except where specifically agreed in writing **Agent** shall have no authority to bind reinsurance or retrocessions on behalf of **Company**. The Schedule of Business shall provide the authority of **Agent** with regard to, but not limited to, underwriting guidelines, the types of risks which may be written, maximum limits of liability, territorial limitations, maximum Policy periods and projected annual premium volume. The Schedule of Business may be amended from time to time as deemed appropriate by **Company**, provided such amendments are in writing.

3.4    **Agent** is hereby authorized, as a trustee for **Company**, and subject to applicable law, to print, maintain, execute and issue Policies and to assemble, countersign and issue Policies.

3.5    **Agent** is hereby authorized, subject to applicable law, Policy provisions and **Company's** ultimate authority, to cancel and renew Policies underwritten or delivered by **Agent** hereunder.

3.6    **Agent** shall be responsible to the Insured while this Agreement continues in effect for the renewal or non-renewal of any Policy underwritten or delivered by **Agent** hereunder and shall in a timely manner and pursuant to applicable statutes and regulations communicate any renewal quote or notice of non-renewal to the insured to preclude the extension of coverage beyond the expiration date of the Policy.

3.7    **Agent** is hereby authorized, as a trustee for **Company**, and subject to the applicable provisions of this Agreement, to receive and receipt for premiums and fees, to pay return premiums, to pay adjustments and to retain and pay commissions out of such collected premiums, subject to the provisions of this Agreement and applicable statutes and regulations.

12/29/97                                    2



3.8    With the exception of Food Services Insurance Managers, Inc., **Agent** shall not authorize any sub-producer or other person or entity to quote, bind, or decline coverages or otherwise underwrite on behalf of **Company** without the prior written consent of the **Company.**

3.9    The original sources of some or all business under this Agreement shall be sub-producers. **Agent** is hereby authorized to enter into agreements with such sub-producers with respect to the business hereunder; provided **Agent** shall have no authority to obligate Company in any manner to such sub-producers and all agreements with such sub-producers shall provide that the sub-producers shall have no claims or causes of action against **Company** except for reckless conduct or willful misconduct of **Company.** Additionally, **Agent** shall be responsible for verifying the proper licensing of such sub-producers, and if any liabilities are incurred by **Company** as the result of **Agent's** accepting business from unlicensed or improperly licensed sub-producers, **Agent** shall indemnify and hold **Company** harmless from, and reimburse **Company** for, any and all such liabilities, including but not limited to fines, court costs and expenses, legal fees and travel expenses.

3.10   **Agent** may accept as a trustee for **Company** premium financed by premium finance companies, upon terms and conditions approved in writing by Company.

3.11   **Agent** shall not process, adjust, settle or pay any claims under Policies underwritten or delivered by **Agent** pursuant to this Agreement, nor shall **Agent** commit **Company** to pay any claim. Should **Agent** become aware, or have delivered to it any notice of claim or claims, **Agent** immediately shall forward such notice of claim or claims to **Company** or its designee in a manner designated by **Company.**

## ARTICLE 4 - COMPENSATION

4.1    Except as otherwise specified on the Schedule of Business, **Company** shall allow **Agent** a gross commission of twelve (**12%**) of all gross written premium collected, for Policies underwritten or delivered by **Agent** hereunder. This commission arrangement shall be reviewed from time to time and shall be subject to adjustment at the discretion of the Company on a prospective basis and upon at least sixty (60) days prior written notice to the **Agent.**

4.2    The **Agent** is responsible for all commissions due to sub-producers and others with respect to Policies written or delivered hereunder. The **Company** shall not be responsible to pay sub-producers.

4.3    **Agent** shall charge and collect for all Policy and other fees required with respect

12/29/97                                3

FIC/FSIM 000073

to business produced hereunder to the extent such charges are permitted by law.

## ARTICLE 5 - ACCOUNTING, RECORDS AND EDP

5.1    **Agent** shall provide and maintain in forms reasonably acceptable to **Company** complete and accurate books, records, dailies and correspondence necessary to determine the amount of liability of **Company** and the amount of premium and expense derived from business written hereunder.

5.2    The omission of any item from any statement, or report applicable to the business hereunder shall not affect the responsibility of either party to account for and pay all amounts due the other party hereunder, nor shall it prejudice the rights of either party to collect all such amounts due from the other party.

5.3    **Agent** shall prepare separate, itemized, invoices and/or monthly statements for each sub-producer for the business produced by the sub-producer hereunder, and furnish the sub-producers IRS Forms 1099 each year if and when required.

5.4    All of **Agent's** records applicable to the business hereunder shall be kept in such manner and form as are generally recognized as acceptable in the insurance industry or as reasonably may be required by **Company**. Such records shall be maintained for five (5) years or for any longer retention period required by law or **Company.**

5.5    All records in **Agent's** possession or control and applicable to the business hereunder shall be made available for inspection, copying and/or audit at reasonable times by **Company** or its **Agents**, or any governmental authority with the right to inspect.

5.6    All records in **Agent's** possession or control and applicable to the business hereunder shall be made available, upon prior written request and at the **Company's** cost, for inspection at any office of **Company**, should such inspection be requested by insurance department or other governmental authorities.

5.7    **Agent** shall immediately forward upon request to Company or Company's Agent's exact, as written, copies of all applications, Policies and reports underwritten or delivered by **Agent** or used by **Agent** hereunder, including all other evidence of insurance written, modified or terminated.

5.8    **Agent** shall be solely responsible for and shall keep accurate records of all Policy supplies assigned to **Agent** and shall account to **Company,** upon **Company's** request, for all outstanding and unused Policy supplies. If canceled or terminated Policy supplies are unavailable, **Agent** shall forward or cause to be forwarded to

12/29/97                    4

FIC/FSIM 000074

**Company** properly executed lost Policy receipts therefor. Upon termination of this Agreement, **Agent** shall promptly dispose of all Policy supplies and other property of the **Company** as directed by the **Company.**

5.9    **Company** shall be entitled to conduct examinations of Agent's operations at any reasonable time. Such examinations shall be conducted in reasonable manners and may cover such matters as required or permitted by law and as are relevant to the business done hereunder.

5.10    **Agent** shall furnish **Company,** with any additional information and reports as reasonably requested by **Company** and necessary to complete **Company's** quarterly and annual statements filed with regulatory authorities or otherwise satisfy regulatory requirements.

5.11    **Agent** shall annually furnish **Company,** within ninety (90) days following the end of the **Agent's** fiscal year, current (audited, if available) financial statements of **Agent.** These financial statements shall include, but not be limited to, profit and loss, balance sheet and cash flow statements.

## ARTICLE 6 - ACCOUNT CURRENT

6.1    The **Agent** shall, not later than fifteen (15) days after the end of each month, prepare and forward to the **Company** a detailed and itemized statement of account of all premiums written and premium adjustments made (whether additional or return) within the month for which the statement (herein referred to as the "Account Current") is rendered. However, the **Company** shall have the privilege, exercisable at its option, of preparing the Account Current.

6.2.    The **Agent** shall pay the balance, if any, due the **Company** as shown on each Account Current within forty-five (45) days following the end of the month for which the Account Current was rendered. Upon rendition by the **Company** of invoices or statements adjusting or correcting any Account Current, the **Agent** shall pay to the **Company** forthwith the balance, if any, shown to be due thereon. **Agent** shall be responsible to pay written premium to the **Company,** whether or not premium has been paid by any insured or sub-producer, it being understood that **Agent** assumes the credit risk should it bind insurance without receiving premium.

6.3    The Account Current between the parties prepared and forwarded by the **Company** in accordance with the above, or invoices, statements or adjustments on any Account Current transmitted to the **Agent** by the **Company** shall be binding and conclusive on the **Agent** unless the **Agent,** within ten (10) days from receipt of such Account Current, invoice, statement or adjustment shall send to the **Company** a

12/29/97                                              5

written itemization of objections thereto.

6.4    The provisions of this Article, which are binding upon the parties subsequent to the termination of this Agreement, shall survive such termination until all obligations are finally discharged.

## ARTICLE 7 - EXPENSES

7.1    **Agent** shall be responsible for and promptly pay all expenses attributable to producing and servicing business under this Agreement, except as specified in Section 7.2. This responsibility shall not be altered whether the expenses are billed to **Agent** or **Company.** These expenses shall include, but not be limited to:

(a)    Salaries, related taxes and benefits of all employees of **Agent;**

(b)    Transportation, lodging and meals of employees of **Agent;**

(c)    Postage and other delivery charges;

(d)    Advertising unless specifically agreed otherwise by **Company** in writing;

(e)    EDP hardware, software and programming;

(f)    Countersignature fees or commissions;

(g)    License and appointment fees for **Agent's,** brokers, sub-producers and others;

(h)    Income and state and local sales taxes, if any, directly applicable to **Agent's** business;

(i)    Taxes on surplus lines premium, and Policy fees if necessary in respect of Policies underwritten or delivered by **Agent** hereunder;

(j)    Costs of office space, facilities, equipment and occupancy used by **Agent;**

(k)    Legal and auditing expenses incurred by **Agent** in the normal conduct of its business; and

(l)    Such other expenses as are customarily borne by insurance producers.

12/29/97                                    6

FIC/FSIM 000076

(m)  Any and all charges made by NCCI or applicable state governing body against premium volume written under this program. It being understood that **Company** is an NCCI member company and that NCCI or state governing body charges are applicable on both a fee for service basis and a percentage charge applicable against total premium volume written under this program;

(n)  Printing of preposals, booklets, certificates, solicitation brochures, premium notices, records and reports, and all documents and other materials required to fulfill the obligation of Manager under this agreement;

7.2  **Company** shall be responsible for and promptly pay all expenses incurred by **Company** under this Agreement. This responsibility shall not be altered whether the expenses are billed to **Company** or **Agent.** These expenses shall include but not be limited to:

(a)  Salaries, related taxes and benefits of all employees of **Company;**

(b)  Transportation, lodging and meals of employees of **Company;**

(c)  Board and bureau fees;

(d)  Income and state and local sales taxes, if any, directly applicable to **Company's** business;

(e)  State or guaranty fund assessments;

(f)  Losses and loss adjustment expenses incurred by or at the direction of **Company;**

(g)  Reinsurance costs;

(h)  Legal and auditing expenses incurred by, on behalf of or at the direction of the **Company;** and

(i)  Such other expenses as are customarily borne by insurance companies.

## ARTICLE 8 - HANDLING OF FUNDS

8.1  **Agent** shall accept and maintain at all times all premium collected and other funds relating to the business underwritten by **Agent** under this Agreement in the capacity of a fiduciary and trustee for **Company**. The privilege of retaining commissions shall not be construed as changing the fiduciary capacity.

