UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x
                                          :

Gregory V. Serio, Superintendent of Insurance   :
of the State of New York, as Rehabilitator of     :    04 CV 3361 (KMK)
FRONTIER INSURANCE COMPANY, and as     :
Assignee of PLATINUM INDEMNITY, LTD.,    :
                                            :

                            Plaintiff,     :

                                          :

              -against-           :

                                          :

DWIGHT HALVORSON INSURANCE          :
SERVICES, INC. d/b/a/ F.S.I.M. INSURANCE  :
SERVICES and FOOD SERVICE INSURANCE :
MANAGERS, INC.,                      :
                                          :

                           Defendants.    :
                                          :
-----------------------------------------------------------------------x

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---

ENTWISTLE & CAPPUCCI LLP
280 Park Avenue, 26th Floor
New York, New York 10017
(212) 894-7200

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. ii-iii

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF FACTS .................................................................................... 3

      A.     Parties.......................................................................................... 3

               1.     FIC ......................................................................... 3

               2.     FSIM ...................................................................... 3

               3.     Platinum ................................................................. 3

               4.     DHIS ...................................................................... 4

      B.     The FSIM Program ..................................................................... 4

      C.     The Subscription Agreement ....................................................... 6

      D.     FSIM's Negative Balance ........................................................... 6

      E.     The Note....................................................................................... 7

      F.     FSIM's Default ............................................................................ 8

      G.     The Assignment ........................................................................... 8

ARGUMENT..................................................................................................... 9

     BLACK LETTER LAW, THE NOTE'S PLAIN
     LANGUAGE AND FSIM'S INDISPUTABLE DEFAULT
     COMPEL THE ENTRY OF PARTIAL SUMMARY JUDGMENT .................................. 9

      A.     Controlling Legal Principles....................................................... 9

      B.     FSIM's Obligations Are Set Forth
               Unequivocally in the Plain Language of the Note ................................. 12

      C.     FSIM Has Defaulted on the Note................................................. 13

CONCLUSION.................................................................................................... 14

<u>**TABLE OF AUTHORITIES**</u>

<u>**Cases**</u>

<u>Barclays Business Credit, Inc. v. Inter Urban Broadcasting of Cincinnati, Inc.</u>,
   1991 U.S. Dist. LEXIS 17473, (S.D.N.Y. Nov. 27, 1991)......................................................... 11

<u>Citibank, N.A. v. Benedict</u>,
   2000 U.S. Dist. LEXIS 3815 (S.D.N.Y. Mar. 28, 2000) ........................................................ 11

<u>Columbia Savings and Loan Association v. American International Group, Inc.</u>,
   1994 U.S. Dist. LEXIS 3804 (S.D.N.Y. Mar. 31, 1994) ........................................................ 11

<u>Curtis v. Beatrice Foods Co.</u>,
   481 F. Supp. 1275 (S.D.N.Y.), <u>aff'd</u>, 633 F.2d 203 (2d Cir. 1980)........................................... 9

<u>Guidi v. Inter-Continental Hotels Corp.</u>,
   2003 U.S. Dist. LEXIS 6390 (S.D.N.Y. Apr. 16, 2003)............................................................ 10

<u>Jami Marketing Services, Inc. v. Jami Brokerage Services, Inc.</u>,
   1991 U.S. Dist. LEXIS 11554 (S.D.N.Y. Aug. 21, 1991)........................................................ 11

<u>Joaquin v. Abbott</u>,
   Civil Jurisdiction 1993 No. 302 (Oct. 5, 1994).......................................................................... 10

<u>Locals 302 and 612 of the International Union of Operating Engineers v. Blanchard</u>,
   2005 U.S. Dist. LEXIS 17679 (S.D.N.Y. Aug. 25, 2005) ........................................................ 9

<u>Mulholland v. GMZ Associates, Ltd.</u>,
   2004 U.S. Dist. LEXIS 3867 (S.D.N.Y. Mar. 11, 2004) ........................................................ 11

<u>Nancy Neale Enterprises, Inc. v. Eventful Enterprises, Inc.</u>,
   238 A.D.2d 322, 656 N.Y.S.2d 61 (2d Dep't 1997)................................................................. 12

<u>Sherman, LLC v. DCI Telecommunications, Inc.</u>,
   2002 U.S. Dist. LEXIS 19081 (S.D.N.Y. Oct. 8, 2002) ........................................................ 11

<u>Somersall v. Bank of Bermuda, Ltd.</u>,
   Civil Appeal No. 24 of 1993 (July 1, 1994) ............................................................................. 10

<u>**Rules**</u>

Fed. R. Civ. P. 44.1 ....................................................................................................................... 9

## **Foreign Law**

Bills of Exchange Act 1934 (Bermuda) § 75(1)......................................................... 10

Bills of Exchange Act 1934 (Bermuda) § 80.............................................................. 10

## PRELIMINARY STATEMENT

Plaintiff Gregory V. Serio, Superintendent of Insurance of the State of New York, as Rehabilitator of Frontier Insurance Company ("FIC") and Assignee of Platinum Indemnity, Ltd. ("Platinum"), respectfully submits this memorandum of law in support of the motion for summary judgment on his claim arising out of defendant Food Service Insurance Managers, Inc.'s ("FSIM") default on a promissory note.[1]

As complex as the balance of this litigation may be, the promissory note claim asserted in Count IV of the Complaint could not be any more straightforward. The straightforward nature of that claim reflects the correspondingly straightforward nature of promissory notes in general. A promissory note is universally recognized as an unconditional written promise to pay a sum certain. Utilized in every conceivable form of business transaction, a promissory note's utility flows directly from the unconditional nature of the promissor's obligations and the corresponding degree of security such an unconditional commitment affords the intended beneficiary.

It was against the backdrop of these commercial realities that Platinum, the Superintendent's assignor, accepted the promissory note at issue as security for FSIM's performance of its obligations relating to the insurance program giving rise to this litigation. (A copy of the promissory note in question is attached as Exhibit A to the accompanying Declaration of Andrew McComb ("McComb Decl.")). The language of the note is plain and unambiguous. Therein, FSIM assumed an unconditional obligation to pay a sum certain to Platinum and expressly acknowledged that its obligation to do so was supported by adequate

---

[1]    Subsequent to the commencement of this litigation, Howard Mills succeeded Gregory V. Serio as head of the New York State Insurance Department. Mr. Mills also assumed Mr. Serio's role as FIC's Rehabilitator. See Declaration of Nicholas J. Puleio ("Puleio Decl.") at ¶ 14.

consideration.  Platinum not only relied on the plain language of the note but held a commercially reasonable expectation that, in the event of FSIM's default, a court would treat the note for what it universally is understood to be -- an unconditional obligation that would be enforced regardless of whatever extraneous issues from outside the four corners of the note the maker might raise in an attempt to evade its clear-cut obligations.

The Superintendent's burden on this application is <u>de minimus</u>.  He respectfully submits that summary judgment as to Count IV is warranted in light of the irrefutable evidence that FSIM executed the note and then subsequently defaulted upon that note.  In the end, it is no more complicated than that.  There simply are no genuine issues of material fact that would warrant -- or justify the expense and business disruption relating to -- a trial on this claim.

### STATEMENT OF FACTS

**A.**    **Parties**

     **1.**    **FIC**

FIC is an insurance company organized and existing under the laws of the State of New York. Based in Rock Hill, New York, FIC served as the fronting carrier for the insurance program giving rise to this dispute. See Complaint, ¶¶ 9, 35-38; Answer, ¶ 9.

On August 24, 2001, the Superintendent initiated proceedings in the Supreme Court of the State of New York, New York County, seeking an order placing FIC into rehabilitation pursuant to Article 74 of the New York Insurance Law. On August 27, 2001, the Supreme Court appointed the Superintendent as temporary receiver of FIC. The Supreme Court entered an Order of Rehabilitation with respect to FIC on October 15, 2001. Therein, the Supreme Court appointed the Superintendent as Rehabilitator of FIC, declared FIC insolvent and found that "[i]t is in the best interest of Frontier's policyholders, creditors and the general public that the Superintendent be directed to take possession of Frontier's property and to rehabilitate its business and affairs[.]" Id., ¶¶ 10-12.

     **2.**    **FSIM**

FSIM is a corporate entity organized and existing under the laws of the State of California. Based in Roseville, California during the time period relevant to this dispute, FSIM was engaged in the business of securing workers' compensation insurance coverage for its clients in the agribusiness and food-related industries. Id., ¶¶ 17-19; Answer, ¶¶ 17, 19.

     **3.**    **Platinum**

Platinum was a corporate entity organized and existing under the laws of the Island of Bermuda. Maintaining its principal place of business in Hamilton, Bermuda, Platinum

was the rent-a-captive reinsurer for the workers' compensation program giving rise to this dispute.  Id., ¶ 34; Complaint, ¶¶ 33-34; McComb Decl., ¶¶ 5, 22.

      **4.**    **DHIS**

Defendant Dwight Halvorson Insurance Services, Inc. ("DHIS") is a corporate entity organized and existing under the laws of the State of California.  During the time period relevant to this dispute, DHIS maintained its principal place of business in Roseville, California. See Complaint, ¶¶ 15, 19; Answer, ¶¶ 15, 19.  An insurance agency specializing in providing insurance and risk management services to the food services industry, DHIS served as FIC's agent in connection with the underlying insurance program.  See Complaint, ¶¶ 16, 38; Answer ¶ 38.

    **B.**    **The FSIM Program**

This litigation arises out of a workers' compensation insurance program FSIM and DHIS developed for and marketed to the food service industry in the United States.  The program came to be known as the FSIM Program.  See Complaint, ¶ 1; Answer, ¶ 1; McComb Decl., ¶ 12.

Dwight J. Halvorson, DHIS's president, formed FSIM in or about 1997. Halvorson had been operating DHIS since 1987.  DHIS grew to become a regional leader in that segment of the insurance industry servicing growers, shippers, packers, distributors and processors.  Halvorson established FSIM as part of a comprehensive workers' compensation insurance program developed for and marketed to this industry.  Halvorson's concept was to secure affordable coverage for his clients through an offshore captive insurance facility.  See Complaint, ¶¶ 20-25.

FSIM and DHIS, however, were not insurers.  For the FSIM Program to succeed, it required an established carrier willing to issue the insurance policies providing the coverage

for participating businesses. DHIS ultimately affiliated with FIC to obtain those insurance policies. Id., ¶¶ 35-38; McComb Decl., ¶ 13.

A core component of the FSIM Program was the creation of a captive insurance facility. Captive insurance facilities provide an alternative source of insurance coverage to insureds for whom the conventional approach of purchasing policies from an established insurance carrier may be unavailable or prohibitively expensive. Offshore captives typically are not licensed to issue insurance policies within the United States. As a result, they typically act solely as reinsurers and partner with a "fronting" insurer licensed to issue policies in the United States to the insureds. The fronting carrier issues the policies and then transfers a significant portion of the risk back to the offshore captive pursuant to a reinsurance agreement. Id., ¶¶ 14-16.

One variation of the captive insurance approach -- and the one on which the FSIM Program was based -- is to develop the program around what is called a rent-a-captive. The rent-a-captive is designed to accommodate insureds who either are unable or unwilling to assume the higher costs of establishing their own captive, a process which can be administratively burdensome, involve substantial upfront costs and require significant capital investment. A rent-a-captive facility involves a captive formed by one or more sponsors. The sponsors then "rent" the captive's capital, surplus, services and expertise out to the insured or discrete groups of insureds. Platinum was such a rent-a-captive insurance facility. Id., ¶¶ 17-19.

The insured or insureds who use the rent-a-captive typically purchase non-voting preferred shares in the captive, pay a fee and post some form of collateral to shield the captive reinsurer from any underwriting losses that may arise. In the typical rent-a-captive facility, separate rent-a-captive accounts or "cells" are established within the overall captive

infrastructure for each insured or distinct set of insureds. Premiums collected on policies issued under a particular program are credited to the appropriate rent-a-captive account and loss payments made in connection with those policies are debited from the appropriate account. Id., ¶¶ 20-21.

C.    **The Subscription Agreement**

In late 1997, Platinum agreed to permit FSIM to establish a separate account within Platinum's structure in connection with the FSIM Program. Platinum entered into a Subscription and Shareholder Agreement ("Subscription Agreement") with FSIM on January 16, 1998. Id., ¶ 22-23, Ex. B.

Through the Subscription Agreement, FSIM obligated itself to, among other things, pay to Platinum all amounts necessary to remedy any "Negative Balance" in its account. In essence, a Negative Balance would arise if the losses Platinum was compelled to reinsure and the expenses it incurred under the FSIM Program outstripped both FSIM's contributions to the rent-a-captive account and the level of premium dollars flowing into the account. Platinum was not intended to assume the risk of such a Negative Balance or any liability with respect to such a shortfall. Consistent with industry practice, that risk and liability were assumed solely by FSIM. Id., ¶¶ 25-26., Ex. B at ¶¶ 1(o), 4(a).

D.    **FSIM's Negative Balance**

The insurance policies FIC issued in connection with the FSIM Program spanned two distinct periods: Policy Year 1 (January 1, 1998 - December 31, 1998) and Policy Year 2 (January 1, 1999 - December 31, 1999). By the end of Policy Year 1, FSIM had incurred a substantial Negative Balance in its account. This Negative Balance had a direct and significant impact on Platinum's ability to perform its obligations to FIC with respect to the FSIM Program.

Despite Platinum's efforts to resolve this issue, as of October 1999 -- i.e., well into Policy Year 2 -- FSIM had failed to remedy the Negative Balance for Policy Year 1. Id., ¶¶ 27-29.

In October 1999, Platinum was advised that FIC intended to pull out of the FSIM Program at the conclusion of Policy Year 2. After receiving notice of FIC's intentions, Platinum engaged in discussions with FSIM regarding the Negative Balance in the FSIM Program. On October 13, 1999 (with the end of Policy Year 2 fast approaching), Platinum advised FSIM that Platinum was prepared to continue to facilitate the FSIM Program. Platinum advised FSIM, however, that it would do so only if it first received sufficient capital and/or contingent capital from FSIM to remedy the existing Negative Balance and adequately fund its account. Notwithstanding these discussions, there was no immediate resolution to FSIM's Negative Balance, which continued to negatively impact Platinum's ability to fulfill its obligations to FIC under the FSIM Program. Id., ¶¶ 30-32.

### E.    The Note

On June 19, 2000, representatives of FSIM and Platinum met to discuss the Negative Balance. At this meeting, the FSIM representatives proposed that one means of easing Platinum's concerns with respect to the Negative Balance was to have FSIM post a promissory note as collateral for its performance of FSIM's obligations with respect to paying down the Negative Balance by installments. After a period of negotiations, Platinum and FSIM reached an agreement whereby FSIM would execute a promissory note in Platinum's favor to serve as collateral for FSIM's performance of its obligation to remedy the Negative Balance and adequately fund its cell within the Platinum structure. Id., ¶¶ 33-35.

On November 8, 2000, Platinum forwarded a promissory note (the "Note") to FSIM for execution. Id., ¶ 36, Ex. C. The principal amount of the Note was set at $469,515.00 -- an amount equal to the Negative Balance in FSIM's separate account as of the

7

date of the Note. <u>Id.</u> Also on November 8, 2000, FSIM executed the Note and returned it to

Platinum. <u>Id.</u>, ¶ 37, Ex. D. The Note required FSIM to make monthly payments to Platinum of

$21,000.00 commencing on August 15, 2000. <u>Id.</u>, ¶ Ex. A at ¶ A. The principal and any

outstanding interest were to be paid in full by no later than August 15, 2002. <u>Id.</u>, Ex. A. at ¶ E.

### F.  **FSIM's Default**

FSIM made its first monthly payment of $21,000.00 on the Note on August 28,

2000. It proceeded to make six additional payments on the Note of $21,000.00 each, for a total

of $147,000.00. FSIM made its last monthly $21,000.00 payment on the Note on April 20, 2001,

which left a balance of $322,515.00 remaining on the Note. <u>Id.</u>, ¶¶ 39-41.

Beginning in June 2001, Platinum made repeated demands that FSIM make good

on its obligations under the Note. Despite these demands, FSIM made no further payments on

the Note. <u>Id.</u>, ¶¶ 42-43.

### G.  **The Assignment**

In the wake of FIC's termination of its involvement in the FSIM Program, a

dispute arose between the Superintendent and Platinum regarding FIC and Platinum's respective

rights and obligations under a Reinsurance Agreement relating to the FSIM Program. On

December 27, 2002, the Superintendent and Platinum executed a Commutation Agreement

pursuant to which they resolved their differences amicably. <u>Id.</u>, ¶¶ 44-45, Ex. E; Puleio Decl.,

¶¶ 5-7, Ex. A.

Among other things, the Commutation Agreement required Platinum to assign to

the Superintendent all of its right, title and interest in the Note. Consistent with the terms of the

Commutation Agreement, Platinum formally assigned to the Superintendent its claims against

FSIM. Among other things, Platinum assigned to the Superintendent all right, title and interest

8

in the Note. The unpaid balance on the Note when it was assigned was $322,515.00, exclusive

of interest. Id., ¶¶ 8-9, 12, Ex. B at ¶ (ii); McComb Decl., ¶ 46, Ex. F at (ii).

        On March 5, 2003, the Superintendent sought court approval of the Commutation

Agreement with Platinum, as required by the New York Insurance Law. In an Order dated May

2, 2003, the New York State Supreme Court formally approved the Commutation Agreement.

See Puleio Decl., ¶¶ 10-11, Exs. C-D.

## ARGUMENT[2]

### BLACK LETTER LAW, THE NOTE'S PLAIN LANGUAGE AND FSIM'S INDISPUTABLE DEFAULT COMPEL THE ENTRY OF PARTIAL SUMMARY JUDGMENT

### A.    Controlling Legal Principles

        The Note expressly provides that it is "governed by Bermuda law."[3] Bermuda's

Bills of Exchange Act 1934 (the "Bermuda Act") defines a promissory note as:

---

[2]   For the Court's convenience, copies of the Bermuda laws and decisions, as well as all LEXIS decisions, cited herein are attached hereto in alphabetical order.

[3]   The Court has considerable latitude in determining Bermuda law on this motion. Federal Rule of Civil Procedure 44.1 provides:

> The court, in determining foreign law, may consider any relevant material or source … whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law.

Fed. R. Civ. P. 44.1; see also Fed. R. Civ. P. 44.1 advisory committee's note (1966) ("rule provides flexible procedure for presenting and utilizing material on issues of foreign law by which a sound result can be achieved with fairness to the parties"); id. advisory committee's note (1972) ("purpose of the provision is to free the judge, in determining foreign law, from any restrictions imposed by evidence rules"). Expert testimony with respect to Bermuda law is not required. Indeed, "federal judges may … reach their own decisions on the basis of independent examination of foreign legal authorities." Curtis v. Beatrice Foods Co., 481 F. Supp. 1275, 1285 (S.D.N.Y.), aff'd, 633 F.2d 203 (2d Cir. 1980); see also Locals 302 and 612 of the Int'l. Union of Operating Eng'rs v. Blanchard, 2005 U.S. Dist. LEXIS 17679, (*continued on next page*)

> an <u>unconditional</u> <u>promise</u> in writing made by one
> person to another signed by the maker, engaging to
> pay, on demand or at a fixed or determinable future
> time, a sum certain in money to, or to the order of, a
> specified person or to bearer.

<u>See</u> Bermuda Act, § 75(1) (emphasis supplied). The Bermuda Act further provides that the

maker of a promissory note "by making it … engages that he will pay it accordingly to its tenor."

<u>Id.</u> § 80.

Under Bermuda law, summary adjudication of the parties' respective rights and

obligations under a promissory note is appropriate where it is demonstrated that the note is

signed by the maker, is for a sum certain, is by its terms unconditional, and is payable upon

demand or at a fixed time. For example, in <u>Somersall v. Bank of Bermuda, Ltd.</u>, Civil Appeal

No. 24 of 1993 (July 1, 1994), the court addressed a claim for money due on a promissory note.

The Bermuda Court of Appeals affirmed a decision granting the equivalent of summary

judgment (called an "Order 14 proceeding") to the recipient of a promissory note where the

recipient demonstrated that the note was executed and subsequently defaulted upon. <u>Id.</u> at 1-2.

Significantly, the defendant's various defenses, which included allegedly inadequate

consideration, were rejected out of hand. <u>Id.</u> at 2, 4.

In <u>Joaquin v. Abbott</u>, Civil Jurisdiction 1993 No. 302 (Oct. 5, 1994), the Supreme

Court of Bermuda noted the unconditional nature of a promissory note. <u>Id.</u> at 8. In giving effect

to the terms of a note, the court rejected extraneous evidence of the document's purported intent.

<u>Id.</u> "The note," the court instructed, "has to be interpreted on its face." <u>Id.</u>

---

at *20 (S.D.N.Y. Aug. 25, 2005) ("Interpretation of foreign law is entirely within the discretion
of the Court"); <u>Guidi v. Inter-Continental Hotels Corp.</u>, 2003 U.S. Dist. LEXIS 6390, at *5
(S.D.N.Y. Apr. 16, 2003) (same)

Closer to home, the Honorable Mary Johnson Lowe applied Bermuda law governing promissory notes in <u>Columbia Savings and Loan Association v. American International Group, Inc.</u>, 1994 U.S. Dist. LEXIS 3804 (S.D.N.Y. Mar. 31, 1994). There, the court held that because the "language of the note is unambiguous on its face, under Bermuda law the Court should give the contractual terms their plain meaning without looking outside the terms of the contract." <u>Id</u>. at *11-12.

Bermuda law is entirely consistent with New York law in this context. As in Bermuda, under New York law a promissory note is meant to "stand[] on its own -- the note alone establishes the Plaintiff's right to payment." <u>Sherman, LLC v. DCI Telecomms., Inc.</u>, 2002 U.S. Dist. LEXIS 19081, at *6 (S.D.N.Y. Oct. 8, 2002).

A plaintiff's burden of proof in seeking summary judgment on a promissory note is <u>de minimus</u>. To establish "a prima facie case of entitlement to summary judgment in an action for recovery on a promissory note, plaintiff must submit `the promissory note executed by the defendant together with proof of the defendant's failure to make payment thereon.'" <u>Citibank, N.A. v. Benedict</u>, 2000 U.S. Dist. LEXIS 3815, at *16 (S.D.N.Y. Mar. 28, 2000) (citation omitted); <u>see also</u> <u>Mulholland v. GMZ Assocs., Ltd.</u>, 2004 U.S. Dist. LEXIS 3867, at *2 (S.D.N.Y. Mar. 11, 2004) (in an action on a promissory note "`upon a showing of no material question concerning execution and default, summary judgment is appropriate'") (citation omitted); <u>Barclays Bus. Credit, Inc. v. Inter Urban Broad. of Cincinnati, Inc.</u>, 1991 U.S. Dist. LEXIS 17473, at *11-12 (S.D.N.Y. Nov. 27, 1991) ("well established that in actions to collect on a promissory note, the plaintiff prevails on its cause of action as a matter of law by showing the validity of the promissory note in question and non-payment according to the note's terms"); <u>Jami Marketing Servs., Inc. v. Jami Brokerage Servs., Inc.</u>, 1991 U.S. Dist. LEXIS 11554, at *8

(S.D.N.Y. Aug. 21, 1991) ("holder of a promissory note establishes a prima facie right to a

judgment on the note if [the maker] failed to make payment according to the terms of the Note");

Nancy Neale Enters. Inc. v. Eventful Enters., Inc., 238 A.D.2d 322, 323, 656 N.Y.S.2d 61, 62

(2d Dep't 1997) ("because it is undisputed that the [money] due under the promissory note has

not been paid, the plaintiffs are entitled to summary judgment").

### B.    FSIM's Obligations Are Set Forth Unequivocally in the Plain Language of the Note

The terms of the Note could not be more plain.  This language, agreed to by two

sophisticated business entities, unequivocally reflects the parties' intentions as follows:

- "FOR VALUE RECEIVED . . . [FSIM] . . . promises to pay to the order of [Platinum] . . . the principal sum of Four Hundred Sixty Nine Thousand, Five Hundred and Fifteen Dollars and 00/100 Cents ($469,515.00) with interest[.]" See McComb Decl., Ex. A at introductory paragraph (emphasis supplied);

- "Principal shall be paid . . . as follows:  Twenty One Thousand Dollars and No Cents ($21,000.00) on the fifteenth day of each month commencing with August 15, 2000." Id., Ex. A at ¶ A (emphasis supplied);

- "The balance of principal and any outstanding interest as well as any other sum remaining unpaid on this Note shall be paid in full no later than August 15, 2002. Id., Ex. A at ¶ E (emphasis supplied); and,

- An "`Event of Default´ shall be deemed to have occurred:  (1) If Debtor fails to pay any principal or interest on this Note when it becomes due and payable [.]" Id., Ex. A at ¶ F(1) (emphasis supplied).

C.    <u>**FSIM Has Defaulted on the Note**</u>

FSIM indisputably is in default on the Note. FSIM concedes, as it must, that it executed the Note and delivered it to Platinum. <u>See</u> Complaint ¶ 54; Answer, ¶¶ 54, 125-27; McComb Decl., ¶¶ 36-37, Ex. A. Under the Note, FSIM freely obligated itself to pay Platinum $469,515.00. <u>Id.</u>, Ex. A at introductory paragraph. Therein, FSIM also agreed to pay the principal amount in monthly installments of $21,000.00 each. <u>Id.</u>, ¶ Ex. A. at ¶ A. The Note expressly provides that it was to be paid off in full by no later than August 15, 2002. <u>Id.</u>, Ex. A. at ¶ E.

FSIM made just seven of these monthly payments before ceasing its performance under the Note in April 2001. <u>Id.</u>, ¶¶ 39-41. There is no dispute on this pivotal fact. <u>Id.</u>, ¶ 41; Complaint, ¶ 66; Answer, ¶¶ 66, 128. As of April 2001, a balance of $322,515.00 remained on the Note. <u>See</u> McComb Decl. ¶ 41. Despite due demand by Platinum, FSIM has failed and refused to make any further payment on the Note. <u>Id.</u> ¶¶ 42-43. FSIM indisputably is in default and therefore liable to the Superintendent for the remaining principal, plus interest as is expressly provided for in the Note. <u>Id.</u>, Ex. A at ¶¶ B-F.

## CONCLUSION

For the reasons set forth above, the Superintendent respectfully requests that the

Court enter an Order granting summary judgment in the amount of $322,515.00, plus interest, in

his favor and against FSIM on the claim for default on a promissory note set forth in Count IV of

the Complaint.

Dated: New York, New York
       November 11, 2005

                                    Respectfully submitted,


                                    ENTWISTLE & CAPPUCCI LLP
                                    280 Park Avenue, 26th Floor West
                                    New York, New York 10017
                                    (212) 894-7200

                                    By: _____
                                        WILLIAM S. GYVES (WG 2770)
                                        MICHAEL A. MCDONOUGH (MM 5712)

                                    Attorneys for Plaintiff


                                    14

**Bermuda Laws, Bermuda
Decisions and LEXIS Decisions**

LEXSEE

**BARCLAYS BUSINESS CREDIT, INC., Plaintiff, -against- INTER URBAN BROADCASTING OF CINCINNATI, INC., INTER URBAN BROADCASTING OF ST. LOUIS, INC., INTER URBAN BROADCASTING OF NEW ORLEANS PARTNERSHIP, THOMAS P. LEWIS, AND JAMES J. HUTCHINSON, JR., Defendants.**

90 Civ. 2272 (MJL)

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

1991 U.S. Dist. LEXIS 17473

**November 25, 1991, Decided**
**November 27, 1991, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff creditor filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56 against defendant debtors in the creditor's action for breach of a loan agreement and note, breach of a forbearance agreement, and breach by defendant individual guarantors of their unconditional guarantees of the agreements and note.

**OVERVIEW:** The creditor and debtors entered into agreements under which the creditor was to lend the debtors money and the debtors were to obtain a $ 500,000 irrevocable standby letter of credit and certified financial statements. The creditor filed the action against the debtors and the individual guarantors, alleging various breaches, and the creditor filed a motion for summary judgment in the action. The court granted the motion. Defendants had admitted the validity of the agreements and promissory note and their failure to comply with the terms of the the of the aforementioned agreements. In light of the admissions, defendants' attempts to justify their non-compliance by alleging unconscionability, bad faith, mutual mistake, modification, equitable estoppel, impossibility, lack of consideration, lack of default of the forbearance agreement, and unenforceability of the personal guarantees were insufficient to defeat the motion for summary judgment. Because there was no dispute as to the validity of the promissory note or non-payment according to the note's terms, the creditor prevailed as a matter of law.

**OUTCOME:** The court granted the motion.

**CORE TERMS:** letter of credit, default, summary judgment, forbearance, negotiated, collateral, borrower, mutual mistake, financing, lender, enforceable, matter of law, modify, able to obtain, unconscionable, modification, negotiation, irrevocable, standby, audited, loan agreement, contractual terms, lines of credit, negotiating, prevention, promisor, unfair, admit, commercially reasonable, demanded payment

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN1] A court may grant summary judgment only when it is clear both that no genuine issue of material fact remains to be resolved at trial and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*
[HN2] In a motion for summary judgment, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. However, a party opposing a properly supported motion for summary judgment may not rest upon the mere allegation or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e).

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN3] Only where the entire record would inevitably lead a rational trier of fact to find for the moving party is summary judgment warranted.

*Contracts Law > Types of Contracts > Negotiable Instruments*
*Commercial Law (UCC) > Negotiable Instruments (Article 3) > Enforcement of Instruments*
[HN4] In actions to collect on a promissory note, the plaintiff prevails on its cause of action as a matter of law by showing the validity of the promissory note in question and non-payment according to the note's terms.

*Commercial Law (UCC) > Sales (Article 2) > Obligation & Construction*
*Commercial Law (UCC) > Negotiable Instruments (Article 3) > Enforcement of Instruments*
[HN5] The doctrine of unconscionability is limited in its application to agreements that, at the time of their establishment, are so one-sided as to be oppressive and unfair to one party. U.C.C. § 2-302, Official Cmt. 1 (1990). While the doctrine was intended to prevent oppression and unfair surprise, it is not designed to disturb the allocation of risks due to superior bargaining power. U.C.C. § 2-302 (1990).

*Commercial Law (UCC) > Sales (Article 2) > Obligation & Construction*
*Commercial Law (UCC) > Negotiable Instruments (Article 3) > Enforcement of Instruments*
[HN6] When businesspeople contract in a commercial setting a presumption of conscionability arises.

*Contracts Law > Defenses > Unconscionability*
[HN7] A finding that a contract, particularly when negotiated between experienced businesspeople, is unconscionable is appropriate only where there is an absence of meaningful choice for one party and contractual terms which unreasonably favor the other party.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*
*Commercial Law (UCC) > General Provisions (Article 1) > Good Faith*
[HN8] U.C.C. § 1-203 imposes an obligation of good faith in the performance and enforcement of every contract. However, this obligation of good faith cannot be employed, in interpreting a contract, to override express contract terms.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*
*Commercial Law (UCC) > General Provisions (Article 1) > Good Faith*
[HN9] A party cannot be required, in the name of good faith, to forego or surrender a right that it otherwise possesses. Rather, the chief purpose of the good faith obligation is to enable enforcement of contract terms in a manner consistent with the parties' reasonable expectations at the time of contracting.

*Contracts Law > Contract Conditions & Provisions > Conditions Precedent*
[HN10] The doctrine of prevention provides that when a promisor wrongfully prevents a condition from occurring, that condition is excused. However, one of the well recognized exceptions to the prevention rule occurs where the hindrance is due to some action of the promisor which under the terms of the contract or the customs of business he was permitted to take. The purpose of the prevention doctrine is to prevent a party from benefiting by its wrongful acts.

*Contracts Law > Defenses > Ambiguity & Mistake*
[HN11] In order to obtain reformation of a contract due to mutual mistake, it must be shown that the mutual mistake is of a past or present material fact that existed at the time of the making of the contract, and not a mistake in prophecy, opinion, or in belief, relative to an uncertain event.

*Contracts Law > Contract Modifications*
[HN12] See N.Y. Gen. Oblig. Law § 15-301-1 (1990).

*Contracts Law > Consideration > Promissory Estoppel*
[HN13] The four elements of estoppel are that (1) the party to be estopped must be apprised of the facts; (2) such party must intend that his conduct be relied upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely on the conduct to his injury.

*Contracts Law > Consideration > Promissory Estoppel*
[HN14] Before the power of law can be invoked to enforce a promise, it must be sufficiently certain and specific so that what was promised can be ascertained.

*Contracts Law > Performance > Impossibility of Performance*
[HN15] The doctrine of impossibility of performance only applies in circumstances where unforeseeable events, such as an act of nature or force majeure, cause performance to become impossible. New York law is absolutely clear that where impossibility or difficulty of performance is occasioned only by financial difficulty or economic hardship, even to the extent of insolvency or bankruptcy, performance of a contract is not excused.

*Contracts Law > Consideration*
[HN16] Under New York law, consideration can be either benefit to the promisor or loss or detriment to the promisee, or vice versa.

**COUNSEL:** [*1] APPEARANCES:

JONES, DAY, REAVIS & POGUE, Attorneys for Plaintiff, 599 Lexington Avenue, New York, New York, 10022, By: Christopher P. Hill

STAMELL, TABACCO & SCHAGER, Attorneys for Defendants, 555 Madison Avenue, Suite 600, New York, New York 10022, By: Joseph J. Tabacco, Jr.

**JUDGES:** LOWE

**OPINIONBY:** MARY JOHNSON LOWE

**OPINION:**

OPINION AND ORDER

MARY JOHNSON LOWE, D.J.

Before this Court is the motion of the plaintiff Barclays Business Credit, ("Barclays"), pursuant to Fed. R. Civ. P. 56, for summary judgment against defendants Inter Urban Broadcasting of Cincinnati, Inc., Inter Urban Broadcasting of St. Louis, Inc., and Inter Urban Broadcasting of New Orleans Partnership (collectively "The Inter Urban Group") on Count I of its complaint for breach of a Loan Agreement and Note and Count II of its complaint for breach of a Forbearance Agreement and on Count III of its complaint against defendants Thomas P. Lewis and James J. Hutchinson, Jr., for breach of their unconditional guarantees of the ban Agreement, Note and Forbearance Agreement. n1 For the reasons set forth below, the motion is granted.

n1 The terms and conditions of the loan are contained in a General Loan and Security Agreement ("GLSA") and Note. See GLSA attached to Complaint as Exhibit A, Note attached to Complaint as Exhibit B. For the terms of the Forbearance Agreement, see the Forbearance Agreement, attached to Complaint as Exhibit I.

[*2]

BACKGROUND

The Inter Urban Group owns and operates radio stations in New Orleans, St. Louis and Cincinnati. Barclays Business Credit Inc., is a asset-based financing subsidiary of Barclays American Bank. In March of 1988 the Inter Urban Group began to search for a new banking relationship because their primary lender, Firstmark Financial Corporation of Indianapolis Indiana, was unable to fulfill their funding needs. Hutchinson Affidavit para.

3. By the spring of 1988 the Inter Urban Group was involved in negotiations with both Barclays and National Westminster Bank ("NatWest"). Hutchinson Affidavit para. 4.

The negotiations with Barclays, which were conducted through one of Barclays' Vice Presidents, Mr. Morton, produced three letters of intent, dated, July 1, July 25, and August 5, 1988 respectively. See letters attached to Hutchinson Affidavit as Exhibit A. The letters reflected the Inter Urban Group's discussion with Mr. Morton regarding the general terms and conditions of the loan agreement. Hutchinson Affidavit at para. 5. On August 10, 1988 Mr. Hutchinson indicated his approval of the terms contained in the final letter of intent.

