UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

Gregory V. Serio, Superintendent of Insurance : 04 CV 3361 (KMK)
of the State of New York, as Rehabilitator of :
FRONTIER INSURANCE COMPANY, and as :
Assignee of PLATINUM INDEMNITY, LTD., : **PLAINTIFF'S LOCAL**
: **RULE 56.1 STATEMENT**
                              Plaintiff, :
:
                -against- :
:
DWIGHT HALVORSON INSURANCE :
SERVICES, INC. d/b/a/ F.S.I.M. INSURANCE :
SERVICES and FOOD SERVICE INSURANCE :
MANAGERS, INC., :
:
                          Defendants. :
:
----------------------------------------------------------------x

       Plaintiff Gregory V. Serio, Superintendent of Insurance of the State of New York, as Rehabilitator of Frontier Insurance Company ("FIC") and Assignee of Platinum Indemnity, Ltd. ("Platinum"), pursuant to Local Civil Rule 56.1 of the United States District Courts for the Southern and Eastern Districts of New York, respectfully submits the following statement of undisputed material facts in support of his motion for partial summary judgment against defendant Food Service Insurance Managers, Inc. ("FSIM") with respect to Count IV of the Complaint:

### The Parties

       1.     FIC is an insurance company organized and existing under the laws of the State of New York. See Complaint, ¶ 9; Answer, ¶ 9.

       2.     Based in Rock Hill, New York, FIC served as the fronting carrier for the insurance program giving rise to this dispute. See Complaint, ¶¶ 9, 35-38.

3. On August 24, 2001, the Superintendent initiated proceedings in the Supreme Court of the State of New York, New York County, seeking an order placing FIC into rehabilitation pursuant to Article 74 of the New York Insurance Law. Id., ¶ 10.

4. On August 27, 2001, the Supreme Court appointed the Superintendent as temporary receiver of FIC. Id., ¶ 11.

5. The Supreme Court entered an Order of Rehabilitation with respect to FIC on October 15, 2001. Id., ¶ 12.

6. In its October 15, 2001 Order, the Supreme Court appointed the Superintendent as Rehabilitator of FIC, declared FIC insolvent and found that "[i]t is in the best interest of Frontier's policyholders, creditors and the general public that the Superintendent be directed to take possession of Frontier's property and to rehabilitate its business and affairs[.]" Id.

7. FSIM is a corporate entity organized and existing under the laws of the State of California. Id., ¶ 17; Answer, ¶ 17.

8. Based in Roseville, California during the time period relevant to this dispute, FSIM was engaged in the business of securing workers' compensation insurance coverage for businesses in the agribusiness and food-related industries. See Complaint, ¶¶ 18-19; Answer, ¶ 19.

9. Platinum was a corporate entity organized and existing under the laws of the Island of Bermuda. See Complaint, ¶ 34; Answer, ¶ 34.

10. Maintaining its principal place of business in Hamilton, Bermuda, Platinum was the rent-a-captive reinsurer for the workers' compensation program giving rise to

this dispute. See Complaint, ¶¶ 33-34; Answer, ¶ 34; Declaration of Andrew McComb ("McComb Decl.") at ¶¶ 5, 22.

11. Defendant Dwight Halvorson Insurance Services, Inc. ("DHIS") is a corporate entity organized and existing under the laws of the State of California. See Complaint, ¶ 15; Answer, ¶ 15.

12. During the time period relevant to this dispute, DHIS maintained its principal place of business in Roseville, California. Id., ¶ 19; Complaint, ¶ 19.

13. An insurance agency specializing in providing insurance and risk management services to the food services industry, DHIS served as FIC's agent in connection with the underlying insurance program. Id., ¶¶ 16, 38; Answer, ¶ 38.

**The Subscription Agreement**

14. This dispute arises in the context of a workers' compensation insurance program FSIM and DHIS developed for and marketed to the food service industry in the United States. The program came to be known as the FSIM Program. See Complaint, ¶ 1; Answer, ¶ 1; McComb Decl., ¶ 12.

15. In or about late 1997, Platinum agreed to assist FSIM in establishing a separate account, or cell, within Platinum's structure for use in connection with the FSIM Program. Id., ¶ 22.

16. Platinum entered into a Subscription and Shareholder Agreement with FSIM on or about January 16, 1998. Id., ¶ 23, Ex. B.

17. Therein, as part of its rent-a-captive arrangement with Platinum, FSIM agreed to purchase a $125,000.00 non-voting redeemable preferred share in the captive. Id., ¶ 24, Ex. B at ¶¶ 1(f), 2.

3

18. Under the Subscription Agreement, FSIM obligated itself to pay to Platinum all amounts necessary to remedy any "Negative Balance" in its account. Id., ¶ 25, Ex. B at ¶ 4(a).

19. In essence, a Negative Balance would arise if the losses Platinum was compelled to reinsure and the expenses it incurred under the FSIM Program outstripped both FSIM's contributions to the rent-a-captive account and the level of premium dollars flowing into the account. Id., ¶ 26, Ex. B at ¶¶ 1(o), 4(a).

**The Negative Balance**

20. The FIC insurance policies relating to the FSIM Program spanned two distinct periods: Policy Year 1 (January 1, 1998 - December 31, 1998) and Policy Year 2 (January 1, 1999 - December 31, 1999). Id., ¶ 27.

