SCHINDEL, FARMAN & LIPSIUS LLP
14 Penn Plaza Suite 500
(225 West 34th Street)
New York, New York 10122
Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Gregory V. Serio, Superintendent of Insurance of the State of New York, as Rehabilitator of FRONTIER INSURANCE COMPANY, and as Assignee of PLATINUM INDEMNITY, LTD, <br><br> Plaintiff, <br><br> vs. <br><br> DWIGHT HALVORSON INSURANCE SERVICES, INC d/b/a F.S.I.M. INSURANCE SERVICES and FOOD SERVICES INSURANCE MANAGERS, INC., <br><br> Defendants | **04 CV 3361(KMK)** <br><br> **Hon. Kenneth M. Karas** <br><br> **MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT

## I. PRELIMINARY STATEMENT

This is an action to recover unspecified money damages based on an alleged breach

of written agreements between in Frontier Insurance Company ("Frontier") and Dwight Halvorson

Insurance Services ("DHIS"), and the breach of a "Promissory Note" executed by FSIM in favor of

Platinum Indemnity Limited ("Platinum"). Plaintiff, brings this action as Rehabilitator of Frontier

and, on behalf of Frontier as assignee of Platinum Indemnity Limited ("Platinum").

*Brief In Opposition to Plaintiff's Motion*

The complaint refers to a Limited Agency Agreement between DHIS and Frontier and to the "Subscription Shareholders Agreement" between Platinum and FSIM ("Subscription Agreement) and makes clear that the two agreements are related. Further, it is agreed that "Promissory Note" (the "Note") was ostensibly executed to fulfill obligations under the Subscription Shareholders Agreement.

The instant motion is for summary judgment on the Note. In light of the significant factual disputes and uncertainties, the motion should be denied.    FSIM notes, as pleaded in its answer to the complaint, that it was induced to sign the Note based on misrepresentations and that no consideration was provided for that Note. See Answer at ¶¶ 123-131, 141-153. Moreover, FSIM asserts that the monies for which the Note was demanded were actually paid to Frontier before the Note was signed. Halvorson declaration at ¶ 18 -21.    Frontier, therefore, is not a holder in due course. Moreover, since FSIM paid $147,000 on the Note to Platinum, when in fact Frontier had demanded that FSIM make payments under the Subscription Agreement to Frontier and promised to forward to Platinum, any recovery by Frontier on its claims against FSIM or DHIS must be offset by that amount. See complaint at ¶ 153.

## II.  STATEMENT OF FACTS

The statement of facts relies primarily on the separate declaration of Dwight Halvorson, principal of FSIM and DHIS.    FSIM acknowledges that it signed the Note but also disputed the basis for the Note. After making several payments under the terms of the Note, FSIM determined that the amounts for which the Note was signed was not due and owing. In essence, FSIM concluded that there was no consideration for the Note.    Accordingly, FSIM ceased making any payments under the Note.

FSIM was induced to sign the Note based on the misrepresentations of Mr. McComb, a representative of Platinum. In support its motion for summary judgment, plaintiff submits the declaration of the same Mr. McComb. In his declaration, Mr. McComb states that the Note was provided to cover a "Negative Balance" due under the terms of the Subscription Agreement between FSIM and Platinum. Had the consideration for the Note been this "Negative Balance" and indeed if there had ben such a "Negative Balance," then FSIM would be liable under the Note. However, as stated by Mr. Halvorson in his declaration, there was no "Negative Balance" and no mention was ever made of a "Negative Balance" in the conversations between Halvorson and McComb which resulted in FSIM signing the Note.

## III.  ARGUMENT

**The Motion for Summary Judgment Must be Denied.**
**The Note was Obtained Through the Material Misrepresentations**
**of Platinum and There was No Consideration for the Note**

Frontier brings this motion for partial summary judgment on a Note that it claims was assigned to it by Platinum. The Note is governed by Bermuda Law. Under Bermuda law, a Note is invalid where it is secured without consideration or on the basis of misrepresentations. *See Alef United Corporation v. United Energy Limited*, Supreme Court of Bermuda, Civil Jurisdiction No. 159 (October 28, 1991) **(copy attached)**; *see also Somersall v. Bank of Bermuda, Ltd.*, Bermuda Court of Appeal No. 24 (1993) **(copy attached)**. In its answer to the complaint, FSIM alleged that the Note was secured via misrepresentations and that no consideration was provided for the Note. In his declaration, Mr. Dwight Halvorson, the president of DHIS, makes it clear that he was induced to sign the Note based on the misrepresentations of Mr. McComb of Platinum.

Platinum did not provide, and DHIS did not receive any consideration for the Note.

The Note was demanded by Platinum in order to secure certain payments that Platinum claimed it had not received from Frontier or from DHIS. In fact, DHIS had made those payments directly to Frontier based on an earlier agreement in which Frontier agreed to send those payments to Platinum. In short: DHIS sent the money to Frontier; Frontier agreed to send that money to Platinum; Platinum claimed that it never received the money from Frontier and also claimed that Bermuda authorities would bring an action against DHIS for that money; DHIS signed the Note while disputing it in writing; Platinum assigned the Note to Frontier and Frontier now sues DHIS to "recover" the same monies that DHIS long ago sent to Frontier. Frontier claims that not only is it entitled to the money but that its entitlement is so obvious it is entitled to summary judgment. FSIM strongly disagrees.

In its answer, DHIS alleged that there was no consideration for the Note, that the Note was executed based on the representations of Platinum and  and that Frontier should be stopped from any recovery under th note based on the doctrine of "unclean hands." The answer also pleads a "setoff" of the amounts paid to Platinum under the Note, against any recovery that Frontier claims in this action. *See* Answer at ¶ 153.

Under Bermuda law, where the defenses of lack of consideration and misrepresentation are "arguable", a motion for summary judgment on a note will be denied. Accordingly, the Court should deny plaintiff's motion for summary judgment.

In *Alef United Corporation v. United Energy Limited*, Supreme Court of Bermuda, Civil Jurisdiction No. 159 (October 28, 1991), plaintiff sued to recover on a promissory note and filed a motion for summary judgment. Defendant opposed the motion and alleged that there was no consideration for the note. Defendant also alleged a "fraudulent pattern" at the time the note was negotiated. In denying the motion fir summary judgment, the Bermuda court noted that the absence of consideration and also fraud would present a "compete defense to the claim." The court

emphasized that even though the allegations of the defense were not "fully particularized" they were "arguable." Here, both in answering the complaint and in the declaration of Mr. Halvorson, FSIM asserts that it signed the Note based on the misrepresentations of Mr. McComb and that there was no consideration for the Note. In fact, based on the stark differences between Mr. McComb's declaration and that of Mr. Halvorson, concerning how the Note came to be and the consideration for the Note, clear issues of fact are presented and the motion should be denied.

For example, Mr. McComb asserts that the consideration for the Note was a certain "Negative Balance" under the Subscription Agreement. However, Mr. Halvorson states that there was no discussion of a "Negative Balance" and that Mr. McComb had told him at the time that the Note was necessary in order to avoid an action by authorities in Bermuda against FSIM. The fact that Mr. McComb now asserts that there was a "Negative Balance" as the basis for the Note suggests that he was (and is) aware that there was no consideration for the Note. In any event, there is a material question of fact as to why the Note was demanded and whether there was any consideration.

Accordingly, here, as in *Alef United Corporation*, DHIS has alleged facts that if proven would be a compete bar to the claims under the Note and plaintiff's motion for partial summary judgment on the Note should be denied.

Frontier cites the Bermuda Bills of Exchange Act 1934 and two Bermuda cases as supporting authority for its motion. For the Court's convenience, a complete copy of the statute is attached. Plaintiff cites the statute for a definition of a Note but that statute does not otherwise support plaintiff's motion.

Frontier also cites the cases of *Joaquin v. Abbott*, Supreme Court of Bermuda, Civil Jurisdiction No. 302 (1993) and *Somersall v. Bank of Bermuda, Ltd.*, Bermuda Court of Appeal No. 24 (1993) (**copies attached**). Frontier argues that those cases show that under Bermuda law there

*Brief In Opposition to Plaintiff's Motion*                                                          Page 5 of 7

is no defense to a note and that summary judgment should be granted. Those cases do not support Frontier's claim.

Both cases do deal with motions for summary judgment brought on a note. However, neither supports Frontier's argument. *Joaquin*, for instance, does not deal with a situation involving a claim that there was a misrepresentation and therefore a total lack of consideration. The dispute in that case was solely about the *amount* due under the Note, not the validity of the Note.

*Somersall*, dealt with a claim that a bank officer failed to disclose the fact that he would receive "a benefit from the sale of the property" at issue; that case also did not address the question of whether there was consideration for the Note. Significantly, *Somersall* also dealt with a claim of "misrepresentations by the bank as to the liabilities of the Third Parties." In response to this, the Bermuda court pointed out that the bank officer simply showed an application to the defendant and "there was no representation by the bank that the facts set out in the application were true" (p.3). In the case before this Court, Mr. McComb did not just show a piece of paper to FSIM, he made specific representations about the purpose of the Note, the amount of the Note, the potential consequence if FSIM did not sign the Note.

Frontier also cites several cases interpreting New York law to support the claim that its burden of proof on the motion for summary judgement is *de minimus*. However, as there is no dispute that the Note (and the attendant Subscription Agreement) are governed by Bermuda Law, Frontier's reliance on those cases is misplaced.

Finally, as an affirmative defense, DHIS has alleged a set off against the related claims of Frontier for the monies it paid to Platinum under the Note but which was also paid to Frontier. As such, Frontier's claim (if any) under the Note should await any resolution of its claims that DHIS and/or FSIM owes it premiums under the FSIM Program.

## IV.  CONCLUSION

Based on the applicable Bermuda law and on that facts as alleged, FSIM has asserted valid defenses to the Note on which Frontier brings this motion.  Moreover, there are material issues of fact concerning why the note was demanded, what representations were made regarding the Note and whether there was any consideration for the Note.  Accordingly, the motion for summary judgment must be denied.


Dated:        December 13, 2005
              New York, New York



                              SCHINDEL, FARMAN & LIPSIUS LLP
                              Attorneys Defendants


                              By: _____
                              Lorienton N.A. Palmer (LP3934)
                              14 Penn Plaza, Suite 500
                              New York, NY  10122
                              Telephone No.: (212) 563-1710
                              Fax: (212) 695-6602
                              File No.: 3090.0001

TO:        ENTWISTLE & CAPPUCCI, LLP
           280 Park Avenue -26th Floor
           New York, NY 10017
           Attn:  William S. Gyves, Esq
           Michael McDonough, Esq.



# In the Supreme Court of Bermuda

CIVIL JURISDICTION 1991 **NO. 159**

ALEF UNITED CORPORATION N.V.  **Plaintiff**

**and**

UNITED ENERGY **LIMITED**  **Defendant**

**Mr. John Cooper for the Plaintiff**
Mr. Justin Williams **for the Defendant**

J U D G M E N T

**Norma Wade, A.J.**

**This is an** application **for** Summary Judgment **pursuant to Order 14 of the Rules of the Supreme Court, 1985. The** relevant facts can be briefly **stated.**

The Plaintiff, Alef United Corporation N.V., is **a company** incorporated **under- the Laws of the Netherlands Antilles. The Defendant,** United **Energy** Limited is a company incorporated under the Laws of Bermuda.

**On the 9th October, 1986, the Defendant executed** a promissory note in favour **of the Plaintiff in the sum of** US$200,000.00 repayable on the 31st **August, 1987. By agreement of the** parties, the repayment date was later amended to 31st **August, 1988.**

**Pursuant to the terms of the** promissory note, the Defendant failed to honour his obligation **under the** promissory note on the 31st August, 1988. **Consequently, on the 20th September, 1988, the Plaintiff made a formal demand for repayment of the principal sum of $200,000** aforesaid.

On the 10th May, 1991 the Plaintiff filed a writ claiming **the sums due under** the Promissory Note. **On the 28th May, 1991 the Defendant filed a** Memorandum of Appearance. On the 7th June, 1991 the Plaintiff filed a **summons** seeking Summary Judgment. **The Defendant opposes** this application.

On the 2nd July, 1991 the Defendant filed a defence denying the Plaintiffs claim and averring a total failure of consideration. Further, in support of their objection to the Plaintiffs application, the President of the Defendant Company filed an affidavit wherein he deponed to a 'fraudulent pattern' existing at the time the financial transaction was negotiated.

