SCHINDEL, FARMAN & LIPSIUS LLP
14 Penn Plaza Suite 500
(225 West 34th Street)
New York, New York 10122
Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Gregory V. Serio, Superintendent of
Insurance of the State of New York, as
Rehabilitator of FRONTIER INSURANCE
COMPANY, and as Assignee of
PLATINUM INDEMNITY, LTD,

                    Plaintiff,

vs.

DWIGHT HALVORSON INSURANCE
SERVICES, INC d/b/a F.S.I.M.
INSURANCE SERVICES and FOOD
SERVICES INSURANCE MANAGERS,
INC.,

                    Defendants

**04 CV 3361 (KMK)**

**Hon. Kenneth M. Karas**

**AFFIRMATION IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

### AFFIRMATION IN OPPOSITION TO
### PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

      LORIENTON N.A. PALMER, an attorney duly admitted to practice before the United States District Court for the Southern District of New York, affirms under penalty of perjury as follows:

      1.     I am member of the firm of SCHINDEL, FARMAN & LIPSIUS, LLP, counsel to Defendants Dwight Halvorson Insurance Services, Inc. ("DHIS") and Food Service Insurance Managers, Inc. ("FSIM") in connection with this action. I submit this affirmation in opposition to Plaintiff's motion for partial summary judgment on the issue of the Note.

2.      This is an action to recover money damages based on the claimed breach of the terms of agreements between Frontier Insurance Company ("Frontier") and DHIS and the breach of a "Promissory Note" executed by FSIM in favor of Platinum Indemnity Limited ("Platinum"). Plaintiff, brings this action as Rehabilitator of Frontier and, on behalf of Frontier as assignee of Platinum.

3.      Presently before the Court is Frontier's motion for summary judgment on a Note.

4.      In opposition to the motion, Defendants rely upon the pleadings, the declaration of Dwight Halvorson and upon the Memorandum of Law. Plaintiff's complaint is attached as **Exhibit A** to this affirmation.

5.      Defendants' answer is attached hereto as **Exhibit B**.

6.      The January 1,1998 "Limited Agency Agreement" between Frontier and DHIS is annexed as Exhibit A to Defendants' answer.

7.      The January 16, 1998 "Subscription and Shareholders Agreement" between FSIM and Platinum is annexed as Exhibit B to Defendants' answer.

8.      The November 8, 2000 "Promissory Note" executed by FSIM is annexed as Exhibit C to Defendants' answer.

9.      A copy of the "Reinsurance Agreement" between Platinum and Frontier, produced by Frontier, is annexed hereto as **Exhibit C**.

_____
Lorienton N.A. Palmer (LP3934)

**Exhibit A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Judge Berman

------------------------------------x
Gregory V. Serio, Superintendent of Insurance
of the State of New York, as Rehabilitator of
FRONTIER INSURANCE COMPANY, and as
Assignee of PLATINUM INDEMNITY, LTD.,

                      Plaintiff,

-against-

DWIGHT HALVORSON INSURANCE
SERVICES, INC d/b/a/ F.S.I.M. INSURANCE
SERVICES and FOOD SERVICE INSURANCE
MANAGERS, INC.,

                      Defendants.
------------------------------------x



04 CV 3361

Civil Action No.

ECF CASE

COMPLAINT

RECEIVED
MAY 03 2004
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff Gregory V. Serio, Superintendent of Insurance of the State of New York,

as Rehabilitator of Frontier Insurance Company ("FIC") and as the Assignee of Platinum

Indemnity, Ltd., by and through the undersigned attorneys, as and for his Complaint against

defendants Dwight Halvorson Insurance Services, Inc. d/b/a F.S.I.M. Insurance Services

("DHIS") and Food Service Insurance Managers, Inc. ("FSIM"), hereby alleges as follows:

## NATURE OF THE ACTION

1.     This action arises out of a workers' compensation insurance program that the

defendants developed for and marketed to the food services industry.

2.     FIC provided insurance coverage under this program and, in return, was entitled to

receive from DHIS certain payments pursuant to the terms of the controlling agency agreement.

3.     FIC fully performed its obligations to DHIS by, among other things, not only

issuing the insurance policies in question but also paying out millions of dollars on workers'

compensation claims made on those policies.

4.      DHIS, however, has breached its contractual and fiduciary obligations to FIC by collecting premiums from insureds but failing to forward the payments due and owing to FIC.

5.      Subsequent to the termination of its relationship with the insurance program at issue, FIC confirmed that DHIS improperly has withheld millions of dollars in payments due to it under the program. FIC brings this action to recover these payments from DHIS.

6.      In addition, pursuant to a binding and court-authorized assignment of certain claims belonging to the offshore reinsurer involved in the insurance program giving rise to this litigation, FIC brings this action to recover several million dollars due from FSIM to the reinsurer under certain agreements between those parties.

## JURISDICTION AND VENUE

7.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy is in excess of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

8.      This district is a proper venue pursuant to 28 U.S.C. § 1391(a)(1)(2) because a substantial part of the events and/or omissions giving rise to this action occurred within this district.

## THE PARTIES

### Frontier Insurance Company

9.      FIC at all relevant times was and is an insurance company organized and existing under the laws of the State of New York and maintaining its principal place of business in Rock Hill, New York.

10.     On or about August 24, 2001, the Superintendent of Insurance of the State of New

2

York ("Superintendent") initiated proceedings in the Supreme Court of the State of New York, New York County, seeking an order placing FIC into rehabilitation pursuant to Article 74 of the New York Insurance Law.

11.    On or about August 27, 2001, the Court appointed the Superintendent as temporary receiver of FIC.

12.    The Court entered an Order of Rehabilitation with respect to FIC on or about October 15, 2001. Therein, the Court appointed the Superintendent as Rehabilitator of FIC, declared FIC insolvent and found that "[i]t is in the best interest of Frontier's policyholders, creditors and the general public that the Superintendent be directed to take possession of Frontier's property and to rehabilitate its business and affairs[.]"

13.    The Order of Rehabilitation expressly authorizes the Superintendent to:

> [T]ake possession of [FIC's] property, conduct its business
> . . . take such steps toward the removal of the causes and
> conditions which made [the rehabilitation] proceeding
> necessary as he shall deem wise and expedient; and deal
> with the property and business of [FIC] in its name or in the
> name of the Superintendent as Rehabilitator.

14.    As Rehabilitator, the Superintendent also is authorized and empowered to commence litigation and pursue the recovery of damages on FIC's behalf, as well as for the benefit and protection of its policyholders, insureds and creditors. It is in this capacity that the Superintendent brings this action.

### The Defendants

15.    DHIS at all relevant times was and is a corporate entity organized and existing under the laws of the State of California.

16.    At all times relevant to this litigation, DHIS was an insurance agency specializing in providing insurance and risk management services to clients in the food services industry.

3

17.    FSIM at all relevant times was and is a corporate entity organized and existing under the laws of the State of California.

18.    At all relevant times, FSIM was engaged in the business of securing workers' compensation insurance coverage for insureds in the agribusiness and food-related industries.

19.    Both DHIS and FSIM maintain their principal places of business at 3300 Douglas Boulevard, Roseville, California.

## FACTUAL BACKGROUND

### The FSIM Program

20.    DHIS was formed in or about 1987 as an insurance agency specializing in providing risk management services to businesses in the food services industry in and around California's Sacramento Valley.

21.    DHIS grew to become a regional leader in that segment of the insurance industry, servicing growers, shippers, packers, distributors and processors of food products in Northern California.

22.    In or about 1997, DHIS's president, Dwight J. Halvorson, formed FSIM as part of a comprehensive workers' compensation insurance program specifically designed for and marketed to the agribusiness and food-related industries (the "FSIM Program").

23.    At all relevant times, FSIM was a risk-bearing managing general agency providing workers' compensation coverage to its clients through an offshore rent-a-captive insurance facility.

24.    A captive insurance company is an insurance company owned and controlled by the insureds themselves. Its primary purpose is to insure the risks of those owners.

25.    Captive insurance programs provide an alternative source of coverage to insureds

4

for whom the conventional approach of purchasing policies from an established insurance carrier may be unavailable or prohibitively expensive.

26.    For a variety of regulatory and financial reasons, captive insurers typically are domiciled in offshore jurisdictions such as Bermuda, the Cayman Islands, Barbados and the British Virgin Islands.

27.    These offshore captives typically are not licensed to actually issue insurance policies within the United States.  As a result, they typically act solely as reinsurers and partner with a fronting insurer that is licensed to issue policies in the United States to the insureds.  The fronting carrier issues those policies and then transfers a significant portion of the risk back to the offshore captive pursuant to a reinsurance agreement.

28.    One variation of the captive insurance program approach -- and the alternative the defendants in this action utilized -- is to structure the program around a rent-a-captive.

29.    The rent-a-captive is designed to accommodate insureds who either are unable or unwilling to assume the higher costs of establishing their own captive, a process which can require substantial upfront costs and capital investment.

30.    A rent-a-captive facility involves a captive formed by one or more sponsors who then "rent" the captive's capital, surplus, services and expertise to various insureds or groups of insureds.

31.    The insured or insureds who use the rent-a-captive typically purchase non-voting preferred shares in the captive, pay a fee and post some form of collateral to shield the captive reinsurer from any underwriting losses that may arise.

32.    In the typical rent-a-captive facility, separate rent-a-captive accounts are established within the overall captive infrastructure for each distinct set of insureds.  Premiums

5

collected on policies issued under a particular program are credited to the appropriate rent-a-captive account and loss payments made in connection with those losses are debited from the appropriate account.

33.    Platinum Indemnity, Ltd. ("Platinum Indemnity") served as the rent-a-captive around which the defendants structured the FSIM Program.

34.    At all relevant times, Platinum Indemnity was a corporate entity organized and existing under the laws of the Islands of Bermuda and maintained its principal place of business at Windsor Place, 18 Queen Street, Hamilton, Bermuda.

### FIC Is Enlisted as the FSIM Program's "Fronting" Insurer

35.    In or about 1997, Halvorson, DHIS's president, approached FIC to determine if FIC would be interested in serving as the fronting carrier for the FSIM program.

36.    During its negotiations with DHIS, FIC emphasized that it would consider Halvorson's proposed program only if it received assurance that, whether through reinsurance or otherwise, FIC as the fronting insurer would be exposed to virtually no risk on the underlying policies.

37.    Halvorson acknowledged this demand and assured FIC that the FSIM Program would be structured in such a way that FIC would face minimal exposure on the underlying policies.

38.    FIC and DHIS ultimately entered into a Limited Agency Agreement (the "Agency Agreement") dated effective January 1, 1998.

39.    Under the Agency Agreement, FIC appointed DHIS as its agent and authorized it to quote, bind and decline workers' compensation insurance coverage for agricultural operations,

6

including farms and vineyards, as well as produce packing and handling operations.

40.    The Agency Agreement provided that DHIS, "as a trustee for" FIC, was authorized to receive premiums and fees, pay return premiums, pay adjustments and retain and pay commissions out of the premiums collected through the FSIM program.

41.    The Agency Agreement further provided for DHIS to accept and maintain all premiums and other funds it collected under the FSIM program "in the capacity of a fiduciary and trustee" for FIC.

42.    Pursuant to the Agency Agreement, within fifteen days of the end of each month, DHIS was required to provide FIC with an "Account Current." This monthly Account Current was an itemized statement of all premiums written, as well as any premium adjustments, made within the month in question.

43.    Pursuant to the Agency Agreement, each Account Current forwarded to FIC was to reflect DHIS's customer numbers for each insured; FIC policy numbers for each policy; gross premiums to be paid; the percentage of commission to be retained -- and most significantly for purposes of this dispute -- the net premium payment to be remitted to FIC.

44.    Under the Agency Agreement, within forty-five days following the end of each month, DHIS was obligated to pay to FIC the balance due as reflected on the Account Current relating to that month.

45.    Pursuant to the Agency Agreement, DHIS was obligated to make these payments to FIC regardless of whether the premiums in question actually were paid by the insured or subproducer. Therein, the parties expressly agreed that DHIS "assumes the credit risk should it bind insurance without receiving premium."

46.    Pursuant to the terms of the Agency Agreement, upon termination, all premiums

7

in DHIS's possession as of that time, as well as those DHIS was obligated to collect, became immediately due and owing to FIC.

47.     As compensation for its services, FIC agreed to allow DHIS a gross commission of 12 percent of all gross premium collected on policies underwritten or delivered by DHIS through the program.

48.     Subsequently, the Agency Agreement was amended effective January 1, 1999 to allow DHIS a 15.65 percent commission.

49.     In the Agency Agreement, FIC and DHIS specifically agreed that "the courts of New York shall have exclusive jurisdiction to resolve" any dispute arising between the parties. Further, FIC and DHIS agreed that any such dispute would be resolved under New York law.

### The Subscription and Shareholders Agreement

50.     On or about January 16, 1998, FSIM and Platinum Indemnity entered into a Subscription and Shareholders Agreement.

51.     Therein, as part of its rent-a-captive arrangement with Platinum Indemnity, FSIM agreed to purchase a non-voting redeemable preferred share in the captive for $125,000.00.

52.     Among the rights and obligations reflected in the Subscription and Shareholder's Agreement is FSIM's obligation to pay to Platinum Indemnity all amounts necessary to remedy any "Negative Balance" in its account.

53.     In essence, a Negative Balance would arise under the terms of the Subscription and Shareholders Agreement if the losses Platinum Indemnity was compelled to reinsure under the FSIM Program outstripped the level of premium dollars flowing from DHIS to FIC and, ultimately, into FSIM's rent-a-captive account at Platinum Indemnity.

8

### The Promissory Note

54.     On or about November 8, 2000, FSIM executed and delivered to Platinum Indemnity a promissory note ("Note") obligating itself to pay to Platinum Indemnity the amount of $469,515.00, plus interest.  A copy of the Note is attached hereto as Exhibit A.

55.     The Note was executed as a means of securing FSIM's performance of its financial obligations to Platinum Indemnity under the Subscription and Shareholders Agreement.

56.     Pursuant to the terms of the Note, FSIM was obligated to pay the $469,515.00 in monthly installments of $21,000.00, commencing in or about August 15, 2000.

57.     The Note provides that the "balance of principal and any outstanding interest as well as any other sum remaining unpaid on this Note shall be paid in full no later than August 15, 2002."

58.     The Note further provides that FSIM would be in default thereunder if, among other things, FSIM "fails to pay any principle or interest on this Note when it becomes due and payable, or Debtor fails to pay any other cost, fee, expense or other amount owing to [Platinum Indemnity] under the Note[.]"

59.     The Note expressly authorized Platinum Indemnity to assign its rights thereunder to any third party with or without FSIM's consent.

### DHIS's Failure to Make Payments Due To FIC Under the Agency Agreement

60.     On or about November 10, 1999, FIC placed DHIS on notice of its intention to terminate the Agency Agreement.

61.     The Agency Agreement, in fact, was terminated effective January 1, 2000.

62.     The Agency Agreement was terminated due, in part, to DHIS non-compliance with the FSIM Program's underwriting guidelines and other provisions of said agreement.

63.    Subsequent to its termination of the Agency Agreement, FIC conducted extensive audits of the FSIM Program.

64.    These audits revealed that DHIS improperly withheld millions of dollars in premium collected from insureds covered under the FSIM Program that, once DHIS had deducted its allowable expenses and fees, should have been forwarded to FIC.

65.    Despite FIC's repeated demands for these funds, DHIS has refused to remit to FIC the payments due and owing under the terms of the Agency Agreement.

### FSIM's Failure to Make Payments
### Due to Platinum Indemnity

66.    In addition to DHIS's failure to perform its obligations to FIC under the Agency Agreement, FSIM also has defaulted under the Note. After making just seven monthly payments of $21,000.00 each, in or about 2001 FSIM ceased making the payments, leaving a remaining indebtedness under the Note of approximately $322,515.00, plus interest.

67.    Platinum Indemnity made repeated written demands to FSIM for the payments due and owing under the Note.

68.    Despite these demands, FSIM refused and failed to make the payments due and owing to Platinum Indemnity under the Note.

69.    FSIM also has failed to make the payments to Platinum Indemnity required under the Subscription and Shareholders Agreement to remedy the Negative Balance in its account with the captive.

70.    Several million dollars in outstanding payments relating to the Negative Balance are now outstanding. This figure has risen as FIC has continued to pay out on claims made on the underlying policies and the flow of premium into the FSIM account has ceased.

10

**Platinum Indemnity's Assignment
to FIC of Its Claims Against FSIM**

71.     FIC and Platinum Indemnity's respective rights and obligations with respect to the FSIM program were memorialized in a Reinsurance Agreement dated effective January 1, 1998.

