UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Gregory V. Serio, Superintendent of Insurance of the State of New York, as Rehabilitator of FRONTIER INSURANCE COMPANY, and as Assignee of PLATINUM INDEMNITY, LTD, <br><br>                                  Plaintiff, <br><br>vs. <br><br>DWIGHT HALVORSON INSURANCE SERVICES, INC d/b/a F.S.I.M. INSURANCE SERVICES and FOOD SERVICES INSURANCE MANAGERS, INC., <br><br>                                  Defendants | 04 CV 3361 (KMK) <br><br> Hon. Kenneth M. Karas , U.S.D.J. <br><br> **DECLARATION OF DWIGHT HALVORSON IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

Dwight Halvorson, pursuant to 28 U.S.C. 1746, being of full age, hereby declares as follows:

1. I am the President of Dwight Halvorson Insurance Services, Inc. ("DHIS"), and also the President of Food Service Insurance Managers, Inc. ("FSIM"), who are named as defendants in this matter.

2. I submit this Declaration in opposition to the motion for partial summary judgment brought by Plaintiff Gregory C. Serio, Superintendent of Insurance of the State of New York, as Rehabilitator of Frontier Insurance Company ("Frontier") and as Assignee of Platinum Indemnity, Ltd. ("Platinum")

3. I have personal knowledge of the facts stated herein based on my direct involvement with the businesses of DHIS and FSIM and also based on my direct dealings with representatives of Frontier and Platinum. I have had various conversations with Andrew McComb of Platinum and with Kevin Jeffery of Frontier concerning the matters in this lawsuit.

I have also read the November 11, 2005, Declaration of Andrew McComb that is submitted in support of the referenced motion for partial summary judgment.

I disagree with many portions of Mr. McComb's claims. For purposes of this motion, I must clarify that his claims about the reason for the Note and how the Note came to be are not true.

4.   I understand that Frontier seeks summary judgment based on the disputed Note that Platinum assigned to Frontier. I signed that Note based on misrepresentations that Andrew McComb, on behalf of Platinum, made directly to me. I now know that Platinum provided absolutely nothing for that Note and that the money for which the Note was signed was paid directly to Frontier. Moreover, I now believe that when Mr. McComb presented the Note for me to sign, he knew that the money had been paid to Frontier.

5.   From about 1997 to about 2001, I personally dealt with Mr. McComb and with Mr. Jeffery in connection with the FSIM Program. I knew Mr. McComb to be an officer of Platinum. I knew Kevin Jeffery to be a senior vice president of Frontier. We had various conversations to work out the details of the FSIM Program, and, over the time of the program, we had various conversations to work out issues that arose.

In order to make the program work, we had to rely on what each person said. At times we came to agreements and implemented them while waiting for the paperwork to be completed.

6.   Mr. McComb presented the Note for me to sign, claiming that there was a shortage in the funds that Platinum was to have received and that the Bermuda regulatory authorities would bring legal action against FSIM for that amount. By signing the Note, he said, DHIS would avoid this.

7. Based on Mr. McComb's oral representations to me, I believed that FSIM possibly owed some monies to Platinum and that the Bermuda regulatory authority would bring legal action against FSIM for that amount. Based on those representations, I signed the Note but also wrote to Mr. McComb to make it clear that this was done under protest. A copy of my September 29, 2000, letter to Mr. McComb is annexed as **Exhibit A**.

8. Platinum never provided any proof that the amount stated in the Note was actually owed or that the Bermuda regulatory authorities were bringing an action against FSIM. After making several payments totaling $147,000, (as I said in the letter that I would do) we informed Mr. McComb that FSIM did not owe the money and made no further payments under that Note.

## **BACKGROUND**

9. This lawsuit comes out of a workers compensation insurance program that DHIS, Frontier and Platinum developed. Sometime in 1997, Kevin Jeffery of Frontier approached me with the idea that Frontier wanted to get into the California workers compensation insurance market. It was Kevin Jeffery who also introduced me to Andrew McComb of Platinum. In various conversations involving Mr. Jeffery, Mr. McComb and myself, the "FSIM Program" took form.

10. The FSIM Program was outlined in several agreements. The first is the Agency Agreement between DHIS and Frontier. The second is the Subscription Agreement between FSIM and Platinum. The third was to be the Reinsurance Agreement between Frontier and Platinum, but Frontier never provided me with a copy of that agreement. Finally, there is the "Note" between FSIM and Platinum. These are inter-related agreements that form the

foundation of what is called the FSIM Program.

11. All the agreements, except the Note, were prepared by Mr. Jeffery and/or individuals at Frontier. The Note, I believe, was prepared by Mr. McComb and/or individuals at Platinum.

