UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
                                                              :
Gregory V. Serio, Superintendent of Insurance                 :
of the State of New York, as Rehabilitator of                 :          04 CV 3361 (KMK)
FRONTIER INSURANCE COMPANY, and as                            :
Assignee of PLATINUM INDEMNITY, LTD.,                         :
                                                              :
                                    Plaintiff,                :
                                                              :
                    -against-                                 :
                                                              :
DWIGHT HALVORSON INSURANCE                                     :
SERVICES, INC. d/b/a/ F.S.I.M. INSURANCE                      :
SERVICES and FOOD SERVICE INSURANCE                           :
MANAGERS, INC.,                                               :
                                                              :
                                    Defendants.               :
                                                              :
-----------------------------------------------------------------------x

_____

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

_____


ENTWISTLE & CAPPUCCI LLP
280 Park Avenue, 26th Floor West
New York, New York 10017
(212) 894-7200

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT .................................................................................... 1

ARGUMENT

     FSIM HAS IDENTIFIED NO GENUINE ISSUE OF MATERIAL
     FACT SUFFICIENT TO AVOID SUMMARY JUDGMENT ........................................ 2

          A.     The Fraudulent Inducement Defense ........................................... 3

               1.     The Alleged Misrepresentation
                         Regarding the Funding Deficiency ................................................. 4

               2.     The Alleged Misrepresentation Regarding the
                         Legal Consequences of the Funding Deficiency ........................... 8

          B.     The Alleged Lack of Consideration ............................................. 9

CONCLUSION ............................................................................................................. 10

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

<u>Firemen's Fund Co. of Newark, N.J. v. Keating</u>,
  1994 U.S. Dist. LEXIS 648 (S.D.N.Y. Jan. 26, 1994) ...................................................2

<u>Gilliam v. Trustees of Sheet Metal Workers' National Pension Fund, Plan A</u>,
  2005 U.S. Dist. LEXIS 7904 (S.D.N.Y. May 3, 2005)...................................................2

<u>National Union Fire Insurance Co. of Pittsburgh, PA v. Carlie</u>,
  1991 U.S. Dist. LEXIS 14767 (S.D.N.Y. Oct. 16, 1991) ...............................................2

<u>Wilson v. First Bermuda Securities, Ltd.</u>,
  Civil Jurisdiction 1997 No. 67 (1997) ..........................................................................3

## PRELIMINARY STATEMENT

Plaintiff Gregory V. Serio, Superintendent of Insurance of the State of New York, as Rehabilitator of Frontier Insurance Company and Assignee of Platinum Indemnity, Ltd., respectfully submits this reply memorandum of law in further support of his motion for summary judgment on Count IV of the Complaint.

Scrambling to avoid its obligations under the Note, FSIM advances two arguments that are as predictable as they are unavailing. First, the Court is asked to believe that FSIM -- a sophisticated corporate entity and a recognized leader in its segment of the insurance industry -- somehow was duped into agreeing to the terms of the Note that FSIM itself proposed and then freely executed. Second, notwithstanding the fact that FSIM in the Note expressly acknowledged that it was promising to pay the principal amount in exchange "FOR VALUE RECEIVED," FSIM now reverses course and maintains that the Note was not supported by adequate consideration. These are nothing more than the standard-issue defenses routinely rolled out by parties who, having executed promissory notes when it was to their advantage to do so, later prove unable or simply unwilling to satisfy their obligations as set forth in the unambiguous and unequivocal terms of those agreements.

Here, the defenses set forth in FSIM's opposition papers do not withstand even mild scrutiny. Similarly, its attempt to manufacture the factual issues necessary to preclude summary judgment falls far short of the mark. The language of the Note is clear, as are the facts and circumstances surrounding its execution. There simply are no issues requiring a trial on this straightforward claim. Under the circumstances, the Superintendent respectfully requests that the Court enter summary judgment in his favor on the Note.

## ARGUMENT[1]

## FSIM HAS IDENTIFIED NO GENUINE ISSUE OF MATERIAL FACT SUFFICIENT TO AVOID SUMMARY JUDGMENT

The Superintendent's burden on this motion is minimal.  He has established a prima facie basis for summary judgment by demonstrating that FSIM executed the Note and has failed to pay the principal amount pursuant to its terms.  See Superintendent's Opening Brief at 11-12.  The burden now shifts to FSIM.  As this Court has noted:

> Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor.

Gilliam v. Trustees of Sheet Metal Workers' Nat'l Pension Fund, Plan A, 2005 U.S. Dist. LEXIS 7904, at *8 (S.D.N.Y. May 3, 2005) (quoting Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995)).

On a summary judgment motion, the non-movant "may not rest upon conclusory allegations or denials" to defeat the application; instead, it "must provide `concrete particulars´ in the form of supporting facts or arguments in opposition."  National Union Fire Ins. Co. of Pittsburgh, PA v. Carlie, 1991 U.S. Dist. LEXIS 14767, at *6 (S.D.N.Y. Oct. 16, 1991) (citation omitted).  This is particularly so where, as here, the non-movant attempts to defeat summary judgment by relying upon an affirmative defense such as fraudulent inducement.  See Firemen's Fund Co. of Newark, N.J. v. Keating, 1994 U.S. Dist. LEXIS 648, at *7 (S.D.N.Y. Jan. 26, 1994).

---

[1]    For the Court's convenience, copies of the Bermuda decisions and LEXIS decisions cited herein are attached hereto in alphabetical order.

FSIM has not satisfied its burden on this motion.  As demonstrated below, its opposition articulates no valid defense and identifies no genuine issue of material fact sufficient to necessitate a trial of this straightforward claim.

A.    **The Fraudulent Inducement Defense**

FSIM maintains that it should be relieved of its obligations under the Note because it was fraudulently induced into executing that document.  FSIM contends that Andrew McComb of Platinum made two "misrepresentations" upon which it relied in executing the Note.  First, FSIM focuses on Mr. McComb's statement that there was a shortfall in the funds Platinum was supposed to have received in connection with the FSIM Program.  Second, FSIM focuses on Mr. McComb's statement that Bermuda authorities would commence legal proceedings against FSIM if that funding deficiency was not remedied.

Under Bermuda law, the facts supporting an allegation of fraudulent conduct "must be stated with `especial particularity and care.'"  Wilson v. First Bermuda Secs., Ltd., Civil Jurisdiction 1997 No. 67 at 14 (1997) (quoting Vol. I, Supreme Court Practice at 308 (1997)).  As the Supreme Court of Bermuda has instructed, "Fraudulent conduct must be distinctly alleged (and distinctly proved) and it is not allowable to leave fraud to be inferred from the facts.  Id. (quoting Vol. I, Supreme Court Practice at 310 (1997)).  The skeletal allegations FSIM makes in support of its fraudulent inducement defense fall far short of this heightened standard.  Even if those allegations are deemed to be sufficiently particularized, for the reasons set forth below they still do not support the conclusion -- or even give rise to a fair inference -- that FSIM was fraudulently induced into executing the Note.

3

1.    **The Alleged Misrepresentation**
      **Regarding the Funding Deficiency**

FSIM's contention that Mr. McComb made a misrepresentation regarding the funding deficiency in its account with Platinum is absolutely baseless. As demonstrated in Mr. McComb's accompanying Reply Declaration, the statement attributed to him was accurate when made. As a matter of law and logic, it cannot provide the basis for a fraudulent inducement defense.[2]

The fact of the matter is that FSIM itself <u>did</u> owe money to Platinum in connection with <u>Policy Year 1</u> (i.e., January 1, 1998 - December 31, 1998) of the FSIM Program. Nowhere does FSIM dispute this; instead, FSIM's president, Dwight Halvorson, focuses on a side deal he claims to have struck with FIC regarding who would make what contributions to Platinum for <u>Policy Year 2</u>.

The record clearly reflects that the Note was intended to address FSIM's obligations relating to Policy Year 1 only and had nothing whatsoever to do with Policy Year 2. FSIM's reliance on an agreement relating to Policy Year 2 as a means of avoiding its obligations under a promissory note relating to Policy Year 1 is grossly misplaced. Even if Mr. Halvorson's allegations with respect to this side deal with FIC are accepted as true for purposes of this

---

[2]   Initially, FSIM contends at paragraph 8 of the Declaration of Dwight Halvorson that "Platinum never provided any proof that the amount stated in the Note was actually owed . . . . " This statement is demonstrably false and reflects the degree of FSIM's desperation on this motion. Platinum regularly forwarded to FSIM detailed financial reports with respect to the FSIM Program. These reports reflected data regarding such matters as gross written premium, investment earnings, losses paid, fees and expenses. Most significantly of all, these reports also reported on the collateral deficiencies in FSIM's account at Platinum. <u>See</u> Reply Declaration of Andrew McComb at ¶ 12. For example, on or about October 18, 2000 -- i.e., shortly before Mr. Halvorson executed the Note -- Platinum forwarded to FSIM a program financial report for the period ending June 30, 2000. Note number 7 set forth on the final page of this report reflects that FSIM's account had a negative collateral position for Policy Year 1 of $469,515.00 or -- i.e., precisely the same figure as the principal amount of the Note that Mr. Halvorson ultimately executed. <u>Id.</u> ¶ 13, Ex. A.

4

motion, they raise no issue of fact -- material or otherwise -- with respect to FSIM's obligations under the Note.

For Policy Year 1, FSIM itself -- not FIC, or any other entity for that matter -- was obligated to forward the capital contributions in question to Platinum. See Reply Declaration of Andrew McComb at ¶ 15. Mr. Halvorson repeatedly acknowledges this critical fact in his Declaration. See Halvorson Decl., ¶¶ 14, 16, 26, 27.

The fact is that notwithstanding any direct capital contributions FSIM may have made to Platinum for Policy Year 1 -- the only policy year having any relevance to the Note -- a negative collateral position of $469,515.00 remained in its account at the conclusion of that initial policy year. See McComb Reply Decl., Id., ¶ 20. It is this funding deficiency relative to Policy Year 1 that was at issue when FSIM and Platinum began discussions in the summer of 2000 that culminated in Mr. Halvorson's execution of the Note. The Note had nothing to do with Policy Year 2 or the purported agreement between Mr. Halvorson and FIC pursuant to which FIC allegedly agreed to assume responsibility for forwarding to Platinum FSIM's 4 percent capital contribution for that period. Id., ¶ 21. This is demonstrated clearly in the correspondence between FSIM and Platinum in the months leading up to his execution of the Note.

On or about May 22, 2000, for example, Mr. McComb forwarded to FSIM correspondence in which he addressed the deficiency in FSIM's account and clearly distinguished between Policy Year 1 (the 1998 underwriting year) and Policy Year 2, nor did it have anything to do with (the 1999 underwriting year). Id., ¶ 22, Ex. B. Therein, Mr. McComb acknowledged that "FSIM has provided the 4% of premium as additional capital for the 1998 underwriting year . . . . " Mr. McComb further noted that these contributions would have been sufficient had the scope of risk assumed in the FSIM Program remained consistent with Mr.

Halvorson's initial plans for the program.  In fact, significantly higher than anticipated levels of premiums were written during Policy Year 1 and, as Mr. McComb confirmed in his May 22, 2000 correspondence to FSIM, the retention of funds to cover the expenses associated with claims made as part of the expanded program "is the cause for the <u>unfunded</u> [<u>program risk</u>] <u>gap for the 1998 underwriting year</u>."  <u>Id.</u>, ¶ 23, Ex. B.  (emphasis supplied).

Subsequent to his May 22, 2000 correspondence with FSIM, Mr. McComb met with FSIM representatives to discuss the unfunded program risk gap for Policy Year 1.[3] Specifically, on or about June 19, 2000 Mr. McComb met with FSIM representatives to discuss this funding deficiency.  It was at this meeting that Mr. Halvorson suggested that one means of remedying the unfunded risk gap (or Negative Balance) for Policy Year 1 was for FSIM to post a promissory note as collateral in lieu of making the actual cash contribution necessary to close that gap.  <u>Id.</u>, ¶¶ 24-25.

Following up on this meeting, on or about July 3, 2000 Mr. McComb forwarded to FSIM correspondence in which he again distinguished between Policy Year 1 and Policy Year 2.  <u>Id.</u>, ¶ 27, Ex. C.  In the second numbered paragraph of his July 3, 2000 correspondence, Mr. McComb addressed "the 1998 underwriting year," or Policy Year 1.  Therein, Mr. McComb advised FSIM that "Platinum will consider receipt of a note from FSIM and/or Dwight Halvorson Insurance <u>as collateral for the unfunded risk gap on the 1998 underwriting year</u>."  <u>Id.</u>, Ex. C.  (emphasis supplied).

---

[3]    In his initial Declaration, Mr. McComb refers to this unfunded risk gap as the Negative Balance.  The two terms refer to one and the same concept -- i.e., the funds FSIM was required to contribute to its account at Platinum to ensure that, as Mr. Halvorson states at paragraph 14 of his Declaration, Platinum itself was not exposed to any risk on the FSIM Program.  <u>See</u> McComb Reply Declaration, <u>Id.</u>, ¶ 24.

In the portion of the July 3, 2000 correspondence dealing with Policy Year 1, Mr. McComb further advised FSIM that, based on the most current information available, "the unfunded risk gap is $496,860.00" -- i.e., roughly the same figure as the principal amount of the Note.  Id.  Further, Mr. McComb noted Platinum's potential "acceptance of the note as an alternative to cash or letter of credit collateral for the 1998 underwriting year . . . . "  Id.  The third numbered paragraph of the July 3, 2000 correspondence addressed Policy Year 2, or the "1999 underwriting year."  The Note is not even mentioned with respect to Policy Year 2 because, as stated above, the Note was intended to address only the deficiencies relating to Policy Year 1.  Id., ¶ 31, Ex. C.

