UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
                                    :

Gregory V. Serio, Superintendent of Insurance     :      04 CV 3361 (KMK)
of the State of New York, as Rehabilitator of      :
FRONTIER INSURANCE COMPANY, and as       :
Assignee of PLATINUM INDEMNITY, LTD.,      :
                                      :

                             Plaintiff,     :      **REPLY DECLARATION**
                                      :      **OF ANDREW MCCOMB**

                 -against-           :
                                      :

DWIGHT HALVORSON INSURANCE          :
SERVICES, INC. d/b/a/ F.S.I.M. INSURANCE    :
SERVICES and FOOD SERVICE INSURANCE    :
MANAGERS, INC.,                       :
                                      :

                        Defendants.     :
                                      :
------------------------------------------------------------------------x

        ANDREW MCCOMB, pursuant to 28 U.S.C. § 1746, being of full age, hereby

declares as follows:

             1.      I am the President and Chief Executive Officer of Allegro Insurance and

Risk Management Ltd., a provider of insurance management services based in Hamilton,

Bermuda.

             2.      I respectfully submit this Reply Declaration in further support of the

motion for partial summary judgment brought by the plaintiff in the above-captioned matter,

Gregory V. Serio, Superintendent of Insurance of the State of New York, as both the

Rehabilitator of FIC and Assignee of Platinum.

             3.      I have personal knowledge of the facts set forth herein, based on my direct

involvement with the business transactions at issue in this case, as well as a review of my files

with respect to the subject matter of this litigation.

4.      I have read the Declaration of Dwight Halvorson, president of the corporate defendants in this matter.  Therein, Mr. Halvorson appears to contend that I fraudulently induced him into executing the Note.  Mr. Halvorson also apparently maintains that the Note is not supported by adequate consideration and therefore is unenforceable.

5.      Mr. Halvorson's assertions in this regard are -- at best -- demonstrably inaccurate.  Moreover, I submit that Mr. Halvorson's assertions on their face are implausible given the fact that the Note was Mr. Halvorson's idea (not mine), and that it was I (not he) who needed to be convinced to accept the Note as security in lieu of the cash contribution my company was contractually entitled to at the time.  Under these circumstances, the notion that Mr. Halvorson was induced into doing anything is ridiculous.

6.      On a more fundamental level, Mr. Halvorson's assertion that I somehow defrauded his company is highly offensive and wildly irresponsible.  In the seven years since I first did business with him, Mr. Halvorson has never once even suggested to me that I made any misrepresentations to him or otherwise acted improperly.  That he would make such grave allegations about me at this late juncture is, I submit, a reflection of his desperation in attempting to avoid the consequences of the plain language of the Note that was his idea to begin with and which he freely executed.

### The Alleged Misrepresentations

7.      Mr. Halvorson appears to contend that I made two "misrepresentations" upon which he relied in executing the Note.  First, Mr. Halvorson focuses on my statement that there was a shortfall in the funds Platinum was supposed to have received in connection with the FSIM Program.  Second, Mr. Halvorson focuses on my statement that Bermuda authorities would commence legal proceedings against FSIM if that funding deficiency was not remedied.

8.      I first will address Mr. Halvorson's baseless assertion that I made misrepresentations to him regarding the shortfall of funds that were to have been forwarded to Platinum.

9.      At paragraph 6 of his Declaration, Mr. Halvorson states that I presented the Note to him "claiming that there was a shortage in the funds Platinum was to have received . . . . " In the following paragraph of his Declaration, Mr. Halvorson states that based on this representation, he "believed that FSIM possibly owed some monies to Platinum" and that he executed the Note in reliance upon this representation.

10.     The fact of the matter is that FSIM itself did owe money to Platinum in connection with Policy Year 1 (i.e., January 1, 1998 - December 31, 1998) of the FSIM Program. This funding deficiency with respect to Policy Year 1 was the catalyst for Mr. Halvorson's execution of the Note.  As I discuss in greater detail below, in an attempt to obfuscate the issues, Mr. Halvorson in his Declaration ignores Policy Year 1 and focuses instead on Policy Year 2, which had nothing at all to do with the Note.

11.     Rather than contend that my representation regarding the funding deficiency was false, Mr. Halvorson at paragraph 8 of his Declaration initially states that "Platinum never provided any proof that the amount stated in the Note was actually owed . . . . " Mr. Halvorson surely knows that this statement is inaccurate.

12.     Platinum regularly forwarded to Mr. Halvorson and his colleagues detailed financial reports with respect to the FSIM Program.  These reports reflected data regarding such matters as gross written premium, investment earnings, losses paid, fees and expenses.  Most significantly of all, these reports also reported on the collateral deficiencies in FSIM's account at Platinum.

13.    For example, on or about October 18, 2000 -- i.e., shortly before Mr. Halvorson executed the Note -- I forwarded to Mr. Halvorson a program financial report for the period ending June 30, 2000.  Note number 7 set forth on the final page of this report reflects that FSIM's account had a negative collateral position for Policy Year 1 of $469,515.00 or -- i.e., precisely the same figure as the principal amount of the Note Mr. Halvorson ultimately executed. A true and correct copy of my October 18, 2000 correspondence, including the referenced program report, is attached hereto as Exhibit A.

14.    Elsewhere in his Declaration, Mr. Halvorson discusses at length an oral agreement he and FIC purportedly reached with respect to Policy Year 2.  Here, Mr. Halvorson is simply attempting to muddy the waters.  As Mr. Halvorson knows full well, the Note at issue here related exclusively to Policy Year 1.  The Note has nothing to do with Policy Year 2. Likewise, any side deal Mr. Halvorson may have reached with a third party with respect to Policy Year 2 has nothing to do with the Note.

15.    For Policy Year 1, FSIM -- not FIC -- was obligated to forward the funds in question to Platinum.  Mr.  Halvorson repeatedly acknowledges this fact.

16.    At paragraph 14 of his Declaration, for example, Mr. Halvorson states that during Policy Year 1, "FSIM made certain payments to Platinum under the Subscription Agreement.  These periodic payments are part of the `Additional Capital Contribution' on Schedule 2 of the Subscription Agreement.  These payments to Platinum were to ensure that Platinum was not exposed to risks for managing the FSIM Program."

17.    At paragraph 16 of his Declaration, Mr. Halvorson states that for Policy Year 1 "DHIS sent the `additional capital contribution equal to 4% of gross written premium under the program' directly to Platinum."

18.    As Mr. Halvorson further concedes at paragraph 26 of his Declaration, "Under the Subscription Agreement, FSIM agreed to provide Platinum `additional capital contributions equal to 4% of the gross written premiums under the program´ on a monthly basis" during Policy Year 1.

