UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GREGORY V. SERIO, Superintendent of Insurance of the State of New York, as Rehabilitator of Frontier Insurance Company and as Assignee of Platinum Indemnity, Ltd. | Case No. 04-CV-3361 (KMK) |
| Plaintiff, | OPINION & ORDER |
| -v- | |
| DWIGHT HALVORSON INSURANCE SERVICES, INC. d/b/a F.S.I.M. Insurance Services | |
| Defendants. | |

Appearances:

Randall J. Ezick, Esq.
Featherstonhaugh, Wiley, Clyne & Cordo, LLP
Albany, New York
*Counsel for Plaintiff*

Lorienton N.A. Palmer, Esq.
Marc Ian Kunkin, Esq.
Schindel, Farman & Lipsius LLP
New York, New York
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

This diversity action arises from a dispute over a series of related insurance agreements.

Plaintiff, Gregory V. Serio, New York's Superintendent of Insurance, brings this action as the

rehabilitator of the Frontier Insurance Company ("Frontier"). He asserts Frontier's claims and

the claims of Platinum Indemnity, Ltd. ("Platinum"), which assigned its claims to Frontier as

part of a 2002 settlement agreement. The Complaint asserts five causes of action. However,

with this Motion, Plaintiff seeks summary judgment with respect to only Count IV, which

contends that Defendant Food Service Insurance Managers, Inc. ("FSIM") defaulted on its

obligations under a promissory note.

For the reasons stated herein, Plaintiff's Motion for Summary Judgment is granted.

## I. Background

### A. Facts

This case involves the relationships between four companies and the various agreements

that governed those relationships. Because Plaintiff seeks summary judgment with respect to

just one cause of action, the facts set forth herein focus on only those relationships and

agreements that are relevant to this Motion.

Frontier is a New York insurance company that sells, among other things, workers'

compensation insurance. (Pl.'s Rule 56.1 Stmt. ¶¶ 1-2.) Platinum is a reinsurer organized under

the laws of Bermuda. (*Id.* ¶ 9.) Defendants Dwight Halvorson Insurance Services, Inc.

("DHIS") and FSIM are California corporations that obtain insurance for the food services

industry, particularly in California and Nevada. (*Id.* ¶¶ 8, 11.) Beginning in late 1997, Frontier,

Platinum, DHIS, and FSIM jointly developed a workers' compensation insurance program aimed

at the food service industry. (Pl.'s Rule 56.1 Stmt. ¶¶ 14-16; Defs.' Rule 56.1 Stmt. ¶¶ 14-16.)

This program came to be known as the FSIM Program. (Pl.'s Rule 56.1 Stmt. ¶ 14.) Because

DHIS and FSIM were not licensed insurers, they required the services of an established

insurance carrier in order to effectuate the FSIM Program. (Mem. of Law in Supp. of Pl.'s Mot.

for Partial Summ. J. 4-5 ("Pl.'s Br.").) Frontier was enlisted as that carrier, and it entered into an

agreement with DHIS, whereby DHIS was permitted to quote, bind, and decline workers'

compensation insurance coverage on behalf of Frontier, which served as the primary insurer.

(Compl. ¶ 39.)

In order to limit Frontier's risk as the primary insurer, FSIM entered into a Subscription

and Shareholders Agreement (the "Subscription Agreement") with Platinum, pursuant to which

Platinum agreed to provide reinsurance protection to Frontier.  (McComb Decl. Ex. B.)  In this

capacity, Platinum operated as a "rent-a-captive" reinsurer for the FSIM Program.  Under the

Subscription Agreement, FSIM was required to indemnify Platinum for any underwriting loss it

suffered.  (*Id.*)  The Subscription Agreement referred to such underwriting loss as a "Negative

Balance."  (*Id.*)  FSIM was also required to make periodic payments to Platinum under the

Subscription Agreement.  These payments are identified as "Additional Capital Contributions" in

schedule 2 to the Subscription Agreement.  (*Id.*)

During the first year of the FSIM Program, which covered the 1998 calendar year, FSIM

made periodic capital contributions directly to Platinum.  (Halvorson Decl. ¶¶ 14, 16.)  In the

second year of the Program (calendar year 1999), allegedly at Frontier's request, FSIM began

making the contribution payments to Frontier, with the understanding that Frontier would

forward the appropriate amounts to Platinum.  (*Id.* ¶ 16.)  Plaintiff alleges that by the end of the

first year, however, FSIM had incurred a Negative Balance in its account (McComb Decl. ¶ 28),

and that ultimately there was an "unfunded gap for the 1998 underwriting year" of $469,515.