8.2  **Agent** shall establish and maintain a premium trust account designated **Food**

12/29/97                         7

**Services Insurance Managers, Inc., Premium Trust Account - Frontier** in a bank mutually agreed by **Agent** and **Company** and shall deposit into such premium trust account all premiums collected by **Agent** hereunder. **Agent** shall have the right to transfer funds held in such premium trust account to successor banks with the prior written consent of **Company.** All such banks shall be members of the Federal Reserve System whose deposits are insured by the Federal Deposit Insurance Corporation. **Agent** shall be entitled to retain any interest earned on funds deposited in such premium trust accounts until premium is to be remitted to **Company** pursuant to Article 6 hereof.

8.3     **Agent** shall maintain sole signature authority on such premium trust account and may use any and all premium and other funds collected by **Agent** under this Agreement only for the following purposes:

(a)     Payments of amounts due **Company** pursuant to this Agreement;

(b)     Return of unearned premiums arising due to cancellation or endorsement of Policies underwritten or delivered by **Agent;**

(c)     Payment of **Agent's**, sub-producers' and others' compensations as described in Article 4;

(d)     Return of money deposited in error; and

(e)     Withdrawal of interest due **Agent** hereunder.

8.4     **Agent** shall not commingle any funds in such premium trust account with funds in **Agent's** corporate accounts or other funds held by **Agent** in any other capacity.

8.5     **Agent** shall render accounts to **Company** detailing all premium trust account transactions, and remit to **Company** all funds due under this Agreement pursuant to said account by the end of the month following the month during which the **Agent** collected such funds for the account of the **Company.**

8.6     In the absence of negligence or fraud by either party hereto, neither party shall be liable for any loss which occurs by reason of the default or failure of the bank in which an account is carried.

8.7     **Agent** shall promptly account for and refund commissions on Policy cancellations, reductions in premiums or any other return premiums at the same rate at which such commissions were originally retained.

8.8     Neither **Company** nor **Agent** shall offset any balances due under this Agreement

FIC/FSIM 000078

with any amounts due under any other agreement between **Company** and/or its affiliates and **Agent** and/or its affiliates.

## ARTICLE 9 - OWNERSHIP OF BOOKS AND RECORDS

9.1     Subject to Article 5 hereof, upon termination of this Agreement, **Agent's** records and the exclusive use and control of expirations of business produced by sub-producers retained by **Agent** and contracts with such sub-producers shall remain the sole property of **Agent** and be left in **Agent's** undisputed possession, provided **Agent** is not then in default of any payment obligated to **Company** hereunder. If **Agent** is then in default of any such payment obligated and has not cured such default within fifteen (15) days of **Company's** notice to **Agent** thereof, ownership of the records, use and control of expirations and contracts with sub-producers shall become and remain vested in **Company**. **Company** may then dispose of such expirations as it deems proper.

9.2     **Agent** hereby assigns to **Company** as security for the payment obligations of **Agent** under this Agreement all sums due or to become due to **Agent** from any insureds whose Policies were underwritten or delivered by **Agent** hereunder. **Company** shall have full authority to demand and collect such sums if **Agent** is then in default of any payment obligation to **Company** hereunder and has not cured such default within fifteen (15) days of **Company's** notice to **Agent** thereof.

9.3     **Agent** pledges and grants to **Company** to further secure the payment obligations of **Agent** hereunder all of **Agent's** records of expirations of Policies, including, but not limited to, the ownership and use of such expirations. **Company** shall have the rights of the holder of a security interest granted by law, including, but not limited to, the rights of foreclosure to effectuate such security interest, and **Agent** hereby agrees peaceably to surrender possession of such records to the **Company** upon demand.

9.4     **Agent** agrees that this Agreement or a copy hereof may be filed as a financing statement, if **Company** so elects. **Agent** further agrees to sign a UCC-1 Form to secure **Company's** security interest in the expirations and renewals upon request by **Company**; provided that upon termination of this Agreement and **Agent** not being in default of any payment obligation to **Company** hereunder, **Company** immediately shall cancel or terminate such filing.

## ARTICLE 10 - INDEPENDENT CONTRACTOR RELATIONSHIP

10.1    Nothing contained in this Agreement shall be construed to create the relationship of employer and employee between **Company** and **Agent**, or between **Company**

12/29/97                                    9

FIC/FSIM 000079

and any employees, representatives or sub-producers of **Agent**. **Agent** shall carry out its responsibilities hereunder subject to its own discretion and not subject to time or manner directions of **Company**.

## ARTICLE 11 - ADVERTISING

11.1    Before **Agent** uses **Company** name in any form of advertising, a copy of the proposed advertisement shall be forwarded to **Company**. No such advertisement shall be used without the prior written permission of **Company**. All agreements with sub-producers shall require that before they use **Company's** name in any advertising, a copy of the proposed advertisements shall be forwarded to **Company**, and that no such advertisements shall be used without the prior permission of **Company**.

11.2    If an advertisement containing **Company's** name is used by **Agent** or sub-producers retained by **Agent**, **Agent** shall maintain a copy of the advertisement and full details concerning where, when and how it was used, and comply with all legal requirements regarding content, review and approval of advertising and maintenance of records. **Agent**, however, shall not be required to maintain records of the names and addresses of recipients of any direct mailing or advertising but shall only record the geographical area in which such mailing or advertising was used except to the extent retention of such information is required by law.

## ARTICLE 12 - LICENSING

12.1    **Agent** warrants that it has and shall maintain current licenses and authorities as required by law for the conduct of its business pursuant to this Agreement.

12.2    **Agent** shall be responsible for verifying that all sub-producers to **Agent** shall maintain appropriate licenses and authorities as required by law for conduct of their businesses.

12.3    **Agent** shall maintain in force written agreements, in form reasonably satisfactory to **Company**, with sub-producers to **Agent** hereunder.

## ARTICLE 13 - AGENT'S SALE OR TRANSFER

13.1    In the event any interest in **Agent** is to be sold or transferred or is to merge to be consolidated with another firm not under common control, controlling or controlled by **Agent** or **Company**, **Agent** shall give thirty (30) days advance written notice to **Company**, to allow **Company**, at its election:

12/29/97                                    10

(a)     To consent to assignment of this Agreement to the successor;

(b)     To enter into a new Agreement with the successor; or

(c)     To terminate this Agreement.

13.2    **Company**  shall notify **Agent** of its decision within fifteen (15) days of the receipt of the notice.

13.3    **Agent** shall notify **Company** in writing within fifteen (15) days if there is a change in:

(a)     Ownership of ten-percent (10%) or more of the outstanding voting stock of **Agent**; or

(b)     The President of **Agent,**

## ARTICLE 14 - INDEMNITY AGREEMENT

14.1    **Agent** shall indemnify and hold **Company** (including its officers and employees) harmless from any and all claims, causes of action, damages, judgments, fines, penalties and expenses (including, but not limited to, attorney's fees, litigation expenses and costs of court) which may be made against the **Company** by anyone, including any governmental agency or regulatory authority, and which arise, either directly or indirectly, principally out of any negligent or grossly negligent actions or inactions or willful misconduct or violation of any statute or regulation by **Agent**, including, but not limited to, any negligent or grossly negligent actions or inactions or willful misconduct or violation of any statute or regulation by any sub-producer to **Agent** or any of **Agent's** or such sub-producers' employees or representatives arising under this Agreement.

14.2    **Company** shall indemnify and hold **Agent** (including its officers and employees) harmless from any and all claims, causes of actions, damages, judgments, fines, penalties and expenses (including, but not limited to, attorney's fees, litigation expenses and costs of court) which may be made against the **Agent** and which arise either directly or indirectly, principally out of any negligent or grossly negligent actions or inactions or willful misconduct or violation of any statute or regulation by **Company**, including, but not limited to, any negligent or grossly negligent actions or inactions or willful misconduct or violation of any statute or regulation by **Company's** employees or representatives arising under this **Agreement.**

14.3    If any person seeks indemnity hereunder the person to be indemnified ("**Indemnified Person**") shall give the indemnifying party ("Indemnifying Party")

12/29/97                                                 11

FIC/FSIM 000081

prompt written notice of the claim, cause of action, damage, judgment, fine, penalty and expense against which indemnification is sought, including copies of all documents and information reasonably relating thereto. The Indemnifying Party promptly shall commence defending the Indemnified Person through competent attorneys reasonably satisfactory to the Indemnified Person. The Indemnified Person shall cooperate with the Indemnified Party in such defense, but the ultimate decision whether to defend or settle shall be made by the Indemnified Person.

14.4    If either party shall institute any lawsuit to enforce the obligations assumed by the other party under this Agreement, the prevailing party shall be entitled to recover from the other party all costs, expenses, judgments and attorney's fees incurred by the prevailing party in connection with the lawsuit.

14.5    **Agent** warrants that it has and shall maintain Errors & Omissions insurance with an insurer reasonably acceptable to **Company** and providing coverage of the greater of (i) the minimum required by law or (ii) $1,000,000.

## ARTICLE 15 - MEDIATION AND VENUE

15.1    If irreconcilable differences arise as to business done under this Agreement, either party may request, in writing, mediation of such difference. Such mediation shall be conducted pursuant to Commercial Mediation Rules of the American Arbitration Association. Such mediation shall be conducted in **New York** and concluded within thirty (30) days after notice of mediation. The costs of the parties incurred in the mediation shall be allocated by the mediator pursuant to the equities of the parties with respect to the matter mediated. Any such mediation shall be non-binding and without prejudice.

15.2    If any dispute cannot be resolved by mediation, the parties agree that the courts of **New York** shall have exclusive jurisdiction to resolve any such dispute and that the internal law of the state of **Company's** domicile will apply to the interpretation and enforcement of the dispute.

## ARTICLE 16 - TERMINATION

16.1    This Agreement shall be terminable by (i) either party upon fifteen (15) days prior written notice to the other party for "cause" (defined, as hereinafter used, as the other party's permanent legal or physical inability to perform its obligations hereunder, the other party's conviction of a felony, or the other party's "Material Breach" of this Agreement and failure to cure such Material Breach within the applicable cure period); (ii) the **Company** in the event the **Company** determines that the **Agent** has exceeded the authority granted the **Agent** by the **Company**

12/29/97                                12

FIC/FSIM 000082

under Article 3 - Authority of Agent or (iii) upon ninety (90) days prior written notice to the other party as of the end of any calendar quarter. A "Material Breach" shall consist of (a) failure by a party to pay any amount due hereunder when due, which is not paid within fifteen (15) days following the other party's written demand for such payment, or (b) the failure to obtain or maintain, or the termination or suspension of, a license, permit or other authority necessary for a party to conduct its business as contemplated hereunder which is not cured within thirty (30) days.

16.2    Upon termination, **Agent** promptly shall deliver or cause to be delivered to **Company**, at **Company's** expense, all property of **Company** in **Agent's** control or possession, including but not limited to, EDP equipment owned by **Company**, Policies, manuals, forms, unused drafts and all materials used in servicing of Policies, including computerized and data processing records and the physical equipment required for the processing of those records and data. If **Agent** fails to deliver such property within fifteen (15) days after the termination of this Agreement, **Agent** shall bear all reasonable expenses which **Company** may expend or cause to be expended in obtaining such items. If Policy supplies cannot be accounted for by **Agent** or have been destroyed, lost or mislaid, **Agent** agrees to protect, defend and hold **Company** harmless from all persons and claims whatsoever arising with respect to such Policy supplies.