In mid-August Mr. Morton notified the Inter [*3] Urban Group that Barclays' senior commitment committee had approved the loan commitment subject to a few additional considerations. The additional conditions to closing included the requirement that the Inter Urban Group obtain a $ 500,000 irrevocable standby letter of credit and certified financial statements for the year ending December 31, 1987. The Inter Urban Group alleges that despite their concern that they would have difficulty obtaining the required letter of credit, they agreed to the additional conditions in reliance on Barclays' reputation and leadership as a commercial lender and the belief of Barclays' Vice President, Morton, that they would be able to obtain the required letter of credit. Hutchinson Affidavit at para. 9. After the Inter Urban Group received the August 12, 1988 commitment letter containing the additional terms, they attempted to secure a letter of credit, but were unsuccessful for some time. Hutchinson Affidavit para. 11. The Inter Urban Group became concerned that they would not be able to obtain the letter of credit prior to the loan closing date. They allege that when they communicated their concern to Mr. Morton, he suggested that Barclays would [*4] allow the loan to close prior to the acquisition of a letter of credit, but that the Inter Urban Group would have to secure the letter of Credit within 90 days of closing. The Inter Urban Group agreed to the terms of the final Amended Commitment letter of August 29, 1988 on September 8, 1988, including GLSA section 3.2, which provided that Barclays receive a lien on all of the assets of the Inter Urban Group. n2

n2 Therefore, for this term Barclays would hold as collateral, in addition to the $ 20 million worth of Inter Urban collateral being held as a condition to the loan, a commercial building owned by Mr. Lewis which could be released to the bank issuing the letter of credit. Amended

Commitment Letter, attached to Hutchinson Affidavit as Exhibit D.

The Inter Urban Group also received a Commitment Letter from NatWest on August 23, 1988. See Hutchinson Affidavit Exhibit E. NatWest also required that the Inter Urban Group supply 100% of their assets as collateral for the proposed loan, but did not require a letter of [*5] credit as the Barclays loan did. Although the Inter Urban Group was experiencing difficulty obtaining a letter of credit under the terms of the Barclays commitment, the Inter Urban Group chose to enter into the loan agreement with Barclays.

In November 1988, the Inter Urban Group received its loan from Barclays in the amount of $ 10.5 million. On the loan execution date defendant Hutchinson was the President and defendant Lewis was the Chairman of the Inter Urban Group. Lewis Affidavit para. 1, attached to Joseph J. Tabacco Jr., Affidavit as Exhibit C. The loan was unconditionally guaranteed by defendants Hutchinson and Lewis. See Guarantee attached to Complaint as Exhibit C. The loan to the Inter Urban Group was structured as follows: $ 9.4 million in cash was advanced at closing to prepay outstanding indebtedness to Firstmark Financial Corporation of Indianapolis, the Inter Urban Group's primary lender (GLSA 2.7(a)); up to $ 300,000 was conditionally available for working capital (GLSA 2.1(a)(i)(A)(1)); up to 600,000 was available as interest reserve (GLSA 2.1(a)(i)(A)(2)); and $ 200,000 was available for capital expenditures (GLSA 2.1(a)(i)(A)(3)). The plaintiff alleges that [*6] within four months from the November, 1988 closing, of the loan, the Inter Urban Group had committed multiple defaults, including;

1) failing to deliver, within 30 days of closing, audited financial statements for the fiscal year ending December 31, 1987 (GLSA at § 9.18; Complaint at para. 13);

2) failing to deliver, within 90 days of closing, a $ 500,000 standby letter of credit payable to Barclays (GLSA at § 9.15; Complaint at para. 13 ); and

3) failing to achieve an operating profit of at least $ 1 million in fiscal year 1988. (Complaint at para. 15). Rather than showing a profit of $ 1 million in fiscal year 1988, the Inter Urban Group lost in excess of $ 50,000. IUG Admission Nos. 14-17, attached to Affidavit of Thomas P. Hall as Exhibit F.

Barclays further alleges that the Inter Urban Group has failed to fulfill its obligation to pay interest on the loan. Barclays claims that the Inter Urban Group was only able to make its monthly payments up to March 1989 by drawing $ 335,000 out of the $ 600,000 Interest

Reserve Line. However, in April 1989 Barclays refused, pursuant to Article 10 of the GLSA, to permit any further advances on the Interest Reserve line because of existing [*7] defaults under the GLSA. Plaintiffs Rule 3(g) Statement para. 14. Barclays contends that the Inter Urban Group did not pay any interest on the loan from April 1989 through October 1989, (IUG Admission Nos. 18-20, attached to Affidavit of Christopher P. Hall as Exhibit F), and although the group made nominal payments from November 1989-February 1990, they did not make a single full monthly interest payment during this period. (Affidavit of Thomas B. Hedges at para. 5 (hereinafter "Hedges Affidavit")). Finally, Barclays contends that since February 1990, the Inter Urban Group has paid absolutely no interest on the $ 10.5 million loan.

As the Inter Urban Group fell deeper into default, Barclays gave notice to the Group of the existing defaults and sought their cure. Exhibits D-F attached to the Complaint; IUG Admission Nos. 36-38, attached to Affidavit of Christopher P. Hall as Exhibit F. When the Inter Urban Group failed to cure the defaults Barclays exercised its option to accelerate the loan in accordance with Article 10.1 of the GLSA. In a letter dated July 14, 1989 Barclays demanded payment in full by September 15, 1989. See Exhibit H, attached to Complaint; IUG Admission No. [*8] 26, attached to Affidavit of Christopher P. Hall as Exhibit F. However, at the request of the Inter Urban Group and the guarantors, Hutchinson and Lewis, Barclays entered into a Forbearance Agreement in order to allow the Inter Urban Group more time to pay. The Forbearance Agreement was executed on December 15, 1989 and was unconditionally guaranteed by Hutchinson and Lewis. In the Forbearance Agreement, the Inter Urban Group specifically acknowledged the existing defaults and the validity of the loan documents and debt to Barclays. Forbearance Agreement at paras. 1, 12.

Barclays contends that the Inter Urban Group subsequently defaulted under several provisions of the Forbearance Agreement. Specifically, the Group 1) failed to enter into one or more binding agreements by March 7, 1990 to sell one or more of their radio stations (Forbearance Agreement at para. 4, Amended Answer at 16); 2) failed to submit weekly accounting data showing cash receipts and disbursements for each member of the Inter Urban Group (Forbearance Agreement at para. 2; IUG Admission Nos. 43-44); and 3) failed to submit monthly financial statements in conformity with § 6.2 of the GLSA (Forbearance Agreement at [*9] para. 2; IUG Admission Nos. 45-47).

Barclays contends that the above defaults terminated the Forbearance period and that they were therefore entitled to receive the $ 100,000 forbearance fee immediately. (Forbearance Agreement at para. 9; IUG Admis-

sion Nos. 48-49). Barclays demanded payment, including the $ 100,000 forbearance fee, by March 31, 1990. (Exhibit J, attached to the Complaint; IUG Admission No. 50). Barclays also notified and demanded payment from Hutchinson and Lewis. Lewis and Hutchinson Admissions Nos 15, 17, 18, attached to Affidavit of Christopher P. Hall as Exhibits D and E. When the deadline arrived and Barclays received no payment from either the Inter Urban Group or the guarantors, they commenced this action.

Defendants do not dispute that the GLSA, Note, Guarantees and Forbearance Agreement were duly executed and are in full force and effect. Defendants Rule 3(g) Statement. Further, they do not deny that they defaulted under various provisions of the GLSA or that in the normal course of events hundreds of thousands of dollars would be due and owing pursuant to the terms of the GLSA. Defendants' Memorandum in Opposition to Motion for Summary Judgment 4 (hereinafter [*10] "Defendants Opposition Memo"); Defendants Rule 3(g) Statement. However, they contend that in this case there are sharply contested issues of fact rendering summary judgement inappropriate.

The Inter Urban Group contends that summary judgment is inappropriate for several reasons. Specifically, they contend that the terms of the GLSA and Note were unconscionable; that Barclays breached the GLSA and implied covenants of good faith and fair dealings by unreasonably refusing to permit any modification in its exclusive security of all of Inter Urban's assets; that Barclays and the Inter Urban Group made a mutual mistake when entering into certain provisions of the GLSA, specifically Section 9.15, believing that Inter Urban would be able to obtain an irrevocable standby letter of credit in the amount of $ 500,000 without being able to offer the issuing bank the right to share in any portion of the $ 20 million worth of Inter Urban collateral held by Barclays; and that as a matter of public policy Barclays should not be able to enforce the personal guarantees of Hutchinson and Lewis if it is found that Barclays has no basis for obtaining summary judgment on the underlying loan and forbearance [*11] agreement.

## DISCUSSION

[HN1] A court may grant summary judgment only when it is clear both that no genuine issue of material fact remains to be resolved at trial and that the movant is entitled to judgment as a matter of law. Fed. A. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). [HN2] The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. Knight v. U.S.-Fire Insurance Co., 804 F.2d 9, 11 (2d Cir. 1986) cert. denied, 480 U.S. 932 (1987). However, a party opposing a properly supported motion

for summary judgment "may not rest upon the mere allegation or denials of his pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 250 (1986). In other words [HN3] only where the entire record would inevitably lead a rational trier of fact to find for the moving party is summary judgment warranted. Anderson at 249-50.

It is well established that [HN4] in actions to collect on a promissory note, the plaintiff prevails on its cause of [*12] action as a matter of law by showing the validity of the promissory note in question and non-payment according to the note's terms. Alicanto, S.A. v. Woolverton, 142 A.D.2d 703, 531 N.Y.S.2d 296, 297 (2d Dept. 1988); Grasso v. Shutts Agency, 132 A.D.2d 768, 517 N.Y.S.2d 113, 114 (3d Dept. 1967); Conolog Corp. v. P.R. Electronics Export, Inc., 140 A.D.2d 190, 528 N.Y.S.2d 44, 46 (1st Dept. 1988). The defendants have admitted the validity of the GLSA, Note and Forbearance Agreements and their failure to comply with the terms of the the of the aforementioned agreements. Affidavit of Christopher P. Hall, Exhibit F. In light of these admissions, the defendants' attempts to justify their non-compliance are insufficient to defeat plaintiff's motion for summary judgment. For the sake of clarity, we discuss each of the defendants' failed arguments as follows.

## I. Unconscionability

Inter Urban asserts that Barclays is responsible in part for the defendants' inability to meet all of the "unconscionable" criteria required by Barclays under the various agreements. Defendants Amended Answer and Affirmative [*13] Defenses (hereinafter "Amended Answer") para. 39.

[HN5] The doctrine of unconscionability is limited in its application to agreements that, at the time of their establishment, are so one-sided as to be oppressive and unfair to (one party). See UCC § 2-302, Official Comment 1 (1990); Equitable Lumber Co. v. IPA Land Development Corp. 38 N.Y.2d 516, 381 N.Y.S.2d 459 (1976); Chrysler Credit Corp. v. Kosal, 132 A.D.2d 686, 518 N.Y.S.2d 162, 164 (2d Dept. 1987). While the doctrine was intended to prevent oppression and unfair surprise, it is not designed to disturb the allocation of risks due to superior bargaining power. See UCC § 2-302 (1990); Glopak Corp. v. United States, 851 F.2d 334, 338 (Fed. Cir. 1986); Equitable Lumber Co., 381 N.Y.S.2d at 464.

Furthermore, [HN6] when, as in this case, businesspeople contract in a commercial setting, a presumption of conscionability arises. Earman Oil Co. v. Burroughs Corp., 625 F.2d 1291, 1300 (5th Cir. 1980); Chrysler Credit Corp. v. Kosal, 518 N.Y.S.2d at 164. The Inter

Urban Group [*14] admits that the terms of the GLSA and other documents were negotiated by Inter Urban representatives and plaintiff's representatives over a period of almost two months. Affidavit of James J. Hutchinson, Jr., para. 24. They admit that they were represented by counsel throughout the negotiations. Id. While the Inter Urban Group now suggests that Barclays' inclusion of the letter of credit provision was onerous and unfair, the Inter Urban Group, represented by counsel, agreed to that and other provisions suggested by Barclays. Even if some of the terms of the agreements were insisted upon by Barclays, Barclays' insistence would not make the parties' discussions any less a negotiation. See Glopak Corp. v. United States, 851 F.2d at 338-39. It is not unusual in negotiating a contract for one party to insist on the inclusion of particular provisions. Id.

Furthermore, and of substantial significance, at the same time that the Inter Urban Group was negotiating with Barclays, it was negotiating with National Westminster link, ("NatWest"), which also offered to loan defendants $ 10.5 million. The NatWest terms were very similar to Barclays', but the NatWest [*15] commitment did not require a letter of credit. However, despite defendants' alleged concern that they would not be able to obtain a letter of credit and their unsuccessful attempts to obtain a letter of credit prior to signing the August 29, 1988 commitment letter, the defendants chose to accept the terms of the Barclays agreements. Inter Urban was able to compare NatWest's terms to those offered by Barclays and to determine that, for whatever reason, the Inter Urban Group believed Barclays' terms to be preferable. Inter Urban had a choice of at least two financing institutions, and their rejection of the NatWest offer demonstrated their ability to exercise that choice. While the defendants may not be experts in arranging advantageous financing arrangements, they were experienced businessmen, were represented by counsel and had the opportunity to negotiate and choose to assent to the terms of the agreement that they ultimately signed.

The defendants have merely alleged that they now believe the terms of the agreements to have been unreasonably onerous. No evidence has been offered to support an argument that the terms of the agreements are so commercially unreasonable and so overbalanced [*16] in favor of Barclays as to be unconscionable. In fact, defendant Lewis indicated that there was no question that the defendants' representatives, as businessmen, understood and accepted the rigorous requirements included by Barclays in the language of the GLSA. Affidavit of Thomas P. Lewis para. 9, Attached to Affidavit of Joseph J. Tabacco Jr., as Exhibit C.

[HN7] A finding that a contract (particularly when negotiated between experienced businesspeople) is un-

conscionable is appropriate only where there is an absence of meaningful choice for one party and contractual terms which unreasonably favor the other party. See Credit Alliance Corp. v. Joshco Min. Corp., 90 F.R.D. 187, 189 (S.D.N.Y 1981). The defendants make no claim and fail at any point to demonstrate that they had no meaningful choice in the bargaining process or that the bargaining process was unfair. In fact the evidence suggests the contrary. Specifically, Inter Urban had the ability to identify unfavorable terms, negotiate for favorable or agreeable terms, and arrange financing with another institution (such as NatWest) if Barclays' terms were too stringent. Therefore, as a matter of law, the defendants' [*17] argument of unconscionability is inadequate to excuse their default under the terms of the various agreements between the parties.

II. Bad Faith

Inter Urban alleges that Barclays' conduct in refusing to permit an equal sharing of $ 250,000 worth of the more than $ 22 million Inter Urban collateral with another financial entity in order to assist Inter Urban in securing a letter of credit, was unreasonable and constituted a material breach of the implied covenant of good faith and fair dealings. Defendants Answer at 17. In support of this argument, defendants suggest that the holdings in K.M.C. v. Irving Trust Co., 757 F.2d 752 (6th Cir. 1985) and Reid v. Key Bank of Southern Maine Inc., 821 F.2d 9 (1st Cir. 1987) should be applied to the case at bar. Both K.M.C. and Reid involved financing agreements in which a lender, having provided a borrower with an agreed line of credit, precipitously and without warning halted further advances on which it knew the borrower's business depended. In both KMC and Reid, the court held that the lender's refusal, without prior notice, to continue to advance promised funds, breached a duty [*18] of good faith performance implied in the agreement. However, unlike the case at bar, in both KMC and Reid there was ample evidence in the record to support a finding that the refusal to advance funds without notice was conduct that was both unreasonable and contrary to normal practice. Specifically, in both cases bank executives indicated that it was not normal bank policy to terminate financing without notice and that there was no indication of any valid business reason for failing to give notice to the borrower. See Reid at 16; K.M.C. at 759. The facts in the instant action are very different, and do not support a finding that Barclays' refusal to modify the agreed upon terms of the GLSA and Note and allow another bank issuing a letter of credit to share in the assets secured by Barclays was commercially unreasonable and in bad faith. Unlike K.M.C. and Reid, where the banks and the borrowers were involved in a ongoing contractual relationship which was abruptly terminated by the bank without cause, defendants here

are arguing that Barclays should have agreed to modify contractual terms which were fully negotiated, in order to make it easier for the Inter [*19] Urban Group to comply with those contract terms. Neither K.M.C. nor Reid suggests that good faith dealing requires that one party agree to modify the terms of a negotiated contract in order to assist the other party in meeting its initial contractual obligations.

Attempting to support its position, the Inter Urban Group correctly notes that UCC § 1-203 [HN8] imposes an obligation of good faith in the performance and enforcement of every contract. However, this obligation of good faith cannot be employed, in interpreting a contract, to override express contract terms. See Grand Light Supply Co. v. Honeywell, Inc. 771 F.2d 672, 679 (2d Cir. 1985); Triangle Mining Co. v. Stauffer Chemical Co., 753 F.2d 734, 740 (9th Cir. 1985). The contract between Inter Urban and Barclays was negotiated by experienced businessmen, and there has been no showing by the defendants that would warrant this Court's applying the UCC good faith requirement in a way that would override the express, negotiated provision requiring that Barclays retain a security interest in all of the Inter Urban Groups' assets. See Grand Light & Supply Co. v. Honeywell, supra. [HN9] A [*20] party cannot be required, in the name of good faith, to forego or surrender a right that it otherwise possesses. General Aviation, Inc., supra. Rather, the chief purpose of the good faith obligation is to enable enforcement of contract terms in a manner consistent with the parties' reasonable expectations at the time of contracting. Id. n3

    n3 Defendants also attempt to rely on the doctrine of prevention, which [HN10] provides that when a promisor wrongfully prevents a condition from occurring, that condition is excused. District-Realty Title Insurance Corp. v. Ensmann, 767 F.2d 1018, 1023 (D.C. Cir. 1985); Calamari Perillo, Contracts § 1128 (3d ed. 1987). However, one of the well recognized exceptions to the prevention rule occurs where the hindrance is due to some action of the promisor which under the terms of the contract or the customs of business he was permitted to take. Shear v. National Rifle Association, 606 F.2d 1251, 1259 (C.C. Cir. 1979); 5 Williston on Contracts § 677A at 235. The purpose of the prevention doctrine is to prevent a party from benefiting by its wrongful acts. Seattle Totems Hockey Club, Inc. v. National Hockey League, 783 F.2d 1347, 1353 (9th Cir. 1986) cert. denied, 479 U.S. 932 (1986).

The terms of the GLSA and Note provided that Barclays receive all of the assets of the Inter Urban Group as collateral and that Group obtain a Letter of Credit for a minimum amount of $ 250,000 within ninety days off closing. As discussed thoroughly above, these terms were fully negotiated and agreed to by the Inter Urban Group. There is no doubt that Barclays was permitted to insist that Inter Urban comply with these terms and that there was nothing wrongful about its conduct in refusing to modify the loan terms.

[*21]
### III. Mutual Mistake

The Inter Urban Group argues that the parties made a mutual mistake at the time of the loan, believing that the Inter Urban Group could obtain an irrevocable $ 500,000 standby letter of credit in favor of Barclays by offering a second mortgage on Mr. Lewis' commercial building. Answer at 25. However, [HN11] in order to obtain reformation of a contract due to mutual mistake, it must be shown that the mutual mistake is of a past or present material fact that existed at the time of the making of the contract, and not a mistake in prophecy, opinion, or in belief, relative to an uncertain event. Baker v. Penn Mutual Life insurance Co., 788 F.2d 650, 661-62 (10th Cir. 1986) quoting Restatement 2d of Contracts § 151(a); Sabine Corp. v. Ong Western, Inc., 725 F. Supp 1157, 1189 (W.D. Okl. 1989). The Inter Urban Group claims that it mistakenly believed Mr. Morton's opinion that the Inter Urban Group would have no difficulty complying with the letter of credit provisions of the contract to be accurate. Answer at 25. However, this mistake related to an opinion or belief relative to an uncertain event, and not to a fact existing [*22] at the time of contracting, and therefore the argument of mutual mistake must fail.

### IV. Modification

The defendants argue that Barclays waived § 9.18 of the GLSA and therefore waived any default under that provision. Section 9.18 of the GLSA states that, within 30 days of the closing of the audited financial statements, the borrower must deliver those statements to the lender. Defendants assert that Barclays orally agreed to accept a draft of their 1987 financial statement because Inter Urban was unable to pay for final audited financial statements. However, GLSA Section 11.6 specifically states that "no modification, amendment or waiver of or with respect to any provision of (the) Agreement, the Note, or any of the other Loan Documents, nor consent to any departure by any of the Borrowers from any of the terms or conditions thereof, shall in any event be effective unless it shall be in writing and signed by the Lender."

Id. Since the defendants have not pointed to any written agreement modifying the GLSA or Note, their failure to supply 1987 audited financial statements constitutes a default under the terms of the GLSA and Note. New York law is clear that, in these circumstances, [*23] "without a writing to change the note's terms, there is no basis for a defense." Capri Jewelry, Inc. v. Chayavi, 117 A.D.2d 464, 503 N.Y.S.2d 370, 372(1st Dept. 1986); Key Bank, N.A. v. Ryan, 132 A.D.2d 220, 522 N.Y.S.2d 369, 371 (3d Dept. 1987). See also N.Y. Gen. Oblig. L. § 15-301-1 (McKinney 1990) [HN12] ("a written agreement . . . which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless sub [an] agreement is in writing and signed"). n4

n4 Furthermore, even if this default were excusable, it is only one of several to which the defendants have admitted.

## V. Equitable Estoppel

The Inter Urban Group appears to argue that Barclays should be estopped from enforcing the GLSA provision which required Inter Urban to obtain a letter of credit of not less than $ 500,000 within ninety days of closing. [HN13] The four elements of estoppel are that (1) the party to be estopped must be apprised of the [*24] facts; (2) such party must intend that his conduct be relied upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely on the conduct to his injury.

First, absent any evidence to the contrary, it is apparent that the representations made by Mr. Morton were his opinions, or, as characterized by the defendants, "his predictions" that Inter Urban would have no problem obtaining a Letter of Credit and that Barclays would assist Inter Urban in obtaining the Letter of Credit if necessary. Answer at 9. Mr. Morton's statement represents his professional belief and as such indicates a degree of uncertainty and opinion. Therefore his statements can not be construed as a misrepresentation of facts.

Second, the defendants have not submitted any evidence suggesting that Mr. Morton's representations were made in order to induce the Inter Urban Group to accept the letter of credit terms, or that he acted intentionally to mislead or deceive them.

Third, even if we held that Barclays' statements were factual representations, Inter Urban Groups' did not rely on those representations [*25] based on their ignorance

of the true facts. On the contrary, they have stated they had reservations about their ability to get a letter of credit all along, and chose to take the risk nonetheless. Hutchinson Affidavit para. 9. n5

n5 Additionally, the reference to Mr. Morton's alleged statement, that Barclays would assist Inter Urban in obtaining the letter of credit if necessary, is vague and indefinite. See Hutchinson Affidavit para. 14. [HN14] Before the power of law can be invoked to enforce a promise, it must be sufficiently certain and specific so that what was promised can be ascertained. Candid Productions v. International Skating Union, 530 F. Supp 1330, 1334 (S.D.N.Y. 1982). Furthermore, such a statement does not in any way suggest that the help offered included modification of the contractual terms as defendants desired.

In light of the foregoing discussion, the defendants have not established the necessary elements of equitable estoppel. Therefore, this attempted defense does not, as a matter [*26] of law, excuse the defendants' default under this provision of the agreements.

## VI. Impossibility due to Changed Circumstances

Defendants' third affirmative defense alleges that its inability to comply with the provisions of the GLSA was due to intervening and superseding circumstances beyond their control. The defendants do not indicate the nature of the intervening and superseding circumstances. However, based on a review of the documents filed by the defendants it appears that these events may be the loss of income that the Group sustained due to the slowdown in the New Orleans economy. Hutchinson Affidavit at para. 6. This defense must fail if economic hardship is its basis. [HN15] The doctrine of impossibility of performance only applies in circumstances where unforeseeable events, such as an act of nature or force majeure, cause performance to become impossible. New York law is absolutely clear that "where impossibility or difficulty of performance is occasioned only by financial difficulty or economic hardship, even to the extent of insolvency or bankruptcy, performance of a contract is not excused. 407 East 61st St. Garage Inc., v. Savoy Fifth Avenue Corp., 23 N.Y.2d 275, 296 N.Y.S.2d 338, 344 (1968); [*27] Pettinelli Electric Co., Inc. v. Board of Education, 56 A.D.2d 520, 391 N.Y.S.2d 118, 119 aff'd, 43 N.Y.2d 760(1977).

## VII. Consideration

The defendants suggest that as the majority of the loan proceeds they received from Barclays were used to

prepay a portion of their total outstanding loans from Firstmark Financial Corporation of Indianapolis Indiana, they did not actually have a benefit from the disbursement, and that therefore was a lack of consideration. The Inter Urban Group therefore, alleges that the true consideration given by Barclays was its promise to provide a $ 1.1 million reserve lines of credit. See Amended Answer paras. 42-45. Since Barclays did not provide the total amount of funds provided for in the reserve lines, defendants contend that Barclays provided no consideration and the debt is void. [HN16] Under New York law, consideration can be either benefit to the promisor or loss or detriment to the promisee, or vice versa. Banque Arabe et Internationale D'Investissement v. Bulk Oil(USA), 726 F. Supp. 1411, 1419 (S.D.N.Y. 1989); Holt v. Feigenbaum, 52 N.Y.2d 291, 437 N.Y.S. 2d 654, 658-59, 419 N.E.2d 332 (1981). [*28] Barclays loaned the Inter Urban Group a substantial amount of money, and the defendants benefitted from the loan by being able to eliminate some of their other debt. Since the Inter Urban Group's promise to repay the loan induced Barclays to incur a specific bargained for detriment to the Group's advantage, there was clearly sufficient consideration for defendants' promise, and the promise is therefore enforceable at law. n6

n6 Additionally, Barclays did fulfill its promise to provide the reserve lines of credit on the terms and conditions to which the parties explicitly agreed. Barclays continued to make Interest Reserve line advances to the Inter Urban Group until such time as it refused any further advances because Inter Urban was in default of several provisions of the GLSA. Article 10 of the GLSA specifically provides that Barclays had no obligation to make any advances on the reserve lines of credit if any defaults exit.

VIII. Forbearance Agreement

The Inter Urban Group admits that the Forbearance Agreement [*29] is valid and enforceable. IUG Admission No.7, attached to Affidavit of Christopher P. Hall as Exhibit F. However, the Inter Urban Group alleges that because they did not receive any commercially reasonable offers, they were unable to comply with the provisions requiring them to sell one or more of their radio station properties by March 7, 1990. Answer para. 16. The Inter Urban Group contends that since they did not receive a commercially reasonable offer and Article 9 of the UCC mandates a commercially reasonable sale, its failure to sell does not constitute a default.

The provisions of the U.C.C. to which the Inter Urban Group refers pertains to post-default foreclosure sales by secured parties in possession of collateral, and not to separate contractual agreements for one party to sell property by a certain date in order to pay off a debt. See U.C.C. § 9-504 (1990). The Inter Urban Group contractually agreed in the Forbearance Agreement, without qualification, to sell some or all of its properties in order to retire an existing debt. Therefore, the principles on which the Inter Urban Group seeks to rely are wholly inapplicable to this case. n7

n7 With this agreement as well, in addition to the Inter Urban Group's failure to comply with the sales provision in the Forbearance Agreement, they have admitted to violating several additional provisions of the Agreement. Specifically, they have failed to provide weekly cash receipts and disbursements data and monthly financial statements prepared pursuant to the terms of section 6.2 of the GLSA. IUG Admission Nos. 41, 43, 46, 47, attached to Affidavit of Christopher P. Hall as Exhibit F. The clear terms of the Forbearance Agreement provide for termination of the forbearance period upon occurrence of any default, and further provide that upon termination of the forbearance period, and that the Inter Urban Group will pay Barclays a $ 100,000 forbearance fee. Forbearance Agreement para. 7, 9; IUG Admission No. 48.

[*30]
IX. Guaranty

Inter Urban does not dispute that the personal guarantees executed by Mr. Hutchinson and Mr. Lewis are "irrevocable and unconditional and that the guarantees also contain language indicating that Lewis and Hutchinson waive ". . . any defense to the liability of Inter Urban . . .". Defendants' Opposition Memo at 26. However, Lewis and Hutchinson assert that the personal guarantees should not be enforceable in this case. Defendants Opposition Memo at 25-26. However, since we have held that the obligations under the underlying loan documents are enforceable, the personal guarantees of Mr. Lewis and Mr. Hutchinson are also enforceable.

CONCLUSION

Close scrutiny of the opposing papers submitted by the Inter Urban Group in support of its Rule 3(g) statement indicates that the defendants have failed to set forth any substantive defenses to their obligations under the loan agreements and guarantees, this Court must grant

the plaintiff summary judgment on Counts I, II, and III of its Complaint. n8

n8 The GLSA and Forbearance Agreement provide that the Inter Urban Group must pay Barclays' costs, including reasonable attorneys' fees, in enforcing its rights under the loan documents. See GLSA § 11.1: Forbearance Agreement para. 14. Therefore, plaintiffs are to submit to the Court, within 90 days of the date of this order, documentation detailing those costs.

[*31]
It Is So Ordered.

Mary Johnson Lowe
UNITED STATES DISTRICT JUDGE

Dated: November 25, 1991
New York, New York

**BERMUDA**
**1934 : 8**

**BILLS OF EXCHANGE ACT 1934**

ARRANGEMENT OF SECTIONS

1    Interpretation
2    Definition of bill of ex-
     change
3    Inland and foreign bills
4    Effect where different par-
     ties to bill are the same
     person
5    Indication of drawee
6    Indication of payee
7    Conditions under which
     bills are negotiable
8    Sums payable by a bill
9    Bill payable on demand
10   Bill payable at a future
     time
11   Omission of date in bill
     payable after date
12   Ante-dating and post-
     dating bill etc
13   Computation of time of
     payment
14   Referee in case of need
15   Optional stipulations by
     drawer or indorser
16   Definition and requisites
     of acceptance
17   Time for acceptance
18   General and qualified ac-
     ceptances
19   Inchoate instruments
20   Delivery of instrument
21   Capacity of parties
22   Signature essential to va-
     lidity
23   Forged or unauthorized
     signature on a bill
24   Signature by procuration
25   Person signing as agent or
     in a representative capac-
     ity
26   Value and holder for value
     of a bill
27   Accommodation party to a
     bill
28   Holder in due course
29   Presumption of value and
     good faith
30   Negotiation of bills

**BILLS OF EXCHANGE ACT 1934**

31  Requisites of a valid in-
    dorsement
32  Conditional indorsement
33  Indorsement in blank and
    special indorsement
34  Restrictive indorsement
35  Negotiation of overdue or
    dishonoured bill
36  Negotiation of bill to party
    already liable thereon
37  Rights of holder
38  When presentment for ac-
    ceptance is necessary
39  Time for presenting bill
    payable after sight
40  Rules as to presentment
    for acceptance; excuses
    for non-presentment
41  Non-acceptance of bill
42  Dishonour by non-accep-
    tance
43  Duties as to qualified ac-
    ceptance
44  Rules as to presentment
    for payment
45  Excuse for delay or non-
    presentment for payment
46  Dishonour by non-pay-
    ment
47  Notice of dishonour and
    effect of non-notice
48  Rules as to notice of dis-
    honour
49  Expenses for non-notice
    and delay
50  Noting or protest of bill
51  Duties of holder as re-
    gards drawee or acceptor
52  Funds in hands of drawee
53  Liability of acceptor

54  Liability of drawer or in-
    dorser
55  Liability of stranger sign-
    ing bill as indorser
56  Measure of damages
    against parties to dishon-
    oured bill
57  Transferor by delivery and
    transferee
58  Discharge of bill by pay-
    ment in due course
59  Banker paying on demand
    draft whereon endorse-
    ment is forged
60  Acceptor the holder at
    maturity
61  Express waiver
62  Cancellation of bill
63  Alteration of bill
64  Acceptance for honour
    supra protest
65  Liability of acceptor for
    honour
66  Presentment to acceptor
    for honour
67  Payment for honour supra
    protest
68  Rights of holder to dupli-
    cate of lost bill
69  Action on lost bill
70  Rules as to bills drawn in
    sets
71  Rules where laws conflict
72  Definition of cheque; ap-
    plication of Act
73  Presentment of cheque for
    payment
74  Revocation of banker's
    authority
75  Definition of promissory
    note

**2**                                    *1989 Revision*

76   Effect of delivery of
     promissory note
77   Joint and several promis-
     sory notes
78   Promissory note payable

on demand

79   Presentment of promis-
      sory note for payment

80   Liability of maker of
      promissory note

81   Application of certain pro-
      visions of Act to promis-
      sory notes

82   Good faith

83   Signature of instrument

84   Computation of time

85   When noting equivalent to
      protest

86   Protest when notary not
      accessible

87   Saving for rules of com-
      mon law

SCHEDULE

Form of protest which may be
used when services of a notary
cannot be obtained

[21 March 1934]

*[preamble and words of enactment omitted]*

**Interpretation**

1       In this Act, unless the context otherwise requires—

"acceptance" means an acceptance completed by delivery or no-
tification;

"action" includes counter claim and set off;

"banker" includes a body of persons, whether incorporated or
not, who carry on the business of banking;

"bankrupt" includes any person whose estate is vested in a
trustee or assignee under the law for the time being in force
relating to bankruptcy;

"bearer" means the person in possession of a bill or note which is
payable to bearer;

"bill" means a bill of exchange;

"delivery" means transfer of possession, actual or constructive,
from one person to another;

"holder" means the payee or indorsee of a bill or note who is in
possession of it, or the bearer thereof;

"indorsement" means an indorsement completed by delivery;

"issue" means the first delivery of a bill or note, complete in form,
to a person who takes it as a holder;

"note" means a promissory note;

**BILLS OF EXCHANGE ACT 1934**

**Definition of promissory note**

75      (1)    A promissory note is an unconditional promise in writing made by one person to another signed by the maker, engaging to pay, on demand or at a fixed or determinable future time, a sum certain in money to, or to the order of, a specified person or to bearer.

(2)    An instrument in the form of a note payable to maker's order is not a note within the meaning of this section unless and until it is indorsed by the maker.

(3)    A note is not invalid by reason only that it contains also a pledge of collateral security with authority to sell or dispose thereof.

(4)    A note which is, or on the face of it purports to be, both made and payable within Bermuda is an inland note; and any other note is a foreign note.

**Effect of delivery of promissory note**

76      A promissory note is inchoate and incomplete until delivery thereof to the payee or bearer.

**Joint and several promissory notes**

77      (1)    A promissory note may be made by two or more makers, and they may be liable thereon jointly, or jointly and severally according to its tenor.

(2)    Where a note runs "I promise to pay" and is signed by two or more persons it is deemed to be their joint and several note.

**Promissory note payable on demand**

78      (1)    Where a note payable on demand has been indorsed, it must be presented for payment within a reasonable time of the indorsement; and if it is not so presented the indorser is discharged.

(2)    In determining what is a reasonable time, regard shall be had to the nature of the instrument, the usage of trade, and the facts of the particular case.

(3)    Where a note payable on demand is negotiated, it is not deemed to be overdue, for the purpose of affecting the holder with defects of title of which he had no notice, by reason that it appears that a reasonable time for presenting it for payment has elapsed since its issue.

**Presentment of promissory note for payment**

79      (1)   Where a promissory note is in the body of it made payable at a particular place, it must be presented for payment at that place in order to render the maker liable; but in any other case presentment for payment is not necessary in order to render the maker liable.

(2)   Presentment for payment is necessary in order to render the indorser of a note liable.

(3)   Where a note is in the body of it made payable at a particular place, presentment at that place is necessary in order to render an indorser liable; but when a place of payment is indicated by way of memorandum only, presentment at that place is sufficient to render the indorser liable; but a presentment to the maker elsewhere, if sufficient in other respects, shall also suffice.

**Liability of maker of promissory note**

80      The maker of a promissory note by making it—

(a) engages that he will pay it accordingly to its tenor;

(b) is precluded from denying to a holder in due course the existence of the payee and his then capacity to indorse.

**Application of certain provisions of Act to promissory notes**

81      (1)   Subject sections 75 to 80 and except as by this section provided, the provisions of this Act relating to bills of exchange apply, with the necessary modifications, to promissory notes.

(2)   In applying those provisions the maker of a note shall be deemed to correspond with the acceptor of a bill, and the first indorser of a note shall be deemed to correspond with the drawer of an accepted bill payable to drawer's order.

(3)   The following provisions as to bills do not apply to notes—

(a) provisions relating to presentment for acceptance;

(b) provisions relating to acceptance;

(c) provisions relating to acceptance supra protest; and

(d) provisions relating to bills in a set.

(4)   Where a foreign note is dishonoured, protest thereof is unnecessary.

LEXSEE

CITIBANK, N.A., Plaintiff, -against- HOWARD M. BENEDICT and RUTH L.
BENEDICT, Defendants.