21. At the conclusion of Policy Year 1, FSIM had incurred a Negative Balance in its account. Id., ¶ 28.

22. Despite Platinum's efforts to resolve this issue, as of October 1999 FSIM had failed to remedy the Negative Balance for Policy Year 1. Id., ¶ 29.

23. In or about October 1999, Platinum was advised that FIC intended to pull out of the FSIM Program at the conclusion of Policy Year 2. Id., ¶ 30.

24. After receiving notice of FIC's intention, Platinum engaged in further discussions with FSIM regarding the Negative Balance in the FSIM Program. Id., ¶ 31.

25. On or about October 13, 1999, Platinum advised FSIM that Platinum was prepared to continue to facilitate the FSIM Program. Id.

26. Platinum advised FSIM, however, that Platinum would do so only if it first received appropriate capital and/or contingent capital from FSIM to remedy the existing Negative Balance and adequately fund its account. Id.

27.    There was no immediate resolution, however, to FSIM's Negative Balance. Id., ¶ 32.

### The Note

28.    On about June 19, 2000, Platinum and FSIM representatives met to discuss the Negative Balance. Id., ¶ 33.

29.    At this meeting, the FSIM representatives suggested that one means of remedying the Negative Balance was to have FSIM post a promissory note as collateral for its performance of FSIM's obligations with respect to paying down the Negative Balance by installments. Id., ¶ 34.

30.    After a period of negotiations, Platinum and FSIM reached an agreement whereby FSIM would execute a promissory note in Platinum's favor to serve as collateral for FSIM's performance of its obligation to remedy the Negative Balance and adequately fund its cell within the Platinum structure. Id., ¶ 35.

31.    On or about November 8, 2000, Platinum forwarded a promissory note to FSIM for execution (the "Note"). The principal of the Note was $469,515.00, an amount stipulated by the parties to be equal to FSIM's Negative Balance as of November 8, 2000. Id., ¶ 36, Ex. C; Answer, ¶ 125.

32.    On the same day, November 8, 2000, FSIM executed the Note and returned it to Platinum. See McComb Decl., ¶ 37, Ex. D.

33.    FSIM subsequently forwarded to Platinum the original, fully executed copy of the Note. Id., ¶ 37, Ex. A; Answer, ¶¶ 54, 127.

### FSIM's Default

34.    FSIM made its first monthly payment of $21,000.00 on the Note on or about August 28, 2000. Id., ¶ 39.

35. FSIM proceeded to make six additional payments on the Note of $21,000.00 each, for a total of $147,000.00. Id., ¶ 40.

36. FSIM made its last monthly $21,000.00 payment on the Note in or about April 20, 2001, which left a balance of approximately $322,515.00, plus interest, remaining on the Note. Id., ¶ 41.

37. Beginning in June of 2001, Platinum made repeated demands that FSIM make good on its obligations under the Note. Id., ¶ 42.

38. Despite Platinum's repeated demands, FSIM never made any additional payment on the Note. Id., ¶ 43.

**The Assignment**

39. In connection with the FSIM Program, FIC and Platinum entered into a Reinsurance Agreement. See Declaration of Nicholas J. Puleio ("Puleio Decl.") at ¶ 5.

40. Subsequent to FIC's termination of its involvement in the FSIM Program, a dispute arose between the Superintendent and Platinum regarding the Reinsurance Agreement. Id., ¶ 6; McComb Decl., ¶ 44.

41. On or about December 27, 2002, the Superintendent and Platinum executed a Commutation Agreement pursuant to which they resolved their differences amicably. See Puleio Decl., ¶ 7, Ex. A; McComb Decl., ¶ 45, Ex. E.

42. Among other things, the Commutation Agreement required Platinum to assign to the Superintendent all of its right, title and interest in, among other things, the Note. See Puleio Decl., ¶ 8, Ex. A at 2; McComb Decl., ¶ 45, Ex. E at 2.

43. Simultaneous with its execution of the Commutation Agreement, Platinum also executed an assignment in which it assigned to the Superintendent its claims against FSIM. Id., ¶ 9, Ex. B; McComb Decl., ¶ 46, Ex. F.

6

44. Among other things, Platinum assigned to the Superintendent all of its right, title and interest in the Note. See Puleio Decl., ¶ 9, Ex. B at ¶ (ii); McComb Decl., ¶ 46, Ex. F at ¶ (ii).

45. On or about March 5, 2003, the Superintendent sought court approval of the Commutation Agreement with Platinum, as required by the New York Insurance Law. See Puleio Decl., ¶ 10, Ex. C.

46. In an Order dated May 2, 2003, the New York State Supreme Court formally approved the Commutation Agreement between the Superintendent and Platinum. See Puleio Decl., ¶ 11, Ex. D.

47. The unpaid balance on the Note as of the date of the Assignment was $322,515.00, exclusive of the interest which is expressly provided for in the Note. Id., ¶ 12; McComb Decl., Ex. A at ¶¶ B-D.

48. The Superintendent is pursuing his claim against FSIM for default on the Note in his capacity as Platinum's assignee. See Puleio Decl., ¶ 13.

Dated: New York, New York
      November 11, 2005

Respectfully submitted,

ENTWISTLE & CAPPUCCI LLP
280 Park Avenue, 26th Floor West
New York, New York 10017
(212) 894-7200

By: _____
    WILLIAM S. GYVES (WG 2770)
    MICHAEL A. MCDONOUGH (MM 5712)

Attorneys for Plaintiff