Mr. Cooper, counsel for the Plaintiff, has urged the court to make an order for Summary Judgment. He submitted that it is for the Defendant to establish that there has been a total failure of consideration. He said Section 29 of the Bill of Exchange Act, 1934 stipulates that:

> "Every party whose signature appears on a Bill is prima facae deemed to have become a party thereto for value . .."

Counsel said that bills and notes are treated differently from a simple contract, therefore, it is generally unnecessary for the person seeking enforcement to aver consideration or to prove consideration. It is for the Defendant to prove that there has been a total failure of consideration? and the documents do not establish this.

Further, Mr. Cooper urged, the allegation of fraud is a mere oblique, unparticularized accusation which is disputed by the Plaintiff.

Mr. Cooper accepted that fraud is a valid defence to an action on a Promissory note, but submitted that it should be part of the defence, and pleaded with particularity.

'He argued that the only defence pleaded is one of total failure of consideration, and the basis put forward for this proposition, that there is total failure of consideration, is unsound.

Viewed in its totality, it is the Plaintiffs view that the Defendant's "unsubstantiated allegations" as to the existence of a "pattern of fraud" and the averment of the "total failure of consideration..." are being made in order to cloud the issue and to delay repayment of the sums due under the promissory note.

Mr. Cooper submitted that if the court disagrees with his submission, as an alternative, he seeks an order that the Defendant should pay into court the full amount of the Promissory note. There is authority to show that where a defence is weak, the court may make such an order.

Counsel for the defence did not respond to this submission.

Mr. Williams, counsel for the Defendant, conceded that neither the

allegation of fraud nor the defence averring failure of consideration was fully particularized. But, there is a defence on file and if the Defendant's are correct, the defence will be a complete defence to the claim.

Order 14 is to enable the Plaintiff to obtain a quick judgment where there is no defence to the claim. Despite the fact of Mr. Cooper's argument, I am satisfied that the defence has demonstrated that there is an arguable defence although it is not fully particularized.

If the defence is able to show that the consideration has totally failed and or the agreement as evidenced by the Promissory note is vitiated by fraud – that would be the end of the matter.

The Supreme Court Practice 1979 at page 141 indicates that where a defendant shows that he has "... reasonable grounds for setting up a defence or even a fair probability that he has a bona fide defence, he ought to be given leave to defend...."

The law is clear as long as there is a triable issue. The Defendant should be given leave to defend and it would be improper for me to second guess the outcome of any such trial.

The law is equally clear, if the defence is shadowey, and the court is very nearly prepared to give judgment to the Plaintiff, the court has a discretion to impose conditions.

I have been able to ascertain from the affidavits that the Promissory note was issued on the 9th October, 1986. This note was amended on the 1st July, 1987, whereby the parties extended the repayment date. The share purchase agreement dated 1st July, 1987 was signed by Mr. Samuel acknowledging the loan between the Plaintiff and the Defendant. Mr. Samuel is the President of United Energy, the Defendant company, and the deponent of the affidavit in support of the Defendant's objection to the Plaintiff's application for Summary Judgment. Neither Mr. Samuel nor any other officers of the company, questioned the nature of the arrangement until the Plaintiffs made their demand for payment.

"The condition of payment into court or giving security, is nowadays more often imposed than formerly, and not only where the Defendant consents, but also where there is a good ground in the evidence for believing that the defences' set up is a sham defence, and the master is

prepared, very nearly to give judgment for the Plaintiff."

... Those conditions Cof bringing money into court or giving security should only be applied when there is something suspicious in the Defendant's mode of presenting his case."

[See **Fieldrank Ltd. -v- Stein**, 1961 3 All E.R. at page 683-684.]

The question I ask myself is, can the Defendant seriously contend that the transaction is a sham? Additionally, I am of the view that there is something "suspicious in the Defendant's mode of presenting its case."

**The order I make therefore, is this; the Defendant shall have** unconditional leave to defend this matter upon paying into court the sum of $200,000.00 within 28 days hereof.

Costs of this application reserved for the trial judge.


DATED the 28/h day of October, 1991.



_____

Norma M. Wade
Acting Puisne Judge



**BERMUDA**
**1934 : 8**

**BILLS OF EXCHANGE ACT 1934**

ARRANGEMENT OF SECTIONS

| | |
|---|---|
| 1 | Interpretation |
| 2 | Definition of bill of exchange |
| 3 | Inland and foreign bills |
| 4 | Effect where different parties to bill are the same person |
| 5 | Indication of drawee |
| 6 | Indication of payee |
| 7 | Conditions under which bills are negotiable |
| 8 | Sums payable by a bill |
| 9 | Bill payable on demand |
| 10 | Bill payable at a future time |
| 11 | Omission of date in bill payable after date |
| 12 | Ante-dating and post-dating bill etc |
| 13 | Computation of time of payment |
| 14 | Referee in case of need |
| 15 | Optional stipulations by drawer or indorser |
| 16 | Definition and requisites of acceptance |
| 17 | Time for acceptance |
| 18 | General and qualified acceptances |
| 19 | Inchoate instruments |
| 20 | Delivery of instrument |
| 21 | Capacity of parties |
| 22 | Signature essential to validity |
| 23 | Forged or unauthorized signature on a bill |
| 24 | Signature by procuration |
| 25 | Person signing as agent or in a representative capacity |
| 26 | Value and holder for value of a bill |
| 27 | Accommodation party to a bill |
| 28 | Holder in due course |
| 29 | Presumption of value and good faith |
| 30 | Negotiation of bills |

**BILLS OF EXCHANGE ACT 1934**

| | |
|---|---|
| 31 | Requisites of a valid indorsement |
| 32 | Conditional indorsement |
| 33 | Indorsement in blank and special indorsement |
| 34 | Restrictive indorsement |
| 35 | Negotiation of overdue or dishonoured bill |
| 36 | Negotiation of bill to party already liable thereon |
| 37 | Rights of holder |
| 38 | When presentment for acceptance is necessary |
| 39 | Time for presenting bill payable after sight |
| 40 | Rules as to presentment for acceptance; excuses for non-presentment |
| 41 | Non-acceptance of bill |
| 42 | Dishonour by non-acceptance |
| 43 | Duties as to qualified acceptance |
| 44 | Rules as to presentment for payment |
| 45 | Excuse for delay or non-presentment for payment |
| 46 | Dishonour by non-payment |
| 47 | Notice of dishonour and effect of non-notice |
| 48 | Rules as to notice of dishonour |
| 49 | Expenses for non-notice and delay |
| 50 | Noting or protest of bill |
| 51 | Duties of holder as regards drawee or acceptor |
| 52 | Funds in hands of drawee |
| 53 | Liability of acceptor |

| | |
|---|---|
| 54 | Liability of drawer or indorser |
| 55 | Liability of stranger signing bill as indorser |
| 56 | Measure of damages against parties to dishonoured bill |
| 57 | Transferor by delivery and transferee |
| 58 | Discharge of bill by payment in due course |
| 59 | Banker paying on demand draft whereon endorsement is forged |
| 60 | Acceptor the holder at maturity |
| 61 | Express waiver |
| 62 | Cancellation of bill |
| 63 | Alteration of bill |
| 64 | Acceptance for honour supra protest |
| 65 | Liability of acceptor for honour |
| 66 | Presentment to acceptor for honour |
| 67 | Payment for honour supra protest |
| 68 | Rights of holder to duplicate of lost bill |
| 69 | Action on lost bill |
| 70 | Rules as to bills drawn in sets |
| 71 | Rules where laws conflict |
| 72 | Definition of cheque; application of Act |
| 73 | Presentment of cheque for payment |
| 74 | Revocation of banker's authority |
| 75 | Definition of promissory note |

*Laws of Bermuda*

76   Effect of delivery of
     promissory note
77   Joint and several promis-
     sory notes
78   Promissory note payable

*1989 Revision*                                                    **3**

on demand

79  Presentment of promis-
sory note for payment

80  Liability of maker of
promissory note

81  Application of certain pro-
visions of Act to promis-
sory notes

82  Good faith

83  Signature of instrument

84  Computation of time

85  When noting equivalent to
protest

86  Protest when notary not
accessible

87  Saving for rules of com-
mon law

SCHEDULE

Form of protest which may be
used when services of a notary
cannot be obtained

[21 March 1934]

*[preamble and words of enactment omitted]*

**Interpretation**

1      In this Act, unless the context otherwise requires—

"acceptance" means an acceptance completed by delivery or no-
tification;

"action" includes counter claim and set off;

"banker" includes a body of persons, whether incorporated or
not, who carry on the business of banking;

"bankrupt" includes any person whose estate is vested in a
trustee or assignee under the law for the time being in force
relating to bankruptcy;

"bearer" means the person in possession of a bill or note which is
payable to bearer;

"bill" means a bill of exchange;

"delivery" means transfer of possession, actual or constructive,
from one person to another;

"holder" means the payee or indorsee of a bill or note who is in
possession of it, or the bearer thereof;

"indorsement" means an indorsement completed by delivery;

"issue" means the first delivery of a bill or note, complete in form,
to a person who takes it as a holder;

"note" means a promissory note;

**BILLS OF EXCHANGE ACT 1934**

"person" includes a body of persons, whether incorporated or not;

"value" means valuable consideration;

"written" includes printed, and the expression "writing" includes print; and neither expression includes things written or any writing in ordinary lead pencil or other substance which may be easily erased.

**Definition of bill of exchange**

2    (1)    A bill of exchange is an unconditional order in writing, addressed by one person to another, signed by the person giving it, requiring the person to whom it is addressed to pay on demand or at a fixed or determinable future time a sum certain in money to, or to the order of, a specified person, or to a bearer.

(2)    An instrument which does not comply with these conditions, or which orders any act to be done in addition to the payment of money, is not a bill of exchange.

(3)    An order to pay out of a particular fund is not unconditional within the meaning of this section; but an unqualified order to pay, coupled with an indication of a particular fund out of which the drawee is to reimburse himself or a particular account to be debited with the amount, or a statement of the transaction which gives rise to the bill is unconditional.

(4)    A bill is not invalid—

(a) by reason that it is not dated; or

(b) by reason that it does not specify the value given, or that any value has been given therefor; or

(c) by reason that it does not specify the place where it is drawn or the place where it is payable.

**Inland and foreign bills**

3    (1)    An inland bill is a bill which is, or on the face of it purports to be—

(a) both drawn and payable within Bermuda; or

(b) drawn within Bermuda upon some person resident therein.

(2)    Any other bill is a foreign bill.

(3)    Unless the contrary appears on the face of the bill the

holder may treat it as an inland bill.

**Effect where different parties to bill are the same person**
4      (1)    A bill may be drawn payable to, or to the order of, the drawer; or it may be drawn payable to, or to the order of, the drawee.

(2)    Where in a bill the drawer and drawee are the same person, or where the drawee is a fictitious person or a person not having capacity to contract, the holder may treat the instrument, at his option, either as a bill of exchange or as a promissory note.

(3)    Where a banker carries on the business of banking at more branches than one, he shall, for the purposes of this section, be deemed to be an independent banker in respect of each of such branches, and a bill issued by one of such branches and payable at another branch shall be deemed to be a bill, and, if payable on demand, a cheque; and a balance at one branch may be applied in reduction of an overdrawn account at another branch without notice to the customer.

**Indication of drawee**
5      (1)    The drawee must be named or otherwise indicated in a bill with reasonable certainty.

(2)    A bill may be addressed to two or more drawees whether they are partners or not, but an order addressed to two drawees in the alternative or to two or more drawees in succession is not a bill of exchange.

**Indication of payee**
6      (1)    Where a bill is not payable to bearer, the payee must be named or otherwise indicated therein with reasonable certainty.

(2)    A bill may be made payable to two or more payees jointly, or it may be made payable in the alternative to one of two, or one of some of several, payees. A bill may also be made payable to the holder of an office for the time being.

(3)    Where the payee is a fictitious or non-existing person the bill may be treated as payable to bearer.

(4)    Where a person is induced by fraud to sign a bill as acceptor, or a cheque as drawer, to an existing person who is never intended to receive the instrument, or any proceeds thereof, by the person fraudulently inducing the acceptor or drawer to sign such bill or cheque, the instrument thus executed may be treated as payable to bearer.

**BILLS OF EXCHANGE ACT 1934**

**Conditions under which bills are negotiable**

7        (1)    When a bill contains words prohibiting transfer, or indicating an intention that it should not be transferable, it is valid as between the parties thereto, but is not negotiable.

(2)    A negotiable bill may be payable either to order or to bearer.

(3)    A bill is payable to bearer which is expressed to be so payable, or on which the only or last indorsement is an indorsement in blank.