72.     Pursuant to the Reinsurance Agreement, Platinum Indemnity obligated itself to reinsure certain of FIC's risks on the policies it issued in connection with the FSIM Program.

73.     In the wake of FIC's termination of its involvement with the FSIM Program, a dispute arose between FIC and Platinum Indemnity regarding their respective rights and obligations under the Reinsurance Agreement.

74.     On or about December 2, 2002, FIC and Platinum Indemnity executed a Commutation Agreement pursuant to which they resolved their differences amicably.

75.     The Commutation Agreement provided for Platinum Indemnity to pay FIC $2,918,851.65 to resolve the dispute.  This settlement amount was to consist of $15,000.00 in cash and an assignment of claims relating to FSIM's outstanding obligations to Platinum Indemnity relating to the FSIM Program.

76.     In the Commutation Agreement, FIC and Platinum Indemnity exchanged mutual releases.

77.     On or about December 2, 2002, Platinum Indemnity executed an Assignment to FIC of its claims against FSIM.  Specifically, this Assignment assigned to FIC all of Platinum Indemnity's right, title and interest in the Subscription and Shareholders Agreement as well as the Note.

78.     In an Order dated May 2, 2003, the Supreme Court of the State of New York for New York County, formally approved the Commutation Agreement between FIC and Platinum

11

Indemnity, as required by the New York Insurance Law.

79. In a Verified Petition seeking the Court approval of the Commutation Agreement, the Superintendent explained that the "primary reasons" for settling with Platinum Indemnity was that the commutation "will enable the Rehabilitator to pursue the balances due from FSIM including all claims paid as of the date of valuation [as well as] balances due on future claims as they are settled."

## COUNT I

### (Breach of Contract - DHIS)

80. FIC repeats and realleges each and every allegation set forth in paragraphs 1 through 79 above as if fully set forth herein.

81. The Agency Agreement constitutes a valid and binding contract between FIC and DHIS.

82. FIC performed all of its contractual obligations to DHIS as set forth in the Agency Agreement.

83. Through its acts and/or omissions, including its failure to remit net premiums and other payments due to FIC, DHIS has materially breached its obligations under the Agency Agreement.

84. As a result of DHIS's material breach of the Agency Agreement, FIC has sustained and continues to sustain substantial monetary damages.

12

## COUNT II

### (Breach of Duty of Good Faith – DHIS)

85.    FIC repeats and realleges each and every allegation set forth in paragraphs 1 through 84 above as if fully set forth herein.

86.    Implied in the Agency Agreement between FIC and DHIS was a covenant of good faith and fair dealing pursuant to which DHIS obligated itself to refrain from engaging in conduct that would destroy or injure FIC's right to obtain the benefit of that contractual arrangement.

87.    Through its acts and/or omissions, including its improper retention of net premiums and other payments due to FIC, DHIS has materially breached this implied covenant of good faith and fair dealing.

88.    By engaging in this improper conduct in violation of the covenant of good faith and fair dealing, DHIS has deprived FIC of the anticipated benefit of the Agency Agreement.

## COUNT III

### (Breach of Fiduciary Duty – DHIS)

89.    FIC repeats and realleges each and every allegation set forth in paragraphs 1 through 88 above as if fully set forth herein.

90.    Both by contract and as a matter of law, DHIS served in a fiduciary capacity to FIC in connection with the FSIM Program.

91.    Through its acts and/or omissions, including its failure to remit net premiums and other payments due to FIC, DHIS has breached its fiduciary duties to FIC.

92.    As a result of DHIS's breach of its fiduciary duties, FIC has sustained and will continue to sustain substantial monetary injury.

13

## COUNT IV

### (Default on Promissory Note – FSIM)

93. FIC repeats and realleges each and every allegation set forth in paragraphs 1 through 92 above as if fully set forth herein.

94. The Note constitutes a valid and binding obligation on the part of FSIM to pay monies to Platinum Indemnity.

95. Through its acts and/or omissions, including its failure to make the payments required under the Note, FSIM is in default.

96. As a result of FSIM's default, Platinum Indemnity sustained substantial monetary injury.

97. Platinum Indemnity has assigned to FIC its rights against FSIM with respect to Note.

98. By operation of the Assignment of Platinum Indemnity's rights to FIC, the balance of principal and interest on the Note previously due to Platinum Indemnity under the Note is now properly due and owing to FIC.

## COUNT V

### (Breach of Contract - FSIM)

99. FIC repeats and realleges each and every allegation set forth in paragraphs 1 through 98 above as if fully set forth herein.

100. The Subscription and Shareholders Agreement constitutes a valid and binding contract between FSIM and Platinum Indemnity.

101. Platinum Indemnity performed all of its obligations to FSIM as set forth in the Subscription and Shareholders Agreement.

14

102.    Through its acts and/or omissions, including its failure to make those payments necessary to remedy the Negative Balance in its account with Platinum Indemnity, FSIM has materially breached its obligations under the Subscription and Shareholders Agreement.

103.    As a result of FSIM's material breach of the Subscription and Shareholders Agreement, Platinum Indemnity sustained substantial monetary damages.

104.    Platinum Indemnity has assigned to FIC its rights against FSIM with respect to the Subscription and Stockholders Agreement.

105.    By operation of the assignment of Platinum Indemnity's rights to FIC. FIC is entitled to recover all damages flowing from FSIM's breaching conduct.

WHEREFORE, plaintiff Gregory V. Serio, Superintendent of Insurance of the State of New York, as Rehabilitator of Frontier Insurance Company and Assignee of Platinum Indemnity, Ltd., hereby demands judgment as follows:

A.    awarding FIC an amount to be determined at trial; and,

B.    granting FIC such other and further relief as the Court deems just and proper under the circumstances.

Dated:  New York, New York
        May 3, 2004

                    ENTWISTLE & CAPPUCCI LLP
                    299 Park Avenue, 14th Floor
                    New York, New York 10171
                    (212) 894-7200

                    By: _____
                        William S. Gyves (WG 2770)
                        Gerard N. Saggese III (GS 5346)

                    Attorneys for Plaintiff

15

# EXHIBIT A

# PROMISSORY NOTE

**PRINCIPAL: $469,515.00**

**November 8, 2000**

FOR VALUE RECEIVED on the above referenced date, Food Service Insurance Managers, Inc., a California corporation ("Debtor"), promises to pay to the order of Platinum Indemnity Limited, a Bermuda Company ("Creditor"), at Windsor Place, 3rd Floor, 18 Queen Street, Hamilton, Bermuda the principal sum of Four Hundred and Sixty Nine Thousand, Five Hundred and Fifteen Dollars and 00/100 Cents ($469,515.00) with interest as set forth herein, payable as follows:

A.    Principal shall be paid on this Promissory Note (this "Note") as follows: Twenty One Thousand Dollars and No Cents ($21,000.00) on the fifteenth day of each month commencing with August 15, 2000. Such payment to be made by bank wire transfer to the bank and account detailed in Schedule 1 attached hereto, and any other bank and account as may be advised by the Creditor from time to time.

B.    Subject to paragraph D below, interest at a variable rate, namely the Federal Funds Rate (the target interest rate for banks borrowing reserves among themselves as announced and in effect from time to time by the Federal Open Markets Committee of the U.S. Federal Reserve Board) plus two percentage points, shall accrue on principal outstanding from time to time. Subject to paragraph D below, interest payments shall be due on the fifteenth day of every month until Maturity.

C.    Should interest not be paid by Debtor as stated, it shall thereafter bear like interest as the principal. Unpaid interest shall be compounded at a rate not to exceed simple interest on the unpaid principal at the maximum rate permitted by law.

D.    Notwithstanding anything to the contrary herein, interest shall not begin to accrue on any amounts due hereunder until such time as the "Separate Account" maintained for Debtor by Creditor ceases to have a positive balance. The "Separate Account" is an account maintained by Creditor on its books which represents an ownership interest of Debtor in certain segregated assets of Creditor pursuant to the Subscription and Shareholder Agreement ("Agreement") dated January 16, 1998 between the Creditor and the Debtor and executed by both parties in Hamilton, Bermuda. For purposes of this Note, Creditor shall determine from time to time whether the Separate Account has a positive balance in accordance with the terms of the Agreement, and such determination shall be conclusive and binding on Debtor, absent manifest error. If Debtor nonetheless disputes Creditor's determination, Debtor shall pay the interest and principal amounts due hereunder as if such determination were undisputed and such dispute did not exist and Debtor's sole recourse against Creditor for such manifest error shall be an action separate from this Note.

E.    This Promissory Note may be prepaid at any time without penalty. The

CHI99 3516723-1.040965.0010

balance of principal and any outstanding interest as well as any other sum remaining unpaid on this Note shall be paid in full no later than August 15, 2002.

      F.    If any of the following events shall occur and be continuing for any reason whatsoever (and whether such occurrence shall be voluntary or involuntary or come about or be effected by operation of law or otherwise), an "Event of Default" shall be deemed to have occurred:

          (1)    If Debtor fails to pay any principal or interest on this Note when it becomes due and payable, or Debtor fails to pay any other cost, fee, expense or other amount owing to Creditor under this Note; or

          (2)    Debtor becomes insolvent or generally fails to pay, or admits in writing its inability or refusal to pay, debts as they become due; or Debtor applies for, consents to, or acquiesces in the appointment of a trustee, receiver or other custodian for Debtor or any property thereof, or makes a general assignment for the benefit of creditors; or, in the absence of such application, consent or acquiescence, a trustee, receiver or other custodian is appointed for Debtor or for a substantial part of the property of Debtor and is not discharged within 30 days; or any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any bankruptcy or insolvency law, or any dissolution or liquidation, is commenced in respect of Debtor, and if such case or proceeding is not commenced by Debtor, it is consented to or acquiesced in by Debtor, or remains for 30 days undismissed; or Debtor takes any action to authorize, or in furtherance of, any of the foregoing.

      G.    THIS PROMISSORY NOTE SHALL BE GOVERNED BY BERMUDA LAW WITHOUT REGARD OR CONFLICT OF LAWS PRINCIPLES. SUIT HEREUNDER MAY BE BROUGHT IN A BERMUDA COURT. DEBTOR HEREBY IRREVOCABLY AND KNOWINGLY WAIVES ANY OBJECTION TO SUIT IN SUCH COURT DUE TO INCONVENIENCE OR UNSUITABILITY OF FORUM, VENUE OR OTHERWISE, AND HEREBY WAIVES ANY RIGHT DEBTOR MAY HAVE TO A JURY TRIAL. The foregoing shall not prejudice Creditor's right to bring suit in any jurisdiction it deems desirable or to enforce any judgments obtained in any jurisdiction. The remedies provided herein are not exclusive and Creditor shall have the option to utilize any one or more remedies available at law or in equity to enforce the provisions of this Note.

      H.    Principal and interest shall be payable in lawful money of the United States.

      I.    Debtor waives presentment, demand, notice of demand, protest, notice of protest, notice of dishonor and notice of non-payment and agrees to pay such costs, expenses and reasonable attorneys' fees as may be adjudged by a court in connection with any litigation relating to this Note. No delay or omission of Creditor in exercising any right or remedy hereunder shall impair any such right or operate as a waiver thereof. No single or partial exercise by Creditor of any remedy shall preclude any further exercise thereof.

J.    Creditor may assign this Note without Debtor's consent; Debtor may not assign this Note without Creditor's prior written consent.

K.    If any provision or any word, term, clause or part of any provision of this Note shall be invalid for any reason, the same shall be ineffective, but the remainder of this Note and of the provisions shall not be affected and shall remain in full force and effect.

IN WITNESS WHEREOF, Debtor has caused this Note to be executed by its officers thereunto duly authorized, all as of the day and year first above written.

**FOOD SERVICE INSURANCE**
**MANAGERS, INC.**

By: _____
President

ATTEST:

By: _____
Secretary

Cff199 3516723-1.040965.0010

PROMISSORY NOTE DATED NOVEMBER 8, 2000

SCHEDULE 1

BANK ACCOUNT DETAILS AND ROUTING INSTRUCTIONS

**PLEASE REQUEST THAT CHASE MANHATTAN BANK N.A. WIRE FUNDS TO THE INSTRUCTIONS BELOW <u>UNDER A SWIFT 100 ORDER.</u> This will cause the Bank of Butterfield & Son Ltd. in Bermuda to be notified in advance of funds to be received into Platinum Indemnity Limited-FSIM Buttress MMF A/C # 006922.**

BANK:

Chase Manhattan Bank, N.A.
Building F, Floor 8
4 Chase Metrotech Centre
New York, N.Y. 11245, USA

ABA #:

021-000-021

SWIFT:

CHAS US 33

For Credit to:

BENEFICIARY BANK:

The Bank of N.T. Butterfield & Son Ltd.
Hamilton, Bermuda

ACCOUNT NUMBER:

001-106-7808

For Further Credit to: Butterfield Money Market Fund Ltd.

BENEFICIARY ACCOUNT NUMBER:

006922

BENEFICIARY ACCOUNT NAME:

Platinum Indemnity Limited-FSIM

CHI99 3516723-1.040965.0010

05/17/2004 14:02 2128947251



Exhibit B

SCHINDEL, FARMAN & LIPSIUS LLP
14 Penn Plaza Suite 500
(225 West 34th Street)
New York, New York 10122
Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



--------------------------------------------x

Gregory V. Serio, Superintendent of Insurance of
the State of New York, as Rehabilitator of
FRONTIER INSURANCE COMPANY, and as
Assignee of PLATINUM INDEMNITY, LTD,

                          Plaintiff,

        v.

DWIGHT HALVORSON INSURANCE
SERVICES, INC d/b/a F.S.I.M. INSURANCE
SERVICES and FOOD SERVICES
INSURANCE MANAGERS, INC.,

                     Defendant.

--------------------------------------------x

**Case No.: 04 CV 3361**
Hon. Richard M. Berman

**ANSWER**

        Defendants Dwight Halvorson Insurance Services, Inc. ("DHIS") and Food Service

Insurance Managers, Inc. (FSIM"), as and for their answer to the claims asserted herein by

Gregory V. Serio, Superintendent of Insurance of the State of New York, as Rehabilitator of

of Frontier Insurance Company ("Frontier") and by Frontier as assignee of Platinum Indemnity

Company, LTD,  ("Platinum"), allege as follows:

## NATURE OF THE ACTION

1.      Deny, except state this matter concerns a workers compensation insurance

program related to the food services industry in California and in which the parties herein participated as insurers, reinsurers, agents and/or representatives.

2.     Admit that DHIS admits that it entered into a Limited Agency Agreement ("Agency Agreement") with Frontier effective January 1, 1998, and refers the Court to that Agency Agreement for its terms and conditions, and otherwise deny the allegations in paragraph "2". A copy of the Agency Agreement is annexed hereto as **Exhibit A.**

3.     Deny the allegations contained in paragraph "3" of the complaint.

4.     Deny the allegations contained in paragraph "4" of the complaint.

5.     Deny the allegations contained in paragraph "5" of the complaint.

6.     Deny the allegations contained in paragraph "6" of the complaint to the extent they claim defendants owe monies to plaintiffs and otherwise deny knowledge or information sufficient to form a belief as to the assertions of the "court authorized assignment" alleged.

## JURISDICTION AND VENUE

7.     Defendants deny the allegations contained in paragraph "7" of the complaint except admit that the matter in controversy is between citizens of different states.

8.     Deny the allegations contained in paragraph "8" of the complaint.

## THE PARTIES

9.     Admit, upon information and belief, the allegations in paragraph "9" of the complaint.

10.    Deny knowledge or information sufficient to form a belief as to truth of the

allegations contained in paragraph "10" of the complaint.

11.　　　Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "11" of the complaint.

12.　　　Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "12" of the complaint.

. 13.　　　Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "13" of the complaint.

14.　　　Deny knowledge or information sufficient to form a belief as to the allegations contained in paragraph "14" of the complaint.

15.　　　Admit the allegations contained in paragraph "15".

16.　　　Deny the allegations contained in paragraph "16" of the complaint.

17.　　　Admit the allegations contained in paragraph "17" of the complaint.

18.　　　Deny the allegations contained in paragraph "18" of the complaint.

19.　　　Deny. As of October 2003, DHIS and FSIM maintain their place of business at 3260 Penryn Road, Loomis California.

## RESPONSE TO FACTUAL BACKGROUND

20.　　　Deny the allegations contained in paragraph "20" of the complaint.

21.　　　Deny, except state that DHIS procures policies of insurance for growers, shippers, packers, distributors and processors of food products.