12. Frontier provided the insurance, and Platinum provided the reinsurance. However, since the policies were issued in Frontier's name, Mr. Jeffery had the last word on how things worked.

13. As a practical matter, under the FSIM Program, DHIS (as agent for Frontier) would issue the policies and collect the premiums. Claims under the policies were to be paid from the premiums collected. DHIS would collect the premiums, withhold a certain portion and forward the remainder to Frontier. Frontier was obligated to retain a portion and forward the remainder to Platinum. The amount forwarded to Frontier was to be held in an interest bearing account. The principal plus interest was to be held in trust for payment of claims that were made under the policies. The interest on that principal was to be held for DHIS. Platinum was to make periodic accounting to FSIM concerning the program.

14. During the first year of the FSIM Program, FSIM made certain payments to Platinum under the Subscription Agreement. These periodic payments are part of the "Additional Capital Contribution" on schedule 2 of the Subscription Agreement. These payments to Platinum were to ensure that Platinum was not exposed to risks for managing the FSIM Program.

15. The FSIM program lasted for approximately two years. The first year was 1998, and the second year was 1999.

16. In the first year of the FSIM Program, DHIS sent the "additional capital

contributions equal to 4% of gross written premiums under the program" directly to Platinum.

On or about December 15, 1998, just before the start of the second year, I spoke with Mr. Jeffery about some changes for the second year of the program. Mr. Jeffery directed that, for the second year of the FSIM Program, we were to reduce the amount that was withheld from collected premiums by 4% (effectively sending that 4% to Frontier) and that Frontier would pay that 4% directly to Platinum. As with the other agreements and their amendments, Mr. Jeffery was to draft the appropriate document and send it to me. I never got the actual amendments before Mr. Jeffery's employment with Frontier was terminated.

Shortly after this December 1988 agreement, Mr. Jeffery went on a leave of absence for about two months. I understand this was due to an illness. As a result, I never received a copy of the modifications agreed to in December, 1988.

17.     Sometime in mid 1999, I found out that Mr. Jeffery was fired from Frontier. I spoke to Mr. Jeffery shortly before he left Frontier and asked him what would happen with the program. He said he could not discuss the program with me because he was getting one year's severance pay from Frontier and that he was under a "confidentiality agreement." That was my last conversation with Mr. Jeffery.

18.     Sometime in about the summer of 2000, Mr. McComb came to California and told me that the monthly payments (the 4%) had not been made and there was a shortage in the "capital contribution" to Platinum.

Mr. McComb also told me that the "regulatory authorities" in Bermuda would take legal action against FSIM for the amount he claimed was missing and that the Note would prevent this.

19.     I told him that the payments were made to Frontier as Mr. Jeffery directed, but

he said Platinum never got them. I suspected he knew the monies were paid to Frontier because he also made a comment to the effect that he (meaning Platinum) had a lot of other business with Frontier and was not in a position to question Frontier's reports to him.

20.     I now believe the Mr. McComb misrepresented the facts in order to get me to sign the Note. Despite requests, he never provided any documentation of the amounts he claimed Frontier was not paying. He also never provided an accounting of the funds that were forwarded to Platinum by DHIS or by Frontier. Also, at about the same time that I signed the Note, I wrote to Mr. McComb to let him know that I did not take his representations to be true but that we were making payments in "good faith." A copy of the letter is attached as Exhibit A.

To this day, Platinum has never provided documentation of the payments it received from Frontier or documentation of any claimed shortage.

21.     As I said in the letter, we made payments until March, 2001. At the same time, we continued to follow the December 1998 agreement with Mr. Jeffery. However, by March, 2001, Mr. McComb had provided nothing to support the amounts for which he said the Note was needed, and it was now very clear that we were paying the same money twice. We again told him that the amounts he claimed under the Note had been paid to Frontier and that no further payments would be made.

22.     I now understand that Mr. McComb, acting on behalf of Platinum, assigned the disputed Note to Frontier and that Frontier is now trying to get us to pay what it claims is due under the Note. This is absurd. The money that Frontier is trying to collect under the Note is money that it already has. In fact, the $147,000 that FSIM paid to Platinum under the Note is money to which Platinum was not entitled and money that should be returned to FSIM.

23. Platinum never made a written demand to pay a "Negative Balance."

24. Platinum has not provided an accounting of the "investment income earned on the capital provided to" Platinum.

25. Platinum has not provided to FSIM the "investment income earned on the capital provided to" Platinum.

26. Under the Subscription Agreement, FSIM agreed to provide to Platinum "additional capital contribution equal to 4% of the gross written premiums under the program" on a monthly basis.

27. In the first year of the program, FSIM paid in excess of $412,000 directly to Platinum as "additional capital contribution" under the terms of the Subscription Agreement.