Mr. McComb again wrote to FSIM approximately three weeks prior to Mr. Halvorson's execution of the Note.  Specifically, on or about October 18, 2000, Mr. McComb advised FSIM that "[f]ollowing our agreement on wording, amount and term of the Promissory Note, we advised our Board, auditors and authorities that we have collateral in place for the funding deficiency in respect of the first underwriting year of the FSIM program."  Id., ¶ 32, Ex. A.  (emphasis supplied).  Mr. McComb further advised FSIM that he had reviewed its request to revise the principal amount of the Note "and can confirm that a revised amount of $469,515 which is detailed as the funding deficiency for Year 1 in the notes to the attached program financial statements is acceptable to us."  Id., Ex. A.  (emphasis supplied).

The Superintendent respectfully submits that this correspondence between FSIM and Platinum makes clear that the parties intended for the Note to address only the funding deficiency relating to Policy Year 1.  Thus, Mr. Halvorson's extensive discussion of the oral agreement he claims to have reached with FIC with respect to funding obligations for Policy Year 2 is irrelevant both to the Note and this motion.  For purposes of this motion, all that

matters is that for Policy Year 1, there <u>was</u> a deficiency in the funds FSIM was obligated to forward to Platinum. Mr. McComb's statement in this regard was entirely accurate. To the extent Mr. Halvorson relied on this statement in executing the Note, he relied on a truthful representation of the facts. Mr. McComb's truthful statement on this point certainly provides no basis for FSIM to dodge its obligations under the Note through some transparently bogus fraudulent inducement theory.

### 2.     The Alleged Misrepresentation Regarding the Legal Consequences of the Funding Deficiency

Next, FSIM contends that Mr. McComb somehow misrepresented the legal consequences of its failure to remedy the funding deficiency. Specifically, at paragraph 6 of his Declaration, Mr. Halvorson contends that at the time the Note was executed, Mr. McComb represented that "the Bermuda regulatory authorities would bring legal action against FSIM" with respect to the deficiency and that "[b]y signing the Note . . . DHIS would avoid this."

Significantly, Mr. Halvorson does not even contend that this statement was false, nor could he do so credibly. As the October 18, 2000 correspondence attached as Exhibit A to the Mr. McComb's Reply Declaration states, FSIM's execution of the Note was necessary "to avoid any further regulatory complications." <u>Id.</u>, ¶ 39, Ex. A. The reality is that the captive insurance industry in Bermuda is highly regulated. Deficiencies of the kind that had developed in FSIM's account by the end of Policy Year 1 had attracted the attention of Platinum's auditors -- as well as its regulators. <u>Id.</u>, ¶ 40.

As a regulated entity, Platinum was required to file a business plan with its regulators. Therein, Platinum was described as rent-a-captive that operated on a "fully funded," or "risk-free," basis. Indeed, Platinum had secured from its regulators a number of critically important waivers from the Insurance Act on the condition that it would operate on a risk-free

basis.  As Mr. McComb explained in his initial Declaration at paragraph 20, FSIM, as the entity maintaining the account with Platinum, was intended to assume all of the risk associated with the FSIM program.  The serious funding deficiency that had developed in FSIM's account for Policy Year 1 in effect exposed Platinum to risk on the program, in direct contravention of its commitments to regulators regarding Platinum's risk-free business plan and model.  Id., ¶ 41. Throughout his discussions with FSIM regarding the deficiency, Mr. McComb repeatedly warned Mr. Halvorson that Platinum's auditors had advised that the funding deficiency was, from a regulatory standpoint, a very serious matter that had to be resolved immediately.  Id., ¶ 42.

In short, the statement attributed to Mr. McComb with respect to the Bermuda regulators was accurate when made.  Once again, if Mr. Halvorson relied on this statement in executing the Note, he was relying on a truthful representation regarding the consequences that would flow from FSIM's failure to meet its funding obligations for Policy Year 1.  There was no misrepresentation and this truthful statement cannot possibly be construed to have fraudulently induced Mr. Halvorson to execute the Note.

**B.    The Alleged Lack of Consideration**

Finally, FSIM contends that the Note is unenforceable because it was not supported by adequate consideration.  This assertion is entirely without merit.  It is in direct conflict with the language of the Note, attached as Exhibit A to Mr. McComb's initial Declaration.  Therein, Mr. Halvorson acknowledged that FSIM was committing to pay the principal amount of the Note in exchange "FOR VALUE RECEIVED."

Further, the contention that there was a lack of consideration because FSIM allegedly paid certain monies to FIC with respect to the risk gap for Policy Year 2 is baseless. As discussed above, the Note was provided to secure FSIM's funding obligation for Policy Year

1 and was independent of any payments FSIM may have made to FIC with respect to Policy

Year 2.  Id., ¶ 46.

       Moreover, in arguing that there was a lack of consideration, Mr. Halvorson

ignores the fact that in return for the Note, Platinum agreed to continue participating in and

facilitating the FSIM Program.  Id., ¶ 47.  McComb noted this in his initial Declaration at

paragraph 31.  Nowhere does Mr. Halvorson dispute the value of Platinum's continued

involvement in the FSIM Program.

       Finally, FSIM received consideration in the form of Platinum's agreement to

forego legal proceedings against FSIM to resolve the funding deficiency.  Id., ¶ 48.  As Mr.

McComb stated in his initial Declaration at paragraph 38, had FSIM refused to execute the Note,

Platinum would have commenced legal proceedings to compel FSIM to remedy the funding

deficiency.  Once again, nowhere does Mr. Halvorson dispute that FSIM avoided this

consequence by executing the Note.

## **CONCLUSION**

For the reasons set forth above as well as in his initial brief, the Superintendent

respectfully requests that the Court enter an Order granting summary judgment in the amount of

$322,515.00, plus interest, in his favor and against FSIM on the claim for default on a

promissory note set forth in Count IV of the Complaint.

Dated: New York, New York
       December 30, 2005

                              Respectfully submitted,


                              ENTWISTLE & CAPPUCCI LLP
                              280 Park Avenue, 26th Floor West
                              New York, New York 10017
                              (212) 894-7200

                              By: _____/s/ William S. Gyves_____
                                    WILLIAM S. GYVES (WG 2770)
                                    MICHAEL A. MCDONOUGH (MM 5712)

                              Attorneys for Plaintiff

**Unreported Decisions**

LEXSEE

**FIREMEN'S INSURANCE COMPANY OF NEWARK, NEW JERSEY, Plaintiff, v. ROBERT F. KEATING, et. al., Defendants and consolidated actions 90 Civ. 1677 (PKL), 90 Civ. 6164 (PKL).**

90 Civ. 1076 (PKL)

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

1994 U.S. Dist. LEXIS 648

**January 26, 1994, Decided
January 26, 1994, Filed**

## CASE SUMMARY:

**PROCEDURAL POSTURE:** Plaintiff surety brought a motion pursuant to Fed. R. Civ. P. 56 for summary judgment and a motion pursuant to Fed. R. Civ. P. 11 for sanctions against counsel for defendant principals in its action for indemnification against its principals based upon written agreements of indemnity.

**OVERVIEW:** The surety brought an action for indemnification against its principals when the principals defaulted on the payment of promissory notes that were guaranteed by investor bonds and subject to written agreements of indemnity. The court granted the motion for summary judgment but denied the motion for sanctions because it found that: 1) the principals failed to contest or attempt to rebut the surety's prima facie case of liability under the provision of the indemnification agreements; 2) summary judgment was appropriate because no questions of material facts existed as to the affirmative defense of fraudulent inducement; and 3) the imposition of Rule 11 sanctions was not merited because although defense counsel's arguments were rejected by the court, they did not rise to the level of frivolousness that would make the imposition of sanctions appropriate.

**OUTCOME:** The court granted the surety's motion for summary judgment in its complaint against the principals under an indemnity agreement. Sanctions against the principal's attorney for arguments rejected by the court were not warranted.

**CORE TERMS:** summary judgment, fraudulent, inducement, discovery, surety, genuine issue of material fact, nonmoving party, burden of proof, reasons stated, indemnification, advocacy, waived, signer, prima facie case, defaulted, demanded

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN1] Summary judgment may be granted if, upon reviewing the evidence in the light most favorable to the non-movant, the court determines that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. In deciding the motion, the court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*
[HN2] The party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying which materials it believes demonstrate the absence of a genuine issue of material fact. Once a motion for summary judgment is properly made the burden then shifts to the nonmoving party, which must set forth specific facts showing that there is a genuine issue for trial.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Waiver & Preservation*
*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses*

[HN3] A party will only be found to have waived a defense of fraudulent inducement if the language of the waiver is sufficiently specific to encompass the alleged fraud.

*Evidence > Procedural Considerations > Inferences & Presumptions*
*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses*
[HN4] Fraudulent inducement is an affirmative defense upon which a defendant bears the burden of proof.

*Civil Procedure > Sanctions > Baseless Filings*
[HN5] In deciding whether the signer of a pleading, motion, or other paper has crossed the line between zealous advocacy and plain pettifoggery, the court applies an objective standard of reasonableness. So long as his pleadings meet the test of reasonableness and are not interposed for improper purposes sanctions are not warranted. This applies even to those positions that may arguably be at odds with existing precedent. Not all unsuccessful legal arguments are frivolous or warrant sanction. Courts will resolve all doubts in favor of the signer.

COUNSEL: [*1] For Plaintiff: HART & HUME, New York, New York, Mark S. Gamell, Esq., of counsel.

For Defendant R. Hamilton Morrison: BARRY HART, ESQ., Scottsdale, Arizona. KELLY & ROTH, New York, New York.

JUDGES: Leisure

OPINIONBY: Peter K. Leisure

OPINION:

## OPINION AND ORDER

LEISURE, District Judge

This is an action by a surety for indemnification against its principals based upon written agreements of indemnity. The surety, Firemen's Insurance Company of Newark, New Jersey ("Firemen's"), has moved for summary judgment against defendants Albert and Cynthia Stone (the "Stones") and R. Hamilton Morrison (collectively, the "Defendants") pursuant to <u>Fed. R. Civ. P. 56</u>. n1 Firemen's also seeks sanctions against Barry H. Hart, Esq., counsel for Morrison, pursuant to <u>Fed. R. Civ. P. 11</u>. For the reasons stated herein, Firemen's motion for summary judgment is granted but its motion for sanctions is denied.

n1 Other defendants against whom Firemen's moved for summary judgement have settled with Fireman's since this motion was filed.

## BACKGROUND

The [*2] following constitute the undisputed facts of this case. The Defendants in this action invested in a limited partnership known as CSH-I Hotel Limited Partnership (the "Partnership") by making cash downpayments and, for the remainder of their required capital contribution, executing promissory notes (the "Promissory Notes") payable to the Partnership. To guarantee Payment of the Promissory Notes, the Defendants obtained investor bonds (the "Investor Bonds") from Firemen's. In addition, the Defendants executed indemnification agreements (the "Indemnification Agreements") in favor of Firemen's to permit Firemen's to recover from the Defendants if Firemen's was required to pay under the Investor Bonds. When the Defendants defaulted on payment of the required Promissory Notes, payment by Firemen's under the Investor Bonds was demanded and made.

In 1990, Firemen's instituted the instant actions to recover under the Indemnification Agreements which were consolidated pursuant to <u>Fed. Rule Civ. P. 42(a)</u>. On September 27, 1991 this Court ordered that all discovery be completed by November 27, 1991. No discovery was ever sought by the Defendants.

## DISCUSSION

### I. MOTION FOR SUMMARY JUDGMENT [*3]

[HN1] "Summary judgment may be granted if, upon reviewing the evidence in the light most favorable to the non-movant, the court determines that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." <u>Richardson v. Selsky, 5 F.3d 616, 620 (2d Cir. 1993)</u>. In deciding the motion, the Court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. <u>Gladstone v. Fireman's Fund Ins. Co., 536 F.2d 1403, 1406 (2d Cir. 1976)</u> (quoting <u>Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1320 (2d Cir. 1975)</u>). "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." <u>Cruden v. Bank of New York, 957 F.2d 961, 975 (2d Cir. 1992); Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991)</u>.

[HN2] The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and identifying which materials "it believes demonstrate the absence of a genuine issue [*4] of material fact." <u>Celotex Corp. v. Catrett, 477 U.S.</u>

317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). Once a motion for summary judgment is properly made, however, the burden then shifts to the nonmoving party, which "'must set forth specific facts showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 250, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986) (quoting Fed. R. Civ. P. 56(e)).

In the instant case, the plaintiff's prima facie case is uncontested. Firemen's has provided affidavits establishing (1) that the Defendants executed the Promissory Notes and the Indemnification Agreements, see Affidavit of Fred J. Sichel, sworn to on June 4, 1992 ("Sichel Affidavit"), at PP 2, 5 and Exhibits B and D; (2) that Firemen's issued Investor Bonds to the Defendants, see Sichel Affidavit at PP 8-9 and Exhibit A; (3) that the Defendants defaulted upon the Promissory Notes, see Sichel Affidavit at P 2; (4) and that the holders of the Investor Bonds demanded and received payment thereon from Firemen's, see Sichel Affidavit at P 10 and Exhibit E. The Indemnification Agreements provided in pertinent part as follows:

> (a) The Principal will indemnify [*5] and hold harmless the Surety against any and all liabilities, losses, costs, damages and expenses . . . which the Surety may sustain or incur (i) by reason of the execution and delivery of the Investor Bond (and any renewal or continuation thereof), (ii) by reason of the failure of the Principal to pay the Bonded Indebtedness in accordance with the stated terms of the Note.

Sichel Affidavit at Exhibit E. The facts established by Firemen's plainly make out a prima facie case for liability under this provision of the Indemnification Agreements. The Defendants have not in any way sought to rebut the evidence establishing these facts.

Morrison contends that he should not be liable under the Indemnification Agreement because he instructed Firemen's not to pay upon the Investors Bonds. However, Morrison can point to no provision of the Indemnification Agreement that would make his obligations thereunder conditional on approval by him of payment under the Investor Bonds.