19.    Further, at paragraph 27 of his Declaration, Mr. Halvorson states that in Policy Year 1, "FSIM paid in excess of $412,000.00 directly to Platinum as `additional capital contribution´ under the terms of the Subscription Agreement."

20.    The fact is that notwithstanding any direct capital contributions FSIM may have made to its account at Platinum for Policy Year 1 -- the only policy year having any relevance to the Note -- a negative collateral position of $469,515.00 remained in that account at the conclusion of this initial policy year.

21.    It is this funding deficiency relative to Policy Year 1 that was at issue when Mr. Halvorson and I began discussions in the summer of 2000 that culminated in Mr. Halvorson's execution of the Note. The Note Mr. Halvorson and I discussed had nothing to do with the purported agreement between Mr. Halvorson and FIC pursuant to which FIC allegedly agreed to assume responsibility for forwarding to Platinum FSIM's 4 percent capital contribution during Policy Year 2. This much is clear in my correspondence with Mr. Halvorson in the months leading up to his execution of the Note.

22.    On or about May 22, 2000, for example, I forwarded to FSIM correspondence in which I addressed the collateral deficiency in FSIM's account and clearly distinguished between Policy Year 1 (the 1998 underwriting year) and Policy Year 2 (the 1999 underwriting year). A true and correct copy of this correspondence is attached hereto as Exhibit B.

23.     In my May 22, 2000 correspondence to FSIM, I acknowledged that "FSIM has provided the 4% of premium as additional capital for the 1998 underwriting year . . . . " I further noted that these contributions would have been sufficient had the scope of risk assumed in the FSIM Program remained consistent with Mr. Halvorson's initial plans for the program. In fact, significantly higher than anticipated levels of premiums were written during Policy Year 1 and, as I confirmed in my May 22, 2000 correspondence to FSIM, the retention of funds to cover the expenses associated with claims made as part of the expanded program "is the cause for the unfunded [program risk] gap for the 1998 underwriting year." (emphasis supplied).

24.     Subsequent to my May 22, 2000 correspondence with FSIM, I met with FSIM representatives to discuss the unfunded program risk gap for Policy Year 1. (In my initial Declaration, I refer to this unfunded risk gap as a Negative Balance. The two terms refer to one and the same concept -- i.e., the funds FSIM was required to contribute to its account at Platinum to ensure that, as Mr. Halvorson states at paragraph 14 of his Declaration, Platinum itself was not exposed to any risk in connection with the FSIM Program.)

25.     Specifically, on or about June 19, 2000 I met with FSIM representatives to discuss this funding deficiency. It was at this meeting that Mr. Halvorson suggested that one means of remedying the unfunded risk gap (or Negative Balance) for Policy Year 1 was to post a promissory note as collateral in lieu of the cash contribution necessary to close that gap.

26.     Following up on this meeting, on or about July 3, 2000 I forwarded to Mr. Halvorson correspondence in which I thanked him and his colleagues for "taking the time out during your busy period to meet with me to discuss . . . . the funding deficiency." A true and correct copy of this correspondence is attached hereto as Exhibit C.

27.    As I did in my May 22, 2000 correspondence attached as Exhibit B, in my July 3, 2000 correspondence to Mr. Halvorson I distinguished between Policy Year 1 and Policy Year 2.

28.    In the second numbered paragraph of my July 3, 2000 correspondence, I addressed "the 1998 underwriting year," or Policy Year 1. Therein, I advised Mr. Halvorson that "Platinum will consider receipt of a note from FSIM and/or Dwight Halvorson Insurance <u>as collateral for the unfunded risk gap on the 1998 underwriting year.</u>" (emphasis supplied).

29.    In the portion of my July 3, 2000 correspondence dealing with Policy Year 1, I further advised Mr. Halvorson that, based on the most current program information available at that time, "the unfunded risk gap is $496,860.00" -- i.e., roughly the same figure as the principal amount of the Note.

30.    Further, in my July 3, 2000 correspondence I noted Platinum's potential "acceptance of the note as an alternative to cash or letter of credit collateral <u>for the 1998 underwriting year</u> . . . . " (emphasis supplied).

31.    The third numbered paragraph of my July 3, 2000 correspondence addressed Policy Year 2, or the "1999 underwriting year." The Note is not even mentioned with respect to Policy Year 2 because, as stated above, the Note was intended to address only the deficiencies relating to Policy Year 1.

32.    I again wrote to Mr. Halvorson approximately three weeks prior to his execution of the Note. Specifically, on or about October 18, 2000, I forwarded to Mr. Halvorson the correspondence attached hereto as Exhibit A in which I advised that "[f]ollowing our agreement on wording, amount and term of the Promissory Note, we advised our Board, auditors

and authorities that we have collateral in place for the funding deficiency <u>in respect of the first</u>

<u>underwriting year of the FSIM program</u>." (emphasis supplied).

33.    In my October 18, 2000 correspondence, I further advised Mr. Halvorson

that I had reviewed an earlier request to revise the principal amount of the Note "and can confirm

that a revised amount of $469,515 which is detailed as <u>the funding deficiency for Year 1</u> in the

notes to the attached program financial statements is acceptable to us." (emphasis supplied).

34.    I respectfully submit that the correspondence discussed above makes clear

that Platinum and FSIM intended for the Note to address only the funding deficiency or Negative

Balance relating to Policy Year 1.

35.    Thus, Mr. Halvorson's extensive discussion in his Declaration at

paragraphs 16-17, 28-29 and 34 of the oral agreement he claims to have reached with FIC with

respect to funding obligations for Policy Year 2 is irrelevant both to the Note and this motion.

36.    In conclusion, the very best that can be said of Mr. Halvorson's assertion

that I misrepresented anything by stating that there was a "shortage" in the funds Platinum was

expecting to receive from FSIM is that it is inaccurate.  For Policy Year 1, there <u>was</u> a deficiency

in the funds FSIM was obligated to forward to Platinum.  My statement in this regard was

entirely accurate.  To the extent Mr. Halvorson relied on this statement in executing the Note, he

relied on a truthful representation of the facts.  My representation to Mr. Halvorson on this point

certainly provides no basis for FSIM to avoid its obligations under the Note.

**The Alleged Misrepresentation Regarding the**
**<u>Legal Consequences of the Funding Deficiency</u>**

37.    Next, Mr. Halvorson appears to contend that I somehow misrepresented

the legal consequences of FSIM's failure to remedy the Negative Balance.  Specifically, at

paragraph 6 of his Declaration, Mr. Halvorson contends that at the time the Note was executed, I

8

represented that "the Bermuda regulatory authorities would bring legal action against FSIM" with respect to the deficiency and that "[b]y signing the Note . . . DHIS would avoid this."