(McComb Reply Decl. Ex. B.)

In the summer of 2000, Platinum and FSIM began what would be several months of

correspondence and discussions regarding certain funds that were due to Platinum under the

Subscription Agreement.  (Halvorson Decl. ¶ 18, Ex. A; McComb Decl. ¶ 33; McComb Reply

Decl. Exs. A-C.)  The Parties' descriptions of these discussions differ.  FSIM claims that the

Director and Chief Financial Officer of Platinum, Andrew McComb ("McComb"), implied to

FSIM that the periodic contribution payments for the *second* policy year (1999) had not been

made and that the Bermuda regulatory authorities would take action against Platinum if this was

not remedied.  (Halvorson Decl. ¶¶ 18-19.)  Plaintiff contends, based on a variety of documents,

that FSIM had failed to meet its periodic payments under the Subscription Agreement; however,

in Plaintiff's view, the dispute concerned only the *first* policy year (1998), not the second.

(McComb Decl. ¶ 28; McComb Reply Decl. ¶ 10.)

On November 8, 2000, in an effort to resolve the dispute, FSIM executed a promissory

note (the "Note"), "FOR VALUE RECEIVED," the terms of which required FSIM to pay

Platinum $469,515 plus interest, in monthly installments.  (McComb Decl. Ex. A.)  Dwight

Halvorson ("Halvorson"), President of FSIM, signed the Note to secure what he understood to be

FSIM's obligations under the Subscription Agreement.  (Answer ¶ 55.)  None of the Parties

disputes that the Note is valid on its face.  However, FSIM now contends that "McComb

misrepresented the facts in order to get [Halvorson] to sign the Note" and that, for reasons not

explained, FSIM signed the Note even though it received no consideration therefor.  (Halvorson

Decl. ¶¶ 20-21.)[1]

By its terms, the Note is governed by Bermuda law.  (McClomb Decl. Ex A.)  FSIM

began making $21,000 monthly payments to Platinum in September 2000, purportedly to

---

[1]The only evidence supporting FSIM's claims of misrepresentations by McComb and a lack of consideration for the Note is found in Halvorson's Declaration.  As discussed below, however, that Declaration was directly contradicted by Halvorson's subsequent deposition and other documents.

discharge its obligations under the Subscription Agreement.[2]  (Halvorson Decl. Ex. A.)  FSIM

ceased making these payments in April 2001, leaving a balance on the Note of $322,515, plus

interest.  (Compl. ¶ 66; Answer ¶ 66.)  On December 2, 2002, Platinum and Frontier executed a

settlement agreement to resolve disputes stemming from the FSIM Program.  (Compl. ¶¶ 73-74.)

As part of the settlement agreement, Platinum transferred to Frontier its rights under the Note.

(*Id.* ¶ 77.)

## II.  Discussion

### A.  Dwight Halvorson's Deposition Testimony

During oral argument, it was brought to the Court's attention that, after the Motion had

been fully briefed, Halvorson was deposed regarding topics bearing on the outcome of the

Motion.  Consequently, the Court ordered limited additional briefing to address the admissibility

and effect of Halvorson's deposition testimony.

Plaintiff argues that the Court should consider the Halvorson deposition.  Not

surprisingly, FSIM opposes consideration of the deposition, even while conceding that "it is

within the discretion of th[e] Court . . . to consider the March, 2006 deposition of Mr.

Halvorson."  (Mem. of Law in Opp'n to Pl.'s Motion for Partial Summ. J. 2 ("FSIM's

Supplemental Mem.").)  FSIM argues that the Court should nevertheless prohibit Plaintiff from

supplementing the record given the length of time that has passed since the Motion was first

filed.  The Court rejects this argument.  While it would undoubtedly have been more efficient for

---

[2]FSIM began making monthly payments approximately two months before it executed the Note.  However, both Parties appear to consider all of FSIM's payments applicable to its obligations under the Note, including those made before the Note was issued. (*See* Compl. ¶ 66; Answer ¶ 66.)