16.3    **Company** may, for "cause," in its sole discretion, suspend any and all of **Agent's** authority pursuant to this Agreement. Such suspension shall be effective upon written notification to **Agent** setting forth the nature of the "cause" in reasonable detail.

16.4    In the event of termination of this Agreement by **Company** for "cause" any indebtedness of **Agent** to **Company** and all premiums in the possession of **Agent**, or for the collection of which **Agent** is responsible, shall become immediately due to **Company.**

16.5    The failure of either party to declare promptly a default or breach of any of the terms and conditions of this Agreement shall not be construed as a waiver of any of such terms and conditions, nor stop either party from thereafter demanding full and complete compliance herewith.

16.6    In the event of termination of the Reinsurance Agreement between Platinum Indemnity Limited and **Company, Company** reserves the right to terminate this Agreement effective immediately upon written notice to the **Agent**.

16.7    Notwithstanding the termination of this Agreement, the provisions of this Agreement shall continue to apply to all unfinished business to the end that all obligations and liabilities incurred by each party as a result of this Agreement shall be fully

12/29/97                                      13

performed and discharged according to its terms.

## ARTICLE 17 - MISCELLANEOUS

17.1    This Agreement supersedes all previous agreements, if any, whether written or oral, between **Company** and **Agent** relating specifically to the subject matter hereof.

17.2    Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and plural and any term stated in either the masculine, or feminine or the neuter gender, shall include the masculine, the feminine and the neuter gender.  All captions and section headings are intended to be for purposes of reference only and do not affect the substance of the section to which they refer.

17.3    Each party hereto agrees to perform any further acts and execute and deliver any further documents which may be reasonably necessary to carry out the provisions of this Agreement.

17.4    In the event that any of the provisions, or portions thereof, of this Agreement are held to be illegal, invalid or unenforceable by any court of competent jurisdiction, the validity and enforceability of the remaining provisions, or portions thereof, shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom.

17.5    Any and all notices required or permitted to be given under this Agreement shall be in writing and shall be deemed given when deposited in the United States Postal Service, Certified Mail, Return Receipt Requested or faxed with confirmation by telephone to a Vice President or senior officer of the recipient, to the parties' addresses as provided below or such other addresses provided by the parties by like means:

**COMPANY:**

**Frontier Insurance Company**
**195 Lake Louise Marie Road**
**Rock Hill, New York 12775**

**Attn:  Kevin F. Jeffery**
           **Senior Vice President**

12/29/97                                14

**AGENT:**

> **Dwight Halvorson Insurance Services**
> **3300 Douglas Blvd.**
> **Suite # 295**
> **Roseville, CA 95661-3807**

**Attn: Dwight Halvorson**
**President**

17.6  This Agreement may be executed in multiple counterparts, each of which and together shall constitute an original document.


**COMPANY:**                          **AGENT:**

FRONTIER INSURANCE COMPANY            DWIGHT HALVORSON INSURANCE
                                      SERVICES

By: _RW Pulll_____                By: _Dwight J Halvorson_____

Date: _January 14, 1998_____      Date: _12/7/98_____


12/29/97                              15

FIC/FSIM 000085

Addendum No. 1

"Schedule of Business"

(A)    Lines of Coverage:

      (1)    Workers Compensation

(B)    Territory:

      California, Arizona

(C)    Maximum Policy Period(s):

      Twelve (12) months plus odd time not to exceed eighteen (18) months.

(D)    Class of Business:

      Agricultural operations with governing class codes of 0172-Truck Farms, 0171- Crops, 0040-Vineyards and 8209-Fresh fruit/vegetable packing and handling including storage.

(E)    Maximum Limits of Binding Authority:

      Dwight Halvorson Insurance Services is authorized to bind agricultural operations for the following limits:

      (1)    Coverage A: Statutory

      (2)    Coverage B: $1,000,000.

(F)    Projected Annual Premium Volume:

      $10,500,000. the first calendar year.

FIC/FSIM 000086

ADDENDUM #2

## FRONTIER INSURANCE COMPANY
## FOOD SERVICES INSURANCE MANAGERS, INC. PROGRAM

It is hereby agreed that this Addendum modifies the Limited Agency Agreement executed between Frontier Insurance Company and Dwight Halvorson Insurance Services. This Addendum supersedes the original Addendum #2 executed by Dwight J. Halvorson.

## I. UNDERWRITING GUIDELINES

Insureds may be added to this program on an automatic basis provided the following criteria are met:

1.    The prospective insured's net premium is $50,000. or greater;

2.    Experience modification factors shall be obtained prior to quoting any new or renewal risk. Experience modification factors shall be obtained from the Workers Compensation Insurance Rating Bureau of CA, NCCI, or governing state as applicable. Experience modification must be 1.25 or lower based on three (3) years or more of loss experience;

3.    No prospect without prior Workers' Compensation coverage will be considered for admission to the program. The prospective insured must have been in business a minimum of three (3) years and provided a full three (3) years plus current year of currently valued (within 120 days prior to expiration date) loss experience including large losses in excess of $25,000. Such loss runs shall be obtained prior to quoting any new or renewal risk;

4.    The prospective insured's classification codes do not deviate from those listed in the Class/Rate Schedule in Section III. of this Addendum.;

5.    No single claim, any one occurrence, has exceeded $125,000. Prior carrier loss runs confirming this shall be obtained prior to quoting any new or renewal risk;

6.    The prospective insured's most recent three (3) year cumulative loss ratio does not exceed 50%. Prior carrier loss runs confirming this shall be obtained prior to quoting any new or renewal risk;

7.    NCCI underwriting criteria must be complied with, including scheduled credits and rate deviations.

5/19/98 - food4.wpd

FIC/FSIM 000087

8.    Rating shall be performed using Frontier's currently filed rates, premium discount and schedule debits/credits.

9.    A maximum thirty percent (30%) schedule credit may be applied to risks in the State of CA with standard premium ranging from $50,000 to $149,999.

A maximum forty -five percent (45%) schedule credit may be applied to risks in the State of CA with standard premium ranging from $150,000. to $599,999.

A maximum forty percent (40%) schedule credit may be applied to risks in the State of CA with standard premium of $650,000. or more.

10.   A maximum twenty -five percent (25%) schedule credit may be applied to risks in the State of AZ.


Any risk not falling within the above guidelines must be submitted to Frontier for special consideration and no such risk may be bound without prior written approval by an underwriter employed by Frontier. Frontier shall have no obligation to accept any risk submitted for special consideration by Agent. In addition, the following risks must be submitted to Frontier, prior to binding:

1.    All risks providing bus transportation to their employees; and

2.    All risks having aircraft exposures.


The following operations are prohibited:

1.    Aircraft and airline operations;

2.    Navigation and operation of all vessels;

3.    Construction and/or maintenance of cofferdams;

4.    Operation of drydocks;

5.    Subaqueous work;

6.    Subway construction;

7.    Tunneling operations;

5/19/98 - food4.wpd

8.    Wrecking or demolition of bridges, structures or vessels;

9.    All coal mining operations;

10.   All underground mining operations;

11.   Onshore and offshore gas and oil drilling operations;

12.   Manufacture, production or refining of natural or artificial fuel, gas, butane, propane or liquefied petroleum gases or gasoline;

13.   Manufacture of fireworks, fuses, nitroglycerine, celluloid and pyroxylin;    _

14.   Manufacture of any explosive substance intended for use as an explosive; and

15.   Loading, handling, transportation or storage of explosives.

## II.  SUBMISSION REQUIREMENTS

The following are to be submitted to Frontier for each insured included in this program:

1.    Fully completed Application;

2.    Three (3) years plus current year premium and payroll history;

3.    Currently valued (within 120 days) loss experience for past three (3) years plus current year;

4.    Large losses excess of $25,000. for past three (3) years plus current year; and

5.    Most recent experience modification.

5/19/98 - food4.wpd

FIC/FSIM 000089

## III.  CLASS/RATE SCHEDULE

Approved Classification Codes: California        Effective: January 1998

| Code | Description | Rates |
|------|-------------|-------|
|      |             | Rate X 1.134 (LCM) |
| 7421 | Aircraft Operations, Transport. of Personnel | 2.48 |
| 2003 | Bakeries & Cracker Mfg. | 6.26 |
| 7392 | Beer or Ale Dealers | 10.61 |
| 2163 | Bottling-Beverages-No spirituous liquors | 5.72 |
| 2121 | Breweries /.Malt Houses-Incl Bottling/Canning | 4.85 |
| 0079 | Bush Berry Crops | 6.26 |
| 2113 | Canneries-Fish | 8.28 |
| 2111 | Canneries,NOC-Incl Fruit Preserving | 8.23 |
| 8810 | Clerical Office Employees, NOC | 0.71 |
| 6504 | Confections&Food Sundries,Mfg.or ProcNOC | 6.96 |
| 0044 | Cotton Farms | 7.41 |
| 0401 | Cotton Gin Operation | 10.39 |
| 0400 | Cotton Merchants | 9.67 |
| 4683 | Cottonseed Oil Mfg. & Refining | 3.44 |
| 2063 | Creameries& Dairy Products  Mfg. | 5.86 |
| 0036 | Dairy Farms | 8.30 |
| 2142 | Distilling, NOC | 6.13 |
| 2014 | Feed Mfg.Prep & Compounding Feeds for Livestock & Poultry | 8.75 |
| 0038 | Feed Yards | 16.35 |
| 0171 | Field Crops | 12.21 |

5/19/98 - food4.wpd

| Code | Description | Rates |
|------|-------------|-------|
| 2108 | Fruit-Citrus Fruit packing & handling; Including Storage | 8.12 |
| 2109 | Fruit-Dried Fruit packing & handling | 7.19 |
| 2107 | Fruit- Fresh Fruit packing & handling; Including Storage | 7.22 |
| 2116 | Fruit Juice or Concentrate Mfg. | 7.26 |
| 2102 | Fruit or Vegetable Evaporation or Dehydrating | 5.00 |
| 8304 | Grain Elevators or Grain Storage Warehouses | 10.39 |
| 2014 | Grain or Rice Milling | 8.75 |
| 8215 | Hay, Grain or Feed Dealers | 10.26 |
| 2002 | Macaroni Mfg. | 7.77 |
| 2095 | Meat Products Mfg.-NOC Including Canning | 6.19 |
| 2106 | Olive Handling- Sorting,curing,packing,canning including Olive Oil Mfg. | 7.99 |
| 0016 | Orchards- Citrus & Deciduous Fruits | 9.89 |
| 0045 | Orchards-Nut Crops | 7.71 |
| 2106 | Pickle Mfg. | 7.99 |
| 0041 | Potato Crops | 4.52 |
| 0034 | Poultry Raising, Egg Production &Hatcheries | 9.57 |
| 9079 | Restaurants or Taverns-All Employees | 4.79 |
| 8742 | Salespersons-Outside | 0.83 |
| 4000 | Salt Production-by Solar Evaporation exclusively | 5.96 |
| 8102 | Seed Merchants-including operation of seed sorting machinery | 4.20 |
| 0034 | Sheep Raising & Hog Farms | 9.57 |