97 Civ. 9541 (AGS)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2000 U.S. Dist. LEXIS 3815

March 27, 2000, Decided
March 28, 2000, Filed

**DISPOSITION:** [*1] Plaintiff's motion for summary judgment GRANTED in part and DENIED in part. Defendants' cross-motion for partial summary judgment as to R. Benedict DENIED. Plaintiff's motion for preliminary injunction GRANTED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff bank moved for summary judgment asserting breach of contract out of defendant debtor's failure to pay the terms of their promissory notes. Plaintiff also alleged fraudulent transfers under N.Y. Debt. & Cred. Law § § 270 et seq. Defendant creditors husband and wife cross-moved for partial summary judgment as to defendant wife.

**OVERVIEW:** Plaintiff bank asserted claims for breach of contract arising out of defendant debtors' alleged failure to pay in accordance with the terms of promissory notes. Plaintiff also asserts a claim under the N. Y. Debt. & Cred. Law § § 270 et seq., alleging that defendants engaged in a series of fraudulent conveyances. Plaintiff moved for summary judgment and defendant wife cross-moved for partial summary judgment. Plaintiff's summary judgment motion was granted on the breach of contract claims against defendant husband, and the fraudulent transfer claims against both defendants, since there was intent to hinder, delay, or defraud creditors as shown by indicia of fraud. Plaintiff's summary judgment motion was denied against defendant wife for reasons of release, statute of limitations, and discharge. Plaintiff was awarded attorney's fees and injunctive damages, although no punitive damages.

**OUTCOME:** Plaintiff's summary judgment motion was granted on breach of contract and fraudulent transfer claims due to secrecy and retention of control. Plaintiff's summary judgment motion was denied against defendant wife because of statute of limitations, release, and discharge. Plaintiff was awarded attorney's fees, and injunctive damages, but not punitive damages. Defendants' cross-motion was denied.

**CORE TERMS:** summary judgment, conveyance, stock, transferred, transferee, fraudulent conveyance, cross-motion, novation, notice, breach of contract, badge, financial statement, actual intent, promissory, preliminary injunction, disposing, entity, fair consideration, undisputed, fraudulent conveyances, statute of limitations, antecedent debt, real estate, fraudulent, close relationship, promissory note, transferor, inferred, triable issues of fact, indicia

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*
[HN1] All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*
*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN2] A court may grant summary judgment under Fed. R. Civ. P. 56 only if it is satisfied that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. The initial burden rests on the moving party to demonstrate the absence of a genuine issue of material fact, and all inferences and ambiguities must be resolved in favor of the party against whom summary judgment is sought. If this burden is

met, the burden then shifts to the non-moving party to come forward with evidence to defeat the motion for summary judgment. The non-moving party must set forth specific facts showing that there is a genuine issue for trial and the evidence cannot consist of mere allegations or denials of the adverse party's pleading. Fed. R. Civ. P. 56(e).

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN3] In order to establish a prima facie case of entitlement to summary judgment in an action for recovery on a promissory note, plaintiff ordinarily would have to submit the promissory note executed by the defendant together with proof of the defendant's failure to make payment thereon.

*Commercial Law (UCC) > Negotiable Instruments (Article 3) > Enforcement of Instruments*
[HN4] N.Y. U.C.C. Law § 3-804 provides that even if plaintiff has lost the instrument the owner of an instrument which is lost may maintain an action and recover from any party liable thereon upon due proof of his ownership, the facts which prevent the production of the instrument, and its terms.

*Commercial Law (UCC) > Negotiable Instruments (Article 3) > Enforcement of Instruments*
[HN5] Notwithstanding a failure to produce an original promissory notes, defendant can still recover pursuant to N.Y. U.C.C. Law § 3-804.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses*
[HN6] A part payment may revive a time-barred debt by starting the statute of limitations running anew if the payment is made under circumstances amounting to an absolute and unqualified acknowledgment by the debtor, so that a promise to pay the balance may be inferred, and indicate an intent that it shall be so taken by the creditor. Where, as here, the limitations period has expired, more evidence is required to start running a new Statute of Limitations than would be required as to a debt not barred.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses*
[HN7] A determination must be made as to which individual furnished debtor with the monies with which to make the part payment to the creditor in order to determine whether a claim against a joint debtor has also been revived under the statute of limitations.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses*

[HN8] A payment by one debtor may revive the debt as against another party liable for the same debt where the payment is ratified or authorized by the second debtor. In the case of joint obligors upon a note or any contract, the payment by one joint obligor affects the defense of the statute of limitations as to the others, if the payment was previously authorized or subsequently ratified by the others.

*Contracts Law > Performance > Assignment & Novation*
[HN9] Under New York law, the following elements are required for novation: (i) a previous valid obligation; (ii) agreement of all parties to a new obligation; (iii) extinguishment of the previous obligation; and (iv) a valid new contract. New York courts set a stringent standard for novation. To satisfy the second and third elements, for example, all parties must have clearly expressed their intention that a subsequent agreement superseded or substituted for an old agreement.

*Contracts Law > Performance > Assignment & Novation*
[HN10] It is well established that the execution of a subsequent note does not discharge the original debt secured unless there is an express agreement between the parties.

*Commercial Law (UCC) > Negotiable Instruments (Article 3) > Discharge & Payment*
[HN11] See N.Y. U.C.C. Law § 3-606(1)(a).

*Commercial Law (UCC) > Negotiable Instruments (Article 3) > Discharge & Payment*
[HN12] Pursuant to N.Y. U.C.C. Law § 3-606, discharge of an obligor requires the obligor's lack of consent.

*Commercial Law (UCC) > Negotiable Instruments (Article 3) > Discharge & Payment*
[HN13] Consent given in advance and incorporated in the instrument is valid under New York Uniform Commercial Code and it operates as a waiver of the consenting party's right to claim his own discharge.

*Real & Personal Property Law > Sales, Exchanges & Remedies*
[HN14] N.Y. Debt. & Cred. Law § 276 provides that every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors. Thus, N.Y. Debt. & Cred. Law § 276 focuses on the actual intent of the transacting parties to defraud the creditors. Due to the difficulty of proving actual intent, the pleader is allowed to rely on badges of fraud

circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent.

*Real & Personal Property Law > Sales, Exchanges & Remedies*
[HN15] In the context of fraudulent transfers, badges of fraud include: A close relationship between the parties to the alleged fraudulent transaction; a questionable transfer not in the usual course of business; inadequacy of consideration; the transferors' knowledge of the creditors' claim and the inability to pay it and retention of control of the property by the transferor after the conveyance.

*Real & Personal Property Law > Sales, Exchanges & Remedies*
[HN16] Under the N. Y. Debt. & Cred. Law § 276, the fraudulent nature of a conveyance may be inferred from the relationship among the parties to the transaction and the secrecy of the sale, or from inadequacy of consideration and hasty, unusual transactions. While summary judgment is normally inappropriate when intent is at issue, nevertheless, courts do grant summary judgment on claims pursuant to the N. Y. Debt. & Cred. Law § 276 where badges of fraud give rise to an inference of actual intent.

*Real & Personal Property Law > Sales, Exchanges & Remedies*
[HN17] Antecedent debt satisfies the value element of fair consideration under New York Debtor and Creditor Law § 272. However, the payment of an antecedent debt satisfies the value component but does not necessarily meet the good faith requirement. In particular, the law has carved out an exception for insider preferences and transfer to an affiliate or insider in satisfaction of an antecedent debt lacks good faith.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses*
[HN18] A fraudulent conveyance claim is timely if brought within six years of the date that the conveyance occurs or within two years of the date that the conveyance is discovered or should have been discovered, whichever is longer. Where a plaintiff has shown entitlement to summary judgment on a fraudulent conveyance claim, the court may set aside the fraudulent transfer pursuant to N. Y. Debt. & Cred. Law § 278.

*Real & Personal Property Law > Sales, Exchanges & Remedies*
[HN19] Where a transferee has disposed of the property or has damaged it, the creditor should have personal judgment against the transferee for value.

*Real & Personal Property Law > Sales, Exchanges & Remedies*
[HN20] A personal judgment against the transferee of a fraudulent conveyance may be obtained where the transferee has made it impossible to return the property to the creditor, by, for example, disposing of wrongfully conveyed property or depreciating it.

*Real & Personal Property Law > Sales, Exchanges & Remedies*
[HN21] Reasonable fees pursuant to N.Y. Cred. & Debt. Law § 276(a) may be recovered under New York law where a conveyance is found to have been made by the debtor and received by the transferee with actual intent to hinder, delay, or defraud creditors.

*Real & Personal Property Law > Sales, Exchanges & Remedies*
[HN22] Fraudulent conveyances are not the type of behavior for which punitive damages are available.

*Civil Procedure > Injunctions > Preliminary & Temporary Injunctions*
[HN23] A party seeking to obtain a preliminary injunction must normally satisfy a two-prong test: it must (1) establish that is is likely to suffer irreparable injury in the absence of the injunction; and (ii) demonstrate either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the its favor. As a general rule, a party may not establish irreparable injury where, as here, the party is claiming a loss that can be adequately remedied by an award of money damages. However, federal courts have found preliminary injunctions appropriate where it has been shown that the defendant intended to frustrate any judgment on the merits by making it uncollectible.

COUNSEL: For CITIBANK, plaintiff: Donald Pearce, Tanner, Propp, New York, NY.

For HOWARD M. BENEDICT, RUTH L. BENEDICT, defendants: Howard C. Crystal, Lynch, Rowin, Novack, Burnbaum & Crystal, P.C., New York, NY.

JUDGES: ALLEN G. SCHWARTZ, U.S.D.J.

OPINIONBY: ALLEN G. SCHWARTZ

OPINION:

OPINION AND ORDER

ALLEN G. SCHWARTZ, DISTRICT JUDGE:

Plaintiff Citibank, N.A. ("plaintiff" or "Citibank") by this action asserts claims for breach of contract arising out of defendants' alleged failure to pay plaintiff in accordance with the terms of certain promissory notes. Plaintiff also asserts a claim under the New York Debtor and Creditor Law ("DCL") § § 270 et seq., alleging that defendants engaged in a series of fraudulent conveyances. The matter is before the Court on plaintiff's motion for summary judgment and defendants' cross-motion for partial summary judgment as to defendant Ruth L. Benedict. Plaintiff also moves for a preliminary injunction directing defendants to refrain from transferring, encumbering, or disposing of certain assets. For the reasons set forth below, plaintiff's motion for summary judgment is GRANTED in part and DENIED in part, and defendants' cross-motion for partial [*2] summary judgment is DENIED. Plaintiff's motion for a preliminary injunction is GRANTED.

**FACTS n1**

> n1 Except as otherwise indicated, the facts stated herein are undisputed. Cf. <u>Domino Media, Inc. v. Kranis, 9 F. Supp. 2d 374, 386 n.1 (S.D.N.Y. 1998)</u> (" [HN1] All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.") (citing Local Rule 56.1(c)).

In May 1985, defendants Howard M. Benedict ("H. Benedict") and Ruth L. Benedict ("R. Benedict") (collectively: "defendants"), a married couple, signed a demand note dated May 6, 1985 to the order of Citibank, in the amount of $ 500,000 plus interest ("May Note"). (Pl.'s 56.1 Statement PP 2, 180; Exh. A to Affidavit of Hope H. Tate in Support of Plaintiff's Motion for Summary Judgment and for Other Relief ("Tate Aff.").) The May Note provides, inter alia, that defendants are jointly and severally liable for repayment. [*3] (Pl.'s 56.1 Statement P 3.) The May Note also provides, inter alia, that defendants would pay plaintiff its attorney's fees equal to 15% of the full amount due under the May Note, plus court costs, if any indebtedness under the May Note was "referred to an attorney for collection". (Pl.'s 56.1 Statement P 25; Exh. A to Tate Aff. at § Ill.) Both defendants signed a letter dated May 6, 1985, clarified by a June 7, 1985 letter from Citibank, stating that until the May Note was paid, Citibank would be given notice before assets in excess of $ 100,000 were pledged, exchanged, or disposed of in any one year. (Pl.'s 56.1 Statement PP 6, 7.)

H. Benedict alone applied for and was granted an increase in his credit line at Citibank. H. Benedict alone signed a demand note in the amount of $ 750,000 plus interest, to the order of Citibank, dated November 19, 1985 ("November Note") and a letter dated November 19, 1985, substantially identical to the May 6, 1985 letter. (Pl.'s 56.1 Statement PP 8, 9; Defs.' 56.1 Statement II:9).

Thereafter, H. Benedict submitted a financial statement, dated March 15, 1986, to plaintiff, which represented H. Benedict's net worth as approximately $ 6,700,000. [*4] (Pl.'s 56.1 Statement P 58.) This financial statement was prepared for submission by both defendants. (Pl.'s 56.1 Statement P 56.) The financial statement referred, inter alia, to a condominium unit owned by H. Benedict, located at 330 East 33 Street, New York, New York ("the New York Condo") valued at $ 250,000. (Pl.'s 56.1 Statement PP 90, 91.)

In late 1985 or early 1986, drastically declining oil prices adversely affected the Alaskan economy. (Pl.'s 56.1 Statement PP 39, 43.) Concomitantly, H. Benedict's Alaskan real estate investments were adversely affected. (Pl.'s 56.1 Statement P 44.) On August 6, 1986, H. Benedict transferred legal title in the New York Condo to R. Benedict. (Defs.' 56.1 Statement P I:13.) No real estate transfer tax was paid. (Pl.'s 56.1 Statement P 92.) On September 25, 1986, H. Benedict formed a Delaware corporation, the Alaska Seafood Center, Inc., which is engaged in the business of processing seafood. (Defs.' 56.1 Statement P I:14, 16.) All of the stock of such corporation was initially owned by H. Benedict, who thereafter sold approximately 40% of the shares to third parties. (Pl.'s 56.1 Statement P 131.) H. Benedict repeatedly represented to plaintiff [*5] that the success of this project would afford H. Benedict the means to repay his debt to plaintiff. (Pl.'s 56.1 Statement P 125.)

In December 1986, H. Benedict signed a third demand note to the order of Citibank in the amount of $ 950,000 plus interest ("December Note"). (Pl.'s 56.1 Statement P 10; Exh. H to Tate Aff.) Under the December Note, as under the May and November Notes, H. Benedict agreed to pay plaintiff its attorney's fees equal to 15% of the full amount due under the December Note, plus court costs, if any indebtedness under the December Note was "referred to an attorney for collection". (Pl.'s 56.1 Statement P 25; Exh. H to Tate Aff., § Ill.) H. Benedict alone signed a letter dated December 19, 1986, substantially identical to the May 6, 1985 letter. (Pl.'s 56.1 Statement P 15; Defs.' 56.1 Statement II:15.)

On January 9, 1987, H. Benedict conveyed legal title to real property located at 55 Westwoods Road, Hamden, Connecticut, ("Westwoods") to R. Benedict. (Defs.' 56.1 Statement P I:15.) The consideration recited in the deed was $ 100 or less and no real estate transfer tax was paid. (Pl.'s 56.1 Statement P 102.) In August 1987, H. Bene-

dict represented to plaintiff [*6] that H. Benedict's net worth had plunged. H. Benedict's financial statement, dated August 10, 1987 represented H. Benedict's net worth as approximately $ 150,000. (Pl.'s 56.1 Statement P 59.)

On May 10, 1989, R. Benedict transferred Westwoods, real property located at 275 Blue Trail, Hamden, Connecticut ("Blue Trail"), and real property located at 2355 Dixwell Avenue, Hamden, Connecticut ("Dixwell") to her sons Howard M. Benedict and Craig A. Benedict, pursuant to a revocable trust agreement. (Pl.'s 56.1 Statement PP 95, 105, 106.) R. Benedict later withdrew Westwoods and Blue Trail from the trust and mortgaged them for $ 350,000 and $ 465,000 respectively. (Pl.'s 56.1 Statement PP 112, 121.)

Since approximately 1988, H. Benedict has not had a checking account in his name. (Pl.'s 56.1 Statement P 49.) When H. Benedict has needed to pay expenses he ask R. Benedict for money. (Pl.'s 56.1 Statement PP 51, 52.) R. Benedict questions H. Benedict concerning the nature of the expenses and either writes a check on H. Benedict's behalf or refuses to provide the money. (Pl.'s 56.1 Statement PP 51, 52.) On August 21, 1991, H. Benedict asked R. Benedict to make a $ 25,000 cashier's check payable [*7] to Citibank "so that [Citibank] knew that once we had some free money, that we would try to pay our obligation." (Pl.'s 56.1 Statement P 260.) The $ 25,000 was drawn on R. Benedict's account. (Pl.'s 56.1 Statement P 276.) R. Benedict testified that she was aware of this payment to plaintiff and had obtained the cashier's check knowing to what use it would be put. (Pl.'s 56.1 Statement PP 261, 263, 277, 278.)

A financial statement dated February 20, 1993, which H. Benedict submitted to plaintiff, represented H. Benedict's net worth as approximately $ 3,850,000. (Pl.'s 56.1 Statement P 81.) Plaintiff alleges that all but $ 187,500 of the asset value on which H. Benedict calculated his net worth was based on his Alaska Seafood Center, Inc. stock, valued at $ 5,000,000. (Pl.'s 56.1 Statement PP 86, 138; Defs.' 56.1 Statement II:86.)

Thereafter, H. Benedict recruited a joint venture investor and, on December 23, 1996, formed an entity called Alaska Seafood Center LLC ("ASC"). (Pl.'s 56.1 Statement PP 133, 134.) Investors in Alaska Seafood Center, Inc. were provided with proportional interests in the ASC. (Pl.'s 56.1 Statement P 135.) An entity, ASC's joint venturor invested approximately [*8] $ 16,000,000 in the seafood processing project. (Pl.'s 56.1 Statement P 139.)

On December 30, 1996, the Benedict Family Limited Partnership ("Partnership") was registered. (Pl.'s 56.1 Statement P 141.) R. and H. Benedict are the general partners and manage all of the Partnership's affairs.

(Pl.'s 56.1 Statement PP 143, 144.) The other partners are the Benedict's four sons and various trusts set up for family members. (Pl.'s 56.1 Statement P 142.) The only asset owned by the Partnership is the 60% interest in ASC stock that H. Benedict allegedly transferred to the Partnership in 1996 or 1997 for no consideration. (Pl.'s 56.1 Statement PP 146, 147, 153.) H. Benedict disclosed the conveyance of his ASC stock to the Partnership in 1997, when plaintiff raised the issue of a security interest in ASC stock. (Pl.'s 56.1 Statement P 149.) At the same time that H. Benedict informed plaintiff of the conveyance, H. Benedict stated that he was "judgment proof". (Pl.'s 56.1 Statement P 150.) R. Benedict testified at her deposition that she believed that plaintiff would not file a lawsuit as long as defendants could not repay plaintiff because the lawsuit "wouldn't do any good." (Pl.'s 56.1 Statement [*9] PP 243, 253.)

Demand has been duly made of defendants for payment under the May and December Notes. (Pl.'s 56.1 Statement PP 18, 19.) Plaintiff has in its possession the original of the December Note but has been unable to locate the original of the May Note and asserts that the May Note has been lost or misplaced. (Pl.'s 56.1 Statement PP 29, 30.)

**B. Procedural History**

Plaintiff filed this action on August 19, 1997 in Supreme Court, New York County. On December 30, 1997, defendants removed the action to this court. On August 31, 1998, plaintiff filed the First Amended Complaint ("Amended Complaint"). Claim one charges both defendants with breach of contract under New York law for failure to pay the May Note. Claim two charges H. Benedict with breach of contract under New York law for failure to pay the December Note. Claim three charges both defendants with breach of contract under New York law for disposing of assets without first notifying plaintiff. Claim four charges both defendants with having engaged in a series of fraudulent conveyances in violation of the New York Debtor and Creditor Law. Plaintiff seeks monetary and injunctive relief.

On August 9, 1999, plaintiff [*10] filed the instant motion for summary judgment and defendants filed the cross-motion for partial summary judgment as to R. Benedict. n2 Plaintiff also moves for a preliminary injunction directing defendants to refrain from transferring, conveying, encumbering, or disposing of certain assets pending the outcome of this litigation.

n2 The Court notes that at page 15 of Defendant Ruth Benedict's Reply to Citibank's Opposition to Ruth Benedict's Motion for Summary Judgment, defendants assert that the cross-motion

is for summary judgment "in favor of Ruth Bene-
dict as to all claims filed by Citibank against her".
Claims one, three, and four are asserted against
R. Benedict. Because defendants' memoranda in
support of defendants' motion for summary
judgment fail to address claims three and four,
the Court deems defendants to have abandoned
the motion for partial summary judgment as to
those claims.

## DISCUSSION

### I. LEGAL STANDARD FOR SUMMARY JUDGMENT

[HN2] A court may grant summary judgment under
Fed. R. Civ. [*11] P. 56 only if it is satisfied that "there
is no genuine issue as to any material fact and . . . the
moving party is entitled to a judgment as a matter of
law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); see also
Mitchell v. Washingtonville Central School District, 190
F.3d 1, 5 (2d Cir. 1999). The initial burden rests on the
moving party to demonstrate the absence of a genuine
issue of material fact, and all inferences and ambiguities
must be resolved in favor of the party against whom
summary judgment is sought. See Gallo v. Prudential
Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223
(2d Cir.1994) (citations omitted).

If this burden is met, the burden then shifts to the
non-moving party to come forward with evidence to de-
feat the motion for summary judgment. See Anderson,
477 U.S. at 248. The non-moving party must set forth
"specific facts showing that there is a genuine issue for
trial" and the evidence cannot consist of "mere allega-
tions or denials of the adverse party's pleading."
Fed.R.Civ.P. 56(e); see also Delaware & Hudson Ry. v.
Consolidated Rail Corp., 902 F.2d 174, 178 (2d Cir.
1990) [*12] ("Conclusory allegations will not suffice to
create a genuine issue.").

## II. BREACH OF CONTRACT CLAIMS

### A. H. Benedict

#### 1. Claims one and two

Plaintiff's first two claims charge H. Benedict with
breach of contract arising out of H. Benedict's alleged
failure to remit monies owing on the May and December
Notes. Specifically, plaintiff seeks to recover the out-
standing principal, interest, and contractually stipulated
legal fees. Plaintiff moves for summary judgment.

[HN3] In order to establish a prima facie case of en-
titlement to summary judgment in an action for recovery
on a promissory note, plaintiff ordinarily would have to

submit "the promissory note executed by the defendant
together with proof of the defendant's failure to make
payment thereon". Bank of Baroda v. Shah, 191 A.D.2d
237, 594 N.Y.S.2d 255 (App. Div. 1993); see MDJR
Enterprises, Inc. v. LaTorre, 268 A.D.2d 509, 703
N.Y.S.2d 54, 2000 WL 104064, *1 (N.Y. App. Div.
2000).

Here, defendants do not contest that plaintiff is enti-
tled to summary judgment on claims one and two. De-
fendants expressly concede that H. Benedict owes plain-
tiff the outstanding principal and interest that plaintiff
seeks. [*13] (Defendant's Memorandum of Law in Sup-
port of their Opposition to Plaintiff's Motion for Sum-
mary Judgment ("Defs.' Mem. Opp. Pl.'s Mot.") at 1, 11,
16.) Cf. Seaman-Andwall Corp. v. Wright Machine
Corp., 31 A.D.2d 136, 137, 295 N.Y.S.2d 752 (App. Div.
1968) (reversing lower court and granting summary
judgment to plaintiff where defendants, inter alia, con-
ceded execution of promissory note and defendants' de-
fault). Nor do defendants dispute that plaintiff would be
entitled to contractually stipulated legal fees "in the event
that any of the obligations is referred to an attorney for
collection", as provided by section III of the May and
December Notes. (Exhs. A, H to Tate Aff.)

Defendants do dispute that "any of [H. Benedict's]
obligations was referred to an attorney for collection".
(Defs.' Mem. Opp. Pl.'s Mot. at 1, 16.) Defendants sum-
marily assert that, because H. Benedict has never "con-
tested his obligation" to pay the principal and interest
owing on the promissory notes, the instant litigation is
unrelated to collection and plaintiff is not entitled to the
contractually stipulated legal fees. (Defs.' Mem Opp.
Pl.'s Mot. at 1, 11, 16.)

Defendant's contention [*14] is without merit.
Plaintiff commenced this action for the purpose of "col-
lecting" monies that have not yet been remitted to plain-
tiff. Additionally, plaintiff's allegation that H. Benedict
fraudulently conveyed assets, the fourth claim in the
Amended Complaint, is closely related to plaintiff's abil-
ity to "collect" monies owing on the promissory notes
and is actually contested by defendants. Defendants have
set forth no "specific facts showing that there is a genu-
ine issue of triable fact" concerning H. Benedict's liabil-
ity for the contractually stipulated legal fees.

Accordingly, plaintiff is granted summary judgment
on claims one and two for principal, interest and stipu-
lated legal fees, the amount of which shall be determined
by the court upon inquest.

#### 2. Claim three

Plaintiff's third claim charges H. Benedict with
breach of contract arising out of H. Benedict's alleged
failure to provide notice to Citibank of asset transfers in

excess of $ 100,000. Specifically, plaintiff asserts that H. Benedict transferred the New York Condo, Westwoods, and the ASC stock without affording plaintiff prior notice. (Defs.' 56.1 Statement I: 13, 15; Pl.'s 56.1 Statement P 148.) The failure [*15] to provide notice was allegedly in violation of H. Benedict's obligations under the May Note. Plaintiff moves for summary judgment.

It is undisputed that H. Benedict failed to forewarn plaintiff of these transfers. Defendants have set forth no "specific facts showing that there is a genuine issue for trial". Cf. European American Bank & Trust Company v. Leonard Masonry, Inc., 107 A.D.2d 657, 484 N.Y.S.2d 27 (App. Div. 1985) (affirming grant of summary judgment to plaintiff in action to recover on demand promissory note because "there was a complete absence of any proof of evidentiary facts to raise genuine triable issues" in "papers submitted in opposition to the plaintiff's motion for summary judgment"). Accordingly, the Court awards plaintiff summary judgment as to H. Benedict's liability on the third claim but reserves for an inquest the issue as to the damages owed.

**B. R. Benedict**

**1. Claim one**

Claim one charges R. Benedict with breach of contract arising out of R. Benedict's joint and several liability for payment of monies allegedly owed to plaintiff on the May Note. Plaintiff and defendants cross-move for summary judgment as to this claim. [*16]

In order to establish a prima facie case of entitlement to summary judgment in an action for recovery on a promissory note, plaintiff must submit "the promissory note executed by the defendant together with proof of the defendant's failure to make payment thereon". Shah, 191 A.D.2d 237, 594 N.Y.S.2d 255. Here, plaintiff has failed to submit the May Note executed by R. Benedict. n3 Plaintiff asserts that the May Note has been lost or misplaced and that, pursuant to New York U.C.C. § 3-804 ("§ 3-804"), plaintiff may still be awarded summary judgment. [HN4] Section 3-804 provides that even if plaintiff has lost the instrument "the owner of an instrument which is lost . . . may maintain an action . . . and recover from any party liable thereon upon due proof of his ownership, the facts which prevent the production of the instrument, and its terms." (emphasis added); see Marrazzo v. Piccolo, 163 A.D.2d 369, 558 N.Y.S.2d 103, 104 (App. Div. 1990) (" [HN5] Notwithstanding her failure to produce the original promissory notes, the defendant could still recover pursuant to [§ 3-804] . . . "). n4

n3 R. Benedict's failure to make payments under the May Note, the other element of plaintiff's prima facie case, is not in dispute.

[*17]

n4 Contrary to defendants' argument, plaintiff's posting of a bond in the amount of the allegedly unpaid negotiable instrument is not a mandatory prerequisite for the invocation of § 3-804. "In the [Commentary and Official Comment set forth under Uniform Commercial Code section 3-804] it is stated that the court is authorized to require security indemnifying the obligor against loss but 'there may be cases in which so much time has elapsed or there is so little possible doubt as to the destruction of the instrument and its ownership that there is no good reason to require a security.'" See 487 Clinton Avenue Corp. v. Chase Manhattan Bank, 63 Misc. 2d 715, 313 N.Y.S.2d 445 (Sup. Ct. 1970). Here, plaintiff has not posted a bond. The Court notes that one basis for not requiring plaintiff to post a security is that "there is little possible doubt as to the destruction" of the instrument and here it is defendants themselves who urge that the Note has been destroyed. For the reasons stated in the text infra, the Court finds that there is no good reason to require plaintiff to post a security.

[*18]

Here, the terms of the lost instrument are undisputed. Further, plaintiff offers satisfactory proof of ownership and of the facts preventing the production of the instrument. First, plaintiff asserts that there is no paper trail, for example, an executed assignment agreement or internal Citibank memorandum, that would support the contention that the May Note was transferred to another entity. (Tate Aff. P 25; Pl.'s 56.1 Statement P 34.) Second, plaintiff avers that it is not Citibank policy to destroy paid notes and that the internal memorandum that is mandated by Citibank policy when notes are paid is absent. (Tate Aff. PP 21 22.) Third, plaintiff asserts that the unavailability of the original of the May Note can be explained by the fact that many bank officers had access to the file. (Pl.'s 56.1 Statement PP 30, 31.) Plaintiff also details the precise steps of plaintiff's exhaustive search for the original note. (Tate Aff. P 26.) n5

n5 Defendants contention that plaintiff has failed to satisfy § 3-804 relies on a misstatement of the facts. Defendants assert that the May Note credit-line was closed and that the relevant documents were destroyed, not lost. Defendant refers to Exhibit D57 attached to the Affidavit of Walter Featherly, Esq. in Support of Reply to

Plaintiff's Opposition to Motion for Summary Judgment. Defendants assert that the document has handwritten across its face a statement that the "line" was closed in 1987 and the documents "destroyed". Plaintiff explains that the closing of the credit line in 1987 did not refer to the transfer or purge of the May Note specifically but related to plaintiff's prudent refusal to permit defendants to continue to borrow monies after the 1985 and 1986 promissory notes fell due and remained unpaid. Further, plaintiff notes in its sur-reply that the handwritten lines do not state that documents were destroyed. The handwritten lines state that a file was "tsfd", which plaintiff asserts was the affiant's abbreviation for "transferred". (Affidavit of Philip Vincenti in Opposition to Defendant's Motion for Summary Judgment as to Ruth L. Benedict P 5; Letter from Charles D. Hellman dated September 23, 1999.) Further, the Court notes that defendant's argument is in actuality only applicable to defendants' assertion of the novation defense, see text infra, and not to the § 3-804 discussion. Section 3-804 implicates actions concerning instruments that have been destroyed, as well as instruments that have been allegedly lost.

[*19]

Notwithstanding the foregoing, plaintiff's motion for summary judgment must be denied as a result of the existence of triable issues of material fact presented on defendants' cross-motion for summary judgment which alleges grounds of: (i) novation; (ii) statute of limitations; and (iii) discharge under § 3-606. These issues, contested by plaintiff, establish that there are triable issues of fact which preclude summary judgment for either side.

**a. Statute of Limitations**

Defendants cite the statute of limitations both as a defense to plaintiff's motion for summary judgment and in support of defendants' cross-motion for summary judgment. Defendants argue that summary judgment should be granted to defendants because plaintiff's first claim is time-barred with respect to R. Benedict. Plaintiff concedes that, pursuant to New York Civil Practice & Rules ("CPLR") § 213, the statute of limitations for plaintiff's first claim as to R. Benedict is six years. Plaintiff also concedes that, when this action was filed on August 17, 1997, the limitations period had long expired. What is disputed is whether a partial payment of $ 25,000 to plaintiff on August 21, 1991 started the statute [*20] of limitations running anew as to R. Benedict.

[HN6] A part payment may revive a time-barred debt by starting the statute of limitations running anew if the payment is "made under circumstances amounting to an absolute and unqualified acknowledgment by the debtor, so that a promise to pay the balance may be inferred, and indicate an intent that it shall be so taken by the creditor." Scott v. Palmer, 246 A.D. 379, 286 N.Y.S. 453, 455 (App. Div.), aff'd, 273 N.Y. 471, 6 N.E.2d 409 (1936) (emphasis added); accord Chemical Fin. Servs. Corp. v. Zagaro, 173 Misc. 2d 745, 661 N.Y.S.2d 926, 927 (Sup. Ct. 1997). Where, as here, the limitations period has expired, "more evidence is required to start running a new Statute of Limitations than would be required as to a debt not barred". Carlos Land Co. v. Root, 282 A.D. 349, 122 N.Y.S.2d 650, 653 (App. Div. 1953) (citation omitted).

Here, it is undisputed that H. Benedict has consistently expressed his "absolute and unqualified" intention to pay to plaintiff the balance of what H. Benedict owes. (Pl.'s 56.1 Statement PP 256, 260.) H. Benedict also testified that the $ 25,000 payment [*21] was made "so that [Citibank] knew that once we had some free money, that we would try to pay our obligation." (Pl.'s 56.1 Statement P 260.) However, it is undisputed that: (i) the $ 25,000 was drawn on R. Benedict's bank account (Pl.'s 56.1 Statement P 276); and (ii) at the time the $ 25,000 payment was made, H. Benedict had no bank account of his own and had obtained the monies from R. Benedict as a loan, (Pl.'s 56.1 Statement P 49). Defendants assert that the $ 25,000 were part of the funds of H. Benedict. Defendants conclude that the part payment revived the debt only as to H. Benedict and not as to R. Benedict. Cf. Hoover v. Hubbard, 202 N.Y. 289, 291, 95 N.E. 702 (1911) ("To make payments effective against a party to save a claim from the statute, they must have been made by him . . . .").

However, plaintiff raises several triable issues of fact. First, plaintiff states that there is a genuine and material issue as to whether the monies used to make the part payment belonged to H. Benedict. If the monies belonged to R. Benedict, not H. Benedict, then it would be possible for the part payment to begin the limitations period anew for R. Benedict. See Scott v. Palmer, 157 Misc. 133, 283 N.Y.S. 114, 117 (Sup. Ct. 1934) [*22] ( [HN7] requiring determination as to which individual had furnished defendant with the monies with which to make the part payment to the creditor in order to determine whether claim against joint debtor had also been revived). The Court notes that the cashier check used to make the $ 25,000 payment was purchased by R. Benedict and drawn on her account. (Pl.'s 56.1 Statement P 276-78.) In assessing this fact, the Court further notes that defendants not only share the general closeness of the marital relationship but, for many years, have also

shared a close relationship with regard to financial matters. First, R. Benedict had a practice of preparing H. Benedict's financial statements, including those submitted to plaintiff in 1986, 1987, and 1993 that are relevant to this case. (Pl.'s 56.1 Statement P 56.) Second, it is undisputed that H. Benedict has had no bank account of his own since 1988 and, for the last decade, has asked R. Benedict to write checks when H. Benedict requires funds. (Pl.'s 56.1 Statement PP 49, 51, 52.) Third, R. Benedict has testified that she does not simply withdraw money at H. Benedict's request but questions H. Benedict concerning the nature of the expenses and [*23] reserves the option of refusing to provide the monies. (Pl.'s 56.1 Statement PP 51, 52.) Fourth, the record reveals evidence that R. Benedict financed some of H. Benedict's projects. For example, R. Benedict transferred monies received from mortgaging Westwoods to H. Benedict to help fund the seafood processing project. (Pl.'s 56.1 Statement PP 112, 114, 115.) The intricate financial dealings between the two defendants support plaintiffs contention that the source of the monies is a genuine issue of material fact.

Second, even if the monies belonged to H. Benedict, plaintiff also sets forth sufficient facts to raise a triable issue concerning whether R. Benedict ratified or authorized H. Benedict's payment. [HN8] A payment by one debtor may revive the debt as against another party liable for the same debt where the payment is ratified or authorized by the second debtor. "In the case of joint obligors upon a note or any contract, the payment by one joint obligor . . . affect[s] the defense of the statute as to the others, [if] the payment was previously authorized or subsequently ratified by the others." Celenski v. Celenski, 23 Misc. 2d 942, 198 N.Y.S.2d 412, 413-14 (Sup. Ct. 1960). [*24] Here, defendants are jointly and severally liable under the May Note. Plaintiff asserts that R. Benedict authorized or ratified the $ 25,000 payment based on R. Benedict's deposition testimony that she would refuse to write checks on behalf of H. Benedict if she did not agree with his intended use of the monies. (Pl.'s 56.1 Statement PP 51-52.) In further support of plaintiff's ratification argument plaintiff refers to testimony by R. Benedict as to her belief in the importance of repaying debt. (Pl.'s 56.1 Statement PP 243, 253.)