(4)    A bill is payable to order which is expressed to be so payable, or which is expressed to be payable to a particular person, and does not contain words prohibiting transfer or indicating an intention that it should not be transferable.

(5)    Where a bill, either originally or by indorsement, is expressed to be payable to the order of a specified person, and not to him or his order, it is nevertheless payable to him or his order at his option.

**Sums payable by a bill**

8        (1)    The sum payable by a bill is a sum certain within the meaning of this Act, although it is required to be paid—

(a) by stated instalments;

(b) with interest;

(c) by stated instalments, with a provision that upon default in payment of any instalment the whole shall become due; or

(d) according to an indicated rate of exchange or according to a rate of exchange to be ascertained as directed by the bill.

(2)    Where the sum payable is expressed in words and also in figures, and there is a discrepancy between the two, the sum denoted by the words is the amount payable.

(3)    Where a bill is expressed to be payable with interest, then, unless the instrument otherwise provides, interest runs from the date of the bill, or if the bill is undated, from the issue thereof.

**Bill payable on demand**

9        (1)    A bill is payable on demand—

(a) which is expressed to be payable on demand, or at

sight, or on presentation; or

(b) in which no time for payment is expressed.

(2)   Where a bill is accepted or indorsed when it is overdue, it shall, as regards the acceptor who so accepts or any indorser who so indorses it, be deemed to be a bill payable on demand.

**Bill payable at a future time**

10    (1)   A bill is payable at a determinable future time within the meaning of this Act which is expressed to be payable—

(a) at a fixed period after date or sight;

(b) on or at a fixed period after the occurrence of a specified event which is certain to happen, though the time of happening may be uncertain.

(2)   An instrument expressed to be payable on a contingency is not a bill, and the happening of the event does not cure the defect.

**Omission of date in bill payable after date**

11    Where a bill expressed to be payable at a fixed period after date is issued undated, or where the acceptance of a bill payable at a fixed period after sight is undated, any holder may insert therein the true date of issue or acceptance, and the bill shall be payable accordingly:

Provided that—

(a) where the holder in good faith and by mistake inserts a wrong date; and

(b) in every case where a wrong date is inserted, if the bill subsequently comes into the hands of a holder in due course,

the bill shall not be avoided thereby, but shall operate and be payable as if the date so inserted had been the true date.

**Ante-dating and post-dating bill etc**

12    (1)   Where a bill or an acceptance or any indorsement on a bill is dated, the date shall, unless the contrary is proved, be deemed to be the true date of the drawing, acceptance or indorsement, as the case may be.

(2)   A bill is not invalid by reason only that it is ante-dated or post-dated, or that it bears date on a Sunday.

**BILLS OF EXCHANGE ACT 1934**

**Computation of time of payment**

13      Where a bill is not payable on demand the day on which it falls due is determined as follows—

> (a) three days, called days of grace, are, in every case where the bill itself does not otherwise provide, added to the time of payment as fixed by the bill, and the bill is due and payable on the last day of grace;
>
> (b) when the last day of grace falls on a public holiday, the bill is due and payable on the preceding business day:
>
> Provided that when two or more such holidays occur on successive days the bill in respect whereof the last day of grace falls on the second or third of such successive days, shall be due and payable on the succeeding business day;
>
> (c) where a bill is payable at a fixed period after date, after sight, or after the happening of a specified event, the time of payment is determined by excluding the day from which the time is to begin to run and by including the day of payment;
>
> (d) where a bill is payable at a fixed period after sight, the time begins to run from the date of the acceptance if the bill be accepted, and from the date of noting or protest if the bill be noted or protested for non-acceptance, or for non-delivery.

**Referee in case of need**

14      (1)   The drawer of a bill and any indorser may insert therein the name of a person to whom the holder may resort in case of need, that is to say, in case the bill is dishonoured by nonacceptance or non-payment, and any such person is called the referee in case of need.

        (2)   It is in the option of the holder to resort to the referee in case of need or not as he may think fit.

**Optional stipulations by drawer or indorser**

15      The drawer of a bill, and any indorser, may insert therein an express stipulation—

> (a) negativing or limiting his own liability to the holder;
>
> (b) waiving, as regards himself, some or all of the holder's

*Laws of Bermuda*

duties.

**Definition and requisites of acceptance**

16    (1)    The acceptance of a bill is the signification by the drawee of his assent to the order of the drawer.

(2)    An acceptance is invalid unless it complies with the following conditions—

(a) it must be written on the bill and be signed by the drawee, and in such case the mere signature of the drawee without additional words is sufficient; and

(b) it must not express that the drawee will perform his promise by any other means than the payment of money.

**Time for acceptance**

17    (1)    A bill may be accepted—

(a) before it has been signed by the drawer, or while otherwise incomplete;

(b) when it is overdue, or after it has been dishonoured by a previous refusal to accept, or by non-payment.

(2)    When a bill payable after sight is dishonoured by nonacceptance, and the drawee subsequently accepts it, the holder, in the absence of any different agreement, is entitled to have the bill accepted as of the date of first presentment to the drawee for acceptance.

**General and qualified acceptances**

18    (1)    An acceptance is either general or qualified.

(2)    A general acceptance assents without qualification to the order of the drawer.

(3)    A qualified acceptance in express terms varies the effect of the bill as drawn; and in particular an acceptance is qualified—

(a) which is conditional, that is to say, which makes payment by the acceptor dependent on the fulfilment of a condition therein stated;

(b) which is partial, that is to say, an acceptance to pay part only of the amount for which the bill is drawn;

(c) which is local, that is to say, an acceptance to pay only at a particular specified place;

*1989 Revision*                                                                 **9**

**BILLS OF EXCHANGE ACT 1934**

      (d) which is qualified as to time; or

      (e) which is the acceptance of some one or more of the drawees, but not of all.

    (4)    An acceptance to pay at a particular place is a general acceptance, unless it expressly states that the bill is to be paid there only and not elsewhere.

**Inchoate instruments**

19     (1)    Where a simple signature on a blank stamped paper is delivered by the signer in order that it may be converted into a bill, it operates, prima facie, as an authority to fill it up as a complete bill for any amount the stamp will cover, using the signature for that of the drawer, or the acceptor, or an indorser; and, in like manner, when a bill is wanting in any material particular the person in possession of it has, prima facie, an authority to fill up the omission in any way he thinks fit.

    (2)    In order that any such instrument when completed may be enforceable against any person who became a party thereto prior to its completion, it must be filled up within a reasonable time, and strictly in accordance with the authority given; and what is reasonable time for this purpose is declared to be a question of fact:

    Provided that if any such instrument after completion is negotiated to a holder in due course it shall be valid and effectual for all purposes in his hands, and he may enforce it as if it had been filled up within a reasonable time and strictly in accordance with the authority given.

**Delivery of instrument**

20     (1)    Every contract on a bill, whether it is the drawer's, the acceptor's, or an indorser's, is incomplete and revocable, until the delivery of the instrument in order to give effect thereto:

    Provided that where an acceptance is written on a bill, and the drawee gives notice to or according to the directions of the person entitled to the bill that he has accepted it, the acceptance then becomes complete and irrevocable.

    (2)    As between immediate parties, and as regards a remote party other than a holder in due course, the delivery—

      (a) in order to be effectual must be made either by or under the authority of the party drawing, accepting, or indorsing, as the case may be;

(b) may be shown to have been conditional or for a special purpose only, and not for the purpose of transferring the property in the bill;

so, however, that if the bill is in the hands of a holder in due course a valid delivery of the bill by all parties prior to him so as to make them liable to him is conclusively presumed.

(3)   Where a bill is no longer in the possession of a party who has signed it as a drawer, acceptor, or indorser, a valid and unconditional delivery by him is presumed until the contrary is proved.

**Capacity of parties**
21   (1)   Capacity to incur liability as a party to a bill is coextensive with capacity to contract:

Provided that nothing in this section shall enable a corporation to make itself liable as a drawer, acceptor, or indorser, of a bill unless it is competent to the corporation to do so under the law for the time being in force relating to corporations.

(2)   Where a bill is drawn or indorsed by an infant, minor, or corporation having no capacity or power to incur liability on a bill, the drawing or indorsement entitles the holder to receive payment of the bill, and to enforce it against any other party thereto.

**Signature essential to validity**
22   No person is liable as drawer, indorser, or acceptor of a bill, who has not signed it as such:

Provided that—

(a) where a person signs a bill in a trade or assumed name, he is liable thereon as if he had signed it in his own name;

(b) the signature of the name of a firm is equivalent to the signature by the person so signing of the names of all persons liable as partners of that firm.

**Forged or unauthorized signature on a bill**
23   Subject to the provisions of this Act, where a signature on a bill is forged or placed thereon without the authority of the person whose signature it purports to be, the forged or unauthorized signature is wholly inoperative, and no right to retain the bill or to give a discharge therefor or to enforce payment thereof against any party thereto can be acquired through or under that signature, unless the party against

**BILLS OF EXCHANGE ACT 1934**

whom it is sought to retain or enforce payment of the bill is precluded from setting up the forgery or want of authority:

Provided that nothing in this section shall affect the ratification of an unauthorized signature not amounting to a forgery.

**Signature by procuration**

24    A signature by procuration operates as notice that the agent has but a limited authority to sign, and the principal is only bound by such signature if the agent in so signing was acting within the actual limits of his authority.

**Person signing as agent or in a representative capacity**

25    (1)   Where a person signs a bill as drawer, indorser, or acceptor, and adds words to his signature, indicating that he signs for or on behalf of a principal, or in a representative character, he is not personally liable thereon; but the mere addition to his signature of words describing him as an agent, or as filling a representative character, does not exempt him from personal liability.

(2)   In determining whether a signature on a bill is that of the principal or that of the agent by whose hand it is written, the construction most favourable to the validity of the instrument shall be adopted.

**Value and holder for value of a bill**

26    (1)   Valuable consideration for a bill may be constituted—

(a) by any consideration sufficient to support a simple contract; or

(b) by an antecedent debt or liability; and any such debt or liability is deemed valuable consideration whether the bill is payable on demand or at a future time:

Provided that a banker shall not be deemed to be a holder for value of any cheque, bill or note received into his hands for collection, unless he has already unconditionally credited its amount to the account of the customer for whom it is collected.

(2)   Where value has at any time been given for a bill the holder is deemed to be a holder for value as regards the acceptor and all parties to the bill who became parties prior to such time.

(3)   Where the holder of a bill has a lien on it, arising either from contract or by implication of law, he is deemed to be a holder for value to the extent of the sum for which he has a lien.

**Accommodation party to a bill**

27    (1)    An accommodation party to a bill is a person who has signed a bill as drawer, acceptor, or indorser, without receiving value therefor, and for the purpose of lending his name to some other person.

(2)    An accommodation party is liable on the bill to a holder for value; and it is immaterial whether, when such holder took the bill, he knew such party to be an accommodation party or not.

**Holder in due course**

28    (1)    A holder in due course is a holder who has taken a bill, complete and regular on the face of it, under the following conditions—

a)    that he became the holder of it before it was overdue, and without notice that it had been previously dishonoured, if such was the fact;

(b)    that he took the bill in good faith and for value, and that at the time the bill was negotiated to him he had no notice of any defect in the title of the person who negotiated it.

(2)    In particular the title of a person who negotiates a bill is defective within the meaning of this Act when he obtained the bill, or the acceptance thereof, by fraud, duress, or other unlawful means, or for an illegal consideration, or when he negotiates it in breach of faith, or under such circumstances as amount to fraud.

(3)    A holder (whether for value or not) who derives his title to a bill through a holder in due course, and who is not himself a party to any fraud or illegality affecting it, has all the rights of that holder in due course as regards the acceptor and all parties to the bill prior to that holder.

**Presumption of value and good faith**

29    (1)    Every party whose signature appears on a bill is, prima facie, deemed to have become a party thereto for value.

(2)    Every holder of a bill is, prima facie, deemed to be a holder in due course; but if in an action on a bill it is admitted or proved that the acceptance, issue, or subsequent negotiation of the bill is effected with fraud, duress, or illegality, the burden of proof is shifted, unless and until the holder proves that, subsequent to the alleged fraud or illegality, value has in good faith been given for the bill.

**BILLS OF EXCHANGE ACT 1934**

**Negotiation of bills**

30    (1)    A bill is negotiated when it is transferred from one person to another in such a manner as to constitute the transferee the holder of the bill.

(2)    A bill payable to bearer is negotiated by delivery.

(3)    A bill payable to order is negotiated by the indorsement of the holder completed by delivery.

(4)    Where the holder of a bill payable to his order transfers it for value without indorsing it, the transfer gives the transferee such title as the transferor had in the bill, and the transferee in addition acquires the right to have the indorsement of the transferor.