22.　　　Deny the allegations contained in paragraph "22" of the complaint, but state that Dwight J. Halvorson, and others, formed FSIM in 1996 and that FSIM is involved in

administering workers compensation related matters for agribusiness and food-related industries.

23.    Deny the allegations contained in paragraph "23" of the complaint, but state that FSIM is involved in administering workers compensation related matters for agribusiness and food-related industries.

24.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "24" of the complaint.

25.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "25" of the complaint.

26.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "26" of the complaint.

27.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "27" of the complaint.

28.    Deny the allegations contained in paragraph "28" of the complaint to the extent they refer to any actions of defendants and otherwise deny knowledge or information sufficient to form a belief as to the truth of the further allegations contained in paragraph "28" of the complaint.

29.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "29" of the complaint.

30.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "30" of the complaint.

31.    Deny knowledge or information sufficient to form a belief as to the truth of the

allegations contained in paragraph "31" of the complaint.

32.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "32" of the complaint.

33.     Deny the allegations contained in paragraph "33" of the complaint, except refer the Court to the contracts, agreements and policies between the parties herein and otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "33" of the complaint.

34.     Admit the allegations contained in paragraph "34" of the complaint, upon information and belief.

35.     Deny the allegations contained in paragraph "35" of the complaint.

36.     Deny the allegations contained in paragraph "36" of the complaint.

37.     Deny the allegations contained in paragraph "37" of the complaint.

38.     Admit the allegations contained in paragraph "38" of the complaint.

39.     Defendants admit that Frontier and DHIS entered into a Limited Agency Agreement effective January 1, 1998 and refer to that Agency Agreement for its terms and conditions, and otherwise deny the allegations contained in paragraph "39" of the complaint to the extent those allegations are not consistent with the terms of that Agency Agreement.

40.     Defendants admit that Frontier and DHIS entered into a Limited Agency Agreement effective January 1, 1998 and refer to that Agency Agreement for its terms and conditions, and otherwise deny the allegations contained in paragraph "40" of the complaint to the extent those allegations are not consistent with the terms of that Agency Agreement.

41.     Defendants admit that Frontier and DHIS entered into a Limited Agency

Agreement effective January 1, 1998 and refer to that Agency Agreement for its terms and conditions, and otherwise deny the allegations contained in paragraph "41" of the complaint to the extent those allegations are not consistent with the terms of that Agency Agreement.

42.     Defendants admit that Frontier and DHIS entered into a Limited Agency Agreement effective January 1, 1998 and refer to that Agency Agreement for its terms and conditions, and otherwise deny the allegations contained in paragraph "42" of the complaint to the extent those allegations are not consistent with the terms of that Agency Agreement.

43.     Defendants admit that Frontier and DHIS entered into a Limited Agency Agreement effective January 1, 1998 and refer to that Agency Agreement for its terms and conditions, and otherwise deny the allegations contained in paragraph "43" of the complaint to the extent those allegations are not consistent with the terms of that Agency Agreement.

44.     Defendants admit that Frontier and DHIS entered into a Limited Agency Agreement effective January 1, 1998 and refer to that Agency Agreement for its terms and conditions, and otherwise deny the allegations contained in paragraph "44" of the complaint to the extent those allegations are not consistent with the terms of that Agency Agreement.

45.     Defendants admit that Frontier and DHIS entered into a Limited Agency Agreement effective January 1, 1998 and refer to that Agency Agreement for its terms and conditions, and otherwise deny the allegations contained in paragraph "45" of the complaint to the extent those allegations are not consistent with the terms of that Agency Agreement.

46.     Defendants admit that Frontier and DHIS entered into a Limited Agency Agreement effective January 1, 1998 and refer to that Agency Agreement for its terms and conditions, and otherwise deny the allegations contained in paragraph "46" of the complaint to

the extent those allegations are not consistent with the terms of that Agency Agreement.

47.    Defendants admit that Frontier and DHIS entered into a Limited Agency Agreement effective January 1, 1998 and refer to that Agency Agreement for its terms and conditions, and otherwise deny the allegations contained in paragraph "47" of the complaint to the extent those allegations are not consistent with the terms of that Agency Agreement.

48.    Defendants admit that the Limited Agency Agreement was amended effective January 1, 1999, and refer to the Agency Agreement and its amendments for their terms and conditions, and otherwise deny the allegations contained in paragraph "48" of the complaint to the extent those allegations are not consistent with the terms of that Agency Agreement.

49.    Defendants admit that Frontier and DHIS entered into a Limited Agency Agreement effective January 1, 1998 and refer to that Agency Agreement for its terms and conditions, and otherwise deny the allegations contained in paragraph "49" of the complaint to the extent those allegations are not consistent with the terms of that Agency Agreement.

50.    Admit that FSIM and Platinum entered into a Subscription and Shareholders Agreement ("Shareholders Agreement") on or about January 16, 1998. A true copy of that "Shareholders Agreement" is annexed hereto as **Exhibit B**.

51.    Admit that FSIM and Platinum entered into a Subscription and Shareholders Agreement on or about January 16, 1998, and refer to that Shareholders Agreement for its terms and conditions, and otherwise deny the allegations contained in paragraph "51" of the complaint to the extent those allegations are not consistent with the terms of that Shareholders Agreement.

52.    Admit that FSIM and Platinum entered into a Subscription and Shareholders Agreement on or about January 16, 1998, and refer to that Shareholders Agreement for its terms

and conditions, and otherwise deny the allegations contained in paragraph "52" of the complaint to the extent those allegations are not consistent with the terms of that Shareholders Agreement.

53.    Admit that FSIM and Platinum entered into a Subscription and Shareholders Agreement on or about January 16, 1998, and refer to that Shareholders Agreement for its terms and conditions, and otherwise deny the allegations contained in paragraph "53" of the complaint to the extent those allegations are not consistent with the terms of that Shareholders Agreement.

54.    Admit that on or about November 8, 2000, FSIM executed a document titled "Promissory Note" and refer to that document for its specific terms, and otherwise deny the allegations contained in paragraph "54" of the complaint and deny that FSIM has any obligations under the document titled "Promissory Note." A copy of that document is annexed hereto as **Exhibit C**.

55.    Deny the allegations contained in paragraph "55" of the complaint but state that FSIM believed the document titled "Promissory Note" was to secure its obligations under the Shareholders Agreement.

56.    Admit that on or about November 8, 2000, FSIM executed a document titled "Promissory Note" and refer to that document for its specific terms, and otherwise deny the allegations contained in paragraph "56" of the complaint and deny that FSIM has any obligations under the document titled "Promissory Note."

57.    Admit that on or about November 8, 2000, FSIM executed a document titled "Promissory Note" and refer to that document for its specific terms, and otherwise deny the allegations contained in paragraph "57" of the complaint and deny that FSIM has any obligations under the document titled "Promissory Note".

58.    Admit that on or about November 8, 2000, FSIM executed a document titled "Promissory Note" and refer to that document for its specific terms, and otherwise deny the allegations contained in paragraph "58" of the complaint and deny that FSIM has any obligations under the document titled "Promissory Note".

59.    Admit that on or about November 8, 2000, FSIM executed a document titled "Promissory Note" and refer to that document for its specific terms, and otherwise deny the allegations contained in paragraph "59" of the complaint and deny that FSIM has any obligations under the document titled "Promissory Note".

60.    Admit that on or about November 10, 1999 Frontier notified DHIS that it would terminate the Agency Agreement.

61.    Admit that Frontier terminated the Agency Agreement effective January 1, 2000.

62.    Deny the allegation that DHIS did not comply with the "underwriting guidelines and other provisions of the" Agency Agreement and otherwise deny knowledge or information sufficient to form a belief as to the further allegations contained in paragraph "62" of the complaint.

63.    Admit that Frontier conducted extensive audits of FSIM's records related to the Agency Agreement and otherwise deny the allegations in paragraph "63" of the complaint.

64.    Deny the allegations contained in paragraph "64" of the complaint.

65.    FSIM admits that Frontier and/or its representatives demanded various sums of money from FSIM, however FSIM denies it owes any monies to Frontier and denies it owes any payments under the terms of the Agency Agreement and otherwise denies the further allegations in paragraph "65" of the complaint.

66.    FSIM admits that it made seven payments of $21,000.00 each to Platinum but otherwise denies the further allegations contained in paragraph "66" of the complaint and specifically denies that it owes any monies to Platinum.

67.    Deny the allegations contained in paragraph "67" of the complaint.

68.    Deny the allegations contained in paragraph "68" of the complaint.

69.    Deny the allegations contained in paragraph "69" of the complaint.

70.    Deny the allegations contained in paragraph "70" of the complaint.

71.    Deny knowledge or information sufficient to form a belief as to the allegations contained in paragraph "71" of the complaint.

72.    Deny knowledge or information sufficient to form a belief as to the allegations contained in paragraph "72" of the complaint.

73.    Deny knowledge or information sufficient to form a belief as to the allegations contained in paragraph "73" of the complaint.

74.    Deny knowledge or information sufficient to form a belief as to the allegations contained in paragraph "74" of the complaint.

75.    Deny knowledge or information sufficient to form a belief as to the allegations contained in paragraph "75" of the complaint.

76.    Deny knowledge or information sufficient to form a belief as to the allegations contained in paragraph "76" of the complaint.

77.    Deny knowledge or information sufficient to form a belief as to the allegations contained in paragraph "77" of the complaint.

78.    Deny knowledge or information sufficient to form a belief as to the allegations

contained in paragraph "78" of the complaint.

79.     Deny knowledge or information sufficient to form a belief as to the allegations contained in paragraph "79" of the complaint.

## RESPONDING TO COUNT I
### (Breach of Contract -DHIS)

80.     As and for their response to the allegations contained in paragraph "80" of the complaint, defendants repeat their responses above to the allegations set out in paragraphs "1" through "79" of the complaint.

81.     Admit that the Agency Agreement was a valid contract between Frontier and DHIS and otherwise refer to the Agency Agreement for its terms and conditions and refer questions of law to the court.

82.     Deny the allegations contained in paragraph "82" of the complaint.

83.     Deny the allegations contained in paragraph "83" of the complaint.

84.     Deny the allegations contained in paragraph "84" of the complaint.

## RESPONDING TO COUNT II
### (Breach of Duty of Good Faith Contract -DHIS)

85.     As and for their response to the allegations contained in paragraph "85" of the complaint, defendants repeat their responses above to the allegations set out in paragraphs "1" through "85" of the complaint.

86.     Defendants admit that Frontier and DHIS entered into a Limited Agency Agreement effective January 1, 1998 and refer to that Agency Agreement for its terms and

conditions, and otherwise deny the allegations contained in paragraph "86" of the complaint to the extent those allegations are not consistent with the terms of that Agency Agreement and refer questions of law to the court.

87.    Deny the allegations contained in paragraph "87" of the complaint.

88.    Deny the allegations contained in paragraph "88" of the complaint.

## RESPONDING TO COUNT III
### (Breach of Fiduciary Duty -DHIS)

89.    As and for their response to the allegations contained in paragraph "89" of the complaint, defendants repeat their responses above to the allegations set out in paragraphs "1" through "88" of the complaint.

90.    Defendants admit that Frontier and DHIS entered into a Limited Agency Agreement effective January 1, 1998 and refer to that Agency Agreement for its terms and conditions, and otherwise deny the allegations contained in paragraph "90" of the complaint to the extent those allegations are not consistent with the terms of that Agency Agreement and refer questions of law to the court.

91.    Deny the allegations contained in paragraph "91" of the complaint.

92.    Deny the allegations contained in paragraph "92" of the complaint.

## RESPONDING TO COUNT IV
### (Breach of Fiduciary Duty -FSIM)

93.    As and for their response to the allegations contained in paragraph "93" of the complaint, defendants repeat their responses above to the allegations set out in paragraphs "1"

through "92" of the complaint.

94.    Deny the allegations contained in paragraph "94" of the complaint.

95.    Deny the allegations contained in paragraph "95" of the complaint.

96.    Deny the allegations contained in paragraph "96" of the complaint.

97.    Deny that Platinum has any rights against FSIM and otherwise deny knowledge or information to form a belief as to the allegations contained in paragraph "97" of the complaint.

98.    Deny the allegations contained in paragraph "98" of the complaint.


## RESPONDING TO COUNT V
### (Breach of Contract -FSIM)

99.    As and for their response to the allegations contained in paragraph "99" of the complaint, defendants repeat their responses above to the allegations set out in paragraphs "1" through "98" of the complaint.

100.    Admit that FSIM and Platinum entered into a Subscription and Shareholders Agreement on or about January 16, 1998, and refer to that Shareholders Agreement for its terms and conditions, and refer questions of law to the Court.

101.    Deny the allegations contained in paragraph "101" of the complaint.

102.    Deny the allegations contained in paragraph "102" of the complaint.

103.    Deny the allegations contained in paragraph "103" of the complaint.

104.    Deny that Platinum has any rights against FSIM and otherwise deny knowledge or information to form a belief as to the allegations contained in paragraph "104" of the

complaint.

105.    Deny the allegations contained in paragraph "105" of the complaint.

## AFFIRMATIVE DEFENSES TO PLAINTIFF'S CLAIMS

**General Allegations:**

106.    The Agency Agreement between Frontier and DHIS (Exhibit A at page 12) provides that disagreements under the Agency Agreement shall be first submitted to mediation.

107.    The Subscription Agreement between Platinum and FSIM (Exhibit B at page 5) provides that it shall be governed by the courts and laws of Bermuda.

108.    The document titled "Promissory Note" (Exhibit C at paragraph G), provides that it is governed by Bermuda law and that suit may be brought in a Bermuda court.

109.    DHIS demanded mediation, pursuant to the Agency Agreement, by letter dated July 2, 2001. A copy of that letter is annexed hereto as **Exhibit D.**

110.    Frontier has failed and/or refused to respond to DHIS's demand for mediation.

111.    The Subscription Agreement (Exhibit B at page 5) provides that any dispute concerning the Subscription Agreement shall be submitted to arbitration.

112.    The Subscription Agreement further provides that the arbitration shall take place in Bermuda.

113.    Under the terms of the Subscription Agreement, FSIM is entitled to receive the "investment income earned on the capital provided to" Platinum.

114.    Under the terms of the Subscription Agreement, FSIM is entitled to a an

accounting of the "investment income earned on the capital provided to" Platinum.

115.    Platinum has not provided an accounting of the "investment income earned on the capital provided to" Platinum.

116.    Platinum has not provided to FSIM the "investment income earned on the capital provided to" Platinum.

117.    Under the terms of the Subscription Agreement, FSIM agreed to provide to Platinum "additional capital contribution equal to 4% of the gross written premiums under the program" on a monthly basis.

118.    In 1998 -1999 program year, FSIM paid in excess of $412,000.00 directly to Platinum as "additional capital contribution" under the terms of the Subscription Agreement.

119.    For the 1999-2000 program year, Frontier directed that this "additional capital contribution equal to 4% of the gross written premiums under the program" be forwarded directly to Frontier. This was done with the knowledge and consent of Platinum.

120.    For the 1999-2000 program year, Frontier assumed the responsibility to forwarded this "additional capital contribution equal to 4% of the gross written premiums under the program" to Platinum.

121.    For the 1999-2000 program year, FSIM forwarded this "additional capital contribution equal to 4% of the gross written premiums under the program" to Frontier.

122.    Upon information and belief, Frontier failed and/or refused to provide that "additional capital contribution equal to 4% of the gross written premiums under the program" to Platinum.

123.    In or about August, 2000, Platinum represented to FSIM that Frontier did not

forward to Platinum, the "additional capital contribution equal to 4% of the gross written premiums under the program" that was forwarded by FSIM to Frontier.

124.    Platinum further represented that because Frontier it did not receive the "additional capital contribution equal to 4% of the gross written premiums under the program," Platinum was undercapitalized in the amount of $469,515.00, that Platinum was at risk of insolvency and that the regulatory authorities in Bermuda would look to FSIM for the additional capital.

125.    Platinum presented the document titled "Promissory Note" to FSIM for its signature.

126.    FSIM believed it was obligated to pay the $469,515.00 to Platinum.

127.    FSIM executed the document based on the representations of Platinum.

128.    FSIM made seven payments of $21,000 each to Platinum under the "Promissory Note."

129.    FSIM also continued to forward to Frontier, the "additional capital contribution equal to 4% of the gross written premiums under the program".

130.    In 2001, After making the seven payments of $21,000 each to Platinum, FSIM realized it did not owe the $469,515.00 as represented by Platinum. FSIM notified Platinum that it would make no further payments towards the $469,515.00 claimed and made no further payments.