28. For the second year of the program, Frontier directed that this "additional capital contribution equal to 4% of the gross written premiums under the program" be forwarded directly to Frontier. I believe this was done with the knowledge and consent of Platinum.

29. For the second year of the program, Frontier assumed the responsibility to forward this "additional capital contribution equal to 4% of the gross written premiums under the program" to Platinum.

30. Frontier makes this motion based on the Note which it claims was issued to secure FSIM's obligations under the Subscription Agreement. However, this is an oversimplification of the relationship among FSIM/DHIS, Frontier and Platinum, and that oversimplification leads to the confusion or misrepresentation of the facts. Despite the claim by Mr. McComb, the Note can only be understood when the relationships of the parties are understood.

31.   There are several agreements involved in this matter. The first is the Agency Agreement between DHIS and Frontier. The second is the Subscription Agreement between FSIM and Platinum. The third is the Reinsurance Agreement between Frontier and Platinum. Finally, there is the "Note" between FSIM and Platinum. These are inter-related agreements that form the foundation of what is called the FSIM program.

32   In connection with the Note, I never spoke with Mr. McComb about what he refers to as a "Negative Balance." We discussed the "4% of gross written premiums under the program" that was to go to Platinum on a monthly basis. That is what he told me the Note was to secure. The Note was not for any "Negative Balance," and we did not talk about that.

33.   A "Negative Balance" involves a specific and detailed calculation that is stated in the Subscription Agreement. If there was a "Negative Balance," Platinum was supposed to make a demand in writing. As far as I know, there was no "Negative Balance," and Platinum never made a demand about a "Negative Balance."

34.   However, there was discussion about who should pay the "4% of gross written premiums under the program." In the first year of the FSIM program, FSIM paid that "4% of gross written premiums under the program" directly to Platinum. However, in December, 1998, before the second year of the program, Mr. Jeffery instructed me to reduce retention by 4% and informed me that Frontier would pay that 4% directly to Platinum. Based on my conversations with Mr. Jeffery, I believe Mr. Jeffery intended to invest that additional 4% and retain the interest for Frontier.

### Mr. McComb's Declaration

35.     Besides what I have said above, there are other parts of Mr. McComb's declaration that are just not true. I cannot deal with all of the misstatements, but I can deal with some of them. In paragraph "9," he claims that the Note was not related to anything else. This is just not true. The Note was about money he claimed Platinum had not received but which he knew was to come from Frontier. In fact, the Note itself refers to the "separate Account" and to the Subscription Agreement. Also, starting in paragraph "25," Mr. McComb talks about the "Negative Balance" under the Subscription Agreement and claims that the Note was for a claimed "Negative Balance." Mr. McComb also claims that he had "discussions with FSIM" in 1999 about "Negative Balances." This is just not so.

Finally, in paragraph "38," Mr. McComb talks about "commencing legal proceedings," about a "Negative Balance" and, in paragraphs "42" and "43," he talks about "repeated demands" for payment on the Note. First, just so it is clear, in talking about the reason for the Note, there was nothing said about Platinum suing FSIM. What McComb represented was that the Bermuda regulatory authorities would bring an action against FSIM. As to the claim that he made "repeated demands," "beginning in June 2001," he never made any such demands to me.

I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct. Signed this 13 day of December, 2005.

*[signature]*

DWIGHT HALVORSON

**Exhibit A**



**FOOD SERVICES INSURANCE MANAGERS**

September 29, 2000

<u>*Via Facsimile & Airmail:*</u>
+441.292.1196

Mr. Andrew McComb
Platinum Indemnity Limited
P.O. Box HM 2267
Windsor Place, 3rd Floor
18 Queen Street
Hamilton HM JX, Bermuda

        Re: *Food Service Insurance Managers, Inc.*

Dear Mr. McComb:

    As you know, you submitted a promissory note to me last month and requested that I sign it. Although we have yet to sign and return the note, my company has made the monthly payments due thereunder, in the sum of $21,000.00, per month, for the months of September and October, 2000.

    After review of our records, we do not feel that the amount of the obligation is accurately stated in the note. As a show of good faith and cooperation, however, we have made the requested monthly payments, and shall continue to do so. However, we feel that the principal amount of the obligation will ultimately be less than stated because of the great number of return premiums. Accordingly, we propose that we continue to make the current monthly payments until March, 2001. At that time, we believe that the balance due will be able to be determined with certainty, and will, thereafter, continue to make monthly payments to retire the obligation, in full.

    We trust that this is acceptable and look forward to your continued cooperation.

                              Very truly yours,

                              FOOD SERVICE MANAGERS, INC.

                              By: _____
                                Dwight Halvorson, C.E.O.