Morrison advances two additional arguments for denying the summary judgment motions: (1) because "plaintiff issued a Surety Bond to a Partnership which plaintiff knew or should have known was selling securities in violation [*6] of the offering materials and as security bonds," Morrison's Memorandum of Law, dated July 8, 1992, at 2; (2) because "plaintiff and others

knowingly switched the documents at the time of signing." Id. at 3. Firemen's argues that these defenses are foreclosed by waivers contained in the Indenture Agreements and that such waivers are enforceable. Regrettably, Morrison fails to clarify the nature of his defenses, to address the issue of waiver, or to cite a single case in any portion of his brief other than that concerning Rule 11 sanctions. Assuming, however, that Morrison is claiming fraudulent inducement, this defense may not have been waived. [HN3] A party will only be found to have waived a defense of fraudulent inducement if the language of the waiver is sufficiently specific to encompass the alleged fraud. Manufacturers Hanover Trust Co. v. Yanakas, 7 F.3d 310, 317 (2d Cir. 1993). Here Firemen's has not pointed to language in the waiver that is specifically directed at the defense of fraudulent inducement.

Nonetheless, summary judgment is appropriate in this matter because Morrison has failed to provide any evidence in support of his defense of fraudulent [*7] inducement. [HN4] Fraudulent inducement is an affirmative defense upon which Morrison bears the burden of proof. See Sheffield Commercial Corp. v. Clemente, 792 F.2d 282, 285 (2d Cir. 1986). Rule 56(c) of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322; accord Irvin Indus., Inc. v. Goodyear Aerospace Corp., 974 F.2d 241, 244 (2d Cir. 1992). Morrison was given ample opportunity for discovery but has failed to produce, or apparently even to seek, any evidence in support of his claim of fraudulent inducement. Thus, Firemen's has met its burden of showing that no questions of material fact exist as to the issue of fraudulent inducement by pointing out Morrison's failure to produce evidence on this issue. See Celotex, 477 U.S. at 325.

Accordingly, Firemen's has carried its burden [*8] of showing that no questions of material fact exist as to the liability of Morrison under the Indemnification Agreements and that summary judgment may therefore be granted in Firemen's favor.

Similarly, Firemen's has met its burden of demonstrating the absence of material facts as to the liability of the Stones under the Indemnification Agreements and they failed to submit any papers in opposition to the motion for summary judgment. Accordingly, summary judgment is granted as to the liability of both the Stones and Morrison.

## II. SANCTIONS PURSUANT TO RULE 11

The Court next turns to plaintiff's motion for sanctions pursuant to Fed. R. Civ. P. 11. The goal of Rule 11 is to "discourage dilatory and abusive litigation tactics and eliminate frivolous claims and defenses, thereby speeding up and reducing the costs of the litigation process." McMahon v. Shearson/American Express, Inc., 896 F.2d 17, 21 (2d Cir. 1990). [HN5] "In deciding whether the signer of a pleading, motion, or other paper has crossed the line between zealous advocacy and plain pettifoggery, the court applies an objective standard of reasonableness." United States v. International Brotherhood of Teamsters, 948 F.2d 1338, 1344 (2d Cir. 1991) [*9] "Rule 11 is not intended to chill an attorney's creative, imaginative or enthusiastic advocacy on his client's behalf. So long as his pleadings meet the test of reasonableness and are not interposed for . . . improper purposes . . . sanctions are not warranted." McMahon, 896 F.2d at 22. This applies even to those "positions that may arguably be at odds with existing precedent." Cross & Cross Properties, Ltd. v. Everett Allied Co., 886 F.2d 497, 504 (2d Cir. 1989). "Thus, not all unsuccessful legal arguments are frivolous or warrant sanction." Mareno v. Rowe, 910 F.2d 1043 (2d Cir. 1990), cert. denied, 498 U.S. 1028 (1991). Moreover, "courts should . . . resolve all doubts in favor of the signer." Cross, 886 F.2d at 504.

Having reviewed the arguments raised by Morrison in the instant case, the Court concludes that the imposition of Rule 11 sanctions is not merited. Although Morrison's arguments were rejected by the Court, they did not rise to the level of frivolousness that would make the imposition of sanctions appropriate.

## CONCLUSION [*10]

For the reasons stated above, Firemen's motion for summary judgment pursuant to Fed. R. Civ. P. 56 is granted in its entirety but its motion for sanctions pursuant to Fed. R. Civ. P. 11 is denied. Firemen's is hereby instructed to submit a judgment to the judgment clerk within 30 days from the date of this Opinion and Order.

## SO ORDERED

Dated: January 26, 1994
New York, New York

Peter K. Leisure

U.S.D.J.

LEXSEE

ERWIN GILLIAM, Plaintiff, -v- TRUSTEES OF SHEET METAL WORKERS'
NATIONAL PENSION FUND, PLAN A, Defendants.

Case No. 03-CV-7421 (KMK)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2005 U.S. Dist. LEXIS 7904

April 27, 2005, Decided
May 3, 2005, Filed

**DISPOSITION:** [*1] Defendants' motion for summary judgment GRANTED, and judgment entered in favor of Defendants.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employee filed suit against defendant trustees, challenging their denial of his application for pension benefits under the Employee Retirement Income Security Act of 1974, 29 U.S.C.S. § 1001 et seq. The trustees filed a motion for summary judgment.

**OVERVIEW:** The employee, who was disabled, sought a full pension under an employee benefit plan that he participated in through his work in the sheet-metal industry. The trustees denied the employee's application because he had not met one of the requirements for a disability pension; specifically, he had not worked 435 hours of "covered employment" within the two years immediately preceding the onset of his disability. The employee filed suit to challenge the trustees' decision, and the trustees filed a motion for summary judgment. The court held that the trustees were entitled to summary judgment because their decision to deny benefits was supported by substantial evidence and was not erroneous as a matter of law. The court found that the employee had admitted that he did not meet the requirements for a disability pension because he was not given any covered employment after he was laid off more than 10 years before he filed his application for benefits. The fact that the employee's lack of work in covered employment was not of his own choosing was irrelevant and did not make the trustees' decision arbitrary or capricious.

**OUTCOME:** The court granted the trustees' motion for summary judgment.

**CORE TERMS:** covered employment, pension, disability, disability pension, sheet-metal, summary judgment, disabled, administrator, arbitrary and capricious, month period, substantial evidence, oral argument, eligibility, lawsuit, onset, discretionary authority, disability benefits, preceded, eligible, pension benefits, matter of law, construe, hours of work, permanently, crediting, seizure, binding, qualify, genuine issue of material fact, summary judgment motion

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN1] Summary judgment may be granted where it is shown that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN2] On a motion for summary judgment, the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor.

*Civil Procedure > Joinder of Claims & Parties > Self-Representing Parties*
[HN3] When a plaintiff is proceeding pro se, a court liberally construes the plaintiff's complaint to raise the strongest arguments it suggests.

**Civil Procedure > Summary Judgment > Burdens of Production & Proof**
[HN4] A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor.

**Civil Procedure > Summary Judgment > Burdens of Production & Proof**
[HN5] A motion for summary judgment will not be defeated merely on the basis of conjecture or surmise.

**Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies**
**Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies**
[HN6] The Employee Retirement Income Security Act of 1974 provides a beneficiary with a cause of action to recover benefits due him under the terms of his plan, to enforce his rights under the terms of his plan, or to clarify his rights to future benefits under the terms of his plan. 29 U.S.C.S. § 1132(a)(1)(B).

**Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies**
**Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies**
[HN7] Where written plan documents confer upon a plan administrator or fiduciary the discretionary authority to determine eligibility for benefits or to construe the terms of the plan, a court confronted with a claim for denied benefits under 29 U.S.C.S. § 1132(a)(1)(B) should not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious.

**Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies**
**Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies**
[HN8] The arbitrary and capricious standard of review is narrow, and a court applying that standard may not overturn a plan administrator's decision to deny benefits unless it was without reason, unsupported by substantial evidence, or erroneous as a matter of law.

**Civil Procedure > Appeals > Standards of Review > Substantial Evidence**
**Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies**
**Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies**
[HN9] "Substantial evidence" is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by a plan administrator and requires more than a scintilla but less than a preponderance.

**Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies**
**Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies**
[HN10] A court should not substitute its own judgment for that of a plan administrator as if the court were considering the issue of eligibility for benefits anew.

**Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies**
**Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies**
[HN11] When plan trustees are given discretion to determine eligibility for benefits, a court should review their decisions with a strong measure of deference.

**Civil Procedure > Appeals > Standards of Review > Abuse of Discretion**
**Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies**
**Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies**
[HN12] In reviewing a decision to deny benefits, courts should take into consideration any conflicts of interest that a plan administrator may have. In such a situation, courts must still apply the "arbitrary and capricious" standard but must consider the conflict as a factor in determining whether there is an abuse of discretion.

**Labor & Employment Law > Employee Retirement Income Security Act (ERISA) > Fiduciary Responsibilities**
**Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Fiduciary Responsibilities**
[HN13] See 29 U.S.C.S. § 1104(a)(1)(D).

**COUNSEL:** Erwin Gilliam, Plaintiff, Pro se, Pelham, NY.

2005 U.S. Dist. LEXIS 7904, *

Stephen Mark Rosenblatt, Esq., Alexandria, VA, Counsel for Defendants.

**JUDGES:** KENNETH M. KARAS, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** KENNETH M. KARAS

**OPINION:**

OPINION AND ORDER

KENNETH M. KARAS, District Judge n1:

> n1 On September 3, 2004, this case was randomly reassigned to the undersigned for all purposes.

This is a case challenging the denial of benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and is before the Court on Defendants' motion for summary judgment. Plaintiff is disabled and seeks a full pension under an employee benefit plan that he participated in through his work in the sheet-metal industry. Defendants denied Plaintiff's application for pension benefits because he had not met one of the requirements for a disability pension, namely, that he had not worked 435 hours [*2] of "covered employment" within the two years immediately preceding the onset of his disability. In their summary judgment motion, Defendants argue that the Court should uphold their decision and also that the instant lawsuit is untimely because Plaintiff waited longer than the contractually-provided, 90-day limitations period for initiating a lawsuit after Defendants' final decision on Plaintiff's benefits application. The Court has reviewed the parties' submissions, the record, the applicable law, and heard argument on the motion from the parties. Because the Court finds that Defendants' decision to deny benefits was supported by substantial evidence and was not erroneous as a matter of law, the Court grants Defendants' motion for summary judgment.

I. Background

The material facts are not in dispute. n2 Plaintiff Erwin Gilliam is 53-years old, resides in this district, and was a former worker in the sheet-metal industry. Defendants are the administrators of the Sheet Metal Workers' National Pension Fund, Plan A (the "Fund"), which is a nationwide employee pension benefit plan that provides retirement benefits to eligible sheet-metal workers. The Fund is a defined-benefit plan [*3] that provides a specified level of pension benefits that depends on two factors: (i) the hours worked by each participant and (ii) the amount which the participant's employer is obligated to

contribute to the Fund for each hour of work performed by the participant.

> n2 As required by Local Rule 56.1(a), Defendants submitted a statement of material facts with their motion papers. Defendants also provided Plaintiff with the notice that is due to *pro se* litigants defending summary judgment motions pursuant to Local Rule 56.2. Because Plaintiff did not submit any evidence controverting Defendants' factual assertions, they are deemed to be admitted for purposes of the motion. *See* Local Rule 56.1(b).

The uncontested facts show that Mr. Gilliam worked for sheet-metal employers who contributed to the Fund from July 1979 through September 1990, when he was laid off. Since 1990, and through no fault of his own, Mr. Gilliam has done no work in the sheet-metal industry but has worked in other fields. Based on the [*4] sheet-metal work he has done, however, Mr. Gilliam is qualified for 11 years of pension credit, which entitles him to a normal retirement pension at age 65 or an early-retirement pension at age 55.

Mr. Gilliam apparently began suffering from seizures in 1997, and stopped work in September 2000 after he experienced a seizure at work that caused him to fall. The Social Security Administration found that Mr. Gilliam was disabled as of September 15, 2000 and that he was entitled to Social Security disability benefits as of March 2001.

Mr. Gilliam submitted an application to the Fund for a disability pension in or about April 2001. Defendants reviewed Mr. Gilliam's medical records and employment history, ultimately determining that Mr. Gilliam's disability began in September 2000 and that he had not had any covered employment (as defined by the Fund's plan documents) since 1990. Accordingly, the Defendants denied Mr. Gilliam's application because he did not did not have any covered employment for at least 435 hours in the 24-month period immediately preceding his disability date, which is a requirement of receiving the Fund's disability pension. However, Defendants did inform Mr. Gilliam [*5] that, based on the pension credit he had accumulated with the Fund during his work with participating employers, he was entitled to receive a normal retirement pension at age 65 or an early retirement pension at age 55.

Mr. Gilliam appealed the decision, and the Fund's Appeals Committee considered whether he was entitled to any of the disability benefits offered by the Fund. On December 7, 2001, the Appeals Committee determined

that Mr. Gilliam was not because he did not have the requisite 435 hours of covered employment in the 24-months immediately proceeding the onset of his disability, which the Appeals Committee determined was September 15, 2000.

The Fund's Board of Trustees has, and at all relevant times had, the sole discretionary authority regarding, among other things, the application and interpretation of the Fund's plan document. The Board consists of an equal number of representatives from labor and management. (Excerpt of Trust Agreement, Art. III § 1(a), attached as Exhibit B to Aff. of Debra Elkins Santi ("Santi Aff.")) The Board delegated discretion to grant or deny any appeal relating to the payment of Fund benefits to the Appeals Committee. The Appeals Committee's [*6] decisions on these issues are final and binding. The Fund is managed on a day-to-day basis by Associated Third-Party Administrators, Inc., which is responsible for, among other things, benefit determinations, distribution of benefits, resolution of benefit-eligibility questions, and coordination of benefit appeals, which includes briefing the Appeals Committee on the reasons for benefit decisions.