38.     Significantly, Mr. Halvorson does not even contend that this statement attributed to me was false. Indeed, the statement Mr. Halvorson attributes to me was accurate at the time it was made. It was not a misrepresentation at all.

39.     As my October 18, 2000, correspondence to Mr. Halvorson attached hereto as Exhibit A states, FSIM's execution of the Note was necessary "to avoid any further regulatory complications."

40.     The simple fact of the matter is that the captive insurance industry in Bermuda is regulated and deficiencies of the kind that had developed in FSIM's account with Platinum by the end of Policy Year 1 had attracted the attention of Platinum's auditors and regulators.

41.     Platinum was required to file its business plan with these regulators. Therein, Platinum was described as rent-a-captive that operated on a "fully funded," or "risk-free," basis. Indeed, Platinum received a number of important waivers from the Insurance Act on the condition that we would operate on a risk-free basis. As I explained in my initial Declaration at paragraph 20, the insured or program participant maintaining an account with Platinum (here, FSIM) assumed all of the business risk associated with that program. The serious funding deficiency that had developed in FSIM's account in effect exposed Platinum to risk on the program, in direct contravention of our commitments to regulators regarding our business plan and model.

42.     Through the course of my discussions with Mr. Halvorson regarding the deficiency, I repeatedly warned him that Platinum's auditors had advised that the funding

deficiency was, from a regulatory standpoint, a very serious matter that had to be resolved immediately.

43.    In short, the statement attributed to me with respect to the Bermuda regulators was accurate when made. Once again, if Mr. Halvorson relied on these statements in executing the Note, he was relying on truthful representations regarding the consequences that would flow from FSIM's failure to meet its funding obligations for Policy Year 1. There was no misrepresentation and this truthful statement cannot possibly be construed to have fraudulently induced Mr. Halvorson to execute the Note.

### The Alleged Lack of Consideration

44.    Finally, Mr. Halvorson appears to contend that the Note is unenforceable because it was not supported by adequate consideration. Specifically, at paragraph 4 of his Declaration, Mr. Halvorson maintains that "Platinum provided absolutely nothing for [the] Note . . . ." Mr. Halvorson appears to contend that there was no consideration because "the money for which the Note was signed was paid directly to Frontier."

45.    Mr. Halvorson's assertion relating to an alleged lack of consideration is entirely without merit. As a preliminary matter, these assertions are in direct conflict with the language of the Note. Therein, Mr. Halvorson acknowledged that FSIM was committing to pay the principal amount of the Note in exchange "for value received."

46.    Further, the contention that there was a lack of consideration because FSIM paid certain monies to FIC with respect to the risk gap for Policy Year 2 is baseless. As demonstrated above, the Note was provided to secure FSIM's funding obligation for Policy Year 1. It had nothing to do with Policy Year 2. In essence, the Note secured FSIM's obligation to pay down on a monthly basis the funds it was delinquent in forwarding to Platinum with respect to Year 1. The Policy Year 1 payments from FSIM to Platinum had nothing to do with any

payments FSIM may have expected FIC to make to Platinum on FSIM's behalf for Policy Year 2.

47.    Moreover, in arguing that there was a lack of consideration, Mr. Halvorson ignores the fact that in return for the Note, Platinum agreed to continue participating in and facilitating the FSIM Program. I noted this in my initial Declaration at paragraph 31 and Mr. Halvorson does not dispute the value of Platinum's continued involvement in the FSIM Program.

48.    In addition, FSIM received consideration in exchange for its execution of the Note in the form of Platinum's agreement to forego legal proceedings to resolve the funding deficiency. As I stated in my initial Declaration at paragraph 38, had FSIM refused to execute the Note, Platinum would have commenced legal proceedings to compel FSIM to remedy the funding deficiency. Nowhere does Mr. Halvorson dispute that FSIM avoided this consequence by executing the Note.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on December 29, 2005.

ANDREW MCCOMB

**EXHIBIT A**

# PLATINUM
## PLATINUM INDEMNITY LIMITED

P.O. Box HM 2267, Windsor Place, 3rd floor, 18 Queen Street, Hamilton HM JX, Bermuda
Tel: (441) 295-8495   Fax: (441) 292-1196

---

### FACSIMILE COVER SHEET

---

| | |
|---|---|
| To: Dwight Halvorson | From: Andy McComb |
| Company: FSIM | Date: 18-Oct-00   Time: 14:52 |
| Fax Number: 916-773-0402 | Number of Pages: Seven |

Dear Dwight,

**Promissory Note**

I apologise for my delay in responding to your recent fax concerning the agreed upon Promissory Note. We have been attempting to obtain up to date program information from the ceding company.

Following our agreement on wording, amount and term of the Promissory Note, we advised our Board, auditors and authorities that we have collateral in place for the funding deficiency in respect of the first underwriting year of the FSIM program. We therefore, have to request that the Promissory Note be executed and delivered to avoid any further regulatory complications.

I have reviewed your request to reconsider the amount of the Promissory Note and can confirm that a revised amount of $469,515 which is detailed as the funding deficiency for Year 1 in the notes to the attached program financial statements is acceptable to us. The monthly installments already paid will be applied against this revised amount.

In the event that significant return premiums for Year 1 materialise through cession reports from the ceding company we are agreeable to reviewing the amount of the Promissory Note at that time.

I would appreciate you expediting execution of the Promissory Note and forwarding an original copy to my attention at the above address.

Do not hesitate to contact me direct on 441-295-2749 should you have any questions.

Best regards,

THIS FACSIMILE TRANSMISSION CONTAINS CONFIDENTIAL AND PRIVILEGED INFORMATION INTENDED ONLY FOR THE USE OF THE INDIVIDUAL(S) NAMED ON THE TRANSMISSION SHEET. IF YOU ARE NOT THE INTENDED RECIPIENT YOU ARE HEREBY NOTIFIED THAT ANY DISCLOSURE, COPYING, DISTRIBUTION AND OR THE TAKING OF ANY ACTION IN RELIANCE ON THE CONTENTS OF THIS FACSIMILE TRANSMISSION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE CALL US.