Plaintiff to have supplemented his Motion at an earlier date (or to have waited until after

Halvorson's deposition to file this motion), FSIM has not substantiated any claim that it has been

prejudiced by this delay, and, in fact, because FSIM has been given ample time to address

Plaintiff's Motion and its reliance on Halvorson's deposition, no claim of prejudice would be

credible.  *See Warner Bros. Inc. v. Am. Broad. Co.*, 720 F.2d 231, 246 (2d Cir. 1983) (permitting

renewal of motion for summary judgment where "plaintiffs . . . did not act to their detriment in

reliance on the initial ruling").  Moreover, because a "party may renew its motion for summary

judgment as long as it is supported by new material[,]" *Wechsler v. Hunt Health Sys., Ltd.*, 198

F. Supp. 2d 508, 514 (S.D.N.Y. 2002), Plaintiff would in any event be permitted to renew its

Motion should the Court exclude Halvorson's deposition testimony in this instance.

Accordingly, because both Parties have had the opportunity to file briefs regarding the effect of

Halvorson's testimony, and because no Party will be prejudiced by inclusion of the testimony,

the Court will consider that testimony in deciding this Motion.

B.  Choice of Law

Before turning to the merits, the Court must determine which jurisdiction's law applies.

"Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and

federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996).  In

determining which jurisdiction's substantive law governs, "[f]ederal courts sitting in diversity

must apply the choice-of-law rules of the forum state." *Every v. Makita U.S.A., Inc.*, No. 02 Civ.

8545, 2005 WL 2757952, at *1 (S.D.N.Y. Oct. 24, 2005).  Here, the Note contains a choice-of-

law provision, dictating that "this promissory note shall be governed by Bermuda law."

(McComb Decl. Ex. A.)  In the face of such a provision, "New York law is unambiguous . . . .

[A]bsent fraud or violation of public policy, contractual selection of governing law is generally

determinative so long as the State selected has sufficient contacts with the transaction." *Int'l*

*Minerals & Resources, S.A. v. Pappas*, 96 F.3d 586, 592 (2d Cir. 1996) (internal quotation marks

omitted) (second alteration in original); *accord RLS Assocs. v. United Bank of Kuwait PLC*, 464

F. Supp. 2d 206, 214 (S.D.N.Y. 2006).  Accordingly, because the Note contains a Bermuda

choice-of-law provision, because there is no claim of fraud in connection with this provision, and

because one of the original contracting parties, Platinum, was a Bermuda corporation, the Court

will apply Bermuda substantive law in evaluating the Note.  About this conclusion, there is no

disagreement among the Parties.

       But this does not end the inquiry.  The Court must also determine what rules constitute

substantive, as opposed to procedural, law.  *See Gasperini*, 518 U.S. at 427.  Clearly, questions

relating to the formation, avoidance, and legality of a promissory note are substantive and are

therefore governed by Bermuda law.  It is less clear, however, whether the Court should apply

the federal summary judgment standard or its Bermuda counterpart.  On this question, the

Second Circuit has been silent:  "It is not settled in this circuit whether, in a diversity case, the

sufficiency of the evidence to warrant submission of an issue to a jury is a question governed by

federal or state law."  *Willis v. Westin Hotel Co.*, 884 F.2d 1556, 1563 n.5 (2d Cir. 1989); *see*

*also Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 429 (2d Cir. 1999);

*Every*, 2005 WL 2757952, at *2 ("Somewhat surprisingly, the question is unsettled in this

Circuit.  Our Court of Appeals has refused to decide the issue on many occasions.").  Moreover,

the Parties unfortunately do not address this issue in their briefs.

       Although the Second Circuit has not yet ruled on this issue, "most circuits that have

squarely addressed the issue agree that the federal standard under Rule 56 should control."

*Every*, 2005 WL 2757952, at *3; *see also Mayer v. Gary Partners & Co.*, 29 F.3d 330, 335 (7th

Cir. 1994) (noting that "courts of appeals other than this one [the Seventh Circuit] use the federal

standard" and that several circuits that had initially applied the state standard have since

"changed their minds"). *But see McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800-01 (6th

Cir. 2000) (applying state law in diversity action to determine sufficiency of evidence when

reviewing district court's grant of summary judgment). With some exceptions, this position is

also "supported by most commentators." 9A Charles Alan Wright & Arthur R. Miller, *Federal*

*Practice and Procedure* § 2525 (2d ed. 2007).