5/19/98 - food4.wpd

FIC/FSIM 000091

| Code | Description | Rates |
|------|-------------|-------|
| 0038 | Stock Yards | 16.35 |
| 2081 | Stockyards-with/without butchering | 14.38 |
| 8006 | Stores-Delicatessen-retail | 4.94 |
| 8117 | Stores-Feed,tack & farm supplies-retail | 7.86 |
| 8006 | Stores-Fruit or Vegetables-retail | 4.94 |
| 8061 | Stores-Groceries or provisions-convenience-retail | 9.20 |
| 8006 | Stores-Groceries or provisions-retail | 4.94 |
| 8031 | Stores-Meat, fish or poultry-retail | 7.27 |
| 8021 | Stores-Meat, fish or poultry-retail | 11.96 |
| 8017 | Stores-Retail, NOC | 4.14 |
| 8060 | Stores-Wine, Beer or Spirits-Retail | 6.91 |
| 8041 | Stores-Wine or spirits-wholesale, including blending, rectifiying, distilling or bottling | 9.56 |
| 0079 | Strawberry Crops | 6.26 |
| 2030 | Sugar Mfg. or Refining- beet or cane | 7.60 |
| 0172 | Truck Farms | 7.58 |
| 2117 | Vegetable or Fruit Processors-Frozen | 10.60 |
| 8209 | Vegetables-Fresh vegetable and tomato packing and handling-including storage | 9.25 |
| 9079 | Vending Concessionaires-Dispensing food,drinks,candy,etc.at ball parks,race tracks,theaters & exhibitions | 4.79 |
| 0040 | Vineyards | 5.64 |
| 4831 | Vitamin or Food Supplement Mfg.-compounding,blending or packaging only | 4.58 |
| 2142 | Vinegar Mfg. | 6.13 |

5/19/98 - food4.wpd

FIC/FSIM 000092

| Code | Description | Rates |
|------|-------------|-------|
| 8291 | Warehouses-Cold Storage | 7.31 |
| 0400 | Warehouses-Cotton, including cotton compressing "cotton gin operation" | 9.67 |
| 8215 | Warehouses-Grain or bean-including cleaning & handling | 10.26 |
| 2142 | Wineries-All operations | 6.13 |

5/19/98 - food4.wpd

FIC/FSIM 000093

Approved Classification Codes: Arizona          Effective: October 1997

| Code | Description | Rates |
|------|-------------|-------|
| 7421 | Aircraft Operations, Transport of Personnel | 2.60 |
| 2003 | Bakeries & Cracker Mfg. | 6.31 |
| 2121 | Breweries/Malt Houses-Incl Bottling/Canning | 2.94 |
| 2111 | Canneries, NOC-Incl Fruit Preserving | 7.85 |
| 8810 | Clerical Office Employees, NOC | .41 |
| 6504 | Confections&Food Sundries,Mfg.orProc NOC | 4.03 |
| 0401 | Cotton Gin Operation | 14.14 |
| 0400 | Cotton Merchants | 11.73 |
| 4683 | Cottonseed Oil Mfg. & Refining | 4.34 |
| 0036 | Dairy Farms | 7.53 |
| 2014 | Feed Mfg.Prep&Compounding Feeds for Livestock & Poultry | 8.81 |
| 8304 | Grain Elevators or Grain Storage Warehouses | 18.10 |
| 2014 | Grain or Rice Milling | 8.81 |
| 8215 | Hay,Grain or Feed Dealers | 10.00 |
| 2002 | Macaroni Mfg. | 8.29 |
| 2095 | Meat Products Mfg.-NOC Including Canning | 14.04 |
| 0016 | Orchards-Citrus & Deciduous Fruits | 5.36 |
| 0034 | Poultry Raising, Egg Production & Hatcheries | 5.39 |
| 9082 | Restaurants or Taverns-All Employees | 2.81 |
| 8742 | Salespersons-Outside | .53 |
| 4000 | Salt Products-by Solar Evaporation exclusively | 6.59 |
| 8102 | Seed Merchants-including operation of seed sorting machine | 4.98 |

5/19/98 - food4.wpd

FIC/FSIM 000094

| Code | Description | Rates |
|------|-------------|-------|
| 0034 | Sheep Raising & Hog Farms | 5.39 |
| 2081 | Stockyards-with/without butchering | 4.57 |
| 8006 | Stores-Delicatessen-retail | 4.14 |
| 8006 | Stores-Fruit or Vegetables-retail | 4.14 |
| 8006 | Stores-Groceries or provisions-retail | 4.14 |
| 8031 | Stores-Meat, Fish or poultry-retail | 3.18 |
| 8021 | Stores-Meat, fish or poultry-retail | 5.43 |
| 8017 | Stores-Retail, NOC | 1.99 |
| 2021 | Sugar Mfg. or Refining-beet or cane | 2.40 |
| 8209 | Vegetables-Fresh vegetable and tomato packing and handling-including storage | 3.67 |
| 9082 | Vending Concessionaires-Dispensing food, drinks, candy, etc. at ball parks, race tracks, theaters & exhibitions | 2.81 |
| 8291 | Warehouses-Cold Storage | 6.48 |
| 8215 | Warehouse-Grain or bean-including cleaning & handling | 10.00 |

5/19/98 - food4.wpd

FIC/FSIM 000095

This Addendum shall not go into force until duly executed on behalf of Agent and Company.

IN WITNESS WHEREOF, the parties have set their hands:

at Rock Hill, NY

this 12ᵗʰ day of January, 1998

FRONTIER INSURANCE COMPANY

By: _Kevin F. Jeffery_
Kevin F. Jeffery
Senior Vice President

at Roseville, California

this 8ᵗʰ day of December, 1998

DWIGHT HALVORSON INSURANCE SERVICES

By: _Dwight J. Halvorson_

Name: _DWIGHT J. HALVORSON_

Title: _President_

Addendum No. 3

It is hereby agreed that effective 01/01/98 item (B) of Addendum No. 1 "Schedule of Business" to the Limited Agency Agreement executed between Frontier Insurance Company and Dwight Halvorson Insurance Services is replaced by the following:

(B)    Territory:

        Arizona, California, Colorado, Texas

All other terms and conditions remain as originally agreed to by Frontier Insurance Company and Dwight Halvorson Insurance Services.

IN WITNESS WHEREOF, the parties have set their hands:

at Rock Hill, NY this _24th_ day of _Dec_, 199_8_

FRONTIER INSURANCE COMPANY

By:    _Kevin F. Jeffery_
       Kevin F. Jeffery
       Senior Vice President

at Roseville, CA this _31_ day of _Dec._, 199_8_

DWIGHT HALVORSON INSURANCE SERVICES

By:    _Dwight D Halvorson_

Name:    Dwight J. Halvorson

Title:    _President_

**ADDENDUM NO. 3 TO**

**LIMITED AGENCY AGREEMENT BETWEEN**

**FRONTIER INSURANCE COMPANY ("COMPANY")**

**AND**

**DWIGHT HALVORSON INSURANCE SERVICES, INC. ("AGENT")**

In consideration of the Limited Agency Agreement, Company shall loan Agent $200,000 pursuant to a Promissory Note in the form annexed hereto as Exhibit A (the "Loan").

Company shall forgive repayment of the Loan subject to the following conditions:

1.      The Limited Agency Agreement remains in full force and effect at all times while any part of the Loan remains unrepaid;

2.      Upon the first anniversary of the Loan, the Company shall forgive repayment of one-third of the original principal, plus a proportional share of interest, so long as Agent's premium volume under the Limited Agency Agreement is equal to or greater than $5.0 million during that year;

3.      Upon the second anniversary of the Loan, the Company shall forgive repayment of a second one-third of the original principal, plus a proportional share of interest, so long as Agent's premium volume under the Limited Agency Agreement is equal to or greater than $8.0 million during that year; and

- 1 -

FIC/FSIM 000098

4.      Upon the third anniversary of the Loan, the Company shall forgive repayment of all remaining principal and interest, so long as Agent's premium volume under the Limited Agency Agreement is equal to or greater than $12.0 million during that year.

5.      All other terms and conditions of the Limited Agency Agreement remain unchanged and are hereby ratified and reaffirmed.

DATED:  May 29, 1998

FRONTIER INSURANCE COMPANY

By: _____

DWIGHT HALVORSON INSURANCE
SERVICES, INC.

By: _____

(doc.limtagr5)

- 2 -

FIC/FSIM 000099

## PROMISSORY NOTE

$200,000.00                                    Roseville, California
                                               May 29, 1998

DWIGHT HALVORSON INSURANCE SERVICES, INC, a California corporation, and DWIGHT J. HALVORSON, an individual, for value received, hereby promise, jointly and severally, to pay on demand to the order of Frontier Insurance Company, a New York corporation ("Frontier") at its offices at 195 Lake Louise Marie Road, Rock Hill, New York 12775-8000, or such other address as Frontier may designate, the principal amount of Two Hundred Thousand Dollars ($200,000.00), together with interest thereon at an annual rate of 7.0%.

We hereby waive presentment for payment, protest, notice of protest and notice of nonpayment of this Promissory Note. It is further agreed that any delay on the part of the payee in exercising any of its rights hereunder shall not operate as a waiver of said rights.

In the event this Promissory Note is collected by an attorney, either with or without suit, we hereby agree to pay a reasonable attorney's fee and all expenses of collection.

— 1 —

## EXHIBIT  A

FIC/FSIM 000100

This Note has been issued pursuant to Addendum No.3 dated May 29, 1998 to a Limited Agency Agreement between Frontier and DWIGHT HALVORSON INSURANCE SERVICES, INC.


DWIGHT HALVORSON INSURANCE SERVICES, INC.


By: _____
      Dwight J. Halvorson, President



_____
DWIGHT J. HALVORSON
INDIVIDUALLY AND PERSONALLY


(doc.promis5.1)

– 2 –

FIC/FSIM 000101



# MEMO

**To:**      Mark Mishler

**From:**    Kevin Jeffery

**Subject:** Food Services Insurance Managers
Promissory Note and Addendum No. 3 to Limited Agency Agreement

**Date:**    June 4, 1998

Mark,

Per our previous discussions with Peter Foley and myself, attached find the original Promissory Note and a copy of Addendum No. 3 to the Limited Agency Agreement for the Food Services Insurance Managers program in California.

Let me know if there is anything else you need to cut a check.