Because defendants raise a genuine issue of material fact as to the timeliness of plaintiff's claim, plaintiff's motion for summary judgment is denied. By the same token, the presence of triable issues of fact precludes an award to defendants of summary judgment based on this legal theory.

### b. Novation

Defendants assert novation both as a defense against plaintiff's motion for summary judgment and as a basis for defendants' cross-motion for summary judgment.

Defendants' contention is that the November and December Notes constituted an implied novation, releasing R. Benedict from any liability under the May Note. The Court finds R. Benedict's novation [*25] arguments unavailing.

[HN9] Under New York law, the following elements are required for novation: "(i) a previous valid obligation; (ii) agreement of all parties to a new obligation; (iii) extinguishment of the previous obligation; and (iv) a valid new contract." Wasserstrom v. Interstate Litho Corp., 114 A.D.2d 952, 495 N.Y.S.2d 217, 219 (App. Div. 1985). "New York courts have set a stringent standard for novation." Wang v. Chen, 1992 U.S. Dist. LEXIS 299, *15, 1992 WL 7840, *6 (S.D.N.Y. Jan. 10, 1992).

Here, defendants fail to show that a novation occurred. To satisfy the second and third elements, for example, all parties must have "clearly expressed their intention that a subsequent agreement superseded or substituted for an old agreement." Flaum v. Birnbaum, 120 A.D.2d 183, 508 N.Y.S.2d 115, 120 (App. Div. 1986) (quoting Northville Indus. Corp. v. Fort Neck Oil Terminals Corp., 100 A.D.2d 865, 474 N.Y.S.2d 122, 125 (App. Div. 1984), aff'd, 64 N.Y.2d 930, 488 N.Y.S.2d 648, 477 N.E.2d 1102 (1985));see also Home & City Savings Bank v. Bilinski, 177 A.D.2d 73, 580 N.Y.S.2d 561, 562 (App. Div. 1992) (" [HN10] It is well established that the [*26] execution of a subsequent note does not discharge the original debt secured unless there is an express agreement between the parties.") (emphasis added). In attempting to establish that all parties "clearly expressed" that R. Benedict would be released, defendants assert, inter alia, that: (i) H. Benedict told "someone at Citibank" that R. Benedict would like to be released from her liability under the May Note before the November Note was signed (Pl.'s 56.1 Statement PP 200, 201); (ii) R. Benedict's name was removed from correspondence and monthly accountings after the November Note was signed by H. Benedict, (Defs.' 56.1 Statement II:234); (iii) an internal Citibank memorandum concerning the November Note, which was no longer secured by R. Benedict's properties, reflects a decrease in plaintiff's secured credit and an increase in unsecured credit relative to the credit available under the May Note (Pl.'s 56.1 Statement PP 294, 295); and (iv) other internal Citibank memoranda allegedly refer to the entire line of credit as being in the name of H. Benedict only, (Defs.' 56.1 Statement II:298, 316.)

Plaintiff sets forth specific facts showing that a reasonable juror might disagree [*27] that R. Benedict's liability under the May Note has been extinguished. First, plaintiff notes that John Catherwood, who would have been one of the three Citibank officers whose approval was required to effect the release of R. Benedict,

testified that he never approved, advised anyone he had approved, or was asked to approve such a release. (Pl.'s 56.1 Statement PP 301-03, 305-07.) Second, plaintiff avers that defendants would not have been shown internal Citibank memoranda prior to discovery in this litigation. (Pl.'s 56.1 Statement P 225.) Consequently, defendants would have been unaware of a novation predicated on those memoranda. Third, plaintiff's practice allegedly is to direct correspondence to the husband when the joint borrowers are married and accounts for the pervasiveness of H. Benedict's name in Citibank's documents. (Pl.'s 56.1 Statement P 323.)

The Court concludes that there are triable issues of fact concerning the existence of an express agreement to release R. Benedict. These issues of material fact are independent grounds for denying plaintiff's motion for summary judgment. Further, because plaintiff has raised issues of material fact, the defense of novation may [*28] not serve as grounds for awarding summary judgment to defendants on their cross-motion.

### c. Discharge

Defendants assert discharge as a defense against plaintiff's motion for summary judgment and as a basis for defendant's cross-motion for summary judgment. Specifically, defendants argue that New York U.C.C. § 3-606 operates to discharge R. Benedict's liability under the May Note.

[HN11] Section 3-606(1)(a) provides in relevant part:

> (1) The holder discharges any party to the instrument to the extent that without such party's consent the holder (a) . . . agrees to suspend the right to enforce against any [person against whom the party has to the knowledge of the holder a right of recourse] the instrument . . . .

(emphasis added). Accordingly, [HN12] pursuant to § 3-606, discharge of an obligor requires the obligor's lack of consent. See also Indianapolis Morris Plan Corp. v. Karlen, 28 N.Y.2d 30, 319 N.Y.S.2d 831, 832, 268 N.E.2d 632 (1971) ("The absence of consent is critical and expressed in [§ 3-606]."). Defendants contend that plaintiff, the holder, "suspended the right to enforce" the instrument against H. Benedict by granting H. Benedict an extension of time [*29] and that the extension was granted without R. Benedict's consent. Cf. Republic Nat'l Bank of New York v. Sabet, 512 F. Supp. 416, 426 (S.D.N.Y. 1981) (discussing discharge based on exten-

sion of time granted by creditor). This argument is unpersuasive.

The Court notes that in section VII of the May Note defendants consented in advance to any "suspension of the right to enforce" the instrument. Section VII provides:

> [T]this note shall not be revoked or impaired as to any one or more of [defendants] by the revocation or release of any obligation hereunder of any other(s) of [defendants].

(Exh. A to Tate Aff.) [HN13] Consent given in advance and incorporated in the instrument is valid under New York law. See Karlen, 319 N.Y.S.2d at 832 ("Consent may be given in advance, and is commonly incorporated in the instrument" and it "operates as a waiver of the consenting party's right to claim his own discharge"); Sabet, 512 F. Supp. at 426 ("Even if § 3-606 is applied, however, Hormuz Sabet cannot assert a defense based on this section . . . [because] the guarantors in this instance certainly consented to any modification, [*30] since the guarantee signed by the Sabets expressly waives such a defense and Sabet allegedly arranged for the extension."). Defendants cannot establish a prima facie case for the discharge of R. Benedict's liability pursuant to § 3-606. n6 This legal theory affords defendants neither a defense against plaintiff's motion nor a basis for awarding summary judgment to defendants.

> n6 Even if plaintiff had not consented in advance and § 3-606 were applicable, defendants have failed to establish that there has been any extension modifying the terms of the May Note. The Court first notes that defendants refer to no mechanism for extension of time other than the promissory notes themselves. Defendants do not cite any case law supporting the proposition that a subsequent promissory note, in itself, "extends" time on a previous one. The May Note remains payable as originally executed. Further, under the terms of this particular promissory note, the May Note, defendants agreed in section VIII that "none of [the May Note's] terms of provision may be waived, altered, modified or amended except as the Bank may consent thereto in writing duly signed for and on its behalf." (Exh. A to Tate Aff.) Here, neither of the two subsequent promissory notes were signed by plaintiff. Consequently, under the terms of the May Note, the subsequent promissory notes could not be a valid

extension mechanism. The Court concludes, based upon the record, that there was no extension granted to H. Benedict.

[*31]

#### d. Conclusion

The Court finds that defendants successfully establish the existence of triable issues of fact. The Court further finds that these issues, contested by plaintiff, establish that there are triable issues of fact which preclude summary judgment for either side on claim one as to R. Benedict.

### 2. Claim three

The third claim charges R. Benedict with breach of contract arising out of her alleged failure to provide plaintiff with notice of asset transfers in excess of $ 100,000. Specifically, plaintiff refers to R. Benedict's failure to have provided notice concerning the transfers of: (i) the New York Condo to a third party in May 1989; and (ii) Westwoods, Blue Trail, and Dixwell in October 1989 to a revocable trust that R. Benedict had established. (Pl.'s 56.1 Statement PP 95, 107.)

The Court notes that R. Benedict's failure to have provided notice is allegedly in violation of R. Benedict's obligations under the May Note. Therefore, claim three is necessarily predicated on R. Benedict's obligations under the May Note. For the same reasons that the Court denied plaintiff's motion for summary judgment on claim one for breach of contract asserted against R. Benedict, [*32] the Court denies plaintiff's motion for summary judgment as to R. Benedict on claim three.

## III. FRAUDULENT CONVEYANCE CLAIM

### A. H. Benedict

Claim four charges H. Benedict with engaging in a series of fraudulent conveyances in violation of the N.Y. Debtor and Creditor Law. The conveyances in question are H. Benedict's transfers of: (i) the New York Condo and Westwoods to R. Benedict; and (ii) the ASC stock to the Partnership.

### 1. Legal Standard

[HN14] Section 276 of the DCL provides:

> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

Thus, section 276 focuses on the "actual intent" of the transacting parties to defraud the creditors. See United States v. McCombs, 30 F.3d 310, 328 (2d Cir. 1990). "Due to the difficulty of proving actual intent, the pleader is allowed to rely on badges of fraud . . circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." Wall Street Assoc. v. Brodsky, 257 A.D.2d 526, 684 N.Y.S.2d 244, 247 (App. Div. 1999) [*33] (citations omitted)). These [HN15] badges of fraud include:

> [A] close relationship between the parties to the alleged fraudulent transaction; a questionable transfer not in the usual course of business; inadequacy of consideration; the transferors' knowledge of the creditors' claim and the inability to pay it and retention of control of the property by the transferor after the conveyance.

Wall Street, 684 N.Y.S.2d at 247; see also McCombs, 30 F.3d at 328 (" [HN16] Under section 276, 'the fraudulent nature of a conveyance may be inferred from the relationship among the parties to the transaction and the secrecy of the sale, or from inadequacy of consideration and hasty, unusual transactions.'"). While summary judgment is normally inappropriate when intent is at issue, nevertheless, courts do grant summary judgment on claims pursuant to § 276 where badges of fraud give rise to an inference of actual intent. See, e.g., Dillon v. Dean, 236 A.D.2d 360, 653 N.Y.S.2d 639 (App. Div. 1997); United States v. Carlin, 948 F. Supp. 271, 277-78 (S.D.N.Y. 1996) (granting plaintiff summary judgment on § 276 claim); First Fidelity Bank v. Manzo, 250 A.D.2d 730, 673 N.Y.S.2d 196, 197 (App. Div. 1998) [*34] (granting plaintiff summary judgment on § 276 claim).

### 2. Indicia of Fraud

#### a. Westwoods and the New York Condo

Here, plaintiff sets forth specific facts evincing several indicia of fraud in the H. Benedict's transfer of Westwoods and the New York Condo to R. Benedict.

First, because it is undisputed that "the parties to the transaction" are husband and wife, the Court finds that there is a "close relationship between the parties to the alleged fraudulent transaction". Second, the Court notes that, in March 1986, prior to H. Benedict's transfers of the realty to R. Benedict in August 1986 and January 1987, both defendants prepared the financial statement

that H. Benedict submitted to plaintiff. (Pl.'s 56.1 Statement P 56.) The Court finds that both transferor and transferee "knew of the creditor's claim" and that at the time of the transfers, knew that H. Benedict "had an inability to pay" the claim. Cf. Fromer v. Yogel, 50 F. Supp. 2d 227, 247 (S.D.N.Y. 1999) (noting defendant's involvement in the day-to-day operations and in acting as signatory on numerous confirmations of purchases . . . raises a strong inference of knowledge with regard to the fraudulent [*35] conveyances").

Third, the Court identifies the presence of another badge of fraud, "inadequacy of consideration", based on several factors. The Court first notes that no real estate transfer tax was paid on either conveyance. (Pl.'s 56.1 Statement PP 92, 102.) The fact that real estate transfer tax is not paid is evidence of inadequate consideration. See Polkowski v. Mela, 143 A.D.2d 260, 532 N.Y.S.2d 159 (App. Div. 1988) (holding that absence of real estate transfer tax is accepted as evidence that there was an absence of fair consideration). Further, consideration for the transfer of Westwoods was recorded as $ 100 or less, which appears to be considerably less than the value of Westwoods. (Pl.'s 56.1 Statement P 102.) Westwoods was mortgaged in 1990 for approximately $ 350,000. (Pl.'s 56.1 Statement P 112.) See McCombs, 30 F.3d at 328 (stating that fair consideration under the DCL means a value "roughly equivalent" to the property at issue); Hassett v. Goetzmann, 217 B.R. 9, 18 (N.D.N.Y. 1998) (stating that pursuant to DCL § 272, a transfer for fair consideration is one that is made in exchange for, inter alia, "a fair equivalent"). The Court [*36] concludes that H. Benedict's actual intent to defraud plaintiff by conveying the New York Condo and Westwoods may be inferred from the indicia of fraud that the Court has identified.

**b. ASC stock**

Plaintiff has also set forth evidence of fraud in H. Benedict's conveyance of his ASC shares to the Partnership.

First, because the partners in the Partnership are H. Benedict's wife, sons, and trusts established for other family members, the transfer was made to an entity controlled by persons "in a close relationship" with H. Benedict. (Pl.'s 56.1 Statement P 142.) Second, the ASC stock was allegedly transferred to the Partnership "for no consideration" in 1996, even though H. Benedict had valued the stock at $ 5,000,000 in his 1993 financial statement. (Pl.'s 56.1 Statement PP 86, 138, 146-47, 153.) Further, the value of the stock only increased over time. Units of ASC stock sold after 1996 were sold for a price that, if applied to the stock that H. Benedict had transferred to the Partnership in 1996 "for no consideration", would have been worth $ 30,000,000. (Pl.'s 56.1 Statement PP

147, 150.) Third, the Court notes that H. Benedict knew the effect of his transaction on his ability [*37] to pay plaintiff: (i) H. Benedict helped prepare his 1993 financial statement, which allegedly set out the ASC stock as H. Benedict's main asset; and (ii) in informing plaintiff of the conveyance of ASC stock to the Partnership in 1996, H. Benedict described himself to plaintiff as "judgment proof". (Pl.'s 56.1 Statement PP 86, 138, 150.) For these reasons, the Court finds that the ASC transfer bears the badges of "close relationship between the parties", "inadequacy of consideration", and the "transferor's knowledge of his own indebtedness and his inability to pay [the debt]". See Wall Street, 684 N.Y.S.2d at 247 (stating that badges of fraud were manifest in defendants' issuance to defendants' spouses of 25% of the shares in a company that defendants controlled "for a consideration of questionable fairness" simultaneously rendering defendants judgment proof); see also Carlin, 948 F. Supp. at 277 (finding that § 276 was satisfied when defendant transferred her interest in realty for no consideration to another entity of which she was sole officer, and that entity later conveyed for inadequate consideration defendant's interest in the realty to [*38] an entity whose sole officer was defendant's husband's cousin).

Additionally, the Court finds that the ASC conveyance to the Partnership bears the badge of fraud of "retention of control by the transferor after the transfer". H. Benedict manages the Partnership's assets as a general partner of the Partnership and the ASC interest is the Partnership's only asset. (Pl.'s 56.1 Statement PP 142, 146, 147, 153.)

In identifying a final indicia of fraud, the Court notes the secrecy with which the transaction was conducted. H. Benedict failed to provide notice to plaintiff of the transaction until well after the transaction, and then only when he was queried concerning the stock. H. Benedict not only failed to provide notice, he breached his contractual obligation to provide that notice. The Court granted plaintiff summary judgment on its breach of contract claim arising out of H. Benedict's failure to provide notice of asset transfers in excess of $ 100,000. The fraudulent nature of the conveyance may be inferred from "the secrecy of the sale". The Court concludes that H. Benedict's actual intent to defraud plaintiff by conveying the ASC stock may be inferred from the numerous indicia of [*39] fraud that the Court has identified.

**3. Defendants do not raise a triable issue of fact**

**a. Antecedent debt**

Defendants first argue that there was fair consideration given for H. Benedict's ASC stock, disputing one of the badges of fraud supporting plaintiff's argument under § 276. Specifically, defendants argue that the considera-

tion for the conveyance of H. Benedict's interest in the ASC was an antecedent debt.

[HN17] Antecedent debt satisfies the value element of fair consideration under DCL § 272. See Whitemetal Rolling and Stamping Corp. v. Drew Indus. Inc., 222 B.R. 417, 430 (S.D.N.Y. 1998). However, "the payment of an antecedent debt satisfies the value component but does not necessarily meet the good faith requirement." Whitemetal, 222 B.R. at 430. In particular, "the law has carved out an exception for insider preferences . . .[and] transfer to an affiliate or insider in satisfaction of an antecedent debt lacks good faith". Whitemetal, 222 B.R. at 430; cf. Liggio v. Liggio, 53 A.D.2d 543, 385 N.Y.S.2d 33 (App. Div. 1976) ("In an intra-family transaction it is well settled that a heavier burden is [*40] placed on the grantee to establish fair consideration for the transfer.").

The Court notes at the outset that H. Benedict is a partner in the Partnership and that the other partners are members of his family. The intra-familial nature of H. Benedict's transaction makes a claim of fair consideration based on antecedent debt difficult to establish. Further, defendants do not provide evidence establishing the existence of an antecedent debt owed to the Partnership. Instead, defendants contend that the ASC stock had been transferred several years earlier, to R. Benedict, in consideration for an antecedent debt owed to R. Benedict. However, a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that contradicts the affiant's previous deposition testimony. See, e.g., Hayes v. New York City Dep't of Corrections, 84 F.3d 614, 619 (2d Cir. 1996). Previously, defendants had testified that H. Benedict owned 60% of the stock until he transferred his entire interest to the Partnership in 1996 or 1997. (Pl.'s 56.1 Statement 146, 147, 153.) Additionally, R. Benedict had previously testified that her promissory notes from H. [*41] Benedict were unsecured, (Exh. D to Hellman Aff at 63.), though R. Benedict now asserts that H. Benedict's interest in ASC was transferred to her in 1994 as security for the loans that she had made to H. Benedict, (Ruth Benedict Aff. PP 28, 29.) Defendants cannot now create issues of fact by contradicting their own deposition testimony.

Accordingly, defendants' contentions concerning the existence of an antecedent debt does not suffice to defeat plaintiff's motion for summary judgment.

**b. Statute of limitations**

Defendants' statute of limitations defense is equally unavailing. [HN18] A fraudulent conveyance claim is timely if brought "within six years of the date that the . . . conveyance occurs or within two years of the date that the . . . conveyance is discovered or should have been discovered, whichever is longer". Wall Street, 684

N.Y.S.2d at 248 (emphasis added); see also CPLR § 213.

Here, the New York Condo was transferred to R. Benedict in 1987 and Westwoods was transferred in 1989. (Defs.' 56.1 Statement I: 13, 15.) This action, which was filed in 1997, did not commence within six years of H. Benedict's transfer of the properties to R. Benedict. [*42] However, the action was brought within months of plaintiff's discovery of the conveyances in 1997. The record reflects that plaintiff had exercised reasonable diligence by repeatedly seeking financial disclosure and that the financial statements that H. Benedict provided were incomplete. See Jenkins v. Jenkins, 181 Misc. 2d 1, 691 N.Y.S.2d 724, 731 (Sup. Ct. 1999) (finding reasonable diligence when plaintiff has sought financial disclosure). H. Benedict breached his obligation to provide plaintiff with notice. It was only when plaintiff asked H. Benedict for a security interest in the ASC stock in 1997 and H. Benedict informed plaintiff that the ASC stock had been conveyed to the Partnership, that plaintiff was put on notice of suspect dealings and thereafter unearthed the two real estate conveyances. (Pl.'s 56.1 Statement PP 150.) Defendants unpersuasively argue that because the New York Condo and Westwoods conveyances had been recorded, the fraud "should have been discovered" more than two years prior to bringing this action and plaintiff has not been reasonably diligent. However, "the mere fact that plaintiff . . . could have obtained or inspected public records [*43] is not determinative as to whether he exercised reasonable diligence to discover the fraud." Jenkins, 691 N.Y.S.2d at 731; see also McGuinness v. Standard Drywall Corp., 193 A.D.2d 518, 597 N.Y.S.2d 407, 408 (App. Div. 1993) (holding that plaintiff's failure to inspect public records is not determinative as to whether plaintiff had exercised reasonable diligence in discovering the fraudulent conveyances). The fraudulent conveyance claim predicated on H. Benedict's 1989 transfers was timely asserted. n7

n7 Defendants also contend that R. Benedict had equitable title to the realty and that, consequently, the conveyances of the realty were not fraudulent. This argument is unpersuasive. Defendants cite no legal support for this argument. Further, the argument lacks factual support. A party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that contradicts the affiant's previous deposition testimony. See, e.g., Hayes, 84 F.3d at 619. Here, R. Benedict previously testified that if there were properties titled in H. Benedict's name, she would consider that H. Benedict's property. (Exh D to Hellman Aff. at 31:8-17.) Now R. Benedict asserts that she equi-

tably owned the property prior to 1987, notwith-standing that the property was in H. Benedict's name. Additionally, plaintiff's 56.1 statement sets forth that the 1986 financial statement, which both defendants prepared, provided that H. Bene-dict owned 100% of both Westwoods and the New York Condo and asserted figures for H. Benedict's equity in these properties. Defendants failed to controvert these statements and, conse-quently, these facts are deemed to be admitted. See Domino, 9 F. Supp. 2d at 386 n.1.

[*44]

The Court finds that defendants have failed to estab-lish the existence of genuine issues of material fact. Ac-cordingly, the Court awards plaintiff summary judgment on the fraudulent conveyance claim as against H. Bene-dict.

**B. R. Benedict**

Claim four charges R. Benedict with fraudulent con-veyance under sections 273 and 276 of the DCL.

The Court notes that sections 273 and 276 expressly apply only to individuals defrauding "creditors". There-fore, plaintiff's fraudulent conveyance claim as to R. Benedict is necessarily predicated on the fact that R. Benedict is liable to plaintiff for repayment of the May Note. Because the Court has denied the cross-motions for summary judgment on claim one as to R. Benedict's li-ability under the May Note, the Court denies plaintiff's motion for summary judgment as to this claim.

**C. Voiding conveyances**

Plaintiff requests that the conveyances found fraudu-lent be set aside and, if the wrongfully conveyed prop-erty was depreciated or reconveyed, that a money judg-ment be awarded against the transferees. The Court, hav-ing granted summary judgment to plaintiff on claim four only as to H. Benedict, addresses plaintiff's application only as to [*45]   H. Benedict and, specifically, to H. Benedict's conveyances of Westwoods, the New York Condo, and the ASC stock.

Where, as here, a plaintiff has shown entitlement to summary judgment on a fraudulent conveyance claim, the court may set aside the fraudulent transfer pursuant to DCL § 278. See United States v. Bushlow, 832 F. Supp. 574, 582 (E.D.N.Y. 1993).

Accordingly, the Court sets aside H. Benedict's con-veyance of ASC stock to the Partnership. The Court de-clines to set aside H. Benedict's conveyances of West-woods and the New York Condo to R. Benedict because those properties are no longer in R. Benedict's posses-sion. The New York Condo was sold to a third party in

1990 for approximately $ 250,000. (Pl.'s 56.1 Statement P 93.) Westwoods was mortgaged for $ 350,000 in 1994, and was transferred to the lending bank by deed in lieu in 1995. (Pl.'s 56.1 Statement PP 112, 117.)

However, plaintiff correctly asserts that plaintiff's recovery is not barred by R. Benedict's lack of posses-sion. [HN19] Where a "transferee has disposed of the property or has damaged it, the [creditor] should have personal judgment against the transferee for value." Bushlow, 832 F. Supp. at 582 [*46]   (citation omitted); see also Federal Deposit Ins. Corp. v. Heilbrun, 167 A.D.2d 294, 562 N.Y.S.2d 35, 35-36 (App. Div. 1990) (" [HN20] A personal judgment against the transferee of a fraudulent conveyance may be obtained where the trans-feree has made it impossible to return the property to the creditor, by, for example, disposing of wrongfully con-veyed property or depreciating it.") (citing Marine Mid-land Bank v. Murkoff, 120 A.D.2d 122, 508 N.Y.S.2d 17 (App. Div. 1963). The money judgment against the trans-feree, here R. Benedict, is limited to "the amount of plaintiff's claim, limited only by the value of the trans-ferred property". Brown v. Kimmel, 68 A.D.2d 896, 414 N.Y.S.2d 226, 227 (App. Div. 1979). Accordingly, the Court grants plaintiff a judgment against R. Benedict in the amount of plaintiff's claim, limited by the value of the New York Condo and Westwoods. The Court re-serves for an inquest the issue as to the value of these properties.

**D. Attorneys Fees Under § 276(a)**

Plaintiff requests attorney's fees pursuant to DCL § 276(a). [HN21] Reasonable fees pursuant to § 276(a) may be recovered under New York law where a convey-ance is [*47]   found to have been made by the debtor and received by the transferee with actual intent to hinder, delay, or defraud creditors. See In re Crazy Eddie, Inc., 1992 Bankr. LEXIS 2018, *18, 1992 WL 406543, *6 (Bankr. S.D.N.Y., Dec 17, 1992) ("Attorney's fees are appropriate in a fraudulent conveyance action under § 276").

Here, the Court has granted summary judgment to plaintiff on the § 276 claim asserted against H. Benedict. Consequently, H. Benedict's conveyances of Westwoods, the New York Condo, and the ASC stock meet the crite-ria under § 276(a) of transfer with "actual intent" to de-fraud, hinder, or delay.

The Court further finds that the transferees, R. Benedict and the Partnership, also had actual intent to hinder, delay or defraud plaintiff. Some of the same indi-cia of fraud that give rise to the inference of actual intent as to the transferor, H. Benedict, give rise to the infer-ence of actual intent as to the transferees, for example: (i) the close relationship between the parties to the transac-tion; and (ii) the secrecy of the transaction. Further, the

Court finds that the transferees had "knowledge of H. Benedict's debts and of H. Benedict's inability to pay the creditors". R. Benedict [*48] was familiar with her husband's financial history, because, inter alia, she wrote checks on his behalf and prepared financial statements for him to submit to plaintiff. Cf. Fromer, 50 F. Supp. 2d at 247 (noting defendant's involvement in the day-to-day operations and in acting as signatory on numerous confirmations of purchases . . . raises a strong inference of knowledge with regard to the fraudulent conveyances"). Further, R. Benedict and H. Benedict are the only general managers of the Partnership and, consequently, the transferee Partnership was also cognizant of the details of H. Benedict's financial history.

Accordingly, the Court grants plaintiff's requests for attorney's fees pursuant to § 276(a), the amount of which shall be determined by the Court upon inquest.

### E. Punitive Damages

The Court denies plaintiff's request for punitive damages. The New York Court of Appeals has held that [HN22] fraudulent conveyances are not "the type of behavior for which punitive damages are available". James v. Powell, 19 N.Y.2d 249, 279 N.Y.S.2d 10, 225 N.E.2d 741 (1967).

## IV. INJUNCTIVE RELIEF

Plaintiff moves for a preliminary injunction directing defendants, [*49] pending the outcome of litigation, to: (i) deliver the ASC certificates to the Court for safekeeping or to refrain from transferring, encumbering, or disposing of ASC stock; and (ii) refrain from assigning, transferring, encumbering, or disposing of Dixwell.

[HN23] A party seeking to obtain a preliminary injunction must normally satisfy a two-prong test: it must (1) establish that is likely to suffer irreparable injury in the absence of the injunction; and (ii) demonstrate either (1) a likelihood of success on the merits or (2) "sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the its favor". See Jolly v. Coughlin, 76 F.3d 468, 473 (2d Cir. 1996). As a general rule, a party may not establish irreparable injury where, as here, the party is claiming a loss that can be adequately remedied by an award of money damages. See Pashaian v. Eccelston Properties, Ltd., 88 F.3d 77, 87 (2d Cir. 1996). However, federal courts have found preliminary injunctions appropriate where it has been shown that the defendant "intended to frustrate any judgment on the merits" by "making [*50] it uncollectible." See Pashaian, 88 F.3d at 87. Here, because plaintiff asserts a claim for fraudulent conveyance, the irreparable injury and success on the merits prongs merge.

The Court has concluded that H. Benedict intended to defraud his creditor, plaintiff, granting plaintiff summary judgment on claim four as to H. Benedict. See Pashaian, 88 F.3d at 87 ("A fortiori, the irreparable harm requirement is satisfied in [a] case which involves completed actions to frustrate a judgment, rather than inferred intentions to take future such actions."). Injunctive relief against H. Benedict is appropriate.

An injunction is proper against R. Benedict as well, though the Court has not yet adjudicated the fraudulent conveyance claims with which she is charged, because the record reflects indicia of attempted fraudulent conveyance. See In re Feit & Drexler, 760 F.2d 406, 414-15 (2d Cir. 1985). For example, "retention of control . . . after conveyance" is reflected by R. Benedict's conveyance of Westwoods, Dixwell, and Blue Trail to a revocable trust, under whose terms R. Benedict retains the right to withdraw properties. (Pl.'s 56.1 Statement [*51] PP 95, 105, 106, 111, 112, 121.) Indeed, R. Benedict did thereafter withdraw Westwoods and Blue Trail from the trust in order to mortgage them. Further, R. Benedict's conveyances of these properties to the revocable trust were for little or no consideration, invoking the badge of fraud "inadequacy of consideration". Injunctive relief is appropriate against R. Benedict.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is GRANTED in part and DENIED in part. Plaintiff's motion is GRANTED as to claims asserted against H. Benedict and DENIED as to claims asserted against R. Benedict. Defendants' cross-motion for partial summary judgment as to R. Benedict is DENIED.

Plaintiff's motion for a preliminary injunction is GRANTED. Accordingly, the Court hereby issues the following preliminary injunction:

> 1. Defendant H. Benedict is hereby ORDERED to refrain from transferring, encumbering, or otherwise disposing of his stock in Alaska Seafood Center LLC or in any of the Alaska Seafood entities, pending the outcome of litigation; and

> 2. Defendant R. Benedict is hereby ORDERED to refrain from transferring, encumbering, or otherwise disposing of the [*52] real property located at 2355 Dixwell Avenue, Hamden, Connecticut, pending the outcome of litigation.

2000 U.S. Dist. LEXIS 3815, *

The preliminary injunction is conditioned upon plaintiff's filing with the Court a bond in the amount of one million dollars to secure defendants against loss or expense, including reasonable attorney's fees, pending determination of the action.

The matter is referred to the Magistrate Judge for an inquest on: (i) damages as to claims one, two, and three against H. Benedict; (ii) the amount of the personal judgment to be taken against R. Benedict under claim four against H. Benedict; and (iii) the amount of attorneys fees to be awarded pursuant to § 276(a). The claims against R. Benedict will proceed to trial. Counsel for the parties are directed to appear at a conference on April 17, 2000 at 12:45 p.m., in Courtroom 14C, for the purpose of further scheduling.

SO ORDERED.

ALLEN G. SCHWARTZ, U.S.D.J.

Dated: New York, New York

March 27, 2000

LEXSEE

**COLUMBIA SAVINGS AND LOAN ASSOCIATION and LIBERTY SERVICE CORPORATION, Plaintiff, v. AMERICAN INTERNATIONAL GROUP, INC., AIG CAPITAL CORP., AMERICAN INTERNATIONAL FUND DISTRIBUTORS, INC., AMERICAN INTERNATIONAL REINSURANCE COMPANY, LTD., and TRICAPITAL, LTD., Defendants.**

91 Civ. 0589 (MJL)

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

1994 U.S. Dist. LEXIS 3804; Fed. Sec. L. Rep. (CCH) P98,179

**March 18, 1994, Decided
March 31, 1994, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff investors filed suit against defendant investment companies for various violations of federal security law, California statutory law, and the common law. The investment companies filed a motion to dismiss pursuant to Fed. R. Civ. P. 9(b) and Fed. R. Civ. 12(b)(6).

**OVERVIEW:** The investors invested in junk bonds managed by the investment companies. The investment companies provided a private placement memorandum that indicated that committee members were experienced professionals. The investors filed suit and maintained that the committee members were not experienced junk bond investors and that experienced junk bond investors would not have approved of the investments. The investment companies filed a motion to dismiss. The court held that: (1) in order to satisfy the statute of limitation the investors must set forth the time of discovery of the fraudulent statement or omission, and plead facts that demonstrated the investor's efforts to discover the alleged fraud and set forth the reasons the investors did not discover the fraud sooner; (2) the investors did not need to prove scienter to recover under § 12(2) of the Securities Act of 1933; and (3) Fed. R. Civ. P. 9(b) applied to negligent misrepresentation claims, but not to breach of warranty claims.

**OUTCOME:** The court dismissed the federal securities and state law claims for failure to plead compliance with the relevant statutes of limitation. Statutory and common law claims were dismissed for failure to comply with the heightened pleading requirements. The court denied the motions to dismiss with respect to other common law claims. The investors were given leave to replead certain claims.

**CORE TERMS:** recommendation, memorandum, motion to dismiss, junk bond, particularity, placement, plead, experienced, subsidiary, recommends, breach of warranty, failed to meet, scienter, negligent misrepresentation, breach of contract, discover, advisory committee, underwritten, wholly-owned, accelerate, investing, causation, appointed, omissions, Securities Act, leave to replead, demonstrating, recommended, misconduct, asserting

**LexisNexis(R) Headnotes**

*Governments > Legislation > Statutes of Limitations > Pleading & Proof*
[HN1] In order to satisfy the applicable statute of limitations, plaintiffs must, in addition to setting forth the time and circumstances of the discovery of the allegedly fraudulent statements or omissions, plead facts demonstrating the efforts they made to discover the alleged fraud and the reasons why they could not have done so sooner.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
[HN2] Fed. R. Civ. P. 9(b) provides that all averments of fraud be stated with particularity. While Fed. R. Civ. P. 9(b) does not require that scienter be pleaded with great particularity, a plaintiff, nevertheless, must allege circumstances that provide at least a minimum factual basis for allegations of scienter.

1994 U.S. Dist. LEXIS 3804, *; Fed. Sec. L. Rep. (CCH) P98,179

*Securities Law > Bases for Liability > Liability for Fraud*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*

[HN3] With respect to § 12(2) of the Securities Act of 1933 claims there need be no showing of knowing misrepresentation or reckless disregard of the truth. Section 12(2) imposes strict liability, subject to the reasonable-care defense. The resulting standard is one of negligence. Plaintiffs do not need to prove scienter to recover under a § 12(2) claim.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

[HN4] When a party moves to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the court should, looking at all the allegations in the light most favorable to the party opposing the motion, determine whether a claim for recovery has been stated.

*Torts > Business & Employment Torts > Negligent Misrepresentation*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*

[HN5] California has consistently applied Fed. R. Civ. P. 9(b) to negligent misrepresentation claims.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
*Commercial Law (UCC) > Investment Securities (Article 8) > Warranties*

[HN6] The court is not persuaded that Fed. R. Civ. P. 9(b) should apply to a breach of warranty claim.

**COUNSEL:**    [*1]    For Plaintiffs: ORRICK, HERRINGTON & SUTCLIFFE, New York, New York, By: Gregory A. Markel, Esq.

For Defendants: SULLIVAN & CROMWELL, New York, New York, By: Richard H. Klapper, Esq.

**JUDGES:** Lowe

**OPINIONBY:** MARY JOHNSON LOWE

**OPINION:**

OPINION AND ORDER

MARY JOHNSON LOWE, D.J.

Before this Court is the Report and Recommendation (the "Report") of Magistrate Judge Nina Gershon dated March 25, 1993. The Report addresses defendants'

motion to dismiss, pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, plaintiffs', Columbia Savings and Loan Association ("Columbia") and Liberty Service Corporation ("Liberty" and together with Columbia, "Plaintiffs"), complaint. For the reasons stated below, this Court, after a de novo review, adopts the Report in part and modifies the Report in part.

BACKGROUND

While the facts are more fully set forth in the Report, this Court will briefly summarize the facts in this case. In May of 1988, non-defendant, Drexel Burnham Lambert Group, Inc. ("Drexel Group") and defendant American International Group ("AIG") formed TriCapital, Ltd. ("TriCap"), a Bermuda-based corporation, the assets of which were to be invested in a diversified pool of high-yield, short-term, non-investment [*2] grade, corporate debt securities, commonly known as junk bonds.