(5)    Where any person is under obligation to indorse a bill in a representative capacity, he may indorse the bill in such terms as to negative personal liability.

**Requisites of a valid indorsement**

31    An indorsement in order to operate as a negotiation must comply with the following conditions—

(a)  it must be written on the bill itself and be signed by the indorser; and the simple signature of the indorser on the bill, without additional words, is sufficient.

An indorsement written on an allonge, or on a "copy" of a bill issued or negotiated in a country where "copies" are recognized, is deemed to be written on the bill itself;

(b)  it must be an indorsement of the entire bill; and a partial indorsement, that is to say, an indorsement which purports to transfer to the indorsee a part only of the amount payable, or which purports to transfer the bill to two or more indorsees severally, does not operate as a negotiation of the bill;

(c)  where a bill is payable to the order of two or more payees or indorsees who are not partners all must indorse, unless the one indorsing has authority to indorse for the others;

(d)  where, in a bill payable to order, the payee or indorsee is wrongly designated, or his name is misspelt, he may indorse the bill as therein described, adding, if he thinks fit, his proper signature;

**14**

*1989 Revision*

*Laws of Bermuda*

(e) where there are two or more indorsements on a bill, each indorsement is deemed to have been made in the order in which it appears on the bill, until the contrary is proved;

(f) an indorsement may be made in blank or special, and may also contain terms making it restrictive.

**Conditional indorsement**

32    Where a bill purports to be indorsed conditionally the condition may be disregarded by the payer; and payment to the indorsee is valid whether the condition has been fulfilled or not.

**Indorsement in blank and special indorsement**

33    (1)    An indorsement in blank specifies no indorsee, and a bill so indorsed becomes payable to bearer.

(2)    A special indorsement specifies the person to whom, or to whose order, the bill is to be payable.

(3)    The provisions of this Act relating to a payee apply with the necessary modifications to an indorsee under a special indorsement.

(4)    When a bill has been indorsed in blank, any holder may convert the blank indorsement into a special indorsement by writing above the indorser's signature a direction to pay the bill to or to the order of himself or some other person.

**Restrictive indorsement**

34    (1)    An indorsement is restrictive which prohibits the further negotiation of the bill or which expresses that it is a mere authority to deal with the bill as thereby directed and not a transfer of the ownership thereof, as, for example, if a bill is indorsed "Pay D. only" or "Pay D. for the account of X.," or "Pay D. or order for collection.".

(2)    A restrictive indorsement gives the indorsee the right to receive payment of the bill and to sue any party thereto that his indorser could have sued, but gives him no power to transfer his rights as indorsee unless it expressly authorizes him to do so.

(3)    Where a restrictive indorsement authorizes further transfer, all subsequent indorsees take the bill with the same rights and subject to the same liabilities as the first indorsee under the restrictive indorsement.

**BILLS OF EXCHANGE ACT 1934**

**Negotiation of overdue or dishonoured bill**

35    (1)    Where a bill is negotiable in its origin it continues to be negotiable until it has been restrictively indorsed or discharged by payment or otherwise.

(2)    Where an overdue bill is negotiated, it can only be negotiated subject to any defect of title affecting it at its maturity, and thenceforward no person who takes it can acquire or give a better title than that which the person from whom he took it had.

(3)    A bill payable on demand is deemed to be overdue within the meaning, and for the purposes of, this section, when it appears on the face of it to have been in circulation for an unreasonable length of time; and what is an unreasonable length of time for this purpose is declared to be a question of fact.

(4)    Except where an indorsement bears date after the maturity of the bill, every negotiation is, prima facie, deemed to have been effected before the bill was overdue.

(5)    Where a bill which is not overdue has been dishonoured, then any person who takes it with notice of the dishonour takes it subject to any defect of title attaching thereto at the time of dishonour; but nothing in this subsection shall affect the rights of a holder in due course.

**Negotiation of bill to party already liable thereon**

36    Where a bill is negotiated back to the drawer, or to a prior indorser or to the acceptor, such party may, subject to this Act re-issue and further negotiate the bill; but he is not entitled to enforce payment of the bill against any intervening party to whom he was previously liable.

**Rights of holder**

37    The rights and powers of the holder of a bill are as follows—

(a) he may sue on the bill in his own name;

(b) where he is a holder in due course, he holds the bill free from any defect of title of prior parties, as well as from mere personal defences, available to prior parties among themselves, and may enforce payment against all parties liable on the bill;

(c) where his title is defective if he negotiates the bill to a holder in due course, that holder obtains a good and complete title to the bill, and if he obtains payment of

the bill the person who pays him in due course gets a valid discharge for the bill.

**When presentment for acceptance is necessary**

38    (1)    Where a bill is payable after sight, presentment for acceptance is necessary in order to fix the maturity of the instrument.

(2)    Where a bill expressly stipulates that it shall be presented for acceptance, or where a bill is drawn payable elsewhere than at the residence or place of business of the drawee, it must be presented for acceptance before it can be presented for payment.

(3)    In no other case is presentment for acceptance necessary in order to render liable any party to the bill.

(4)    Where the holder of a bill, drawn payable elsewhere than at the place of business or residence of the drawee, has not time, with the exercise of reasonable diligence, to present the bill for acceptance before presenting it for payment on the day that it falls due, then the delay caused by presenting the bill for acceptance before presenting it for payment is excused, and does not discharge the drawer and indorsers.

**Time for presenting bill payable after sight**

39    (1)    Subject to this Act, when a bill payable after sight is negotiated, the holder must either present it for acceptance or negotiate it within a reasonable time.

(2)    If he does not present the bill for acceptance or negotiate it, the drawer and all indorsers prior to that holder are discharged.

(3)    In determining what is a reasonable time within the meaning of this section, regard shall be had to the nature of the bill, the usage of trade with respect to similar bills, and the facts of the particular case.

**Rules as to presentment for acceptance; excuses for non-presentment**

40    (1)    A bill is duly presented for acceptance which is presented in accordance with the following rules—

(a) the presentment must be made by or on behalf of the holder to the drawee or to some person authorized to accept or refuse acceptance on his behalf at a reasonable hour on a business day and before the bill is overdue;

(b) where a bill is addressed to two or more drawees, who are not partners, presentment must be made to them all, unless one has authority to accept for all, then presentment may be made to him only;

**BILLS OF EXCHANGE ACT 1934**

(c) where the drawee is dead presentment may be made to his personal representative;

(d) where the drawee is bankrupt, presentment may be made to him or to his trustee;

(e) where authorized by agreement or usage, a presentment through the post office is sufficient.

(2)    Presentment in accordance with these rules is excused, and a bill may be treated as dishonoured by non-acceptance—

(a) where the drawee is dead or bankrupt, or is a fictitious person or a person not having capacity to contract by bill;

(b) where, after the exercise of reasonable diligence, such presentment cannot be effected;

(c) where, although the presentment has been irregular, acceptance has been refused on some other ground.

(3)    The fact that the holder has reason to believe that the bill, on presentment, will be dishonoured does not excuse presentment.

**Non-acceptance of bill**
41       When a bill is duly presented for acceptance and is not accepted within the customary time, the person presenting the bill must treat it as dishonoured by non-acceptance.

If he does not so treat it, the holder shall lose his right of recourse against the drawer and indorsers.

**Dishonour by non-acceptance**
42       (1)    A bill is dishonoured by non-acceptance—

(a) when it is duly presented for acceptance, and such an acceptance as is prescribed by this Act is refused or cannot be obtained; or

(b) when presentment for acceptance is excused and the bill is not accepted.

(2)    Subject to this Act, when a bill is dishonoured by non-acceptance, an immediate right of recourse against the drawer and in-

dorsers accrues to the holder, and no presentment for payment is necessary.

### Duties as to qualified acceptance

43    (1)    The holder of a bill may refuse to take a qualified acceptance, and if he does not obtain an unqualified acceptance may treat the bill as dishonoured by non-acceptance.

(2)    Where a qualified acceptance is taken, and the drawer or an indorser has not expressly or impliedly authorized the holder to take a qualified acceptance, or does not subsequently assent thereto, such drawer or indorser is discharged from his liability on the bill.

This subsection does not apply to a partial acceptance, whereof due notice has been given.

(3)    Where a foreign bill has been accepted as to part, it must be protested as to the balance.

(4)    When the drawer or indorser of a bill receives notice of a qualified acceptance, and does not within a reasonable time express his dissent to the holder, he shall be deemed to have assented thereto.

### Rules as to presentment for payment

44    (1)    Subject to this Act a bill must be duly presented for payment; and if it is not so presented the drawer and indorsers shall be discharged.

(2)    A bill is duly presented for payment which is presented in accordance with the following rules—

(a)    where the bill is not payable on demand, presentment must be made on the day it falls due;

(b)    where the bill is payable on demand, then, subject to this Act, presentment must be made within a reasonable time after its issue in order to render the drawer liable, and within a reasonable time after its indorsement, in order to render the indorser liable.

In determining what is a reasonable time, regard shall be had to the nature of the bill, the usage of trade with regard to similar bills, and the facts of the particular case;

(c)    presentment must be made by the holder or by some person authorized to receive payment on his behalf at a reasonable hour on a business day, at the proper place as hereinafter defined, either to the person designated by

**BILLS OF EXCHANGE ACT 1934**

the bill as payer, or to some person authorized to pay or refuse payment on his behalf if with the exercise of reasonable diligence such person can there be found;

(d) a bill is presented at the proper place—

    (i)    where a place of payment is specified in the bill and the bill is there presented;

    (ii)    where no place of payment is specified, but the address of the drawee or acceptor is given in the bill, and the bill is there presented;

    (iii)    where no place of payment is specified and no address is given, and the bill is presented at the drawee's or acceptor's place of business, if known, and, if not, at his ordinary residence, if known;

    (iv)    in any other case, if presented to the drawee or acceptor wherever he can be found, or if presented at his last known place of business or residence;

(e) where a bill is presented at the proper place, and after the exercise of reasonable diligence no person authorized to pay or refuse payment can be found there, no further presentment to the drawee or acceptor is required;

(f) where a bill is drawn upon, or accepted by, two or more persons who are not partners, and no place of payment is specified, presentment must be made to them all;

(g) where the drawee or acceptor of a bill is dead, and no place of payment is specified, presentment must be made to a personal representative, if such there is, and with the exercise of reasonable diligence he can be found;

(h) where authorized by agreement or usage a presentment through the post office is sufficient.

**Excuse for delay or non-presentment for payment**

45    (1)    Delay in making presentment for payment is excused when

the delay is caused by circumstances beyond the control of the holder, and not imputable to his default, misconduct or negligence; but when the cause of delay ceases to operate presentment must be made with reasonable diligence.

(2)    Presentment for payment is dispensed with—

(a) where, after the exercise of reasonable diligence, presentment, as required by this Act, cannot be effected.

The fact that the holder has reason to believe that the bill will, on presentment, be dishonoured, does not dispense with the necessity for presentment;

(b) where the drawee is a fictitious person;

(c) as regards the drawer, where the drawee or acceptor is not bound, as between himself and the drawer, to accept or pay the bill, and the drawer has no reason to believe that the bill would be paid if presented;

(d) as regards an indorser, where the bill was accepted or made for the accommodation of that indorser and he has no reason to expect that the bill would be paid if presented;

(e) by waiver of presentment, express or implied.

**Dishonour by non-payment**
46      (1)    A bill is dishonoured by non-payment—

(a) when it is duly presented for payment and payment is refused or cannot be obtained; or

(b) when presentment is excused and the bill is overdue and unpaid.

(2)    Subject to this Act, when a bill is dishonoured by non-payment, an immediate right of recourse against the drawer and indorsers accrues to the holder.

**Notice of dishonour and effect of non-notice**
47      Subject to this Act, when a bill has been dishonoured by non-acceptance or by non-payment, notice of dishonour must be given to the drawer and each indorser, and any drawer or indorser to whom such notice is not given is discharged:

Provided that—

(a) where a bill is dishonoured by non-acceptance, and notice of dishonour is not given, the rights of a holder in

**BILLS OF EXCHANGE ACT 1934**

due course subsequent to the omission shall not be prejudiced by the omission;

(b) where a bill is dishonoured by non-acceptance and due notice of dishonour is given, it shall not be necessary to give notice of a subsequent dishonour by non-payment unless the bill is, in the meantime, accepted.