131.    Platinum accepted FSIM's explanation and made no request to FSIM for any payment under the "Promissory Note."

132.    Prior to Frontier's cancellation of the program, FSIM provided certain loss

control services to Frontier.

133.    The value of those loss control services exceeded $60,000.

134.    Frontier has failed and/or refused to pay for those loss control services.

135.    Prior to the cancellation of the program, at Frontier's request, FSIM provided additional services to Frontier which included preparing OSHA filing with the California regulatory authorities on behalf of Frontier.

136.    Frontier has failed and/or refused to pay for those additional services.

137.    The value of those additional services is to be determined at trial.


## FIRST AFFIRMATIVE DEFENSE

138.    The Court lacks jurisdiction over the matters asserted in the complaint. The Agency Agreements at issue provides for mediation of disputes. The Shareholders Agreement at issue provides for arbitration of disputes in Bermuda pursuant to Bermuda laws. The "Promissory Note" at issue also provides for the application of Bermuda and for lawsuits in Bermuda courts.

## SECOND AFFIRMATIVE DEFENSE

139.    This is an improper venue for this matter. The matters alleged as the basis of the complaint did not take place in the district in which this action is brought or in the State of New York. Additionally, the Shareholders Agreement and the "Promissory Note" provide for the application of Bermuda law.

## THIRD AFFIRMATIVE DEFENSE

140.    Frontier breached the terms of the Agency Agreement by refusing to honor the

demand for mediation.

## FOURTH AFFIRMATIVE DEFENSE

141.    FSIM was induced to execute the document titled "Promissory Note" based on the misrepresentation of Platinum and/or Frontier.  Accordingly, that "Promissory Note" is not enforceable.

## FIFTH AFFIRMATIVE DEFENSE

142.    The claimed "Promissory Note" is unenforceable as no consideration was provided to FSIM  for that "Promissory Note".

## SIXTH AFFIRMATIVE DEFENSE

143.    Frontier is barred from any attempt to recover on the "Promissory Note" as Frontier is not a holder in due course of that "Promissory Note."

## SEVENTH AFFIRMATIVE DEFENSE

144.    Frontier is barred from any attempt to recover on the "Promissory Note" as the amounts claimed under that  "Promissory Note" were previously paid by FSIM to Frontier.

## EIGHTH AFFIRMATIVE DEFENSE

145.    Frontier is barred from any recovery herein by the doctrine of  "un clean hands".

## NINTH AFFIRMATIVE DEFENSE

146.    The assignment of the "Promissory Note" by Platinum to Frontier effected a satisfaction of its terms.

## TENTH AFFIRMATIVE DEFENSE

147.    Platinum waived any rights it may have had under the "Promissory Note".

## ELEVENTH AFFIRMATIVE DEFENSE

148.    Recovery under the "Promissory Note" is barred by the doctrine of laches.

## TWELFTH AFFIRMATIVE DEFENSE

149.    Plaintiff's claims herein, if any, shall be reduced by the amounts owed to defendants by Frontier and by the amount of the payments made by FSIM to Platinum under the terms of the "Promissory Note."

## THIRTEENTH AFFIRMATIVE DEFENSE

150.    Plaintiff's claims herein, if any, shall be reduced by the amounts owed to defendants by Frontier and by the amount of the payments made by FSIM to Frontier on behalf of Platinum.

## FOURTEENTH AFFIRMATIVE DEFENSE

151.    Frontier and/or Platinum failed and or refused to mitigate their claimed damages.

## FIFTEENTH AFFIRMATIVE DEFENSE

152.    Platinum failed and/or refused to provide FSIM with the "investment income earned on the capital provided to Platinum" and any recovery herein from FSIM should be offset by those amounts owed by Platinum to FSIM.

## SIXTEENTH AFFIRMATIVE DEFENSE

153.    Frontier improperly withheld funds it collected on behalf of Platinum, and as a result FSIM paid the sum of $147,000 to Platinum. Frontier was unjustly enriched by that $147,000 and any recovery herein should be reduced by that amount.

## SEVENTEENTH AFFIRMATIVE DEFENSE

154.    The claims herein and barred, in whole or in part, by the applicable statute of limitations.


WHEREFORE, Defenfddants Dwight Halvorson Insurance Services, Inc. ("DHIS") and Food Service Insurance Managers, Inc. (FSIM") demand judgment dismissing the complaint herein, along with such other further relief as this Court may deem just and proper.


Dated:    June 25, 2004
          New York, New York


                              SCHINDEL, FARMAN & LIPSIUS LLP
                              Attorneys for Defendants Dwight Halvorson
                              Insurance Services, Inc., and Food Service
                              Insurance Managers, Inc.



                              By:
                                 Laurence J. Rabinovich  (LR 8616)
                                 Lorienton N.A. Palmer (LP 3934)
                                 14 Penn Plaza -Suite 500
                                 (225 West 34th Street)
                                 New York, New York 10122
                                 (212) 563-1710
                                 File No. 3090/0001


TO:    ENTWISTLE & CAPPUCCI, LLP
       299 Park Avenue - 14th Floor
       New York, NY 10171
       (212) 894-7200
       Attn:  William S. Gyves, Esq.



Exhibit B — |

**Exhibit A**

# FRONTIER INSURANCE COMPANY

# LIMITED AGENCY AGREEMENT

This Limited Agency Agreement ("Agreement") is entered into by and between FRONTIER INSURANCE COMPANY, an insurance company domiciled in New York ("Company")(and/or their subsidiary companies as required), and Dwight Halvorson Insurance Services, a California Corporation ("Agent").

## COMPANY AND AGENT HEREBY AGREE AS FOLLOWS:

### ARTICLE 1 - APPOINTMENT

1.1    Company hereby appoints Agent to act on behalf of Company with the authority and subject to the terms and conditions hereinafter set forth, and Agent hereby accepts such appointment.

1.2    Company's appointment of Agent hereby shall not restrict in any manner Company's right to appoint other producers and agents.

### ARTICLE 2 - DEFINITIONS

2.1    "Sub-producer" shall mean any insurance broker, insurance agent or other person or entity properly licensed to produce insurance and through which Policies may be produced to Agent.

X  2.2    "Effective Date" shall mean 12:01 a.m., January 1, 1998.

2.3    "Policy" shall mean any Policy, contract, coverage slip, endorsement, binder, certificate, proposal for insurance or other document which binds Company to Insurance or coverage issued or renewed by Company on or after the Effective Date through Agent and shall also include any rewrite, renewal or extension (whether before or after termination of this Agreement) through Agent required by law.

### ARTICLE 3 - AUTHORITY OF AGENT

3.1    Agent is hereby authorized and assumes the duty to act on behalf of Company as a casualty broker-Agent. All actions and inactions of Agent under this authorization

12/29/97

1

shall be subject to the ultimate authority of Company, and Company from time to time shall be entitled to place reasonable restrictions on Agent's authority; provided such restrictions are in writing.

3.2     Agent is hereby authorized, subject to the terms of Article 11, requiring prior written permission and applicable law, to advertise and solicit with respect to Company and the business to be produced through the Agent hereunder.

3.3     Agent is hereby authorized, subject to underwriting guidelines established and rates set by Company from time to time and applicable law to accept applications, to quote, bind and decline coverages and to conduct audits ("Underwrite") on behalf of Company for all classes or lines of insurance set forth in Addendum No. 1, Schedule of Business prepared by Company and attached hereto ("Schedule of Business"); provided Agent shall use applications and quote, bind and decline forms approved by Company or where unregulated business, the generally accepted market forms, and provided additionally that except where specifically agreed in writing Agent shall have no authority to bind reinsurance or retrocessions on behalf of Company. The Schedule of Business shall provide the authority of Agent with regard to, but not limited to, underwriting guidelines, the types of risks which may be written, maximum limits of liability, territorial limitations, maximum Policy periods and projected annual premium volume. The Schedule of Business may be amended from time to time as deemed appropriate by Company, provided such amendments are in writing.

3.4     Agent is hereby authorized, as a trustee for Company, and subject to applicable law, to print, maintain, execute and issue Policies and to assemble, countersign and issue Policies.

3.5     Agent is hereby authorized, subject to applicable law, Policy provisions and Company's ultimate authority, to cancel and renew Policies underwritten or delivered by Agent hereunder.

3.6     Agent shall be responsible to the insured while this Agreement continues in effect for the renewal or non-renewal of any Policy underwritten or delivered by Agent hereunder and shall in a timely manner and pursuant to applicable statutes and regulations communicate any renewal quote or notice of non-renewal to the insured to preclude the extension of coverage beyond the expiration date of the Policy.

3.7     Agent is hereby authorized, as a trustee for Company, and subject to the applicable provisions of this Agreement, to receive and receipt for premiums and fees, to pay return premiums, to pay adjustments and to retain and pay commissions out of such collected premiums, subject to the provisions of this Agreement and applicable statutes and regulations.

12/29/97

2

3.8   With the exception of Food Services Insurance Managers, Inc., Agent shall not authorize any sub-producer or other person or entity to quote, bind, or decline coverages or otherwise underwrite on behalf of Company without the prior written consent of the Company.

3.9   The original sources of some or all business under this Agreement shall be sub-producers. Agent is hereby authorized to enter into agreements with such sub-producers with respect to the business hereunder; provided Agent shall have no authority to obligate Company in any manner to such sub-producers and all agreements with such sub-producers shall provide that the sub-producers shall have no claims or causes of action against Company except for reckless conduct or willful misconduct of Company. Additionally, Agent shall be responsible for verifying the proper licensing of such sub-producers, and if any liabilities are incurred by Company as the result of Agent's accepting business from unlicensed or improperly licensed sub-producers, Agent shall indemnify and hold Company harmless from, and reimburse Company for, any and all such liabilities, including but not limited to fines, court costs and expenses, legal fees and travel expenses.

3.10  Agent may accept as a trustee for Company premium financed by premium finance companies, upon terms and conditions approved in writing by Company.

3.11  Agent shall not process, adjust, settle or pay any claims under Policies underwritten or delivered by Agent pursuant to this Agreement, nor shall Agent commit Company to pay any claim. Should Agent become aware, or have delivered to it any notice of claim or claims, Agent immediately shall forward such notice of claim or claims to Company or its designee in a manner designated by Company.

# ARTICLE 4 - COMPENSATION

4.1   Except as otherwise specified on the Schedule of Business, Company shall allow Agent a gross commission of twelve (12%) of all gross written premium collected for Policies underwritten or delivered by Agent hereunder. This commission arrangement shall be reviewed from time to time and shall be subject to adjustment at the discretion of the Company on a prospective basis and upon at least sixty (60) days prior written notice to the Agent.

4.2   The Agent is responsible for all commissions due to sub-producers and others with respect to Policies written or delivered hereunder. The Company shall not be responsible to pay sub-producers.

4.3   Agent shall charge and collect for all Policy and other fees required with respect

12/29/97

3

to business produced hereunder to the extent such charges are permitted by law.

## ARTICLE 5 - ACCOUNTING, RECORDS AND EDP

5.1    Agent shall provide and maintain in forms reasonably acceptable to Company complete and accurate books, records, dailies and correspondence necessary to determine the amount of liability of Company and the amount of premium and expense derived from business written hereunder.

5.2    The omission of any item from any statement, or report applicable to the business hereunder shall not affect the responsibility of either party to account for and pay all amounts due the other party hereunder, nor shall it prejudice the rights of either party to collect all such amounts due from the other party.

5.3    Agent shall prepare separate, itemized, invoices and/or monthly statements for each sub-producer for the business produced by the sub-producer hereunder, and furnish the sub-producers IRS Forms 1099 each year if and when required.

5.4    All of Agent's records applicable to the business hereunder shall be kept in such manner and form as are generally recognized as acceptable in the insurance industry or as reasonably may be required by Company. Such records shall be maintained for five (5) years or for any longer retention period required by law or Company.

5.5    All records in Agent's possession or control and applicable to the business hereunder shall be made available for inspection, copying and/or audit at reasonable times by Company or its Agents, or any governmental authority with the right to inspect.

5.6    All records in Agent's possession or control and applicable to the business hereunder shall be made available, upon prior written request and at the Company's cost, for inspection at any office of Company, should such inspection be requested by insurance department or other governmental authorities.

5.7    Agent shall immediately forward upon request to Company or Company's Agent's exact, as written, copies of all applications, Policies and reports underwritten or delivered by Agent or used by Agent hereunder, including all other evidence of insurance written, modified or terminated.

5.8    Agent shall be solely responsible for and shall keep accurate records of all Policy supplies assigned to Agent and shall account to Company, upon Company's request, for all outstanding and unused Policy supplies. If canceled or terminated Policy supplies are unavailable, Agent shall forward or cause to be forwarded to

12/29/97                                     4

Company properly executed lost Policy receipts therefor. Upon termination of this Agreement, Agent shall promptly dispose of all Policy supplies and other property of the Company as directed by the Company.

5.9 Company shall be entitled to conduct examinations of Agent's operations at any reasonable time. Such examinations shall be conducted in reasonable manners and may cover such matters as required or permitted by law and as are relevant to the business done hereunder.

5.10 Agent shall furnish Company, with any additional information and reports as reasonably requested by Company and necessary to complete Company's quarterly and annual statements filed with regulatory authorities or otherwise satisfy regulatory requirements.

5.11 Agent shall annually furnish Company, within ninety (90) days following the end of the Agent's fiscal year, current (audited, if available) financial statements of Agent. These financial statements shall include, but not be limited to, profit and loss, balance sheet and cash flow statements.

# ARTICLE 6 - ACCOUNT CURRENT

6.1 The Agent shall, not later than fifteen (15) days after the end of each month, prepare and forward to the Company a detailed and itemized statement of account of all premiums written and premium adjustments made (whether additional or return) within the month for which the statement (herein referred to as the "Account Current") is rendered. However, the Company shall have the privilege, exercisable at its option, of preparing the Account Current.

6.2. The Agent shall pay the balance, if any, due the Company as shown on each Account Current within forty-five (45) days following the end of the month for which the Account Current was rendered. Upon rendition by the Company of invoices or statements adjusting or correcting any Account Current, the Agent shall pay to the Company forthwith the balance, if any, shown to be due thereon. Agent shall be responsible to pay written premium to the Company, whether or not premium has been paid by any insured or sub-producer, it being understood that Agent assumes the credit risk should it bind insurance without receiving premium.

6.3 The Account Current between the parties prepared and forwarded by the Company in accordance with the above, or invoices, statements or adjustments on any Account Current transmitted to the Agent by the Company shall be binding and conclusive on the Agent unless the Agent, within ten (10) days from receipt of such Account Current, invoice, statement or adjustment shall send to the Company a

12/29/97

written itemization of objections thereto.

6.4    The provisions of this Article, which are binding upon the parties subsequent to the termination of this Agreement, shall survive such termination until all obligations are finally discharged.

## ARTICLE 7 - EXPENSES

7.1    Agent shall be responsible for and promptly pay all expenses attributable to producing and servicing business under this Agreement, except as specified in Section 7.2. This responsibility shall not be altered whether the expenses are billed to Agent or Company. These expenses shall include, but not be limited to:

(a)    Salaries, related taxes and benefits of all employees of Agent;

(b)    Transportation, lodging and meals of employees of Agent;

(c)    Postage and other delivery charges;

(d)    Advertising unless specifically agreed otherwise by Company in writing;

(e)    EDP hardware, software and programming;

(f)    Countersignature fees or commissions;

(g)    License and appointment fees for Agent's, brokers, sub-producers and others;

(h)    Income and state and local sales taxes, if any, directly applicable to Agent's business;

(i)    Taxes on surplus lines premium, and Policy fees if necessary in respect of Policies underwritten or delivered by Agent hereunder;

(j)    Costs of office space, facilities, equipment and occupancy used by Agent;

(k)    Legal and auditing expenses incurred by Agent in the normal conduct of its business; and

(l)    Such other expenses as are customarily borne by insurance producers.

12/29/97

6

(m)    Any and all charges made by NCCI or applicable state governing body against premium volume written under this program. It being understood that Company is an NCCI member company and that NCCI or state governing body charges are applicable on both a fee for service basis and a percentage charge applicable against total premium volume written under this program;

(n)    Printing of preposals, booklets, certificates, solicitation brochures, premium notices, records and reports, and all documents and other materials required to fulfill the obligation of Manager under this agreement;

7.2    Company shall be responsible for and promptly pay all expenses incurred by Company under this Agreement. This responsibility shall not be altered whether the expenses are billed to Company or Agent. These expenses shall include but not be limited to:

(a)    Salaries, related taxes and benefits of all employees of Company;

(b)    Transportation, lodging and meals of employees of Company;

(c)    Board and bureau fees;

(d)    Income and state and local sales taxes, if any, directly applicable to Company's business;

(e)    State or guaranty fund assessments;

(f)    Losses and loss adjustment expenses incurred by or at the direction of Company;

(g)    Reinsurance costs;

(h)    Legal and auditing expenses incurred by, on behalf of or at the direction of the Company; and

(i)    Such other expenses as are customarily borne by insurance companies.