After additional correspondence between Mr. Gilliam and the Defendants, Mr. Gilliam filed the instant lawsuit on September 22, 2003. On December 30, 2004, Defendants moved for summary judgment. On January 5, 2005, Mr. Gilliam submitted a response in opposition to Defendants' motion. Defendants did not submit a formal reply.

The Court heard oral argument on the motion on February 15, 2005. At oral argument, Mr. Gilliam was given another opportunity to provide any facts that contradicted those submitted by Defendants in support of their summary judgment motion. During this argument, Mr. Gilliam candidly admitted that he had no objection to Defendants' factual proffer that he had not worked in covered employment for at least 435 hours during the 24 months preceding his disability. Instead, [*7] Mr. Gilliam insisted that his lack of work in covered employment was not his choice, and he noted that he would be willing, notwithstanding his disability, to make up the 435 hours of work so he could qualify for disability benefits.

II. Applicable Standards

A. Summary Judgment Standard

[HN1] Summary judgment may be granted where it is shown that there is "no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). [HN2] "The court must view the evi-

dence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." *L.B. Foster Co. v. Am. Piles, Inc.,* 138 F.3d 81, 87 (2d Cir. 1998). Further, [HN3] because Mr. Gilliam is proceeding *pro se,* the Court liberally construes the Amended Complaint "'to raise the strongest arguments that they suggest.'" *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir. 1994)). [HN4] A party seeking summary judgment bears [*8] the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970). "Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor." *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir. 1995). [HN5] "The motion 'will not be defeated merely . . . on the basis of conjecture or surmise.'" *Id.* (quoting *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir. 1991)).

B. ERISA Standard

Mr. Gilliam's initial Complaint did not contain allegations based on the ERISA statue, but on September 22, 2003, Chief Judge Michael B. Mukasey construed Mr. Gilliam's claims as arising under ERISA. (Order filed Sept. 22, 2003, at 1) [HN6] ERISA provides a beneficiary with a cause of action "to recover benefits due him under the terms of his plan, to enforce his rights under the terms of his plan, or to clarify his rights to future benefits under the terms of [*9] his plan." 29 U.S.C. § 1132(a)(1)(B). Defendants do not contest the applicability of ERISA to this lawsuit.

The Fund's plan document grants broad discretionary authority to the Defendants to determine, among other things, "(a) the standard of proof required in any case; (b) the application and interpretation of this Plan; (c) entitlement to or amount of a pension; (d) the disability, extent of disability, or non-disability of Plan participants; (e) the crediting of Future or Past Service Credit; and (f) the crediting of Hours of Work and Years of Service." (Amended & Restated Rules and Regulations for the Sheet Metal Workers' National Pension Fund Construction Employees (Plan A) ("2001 Plan Document") n3 § 9.03, attached as Exhibit C to Santi Aff.) "The decisions of the Trustees with respect to any of the foregoing shall be final and binding." (2001 Plan Document § 9.03)

n3 According to the Defendants, this is the version of the Fund's plan document that was in

effect when Mr. Gilliam appealed the Defendants' denial of his application for pension benefits. (Santi Aff. P9)

[*10]

The 2001 Plan Document further provides that a participant who is denied benefits may appeal the denial, and that "the appeal shall be considered by the Trustees or by a person or committee designated by the Trustees." (2001 Plan Document § 9.04) Any decision on the appeal "shall be final." (2001 Plan Document § 9.04) Pursuant to this provision, the Fund's trustees have delegated the authority to consider appeals to the Appeals Committee. (Santi Aff. P10)

The Court notes that these provisions are similar to those in the version of the plan document that was in effect the last time Mr. Gilliam worked in covered employment. (Rules and Regulations for the Sheet Metal Workers National Pension Fund Construction Employees (Plan A) ("1990 Plan Document") § § 8.03, 8.04, attached as Exhibit E to Santi Aff.) n4

n4 For example, the 1990 Plan Document provides, in language similar to the 2001 Plan Document, that the Trustees have broad discretionary power to determine "(a) the standard of proof required in any case; (b) the application and interpretation of this Plan; (c) entitlement to or amount of pension; (d) the disability, extent of disability, or nondisability of Plan participants; and (e) the crediting of Future or Past Service." (1990 Plan Document § 8.03) "The decisions of the Trustees with respect to any of the foregoing shall be final and binding." (1990 Plan Document § 8.03) The 1990 Plan Document further provides, like the 2001 Plan Document, that an appeal of the denial of benefits "shall be considered by the Trustees or by a person or committee designated by the Trustees." (1990 Plan Document § 8.04) Any decision on the appeal "shall be final." (1990 Plan Document § 8.04)

[*11]

[HN7] Where the written plan documents confer upon a plan "'administrator or fiduciary the discretionary authority to determine eligibility for benefits or to construe the terms of the plan,'" a court confronted with a claim for denied benefits under 29 U.S.C. § 1132(a)(1)(B) should "not disturb the administrator's ultimate conclusion unless it is 'arbitrary and capricious.'" *Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 441 (2d Cir. 1995) (quoting *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 103 L. Ed. 2d 80, 109 S. Ct.

948 (1989)). Because the Fund's plan document expressly confers such broad discretionary authority on the Fund's trustees, the Court will evaluate the Appeals Committee's decision under the "arbitrary and capricious" standard.

[HN8] The arbitrary and capricious standard of review is narrow, see *Celardo v. GNY Auto. Dealers Health & Welfare Trust,* 318 F.3d 142, 146 (2d Cir. 2003), and a court applying that standard may not overturn a plan administrator's decision to deny benefits unless "it was 'without reason, unsupported by substantial evidence or erroneous as a matter of law,'" *Pagan,* 52 F.3d at 442 (quoting [*12] *Abnathya v. Hoffmann-La Roche, Inc.,* 2 F.3d 40, 45 (3d Cir. 1993)). [HN9] "Substantial evidence is 'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] . . . requires more than a scintilla but less than a preponderance.'" *Celardo,* 318 F.3d at 146 (quoting *Miller v. United Welfare Fund,* 72 F.3d 1066, 1070 (2d Cir. 1995)). [HN10] A court should not substitute its own judgment for that of the plan administrator as if the court were considering the issue of eligibility for benefits anew. *Pagan,* 52 F.3d at 442; see also *Billinger v. Bell Atl.,* 240 F. Supp. 2d 274, 281 (S.D.N.Y. 2003) [HN11] ("When the Plan Trustees are given discretion to determine eligibility . . . the court shall review their decisions with a 'strong measure of deference' . . . .") (citations omitted), *aff'd,* 124 Fed. Appx. 669, 2005 U.S. App. LEXIS 1208 (2d Cir. Jan. 21, 2005).

III. Discussion

The Fund offered two types of disability pensions when Mr. Gilliam applied for benefits in 2001--a Disability Pension and an Industry-Related Disability Pension. (2001 Plan Document § § 5.06 [*13] & 5.07) The Disability Pension pays a full pension when an eligible participant has become completely disabled, but the Industry-Related Disability Pension pays a reduced pension when an eligible participant is unable to work in the sheet-metal industry, but can hold other types of employment. The amount paid under each benefit differs, but both have similar requirements that are relevant here. The Disability Pension requires that the applicant "worked in Covered Employment for at least 435 hours in the 24 month period that immediately preceded the date that he became permanently and totally disabled as demonstrated by proof of approval for Social Security Disability . . . ." (2001 Plan Document § 5.06(a)(4)) The Industry-Related Disability Pension requires that the applicant "worked in Covered Employment for at least 435 hours in the 24 month period that immediately preceded the date that the Trustees determined he became totally and permanently unable to return to employment

in the Sheet Metal Industry." (2001 Plan Document § 5.07(a)(4)) n5

> n5 The Court notes that the requirement for a Disability Pension is the same in the version of the plan that was in effect when Mr. Gilliam last worked in covered employment. (1990 Plan Document § 5.10(a)(4) (requiring work "in Covered Employment for at least 435 hours in the 24 month period that immediately preceded the date that he became permanently and totally disabled")) The 1990 Plan Document does not have a provision for an Industry-Related Disability Pension.

[*14]

The Court reviews each element of the Defendants' determinations below.

A. The Defendants' Factual Determinations

1. Mr. Gilliam's Work in "Covered Employment"

Defendants informed Mr. Gilliam that they found that his last Covered Employment was in 1990. (Exhibit D to Santi Aff., at A.R. 89) n6 The 2001 Plan Document defines "Covered Employment" as work done for an employer which, pursuant to a collective bargaining agreement with the sheet-metal workers' union, contributes to the Fund. (2001 Plan Document § § 1.08, 1.11) It is undisputed that Mr. Gilliam's last work for a Contributing Employer, indeed, for any employer in the sheet-metal industry, ceased in September 1990. Indeed, Mr. Gilliam expressly admitted as much during oral argument. n7 Accordingly, the Court finds that the Defendants' determination that Mr. Gilliam's last Covered Employment occurred in 1990 is supported by substantial evidence.

> n6 The Administrative Record to Mr. Gilliam's application for benefits is attached as Exhibit D to the Santi Affidavit. The Court will hereinafter refer to the record as "A.R."

> n7 Mr. Gilliam notes, and Defendants do not dispute, that his lack of "covered employment" after 1990 was not of his own choosing, and the Court does not doubt that or Mr. Gilliam's wish that circumstances were otherwise. However, the Court finds nothing in the plan documents that makes this fact relevant, or which makes Defendants' denial arbitrary or capricious.

[*15]

2. Onset of Mr. Gilliam's Disability

Defendants also informed Mr. Gilliam that his disability started in 2000. (A.R. 89) The Social Security Administration found that Mr. Gilliam became disabled on September 15, 2000. (A.R. 27) Mr. Gilliam himself admitted that he first became disabled in September 2000 in his application for disability benefits to the Fund and repeated the same during oral argument. (A.R. 3) Accordingly, the Court finds that Defendants' determination of the onset of Mr. Gilliam's disability to be supported by substantial evidence.

B. Application of Facts to the Terms of the Plan Documents

Regardless of whether Mr. Gilliam sought a Disability Pension or an Industry-Related Disability Pension, the 2001 Plan Document clearly requires that the applicant worked at least 435 hours in the 24-month period that immediately preceded the date the applicant became disabled. (2001 Plan Document § § 5.06 & 5.07) There is no dispute here that Mr. Gilliam cannot satisfy this requirement. The last Covered Employment he had was in 1990 and he became disabled in 2000. n8 Accordingly, the Court finds that Defendants' denial of his application is supported by substantial evidence [*16] and is therefore not arbitrary and capricious. n9

> n8 Although Defendants and the Social Security Administration found Mr. Gilliam's disability began in 2000, the Court is aware that Mr. Gilliam has alleged that he started experiencing seizures in 1997. Even if the Court were to find that Mr. Gilliam became disabled in 1997, however, Mr. Gilliam would still not be entitled to benefits, as he had not worked, by his own admission, 435 hours in the 24-month period prior to 1997.

> n9 The Court notes that the Second Circuit has held that [HN12] courts should take into consideration any conflicts of interest that the administrator may have. *See Pagan,* 52 F.3d at 442. In such a situation, the court of appeals determined that the district court must still apply the "arbitrary and capricious" standard, but must consider the conflict as "a factor in determining whether there is an abuse of discretion.'" *Id.* (quoting *Bruch,* 489 U.S. at 115). Here, there arguably is a conflict because half the Trustees are labor union representatives, and thus, may also be participants in the Fund. But even if this is an actual conflict the Court's decision would remain the same, regardless of whether it followed the Second Circuit's holding in *Pagan* and applied the arbitrary and capricious standard (but considered the conflict as a factor in its analysis) or re-

viewed Defendants' decision *de novo.* The Court finds that Defendants afforded Mr. Gilliam a full and fair opportunity to appeal the denial of benefits and their decision denying his appeal is supported by the clear language of the plan documents and by the undisputed facts, and there is no evidence that Defendants abused their discretion or were guided by any conflict in reaching their decision.

[*17]

C. Mr. Gilliam's Response

Mr. Gilliam does not provide any evidence to counter that presented by Defendants. Nor does Mr. Gilliam provide any significant argument as to why Defendants' motion should be denied. In a letter he submitted to the Court on December 6, 2004, however, he makes a number of statements, which the Court addresses in turn.

*First,* Mr. Gilliam states that he is entitled to a "full pension" under § 5.05 of the 2001 Plan Document. (Letter from Mr. Gilliam to the Court of Dec. 6, 2004 ("Dec. 6, 2004 Letter")) First, the Court notes that § 5.05, which provides for a "Special Early Retirement Pension" for participants who have "attained age 55," does not apply to Mr. Gilliam. Instead, it applies to participants who have performed at least 3,500 hours of work during the 5 years preceding the application (which Mr. Gilliam concededly cannot meet). (2001 Plan Document § 5.05(a)(2)) Moreover, the Special Early Retirement Pension does not provide for a full pension, but one that is reduced for participants younger than age 62. (2001 Plan Document § 5.05(b)) The Court instead construes Mr. Gilliam's request as one for an Early Retirement Pension. Defendants concede [*18] that Mr. Gilliam will be eligible for an Early Retirement Pension once he turns 55-- but that pension will pay reduced, not full, benefits. Mr. Gilliam is 53, however, and therefore must wait until he turns 55 to obtain this pension. n10 Mr. Gilliam did not challenge this claim at oral argument.

n10 Similarly, the Special Early Retirement Pension also requires that participants be 55 or older to obtain benefits, and thus Mr. Gilliam does not presently qualify for that pension even if he did meet the other requirements discussed above.