# PLATINUM INDEMNITY LIMITED

# FOOD SERVICE
# INSURANCE MANAGERS INC.

# PROGRAM FINANCIAL REPORT

# JUNE 30, 2000

September 14th, 2000
Prepared by:  G. Dowling
Distribution:  D. Halvorsen  - Food Service Insurance Managers
               A. McComb     - Powerscourt

POWERSCOURT

P.O. Box HM 2267
Windsor Place, 18 Queen Street
Hamilton HM JX, Bermuda
Telephone: (441) 295-8495
Facsimile: (441) 292-1196

## PLATINUM INDEMNITY LIMITED - FSIM

### *PROGRAM CASH FLOW*

#### *For the 3 months Ended June 30, 2000*

| | | Notes | |
|---|---|---|---|
| Opening Cash & Investments | 31-Mar-00 | | $361,197 |
| | | | |
| Inwards Cessions : | Gross Premiums | | |
| | Reinsurance | | |
| | Expenses | | |
| | Losses Paid | | |
| | | | |
| Contributed surplus payments | | | 106,162 |
| | | | |
| Investment Earnings | | 1 | 6,180 |
| | | | |
| LOC Fees | | | |
| | | | |
| Program Fees : | Underwriting | | 0 |
| | Management (1% p.a.) | 2 | 0 |
| | | | |
| *Closing Cash & Investments* | *30-Jun-00* | | $473,539 |

| *Comprised of :* | No.of shares | Market Value | |
|---|---|---|---|
| | | | |
| Bank of Butterfield Money Market fund | 19,438.41 | 18.96 | 368,537 |
| UBS Fixed Deposit | | | 105,002 |
| | | | |
| *Total Cash & Investments* | *30-Jun-00* | | $473,539 |

Note 1 :  Represents movement in marked to market adjustment on holding in TELF and NTB money market fund
Note 2 :  Based on previous quarter average funds and deducted this quarter

| PLATINUM INDEMNITY LIMITED - FSIM |
| --- |

## PROGRAM INCEPTION TO DATE SUMMARY

### *June 30, 2000*                                        *All Policy Years*

|  | Notes | % | Written | Earned |
| --- | --- | --- | --- | --- |
| Gross Premiums Written |  | 100.00 | $19,637,904 | $18,096,475 |
| *Gross Premiums Ceded* |  | 100.00 | $19,637,904 | 18,096,475 |
| Specific and Aggregate Reinsurance |  | 8.00 | $1,351,171 | $1,258,686 |
| *Net Premiums Ceded* |  |  | 18,286,733 | 16,837,789 |
| Expenses :    Fronting Fee | 3 | 5.00 | $981,895 | $904,824 |
| Administration |  | 2.00 | $172,897 | $172,897 |
| Boards, Bureaus & Assessments |  | 3.30 | $735,995 | $672,797 |
| Claims Admin |  | 6.00 | $573,656 | $565,949 |
| Federal Excise Tax | 4 | 0.92 | $182,867 | $168,378 |
| Commission |  | 12.00 | $2,757,795 | $2,516,561 |
|  |  | 29.22 | 5,405,106 | 5,001,406 |
| *Net Premiums Ceded after expenses* |  |  | 12,881,627 | 11,836,384 |
| Losses Paid |  |  | (9,584,998) | (9,584,998) |
| *Net Cession from Frontier* |  |  | 3,296,629 | 2,251,386 |
| Investment Earnings -    on funds held | 5 (a) |  | 32,351 | 32,351 |
| on funds withheld | 5 (a) |  | 138,916 | 138,916 |
| LOC Fees |  |  | 0 | 0 |
| Program Fees -  Underwriting ($25,000 p.a.) |  |  | (50,000) | (50,000) |
| Management  (1% p.a.) | 5 (b) |  | (28,947) | (28,947) |
| *NET LOSS FUND* |  |  | $3,388,949 | $2,343,706 |

| Loss Reserves - | Case |  |  | $4,681,087 | $4,681,087 |
| --- | --- | --- | --- | --- | --- |
|  | IBNR | 75.00% | 6 | $1,318,674 | $185,724 |
| Total Reserves |  |  |  | $5,999,761 | $4,866,811 |

### *Reconciliation to Cash & Investments*

| Net Loss Fund - Written Basis (per above) | $3,388,949 |
| --- | --- |
| Amount Receivable from Frontier Insurance | (3,296,629) |
| Interest due from Frontier | (138,916) |
| Fees payable to Platinum | 3,697 |
| Capital subscription - Food Service Insurance Managers Inc. | 120,000 |
| Additional contributed surplus paid to date | 396,438 |
| *Total Cash & Investments* | $473,539 |

| PLATINUM INDEMNITY LIMITED - FSIM |
|---|

### PROGRAM INCEPTION TO DATE SUMMARY

*June 30, 2000*          *Policy Year 1999*

| | Notes | % | Written | Earned |
|---|---|---|---|---|
| Gross Premiums Written | | 100.00 | $10,993,053 | $9,451,624 |
| *Gross Premiums Ceded* | | 100.00 | 10,993,053 | 9,451,624 |
| Specific and Aggregate Reinsurance | | 6.00 | 659,583 | 567,097 |
| *Net Premiums Ceded* | | | **10,333,470** | **8,884,527** |
| Expenses :   Fronting Fee | 3 | 5.00 | 549,653 | 472,581 |
| Administration | | 0.00 | 0 | 0 |
| Boards, Bureaus & Assessments | | 4.10 | 450,715 | 387,517 |
| Claims Admin | | 0.50 | 54,965 | 47,258 |
| Federal Excise Tax | 4 | 0.94 | 103,335 | 88,845 |
| Commission | | 15.65 | 1,720,413 | 1,479,179 |
| | | 26.19 | 2,879,081 | 2,475,380 |
| *Net Premiums Ceded after expenses* | | | **7,454,389** | **6,409,146** |
| Losses Paid | | | (4,012,837) | (4,012,837) |
| *Net Cession from Frontier* | | | 3,441,552 | 2,396,309 |
| Investment Earnings -   on funds held | 5 (a) | | 0 | 0 |
| on funds withheld | 5 (a) | | 25,569 | 25,569 |
| LOC Fees | | | 0 | 0 |
| Program Fees -   Underwriting ($25,000 p.a.) | | | (25,000) | (25,000) |
| Management (1% p.a.) | 5 (b) | | (16,204) | (16,204) |
| *NET LOSS FUND* | | | **$3,425,917** | **$2,380,674** |

| Loss Reserves - | Case | | $2,748,383 | $2,748,383 |
|---|---|---|---|---|
| | IBNR | 6 | 1,318,674 | 185,724 |
| Total Reserves | | | $4,067,057 | $2,934,107 |

| Ultimate loss projection (aggregate attachment point) | 73.5% | 8,079,894 | 6,946,944 |
|---|---|---|---|