As the Seventh Circuit noted in *Mayer*, and as Judge Lynch observed in *Every*, there is

good reason to adopt the majority position. The question of *who* decides a particular issue is

different than the question of *how* that issue is decided. "The [substantial evidence] standard

determines *who* resolves the factual dispute, and the preponderance standard tells the body *how*

to evaluate the evidence presented." *Every*, 2005 WL 2757952, at *3 (internal quotation marks

omitted) (alteration and emphasis in original). Thus, the "'who' question is a procedural one, so

it is left to Rule 56." *Id.* This conclusion is consistent with the "strong federal policy against

allowing state rules to disrupt the judge-jury relationship in the federal courts." *Byrd v. Blue*

*Ridge Rural Elec. Co-op., Inc.*, 356 U.S. 525, 538 (1958); *see also Mayer*, 29 F.3d at 335

("Scholars . . . believe that the use of federal norms flows directly from the fact that the division

of tasks between judge and jury in federal court is a subject of national law."). For these

reasons, the Court will apply Rule 56 when deciding whether there is sufficient evidence to

warrant submission of Count IV to a jury.[3]

C. Federal Standard of Review

Pursuant to Rule 56(c), "[s]ummary judgment shall be granted when there is no genuine

issue of material fact and the moving party is entitled to judgment as a matter of law." *See*

*Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004)); *see also Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Summary judgment is appropriate when the non-

movant "has not shown that evidence of an essential element of her case – one on which she has

the burden of proof – exists." *See Powell*, 364 F.3d at 84.

The burden is on the movant to show that there is no genuine factual dispute. *See*

*Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) (citing *Adickes v. S.H. Kress &*

*Co.*, 398 U.S. 144, 157 (1970)). "In deciding a motion for summary judgment, all ambiguities

must be resolved and all reasonable inferences drawn in favor of the party opposing the motion."

*EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 61 (2d Cir.

2000) (citing *Anderson*, 477 U.S. at 255); *see also Giannullo*, 322 F.3d at 140. "If the evidence

---

[3]FSIM provided sparse caselaw on the standard for summary judgment under Bermuda law. However, one case cited by FSIM is *ALEF United Corp. v. United Energy Limited*, Supreme Court of Bermuda, Civil Jurisdiction No. 159 (Oct. 28, 1991). In *ALEF United Corp.*, the court denied plaintiff's motion for summary judgment to collect on a note because the defenses of fraud and lack of consideration, described in an affidavit, were "arguable." *Id.* In so holding, the court specifically noted that these defenses need not be "fully particularized." *Id.*

Based on this one case, it is not clear that the test for summary judgment under Rule 56 is that different from the test applied by Bermuda courts. But, even if it differs slightly, applying the test used in *ALEF United Corp.* here likely would yield the same result. As discussed more fully below, the problem with FSIM's defenses is not lack of particularization but instead a lack of any evidence that makes the defenses arguable. Halvorson's Declaration is neutered by the contradictions in his later deposition, and FSIM has no answer to the documentary evidence presented by Plaintiff.

is such that, when viewed in the light most favorable to the nonmoving party, a reasonable fact

finder could return a verdict for that party, then a genuine issue of material fact exists, and

summary judgment is not warranted." *Magan v. Lufthansa German Airlines*, 339 F.3d 158, 161

(2d Cir. 2003) (citing *Green Door Realty Corp. v. TIG Ins. Co.*, 329 F.3d 282, 286-87 (2d Cir.

2003)).

However, Fed. R. Civ. P. 56(e) itself provides that the adverse party "may not rest upon

the mere allegations or denials of [its] pleading, but the adverse party's response, by affidavits or

as otherwise provided in this rule, must set forth specific facts showing that there is a genuine

issue for trial." Thus, "[o]nce a moving party has made a showing that no material issues of fact

are in dispute, mere conjecture or speculation by the party resisting summary judgment does not

provide a basis upon which to deny the motion." *Quarles v. General Motors Corp. (Motors

Holding Div.)*, 758 F.2d 839, 840 (2d Cir. 1985); *accord Woodman v. WWOR-TV,* Inc., 411 F.3d

69, 85 (2d Cir. 2005) ("The law is well established that conclusory statements, conjecture, or

speculation are inadequate to defeat a motion for summary judgment." (internal quotation marks

omitted)).

In cases regarding notes, "[i]t is well established that in actions to collect on a promissory

note, the plaintiff prevails on its cause of action as a matter of law by showing the validity of the

promissory note in question and non-payment according to the note's terms." *Barclays Bus.

Credit, Inc. v. Inter Urban Broad. of Cincinnati, Inc.*, No. 90 Civ. 2272, 1991 WL 258751, at *4

(S.D.N.Y. Nov. 27, 1991); *see also Citibank, N.A. v. Benedict*, No. 97 Civ. 9541, 2000 WL

322785, at *4 (S.D.N.Y. Mar. 28, 2000) ("In order to establish a prima facie case of entitlement

to summary judgment in an action for recovery on a promissory note, plaintiff ordinarily would

have to submit the promissory note executed by the defendant together with proof of the

defendant's failure to make payment thereon." (internal quotation marks omitted)).