KJF:jr

cc:    Harry Rhulen - without attachments
Peter Foley - with attachments

FIC/FSIM 000102

Addendum No. 4

It is hereby agreed that effective 01/01/99, item 4.1 of Article 4 – Compensation of the Limited Agency Agreement executed between Frontier Insurance Company and Dwight Halvorson Insurance Services is replaced by the following:

4.1    Except as otherwise specified on the Schedule of Business, Company shall allow Agent a gross commission of 15.65% of all gross written premium collected for Policies underwritten or delivered by Agent hereunder. This commission arrangement shall be reviewed from time to time and shall be subject to adjustment at the discretion of the Company on a prospective basis and upon at least sixty (60) days prior written notice to the Agent.

All other terms and conditions remain as originally agreed to by Frontier Insurance Company and Dwight Halvorson Insurance Services.

IN WITNESS WHEREOF, the parties have set their hands:

at Rock Hill, NY this 24th day of Dec , 1998

FRONTIER INSURANCE COMPANY

By: _____
Kevin F. Jeffery
Senior Vice President

at Roseville, CA this 31 day of Dcc. , 1998

DWIGHT HALVORSON INSURANCE SERVICES

By: _____

Name:    Dwight J. Halvorson

Title:    President

Addendum No. 5

It is hereby agreed that effective 01/01/99 Addendum #2 to the Limited Agency Agreement executed between Frontier Insurance Company and Dwight Halvorson Insurance Services is amended as follows:

Item 1. of I. Underwriting Guidelines is replaced by the following:

    1.    The prospective insured's net premium is $2,000 or greater;

Item 2. of I. Underwriting Guidelines is replaced by the following:

    2.    Experience modification factors shall be obtained prior to quoting any new or renewal risk.  Experience modification factors shall be obtained from the NCCI or state governed insurance rating bureau as applicable.  Experience modification factors must be 1.50 or lower based on three (3) years or more of loss experience.  Recent trending (current plus prior year) for both frequency and severity must be positive (downward trend) for any risk having in excess of a 1.25 experience modification factor.

Item 3. of I. Underwriting Guidelines is replaced by the following:

    3.    Agent has secured three (3) years plus current year of currently valued (within 120 days) hard copy loss runs, including large losses in excess of $25,000.  Such loss runs shall be obtained prior to quoting any new or renewal risk.  Risks having less than three (3) years of experience shall be eligible for inclusion in the program provided they have had prior experience in either an ownership or management capacity, in the same type of operation, for a period of five (5) years or more.

Item 4. of I. Underwriting Guidelines is hereby deleted.

Item 9. of I. Underwriting Guidelines is replaced by the following:

    9.    <u>California</u>

        A maximum thirty percent (30%) schedule credit may be applied to risks with standard premium ranging from $2,000 to $49,999.

        A maximum fifty percent (50%) schedule credit may be applied to risks with standard premium ranging from $50,000 to $999,999,

FIC/FSIM 000104

A maximum forty-five percent (45%) schedule credit may be applied to risks with standard premium of $1,000,000 or more.

Arizona

A maximum twenty-five percent (25%) schedule credit may be applied to any risk bound in the State of AZ.

Colorado

A maximum twenty-five percent (25%) schedule credit may be applied to any risk bound in the State of CO.

Texas

A maximum twenty-five percent (25%) schedule credit may be applied to risks in the State of TX.

A yearly average of plus or minus forty percent (40%) of Company's filed rates must be maintained on the overall book of business.

All other terms and conditions remain as originally agreed to by Frontier Insurance Company and Dwight Halvorson Insurance Services.

IN WITNESS WHEREOF, the parties have set their hands:

at Rock Hill, NY this  24ᵗ day of  Dec  , 1998

FRONTIER INSURANCE COMPANY

By: _____
     Kevin F. Jeffery
     Senior Vice President

at Roseville, CA this  31  day of  Dec  , 1998

DWIGHT HALVORSON INSURANCE SERVICES

By: _____

Name:     Dwight J. Halvorson

Title:     President

FIC/FSIM 000105

Addendum No. 6

It is hereby agreed that item (B) of Addendum No. 1 "Schedule of Business" to the Limited Agency Agreement executed between Frontier Insurance Company and Dwight Halvorson Insurance Services is extended to the States of Maryland and New Jersey with respect to coverage bound for Amy's Kitchen. This extension of coverage is applicable to the aforementioned risk only. All other terms and conditions remain as originally agreed to by Frontier Insurance Company and Dwight Halvorson Insurance Services.

IN WITNESS WHEREOF, the parties have set their hands:

at Rock Hill, NY this _24th_ day of _Dec_ , 199_8_

FRONTIER INSURANCE COMPANY

By: _____
    Kevin F. Jeffery
    Senior Vice President

at Roseville, CA this _31_ day of _Dec._ , 199_8_

DWIGHT HALVORSON INSURANCE SERVICES

By: _____

Name:    Dwight J. Halvorson

Title:    _President_

**EXHIBIT B**

## Subscription and Shareholders Agreement

This Agreement is made as of January 16, 1998

**Between**

(1)     Platinum Indemnity Limited a company organized and existing under the laws of the Islands of Bermuda (hereinafter "Platinum") and

(2)     Food Service Insurance Managers Inc., a corporation organized and existing under the laws of California (hereinafter the "Shareholder").

**Witnesseth**

**Whereas**, Shareholder wishes to purchase the "Preferred Share" for the "Purchase Price", and

**Whereas**, Platinum wishes to repurchase the "Preferred Share" on the "Repurchase Date" at the "Repurchase Price", and

**Whereas**, Platinum wishes to enter into certain reinsurance contracts with the Ceding Companies pursuant to which Platinum will reinsure certain of the liabilities of the Ceding Companies under one or more contracts of insurance produced by the Shareholder.

**Now, therefore**, in consideration of the premises and mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1)   **Definitions.**  The following terms are defined as follows:

   a)   "Business Day" shall mean any day other than a Saturday or Sunday or a day on which banks located in Bermuda are authorized or required by law or executive order to close.

   b)   "Ceding Companies" shall mean the reinsured or reinsureds which are parties to the Treaties.

   c)   "Dividend Date" shall mean the dates shown on Schedule 2 on which a dividend to the extent permitted by law shall be declared to the owner of record of the Preferred Share.

   d)   "Net Premium" shall mean the aggregate net premium received by Platinum under the Treaties after all deductions made by, or credited or paid to, the Ceding Companies including, but not limited to, ceding commissions, boards, bureaus, taxes, fees, licenses, residual risk facility charges, guarantee fund assessments and other charges as provided in the Treaties.

   e)   "Preferred Share" shall mean the preferred share to be issued by Platinum pursuant to the provisions of this Agreement as more particularly described in Schedule 1 hereto.

   f)   "Purchase Price" shall mean One-hundred and twenty-five thousand United States Dollars(US$125,000.00).

   g)   "Purchase Price Administrative Fee" shall mean (i) during the term of the Treaties (or any renewal thereof), 1% of the average "Purchase Price Investment Funds" held by Platinum during each 12 month period beginning on the date the Purchase Price for the Preferred Share is paid and on each anniversary thereof, and (ii) after the termination or expiration of the Treaties, 1% of the average Purchase Price Investment Funds held by Platinum during each 12 month period.

1

h) "Purchase Price Investment Funds" shall mean the total of the Purchase Price proceeds, plus any additional contribution to the capital of Platinum, and all accumulated investment income earned thereon (which is not the subject of prior dividend payment).

i) "Repurchase Date" shall mean five (5) business days after the Ceding Companies acknowledge in writing to Platinum that Platinum has no further liability under the Treaties. Platinum shall be deemed to have no further liability when all losses on policies ceded to Platinum pursuant to the Treaties have been fully run-off or the aggregate limit of the liability of Platinum under the Treaties has been exhausted or, all liability under the Treaties has been commuted.

j) "Repurchase Price" shall mean an amount equal to the Purchase Price, plus any additional contribution to the capital of Platinum by the Shareholder, plus any Undistributed Profits Attributable to the Preferred Share.

k) "Treaties" shall mean the reinsurance agreement or agreements identified in Schedule 2 between Platinum, as assuming reinsurer, and the Ceding Companies, the subject of which are policies of insurance issued pursuant to business produced by the Shareholder.

l) "Treaties Administrative Fee" shall mean, (i) during the term of the Treaties (or any renewal thereof) 1% of the average "Treaties Investment Funds" during each 12 month period beginning on the date the Purchase Price for the Preferred Share is paid and on each anniversary thereof, and (ii) after the termination or expiration of the Treaties, 1% of the average treaties Investment Fund during each 12 month period.

m) "Treaties Investment Funds" shall mean (i) the Net Premium, plus (ii) all amounts actually recovered and received by Platinum under the Treaties by way of salvage or subrogation (net of expenses allocable to Platinum), less (iii) all losses and expenses paid and all premium returned by Platinum to the Ceding Companies pursuant to the Treaties, less (iv) Underwriting Profit previously paid out in dividends.

n) "Underwriting Profit or Loss" shall mean ("except as otherwise provided in this Agreement")
i) the "Net Premium", plus
ii) the amounts actually recovered and received by Platinum under the Treaties contracts by way of salvage or subrogation (net of expenses allocable to Platinum); less
iii) all losses and loss expenses paid, or incurred by Platinum under the Treaties (including reserves set aside for incurred but not reported losses and expenses, as determined by Platinum, but in no event in an amount less than the amount estimated by the Ceding Companies); less
iv) the Treaties Administrative Fee; and less
v) the cost of aggregate stop loss reinsurance; less
vi) the actual cost incurred by Platinum in establishing and maintaining letter(s) of credit in favor of the Ceding Companies pursuant to the Treaties; plus
vii) investment income earned on the capital provided by the Shareholder as required from time to time, and directly related to the underwriting of the Treaties.

o) The "Undistributed Profit Attributable to the Preferred Share" on any date is the aggregate sum of the following:

i) The amount of investment income, if any, earned by Platinum on the Purchase Price Investments Funds, since the last Dividend Date (if any);

ii) The amount of investment income, if any, earned by Platinum on the Treaties Investment Funds since the last Dividend Date (if any); less (ii)the Treaties Administrative Fee allocable to the period since the last Dividend Date (if any); plus or minus

iii) The Underwriting Profit or Loss since the last Dividend Date (if any); plus or minus

2

     iv) any Underwriting Profit or Loss prior to the last Dividend Date (if any) not previously distributed by way of dividend.

2) **The Purchase Price.** The Shareholder agrees to purchase and Platinum agrees to issue the Preferred Share at the Purchase Price. Platinum shall issue and deliver the Preferred Share to the Shareholder within five (5) business days after the Shareholder pays Platinum the Purchase Price. The Purchase Price shall be paid within thirty (30) days of the execution of this Agreement. The Purchase Price may be provided in the form of a letter of credit.

3) **Dividends.** To the extent permitted by law, Platinum agrees to cause a dividend to be declared to the owner of record of the Preferred Share on each Dividend Date in an amount equal to the positive Undistributed Profit Attributable to the Preferred Share (if any).