On June 30, 1988, a private placement memorandum, soliciting investment in TriCap, was issued. The memorandum offered several TriCap securities as investments, including senior indenture notes, senior loan notes, subordinated indenture notes, subordinated loans of TriCap and TriCap's Class B common stock. TriCap's Class A stock, the only class of security with voting rights, was purchased and held in equal share by American International Reinsurance Company, Ltd. ("AIRCO"), one of AIG's principal insurance company subsidiaries and Capital Securities Assurance, Ltd. ("Capital Securities"), a wholly-owned subsidiary of Drexel Group. This gave AIG Capital Corporation ("AIG Capital"), a wholly-owned subsidiary of AIG, and Drexel Group the power to appoint two directors each to TriCap's four-member board. The memorandum assured investors that any investment by TriCap in any junk bond security for which Drexel Burnham Lambert, Inc. ("Drexel Burnham"), a wholly-owned subsidiary of Drexel Group and an affiliate of Capital Securities, acted as underwriter would have to be approved by both AIRCO representatives of TriCap's four-member [*3] board of Directors.

TriCap entered into an Investment Advisory Agreement with DBL-AIG Advisers ("DBL-AIG"), a general partnership consisting of Drexel Burnham and AIG Capital. Under the terms of this agreement, DBL-AIG rendered investment advice to TriCap's directors on junk bond investments through an investment committee. The DBL-AIG committee consisted of four members, two of whom were appointed by Drexel Burnham, and two of whom were appointed by AIG Capital. The committee's recommendations were subject to several constraints, including that no recommendation was to be furnished to TriCap unless three of the four committee members ap-

1994 U.S. Dist. LEXIS 3804, *; Fed. Sec. L. Rep. (CCH) P98,179

proved of it and that any recommendation to purchase a junk bond for which Drexel Burnham was an underwriter would have to be approved by both committee members appointed by AIG Capital before such recommendation could be given to TriCap. DBL-AIG received fees for this service.

The private placement memorandum identifies AIG Capital's appointments to DBL-AIG as Frank Filipps, President of AIG Capital and Treasurer of AIG, and Kevin Clowe, Vice President of AIG Capital and Chief Executive Officer of American International Fund. Plaintiffs allege that [*4] the memorandum described Fillips and Clowe as "experienced professionals."

In July of 1988, Plaintiffs purchased TriCap securities, allegedly in reliance on the representations in the private placement memorandum. In the Purchase Agreement, TriCap warranted that the private placement memorandum did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein, in light of the circumstances in which that were made, not misleading."

Finally, the Complaint states that under the terms of the notes which Columbia purchased, TriCap's Board of Directors were empowered to accelerate repayment on the notes upon a determination by it that an "adverse market condition existed."

Columbia and Liberty commenced the present action asserting claims under the federal securities laws, 15 U.S.C. § § 771(2) (Count I) and 78j(b) (Count II); California statutory law, California Corporations Code § § 25400 and 25500 (Count III), § § 25401, 25501, 25504 and 25504.1 (Count IV) and California Civil Code § § 1709 and 1710 (Count V); and the common law (Counts VI through XII).

Plaintiffs allege that, given [*5] Drexel Burnham's dominance of the junk bond markets, the role of Filipps and Clowe, as the two non-Drexel members of the DBL-AIG advisory committee, was critical to investors, and that plaintiffs relied on Filipps and Clowe to protect their investment in TriCap from the otherwise broad power of a Drexel Burnham affiliate to invest TriCap funds in securities underwritten by Drexel Burnham. Plaintiffs allege that Filipps and Clowe were not experienced in investing in junk bonds. Plaintiffs claim that the statement in the private placement memorandum that Filipps and Clowe were "experienced professionals" was a material misrepresentation and that by failing to state that Filipps and Clowe were not experienced in junk bond investing, defendants omitted a material fact.

Plaintiffs further allege that two other material omissions were made in the private placement memorandum. First, they assert that the memorandum omitted to state

"that neither AIG nor any of its subsidiaries participating in the offering or in the activities of TriCap had any experience in making junk bond investments . . ." (Complaint P 36(a)). Second, Plaintiffs cite the absence of an admission in the memorandum "that [*6] the representatives of AIRCO sitting on the Board of Directors of Tri-Cap did not have any experience or expertise in making junk bond investments . . ." (Complaint P 36(b)).

Plaintiffs contend that certain securities underwritten by Drexel Burnham in which TriCap invested, which decreased substantially in value would not have been approved by the independent members of the advisory committee had they, in fact, been experienced in junk bond investing. Plaintiffs allege that non-defendant Drexel Burnham used TriCap as a vehicle to unload securities it had underwritten which would otherwise have been difficult or impossible to place. Plaintiffs contend that as a result of the foregoing acts Plaintiffs suffered substantial damages.

On April 5, 1991 defendants made the present motion to dismiss plaintiffs' claims. Magistrate Judge Gershon issued the Report on March 25, 1993 and concluded that: Counts I (Section 12(2) of the Securities Act of 1933), III (California Corporation Code § § 25400 and 25500) and IV (California Corporations Code § § 25401, 25501 and 25504) should be dismissed for failure to plead compliance with the relevant statutes of limitations; Counts II (Section 10(b) of The [*7] Securities Act of 1934) and V (California Civil Code § § 1709 and 1710) should be dismissed under Rule 9(b); Counts VIII (breach of contract) and IX (negligence) should be dismissed under Rule 12(b)(6); and defendants' motion to dismiss should be denied with respect to Counts VI, VII, X, XI and XII. Finally, Magistrate Judge Gershon recommended that Plaintiffs should be given leave to re-plead Counts I, II, III, IV and V. Defendants and Plaintiffs have objected to the Report.

DISCUSSION

Counts I, III and IV

Magistrate Judge Gershon recommended dismissal of Counts I, III and IV, for failure to satisfy the pleading requirements of the applicable statutes of limitations. (See Report 13-15). Plaintiffs object to Magistrate Judge Gershon's recommendation contending that they have adequately pled compliance with the statute of limitations. This Court does not agree with Plaintiffs' contentions. [HN1] In order to satisfy the applicable statute of limitations, Plaintiffs must, in addition to setting forth the time and circumstances of the discovery of the allegedly fraudulent statements or omissions, plead facts demonstrating the efforts they made to discover the alleged fraud and the reasons [*8] why they could not

Case 1:04-cv-03361-RJS-HBP     Document 39-3     Filed 12/30/2005     Page 5 of 30

1994 U.S. Dist. LEXIS 3804, *; Fed. Sec. L. Rep. (CCH) P98,179

have done so sooner." <u>Friedman v. Arizona World Nurs-eries Limited Partnership, 730 F. Supp. 521, 543 (S.D.N.Y 1990).</u> As Magistrate Judge Gershon aptly noted in the Report, Plaintiffs have failed to meet the pleading requirements as they do not allege the reason the alleged misconduct was not discovered earlier, nor the efforts undertaken by Plaintiffs to discover the mis-conduct earlier. Other than Plaintiffs' statement that they could not have discovered the misrepresentations and omissions earlier, they do not plead any facts demon-strating the efforts which were made to discover the al-leged fraud nor do they state any reason why they could not have done so sooner. Therefore, this Court adopts Magistrate Judge Gershon's recommendation that Counts I, III and IV should be dismissed for failure to comply with the pleading requirements of the applicable statutes of limitations.

Defendants, while agreeing that Counts I, III and IV should be dismissed for failure to satisfy the pleading requirements of the applicable Statutes of Limitations, contend that such Counts should additionally be dis-missed for failure to satisfy the particularity [*9] re-quirements set forth in Rule 9(b). Defendants note that the Report recommends dismissal of Count II and Count V on the basis of Plaintiffs' Rule 9(b) pleading deficien-cies, yet the Report overlooks defendants' arguments that Rule 9(b) applies to Counts I, III and IV.

This Court agrees that Rule 9(b) applies to Counts III and IV. [HN2] <u>Rule 9(b) of the Federal Rule of Civil Procedure</u> provides, inter alia, that "all averments of fraud . . . be stated with particularity." This Court fully agrees with Magistrate Judge Gershon's determination that Plaintiffs have failed to meet the particularity re-quirement of Rule 9(b). (See Report 17-21). "While <u>Fed. R. Civ. P. 9(b)</u> does not require that scienter be pleaded with great particularity, a plaintiff, nevertheless, must allege circumstances that provide at least a minimum factual basis for allegations of scienter." <u>Connecticut Nat'l Bank v. Fluor Corp., 808 F.2d. 957, 963 (2d Cir. 1987).</u> This Court does not believe that the factual alle-gations in the complaint adequately establish the neces-sary inference of scienter. As fraud is an element neces-sary to the proof of claims under Counts III and IV, Rule 9(b) [*10] applies. See <u>Mayatextil, S.A. v. Liztex U.S.A., Incl, No. 92 Civ. 4528 (LJF), 1993 WL 51092 (S.D.N.Y. 1993).</u> As Plaintiffs have failed to meet the particularity requirements of Rule 9(b), Counts III and IV are properly dismissed under Rule 9(b).

Defendants' assertion that Rule 9(b) is a basis for dismissal of Count I, however, is misplaced. [HN3] "With respect to . . . § 12(2) claim[s] . . . there need be no showing of knowing misrepresentation or reckless disregard of the truth. Section 12(2) imposes strict liabil-ity, subject to the reasonable-care defense. The resulting standard is one of negligence." <u>Odette v. Shearson, Ham-mill & Co., 394 F. Supp. 946, 956 (S.D.N.Y. 1975).</u> Plaintiffs do not need to prove scienter to recover under a § 12(2) claim.

Counts II and V

The Report recommends that Counts II and V should be dismissed under Rule 9(b). Plaintiffs argue that they have fulfilled the requirement under Rule 9(b). As this Court stated earlier, it fully agrees with Magistrate Judge Gershon's determination that plaintiffs have failed to meet the particularity requirement of Rule 9(b). (See Report 17-21). Thus, this Court fully adopts Magistrate [*11] Judge Gershon's recommendation that Counts II and V be dismissed for failure to satisfy the particularity requirements of Rule 9(b).

Defendants argue that Counts II, V and VI should additionally be dismissed under Rule 12(b)(6) for failure to plead reliance and causation. Magistrate Judge Ger-shon, after consideration of Defendants' arguments, con-cluded that Plaintiffs have met their pleading responsi-bilities as to reliance and causation. (See Report 21-24). As the Report notes, [HN4] when a party moves to dis-miss for failure to state a claim under Rule 12(b)(6), the Court should, looking at all the allegations in the light most favorable to the party opposing the motion, deter-mine whether a claim for recovery has been stated. Un-der this standard, Plaintiffs have adequately pleaded reli-ance and causation.

Counts VIII and IX

Magistrate Judge Gershon recommends that Count VIII (breach of contract claim) and Count IX (claim for negligence) should be dismissed pursuant to Rule 12(b)(6). Magistrate Judge Gershon concluded that as the language of the note is unambiguous on its face, under Bermuda law the Court should give the contractual terms their plain meaning without looking outside [*12] the terms of the contract. Plaintiffs now contend that the terms of the note are vague and ambiguous and therefore the intent of the parties should control. Plaintiffs claim that Magistrate Judge Gershon's conclusion that Colum-bia "acknowledges" that the language of the note is "plainly permissive" is incorrect. In its Memorandum In Opposition to Defendants' Motion To Dismiss, Columbia clearly states that the "literal language of the Note Agreement provides that TriCap's directors 'may' accel-erate upon finding an 'adverse market condition' to ex-ist". (p. 43). Plaintiffs give no explanation as to why the believe that the terms of the Note are vague or ambigu-ous. The note clearly states "Whenever an Adverse Mar-ket Condition exists, the Company may, upon notice to the Subordinated Loan Agent in accordance with the Subordinated Loan Agreement, [accelerate repayment on

Case 1:04-cv-03361-RJS-HBP    Document 39-3    Filed 12/30/2005    Page 6 of 30

1994 U.S. Dist. LEXIS 3804, *; Fed. Sec. L. Rep. (CCH) P98,179

the note]. (emphasis added). This Court agrees with Magistrate Judge Gershon's determination that the note in unambiguous. Looking at the plain meaning of the note this Court believes the accelerations clause is permissive, thus this Court adopts Magistrate Judge Gershon's recommendation that Count VIII be dismissed. [*13]

In Count IX, Columbia alleges a claim against Tri-Cap for negligence. The Report recommends that Count IX be dismissed because it fails to state a claim under any possible jurisdiction's law. This Court agrees with Magistrate Judge Gershon. As noted in the Report, under California, New York and Bermuda law, a tort claim that is merely a refrained claim for breach of contract will not stand. Columbia argues that there was a breach of duty independent of the contractual relationship and requests that it be given a opportunity to replead Count IX. While this Court agrees that Count IX should be dismissed for failure to state a claim, this Court grants Plaintiffs request to replead.

Counts VI and VII

The Report recommends that Defendants' motion to dismiss Counts VI and VII should be denied. Magistrate Judge Gershon concluded that Plaintiffs' negligent misrepresentation and breach of warranty claims were not subject to scrutiny under Rule 9(b). Defendants object, asserting that under California law a state law claim of negligent misrepresentation that is based on the same alleged misstatements as a fraud-based federal securities law claim must satisfy the strict pleading requirements [*14] imposed by Rule 9(b). Defendants argue that the Report's reliance on In re Lilco Secs. Litig., 625 F. Supp. 1500 (E.D.N.Y. 1986) (Report 25-26) is misplaced because that case was not decided under California law.

As Plaintiffs' negligent misrepresentation claim was brought under California law, this Court believes it should adhere to California authority. [HN5] California has consistently applied Rule 9(b) to negligent misrepresentation claims. (See U.S. Concord, Inc. v. Harris Graphics Corp., 757 F. Supp. 1053, 1058 (N.D. Cal. 1991); In re Seagate Technology Secs. Litig., [1985-1986 Transfer Binder]Fed. Sec. L. Rep. (CCH) P 92,435 at 92,659 (N.D. Cal. Dec. 23, 1985)). As Rule 9(b) applies and as this Court has determined that Plaintiffs have failed to satisfy the particularity requirements of Rule 9(b), this Court declines to adopt the Report with respect to Count VI and Count VI is hereby dismissed under Rule 9(b).

Defendants also contend that Rule 9(b) applies to the breach of warranty claim. Defendants allege that as the

warranty claim is "in essence a claim for fraud", Rule 9(b) applies. This [*15] Court disagrees. As noted in the Report, Count VII is not a claim of fraud but of breach of warranty. (See Report 26). Defendants do not cite to any authority which contradicts the Report nor do they persuade [HN6] this Court that Rule 9(b) should apply to a breach of warranty claim. Thus, this Court adopts Magistrate Judge Gershon's recommendation that Defendants' motion to dismiss Count VII should be denied.

Counts X, XI and XII

In Counts X, XI and XII, Plaintiffs charge AIG Capital with negligence and breach of a fiduciary duty owed to TriCap's equityholders. The alleged malfeasance was AIG Capital's appointment of Filipps and Clowe to DBL-AIG pursuant to the Investment Advisory Agreement and AIG Capital's failure to monitor Filipps' and Clowe's performance on the investment advisory committee. Defendants, in support of their motion to dismiss, argued that Bermuda law controlled the choice of law issue and that Defendants owed no duty to Plaintiffs.

The Report concluded that the issue as to "the nature of any duty of care that might exist" and the "applicability of the choice of law clause" depends upon an "interpretation of the Investment Advisory Agreement, which is not properly [*16] before the court on [Defendants'] motion to dismiss." (Report at 33). After a careful reading of the transcript, this Court agrees with Magistrate Judge Gershon's determination that the Investment Advisory Agreement is not properly before the Court. Therefore, this Court adopts in full Magistrate judge Gershon's recommendation that defendants' motion to dismiss Counts X, XI and XII be denied.

CONCLUSION

In sum, Counts I, III and IV are dismissed for failure to plead compliance with the relevant statutes of limitations; Counts II, III, IV, V and VI are dismissed under Rule 9(b); and Counts VIII and IX are dismissed under Rule 12(b)(6). Defendants' motion to dismiss is denied with respect to Counts VII, X, XI and XII. Plaintiffs are given leave to replead Counts I, II, III, IV, V, VI and IX.

It Is So Ordered.

Dated: New York, New York
March 18, 1994

    Mary Johnson Lowe

    United States District Judge

LEXSEE

**KAREN GUIDI, Individually and as Executrix of the Estate of Robert L. Guidi, EVE HOFFMAN, Individually and as Executrix of the Estate of Coby M. Hoffman, MERRILL KRAMER and LOIS KRAMER, Plaintiffs, -against- INTER-CONTINENTAL HOTELS CORPORATION, a Delaware Corporation, INTER-CONTINENTAL HOTELS CORPORATION, a Corporation of the United Kingdom, INTER-CONTINENTAL HOTELS AND RESORTS CORPORATION, SEMIRAMIS HOTEL CORP., SAISON HOLDINGS, B.V., SAISON CORPORATION, Defendants.**

**95 Civ. 9006 (LAP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2003 U.S. Dist. LEXIS 6390**

**April 15, 2003, Decided**
**April 16, 2003, Filed**

**SUBSEQUENT HISTORY:** Motion granted by Guidi v. Inter-Continental Hotels Corp., 2003 U.S. Dist. LEXIS 6385 (S.D.N.Y., Apr. 16, 2003)

**PRIOR HISTORY:** Guidi v. Inter-Continental Hotels Corp., 2003 U.S. Dist. LEXIS 6167 (S.D.N.Y., Apr. 11, 2003)

**DISPOSITION:** [*1] Defendant's motion in limine to apply foreign law granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, on behalf of themselves and decedents' estates, filed a personal injury action against defendant hotel. The hotel filed a motion in limine to establish and apply Egyptian substantive law.

**OVERVIEW:** Plaintiffs filed an action against the hotel for injuries that occurred primarily in Cairo, Egypt and in part in London, England. The court held that the law of Egypt applied to determine what standard of care was applicable to the injuries. Although plaintiffs contended that the standard of care under Egyptian law for hotel owners was one of strict liability, the court agreed with the expert testimony offered by the hotel which indicated that the appropriate standard was one of reasonableness. The court held that punitive damages were a conduct-regulating, not a loss allocating issue. As such, the applicable law to apply was that in which the tort occurred.

The court determined that the conduct at issue took place primarily in Egypt and the Egyptian law of punitive damages was thus applicable. Under Egyptian law, plaintiffs could not recover punitive damages. The court also applied Egyptian law for pre-judgment interest because New York had only a minimal interest in applying its law on the issue, and plaintiffs had not overcome the presumption that the law of the place of injury should apply.

**OUTCOME:** The court granted the hotel's motion in limine.

**CORE TERMS:** punitive damages, domicile, prejudgment interest, standard of care, reasonableness, conduct-regulating, locus, foreign law, loss-allocating, regulating, parties agree, hotel, choice of law, highway, tortious conduct, strict liability, substantive law, driver, substantial interest, applicable rule, wrongful death, smooth working, guest statute, governing law, domiciliary, displacing, multistate, compensate, producing, impairing

**LexisNexis(R) Headnotes**

*Torts > Procedure > Conflicts of Laws*
*Civil Procedure > State & Federal Interrelationships > Choice of Law*
[HN1] In the context of tort law, the State of New York utilizes an interest analysis to determine which of two or more competing jurisdictions has the greater interest in having its law applied in the litigation. Under this formu-

lation, the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort. In applying the interests analysis to tort cases, New York courts distinguish between conflicts involving conduct-regulating rules and conflicts involving loss-allocating rules.

*Torts > Procedure > Conflicts of Laws*
*Civil Procedure > State & Federal Interrelationships > Choice of Law*
[HN2] As an initial matter, the threshold choice of law issue is whether a conflict of law exists among the competing jurisdictions. If there is no true conflict of laws, the law of the forum jurisdiction will not be displaced.

*Torts > Procedure > Conflicts of Laws*
*Civil Procedure > State & Federal Interrelationships > Choice of Law*
[HN3] Where there are conflicts involving conduct-regulating rules, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders.

*Torts > Procedure > Conflicts of Laws*
*Civil Procedure > State & Federal Interrelationships > Choice of Law*
[HN4] When the issue concerns loss-allocation rather than conduct, New York courts will analyze the respective domiciliary interests in light of three general rules, articulated by the New York Court of Appeals in Neumeier, a guest statute case.

*Torts > Procedure > Conflicts of Laws*
*Civil Procedure > State & Federal Interrelationships > Choice of Law*
[HN5] Under the first Neumeier rule, when the driver-host and passenger-guest share a common domicile, that law should control. The second Neumeier rule addresses "true" conflicts, where the parties are domiciled in different states and the local law favors the respective domiciliary. When plaintiff's state, for example, would allocate the loss to defendant but defendant's state would force plaintiff to bear the loss, a true conflict arises. The rule provides that when defendant's conduct occurred in the state of domicile and that state would not impose liability, the driver should not be exposed to liability under the law of the victim's domicile. Conversely, when the plaintiff is injured in the place of domicile and would be entitled to recover, the out-of-state driver should generally be unable to interpose the law of his domicile to defeat recovery. In essence, then, the second rule adopts a "place of injury" test for true conflict. The third Neumeier rule, applicable to other split-domicile cases, provides that the usually governing law will be that of

the place where the accident occurred, unless displacing that normally applicable rule will advance the relevant substantive law purposes without impairing the smooth working of the multistate system or producing great uncertainty for litigants. This rule generally uses the place of injury, or locus, as the determining factor.

*Torts > Procedure > Conflicts of Laws*
*Civil Procedure > State & Federal Interrelationships > Choice of Law*
[HN6] The standard of care is a conduct-regulating rule. Therefore, if a conflict of law exists, the law of the place of the tort applies.

*International Law > Dispute Resolution > Conflicts of Laws*
*Torts > Procedure > Conflicts of Laws*
[HN7] Interpretation of a foreign law is entirely within the discretion of a federal district court. Fed. R. Civ. P. 44.1 controls determinations of foreign law in federal court. Rule 44.1 gives a district court wide latitude in resolving issues of foreign law. The court in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law. Fed. R. Civ. P. 44.1. Because of this latitude, a court may reject even uncontradicted expert testimony and reach its own decisions on the basis of independent examination of foreign legal authorities. Moreover, disagreement among legal experts on content, applicability, or interpretation of foreign law does not create genuine issues of material fact for summary judgment purposes.

*Torts > Damages > Punitive Damages*
*Torts > Procedure > Conflicts of Laws*
[HN8] Punitive damages are conduct-regulating, not loss-allocating, issues. Punitive damages are not meant to compensate the plaintiff, but rather are designed to punish the defendant for egregious conduct. Clearly, New York's policy goal behind punitive damages is deterring egregious conduct within New York.

*Torts > Damages > Prejudgment Interest*
*Torts > Procedure > Conflicts of Laws*
[HN9] Prejudgment interest is a loss-allocating rule.

*Torts > Procedure > Conflicts of Laws*
*Civil Procedure > State & Federal Interrelationships > Choice of Law*
[HN10] Where the parties are not domiciled in the same state and there is no "true" conflict of law, the usually governing law will be that of the place where the accident occurred, unless displacing that normally applicable

2003 U.S. Dist. LEXIS 6390, *

rule will advance the relevant substantive law purposes without impairing the smooth working of the multistate system or producing great uncertainty for litigants. This rule, too, generally uses the place of injury, or locus, as the determining factor.

*Torts > Procedure > Conflicts of Laws*
*Civil Procedure > State & Federal Interrelationships > Choice of Law*
[HN11] Under New York law, the prejudgment interest in a wrongful death action is part of the damages. Moreover, New York courts have held that New York has little interest in having its damages law applied in the context of a wrongful death occurring in another state.

COUNSEL: For Karen Guidi, EVE, Merrill Kramer, Lois Kramer, PLAINTIFFS: Barry W Horowitz, Schneider, Kleinick, Weitz, Damashek & Shoot, New York, NY USA.

For Inter-Continental Hotels Corporation, Inter-Continental Hotels & Resort Corporation, Semiramis Hotel Corp, Saison Holdings, BV, Saison Corporation, DEFENDANTS: Stephen H Helvin, Wilson, Elser, Moskowitz, Edelman & Dicker, New York, NY USA.

For Inter-Continental Hotels Corporation, Inter-Continental Hotels & Resort Corporation, DEFENDANTS: Harry P Brett, Jaffe & Asher LLP, New York, NY USA.

JUDGES: LORETTA A. PRESKA, United States District Judge.

OPINIONBY: LORETTA A. PRESKA

OPINION:

MEMORANDUM AND ORDER

LORETTA A. PRESKA, United States District Judge:

Defendant Inter-Continental Hotels Corporation ("defendant" or "IHC") has moved in limine to establish and apply Egyptian substantive law. For the reasons set forth below, the motion is granted.

DISCUSSION

In this action based on diversity of citizenship, New York's choice of law provisions apply. See Erie R.R. Co. v. Thompkins, 304 U.S. 64, 74-78 (1938); Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941); [*2] Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998).

[HN1] In the context of tort law, New York utilizes an interest analysis to determine which of two or more competing jurisdictions has the greater interest in having its law applied in the litigation. See, e.g., Brink's Ltd. v. South African Airways, 93 F.3d 1022, 1031 (2d Cir. 1996) ("In tort cases, New York courts apply an 'interests' analysis."). "Under this formulation, the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort." Schultz v. Boy Scouts of America, Inc., 65 N.Y.2d 189, 197, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985). In applying the interests analysis to tort cases, New York courts distinguish between conflicts involving conduct-regulating rules and conflicts involving loss-allocating rules.

The parties agree that, [HN2] as an initial matter, the threshold choice of law issue is whether a conflict of law exists among the competing jurisdictions. If there is no true conflict of laws, the law of the forum jurisdiction (here, New York) will not be displaced.

[HN3] Where there are conflicts involving conduct-regulating rules, "the law of the jurisdiction [*3] where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." Cooney v. Osgood Mach., 81 N.Y.2d 66, 72, 595 N.Y.S.2d 919, 612 N.E.2d 277 (1993).

[HN4] When the issue concerns loss-allocation rather than conduct, New York courts will analyze the respective domiciliary interests in light of three general rules, articulated by the New York Court of Appeals in Neumeier v. Kuehner, 31 N.Y.2d 121, 335 N.Y.S.2d 64, 286 N.E.2d 454 (1972), a guest statute case. Those rules, as summarized by the New York Court of Appeals in Cooney, supra, are as follows:

[HN5] Under the first Neumeier rule, when the driver-host and passenger-guest share a common domicile, that law should control ...

The second Neumeier rule addresses "true" conflicts, where the parties are domiciled in different States and the local law favors the respective domiciliary. When plaintiff's State, for example, would allocate the loss to defendant but defendant's State would force plaintiff to bear the loss, a true conflict arises. The rule provides that when the driver's (defendant's) conduct occurred [*4] in the State of domicile and that State would not impose liability, the driver should not be exposed to liability under the law of the victim's domicile. Conversely, when the plaintiff-passenger is injured in the place of domicile and would be entitled to recover, the out-of-State driver should generally be unable to interpose the law of his

or her domicile to defeat recovery. In essence, then, the second Neumeier rule adopts a "place of injury" test for true conflict guest statute cases.

Finally, the third Neumeier rule, applicable to other split-domicile cases, provides that the usually governing law will be that of the place where the accident occurred, unless "'displacing that normally applicable rule will advance the relevant substantive law purposes without impairing the smooth working of the multistate system or producing great uncertainty for litigants.'" This rule, too, generally uses the place of injury, or locus, as the determining factor.

Cooney, 81 N.Y.2d at 73-74 (internal citations omitted).

A. Standard of Care

The parties do not dispute that [HN6] the standard of care is a conduct-regulating rule. See Cooney, 81 N.Y.2d at 72; [*5] see also Esco Fasteners Co. v. Korea Hinomoto Co., 928 F. Supp. 252, 255 (E.D.N.Y. 1996). Therefore, if a conflict of law exists, the law of the place of the tort (Egypt) applies.

The parties also agree that, under New York law, the standard of care is reasonableness. The parties disagree, however, as to the standard of care under Egyptian law. The affidavit of IHC's expert, Dr. Aktham El Kholy, and the affidavit of Dr. Hosni Wahed, another of IHC's experts, conclude that the Egyptian standard of care is also one of reasonableness. (Def's Br. Exs. 9, 10; Def's Br. at 12). In contrast, plaintiffs' expert, Abuel Fadl Hosney, has declared that under Egyptian law, innkeepers are subject to strict liability for the safety of their lodgers but that the defendant may raise reasonableness as an affirmative defense to strict liability. (Pl's Opp. Ex. 1; Pl's Opp. at 8).

[HN7] Interpretation of Egyptian law is entirely within the discretion of the Court. As Judge Keenan explained in Rutgerswerke AG & Frendo S.P.A. v. Abex Corp., 2002 U.S. Dist. LEXIS 9965, No. 93 Civ. 2914 (JFK), 2002 WL 1203836 (S.D.N.Y. June 4, 2002):

Federal Rule of Civil Procedure 44.1 controls determinations of [*6] foreign law in federal court. Rule 44.1 gives a district court wide latitude in resolving issues of foreign law:

"The court in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law." Fed. R. Civ. P. 44.1. Because of this latitude, a court may reject even uncontradicted expert testimony and reach its own decisions on the basis of independent examination of foreign legal authorities. See Curtis v. Beatrice Foods Co., 481 F. Supp. 1275, 1285 (S.D.N.Y.), aff'd, 633 F.2d 203 (2d Cir. 1980). Moreover, disagreement among legal experts on content, applicability, or interpretation of foreign law, as here, does not create genuine issues of material fact for summary judgment purposes. See Banco de Credito Indus., S.A. v. Tesoreria General, 990 F.2d 827, 838 (5th Cir. 1993); see also Bassis v. Universal Line, S.A., 436 F.2d 64, 68 (2d Cir. 1970); Kashfi v. Phibro-Salomon, Inc., 628 F. Supp. 727, 737 (S.D.N.Y. 1986). [*7]

Id. at *16.

Having reviewed the affidavits submitted by both parties as well as the primary materials upon which the experts' conclusions are based, I find that the standard of care under Egyptian law is one of reasonableness, not strict liability.

In so finding, I am persuaded by the opinions of defendant's experts, Dr. El Kholy and Dr. Wahed. In their affidavits, they perform detailed and compelling analyses of Egyptian law. Dr. El Kholy, in his affidavit, engages in a point-by-point survey of the relevant Egyptian precedents, concluding ultimately that the decision rendered by Egypt's Court of Cassation in the Appeal 1466 of Judicial Year 48 (which both parties agree is the controlling precedent in this area of law) established reasonableness as the standard of care. Dr. El Kholy's opinion is buttressed by that of Dr. Wahed, who, in his affidavit, examines pertinent provisions of the Egyptian Civil Code and reaches the same conclusion as Dr. El Kholy; namely, that an innkeeper, under Egyptian law, owes a standard of reasonable care to his guests. Moreover, their conclusions comport with the plain language of both the Court of Cassation decision and the Egyptian Civil [*8] Code provisions. The detailed and searching analyses of defendant's experts, combined with the plain language of the primary materials, compel the conclusion that rea-

2003 U.S. Dist. LEXIS 6390, *

sonableness, not strict liability, is the proper standard of care to be applied in this case.

Therefore, because there is no conflict between the law of the locus of the tort (Egypt) and the law of the forum state (New York), New York's reasonableness standard of care will govern the instant case.

B. Punitive Damages

The parties agree that Egyptian law and New York law differ on punitive damages; the former does not recognize punitive damages, while the latter does. (Def's Br. at 13; Pl's Opp. at 4). The dispute revolves around which law should be applied. Plaintiffs assert that New York law should apply because "(1) the allegedly tortious conduct giving rise to plaintiffs' punitive damages claim occurred in New York; (2) New York law would apply under the second Neumeier Rule; (3) punitive damages serve, at least in part, a loss-allocating purpose and (4) interest analysis points to application of the law of the defendant's domicile, in particular where it [sic] its interests do not conflict with those of the [*9] plaintiffs' domiciles." (Pl's Opp. at 19). Defendant, however, urges application of Egyptian law because punitive damages are a conduct-regulating rule and because the tort occurred in Egypt. (Def's Br. at 6).

This Court and other courts in this Circuit have repeatedly held that [HN8] punitive damages are conduct-regulating, not loss-allocating, issues. See, e.g., Lombard v. Economic Dev. Admin., 94 Civ. 1050, 1995 U.S. Dist. LEXIS 10518, at *16 (S.D.N.Y. July 27, 1995) ("The tort issues in conflict, primarily the differences in the availability of punitive damages, are conduct-regulating issues."); Wang v. Marziani, 885 F. Supp. 74, 77 (S.D.N.Y. 1995) (same). Punitive damages "are not meant to compensate the plaintiff, but rather are designed to punish the defendant for egregious conduct." Wilson v. Chevron, 1986 U.S. Dist. LEXIS 16368, 83 Civ. 762, 1986 WL 14925, at *3 (S.D.N.Y. Dec. 17, 1986). "Clearly, New York's policy goal behind punitive damages is deterring egregious conduct within New York." Id.

Thus, it is necessary to determine the jurisdiction in which the tort occurred. See, e.g., Cooney, 81 N.Y.2d at 72. The record is clear, however, [*10] that the tortious conduct occurred primarily, if not entirely, in Cairo and London. (Def's Br. Ex. 2 at 12; Def's Br. Ex. 6 at 3; Def's Br. Ex. 7 at 18-20). Plaintiffs have presented no cognizable evidence to counter the deposition testimony and sworn affidavit put forth by defendant that establish that the decisions regarding security measures were made in Cairo and London. Though plaintiffs argue that the fact that IHC's corporate offices are in New York and that, as such, plaintiffs may attempt to prove that the tortious

conduct occurred in New York, such assertions are insufficient to rebut the sworn statements on personal knowledge to the contrary. Therefore, because the conduct at issue took place primarily in Egypt, and not in New York, Egyptian law of punitive damages is applicable under New York choice of law analysis.

C. Prejudgment Interest

As with punitive damages, the parties agree that Egyptian law does not recognize prejudgment interest, whereas New York law does recognize prejudgment interest. (Def's Br. at 14-16; Pl's Opp. at 4). The parties also do not dispute that [HN9] prejudgment interest is a loss-allocating rule. (Def's Br. at 6; Pl's Opp. at 4). However, whereas [*11] plaintiffs insist that the interests analysis under Neumeier favors application of New York law, defendant asserts that the Neumeier rules compel application of Egyptian law.

Here, it is clear that the third Neumeier rule applies, because the parties are not domiciled in the same state and there is no "true" conflict, as defined in Cooney, supra, to justify invoking the second Neumeier rule. With regard to the third Neumeier rule, the Cooney court noted,

> [HN10] The usually governing law will be that of the place where the accident occurred, unless "'displacing that normally applicable rule will advance the relevant substantive law purposes without impairing the smooth working of the multistate system or producing great uncertainty for litigants.'" This rule, too, generally uses the place of injury, or locus, as the determining factor.

Cooney, 81 N.Y.2d at 74 (internal citations omitted). Thus, the strong presumption is that the law of the locus of the tort will apply. See Pescatore v. Pan Am. World Airways, Inc., 97 F.3d 1, 13 (2d Cir. 1996) (noting the presumptive application of the law of the locus [*12] of the injury under the third Neumeier rule).

[HN11] Under New York law, "the prejudgment interest in a wrongful death action is 'part of the damages.'" Davenport v. Webb, 11 N.Y.2d 392, 393, 230 N.Y.S.2d 17, 183 N.E.2d 902 (1962) (citation omitted). Moreover, New York courts have held that New York has little interest in having its damages law applied in the context of a wrongful death occurring in another state. See Sullivan v. J.V. McNicholas Transfer Co., 224 A.D.2d 966, 967,

638 N.Y.S.2d 260 (4th Dept. 1996). The Sullivan court declared that

> We perceive no interest that New York has in regulating the wrongful death damages that an Ohio corporation may incur because of the negligence of its employee on an Ohio highway. On the other hand, Ohio has a substantial interest in regulating conduct on its highways and in ensuring that those who use its highway will compensate those whom they have injured.

Id. Here, that logic applies with equal force. Whereas New York has minimal interest in regulating the damages (in this case, in the form of prejudgment interest) that may be incurred here, Egypt has a substantial interest in seeing [*13] its damages laws applied where defendant has deliberately chosen to place a hotel within its borders. See Simons v. Marriot Corp., 1993 U.S. Dist.