**Rules as to notice of dishonour**

48      Notice of dishonour in order to be valid and effectual must be given in accordance with the following rules—

(a) the notice must be given by or on behalf of the holder, or by or on behalf of an indorser who, at the time of giving it, is himself liable on the bill;

(b) notice of dishonour may be given by an agent either in his own name, or in the name of any party entitled to give notice, whether that party be his principal or not;

(c) where the notice is given by or on behalf of the holder, it enures for the benefit of all subsequent holders and all prior indorsers who have a right of recourse against the party to whom it is given;

(d) where notice is given by or on behalf of an indorser entitled to give notice as hereinbefore provided, it enures for the benefit of the holder and all indorsers subsequent to the party to whom notice is given;

(e) the notice may be given in writing or by personal communication, and may be given in any terms which sufficiently identify the bill, and intimate that the bill has been dishonoured by non-acceptance or non-payment;

(f) the return of a dishonoured bill to the drawer or an indorser is, in point of form, deemed to be a sufficient notice of dishonour;

(g) a written notice need not be signed, and an insufficient written notice may be supplemented and validated by verbal communication; and a misdescription of the bill shall not vitiate the notice unless the party to whom the notice is given is in fact misled thereby;

(h) where notice of dishonour is required to be given to any person, it may be given either to the party himself, or to his agent in that behalf;

(i) where the drawer or indorser is dead, and the party giving notice knows it, the notice must be given to a personal representative if such there be, and with the exercise of reasonable diligence he can be found;

(j) where the drawer or indorser is bankrupt, notice may be given either to the party himself or to the trustee;

(k) where there are two or more drawers or indorsers who are not partners, notice must be given to each of them, unless one of them has authority to receive such notice for the others;

(l) the notice may be given as soon as the bill is dishonoured, and must be given within a reasonable time thereafter.

In the absence of special circumstances notice is not deemed to have been given within a reasonable time, unless—

   (i) where the person giving and the person to receive notice reside in the same place, the notice is given or sent off in time to reach the latter on the day after the dishonour of the bill;

   (ii) where the person giving and the person to receive notice reside in different places, the notice is sent off on the day after the dishonour of the bill, if there is a post at a convenient hour on that day, and, if there is no such post on that day, then by the next post thereafter;

(m) where a bill, when dishonoured, is in the hands of an agent, he may either himself give notice to the parties liable on the bill, or he may give notice to his principal; and if he gives notice to his principal, he must do so within the same time as if he were the holder, and the principal upon receipt of such notice has himself the same time for giving notice as if the agent had been an independent holder;

(n) where a party to a bill receives due notice of dishonour, he has after the receipt of such notice the same period of time for giving notice to antecedent parties that the holder has after the dishonour;

**BILLS OF EXCHANGE ACT 1934**

(o) where a notice of dishonour is duly addressed and posted, the sender is deemed to have given due notice of dishonour, notwithstanding any miscarriage by the post office.

**Expenses for non-notice and delay**

49    (1)    Delay in giving notice of dishonour is excused where the delay is caused by circumstances beyond the control of the party giving notice, and not imputable to his default, misconduct, or negligence; but when the cause of delay ceases to operate the notice must be given with reasonable diligence.

(2)    Notice of dishonour is dispensed with—

(a) when, after the exercise of reasonable diligence, notice as required by this Act cannot be given to or does not reach the drawer or indorser sought to be charged;

(b) by waiver express or implied; notice of dishonour may be waived before the time of giving notice has arrived, or after the omission to give due notice;

(c) as regards the drawer, in the following cases—

(i)    where drawer and drawee are the same person;

(ii)    where the drawee is a fictitious person or a person not having capacity to contract;

(iii)    where the drawer is the person to whom the bill is presented for payment;

(iv)    where the drawee or acceptor is as between himself and the drawer under no obligation to accept or pay the bill;

(v)    where the drawer has countermanded payment;

(d) as regards the indorser, in the following cases—

(i)    where the drawee is a fictitious person or a person not having capacity to contract and the indorser was aware of the fact at the time he in-

dorsed the bill;

(ii)     where the indorser is the person to whom the bill is presented for payment;

(iii)    where the bill was accepted or made for his accommodation.

**Noting or protest of bill**

50     (1)    Where an inland bill has been dishonoured it may, if the holder thinks fit, be noted for non-acceptance or non--payment, as the case may be, but it shall not be necessary to note or protest any such bill in order to preserve the recourse against the drawer or indorser.

(2)    Where a foreign bill, appearing on the face of it to be such, has been dishonoured by non-acceptance, it must be duly protested for non-acceptance, and where such a bill, which has not been previously dishonoured by non-acceptance, is dishonoured by non-payment it must be duly protested for non-payment; and if it is not so protested the drawer and indorsers are discharged.

(3)    Where a bill does not appear on the face of it to be a foreign bill, protest thereof in the case of dishonour is unnecessary.

(4)    A bill which has been protested for non-acceptance may be subsequently protested for nonpayment.

(5)    Subject to this Act, when a bill is noted or protested, it may be noted on the day of its dishonour and must be noted not later than the next succeeding business day. When a bill has been duly noted, the protest may be subsequently extended as of the date of the noting.

(6)    Where the acceptor of a bill becomes a bankrupt or insolvent or suspends payment before it matures, the holder may cause the bill to be protested for better security against the drawer and indorsers.

(7)    A bill must be protested at the place where it is dishonoured:

Provided that—

(a) when a bill is presented through the post office, and returned by post dishonoured, it may be protested at the place to which it is returned, and on the day of its return if received during business hours, and if not received during business hours, then not later than the next business day;

(b) when a bill drawn payable at the place of business or residence of some person other than the drawee, has

**BILLS OF EXCHANGE ACT 1934**

been dishonoured by non-acceptance, it must be protested for non-payment at the place where it is expressed to be payable, and no further presentment for payment to, or demand on, the drawee is necessary.

(8)    A protest must contain a copy of the bill, and must be signed by the notary making it, and must specify—

(a) the person at whose request the bill is protested;

(b) the place and date of protest, the cause or reason for protesting the bill, the demand made, and the answer given, if any, or the fact that the drawee or acceptor could not be found.

(9)    Where a bill is lost or destroyed, or is wrongly detained from the person entitled to hold it, protest may be made on a copy or written particulars thereof.

(10)  Protest is dispensed with by any circumstance which would dispense with notice of dishonour. Delay in noting or protesting is excused when the delay is caused by circumstances beyond the control of the holder, and not imputable to his default, misconduct, or negligence. When the cause of delay ceases to operate the bill must be noted or protested with reasonable diligence.

**Duties of holder as regards drawee or acceptor**

51    (1)    When a bill is accepted generally presentment for payment is not necessary in order to render the acceptor liable.

(2)    When by the terms of a qualified acceptance presentment for payment is required, the acceptor, in the absence of an express stipulation to that effect, is not discharged by the omission to present the bill for payment on the day that it matures.

(3)    In order to render the acceptor of a bill liable it is not necessary to protest it, or that notice of dishonour should be given to him.

(4)    Where the holder of a bill presents it for payment, he shall exhibit the bill to the person from whom he demands payment, and when a bill is paid the holder shall forthwith deliver it up to the party paying it.

**Funds in hands of drawee**

52    A bill, of itself, does not operate as an assignment of funds in the hands of the drawee available for the payment thereof, and the

drawee of a bill who does not accept as required by this Act is not liable on the instrument.

**Liability of acceptor**

53    The acceptor of a bill, by accepting it—

(a) engages that he will pay it according to the tenor of his acceptance;

(b) is precluded from denying to a holder in due course—

(i)    the existence of the drawer, the genuineness of his signature, and his capacity and authority to draw the bill;

(ii)    in the case of a bill payable to drawer's order, the then capacity of the drawer to indorse, but not the genuineness or validity of his indorsement;

(iii)    in the case of a bill payable to the order of a third person, the existence of the payee and his then capacity to indorse, but not the genuineness or validity of his indorsement.

**Liability of drawer or indorser**

54    (1)    The drawer of a bill by drawing it—

(a) engages that on due presentment it shall be accepted and paid according to its tenor, and that if it is dishonoured he will compensate the holder or any indorser who is compelled to pay it, provided that the requisite proceedings on dishonour are duly taken;

(b) is precluded from denying to a holder in due course the existence of the payee and his then capacity to indorse.

(2)    The indorser of a bill by indorsing it—

(a) engages that on due presentment it shall be accepted and paid according to its tenor, and that if it is dishonoured he will compensate the holder or a subsequent indorser who is compelled to pay it, provided that the requisite proceedings on dishonour are duly taken;

(b) is precluded from denying to a holder in due course the genuineness and regularity in all respects of the drawer's signature and all previous indorsements;

**BILLS OF EXCHANGE ACT 1934**

(c) is precluded from denying to his immediate or a subsequent indorsee that the bill was at the time of his indorsement a valid and subsisting bill, and that he had then a good title thereto.

**Liability of stranger signing bill as indorser**

55    Where a person signs a bill otherwise than as drawer or acceptor, he thereby incurs the liability of an indorser to a holder in due course.

**Measure of damages against parties to dishonoured bill**

56    Where a bill is dishonoured, the measure of damages, which shall be deemed to be liquidated damages, shall be as follows—

(a) the holder may recover from any party liable on the bill, and the drawer who has been compelled to pay the bill may recover from the acceptor, and an indorser who has been compelled to pay the bill may recover from the acceptor or from the drawer, or from any prior indorser—

(i)    the amount of the bill;

(ii)   interest thereon from the time of presentment for payment if the bill is payable on demand, and from the maturity of the bill in any other case; and

(iii)  the expenses of noting, or, when protest is necessary, and the protest has been extended, the expenses of protest;

(b) in the case of a bill which has been dishonoured abroad, in lieu of the above damages, the holder may recover from the drawer or an indorser, and the drawer or an indorser who has been compelled to pay the bill may recover from any party liable to him, the amount of the re-exchange with interest thereon until the time of payment;

(c) where by this Act interest may be recovered as damages, such interest may, if justice requires it, be withheld wholly or in part, and where a bill is expressed to be payable with interest at a given rate, interest as

damages may or may not be given at the same rate as interest proper.

**Transferor by delivery and transferee**

57    (1)    Where the holder of a bill payable to bearer negotiates it by delivery without indorsing it, he is called a "transferor by delivery".

(2)    A transferor by delivery is not liable on the instrument.

(3)    A transferor by delivery who negotiates a bill thereby warrants to his immediate transferee being a holder for value that the bill is what it purports to be, that he has a right to transfer it, and that at the time of transfer he is not aware of any fact which renders it valueless.

**Discharge of bill by payment in due course**

58    (1)    A bill is discharged by payment in due course by or on behalf of the drawee or acceptor.

In this subsection "payment in due course" means payment made at or after the maturity of the bill to the holder thereof in good faith and without notice that his title to the bill is defective.

(2)    Subject to the provisions hereinafter contained, when a bill is paid by the drawer or an indorser it is not discharged; but

(a)    where a bill payable to, or to the order of, a third party is paid by the drawer the drawer may enforce payment thereof against the acceptor, but may not re-issue the bill;

(b)    where a bill is paid by an indorser, or where a bill payable to drawer's order is paid by the drawer, the party paying it is remitted to his former rights as regards the acceptor or antecedent parties, and he may, if he thinks fit, strike out his own and subsequent indorsements, and again negotiate the bill.

(3)    Where an accommodation bill is paid in due course by the party accommodated the bill is discharged.

**Banker paying on demand draft whereon endorsement is forged**

59    When a bill payable to order on demand is drawn on a banker, and the banker on whom it is drawn pays the bill in good faith and in the ordinary course of business, it is not incumbent on the banker to show that the indorsement of the payee or any subsequent indorsement was made by or under the authority of the person whose indorsement it purports to be, and the banker is deemed to have paid the bill in due

**BILLS OF EXCHANGE ACT 1934**

course, although such indorsement has been forged or made without authority.

**Acceptor the holder at maturity**
60    When the acceptor of a bill is or becomes the holder of it at or after its maturity, in his own right, the bill is discharged.

**Express waiver**
61    (1)    When the holder of a bill at or after its maturity absolutely and unconditionally renounces his rights against the acceptor the bill is discharged.

(2)    The renunciation must be in writing, unless the bill is delivered up to the acceptor.

(3)    The liabilities of any party to a bill may in like manner be renounced by the holder before, at, or after its maturity; but nothing in this section shall affect the rights of a holder in due course without notice of the renunciation.

**Cancellation of bill**
62    (1)    Where a bill is intentionally cancelled by the holder or his agent, and the cancellation is apparent thereon, the bill is discharged.

(2)    In like manner any party liable on a bill may be discharged by the intentional cancellation of his signature by the holder or his agent. In such case any indorser who would have had a right of recourse against the party whose signature is cancelled, is also discharged.