## ARTICLE 8 - HANDLING OF FUNDS

8.1    Agent shall accept and maintain at all times all premium collected and other funds relating to the business underwritten by Agent under this Agreement in the capacity of a fiduciary and trustee for Company. The privilege of retaining commissions shall not be construed as changing the fiduciary capacity.

8.2    Agent shall establish and maintain a premium trust account designated Food

12/29/97

7

Services Insurance Managers, Inc., Premium Trust Account - Frontier in a bank mutually agreed by Agent and Company and shall deposit into such premium trust account all premiums collected by Agent hereunder. Agent shall have the right to transfer funds held in such premium trust account to successor banks with the prior written consent of Company. All such banks shall be members of the Federal Reserve System whose deposits are insured by the Federal Deposit Insurance Corporation. Agent shall be entitled to retain any interest earned on funds deposited in such premium trust accounts until premium is to be remitted to Company pursuant to Article 6 hereof.

8.3    Agent shall maintain sole signature authority on such premium trust account and may use any and all premium and other funds collected by Agent under this Agreement only for the following purposes:

(a)    Payments of amounts due Company pursuant to this Agreement;

(b)    Return of unearned premiums arising due to cancellation or endorsement of Policies underwritten or delivered by Agent;

(c)    Payment of Agent's, sub-producers' and others' compensations as described in Article 4;

(d)    Return of money deposited in error; and

(e)    Withdrawal of interest due Agent hereunder.

8.4    Agent shall not commingle any funds in such premium trust account with funds in Agent's corporate accounts or other funds held by Agent in any other capacity.

8.5    Agent shall render accounts to Company detailing all premium trust account transactions, and remit to Company all funds due under this Agreement pursuant to said account by the end of the month following the month during which the Agent collected such funds for the account of the Company.

8.6    In the absence of negligence or fraud by either party hereto, neither party shall be liable for any loss which occurs by reason of the default or failure of the bank in which an account is carried.

8.7    Agent shall promptly account for and refund commissions on Policy cancellations, reductions in premiums or any other return premiums at the same rate at which such commissions were originally retained.

8.8    Neither Company nor Agent shall offset any balances due under this Agreement

12/29/97

with any amounts due under any other agreement between Company and/or its affiliates and Agent and/or its affiliates.

## ARTICLE 9 - OWNERSHIP OF BOOKS AND RECORDS

9.1     Subject to Article 5 hereof, upon termination of this Agreement, Agent's records and the exclusive use and control of expirations of business produced by sub-producers retained by Agent and contracts with such sub-producers shall remain the sole property of Agent and be left in Agent's undisputed possession, provided Agent is not then in default of any payment obligated to Company hereunder. If Agent is then in default of any such payment obligated and has not cured such default within fifteen (15) days of Company's notice to Agent thereof, ownership of the records, use and control of expirations and contracts with sub-producers shall become and remain vested in Company. Company may then dispose of such expirations as it deems proper.

9.2     Agent hereby assigns to Company as security for the payment obligations of Agent under this Agreement all sums due or to become due to Agent from any insureds whose Policies were underwritten or delivered by Agent hereunder. Company shall have full authority to demand and collect such sums if Agent is then in default of any payment obligation to Company hereunder and has not cured such default within fifteen (15) days of Company's notice to Agent thereof.

9.3     Agent pledges and grants to Company to further secure the payment obligations of Agent hereunder all of Agent's records of expirations of Policies, including, but not limited to, the ownership and use of such expirations. Company shall have the rights of the holder of a security interest granted by law, including, but not limited to, the rights of foreclosure to effectuate such security interest, and Agent hereby agrees peaceably to surrender possession of such records to the Company upon demand.

9.4     Agent agrees that this Agreement or a copy hereof may be filed as a financing statement, if Company so elects. Agent further agrees to sign a UCC-1 Form to secure Company's security interest in the expirations and renewals upon request by Company; provided that upon termination of this Agreement and Agent not being in default of any payment obligation to Company hereunder, Company immediately shall cancel or terminate such filing.

## ARTICLE 10 - INDEPENDENT CONTRACTOR RELATIONSHIP

10.1   Nothing contained in this Agreement shall be construed to create the relationship of employer and employee between Company and Agent, or between Company

12/29/97

9

and any employees, representatives or sub-producers of Agent. Agent shall carry out its responsibilities hereunder subject to its own discretion and not subject to time or manner directions of Company.

## ARTICLE 11 - ADVERTISING

11.1  Before Agent uses Company name in any form of advertising, a copy of the proposed advertisement shall be forwarded to Company. No such advertisement shall be used without the prior written permission of Company. All agreements with sub-producers shall require that before they use Company's name in any advertising, a copy of the proposed advertisements shall be forwarded to Company, and that no such advertisements shall be used without the prior permission of Company.

11.2  If an advertisement containing Company's name is used by Agent or sub-producers retained by Agent, Agent shall maintain a copy of the advertisement and full details concerning where, when and how it was used, and comply with all legal requirements regarding content, review and approval of advertising and maintenance of records. Agent, however, shall not be required to maintain records of the names and addresses of recipients of any direct mailing or advertising but shall only record the geographical area in which such mailing or advertising was used except to the extent retention of such information is required by law.

## ARTICLE 12 - LICENSING

12.1  Agent warrants that it has and shall maintain current licenses and authorities as required by law for the conduct of its business pursuant to this Agreement.

12.2  Agent shall be responsible for verifying that all sub-producers to Agent shall maintain appropriate licenses and authorities as required by law for conduct of their businesses.

12.3  Agent shall maintain in force written agreements, in form reasonably satisfactory to Company, with sub-producers to Agent hereunder.

## ARTICLE 13 - AGENT'S SALE OR TRANSFER

13.1  In the event any interest in Agent is to be sold or transferred or is to merge to be consolidated with another firm not under common control, controlling or controlled by Agent or Company, Agent shall give thirty (30) days advance written notice to Company, to allow Company, at its election:

12/29/97                                   10

(a)    To consent to assignment of this Agreement to the successor;

(b)    To enter into a new Agreement with the successor; or

(c)    To terminate this Agreement.

13.2    **Company** shall notify **Agent** of its decision within fifteen (15) days of the receipt of the notice.

13.3    **Agent** shall notify **Company** in writing within fifteen (15) days if there is a change in:

(a)    Ownership of ten-percent (10%) or more of the outstanding voting stock of **Agent**; or

(b)    The President of **Agent**,

# ARTICLE 14 - INDEMNITY AGREEMENT

14.1    **Agent** shall indemnify and hold **Company** (including its officers and employees) harmless from any and all claims, causes of action, damages, judgments, fines, penalties and expenses (including, but not limited to, attorney's fees, litigation expenses and costs of court) which may be made against the **Company** by anyone, including any governmental agency or regulatory authority, and which arise, either directly or indirectly, principally out of any negligent or grossly negligent actions or inactions or willful misconduct or violation of any statute or regulation by **Agent**, including, but not limited to, any negligent or grossly negligent actions or inactions or willful misconduct or violation of any statute or regulation by any sub-producer to **Agent** or any of **Agent's** or such sub-producers' employees or representatives arising under this Agreement.

14.2    **Company** shall indemnify and hold **Agent** (including its officers and employees) harmless from any and all claims, causes of actions, damages, judgments, fines, penalties and expenses (including, but not limited to, attorney's fees, litigation expenses and costs of court) which may be made against the **Agent** and which arise either directly or indirectly, principally out of any negligent or grossly negligent actions or inactions or willful misconduct or violation of any statute or regulation by **Company**, including, but not limited to, any negligent or grossly negligent actions or inactions or willful misconduct or violation of any statute or regulation by **Company's** employees or representatives arising under this Agreement.

14.3    If any person seeks indemnity hereunder the person to be indemnified ("Indemnified Person") shall give the indemnifying party ("Indemnifying Party")

12/29/97                                                11

prompt written notice of the claim, cause of action, damage, judgment, fine, penalty and expense against which indemnification is sought, including copies of all documents and information reasonably relating thereto. The Indemnifying Party promptly shall commence defending the Indemnified Person through competent attorneys reasonably satisfactory to the Indemnified Person. The Indemnified Person shall cooperate with the Indemnified Party in such defense, but the ultimate decision whether to defend or settle shall be made by the Indemnified Person.

14.4   If either party shall institute any lawsuit to enforce the obligations assumed by the other party under this Agreement, the prevailing party shall be entitled to recover from the other party all costs, expenses, judgments and attorney's fees incurred by the prevailing party in connection with the lawsuit.

14.5   Agent warrants that it has and shall maintain Errors & Omissions insurance with an insurer reasonably acceptable to Company and providing coverage of the greater of (i) the minimum required by law or (ii) $1,000,000.

## ARTICLE 15 - MEDIATION AND VENUE

15.1   If irreconcilable differences arise as to business done under this Agreement, either party may request, in writing, mediation of such difference. Such mediation shall be conducted pursuant to Commercial Mediation Rules of the American Arbitration Association. Such mediation shall be conducted in New York and concluded within thirty (30) days after notice of mediation. The costs of the parties incurred in the mediation shall be allocated by the mediator pursuant to the equities of the parties with respect to the matter mediated. Any such mediation shall be non-binding and without prejudice.

15.2   If any dispute cannot be resolved by mediation, the parties agree that the courts of New York shall have exclusive jurisdiction to resolve any such dispute and that the internal law of the state of Company's domicile will apply to the interpretation and enforcement of the dispute.

## ARTICLE 16 - TERMINATION

16.1   This Agreement shall be terminable by (i) either party upon fifteen (15) days prior written notice to the other party for "cause" (defined, as hereinafter used, as the other party's permanent legal or physical inability to perform its obligations hereunder, the other party's conviction of a felony, or the other party's "Material Breach" of this Agreement and failure to cure such Material Breach within the applicable cure period); (ii) the Company in the event the Company determines that the Agent has exceeded the authority granted the Agent by the Company

12/29/97                                    12

under Article 3 - Authority of Agent or (iii) upon ninety (90) days prior written notice to the other party as of the end of any calendar quarter. A "Material Breach" shall consist of (a) failure by a party to pay any amount due hereunder when due, which is not paid within fifteen (15) days following the other party's written demand for such payment, or (b) the failure to obtain or maintain, or the termination or suspension of, a license, permit or other authority necessary for a party to conduct its business as contemplated hereunder which is not cured within thirty (30) days.

16.2    Upon termination, Agent promptly shall deliver or cause to be delivered to Company, at Company's expense, all property of Company in Agent's control or possession, including but not limited to, EDP equipment owned by Company, Policies, manuals, forms, unused drafts and all materials used in servicing of Policies, including computerized and data processing records and the physical equipment required for the processing of those records and data. If Agent fails to deliver such property within fifteen (15) days after the termination of this Agreement, Agent shall bear all reasonable expenses which Company may expend or cause to be expended in obtaining such items. If Policy supplies cannot be accounted for by Agent or have been destroyed, lost or mislaid, Agent agrees to protect, defend and hold Company harmless from all persons and claims whatsoever arising with respect to such Policy supplies.

16.3    Company may, for "cause," in its sole discretion, suspend any and all of Agent's authority pursuant to this Agreement. Such suspension shall be effective upon written notification to Agent setting forth the nature of the "cause" in reasonable detail.

16.4    In the event of termination of this Agreement by Company for "cause", any indebtedness of Agent to Company and all premiums in the possession of Agent, or for the collection of which Agent is responsible, shall become immediately due to Company.

16.5    The failure of either party to declare promptly a default or breach of any of the terms and conditions of this Agreement shall not be construed as a waiver of any of such terms and conditions, nor stop either party from thereafter demanding full and complete compliance herewith.

16.6    In the event of termination of the Reinsurance Agreement between Platinum Indemnity Limited and Company, Company reserves the right to terminate this Agreement effective immediately upon written notice to the Agent.

16.7    Notwithstanding the termination of this Agreement, the provisions of this Agreement shall continue to apply to all unfinished business to the end that all obligations and liabilities incurred by each party as a result of this Agreement shall be fully

12/29/97

13

performed and discharged according to its terms.

## ARTICLE 17 - MISCELLANEOUS

17.1   This Agreement supersedes all previous agreements, if any, whether written or oral, between Company and Agent relating specifically to the subject matter hereof.

17.2   Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and plural and any term stated in either the masculine, or feminine or the neuter gender, shall include the masculine, the feminine and the neuter gender. All captions and section headings are intended to be for purposes of reference only and do not affect the substance of the section to which they refer.

17.3   Each party hereto agrees to perform any further acts and execute and deliver any further documents which may be reasonably necessary to carry out the provisions of this Agreement.

17.4   In the event that any of the provisions, or portions thereof, of this Agreement are held to be illegal, invalid or unenforceable by any court of competent jurisdiction, the validity and enforceability of the remaining provisions, or portions thereof, shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom.

17.5   Any and all notices required or permitted to be given under this Agreement shall be in writing and shall be deemed given when deposited in the United States Postal Service, Certified Mail, Return Receipt Requested or faxed with confirmation by telephone to a Vice President or senior officer of the recipient, to the parties' addresses as provided below or such other addresses provided by the parties by like means:

### COMPANY:

Frontier Insurance Company
195 Lake Louise Marie Road
Rock Hill, New York 12775

Attn:  Kevin F. Jeffery
          Senior Vice President

12/29/97                                    14

AGENT:

Dwight Halvorson Insurance Services
3300 Douglas Blvd.
Suite # 295
Roseville, CA 95661-3807

Attn:  Dwight Halvorson
President

17.6  This Agreement may be executed in multiple counterparts, each of which and together shall constitute an original document.

COMPANY:                          AGENT:

FRONTIER INSURANCE COMPANY        DWIGHT HALVORSON INSURANCE
                                  SERVICES

By: _R.l P ulll_                  By: _Dwight J Halvorson_

Date: _January 14, 1998_          Date: _12/7/98_

12/29/97                    15

Addendum No. 1

"Schedule of Business"

(A)    Lines of Coverage:

       (1)    Workers Compensation

(B)    Territory:

      California, Arizona

(C)    Maximum Policy Period(s):

      Twelve (12) months plus odd time not to exceed eighteen (18) months.

(D)    Class of Business:

      Agricultural operations with governing class codes of 0172-Truck Farms, 0171- Crops, 0040-Vineyards and 8209-Fresh fruit/vegetable packing and handling including storage.

(E)    Maximum Limits of Binding Authority:

      Dwight Halvorson Insurance Services is authorized to bind agricultural operations for the following limits:

       (1)    Coverage A: Statutory

       (2)    Coverage B: $1,000,000.

(F)    Projected Annual Premium Volume:

      $10,500,000. the first calendar year.

## ADDENDUM #2

### FRONTIER INSURANCE COMPANY
### FOOD SERVICES INSURANCE MANAGERS, INC. PROGRAM

It is hereby agreed that this Addendum modifies the Limited Agency Agreement executed between Frontier Insurance Company and Dwight Halvorson Insurance Services.

### I.  UNDERWRITING GUIDELINES

Insureds may be added to this program on an automatic basis provided the following criteria are met:

1.  The prospective insured's net premium is $50,000. or greater;

2.  Experience modification factors shall be obtained from the Workers' Compensation Insurance Rating Bureau of CA, NCCI, or governing state as applicable.  Experience modification must be 1.25 or lower based on three (3) years or more of loss experience.