*Second,* Mr. Gilliam states that he does not meet the requirements for the disability pensions because he was not given any Covered Employment after he was laid off in 1990. He states that "time was never allotted to me at *Local 38* because I was laid off for 3 years." (Dec. 6, 2004 Letter (emphasis in original)) While the Court notes that it is unfortunate that Mr. Gilliam was unable to obtain work in the sheet-metal industry after 1990, the Court is also aware that Defendants' [*19] are obligated to follow the express requirements in the plan document for determining eligibility for benefits. *See* [HN13] 29 U.S.C. § 1104(a)(1)(D) ("[A] fiduciary shall discharge his duties with respect to a plan . . . in accordance with the documents and instruments governing the plan . . . ."). The Fund does not have unlimited resources and could not afford to pay benefits to every participant who asks for them but does not qualify for them. (Aff. of Marc E. Le Blanc, at PP8-9 (explaining that if the Fund were liquidated as of January 1, 2004, its assets would cover only approximately 57% of benefits owed))

IV. Conclusion

For the reasons stated above, Defendants' motion for summary judgment is GRANTED, and judgment will be entered in favor of Defendants. n11 The parties shall bear their own costs and expenses. The Clerk of the Court is directed to close this case.

n11 Because the Court finds that Mr. Gilliam is clearly not entitled to a disability pension under the Fund's plan document, it does not need to reach the Defendants' alternative argument that this action is barred by the limitations period set by the plan document.

[*20]

SO ORDERED.

Dated: April 27, 2005

New York, New York

KENNETH M. KARAS

UNITED STATES DISTRICT JUDGE

LEXSEE

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.,
Plaintiff, v. CARL J. CARLIE, et al., Defendants**

**No. 88 Civ. 4768 (LLS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

**1991 U.S. Dist. LEXIS 14767**

**October 15, 1991, Decided
October 16, 1991, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff financial guarantee bond issuer filed suit against defendant limited partner to enforce an indemnity agreement between the bond issuer and the limited partner in a tax shelter limited partnership. The bond issuer also sought to enforce its rights as the transferee of a promissory note executed by the limited partner. The limited partner filed a motion to transfer the case and the bond issuer filed a motion for summary judgment.

**OVERVIEW:** A limited partner bought an interest in a tax shelter limited partnership, paid for in cash and with five promissory notes. He and the financial guarantee bond issuer had an indemnity contract where the bond issuer would pay any amount the limited partner failed to pay as capital contributions represented by the promissory notes. He and the other limited partners failed to make their final contributions. The promissory notes had been conveyed to a bank. The bond issuer sought enforcement of the agreement and of its rights as the bank's transferee of the promissory note. The limited partner was the only partner left in the suit. He filed for a motion to transfer under 28 U.S.C.S. § 1401(a), which the court denied because it would not serve the interests of justice. The bond issuer's motion for summary judgment was granted. The court discounted the limited partner's claim of fraud with regard to the limited partnership, which had been involved in earlier litigation, and that the bank was on notice of the fraud. The bank was a holder in due course. The bond issuer as transferee took all the rights of the transferor bank, including enforcement of the note.

**OUTCOME:** The court denied the motion to transfer the case filed by the only limited partner remaining in the litigation filed by the financial guarantee bond issuer against the partner in its suit to enforce the indemnity agreement and its rights as the transferee of a promissory note. The court granted the bond issuer's motion for summary judgment.

**CORE TERMS:** holder, transferee, indemnity agreement, partnership, summary judgment, notice, genuine issue, partner, illegality, actual knowledge, promissory note, guaranteed, package, motion to transfer, prima facie case, factual issue, inappropriate, misstatements, entitlement, conclusory, subjective, severance, inferred, offering, genuine, disable, written notice, subrogee, reimbursement, acceleration

**LexisNexis(R) Headnotes**

*Civil Procedure > Venue > Change of Venue in Federal Courts*
[HN1] 28 U.S.C.S. § 1404(a) states: For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

*Civil Procedure > Trials > Separate Trials*
*Civil Procedure > Venue > Change of Venue in Federal Courts*
[HN2] A district court may sever claims against one or more defendants to permit transfer of an action, where the administration of justice would be materially advanced by severance and transfer.

*Civil Procedure > Trials > Separate Trials*
*Civil Procedure > Venue > Change of Venue in Federal Courts*
[HN3] The court does not agree that an entire action must mean the action as originally brought. Where certain claims are properly severed, the result is that there are then two or more separate "actions," and the district court may, pursuant to 28 U.S.C.S. § 1404(a), transfer certain of such separate actions while retaining jurisdiction of others.

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN4] Under Fed. R. Civ. P. 56(c) the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. The court must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion. The non-movant may not rest upon conclusory allegations or denials to defeat the motion, but rather must provide concrete particulars in the form of supporting facts or arguments in opposition.

*Commercial Law (UCC) > Negotiable Instruments (Article 3) > Rights of a Holder*
[HN5] A holder in due course is a holder who takes the instrument (a) for value; and (b) in good faith; and (c) without notice that it is overdue or has been dishonored or of any defense against it or claim to it on the part of any person. Uniform Commercial Code § 3-302(1).

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*
[HN6] When opposing a properly supported motion for summary judgment, a party must go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, or admissions that a genuine factual dispute exists.

*Commercial Law (UCC) > Negotiable Instruments (Article 3) > Rights of a Holder*
[HN7] Notice of a defense is a subjective inquiry of whether the purported holder in due course had actual knowledge of the defense. However, the holder is not bound to be alert for circumstances which might possibly excite the suspicions of wary vigilance.

*Commercial Law (UCC) > Negotiable Instruments (Article 3) > Rights of a Holder*
[HN8] Uniform Commercial Code § 3-305(2) provides that a holder in due course takes the instrument free from all defenses of any party to the instrument with whom he has not dealt.

*Commercial Law (UCC) > Negotiable Instruments (Article 3) > Rights of a Holder*
[HN9] A holder of a promissory note establishes a prima facie case for recovery by proving execution of the note and a default in payment pursuant to its terms. Once a holder establishes a prima facie case, the maker has the burden of coming forward with proof of evidentiary facts, not merely conclusory allegations, demonstrating the existence of a genuine and substantial issue regarding the holder's entitlement to payment.

*Commercial Law (UCC) > Negotiable Instruments (Article 3) > Transfers*
*Commercial Law (UCC) > Negotiable Instruments (Article 3) > Rights of a Holder*
[HN10] A transferee receives all the rights of the transferor unless the transferee has himself been a party to any fraud or illegality affecting the instrument or as a prior holder had notice of a defense or claim against it. Uniform Commercial Code § 3-201(1).

*Contracts Law > Defenses > Fraud & Misrepresentation*
[HN11] To establish fraud, defendant must show the traditional five elements of fraud: misrepresentation of a material fact, falsity of that representation, scienter, reliance and damages.

**JUDGES:** [*1]

Louis L. Stanton, United States District Judge.

**OPINIONBY:**

STANTON

**OPINION:**

OPINION AND ORDER

National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), an issuer of financial guarantee bonds, sues to enforce an indemnity agreement between itself and a limited partner in a tax shelter limited partnership, and to enforce its rights as transferee of the limited partner's promissory note. National Union issued a bond which guaranteed to the partnership, and to

the bank that financed the partnership, that the limited partner would make all required capital contributions represented by his promissory notes to the partnership. Defendant Stephen C. Hartel ("Hartel") did not make a required contribution, and National Union was compelled to make it on his behalf. Now National Union sues Hartel for reimbursement, under an indemnity agreement he gave National Union at the time it guaranteed his payments, and as transferee of the unpaid note.

BACKGROUND

In October, 1983, Hartel purchased a limited partnership interest in Oppenheimer HPA Partners ("O-HPA"). Hartel paid for this interest partly with cash and partly with a series of five promissory notes (the "notes") in the total principal amount [*2] of $ 93,300 (Pl. Statement Pursuant to Rule 3(g) para. 2). The notes stated that they would "be governed by and construed in accordance with the laws of New York." (Exh. C to 7/2/91 Goldstein Aff.).

Hartel and National Union entered into an indemnity agreement regarding the notes (the "indemnity agreement"), and National Union issued a bond guaranteeing the notes (the "bond"). The bond guaranteed Hartel's payment of the notes and required National Union, as surety, to pay them if Hartel defaulted. The indemnity agreement required Hartel to reimburse National Union for any such payments it made under the bond, and for interest and expenses incurred in obtaining reimbursement (Pl. 3(g) Statement paras. 3-4).

Following the issuance of the bond, the notes executed by the limited partners, including defendant's note, were negotiated and endorsed to Marine Midland Bank, N.A. ("the bank") (7/2/91 Goldstein Aff. para. 7).

Hartel and eleven other limited partners failed to pay their final notes, which became due on February 24, 1988. n1 Pursuant to the terms of the bond, National Union paid the notes on their behalf. National Union sues to recover these payments plus interest, attorneys' fees, [*3] and expenses pursuant to the indemnity agreement and as the bank's transferee.

---

n1 According to the PPM, the final note was "due December 15, 1988, subject to acceleration to a date not earlier than February 21, 1988, upon 30 days prior written notice from the Managing General Partner." (Exh. D to 7/8/91 Baronio Aff.). Hartel acknowledged receipt of such written notice of acceleration (See Exh. C to 7/8/91 Baronio Aff.).

---

Hartel, now the sole remaining defendant, moves to transfer this case to the United States District Court for the Eastern District of Louisiana pursuant to 28 U.S.C. § 1404(a). National Union cross-moves for summary judgment pursuant to Fed. R. Civ. P. 56.

DISCUSSION

I. MR. HARTEL'S MOTION TO TRANSFER

[HN1]   28 U.S.C. § 1404(a) states: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Pointing to his poor health, his advanced age, the convenience of the parties,  [*4] and the location of the operative facts of this action, Hartel seeks transfer to Louisiana, where he resides.

The complaint in this action named twelve defendants. Of them, only Hartel lives in the Eastern District of Louisiana. Further, most of the causes of action did not arise in that district. Therefore, that district was not a proper venue under 28 U.S.C. § 1391(a) at the time the action was commenced, nor a district where the action "might have been brought" under § 1404(a). National Union argues that transfer is therefore inappropriate.

[HN2] A district court may sever claims against one or more defendants to permit transfer of an action, "where the administration of justice would be materially advanced by severance and transfer." Wyndham Assocs. v. Bintliff, 398 F.2d 614, 618 (2d Cir.), cert. denied, 393 U.S. 977 (1968). See also, Cain v. New York State Bd. of Elections, 630 F. Supp. 221, 225-26 (E.D.N.Y. 1986); 15 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3845, at 351-53 (1986).

Here, severance is inapplicable because Hartel is the sole remaining defendant, since National Union has dismissed [*5]  or obtained judgments against, or settled with, the other eleven defendants. However, the Wyndham principle applies:

[HN3] We do not agree that an entire action must mean the action as originally brought. Where certain claims are properly severed, the result is that there are then two or more separate "actions," and the district court may, pursuant to § 1404(a), transfer certain of such separate actions while retaining jurisdiction of others.

398 F.2d at 618.

Nevertheless, in the interests of justice, a transfer should not be made. National Union has moved for summary judgment, which Hartel has opposed. For the reasons stated below, National Union's motion is granted. There is no need further to delay a final disposition or to

force the parties to duplicate their efforts in another district. Therefore, Hartel's motion to transfer is denied.

## II. NATIONAL UNION'S MOTION FOR SUMMARY JUDGMENT

### 1. Summary Judgment

[HN4] Under Fed. R. Civ. P. 56(c) the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). [*6] The "court must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." Eastway Constr. Corp. v. New York, 762 F.2d 243, 249 (2d Cir. 1985) (citations omitted), cert. denied, 484 U.S. 918 (1987). The non-movant may not rest upon conclusory allegations or denials to defeat the motion, but rather must provide "concrete particulars" in the form of supporting facts or arguments in opposition. R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir. 1984); Markowitz v. Republic Nat. Bank, 651 F.2d 825, 828 (2d Cir. 1981).

### 2. National Union's Rights as Subrogee of the Bank Under the Promissory Note

National Union seeks recovery under the note, as transferee from the bank. It argues that the bank was a holder in due course of the note, and that it enjoys all the bank's rights, and is entitled to payment on the note, as the bank's transferee.

Hartel argues that the bank was not a holder in due course. [HN5] "A holder in due course is a holder who takes the instrument (a) for value; and (b) in good faith; and (c) without notice that it is overdue or [*7] has been dishonored or of any defense against it or claim to it on the part of any person." U.C.C. § 3-302(1). There is no dispute that the note was a negotiable instrument and that the bank took it for value. Hartel argues that the bank took the note in bad faith or with notice of a defense against it, or both.

Hartel's argument is premised on alleged fraud in the Private Placement Memorandum ("PPM") on which he relied when he purchased his interest in O-HPA. He argues that the bank was aware, or at least should have been aware, of the fraud in the PPM, and that this awareness amounted to bad faith or notice of a defense against the note.

As "evidence" of fraud in the PPM, Hartel offers only a copy of the complaint in R.A. Seale, Jr. et al. v. Oppenheimer & Co., Inc. et al., No. H-87-2857 (S.D. Tex.) which involves the O-HPA partnership (Exh. 5 to 5/22/91 Hartel Aff.). Neither the bank nor National Union is a party to that action. In an affidavit Hartel states:

"Rather than reiterate the voluminous allegations" regarding fraud in the O-HPA PPM made by the Seale plaintiffs, "deponent adopts those allegations and respectfully refers the Court to that pleading." (Hartel 7/25/91 [*8] Aff. para. 7).

[HN6] When opposing a properly supported motion for summary judgment, a party must go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, or admissions that a genuine factual dispute exists. Celotex, 477 U.S. at 324. To raise a genuine issue of fraud in the PPM, Hartel was required to proffer "statements sworn to by anyone who had knowledge of the facts asserted." Beyah v. Coughlin, 789 F.2d 986, 990 (2d Cir. 1986). His submission of the unverified Seale complaint is insufficient, and this insufficiency is not cured by his "adoption", apparently without personal knowledge, of the Seale allegations.

Even if Hartel had raised a genuine issue of fraud in the PPM, he does not raise a genuine issue of the bank's bad faith or actual notice of a defense. In Chemical Bank v. Haskell, 51 N.Y.2d 85, 432 N.Y.S.2d 478 (1980), the New York State Court of Appeals held that "good faith" is a subjective inquiry, not governed by the objective test of commercial reasonableness.