| PLATINUM INDEMNITY LIMITED - FSIM |
| --- |

## PROGRAM INCEPTION TO DATE SUMMARY

*June 30, 2000*          *Policy Year 1998*

|  | Notes | % | Written | Earned |
|---|---|---|---|---|
| Gross Premiums Written |  | 100.00 | $8,644,851 | $8,644,851 |
| *Gross Premiums Ceded* |  | 100.00 | 8,644,851 | 8,644,851 |
| Specific and Aggregate Reinsurance |  | 8.00 | 691,588 | 691,588 |
| *Net Premiums Ceded* |  |  | **7,953,263** | **7,953,263** |
| Expenses :   Fronting Fee | 3 | 5.00 | 432,243 | 432,243 |
| Administration |  | 2.00 | 172,897 | 172,897 |
| Boards, Bureaus & Assessments |  | 3.30 | 285,280 | 285,280 |
| Claims Admin |  | 6.00 | 518,691 | 518,691 |
| Federal Excise Tax | 4 | 0.92 | 79,533 | 79,533 |
| Commission |  | 12.00 | 1,037,382 | 1,037,382 |
|  |  | 29.22 | 2,526,025 | 2,526,025 |
| *Net Premiums Ceded after expenses* |  |  | **5,427,237** | **5,427,237** |
| Losses Paid |  |  | (5,572,161) | (5,572,161) |
| *Net Cession from Frontier* |  |  | **(144,924)** | **(144,924)** |
| Investment Earnings -   on funds held | 5 (a) |  | 32,351 | 32,351 |
| on funds withheld | 5 (a) |  | 113,347 | 113,347 |
| LOC Fees |  |  | 0 | 0 |
| Program Fees -   Underwriting ($25,000 p.a.) |  |  | (25,000) | (25,000) |
| Management (1% p.a.) | 5 (b) |  | (12,743) | (12,743) |
| *NET LOSS FUND* |  |  | **-$36,968** | **-$36,968** |

| Loss Reserves - | Case |  | $1,932,704 | $1,932,704 |
|---|---|---|---|---|
|  | IBNR | 6 | 0 | 0 |
| Total Reserves |  |  | $1,932,704 | $1,932,704 |

| Ultimate loss projection (aggregate attachment point) | 75.0% | 6,483,638 | 6,483,638 |
|---|---|---|---|

## PLATINUM INDEMNITY LIMITED  -  FSIM

### PROGRAM SUMMARY & NOTES

### June 30, 2000

| | |
|---|---|
| 1 | Platinum reinsures Frontier Insurance Company for 100% of the first $250,000 per claim in respect of workers compensation coverage subject to an annual aggregate maximum of 75% of gross premiums ceded and a total aggregate limit of $10,000,000 for policy year 1998 and an annual aggregtae maximum of 73.5.% of gross premiums for policy year 1999. |
| 2 | Program Year : January 1 - December 31. |
| 3 | Expense deductions are calculated based on gross premiums ceded. |
| 4 | FET is calculated on gross premium less excess reinsurance. |
| 5 (a) | Investment income consists of interest earned on initial cash received and an estimated accrual due from Frontier on funds withheld of $138,916 |
| (b) | Based on 1% of initial funds received plus funds withheld by Frontier. |
| 6 | Provision for ultimate losses has been reserved to the aggregate attachment point for both years. |

7  Collateral position :

| | | | Year 1 | Year 2 | Total |
|---|---|---|---|---|---|
| Gross Premiums Ceded at 100 % Quota share | | | $8,644,851 | $10,993,053 | $19,637,904 |
| | Yr 1 | Yr 2 | | | |
| Aggregate attachment | 75.00% | 73.50% | 6,483,638 | 8,079,894 | 14,563,532 |
| Less :         Losses Paid | | | (5,572,161) | (4,012,837) | (9,584,998) |
| Aggregate exposure remaining | | | 911,477 | 4,067,057 | 4,978,534 |
| Less:          Fees payable to Platinum | | | 0 | 3,697 | 3,697 |
| Cash & Investments | | | $473,539 | 0 | 473,539 |
| Cession settlements due from Frontier | | | (144,924) | 3,441,552 | 3,296,629 |
| Interest due from Frontier | | | 113,347 | 25,569 | 138,916 |
| | | | ($469,515) | ($596,239) | ($1,065,753) |

```
************************
***   TX REPORT   ***
************************


TRANSMISSION OK

TX/RX NO                3925
CONNECTION TEL          728585#619167730402
SUBADDRESS
CONNECTION ID
ST. TIME                10/18 14:58
USAGE T                 01'13
PGS. SENT                  7
RESULT                  OK
```

# PLATINUM

## PLATINUM INDEMNITY LIMITED

P.O. Box HM 2267, Windsor Place, 3rd floor, 18 Queen Street, Hamilton HM JX, Bermuda
Tel: (441) 295-8495   Fax: (441) 292-1196

## FACSIMILE COVER SHEET

| | |
|---|---|
| To: Dwight Halvorson | From: Andy McComb |
| Company: FSIM | Date: 18-Oct-00   Time: 14:52 |
| Fax Number: 916-773-0402 | Number of Pages: Seven |

Dear Dwight,

**Promissory Note**

I apologise for my delay in responding to your recent fax concerning the agreed upon Promissory Note. We have been attempting to obtain up to date program information from the ceding company.

Following our agreement on wording, amount and term of the Promissory Note, we advised our Board, auditors and authorities that we have collateral in place for the funding deficiency in respect of the first underwriting year of the FSIM program. We therefore, have to request that the Promissory Note be executed and delivered to avoid any further regulatory complications.

I have reviewed your request to reconsider the amount of the Promissory Note and can confirm that a revised amount of $469,515 which is detailed as the funding deficiency for Year 1 in the notes to the attached program financial statements is acceptable to us. The monthly installments already paid will be applied against this revised amount.

**EXHIBIT B**

# PLATINUM

## PLATINUM INDEMNITY LIMITED

P.O. Box HM 2267, Windsor Place, 3rd floor, 18 Queen Street, Hamilton HM JX, Bermuda
Tel: (441) 295-8495  Fax: (441) 292-1196

## FACSIMILE COVER SHEET

| | |
|---|---|
| To: Tony Miller | From: Andy McComb |
| Company: FSIM | Date: 22-May-00  Time: 18:00 |
| Fax Number: 916-773-0402 | Number of Pages: Four |

Dear Tony,

**FSIM Program**

1. Interest credit.

Further to our recent correspondence, attached are the detailed workings prepared by Frontier Insurance supporting the interest credit on funds withheld by Frontier Insurance.  The net amount currently earned of $138,916 is in line with our own independent calculation.

Please review the details provided in respect of "Amount Collected by Frontier" to ensure it is not materially different from your records.