D.  Plaintiff is a Holder in Due Course of the Promissory Note

Pursuant to Bermuda's Bills of Exchange Act of 1934 (the "Act"), with certain delineated

exceptions not relevant here, all rules that apply to bills of exchange apply with equal force to

promissory notes.  Bills of Exchange Act, 1934, § 81(1) ( "[T]he provisions of this Act relating

to bills of exchange apply, with the necessary modifications, to promissory notes.").[4]  Under the

Act, a person is a "holder in due course" of a bill of exchange (and therefore also a promissory

note) where the bill is "complete and regular" on its face, provided:

> a) that he became the holder of it before it was overdue, and
> without notice that it had been previously dishonoured, if such
> was the fact; [and]
>
> b) that he took the bill in good faith and for value, and that at the
> time the bill was negotiated to him he had no notice of any defect
> in the title of the person who negotiated it.

*Id.* § 28(1).  Bermuda law confers strong protections upon holders in due course.  For example,

where a holder of a bill with a defective title transfers that bill to a holder in due course, the

---

[4]The Act defines a promissory note as follows:

> A promissory note is an unconditional promise in writing made by
> one person to another signed by the maker, engaging to pay, on
> demand or at a fixed or determinable future time, a sum certain in
> money to, or to the order of, a specified person or to bearer.

Bills of Exchange Act, 1934, § 75(1).

holder in due course "obtains a good and complete title to the bill," and "holds the bill free from any defect of title of prior parties . . . and may enforce payment against all parties liable on the bill[.]"  *Id.* § 37(b)-(c).

Applying these rules, in order to defeat Plaintiff's Motion for Summary Judgment, FSIM must show (1) that the Note, as issued to Platinum, was defective, *and* (2) that Frontier had notice of the defect and is therefore not a holder in due course.  Consistent with the requirements of Rule 56, FSIM must make this showing with sufficient evidence such that a material fact is in dispute.  *See Magan*, 339 F.3d at 161.

<u>1.  There Is No Question of Fact as to Whether the Note Was Defective</u>

Under Bermuda law, a promissory note is defective if "the consideration has totally failed . . . or the agreement as evidenced by the Promissory note is vitiated by fraud."  *ALEF United Corp. v. United Energy Ltd.*, Supreme Court of Bermuda, Civil Jurisdiction No. 159 (Oct. 28, 1991).  Here, FSIM argues that the Note is invalid based on both of these grounds.  FSIM contends that Platinum demanded the Note as security for what Platinum claimed were missing payments under the Subscription Agreement.  (Halvorson Decl. ¶ 18.)  According to FSIM, Platinum fraudulently caused FSIM to believe that these payments were required to satisfy FSIM's obligations under the *second year* of that agreement.  (*Id.* ¶¶ 16, 19-20.)  FSIM claims, however, that it in fact made the required payments during the second year of the agreement, albeit indirectly through its payments to Frontier.  Thus, according to FSIM, because it had already discharged its obligations under the second year of the Subscription Agreement, there was no consideration for the Note.  And, according to FSIM, because Platinum knew this to be the case – yet nevertheless represented otherwise – the Note was fraudulently acquired.  As

discussed below, however, these claims fail because FSIM is unable to tender any evidence that

challenges the evidence offered by Plaintiff.

In support of its claims that the Note was executed without consideration and in reliance

on false representations, FSIM submits only Halvorson's Declaration.  Halvorson's Declaration,

however, contains only speculative and conclusory statements regarding several key issues.

First, Halvorson can do no more than speculate as to whether Platinum knew that FSIM had

made payments to Frontier during the second year of the Subscription Agreement, attesting that:

"I now *believe* that when Mr. McComb presented the Note for me to sign, he knew that the

money had been paid to Frontier" (Halvorson Decl. ¶ 4 (emphasis added)); and "I *suspected* that

[McComb] knew the monies were paid to Frontier because he also made a comment to the effect

that he (meaning Platinum) had a lot of other business with Frontier and was not in a position to

question Frontier's reports to him."  (Halvorson Decl. ¶ 19 (emphasis added).)  Platinum's

knowledge of any payments to Frontier is a necessary element of FSIM's fraud claim, yet

beyond his wholly speculative statements, Halvorson attests to no facts based on first-hand

knowledge that would support a finding that Platinum knew of FSIM's payments to Frontier.