4) **Negative Balance/ Indemnification**

    a) In the event the Undistributed profit Attributable to the Preferred Share, minus the cumulative amounts of dividends paid to the Shareholder is, at any time, negative (the "Negative Balance", the Shareholder agrees, within 30 days after receipt of written demand by Platinum, to pay Platinum the Negative Balance minus all previous payments made to Platinum since the last Dividend date (if any) under this paragraph; provided, however, that, for purposes of this provision only, Underwriting Profit or Loss shall not take into account unpaid losses and expenses other than such losses and expenses which Platinum believes are likely to be paid within the following ninety (90) days.

    b) The Shareholder will indemnify and hold Platinum harmless from all dangers, costs, losses, fees, liabilities, judgements, penalties and expenses (including without limitation, reasonable attorneys' fees and expenses of legal counsel) that Platinum may suffer, sustain, incur or become subject to, whether directly or indirectly, arising out of, based upon, resulting from or in connection with the failure of the Shareholder to comply with Paragraph 4.(a) hereof.

5) **Maintenance of Records.** Platinum shall maintain such records as are necessary to verify the amount of investment income earned on the Purchase Price Investment Funds and on the Treaties Investment Funds and shall produce copies of such records to the Shareholder within a reasonable time after the Shareholder's written request therefor.

6) **Repurchase Procedure.** On the Repurchase Date, Platinum shall repurchase the Preferred Share for the Repurchase Price, from the Shareholder. The Shareholder shall deliver the certificate representing the Preferred Share together with proper instrument of assignment and transfer thereof duly executed in blank.

7) **Representations and Warranties.** The Shareholder represents and warrants that:

    a) It is purchasing the Preferred Share for the Shareholder's own account for investment purposes and not with a view to resale or distribution.

    b) The Shareholder has adequate means for providing for the Shareholder's current needs and possible personal contingencies and has no need for liquidity of the Shareholder's investment and has no reason to anticipate any change in personal circumstances, financial or otherwise, which may cause or require the sale or distribution of the Preferred Share.

    c) The Shareholder understands that the Preferred Share has not been and will not be registered under the United States Securities Act of 1933, as amended, and that the Preferred Share may not be sold, transferred, pledged, hypothecated, assigned or otherwise disposed of.

8) **Preferred Share Not Transferable.** The Shareholder covenants and agrees not to, or attempt to, sell, transfer, pledge, hypothecate, assign or otherwise dispose of the Preferred Share.

9) It is acknowledged and agreed that the certificate representing the Preferred Share shall bear the following legend:

> "The share evidenced by this certificate has not been registered under the Securities Act of 1933, as amended. This share has been acquired for investment purposes only and may not be sold, transferred, pledged, hypothecated, assigned or otherwise disposed of."

10) **Waiver or Modification.** Neither this Agreement nor any of the terms hereof may be changed, waived or discharged orally, but only by an instrument in writing signed by the party against which enforcement of such change, waiver or discharge is sought.

11) **Entire Agreement.** This Agreement constitutes the sole and entire agreement of the parties hereto relating to the subject matter hereof and supersedes all prior agreements and understanding related to the subject matter hereof.

12) **Agreement Governs.** The parties agree that in the event the terms of this Agreement conflict with the bye-laws of Platinum, the parties shall cause the bye-laws to be amended to conform with this Agreement; provided, however, in the event such bye-laws are not amended, this Agreement shall govern.

13) **Notices.** All notices, request, demands or other communications required or permitted to be given hereunder shall be in writing and shall be delivered by facsimile, by hand, or by first class mail, addressed to the address for service of the parties as follows:

    If to Platinum:
    Platinum Indemnity Limited,
    Windsor Place, 3rd Floor, 18 Queen Street, Hamilton, Bermuda,
    Fax No. 441-292-1196,
    Attn: Andrew McComb

    If to the Shareholder:
    Food Service Insurance Managers Inc.,
    3300 Douglas Boulevard, Suite 295
    Roseville, CA 95661-3807
    Attn: J. Daniel Henke, Secretary

Unless shown to have been received earlier, any such notice so delivered shall be deemed to have been given:

a) if delivered by hand when delivered if delivered during normal business hours of the recipient or if delivered outside such hours at the opening of business on the next business day of the recipient;

b) if delivered by facsimile three hours after the time of transmission if transmitted during normal business hours of the recipient or if delivered outside such hours at the opening of business on the next business day of the recipient;

c) if mailed by first class mail or by registered mail three days after the date of mailing unless the notice was mailed during postal strike or other postal disruption in which case the notice shall be deemed to have been received within three days after the resumption of normal mail service.

4

Any party by notice in writing given to the other party in the manner specified above may change the name and address to which notices, request, demands or other communication to which shall be given pursuant to this Agreement.

14) **Governing Law and Jurisdiction.** This Agreement shall be constructed and enforced in accordance with, and governed by, the laws of Bermuda.  Subject to Paragraph 14. The courts of Bermuda shall be vested with the non-exclusive jurisdiction to resolve any  dispute arising out of or related to this Agreement and the Shareholder will submit to the jurisdiction of any court of competent jurisdiction in Bermuda and will comply with all requirements necessary to give such court jurisdiction.

15) **Arbitration.** If any dispute shall arise between the parties to this Agreement with reference to the interpretation of this Agreement or their rights with respect to any transaction involved, whether such disputes arises before or after termination of this Agreement, such dispute, upon the written request of either party, shall be submitted to three arbitrators, one to be chosen by each party and the third by the two so chosen. If either party refuses or neglects to appoint an arbitrator within thirty days after the receipt of written notice from the other party requesting it to do so, the requesting party may appoint a second arbitrator. If the two arbitrators fail to agree on the selection of a third arbitrator within thirty days of their appointment, either of the parties may apply upon notice to the other to the President of Bermuda Bar Association to name a third arbitrator. All arbitrators shall be active or retired executive officers of insurance or reinsurance companies not under the control of either party to this Agreement and having no personal or financial interest in the outcome of the arbitration. Each party shall submit its case to the arbitrator within thirty days of the appointment of the third arbitrator. The decision in writing of any two arbitrators , when filed with the parties hereto, shall be final and binding on both parties. Unless otherwise specified in the decision of the arbitrators, the expense of the arbitrators and of the arbitration shall be equally divided between the two parties. The said arbitration shall take place in Bermuda unless some other place is mutually agreed upon by the parties to this Agreement. Except as to matters otherwise provided herein, the provisions of the Bermuda International Conciliation and Arbitration Act, 1993  (or any successor statute) shall apply; and the procedural rules set forth in Section III and IV of UNCITRAL shall be followed.

16) **Currency.**   All amounts referred to herein are expressed in United States Dollars and all payments shall be made in such dollars.

5

**In witness whereof,** the parties hereto have duly executed this Agreement as of the date first above written.

**Platinum Indemnity Limited**

In Hamilton, Bermuda this 16 day of January, 1998

By:

Name: Andrew McComb

Title: Chief Financial Officer

Witness:

**Food Service Insurance Managers Inc.,**

In Hamilton, Bermuda this 16 day of January, 1998:

By:

Name: J. Daniel Henke

Title: Secretary

Witness:

6

Schedule 1

### Description of the Preferred Share

**Share classification**

Class G non-voting Redeemable Preferred Share

**Number of shares authorised in class**

One (1) - (This is a separate class and no other shares will be issued in this class. There are/will be other classes of shares in Platinum, including without limitations, other preferred shares forming separate classes.)

**Par value**

US$1.00 (One dollar).

**Issue price per share**

US$125,000.00

**Rights in general meetings/ members or shareholders' resolutions**

No right to participate in or to sign any written resolution of the members or shareholders of Platinum and no right (a) to receive notice of, (b) to attend at or, (c) vote at any general meeting of the members or shareholders of Platinum EXCEPT where Bermuda law provides for such rights for all members or shareholders for certain actions e.g.. discontinuance (relocation) of Platinum.

**Dividend and distribution rights**

Only as provided for in the Shareholder Agreement attached. Such rights are accumulated when payment of a dividend at any particular Dividend Date is not permitted under Bermuda law and paid at the next Dividend Date if permitted without any interest.

**Redemption terms**

The Class G Non-voting Redeemable Preferred Shares carry no right of redemption by the Members. Platinum has the right to repurchase the Class 7 Non-voting Redeemable Preferred Shares as provided for in the Shareholder Agreement attached.

**Other Preferred share series classes**

The holder of the Class G Non-voting Redeemable Preferred Shares acknowledges and agrees that Platinum may issue from time to time other shares carrying rights and restrictions similar to the Class [ ] Non-voting Redeemable Preferred Shares but where the dividend and distribution rights are contingent on the underwriting results of other Treaties which are distinct from the Treaties detailed in Schedule 2 to this agreement, and such shareholders have signed a shareholder agreement with similar terms to that to which this is attached (mutatis mutandis).

7

**Schedule 2**

**Treaties**

The following reinsurance agreements:

| Ceding Company | Company Reference | Period |
|---|---|---|
| Frontier Insurance Company | PLA/FIC/007 | 1/1/1998 – 12/31/1998 |

**Dividend date**

Platinum will compute an initial dividend 24 months from the effective date of this agreement, and annually thereafter, in accordance with the provisions of clause 3 of this agreement. Such dividend, if declared, to be paid 30 days thereafter.

**Additional capital contribution**

In addition to the Purchase Price of $125,000.00, additional capital contributions equal to 4% of gross written premiums under the program will be remitted on a monthly basis for policies written in the previous 30 days. These additional contributions will be included in the Purchase Price Investment Funds as specified in the text of the agreement.

8

**EXHIBIT C**



# REINSURANCE AGREEMENT

This Reinsurance Agreement is effective the 1st day of January, 1998, between Frontier Insurance Company, Rock Hill, New York (hereinafter referred to as "Company") and Platinum Indemnity Limited, a Hamilton, Bermuda company (hereinafter referred to as the "Reinsurer").

## GENERAL PROVISIONS

IT IS HEREBY UNDERSTOOD AND AGREED that the Company has agreed to write on a direct basis policies for the purpose of insuring risks classified as food manufacturing and related industries and produced by Dwight Halvorson Insurance Services of Roseville, California (hereinafter referred to as the "subject program") for the coverage of Workers Compensation. The Company obligates itself to cede and the Reinsurer obligates itself to accept reinsurance on the basis set forth herein on the policies written for the subject program.

In consideration of the payment of the reinsurance premium, and subject to the terms, conditions and limits of liability set forth below, the Reinsurer does hereby reinsure the Company in respect of the Company's liability on the above referred to policies.

## DEFINITIONS

1.  "Policy" - Any one or more policy(ies) written or assumed by the Company in the subject program as reflected in the Company's records and any extensions or renewals thereof and endorsements thereto, effective on or after the date of the Agreement first set forth above.

2.  "Incurred Losses" - All paid losses, plus reserves for unpaid losses and allocated loss expense under the policies as estimated by the Company.

3.  "Paid Losses" - All claim payments under the policy paid by the Company or its agents.