LEXIS 14365, 92 Civ. 3762, 1993 WL 410457, at *7 (S.D.N.Y. Oct. 13, 1993) (law of state where accident occurred applied because, inter alia, that state had an interest in seeing its damages laws applied where defendant hotel corporation chose to place a hotel there). Because plaintiffs have not overcome the presumption in favor of applying the law of the place of injury, the third Neumeier rule favors Egyptian law on the issue of prejudgment interest.

CONCLUSION

Defendant's motion in limine is granted. The applicable liability standard to be applied at trial is reasonableness under New York law, and plaintiffs' claims for punitive damages and prejudgment interest are hereby stricken.

SO ORDERED:

April 15, 2003

    LORETTA A. PRESKA, U.S.D.J.

LEXSEE

**JAMI MARKETING SERVICES, INC. and JAMI BROKERAGE SERVICES, INC., Plaintiffs, v. VALASSIS INSERTS, INC., Defendant. VALASSIS INSERTS, INC., Plaintiff, v. JAMI BROKERAGE SERVICES, INC., JAMI MARKETING SERVICES, INC., JEFFREY L. SCHWARTZ AND MICHAEL G. MILLER, Defendants**

Nos. 89 Civ. 3000 (JSM), 89 Civ. 4408 (JSM)

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

1991 U.S. Dist. LEXIS 11554

**August 13, 1991, Decided**
**August 21, 1991, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff advertising insert company (advertiser) filed a motion for summary judgment against defendants, direct marketing companies and affiliated individuals (direct marketers), pursuant to Fed. R. Civ. P. 56.

**OVERVIEW:** The advertiser sold part of its business to the direct marketers, spinning off those assets and taking a promissory note from the direct marketers. The direct marketers claimed that the advertiser promised to do business with them, to give them preferential treatment, and to restrict its solicitation of new customers. None of these terms are in the contract or in the accompanying future business relationship agreement. When the direct marketers did not pay their note, the advertiser brought an action against marketers to collect on the note. The director markets filed a counteraction against the advertiser and pleaded affirmative defenses of the subsequent breach of the ongoing business relationships. Advertiser filed a motion for summary judgment against the direct marketers to collect on the note. The court granted summary judgment for the advertiser for the note payment. The court determined that the agreement was unambiguous and that parol evidence of any informal agreements was inadmissible. The court also noted that, even if true, these subsequent, alleged breaches were separate and unrelated claims and did not state a defense against the nonpayment of the note.

**OUTCOME:** The court entered summary judgment in favor of the advertiser against the direct marketers for payment of the note.

**CORE TERMS:** customer, summary judgment, written agreement, seller, promissory note, counterclaim, tendered, implied covenant, ongoing, parole, solicitation, unambiguous, breached, offering, entitlement, purchaser, goodwill, defeat, entitled to summary judgment, preferential treatment, costs incurred, plus interest, direct mail, covenant, outstanding, collection, directing, mailing, refrain, limine

**LexisNexis(R) Headnotes**

*Evidence > Relevance > Parol Evidence Rule*
*Contracts Law > Contract Interpretation > Parol Evidence Rule*
[HN1] Since the terms of the Future Business Relationship Agreement are unambiguous, then parole evidence may not be admitted to explain the terms. Nor can alleged oral statements or representations made outside a written agreement be admitted to add or vary that agreement. In addition, where a written agreement contains an integration clause providing that the agreement represents the entire understanding of the parties, parole evidence may not be introduced to add or vary the written agreement.

*Contracts Law > Contract Interpretation > Parol Evidence Rule*

Page 1

[HN2] Given the fact that the parties specifically addressed their future business relationship in a written agreement it would be inappropriate for the court to imply some additional covenant requiring the seller of the business to do business with the buyer's customers. The seller remains free to pursue his own economic interests without restraint.

*Contracts Law > Defenses*
*Contracts Law > Breach > Nonperformance*
[HN3] The holder of a promissory note establishes a prima facie right to a judgment on the note if he or she failed to make payment according to the terms of the note. Because no one disputes the basis for the claim, execution of the note and failure to pay according to its terms, the one that failed to pay must come forward with evidentiary proof sufficient to raise an issue as to the defenses.

*Civil Procedure > Summary Judgment*
*Contracts Law > Contract Conditions & Provisions*
[HN4] Allegations of tortious conduct and breaches that occurred after the agreement, raises claims separate and unrelated to the claim on the note. Allegations of a later breach of a covenant for future business dealings are insufficient to defeat a motion for summary judgment on a note tendered as payment for a business.

**JUDGES: [*1]**

John S. Martin, Jr., United States District Judge.

**OPINIONBY:**

MARTIN

**OPINION:**

MEMORANDUM OPINION AND ORDER

Valassis Inserts, Inc. (Valassis) n1 moves pursuant to Rule 56 for summary judgment against Jami Brokerage Services, Inc. and Jami Marketing Services, Inc. n2

n1 Valassis is primarily engaged in the business of publishing and distributing free-standing advertising inserts. ("FSI's") Some of the parties in these two actions are the same as in the Merlite case 89 Civ. 3848. However, these cases involve completely separate claims.

n2 Jami is a direct marketing company which was founded by its principals, Michael Miller and Jeffrey Schwartz, in 1978. Most of Jami's business involves the management and brokerage of mailing lists. As a list manager, Jami markets its customers' mailing lists to other direct mail companies. As a list broker, Jami locates lists for use in its customers' direct mail solicitations.

In 89 Civ. 4408 (the Valassis Note Action), Valassis seeks to collect on a promissory note (the Note) given by Jami [*2] Brokerage Services, Inc. (Jami Brokerage) and guaranteed by Jami Marketing Services, Inc. (Jami Marketing) (together referred to as Jami or the Jami Companies.) The Note upon which Valassis is suing was tendered as the entire consideration for the assets of the Jami companies, which were "spun off" by Valassis in August 1985.

In the other action, 89 Civ. 3000 (the Jami damages action), the Jami companies seek damages from Valassis for alleged contract breaches and business torts occurring after the August 1985 sale of assets. These same alleged post-August 1985 wrongs, which are repeated as Jami's affirmative defenses in the Valassis Note Action, are Jami's only defenses to Valassis' claim on the Note.

Valassis argues that it is entitled to summary judgment on its claim for payment under the August 1985 promissory note. Valassis seeks a judgment directing Jami to pay the outstanding principal on the Note, plus interest and the costs incurred in collection, including reasonable attorneys' fees, as provided for in the Note. Valassis also seeks dismissal of the sixth claim for relief in the Jami Damages Action, which seeks a declaratory judgment that the Note is unenforceable. Valassis [*3] also moves for an Order in limine that would preclude Jami from offering certain evidence at trial.

Jami's damage claim and defenses are based on Jami's contention that as a result of the August 1985 transaction, Valassis undertook: 1) an ongoing obligation to do business with Jami; 2) an ongoing obligation to give Jami preferential treatment in its business dealings with Valassis; and 3) an ongoing obligation to restrict its solicitation of new customers. Valassis seeks the dismissal of Jami's claims that it breached these three obligations and it also seeks to preclude Jami from admitting evidence in support of these three obligations.

Jami's second and fourth claims in its Amended Complaint and its counterclaim in the Valassis Note Action are based on these alleged obligations. Valassis argues that no such agreements or obligations are expressed in any written agreements between the parties and it denies ever agreeing to or undertaking any such obligations.

At the time Valassis sold the Jami assets to the Jami companies the parties expressly addressed their future business relations in a Future Business Relationship Agreement (FBRA). None of the ongoing obligations which Jami [*4] asserts are found in the FBRA nor are

they found in any other written agreement entered into between the parties.

Jami asserts that these claims are based on the "spirit and intent" of oral discussions and negotiations preceding Jami's execution of the FBRA. Jami's arguments about "spirit" and "intent" are in clear conflict with the unambiguous terms of their written agreement with Valassis.

[HN1] Since the terms of the FBRA are unambiguous, then parole evidence may not be admitted to explain the terms. Investors Ins. Co. v. Dorinco Reinsurance Co., 917 F.2d 100, 104 (2d Cir 1990) Nor can alleged oral statements or representations made outside a written agreement be admitted to add or vary that agreement. Fogelson v. Rackfay Const. Co., 300 N.Y. 334, 90 N.E.2d 881 (1950); Tecnoclima v. The PJC Group of New York, No. 89-4437 (S.D.N.Y. Feb. 27, 1991). In addition, where, as here, a written agreement contains an integration clause providing that the agreement represents the entire understanding of the parties, parole evidence may not be introduced to add or vary the written agreement. See Tecnoclima, slip op. at 9.

Thus, it is appropriate [*5] to grant summary judgment dismissing those claims and defenses based on parole evidence. See Shames v. Abel, 141 A.D. 2d 531, 534, 529 N.Y.S.2d 344, 346 (2d Dep't 1988) (construction of unambiguous written agreement is a question of law); see also Tokio Marine and Fire Ins. Co. v. McDonnell Douglas Corp., 617 F.2d 936, 940 (2d Cir. 1980) (summary judgment properly granted after district court determined, as a matter of law, that contract was not ambiguous).

Implied Covenant

Jami asserts that Valassis' alleged obligations to Jami also arise from an implied covenant barring the seller of a business from taking any action to impair the "goodwill" or customer relations of the purchaser. n3 Jami cites Mohawk Maintenance Co. v. Kessler, 52 N.Y.2d 276, 437 N.Y.S.2d 646, 419 N.E.2d 324 (1981). n4

n3 Jami uses this same argument as a defense to Valassis' claim for payment of the Note.

n4 Jami had previously sought a preliminary injunction to force Valassis to accept orders from Jami and its customers. Judge Sprizzo, to whom this case was previously assigned, denied the motion on December 8, 1989. Judge Sprizzo also denied Valassis' motion for summary judgment in lieu of compliant in the Valassis Note Action. This was before any discovery had been taken.

Jami appealed the denial which was upheld by the 2nd Cir. On appeal Jami argued that Valassis was obligated to do business with Jami by the FBRA, as well as by an implied covenant allegedly imposed under the doctrine of Mohawk. The Circuit rejected both arguments, holding that: . . . "Such an obligation can be inferred from neither the requirement under New York law that the seller of a business refrain from impairing the goodwill he has sold, nor from the terms of the Future Business Relationship Agreement."

[*6]

In Mohawk Maintenance the N.Y. Court of Appeals imposed on every seller of a business an implied covenant which requires him or her to refrain from soliciting his or her former customers after the sale. The case at bar is clearly distinguishable from Mohawk Maintenance. Here, there was a sale of an enterprise whose entire management and staff were transferred as part of the transaction. In Mohawk Maintenance the Court was concerned solely with the situation where "the seller actually interferes with the purchaser's relationship with his newly acquired customers by capitalizing upon their personal loyalties to him in an effort to recapture their patronage. " 52 N.Y.2d at 285, 437 N.Y.S.2d at 651. Valassis has not sought to solicit Jami's customers. It has simply chosen to exercise its right not to do business with Jami except as required by the FBRA. [HN2] Given the fact that the parties specifically addressed their future business relationship in a written agreement it would be inappropriate for the Court to imply some additional covenant requiring Valassis [*7] to do business with Jami's customers. As the Court in Mohawk Maintenance recognized ". . . the seller remains free to pursue his own economic interests without restraint . . ." 52 N.Y.2d at 283, 437 N.Y.S.2d at 650, 419 N.E.2d at 328. Thus, Mohawk Maintenance does not preclude Valassis from terminating its sales of FSI space to Jami's customers, changing its prices, or offering low rates to potential new customers. Therefore, all claims that Valassis breached any alleged obligation to do business with Jami, to treat Jami in a preferential manner, or to restrict its solicitation of potential new customers, including the counterclaim in the Valassis Note Action and the second and fourth claims for relief in the Jami Damages Action must be dismissed.

Summary judgment is granted dismissing the 2nd, 4th, and 6th claims for relief in the Jami Damages Action, and the counterclaim in the Valassis Note Action.

Valassis' request for an order in limine that would preclude Jami from offering any evidence at trial in support of these three obligations is granted.

Payment on the Note

Valassis argues that it is entitled to summary judgment [*8] on its claim for payment under the August 1985 promissory note against Jami Brokerage, New Jami and Jami Marketing. Valassis seeks a judgment directing Jami to pay the outstanding principal on the Note, plus interest and the costs incurred in collection, including reasonable attorneys' fees, as provided for in the Note.

As stated above, in August 1985, Jami Brokerage tendered the Note as full payment for the assets of Jami, Inc. Jami Brokerage made the payments due under the Note until March 1989, reducing the balance due from $ 700,000 to slightly over $ 500,000. In March 1989, after Jami Brokerage refused to make any further payments, Valassis exercised its right to accelerate the debt and brought the Valassis Note Action to receiver the balance due.

[HN3] The holder of a promissory note establishes a prima facie right to a judgment on the note if he or she failed to make payment according to the terms of the Note. Miller v. Steloff, 686 F. Supp. 91, 93 (S.D.N.Y. 1988). Since Jami does not dispute the basis for Valassis' claim: execution of the Note and failure to pay according to its terms, "it must come forward with evidentiary proof sufficient to raise an issue [*9] as to the defenses." Seaman-Andwall Corp. v. Wright Machine Corp., 31 A.D.2d 136, 136-37, 295 N.Y.S.2d 752, 754 (1st Dep't 1968) app dismd Seaman-Andwall Corp. v. Wright Machine Corp., 28 N.Y.2d 716, 320 N.Y.S.2d 756, 269 N.E.2d 414 (1971), and affd Seaman-Andwall Corp. v. Wright Machine Corp., 29 N.Y.2d 617, 324 N.Y.S.2d 410, 273 N.E.2d 138 (1971).

The Answer and Counterclaim in the Valassis Note Action asserts four types of alleged misconduct which purportedly relieves Jami Brokerage of its obligations under the Note: 1) the third and fourth affirmative defenses allege that Valassis breached the FBRA; 2) the fifth relates to an alleged breach of an agreement allegedly entered into in October 1988 (more than 3 years after Jami Brokerage tendered the Note); 3) the seventh and eighth purport to assert various business torts allegedly committed by Valassis after the August 1985 sale of assets; 4) the sixth affirmative defense combines claims for breach of the FBRA with claims based on Jami's alleged entitlement to "preferential treatment." These allegations, even [*10] if true, do not state a defense to Valassis' claim for payment on the Note. See Logan v. Williamson & Co., 64 A.D. 2d 466, 409 N.Y.S.2d 883

(4th Dep't 1978), app dismd, Logan v. Williamson & Co. 46 N.Y.2d 996, 416 N.Y.S.2d 242, 389 N.E.2d 837 (1979) (when an unconditional note is exchanged for value, the maker cannot avoid its obligations by alleging a breach of a separate agreement, even if that agreement was executed in connection with the same general transaction in which the note at issue was executed.)

[HN4] Jami's allegations of tortious conduct and breaches that occurred after the August 1985 agreement, raises claims separate and unrelated to Valassis' claim on the Note. See Parry v. Goodson, 89 A.D.2d 543, 452 N.Y.S.2d 635 (1st Dep't 1982) (rejecting defendants' contention that its refusal to pay a note tendered for stock was justified by allegations that plaintiff committed various torts after the sale.)

Jami also relies on its claims under Mohawk Maintenance which the Court rejects above. Even if Jami could assert a valid claim under Mohawk Maintenance, allegations [*11] of a breach of such a covenant are insufficient to defeat a motion for summary judgment on a note tendered as payment for a business. See Spielman v. Acme National Sales Co., 159 A.D.2d 918, 553 N.Y.S.2d 532 (3d Dept 1990) (summary judgment on note granted; alleged breach of a non-competition agreement is "separate and apart from the contract of sale. Thus, it does not constitute a defense to this action on the promissory note and will not defeat plaintiff's motion for summary judgment.")

Since Jami's Answer and Counterclaim asserts defenses which relate entirely to conduct after the August 1985 sale of assets, summary judgment is granted in favor of Valassis in the Valassis Note Action.

Given Valassis' clear entitlement for payment on the Note it would be inequitable to permit Jami to withhold payment of the amount due on the note during the period of time necessary to resolve the factual disputes surrounding the Jami Damages Action.

As required by Rule 54(b), Fed.R.Civ.P., the Court finds that there is no just reason for the delay in entering judgment in favor of Valassis on the Note action and the Court directs the immediate entry of judgment on [*12] this claim. Valassis is directed to submit a proposed judgment to the Court by August 23, 1991.

SO ORDERED.

# In the Supreme Court of Bermuda

CIVIL JURISDICTION 1993 No. 302

| | |
|---|---|
| ARNOLD LESLIE JOAQUIN | Plaintiff |
| – and – | |
| ALEXANDER DEAN ABBOTT | 1st  Defendant |
| – and – | |
| ANTHONY  CHARLES  BURGESS | 2nd  Defendant |

Mr. Lord for the Plaintiff
Ms. Harvey for the 2nd Defendant

### JUDGMENT
(extempore)

This is an action on a promissory note.    Originally the action was against the 1st Defendant on one note and against the 2nd Defendant on a second note.

The background is that the 2nd Defendant took over the debt of the 1st Defendant.    The first note was for two years, maturing on the 12th April 1992.    It carried interest. Tthe interest was to be paid in two annual instalments of $19,950.00 each.    The 1st Defendant paid the first installment, but he only paid part of the second, leaving arrears of $10,017.71 and that figure, as I understand it is agreed.

Before the maturity date of the first note, the 2nd Defendant, Mr. Burgess, entered into negotiations with the plaintiff with a view to taking over the 1st Defendant's liability under the first note.    I should say as an aside here that it appears that that liability related to the purchase of a house.    It is not necessary to know that for the purpose of this action, but it perhaps helps to explain the way these things came about.

It was eventually agreed between the plaintiff and 2nd Defendant that he would take over the liability of the 1st Defendant, but according to the attorney, Mr. Francis Morris,   the 2nd Defendant was slow in coming into his office to sign the promissory note,   and indeed the second note was not signed until the 30th November 1992.    Under that note the 2nd

2

Defendant assumed the principle of $285,000 which had been due under the first note and the balance of interest due in respect of the first note. Now there is a dispute as to the amount of that interest: I simply note it at this stage, and will return to it later.

In those circumstances, as I have outlined them briefly by way of introduction, the plaintiff wisely discontinued against the 1st Defendant, so that this action proceeded before me against the 2nd Defendant alone, on the second promissory note, that of the 30th November 1992.    That second note is not disputed.    A copy of it is in the agreed bundle at pages 9 and 10.    There are now only two items of dispute, as follows:-

1) The computation of interest due in respect of the first note is disputed.    This is set out in the second note as a liquidated sum. The 2nd Defendant now says that that liquidated sum is mistaken and seeks rectification.    The claim for rectification was only pleaded by amendment very late in this action.    Indeed it was first raised by tentative amendment on the 6th May, which is the Friday before this action began on the Monday.    When the matter came before me on Monday, a further amended document was put before me, which included a counterclaim for rectification.    I allowed that amendment and we proceeded on that basis.    I should'also say that the 2nd Defendant tendered a lesser sum representing his computation of the money due in respect of interest, and in respect of the first promissory note, just before the trial. That was refused.

2) The due date for the principal under the second note is disputed. The 2nd Defendant says it is not due until the 30th November 1996, four years from the date of the note.    The plaintiff says the principle became due on demand, or at least it became due on demand when default was made in the payment of interest.

I will deal with each of those points of issues separately. The first is the computation of interest in respect of the first note.    In the second note there are two elements,  included in the sum expressed as the principal sum. That sum is $307,652.70.  It is comprised of the carried forward principal from the first note – being $285,000 – plus (according

3

to the terms of the second note) accumulated arrears of interest of
$22,652.70, described in the second note as "now due and owing as at the
date hereof". That second sum was to be reduced under the terms of the
second note by monthly payments of $1000.

The 2nd Defendant says that the sum $22,652.70 is mistaken, and that
the agreement between the parties was that the sum which would be carried
forward into the second note in respect of the accumulated interest, would
be limited to interest due on the note as at its expiry date. That would
be the balance of the second annual instalment, being $1017.71. The
remainder of the $22,652.00 appears to be attributable to the seven or so
months after the expiry of the first note and before the 30th November
1992. The second defendant, through his counsel, argues that at law the
interest that might have accumulated during that period is not properly to
be regarded as interest under the first note at all but is at best
claimable as damages in any action on the first note.    Counsel relies in
support of this upon section 56 of the <u>Bills of Exchange Act 1934</u> and also
on the case of <u>Cook v. Fowler and Ors.</u> (1874) L.R. 7 H.L. 27. I have no
dispute with that principle of law in respect of promissory notes or
indeed any bill of exchange.   Any sum accruing after the maturity date is
properly to be regarded as damages and not strictly as interest, and that
has various consequences at law. For instance, the sum which may be
awarded by the court in respect of those damages is not limited to the
amount of interest specified in the instrument, and may be more or less,
depending on the state of the market at the time.    In the 19th century
this may also have had an added importance when damages could not be
recovered in an action for debt.    That distinction at least has fallen
away now.

I allowed a late amendment for the 2nd defendant to raise this point,
because –

(a) there is no inconvenience to the plaintiff, as the relevant
witnesses were coming in any event.

(b) it was appropriate that all issues in dispute should be determined
at this trial.

While the rule against parole evidence normally forbids a challenge to
such a formal document as this promissory note by oral evidence as to what

the parties had in fact agreed,  it appears that on a claim for
rectification such oral evidence is allowed, and in support of this I was
referred to Chitty on Contracts, 26th edition paragraph 377. I did
therefore entertain that evidence,  and on the basis of the authority of
that paragraph hold that it was admissible.

 The evidence as to what was agreed, and as to how the note came to be
signed showing the larger sum of $22,652.00, came primarily from Mr.
Francis Morris, the attorney who acted for all parties in this matter, and
also for Mr. Burgess, the 2nd Defendant.   What Mr. Morris says was that he
took Mr. Burgess through his computation for the interest due, which was
broken down into the sum due on the note up to maturity, and the sum
accruing thereafter at the rate of 7%, and that that amount, the amount
which was included in the note was therefore agreed by Mr. Burgess who
read it, heard the explanation and signed the note.   Mr. Morris says that
over the months before 30th November 1992 he had to keep redoing the
interest calculation as Mr. Burgess had been slow in coming in, and the
interest had therefore mounted up.

 What Mr. Burgess said is as follows,  I shall read from his evidence in
chief and from his cross-examination.   In chief he said

 "Francis Morris calculated the figures in his office, but it was
 $285,000 and the balance of the interest which was $10,000 which I had
 agreed.  I gave Mr. Abbott (that was the 1st Defendant) $10,000 before
 signing to send on to Mr. Joaquin, the plaintiff.   I could not put a
 date on when that was.  It was possible two or three months before the
 November document, I can't really remember. Mr. Abbott had run into
 problems with L.P. Gutteridge.   I called Mr. Joaquin to let him know
 what was happening, and that I was willing to take over only for the
 $285,000 and for the half year's interest, because L.P. Gutteridge was
 getting ready to call the mortgage."

 He then went on to explain the position with L.P. Gutteridge.   I don't
think I need go into that.   He was cross-examined on this and on
cross-examination  he  said

5

"I started discussions with Mr. Joaquin some six months before
Abbott's note was was due. It had to be early 1992. It was before
Abbott's note was due. The just was I would take over Abbott's
liability under the note, meaning the principle and interest due on
it. I never saw the note and Francis Horris gave me the figures of
$285,000 and $10,000 for interest. Mr. Joaquin did that also.
Francis Horris did the figures in his own office."

It was then put to him why, if he thought the amount due on the Abbott
note was only $285,000 plus $10,000, he signed the promissory note which
shows the sum of $22,652.00 due in respect of accumulated interest, and he
said-

"I can add $285,000 and $10,000. I signed the note for $307,000
because I thought the amounts I paid to Abbott were paid to Joaquin.
I paid Abbott $10,000 which should have reduced this figure by
$10,000."

I say straight away that I do not see how a payment to Abbott, even if
it had been properly made and passed on to Joaquin, explains how it was
that Mr. Burgess came to except a liability in the note for $22,600. If
he felt he had reduced it by $10,000 by paying to Abbott to pay to
Joaquin, and there was still some $10,000 left, that appears on the face
of it to be an admission that he was accepting the accumulated interest in
the interim.

Be that as it may, I accept Mr. Horris's evidence in respect of how it
was that the note came to be signed, and in particular that he explained
the sum to Mr. Burgess, and Mr. Burgess accepted it. I do this because I
find it inconceivable that the defendant, who is an intelligent and
capable man whom I have seen in the witness box, could not grasp that
$22,652 was more than the $10,000 odd that he had been told both by Mr.
Horris and by Mr. Joaquin and (I take this from his own evidence) was the
balance due under the Abbott note up to maturity. If he knew that $10,000
was due on the Abbott note up to maturity, and he admits that he did, I
can see no explanation for his signing a note for the greater amount,

6

unless he was willingly and freely except that greater amount.

I should also say that, having seen Mr. Morris give evidence and be cross-examined, I preferred his evidence to that of Mr. Burgess.    **And** if it were that the payment of $10,000 odd to Mr. Abbott affected the situation in some material way, I again find it inconceivable that Mr. Burgess would have signed the note in the form he did without demurring in some way.  I do also have to note here that the defendant did not raise the question of rectification until very late in day.    It did not appear in the pleadings until 6th May 1994.    I formed the view that this point was inspired more by counsel's legal analysis of the situation than Mr. Burgess's recollection of the events as they transpired.

I note that the burden or proof on rectification is a high one - I was referred to <u>Chitty,</u> paragraph 379.    That paragraph is headed "Proof of Mistake." It reads -

"The burden of proof is on the party seeking rectification. He must produce "convincing proof" not only that the document to be rectified was not in accordance with the parties'  true intentions at the time of its execution, but also that the document in its proposed form does accord with their intentions. . . .  Where it is sought to rectify a document in accordance with a prior agreement between the parties, it must be shown that the intention of the parties continued unaltered up to the time of the execution of the document."

Having heard all the evidence I find that the document represents what was in fact agreed at the time it was signed, and that at that **time the** 2nd Defendant was quite content then to assume a figure calculated on the basis of 7% running down to the 30th November 1992, and that was the agreement at the time.

I should note that a point was taken that Mr. Burgess was not separately represent.  Mr. Francis Morris acted for all sides in this matter: for Mr. Burgess;  for Mr. Abbott: for Mr. **Joaquin.** I should record that I think that that is unhappy, and that in cases such as this it would be preferable if that did not happen.    However, I think it does not vitiate this transaction in any way.    I find this particularly as the

7

inclusion of interest calculated at 7% down to the 30th November whether
strictly legally it is to be **characterised** as interest or a sum paid to
buy off a potential action for damages,  is a normal and proper commercial
course for the parties to take in these circumstances.    Indeed, I think it
difficult to imagine that Mr. Joaquin would have proceeded on any other
basis, and would have waived his claim for interest for the seven or so
months between April and November.    Had there been an officious bystander
around at the time I am sure that he would have pointed that out to Mr.
Joaquin and got a clear answer:    "No of course I don't mean to waive that
interest."    However, in view of the facts that I found that question does
not arise.,

On that basis I therefore dismiss the Counterclaim for rectification.
I now turn to the term of the note and when it was due.    The 2nd
defendants pleads that the note was not due until the 30th November 1996.
The note reads in part as follows:

"FOR VALUE RECEIVED, I, ANTHONY CHARLES BURGESS, the undersigned
Debtor and Promisor of Elys Harbour,  Sandys Parish in the said Islands
HEREBY PROMISE to pay on demand to or to the order of Arnold Leslie
Joaquin (hereinafter called the "Creditor") the principal sum of Three
hundred and seven thousand six hundred and fifty-two dollars.
The Interest so payable shall be at the rate of seven percent (7%) per
annum payable on the 30th day of each month commencing from the 1st
day of December 1992 and continuing monthly thereafter for a period of
Four(4) years, that is to say, on the said sum of **$285,000.00.**"

The fourth paragraph reads as follows:-

"**The** principal sum of Three hundred and seven thousand six hundred and
fifty-two dollars and seventy cents (**$307,652.70**) shall become due
and payable on the 30th day of November 1996."

The Second paragraph  on the second page **reads:-**

"The  undersigned  shall be at liberty at any time before the maturity

8

date hereof to pay to the Creditor the said principal sum in full."

There are therefore two provisions as to payment in this note which conflict.    There is the first provision that it is payable on demand, and there is the second provision that it is payable at a fixed future date after four years.    The majority of the body of the note is framed in terms of the four year date,  because interest is provided to be payable over a term of four years.    That is only reconcilable with a four year date, and not with the sum being paid on demand. And the debtor is given liberty to pay off the due sum before the maturity date, which obviously contemplates the maturity date having been fixed.

The definition of a promissory note is pertinent to this and it is contained in section 75 of the Bills of Exchange Act.   Section 75(1) reads –

"A promissory note is an unconditional promise in writing made by one person to another signed by the maker, engaging to pay, on demand or at a fixed or determinable future time, a sum certain in money to, or to the order of, a specified person."

It will be noted immediately that the sum is either payable on demand or it is payable at a fixed and determinable future date.    It is not, and it cannot be, both.  Mr. Morris, the draftsman, gave evidence that he framed the note in this way because it was intended to permit the collection on demand in default of the payment of interest.  I say straight away that his evidence on that is not admissible as an aid to construction.    The note has to be interpreted on its face. However, I do note that it would certainly be possible to achieve some such result in the case of a note that provided for the payment of the sum of money by instalments, because that is contemplated by section 8 (I), of the Bills of Exchange Act.   It is helpful to look at that. Paragraph (a) says that the sum payable by a bill may be paid by stated instalments; and paragraph (c) says it may be payable by stated instalments with a provision that upon default in payment of any instalment the whole shall become due. That is a good example of how one may frame a note expressly to make the

9

whole become due upon default in the payment in the instalments. That is not the form that Mr. Morris used in drafting the note.    It may in fact be more difficult to achieve this result in respect of interest, because a provision that the whole amount of the note shall be come due on default in the payment of interest, a provision which is common in mortgages, would be a provision that the note become due on a contingency.    As such it might not be permissible in a promissory note, because of the provisions of s. 10(2) of the Act.    I do not have to consider that, because in this case there was, as I have already found, no express wording that could put into effect what Mr. Morris said was his intention.    I therefore have no grounds for interpreting the instrument in the way Mr. Morris said he intended.

I have canvassed in my own mind whether the note is void for uncertainty, because of this conflict.    I think, however, that the principle in construing a commercial document such as this is that I should seek to give effect to it wherever possible.    I consider that the very clear provision as to the four year term, and the concomitant terms as to the payments of interest which accord therewith, must on that basis prevail.    I also note that that accords with the evidence from both sides as to what they had agreed.    Both of them told me they had agreed on a four year term.    Mr. Burgess indeed had asked for a five year term to begin with.    Mr. Joaquin refused that, but said that he was willing to give a four year note, and this was communicated to Mr. Burgess by Mr. Morris, and was accepted.

I Therefore find that the principal sum is not due until the 30th November 1996.    I propose to ignore the words "on demand," and would have struck them out if formal rectification of the document had been sought in this regard.

The plaintiff's action, therefore, for the principal sum fails because it is not yet due.    I should note that when it is due this judgment does not stand as res judicata in respect of that.

The plaintiff, however, wins in respect to the arrears of interest sought to date because they are now due.    And he also wins in respect of the arrears of the monthly payment of $1000 in respect of the accrued Abbott  arrears.

10

I now term to the computation of the sum which I should award to the plaintiff under the judgment that I will give for him.    It is agreed, and excepted by the plaintiff, that Mr. Burgess paid, and paid only, **$7,362.50** on account of his liability under the second note.    Under the second note the first interest appears to have been due on the 31st December 1992. There is a reference to interest commencing on the first day of December 1992, but the plaintiff accepts (and I think rightly) that the first actual payment of interest was due on the 30th of that month.    And I think that that same provision also applies in respect of the $1000 per month payable on the Abbott arrears,    although it is not expressly stated.

There have on my calculation been seventeen payments due down to the 30th April 1994.    The monthly sum in respect of interest on the principle of $285,000 is agreed at **$1,662.50** per month.    By my calculation that gives the sum of **$28,326.25** for interest to the 30th April.    Add to that the seventeen payments of $1000 for the Abbott arrears which were due, and one comes to a total of **$45,262.50.**    I deduct from this the amount which Mr. Burgess has paid (that is $7362.50) and arrive at the sum of $37,900 for arrears of interest and monthly payments under the note.    That is down to the 30th April 1994, and I give judgment in that sum in the plaintiffs favour.

I now turn to the question of costs.    I have heard argument on this. The note itself contains a provision for costs.    It says that Mr. Burgess "agrees to pay on demand all costs of collection, including legal fees incurred by the Creditor in enforcing this note."    On that basis, and on the basis that he has won at least in part on the action, Mr. Lord urges upon me that I should award the plaintiff the costs of the action on a indemnity basis - which he expresses as a solicitor and own client basis.

Ms. Harvey, counsel for the defendant, urged on me that, if I reached the stage that I have in my judgment, that I should apportion costs, because the plaintiff had only won in part, and has not won on the claim in respect of the principal.    I have considered this. I do not think that, in all the circumstances of this case, it is appropriate to apportion the costs.    The plaintiff has had to come to court to obtain the money due to him due to the 2nd defendant's default on the note, and

though some of that amount was conceded and tendered on the Friday before the case came on, the full amount was not tendered and the plaintiff had to come to court to argue about the rectification point, which occupied a good deal of time at trial and indeed occupied most of the evidence.    I am not therefore going to divide the costs up, but I am going to award the plaintiff his full costs of the action.    In doing this I should also note that I take into account that the rectification point was only raised very late in the day by amendment.

I am going to award the plaintiff his costs to be taxed on an indemnity basis, as explained in **EMI** Records Ltd. v. Wallace **[1983]** Ch. 59 as applied in this jurisdiction by my judgment on costs in Degroote v. MacMillan given on the 17th December 1993 in action 1991 No. 48. Costs on a indemnity basis are sometimes describes as costs on a solicitor and own client basis.    In **EMI** Records the Vice Chancellor said that was a confusing term and urged the use of the expression "indemnity costs," and I accept and adopt that as a proper practice.

The plaintiff gets judgment for $37,900 plus the costs of the action on an indemnity basis.

Richard Ground
**10.5.94**

LEXSEE

**LOCALS 302 AND 612 OF THE INTERNATIONAL UNION OF OPERATING
ENGINEERS - EMPLOYERS CONSTRUCTION INDUSTRY RETIREMENT
TRUST, INDIANA ELECTRICAL WORKERS PENSION TRUST FUND IBEW, et
al. Plaintiffs, -v- JAMES J. BLANCHARD, et al., Defendants.**

04 Civ. 5954 (LAP)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2005 U.S. Dist. LEXIS 17679

**August 25, 2005, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, two local unions and their pension trust fund, brought a derivative suit against defendant corporation alleging injury to the corporation from accounting improprieties that artificially inflated the corporation's stock price and from unjust enrichment by certain officers of the corporation. The corporation filed a motion to dismiss the complaint for lack of jurisdiction. Plaintiffs contested the motion.

**OVERVIEW:** The corporation was a chartered Canadian business that supplied networking products using wireless and wireline technologies. Plaintiffs sent a letter demanding that it investigate the allegations set forth in an attached 111-page draft complaint. The corporation responded that it would review the demand letter, and it convened a special subcommittee for this purpose. Plaintiffs filed suit three weeks later. The corporation argued that the suit was governed by the Canadian Business Corporations Act (CBCA), which required leave from a specifically enumerated Canadian court, and that plaintiffs did not allow sufficient response time under the CBCA. The court dismissed the complaint. Under the "internal affairs" choice of law doctrine, a derivative suit was governed by the laws of the forum of a company's incorporation. Thus, Canadian law applied. Section 239 of the CBCA required plaintiffs to seek leave to proceed from a Canadian court specifically enumerated in § 2 of the CBCA, which they failed to do. Even if jurisdiction was present, under the CBCA or under the analogous provisions of Fed. R. Civ. P. 23.1, plaintiffs did not permit a reasonable response time to their demand.