(3)    A cancellation made unintentionally, or under a mistake, or without the authority of the holder, is inoperative; but where a bill or any signature thereon appears to have been cancelled the burden of proof lies on the party who alleges that the cancellation was made unintentionally, or under a mistake, or without authority.

**Alteration of bill**
63    (1)    Where a bill or acceptance is materially altered without the assent of all parties liable on the bill, the bill is avoided except as against a party who has himself made, authorized, or assented to the alteration, and subsequent indorsers:

Provided that where a bill has been materially altered, but the alteration is not apparent, and the bill is in the hands of a holder in due course, such holder may avail himself of the bill as if it had not been al-

tered, and may enforce payment of it according to its original tenor.

(2)   In particular the following alterations are material, that is to say, any alteration of the date, the sum payable, the time of payment, the place of payment, and, where a bill has been accepted generally, the addition of a place of payment without the acceptor's assent.

**Acceptance for honour supra protest**

64      (1)   Where a bill of exchange has been protested for dishonour by non-acceptance, or protested for better security, and is not overdue, then any person, not being a party already liable thereon, may, with the consent of the holder, intervene and accept the bill supra protest, for the honour of any party liable thereon, or for the honour of the person for whose account the bill is drawn.

(2)   A bill may be accepted for honour for part only of the sum for which it is drawn.

(3)   An acceptance for honour supra protest must, in order to be valid—

   (a) be written on the bill, and indicate that it is an acceptance for honour;

   (b) be signed by the acceptor for honour.

(4)   Where an acceptance for honour does not expressly state for whose honour it is made, it is deemed to be an acceptance for the honour of the drawer.

(5)   Where a bill payable after sight is accepted for honour its maturity is calculated from the date of the noting, for non-acceptance, and not from the date of the acceptance for honour.

**Liability of acceptor for honour**

65      (1)   The acceptor for honour of a bill by accepting it engages that he will, on due presentment, pay the bill according to the tenor of his acceptance, if it is not paid by the drawee, provided it has been duly presented for payment, and protested for non-payment, and that he receives notice of these facts.

(2)   The acceptor for honour is liable to the holder and to all parties to the bill subsequent to the party for whose honour he has accepted.

**Presentment to acceptor for honour**

66      (1)  Where a dishonoured bill has been accepted for honour supra protest, or contains a reference in case of need, it must be

**BILLS OF EXCHANGE ACT 1934**

protested for non-payment before it is presented for payment to the acceptor for honour, or referee in case of need.

(2)   Where the address of the acceptor for honour is in the same place where the bill is protested for non-payment, the bill must be presented to him not later than the day following its maturity; and where the address of the acceptor for honour is in some place other than that place where it was protested for non-payment, the bill must be forwarded not later than the day following its maturity for presentment to him.

(3)   Delay in presentment or non-presentment is excused by any circumstance which would excuse delay in presentment for payment or non-presentment for payment.

(4)   When a bill of exchange is dishonoured by the acceptor for honour it must be protested for non-payment by him.

**Payment for honour supra protest**
67      (1)   Where a bill has been protested for non-payment, any person may intervene and pay it supra protest for the honour of any party liable thereon, or for the honour of the person for whose account the bill is drawn.

(2)   Where two or more persons offer to pay a bill for the honour of different parties, the person whose payment will discharge most parties to the bill shall have the preference.

(3)   Payment for honour supra protest, in order to operate as such and not as a mere voluntary payment, must be attested by a notarial act of honour which may be appended to the protest or form an extension of it.

(4)   The notarial act of honour must be founded on a declaration made by the payer for honour, or his agent in that behalf, declaring his intention to pay the bill for honour, and for whose honour he pays.

(5)   Where a bill has been paid for honour, all parties subsequent to the party for whose honour it is paid are discharged, but the payer for honour is subrogated for, and succeeds to both the rights and duties of, the holder as regards the party for whose honour he pays, and all parties liable to that party.

(6)   The payer for honour on paying to the holder the amount of the bill and the notarial expenses incidental to its dishonour is entitled to receive both the bill itself and the protest. If the holder do not on demand deliver them up he shall be liable to the payer for honour in damages.

*Laws of Bermuda*

(7)   Where the holder of a bill refuses to receive payment supra protest he shall lose his right of recourse against any party who would have been discharged by such payment.

**Rights of holder to duplicate of lost bill**

68      (1)   Where a bill has been lost before it is overdue, the person who was the holder of it may apply to the drawer to give him another bill of the same tenor, giving security to the drawer if required to indemnify him against all persons whatever in case the bill alleged to have been lost shall be found again.

(2)   If the drawer on request as aforesaid refuses to give such duplicate bill, he may be compelled to do so.

**Action on lost bill**

69      In any action or proceeding upon a bill, the Court or a Judge may order that the loss of the instrument shall not be set up, provided an indemnity is given to the satisfaction of the Court or Judge against the claims of any other person upon the instrument in question.

**Rules as to bills drawn in sets**

70      (1)   Where a bill is drawn in a set, each part of the set being numbered, and containing a reference to the other parts, the whole of the parts constitute one bill.

(2)   Where the holder of a set indorses two or more parts to different persons, he is liable on every such part, and every indorser subsequent to him is liable on the part he has himself indorsed as if the said parts were separate bills.

(3)   Where two or more parts of a set are negotiated to different holders in due course, the holder whose title first accrues is, as between such holders, deemed to be the true owner of the bill; but nothing in this subsection shall affect the rights of a person who in due course accepts or pays the part first presented to him.

(4)   The acceptance may be written on any part, and it must be written on one part only.

If the drawee accepts more than one part, and such accepted parts get into the hands of different holders in due course, he is liable on every such part as if it were a separate bill.

(5)   When the acceptor of a bill drawn in a set pays it without requiring the part bearing his acceptance to be delivered up to him, and that part at maturity is outstanding in the hands of a holder in due course, he is liable to the holder thereof.

and the sum payable is not expressed in the currency of the United Kingdom, the amount shall, in the absence of some expressed stipulation, be calculated according to the rate of exchange for sight drafts at the place of payment on the day the bill is paid; and

(e) where the bill is drawn in one country and is payable in another, the due date thereof is determined according to the law of the place where it is payable.

**Definition of cheque; application of Act**
72    (1)    A cheque is a bill of exchange drawn on a banker payable on demand.

(2)    Except as otherwise provided in the next two following sections, this Act applicable to a bill of exchange on demand apply to a cheque.

**Presentment of cheque for payment**
73    Subject to this Act—

(a) where a cheque is not presented for payment within a reasonable time of its issue, and the drawer or the person on whose account it is drawn had the right at the time of such presentment as between him and the banker to have the cheque paid and suffers actual damage through the delay, he is discharged to the extent of such damage, that is to say, to the extent to which such drawer or person is a creditor of such banker to a larger amount than he would have been had such cheque been paid;

(b) in determining what is a reasonable time regard shall be had to the nature of the instrument, the usage of trade and of bankers, and the facts of the particular case;

(c) the holder of such cheque as to which such drawer or person is discharged shall be a creditor, in lieu of such drawer or person, of such banker to the extent of such discharge, and entitled to recover the amount from him.

**Revocation of banker's authority**
74    The duty and authority of a banker to pay a cheque drawn on him by his customer are determined—

(a) by countermand of payment;

(b) by notice of the customer's death.

**BILLS OF EXCHANGE ACT 1934**

**Definition of promissory note**

75      (1)   A promissory note is an unconditional promise in writing made by one person to another signed by the maker, engaging to pay, on demand or at a fixed or determinable future time, a sum certain in money to, or to the order of, a specified person or to bearer.

(2)   An instrument in the form of a note payable to maker's order is not a note within the meaning of this section unless and until it is indorsed by the maker.

(3)   A note is not invalid by reason only that it contains also a pledge of collateral security with authority to sell or dispose thereof.

(4)   A note which is, or on the face of it purports to be, both made and payable within Bermuda is an inland note; and any other note is a foreign note.

**Effect of delivery of promissory note**

76      A promissory note is inchoate and incomplete until delivery thereof to the payee or bearer.

**Joint and several promissory notes**

77      (1)   A promissory note may be made by two or more makers, and they may be liable thereon jointly, or jointly and severally according to its tenor.

(2)   Where a note runs "I promise to pay" and is signed by two or more persons it is deemed to be their joint and several note.

**Promissory note payable on demand**

78      (1)   Where a note payable on demand has been indorsed, it must be presented for payment within a reasonable time of the indorsement; and if it is not so presented the indorser is discharged.

(2)   In determining what is a reasonable time, regard shall be had to the nature of the instrument, the usage of trade, and the facts of the particular case.

(3)   Where a note payable on demand is negotiated, it is not deemed to be overdue, for the purpose of affecting the holder with defects of title of which he had no notice, by reason that it appears that a reasonable time for presenting it for payment has elapsed since its issue.

**Presentment of promissory note for payment**

79    (1)    Where a promissory note is in the body of it made payable at a particular place, it must be presented for payment at that place in order to render the maker liable; but in any other case presentment for payment is not necessary in order to render the maker liable.

(2)    Presentment for payment is necessary in order to render the indorser of a note liable.

(3)    Where a note is in the body of it made payable at a particular place, presentment at that place is necessary in order to render an indorser liable; but when a place of payment is indicated by way of memorandum only, presentment at that place is sufficient to render the indorser liable; but a presentment to the maker elsewhere, if sufficient in other respects, shall also suffice.

**Liability of maker of promissory note**

80    The maker of a promissory note by making it—

(a) engages that he will pay it accordingly to its tenor;

(b) is precluded from denying to a holder in due course the existence of the payee and his then capacity to indorse.

**Application of certain provisions of Act to promissory notes**

81    (1)    Subject sections 75 to 80 and except as by this section provided, the provisions of this Act relating to bills of exchange apply, with the necessary modifications, to promissory notes.

(2)    In applying those provisions the maker of a note shall be deemed to correspond with the acceptor of a bill, and the first indorser of a note shall be deemed to correspond with the drawer of an accepted bill payable to drawer's order.

(3)    The following provisions as to bills do not apply to notes—

(a) provisions relating to presentment for acceptance;

(b) provisions relating to acceptance;

(c) provisions relating to acceptance supra protest; and

(d) provisions relating to bills in a set.

(4)    Where a foreign note is dishonoured, protest thereof is unnecessary.

**BILLS OF EXCHANGE ACT 1934**

**Good faith**

82      A thing is deemed to be done in good faith, within the meaning of this Act, where it is in fact done honestly, whether it is done negligently of not.

**Signature of instrument**

83      (1)   Where, by this Act, any instrument or writing is required to be signed by any person, it is not necessary that he should sign it with his own hand, but it is sufficient if his signature is written thereon by some other person by or under his authority.

(2)   In the case of a corporation, where by this Act, any instrument or writing is required to be signed, it is sufficient if the instrument or writing is sealed with the corporate seal:

Provided that nothing in this section shall be construed as requiring the bill or note of a corporation to be under seal.

**Computation of time**

84      (1)   Where, by this Act, the time allowed for doing any act or thing, is less than three days, then in reckoning time, nonbusiness days are excluded.

(2)   For the purpose of this Act, "nonbusiness day" means a public holiday.

**When noting equivalent to protest**

85      For the purposes of this Act, where a bill or note is required to be protested within a specified time or before some further proceeding is taken, it is sufficient that the bill had been noted for protest before the expiration of the specified time or the taking of the proceeding; and the formal protest may be extended at any time thereafter as of the date of noting.

**Protest when notary not accessible**

86      (1)   Where a dishonoured bill or note is authorized or required to be protested, and the services of a notary cannot be obtained at the place where the bill is dishonoured, then any householder or substantial resident of the place may, in the presence of two witnesses, give a certificate, signed by them, attesting the dishonour of the bill, and the certificate shall in all respects operate as if it were a formal protest of the bill.

(2)   The form set out in the Schedule may be used with necessary modifications, and if used shall be sufficient.

**Saving for rules of common law**

87    The rules of common law, including the law merchant, save in so far as they are inconsistent with the express provisions of this Act, shall continue to apply to bills of exchange, promissory notes, and cheques.

## SCHEDULE

Form of protest which may be used when the services of a notary cannot be obtained

Know all men that I, A.B. [*householder,*] of

Parish in Bermuda, at the request of C.D., there being no notary public available, did on the [*blank*] day of [*blank*] 19 [*blank*], at [*blank*] demand payment [*or acceptance*] of the bill of exchange hereunder written, from E.F., to which demand he made answer [*state answer, if any*] wherefore I now, in the presence of G.H. and J.K., do protest the said bill of exchange.