3.  No prospect without prior Workers' Compensation coverage will be considered for admission to the program.  The prospective insured must have been in business a minimum of three (3) years and provided a full three (3) years plus current year of currently valued (within 120 days prior to expiration date) loss experience including large losses in excess of $25,000.;

4.  The prospective insured's classification codes do not deviate from those listed in the Class/Rate Schedule in Section III. of this Addendum.;

5.  No single claim, any one occurrence, has exceeded $125,000;

6.  The prospective insured's most recent three (3) year cumulative loss ratio does not exceed 50%;

7.  NCCI underwriting criteria must be complied with, including scheduled credits and rate deviations.

Any risk not falling within the above guidelines must be submitted to Frontier for special consideration and no such risk may be bound without prior written approval by an underwriter employed by Frontier.  Frontier shall have no obligation to accept any risk submitted for special consideration by Agent. In addition, the following risks must be submitted to Frontier, prior to binding:

1.    All risks providing bus transportation to their employees; and

2.    All risks having aircraft exposures.

The following operations are prohibited:

1.    Aircraft and airline operations;

2.    Navigation and operation of all vessels;

3.    Construction and/or maintenance of cofferdams;

4.    Operation of drydocks;

5.    Subaqueous work;

6.    Subway construction;

7.    Tunneling operations;

8.    Wrecking or demolition of bridges, structures or vessels;

9.    All coal mining operations;

10.   All underground mining operations;

11.   Onshore and offshore gas and oil drilling operations;

12.   Manufacture, production or refining of natural or artificial fuel, gas, butane, propane or liquefied petroleum gases or gasoline;

13.   Manufacture of fireworks, fuses, nitroglycerine, celluloid and pyroxylin;

14.   Manufacture of any explosive substance intended for use as an explosive; and

15.   Loading, handling, transportation or storage of explosives.

## II.  SUBMISSION REQUIREMENTS

The following are to be submitted to Frontier for each insured included in this program:

1. Fully completed Application;

2. Three (3) years plus current year premium and payroll history;

3. Currently valued (within 120 days) loss experience for past three (3) years plus current year;

4. Large losses excess of $25,000. for past three (3) years plus current year; and

5. Most recent experience modification.

## III. CLASS/RATE SCHEDULE

Approved Classification Codes:

| Code | Description | Rates |
|------|-------------|-------|
| 7421 | Aircraft Operations, Transport. of Personnel | 2.62 |
| 2003 | Bakeries & Cracker Mfg. | 6.61 |
| 7392 | Beer or Ale Dealers | 11.21 |
| 2163 | Bottling-Beverages-No spirituous liquors | 6.04 |
| 2121 | Breweries / Malt Houses-Incl Bottling/Canning | 5.13 |
| 0079 | Bush Berry Crops | 6.61 |
| 2113 | Canneries-Fish | 8.75 |
| 2111 | Canneries,NOC-Incl Fruit Preserving | 8.70 |
| 8810 | Clerical Office Employees, NOC | 0.75 |
| 6504 | Confections&Food Sundries,Mfg.or ProcNOC | 7.36 |
| 0044 | Cotton Farms | 7.82 |
| 0401 | Cotton Gin Operation | 10.97 |
| 0400 | Cotton Merchants | 10.22 |
| 4683 | Cottonseed Oil Mfg. & Refining | 3.63 |
| 2063 | Creameries& Dairy Products  Mfg. | 6.19 |
| 0036 | Dairy Farms | 8.77 |
| 2142 | Distilling, NOC | 6.48 |

# Subscription and Shareholders Agreement

**This Agreement** is made as of January 16, 1998

**Between**

(1)     Platinum Indemnity Limited a company organized and existing under the laws of the Islands of Bermuda (hereinafter "Platinum") and

(2)     Food Service Insurance Managers Inc., a corporation organized and existing under the laws of California (hereinafter the "Shareholder").

**Witnesseth**

**Whereas**, Shareholder wishes to purchase the "Preferred Share" for the "Purchase Price", and

**Whereas**, Platinum wishes to repurchase the "Preferred Share" on the "Repurchase Date" at the "Repurchase Price", and

**Whereas**, Platinum wishes to enter into certain reinsurance contracts with the Ceding Companies pursuant to which Platinum will reinsure certain of the liabilities of the Ceding Companies under one or more contracts of insurance produced by the Shareholder.

**Now, therefore**, in consideration of the premises and mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1) **Definitions.** The following terms are defined as follows:

   a)   "Business Day" shall mean any day other than a Saturday or Sunday or a day on which banks located in Bermuda are authorized or required by law or executive order to close.

   b)   "Ceding Companies" shall mean the reinsured or reinsureds which are parties to the Treaties.

   c)   "Dividend Date" shall mean the dates shown on Schedule 2 on which a dividend to the extent permitted by law shall be declared to the owner of record of the Preferred Share.

   d)   "Net Premium" shall mean the aggregate net premium received by Platinum under the Treaties after all deductions made by, or credited or paid to, the Ceding Companies including, but not limited to, ceding commissions, boards, bureaus, taxes, fees, licenses, residual risk facility charges, guarantee fund assessments and other charges as provided in the Treaties.

   e)   "Preferred Share" shall mean the preferred share to be issued by Platinum pursuant to the provisions of this Agreement as more particularly described in Schedule 1 hereto.

   f)   "Purchase Price" shall mean One-hundred and twenty-five thousand United States Dollars(US$125,000.00).

   g)   "Purchase Price Administrative Fee" shall mean (i) during the term of the Treaties (or any renewal thereof), 1% of the average "Purchase Price Investment Funds" held by Platinum during each 12 month period beginning on the date the Purchase Price for the Preferred Share is paid and on each anniversary thereof, and (ii) after the termination or expiration of the Treaties, 1% of the average Purchase Price Investment Funds held by Platinum during each 12 month period.

1

h) "Purchase Price Investment Funds" shall mean the total of the Purchase Price proceeds, plus any additional contribution to the capital of Platinum, and all accumulated investment income earned thereon (which is not the subject of prior dividend payment).

i) "Repurchase Date" shall mean five (5) business days after the Ceding Companies acknowledge in writing to Platinum that Platinum has no further liability under the Treaties. Platinum shall be deemed to have no further liability when all losses on policies ceded to Platinum pursuant to the Treaties have been fully run-off or the aggregate limit of the liability of Platinum under the Treaties has been exhausted or, all liability under the Treaties has been commuted.

j) "Repurchase Price" shall mean an amount equal to the Purchase Price, plus any additional contribution to the capital of Platinum by the Shareholder, plus any Undistributed Profits Attributable to the Preferred Share.

k) "Treaties" shall mean the reinsurance agreement or agreements identified in Schedule 2 between Platinum, as assuming reinsurer, and the Ceding Companies, the subject of which are policies of insurance issued pursuant to business produced by the Shareholder.

l) "Treaties Administrative Fee" shall mean, (i) during the term of the Treaties (or any renewal thereof) 1% of the average "Treaties Investment Funds" during each 12 month period beginning on the date the Purchase Price for the Preferred Share is paid and on each anniversary thereof, and (ii) after the termination or expiration of the Treaties, 1% of the average treaties Investment Fund during each 12 month period.

m) "Treaties Investment Funds" shall mean (i) the Net Premium, plus (ii) all amounts actually recovered and received by Platinum under the Treaties by way of salvage or subrogation (net of expenses allocable to Platinum), less (iii) all losses and expenses paid and all premium returned by Platinum to the Ceding Companies pursuant to the Treaties, less (iv) Underwriting Profit previously paid out in dividends.

n) "Underwriting Profit or Loss" shall mean ("except as otherwise provided in this Agreement")
   i) the "Net Premium", plus
   ii) the amounts actually recovered and received by Platinum under the Treaties contracts by way of salvage or subrogation (net of expenses allocable to Platinum); less
   iii) all losses and loss expenses paid, or incurred by Platinum under the Treaties (including reserves set aside for incurred but not reported losses and expenses, as determined by Platinum, but in no event in an amount less than the amount estimated by the Ceding Companies) less;
   iv) the Treaties Administrative Fee; and less
   v) the cost of aggregate stop loss reinsurance; less
   vi) the actual cost incurred by Platinum in establishing and maintaining letter(s) of credit in favor of the Ceding Companies pursuant to the Treaties; plus
   vii) investment income earned on the capital provided by the Shareholder as required from time to time, and directly related to the underwriting of the Treaties.

o) The "Undistributed Profit Attributable to the Preferred Share" on any date is the aggregate sum of the following:

   i) The amount of investment income, if any, earned by Platinum on the Purchase Price Investments Funds, since the last Dividend Date (if any);

   ii) The amount of investment income, if any, earned by Platinum on the Treaties Investment Funds since the last Dividend Date (if any); less (ii)the Treaties Administrative Fee allocable to the period since the last Dividend Date (if any); plus or minus

   iii) The Underwriting Profit or Loss since the last Dividend Date (if any); plus or minus

iv) any Underwriting Profit or Loss prior to the last Dividend Date (if any) not previously distributed by way of dividend.

2) **The Purchase Price.** The Shareholder agrees to purchase and Platinum agrees to issue the Preferred Share at the Purchase Price. Platinum shall issue and deliver the Preferred Share to the Shareholder within five (5) business days after the Shareholder pays Platinum the Purchase Price. The Purchase Price shall be paid within thirty (30) days of the execution of this Agreement. The Purchase Price may be provided in the form of a letter of credit.

3) **Dividends.** To the extent permitted by law, Platinum agrees to cause a dividend to be declared to the owner of record of the Preferred Share on each Dividend Date in an amount equal to the positive Undistributed Profit Attributable to the Preferred Share (if any).

4) **Negative Balance/ Indemnification**

a) In the event the Undistributed profit Attributable to the Preferred Share, minus the cumulative amounts of dividends paid to the Shareholder is, at any time, negative (the "Negative Balance", the Shareholder agrees, within 30 days after receipt of written demand by Platinum, to pay Platinum the Negative Balance minus all previous payments made to Platinum since the last Dividend date (if any) under this paragraph; provided, however, that for purposes of this provision only, Underwriting Profit or Loss shall not take into account unpaid losses and expenses other than such losses and expenses which Platinum believes are likely to be paid within the following ninety (90) days.

b) The Shareholder will indemnify and hold Platinum harmless from all dangers, costs, losses, fees, liabilities, judgements, penalties and expenses (including without limitation, reasonable attorneys' fees and expenses of legal counsel) that Platinum may suffer, sustain, incur or become subject to, whether directly or indirectly, arising out of, based upon, resulting from or in connection with the failure of the Shareholder to comply with Paragraph 4. (a) hereof.

5) **Maintenance of Records.** Platinum shall maintain such records as are necessary to verify the amount of investment Income earned on the Purchase Price Investment Funds and on the Treaties Investment Funds and shall produce copies of such records to the Shareholder within a reasonable time after the Shareholder's written request therefor.

6) **Repurchase Procedure.** On the Repurchase Date, Platinum shall repurchase the Preferred Share for the Repurchase Price from the Shareholder. The Shareholder shall deliver the certificate representing the Preferred Share together with proper instrument of assignment and transfer thereof duly executed in blank.

7) **Representations and Warranties.** The Shareholder represents and warrants that:

a) It is purchasing the Preferred Share for the Shareholder's own account for investment purposes and not with a view to resale or distribution.

b) The Shareholder has adequate means for providing for the Shareholder's current needs and possible personal contingencies and has no need for liquidity of the Shareholder's investment and has no reason to anticipate any change in personal circumstances, financial or otherwise, which may cause or require the sale or distribution of the Preferred Share.

c) The Shareholder understands that the Preferred Share has not been and will not be registered under the United States Securities Act of 1933, as amended, and that the Preferred Share may not be sold, transferred, pledged, hypothecated, assigned or otherwise disposed of.

3

8) **Preferred Share Not Transferable.** The Shareholder covenants and agrees not to, or attempt to, sell, transfer, pledge, hypothecate, assign or otherwise dispose of the Preferred Share.

9) It is acknowledged and agreed that the certificate representing the Preferred Share shall bear the following legend:

> "The share evidenced by this certificate has not been registered under the Securities Act of 1933, as amended. This share has been acquired for investment purposes only and may not be sold, transferred, pledged, hypothecated, assigned or otherwise disposed of."

10) **Waiver or Modification.** Neither this Agreement nor any of the terms hereof may be changed, waived or discharged orally, but only by an instrument in writing signed by the party against which enforcement of such change, waiver or discharge is sought.

11) **Entire Agreement.** This Agreement constitutes the sole and entire agreement of the parties hereto relating to the subject matter hereof and supersedes all prior agreements and understanding related to the subject matter hereof.

12) **Agreement Governs.** The parties agree that in the event the terms of this Agreement conflict with the bye-laws of Platinum, the parties shall cause the bye-laws to be amended to conform with this Agreement; provided, however, in the event such bye-laws are not amended, this Agreement shall govern.

13) **Notices.** All notices, request, demands or other communications required or permitted to be given hereunder shall be in writing and shall be delivered by facsimile, by hand, or by first class mail, addressed to the address for service of the parties as follows:

> If to Platinum:
> Platinum Indemnity Limited,
> Windsor Place, 3rd Floor, 18 Queen Street, Hamilton, Bermuda,
> Fax No. 441-292-1196,
> Attn: Andrew McComb
>
> If to the Shareholder:
> Food Service Insurance Managers Inc.
> 3300 Douglas Boulevard, Suite 295
> Roseville, CA 95661-3807
> Attn: J. Daniel Henke, Secretary

Unless shown to have been received earlier, any such notice so delivered shall be deemed to have been given:

a) if delivered by hand when delivered if delivered during normal business hours of the recipient or if delivered outside such hours at the opening of business on the next business day of the recipient;

b) if delivered by facsimile three hours after the time of transmission if transmitted during normal business hours of the recipient or if delivered outside such hours at the opening of business on the next business day of the recipient;

c) if mailed by first class mail or by registered mail three days after the date of mailing unless the notice was mailed during postal strike or other postal disruption in which case the notice shall be deemed to have been received within three days after the resumption of normal mail service.

4

Any party by notice in writing given to the other party in the manner specified above may change the name and address to which notices, request, demands or other communication to which shall be given pursuant to this Agreement.

14) **Governing Law and Jurisdiction.** This Agreement shall be constructed and enforced in accordance with, and governed by, the laws of Bermuda. Subject to Paragraph 14. The courts of Bermuda shall be vested with the non-exclusive jurisdiction to resolve any dispute arising out of or related to this Agreement and the Shareholder will submit to the jurisdiction of any court of competent jurisdiction in Bermuda and will comply with all requirements necessary to give such court jurisdiction.

15) **Arbitration.** If any dispute shall arise between the parties to this Agreement with reference to the interpretation of this Agreement or their rights with respect to any transaction involved, whether such disputes arises before or after termination of this Agreement, such dispute, upon the written request of either party, shall be submitted to three arbitrators, one to be chosen by each party and the third by the two so chosen. If either party refuses or neglects to appoint an arbitrator within thirty days after the receipt of written notice from the other party requesting it to do so, the requesting party may appoint a second arbitrator. If the two arbitrators fail to agree on the selection of a third arbitrator within thirty days of their appointment, either of the parties may apply upon notice to the other to the President of Bermuda Bar Association to name a third arbitrator. All arbitrators shall be active or retired executive officers of insurance or reinsurance companies not under the control of either party to this Agreement and having no personal or financial interest in the outcome of the arbitration. Each party shall submit its case to the arbitrator within thirty days of the appointment of the third arbitrator. The decision in writing of any two arbitrators, when filed with the parties hereto, shall be final and binding on both parties. Unless otherwise specified in the decision of the arbitrators, the expense of the arbitrators and of the arbitration shall be equally divided between the two parties. The said arbitration shall take place in Bermuda unless some other place is mutually agreed upon by the parties to this Agreement. Except as to matters otherwise provided herein, the provisions of the Bermuda International Conciliation and Arbitration Act, 1993 (or any successor statute) shall apply; and the procedural rules set forth in Section III and IV of UNCITRAL shall be followed.

16) **Currency.** All amounts referred to herein are expressed in United States Dollars and all payments shall be made in such dollars.

In witness whereof, the parties hereto have duly executed this Agreement as of the date first above written.

**Platinum Indemnity Limited**

In Hamilton, Bermuda this 16 day of January, 1998

By:

Name: Andrew McComb

Title: Chief Financial Officer

Witness

**Food Service Insurance Managers Inc.,**

In Hamilton, Bermuda this 16 day of January, 1998:

By:

Name: J. Daniel Henke

Title: Secretary

Witness

6

## Schedule 1

## Description of the Preferred Share

### Share classification

Class G non-voting Redeemable Preferred Share

### Number of shares authorised in class

One (1) - (This is a separate class and no other shares will be issued in this class. There are/will be other classes of shares in Platinum, including without limitations, other preferred shares forming separate classes.)

### Par value

US$1.00 (One dollar).

### Issue price per share

US$125,000.00

### Rights in general meetings/ members or shareholders' resolutions

No right to participate in or to sign any written resolution of the members or shareholders of Platinum and no right (a) to receive notice of, (b) to attend at or, (c) vote at any general meeting of the members or shareholders of Platinum EXCEPT where Bermuda law provides for such rights for all members or shareholders for certain actions e.g. discontinuance (relocation) of Platinum.

### Dividend and distribution rights

Only as provided for in the Shareholder Agreement attached. Such rights are accumulated when payment of a dividend at any particular Dividend Date is not permitted under Bermuda law and paid at the next Dividend Date if permitted without any interest.