The inquiry is not whether a reasonable banker in Chemical's position would have known, or would have [*9] inquired concerning the alleged breach [of partnership duties], but rather, the inquiry is what Chemical itself actually knew. If Chemical did not have actual knowledge of some fact which would prevent a commercially honest individual from taking up the instruments, then its good faith was sufficiently shown.

Id. at 480 (citations omitted). The Court similarly held that [HN7] "notice of a defense" is a subjective inquiry of whether the purported holder in due course had actual knowledge of the defense. However, the holder is "not bound to be 'alert for circumstances which might possibly excite the suspicions of wary vigilance.'" Id. at 481 (quoting Hall v. Bank of Blasdell, 306 N.Y. 336, 341 (1954)). Accord, Indyk v. Habib Bank, Ltd., 694 F.2d 54, 56-57 (2d Cir. 1982); FDIC v. Russo, 452 N.Y.S.2d 231, 232-33 (2d Dept. 1982) (bank's knowledge that breach of underlying agreement might occur did not mean that it took the note in bad faith), aff'd, 58 N.Y.2d 929 (1983); National Union Fire Ins. Co. v. Woodhead, Fed. Sec. L. Rep. (CCH) para. 94,455 at 92,928-929 (S.D.N.Y. May 15, 1989) [*10] (1989 WL 53004), aff'd 917 F.2d 752, 756 (2d Cir. 1990). Thus to dispute the bank's status as a holder in due course, Hartel must set forth its knowledge of some facts, rather than only of claims, to give rise to the inference that the bank had actual knowledge of the alleged fraud.

Hartel avers that the bank was an integral part of the offering; that it was identified in the PPM as the "pledgee bank"; that the PPM represented that the bank had issued a letter of intent to extend to O-HPA a revolving line of credit of approximately $ 30,000,000; that in return the bank received a pledge of the limited partners' notes and was the beneficiary of National Union's bond; and that it received an interest rate of 13% per annum. (Hartel 7/25/91 Aff. paras. 9-11). None of these facts, separately or together, creates a factual issue whether the bank actually knew of a fraud or acted in bad faith. See Citibank, N.A. v. Deutsch, 471 N.Y.S.2d 277, 278 (1st Dept. 1984).

Hartel was required to execute an estoppel letter addressed to the bank (Exh. C. to 8/12/91 Baronio Aff.). He argues that therefore the bank dealt with him as a party to the note, and he can [*11] raise against the bank his personal defenses of fraud in the inducement and failure of consideration. See [HN8] U.C.C. § 3-305(2) (a holder in due course takes the instrument free from "all defenses of any party to the instrument with whom he has not dealt. . . ."). However, in that letter Hartel stated that he did not rely on the bank when making his investment and acknowledged that the bank did not play any part in soliciting his investment. n2 Therefore, Hartel acknowledged that he is not a party with whom the bank dealt, and the bank held the note free from any of his personal defenses.

n2 The letter states, in part:

I hereby certify to you that I have made and rely upon my own personal investigation as to the appropriateness for me and soundness of this, investment, the tax benefits available and the reputation of the principals and sponsors. I hereby acknowledge that: (i) Marine Midland Bank, N.A. (the "Bank") has neither solicited nor discussed with me the desirability of, my investment in the Partnership; (ii) the Bank has not investigated the merits of the Unit(s) as an investment opportunity; and (iii) I am not relying in any way on the Bank's involvement with the Partnership, if any, in my decision to invest in the Partnership.

You have made no representation to me, directly or indirectly, and I expressly disclaim any liability on your part for my participation in this endeavor. . . .

[*12]

[HN9] A holder of a promissory note establishes a prima facie case for recovery by proving execution of the note and a default in payment pursuant to its terms.

Hogan & Co. v. Saturn Management, Inc., 78 A.D.2d 837, 433 N.Y.S.2d 168, 169 (1st Dept. 1980); Shields v. Stevens, 55 A.D.2d 1017, 391 N.Y.S.2d 766, 767 (4th Dept. 1977). Once a holder establishes a prima facie case, the maker has the burden of coming forward with proof of evidentiary facts--not merely conclusory allegations--demonstrating the existence of a genuine and substantial issue regarding the holder's entitlement to payment. Shields, 391 N.Y.S.2d at 767.

National Union, as the bank's [HN10] transferee, received all the rights of the transferor unless the "transferee . . . has himself been a party to any fraud or illegality affecting the instrument or . . . as a prior holder had notice of a defense or claim against it. . . ." U.C.C. § 3-201(1).

Hartel relies on National Union Fire Ins. Co. v. Turtur, 892 F.2d 199 (2d Cir. 1989). In Turtur, the district court found, and the Second Circuit affirmed, that [*13] defendants had

barely raised a factual issue as to whether National Union was aware of the misstatements in the PPM before it issued the bond, (assuming that such knowledge would make National Union such a "party to [a] fraud or illegality affecting the [notes]" as to disable it from improving its position by suing as the Bank's subrogee . . .)

Id. at 206. This finding was based on Turtur's specific factual allegations of incidents and information which might have put National Union on notice of the fraud before it issued the bond.

Hartel alleges that National Union was, or should have been, aware of fraudulent statements in the PPM prior to issuing the bond. He avers that National Union was identified in the PPM as the surety and therefore was an integral participant in the offering; that he was required to sign an indemnity agreement with National Union as part of the investment package; and that National Union received a fee in excess of $ 1,000,000, with additional fees due in future years depending upon the balances unpaid on the investor notes (Hartel 7/25/91 Aff. paras. 14-17).

[HN11] To establish fraud, Hartel must show "the traditional five elements of fraud: [*14] misrepresentation of a material fact, falsity of that representation, scienter, reliance and damages." Mallis v. Bankers Trust Co., 615 F.2d 68, 80 (2d Cir. 1980) (italics in original) (citations omitted), cert. denied, 449 U.S. 1123 (1981).

Even if Hartel sufficiently raised the issue of fraud in the PPM (which, as explained at pp. 6-7 above, he does not), he does not raise a genuine issue of whether National Union was a party to that fraud. National Union made no direct representations to him concerning the

investment. It was not the author of the PPM, and the alleged facts and circumstances regarding its role show no basis from which its knowing participation in the alleged fraud could be inferred. Accordingly, Hartel has not raised a genuine issue whether National Union was a party to any fraud or illegality affecting the instrument. See National Union Fire Ins. Co. v. Woodhead, 917 F.2d 752, 757-58 (2d Cir. 1990). n3

> n3 Nor should the assumption in which this court indulged in Turtur (that knowledge of misstatements might render National Union a "party" to a fraud) be extended here. Under U.C.C. § 3-201(1) mere "notice of a defense" (such as fraud or illegality) does not disable the transferee unless the transferee had that notice as "a prior holder" -- which indisputably National Union was not. Further, National Union owed Hartel no fiduciary duty, and was under no obligation to disclose to him deficiencies in the PPM of which it became aware in the course of making its own investigations for its own purposes. See Woodhead, 917 F.2d at 758.

[*15]

It is undisputed that National Union was not a prior holder of the note and did not transfer the note with knowledge of any defense or claim against it. Therefore, National Union, as the bank's transferee, enjoys all the rights of a holder in due course. See id. at 758 (even if National Union could not itself be holder in due course,

it still could be entitled to rights of holder in due course as transferee of holder in due course).

Hartel had no defenses to payment against the bank, which was a holder in due course. National Union is entitled to summary judgment on the note as the bank's transferee.

3. National Union's Rights Under the Indemnity Agreement

In Turtur, 892 F.2d at 203-05, the Court of Appeals held that if an indemnity agreement is part of a package of interdependent contracts, one of which was induced by a fraud to which the plaintiff was a party, all of the contracts in that package may be unenforceable by that plaintiff. The court held that the interdependency of contracts "boils down to the intent of the parties", and that "questions of intent . . . are usually inappropriate for disposition on summary judgment." Id. at 205. [*16]

Here, even assuming that Hartel raises a genuine issue of interdependence of the contracts, he does not raise the issues of fraud by third parties or of whether National Union was a party to any fraud because, as explained above, he has not alleged any facts or circumstances from which National Union's knowing participation in fraudulent activity can be inferred.

Hartel has not raised a genuine issue of fact regarding National Union's right to enforce the indemnity agreement.

CONCLUSION

Hartel's motion to transfer is denied. National Union's motion for summary judgment is granted.

32



# In the Supreme Court of Bermuda

## IN THE SUPREME COURT OF BERMUDA

### CIVIL JURISDICTION

### 1997: No. 67

BETWEEN

     (1)    **GAVIN WILSON**

     (2)    **WILLIAM CRAIG**          **Plaintiffs**

v.

     (1)    **FIRST BERMUDA SECURITIES LIMITED**

     (2)    **F.B.S. NOMINEES LIMITED**

     (3)    **LINDA MILLIGAN-WHYTE**

     (4)    **JOSEPH TAUSSIG**

     (5)    **JEREMY CONYERS**

                                      **Defendants**

There are two summonses before the Court. The first summons seeking order for strike out of the Plaintiffs Writ and Statement of Claim which was filed on the 9th May 1997 by the first, second and fifth Defendants pray orders that the Plaintiff's Statement of Claim dated the 9th April, 1997 be struck out on the grounds that the Statement of Claim;

    1.    discloses no reasonable cause of action and/or

    2.    is scandalous, frivolous or vexatious; and/or

    3.    is otherwise and abuse of process of the court.

The Second Summons which was filed on the 14th May 1997, by the Third Defendant pray Orders that the Plaintiff's said Writ and Statement of Claim be struck out on the grounds:

    1.    that they disclose no reasonable course of action; and/or

2                                    33

2.    that they are an abuse of the process of the court under the provisions of Order 18

Rule 19 of the Rules of the Supreme Court.

An Order is also sought that the said Writ and Statement of Claim be struck out.

3.    under the inherent jurisdiction of the Court.

## Statement of Claim

The thrust of the Plaintiffs complaint can be gleaned from paragraphs 2,3,4,5, 9 to 12 and 17 to 22 of the Statement of Claim which pleads *inter alia* that.

2.    In recognition of the time and effort given by Craig in the establishment of the company Wilson agreed with Craig in 1986 (hereinafter referred to as "the 1986 agreement") to transfer to Craig all rights to any distribution of cash or property made by BCL as a dividend and to cooperate with Craig in the exercise of rights attached to Wilson's shares and to transfer to Craig half of his shareholding provided that this did not infringe the laws of these Islands governing the percentage of voting rights which may be owned by non-Bermudians. (The 1986 agreement will be relied upon at the trial hereof for its full terms and effect).

3.    At all material times the First Defendant, First Bermuda Securities Limited (hereinafter referred to as "FBS"), was a local company incorporated and existing according to the laws of the Islands of Bermuda carrying on business as investment advisers and brokers.    At all material times the Second Defendant (hereinafter referred to as "Milligan-Whyte"), the Third Defendant (hereinafter referred to as "Taussig") and the Fourth Defendant (hereinafter referred to as "Conyers") were directors of FBS and/or authorised by FBS to carry on the negotiations hereinafter described on behalf of FBS and directors and/or agents of the 2nd Defendant, F.B.S. Nominees Ltd., (hereinafter referred to as "Nominees").  Nominees is and was at all material times a local limited liability company organized and existing in accordance with the laws of these Islands with the object (*inter alia*) of acquiring and holding shares as principal, agent or nominee for others.

4.    In or about the early part of December, 1991 Wilson and Craig met with Milligan-Whyte, Taussig and Conyers acting as aforesaid with a view to the acquisition by FBS (or its nominee) of an option to purchase all of Wilson's shares in BCL (free and clear of any restrictions on the exercise of the rights attached to such shares in favour of Craig or his entitlements to the distributions in respect of the same under the 1986 agreement or otherwise).

5.    The said negotiations resulted in an offer by FBS to Wilson whereby Wilson would enter into a written option agreement entitled "Option" with Nominees and FBS would procure that Nominees enter into two written option agreements entitled respectively "Call Option" and "Put Option" with Craig.

9.    In the course of the negotiations it was represented by Milligan-Whyte Taussig and Conyers acting within the scope of their authority as agents of FBS and Nominees.

    a) that Nominees had an authorised share capital of BD$20,000 divided into 20,000 common shares at par value of BD$1.00 each.

    b) that only 12,000 shares of its said authorised capital were issued.;

    c) further or in the alternative, that the Call Option agreement was enforceable by Craig in accordance with its terms.

10.    The said representations were made by Milligan-Whyte, Taussig and Conyers, acting as aforesaid by their conduct in tendering in accordance with the said FBS offer the Call Option agreement [ and the Put Option agreement] for execution by Craig.....

11.    The said representations were made by FBS and Nominees and by Milligan-Whyte, Taussig and Conyers acting as aforesaid with knowledge that they were untrue, or recklessly as to whether or not they were true and with the intention of inducing Wilson to accept the FBS offer and to enter into the Option agreement with Nominees and with the intention of inducing Craig to enter into the Call Option [ and Put Option] agreement.

12.    (a) It was reasonable for Wilson to rely upon ( and he did rely upon) the said representations in accepting (as he did) the FBS offer on the 11th day of December, 1991 (hereinafter referred to as "the FBS agreement") and in entering into the written Option agreement with Nominees (as he did) on the same day whereby Nominees obtained the right to acquire Wilson's' shares in BCL on the terms and conditions contained therein.

    (b) It was reasonable for Craig to rely upon (and he did rely upon) the said representations in entering into (as he did) the Call Option (and Put Option) agreement with Nominees at the same time.

    13....

    14....

    15.....

    16.....

4                                    35

17.    On the 1st day of July, 1996,  pursuant to the terms of the Call Option agreement Craig caused a written notice of his intention to exercise his option to acquire 8,000 shares of Nominees together with the agreed purchase price of BD$8,000 to be delivered to Nominees at its registered office.    However, Nominees failed and refuses to issue him the said shares.