My understanding from your fax of May 17 is that with this information you will be able to provide a complete response to the requested audit confirmation.  Your urgent attention to this would be appreciated so we may conclude our audit.

2. 4% of Premium as additional capital.

I would like to explain the circumstances surrounding the 4% of premium due as additional capital mentioned in your fax as I believe there is some confusion.

(i).      For the 1998 underwriting year it was agreed in the shareholder agreement that FSIM would provide Platinum with additional capital at the rate of 4%

THIS FACSIMILE TRANSMISSION CONTAINS CONFIDENTIAL AND PRIVILEGED INFORMATION INTENDED ONLY FOR THE USE OF THE INDIVIDUAL(S) NAMED ON THE TRANSMISSION SHEET.  IF YOU ARE NOT THE INTENDED RECIPIENT YOU ARE HEREBY NOTIFIED THAT ANY DISCLOSURE, COPYING, DISTRIBUTION AND OR THE TAKING OF ANY ACTION IN RELIANCE ON THE CONTENTS OF THIS FACSIMILE TRANSMISSION IS STRICTLY PROHIBITED.  IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE CALL US.

of written premium to be remitted on a monthly basis for policies written in the previous 30 days.

FSIM has provided the 4% of premium as additional capital for the 1998 underwriting year on a premium collected basis. I understand from Geoff that you have forwarded additional funds in this regard resulting from additional audited premiums.

This additional capital would have been sufficient to cover the program risk gap based on the original proforma agreed to between FSIM and Frontier Insurance. The significant increase in premiums written from expected, and additional funds retained for claims expenses is the cause of the unfunded gap for the 1998 underwriting year.

(ii).    For the 1999 underwriting year terms were renegotiated between FSIM and Frontier Insurance such that commissions deducted by FSIM, and consequently program expenses, were reduced to enable additional funds to be ceded to the loss fund held by Platinum. We are unaware of there being any commitment by Frontier Insurance to flow additional funds to Platinum and this would be contrary to the agreed program structure.

Now you are in possession of the information you requested we would appreciate a complete response to our audit confirmation request. Should you require any additional information please contact me direct on 441-295-2749.

Best regards,

THIS FACSIMILE TRANSMISSION CONTAINS CONFIDENTIAL AND PRIVILEGED INFORMATION INTENDED ONLY FOR THE USE OF THE INDIVIDUAL(S) NAMED ON THE TRANSMISSION SHEET. IF YOU ARE NOT THE INTENDED RECIPIENT YOU ARE HEREBY NOTIFIED THAT ANY DISCLOSURE, COPYING, DISTRIBUTION AND OR THE TAKING OF ANY ACTION IN RELIANCE ON THE CONTENTS OF THIS FACSIMILE TRANSMISSION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE CALL US.

Frontier Insurance Company
Food Service In...ance Managers, Inc.
Interest Calculation (6%)
Inception to Date Ending December 31, 1999

Interest = 6%

* Make note ceded premium due Platinum is offset by claims paid by Frontier and not yet recovered.

| | Amount Collected by Frontier | Date to Frontier | Amount Due Platinum | Platinum Due Date | Payment Date | Days Late | % | Interest Due Platinum |
|---|---|---|---|---|---|---|---|---|
| January 1998 | 183,753.98 | 04/05/98 | 136,157.27 | 05/31/98 | 12/31/98 | 579 | 158.63% | 12,959.99 |
| February 1998 | 69,524.53 | 04/10/98 | 49,600.07 | 05/31/98 | 12/31/99 | 579 | 158.63% | 4,720.64 |
| March 1998 | 40,762.73 | 05/28/98 | 44,801.04 | 06/30/98 | 12/31/99 | 549 | 150.41% | 4,043.64 |
| April 1998 | 82,324.91 | 06/12/98 | 62,442.33 | 07/31/98 | 12/31/99 | 518 | 141.92% | 5,317.01 |
| May 1998 | 176,234.26 | 07/17/98 | 134,928.39 | 08/31/98 | 12/31/99 | 487 | 133.42% | 10,801.06 |
| June 1998 | 223,162.48 | 08/17/98 | 166,001.06 | 09/30/98 | 12/31/99 | 457 | 125.21% | 12,470.95 |
| July 1998 | 496,042.58 | 09/15/98 | 423,408.12 | 10/31/98 | 12/31/99 | 426 | 116.71% | 29,650.17 |
| August 1998 | 617,513.85 | 10/20/98 | 471,995.12 | 11/30/98 | 12/31/99 | 396 | 108.49% | 30,724.71 |
| September 1998 | 227,909.19 | 11/11/98 | 173,837.88 | 12/31/98 | 12/31/99 | 365 | 100.00% | 10,430.27 |
| October 1998 | 186,578.22 | 11/11/98 | 142,183.05 | 12/31/98 | 12/31/99 | 365 | 100.00% | 8,530.08 |
| November 1998 | 667,773.00 | 12/16/98 | 503,136.36 | 01/30/99 | 12/31/99 | 335 | 91.78% | 27,706.86 |
| December 1998 | 474,706.21 | 03/25/99 | 372,469.66 | 03/31/99 | 12/31/99 | 275 | 75.34% | 16,837.17 |
| January 1999 | 527,674.99 | 03/10/99 | 398,550.34 | 03/31/99 | 12/31/99 | 275 | 75.34% | 18,016.16 |
| February 1999 | 642,052.99 | 04/07/99 | 493,845.02 | 04/30/99 | 12/31/99 | 245 | 67.12% | 19,889.10 |
| March 1999 | 586,147.28 | 05/05/99 | 457,162.58 | 05/31/99 | 12/31/99 | 214 | 58.63% | 16,082.00 |
| April 1999 | 490,642.91 | 05/27/99 | 381,836.06 | 06/30/99 | 12/31/99 | 184 | 50.41% | 11,549.22 |
| May 1999 | 488,638.02 | 06/23/99 | 387,751.80 | 07/31/99 | 12/31/99 | 153 | 41.92% | 9,752.22 |
| June 1999 | 1,101,373.63 | 07/23/99 | 928,731.50 | 08/31/99 | 12/31/99 | 122 | 33.42% | 18,625.37 |
| July 1999 | 321,550.68 | 08/17/99 | 255,209.11 | 09/30/99 | 12/31/99 | 92 | 25.21% | 3,859.60 |
| August 1999 | 1,050,497.00 | 09/17/99 | 823,263.18 | 10/31/99 | 12/31/99 | 61 | 16.71% | 8,255.10 |
| September 1999 | 280,532.30 | 10/28/99 | 224,235.73 | 11/30/99 | 12/31/99 | 31 | 8.49% | 1,142.12 |
| October 1999 | 761,754.08 | 12/01/99 | 611,453.47 | 12/31/99 | 12/31/99 | 0 | 0.00% | 0.00 |
| November 1999 | 836,116.80 | 01/06/00 | 648,128.02 | 01/31/00 | 12/31/99 | 0 | 0.00% | 0.00 |
| December 1999 | 556,789.10 | 01/19/00 | 437,171.73 | 02/29/00 | 12/31/99 | 0 | 0.00% | 0.00 |
| | 11,090,055.72 | | 8,728,298.89 | | | | | 281,365.69 |