Second, Halvorson fails to allege, other than in an entirely speculative fashion, that Platinum

actually received any money from Frontier in connection with the Subscription Agreement.  (*See*

Halvorson Dep. 61:1-2 ("Whether or not that ever happened [Frontier made payments to

Platinum] – well, we assume that it did.").)

In the Second Circuit, it is well-established that a motion for summary judgment cannot

be defeated based on speculative or conclusory statements.  *See McPherson v. New York City*

*Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to

defeat a motion for summary judgment."); *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002)

("[R]eliance upon conclusory statements or mere allegations is not sufficient to defeat a

summary judgment motion."); *accord* 10B Wright & Miller, *supra*, § 2738 ("[C]onclusory facts .

. . as well as statements made on belief or 'on information and belief,' cannot be utilized on a

summary-judgment motion." (citations omitted)).  Indeed, the plain language of Rule 56 requires

that "[s]upporting and opposing affidavits shall be made on personal knowledge [and] shall set

forth such facts as would be admissible in evidence."  Fed. R. Civ. P. 56(e).  Thus, the

speculative and conclusory allegations in Halvorson's Declaration relating to Platinum's

knowledge of FSIM's alleged payments to Frontier during the second year of the Subscription

Agreement fall short of the requirements of Rule 56 and cannot defeat Plaintiff's Motion for

Summary Judgment.

   Moreover, even if the Court were to find the statements in Halvorson's Declaration to be

anything other than speculative and conclusory, his allegations fail to create a factual dispute as

they are inconsistent with Halvorson's deposition testimony.  In fact, Halvorson directly

contradicts himself on several critical points.  In his Declaration, which again was executed

before his deposition, Halvorson stated that "[s]ometime in about the summer of 2000, Mr.

McComb came to California and told me that the monthly payments (4%) had not been made

and there was a shortage in the 'capital contribution' to Platinum."  (Halvorson Decl. ¶ 18.)

During this meeting, according to Halvorson, McComb represented that the "'regulatory

authorities' in Bermuda would take legal action against FSIM for the amount he claimed was

missing and that the Note would prevent this."  (*Id.*)  According to Halvorson, he responded by

telling McComb "that the payments were made to Frontier" but McComb denied ever getting

these payments. (*Id.* ¶ 19.) In fact, according to Halvorson's Declaration, "Platinum has never

provided documentation of the payments it received from Frontier or documentation of any

claimed shortage." (*Id.* ¶ 20.) Moreover, Halvorson claims that he never spoke with "McComb

about what he refers to as a 'Negative Balance,' and that the Note was not for any 'Negative

Balance,' but to secure FSIM's obligation to pay the 4% of gross written premiums under the

program." (*Id.* ¶ 32.)[5] From this description of events, Halvorson asserts, without any

supporting documentation, that the supposed shortfall Platinum claimed FSIM owed, and for

which the Note was executed in November 2000, was for the second year of the program, when

FSIM began making payments to Frontier. (*Id.* ¶¶ 4, 28, 29.) Thus, Halvorson's conclusion is

that Frontier, the assignee of the Note, is collecting twice for payments it received in the second

---

[5]While Halvorson contends that he never discussed a "Negative Balance" in FSIM's
obligations, he also claims that he signed the Note "under protest" because he disputed the
amount of money FSIM owed to Platinum but not the fact that FSIM owed some money to
Platinum. (Halvorson Decl. ¶ 7.) To substantiate this assertion, Halvorson attached to his
Declaration a letter dated September 29, 2000 wherein he advised McComb that he did "not feel
the amount of the obligation is accurately stated in the note." (Halvorson Decl. Ex. A.) Thus,
while Halvorson says he never discussed the Negative Balance FSIM owed Platinum, he admits
that as of September 2000 he knew that FSIM owed Platinum some money, just not the precise
amount initially claimed by Platinum in September 2000.
      Another point worth mentioning is that Halvorson claims in his Declaration that he
signed the Note under protest. The implication from this claim is that he signed the Note in
September, at around the time of his letter disagreeing with the amount to be covered by the
Note. Yet, the unrefuted evidence in the record reveals, in fact, that Halvorson executed the
Note on November 8, 2000. (McComb Decl., Ex. D.) Moreover, on October 18, 2000, after
Halvorson's supposed protest letter of September 29, 2000, McComb faxed a memo to
Halvorson stating that McComb had "reviewed" Halvorson's "request to reconsider the amount
of the Promissory Note" and had revised the amount of the "funding deficiency for Year 1."
(McComb Reply Decl., Ex. A.) McComb subsequently sent a revised Note, which Halvorson
signed, "with [an] amended amount due per [McComb's] fax to [Halvorson] of October18,
2000." (McComb Decl., Ex. C.) Thus, while Halvorson clearly did protest the early calculation
of the Negative Balance FSIM owed to Platinum, there is no conflict in the evidence about
Halvorson being aware, by the time he executed the Note, of FSIM's precise obligations under
the Note.