4.  "Allocated Loss Expense" - Such claims expenses that the Company, under its accounting practices, directly allocates to a particular claim. Such expenses include, but are not limited to, attorney's fees, rehabilitation fees, court costs or related costs such as filing fees, and the cost of medical examination, expert medical or other testimony, laboratory services and x - rays, autopsies, stenographic services, witnesses, summonses and copies of documents, but shall not include the salaries and traveling expenses of the Company's employees. The Reinsurer will not be required to pay any type of expense that the Company is not required to pay under the policies.

LOC 04/21/98 ed.                 Page 1 of 9



5.    "Unallocated Loss Expense" - Such claims expenses that the Company, under its accounting practices, does not directly allocate to a particular claim. Such expenses include the salaries and traveling expenses of the Company's employees. For purposes of this Agreement, Unallocated Loss Expense is understood to be equal to six percent (6%) of the Company's gross written premium.

## REINSURER'S LIABILITY

The Reinsurer will pay to the Company 100% of all losses and 100% of all allocated and unallocated loss expense under all binders, policies, agreements or other evidence of insurance or reinsurance, whether written or oral, underwritten for the subject program during the term of this Agreement; Reinsurer will also reinsure any and all assigned risks and shall pay its proportionate share of any assessments. The maximum direct loss which will be ceded hereunder as respects any risk is $250,000 per occurrence. The Reinsurer's maximum aggregate liability hereunder shall not exceed 75% of original gross subject written premium. However, in no event shall the Company's liability for losses and allocated loss adjustment expenses in excess of 75% of the normal gross written premium exceed ten million dollars ($10,000,000). Any loss and allocated loss adjustment expense in excess of this amount shall be ceded to the Reinsurer as provided for under the terms of this Agreement.

The liability of the Reinsurer shall follow the Liability of the Company and shall be subject to the same risks, conditions and modes of settlement, it being the intention of this Agreement that the Reinsurer shall, in proportion, follow the fortunes of the Company in all respects under business subject to this Agreement.

The liability of the Reinsurer hereunder shall commence obligatorily and simultaneously with that of the Company. The Reinsurer will receive written notice of any liability or claim of any type which could cause financial exposure to the Reinsurer.

The Reinsurer binds itself unconditionally to follow the Company in the acceptance or rejection of business, its settlement or rejection of claims, its premium rates and its terms of insurance to its insured, and in all policies, whether originally adopted or subsequently changed by the Company, and in every act that the Company performed under the development, preservation, conduct or liquidation of business which is subject to this Agreement. While the Reinsurer does not undertake to investigate claims or defend suits, reject or accept business or set premium rates, it reserves the right to participate in these determinations.

Reinsurer further agrees that it will indemnify and hold harmless the Company for 100% of all actions proceedings, claims, demands, costs, damages and expenses to which the Company may be subjected as a result of business written under this Agreement, including any and all claims for bad faith or any claims for extra - contractual damages of any kind or

FIC/FSIM 000112

amount, except for claims as a result of the malicious or intentional acts of the Company or its Agents.

## TERRITORY

This Agreement shall cover wherever the Company's policies cover.

## TERM AND CANCELLATION

3 c days

This Agreement shall take effect as of January 1, 1998, and is continuous in its duration, but may be canceled without cause or liability by either party giving notice in writing by registered or certified mail to the other party, at least 120 days prior to the anniversary date. This Agreement may also be canceled immediately by mutual consent.

iv

Unless otherwise agreed by the parties hereto, the Reinsurer shall remain liable for their share of losses under policies in force at the termination of this Agreement until the natural expiration or cancellation. In the event the Company is required by law or regulation to provide continuity of protection to original insureds, the Reinsurer shall remain liable for its entire share of such policies until the Company legally effects termination of such policies.

Notwithstanding anything to the contrary herein, this Agreement may be terminated by the Company if it does not approve of the acceptance or assumption of any business by the Reinsurer which is outside the scope of the Agreement. In such case, cancellation is effective 60 days from notification.

## ACCOUNTS AND PREMIUM REMITTANCE

Within thirty (30) days after the end of each month for the transactions during that month, the Company shall forward to the Reinsurer a monthly account to which shall be posted all premiums, return premiums, commissions, losses, loss expenses (including reserves) and loss recoveries, and respective transactions under this Agreement during the month. The balance due either party shall be remitted within sixty (60) days of the end of the month. It is understood, however, that the Company shall not be liable under any circumstances for the payment of any premiums or other monies due the Reinsurer other than those remitted to the Company.

Because the Company will suffer a loss or diminution of its surplus because the Reinsurer is not authorized in the Company's state(s) of domicile, a funding mechanism shall be adopted in a form which shall be acceptable to the appropriate regulatory authorities; the Reinsurer has agreed to provide the Company with a clean, unconditional and irrevocable Letter of Credit issued by a bank or banks meeting the NAIC Securities Valuation Office credit standards for issuers of letters of credit and acceptable to the regulatory authorities of the Company's state of domicile to avoid such loss or diminution of the Company's surplus. The

LOC 04/21/98 ed.                    Page 3 of 9

Letter of Credit shall be established for the benefit of the Company to pay all obligations of the Reinsurer owed under this Agreement on all business the Company cedes to the Reinsurer.

It is agreed that the Letter of Credit will be issued for a term of at least one year and will include an "evergreen clause", which automatically extends the terms for at least one additional year at each expiration date unless written notice of non-renewal is given to the Company not less than 30 days prior to said expiration date. The Company and the Reinsurer further agree, notwithstanding anything to the contrary in this Agreement, that said Letter of Credit may be drawn upon by the Company or its successors in interest at any time, without diminution because of the insolvency of the Company or the Reinsurer, but only for one or more of the following purposes:

1.    To reimburse itself for the Reinsurer's share of unearned premiums returned to insureds on account of policy cancellations, unless paid in cash by the Reinsurer;

2.    To reimburse itself for the Reinsurer's share of losses and/or loss adjustment expense paid under the terms of policies reinsured hereunder, unless paid in cash by the Reinsurer;

3.    To reimburse itself for the Reinsurer's share of any other amounts claimed to be due hereunder, unless paid in cash by the Reinsurer;

4.    To fund a cash account in an amount equal to the Reinsurer's share of any ceded unearned premium and/or outstanding loss and loss adjustment expense reserves (including incurred but not reported reserves) funded by means of a Letter of Credit which is under non-renewal notice, if said Letter of Credit has not been renewed or replaced by the Reinsurer Ten (10) days prior to its expiration date;

5.    To refund to the Reinsurer any sum in excess of the actual amount required to fund the Reinsurer's share of the Company's ceded unearned premium and/or outstanding loss and loss adjustment expense reserves (including incurred but not reported reserves), if so requested by the Reinsurer.

In the event the amount drawn by the Company on the Letter of Credit is in excess of the actual amount required for B(1), B(2) or B(4), or in the case of B(3), the actual amount determined to be due, the Company shall promptly return to the Reinsurer the excess amount so drawn.

The Company may, nevertheless, report promptly any individual loss paid, or to be paid, which is $10,000 or more, and the Reinsurer shall, at the Company's request, fund the Company immediately for any such loss. The Company will prepare a loss account containing all particulars necessary to identify the loss. Losses thus paid will be credited to

FIC/ESIM 000114

the Reinsurer on the monthly account wherein such losses would have normally been debited.

## PAYMENTS TO THE COMPANY

All payments to the Company shall be made in the currency of the United States of America and will be paid or provided to the Company within Ten (10) calendar days from the date the Company sends to the Reinsurer a request for any such payments or funds, except as otherwise provided herein.

## OFFSET CLAUSE

The Company or the Reinsurer may offset any balance(s) whether on account of premium, commission, claims or losses, adjustments, expenses, salvage, or any other amounts that are due from one party to the other under this Agreement. The provisions of this clause will survive the termination of this Agreement.

## ARBITRATION

As a precedent to any right of action hereunder, if any dispute shall arise between the parties with reference to the interpretation of this Agreement, with respect to any transaction involved, whether such dispute arises before or after termination of this Agreement, such dispute, upon the written request of either party, shall be submitted to three (3) arbitrators, one to be chosen by each party, and the third by the two chosen. If either party refuses or neglects to appoint an arbitrator within thirty (30) days after receipt of written notice from the other party requesting it to do so, the requesting party may appoint two arbitrators. If the two arbitrators fail to agree in the selection of a third arbitrator within thirty (30) days of their appointment, each of them shall name two, of whom the other shall decline one and the decision between the remaining two shall be made by drawing lots. All arbitrators shall be executive officers of insurance or reinsurance companies not under the control of either party to this Agreement.

Each party shall submit its case to its arbitrator within thirty (30) days of the appointment of the third arbitrator. The decision in writing of any two arbitrators, when filed with the parties hereto, shall be final and binding on both parties. Judgement may be entered upon the final decision of the arbitrators in any Court having jurisdiction. Each party shall bear the expense of its own arbitrator and shall jointly and equally bear with the other party the expense of the third arbitrator and of the arbitration. Such arbitration shall take place in New York, New York.

EIC/ESIM 000115



## LOSS AND LOSS ADJUSTMENT EXPENSES

All loss settlements made by the Company shall be unconditionally binding upon the Reinsurer.

It is understood and agreed that the claims service company chosen to handle all claims under this Agreement is Risk Management Services, Inc. of Sacramento, California.

The Reinsurer agrees to abide by the loss settlements of the Company, it being understood, however, that when so requested the Company will afford the Reinsurer an opportunity to be associated with the Company, at the expense of the Reinsurer, in the defense of any claim, suit or proceeding involving this reinsurance, and that the Reinsurer may cooperate in every respect in the defense or control of such claims, suits or proceedings.

## AUDITS

The Reinsurer or their duly appointed representative shall have free access at any and all reasonable times to such books and records of the Company for the purpose of obtaining information concerning this Agreement or the subject matter hereof.

## RESERVES

The Reinsurer shall maintain reserves as may be required with respect to the Reinsurer's proportion of outstanding losses and loss adjustment expenses, including IBNR, which are in excess of funds withheld hereunder by the Company.

## FINANCIAL IMPAIRMENT CLAUSE

Each party hereto expressly reserves the right, upon notice in writing, to terminate this Agreement immediately in the event the other party is found not to be in sound financial condition, or in the event receivership, bankruptcy, dissolution or analogous proceedings are instituted with respect to the other party. In the event of termination pursuant to this Article, the Company shall have the right to reassume all liability hereunder upon notice to the Reinsurer in which event the Reinsurer (or its receiver, liquidator or statutory successor) shall immediately refund to the Company an amount equal to the pro rata unearned premium hereunder, less commission, charges and allowances previously allowed on such premium, plus reserves for outstanding losses (including recorded reserves for incurred but not reported losses) and loss expenses.

LOC 04/21/98 ed.                    Page 6 of 9

## INSOLVENCY

1. The reinsurance under this Agreement shall be payable by the Reinsurer on the basis of the liability of the Company under the policy or policies reinsured without diminution because of the insolvency of the Company.