**OUTCOME:** The court granted the corporation's motion to dismiss the complaint.

**CORE TERMS:** derivative action, shareholder, demand letter, incorporation, internal affairs, derivative, common law, choice of law, oppression, foreign law, subsidiary, specifically enumerated, motion to dismiss, investigate, derivative suit, present facts, stockholders, conditions precedent, body corporate, declaration, restatement, enumerated, accounting, chartered, announced, publicly, ongoing, bonuses, bonus, subject matter jurisdiction

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN1] In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must view the complaint in the light most favorable to the plaintiff. It must accept as true the factual allegations stated in the complaint, and draw all reasonable inferences in favor of the plaintiff. A motion to dismiss can only be granted if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle plaintiff to relief.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
*Civil Procedure > Class Actions > Derivative Actions*
*Civil Procedure > State & Federal Interrelationships > Choice of Law*
*International Law > Dispute Resolution > Conflicts of Laws*
[HN2] In considering derivative actions, the United States Court of Appeals for the Second Circuit has unambiguously held that such actions are governed by the laws of the forum of the company's incorporation. The

right of a shareholder to object to conduct occurring in the operation of the corporate enterprise is determined by the law of the state of incorporation. This includes acts that are beyond the purposes of incorporation, acts which are prohibited either by the state of incorporation or by the state where the acts are to be performed and the acts which are alleged to be beyond the authority of the officers or directors. This "internal affairs" choice of law doctrine is well established and generally followed throughout this country. The internal affairs doctrine is equally applicable to a foreign corporation.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
*Business & Corporate Entities > Foreign Businesses*
[HN3] Section 239 of the Canadian Business Corporations Act (CBCA) provides the governing law for derivative actions against Canadian corporations and enumerates specific Canadian courts where such actions may exclusively be heard. Section 239(2) of the CBCA states that no action may be brought unless the court is satisfied that the conditions precedent have been met, and the term "court" is defined in § 2 of the CBCA as various enumerated Canadian courts.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
*Business & Corporate Entities > Foreign Businesses*
[HN4] See § 239 of the Canadian Business Corporations Act.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
*Business & Corporate Entities > Foreign Businesses*
[HN5] See § 2 of the Canadian Business Corporations Act.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
*Business & Corporate Entities > Foreign Businesses*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Action*
[HN6] Where the Canadian Business Corporations Act specifically establishes exclusive jurisdiction over an action, that choice of forum must be respected.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
*Civil Procedure > State & Federal Interrelationships > Choice of Law*

[HN7] New York courts must look to the law of the state of incorporation for all principles that will govern a derivative action. N.Y. Bus. Corp. Law § 1319 is not a conflict of laws rule, and does not compel the application of New York domestic law to derivative claims; the law of the state of incorporation applies.

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
*Civil Procedure > Trials > Judicial Discretion*
*International Law > Dispute Resolution > Conflicts of Laws*
[HN8] Fed. R. Civ. P. 44.1 controls determinations of foreign law in federal court. Rule 44.1 gives a district court wide latitude in resolving issues of foreign law: A court in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. A court's determination shall be treated as a ruling on a question of law. Fed. R. Civ. P. 44.1. Because of this latitude, a court may reject even uncontradicted expert testimony and reach its own decisions on the basis of independent examination of foreign legal authorities. Disagreement among legal experts on content, applicability, or interpretation of foreign law does not create genuine issues of material fact for summary judgment purposes.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
*Governments > Legislation > Types of Statutes*
[HN9] Demand rules in derivative actions are substantive in nature. The issue is not just "who" may maintain an action or "how" it will be brought, but "if" it will be brought. No determination could be more substantive.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*
*Business & Corporate Entities > Foreign Businesses*
[HN10] Pursuant to § 239(2)(a) of the Canadian Business Corporations Act, a derivative action cannot be brought unless the directors of a corporation do not bring, diligently prosecute, or defend, or discontinue an action. Directors must be allowed a reasonable period of time to decide whether to take the action proposed in a shareholder's demand letter, and a court will not infer that a board has refused to bring an action simply because it has not issued a definitive answer.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*

[HN11] Fed. R. Civ. P. 23.1 and analogous state law rules require that a demand be made or that shareholders plead with particularity exceptional circumstances that would render a demand futile.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Actions Against Corporations*

[HN12] The reasonableness of a time period for investigating a demand in a shareholder derivative action varies in direct proportion to the complexity of the technological, quantitative, and legal issues raised by the demand.

COUNSEL: [*1] For Locals 302 and 612 of the International Union of Operating Engineers - Employers Construction Industry Retirement Trust, Indiana Electrical Workers Pension Trust Fund IBEW, Dong Wen, Derivatively on behalf of Nortel Networks Corporation, Plaintiffs: Samuel Howard Rudman, Lerach, Coughlin, Stoia, Geller, Rudman, & Robbins, LLP, Melville, NY.

For Frank Dunn, Defendant: Richard Franklin Albert, Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., New York, NY.

For Michael J. Gollogy, Defendant: Lee S Richards, III, Richards Spears Kibbe & Orbe LLP, Washington, DC.

For James Kinney, Defendant: Autumn Ji Sun Hwang, Fish & Richardson P.C., New York, NY.

For Ken Taylor, Defendant: William W. Wickersham, Entwistle & Cappucci LLP(NJ), Florham Park, NJ.

For Craig A. Johnson, Defendant: Guy Petrillo, Swidler Berlin Shereff Friedman, LLP, New York, NY.

For Doug Hamilton, Defendant: Don D. Buchwald, Buchwald and Kaufman, NY, NY.

JUDGES: LORETTA A. PRESKA, U.S.D.J.

OPINIONBY: LORETTA A. PRESKA

OPINION: OPINION AND ORDER

LORETTA A. PRESKA, U.S.D.J.:

Defendant Nortel Networks Corporation ("Defendant" or "Nortel") presently moves to dismiss the derivative action filed by Plaintiff [*2] Locals 302 and 612 of the International Union of Operating Engineers - Employers Construction Industry Retirement Trust and Plaintiff Indiana Electrical Workers Pension Trust Fund IBEW (collectively, "Plaintiffs"). Counsel appeared on August 2, 2005 for oral argument on the motion. Upon consideration of the parties' written and oral submissions, Nortel's motion to dismiss is granted.

I. Background

Nortel is a federally chartered Canadian corporation with its headquarters and principal place of business in Brampton, Ontario, Canada. (Compl., P 60(a).) Nortel is a supplier of networking products using wireless and wireline technologies. (Id., PP 7, 18.)

On February 15, 2001, Nortel publicly announced that it would not grow as robustly as it had projected in previous months. (Id., P 20.) This announcement triggered a substantial drop in Nortel's stock price. Id. Twenty-five class actions were subsequently filed, alleging that Nortel's prior forecasts constituted securities fraud. (Id., P 23.) Those cases are ongoing and have been consolidated before the Honorable Richard M. Berman ("Nortel I").

On October 23, 2003, Nortel publicly announced that it would file [*3] a restatement of certain past financial statements, adjusting approximately $ 952 million in liabilities that were recorded incorrectly. (Id., P 32.) Nortel's Audit Committee then initiated an independent investigation of the circumstances between the fourth quarter of 2002 and the end of 2003 that caused the irregularities. On March 10, 2004, Nortel issued a press release describing the need for a further restatement to correct additional errors regarding liabilities that had been since detected. (Id., P 35.) Shortly thereafter, Nortel terminated for cause its Chief Executive Officer, Chief Financial Officer and Controller, each of whom is a named defendant in this case. The March 10, 2004 press release inspired another series of class actions ("Nortel II") alleging the manipulation of reserves to achieve earnings targets. Those lawsuits are ongoing have also been consolidated before this Court.

Plaintiff Indiana Electrical Workers Trust Fund IBEW (the "Electrical Workers Fund") was one of the parties that originally filed a complaint in Nortel II. On July 1, 2004, this Court designated lead plaintiffs and lead counsel, which did not include the Electrical Workers Fund or [*4] its counsel. (Decl. of Tai H. Park ("Park Decl."), dated May 26, 2005, Ex. A.) One week later, on July 8, 2004, the Electrical Workers Fund demanded by letter (the "Demand Letter") that Nortel's Board investigate the allegations set forth in a 111-page draft complaint attached to the letter. (Park Decl., Ex. B.) The Demand Letter drew heavily from the allegations of Nortel I and Nortel II, though Plaintiffs claim that the letter expands upon the scope and magnitude of those allegations. The Demand Letter also requested that the Nortel Board commence legal proceedings against a

number of current and former directors and employees of Nortel. (Id., Ex. B, P 5.)

By July 20, 2004, Nortel's Corporate Secretary sent a letter in response, stating that the Nortel Board would review the matters discussed in the Demand Letter, would consider appropriate procedures to evaluate those matters and would provide a fuller response in due course. (Id., Ex. C, P 2.) The Nortel Board then convened a special subcommittee comprised of the single new Board member who had not been listed as a potential defendant in the draft complaint, Dr. Manfred Bischoff. Dr. Bischoff was appointed to the Board [*5] in April 2004, well after the alleged malfeasance occurred. (Compl., P 73.)

Notwithstanding Nortel's response letter of July 20, 2004, Plaintiffs filed the present Complaint on July 30, 2004. The five-count Complaint alleges that certain of the individual defendants engaged in accounting improprieties from 2000 to 2004, creating a distorted picture of Nortel's financial condition to inflate artificially Nortel's stock price, that individual defendants unjustly enriched themselves by taking certain bonuses tied to Nortel's allegedly inflated performance, and that Nortel was injured as a result. n1 (Compl., PP 6-38, 40-44.) The Electrical Workers Fund subsequently filed a voluntary dismissal of its complaint in Nortel II. (Park Decl., Ex. D.)

n1 Recent events in Canada also provide relevant background to this case. On July 28, 2004, two days prior to the filing of this action, certain shareholders of Nortel commenced an "oppression" proceeding in Ontario, seeking remedies for alleged injuries to shareholders. (Park Decl., Ex. E.) Plaintiffs in that case have asked the Canadian court for: (1) a declaration that Nortel and certain of its directors and officers have contravened Section 241 of the Canadian Business Corporations Act ("CBCA") and have "oppressed, unfairly prejudiced or unfairly disregarded the interests of" plaintiffs and other class members by approving and paying certain bonuses; (2) an order directing an investigation into Nortel's payments under its bonus program; (3) an accounting from certain directors and officers of the benefits they received under the bonus program; and (4) a declaration that certain of Nortel's directors and officers caused the oppression. (Id., Ex. E, P 2.) The Canadian case appears to resemble closely the instant case.

[*6]

Since the filing of the Complaint, Nortel has continued to take remedial action. On January 11, 2005, Nortel

publicly filed a restatement of financial data dating back to 2001, taking into account revenue adjustments from 2001 to 2003. Nortel published a summary of the findings of its internal investigation and announced that the independent review of revenue adjustments for 2000 and 2001 was underway and would continue. Additionally, Nortel has demanded the return of bonus payments from terminated employees, and on January 31, 2005, Nortel commenced legal action in Canada against the former Chief Executive Officer, Chief Financial Officer and Controller who refused to comply with the request to return the bonuses. (Park Decl., Ex. G.)

Nortel filed the present motion to dismiss, contending that: (1) Canadian law applies to Plaintiffs' derivative action, and pursuant to the CBCA, a derivative action against a Canadian corporation must seek leave of a specifically enumerated Canadian court; and (2) Plaintiffs have not allowed Defendant sufficient time to respond to their demand as required under the CBCA.

## II. Standard for a Motion to Dismiss

[HN1] In deciding a motion to dismiss [*7] under Fed. R. Civ. P. 12(b)(6), I must view the complaint in the light most favorable to the plaintiff. Yoder v. Orthomolecular Nutrition Inst., Inc., 751 F.2d 555, 562 (2d Cir. 1985) (citing Conley v. Gibson, 355 U.S. 41, 47-48, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)). I must accept as true the factual allegations stated in the complaint, Zinermon v. Burch, 494 U.S. 113, 118, 108 L. Ed. 2d 100, 110 S. Ct. 975 (1990), and draw all reasonable inferences in favor of the plaintiff. Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974); Hertz Corp. v. City of N.Y., 1 F.3d 121, 125 (2d Cir. 1993). A motion to dismiss can only be granted if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle plaintiff to relief. Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).

## III. Discussion

### A. Exclusive Jurisdiction of the Canadian Courts

Plaintiffs base their derivative suit on diversity of citizenship. (Compl., P 58.) Accordingly, New York State conflict of law analysis applies. See [*8] AroChem Int'l, Inc. v. Buirkle, 968 F.2d 299, 269-70 (2d Cir. 1992); Hausman v. Buckley, 299 F.2d 696, 700 (2d Cir. 1962). [HN2] In considering derivative actions, the Court of Appeals has unambiguously held that such actions are governed by the laws of the forum of the company's incorporation:

The right of a shareholder to object to conduct occurring in the operation of the corporate enterprise is determined by the law of the state of incorporation. This includes acts that are beyond the purposes of incorporation, acts which are prohibited either by the state of incorporation or by the state where the acts are to be performed and the acts which are alleged to be beyond the authority of the officers or directors.

Hausman, 299 F.2d at 702-03 (internal citations omitted). This "internal affairs" choice of law doctrine is "well established and generally followed throughout this country." Id.

The internal affairs doctrine is equally applicable to a foreign corporation. Id. at 702-06 (applying Venezuelan law to dismiss a derivative action brought on behalf of a corporation chartered in Venezuela); Batchelder v. Kawamoto, 147 F.3d 915, 922 [*9] (9th Cir.), cert. denied, 525 U.S. 982, 142 L. Ed. 2d 400, 119 S. Ct. 446 (1998) (dismissing derivative action filed against Japanese company, where there was no standing under Japanese law). n2

n2 Further, stockholders impliedly consent to be governed by the law of a corporation's state of incorporation when they purchase stock in the company. See Groom v. Mortimer Land Co., 192 F. 849, 852 (5th Cir. 1912) ("Stockholders . . . were impliedly bound by such [state] laws as part of the organic law of the corporation of which they were members."); Fleeger v. Clarkson Co. Ltd., 86 F.R.D. 388, 395 (N.D. Tex. 1980) (quoting Groom). Here, Plaintiffs, as Nortel stockholders, have agreed to be bound by the CBCA.

Nortel is a Canadian company incorporated under the CBCA. (Compl., P 60(a).) [HN3] Section 239 of the CBCA provides the governing law for derivative actions against Canadian corporations and enumerates specific Canadian courts where such actions may exclusively be heard. n3 [*10] Section 239(2) states that "no action may be brought . . . unless the court is satisfied that [the conditions precedent have been met]," and the term "court" is defined in Section 2 of the CBCA as various enumerated Canadian courts. n4

n3 The full text of Section 239 reads:

Commencing derivative action
[HN4] 239. (1) Subject to subsection (2), a complainant may apply to a court for leave to bring an action in the name and on behalf of a corporation or any of its subsidiaries, or intervene in an action to which any such body corporate is a party, for the purpose of prosecuting, defending or discontinuing the action on behalf of the body corporate.

Conditions precedent
(2) No action may be brought and no intervention in an action may be made under subsection (1) unless the court is satisfied that
(a) the complainant has given notice to the directors of the corporation or its subsidiary of the complainant's intention to apply to the court under subsection (1) not less than fourteen days before bringing the application, or as otherwise ordered by the court, if the directors of the corporation or its subsidiary do not bring, diligently prosecute or defend or discontinue the action;
(b) the complainant is acting in good faith; and
(c) it appears to be in the interests of the corporation or its subsidiary that the action be brought, prosecuted, defended or discontinued.

[*11]

n4 [HN5] (1) In this Act, . . . "court" means:

(a) in the Province of Newfoundland, and Prince Edward Island, the trial division or branch of the Supreme Court of the Province,
(a.1) in the Province of Ontario, the Superior Court of Justice,
(b) in the Provinces of Nova Scotia and British Columbia, the Supreme Court of the Province
(c) in the Province of Manitoba, Saskatchewan, Alberta and New

Brunswick, the Court of Queen's Bench for the Province,
(d) in the Province of Quebec, the Superior Court of the Province, and
(e) the Supreme Court of Yukon, the Supreme Court of the Northwest Territories and the Nunavut Court of Justice.

Both Canadian and United States courts have made clear that [HN6] where the CBCA specifically establishes exclusive jurisdiction over an action, that choice of forum must be respected. In Nova Ban-Corp Ltd. v. Tottrup, [1990] 1 F.C. 288, F. Cas. No. 131 (F.C.T.D.), plaintiffs brought a derivative action under the predecessor to Section 239 in the Federal Court of Canada. While plaintiffs had been given leave to proceed by the Court of the Queen's Bench in Alberta, [*12] when the plaintiffs sought relief in the Federal Court of Canada, the Court held that plaintiffs must bring their derivative action in one of the enumerated Section 2 courts. "It is clear from subsections 232(2) and 234(2) that the action or application when brought must also be brought in the "court" as defined; namely, in Alberta, in the Court of Queen's Bench." Id. at 293. See also Anderson v. Ralston Court Ltd., [1993] B.C.J. No. 2700 (Prov. Ct.) (QL) (provincial court lacked jurisdiction over action filed under British Columbia Corporations Act because Act defines a court as British Columbia Supreme Court).

United States Courts have followed this reasoning in deferring to Canadian courts. In Taylor v. LSI Logic Corp., 715 A.2d 837 (Del. 1998), the Delaware Supreme Court held that it lacked jurisdiction over a shareholder action seeking an oppression remedy pursuant to Section 241 of the CBCA -- Section 241, like Section 239, contains express references to enumerated "courts." Relying on Nova Ban-Corp, the Taylor court held:

We, therefore, find that it was the intent of the Parliament that actions brought under [*13] Section 241 of the Canada Business Corporations Act be brought only in the courts of Canada identified in Section 2 of the Canadian Act.

Taylor, 715 A.2d at 841; see also Ison v. E.I. DuPont de Nemours & Co., Inc., 729 A.2d 832, 838 (Del. 1999) (construing Taylor, Supreme Court of Delaware observed that the "Canadian law at issue actually required

adjudication in a Canadian Court leaving the Court of Chancery with no subject matter jurisdiction"). n5

n5 Nord Resources Corp v. Nord Pacific, (2003), 35 B.L.R. (3d) 260 brings the Taylor line of cases full circle. Plaintiffs, having filed a derivative action in a New Mexico state court, moved to stay proceedings before the New Brunswick Court of the Queen's Bench in a parallel action brought under the New Brunswick Corporations Act, which, like Section 239 of the CBCA, defines "court" as a specific Canadian court. The New Brunswick Court held that the New Mexico court did not have subject matter jurisdiction over the derivative action and thus that the Canadian action should proceed. Id. at 35 B.L.R. (3d) 260.

[*14]

Applying Hausman, the internal affairs doctrine and the Taylor line of cases to the present facts, there is no doubt that Canadian law applies to Plaintiffs' claims and that Section 239 of the CBCA requires Plaintiffs to seek leave of a Canadian court specifically enumerated in Section 2 of the CBCA. Accordingly, this Court cannot properly exercise jurisdiction over Plaintiffs' derivative action.

Despite this relatively straightforward application of Hausman and the internal affairs doctrine, Plaintiffs attempt a theory by which their derivative action sidesteps the internal affairs doctrine allowing it to proceed in this Court. Plaintiffs initially maintain that they are not obligated to bring their derivative action under the CBCA and may instead bring their action under Sections 626 and 1319 of the New York Business Corporations Law ("NYBCL"), which allows shareholders of a foreign corporation to sue derivatively in the State of New York. n6

n6 Indeed, Plaintiffs also suggest that they are free to bring their derivative action under Canadian common law rather than the CBCA, as the CBCA (and specifically § 122(1)) is merely a codification of pre-existing common law. (Pl's. Br. 5.) However, Canadian courts have addressed this issue and held that the common law of derivative actions has been superceded by the statutory law of the CBCA. See Shield Dev. Co. v. Snyder, [1976] 3 W.W.R. 44 (enactment of British Columbia's statutory analogue to CBCA Section 239 abrogated the common law derivative remedy); Farnham v. Feingold, [1973] 2 Ore. 132 (analogous section of Ontario Business Corporations Act "embraces all causes of action under

any statute in law or in equity, that a shareholder may sue for on behalf of a corporation"). The cases that Plaintiffs cite in support of their common law derivative action argument, In re Credit Canadien Inc., [1937] S.C.R. 305 and Peso Silver Mines Ltd. (N.P.L.) v. Cropper, [1966] 58 D.L.R. (2d) 1, were both decided years before the CBCA was enacted in 1975 and are accordingly irrelevant (Peso appears to have been mistakenly cited by Plaintiffs as being decided in 1996 as opposed to 1966).

[*15]

While Plaintiffs seem to suggest that this choice alone resolves this motion in their favor, Section 626 by no means obviates the choice of law analysis that must proceed in any action based on diversity of citizenship. [HN7] New York Courts must look to the law of the state of incorporation for all principles that will govern the action. See Lewis v. Dicker, 118 Misc. 2d 28, 459 N.Y.S.2d 215, 216 (Sup. Ct. Kings County 1982) (NYBCL § 1319 is "not a conflict of laws rule, and does not compel the application of New York domestic law" to derivative claims; instead, law of state of incorporation applies); CPF Acquisition Co. by Kagan v. CPF Acquisition Co., 255 A.D.2d 200, 682 N.Y.S.2d 3 (App. Div. 1st Dep't 1998) (remanding case where trial court erroneously applied demand requirement under NYBCL § 626 rather than those of Delaware, the state of incorporation); Hart v. General Motors, 129 A.D.2d 179, 517 N.Y.S.2d 490, 492 (App. Div. 1st Dep't 1987) (applying Delaware law regarding adequacy of plaintiff's demand because "one of the abiding principles of the law of corporations is that the issue of [*16] corporate governance, including the threshold demand issue, is governed by the law of the state in which the corporation is chartered").

Faced with the choice of law analysis, therefore, Plaintiffs respond to Hausman and the internal affairs doctrine in two ways. Plaintiffs argue: (1) that Hausman is distinguishable from the present facts; and (2) that Section 239 of the CBCA is procedural rather than substantive and therefore should not bar the derivative action from continuing here. Both arguments are without merit.

Plaintiffs address Hausman in a single footnote. (Pl's. Br. at 18, n.17.) Plaintiffs argue that because Hausman concerned a requirement under Venezuelan law that the derivative plaintiff obtain the approval of a majority of the Venezuelan company's shareholders prior to commencing the derivative suit -- a requirement not imposed by the CBCA -- that Hausman is inapposite to this case. In essence, Plaintiffs argue that because the specific requirements of Venezuelan law and the CBCA are not identical, the principle enunciated in Hausman,

that a court must follow the internal affairs doctrine and look to the law of the forum of incorporation in [*17] adjudicating claims, is inapplicable. Plaintiffs are simply wrong; the difference between Venezuelan corporate law's majority requirement and the CBCA's requirement that a plaintiff seek leave of a specifically enumerated Canadian court before bringing a derivative action against a Canadian corporation does not diminish the relevance of the principles of the Hausman case to the present facts. n7

n7 While Plaintiffs point to Messinger v. United Canso Oil and Gas, Ltd., 486 F. Supp. 788, 797-98 (D. Conn. 1980), in support of their position, there are multiple grounds to find Hausman far more persuasive authority. Passing for a moment that Hausman is binding and Messinger is not, the Messinger court did not address any conflict of law principles and failed even to mention Hausman. Additionally, because the facts underlying Messinger occurred prior to the enactment of the CBCA, the court noted that "the new statutes are not directly applicable to the instant case" and appeared to consider the new law in an advisory fashion. Id. at 793.

[*18]

Plaintiffs also argue that the leave of court requirement contained in Section 239 of the CBCA is procedural rather than substantive and, therefore, should not act as a bar to continuation of their derivative action before this Court. Plaintiffs cite Woodling v. Garrett Corp., 813 F.2d 543, 551-52 (2d Cir. 1987), for the proposition that choice of law rules are designed only to import another forum's substantive law, not procedural law; however, Plaintiffs have not and, indeed, cannot show that Section 239 of the CBCA is merely procedural.

Relying on an excerpt from a treatise by Dennis H. Peterson, a well-regarded Canadian jurist also cited by Defendants, Plaintiffs attempt to describe Section 239 as procedural:

> The statutory derivative action [CBCA § 239] is a procedural code that allows certain parties in certain conditions to enforce rights or remedies that are otherwise available to the corporation as a question of substantive law.

DENNIS H. PETERSON, SHAREHOLDER REMEDIES IN CANADA § 17.28 (1989). Plaintiffs'

attempt to characterize Section 239 as procedural, which is based solely on the Peterson quote and the previously distinguished [*19] Messinger case, fails for several reasons. n8

> n8 Over three weeks after Defendants submitted their reply brief in this case, Plaintiffs sent to the Court a request to file a sur-reply which actually attached the rather voluminous sur-reply that was the very subject of the request. Pursuant to United States v. International Bus. Mach. Corp., 66 F.R.D. 383, 385 (S.D.N.Y. 1975), I rejected the submission:
>
>> To permit the . . . papers to accompany the request, as they do in the instant case, is to enable the requesting party to accomplish its goal of placing the papers before the court, thereby reducing the question of whether the papers should be accepted for filing to relative unimportance.
>
> See also Travelers Inc. Co. v. Buffalo Reinsurance Co., 735 F. Supp. 492, 495 (S.D.N.Y. 1990), vac'd in part on other grounds, 739 F. Supp. 209 (S.D.N.Y. 1990).
>
> The reply papers offered additional argument on the procedure versus substance question, specifically quoting one of Defendants' experts, Stanley M. Beck. Plaintiffs argue that Mr. Beck unequivocally stated that the CBCA's derivative action provisions are procedural in nature. In 1974, before the CBCA was passed, Mr. Beck wrote that: "some of the matters in [the CBCA's derivative action provisions] . . . are procedural only," "attempts to encourage shareholder litigation and clear the procedural thicket that all but blocks entrance to the courts," and "Professor Rostow has characterized such shareholder actions as 'the most important procedure the law has yet developed to police the internal affairs of corporations." Stanley M. Beck, The Shareholders' Derivative Action, 52 CANADIAN BAR REVIEW 159, 168 (May 1974).
>
> Passing that these papers were stricken, Plaintiffs mischaracterize the meaning of their own quoted selections. Mr. Beck quite obviously does not address any choice of law issues in these quotations, and therefore his comments do not bear on the procedure versus substance argument at hand. Additionally, Plaintiff's carefully chosen quotations are not sufficient to overcome the substantial and detailed Declaration provided by Mr. Beck in support of Defendant's position. (Decl. of Stanley M. Beck, dated May 15, 2005 ("Beck Decl."), PP 1-20.)

[*20]

Initially, interpretation of foreign law falls entirely within the discretion of the Court. As Judge Keenan explained in Rutgerswerke AG & Frendo S.P.A. v. Abex Corp., No. 93 Civ. 2914, 2002 U.S. Dist. LEXIS 9965 (S.D.N.Y. June 4, 2002):

> [HN8] Federal Rule of Civil Procedure 44.1 controls determinations of foreign law in federal court. Rule 44.1 gives a district court wide latitude in resolving issues of foreign law: "The court in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law." Fed. R. Civ. P. 44.1. Because of this latitude, a court may reject even uncontradicted expert testimony and reach its own decisions on the basis of independent examination of foreign legal authorities. See Curtis V. Beatrice Foods Co., 481 F. Supp. 1275, 1285 (S.D.N.Y.), aff'd, 633 F.2d 203 (2d Cir. 1980). Moreover, disagreement among legal experts on content, applicability, [*21] or interpretation of foreign law, as here, does not create genuine issues of material fact for summary judgment purposes. See Banco de Credito Indus., S.A. v. Tesoreria General, 990 F.2d 827, 838 (5th Cir. 1993); Bassis v. Universal Line, S.A., 436 F.2d 64, 68 (2d Cir. 1970); Kashfi v. Phibro-Salomon, Inc., 628 F. Supp. 727, 737 (S.D.N.Y. 1986).

Id. at *16. Plaintiff's singular reference to Mr. Peterson's description of Section 239 of the CBCA as a "procedural code" is insufficient to find the provision procedural rather than substantive for choice of law purposes. Far more informative and persuasive was the Beck Declaration. There, Mr. Beck, who has more than 30 years of

experience in corporate and securities law as a former Canadian law professor and Dean of Osgoode Hall Law School in Toronto, Canada, (Beck. Decl., P 4), described the purpose of Part XX of the CBCA:

> Part XX, Remedies, Offences and Punishment, of the CBCA, ss. 238-252, provides a complete statutory code for shareholders' remedies. Part XX encompasses derivative actions, an oppression remedy, restraining and compliance orders, and summary conviction [*22] offenses for failure to comply or filing false reports. In addition, under the very broad powers given to the court under the oppression remedy section, the court can make an order directing an investigation, ordering the trial of an issue, or ordering the dissolution of the corporation. In addition, Part XX contains with it a complete code for these particular remedies.

(Beck Decl., P 7.) He notes that "common law remedies are completely ousted by the remedial code under Part XX of the CBCA." Id., P 10.) With respect to the leave requirement of Section 239, Mr. Beck states:

> Given the definition of court set out above, under Canadian law with respect to corporations organized under the CBCA, a court other than a court set out in section 2 of the CBCA would lack jurisdiction to entertain a claim under Part XX of the Act, and in particular a derivative action under section 239.

Id. at P 15. Finally, Mr. Beck concludes:

> Canadian courts have consistently held that "matters of internal management of a corporation and questions affecting the status of a corporation" should be determined by the courts in the jurisdiction of the corporation's domicile. [*23] And given the very broad powers vested in the court under both the derivative action and the oppression remedy in Part XX of the CBCA, it is clear under conflicts of laws principles, apart from the very clear definition of court in section 2 of the Canada

Act, that a derivative action and matters arising therefrom are matters for the courts in the corporation's domicile.

Id. at P 20. I find Mr. Beck's Declaration to be a correct statement of Canadian law on these topics.

Further, both the Supreme Court and Court of Appeals have found that [HN9] demand rules in derivative actions are substantive in nature. See Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 96-97, 108-09, 114 L. Ed. 2d 152, 111 S. Ct. 1711 (1991); RCM Sec. Fund, Inc. v. Stanton, 928 F.2d 1318, 1326-27 (2d Cir. 1991). As stated in Hausman, "the issue is not just 'who' may maintain an action or 'how' it will be brought, but 'if' it will be brought." Hausman, 299 F.2d at 701. No determination could be more substantive. Accordingly, the CBCA's leave requirement is "not a mere formality" but rather one of several substantive "statutory preconditions . . . intended to protect the [*24] corporation from undue interference." Charas v. Sand Tech. Sys. Int'l Inc., No. 90 Civ. 5638, 1992 U.S. Dist. LEXIS 15227 at *7 (S.D.N.Y. Oct. 7, 1992).

In sum, I find that the internal affairs doctrine mandates that the law of the forum of incorporation governs Plaintiffs' claims. Nortel is a federally-chartered Canadian corporation, and, therefore, the CBCA controls. Section 239 of the CBCA requires that a plaintiff seek leave of a specifically enumerated Canadian court before proceeding with a derivative action. Plaintiffs did not seek such leave here, and consequently, this Court has no jurisdiction over Plaintiffs' claim.

B. Failure to Afford Reasonable Time to Respond to Demand

[HN10] Pursuant to Section 239(2)(a) of the CBCA, a derivative action cannot be brought unless "the directors of the corporation . . . do not bring, diligently prosecute or defend or discontinue the action." Directors must be allowed a reasonable period of time to decide whether to take the action proposed in a shareholder's demand letter, and a court will not infer that a board has refused to bring an action simply because it has not issued a definitive answer. See Tremblett v. S.C.B. Fisheries, [*25] Ltd., [1993] St. J. No. 2455, 1993 A.C.W.S.J. LEXIS 28013 (Nfl. Supr. Ct. 1993) (shareholder's application for leave to sue denied where board charged with investigating plaintiff's demand needed more time to determine whether legal action was appropriate).

This principle mirrors the law in the United States. [HN11] Fed. R. Civ. P. 23.1 and analogous state law rules require that a demand be made or that shareholders plead with particularity exceptional circumstances that would render a demand futile. See, e.g., Scalisi v. Fund

Asset Mgmt., L.P., 380 F.3d 133, (2d Cir. 2004); Kaster v. Modification Systems, Inc., 731 F.2d 1014 (2d Cir. 1984); RCM, 928 F.2d at 1326; Allison v. Gen. Motors Corp., 604 F. Supp. 1106, 1112 (D. Del.), aff'd, 782 F.2d 1026 (3d Cir. 1985).

Here, Plaintiffs allowed only ten days to elapse between Defendant's response to the Demand Letter and the filing of this Complaint. Defendant received the Demand Letter accompanied by a 111-page draft complaint on July 8, 2004. Defendant's response, dated July 20, 2004, stated [*26] that Defendant would "carefully consider the matters raised in [the] letter and accompanying draft complaint . . . [and] provide a response . . . in due course." (Park Decl., Ex. C, P 2.) The Board then appointed an independent director to investigate the allegations made in the Demand Letter and to analyze whether such a derivative action would be in the company's best interests. (Compl., P 73.) On July 30, 2004, Plaintiffs commenced the derivative action in this Court.

The mere three weeks that Plaintiffs allowed to pass between the Demand Letter and the initiation of this action runs entirely afoul of the cases (both Canadian and United States) considering the appropriate length of time between a demand and the filing of a complaint. Initially, [HN12] the reasonableness of a time period for investigating a demand varies "in direct proportion to the complexity of the technological, quantitative and legal issues raised by the demand." Allison, 604 F. Supp. at 1117-18. Plaintiffs do not cite a single case, Canadian or otherwise, to stand for the proposition that a three-week period between demand letter and complaint is sufficient to investigate the complex financial [*27] and accounting issues at stake here.

In fact, the relevant case law weighs heavily against this notion. See Tremblett, 1993 A.C.W.S.J. LEXIS 28013 at *23-32 (30 days notice not reasonable where board's decision had to consider evolving business consequences); Bellman v. Western Approaches Ltd., (1981), 130 D.L.R. (3d) 193 (B.C.C.A.) (finding that a good faith determination by the board that an action would not be in the best interest of the company "will be a bar to the bringing of a derivative suit by a shareholder"); Mozes on behalf of General Electric Co. v. Welch, 638 F. Supp. 215, 221-22 (D. Conn. 1986) (eight-month period between demand and filing of action deemed insufficient given complexity of legal issues, ongoing internal investigation and parallel criminal investigation); Charal Inv. Co., Inc. v. Rockefeller, 1995 Del. Ch. LEXIS 132, No. Civ. A. 14397, 1995 WL 684869 at *3 (Del. Ch. Nov. 7, 1995) (five-month period deemed insufficient given complicated corporate waste scheme); Recchion v. Kirby, 637 F. Supp. 1309, 1319

(W.D. Pa. 1986) (two-months insufficient given complex securities fraud allegations).

Plaintiffs respond to this line of cases [*28] as they did Section 239's leave requirement. They describe the required interim period between demand letter and complaint as procedural rather than substantive. That argument fails here for the same reason it failed above; the determination of whether or not a derivative action will be brought is entirely substantive.

At oral argument, Plaintiffs also appeared to suggest that the 14-day notice requirement contained in the "conditions precedent" provision of Section 239, Section 239(2)(a)(1), was the only waiting period that the CBCA imposed on a plaintiff in a derivative action. Initially, however, to read the 14-day period as the only requirement would render meaningless the preceding clause which states that "a complainant may apply to a court for leave to bring an action . . . for the purpose of prosecuting, defending or discontinuing the action on behalf of the body corporate." For that clause to have any meaning, a corporation must be afforded reasonable time to evaluate and investigate a shareholder's demand letter. Tremblett, 1993 A.C.W.S.J. LEXIS 28013 at *23-32.

Secondly, in addition to the 14-day requirement, according to Section 239(2)(c), a court must [*29] determine whether it "appears to be in the interests of the corporation or its subsidiary that the [derivative] action be brought, prosecuted, defended or discontinued." As the Nortel Board has taken considerable action since receiving the Plaintiffs' Demand Letter (see pgs. 4-5, supra) and continues to take remedial steps, it is highly doubtful that a Canadian court would have viewed favorably the three-week window that Plaintiffs allowed Defendants between Demand Letter and Complaint, and Plaintiffs may not sidestep that determination by filing their derivative action here.

Accordingly, even if jurisdiction were present in this court, Plaintiffs have failed to satisfy the conditions precedent to filing a derivative action pursuant to Section 239 of the CBCA.

IV. Conclusion

For the reasons set out above, Defendant's motion to dismiss is granted. The Clerk of the Court shall mark this action closed and all pending motions denied as moot.

SO ORDERED.

August ___, 2005

LORETTA A. PRESKA, U.S.D.J.