(signed) A.B.

G.H.            Witnesses.

J.K.

N.B. The bill itself should be annexed, or a copy of the bill and all that is written thereon should be underwritten.



**BILLS OF EXCHANGE ACT 1934**

*[This page intentionally left blank]*

[Amended by
    1947 : 35]

*1989 Revision*



# In the Supreme Court of Bermuda

CIVIL JURISDICTION 1993 No. 302

| | |
|---|---|
| ARNOLD LESLIE JOAQUIN | Plaintiff |
| - and - | |
| ALEXANDER DEAN ABBOTT | 1st Defendant |
| - and - | |
| ANTHONY CHARLES BURGESS | 2nd Defendant |

-----------

Mr. Lord for the Plaintiff
Ms. Harvey for the 2nd Defendant

## JUDGMENT
(extempore)

This is an action on a promissory note.   Originally the action was against the 1st Defendant on one note and against the 2nd Defendant on a second note.

The background is that the 2nd Defendant took over the debt of the 1st Defendant.   The first note was for two years, maturing on the 12th April 1992.   It carried interest. Tthe interest was to be paid in two annual instalments of **$19,950.00** each.   The 1st Defendant paid the first installment, but he only paid part of the second, leaving arrears of **$10,017.71** and that figure, as I understand it is agreed.

Before the maturity date of the first note, the 2nd Defendant, Mr. Burgess,  entered into negotiations with the plaintiff with a view to taking over the 1st Defendant's liability under the first note.     I should say as an aside here that it appears that that liability related to the purchase of a house.   It is not necessary to know that for the purpose of this action, but it perhaps helps to explain the way these things came about.

It was eventually agreed between the plaintiff and 2nd Defendant that he would take over the liability of the 1st Defendant, but according to the attorney, Mr. Francis Morris,  the 2nd Defendant was slow in coming into his office to sign the promissory note,  and indeed the second note was not signed until the 30th November 1992.   Under that note the 2nd

2

Defendant assumed the principle of $285,000 which had been due under the first note and the balance of interest due in respect of the first note. Now there is a dispute as to the amount of that interest: I simply note it at this stage, and will return to it later.

In those circumstances, as I have outlined them briefly by way of introduction, the plaintiff wisely discontinued against the 1st Defendant, so that this action proceeded before me against the 2nd Defendant alone, on the second promissory note, that of the 30th November 1992.    That second note is not disputed.    A copy of it is in the agreed bundle at pages 9 and 10.    There are now only two items of dispute, as follows:-

1) The computation of interest due in respect of the first note is disputed.    This is set out in the second note as a liquidated sum. The 2nd Defendant now says that that liquidated sum is mistaken and seeks rectification.    The claim for rectification was only pleaded by amendment very late in this action.    Indeed it was first raised by tentative amendment on the 6th May, which is the Friday before this action began on the Monday.    When the matter came before me on Monday, a further amended document was put before me, which included a counterclaim for rectification.    I allowed that amendment and we proceeded on that basis.    I should also say that the 2nd Defendant tendered a lesser sum representing his computation of the money due in respect of interest, and in respect of the first promissory note, just before the trial. That was refused.

2) The due date for the principal under the second note is disputed. The 2nd Defendant says it is not due until the 30th November 1996, four years from the date of the note.    The plaintiff says the principle became due on demand, or at least it became due on demand when default was made in the payment of interest.

I will deal with each of those points of issues separately. The first is the computation of interest in respect of the first note.    In the second note there are two elements,    included in the sum expressed as the principal sum.    That sum is **$307,652.70**.  It is comprised of the carried forward principal from the first note ▪ being $285,000 ▪ plus (according

to the terms of the second note) accumulated arrears of interest of **$22,652.70,** described in the second note as "now due and owing as at the date hereof".    That second sum was to be reduced under the terms of the second note by monthly payments of $1000.

The 2nd Defendant says that the sum **$22,652.70** is mistaken, and that the agreement between the parties was that the sum which would be carried forward into the second note in respect of the accumulated interest, would be limited to interest due on the note as at its expiry date. That would be the balance of the second annual instalment, being $1017.71. The remainder of the **$22,652.00** appears to be attributable to the seven or so months after the expiry of the first note and before the 30th November 1992. The second defendant, through his counsel, argues that at law the interest that might have accumulated during that period is not properly to be regarded as interest under the first note at all but is at best claimable as damages in any action on the first note.    Counsel relies in support of this upon section 56 of the Bills of **Exchange** Act 1934 and also on the case of Cook v. Fowler and **Ors.**(1874) L.R. 7 H.L. 27. I have no dispute with that principle of law in respect of promissory notes or indeed any bill of exchange.    Any sum accruing after the maturity date is properly to be regarded as damages and not strictly as interest, and that has various consequences at law. For instance, the sum which may be awarded by the court in respect of those damages is not limited to the amount of interest specified in the instrument, and may be more or less, depending on the state of the market at the time.    In the 19th century this may also have had an added importance when damages could not be recovered in an action for debt.    That distinction at least has fallen away now.

I allowed a late amendment for the 2nd defendant to raise this point, because –

(a) there is no inconvenience to the plaintiff, as the relevant witnesses were coming in any event.

**(b)** it was appropriate that all issues in dispute should be determined at this trial.

While the rule against parole evidence normally forbids a challenge to such a formal document as this promissory note by oral evidence as to what

the parties had in fact agreed,   it appears that on a claim for rectification such oral evidence is allowed, and in support of this I was referred to Chitty on Contracts, 26th edition paragraph 377. I did therefore entertain that evidence,   and on the basis of the authority of that paragraph hold that it was admissible.

The evidence as to what was agreed, and as to how the note came to be signed showing the larger sum of **$22,652.00,** came primarily from Mr. Francis Morris, the attorney who acted for all parties in this matter, and also for Mr. Burgess, the 2nd Defendant.   What Mr. Morris says was that he took Mr. Burgess through his computation for the interest due, which was broken down into the sum due on the note up to maturity, and the sum accruing thereafter at the rate of **7%,** and that that amount, the amount which was included in the note was therefore agreed by Mr. Burgess who read it, heard the explanation and signed the note.   Mr. Morris says that over the months before 30th November 1992 he had to keep redoing the interest calculation as Mr. Burgess had been slow in coming in, and the interest had therefore mounted up.

What Mr. Burgess said is as follows,   I shall read from his evidence in chief and from his cross-examination.   In chief he said

> "Francis Morris calculated the figures in his office, but it was
> $285,000 and the balance of the interest which was $10,000 which I had
> agreed.   I gave Mr. Abbott (that was the 1st Defendant) $10,000 before
> signing to send on to Mr. Joaquin, the plaintiff.   I could not put a
> date on when that was.   It was possible two or three months before the
> November document, I can't really remember. Mr. Abbott had run into
> problems with L.P. Gutteridge.   I called Mr. Joaquin to let him know
> what was happening, and that I was willing to take over only for the
> $285,000 and for the half year's interest, because L.P. Gutteridge was
> getting ready to call the mortgage."

He then went on to explain the position with L.P. Gutteridge.   I don't think I need go into that.   He was cross-examined on this and on cross-examination he said

"I started discussions with Mr. Joaquin some six months before Abbott's note was was due. It had to be early 1992. It was before Abbott's note was due. The just was I would take over Abbott's liability under the note, meaning the principle and interest due on it. I never saw the note and Francis Morris gave me the figures of $285,000 and $10,000 for interest. Mr. Joaquin did that also. Francis Morris did the figures in his own office."

It was then put to him why, if he thought the amount due on the Abbott note was only $285,000 plus $10,000, he signed the promissory note which shows the sum of $22,652.00 due in respect of accumulated interest, and he said-

"I can add $285,000 and $10,000. I signed the note for $307,000 because I thought the amounts I paid to Abbott were paid to Joaquin. I paid Abbott $10,000 which should have reduced this figure by $10,000."

I say straight away that I do not see how a payment to Abbott, even if it had been properly made and passed on to Joaquin, explains how it was that Mr. Burgess came to except a liability in the note for $22,600.  If he felt he had reduced it by $10,000 by paying to Abbott to pay to Joaquin, and there was still some $10,000 left, that appears on the face of it to be an admission that he was accepting the accumulated interest in the interim.

Be that as it may, I accept Mr. Morris's evidence in respect of how it was that the note came to be signed, and in particular that he explained the sum to Mr. Burgess, and Mr. Burgess accepted it.  I do this because I find it inconceivable that the defendant, who is an intelligent and capable man whom I have seen in the witness box, could not grasp that $22,652 was more than the $10,000 odd that he had been told both by Mr. Morris and by Mr. Joaquin and (I take this from his own evidence) was the balance due under the Abbott note up to maturity.  If he knew that $10,000 was due on the Abbott note up to maturity, and he admits that he did, I can see no explanation for his signing a note for the greater amount,

6

unless he was willingly and freely except that greater amount.

I should also say that, having seen Mr. Morris give evidence and be cross-examined, I preferred his evidence to that of Mr. Burgess.   **And** if it were that the payment of $10,000 odd to Mr. Abbott affected the situation in some material way, I again find it inconceivable that Mr. Burgess would have signed the note in the form he did without demurring in some way.   I do also have to note here that the defendant did not raise the question of rectification until very late in day.   It did not appear in the pleadings until 6th May 1994.   I formed the view that this point was inspired more by counsel's legal analysis of the situation than Mr. Burgess's recollection of the events as they transpired.

I note that the burden or proof on rectification is a high one - I was referred to Chitty, paragraph 379.   That paragraph is headed "Proof of Mistake." It reads -

> "The burden of proof is on the party seeking rectification. He must produce "convincing proof" not only that the document to be rectified was not in accordance with the parties'  true intentions at the time of its execution, but also that the document in its proposed form does accord with their intentions. . . . Where it is sought to rectify a document in accordance with a prior agreement between the parties, it must be shown that the intention of the parties continued unaltered up to the time of the execution of the document."

Having heard all the evidence I find that the document represents what was in fact agreed at the time it was signed, and that at that **time the** 2nd Defendant was quite content then to assume a figure calculated on the basis of 7% running down to the 30th November 1992, and that was the agreement at the time.

I should note that a point was taken that Mr. Burgess was not separately represent.  Mr. Francis Morris acted for all sides in this matter: for Mr. Burgess;  for Mr. Abbott: for Mr. **Joaquin.** I should record that I think that that is unhappy, and that in cases such as this it would be preferable if that did not happen.   However, I think it does not vitiate this transaction in any way.   I find this particularly as the

inclusion of interest calculated at 7% down to the 30th November whether strictly legally it is to be **characterised** as interest or a sum paid to buy off a potential action for damages, is a normal and proper commercial course for the parties to take in these circumstances. Indeed, I think it difficult to imagine that Mr. Joaquin would have proceeded on any other basis, and would have waived his claim for interest for the seven or so months between April and November. Had there been an officious bystander around at the time I am sure that he would have pointed that out to Mr. Joaquin and got a clear answer: "No of course I don't mean to waive that interest." However, in view of the facts that I found that question does not arise.,

On that basis I therefore dismiss the Counterclaim for rectification. I now turn to the term of the note and when it was due. The 2nd defendants pleads that the note was not due until the 30th November 1996. The note reads in part as follows:

"FOR VALUE RECEIVED, I, ANTHONY CHARLES BURGESS, the undersigned Debtor and Promisor of Elys Harbour, Sandys Parish in the said Islands HEREBY PROMISE to pay on demand to or to the order of Arnold Leslie Joaquin (hereinafter called the "Creditor") the principal sum of Three hundred and seven thousand six hundred and fifty-two dollars. The Interest so payable shall be at the rate of seven percent (7%) per annum payable on the 30th day of each month commencing from the 1st day of December 1992 and continuing monthly thereafter for a period of Four(4) years, that is to say, on the said sum of **$285,000.00.**"

The fourth paragraph reads as follows:-

**"The** principal sum of Three hundred and seven thousand six hundred and fifty-two dollars and seventy cents (**$307,652.70**) shall become due and payable on the 30th day of November 1996."

The Second paragraph on the second page **reads:-**

"The undersigned shall be at liberty at any time before the maturity

8

date hereof to pay to the Creditor the said principal sum in full."

There are therefore two provisions as to payment in this note which conflict.    There is the first provision that it is payable on demand, and there is the second provision that it is payable at a fixed future date after four years.    The majority of the body of the note is framed in terms of the four year date,  because interest is provided to be payable over a term of four years.    That is only reconcilable with a four year date, and not with the sum being paid on demand. And the debtor is given liberty to pay off the due sum before the maturity date, which obviously contemplates the maturity date having been fixed.