### Redemption terms

The Class G Non-voting Redeemable Preferred Shares carry no right of redemption by the Members. Platinum has the right to repurchase the Class 2 Non-voting Redeemable Preferred Shares as provided for in the Shareholder Agreement attached.

### Other Preferred share series classes

The holder of the Class G Non-voting Redeemable Preferred Shares acknowledges and agrees that Platinum may issue from time to time other shares carrying rights and restrictions similar to the Class [ ] Non-voting Redeemable Preferred Shares but where the dividend and distribution rights are contingent on the underwriting results of other Treaties which are distinct from the Treaties detailed in Schedule 2 to this agreement, and such shareholders have signed a shareholder agreement with similar terms to that to which this is attached (mutatis mutandis).

## Schedule 2

### Treaties

The following reinsurance agreements:

| Ceding Company | Company Reference | Period |
|---|---|---|
| Frontier Insurance Company | PLA/FIC/007 | 1/1/1998 – 12/31/1998 |

### Dividend date

Platinum will compute an initial dividend 24 months from the effective date of this agreement, and annually thereafter, in accordance with the provisions of clause 3 of this agreement. Such dividend, if declared, to be paid 30 days thereafter.

### Additional capital contribution

In addition to the Purchase Price of $125,000.00, additional capital contributions equal to 4% of gross written premiums under the program will be remitted on a monthly basis for policies written in the previous 30 days. These additional contributions will be included in the Purchase Price Investment Funds as specified in the text of the agreement.

**Exhibit C**

# PROMISSORY NOTE

**PRINCIPAL: $469,515.00**

November 8, 2000

FOR VALUE RECEIVED on the above referenced date, Food Service Insurance Managers, Inc., a California corporation ("Debtor"), promises to pay to the order of Platinum Indemnity Limited, a Bermuda Company ("Creditor"), at Windsor Place, 3rd Floor, 18 Queen Street, Hamilton, Bermuda the principal sum of Four Hundred and Sixty Nine Thousand, Five Hundred and Fifteen Dollars and 00/100 Cents ($469,515.00) with interest as set forth herein, payable as follows:

A.     Principal shall be paid on this Promissory Note (this "Note") as follows: Twenty One Thousand Dollars and No Cents ($21,000.00) on the fifteenth day of each month commencing with August 15, 2000. Such payment to be made by bank wire transfer to the bank and account detailed in Schedule 1 attached hereto, and any other bank and account as may be advised by the Creditor from time to time.

B.     Subject to paragraph D below, interest at a variable rate, namely the Federal Funds Rate (the target interest rate for banks borrowing reserves among themselves as announced and in effect from time to time by the Federal Open Markets Committee of the U.S. Federal Reserve Board) plus two percentage points, shall accrue on principal outstanding from time to time. Subject to paragraph D below, interest payments shall be due on the fifteenth day of every month until Maturity.

C.     Should interest not be paid by Debtor as stated, it shall thereafter bear like interest as the principal. Unpaid interest shall be compounded at a rate not to exceed simple interest on the unpaid principal at the maximum rate permitted by law.

D.     Notwithstanding anything to the contrary herein, interest shall not begin to accrue on any amounts due hereunder until such time as the "Separate Account" maintained for Debtor by Creditor ceases to have a positive balance. The "Separate Account" is an account maintained by Creditor on its books which represents an ownership interest of Debtor in certain segregated assets of Creditor pursuant to the Subscription and Shareholder Agreement ("Agreement") dated January 16, 1998 between the Creditor and the Debtor and executed by both parties in Hamilton, Bermuda. For purposes of this Note, Creditor shall determine from time to time whether the Separate Account has a positive balance in accordance with the terms of the Agreement, and such determination shall be conclusive and binding on Debtor, absent manifest error. If Debtor nonetheless disputes Creditor's determination, Debtor shall pay the interest and principal amounts due hereunder as if such determination were undisputed and such dispute did not exist and Debtor's sole recourse against Creditor for such manifest error shall be an action separate from this Note.

E.     This Promissory Note may be prepaid at any time without penalty. The

balance of principal and any outstanding interest as well as any other sum remaining unpaid on this Note shall be paid in full no later than August 15, 2002.

F.    If any of the following events shall occur and be continuing for any reason whatsoever (and whether such occurrence shall be voluntary or involuntary or come about or be effected by operation of law or otherwise), an "Event of Default" shall be deemed to have occurred:

(1)    If Debtor fails to pay any principal or interest on this Note when it becomes due and payable, or Debtor fails to pay any other cost, fee, expense or other amount owing to Creditor under this Note; or

(2)    Debtor becomes insolvent or generally fails to pay, or admits in writing its inability or refusal to pay, debts as they become due; or Debtor applies for, consents to, or acquiesces in the appointment of a trustee, receiver or other custodian for Debtor or any property thereof, or makes a general assignment for the benefit of creditors; or, in the absence of such application, consent or acquiescence, a trustee, receiver or other custodian is appointed for Debtor or for a substantial part of the property of Debtor and is not discharged within 30 days; or any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any bankruptcy or insolvency law, or any dissolution or liquidation, is commenced in respect of Debtor, and if such case or proceeding is not commenced by Debtor, it is consented to or acquiesced in by Debtor, or remains for 30 days undismissed; or Debtor takes any action to authorize, or in furtherance of, any of the foregoing.

G.    THIS PROMISSORY NOTE SHALL BE GOVERNED BY BERMUDA LAW WITHOUT REGARD OR CONFLICT OF LAWS PRINCIPLES. SUIT HEREUNDER MAY BE BROUGHT IN A BERMUDA COURT. DEBTOR HEREBY IRREVOCABLY AND KNOWINGLY WAIVES ANY OBJECTION TO SUIT IN SUCH COURT DUE TO INCONVENIENCE OR UNSUITABILITY OF FORUM, VENUE OR OTHERWISE, AND HEREBY WAIVES ANY RIGHT DEBTOR MAY HAVE TO A JURY TRIAL. The foregoing shall not prejudice Creditor's right to bring suit in any jurisdiction it deems desirable or to enforce any judgments obtained in any jurisdiction. The remedies provided herein are not exclusive and Creditor shall have the option to utilize any one or more remedies available at law or in equity to enforce the provisions of this Note.

H.    Principal and interest shall be payable in lawful money of the United States.

I.    Debtor waives presentment, demand, notice of demand, protest, notice of protest, notice of dishonor and notice of non-payment and agrees to pay such costs, expenses and reasonable attorneys' fees as may be adjudged by a court in connection with any litigation relating to this Note. No delay or omission of Creditor in exercising any right or remedy hereunder shall impair any such right or operate as a waiver thereof. No single or partial exercise by Creditor of any remedy shall preclude any further exercise thereof.

J.    Creditor may assign this Note without Debtor's consent; Debtor may not assign this Note without Creditor's prior written consent.

K.    If any provision or any word, term, clause or part of any provision of this Note shall be invalid for any reason, the same shall be ineffective, but the remainder of this Note and of the provisions shall not be affected and shall remain in full force and effect.

IN WITNESS WHEREOF, Debtor has caused this Note to be executed by its officers thereunto duly authorized, all as of the day and year first above written.

FOOD SERVICE INSURANCE
MANAGERS, INC.

By: _____
President

ATTEST:

By: _____
Secretary

PROMISSORY NOTE DATED NOVEMBER 8, 2000

SCHEDULE 1

BANK ACCOUNT DETAILS AND ROUTING INSTRUCTIONS

PLEASE REQUEST THAT CHASE MANHATTAN BANK N.A. WIRE FUNDS TO THE INSTRUCTIONS BELOW <u>UNDER A SWIFT 100 ORDER.</u> This will cause the Bank of Butterfield & Son Ltd. in Bermuda to be notified in advance of funds to be received into Platinum Indemnity Limited-FSIM Buttress MMF A/C # 006922.

BANK:

Chase Manhattan Bank, N.A.
Building F, Floor 8
4 Chase Metrotech Centre
New York, N.Y. 11245, USA

ABA #:

021-000-021

SWIFT:

CHAS US 33

For Credit to:

BENEFICIARY BANK:

The Bank of N.T. Butterfield & Son Ltd.
Hamilton, Bermuda

ACCOUNT NUMBER:

001-106-7808

For Further Credit to: Butterfield Money
Market Fund Ltd.

BENEFICIARY ACCOUNT NUMBER:     006922

BENEFICIARY ACCOUNT NAME:     Platinum Indemnity Limited-FSIM

CH99 3516723-1.040965.0010

**Exhibit D**



## Dwight Halvorson
### INSURANCE SERVICES

July 2, 2001

Christopher DuBois
The Law Offices of CHRISTOPHER DuBOIS
Attorney at Law
195 Lake Louise Marie Road
Rock Hill, NY 12775-8000

RE:   Agency Balance with Frontier Insurance Company

Dear Chris:

This correspondence shall serve as a formal notice that Dwight Halvorson Insurance Services is requesting mediation pursuant to Article 15.1 of the Frontier Insurance Limited Agency Agreement.

Specifically, this mediation is requested in response to the matters set forth in your correspondence of June 25, 2001.

Please contact the undersigned as soon as possible so that we may proceed forward with the necessary arrangements.

Very truly yours,

ROBERT J. FRANCESCHI
General Counsel

RJF:baa

cc:   Dwight Halvorson

3300 Douglas Blvd., Suite 295, Roseville, CA  95661-3807
(916) 773-0206  •  FAX (916) 773-0402

**Exhibit C**


Frontier

# REINSURANCE AGREEMENT

This Reinsurance Agreement is effective the 1st day of January, 1998, between Frontier Insurance Company, Rock Hill, New York (hereinafter referred to as "Company") and Platinum Indemnity Limited, a Hamilton, Bermuda company (hereinafter referred to as the "Reinsurer").

## GENERAL PROVISIONS

IT IS HEREBY UNDERSTOOD AND AGREED that the Company has agreed to write on a direct basis policies for the purpose of insuring risks classified as food manufacturing and related industries and produced by Dwight Halvorson Insurance Services of Roseville, California (hereinafter referred to as the "subject program") for the coverage of Workers Compensation. The Company obligates itself to cede and the Reinsurer obligates itself to accept reinsurance on the basis set forth herein on the policies written for the subject program.

In consideration of the payment of the reinsurance premium, and subject to the terms, conditions and limits of liability set forth below, the Reinsurer does hereby reinsure the Company in respect of the Company's liability on the above referred to policies.

## DEFINITIONS

1.  "Policy" - Any one or more policy(ies) written or assumed by the Company in the subject program as reflected in the Company's records and any extensions or renewals thereof and endorsements thereto, effective on or after the date of the Agreement first set forth above.

2.  "Incurred Losses" - All paid losses, plus reserves for unpaid losses and allocated loss expense under the policies as estimated by the Company.

3.  "Paid Losses" - All claim payments under the policy paid by the Company or its agents.

4.  "Allocated Loss Expense" - Such claims expenses that the Company, under its accounting practices, directly allocates to a particular claim. Such expenses include, but are not limited to, attorney's fees, rehabilitation fees, court costs or related costs such as filing fees, and the cost of medical examination, expert medical or other testimony, laboratory services and x - rays, autopsies, stenographic services, witnesses, summonses and copies of documents, but shall not include the salaries and traveling expenses of the Company's employees. The Reinsurer will not be required to pay any type of expense that the Company is not required to pay under the policies.

LOC 04/21/98 ed.                    Page 1 of 9

COPY

FIC/FSTM 000111


5.   "Unallocated Loss Expense" - Such claims expenses that the Company, under its accounting practices, does not directly allocate to a particular claim.  Such expenses include the salaries and traveling expenses of the Company's employees.  For purposes of this Agreement, Unallocated Loss Expense is understood to be equal to six percent (6%) of the Company's gross written premium.

## REINSURER'S LIABILITY

The Reinsurer will pay to the Company 100% of all losses and 100% of all allocated and unallocated loss expense under all binders, policies, agreements or other evidence of insurance or reinsurance, whether written or oral, underwritten for the subject program during the term of this Agreement;  Reinsurer will also reinsure any and all assigned risks and shall pay its proportionate share of any assessments.  The maximum direct loss which will be ceded hereunder as respects any risk is $250,000 per occurrence. The Reinsurer's maximum aggregate liability hereunder shall not exceed 75% of original gross subject written premium.  However, in no event shall the Company's liability for losses and allocated loss adjustment expenses in excess of 75% of the normal gross written premium exceed ten million dollars ($10,000,000).  Any loss and allocated loss adjustment expense in excess of this amount shall be ceded to the Reinsurer as provided for under the terms of this Agreement.

The liability of the Reinsurer shall follow the Liability of the Company and shall be subject to the same risks, conditions and modes of settlement, it being the intention of this Agreement that the Reinsurer shall, in proportion, follow the fortunes of the Company in all respects under business subject to this Agreement.

The liability of the Reinsurer hereunder shall commence obligatorily and simultaneously with that of the Company.  The Reinsurer will receive written notice of any liability or claim of any type which could cause financial exposure to the Reinsurer.

The Reinsurer binds itself unconditionally to follow the Company in the acceptance or rejection of business, its settlement or rejection of claims, its premium rates and its terms of insurance to its insured, and in all policies, whether originally adopted or subsequently changed by the Company, and in every act that the Company performed under the development, preservation, conduct or liquidation of business which is subject to this Agreement.  While the Reinsurer does not undertake to investigate claims or defend suits, reject or accept business or set premium rates, it reserves the right to participate in these determinations.

Reinsurer further agrees that it will indemnify and hold harmless the Company for 100% of all actions proceedings, claims, demands, costs, damages and expenses to which the Company may be subjected as a result of business written under this Agreement, including any and all claims for bad faith or any claims for extra - contractual damages of any kind or

FIC/ESIM 000112

amount, except for claims as a result of the malicious or intentional acts of the Company or its Agents.

## TERRITORY

This Agreement shall cover wherever the Company's policies cover.

## TERM AND CANCELLATION

*30 days*

This Agreement shall take effect as of January 1, 1998, and is continuous in its duration, but may be canceled without cause or liability by either party giving notice in writing by registered or certified mail to the other party, ~~at least 120 days prior to the anniversary date.~~ This Agreement may also be canceled immediately by mutual consent.

Unless otherwise agreed by the parties hereto, the Reinsurer shall remain liable for their share of losses under policies in force at the termination of this Agreement until the natural expiration or cancellation. In the event the Company is required by law or regulation to provide continuity of protection to original insureds, the Reinsurer shall remain liable for its entire share of such policies until the Company legally effects termination of such policies.

Notwithstanding anything to the contrary herein, this Agreement may be terminated by the Company if it does not approve of the acceptance or assumption of any business by the Reinsurer which is outside the scope of the Agreement. In such case, cancellation is effective 60 days from notification.

## ACCOUNTS AND PREMIUM REMITTANCE

Within thirty (30) days after the end of each month for the transactions during that month, the Company shall forward to the Reinsurer a monthly account to which shall be posted all premiums, return premiums, commissions, losses, loss expenses (including reserves) and loss recoveries, and respective transactions under this Agreement during the month. The balance due either party shall be remitted within sixty (60) days of the end of the month. It is understood, however, that the Company shall not be liable under any circumstances for the payment of any premiums or other monies due the Reinsurer other than those remitted to the Company.

Because the Company will suffer a loss or diminution of its surplus because the Reinsurer is not authorized in the Company's state(s) of domicile, a funding mechanism shall be adopted in a form which shall be acceptable to the appropriate regulatory authorities; the Reinsurer has agreed to provide the Company with a clean, unconditional and irrevocable Letter of Credit issued by a bank or banks meeting the NAIC Securities Valuation Office credit standards for issuers of letters of credit and acceptable to the regulatory authorities of the Company's state of domicile to avoid such loss or diminution of the Company's surplus. The

LOC 04/21/98 ed.                    Page 3 of 9

FIC/FSIM 000113

Letter of Credit shall be established for the benefit of the Company to pay all obligations of the Reinsurer owed under this Agreement on all business the Company cedes to the Reinsurer.