18.    In an action commenced by Craig in this Honorable Court (Action NO 328 of 1996) for an order to compel Nominees to issue the said shares Nominees by way of defence asserted that:

"4.    Clause (I) of the Preamble to the Call Option expressly provided that the Defendant represents that it has an authorised share capital of BD$20,000 divided into 20,000 common shares at a par value of BD$1.00 each".  This representation was made by mistake and/or was false.   The authorised and issued share capital of the Defendant Company was at all material times, and remains BD$12,000 divided common shares at a par value of BD$1.00 each".

19.    On the 17th December 1996 Craig caused a letter of the same date to be delivered to Nominees and to FBS requesting that the necessary steps be taken to cause the share capital of Nominees to be increased to enable the 8,000 shares promised to him under the Call Option agreement to be issued. However, Nominees and FBS have failed and refuse to respond to the said letter.

20.    By reason of the said failure and refusal of Nominees Craig is unable to exercise his rights and obtain the benefits which he was promised under the Call Option and Put Options agreements.  Had he been issued the said 8,000 shares promised to him by the terms of the Call Option agreement he would have been able to compel and would have compelled Nominees to purchase the same for the sums payable under the Put Option agreement.

21.    By reason of the matters aforesaid, Wilson has suffered loss and damage in the said amount (for part of which he is accountable to Craig) and is entitled to recover the said sum (a) from FBS, Milligan-Whyte, Taussig and Conyers jointly and severally as damage for the misrepresentations referred to in Paragraph 9 above; and/or (b) from FBS as damages for breach of the implied warranties referred to in Paragraph 13 above.

5                                    36

22.   Further or in the alternative, by reason of the matters aforesaid Craig has suffered loss and damage in the said amount (for part of which he is accountable to Wilson) and is entitled to recover the said sum (a) from FBS, Milligan-Whyte, referred to in Paragraph 9 above; and/or (b) from Nominees for breach of the implied warranties referred to in Paragraph 14 above.

I shall deal first with the Third Defendant's summons.

Mr Wolinski, Counsel for the Third Defendant argued that the case against the Third Defendant ought to be struck out on 3 grounds:

## THIRD DEFENDANT'S GROUND I

### The Put Option Misunderstanding

"First, Mr Wolinski contended that the Plaintiffs' case as pleaded in paragraph 18 of the Statement of Claim is based on a fundamental misinterpretation of the true terms and effect of the Put Option agreement.   The Put Option Agreement was enforceable only by Nominees against Craig, not vice versa. As Craig could not in any event compel Nominees to purchase the 8000 shares hoped to purchase under the Call Option Agreement, Mrs Milligan-Whyte cannot be said to have caused the loss of which he complains.   On this clear and unarguable basis, the Plaintiff's claim is bound to fail".

As to first ground Mr Wolinski submitted that on the pleading as it stands the contract does not meet what the Plaintiff say in the pleading.   The put options agreement was an option granted by Craig to Nominees.  It was an option exercisable by the Nominees on or before June 30, 1997, only if Craig had exercised the call option.   If Craig had exercised the call option only the Nominees could purchase the shares by giving notice to the sellers.  Craig could not compel Nominees to exercise its put option to buy back the 8,000 shares.  Consequently Mrs Milligan-Whyte cannot be said to have caused the loss of which their is complaint.  Therefore the Plaintiffs' claim is bound to fail on this clear and unarguable basis.

Mr Kesseram responded that it is only if it is clear and obvious that the meaning and effect of the documents is as the 3rd Defendant says that is an option exercisable by Nominees only at its discretion, that the court would be entitled to say at this stage that this action is an abuse of the process of the court.   But the Plaintiffs' say it is not plain and obvious.

Mr Kesseram stressed if there is some ambiguity in the meaning, the court is entitled to look to the words used in the contract against the background of facts to ascertain what was the intention of the parties as well as the commercial purpose of the contract.

6

37

Mr Kesseram maintained that it is sufficient to plead what the pleader construes to be the meaning and effect of the contract without setting out the background facts to support the allegation - See Order 18 Rule 7 The Supreme Court Practice, 1997, Vol. I at Page 294 - and no issue has been joined on the pleadings.

Further Mr Kesseram said that the court does not have all the relevant facts. The court has the Option agreement, the Call Option agreement and the Put Option agreement only. However it is clear that there are two clerical errors in the Put Option agreement namely: in paragraph 2 the word "PURCHASER" should be transposed for the word SELLER where it first appears; and in paragraph 6 the word "SELLER" should be transposed for the word PURCHASER.

Mr Kesseram contended that it is clear from the three agreements that were executed on the same day that Craig was to have the right to "put" that is, to compel Nominees to purchase the shares. These two simple changes would allow the document to read with internal and external consistency. There is evidence that there were clerical errors and the court would be at liberty at the trial of this action in construing this agreement to correct these misnomers. See NITTAN (U.K.) Ltd. v SOLENT STEEL FABRICATION LTD. (1981) 1 LLOYD'S REP. 633 BRIGHTMAN, L. J. p. 639.

At this point Mr Wolinski countered the assertion that there is a typographical or clerical error is not pleaded, and there is no evidence before the court that there is a mistake, and there is no plea of rectification or common error before the court. Further the document on its face makes perfect sense. There is nothing obvious if one reads the document and the court will give the document the meaning which the words on the face means.

**Court**

If one assumes for the purposes of this application that the Plaintiffs have or either of them has suffered any actionable loss and damage, and also assume in the Second Plaintiff's favour that he was entitled to have the Second Defendant issue 8,000 shares to him under the Call Option agreement; I would agree with Mr Wolinski that any actionable loss or damage would not have been caused by the Third Defendant Mrs Milligan-Whyte. It would appear, without proof, that any such loss and damage would have been caused by FBS Nominees' failure to issue the 8,000 shares to William Craig under the Call Option agreement. The probability is that any such loss and damage would have been caused by the Second Defendant's failure to issue 8,000 shares of Capital Stock to the Second Plaintiff under the Call Option agreement.

The "Put Option" agreement in part reads....

> (i) WHEREAS the SELLER [William R. Craig - Party to the First Part] represents

7

38

that he is in a position to sell 8,000 Common Shares of the par value of $1,000 each ("the Optioned Shares") in the capital stock of F.B.S. Nominees Ltd.

(ii) AND WHEREAS the PURCHASER [FBS Nominees Ltd - Party to the second part] has agreed to purchase all or any part of the Optioned Shares at the price and on the conditions and terms hereinafter stated:

(iii) AND WHEREAS the PURCHASER has previously exercised an option to purchase 726,414 shares of Bermuda Cablevision Ltd from W. Gavin Wilson ("the WILSON OPTION").

NOW THEREFORE IN CONSIDERATION of the premises and of the sum of $8,000 in lawful Bermuda dollars (the receipt of which is hereby acknowledged by the SELLER) this Agreement witnesseth as follows:

(1) The SELLER [the first Plaintiff] hereby grants unto the PURCHASER [the Second Plaintiff] the sole and exclusive option irrevocable within the time hereinafter limited to purchase all or any part of the Optioned Shares and the PURCHASER agrees to pay $1.00 for each of the shares, "put to it ....

(2) The said option shall be exercisable at any time up to 11:59 p.m. on the 30 th day of June 1997, by delivering a written Notice to the PURCHASER at its address hereinbefore mentioned, provided the call option granted to the SELLER by the PURCHASER has been exercised.

(3) This Option may be exercised by the SELLER or its successors or assigns and may be transferred without restriction.....

(4) ............

(5) ......

(6) This Option shall be fully negotiable and may be sold or assigned during the Term of the option without restriction".

Under the Put Option agreement the seller, William Craig, the Second Plaintiff, represented that he was in a position to sell 8,000 common shares in the capital stock of FBS Nominees Ltd. FBS Nominees the Purchaser, agreed to purchase all or any part of the optioned shares (the 8,000 common shares).

For consideration the seller William Craig, granted the Purchaser (FBS Nominees Ltd) the sole and exclusive option irrevocable within a specified period, that is exercisable at any time up to 11:59 p.m. on the 30th June 1997, to purchase all or any part of the optioned shares.

It seems clear therefore that on the face of the Put Option agreement in accordance with the plain and ordinary meaning of the words, it was F.B.S. Nominees Limited, the Second Defendant which was in a position if it wanted to enforce the Put Option. Further it seems that the FBS Nominees was not obliged to purchase all of the optioned shares. It had the option to

9

40

remedy is against the Second Defendant. As to how the latter may satisfy a successful claim against it is an entirely different matter.

It is to be noted that by Clause 2 of the Put Option agreement the Option was exercisable in the manner set out therein, provided that the Call Option granted to the SELLER [ the Second Plaintiff] by the PURCHASER [ the Second Defendant] has been exercised. In my view that lends further credence to the Third Defendant's contention that there has been no misnomers in the Put Option agreement. The Call Option has not been exercised; accordingly the proviso was not satisfied and the Put Option could not have been exercised.

The Second Plaintiff was never in a position to put the shares to the Second Defendant. In my view, whatever the position and whether or not the Second Plaintiff could have compelled the Second Defendant to purchase the Optioned shares, the Third Defendant was not the cause of the inability on the part of the Second Plaintiff to put the share to the Second Defendant. It was, if anyone, the Second Defendant which would or might be responsible for that frustration of the Call Option to the Second Plaintiff's disadvantage.

## THIRD DEFENDANT'S GROUND II
### No Causation of Loss Point

As to the Second Ground Mr Wolinski said that "The Statement of Claim on its face does not allege that Mrs Milligan-Whyte caused the damage complained, namely loss of bargain or opportunity to make a profit. The tort of deceit or fraudulent misrepresentation, the only claim asserted against Mrs Milligan-Whyte (who was not a party to the relevant contracts and has no contractual liability) is not actionable without proof of damage, and no damage is alleged by the Statement of Claim to have been caused by Mrs Milligan-Whyte. The Plaintiffs' claim is accordingly bound to fail".

For the purpose of this submission Mr Wolinski has asked the court to assume that the contract is written the way the Plaintiffs say it is written.

Mr Wolinski submitted on the face of their pleaded case the Plaintiffs claim the sum of $13,768,768.00 as damages arising from the failure of Nominees to comply with Craig's request by letter dated 12th December 1996, to increase its share capital to enable the 8,000 shares promised to him under the call option agreement to be issued to him and the Nominees haven't exercised the option.

Mr Wolinski argued on the Plaintiffs pleaded case the damage sustained was caused by Nominees failure when requested to issue the 8,000 shares it agreed to. No damage was caused by the 3rd Defendant for which she is liable to the Plaintiffs. It simply isn't her fault Craig isn't getting his shares. On this basis alone the Plaintiffs claim is bound to fail and should be struck

10

**41**

out as an abuse of process of the court.    [See paragraphs 17-22 of the statement of claim]
Additionally according to Mr Wolinski the claim is bound to fail, the Plaintiffs pleaded the wrong
measure of damages.    The cause of action in the tort of deceit or fraudulent misrepresentation is
only actionable on proof of damage.    Even if the court assumes that sufficient particulars pleaded
for fraudulent claim and even if the court assumes that the Third Defendant is deceitful the
damage is not caused by that misrepresentation.    The loss must be suffered as a result of relying
on the misrepresentation.    The only loss suffered is the price that Craig paid for entering into the
original contract and under this contract Craig paid $10.00.

In response to Mr Wolinski's charge Mr Kesseram responded had the representations been
true Craig would have acquired legally enforceable rights i.e. had the call option been exercisable
in accordance with its terms and the representation true, Craig would have had an action
enforceable in equity for specific performance to compel Nominees to issue 8,000 shares to
satisfy its obligation to Craig.    It requires shareholders approval before share capital can increase
and the shareholders are not parties to the agreement.    The Call Option agreement is
unenforceable consequently the scheme for the payment of the balance of the purchase price is
unworkable.    "The misrepresentation induced them to enter into agreements which (because the
facts were not as they were represented to be) were unenforceable".    And because they were
unenforceable the Plaintiffs have only received part of the value of their shares.    Mr Kesseram said
that paragraphs 21 and 22 of the statement of claim make it plain that this is the Plaintiffs' case
and includes the representations made by the 3rd Defendant which induced the parties to enter
into the agreements in question.

**Court**

The clear allegation in the first sentence of paragraph 20 of the Statement of Claim is that
it was the **Second Defendant's** failure and refusal (to respond to the Second Plaintiff, in the
circumstances set out in paragraph 19 of the Statement of Claim) which gave rise to the Second
Plaintiff's inability to exercise and to obtain the benefit of the Call Option agreement.    It would
therefore have been the Second Defendant which would have caused any loss and damage
although I do not have to decide that point.

There is no allegation that it was the Third Defendant who was the cause of that inability
on the part of the Second Plaintiff to benefit from the Call Option.    Indeed it is difficult to see
how such an allegation could be made out.    The second sentence of paragraph 20 of the
Statement of Claim reinforces the view that whatever loss or damage the Second Plaintiff may
have suffered, it was the Second Defendant, not the Third Defendant, which was the cause of
such loss and damage.

There is a further allegation in the second sentence of paragraph 20 of the Statement of
Claim which is noted; that is, that had the Second Defendant issued in favour of the Second
Plaintiff the 8,000 shares under the Call Option agreement, the Second Plaintiff would have been

11                                                  42

able to compel and would have compelled the Second Defendant to purchase them. Given the Second Defendant, under the Put Option agreement, had an Option which it might or might not exercise, it is difficult to see how the Second Plaintiff could have compelled the exercise of the Option by the Second Defendant, a contradiction in terms.

There is of course an allegation by the First Plaintiff, Gavin Wilson, in paragraph 21 of the Statement of Claim that by reason of all the matters in the Statement of Claim, the First Plaintiff had suffered loss and damage in the sum of BD$13,768,768 and that the First Plaintiff was entitled to recover that sum jointly and severally "(a) from ", *inter alia*, the Third Defendant, "as damages for the misrepresentations referred to in Paragraph 9 ...... ; and/or (b) from FBS [the First Defendant] as damages for breach of implied warranties referred to in Paragraph 13 above".