5/22/00

Interest

Allison Wingerter

Frontier Insuran ͨompany
Food Service Ir. ᷍nce Managers, Inc.
Interest Calculation (6%)
Inception to Date Ending December 31, 1999

| | Amount Paid By Frontier | Date Frontier Reimbursed Claim Account | Amount Due Frontier | Date Due To Frontier | Payment Date | Days Late | % | Interest Due Frontier |
|---|---|---|---|---|---|---|---|---|
| June 1998 | 118,446.20 | 07/16/98 | 118,446.20 | 08/31/98 | 12/31/99 | 487 | 133.42% | 9,482.19 |
| July 1998 | 75,912.60 | 08/11/98 | 75,912.60 | 09/30/98 | 12/31/99 | 457 | 125.21% | 5,702.80 |
| August 1998 | 53,427.15 | 09/25/98 | 53,427.15 | 10/31/98 | 12/31/99 | 426 | 116.71% | 3,741.36 |
| September 1998 | 144,202.92 | 10/23/98 | 144,202.92 | 11/30/98 | 12/31/99 | 396 | 108.49% | 9,387.02 |
| October 1998 | 44,801.01 | 11/09/98 | 44,801.01 | 12/31/98 | 12/31/99 | 365 | 100.00% | 2,688.06 |
| October 1998 | 112,599.13 | 11/23/98 | 112,599.03 | 12/31/98 | 12/31/99 | 365 | 100.00% | 6,755.94 |
| November 1998 | 147,707.67 | 12/16/98 | 147,707.67 | 01/31/99 | 12/31/99 | 334 | 91.51% | 8,109.76 |
| November 1998 | 105,214.00 | 12/31/98 | 105,214.00 | 01/31/99 | 12/31/99 | 334 | 91.51% | 5,776.68 |
| December 1998 | 182,946.99 | 01/18/99 | 182,946.99 | 02/28/99 | 12/31/99 | 306 | 83.84% | 9,202.48 |
| January 1999 | 228,715.16 | 01/28/99 | 228,715.16 | 02/28/99 | 12/31/99 | 306 | 83.84% | 11,504.69 |
| January 1999 | 2,347.73 | 03/05/99 | 2,347.73 | 04/30/99 | 12/31/99 | 245 | 67.12% | 94.55 |
| February 1999 | 322,879.27 | 03/05/99 | 322,879.27 | 04/30/99 | 12/31/99 | 245 | 67.12% | 13,003.63 |
| March 1999 | 242,413.48 | 04/08/99 | 242,413.48 | 05/31/99 | 12/31/99 | 214 | 58.63% | 8,527.64 |
| March 1999 | 18,260.67 | 04/15/99 | 18,260.67 | 05/31/99 | 12/31/99 | 214 | 58.63% | 642.38 |
| April 1999 | 246,970.68 | 04/23/99 | 246,970.68 | 05/31/99 | 12/31/99 | 214 | 58.63% | 8,687.95 |
| April 1999 | 122,843.53 | 05/18/99 | 122,843.53 | 06/30/99 | 12/31/99 | 184 | 50.41% | 3,715.60 |
| May 1999 | 34,560.00 | 05/18/99 | 34,560.00 | 06/30/99 | 12/31/99 | 184 | 50.41% | 1,045.32 |
| May 1999 | 149,435.86 | 06/03/99 | 149,435.86 | 07/31/99 | 12/31/99 | 153 | 41.92% | 3,758.41 |
| May 1999 | 84,845.75 | 06/17/99 | 84,845.75 | 07/31/99 | 12/31/99 | 153 | 41.92% | 2,133.93 |
| June 1999 | 152,028.74 | 06/17/99 | 152,028.74 | 07/31/99 | 12/31/99 | 153 | 41.92% | 3,823.63 |
| June 1999 | 195,207.89 | 06/24/99 | 195,207.89 | 07/31/99 | 12/31/99 | 153 | 41.92% | 4,909.61 |
| June 1999 | 259,202.93 | 07/09/99 | 259,202.93 | 08/31/99 | 12/31/99 | 122 | 33.42% | 5,198.26 |
| July 1999 | 416,224.05 | 08/09/99 | 416,224.05 | 09/30/99 | 12/31/99 | 92 | 25.21% | 6,294.68 |
| August 1999 | 333,071.93 | 09/08/99 | 333,071.93 | 10/31/99 | 12/31/99 | 61 | 16.71% | 3,339.84 |
| September 1999 | 443,367.49 | 10/04/99 | 443,367.49 | 11/30/99 | 12/31/99 | 31 | 8.49% | 2,259.35 |
| September 1999 | 31,870.60 | 10/15/99 | 31,870.60 | 11/30/99 | 12/31/99 | 31 | 8.49% | 162.41 |
| October 1999 | 250,020.31 | 10/15/99 | 250,020.31 | 11/30/99 | 12/31/99 | 31 | 8.49% | 1,274.08 |
| October 1999 | 240,869.33 | 10/27/99 | 240,869.33 | 11/30/99 | 12/31/99 | 31 | 8.49% | 1,227.44 |
| October 1999 | 141,243.84 | 11/12/99 | 141,243.84 | 12/31/99 | 12/31/99 | 0 | 0.00% | 0.00 |
| Nobember 1999 | 346,442.24 | 12/08/99 | 346,442.24 | 01/31/00 | 12/31/99 | 0 | 0.00% | 0.00 |
| December 1999 | 253,051.60 | 12/22/99 | 253,051.60 | 01/31/00 | 12/31/99 | 0 | 0.00% | 0.00 |
| | 5,501,130.75 | | 5,501,130.65 | | | | | 142,449.70 |

Interest     Net Interest Due Platinum     $138,915.99

Allison Wingerter

5/22/00

```
*********************
***   TX REPORT   ***
*********************

TRANSMISSION OK

TX/RX NO               2071
CONNECTION TEL         28585#6*919167730402
SUBADDRESS
CONNECTION ID
ST. TIME               05/22 18:03
USAGE T                01'41
PGS. SENT                 4
RESULT                 OK
```

# PLATINUM

## PLATINUM INDEMNITY LIMITED

P.O. Box HM 2267, Windsor Place, 3rd floor, 18 Queen Street, Hamilton HM JX, Bermuda
Tel: (441) 295-8495  Fax: (441) 292-1196

---

### FACSIMILE COVER SHEET

---

To: Tony Miller                            From: Andy McComb

---

Company: FSIM                              Date: 22-May-00  Time: 18:00

---

Fax Number: 916-773-0402                   Number of Pages: Four

---

Dear Tony,

**FSIM Program**

1. Interest credit.

Further to our recent correspondence, attached are the detailed workings prepared by
Frontier Insurance supporting the interest credit on funds withheld by Frontier
Insurance.  The net amount currently earned of $138,916 is in line with our own
independent calculation.