year of the Program.  (*Id.*)

At his deposition, Halvorson told a different story.  First, contrary to his claim in his

Declaration about FSIM's obligation to secure any unpaid obligations to Platinum, and the

implications under Bermuda law if FSIM failed to honor its obligations, Halvorson

acknowledged that because Bermuda law prohibited Platinum from assuming certain risks on

insurance policies, FSIM would be required to "cover" and "collateralize" any "negative

balance," or as he called it, "a shortage of collateral in the gap to cover . . . what could be the

ultimate loss."  (Halvorson Dep. 49: 14-20.)  The point here is that while Halvorson may have

denied literally discussing the "Negative Balance" FSIM owed Platinum under the Subscription

Agreement, he plainly knew that FSIM was in arrears on its obligations under the Agreement.

Second, unlike his earlier claim that Platinum never provided documents substantiating the

claimed shortage, Halvorson admitted at his deposition that he recalled receiving via facsimile a

July 3, 2000 document from McComb, which substantiated Platinum's basis for seeking a Note

from FSIM for the unfunded risk gap on the 1998 underwriting year (year one of the Program).

(*Id.* 127:13-128:17.)[6]  Third, Halvorson admitted in his deposition that Frontier's request that

---

[6]In the July 3 fax, McComb indicated that the latest data suggested that the unfunded risk
gap was $496,860.  (McComb Reply Decl. Ex. C.)  It was this estimate that Halvorson objected
to in his September 29, 2000 letter.  (Halvorson Decl. Ex. A.)  Again, however, it was only a
quarrel over the precise dollar amount that motivated Halvorson's September 29 letter.  (*Id.*
("After a review of our records, we do not feel that the amount of the obligation is accurately
stated in the note."))  Nowhere in this letter does Halvorson claim that the unfunded risk gap
derives from Frontier's failure to remit any payments to Platinum, nor is there any confusion
about which year is at issue.  In fact, it is clear from the entirety of Halvorson's deposition, and
the documents attached to the McComb Declarations (the admissibility of which is not
challenged by FSIM) that Halvorson knew from the beginning that FSIM was seeking the Note
only to cover the 1998 risk gap, not the 1999 gap.  Once that fact is established, the attempt by
Halvorson to muddy the waters in his Declaration by conflating the 1998 gap with the 1999
payments to Frontier is exposed as utterly unsupported by any evidence in the record.

FSIM remit its payments to Platinum under the Subscription Agreement to Frontier for further distribution to Platinum only covered year two of the Program (1999). (*Id.* 95:12-96:22.) Fourth, Halvorson also acknowledged, in direct contradiction to his Declaration, that the Note "dealt only with the '98 program year," the first year of the FSIM Program. (Halvorson Dep. 128:24-129:1.)

The clash between Halvorson's Declaration and his deposition is fatal to FSIM's attempt to thwart summary judgment on this claim. It is well settled in the Second Circuit that a party cannot create a question of fact sufficient to withstand summary judgment by submitting an affidavit that is contradicted by the affiant's own deposition testimony. *See Rubens v. Mason*, 387 F.3d 183, 192 (2d Cir. 2004) (holding that a properly supported motion for summary judgment "may not [be] defeat[ed]" by allegations made in plaintiff's unsupported affidavit that contradict plaintiff's prior deposition testimony); *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("[F]actual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony."). Accordingly, FSIM's claims that the Note related to the second year of the FSIM Program, and with it FSIM's claims of fraud and lack of consideration, crumble from a lack of any evidentiary support.