2. In the event of the insolvency of the Company the liquidator, receiver or statutory successor of the Company shall give written notice to the Reinsurer of the pendency of a claim against the Company on the policy or policies filed in the insolvency proceedings; that during the pendency of such claim the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated any defense or defenses which it may deem available to the Company or its liquidator, receiver or statutory successor; that the expense thus incurred by the Reinsurer shall be chargeable, subject to court approval, against the Company as part of the expense of liquidation to the extent of a proportionate share of the benefit which may accrue to the Company solely as a result of the defense undertaken by the Reinsurer.

3. Where two or more Reinsurers are involved in the same claim and a majority in interest elects to interpose defense to such claim the expense shall be apportioned in accordance with the terms of this Agreement as though such expense had been incurred by the Company.

In the event of the insolvency of the Company, the reinsurance under this Agreement shall be payable by the Reinsurer directly to the Company or to its liquidator, receiver or statutory successor, except as may be provided by law or except (1) where the Agreement specifically provides another payee of such reinsurance in the event of the insolvency of the Company and (2) where the Reinsurer, with the consent of the direct insured or insureds, has assumed such policy obligations of the Company as direct obligations of the Reinsurer to the payees under such policies and in substitution for the obligations of the Company to such payee.

## SERVICE OF SUIT

It is agreed that in the event of the failure of the Reinsurer hereon to pay any amounts claimed to be due hereunder, the Reinsurer, at the request of the Company, will submit to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court.

## APPLICABLE LAW

This Agreement shall be governed by and constructed into the laws of the State of New York.

EIC/ESPM 000117

## SEVERABILITY

It is further agreed that in event that any of the provisions of this Agreement are found to be unenforceable, that portion so found will in no way affect the purpose and intent of the remaining provisions, and to that extent those provisions will remain binding upon the parties.

## ERRORS AND OMISSIONS

Any inadvertent neglect, delay, omission or error relating to any provision of this Agreement shall not be held to relieve either party hereto from any liability which would attach to it hereunder, provided such neglect, delay, omission or error is rectified upon discovery by an official of the Company.

## PRIOR NOTIFICATION

The Reinsurer shall notify the Company of any acceptance or assumption of any business by the Reinsurer outside the scope of this Agreement. Such notification shall be in writing by registered or certified mail at least 30 days prior to the inception date of such business.

## CALCULATION OF REINSURANCE PREMIUM

In consideration of the reinsurance provided hereunder, there will be a reinsurance premium payable by the Company to the Reinsurer which shall equal 100% of the gross premium earned by the Company under policies, including adjustments to premium (determined in accordance with the Company's applicable rates, appropriate schedule and experience modifications and premium discount factors) after deducting 8% of subject written premiums for the cost of excess reinsurance. The Reinsurer will allow the Company a ceding commission of 29.3%, calculated as follows:

a.    5% fronting fee;

b.    2% of ceded premium to cover the Company's data processing, general administrative expenses, claims handling, underwriting, compliance work and accounting;

c.    Any applicable premium taxes, fees for board and bureaus, and liabilities for assessments and pools currently estimated to be 3.3% of ceded premium;

d.    Any applicable fee for Federal Excise Tax currently estimated to be 1% of ceded premium;

e.    Actual amounts for sales and/or agents commissions loss control, underwriting and policy issuance currently estimated to be 12% of ceded premium.

EIC/ESIM 000118

f.    6% of ceded premium to cover Risk Management Insurance Services' claims handling expenses (ulae).


IN WITNESS WHEREOF, the Parties hereto have set their hands


In Rock Hill, New York, this 27th day of May , 1998.

WITNESS

_____                  _____
                                         Frontier Insurance Company
                                         (Company)


In HAMILTON , BERMUDA , this $3^{d}$ day of JULY, 1998.

_____                  _____
                                         Platinum Indemnity Limited
                                         (Reinsurer)

FIC/FSIM 000119

ENDORSEMENT No. 1 TO THE REINSURANCE AGREEMENT BETWEEN

FRONTIER INSURANCE COMPANY

and

PLATINUM INDEMNITY LIMITED

As Regards the Food Services Insurance Managers, Inc. Program

Effective January 1, 1998,

WHEREAS, the Producer named in the Reinsurance Agreement (the "Agreement") desires that the provisions relating to Separate Accounts under the Palladium Insurance Act, 1995 (the "Act"), applicable to the Reinsurer through written consent of the Minister of Finance dated October 3, 1996, apply to the funds attributable to the Agreement, so that such funds have the protection of being legally segregated from other funds and or assets of or administered by the Reinsurer not attributable to or forming a part of that Separate Account.

IT IS HEREBY UNDERSTOOD AND AGREED THAT the Reinsurer will establish a Separate Account and shall allocate funds ceded under this Agreement to such Separate Account so that such funds have the protection of being legally segregated from other funds and or assets of or administered by the Reinsurer not attributable to or forming part of that Separate Account.

IN WITNESS WHEREOF, the Parties hereunto set their hands

In Rock Hill, New York, this _27th_ day of _May_, 1998.

_____
Frontier  Insurance Company
(Company)

In Hamilton, Bermuda, this _3rd_ day of _July_, 1998

_____
Platinum Indemnity, Ltd.
(Reinsurer)



**INSURANCE COMPANY**

195 Lake Louise Marie Road
Rock Hill, New York 12775-8000
(800) 836-2100 / (914) 796-2100

*A Subsidiary of Frontier Insurance Group, Inc.*

*File w/ F.S.I.M.*
*core file*

June 1, 1999

Mr. Jeff Dowling
PowersCourt Management Ltd
P.O. Box HM 2267
Windsor Place, 3rd Floor
18 Queen Street
Hamilton HM JX

RE:     **Revised Pages 1 and 2 of Platinum/Food Services Insurance Managers Contract
        Addendum No. 1**

Dear Jeff,

Enclosed please find two copies of revised page 1 and 2 of the Food Services Addendum. As per
our earlier conversation, the executed copies sent to Andy McComb with 04/29/99 cover letter
had incorrect effective date. The effective date of this addendum should be January 1, 1999
and corresponds with the new treaty year for the program. Please replace first two pages of the
original Addendum No. 1 with the revised copies enclosed.

Looking forward to working with you. Should you have any questions please do not hesitate to
contact me at 914-796-2100 ext. 5367.

Sincerely,

Yana M. Hupka, ARe
Reinsurance Accountant

Encls.

cc:     Janet Backer

*Janet,*

*I will give you a copy of executed addendum*
*once we get it back from Bermuda*     FIC/FSIM 000121



**FOOD SERVICES INSURANCE MANAGERS INC., PROGRAM ADDENDUM NO. 1**

ATTACHED TO AND FORMING A PART OF
THE REINSURANCE AGREEMENT

(hereinafter referred to as "Agreement")

between

Frontier Insurance Company
(Company)
and
Platinum Indemnity, LTD
(Reinsurer)

IT IS HEREBY UNDERSTOOD AND AGREED that provisions of this contract are changed effective January 1, 1999, as respects polices incepting on and after that date, as follows:

### REINSURER'S LIABILITY

The first paragraph of the REINSURER'S LIABILITY provision is deleted in its entirety and is substituted with the following:

The Reinsurer will pay to the Company 100% of all losses and 100% of all allocated and unallocated loss expense under all binders, policies, agreements or other evidence of insurance or reinsurance, whether written or oral, underwritten for the subject program during the term of this Agreement; Reinsurer will also reinsure any and all assigned risks and shall pay its proportionate share of any assessments. The maximum direct loss which will be ceded hereunder as respects any risk is $250,000 per occurrence. The Reinsurer's maximum aggregate liability hereunder shall not exceed 73.50% of original gross subject written premium. However, in no event shall the Company's liability for losses and allocated loss adjustment expenses in excess of 73.50% of the original gross written premium exceed ten million dollars ($10,000,000). Any loss and allocated loss adjustment expense in excess of this amount shall be ceded to the Reinsurer as provided for under the terms of this Agreement.

### CALCULATION OF REINSURANCE PREMIUM

The CALCULATION OF REINSURANCE PREMIUM provision is amended to read:

Page 1 of 3

In consideration for the reinsurance provided hereunder, there will be a reinsurance premium payable by the Company to the Reinsurer which shall equal 100% of the gross premium earned by the Company under policies, including adjustments to premium (determined in accordance with the company's applicable rates, appropriate schedule and experience modifications and premium discount factors) after deducting 6.00% of subject earned premiums for the cost of excess reinsurance. The Reinsurer will allow the Company a ceding commission of 27.86%, calculated as follows:

a.    5.32 % Company front fee

b.    0.53% of ceded premium to cover the Company's data processing, general administrative and supervisory expenses.

c.    Any applicable premium taxes, fees for boards and bureaus, and liabilities for assessments and pools currently estimated to be 4.36% of ceded premium.

d.    Any applicable fee for Federal Excise Tax currently estimated to be 1% of ceded Premium.

e.    16.65 % of ceded premium as a commission to Food Services Insurance Managers, Inc. to cover their expenses arising from sales, underwriting, policy issuance, data processing and claims handling.

# F.S.I.M.
# FOOD SERVICES INSURANCE MANAGERS, INC.

3300 Douglas Blvd., Suite #295
Roseville, CA 95661
(916) 773-0206

December 18, 1997

Mr. Richard P. Marshall
Vice President
**FRONTIER INSURANCE COMPANY**
195 Lake Louise Marie Road
Rock Hill, NY 12775

Re: **FOOD SERVICES INSURANCE MANAGERS, INC. (F.S.I.M.)**

Dear Mr. Marshall,

This is to confirm that in the event that *FOOD SERVICES INSURANCE MANAGERS, INC.* is unable to form a rent a captive, *FOOD SERVICES INSURANCE MANAGERS, INC.* agrees to indemnify **FRONTIER INSURANCE COMPANY** for all losses, loss adjustment expenses and/or liability up to $250,000 incurred by the captioned on all policies effective January 1, 1998 and after.

Sincerely,

Dwight Halvorson
President

## CERTIFICATE OF SERVICE

I, Josephine Ricca, hereby certify that I am not a party to the action, I am over the age of eighteen years, I am employed by the law firm of Entwistle & Cappucci LLP, attorneys for plaintiff Gregory V. Serio, Superintendent of Insurance of the State of New York, as Rehabilitator of Frontier Insurance Company, and as Assignee of Platinum Indemnity, Ltd., and that on December 17, 2004, I served the foregoing documents in the within action by causing a true and correct copy of (1) Supplemental Memorandum of Law in Further Opposition to Defendants' Motion to Dismiss and to Compel Mediation; (2) Declaration of Ronald Labenski; and, (3) Declaration of William S. Gyves, Esq. to be sent via first class mail to counsel listed below:

> Lorienton N.A. Palmer, Esq.
> Schindel, Farman & Lipsius LLP
> 14 Penn Plaza, Suite 500
> New York, New York 10122

JOSEPHINE RICCA