LEXSEE 2004 U.S. DIST LEXIS 3867

**JAMES S. MULHOLLAND, Jr., Plaintiff, - against - GMZ ASSOCIATES, LTD., Defendant.**

**02 CV 8678 (MP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2004 U.S. Dist. LEXIS 3867*

**March 11, 2004, Decided
March 11, 2004, Filed**

**DISPOSITION:** [*1] Plaintiff's motion for summary judgment granted. Defendant ordered to pay plaintiff damages plus interest.

**LexisNexis(R) Headnotes**

**COUNSEL:** For GMZ Associates, Ltd., Defendant: Robert M. Calica, LEAD ATTORNEY, Rosenberg Calica & Birney LLP, Garden City, NY.

For James S. Mulholland, Jr., Plaintiff: Ronald M. Glick, LEAD ATTORNEY, New York, NY.

**JUDGES:** Honorable Milton Pollack, Senior United States District Judge.

**OPINIONBY:** Milton Pollack

**OPINION:**

### MOTION FOR SUMMARY JUDGMENT

### DECISION AND ORDER

Plaintiff James S. Mullholland, Jr. moves for summary judgment against Defendant GMZ Associates, Ltd. ("GMZ" or "Defendant") upon his claim for the non-payment of four promissory notes. Defendant has indicated that it will not submit an opposition to the motion. Plaintiff has established that there is no genuine issue as to any material fact in this [*2] case. Thus, Plaintiff's motion is granted.

Under New York law, a note is a negotiable instrument if it is signed by the maker and contains an unconditional promise to pay a sum certain in money at a specific time to order. N.Y.U.C.C. § 3-104 (McKinney's 1991); *Cafiero v. Lifton, 1996 U.S. Dist. LEXIS 13949, No. 95 Civ. 5570 (MBM), 1996 WL 539841, at *5* (S.D.N.Y. 1996) (Mukasey, J.). Each of the four promissory notes at issue here was signed by Defendant and contained an unconditional promise to pay $ 25,000, plus interest at 10% per annum, on August 25, 1997, to Plaintiff. The notes are therefore negotiable instruments governed by *Article 3 of the N.Y.U.C.C.*

The promissory notes remain unpaid and this action to collect was timely filed. "In an action on a promissory note upon a showing of no material question concerning execution and default, summary judgment is appropriate." *Royal Bank of Canada v. Mahrle, 818 F. Supp. 60, 62 (S.D.N.Y. 1993)* (Preska, J.); see also *Bankers Trust Co. v. F. D. Rich. Co., 1991 U.S. Dist. LEXIS 14682, No. 90 Civ. 4827, 1991 WL 221091, at *2 (S.D.N.Y. Oct. 16, 1991)* (Wood, J.) ("Under New York law, summary judgment is proper when plaintiff establishes proof [*3] of a note and a defendant's failure to make payment according to its terms.").

Accordingly, Defendant is hereby ordered to pay Plaintiff the amount of $ 100,000 plus interest. As per the terms of the notes, interest shall be calculated at the rate of 10% per annum from September 30, 1996 through August 25, 1997. n1 After that date, interest is to be calculated at the statutory rate of 9% per annum. N.Y. Civ. Prac. L. & R. 5004 (McKinney 1992); see *Cafiero, 1996 U.S. Dist. LEXIS 13949, 1996 WL 539841, at *7.* According to New York law, interest at the statutory rate accrues "on unpaid interest and principal payments awarded from the date each payment became due under the terms of the promissory note to the date liability is established." *Spodek v. Park Property Development Assocs., 96 N.Y. 2d 577, 581, 759 N.E.2d 760, 733 N.Y.S.2d 674 (2001).* Thus, interest shall be computed at the rate of 9% per annum on the amount of the notes plus the interest that had accumulated as of the maturity date, from August 26, 1997 until the date of judgment.

2004 U.S. Dist. LEXIS 3867, *

n1 There is some confusion as to when the promissory notes were issued, but Plaintiff concedes in his brief that he is only seeking to collect interest from September 30, 1996 ("In so far as interest ... might be due from an earlier date is [sic] waived in connection with granting of the motion." Pl. Br. at 6). There is no dispute that Plaintiff is owed interest from at least that date.

[*4]

Enter judgment hereon accordingly. The Clerk is directed to close the file therein.

So Ordered.
Dated: March 11, 2004

The Honorable Milton Pollack

Senior United States District Judge

*Laws of Bermuda*

**BERMUDA STATUTORY INSTRUMENT**

**GN 470/1985**

**RULES OF THE SUPREME COURT 1985**

[*made under section 62 of the Supreme Court Act 1905 [title 8 item 1] and brought into operation on 4 January 1988*]

ARRANGEMENT OF ORDERS IN THESE RULES OF COURT

PRELIMINARY

Order 1   Citation, commencement, application, interpretation, forms, and revocation

Order 2   Effect of non-compliance

Order 3   Time

COMMENCEMENT AND PROGRESS OF PROCEEDINGS

Order 4   Consolidation of proceedings

Order 5   Mode of beginning civil proceedings in the Court

Order 6   Writ of summons: General provisions

Order 7   Originating summons: General provisions

Order 8   Originating and other motions: General provisions

Order 9   Petitions: General provisions

Order 10   Service of originating process: General provisions

Order 11   Service of process, etc. out of the jurisdiction

Order 12   Entry of appearance to writ or originating summons

Order 13   Default of appearance to writ

## RULES OF THE SUPREME COURT 1985

Order 14 | Summary judgment
Order 15 | Causes of action, counterclaims and parties
Order 16 | Third party and similar proceedings
Order 17 | Interpleader
Order 18 | Pleadings
Order 19 | Default of pleadings
Order 20 | Amendment
Order 21 | Withdrawal and discontinuance
Order 22 | Payment into and out of court
Order 23 | Security for costs
Order 24 | Discovery and inspection of documents
Order 25 | Summons for directions
Order 26 | Interrogatories
Order 27 | Admissions
Order 28 | Originating summons procedure
Order 29 | Interlocutory injunctions, interim preservation of property; interim payments, etc
Order 30 | Receivers
Order 31 | Sales, etc. of land by order of Court
Order 32 | Applications and proceedings in Chambers

TRIAL

Order 33 | Mode of trial

Order 34 | Setting down for trial action begun by writ
Order 35 | Proceedings at trial
Order 36 | Trials before, and inquiries by, special referees
Order 37 | Assessment of damages by the Registrar
Order 38 | Evidence
Order 39 | Evidence by deposition
Order 40 | Court expert
Order 41 | Affidavits

JUDGMENTS AND ORDERS

Order 42 | Judgments and orders
Order 43 | Accounts and inquiries
Order 44 | Proceedings under judgments and orders: in Chancery jurisdiction

ENFORCEMENT OF JUDGMENTS AND ORDERS

Order 45 | Enforcement of judgments and orders: General
Order 46 | Writs of execution: General
Order 47 | Writs of *fieri facias*
Order 48 | Examination of judgment debtor, etc
Order 49 | Garnishee proceedings
Order 50 | [*blank*]

**Title 8
Item 1(a)**

Order 51    Receivers: Equi-
           table execution
Order 52    Committal

APPEALS TO SUPREME
COURT ETC.

Orders 53 and 54

[*blank*]

Order 55      Appeals to
Supreme Court
from court,
tribunal or person:
General

Orders 56 and 57 [*blank*]

Order 58      Appeals from Reg-
istrar

Orders 59 to 61      [*blank*]

COSTS

Order 62      Costs

GENERAL ADMINISTRATIVE
PROVISIONS

Order 63      Registry of the
Supreme Court

Order 64      Office hours

Order 65      Service of docu-
ments

Order 66      Paper, printing,
notices and copies

Order 67      Change of attorney

Order 68      [*blank*]

PROVISIONS AS TO FOREIGN
PROCEEDINGS

Order 69      Service of foreign
process

Order 70      Obtaining evidence
for foreign courts,
etc

Order 71      [*blank*]

Order 72      [*blank*]

SPECIAL PROVISIONS AS TO
PARTICULAR PROCEEDINGS

Order 73      Arbitration pro-
ceedings

Order 74      [*blank*]

Order 75      Admiralty pro-
ceedings

Order 76      Contentious pro-
bate proceedings

Order 77      Proceedings by
and against the
Crown

Orders 78 and 79

[*blank*]

Order 80      Disability

Order 81      Partners

Order 82      Defamation ac-
tions

Orders 83 and 84      [*blank*]

Order 85      Administration
and similar actions

Order 86      Actions for specific
performance, etc:
Summary judg-
ment

Order 87      [*blank*]

Order 88      Mortgage actions

Order 89      Proceedings under
the Law Reform
(Husband and
Wife) Act 1977

Order 90      Proceedings relat-
ing to infants

Order 91      [*blank*]

Order 92      Lodgment, Invest-
ment, etc. of
Funds in Court

Order 93      Application under
section 48 of the
Trustee Act 1975

Orders 94 to 98      [*blank*]

## RULES OF THE SUPREME COURT 1985

| | | | |
|---|---|---|---|
| Order 99 | The Succession Act 1974 | Order 115A | Confiscation and forfeiture in connection with criminal proceedings |
| Order 100 | The Trade Marks Act 1974 | | |
| Order 101 | [blank] | | |
| Order 102 | The Companies Act 1981 | Order 116 | References under section 53(2) of the Stamp Duties Act 1976 |
| Orders 103 to 112 [blank] | | | |
| Order 113 | Summary proceedings for possession of land | Order 117 | Proceedings under the Law Reform (Miscellaneous Provisions)(No. 2) Act 1977 |
| Order 114 | Fundamental rights and freedoms proceedings | | |
| Order 115 | Proceedings under the Life Insurance Act 1978 | | APPENDICES |
| | | | Appendix A Forms |
| | | | Appendix B Special Admiralty Forms |

## PRELIMINARY

### ORDER 1

CITATION, COMMENCEMENT, APPLICATION, INTERPRETATION, FORMS AND REVOCATION

### 1/1 Citation, commencement and revocation

1    (1)    These Rules may be cited as the Rules of the Supreme Court 1985 and shall come into operation on such day as the Chief Justice may appoint by notice published in the Gazette.

(2)    On the date on which these Rules come into operation the Rules of the Supreme Court 1952 shall be revoked.

### 1/2 Application

2    (1)    Subject to the following provisions of this rule, these Rules shall have effect in relation to all proceedings in the Supreme Court.

(2)    These Rules shall not have effect in relation to proceedings of the kinds specified in the first column of the following Table (being

---

ORDER 14

SUMMARY JUDGMENT

**14/1    Application by plaintiff for summary judgment**
1        (1)    Where in an action to which this rule applies a statement of
claim has been served on a defendant and that defendant has entered an
appearance in the action, the plaintiff may, on the ground that the de-
fendant has no defence to a claim included in the writ, or to a particular
part of such a claim, or has no defence to such a claim or part except as
to the amount of any damages claimed, apply to the Court for judgment
against that defendant.

        (2)    Subject to paragraph (3), this rule applies to every action
begun by writ other than one which includes—

                (a) a claim by the plaintiff for libel, slander, malicious pros-
                    ecution or false imprisonment,

                (b) a claim by the plaintiff based on an allegation of fraud,

                (c) an Admiralty action *in rem*.

        (3)    This Order shall not apply to an action to which Order 86
applies.

**14/2    Manner in which application under Rule 1 must be made**
2        (1)    An application under rule 1 must be made by summons
supported by an affidavit verifying the facts on which the claim, or the
part of a claim, to which the application relates is based and stating that
in the deponent's belief there is no defence to that claim or part, as the
case may be, or no defence except as to the amount of any damages
claimed.

        (2)    Unless the Court otherwise directs, an affidavit for the pur-
poses of this rule may contain statements of information or belief with
the sources and grounds thereof.

        (3)    The summons, a copy of the affidavit in support and of any
exhibits referred to therein must be served on the defendant not less
than ten clear days before the return day.

**14/3    Judgment for plaintiff**
3        (1)    Unless on the hearing of an application under rule 1 either
the Court dismisses the application or the defendant satisfies the Court
with respect to the claim, or the part of a claim, to which the application
relates that there is an issue or question in dispute which ought to be
tried or that there ought for some other reason to be a trial of that claim

---

**RULES OF THE SUPREME COURT 1985**

or part, the Court may give such judgment for the plaintiff against that defendant on that claim or part as may be just having regard to the nature of the remedy or relief claimed.

(2)   The Court may by order and subject to such conditions, if any, as may be just, stay execution of any judgment given against a defendant under this rule until after the trial of any counterclaim made or raised by the defendant in the action.

**14/4     Leave to defend**
4      (1)   A defendant may show cause against an application under rule 1 by affidavit or otherwise to the satisfaction of the Court.

(2)   Rule 2(2) applies for the purposes of this rule as it applies for the purposes of that rule.

(3)   The Court may give a defendant against whom such an application is made leave to defend the action with respect to the claim, or the part of a claim, to which the application relates either unconditionally or on such terms as to giving security or time or mode of trial or otherwise as it thinks fit.

(4)   On the hearing of such an application the Court may order a defendant showing cause or, where that defendant is a body corporate, any director, manager, secretary or other similar officer thereof, or any person purporting to act in any such capacity—

(a) to produce any document;

(b) if it appears to the Court that there are special circumstances which make it desirable that he should do so, to attend and be examined on oath.

**14/5     Application for summary judgment on counterclaim**
5      (1)   Where a defendant to an action begun by writ has served a counterclaim on the plaintiff, then, subject to paragraph (3), the defendant may, on the ground that the plaintiff has no defence to a claim made in the counterclaim, or to a particular part of such a claim, apply to the Court for judgment against the plaintiff on that claim or part.

(2)   Rules 2, 3 and 4 shall apply in relation to an application under this rule as they apply in relation to an application under rule 1 but with the following modifications, that is to say—

(a) references to the plaintiff and defendant shall be con-

**38**                                                      *1989 Revision*

strued as references to the defendant and plaintiff respectively;

(b) the words in rule 3(2) "any counterclaim made or raised by the defendant in" shall be omitted; and

(c) the reference in rule 4(3) to the action shall be construed as a reference to the counterclaim to which the application under this rule relates.

(3)   This rule shall not apply to a counterclaim which includes any such claim as is referred to in rule 1(2).

**14/6   Directions**

6       (1)   Where the Court—

(a) orders that a defendant or a plaintiff have leave (whether conditional or unconditional) to defend an action or counterclaim, as the case may be, with respect to a claim or a part of a claim, or

(b) gives judgment for plaintiff or a defendant on a claim or part of a claim but also orders that execution of the judgment be stayed pending the trial of a counterclaim or of the action, as the case may be,

the Court shall give directions as to the further conduct of the action, and Order 25, rules 2 to 7, shall, with the omission of so much of rule 7(1) as requires parties to serve a notice specifying the orders and directions which they require and with any other necessary modifications, apply as if the application under rule 1 of this Order or rule 5 thereof, as the case may be, on which the order was made were a summons for directions.

(2)   In particular, and if the parties consent, the Court may direct that the claim in question and any other claim in the action be tried by the Registrar under the provisions of these Rules relating to the trial of causes or matters or questions or issues by the Registrar.

**14/7   Costs**

7       (1)   If the plaintiff makes an application under rule 1 where the case is not within this Order or if it appears to the Court that the plaintiff knew that the defendant relied on a contention which would entitle him to unconditional leave to defend then, without prejudice to Order 62, and, in particular, to rule 4(1) thereof, the Court may dismiss the application with costs and may require the costs to be paid by him forthwith.

(2)   The Court shall have the same power to dismiss an application under rule 5 as it has under paragraph (1) to dismiss an applica-

**RULES OF THE SUPREME COURT 1985**

tion under rule 1, and that paragraph shall apply accordingly with the necessary modifications.

**14/8    Right to proceed with residue of action or counterclaim**

8        (1)    Where on an application under rule 1 the plaintiff obtains judgment on a claim or a part of a claim against any defendant, he may proceed with the action as respects any other claim or as respects the remainder of the claim or against any other defendant.

        (2)    Where on an application under rule 5 a defendant obtains judgment on a claim or part of a claim made in a counterclaim against the plaintiff, he may proceed with the counterclaim as respects any other claim or as respects the remainder of the claim or against any other defendant to the counter claim.

**14/9    Judgment for delivery up of chattel**

9        Where the claim to which an application under rule 1 or rule 5 relates is for the delivery up of a specified chattel and the Court gives judgment under this Order for the applicant, it shall have the same power to order the party against whom judgment is given to deliver up the chattel without giving him an option to retain it on paying the assessed value thereof as if the judgment had been given after trial.

**14/10    Relief against forfeiture**

10        A tenant shall have the same right to apply for relief after judgment for possession of land on the ground of forfeiture for non-payment of rent has been given under this Order as if the judgment had been given after the trial.

**14/11    Setting aside judgment**

11        Any judgment given against a party who does not appear at the hearing of an application under rule 1 or rule 5 may be set aside or varied by the Court on such terms as it thinks just.

LEXSEE

SHERMAN, LLC, Plaintiff, v. DCI TELECOMMUNICATIONS, INC., Defendant.

01 Civ. 2907 (BSJ)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2002 U.S. Dist. LEXIS 19081

October 4, 2002, Decided
October 8, 2002, Filed

**SUBSEQUENT HISTORY:** Related proceeding at
Sherman, LLC v. DCI Telcoms., Inc., 2003 U.S. Dist.
LEXIS 12458 (S.D.N.Y., July 21, 2003)

**DISPOSITION:** [*1] Plaintiff's motion for summary
judgment granted. Defendant's motion for leave to
amend answer denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff note holder
brought an action against defendant promisor to recover
the unpaid balance due under a promissory note executed
in 2000. The note holder filed a motion for summary
judgment. The promisor argued that the note was an un-
enforceable penalty resulting from the liquidated dam-
ages provisions of two previous agreements. The promi-
sor also filed a motion for leave to amend its answer to
the amended complaint.

**OVERVIEW:** The promisor did not dispute executing
the note and that it had not made payment. It argued that
the note reflected debt that it incurred through a 1998
stock purchase transaction with a note holder affiliate. A
1999 promissory note had included a new loan, and
amounts due as liquidated damages under 1998 stock
transaction. In 2000, an affiliate of the note holder as-
sumed the liquidated damages amount and the promisor
executed a new note, replacing the 1999 note. That 2000
note was the subject of the action and it did not relate to
the 1998 agreements. The argument that the promisor
could have assigned the debt to the affiliate if it had not
incurred debt under the 1998 agreements was specula-
tive. Because the note was unrelated to the validity of the
prior agreements, additional discovery would not create
issues of material fact. The motion to amend the answer
was filed nine months after the motion for summary
judgment and raised numerous counterclaims and new

issues that would unduly delay the action. And, the pro-
posed affirmative defenses and counterclaims related
solely to prior stock purchase agreements, which were
unrelated and irrelevant to the validity of the note at is-
sue.

**OUTCOME:** The note holder's motion for summary
judgment was granted. The promisor's motion for leave
to amend its answer was denied.

**CORE TERMS:** summary judgment, liquidated dam-
ages, unenforceable, discovery, promissory note, preju-
dicial, counterclaims, subsidiary, affiliate, matured, de-
fault, entitled to summary judgment, proposed amend-
ment, prima facie case, material fact, unenforceability,
speculative, belated, defeat, stock purchase, new loan,
undisputed, unrelated, stock

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Summary
Judgment Standard*
[HN1] Summary judgment may not be granted unless the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any,
show there is no genuine issue as to any material fact and
that the moving party is entitled to summary judgment as
a matter of law. Fed. R. Civ. P. 56(c). Summary judg-
ment is inappropriate if a dispute exists about a material
fact such that a reasonable jury could return a verdict for
the nonmoving party. A party cannot defeat a motion for
summary judgment, however, by offering evidence that
is merely speculative.

*Contracts Law > Breach > Causes of Action*
*Civil Procedure > Summary Judgment > Summary
Judgment Standard*

[HN2] An action to enforce a promissory note is appropriate for summary judgment.

*Commercial Law (UCC) > Negotiable Instruments (Article 3) > Enforcement of Instruments*
[HN3] A promissory note stands on its own - the note alone establishes the a plaintiff's right to payment. To establish a prima facie case for recovery, the plaintiff must simply provide evidence of the note and proof of the defendant's failure to make payment.

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN4] A motion for summary judgment will not be defeated merely on the basis of conjecture or surmise.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
[HN5] A proposed amendment to the pleadings is particularly prejudicial when the party has already completed and served a motion for summary judgment.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
[HN6] Leave to amend pleadings need not be granted where the proposed amendment would be futile.

**COUNSEL:** For Sherman, LLC, PLAINTIFF: Harris N Cogan, Blank, Rome, Tenzer, Greenblatt, LLP, New York, NY USA.

For DCI Telecommunications, Inc, DEFENDANT: Robert A Horowitz, Greenberg Traurig, LLP, New York, NY USA. John Francis Desantis, Greenberg, Traurig, LLP, New York, NY USA.

**JUDGES:** BARBARA S. JONES, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** BARBARA S. JONES

**OPINION:**

**Memorandum & Order**

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

Plaintiff Sherman, LLC ("Sherman") brought this action against Defendant DCI Telecommunications, Inc. ("DCI") to recover unpaid principal in the amount of $ 1,000,000, plus interest, pursuant to a May 31, 2000 Promissory Note. Sherman contends that, under the "events of default" provision in the Note, DCI defaulted when one of DCI's subsidiaries, Edge Communications, filed a bankruptcy proceeding.

Sherman moves for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(c). In DCI's opposition to the motion, DCI asserted four arguments: (1) the Note is an unenforceable penalty resulting from [*2] the liquidated damages provisions of two previous agreements; (2) the term "subsidiary" in the "event of default" provision of the Note is vague and ambiguous; (3) Sherman waived, or is estopped from asserting, a default based on the bankruptcy of Edge Communications; and (4) material issues of fact exist that require additional discovery.

The parties' papers relating to this motion were fully submitted as of November 19, 2001. On May 31, 2002 the Note matured. In a subsequent Stipulation, dated June 11, 2002, the parties agreed that the only remaining issue for the Court to determine on this motion is whether the Note is an enforceable contract. Pursuant to the Stipulation and Order, Sherman's motion for summary judgment was deemed amended to reflect that fact. Sherman filed an Amended Complaint on June 19, 2002. DCI was given twenty days from the date of service of the Amended Complaint to serve any additional papers on the amended motion for summary judgment. DCI did not file any papers within those twenty days.

On August 22, 2002, however, DCI filed a motion for leave to amend its answer to the amended complaint, which asserts new affirmative defenses and counterclaims and adds [*3] four additional parties. For the reasons to follow, this Court grants Summary Judgment to the Plaintiff and denies Defendant's motion for leave to amend.

Standard of Summary Judgment

[HN1] Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). Summary judgment is inappropriate if a dispute exists about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. at 248. A party cannot defeat a motion for summary judgment, however, by offering evidence that is merely speculative. See Sun Forest Corp. v. Shvili, 152 F. Supp. 2d 367, 390 (S.D.N.Y. 2001). [HN2] An action to enforce a promissory note is appropriate for summary judgment. See Cavendish Traders Ltd. V. Nice Skate Shoes, Ltd., 117 F. Supp. 2d 394, 398 (S.D.N.Y. 2000). [*4]

Background

Defendant asserts that the Note reflects debt that DCI incurred through a 1998 stock purchase transaction with a Sherman affiliate. It is undisputed that in April of 1998, the parties executed two agreements to govern this stock transaction, the "Stock Subscription Agreement" and the "Registration Agreement" (collectively, the "1998 Agreements"). Each agreement contained a liquidated damages provision, which compensated Sherman for DCI's failure to deliver converted shares and for DCI's failure to timely register unredeemed stock. DCI incurred $ 1,348,605 of debt to Sherman pursuant to these liquidated damages provisions. It is also undisputed that on November 19, 1999 Sherman and DCI executed a Loan Agreement. Pursuant to the Loan Agreement, the parties signed an initial promissory note in December of 1999 in favor of Sherman for a total of $ 2,348,605. This amount consisted of a new loan to DCI for $ 1,000,000 and the $ 1,348,605 that DCI owed to Sherman as liquidated damages. On May 30, 2000, DCI and an affiliate of Sherman, Tanner's Restaurant Group ("TRG"), entered an agreement in which TRG assumed $ 1,348,605 of DCI's debt in exchange for the shares of one [*5] of DCI's subsidiaries. The Note that is the subject of this motion is dated May 31, 2000 and replaced the December note.

The Enforceability of the Note

[HN3] A promissory note stands on its own - the note alone establishes the Plaintiff's right to payment. See U.S. Russia Investment Fund v. Neal & Co., Inc., 1998 U.S. Dist. LEXIS 13581, No. 97 Civ. 178, 1998 WL 557606 *7 (S.D.N.Y. Sept. 2, 1998). To establish a prima facie case for recovery, Sherman must simply provide evidence of the Note and proof of DCI's failure to make payment. See id.; Manufacturers Hanover Trust Co. v. Jayhawk Associates, 766 F. Supp. 124, 125 (S.D.N.Y. 1991). Sherman has demonstrated, and DCI does not dispute, that the parties executed the Note and that DCI has not met its payment obligation since the Note matured on May 31, 2002. Accordingly, Sherman has established a prima facie case that it is entitled to payment under the Note. The burden now shifts to DCI to provide specific evidence to demonstrate that a material issue of fact exists. Fed. R. Civ. P. 56(e); Celotex Corp v. Catrett, 477 U.S. 317, 325-26, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).

Although it does not dispute [*6] the validity of the Note on its face, DCI asserts that the Note is unenforceable because it evidences unenforceable penalties that DCI incurred through the 1998 Agreements. Even if, however, the liquidation clauses were unenforceable in the 1998 Agreements, the proposed link between the unenforceability of those provisions and the Note is a tenuous one. See Nat'l School Reporting Services, Inc.,

v. Nat'l Schools of California, 967 F. Supp. 127, 130 (S.D.N.Y. 1997) (granting summary judgment notwithstanding defendant's argument of an unlawful underlying document). The underlying document that directly relates to the Note is the November 1999 Loan Agreement, not the 1998 Agreements with the liquidated damages provisions. The Loan Agreement, as Defendant does not dispute, consists of two separate debts: $ 1,000,000 for the new loan and $ 1,348,605 for damages under the 1998 Agreements. The initial December note also evidenced DCI's separate obligations by delineating the $ 1,000,000 as the "New Holder Loan" and the $ 1,348,605 as the "Preferred Shares Amount."

The damages arising from the 1998 investment are not the subject of the May 2000 Note. Those damages [*7] were assumed by TRG -- in their exact amount -- by the agreement on May 30, 2000. Accordingly, the Note is traceable to the loan of $ 1,000,000 and not to the April 1998 Agreements. DCI's assertion that it could have assigned the $ 1,000,000 debt to TRG if it had not incurred debt under the 1998 Agreements is speculative and cannot defeat Sherman's motion for summary judgment. See Trans Sport, Inc. v. Starter Sportswear, Inc., 964 F.2d 186, 188 (2d Cir. 1992) [HN4] ("motion will not be defeated merely on the basis of conjecture or surmise").

DCI also asserted that the Court should deny Plaintiff's motion as premature because DCI needed additional discovery to further establish that its prior agreements with Sherman make the Note unenforceable. Because this Court finds that the Note is unrelated to the unenforceability of any of these prior agreements, additional discovery will not create a genuine issue of material fact.

Sherman has established that the parties executed the Note and, as the parties have stipulated, that the Note has matured and DCI has not paid any of the principle due on the Note. Accordingly, Plaintiff is entitled to summary judgment.

DCI's Motion [*8] for Leave to Amend its Answer

Pursuant to the Stipulation and Order, DCI was to serve any additional papers on the amended motion for summary judgment within twenty days of June 19, 2002, the date Sherman served its Amended Complaint. DCI did not serve any papers within those twenty days. Then, on August 22, 2002, nine months after Sherman filed its motion for summary judgment, DCI filed its Motion for Leave to Amend its Answer to the Amended Complaint.

Because the motion for summary judgment was fully submitted for several months before DCI submitted its motion, DCI's belated motion is prejudicial to Sherman. See Ansam Associates, Inc. v. Cola Petroleum, Ltd., 760 F.2d 442, 446 (2d Cir. 1985) (upholding

denial of leave as especially prejudicial when discovery completed and summary judgment motion filed); Classicberry Ltd. V. Musicmaker.Com, Inc., 2001 U.S. Dist. LEXIS 21716, No. 01 Civ. 1756, 2001 WL 1658241, *3 (S.D.N.Y. Dec. 26, 2001) [HN5] ("A proposed amendment is particularly prejudicial when the party has already completed and served a motion for summary judgment"). The belated motion also introduces numerous counterclaims and new issues that would unduly delay the course [*9] of the proceedings. See Grace v. Rosenstock, 228 F.3d 40, 53 (2d Cir. 2000).

Moreover, DCI's proposed affirmative defenses and counterclaims relate solely to prior stock purchase agreements between DCI and Sherman affiliates. As this Court has concluded, prior agreements in 1997 or 1998 are unrelated and irrelevant to the validity of the Note in this action. See Pan American World Airways, Inc. V. Eclipse Holdings, Inc., 1998 U.S. Dist. LEXIS 5871, No. 95 Civ. 2763, 1998 WL 205313 *4 (S.D.N.Y. April 27, 1998) [HN6] ("leave to amend need not be granted where the proposed amendment would be futile") (citing

Advanced Magnetics, Inc. v. Bayfront Partners, Inc., 106 F.3d 11, 18 (2d Cir. 1997)). Further, DCI will not be prejudiced by denial of its motion because DCI can file its claims in a separate action. Accordingly, DCI's motion for leave to amend is denied.

Conclusion

Plaintiff's motion for summary judgment is granted. The Court directs Plaintiff to submit a proposed judgment on or before October 18, 2002. Defendant's motion for leave to amend its answer to Plaintiff's amended complaint is denied.

**SO ORDERED:**

**BARBARA S. JONES**

**UNITED [*10] STATES DISTRICT JUDGE**

Dated: New York, New York

October 4, 2002

IN THE COURT OF APPEAL FOR BERMUDA

CIVIL APPEAL NO. 24 OF 1993

BETWEEN:                LLEWELLYN SOMERSALL       Appellant

and

THE BANK OF BERMUDA LIMITED      Respondent

Before:    Roberts, P.
          **Huggins**, J.A.
          Georges, J.A.

Date of Hearing:  14th and 15th June, 1994.
Date of Judgment: 1st July, 1994.

### J U D G M E N T

Huggins. J.A.

    In Order 14 proceedings the Chief Justice gave leave to the respondent bank to enter judgment against the Appellant for moneys due under a promissory note and upon an overdraft, respectively made by and granted to the Appellant and the Third Parties.  The appellant contends before this court that the Chief Justice wrongly held that there was no arguable **defence** to the action.

    The Third Parties wished to buy accommodation in a condominium and, for that purpose, needed additional finance.  They applied to the bank for a loan, but the bank declined to assist them unless the loan was secured.  There is no suggestion that the bank or any of its officers induced the  Third Parties to purchase the **property,** but it transpired that the bank officer who dealt with the Appellant's application had a 10% interest in the condominium. The Third Parties invited the Appellant to support their application for their loan, and he agreed to do so.  Again, there is no suggestion that the bank or its officer induced the Appellant to go to the aid of the third parties.  In the event, the Appellant executed two documents jointly with the Third Parties.  The first was a promissory note for **$125,000.00,** with interest at 7% per annum and an administration fee of 2% per annum.  The second was a

- 2 -

joint account mandate under which the account holders agreed that they would be jointly and severally liable for any overdraft which might from **time to time** be created on that account. A substantial overdraft was subsequently created and drawn upon.  The bank eventually demanded repayment and, repayment not having been made, brought the present action to recover the outstanding moneys from the Appellant.

The contention of the Appellant is that the transactions between him and the bank were vitiated by non-disclosure by the bank that their officer had an interest in the condominium:  it is said that the bank was fixed with knowledge of that interest and that it had a duty to disclose it, for the Appellant would have instituted further inquiries before executing the documents had he known the full facts.

**It** is, of course, true that the bank officer would receive a benefit from the sale of the property, but, in the absence of any agreement between the officer and the Third Parties to the detriment of the Appellant, I cannot see that the existence of his interest prejudiced the Appellant in **any way**.  The **most** that could be expected was disclosure of all material facts, "i.e. all facts which if disclosed would tend to incline a prudent proposed surety to decline to enter into such a contract, or would tend to persuade him to ask for a greater reward for it than had previously been proposed" (see Spencer Bower on The Law **Relating** to Actionable Non-disclosure (2nd Edition) 157 (8.06)).  The latter part of that explanation is not relevant to the present case, whilst the interest of the bank officer could not have made a reasonably prudent man disinclined to enter into a contract:  it did not increase the risk that the Third Parties would default or decrease the benefit that the Appellant was to receive.  The Appellant says that, had he been told of the officer's interest, he would have made further inquiries whether it was appropriate to support the application.  To that Mr. Elkinson for the Respondent cites the

- 3 -

words of Lord Halsbury, L. C. in **Seaton -v- Burnand** (1900)
A.C. 135, 140:

> "Of course, what people persuade themselves they
> would or would not have done when a liability has
> arisen, is a thing with which one is sufficiently
> familiar in courts of law.  If goods which have been
> contracted for go up or down in the market, one has
> heard of very strange evidence about what induced
> people not to take the goods;  and in the same way,
> when it has turned out that this guarantee is to be
> sued upon, people convince themselves in a very odd
> way as to what would have affected their minds if
> they had known **it at the time**".

It is then submitted that the Appellant was in reality a
guarantor notwithstanding the form of the documents which he
executed.  I do not think the argument is tenable:  whatever had
been in his contemplation before he signed the relevant documents,
he clearly assumed a primary liability to the bank, and this case
is distinguishable from Heald -v- O'Connor (1971) 1 W.L.R. 497.

It is urged that the Appellant was induced to enter into the
contracts by misrepresentations by the bank as to the liabilities
of the Third Parties.  This objection is based upon the fact that
the bank officer showed to the Appellant the original personal loan
application form which had been signed by'the Third Parties.  Into
that form the Third Parties had apparently not entered either their
monthly commitments to pay rent or an existing liability to another
bank.  I accept that leaving a blank constituted a representation
by the signatories (the Third Parties) to the bank that they had no
such commitment or liability, but there was no representation by
the bank to the Appellant that the facts set out in the application
were true.  The officer was not alleged to have vouched for their
accuracy.  It is significant that the loan application form which
was subsequently signed by the Appellant and the Third Parties
together equally left the same spaces blank.

As to the overdraft, the Appellant complains that he was not
told that the facility which he had joined in applying for was
continued beyond the date specified in the form of application as
the date of expiry.  Had the form of application stood alone there

-4 -

might have been much force in that complaint, but it did not:
the Appellant had signed a joint account mandate which
expressly provided:

> "Any loan or overdraft which may from time to time be
> created on any such account shall be our joint and several
> liability".

The expiry date inserted in the application form was merely an
indication of what the parties expected, for the terms and
conditions set out in the form provided that the bank could require
payment before the expiry date and it was obviously open to the
bank to extend the facility if it saw fit.  Any extension would in
no way prejudice the Appellant, who could have fulfilled his
express obligations on the due date if he had so desired. By
failing to do so, he impliedly consented to the continuance of the
facility.  There was not in this case, as in Stiff -v- The Local
Board of Eastbourne (1869) 20 L.T. 339, an agreement, kept secret
from the party sued, which had the effect of altering his
liability.

Much has been made of the fact that everyone involved in these
transactions was aware that the Appellant had not received directly
any part of the moneys lent by the bank:  they were expressly lent
to enable the Third Parties to buy the property.  The Appellant
must be assumed to have thought that there was adequate
consideration for his assuming the liability he did voluntarily
assume.

In my view the Chief Justice came to the right decision and the
appeal should be dismissed.

It was pointed out by counsel for the Respondent that no order
had been made upon a counterclaim, and he submitted that, if the
appeal were dismissed, we should strike out the counterclaim.  The
counterclaim was for damages for negligence and non-disclosure and
was based upon various paragraphs of the Defence.  Having regard to

- 5 -

what I have already said, I agree with counsel's proposition and, as we have power to make any order which ought to have been made in the court below, I would dismiss the counterclaim.

Alan Huggins, J.A.

Duncan                                              for the Appellant
Elkinson                                            for the Respondent

I have read in Draft the judgment of **Huggins**, J.A.    I agree with its reasoning and its conclusions **and have nothing to add.**

Telford Georges, J.A.