The definition of a promissory note is pertinent to this and it is contained in section 75 of the Bills of **Exchange** Act.   Section **75(1)** reads −

> "A promissory note is an unconditional promise in writing made by one
> person to another signed by the maker, engaging to pay, on demand or
> at a fixed or determinable future time, a sum certain in money to, or
> to the order of, a specified person."

It will be noted immediately that the sum is either payable on demand or it is payable at a fixed and determinable future date.    It is not, and it cannot be, both.   Mr. Morris, the draftsman, gave evidence that he framed the note in this way because it was intended to permit the collection on demand in default of the payment of interest.   I say straight away that his evidence on that is not admissible as an aid to construction.    The note has to be interpreted on its face. However, I do note that it would certainly be possible to achieve some such result in the case of a note that provided for the payment of the sum of money by instalments, because that is contemplated by section 8 (I), of the Bills of **Exchange** Act.   It is helpful to look at that. Paragraph (a) says that the sum payable by a bill may be paid by stated instalments; and paragraph (c) says it may be payable by stated instalments with a provision that upon default in payment of any instalment the whole shall become due. That is a good example of how one may frame a note expressly to make the

whole become due upon default in the payment in the instalments. That is not the form that Mr. Morris used in drafting the note.    It may in fact be more difficult to achieve this result in respect of interest, because a provision that the whole amount of the note shall be come due on default in the payment of interest, a provision which is common in mortgages, would be a provision that the note become due on a contingency.    As such it might not be permissible in a promissory note, because of the provisions of s. **10(2)** of the Act.  I do not have to consider that, because in this case there was, as I have already found, no express wording that could put into effect what Mr. Morris said was his intention.    I therefore have no grounds for interpreting the instrument in the way Mr. Morris said he intended.

I have canvassed in my own mind whether the note is void for uncertainty, because of this conflict.    I think, however, that the principle in construing a commercial document such as this is that I should seek to give effect to it wherever possible.    I consider that the very clear provision as to the four year term, and the concomitant terms as to the payments of interest which accord therewith, must on that basis prevail.    I also note that that accords with the evidence from both sides as to what they had agreed.    Both of them told me they had agreed on a four year term.  Mr. Burgess indeed had asked for a five year term to begin with.  Mr. Joaguin refused that, but said that he was willing to give a four year note, and this was communicated to Mr. Burgess by Mr. Morris, and was accepted.

I Therefore find that the principal sum is not due until the 30th November 1996.  I propose to ignore the words "on demand," and would have struck them out if formal rectification of the document had been sought in this regard.

The plaintiff's action, therefore, for the principal sum fails because it is not yet due.  I should note that when it is due this judgment does not stand as res judicata in respect of that.

The plaintiff, however, wins in respect to the arrears of interest sought to date because they are now due.    And he also wins in respect of the arrears of the monthly payment of $1000 in respect of the accrued Abbott arrears.

10

I now term to the computation of the sum which I should award to the plaintiff under the judgment that I will give for him.    It is agreed, and excepted by the plaintiff, that Mr. Burgess paid, and paid only, **$7,362.50** on account of his liability under the second note.    Under the second note the first interest appears to have been due on the 31st December 1992. There is a reference to interest commencing on the first day of December 1992, but the plaintiff accepts (and I think rightly) that the first actual payment of interest was due on the 30th of that month.    And I think that that same provision also applies in respect of the $1000 per month payable on the Abbott arrears,  although it is not expressly stated.

There have on my calculation been seventeen payments due down to the 30th April 1994.    The monthly sum in respect of interest on the principle of $285,000 is agreed at **$1,662.50** per month.  By my calculation that gives the sum of **$28,326.25** for interest to the 30th April.  Add to that the seventeen payments of $1000 for the Abbott arrears which were due, and one comes to a total of **$45,262.50.**  I deduct from this the amount which Mr. Burgess has paid (that is $7362.50) and arrive at the sum of $37,900 for arrears of interest and monthly payments under the note.    That is down to the 30th April 1994, and I give judgment in that sum in the plaintiffs favour.

I now turn to the question of costs.    I have heard argument on this. The note itself contains a provision for costs.    It says that Mr. Burgess "agrees to pay on demand all costs of collection, including legal fees incurred by the Creditor in enforcing this note."    On that basis, and on the basis that he has won at least in part on the action, Mr. Lord urges upon me that I should award the plaintiff the costs of the action on a indemnity basis ▪ which he expresses as a solicitor and own client basis.

Ms. Harvey, counsel for the defendant, urged on me that, if I reached the stage that I have in my judgment, that I should apportion costs, because the plaintiff had only won in part, and has not won on the claim in respect of the principal.    I have considered this. I do not think that, in all the circumstances of this case, it is appropriate to apportion the costs.    The plaintiff has had to come to court to obtain the money due to him due to the 2nd defendant's default on the note, and

though some of that amount was conceded and tendered on the Friday before the case came on, the full amount was not tendered and the plaintiff had to come to court to argue about the rectification point, which occupied a good deal of time at trial and indeed occupied most of the evidence.    I am not therefore going to divide the costs up, but I am going to award the plaintiff his full costs of the action.    In doing this I should also note that I take into account that the rectification point was only raised very late in the day by amendment.

I am going to award the plaintiff his costs to be taxed on an indemnity basis, as explained in **EMI Records Ltd. v. Wallace [1983]** Ch. 59 as applied in this jurisdiction by my judgment on costs in Deqroote v. MacMillan given on the 17th December 1993 in action 1991 No. 48. Costs on a indemnity basis are sometimes describes as costs on a solicitor and own client basis.    In **EMI Records** the Vice Chancellor said that was a confusing term and urged the use of the expression "indemnity costs," and I accept and adopt that as a proper practice.

The plaintiff gets judgment for $37,900 plus the costs of the action on an indemnity basis.

Richard Ground
**10.5.94**

IN THE COURT OF APPEAL FOR BERMUDA

CIVIL APPEAL NO. 24 OF 1993

BETWEEN:

LLEWELLYN SOMERSALL                 Appellant

and

THE BANK OF BERMUDA LIMITED          Respondent

Before:    Roberts, P.
           **Huggins,** J.A.
           Georges, J.A.

Date of Hearing:  14th and 15th June, 1994.
Date of Judgment: 1st July, 1994.

J U D G M E N T

Huasins. J.A.

    In Order 14 proceedings the Chief Justice gave leave to the
respondent bank to enter judgment against the Appellant for moneys
due under a promissory note and upon an overdraft, respectively
made by and granted to the Appellant and the Third Parties.   The
appellant contends before this court that the Chief Justice wrongly
held that there was no arguable **defence** to the action.

    The Third Parties wished to buy accommodation in a condominium
and, for that purpose, needed additional finance.   They applied to
the bank for a loan, but the bank declined to assist them unless
the loan was secured.   There is no suggestion that the bank or any
of its officers induced the  Third Parties to purchase the
**property,** but it transpired that the bank officer who dealt with
the Appellant's application had a 10% interest in the condominium.
The Third Parties invited the Appellant to support their
application for their loan, and he agreed to do so.   Again, there
is no suggestion that the bank or its officer induced the Appellant
to go to the aid of the third parties.   In the event, the Appellant
executed two documents jointly with the Third Parties.   The first
was a promissory note for **$125,000.00,** with interest at 7% per
annum and an administration fee of 2% per annum.   The second was a

- 2 -

joint account mandate under which the account holders agreed that
they would be jointly and severally liable for any overdraft which
might from **time to time** be created on that account. A substantial
overdraft was subsequently created and drawn upon. The bank
eventually demanded repayment and, repayment not having been made,
brought the present action to recover the outstanding moneys from
the Appellant.

The contention of the Appellant is that the transactions
between him and the bank were vitiated by non-disclosure by the
bank that their officer had an interest in the condominium:  it is
said that the bank was fixed with knowledge of that interest and
that it had a duty to disclose it, for the Appellant would have
instituted further inquiries before executing the documents had he
known the full facts.

**It** is, of course, true that the bank officer would receive a
benefit from the sale of the property, but, in the absence of any
agreement between the officer and the Third Parties to the
detriment of the Appellant, I cannot see that the existence of his
interest prejudiced the Appellant in **any way.**  The **most** that could
be expected was disclosure of all material facts, "i.e. all facts
which if disclosed would tend to incline a prudent proposed surety
to decline to enter into such a contract, or would tend to persuade
him to ask for a greater reward for it than had previously been
proposed" (see Spencer Bower on The Law Relating to Actionable
Non-disclosure (2nd Edition) 157 (8.06)).  The latter part of that
explanation is not relevant to the present case, whilst the
interest of the bank officer could not have made a reasonably
prudent man disinclined to enter into a contract:  it did not
increase the risk that the Third Parties would default or decrease
the benefit that the Appellant was to receive.  The Appellant says
that, had he been told of the officer's interest, he would have
made further inquiries whether it was appropriate to support the
application.  To that Mr. Elkinson for the Respondent cites the

- 3 -

words of Lord Halsbury, L. C. in **Seaton -v- Burnand** (1900)
A.C. 135, 140:

> "Of course, what people persuade themselves they
> would or would not have done when a liability has
> arisen, is a thing with which one is sufficiently
> familiar in courts of law.  If goods which have been
> contracted for go up or down in the market, one has
> heard of very strange evidence about what induced
> people not to take the goods;  and in the same way,
> when it has turned out that this guarantee is to be
> sued upon, people convince themselves in a very odd
> way as to what would have affected their minds if
> they had known **it at** the **time**".

It is then submitted that the Appellant was in reality a
guarantor notwithstanding the form of the documents which he
executed.  I do not think the argument is tenable:  whatever had
been in his contemplation before he signed the relevant documents,
he clearly assumed a primary liability to the bank, and this case
is distinguishable from **Heald -v- O'Connor** (1971) 1 W.L.R. 497.

It is urged that the Appellant was induced to enter into the
contracts by misrepresentations by the bank as to the liabilities
of the Third Parties.  This objection is based upon the fact that
the bank officer showed to the Appellant the original personal loan
application form which had been signed by'the Third Parties.  Into
that form the Third Parties had apparently not entered either their
monthly commitments to pay rent or an existing liability to another
bank.  I accept that leaving a blank constituted a representation
by the signatories (the Third Parties) to the bank that they had no
such commitment or liability, but there was no representation by
the bank to the Appellant that the facts set out in the application
were true.  The officer was not alleged to have vouched for their
accuracy.  It is significant that the loan application form which
was subsequently signed by the Appellant and the Third Parties
together equally left the same spaces blank.

As to the overdraft, the Appellant complains that he was not
told that the facility which he had joined in applying for was
continued beyond the date specified in the form of application as
the date of expiry.  Had the form of application stood alone there

- 4 -

might have been much force in that complaint, but it did not: the Appellant had signed a joint account mandate which expressly provided:

> "Any loan or overdraft which may from time to time be created on any such account shall be our joint and several liability".

The expiry date inserted in the application form was merely an indication of what the parties expected, for the terms and conditions set out in the form provided that the bank could require payment before the expiry date and it was obviously open to the bank to extend the facility if it saw fit. Any extension would in no way prejudice the Appellant, who could have fulfilled his express obligations on the due date if he had so desired. By failing to do so, he impliedly consented to the continuance of the facility. There was not in this case, as in <u>Stiff -v- The Local Board of Eastbourne</u> (1869) 20 L.T. 339, an agreement, kept secret from the party sued, which had the effect of altering his liability.

Much has been made of the fact **that everyone** involved in these transactions was aware that the Appellant had not received directly any part of the moneys lent by the bank: they were expressly lent to enable the Third Parties to buy the property. The Appellant must be assumed to have thought that there was adequate consideration for his assuming the liability he did voluntarily assume.

In my view the Chief Justice came to the right decision and the appeal should be dismissed.

It was pointed out by counsel for the Respondent that no order had been made upon a counterclaim, and he submitted that, if the appeal were dismissed, we should strike out the counterclaim. The counterclaim was for damages for negligence and non-disclosure and was based upon various paragraphs of the **Defence.** Having regard to

- 5 -

what I have already said, I agree with counsel' sproposition and, as
we have power to make any order which ought to have been made in
the court below, I would dismiss the counterclaim.

_____
Alan **Huggins**, J.A.

Duncan                                    for the Appellant
Elkinson                                  for the Respondent

I have read in Draft the judgment of **Huggins**, J.A.  I agree with
its reasoning and its conclusions **and have nothing to add.**

_____
Telford Georges, J.A.