It is agreed that the Letter of Credit will be issued for a term of at least one year and will include an "evergreen clause", which automatically extends the terms for at least one additional year at each expiration date unless written notice of non-renewal is given to the Company not less than 30 days prior to said expiration date. The Company and the Reinsurer further agree, notwithstanding anything to the contrary in this Agreement, that said Letter of Credit may be drawn upon by the Company or its successors in interest at any time, without diminution because of the insolvency of the Company or the Reinsurer, but only for one or more of the following purposes:

1.    To reimburse itself for the Reinsurer's share of unearned premiums returned to insureds on account of policy cancellations, unless paid in cash by the Reinsurer;

2.    To reimburse itself for the Reinsurer's share of losses and/or loss adjustment expense paid under the terms of policies reinsured hereunder, unless paid in cash by the Reinsurer;

3.    To reimburse itself for the Reinsurer's share of any other amounts claimed to be due hereunder, unless paid in cash by the Reinsurer;

4.    To fund a cash account in an amount equal to the Reinsurer's share of any ceded unearned premium and/or outstanding loss and loss adjustment expense reserves (including incurred but not reported reserves) funded by means of a Letter of Credit which is under non-renewal notice, if said Letter of Credit has not been renewed or replaced by the Reinsurer Ten (10) days prior to its expiration date;

5.    To refund to the Reinsurer any sum in excess of the actual amount required to fund the Reinsurer's share of the Company's ceded unearned premium and/or outstanding loss and loss adjustment expense reserves (including incurred but not reported reserves), if so requested by the Reinsurer.

In the event the amount drawn by the Company on the Letter of Credit is in excess of the actual amount required for B(1), B(2) or B(4), or in the case of B(3), the actual amount determined to be due, the Company shall promptly return to the Reinsurer the excess amount so drawn.

The Company may, nevertheless, report promptly any individual loss paid, or to be paid, which is $10,000 or more, and the Reinsurer shall, at the Company's request, fund the Company immediately for any such loss. The Company will prepare a loss account containing all particulars necessary to identify the loss. Losses thus paid will be credited to

FIC/FSIM 000114

the Reinsurer on the monthly account wherein such losses would have normally been debited.

## PAYMENTS TO THE COMPANY

All payments to the Company shall be made in the currency of the United States of America and will be paid or provided to the Company within Ten (10) calendar days from the date the Company sends to the Reinsurer a request for any such payments or funds, except as otherwise provided herein.

## OFFSET CLAUSE

The Company or the Reinsurer may offset any balance(s) whether on account of premium, commission, claims or losses, adjustments, expenses, salvage, or any other amounts that are due from one party to the other under this Agreement. The provisions of this clause will survive the termination of this Agreement.

## ARBITRATION

As a precedent to any right of action hereunder, if any dispute shall arise between the parties with reference to the interpretation of this Agreement, with respect to any transaction involved, whether such dispute arises before or after termination of this Agreement, such dispute, upon the written request of either party, shall be submitted to three (3) arbitrators, one to be chosen by each party, and the third by the two chosen. If either party refuses or neglects to appoint an arbitrator within thirty (30) days after receipt of written notice from the other party requesting it to do so, the requesting party may appoint two arbitrators. If the two arbitrators fail to agree in the selection of a third arbitrator within thirty (30) days of their appointment, each of them shall name two, of whom the other shall decline one and the decision between the remaining two shall be made by drawing lots. All arbitrators shall be executive officers of insurance or reinsurance companies not under the control of either party to this Agreement.

Each party shall submit its case to its arbitrator within thirty (30) days of the appointment of the third arbitrator. The decision in writing of any two arbitrators, when filed with the parties hereto, shall be final and binding on both parties. Judgement may be entered upon the final decision of the arbitrators in any Court having jurisdiction. Each party shall bear the expense of its own arbitrator and shall jointly and equally bear with the other party the expense of the third arbitrator and of the arbitration. Such arbitration shall take place in New York, New York.

## LOSS AND LOSS ADJUSTMENT EXPENSES

All loss settlements made by the Company shall be unconditionally binding upon the Reinsurer.

It is understood and agreed that the claims service company chosen to handle all claims under this Agreement is Risk Management Services, Inc. of Sacramento, California.

The Reinsurer agrees to abide by the loss settlements of the Company, it being understood, however, that when so requested the Company will afford the Reinsurer an opportunity to be associated with the Company, at the expense of the Reinsurer, in the defense of any claim, suit or proceeding involving this reinsurance, and that the Reinsurer may cooperate in every respect in the defense or control of such claims, suits or proceedings.

## AUDITS

The Reinsurer or their duly appointed representative shall have free access at any and all reasonable times to such books and records of the Company for the purpose of obtaining information concerning this Agreement or the subject matter hereof.

## RESERVES

The Reinsurer shall maintain reserves as may be required with respect to the Reinsurer's proportion of outstanding losses and loss adjustment expenses, including IBNR, which are in excess of funds withheld hereunder by the Company.

## FINANCIAL IMPAIRMENT CLAUSE

Each party hereto expressly reserves the right, upon notice in writing, to terminate this Agreement immediately in the event the other party is found not to be in sound financial condition, or in the event receivership, bankruptcy, dissolution or analogous proceedings are instituted with respect to the other party. In the event of termination pursuant to this Article, the Company shall have the right to reassume all liability hereunder upon notice to the Reinsurer in which event the Reinsurer (or its receiver, liquidator or statutory successor) shall immediately refund to the Company an amount equal to the pro rata unearned premium hereunder, less commission, charges and allowances previously allowed on such premium, plus reserves for outstanding losses (including recorded reserves for incurred but not reported losses) and loss expenses.

EIC/ESDM 000116

## INSOLVENCY

1.  The reinsurance under this Agreement shall be payable by the Reinsurer on the basis of the liability of the Company under the policy or policies reinsured without diminution because of the insolvency of the Company.

2.  In the event of the insolvency of the Company the liquidator, receiver or statutory successor of the Company shall give written notice to the Reinsurer of the pendency of a claim against the Company on the policy or policies filed in the insolvency proceedings; that during the pendency of such claim the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated any defense or defenses which it may deem available to the Company or its liquidator, receiver or statutory successor; that the expense thus incurred by the Reinsurer shall be chargeable, subject to court approval, against the Company as part of the expense of liquidation to the extent of a proportionate share of the benefit which may accrue to the Company solely as a result of the defense undertaken by the Reinsurer.

3.  Where two or more Reinsurers are involved in the same claim and a majority in interest elects to interpose defense to such claim the expense shall be apportioned in accordance with the terms of this Agreement as though such expense had been incurred by the Company.

In the event of the insolvency of the Company, the reinsurance under this Agreement shall be payable by the Reinsurer directly to the Company or to its liquidator, receiver or statutory successor, except as may be provided by law or except (1) where the Agreement specifically provides another payee of such reinsurance in the event of the insolvency of the Company and (2) where the Reinsurer, with the consent of the direct insured or insureds, has assumed such policy obligations of the Company as direct obligations of the Reinsurer to the payees under such policies and in substitution for the obligations of the Company to such payee.

## SERVICE OF SUIT

It is agreed that in the event of the failure of the Reinsurer hereon to pay any amounts claimed to be due hereunder, the Reinsurer, at the request of the Company, will submit to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court.

## APPLICABLE LAW

This Agreement shall be governed by and constructed into the laws of the State of New York.

FIC/FSIM 000117

## SEVERABILITY

It is further agreed that in event that any of the provisions of this Agreement are found to be unenforceable, that portion so found will in no way affect the purpose and intent of the remaining provisions, and to that extent those provisions will remain binding upon the parties.

## ERRORS AND OMISSIONS

Any inadvertent neglect, delay, omission or error relating to any provision of this Agreement shall not be held to relieve either party hereto from any liability which would attach to it hereunder, provided such neglect, delay, omission or error is rectified upon discovery by an official of the Company.

## PRIOR NOTIFICATION

The Reinsurer shall notify the Company of any acceptance or assumption of any business by the Reinsurer outside the scope of this Agreement. Such notification shall be in writing by registered or certified mail at least 30 days prior to the inception date of such business.

## CALCULATION OF REINSURANCE PREMIUM

In consideration of the reinsurance provided hereunder, there will be a reinsurance premium payable by the Company to the Reinsurer which shall equal 100% of the gross premium earned by the Company under policies, including adjustments to premium (determined in accordance with the Company's applicable rates, appropriate schedule and experience modifications and premium discount factors) after deducting 8% of subject written premiums for the cost of excess reinsurance. The Reinsurer will allow the Company a ceding commission of 29.3%, calculated as follows:

a.    5% fronting fee;

b.    2% of ceded premium to cover the Company's data processing, general administrative expenses, claims handling, underwriting, compliance work and accounting;

c.    Any applicable premium taxes, fees for board and bureaus, and liabilities for assessments and pools currently estimated to be 3.3% of ceded premium;

d.    Any applicable fee for Federal Excise Tax currently estimated to be 1% of ceded premium;

e.    Actual amounts for sales and/or agents commissions loss control, underwriting and policy issuance currently estimated to be 12% of ceded premium.

FIC/FSIM 000118

f.      6% of ceded premium to cover Risk Management Insurance Services' claims handling expenses (ulae).

IN WITNESS WHEREOF, the Parties hereto have set their hands

In Rock Hill, New York, this ___27th___ day of ___May___, 1998.

WITNESS

_____                    _____
                                           Frontier Insurance Company
                                           (Company)

In ___HAMILTON___, ___BERMUDA___, this __3rd__ day of __July__, 1998.

_____                    _____
                                           Platinum Indemnity Limited
                                           (Reinsurer)

LOC 04/21/98 ed.                    Page 9 of 9

ENDORSEMENT No. 1 TO THE REINSURANCE AGREEMENT BETWEEN

FRONTIER INSURANCE COMPANY

and

PLATINUM INDEMNITY LIMITED

As Regards the Food Services Insurance Managers, Inc. Program

Effective January 1, 1998,

WHEREAS, the Producer named in the Reinsurance Agreement (the "Agreement") desires that the provisions relating to Separate Accounts under the Palladium Insurance Act, 1995 (the "Act"), applicable to the Reinsurer through written consent of the Minister of Finance dated October 3, 1996, apply to the funds attributable to the Agreement, so that such funds have the protection of being legally segregated from other funds and or assets of or administered by the Reinsurer not attributable to or forming a part of that Separate Account.

IT IS HEREBY UNDERSTOOD AND AGREED THAT  the Reinsurer will establish a Separate Account and shall allocate funds ceded under this Agreement to such Separate Account so that such funds have the protection of being legally segregated from other funds and or assets of or administered by the Reinsurer not attributable to or forming part of that Separate Account.

IN WITNESS WHEREOF, the Parties hereunto set their hands

In Rock Hill, New York,  this  27th  day of  May , 1998.

_____
Frontier  Insurance Company
(Company)

In Hamilton, Bermuda,  this  3rd  day of  July , 1998

_____
Platinum Indemnity, Ltd.
(Reinsurer)



**Frontier**
INSURANCE COMPANY

195 Lake Louise Marie Road
Rock Hill, New York 12775-8000
(800) 836-2100 / (914) 796-2100

*A Subsidiary of Frontier Insurance Group, Inc.*

File w/ FS.I.M.
core file

June 1, 1999

Mr. Jeff Dowling
PowersCourt Management Ltd
P.O. Box HM 2267
Windsor Place, 3rd Floor
18 Queen Street
Hamilton HM JX

RE:    **Revised Pages 1 and 2 of Platinum/Food Services Insurance Managers Contract
Addendum No. 1**

Dear Jeff,

Enclosed please find two copies of revised page 1 and 2 of the Food Services Addendum. As per
our earlier conversation, the executed copies sent to Andy McComb with 04/29/99 cover letter
had incorrect effective date. The effective date of this addendum should be January 1, 1999
and corresponds with the new treaty year for the program. Please replace first two pages of the
original Addendum No. 1 with the revised copies enclosed.

Looking forward to working with you. Should you have any questions please do not hesitate to
contact me at 914-796-2100 ext. 5367.

Sincerely,

Yana M. Hupka, ARe
Reinsurance Accountant

Encls.

cc:    Janet Backer

Janet,
I will give you a copy of executed addendum
once we get it back from Bermuda

FIC/FSIM 000121

## FOOD SERVICES INSURANCE MANAGERS INC., PROGRAM ADDENDUM NO. 1

### ATTACHED TO AND FORMING A PART OF
### THE REINSURANCE AGREEMENT

(hereinafter referred to as "Agreement")

between

Frontier Insurance Company
(Company)
and
Platinum Indemnity, LTD
(Reinsurer)

IT IS HEREBY UNDERSTOOD AND AGREED that provisions of this contract are changed effective January 1, 1999, as respects polices incepting on and after that date, as follows:

### REINSURER'S LIABILITY

The first paragraph of the REINSURER'S LIABILITY provision is deleted in its entirety and is substituted with the following:

The Reinsurer will pay to the Company 100% of all losses and 100% of all allocated and unallocated loss expense under all binders, policies, agreements or other evidence of insurance or reinsurance, whether written or oral, underwritten for the subject program during the term of this Agreement; Reinsurer will also reinsure any and all assigned risks and shall pay its proportionate share of any assessments. The maximum direct loss which will be ceded hereunder as respects any risk is $250,000 per occurrence. The Reinsurer's maximum aggregate liability hereunder shall not exceed 73.50% of original gross subject written premium. However, in no event shall the Company's liability for losses and allocated loss adjustment expenses in excess of 73.50% of the original gross written premium exceed ten million dollars ($10,000,000). Any loss and allocated loss adjustment expense in excess of this amount shall be ceded to the Reinsurer as provided for under the terms of this Agreement.

### CALCULATION OF REINSURANCE PREMIUM

The CALCULATION OF REINSURANCE PREMIUM provision is amended to read:

Page 1 of 3

FIC/FSIM 000122

In consideration for the reinsurance provided hereunder, there will be a reinsurance premium payable by the Company to the Reinsurer which shall equal 100% of the gross premium earned by the Company under policies, including adjustments to premium (determined in accordance with the company's applicable rates, appropriate schedule and experience modifications and premium discount factors) after deducting 6.00% of subject earned premiums for the cost of excess reinsurance. The Reinsurer will allow the Company a ceding commission of 27.86%, calculated as follows:

a.    5.32 % Company front fee

b.    0.53% of ceded premium to cover the Company's data processing, general administrative and supervisory expenses.

c.    Any applicable premium taxes, fees for boards and bureaus, and liabilities for assessments and pools currently estimated to be 4.36% of ceded premium.

d.    Any applicable fee for Federal Excise Tax currently estimated to be 1% of ceded Premium.

e.    16.65 % of ceded premium as a commission to Food Services Insurance Managers, Inc. to cover their expenses arising from sales, underwriting, policy issuance, data processing and claims handling.

FIC/FSIM 000123

IN WITNESS WHEREOF, the Parties hereunto set their hands

In New York, N.Y., this _29th_ day of _APRL_ , 19 _99_ .

WITNESS

_[signature]_                                    _[signature]_
_____                          _____
                                                 Frontier Insurance Company
                                                      (Company)

In Hamilton, Bermuda, this ___30th___ day of ___Jule___ , 19 _99_ .

_[signature]_                                    _[signature]_
_____                          _____
                                                 Platinum Indemnity Limited
                                                      (Reinsurer)

Page 3 of 3

# F.S.I.M.
# FOOD SERVICES INSURANCE MANAGERS, INC.

3300 Douglas Blvd., Suite #295
Roseville, CA 95661
(916) 773-0206

December 18, 1997

Mr. Richard P. Marshall
Vice President
**FRONTIER INSURANCE COMPANY**
195 Lake Louise Marie Road
Rock Hill, NY 12775

Re: **FOOD SERVICES INSURANCE MANAGERS, INC. (F.S.I.M.)**

Dear Mr. Marshall,

This is to confirm that in the event that *FOOD SERVICES INSURANCE MANAGERS, INC.* is unable to form a rent a captive, *FOOD SERVICES INSURANCE MANAGERS, INC.* agrees to indemnify **FRONTIER INSURANCE COMPANY** for all losses, loss adjustment expenses and/or liability up to $250,000 incurred by the captioned on all policies effective January 1, 1998 and after.

Sincerely,

Dwight Halvorson
President



**Frontier**
INSURANCE COMPANY

*A Subsidiary of Frontier Insurance Group, Inc.*

195 Lake Louise Marie Road
Rock Hill, New York 12775-8000
**(800) 836-2100 / (914) 796-2100**

October 1, 1999

Mr. Andrew McComb
President and CEO
Powerscourt Management Limited
As Managers for Platinum Indemnity Limited
P.O. Box HM 2267
Windsor Place, 18 Queen Street
Hamilton HMJX, Bermuda

Dear Andy:

RE: Quota Share Reinsurance Agreement
For Business Produced By Dwight Halvorson Insurance Services

In accordance with the terms of the above agreement, we hereby tender provisional notice of cancellation to be effective 12:01 AM, January 1, 2000, pending underwriting review of this program.

Very truly yours,

Jerry Hartwick, AIAF, CPCU, ARe
Vice President, Reinsurance
Ext. 5168

JH/kb

cc: Dick Marshall
    Janet Backer
    Dwight Halvorsen