Dealing first with the allegation against the Third Defendant: the allegation in paragraph 9 of the Statement of Claim is of representations made by, *inter alia*, the Third Defendant acting within the scope of [her/their] authority as agents for FBS [ the First Defendant] and Nominees [ the Second Defendant].

On the case, as is pleaded by the Plaintiffs, the named Defendants including the Third Defendant, having acted within the scope of their authority and as agents, the action should be directed at the principal(s), the First and Second Defendants; not the agent(s) in which capacity the Plaintiffs plead the Third Defendant had acted.

So far as the Third Defendant is concerned it is not necessary to deal with the allegations in paragraph 13 of the Statement of Claim against the First Defendant respecting alleged breaches of implied warranties. The Third Defendant was not a contracting party.

There is a further or alternative allegation by the Second Plaintiff, in paragraph 22 of the Statement of Claim. It is that by reason of all the matters in the Statement of Claim, the Second Plaintiff has suffered loss and damage and is entitled to recover the sum jointly and severally from, inter alia, the Third Defendant "... as damages for the misrepresentations referred to in Paragraph 9 above; and/or (b) from Nominees [ the Second Defendant] for breach of the implied warranties in Paragraph 14 above." My observations, in respect of paragraph 21 of the Statement of Claim apply, *mutatis mutandis*, to the allegations in paragraph 22 of the Statement of Claim and for that reason are not now repeated.

In my view on the Plaintiffs' pleading the proximate cause of any loss which may have been suffered would be the Second Defendant.

12

43

## THIRD DEFENDANT'S GROUND III
### Defective Pleading: Fraud

"As to the Third Ground Mr Wolinski advanced that the Statement of Claim fails to plead with sufficient particularity a case of fraudulent misrepresentation against Mrs Milligan-Whyte. It is well established by Bermudian authority that if allegations of wilful neglect or fraud asserted against directors are not adequately pleaded, the offending portions of the Statement of Claim will be struck out".

Mr Wolinski argued that the person accused of fraud must know with a high degree of certainty what is the case they must meet.

Paragraph 11 of the claim alleges fraudulent misrepresentation that is false representations knowingly or being reckless as to whether or not the representations were true. This requires particulars of the misrepresentations itself and particulars of any fraudulent conduct and/or intention relied on and no such particulars are given as against the Third Defendant.

Mr Wolinski maintained that no case was pleaded against the Third Defendant. Allegations of dishonesty must be supported by full particulars otherwise the pleading will be liable to be struck out.

For example argued Mr Wolinski paragraph 11 of the statement of claim contains the only assertion of fraud. There is no plea what the Third Defendant knew versus what the other Defendants knew. Mr Wolinski posed the question how can one plead to this? As he sees it the only way one would be able to plead to this would be by general traverse.

As a further example he said Paragraph 21 suggests a joint design or a joint venture and the fact that it is a joint allegation makes it objectionable.

As to paragraph 22 Mr Wolinski maintained that one cannot make a collective allegation against a Board of Directors one has to particularise against each director on this basis alone the pleading is embarrassing.

Mr Kesseram argued inter alia all material particulars to plead a good cause of action for fraudulent misrepresentation have been pleaded namely a representation, made by the Defendant, which was false, to the knowledge of the defendant or as to the truth of which the defendant was reckless, which was intended to induce the Plaintiff to enter in a contract as a result of which he suffered loss.

He argued the Third Defendant's complaint that no particulars of the conduct in tendering the contract in which the misrepresentations were contained have been pleaded and can be

13

44

addressed by a request for further and better particulars. He stressed the Third Defendant is not embarrassed in any way. The matters that must be met when the parties go to trial are clear.

Mr Kesseram further stated that the Third Defendant also complains that no particulars of the fraudulent intention conduct are given. He added the law requires the conduct which is alleged to be fraudulent be pleaded and allows fraudulent intent to be inferred.

Mr Kesseram maintained that the Third Defendant fails to mention the other facts pleaded to support an inference of "guilty knowledge," namely, a) she took part in negotiations as a director of a company b) these negotiations culminated in (inter-alia) an agreement between that company and one of the Plaintiffs which contained false representations, c) the Third Defendant was a party to the tendering of the agreements for execution by the Plaintiffs in pursuance of the agreed scheme for acquisition of the Bermuda Cablevision shares.

Mr Kesseram stressed to the extent that the Third Defendant submits that only knowledge that a statement is false will suffice to prove fraudulent misrepresentation, the submission is wrong in law...... recklessness will also suffice. Further to the extent that the Third Defendant submits that only a conscious intention to induce the Plaintiff to enter into the agreement in question will suffice, again the submission is wrong in law. It is sufficient if the representation was made under such circumstances that the representor must have supposed that it would probably induce a person in the position of the representee to act upon it. Ultimately it is a question of evidence and proof for the trial judge.

## Court

I turn now to the allegations in paragraph 11 of the Statement of Claim, the relevant paragraph in the pleading:

It is apparent from the Prayer that no claim has been made for damages for misrepresentation, fraudulent or otherwise. The claim is for liquidated damages in the amount of BD $13,768,768, a sum calculated by reference to the Schedule to the Put Option Agreement, a liquidated sum and apparently based on breach of the Put Option Agreement. The Plaintiffs have made it clear that their action has been brought to "... recover the balance of the purchase price..." The Third Defendant was not a party to the Put Option agreement and can have no contractual liability under that agreement. In the circumstances it seems to me proper that the case against the Third Defendant ought to be struck out irrespective of any allegation of fraud.

I approach this issue bearing in mind the following principles:

Particulars cannot take the place of necessary avernments in a pleading; See Vol. 1. Supreme Court Practise 1997, page 308, note 1 to O 18 R 12, (second to last and last paragraph).

In **PINSON v. LLOYDS AND NATIONAL PROVINCIAL FOREIGN BANK LIMITED** [1941] 2 KB 72, C.A. Scott, L.J. said, p. 75.

"All the materials facts constituting the cause of action ought already to have been plainly stated in the pleading itself... the plainest and most fundamental of all the rules of

14                                          **45**

pleading. The proper function of particulars is not to state the material facts omitted from the statement of claim in order, by filling the gaps, to make good an inherently bad pleading, however common that pernicious practice may have become."

In argument Mr Kesseram maintained that the Third Defendant's complaint as to the pleading deficiencies is a matter for further and better particulars. I do not accept this contention When fraud, negligence or misconduct is imputed to an opponent the facts must be stated with **"especial particularity and care"** : See Vol. 1. Supreme Court Practise 1997, ibid.    The Plaintiffs assert in their argument that the Third Defendant was the Second Defendant's Company Secretary but acknowledge that that fact has not been pleaded although it might be a primary fact from which an inference of knowledge adverse to the Third Defendant might be drawn.   When or if pleaded that may or may not add fuel to the Plaintiffs' contentions as any other matters arising from discovery. The fact is that the matter has not been pleaded presently.

Fraudulent conduct must be distinctly alleged (and distinctly proved) **and it is not allowable to leave fraud to be inferred from the facts**: See Vol. 1, Supreme Court Practice 1997, page 310, sub-paragraph (15):

> In **DAVY v GARRETT** [1877] 7 Ch. D. 473, 489 CA, Thesiger, L.J. said:
> "........ no rule was more clearly settled than that **fraud must be distinctly alleged** [emphasis added]........ and that **it was not allowable to leave fraud to be inferred** from the facts [emphasis added] ......... It may not be necessary in all cases to use the word "fraud" - indeed in one of the most ordinary cases it is not necessary.   An allegation that the Defendant made to the Plaintiff representations on which he intended the Plaintiff to act, which representations were untrue, and known to the Defendant to be untrue, is sufficient. The word "fraud" is not used, but two expressions are used pointing at the state of mind of the Defendant - that he intended the representations to be acted upon, and that he knew them to be untrue.   It appears to me that a Plaintiff is bound to show distinctly that he means to allege fraud.  In the present case facts are alleged from which fraud might be inferred, but they are consistent with innocence.  They were innocent acts in themselves, and it is not to be presumed that they were done with a fraudulent intention".

I do not accept the Plaintiffs' contention that the time and place of the alleged tendering of the contract is immaterial and given the number of persons involved; or that it is a matter which should be inferred in the Plaintiffs' favour, I cannot accept that the Statement of Claim contains sufficient allegations of fact from which knowledge of untruth of the representations in the Put Option agreement may be inferred even if it were right that such inferences might be drawn. The mere taking part in negotiations as an agent acting within the scope of authority, the mere tendering of documents and the content of those documents on the face of the pleading do not allow of an inference of the alleged knowledge of untruth on the part of the Third Defendant (or others).

An allegation that a party has been guilty of  bad faith equates to an allegation of dishonesty, though not necessarily for a financial motive, and proper particulars of such an allegation must be pleaded, otherwise the allegation will be struck out: See Vol. 1, Supreme Court Practise 1997, page 308, sub-paragraph (11).

15                                    46

In MARRINER v. THE BISHOP OF BATH AND WELLS [1893] P. 145. Lord Penzance
said, page 146:

> "Then comes the question of particularity. It is a very old question, and
> one which always arises in these suits, and it always comes to this - that the
> Court will require of him who makes a charge, that he shall state that
> charge with as much definiteness and particularity as may be done, both as
> regards time and place."

I do not think that it is satisfactory in the light of the principles outlined and looking at the
pleading as a whole for the pleading to have alleged simpliciter and in a global fashion, that the
representations, allegedly fraudulent, were made by "FBS and Nominees and by Milligan-Whyte,
Taussig and Conyers..... ".    In my view the Third Defendant's contentions are justifiably
advanced and I accept them.

Further assume in the Plaintiffs' favour that the allegation of fraud has been properly
pleaded. There is no claim for damages based on an allegation of fraud. Is it to be inferred that
such a claim is being made. Paragraphs 21 and 22 of the Statement of Claim point to a contrary
conclusion. The claim is for a liquidated sum and apparently for breach of an agreement. Fraud
might be inferred from the facts alleged but they are consistent with innocence. Further, if any
loss and damage was suffered by the Plaintiffs or either of them it seems clear that it may have
been caused by the Second Defendant I do not think that I need to find that it was so caused and
I do not say so. It was not caused by the Third Defendant.

Still further assume that the representations had been made by the Third Defendant,
leaving aside the Third Defendant having acted as an agent within the scope of her authority, as is
pleaded by the Plaintiffs. Assume also, in their favour that the Plaintiffs or either of them had
been induced by the representations to enter into the agreements referred to in paragraph 11 of
the Statement of Claim. It would seem not to follow, either in logic or of necessity that any loss
or damage resulting (again assuming such loss and damage) would have been caused by the Third
Defendant's actions as pleaded in paragraph 11 of the Statement of Claim. In fact it seems that
no claim in tort is made for any loss and damage flowing from any tortious act; the claim is limited
to a contractual claim for liquidated damages and it is clear the Third Defendant was not a party
to any relevant contract.

I think in the circumstances that the allegations in paragraph 11 of the Statement of Claim
are allegations of matters that would tend to prejudice, embarrass, or delay the fair trial of the
action and that the paragraph ought to be struck out. I so order.

Additionally if we assume that I am wrong in respect of all the matters set out above, it
appears nevertheless that the Plaintiffs have an insurmountable obstacle so far as making good
their claim is concerned. It does not appear, on the fact of the three agreements pleaded in
paragraph 6 of the Statement of Claim, that there was any understanding and acceptance by the
parties to those agreements as is pleaded in paragraph 7 of the Statement of Claim; that they

16                                                           47

would be interdependent and indivisible transactions to the extent alleged in that paragraph of the pleading.

No collateral agreement is pleaded.   In effect what the Plaintiffs appear to seek to do is to rely upon an oral understandings to contradict the clear terms of the written agreements, which later record no such understanding or acceptance.     The words of the agreements are in themselves clear and no question of construction seems to arise for consideration in this regard. These were commercially minded parties and if they were so minded it would be odd indeed that they had not caused such understandings and/or acceptances to be written into the agreements or any of them.

Additionally,   although I have not been addressed on this point I should add that as to the allegation in paragraph 2 of the Statement of Claim it is not pleaded that any Defendant, and certainly not the Defendants whose summons are before the Court, knew of or ought to have known of the agreement there pleaded.   I merely say that I do not see how, if it be alleged to be the case, that any loss under the agreement which may be the subject of a claim by the Plaintiffs against the Defendants or either of them, could be recovered under the principles in **Hadley v Baxendale** (1854) 9 Exch. 341 and **Victoria Laundry (Windsor) v Newman Industries** [1949] 2 KB 928 as to remoteness of damage.

I now turn to deal with the first, second and fifth Defendants' summons.

Mr Hall on behalf of the first, second and fifth Defendant said that he adopts and fully relies *"very heavily"* on the submissions advanced by Mr Wolinski and does not wish to add anything to the principal arguments.   Mr Hall described the statement of claim as *"obviously and incontestably"* bad.   His additional submission and Mr Kesseram's response is a matter of record.

In light of the forgoing analysis of the issues although I have considered the other arguments that have been advanced before me on behalf  of the parties   I do not think it is necessary to deal with them.

In my judgment after examination of the allegations against Mrs Milligan-Whyte the Third Defendant and Mr Conyers the Fifth Defendant the Statement of Claim discloses no reasonable cause of action.   The alleged cause of action against them is clearly unsustainable and should be struck out in its entirety.   I so order.

As regards the First and Second Defendant,   I do not find that the Plaintiffs have pleaded the material facts of their fraud allegation with "especial particularity and care" to call upon them to answer consequently I hereby order that paragraph 11 of the Statement of Claim  be struck out.

17                                                          48

     As regards the remainder of the pleading, though in some respects open to criticism there is sufficient pleaded to call upon the First and Second Defendant to answer the allegations and I so order.

N.M. Wade-Miller, P.J.

Dated _____ day of December, 1997.