Please review the details provided in respect of "Amount Collected by Frontier" to
ensure it is not materially different from your records.

My understanding from your fax of May 17 is that with this information you will be

**EXHIBIT C**

# PLATINUM

## PLATINUM INDEMNITY LIMITED

P.O. Box HM 2267, Windsor Place, 3rd floor, 18 Queen Street, Hamilton HM JX, Bermuda
Tel: (441) 295-8495  Fax: (441) 292-1196

### FACSIMILE COVER SHEET

To: Dwight Halvorson                                From: Andy McComb

Company: FSIM                                   Date: 3-Jul-00    Time: 11:07

Fax Number: 916-773-0402                        Number of Pages: 2

Dwight,

Thank you for you and your colleagues taking the time out during your busy period to meet with me to discuss the FSIM/Frontier/Platinum Program and the funding deficiency.

The following is a summary of the agreed actions from our meeting:

1.  Bob Shaw will provide confirmation from Milliman & Robertson of their engagement and commitment to provide an actuarial review and projection of ultimate losses on the FSIM Program for the 1998 and 1999 underwriting years by July 31, 2000. (This has been done).

    Milliman & Robertson will be provided with incurred loss data through June 30, 2000 for both underwriting years.

    The report will also provide sufficient detail for us to determine the expected timing of pay-out of loss reserves in order to determine the potential investment earnings on the 1999 underwriting year.

2.  1998 underwriting year

    Platinum will consider receipt of a note from FSIM and/or Dwight Halvorson Insurance as collateral for the unfunded risk gap on the 1998 underwriting year. Your proposal was for a repayment over 2 years with payments in equal monthly installments commencing on August 15. Interest will only accrue on the note should the loss fund held by Platinum & Frontier be exhausted.

    Based on the latest information received from Frontier, the unfunded risk gap is $496,860 ($583,860 per March 31, 2000 Program Financials, less $87,000 additional contribution

THIS FACSIMILE TRANSMISSION CONTAINS CONFIDENTIAL AND PRIVILEGED INFORMATION INTENDED ONLY FOR THE USE OF THE INDIVIDUAL(S) NAMED ON THE TRANSMISSION SHEET. IF YOU ARE NOT THE INTENDED RECIPIENT YOU ARE HEREBY NOTIFIED THAT ANY DISCLOSURE, COPYING, DISTRIBUTION AND OR THE TAKING OF ANY ACTION IN RELIANCE ON THE CONTENTS OF THIS FACSIMILE TRANSMISSION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE CALL US.

funded subsequent to those financials), requiring monthly installment payments of $21,000.

As discussed, our acceptance of the note as an alternative to cash or letter of credit collateral for the 1998 underwriting year is dependent on the position taken by Frontier and their acceptance of a delay in settlement of paid losses in the event the FSIM Program loss fund is exhausted before payment of the note.

In order for Platinum to determine the acceptability of a note you have agreed to provide the following information:

(i).    Latest management financial statements for FSIM.
(ii).   Latest audited financial statements for FSIM.
(iii).  Cash flow projections for FSIM.

Should the Board of Platinum accept the note as alternative collateral, we will require a copy of a monthly cash flow report and quarterly management financial statements for FSIM for the duration of the note.

3.    1999 underwriting year.

Once Milliman & Robertson have completed their review, we will all be in the position to determine whether the 1999 underwriting year could possibly produce an underwriting profit. Based on that determination we will discuss any necessary corrective action required for funding the 1999 underwriting year.

Should you not agree with the above summary of actions I would appreciate you advising immediately. I look forward to receiving the requested information.

THIS FACSIMILE TRANSMISSION CONTAINS CONFIDENTIAL AND PRIVILEGED INFORMATION INTENDED ONLY FOR THE USE OF THE INDIVIDUAL(S) NAMED ON THE TRANSMISSION SHEET. IF YOU ARE NOT THE INTENDED RECIPIENT YOU ARE HEREBY NOTIFIED THAT ANY DISCLOSURE, COPYING, DISTRIBUTION AND OR THE TAKING OF ANY ACTION IN RELIANCE ON THE CONTENTS OF THIS FACSIMILE TRANSMISSION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE CALL US.

```
*********************
***  TX REPORT  ***
*********************
```

TRANSMISSION OK

| | |
|---|---|
| TX/RX NO | 2660 |
| CONNECTION TEL | 728585#919167730402 |
| SUBADDRESS | |
| CONNECTION ID | |
| ST. TIME | 07/03 11:11 |
| USAGE T | 00'51 |
| PGS. SENT | 2 |
| RESULT | OK |

# PLATINUM
## PLATINUM INDEMNITY LIMITED

P.O. Box HM 2267, Windsor Place, 3rd floor, 18 Queen Street, Hamilton HM JX, Bermuda
Tel: (441) 295-8495  Fax: (441) 292-1196

## FACSIMILE COVER SHEET

| | |
|---|---|
| To: Dwight Halvorson | From: Andy McComb |
| Company: FSIM | Date: 3-Jul-00    Time: 11:07 |
| Fax Number: 916-773-0402 | Number of Pages: 2 |

Dwight,

Thank you for you and your colleagues taking the time out during your busy period to meet with me to discuss the FSIM/Frontier/Platinum Program and the funding deficiency.

The following is a summary of the agreed actions from our meeting:

1.  Bob Shaw will provide confirmation from Milliman & Robertson of their engagement and commitment to provide an actuarial review and projection of ultimate losses on the FSIM Program for the 1998 and 1999 underwriting years by July 31, 2000. (This has been done).

    Milliman & Robertson will be provided with incurred loss data through June 30, 2000 for both underwriting years.

    The report will also provide sufficient detail for us to determine the expected timing of pay-out of loss reserves in order to determine the potential investment earnings on the