The Court has no hesitation in making this finding, as it is consistent with the allegations in McComb's Declarations, and, more importantly, with the contemporaneous documentary evidence contained in the record. Specifically, the record contains copies of three facsimiles, each with a confirmation sheet, that were sent from McComb to Halvorson (two documents) or

an FSIM representative (one document) and that reflect the negotiations leading up to the

execution of the Note.  (McComb Reply Decl. Exs. A-C.)  Each of these facsimiles directly and

unambiguously states that the deficiency at issue relates to the *first year* of the Subscription

Agreement (1998).  (*Id.* Ex. A (noting that the deficiency is "in respect of the first underwriting

year of the FSIM program"); *Id.* Ex. B (explaining the "cause of the unfunded gap for the 1998

underwriting year"); *Id.* Ex. C ("Platinum will consider receipt of a note from FSIM and/or

Dwight Halvorson Insurance as collateral for the unfunded risk gap on the 1998 underwriting

year.").)  Moreover, the record also contains a financial report dated June 30, 2000, which

reflects a funding deficiency for the first underwriting year of $469,515, the precise amount of

the Note.  (*Id.* Ex. A.)  Nothing in FSIM's papers or in Halvorson's Declaration disputes the

authenticity or the admissibility of these documents.[7]

In light of the overwhelming evidence on Plaintiff's side of the ledger, and the lack of

any evidence on the Defendant's side of the ledger– the latter resulting from blatant

contradictions between Halvorson's Declaration and deposition – FSIM's assertions that the

Note was executed due to fraud and without consideration are insufficient to defeat Plaintiff's

motion for summary judgment.  FSIM's fraud and lack-of-consideration claims require a finding

that the Note was executed to secure an obligation stemming from the second year of the

Subscription agreement.  Faced with the record's uncontested documentary evidence to the

---

[7]The September 29, 2000 letter from Halvorson to McComb does not change this
assessment.  (*See* Halvorson Decl. Ex. A.)  As previously noted, this letter indirectly
acknowledges that FSIM owes money to Platinum under the Subscription Agreement, while at
the same time disputing the amount that is owed.  (*Id.*)  The letter is silent, however, as to the
source of FSIM's obligations, and it mentions nothing about whether the claimed shortfall relates
to the first or second year of the Subscription Agreement.  (*Id.*)

contrary and Halvorson's own admissions, no reasonable jury could make such a finding.

### 2. Frontier is a Holder in Due Course

FSIM also has failed to identify a factual dispute as to whether Frontier possesses the

Note as a holder in due course. As outlined above, under Bermuda law, Frontier is a holder in

due course if: 1) the Note is complete on its face; 2) Frontier took the Note in good faith and for

value; and 3) at the time the Note was transferred, Frontier had no notice of any defect in the

title. *See* Bills of Exchange Act, 1934, § 28(1). Furthermore, when a holder of a note has in

good faith provided value for the note, Bermuda law recognizes a presumption that the holder is

a holder in due course, even in the face of claims of fraud or illegality. *Id.* § 29(2). Here,

Plaintiff has established, and FSIM does not dispute, that the Note is complete on its face and

that Frontier provided value in exchange for the Note. (McComb Decl. ¶¶ 45-46, Exs. A, F.)

Accordingly, to survive Plaintiff's motion for summary judgment, FSIM must show that there is

a question of fact as to whether Frontier had notice of any defect in the Note's title at the time

Frontier received the Note through the settlement agreement.

FSIM makes no allegation that Frontier participated in the negotiations for the Note.

Indeed, by the time the Note was negotiated and executed, Frontier had long since terminated its

involvement in the FSIM Program. (McComb Decl. ¶ 44.) Therefore, even assuming that

FSIM's claims regarding the source of its obligations under the Note are correct, there is no

reason to believe that Frontier had notice that the Note stemmed from FSIM's second-year

obligations or that Platinum committed any fraud when it took possession of the Note for value.

On the contrary, as discussed above, if Frontier had sought from Platinum documents

memorializing the consideration for the Note, it would have received correspondence and

financial reports indicating that the Note addressed a dispute relating to the first policy year of

the Subscription Agreement, not the second.  Therefore, Plaintiff's Motion for Summary

Judgment on Count IV is granted.

E.  Defendants' Set Off Claim

Separate from its putative defenses to Count IV of the Complaint, FSIM has alleged in its

Answer that it is entitled to a set off against the related claims of Frontier for sums it paid to

Platinum under the Note, but which allegedly were paid to Frontier.  (Answer ¶ 149.)  Plaintiff

has not addressed this claim.  Thus, Plaintiff is to submit in writing within ten (10) days of the

date of this Opinion and Order an explanation as to why the amount of damages claimed in

Count IV should not be held in escrow until Defendants' set off claims are resolved.  Defendants

have seven (7) days to respond.

### III.  Conclusion

For the reasons stated herein, Plaintiff's Motion for Summary Judgment on Count IV is

GRANTED, subject to the conditions set forth above.  The Clerk of the Court is directed to

terminate the Motion.

SO ORDERED.

Dated:        October 4 , 2007
              White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE